# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| UNITED STATES OF AMERICA | * | |
| --- | --- | --- |
| | * | |
| v. | * | CRIMINAL NO. LKG-25-6 |
| | * | |
| THOMAS C. GOLDSTEIN, | * | |
| | * | |
| **Defendant** | * | |
| | * | |

*******

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S *PRO SE* MOTION REGARDING RELEASE CONDITIONS AND FORFEITURE ALLEGATIONS

The United States of America respectfully requests that the Court deny Defendant's *pro se* motion to review conditions of release and to limit the scope of the forfeiture allegations. ECF 30.[1] On the conditions of release, Defendant's arguments are legally and factually baseless, and a review of the applicable statutory factors—which Defendant's motion ignored—makes clear that Chief Magistrate Judge Sullivan was correct to require posting as collateral the Washington, D.C. residence. On the forfeiture allegations, Defendant never raised the argument before Chief Magistrate Judge Sullivan and Defendant misunderstands the procedures concerning forfeiture of his property, the financing of which was a result of his own fraudulent misconduct.

## BACKGROUND

On January 16, 2025, a federal grand jury returned a twenty-two count Indictment against Defendant for violations of federal tax laws and for making false statements on mortgage loan applications. ECF 1. On January 27, 2025, Defendant made his initial appearance before Chief Magistrate Judge Timothy J. Sullivan and pleaded not guilty to all the charges. ECF 4. Defendant

---

[1] Defendant's *pro se* motion should be stricken, as explained in the Government's motion to strike (ECF 32). The Government is nevertheless submitting this opposition to the extent the *pro se* motion is not stricken.

was released on conditions, including a requirement that Defendant execute a bond for 100% interest in his residence in Washington, D.C. ECF 6 at 2. Consistent with that condition of release, and also on January 27, 2025, Defendant executed an appearance bond and agreement to forfeit property stating that if he "fail[ed] to appear as required for any court proceeding," he would forfeit 100% interest in the Washington, D.C. residence. ECF 8-1.

On January 29, 2025, Defendant filed a motion to modify the conditions of release and substitute three South Carolina properties for the residence in Washington, D.C. ECF 18. On January 29, 2025, Chief Magistrate Judge Sullivan denied the request to substitute the South Carolina properties for the Washington, D.C. residence because doing so was "necessary to reasonably assure that Mr. Goldstein will appear for all future proceedings in this case." ECF 19 at 1. That order further made clear that the Washington, D.C. residence would "only be forfeited if Mr. Goldstein fails to appear as required, and not for other violations of the conditions of release." *Id.*

On February 5, 2025, Defendant filed the instant *pro se* motion asking the Court to substitute the South Carolina properties for the Washington, D.C. residence. ECF 30. The motion also requested for the first time that the Court "limit the scope of the government's forfeiture allegation" as to the Washington, D.C. residence. That forfeiture allegation, which was contained in the Indictment and then subsequently detailed in a bill of particulars (ECF 21) and a *lis pendens* in the property records, notified Defendant and the public that the Government could seek forfeiture of the Washington, D.C. residence because it represents the proceeds of Defendant's false statements on a mortgage loan application. The same day that Defendant's *pro se* motion was filed, this Court directed the Government to respond on or before February 7, 2025. ECF 31.

On February 6, 2025, the Government filed a motion to strike Defendant's *pro se* motion, for violating the District of Maryland's Local Rules. ECF 32. The Court scheduled a hearing on Defendant's *pro se* motion and the Government's motion to strike for February 12, 2025 at 2:30 pm. ECF 33.

**ARGUMENT**

**I.    Defendant's Request To Substitute Alternate Property Should Be Denied**

Chief Magistrate Judge Sullivan was correct in requiring Defendant, as part of his conditions of pretrial release, to post his Washington, D.C. residence as collateral. Defendant's motion for review fails to provide a basis for reversing that decision. Notably, Defendant's motion does not address the applicable factors under 18 U.S.C. § 3142 that the Court "shall" consider in determining what conditions of release are appropriate. *See* 18 U.S.C. § 3142(g). Analyzing those factors makes clear that posting the Washington, D.C. residence as collateral is necessary to "reasonably assure the appearance of [Defendant] as required and the safety of any other person and the community." *Id.*

**A.    The Nature and Circumstances of the Offenses Charged**

The nature and circumstances of the offenses charged—even standing alone—fully support Chief Magistrate Judge Sullivan's decision to require posting the Washington, D.C. residence as collateral to ensure that Defendant will continue to appear at future hearings and trial. Defendant has been charged with twenty-two felony counts of tax crimes and making false statements to mortgage lenders. These are serious charges arising from Defendant's misconduct spanning more

than half a decade. That misconduct continued even after Defendant became aware that the Government was investigating potential violations of tax laws.

The facts underlying the charges also support Chief Magistrate Judge Sullivan's decision. The Indictment alleges that Defendant repeatedly lied to or otherwise misled the federal government. Defendant is charged with hiding millions of dollars in income from the IRS. Defendant is also charged with lying to an IRS Revenue Officer about the source of his income. Defendant is further charged with concealing millions of dollars in cryptocurrency transactions from the IRS. Relatedly, the Indictment alleges that Defendant withheld information about his income from his accountants and employees so that it would not be reported to the IRS on his tax returns. In addition, the Indictment alleges Defendant repeatedly failed to pay and continues to owe money on private debt. For example, as included in the Indictment, Defendant owed over $15 million on private unsecured debt that he repeatedly failed to pay. On one of those notes—which originated in March 2014—Defendant still owes over $7.5 million as of this month. Viewed as a whole, these allegations demonstrate Defendant's disregard for the federal government, the rule of law, and property that is not his own, and underscore the importance of requiring him to post his Washington, D.C. residence as collateral to ensure his continued appearances in this case.

The Indictment also alleges that Defendant lied to multiple mortgage lenders to secure funds to finance his purchase of the Washington, D.C. residence, and notified Defendant that the Government will seek forfeiture of the residence because it constitutes or is derived from "proceeds" directly or indirectly traceable to his crimes. Defendant now objects to posting as collateral the very same residence that, per the Indictment, he would not have been able to purchase but for his fraudulent misconduct. Defendant's motion highlighted that this is his and his wife's "marital residence." ECF 30 at 1. If Defendant was willing to repeatedly violate federal laws to

purchase the Washington, D.C. residence, and now views it as his and his wife's marital residence, then requiring it to be posted as collateral will be more effective in securing his continued appearances than would substituting the South Carolina properties, which Defendant does not own or live in. Defendant is less likely to flee if doing so would result in forfeiture of his marital residence. Moreover, under Defendant's proposal, if he does not appear, the Government would forfeit the properties of innocent third parties, rather than the property that Defendant fraudulently obtained. The Court should reject Defendant's attempt to shift the security of his appearance on others.

Additionally, Defendant's crimes were inextricably intertwined with international travel and contacts. For example, Defendant is accused of willfully failing to report as income nearly $1 million in cash that he brought back from a gambling trip to Macau. Defendant is likewise accused of willfully failing to report millions of dollars in gambling winnings from "heads up" poker matches elsewhere in Asia. The Indictment alleges that a Malaysian citizen, who had a relationship with a financial institution in Montenegro, assisted Defendant in those matches. Further, Defendant is accused of willfully failing to report income that was funneled by that Malaysian citizen through the Montenegrin financial institution where they both held accounts. Defendant's ties to gamblers and individuals in other countries, and his extensive international travel, mean that he is better equipped than the average defendant to leave the United States to avoid the serious felony charges he faces here. Posting the Washington, D.C. residence as collateral is necessary to mitigate the very real risk of Defendant fleeing the country.

B. **The Weight of the Evidence Against Defendant**

The weight of the evidence also supports the posting of the Washington, D.C. residence as collateral. As detailed at length in the Indictment, Defendant's crimes are substantiated by, among

5

other evidence, his own contemporaneous communications, documented loans that he willfully decided not to disclose to multiple mortgage lenders, bank and wire records, gambling-related memoranda authored by Defendant, tax and accounting records, and records reflecting Defendant's extravagant spending on luxury items and other personal payments while he owed substantial taxes to the IRS. As Defendant highlighted in his motion, the Government has collected and will produce in discovery tens of thousands of documents proving his crimes, and the Government has identified nearly 80 witnesses whose testimony could also help prove the crimes. ECF 30 at 6. At trial, the Government will introduce this comprehensive and conclusive evidence.

A few non-exhaustive examples demonstrate the strength of the evidence against Defendant. First, regarding the allegation that Defendant fraudulently failed to report to the IRS $500,000 in legal fee income in 2021, the Government anticipates that a California-based actor ("the Actor") will testify that he retained Defendant and his law firm to serve as the Actor's legal representative in his efforts to secure full payment of a years-old poker debt owed by a Texas-based billionaire ("Texas Businessman"). The Government will introduce contemporaneous communications, including text messages and emails, proving the existence of this relationship and also the legal fee that Defendant stood to gain as a result of his and his law firm's work. Further, the Government anticipates that the Actor will testify that Defendant personally directed the Actor to transfer the legal fee not to Defendant or his law firm, but rather to another individual ("California Businessman-3") to pay down part of a debt that Defendant owed. This testimony will be bolstered by bank records reflecting the payment to California Businessman-3, as well as by testimony from California Businessman-3, the Texas Businessman, and others involved in the initial poker game that gave rise to the debt on which the Actor was seeking repayment. As a result of Defendant's direction that the legal fee be paid to California Businessman-3, the income

was not captured in Defendant's or his law firm's banking records, nor did Defendant notify his accountant about receiving the income. And, as a result, this income was not reported on his tax returns. The Government will also introduce testimony and documents proving that Defendant's scheme to divert this legal fee occurred after he was already aware that the IRS was investigating his tax misconduct.

Second, regarding the allegations that Defendant made false statements to multiple mortgage lenders to finance his purchase of the Washington, D.C. residence, the Government anticipates introducing testimony from two of Defendant's creditors to establish that Defendant owed them millions of dollars when he submitted the at-issue mortgage applications. The Government will introduce promissory notes proving the existence of those debts, and bank records and communications showing that Defendant was actively attempting to pay down those debts. Along the same lines, the Government will introduce Defendant's own emails to a third party acknowledging the existence of the millions of dollars in debt. Further, the Government will introduce the mortgage applications that Defendant signed and that, despite asking for Defendant to disclose his liabilities and making clear the legal repercussions of failing to do so, failed to contain any information as to the substantial debts. Finally, as with the failure to report the $500,000 legal fee from the Actor, the Government will introduce testimony and documents proving that the Defendant defrauded the mortgage lenders despite knowing that he was under investigation.

The testimony and documentary evidence described above is only a small sample of the Government's case, but demonstrates the strength of the evidence and accordingly the

reasonableness of Chief Magistrate Judge Sullivan's decision to require Defendant to post the Washington, D.C. residence as collateral.

C.        **The History and Characteristics of Defendant**

The Defendant's history and characteristics demonstrate that, absent comprehensive conditions of release, including the posting of the Washington, D.C. residence as collateral, the Defendant poses a significant risk of flight and threatens to undermine the integrity of these proceedings.

First, on the issue of Defendant's flight risk, he has significant ties to wealthy individuals in other countries that would make it far easier for Defendant to flee than the average person. Defendant also has traveled extensively abroad in recent years. Defendant's motion stressed that he "has a negative net worth of more than $3.3 million," ECF 30 at 3, but as laid out in the Indictment, Defendant has been successful in securing millions of dollars in loans from wealthy individuals, so he likely has access to funds necessary to flee the country and sustain a life abroad. Further, and also as detailed in the Indictment, Defendant has bought, sold, and held millions of dollars' worth of cryptocurrency, and willfully failed to report such transactions to the IRS.

More generally, as discussed throughout this opposition and the Indictment, Defendant has spent much of the last decade effectively hiding his income and assets from the IRS and federal government. Defendant is a highly sophisticated businessperson, a prominent appellate litigator, and involved in myriad financial transactions. Taken together with his ability to solicit loans from wealthy individuals, Defendant has the means and skills necessary not only to flee the District of Maryland and the United States, but also to live comfortably and evade capture in foreign jurisdictions. *See United States v. Remarque*, PX-19-039, 2020 WL 1983927, at *1-*4 (D. Md. Apr. 27, 2020) (denying appeal of Chief Magistrate Judge Sullivan's pretrial detention order based

on, among other things, defendant's "significant international ties"); *United States v. Fombe*, DKC-19-452-1, 2023 WL 6200018, at *2 (D. Md. Sept. 22, 2023) (denying motion for review of Chief Magistrate Judge Sullivan's pretrial detention order because, among other reasons, defendant had overseas contacts and had demonstrated "the wherewithal to flee, using false documentation, and to travel to myriad foreign countries"); *United States v. Raji*, SAG-20-00369, 2021 WL 825981, at *1-*2 (D. Md. Mar. 4, 2021) (denying motion to reconsider pretrial detention where defendant had the "'motive, means and contacts' to flee and assume another identity either in the United States or abroad"); *United States v. Anderson*, 384 F. Supp.2d 32, 36 (D.D.C. 2005) (finding a defendant's history and characteristics in a tax evasion case weighed in favor of detention based on the defendant's "substantial assets abroad; his connections overseas; . . . his lack of ties to the District of Columbia; and his persistent deceitfulness . . . in his dealings with the government").

Second, Defendant's history and characteristics—including as alleged in the Indictment—proves that he poses a potential danger to the administration of justice in this case. Defendant repeatedly willfully lied to the IRS, explicitly and by omission. The Government is aware that Defendant has instructed third parties, including potential witnesses in the case, to destroy evidence that is relevant to the charges. Defendant has used encrypted, foreign-based email accounts to store evidence of his gambling winnings and income that he did not disclose to the IRS or his accountant. What's more, shortly after Defendant became aware of the federal investigation, the Government understands that he offered things of value, including cryptocurrency, to a potential witness in the case who has intimate knowledge of his and his law firm's finances and income—and that there was no other credible reason for doing so than to attempt to prevent the potential witness from assisting in the investigation. And while Defendant

submitted in his *pro se* motion that he "is a deeply respected member of the bar who practiced at the highest level for decades," ECF 30 at 5, according to the Indictment he also was committing multiple felonies—and a life of deception—while doing so.

The available evidence concerning Defendant's history and characteristics indicates that he poses a flight risk and potential danger to the administration of justice. That is exactly why it was reasonable for Chief Magistrate Judge Sullivan to order as a condition of his release that the Washington, D.C. residence—and not the South Carolina properties—be posted as collateral as a condition of his release.

> **D.     The Nature and Seriousness of the Danger to any Person or the Community That Would Be Posed by Defendant's Release**

If he were not ordered to post his Washington, D.C. residence as collateral, and for all the reasons already described in this opposition, Defendant could very well attempt to flee this prosecution and the United States. Defendant's flight would be harmful to the administration of justice, to the integrity of this Court, and to the integrity of the court system more broadly. In addition, as alleged in the Indictment, Defendant owes millions of dollars in unpaid taxes to the federal government and to private individuals. Should Defendant flee, both the public and Defendant's private creditors would be substantially harmed.

> **E.     Defendant's Arguments in Favor of Substituting the South Carolina Properties Are Unavailing**

While ignoring the applicable factors under 18 U.S.C. § 3142, Defendant has advanced a few unavailing arguments in favor of substituting the South Carolina properties for the Washington, D.C. residence.

Defendant's argument that there "is no realistic prospect of flight" (ECF 30 at 5) ignores that, as explained previously, he has substantial contacts with wealthy individuals in the United States and other countries, extensive experience traveling in the United States and internationally,

and that he is facing twenty-two felony counts that carry the potential for a significant prison sentence. And although it may be more difficult for Defendant to flee abroad without his passport, which was surrendered, it is not impossible. Defendant is a sophisticated individual who has repeatedly weaponized his intelligence and status to violate federal laws, and there is no guarantee that he will not continue to do so without adequate conditions of release such as posting the Washington, D.C. residence as collateral. Moreover, the Government has evidence that Defendant has traveled internationally on private jets, which likely makes it easier for him to escape the United States without a passport. *See United States v. Epstein*, 425 F. Supp. 3d 306, 323 (S.D.N.Y. 2019) (agreeing that defendant was "serious" flight risk given his "wealth, ownership of and access to private planes capable of international travel, and significant international ties"). Regardless, Defendant will be much less likely to attempt to flee if he knows that it could cost him and his wife their Washington, D.C. residence.

Defendant argues that the South Carolina properties "are worth *more* than the [Washington, D.C. residence]" (ECF 30 at 5 (emphasis in original)) but that does not mean substituting them would adequately ensure Defendant's continued participation and appearances in this case. Nothing in 18 U.S.C. § 3142 requires the Court to act as a calculator to compare the value of properties that a defendant may be able to post as collateral. Defendant's *pro se* motion acknowledged that the Washington, D.C. residence is his and his wife's "marital residence." To the contrary, Defendant does not own or live in the South Carolina properties. While the Government is aware of extensive international travel by Defendant in the last decade, it is unaware of Defendant having spent significant time in South Carolina. Clearly Defendant's connection, emotional and financial, to the Washington, D.C. residence is stronger than any connection to the South Carolina properties. Moreover, the Court should not require the forfeiture of properties held

11

by innocent parties if Defendant does not appear, instead of placing the consequences of Defendant's non-appearance squarely on Defendant via the property that Defendant owns. Chief Magistrate Judge Sullivan was correct and reasonable in ordering that the Washington, D.C. residence be posted as collateral.

Defendant next suggests that he will have insufficient funds to pay for counsel if the Court does not substitute the South Carolina properties (ECF 30 at 5-6), but that claim is belied by the record and common sense. As noted in the Pretrial Services Report and by Chief Magistrate Judge Sullivan during the initial appearance, one of Defendant's bank accounts has a balance of $250,000, Defendant is spending $5,000 a month on a housekeeper, $8,000 a month on a personal assistant, and has been paying $20,000 a month for an apartment in Dallas. And as the Indictment alleges, Defendant spent millions on personal and luxury payments. When comparing these vast sums of money to the financial assets of the average person in this District, Defendant's claim that he does not have money to pay for counsel rings hollow.

In addition, the premise of Defendant's argument—that if he can substitute the South Carolina properties, he can use the Washington, D.C. residence to finance his defense—avoids the reality that it would be exceedingly difficult or impossible given the allegations in this case that Defendant will be able to secure financing from any legitimate lender on the Washington, D.C. residence. Indeed, the Indictment alleged that Defendant defrauded multiple mortgage lenders and failed for years to successfully repay poker-related debts from private lenders. The premise also ignores that Defendant's wife may not be willing to participate in his attempts to mortgage the Washington, D.C. residence to pay for his defense.

Finally, regarding Defendant's argument that denying the request to substitute the South Carolina properties would prejudice his wife and her equity interest in the Washington, D.C.

residence (ECF 30 at 7), Defendant has only himself to blame. By intentionally failing to disclose millions of dollars in private debts to the mortgage lenders, and apparently failing to alert his wife to that decision, he gambled that he would not get caught. That turned out to be a losing bet, and now he has been charged with multiple counts of making false statements to mortgage lenders. The notion that the Court or the Government are to blame for whatever happens to the Washington, D.C. residence is an astounding abdication of responsibility for his own deliberate actions.

In sum, Defendant's arguments for substituting the South Carolina properties are legally and factually baseless, and should be denied.

## II. DEFENDANT'S ATTACKS ON THE FORFEITURE ALLEGATIONS ARE MERITLESS

Defendant advances several attacks on the forfeiture notice in the Indictment and the subsequent filing of the Government's bill of particulars—which identified the "proceeds" of the offense that were subject to forfeiture, upon conviction. Defendant's arguments are not only procedurally improper—because they are not subject to any ruling by Chief Magistrate Judge Sullivan—they are also premature and legally deficient.

### A. Forfeiture Standards

Criminal forfeiture is a part of a defendant's sentence, to be imposed only following conviction of a substantive criminal offense. *Libretti v. United States*, 516 U.S. 29, 39 (1995). Consequently, courts have routinely rejected defendants' attempts to limit a forfeiture order before a defendant's conviction and sentencing. *See, e.g. United States v. Akula*, No. 2:21-cr-00098-LMA-KWR, 2023 WL 2667789, *3 (E.D. La. Mar. 28, 2023) (denying defendant's motion to challenge indictment's forfeiture allegation without prejudice as premature where defendant alleged government failed to show nexus between alleged fraud and assets, and noting that "'issues with the source of the funds…that are subject to forfeiture…are factual issues'" that must be

resolved at trial); *United States v. Alrahib*, No. 1:19-cr-20165-RS, 2021 WL 603320, *2 (S.D. Fla. Jan. 29, 2021), *r. & r. adopted*, 2021 WL 602610 (S.D. Fla. Feb. 16, 2021) (court denied as premature defendant's challenge seeking to strike forfeiture allegations in indictment because court does not make forfeiture determination until after guilty verdict is entered or guilty plea is accepted); *United States v. Adames*, No. 1:17-cr-00072-MR-DLH, 2017 WL 4948067, *2 (W.D.N.C. Nov. 1, 2017) (denying motion to dismiss forfeiture notice in superseding indictment as premature when filed before criminal conviction).

Because forfeiture is a part of a court's sentencing determination, Defendant's reliance on a handful of cases limiting the scope of forfeiture—during the sentencing process—is irrelevant. Defendant has not yet been convicted of the forfeiture-related offenses. Accordingly, the Court cannot address the scope or amount of any forfeiture, and Defendant's request for it to do so has no basis in law.

The allegations of the Indictment provided clear notice that the Government would seek to forfeit the proceeds of the offenses related to Defendant's false statements to mortgage lenders. The Government subsequently provided notice in a bill of particulars that Defendant's Washington, D.C. residence would be subject to forfeiture as proceeds of Defendant's false statement offenses. That is all the government is required to do at this point. *See, e.g.*, Fed. Rule Crim. Pro. 32.2(a); *United States v. Poulin*, 690 F. Supp. 2d 415, 420 (E.D. Va. 2010), *aff'd*, 461 F. App'x 272 (4th Cir. 2012) ("In order for a court to enter a judgment of forfeiture following a finding of guilt, the government must first have notified the defendant, either through the indictment or the information, of its intent to seek forfeiture as part of any sentence. Fed. R. Crim Pro. 32.2(a)."); *Boyd v. United States*, 209 F. Supp. 3d 160, 166 (D.D.C. 2016) (Rule 32.2(a) provides that indictment "need not identify the property subject to forfeiture or specify the amount

of any forfeiture money judgment that the government seeks"; indictment that gave notice of forfeiture and listed specific property gave plaintiff suing government more notice than required by rule); *United States v. Lazarenko*, 504 F. Supp. 2d 791, 796–97 (N.D. Cal. 2007) (Rule 32.2(a) requires only that the indictment give defendant notice of the forfeiture in generic terms; identification of assets after conviction is not an impermissible attempt to broaden the indictment); *United States v. Di Gilio*, 667 F. Supp. 191, 198 (D.N.J. 1987) (government must establish its forfeiture allegations at trial; indictment that alleges that defendants received financial benefits from a RICO enterprise, and those benefits are subject to forfeiture, is sufficient to withstand a motion to dismiss).

Given this legal landscape, Defendant's challenge to the forfeiture allegations is premature. Notwithstanding the foregoing, Defendant maintains that the Government is now required to demonstrate that the Washington, D.C. residence is subject to forfeiture. Even if that were so, the Government submits there is ample evidence showing that Defendant's Washington, D.C. residence constitutes "proceeds" of his false statement offenses.

"Proceeds" in the criminal forfeiture context is property a defendant would not have had "but for" the criminal conduct in the offense of conviction. *United States v. Jones*, 622 F. App'x. 204, 207 (4th Cir. 2015); *see also United States v. Shah*, 84 F.4th 190, 252 (5th Cir. 2023) ("The analytical inquiry" to determine if money generated as part of a federal healthcare offense are gross proceeds subject to forfeiture "is whether the defendant would have received the property 'but for' his criminal conduct"); *withdrawn & superseded on denial of reh'g en banc*, 95 F.4th 328 (5th Cir. 2024); *United States v. Warshak*, 631 F.3d 266, 330–333 (6th Cir. 2010) (all proceeds of defendant's business are forfeitable because the business was "permeated with fraud"; but even if a part of the business was legitimate, the proceeds of that part are nevertheless forfeitable if the

legitimate side of the business would not exist but for the "fraudulent beginnings" of the entire operation).

Proceeds do not cease being proceeds just because they change form; even indirect proceeds are forfeitable. *United States v. Tartaglione*, 815 F. App'x. 648, 651–652 (3d Cir. 2020) (defendant convicted of 53 fraud and tax evasion counts indirectly obtained benefits of the crime when she caused mental health clinic that she headed to make payments to contractors performing work on property owned by an LLC she controlled); *United States v. Betancourt*, 422 F.3d 240, 251 (5th Cir. 2005) (if defendant buys a lottery ticket with criminal proceeds, the lottery winnings are traceable to the offense even though the value of the ticket appreciated enormously when it contained the winning number); *United States v. Hawkey*, 148 F.3d 920, 928 (8th Cir. 1998) (if property is subject to forfeiture as property traceable to the offense, it is forfeitable in full, including any appreciation in value since the time the property became subject to forfeiture; the reason for the appreciation does not matter).

Defendant's Washington, D.C. residence constitute proceeds of his false statement offenses because Defendant would not have this property "but for" the false statement offense charged in Count 22 of the Indictment.

After Defendant submitted two unsuccessful—and demonstrably false—mortgage applications to purchase the Washington, D.C. residence, Defendant then turned to a litigation funder (the "Funder"), and executed two agreements through his law firm G&R that provided him with $5.6 million. As a part of Defendant's agreements with the Funder, Defendant caused G&R to pledge anticipated income from certain court cases, and he signed as a guarantor of the agreements, agreeing to be personally responsible if the security recited in the agreements did not fully repay the Funder. One of the agreements further required Defendant to: (1) use the sale

proceeds of his old Chevy Chase house to repay the Funder, (2) get a mortgage on the new house to repay the Funder, and (3) grant the Funder an ownership interest in his new house.

Defendant then used the money obtained by fraud from the Funder to pay off his 2016 and 2017 tax liens on the Chevy Chase home and 2019 federal tax debt, which he was required to do to get a loan on the Washington, D.C. residence. Defendant also used the money from the Funder to purchase the Washington, D.C. residence.

Then, to repay the Funder under the terms of the contract, in July 2021, Defendant applied to NFM Lending seeking a mortgage on the DC home. Defendant submitted the application to NFM on July 11, 2021, seeking $1,987,500. In this application, Defendant again failed to list over $15 million in liabilities, which are the false statements charged in Count 22. As a result of Defendant's false statements, NFM provided the loan. Days after the closing on the loan, the vast majority of the NFM loan funds, $1,967,686.51, were wired directly to the Funder.

The factual history set forth above makes plain that Defendant would not now have the Washington, D.C. residence "but for" the fraudulent loan application submitted to NFM. Had Defendant not paid the Funder back, the Funder would own the Washington, D.C. residence, not Defendant. As such, the Washington, D.C. residence is proceeds of Defendant's false statement offense? Defendant made multiple false statements to a mortgage lender, obtained millions of dollars in proceeds, and wired a large portion of those proceeds to the Funder in exchange for the Funder's interest in the Washington, D.C. residence. These proceeds did not magically cease to exist upon their payment to the Funder—they simply changed form. The Washington, D.C. residence is, even if indirectly, proceeds of Defendant's mortgage fraud offense.

Finally, Defendant references his Sixth Amendment right to counsel in his *pro se* motion concerning the Washington, D.C. residence, because he wants to use his equity in the home (the

amount of which the Government disputes) to fund his defense. But the Government *has not seized* the Washington, D.C. residence. It has only provided notice in the Indictment, bill of particulars, and a *lis pendens* that the property may be subject to forfeiture. As such, the Government is not impeding Defendant's Sixth Amendment right to counsel by seizing assets that Defendant would otherwise be able to use for his defense, because the Government has not seized any assets at all.

Moreover, the Supreme Court has ruled that criminal defendants have no right to use tainted property to pay counsel. *Caplin & Drysdale v. United States*, 491 U.S. 617, 623–35 (1989); *see also United States v. Monsanto*, 491 U.S. 600, 616 (1989) (rejecting Sixth Amendment challenge to pretrial restraining order restricting defendant's use of forfeitable property); *Kaley v. United States*, 571 U.S. 320 (2014) (defendant was not entitled to a hearing on an asset freeze to challenge grand jury's probable cause determination related to the underlying crime). Even if the Court were to allow Defendant to argue that the Washington, D.C. residence was not, in fact, mortgage fraud proceeds, and the Government had seized the property, which it has not, the Defendant would also need to show that he lacks any other funds with which to pay counsel. *See United States v. Farmer*, 274 F.3d 800, 804–805 (4th Cir. 2001) (defendant must show not only that the seized assets in question are untainted, but also that he has no other funds with which to secure counsel). As Chief Magistrate Judge Sullivan observed at Defendant's initial appearance, Defendant admittedly has ample significant liquid assets. Those assets can plainly be used to secure counsel, and therefore Defendant's claims to the contrary are without foundation.

# CONCLUSION

For all the reasons stated above, the Government respectfully requests that the Court deny Defendant's motion in full.

Respectfully submitted,

Erek L. Barron
United States Attorney
/s/_____
Patrick D. Kibbe
Assistant United States Attorney
District of Maryland

Stanley J. Okula, Jr.
Senior Litigation Counsel
Department of Justice—Tax Division

Emerson Gordon-Marvin
Hayter Whitman
Trial Attorneys
Department of Justice—Tax Division