**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. LKG-25-6** |
| | * | |
| **THOMAS C. GOLDSTEIN,** | * | |
| | * | **EX PARTE AND UNDER SEAL** |
| **Defendant** | * | |
| | * | |

**\*\*\*\*\*\*\***

**GOVERNMENT'S *EX PARTE* MOTION UNDER 18 U.S.C. § 3148
FOR ARREST WARRANT AND REVOCATION OF RELEASE ORDER**

Pursuant to 18 U.S.C. § 3148, the United States of America, by and through undersigned counsel, respectfully moves the Court to issue an arrest warrant and revoke the current Order Setting Conditions of Release ("Order") authorizing the pretrial release of Defendant Thomas C. Goldstein (ECF 6).  There is clear and convincing evidence that Goldstein has violated the Order by failing to disclose the existence of two cryptocurrency wallets through which he received over $8 million in cryptocurrency and sent more than $6 million of cryptocurrency over the last five days.  There is also probable cause that Defendant committed violations of 18 U.S.C. § 1001 based on his false statements to Pretrial Services officers.  Defendant's conduct demonstrates that he is a serious risk of flight, that he cannot abide by the conditions of release, and that he has lied to this Court and Pretrial Services.  A rebuttable presumption that Defendant is a danger to the community now applies, and Defendant's conditions of release should be revoked.

**BACKGROUND**

On January 16, 2025, a federal grand jury returned a twenty-two count Indictment against Defendant for violations of federal tax laws and for making false statements on mortgage loan applications.  ECF 1.  On January 27, 2025, Defendant made his initial appearance before Chief

Magistrate Judge Timothy J. Sullivan and pleaded not guilty to all the charges.  ECF 4.  Defendant was released on conditions, including a requirement that Defendant execute a bond for 100% interest in his residence in Washington, D.C.  ECF 6 at 2.  Consistent with that condition of release, Defendant executed an appearance bond and agreement to forfeit property stating that if he "fail[ed] to appear as required for any court proceeding," he would forfeit 100% interest in his Washington, D.C. residence.  ECF 8-1.  The Order also required Defendant to "promptly obey all reasonable directions and instructions of the supervising officer."  ECF 6 at 2.  In addition, over Defendant's objections, Chief Magistrate Judge Sullivan ordered, "Do not open any new bank accounts; do not obtain and/or draw on any lines of credit; [and] do not transfer any funds [without] prior pretrial approval."  ECF 6 at 3.

Since then, Defendant has attempted to remove the potential for the Washington, D.C. residence to be forfeited if he flees or is convicted.  On January 29, 2025, Defendant filed a motion to modify the conditions of release by substituting the Washington, D.C. residence for three properties in South Carolina belonging to his father, stepmother, and half-sister.  ECF 18.  The same day, Chief Magistrate Judge Sullivan denied the request, but clarified that the Washington, D.C. residence would be forfeited only if Defendant failed to appear.  *Id.*  On February 5, 2025, Defendant filed a *pro se* motion for review, asking the Court to substitute the South Carolina properties for the Washington, D.C. residence and limit future forfeiture to a money judgment.  ECF 30.  A central premise of Defendant's *pro se* motion was that he has insufficient funds to afford his lawyers, and without being able to borrow against his equity in the Washington, D.C. residence, his Sixth Amendment right to counsel would be violated.  *Id.* at 1.  On February 6, 2025, the Government filed a motion to strike the *pro se* motion for violating the Local Rules.  ECF 32.  On February 7, 2025, the Government filed an opposition to the *pro se* motion.  ECF 34.  An

attorney inquiry hearing is scheduled for February 12, 2025 at 9:30 AM before Chief Magistrate Judge Sullivan.  ECF 15.  A hearing on Defendant's *pro se* motion and the Government's motion to strike is scheduled for February 12, 2025 at 2:30 PM before Judge Griggsby.  ECF 33.

As described further below, after his initial appearance, Defendant received and sent millions of dollars of cryptocurrency using two undisclosed cryptocurrency wallets.

## LEGAL STANDARD

The Bail Reform Act, 18 U.S.C. § 3148, provides that a person released pending trial who has violated a condition of his release is "subject to a revocation of release" and "an order of detention." 18 U.S.C. § 3148(a).  Under that statute, and on the Government's motion, the Court "*shall* enter an order of revocation and detention" if, after a hearing, it:

(1) finds that there is—

(A) probable cause to believe that the person has committed a Federal, State, or local crime while on release; or

(B) clear and convincing evidence that the person has violated any other condition of  release; and

(2) finds that—

(A) based on the factors set forth in section 3142(g) of [Title 18], there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community, or

(B) the person is unlikely to abide by any condition or combination of conditions of release.

*Id*. § 3148(b) (emphasis added).

Moreover, if there is probable cause to believe that the person committed a federal, state, or local felony while on release, there is a rebuttable presumption that no condition or combination of conditions will assure that the person will not pose a danger to the safety of any other person or

3

the community. *Id.* In other words, when "a condition of pretrial release has been violated, revocation of a release order proceeds not under the initial release provisions of the statute, 18 U.S.C. § 3142, but under 18 U.S.C. § 3148, which sets forth markedly different standards for detention." *United States v. White*, PWG-13-0436, 2015 WL 2374229, at *2 (D. Md. May 15, 2015). "Under 18 U.S.C. § 3148, once probable cause exists that a person on pretrial release has committed a crime, the defendant is presumed to be a danger to the community." *Id.* (citing 18 U.S.C. § 3148(b)).

 As in the Fourth Amendment context, probable cause under § 3148(b) requires that the facts available "'warrant a man of reasonable caution in the belief that the defendant has committed a crime while on bail.'" *United States v. Gotti*, 794 F.2d 773, 777 (2d Cir. 1986) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983) (plurality opinion)); *see also United States v. Maucha*, No. 21-cr-322, 2023 WL 4131016, at *2 (D.D.C. June 22, 2023) (CJN).

Where, as here, a defendant is charged with violating the condition of release commanding that he not commit a federal, state, or local crime during the period of release, the defendant "shall be brought before the judicial officer who ordered the release and whose order is alleged to have been violated" to the extent practicable. 18 U.S.C. § 3148(b).

## ARGUMENT

Defendant has violated his conditions of release and made false statements to Pretrial Services officers in violation of 18 U.S.C. § 1001 related to his use of two undisclosed cryptocurrency wallets to receive and send millions of dollars in cryptocurrency over the past week. Under the Bail Reform Act, Defendant's release conditions should be revoked.

## I.     Defendant's Undisclosed Cryptocurrency Wallets

Defendant has at least two cryptocurrency wallets that he has not disclosed to Pretrial Services or the Court.[1]  The first is a cryptocurrency wallet ending in the digits 935B (the "935B" wallet).[2]  The second is a cryptocurrency wallet ending in the digits 54E3 (the "54E3" wallet).[3]  Both are "unhosted" wallets, meaning that they are controlled by the owner of the wallet, and there is no cryptocurrency exchange (*e.g.*, Coinbase or Binance), bank, or financial institution that controls access to the wallet or could be subpoenaed for the identity of its owner.[4]  The evidence, however, shows that these wallets are controlled by Defendant, and Defendant used these wallets to receive and transfer millions of dollars in cryptocurrency over the last five days.

### a.  Defendant's 935B Wallet

Defendant's 935B wallet was first used on November 14, 2022, and contains numerous transactions using the cryptocurrencies USDT and USDC.[5]  *See* Exhibit 1.a (USDT transactions for the 935B wallet); Exhibit 1.b (USDC transactions for the 935B wallet).  In total, since the wallet was opened, $73,626,044.00 of cryptocurrency has been sent from the wallet, and

---

[1] As explained further below, during its investigation, the Government identified Defendant's unhosted cryptocurrency wallets.  During the hearing on Defendant's conditions of release, the Government raised the issue of Defendant's use of cryptocurrency. However, the Government did not know the status of Defendant's unhosted cryptocurrency wallets at the time.  Both wallets had been dormant, and as explained below, the 935B wallet was empty at the time of the initial appearance.  Following the initial appearance, the Government conducted a financial investigation and discovered Defendant's recent use of the wallets, as described herein.

[2] The full address of the wallet is ███████████████████████ 935B.

[3] The full address of the wallet is ███████████████████████ 54E3.

[4] Unhosted wallets are often referred to as "self-custody wallets," "non-custodial wallets," "cold wallets," or "ledgers."  They are distinguished by granting users absolute command over their private keys. In contrast to hosted wallets, where a third-party service has custody of these keys, unhosted wallets entrust this responsibility solely to the user.

[5] Both USDT (Tether) and USDC (USD Coin) are referred to as "stable coins" because their value is pegged to the value of the U.S. dollar.

$75,627,319.54 of cryptocurrency has been received in the wallet. *See* Exhibit 2. However, at the time of the Indictment on January 16, 2025, there were no assets in the wallet.

Relevant to this motion, on February 4, 2025, at 7:02 AM EST,[6]—six days after Defendant's initial appearance and the day prior to Defendant's *pro se* motion—approximately $10 worth of USDT was sent to the wallet in what appears to have been a test transfer. *See* Exhibit 1.a. At 10:28 AM EST, approximately $8 million of USDT was sent to the wallet. *Id.* Less than an hour later, at 11:18 AM EST, approximately $3 million of USDT was sent out of the wallet, leaving approximately $5 million in the wallet.[7] *Id.* On February 6, 2025, at 11:41 PM EST— approximately 30 minutes after the Government filed its motion to strike Defendant's *pro se* motion—approximately $3 million more of USDT was sent out of the wallet, leaving approximately $2 million in the wallet. *Id.*

Defendant's ownership of the 935B wallet is demonstrated by Defendant's own communications with third parties and financial records, which show that Defendant previously gave the wallet address to another individual to receive cryptocurrency payments, and then confirmed receipt of those payments. Specifically, Defendant frequently enlisted the services of an individual who was the CEO of a West Coast-based luxury travel and concierge service, and self-described "fixer" for ultrawealthy individuals (the "Fixer"). In mid-April 2023, Defendant was messaging with the Fixer regarding a transaction in which the Fixer acted as a middleman between Defendant and another individual from whom Defendant sought to obtain $500,000 worth

---

[6] The times contained in Exhibits 1.a and 1.b are in universal time (UTC), which is five hours ahead of eastern standard time (EST). The times described above have been converted to EST.

[7] In Exhibits 1.a and 1.b, transactions sending cryptocurrency from the 935B wallet to another wallet display the "Value" and "USD Value" amounts in negative numbers, indicated by parentheticals in those columns. Where such negative numbers are listed, the underlying counterparty (*i.e.*, sending address) is Defendant's 935B wallet even though the "Counterparty Address" column lists other addresses.

of cryptocurrency.  *See* Exhibit 3 at 1.  Defendant told the Fixer how to structure the transaction, stating, "I would have him send it to a wallet of yours.  Then do an invoice to sell it to me.  I'll wire to you and have you send the coins for me."  *Id.*

On April 14, 2023, the Fixer sent Defendant the requested invoice.  *See Id.* at 3; Exhibit 4 (invoice).  Defendant then wired $500,000 to the Fixer.  *See* Exhibit 3 at 3 (Defendant: "Wire instructions sent. . . . Will be there today or first thing Mon.").  On April 17, 2023, the Fixer confirmed receipt of the wire.  *See Id.* at 4 (The Fixer: "Just wanted to let you know the wire just hit us, so thank you for getting that over."); Exhibit 5 at 1 (Defendant's wire transfer records, showing $500,000 wire to the Fixer on April 17, 2023); Exhibit 6 (Defendant's bank account statement showing $500,000 wire to the Fixer.)

Two weeks later, the Fixer messaged Defendant to complete the deal by transferring to Defendant $500,000 worth of USDC.  As shown in the messages below, Defendant provided the address for the 935B wallet to receive a test transfer of USDC and then the $500,000 worth of USDC.  Defendant confirmed receipt of the funds both times.

| | |
|---|---|
| [5/1/23, 12:09:38 AM] [the Fixer]: | Hope you are doing well. In Dubai with the client that paid with the coin. I have your coin in the wallet ready to go when you are.<br><br>Once this trip is over, May 9-11 and he gets everything settled (and I transfer the coin to cash), I will send over some of the additional owed as well.<br><br>Thank you as always for your support and hope you are enjoying wherever in the world you are. |
| **[5/4/23, 4:57:54 PM] Tom Goldstein:** | **What crypto is it, please?** |
| **[5/4/23, 4:58:36 PM] Tom Goldstein:** | **USDC or USDT and is it on the ETH protocol?** |

| | |
|---|---|
| [5/4/23, 09:19:44 PM] [the Fixer]: | USDC |
| [5/4/23, 09:19:54 PM] [the Fixer]: | It's on the egg protocol corrrct [sic] |
| [5/4/23, 09:19:57 PM] [the Fixer]: | Correct. |
| [5/4/23, 09:20:06 PM] [the Fixer]: | Sorry, I just woke up. Still in Dubai. |
| [5/4/23, 10:44:18 PM] [the Fixer]: | It's on the ETH protocol** sorry really bad half asleep English. Just lmk which wallet to send to? I'll do a test transaction first then do rest once you confirm you got it |

**[5/5/23, 8:53:22 AM] Tom Goldstein:**   **Amazing ty**

[5/5/23, 8:56:20 AM] [the Fixer]:    you're welcome

**[5/5/23, 9:25:22 AM] Tom Goldstein**: ███████████████████████████ **935B**

| | |
|---|---|
| [5/5/23, 9:28:41 AM] [the Fixer]: | Thank You. |
| [5/5/23, 9:30:52 AM] [the Fixer]: | Just sent 100 |
| [5/5/23, 9:30:55 AM] [the Fixer]: | Lmk if you got it |
| [5/5/23, 9:30:59 AM] [the Fixer]: | And I'll send rest |

**[5/5/23, 9:33:03 AM] Tom Goldstein:**   **Received**

| | |
|---|---|
| [5/5/23, 9:34:09 AM] [the Fixer]: | Sent |
| [5/5/23, 9:34:16 AM] [the Fixer]: | If there are any fees. Lmk I'll wire dinerence |
| [5/5/23, 9:38:58 AM] [the Fixer]: | Received ? |

**[5/5/23, 9:40:59 AM] Tom Goldstein:**   **Received Ty**

Exhibit 1 at 4–5.  Both the Fixer's test transfer and the approximate $500,000 USDC transfer to the Defendant's 935B wallet are recorded in the public ledger for the wallet.  *See* Exhibit 1.b (USDC transfers sent and received from 935B wallet showing transfers from the Fixer).

Defendant's ownership of the 935B wallet is also supported by evidence regarding when the wallet was opened and used.  First, Defendant previously used a Coinbase cryptocurrency account.[8]  Defendant emptied and stopped using his Coinbase account on December 2, 2022.  *See* Ex. 7 at 5 (Defendant's Coinbase account transactions).  Defendant started using the 935B wallet

---

[8] Defendant is charged with false items on his 2020 and 2021 Tax Returns in Counts 13 and 14 of the Indictment, including for falsely concealing his cryptocurrency transactions involving his Coinbase account.

approximately two weeks before, on November 14, 2022. This timing strongly suggests that Defendant switched from his Coinbase account, which the Government could more easily discover his ownership of (and freeze), to his unhosted 935B wallet, which would be nearly impossible to find but for the fact that, as described above, Defendant identified the wallet to others.

Second, Defendant transferred millions of dollars of funds into and out of the 935B wallet while simultaneously urging this Court to lift the forfeiture bond on his Washington, D.C. residence. As described above, Defendant's 935B wallet had nothing in it at the time of the initial appearance. Six days later, and the day prior to Defendant's *pro se* motion, Defendant received $8 million of cryptocurrency into the wallet and quickly transferred $3 million of cryptocurrency out of the wallet. Then, approximately 30 minutes after the Government filed its motion to strike Defendant's *pro se* motion, Defendant transferred approximately $3 million more of cryptocurrency out of the wallet. The timing of these transactions reinforces that Defendant controls the 935B account, and that he is an immediate risk of flight.

In addition to the above, sworn testimony of one of Defendant's former romantic partners confirms that Defendant used an unhosted wallet for cryptocurrency transactions. That witness believed that Defendant stopped using an unhosted wallet in the summer or fall of 2022, on the basis that Defendant stopped asking for her help using it. However, as the messages and financial records listed above make clear, Defendant was still using the 935B wallet in May of 2023 when he asked the Fixer to send cryptocurrency to that wallet, and Defendant has continued to use the wallet since that time. *See* Exhibits 1.a, 1.b.

Defendant concealed the existence of this wallet, the receipt of $8 million into the wallet, and $6 million out of the wallet in the last five days from Pretrial Services and the Court.

### b. Defendant's 54E3 Wallet

Defendant has a second unhosted cryptocurrency wallet, the 54E3 wallet. This wallet has conducted only three transfers—two of them occurred in the past four days. *See* Exhibit 8 (54E3 wallet transfers). The 54E3 wallet was first used when a professional gambler, identified in the Indictment as Professional Gambler-1, transferred Defendant $242,410 in USDT on June 6, 2023, to pay Defendant for a poker loss. *See* Exhibit 9 (Professional Gamber-1 subpoena response letter).

The 54E3 wallet was dormant until, on February 5, 2025, at 4:10 AM EST—the day Defendant filed his *pro se* motion—the wallet received an incoming transfer of $1,306.32 in USDT. *See* Exhibit 8. One minute later, at 4:11 AM EST, a transfer of $22,006.84 in USDT went out of the wallet. *Id.* This left a balance in the wallet of $221,775.13. *See* Exhibit 10 (54E3 wallet balance).

Defendant also concealed the existence of this wallet, Defendant's assets of over $220,000 in the wallet, and the transfers of over $23,000 in the last four days from Pretrial Services and the Court.

### II. Defendant's Violations of Conditions of Release and 18 U.S.C. § 1001

Based on the foregoing, and as described further below, there is clear and convincing evidence that Defendant violated his conditions of release, and probable cause that Defendant violated 18 U.S.C. § 1001, by making false statements to Pretrial Services. *See* 18 U.S.C. § 3148(b)(1).

### A. Clear and Convincing Evidence Demonstrates the Defendant Violated Conditions of Release

Defendant violated his conditions of release by concealing the 935B and 54E3 cryptocurrency wallets when the Pretrial Services officer asked Defendant to disclose all his financial accounts, and because Defendant did not obtain prior approval for the millions of dollars

in transfers. The Court's release Order requires Defendant to "promptly obey all reasonable directions and instructions of the supervising officer." ECF 6 at 2. The Court also ordered, "Do not open any new bank accounts; do not obtain and/or draw on any lines of credit; do not transfer any funds [without] prior pretrial approval." *Id.* at 3.

On February 2, 2025, in response to the Pretrial Services officer's request that Defendant disclose all his financial accounts, Defendant texted the details of certain of his accounts but omitted the cryptocurrency wallets. *See* Exhibit 11 (Defendant message to Pretrial Services officer). On February 6, 2025, Defendant met in person with the Pretrial Services officer, who again asked for information regarding all of Defendant's financial accounts and reviewed the accounts that Defendant provided. Once again, Defendant did not disclose any cryptocurrency wallets. Defendant did not tell the Pretrial Services officer about the existence of the 935B wallet, or the $8 million transfer into the wallet and $3 million transfer out of the wallet (leaving a balance of approximately $5 million) just two days before on February 4, 2025. Defendant also did not tell the Pretrial Services officer about the existence of the 54E3 wallet, or the $1,300 transfer into the wallet and $22,000 transfer out of the wallet (leaving a balance of approximately $220,000) that he conducted the day before on February 5, 2025.

Defendant's lies violate the Court's Order that Defendant follow the instructions of the Pretrial Services officer. The cryptocurrency activity likewise violated the Order because it required Defendant to obtain approval for any transfers of funds, and yet Defendant did not obtain approval for any of the transfers in and out of the wallets.

## B. There is Probable Cause that Defendant's False Statements to Pretrial Services Violated 18 U.S.C. § 1001

Defendant's false statements to Pretrial Services officers are violations of 18 U.S.C. § 1001. That statute makes it a crime when someone, "in any matter within the jurisdiction of the

executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—

> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

> (2) makes any materially false, fictitious, or fraudulent statement or representation; or

> (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry."

18 U.SC. § 1001(a).[9]

Here, Defendant falsified and concealed material facts regarding his finances and cryptocurrency wallets, and made materially false, fictitious, and fraudulent statements and representations regarding the same, in his initial Pretrial Services interview for the preparation of his Pretrial Services Report, in his February 2, 2025, messages with the Pretrial Services officer, and in his February 6, 2025, meeting with the Pretrial Services officer.  In each of these settings, Defendant met with a Pretrial Services officer and was required to accurately report his finances. Instead of doing so, Defendant concealed the fact that he had one cryptocurrency wallet that had cryptocurrency worth over $250,000 in it and another that had just received cryptocurrency worth $8 million.

Courts have routinely found that false statements to a Pretrial Services officer provide grounds for an 18 U.S.C. § 1001 violation.  *See In re Morrissey,* 305 F.3d 211, 218 (4th Cir. 2002) (affirming disbarment of attorney convicted under 18 U.S.C. § 1001 for lying to his probation officer about a conversation he had); *United States v. Lacefield*, 146 F. App'x 15, 18–19 (6th Cir.

---

[9] There is an exception to 18 U.S.C. § 1001(a) for statements made by a party or their counsel to a judge or magistrate in a judicial proceeding.  *See* 18 U.S.C. § 1001(b).  This exception shields Defendant from liability for the materially false representations he made to Judge Griggsby in his *pro se* motion to modify his conditions of release (ECF 30), in which he represented that he was over $3 million in debt but failed to disclose that he had received $8 million the day before. Nonetheless, these false statements to the Court demonstrate that the Court cannot trust Defendant to abide by conditions of release, as discussed further below.

2005) (affirming conviction on two counts of 18 U.S.C. § 1001 for Defendant's false statement to Pretrial Services officer that he was not employed and did not have any other bank accounts than those disclosed, made on two occasions); *United States v. Johnson*, 161 F. App'x 660, 662 (9th Cir. 2005) (affirming conviction under 18 U.S.C. § 1001 for false statement to Pretrial Services officer that his leg was broken).  Accordingly, false statements to a Pretrial Services officer in violation of 18 U.S.C. § 1001 also provide grounds for revocation of pretrial release.  *See United States v. Maucha*, No. 21-cr-322, 2023 WL 4131016, at *2 (D.D.C. June 22, 2023) (CJN) (previously released defendant ordered remanded where judicial officer found defendant made false statements to Pretrial Services officer, in violation of 18 U.S.C. § 1001).

In this case, Defendant's misstatements are no trivial matter.  While Defendant was representing to Pretrial Services that he was in debt, Defendant was concealing over $8 million he had just received in one cryptocurrency wallet, over $250,000 he held in another, and that he was transferring millions of dollars of cryptocurrency out of the wallets.  These false statements demonstrate ample probable cause that Defendant violated 18 U.S.C. § 1001.

### III.    Defendant's Conditions of Release Should be Revoked

Under the Bail Reform Act, the judicial officer must first determine whether there is probable cause to believe someone has committed a crime *or* clear and convincing evidence that the person has violated any other condition of release.  18 U.S.C. § 3148(b)(1) (emphasis added). For the reasons explained above, although only one of the two standards must be met, both have been met here.

The next step is for the judicial officer to determine whether, based on the factors in 18  U.S.C. § 3142(g), there is any condition or combination of conditions of release that will assure the person will not flee *or* pose a danger to the safety of any other person or the community, *or* if

the person is unlikely to abide by any condition or combination of conditions of release. 18 U.S.C. § 3148(b)(2). If any one of those prongs are met, the judicial officer "shall enter" an order of revocation and detention. 18 U.S.C. § 3148(b). Here, the evidence demonstrates that Defendant is a flight risk, a financial danger to the community, and is unlikely to abide by conditions of release. Moreover, because there is probable cause that Defendant violated 18 U.S.C. § 1001, a rebuttable presumption arises that no condition or combination of conditions will assure that Defendant will not pose a danger to the safety of any other person or the community. 18 U.S.C. § 3148(b). Defendant cannot rebut that presumption and should be detained.

### a. Defendant is a Flight Risk

At the initial appearance, the Court rightly recognized the Defendant as a flight risk. As illustrated by the Indictment and Pretrial Services Report, Defendant has significant ties to wealthy individuals in other countries that would make it far easier for Defendant to flee than the average person. Defendant also has traveled extensively abroad in recent years, including trips arranged by the Fixer using private jets. Defendant has spent much of the last decade hiding his income and assets from the IRS and federal government. Defendant is a highly sophisticated businessperson, a prominent appellate litigator, and involved in myriad complex financial transactions. Taken together with his ability to solicit loans from wealthy individuals, Defendant has the means and skills necessary not only to flee the District of Maryland and the United States, but also to live comfortably and evade capture in foreign jurisdictions.

The revelation of Defendant's undisclosed cryptocurrency wallets brings Defendant's risk of flight to an entirely new level. Since November 2022, when he first began using it, Defendant has sent and received a staggering $73,626,044.00 and $75,627,319.54, respectively, from the 935B wallet alone. ██████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████

████    Indeed, that Defendant amassed *and then quickly transferred* millions of dollars in cryptocurrency to other wallets (possibly controlled by individuals abroad) in the past few days strongly suggests he is preparing to offshore his assets and flee.  This inference is further underscored by Defendant falsely concealing his cryptocurrency wallets from Pretrial Services and the Court.

Moreover, the timing of the recent transfers, which occurred after Chief Magistrate Judge Sullivan denied Defendant's motion to substitute the South Carolina properties for his Washington, D.C. residence, and the Government filed a motion to strike Defendant's *pro se* appeal of that Order, reinforces that the forfeiture bond on the Washington, D.C. property is no longer sufficient to secure Defendant's appearance.  Defendant and his family could live comfortably abroad or purchase multiple new houses using the recently transferred $6 million from his wallets and the $2 million remaining.

This Court and others have readily recognized a defendant's risk flight and ordered detention where some of these factors are present.  *See, e.g.*, *United States v. Remarque*, PX-19-039, 2020 WL 1983927, at *1-*4 (D. Md. Apr. 27, 2020) (denying appeal of Chief Magistrate Judge Sullivan's pretrial detention order based on, among other things, defendant's "significant international ties"); *United States v. Fombe*, DKC-19-452-1, 2023 WL 6200018, at *2 (D. Md. Sept. 22, 2023) (denying motion for review of Chief Magistrate Judge Sullivan's pretrial detention order because, among other reasons, defendant had overseas contacts and had demonstrated "the wherewithal to flee, using false documentation, and to travel to myriad foreign countries"); *United States v. Raji*, SAG-20-00369, 2021 WL 825981, at *1-*2 (D. Md. Mar. 4, 2021) (denying motion to reconsider pretrial detention where defendant had the "'motive, means and contacts' to flee and

assume another identity either in the United States or abroad"); *United States v. Anderson*, 384 F. Supp. 2d 32, 36 (D.D.C. 2005) (finding a defendant's history and characteristics in a tax evasion case weighed in favor of detention based on the defendant's "substantial assets abroad; his connections overseas; . . . his lack of ties to the District of Columbia; and his persistent deceitfulness . . . in his dealings with the government"); *United States v. Epstein*, 425 F. Supp. 3d 306, 323 (S.D.N.Y. 2019) (agreeing that defendant was "serious" flight risk given his "wealth, ownership of and access to private planes capable of international travel, and significant international ties").

Given Defendant's concealment of his cryptocurrency wallets and recent transfers of millions of dollars in cryptocurrency, on top of his already extensive international ties, sophistication, and resources, Defendant is a serious flight risk. Accordingly, Defendant should be detained.

### b.  Defendant is a Danger to the Community

Defendant owes millions of dollars in unpaid taxes to the federal government and to private individuals. Should Defendant flee, or continue to conceal and dispose of millions of dollars of assets, both the public and Defendant's private creditors would be substantially harmed.  *See United States v. White*, PWG-13-0436, 2015 WL 2374229, at *2 (D. Md. May 15, 2015) ("[E]conomic danger may qualify as a basis for detention under 18 U.S.C. § 3148." (citing *United States v. Gill,* 2008 WL 2120069, at *3 (E.D. Cal. May 20, 2008) (quoting *United States v. Reynolds,* 956 F.2d 192–93 (9th Cir.1992) (ruling in a violation of pretrial release hearing that "danger may, at least in some cases, encompass pecuniary or economic harm")); *United States v. Madoff,* 586 F. Supp. 2d 240, 253 (S.D.N.Y.2009) ("The Court recognizes . . . that there is

jurisprudence to support the consideration of economic harm in the context of detention to protect the safety of the community")).

In addition, shortly after Defendant became aware of the federal investigation, the Government understands that he offered things of value, including cryptocurrency, to a potential witness in the case who had intimate knowledge of his and his law firm's finances and income—and that there was no other credible reason for doing so than to attempt to prevent the potential witness from assisting in the investigation. This raises the serious concern that Defendant's recent cryptocurrency transactions may also be used to influence potential witnesses to his crimes. Indeed, Defendant has already transferred over $6 million in cryptocurrency out of the wallets this week to yet-unknown individuals. Such conduct would be harmful to the administration of justice, to the integrity of this Court, and to the integrity of the court system more broadly.

Therefore, Defendant cannot rebut the § 3148(b) presumption that he is a danger to the community, and for this reason too, Defendant should be detained.

### c. Defendant is Unlikely to Abide by any Condition or Combination of Conditions of Release

Defendant has demonstrated that the Court cannot trust him to abide by conditions of release. Defendant lied to the Court by failing to disclose the existence of his cryptocurrency wallets and transactions. As discussed above, Defendant omitted these wallets when doing an initial interview with a Pretrial Services officer, during the initial appearance and hearing on release conditions, and in subsequent messages and interviews with the supervising Pretrial Services officer. What's more, on February 5, 2025, Defendant filed his *pro se* motion appealing his conditions of release and seeking to limit the Government's forfeiture of the Washington, D.C. residence to a money judgment. ECF 30. In that signed filing, Defendant represented to the Court that he was in over $3 million in debt and did not have funds to pay for his defense—blatantly

omitting the fact that he received cryptocurrency worth $8 million the day before in the 935B wallet and that he maintained a balance of over $220,000 in cryptocurrency in the 54E3 wallet.

Defendant's false omission of millions of dollars in cryptocurrency transactions conducted through undisclosed wallets this week is more of the same conduct as was alleged in the Indictment.  As detailed in the Indictment, Defendant has bought, sold, and held millions of dollars' worth of cryptocurrency, and willfully failed to report such transactions to the IRS. Defendant has concealed funds from the Government—and now the Court.

Defendant's false statements to Pretrial Services officers and the Court are also more of the same conduct for which Defendant is indicted.  Defendant's charges include ten counts of aiding and assisting the preparation of false and fraudulent tax returns (Counts 5 – 14), and three counts of making false statements on mortgage applications (Counts 20 – 22).  Defendant has repeatedly demonstrated his willingness to lie to evade responsibility.  For example, in March 2018, Defendant falsely told an IRS Revenue Officer seeking to collect his unpaid taxes for 2016 that his unpaid tax liability for that year was attributable to a legal case resulting in a large payment to Defendant whereas, in truth, his liability was attributable principally to gambling income.  *See* Indictment, ECF 1, ¶ 38.  As another example, in October 2018, Defendant traveled to Macau, where he collected approximately $1 million.  Defendant then flew from Hong Kong to Dulles International Airport carrying a duffel bag containing approximately $968,000 in United States dollars. During an encounter with a United States Customs and Border Protection officer at the airport, Defendant admitted that the cash represented gambling winnings.  But Defendant never reported the $968,000 as income on his tax returns.  When a representative of the IRS asked Defendant about this income missing from Defendant's tax return in October 2020, Defendant changed his story and falsely stated that the funds brought back from Hong Kong represented a

"loan." *Id.* ¶ 54. In sum, Defendant has demonstrated his willingness to deceive the Government time and time again, and after continuing his deception with the Court, the Court should not trust Defendant to abide by conditions of release.

Courts have not hesitated in ordering revocation and remand where a defendant charged with tax offense or other financial crimes was found to have committed a new crime—such as a false statement offense—while on release, or where the judicial officer determined that the defendant was unlikely to abide by conditions of release. *See, e.g.*, *United States v. White*, PWG-13-0436, 2015 WL 2374229, at *5 (D. Md. May 15, 2015) (affirming detention order after finding probable cause that defendant (an attorney) sent fraudulent letters while on pretrial release, and clear and convincing evidence that defendant opened new lines of credit without prior approval of pretrial services.); *United States v. Edelman*, No. 24-cr-239, 2024 WL 5093496, at *10 (D.D.C. Dec. 12, 2024) (CKK) (defendant's violation of conditions of release, based on contacting witnesses, supported finding that defendant was unlikely to abide any conditions of release); *United States v. Manafort*, 897 F.3d 340, 348 (D.C. Cir. 2018) (upholding detention in tax/financial fraud case based on commission of crimes while on release, observing that the fact that defendant committed new crime even after being ordered to refrain from committing new crimes supported finding that violations would occur again); *United States v. Manlapaz*, 17-cr-115 (AJT) (E.D. Va. 2017), Docs. 23, 24 (denying motion for reconsideration of Magistrate's detention order in tax fraud prosecution where Government argued that $1.3 million in assets never disclosed to Court at initial detention hearing supported finding that defendant posed risk of flight).

Here, Defendant has violated his release conditions and 18 U.S.C. § 1001 by concealing two cryptocurrency wallets through which he has sent and received millions in cryptocurrency over the last five days. The Court should revoke Defendant's conditions of release to ensure

Defendant's appearance in this case, the safety of the community, and because Defendant has shown he is unlikely to abide by conditions of release. *See* 18 U.S.C. § 3148.

IV.    *Ex Parte* **Motion and Sealing**

The Government is making this motion *ex parte* and requesting that this motion, the Court's Order, and arrest warrant be placed under seal until the time of the revocation hearing. As explained above, Defendant has received over $8 million and sent over $6 million in cryptocurrency through undisclosed wallets over the last five days. Should Defendant learn that the Government is aware of these transfers prior to the revocation hearing, Defendant may flee or cause additional funds to be transferred out of his undisclosed wallets prior to his arrest.

Courts routinely conduct bail revocation and re-determination hearings based on *ex parte* filings made by the Government, to prevent imminent harm such as flight of a defendant or harm to a person involved in the case. *See, e.g.*, *United States v. Horvath*, 575 F. Supp. 516, 521 (D. Minn. 1983) (revoking bond revoked after *ex parte* motion and arrest warrant); *United States v. Page*, 2015 WL 93614 (D. Me. Jan. 7, 2015) (same); *United States v. Slade*, 2013 WL 2455926 (D. Ariz. June 5, 2013) (same); *United States v. Goselin*, 2006 WL 3842109 (C.D. Ill. Dec. 22, 2006) (same); *United States v. Bowdach*, 561 F.2d 1160 (5th Cir. 1977) (examining § 3148 in the context of an arrest warrant having been issued for a violation of a release order permitting release pending appeal, and stating that "we find that an *ex parte* temporary revocation of an appeal bond is constitutional when followed by notice and hearing after the person has been brought into custody").

The Government requests that this motion, the Court's Order, and arrest warrant be unsealed at the time of the revocation hearing, except for redactions for any tax return information and sensitive personal information that will be provided by the Government, in accordance with the Protective Order in this case (ECF 29).

## CONCLUSION

Defendant's receipt of over $8 million in cryptocurrency and transfer of over $6 million of cryptocurrency through undisclosed, unhosted wallets over the last five days—while attempting to shed the bond placed on his D.C. residence by telling the Court he is destitute—presents an urgent risk of flight.  Clear and convincing evidence shows that Defendant has violated his conditions of release based on his failure to disclose the cryptocurrency wallets and conducting the transfers without Pretrial Services approval.  The evidence also establishes probable cause that Defendant violated 18 U.S.C. § 1001 by making false statements to the Pretrial Services officers. Accordingly, Defendant is a flight risk and Defendant cannot rebut the presumption that there are no conditions of release that would reasonably assure the safety of the community.  Likewise, the Court cannot trust Defendant to abide by conditions of release.  The Government requests that the Court immediately issue an arrest warrant for Defendant and set a hearing to revoke Defendant's conditions of release.

Respectfully submitted,

Erek L. Barron
United States Attorney
/s/
Patrick D. Kibbe
Assistant United States Attorney
District of Maryland

Stanley J. Okula, Jr.
Senior Litigation Counsel
Department of Justice—Tax Division

Emerson Gordon-Marvin
Hayter Whitman
Trial Attorneys
Department of Justice—Tax Division