# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### SOUTHERN DIVISION

**UNITED STATES OF AMERICA,**      *

                                       *

         **Plaintiff,**            *

                                         *

   **v.**                     *                  **CRIMINAL NO. LKG-25-6**

                                       *

**THOMAS C. GOLDSTEIN,**       *

                                        *

       **Defendant.**           *

                               ********

## DEFENDANT THOMAS C. GOLDSTEIN'S
## <u>APPEAL OF AMENDED ORDER SETTING CONDITIONS OF RELEASE</u>

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ...................................................................................................................1

    A.    The Government's Motion to Imprison Defendant .................................................2

    B.    The Magistrate Judge's Detention Ruling .............................................................3

    C.    Defendant's Motion for Release .............................................................................5

    D.    The February 13 Hearing on Defendant's Release Motion ....................................6

ARGUMENT .........................................................................................................................8

I.     THE MAGISTRATE JUDGE ERRED IN SUBJECTING DEFENDANT TO
      THE MONITORING CONDITION. ............................................................................8

    A.    The government has failed to prove that Defendant exercises any control
        over the 935B and 54E3 cryptocurrency wallets. ..................................................10

        1.    Defendant does not own or control the 935B wallet...............................10

        2.    Defendant does not own or control the 54E3 wallet...............................14

        3.    The timing of the recent transactions does not show that Defendant
            owns or controls the wallets.....................................................................15

        4.    The government's other evidence does not support its claims. ................17

        5.    There is no merit to the government's backup theory that
            Defendant "co-owns" or has some control over the wallets. ....................18

        6.    There is no merit to the other supposed criticisms of Defendant's
            evidence. ..................................................................................................20

    B.    The Magistrate Judge's reliance on two other wallets rests on a
        misunderstanding of how cryptocurrency operates. ..............................................22

    C.    The government's remaining assertions lack merit. ..............................................23

    D.    The Monitoring Condition is drastic and unwarranted. ........................................24

CONCLUSION......................................................................................................................26

## INTRODUCTION

Defendant Thomas Goldstein (Defendant) respectfully appeals Chief Magistrate Judge Sullivan's order that, as a condition of release, Defendant's electronic devices must be subject to monitoring (the Monitoring Condition). *See* ECF No. 62.[1] The Monitoring Condition should be eliminated because it: (a) rests on an erroneous legal standard; (b) relies on erroneous factual conclusions; (c) depends on a very seriously mistaken understanding of how cryptocurrency operates; and (d) creates the significant prospect of exposing attorney-client privileged communications. The Monitoring Condition is accordingly not the least restrictive condition of release that will reasonably assure Defendant's appearance, particularly given Defendant's other conditions of release. *See* 18 U.S.C. § 3142.

The Monitoring Condition arose from a highly misleading and inaccurate *ex parte* detention motion filed by the government that resulted in Defendant's unjustified and unwarranted incarceration. The government's motion rested on the allegation that Defendant owned two cryptocurrency wallets that had been used to transfer millions of dollars in the last few weeks. As described below, that allegation is demonstrably false. The government's detention motion mischaracterized key evidence and did not advise the Magistrate Judge of significant evidence undermining its claims. As a result of the government's misleading presentation of the evidence, the Magistrate Judge failed to hold the statutorily required evidentiary hearing, at which Defendant could have and would have easily proved the allegations

---

[1]     The Magistrate Judge imposed two other additional conditions, which Defendant is not appealing. Defendant has already fulfilled the condition that he disclose all his assets to Pretrial Services. He confirmed that he does not control any cryptocurrency wallet or otherwise have access to cryptocurrency. The Magistrate Judge also prohibited Defendant from engaging in cryptocurrency transactions, which is duplicative of a prior restriction on Defendant engaging in financial transfers.

false. Indeed, even after the defense presented the government with evidence establishing that its allegations were wrong, the government refused to correct its error, leaving Defendant incarcerated for three days without justification. The Magistrate Judge later ordered Defendant's release when presented with a fuller record, but — as a result of the misleading record presented by the government — imposed the Monitoring Condition.

Because the Monitoring Condition is not remotely supported by the factual record and is not the least restrictive condition that will reasonably assure Defendant's appearance, the Magistrate Judge's order imposing it should be reversed.

## STATEMENT OF FACTS

### A.    The Government's Motion to Imprison Defendant

On Monday, February 10, 2025, the Magistrate Judge issued a warrant for Defendant's arrest based on an *ex parte* motion filed by the government to revoke Defendant's release (ECF No. 40, the Imprisonment Motion). That motion sought Defendant's arrest and imprisonment based on the premise that Defendant owns two cryptocurrency wallets, in which transactions had occurred over the previous few days. In the "935B wallet," roughly $8 million had recently been deposited and $6 million had been withdrawn. In the "54E3 wallet," over the course of a few minutes on a single day, roughly $1,300 had been deposited and $22,000 had been withdrawn.[2]

The government had no evidence that Defendant was involved in those recent transactions. Instead, it cited circumstantial evidence that Defendant had prior connections to both wallets. With respect to the 935B wallet, the government's motion relied on communications concerning a single 2023 transaction between Defendant and an individual

---

[2]    A basic explanation of the functioning of cryptocurrency accounts and wallets is set forth in the declaration of cryptocurrency expert Jason Trager, attached hereto as Exhibit A.

identified in the government's motion as "the Fixer" and referenced here as "the Seller."[3] As discussed further below, the government did not advise the Magistrate Judge of additional messages between Defendant and the Seller that significantly undermined the government's interpretation. With respect to the 54E3 wallet, the government's only evidence was a letter from an attorney for a third party proffering that $250,000 in cryptocurrency was sent by her client to the 54E3 wallet for Defendant. *See* Ex. I (subpoena transmittal letter from counsel to party who sent the cryptocurrency, as well as transaction record).

The government's Imprisonment Motion alleged that Defendant committed a crime — making false statements in violation of 18 U.S.C. § 1001 — and violated his conditions of release by failing to disclose the wallets and recent transfers to Pretrial Services. The government also asserted that Defendant's immediate imprisonment was required because more than $70 million had flowed through the 935B wallet, supposedly demonstrating that Defendant had the ability to flee on a moment's notice. Imprisonment Motion 1, 11-13, 14-16.

## B.    The Magistrate Judge's Detention Ruling

Defendant was arrested on the warrant after Pretrial Services told him to report to the courthouse on the false pretense that he required to take an unscheduled drug test. *See* ECF No. 47. That afternoon, Defendant appeared before Chief Magistrate Judge Sullivan. Under 18 U.S.C. § 3148, the Magistrate Judge was required at that time to hold an evidentiary hearing to determine whether the government could prove its allegations by clear and convincing evidence and to allow Defendant to examine the government's evidence and present his own evidence. *See*

---

[3]    The government's use of the pejorative term "Fixer" to refer to this individual apparently derives from an instance that has nothing to do with the issues raised in this motion. This individual operates an established concierge business, and the government's reference to this individual as "the Fixer" appears intended to give an impression of unwarranted suspicion to his interactions with Defendant.

*United States v. LaFontaine*, 210 F.3d 125, 131 (2d Cir. 2000). Instead, at the outset of the proceedings, the Magistrate Judge announced that he had *already* found on the basis of the government's "proffer" that its allegations were true by clear and convincing evidence, and that he had *already* ordered Defendant's release revoked. *See* ECF No. 69 (Detention Hrg. Tr.), at 2; *id.* at 3; *id.* at 16-17; *see also* ECF No. 64 (Release Order), at 2 (Magistrate Judge ordered Defendant's imprisonment "based on the Government's evidentiary proffer in its Motion to Revoke").

The Magistrate Judge then permitted Defendant to make an oral "proffer" of the evidence he would submit if later given the opportunity. But the Magistrate Judge explained that in order to actually submit that evidence, Defendant would first be required to submit a motion for reconsideration — *pro se*, from prison, and without any attorney permitted to submit materials on his behalf — after which the Court would if appropriate promptly hold a hearing. Detention Hrg. Tr. 18, 28. That would be exceedingly difficult. Pretrial inmates for the Greenbelt Federal Courthouse are generally held in the Chesapeake Detention Facility, which is a SuperMax prison. For the first five days upon their arrival, inmates are kept in virtual isolation, permitted to leave their cells for only one hour a day. In that period, they have no access to the prison library or other realistic mechanism to prepare and submit legal filings.

The Magistrate Judge expressly recognized that this procedure put Defendant at a "disadvantage" and was "not fair." *Id.* at 5, 28. But the Magistrate Judge suggested that it would be even more unfair to ask Defendant to present evidence responding to the government's motion immediately, given that he had just learned of its allegations. *Id.* at 18.

At the hearing, Defendant requested the opportunity to retrieve and look on his phone for just a few minutes — under the supervision of the government — to find the evidence that would

disprove the Imprisonment Motion's allegations. *Id.* at 29. He explained that if he instead was first sent to prison, it would become exceptionally difficult to secure and present that evidence. The Magistrate Judge viewed this as a "conundrum" resulting from Defendant's proceeding *pro se. Id.*

Defendant specifically requested that the "Government [provide] a suggestion of a practical way" for him to "be able to just look for these messages." *Id.* at 30-31. He explained that he was "risking my entire reputation with you, the Court, the world" that the messages on the phone would show that the government's allegations were untrue, so that "everybody would be well advised if it's possible for us to have a pragmatic solution." *Id.* at 31. The Magistrate Judge asked the government for "any thoughts on that." *Id.* In response, the government suggested that Defendant attempt to get a third party to "get to the messages that he's referring to." *Id.* And the government represented to the Magistrate Judge that "the Government doesn't object to that *and would be happy to receive those facts*. And we'd say at this point, Your Honor, the facts the Government presented are in the motion. We're not playing games here. We're not trying to disadvantage Mr. Goldstein." *Id.* (emphasis added). The Magistrate Judge accepted that represented and ordered Defendant imprisoned.

### C.     Defendant's Motion for Release

Soon after Defendant's arrest, undersigned counsel — who had represented Defendant in the four-and-a-half-year investigation that preceded the Indictment — learned of the government's allegations and Defendant's arrest. Counsel then searched a previously taken image of Defendant's phone for references to the 935B and 54E3 cryptocurrency wallets. Counsel immediately discovered two text message strings — discussed further below — that made absolutely clear that Defendant did *not* own or control either wallet. Instead, the messages

show that third parties provided both wallet addresses to Defendant, so that Defendant could have cryptocurrency sent to them. *See infra* at 10-14.

Counsel provided these messages to the government at approximately 6:30pm on February 10, 2025, based on the government's representation to the Magistrate Judge that the solution to Defendant's inability to submit filings was that it would be "happy" to receive any materials tending to disprove its allegations. Counsel's email attached both message threads, explained their significance, and requested that the government immediately disclose the messages to the Court. *See* ECF No. 45-4. The government did not respond that evening.

Instead, the government emailed counsel at approximately 10:40am the next day, *refusing* to provide the messages to the Magistrate Judge. *Id.* Directly contradicting its prior representations, the government stated instead that it would instead await any filing by Defendant. As the government was well aware, Defendant was at that time in effective isolation in prison and could not make such a filing.

Undersigned counsel then decided that it was untenable for Defendant to be forced to remain illegally imprisoned as a result of his *pro se* status and the Magistrate Judge's order forbidding any attorney from submitting any document on his behalf. Counsel accordingly prepared an emergency motion seeking Defendant's release (ECF No. 44, the Release Motion) and entered an appearance on February 11, 2025. The Magistrate Judge immediately directed the government to respond that evening, which it did — albeit after the Magistrate Judge's deadline. The next morning, Defendant submitted a reply. The Magistrate Judge set a hearing for the following day, February 13, 2025, by which time Defendant had been imprisoned for three days.

### D.    **The February 13 Hearing on Defendant's Release Motion**

On the morning of the February 13 hearing, in an abundance of caution, defense counsel emailed the government asking for any information in the government's possession tending to

6

show that Defendant was not the owner of the 935B or 54E3 wallets. In response, the government revealed for the first time that, two days earlier — while Defendant was imprisoned — $2 million had been withdrawn from the 935B wallet. It was of course *impossible* for Defendant to have engaged in that transaction from prison.

At the February 13 hearing, the government abandoned the basis for its motion and the Magistrate Judge's imprisonment order: that Defendant owned the two wallets. It expressly conceded that the evidence presented by Defendant (which, as noted, it had refused to provide the Court) disproved those allegations. Release Hrg. Tr. 23.

But remarkably, the government nonetheless insisted that Defendant should remain imprisoned through trial. It vaguely maintained that the evidence still somehow proved that Defendant *co*-owned the wallets. It placed particular stress on how the timing of transactions was supposedly correlated with proceedings in this case, which it asserted could not be coincidental. But the government did not explain *why* the supposed correlation between the timing of the transactions and the proceedings proved (or even suggested) that Defendant owned the wallets. And once again, the government did not disclose any of the evidence that disproved its claims. *See infra* at 12-13.

At the conclusion of the hearing, the Magistrate Judge granted Defendant's motion for release. The Magistrate Judge concluded that the government had failed to satisfy the "clear and convincing evidence" standard for revoking Defendant's release. But the Magistrate Judge *sua sponte* imposed the Monitoring Condition based on his lingering "suspicio[n]" that Defendant had engaged in cryptocurrency transactions while on release. Release Hrg. Tr. 30:19. As the Magistrate Judge put it, "my spider sense is indeed tingling." *Id.* at 30:20. The Magistrate Judge concluded that the additional release conditions were warranted because "I want to make it as

7

difficult as I can under the Bail Reform Act to prevent the risk of nonappearance." *Id.* at 33:16-19.

In a memorandum issued later that day, ECF No. 64, the Magistrate Judge explained that, "[g]iven the information that Mr. Goldstein has now presented in his Motion, the Court is no longer convinced, by clear and convincing evidence, that Mr. Goldstein violated his conditions of release." *Id.* at 4. However, the Magistrate Judge stated that he was "highly suspicious that Mr. Goldstein has used cryptocurrency while on conditions of release." *Id.* at 5. The Magistrate Judge found it "quite possible that Mr. Goldstein is the owner of the 935B and 54E3 wallets," *id.*, an assertion that not even the government was willing to defend any longer.

## ARGUMENT

## I.    THE MAGISTRATE JUDGE ERRED IN SUBJECTING DEFENDANT TO THE MONITORING CONDITION.

This Court reviews conditions of release imposed by a magistrate judge *de novo*. *United States v. Stewart*, 19 F. App'x 46, 48 (4th Cir. 2001). In so doing, the Court "must make an independent determination of the proper . . . conditions of release." *Id.*

The Magistrate Judge ordered Defendant's release because the record made it impossible to find by clear and convincing evidence that Defendant owns the 935B and 54E3 wallets. Release Order 4-5. The Magistrate Judge nonetheless imposed additional conditions of release (including the Monitoring Condition at issue here) that had not been suggested by either Pretrial Services or the government.

The Magistrate Judge reasoned that he was "highly suspicious" that Defendant had violated his conditions of release by using cryptocurrency without advising Pretrial Services. *Id.* at 5. That conclusion had two bases. First, the Magistrate Judge deemed it "quite possible that Mr. Goldstein is the owner of the 935B and 54E3 wallets and that he transferred the funds just as

the Government alleges" in the Imprisonment Motion. *Id.* Second, "[g]iven Mr. Goldstein's extensive past use of cryptocurrency, the Court [found] it likely that Mr. Goldstein has access to funds that have yet to be identified, and which he might use to flee from prosecution in this case." *Id.* at 6.

The Magistrate Judge erred. His conclusion that it was "quite possible" that Defendant owns the 935B and 54E3 wallets rested not on a factual finding but avowedly on "suspicio[n]" and "spider sense." Release Hrg. Tr. 30:19-20. But the Bail Reform Act does not permit the imposition of conditions of release based on intuition. Here, the government *itself* conceded that its original theory was irreconcilable with the evidence.[4]

Similarly, the finding that Defendant "likely . . . has access to funds that have yet to be identified" in other cryptocurrency wallets has no support. The Magistrate Judge reasoned that "[i]t's hard to know the true value of any assets that Mr. Goldstein holds or controls in his cryptocurrency wallets," *id.* at 32:23-33:15, but that is simply wrong. As explained in the declaration of cryptocurrency expert Jason Trager, cryptocurrency transactions are a matter of public record, and therefore the value of any particular cryptocurrency account is readily ascertainable. Ex. A, ¶ 12. The government has identified just two other cryptocurrency wallets containing a total of approximately $17,000. ECF No. 52 (Release Opp.), at 8. The government alleges that it knows the exact contents of these wallets. *Id.* The government does not allege any recent transactions in these wallets, and has never argued that their existence — a fact known to the government at the time the Indictment was returned — constitutes a basis for the Monitoring

---

[4]    This Court need not decide whether the Magistrate Judge factually erred on the record before him. This Appeal identifies an array of evidence that the government wrongly withheld that unquestionably would have changed the Magistrate Judge's understanding of the facts.

Condition or any other modification of release conditions. In fact, Defendant no longer has access to these wallets, and the government has offered no evidence to the contrary.

More broadly, the Magistrate Judge reasoned that "I want to make it *as difficult as I can* under the Bail Reform Act to prevent the risk of nonappearance." *Id.* at 33:16-19 (emphasis added). But under the statute, the Court may only impose "the least restrictive . . . combination of conditions" that "will reasonably assure the appearance" of Defendant. 18 U.S.C. § 3142(c)(1)(B). Because Defendant has no access to cryptocurrency, and because the Monitoring Condition moreover creates the significant risk of disclosing attorney-client privileged communications, it should be overturned.

### A. <u>The government has failed to prove that Defendant exercises any control over the 935B and 54E3 cryptocurrency wallets.</u>

#### 1. Defendant does not own or control the 935B wallet.

The Magistrate Judge's insistence that it is "quite possible" that Defendant owns the 935B and 54E3 wallets — such that his original order imprisoning Defendant was based on a correct understanding of the facts — is utterly irreconcilable with the record. The government itself expressly abandoned that theory at the hearing on Defendant's motion for release because the record shows that third parties, not Defendant, own and control the wallets.

One fact that the Magistrate Judge failed to acknowledge in his Opinion perfectly illustrates why: As the government belatedly disclosed to the defense, approximately $2 million was transferred out of the 935B wallet on Tuesday, February 11, *while Defendant was incarcerated*. Unless the government's theory is that Defendant transferred the cryptocurrency from the Chesapeake Detention Facility — where he had no access to a computer and all of his communications were monitored — this transaction alone defeats any finding that Defendant owns or controls the wallets.

Before the Magistrate Judge, the government relied on text messages in which Defendant provided the full address of the 935B wallet to the Seller and confirmed that the cryptocurrency had been received. *See* Imprisonment Motion, 7-8. But the complete set of Defendant's communications regarding this specific transaction — which are contained in three message threads, excerpted at Exhibits B, D, and E — demonstrate that Defendant has no control over the 935B wallet. (In addition to the message threads, Exhibit F contains a chart organizing all three threads as well as the cryptocurrency transactions in chronological order.)

Those communications began when Defendant learned on April 13, 2023, that the Seller could provide $500,000 in cryptocurrency. Ex. B, at 1. Defendant advised the Seller that he would purchase the cryptocurrency to send ▬▬▬ for his share of Defendant's poker winnings. *Id.* Defendant explained that he would "have [the Seller] send the [cryptocurrency] coins for me." *Id.*

Defendant separately messaged the phone number 818-▬▬▬ (the 818 number) that "I have $500k USDC I can send to you." Ex. D. The 818 number responded, "Ok I'll make a group now." *Id.* The 818 number then created a three-way message thread with "Tiger" and Defendant. Ex. E. The 818 number instructed Tiger to provide Defendant with an "address" to send cryptocurrency "to me." Tiger responded with the full 935B address. *Id.*

Defendant provided that address to the Seller, who in turn advised Defendant that he had sent a "test" transaction to make sure the wallet worked correctly.[5] Ex. F (chart comparing timing of messages from different threads). Defendant relayed that message to Tiger, who confirmed that the test was received. Defendant confirmed that fact to the Seller, who transmitted

---

[5]    In a "test" transaction, a small transfer is made to the wallet before the full transaction. The test confirms that the wallet is functioning and that the parties are using the correct address. Ex. A, ¶ 19.

the remainder of the funds. Defendant advised Tiger of that fact; he responded: "[g]ot $500k." Ex. F.[6]

These back-and-forth messages as shown in Exhibit F put in *perfect* context the communications on which the government relied before the Magistrate Judge. They make clear that Defendant does not own the 935B wallet. In particular, the messages show that Tiger sent Defendant the full address of the 935B wallet. And they show that Defendant relied on Tiger to confirm receipt of both the initial test transfer and the full transfer.

By contrast, the government's submissions to the Magistrate Judge regarding the 935B wallet were extremely misleading. Most generally, the fact that Defendant had cryptocurrency sent to the wallet did not necessarily imply that he owned it. The government knew that Defendant had repeatedly directed that funds be sent directly to the account of a third party, rather than to himself. Indeed, the Indictment (*see* ECF No. 1, ¶¶ 1, 24(f), 66) describes several such transactions. As defense cryptocurrency expert Jason Trager explains in the attached declaration, it is common in cryptocurrency to send funds directly to their ultimate recipient, to reduce transaction fees and to minimize the chance that repeated transfers will introduce errors and the loss of the funds.  Ex. A, ¶¶ 16-18.

The government withheld from the Magistrate Judge evidence that casts significant doubt about Defendant's ownership or use of these two wallets. To be clear, the government did not

---

[6]    The Magistrate Judge seemingly misunderstood "Tiger" to be the recipient of the cryptocurrency. Release Order 3. In fact, as the message explains, the cryptocurrency was sent to the owner of the 818 phone number. Tiger played the administrative role of managing the wallet (akin to managing a bank account for a third party): he provided the cryptocurrency address and confirmed the transactions' receipt. The factual error did not affect the Magistrate Judge's analysis.

possess either (1) Defendant's messages with the 818 number (Ex. D); or (2) the three-way messages between the 818 number, Tiger, and Defendant (Ex. E).

But the government did have all of Defendant's messages directly with the Seller (Ex. B), which standing alone defeated any finding by "clear and convincing evidence" that Defendant owned the 935B wallet. Those communications discuss not one but four separate cryptocurrency purchases between May and July, 2023. *See* Ex. B. In each instance, Defendant ensured that the Seller provide an invoice documenting the purchase. *See* Ex. C. With respect to *each*, the messages make clear that the Seller was sending the cryptocurrency to wallets owned by *third parties*, not Defendant. The messages (with emphasis added) are as follows:

1. $500,000 to ███████████████████████935B

Defendant: "I can definitely take $500k crypto. But I have to structure it as a purchase. Like I'm going to have a record of buying it from him. Or from you. I need to do that bc *I'm going to send it to* ████ *as his share of poker*."
...
Defendant: "I would have him send it to a wallet of yours. Then do an invoice to sell it to me. I'll wire to you and have you send the coins *for me*."

2. $744,000 to ███████████████████████08ee

Seller: "Lmk if you want USDC or usdt. Can then if you don't mind confining Waller address"
Defendant: "Ok great — *am asking*. Thanks!"
...
Defendant: "Finding out what coin"
...
Defendant: "Can you update me on the crypto? *They asked*."
...
Seller: "this one still accurate? or *do they want to the other one*? Its USDT correct?"
...
Seller: "*Can you confirm they got it before I sent rest?*"
Defendant: "*Yup, I messaged them thanks!*"

3. $5,000 to ███████████████████████4BE5

Seller: "*Did they [sic.] person get their $5k?*"
Defendant: "*I assume. Will let you know if not.*"

4. $504,900 to ███████████████████████ d8f3

Seller: ": Lmk if *they have received it* and if so, I'll get the $499,900 out to bring it to $500k"

...

Seller: "*LMK if they got the test*?"
Defendant: "*No word back*"

...

Defendant: "*He says it wasn't received. But I think he's rechecking.*"

*See* Ex. B (these messages are highlighted in the attached exhibit). Taken together, these messages — which the government withheld from the Magistrate Judge — establish unequivocally that Defendant purchased cryptocurrency from the Seller to be sent directly to wallets owned by third parties.

### 2.    Defendant does not own or control the 54E3 wallet.

The government's sole evidentiary basis for alleging that Defendant owns the 54E3 wallet was a subpoena response letter in which counsel for a witness stated that a transfer of $242,410 to the wallet in 2023 was payment to Defendant for a poker loss. *See* Ex. I. But there was no reason to believe that the attorney had any information about who actually *owned* the wallet. The document produced in response to the subpoena (Ex. I, at 2) does not suggest Defendant was the owner; instead, it merely reproduces a record of the digital transaction, which does not identify who owned the relevant wallet. *See* Ex. A, ¶ 14.

By contrast, the contemporaneous messages concerning that transaction prove that Defendant did not own or control the 54E3 wallet. Those messages show that on the date of the 2023 transaction, Defendant asked a third party for a wallet address to send a partial payment for a debt owed to "Mr. T." Ex. G. The recipient then provided the full address of the 54E3 wallet to Defendant. The amount sent to the 54E3 address and the timing correspond exactly to the

transaction cited by the government's motion. See Ex. H (chart comparing timing of messages with the transaction in the 54E3 wallet).

### 3.    The timing of the recent transactions does not show that Defendant owns or controls the wallets.

The government and the Magistrate Judge both relied on the fact that some (but not all) of the recent transactions in the 935B and 54E3 wallets occurred within a short time of the filings on Defendant's appeal of the release condition concerning the substitution of assets for his appearance bond. But neither the government nor the Magistrate Judge ever explained *why* the timing of the transactions supported the assertion that Defendant owns the wallets. Why would Defendant deposit $8 million and withdraw $6 million from a cryptocurrency wallet, timed to his appellate brief on the conditions of release? Why would he deposit $1,500 and withdraw $22,000 — a fraction of the balance? That appeal concerned the substitution of property to secure an appellate bond, a subject that has nothing to do with cryptocurrency.

In reality, the government principally used the transactions' timing to breathlessly make the point — in bold and italics — that Defendant was appealing the Magistrate Judge's prior order imposing conditions of release. *See* Imprisonment Motion, 8-10; Release Opp., 4-5. Indeed, the government meticulously tracked the *precise number of minutes* separating the transactions and the government's filing in connection the appearance bond — which the government dramatically noted in italics. Release Opp., at 4.[7]

In any event, the defense cryptocurrency expert's analysis of the timing of the recent transactions shows that they do not support the government's contentions or the Magistrate

---

[7]    This rhetorical flourish had its intended effect: The Magistrate Judge described the timing of a withdrawal from the 935B wallet occurring "30 minutes after the government moved to strike Mr. Goldstein's pro se motion to modify his conditions of release" on appeal from the magistrate judge's order, and transactions in the 54E3 wallet as occurring "the same day Mr. Goldstein filed his pro se motion." Release Order 2.

Judge's findings. As explained in Mr. Trager's declaration, the recent transactions in the 935B

wallet are consistent with a consistent pattern of activity in the wallet that predates this case. As

the government noted, the 935B wallet was empty at the time of the indictment, then

subsequently received a large deposit afterwards. But the government failed to advise the

Magistrate Judge that in context, that activity was not at all unusual. The recurring pattern over

the wallet's history was that it would lie empty for a period, then have large deposits and

withdrawals, and revert to being entirely or largely empty. See Ex. A, ¶ 33 (Mr. Trager noting

this pattern). That pattern is demonstrated in the following chart[8]:



Similarly, the recent transactions in the 54E3 wallet show a relatively small amount of

money (approximately $22,000, or about 9% of the full holdings of the wallet) transferred

around the time of the appearance bond filings. Ex. A, ¶ 39. The government has not attempted

---

[8]    This chart was created using the transaction history in the 935B wallet compiled by the
government at ECF Nos. 40-1 & 40-2, and supplemented by the transaction history for
subsequent transactions from the open source blockchain explorer https://etherscan.io/. *See* Ex.
A, ¶ 13.

to explain why it would make sense for Defendant to transfer a fraction of the full value of the wallet at that time.

### 4.    The government's other evidence does not support its claims.

Before the Magistrate Judge, the government made two additional arguments to support its contention that Defendant owns the 935B and 54E3 wallet: (1) that the Defendant supposedly "switched" from a Coinbase wallet to the 935B wallet in November 2022; and (2) that a witness reported that Defendant used an "unhosted" cryptocurrency wallet in 2022. Imprisonment Motion, at 8-9. The Magistrate Judge did not rely on these assertions, and with good reason — the government's characterization of this evidence was highly misleading and in any event does not remotely support its position.

First, the government cited the fact that Defendant emptied the Coinbase wallet two weeks before the first use of the 935B wallet as evidence that Defendant had "switched" from the Coinbase wallet to the 935B wallet. *Id*. But the government did not advise the Magistrate Judge that records in its possession show that when Defendant closed the Coinbase wallet, the funds from that wallet were *not sent* — directly or indirectly — to the 935B wallet.

Second, the government cited a statement by a witness that Defendant in this period had used a wallet that was — like the 935B wallet — "unhosted." *Id.* at 9.[9] But the government omitted that it knew that the unhosted wallet referenced by the witness was *not* the 935B or 54E3 wallet. *Cf.* Arrest Motion 5 n.1 (representing that government had "identified Defendant's unhosted cryptocurrency wallets," but never acknowledging that neither was involved in any transactions with the wallets at issue in the motion).

---

[9]    An "unhosted" wallet is simply one that is not managed by a cryptocurrency exchange, such as Coinbase. *See* Ex. A, ¶ 22.

**5.      There is no merit to the government's backup theory that Defendant "co-owns" or has some control over the wallets.**

In the face of the overwhelming evidence discussed above that Defendant does not own or control the 935B or 54E3 wallet, the government retreated to vaguely suggesting that Defendant may have co-owned the wallets. Thus, the government asserted that the messages discussed above "simply show[] that there may have been other people involved in" the 2023 transactions. Release Opp. 3. The Magistrate Judge did not adopt or even mention the government's co-ownership theory in the memorandum imposing the Monitoring Condition, likely because there is absolutely no evidence to support that claim. No document or witness testimony establishes or even suggests that Defendant had any ability to control the wallets, including control the transfer of the funds they contain.

In fact, the messages discussed above show the contrary. If Defendant shared ownership of the 935B wallet with others, then there would have been no need for the individual requesting the payment to instruct Tiger to "give" Defendant the wallet address to send the payment. *See* Ex. E. The government speculates that Defendant "may not have known the 43-digit wallet number off the top of his head and messaged with his cohorts to obtain it," Release Opp. 3, but that is not what the messages say. Defendant does not ask Tiger or the other individual on the messages to remind him of the full address of their shared wallet. Rather, the other individual on the thread instructs Tiger to provide "a address" for Defendant to send payment in the first instance. Ex. E. Moreover, if the government's supposition were correct, then there would have been no need for Defendant to ask Tiger to verify later that the transfers went through once Tiger sent Defendant the full wallet address; if Defendant co-owned the wallet, he could have done that himself.

More broadly, the government's theory is wildly unlikely on its face, because its premise is that Defendant and some other person each had the complete ability to control the disposition of more than $70 million. To be sure, one person may manage a wallet for another. But as explained in the declaration of Mr. Trager, the defense expert, it is extraordinarily rare for two parties to "share" ownership of a cryptocurrency wallet, particularly where (as here) the wallet contains large sums of money. Ex. A, ¶¶ 26-29. Further, as Mr. Trager explains, in the highly unusual circumstance where two individuals choose to share ownership of a wallet, the public records associated with the wallet would almost certainly bear indicia of the shared ownership — like multiple signature keys — which are not present here. *Id.* ¶¶ 29-30, 33.

The government's opposition to Defendant's release motion also misleadingly suggested that, even if Defendant did not own the 935B or 54E3 wallets, the evidence still supported his detention because he had "used" the wallets by having cryptocurrency sent to them or at least "was aware of[] the recent cryptocurrency transactions forming the basis of the Government's request for detention." Release Opp. 1, 11. But as Mr. Trager explains in his declaration, the fact that Defendant had cryptocurrency sent to the wallets does not suggest in any way that he exercised any control over them. Ex. A, ¶¶ 15-18. The situation is directly analogous to arranging for money to be wired into a third party's bank account.

No doubt, the government will also assert that the 2023 transactions demonstrate that Defendant previously engaged in large cryptocurrency transactions. But the government knew of that allegation well before the Indictment, yet did not suggest that it had any implication for Defendant's conditions of release. (Indeed, the government did not even seek the Monitoring Condition *after* the recent transactions.) The government also knows the details of the 2023 transactions because Defendant insisted on creating a precise documentary record through

19

invoices with the Seller, Ex. C, which is the opposite of the behavior of someone seeking to hide the transactions. The government also knows that the cryptocurrency was then spent in the course of paying poker losses and distributing shares of winnings.

The government's argument is essentially that because Defendant received and disbursed significant amounts of money in 2023, his devices and communications must be closely monitored because the Court should assume that he secretly has access to millions of dollars today. But that is simply a *non sequitur*. That money was spent, and the mere existence of those transactions does not remotely support the inference that Defendant is engaged in more recent transactions through other, hidden accounts. The government's belated defense of the Magistrate Judge's *sua sponte* imposition of the condition is just an effort to articulate some justification for these proceedings, which resulted in Defendant's wrongful imprisonment.

> **6.    There is no merit to the other supposed criticisms of Defendant's evidence.**

The Magistrate Judge's memorandum imposing the Monitoring Condition made some passing criticisms of the evidence submitted by Defendant. None are well founded. The Magistrate Judge thus asserted without explanation in a footnote that "many of Mr. Goldstein's assertions are largely conclusory assertions supported by carefully culled snippets of text messages." Release Order 3 n.4. That is both unfair and inaccurate.

It is unfair because Defendant's counsel submitted materials on an emergency basis one day after the government filed its ill-conceived Imprisonment Motion in an effort to secure Defendant's immediate release. The state of the record before the Magistrate Judge owes also heavily to the Court's failure to hold the statutorily required evidentiary hearing.

But in any event, the Magistrate Judge was simply wrong. In fact, Defendant provided the Court with the complete discussions of the cryptocurrency transactions in the relevant text

message exchanges. *See* ECF Nos. 44-1, 44-2, & 44-3. As discussed above, it was in fact the Government that provided exceedingly misleading excerpts of messages between Defendant and the Seller.

The Magistrate Judge also found it significant that, on the record before him, "[n]either party has provided the Court with sufficient information for the Court to determine ownership of the cryptocurrency wallets at the time of the February 2025 transactions." Release Order 2. Of course, here the government, not Defendant, bears the burden of proof. Further, although the names of the third parties who own the wallets have not been disclosed, the evidence is indisputable on the one point that matters: *Defendant* is not the owner.[10]

The Magistrate Judge broadly characterized Defendant having "been involved in organizing, directing, and ensuring that cryptocurrency transactions went through" the two wallets. *Id.* at 2. But describing the messages at such a high level of generality only obscures the relevant facts: Defendant organized the transactions by asking a third party to provide their cryptocurrency address; directed the sender to deposit the cryptocurrency in the third party's wallet; and ensured that the transactions had succeeded by asking a third party of the cryptocurrency had arrived.

At the Release Hearing, the Magistrate Judge opined that "Mr T" and/or "Tiger" conceivably could be Defendant himself. Release Hrg. Tr. 12-13, 13-14. Again, the government has the burden of proof. But not even the government proffered that extraordinary reading, which

---

[10]     To the extent the Court wants more detail, we are pleased to provide the exact identities (as well as their relationship to Defendant) *ex parte* and *in camera*. That information would also show that neither is a person over whom Defendant has any influence or control, such as an employee. But Defendant has a Fifth Amendment right not to provide that information to the government to aid its prosecution of him.

makes nonsense of the messages: It would mean that Defendant was corresponding directly with himself.

The messages also state the exact *reasons* that Defendant had the cryptocurrency sent to the third parties. For the 935B wallet, it was to pay a share of poker winnings. Ex. B, at 1. For the 54E3 wallet, it was to pay down a debt. Ex. G. It would be nonsensical to say that Defendant was paying himself part of his own winnings or was reducing a debt he owed to himself.

**B.**      **The Magistrate Judge's reliance on two other wallets rests on a misunderstanding of how cryptocurrency operates.**

The government has also asserted that restrictions on Defendant's release are warranted because, with respect to two *other* wallets "defendant has been an active user of cryptocurrency including as recently as last year." Release Opp. 9. Those wallets contain roughly $17,000 in total. The government was well aware of these wallets when the Indictment was returned, yet did not ask for any release condition related to cryptocurrency on that basis. Moreover, the government does not contend that there have been any recent transactions in these wallets. And the government has presented no evidence to dispute Defendant's representations to Pretrial Services that he does not currently control these accounts.

While the Magistrate Judge did not principally rely on these other wallets as a basis to impose the Monitoring Condition, the memorandum mentions them in passing. But the Magistrate Judge's reasoning here rests on a serious misunderstanding of how cryptocurrency functions. The Magistrate Judge apparently believed that it was impossible to tell how much cryptocurrency was in the wallets that the government believed were owned by Defendant.

22

Release Hrg. Tr. 9. He opined that although those wallets were "dormant," they could in fact hold $20 million or even "hundreds of millions" of dollars. *Id*. at 33, 37-38.[11]

That is wrong. The error is no surprise, given that the Magistrate Judge himself repeatedly made clear that because the technology is new, he has no substantial understanding of how cryptocurrency and cryptocurrency wallets operate. Detention Hrg. 32; Release Hrg. Tr. 25. As Mr. Trager explains in his declaration, because the public blockchain records every transaction, it is possible to identify the contents of every wallet with perfect accuracy. Ex. A, ¶ 13. That is why the government itself was able to proffer that the wallets contain $17,000, not potentially hundreds of millions.

### C.    **The government's remaining assertions lack merit.**

The government has also tried to buttress its position by relying on a variety of other meritless assertions not adopted by the Magistrate Judge. In its opposition to Defendant's release motion, the government alleged that Defendant offered cryptocurrency to a "potential witness" and that Defendant "had no credible reason to make the offers other than to attempt to prevent the potential witness from assisting in the investigation, or ensure that the potential witness would not divulge the full truth about Defendant's conduct." Release Opp. at 8. This is a very serious accusation — witness tampering is a federal crime — and it is entirely untrue.

In fact, the "potential witness" was a former firm employee who announced her intention to resign from the firm. In an effort to retain the employee, Defendant offered her inducements to

---

[11]    The Magistrate Judge has been prone to hyperbole regarding Defendant's assets. At the arraignment, the Magistrate Judge stated on the record that "supposedly [Defendant] has money in countries that I've never heard of before." ECF No. 68, at 26.  At the February 13 hearing, the Magistrate Judge speculated that Defendant might have bank accounts in other jurisdictions. Release Hrg. Tr. 33. These speculations are completely untrue, and have no basis in even the unproven allegations of the Indictment. Defendant has no overseas assets, and the government has never claimed otherwise.

remain with the firm. This is utterly commonplace. There has never been the slightest suggestion — other than the government's bald assertions — that this offer had anything to do with the investigation.

###### D.      The Monitoring Condition is drastic and unwarranted.

At the February 13 hearing, the Magistrate Judge explained that he was imposing the Monitoring Condition "to make it *as difficult as I can* under the Bail Reform Act to prevent the risk of nonappearance." Release Hrg. Tr. 33:16-19 (emphasis added). That is not the proper legal standard. Under that statute, the Court may impose only "the least restrictive . . . combination of conditions" that "will reasonably assure the appearance" of Defendant. 18 U.S.C. § 3142(c)(1)(B). Applying the correct standard, the Monitoring Condition is not remotely warranted.

The Monitoring Condition is a drastic condition of release. Under the Monitoring Condition, Defendant may not use any electronic device unless the device has been approved by Pretrial Services. To date, Pretrial Services has approved just two devices: Defendant's cell phone and his desktop computer. Those two devices are equipped with monitoring software that allows Pretrial Services to review the entirety of Defendant's activity for communications related in some undisclosed fashion to the release condition. (The precise nature of the monitoring— including the search terms—is unclear; it may be extremely broad.) This includes Defendant's emails and text messages with counsel and his edits and comments on draft filings exchanged with counsel. That is not just a theoretical concern. The Indictment in this case includes a criminal charge and allegations related to Defendant's alleged failure to check a box on his tax returns related to the use of cryptocurrency. The Monitoring Condition thus creates a significant risk of the disclosure of privileged information, including potentially drafts of this very filing, which discusses "cryptocurrency," exchanged between Defendant and counsel.

24

The Monitoring Condition also threatens Defendant's ability to provide legal advice to others by risking the disclosure of privileged communications between Defendant and his clients. At least 50 times a day, the monitoring software installed by Pretrial Services on Defendant's computer displays a warning that it is his responsibility to tell third parties that it is being monitored. Clients and potential clients are of course far less likely to rely on Defendant for legal advice if they are advised that their communications with him are being monitored by the government.

At the February 13 hearing, the Magistrate Judge suggested that the Monitoring Condition is mild when compared to other cases. Release Hrg. Tr. 35. That is not correct. The Magistrate Judge appears to have been analogizing to cases in which the defendant was indicted for committing crimes — such as fraud, money laundering, or operating an illegal money transmitting business — *through the use* of cryptocurrency. The courts in those cases were naturally concerned that the defendants would continue to commit those offenses using the same means. Here, Defendant is not alleged to have committed any crime using cryptocurrency. Rather, the government's allegation is simply that he did not mark on his tax return the acknowledgment for having engaged in one or more cryptocurrency transactions.

The Monitoring Condition is particularly unwarranted in light of the additional release conditions concerning Defendant's finances. Among other things, Defendant is prohibited from opening new accounts, making financial transfers without the permission of Pretrial Services, and using cryptocurrency at all. Defendant was also required to disclose all of his financial assets to Pretrial Services. Defendant is challenging none of those release conditions. In light of all these conditions, as well as the evidence discussed above showing that Defendant does not own the 935B or 54E3 wallets and that Defendant has not engaged in cryptocurrency transactions

while this case has been pending, it is simply not the case that the Monitoring Condition is the least restrictive condition that will reasonably assure Defendant's appearance.

<b><u>CONCLUSION</u></b>

For the reasons stated above, Defendant respectfully requests that the Court amend his current conditions of release (ECF No. 62) to eliminate the Monitoring Condition.

Respectfully submitted,

/s/ *Jonathan I. Kravis*
_____
Jonathan I. Kravis (*pro hac vice*)
Stephany Reaves (Bar No. 19658)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500E
Washington, DC 20001
(202) 220-1100
Jonathan.Kravis@mto.com
Stephany.Reaves@mto.com

Adeel Mohammadi (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
Adeel.Mohammadi@mto.com

*Attorneys for Defendant Thomas Goldstein*

Dated:  February 27, 2025