# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | **CRIMINAL NO. LKG-25-6** |
| | * | |
| **THOMAS C. GOLDSTEIN,** | * | |
| | * | |
| Defendant. | * | |
| ******** | | |

## DEFENDANT THOMAS C. GOLDSTEIN'S
## REPLY IN SUPPORT OF
## APPEAL OF AMENDED ORDER SETTING CONDITIONS OF RELEASE

**TABLE OF CONTENTS**

**Page**

ARGUMENT ..................................................................................................................................4
I.   THE GOVERNMENT DECLINES TO DEFEND THE RULING BELOW. ....................4
II.  THE GOVERNMENT'S NEWLY ASSERTED BASES FOR THE
     MONITORING CONDITION LACK MERIT. ..................................................................9
III. THE MONITORING CONDITION IS UNWARRANTED. ............................................13

The Monitoring Condition arose from an *ex parte* motion by the government to immediately arrest and imprison Defendant Thomas Goldstein. The premise of the government's motion was that Mr. Goldstein owned two cryptocurrency wallets (the 935B and 54E3 wallets) that had been used to engage in recent transfers of funds (one involving millions of dollars), an assertion the government no longer attempts to defend. Based on the government's misleading, incomplete, and utterly one-sided presentation, the Magistrate Judge ordered Mr. Goldstein detained without the opportunity to present evidence. The government refused Mr. Goldstein's request to access exculpatory evidence on his phone, based on the promise that the government would swiftly bring any such evidence to the Court's attention. The government failed to keep that promise. As a result, Mr. Goldstein was needlessly imprisoned for three days, then eventually released by the Magistrate Judge when the government conceded that Mr. Goldstein's evidence disproved its allegations.

The Magistrate Judge nonetheless imposed the Monitoring Condition, which the government had never requested. The Magistrate Judge did so because he believed that the preponderance of the evidence established three facts: (1) that Mr. Goldstein owned the 935B and 54E3 wallets, Release Order 5; (2) that he owned two other wallets that potentially contained hundreds of millions of dollars, *id.* at 6; Release Hrg. Tr. 33:10-15; and (3) that he violated the conditions of his release by engaging in cryptocurrency transfers, Release Order 5.

Defendant's Opening Brief established that the Magistrate Judge applied both the wrong legal standard and the wrong burden of proof. Opening Br. 21, 24. Just as important, *each* of the Magistrate Judge's findings was wrong and traced *directly* back to serious misrepresentations by the government, which had: (1) withheld significant evidence that the recently used wallets actually belong instead to third parties, Opening Br. 12-14; (2) mischaracterized other evidence

1

about Mr. Goldstein's prior use of cryptocurrency, *id.* at 12; and (3) misled the Magistrate Judge into believing that a party who knows a cryptocurrency wallet's address can control the wallet, *id.* at 19. In addition, the Magistrate Judge was simply wrong in believing that the contents of a cryptocurrency wallet are unknown. *Id.* at 22-23.

In response, the government essentially abandons the Magistrate Judge's decision. It does not defend either the Magistrate Judge's legal standard or application of the burden of proof. Even more important here, the government expressly refuses to defend its conduct, hoping to wave away the facts in a footnote as "overblown rhetoric." ECF No. 83 (Opp.) 5 n.1. Not so. As the defense's opening brief showed, the government directly misled the Magistrate Judge into wrongfully imprisoning Mr. Goldstein. *See* Opening Br. 10-22. None of that is disputed. It cannot be so easily brushed off.[1]

The government halfheartedly suggests that the recent transactions in the 935B and 54E3 wallets "may have been done by or at the direction of" Mr. Goldstein. Opp. 10. But the government's argument, like its *ex parte* detention motion, ignores the overwhelming evidence establishing that Mr. Goldstein has never owned these wallets or controlled the funds in them.

---

[1] The government discloses for the first time that, nearly a full day after Mr. Goldstein's now-counsel provided the government with the exculpatory evidence from Mr. Goldstein's phone, the government finally sent that evidence to the Magistrate Judge *ex parte*. Opp. 4 n.1. The government fails to mention that it disclosed this evidence only *after* Mr. Goldstein's counsel expressed outrage at the government's initial refusal to do so and stated his intention to inform the Court, making the imminent disclosure inevitable. Nor does the government mention that it failed to provide the Magistrate Judge with the defense's explanation of the significance of this evidence, with the result that days of briefing were required while Mr. Goldstein remained incarcerated. *See* ECF No. 44-4, at 1-2 (defense counsel's explanation sent by email to the government on February 10, 2025, which the government did not send to the Magistrate Judge). Nor does the government try to explain why it told the Magistrate Judge on Tuesday, February 11 that this evidence changed nothing, only to reverse course at the February 13 release hearing, after Mr. Goldstein had spent two more days in prison for no reason. Nor does the government deny that it improperly failed to immediately advise the Magistrate Judge that someone withdrew $2 million from the 935B wallet while Mr. Goldstein was in prison on Tuesday, February 11.

2

Rather than defend the accuracy of the Magistrate Judge's findings, the government retreats to the *radically* different claim that the 935B and 54E3 wallets are relevant *not* because Mr. Goldstein owns them, but instead because he has some undefined relationship to other people who do. *Id*. at 10-14. That is not a justification for the Monitoring Condition, which is directed at Mr. Goldstein's own potential use of cryptocurrency. Whereas the Magistrate Judge erroneously found that Mr. Goldstein currently owns vast sums of cryptocurrency and engaged in cryptocurrency transfers after his arraignment, the government now is reduced to arguing that Mr. Goldstein's past use of cryptocurrency is enough to require the imposition of the Monitoring Condition. But the government bears the burden of proof, and as a result of this years-long investigation has extraordinary visibility into Mr. Goldstein's finances. Yet it is now asking the Court simply to *assume* (incorrectly) that Mr. Goldstein has access to vast sums of money that he is ready and willing to use to flee, without providing any evidence to support that conclusion.

Just as telling, nearly all the facts about Mr. Goldstein's prior use of cryptocurrency set forth in the government's opposition were known to the government at the time of arraignment, yet the government never proposed the Monitoring Condition, or any similar restriction on Mr. Goldstein's use of electronic devices, at his initial appearance or at any point thereafter, even at the February 13 hearing on Mr. Goldstein's motion for release. Accordingly, the government's strident assertion that "the Monitoring Condition is the least restrictive condition and is reasonably necessary to assure defendant's appearance," *id*. at 30, rings hollow.

Finally, even if the Court accepted all of the government's meritless arguments and unwarranted assumptions, they would not justify the Monitoring Condition. Instead, at most, those arguments would justify a far less restrictive release condition: an order that Mr. Goldstein's devices be monitored solely to ensure that he not use cryptocurrency applications or

3

visit websites that provide cryptocurrency trading. That condition, in tandem with all the other release conditions in place, would be sufficient "to prevent him from using cryptocurrency transactions," including in an "attempt to flee." Opp. 15. Notably, the government offers no justification for the broader monitoring of his communications, which presents the concrete risk of exposing privileged materials.

## ARGUMENT

### I.  THE GOVERNMENT DECLINES TO DEFEND THE RULING BELOW.

Having already abandoned the Magistrate Judge's first ruling, now the government declines to defend the second. Unable to defend the actual basis for the Monitoring Order, the government would prefer not to talk about it. But because that is the order on appeal, it should be this Court's focus.

The Order imposing the Monitoring Condition was based on the Magistrate Judge's "suspicio[n] that Mr. Goldstein has used cryptocurrency while on conditions of release." Release Order 5; *see also* Release Hrg. Tr. 30:19-21 ("It is quite suspicious to me, and my spider sense is indeed tingling, but his explanation is plausible and it's corroborated by other evidence."). After all, the recent transactions in the 935B and 54E3 cryptocurrency wallets were the government's *only new allegations* related to Mr. Goldstein's release conditions since his arraignment.

The defense's opening brief showed that the Magistrate Judge's order has no factual basis, and that order was the result of the government's highly misleading *ex parte* detention motion, which confidently asserted that Mr. Goldstein was the owner of the 935B and 54E3 cryptocurrency wallets while withholding key evidence in the government's possession showing the contrary. The motion failed to advise the Magistrate Judge of a series of text messages in the government's possession between Mr. Goldstein and the Seller that were inconsistent with the government's theory that Mr. Goldstein owned the cryptocurrency wallets. The motion also

4

failed to disclose that the recent transactions in the 935B wallet were consistent with a broader pattern of activity in the wallet dating back years. And the defense's opening brief cited additional evidence conclusively showing that Mr. Goldstein does not own the wallets: (1) a $2 million transfer out of the 935B wallet that occurred *while Mr. Goldstein was incarcerated*; and (2) a series of text message exchanges in which Mr. Goldstein asked third parties for the addresses of the wallets and to verify transfers into the wallets, communications that would make no sense if Mr. Goldstein owned the wallets.

The government's opposition makes no meaningful attempt to defend its highly misleading detention motion or the Magistrate Judge's erroneous factual findings.[2] Instead, the government backpedals, hedges, and equivocates. The government now says only that the recent transactions in the wallets "*may* have been done by or at the direction of" Mr. Goldstein. Opp. 10 (emphasis added); *id.* at 13. This much weaker assertion does not remotely support a drastic release condition like the Monitoring Condition. But in any event, even this vague, equivocal formulation is not remotely supported by the record.

*First*, the government continues to refuse to acknowledge the messages between Mr. Goldstein and the Seller concerning other cryptocurrency transactions that it did not disclose in its detention motion. The government does not dispute that it knew — but withheld — that Mr.

---

[2]  Oddly, the government ignores *all* of the misrepresentations described by the Opening Brief, but addresses in detail a dispute that is no longer relevant. Below, the government alleged that Mr. Goldstein violated 18 U.S.C. 1001 by making false statements to Pretrial Services about his cryptocurrency accounts during an "in person" meeting. ECF No. 40, at 11. As Mr. Goldstein explained below, that is incorrect; an in-person meeting was scheduled but canceled on the day in question. The Pretrial Services Officer subsequently stated that he believes he nonetheless discussed financial accounts with Mr. Goldstein in a separate FaceTime conversation. Opp. 4 n.1. Mr. Goldstein's recollection is different. But out of deference to the Officer's memory, and because the government has dropped its argument that Mr. Goldstein violated Section 1001 on release, the defense did not raise it.

Goldstein had engaged in four consecutive transactions with the Seller.[3] Unquestionably, in three, the communications showed that the cryptocurrency was sent to wallet addresses supplied by Mr. Goldstein but owned by third parties. That fact seriously undermines the inference that because Mr. Goldstein supplied the 935B address wallet to the Seller, he therefore owned that wallet. The government was obligated to provide those communications to the Court, but did not. *See* Opening Br. 12-14.

In its opposition, the government discusses only the first transaction. It asserts that the better reading of those communications is that the cryptocurrency was being sent to Defendant. Opp. 10-11. The messages withheld by the government show that is not correct. *See* Opening Br. 11, 13 (whereas Defendant originally said that the cryptocurrency would be sent to him, he subsequently said it would be sent "to ▓▓▓ and the Seller would send it "for him"). But even if those messages could be read both ways, the government still had to provide them to the Magistrate Judge to decide for himself. Instead, it impermissibly adopted its preferred reading, then withheld the evidence supporting the contrary view.

The defense's Opening Brief identified two other important misrepresentations that the government used to buttress the weakness of the Imprisonment Motion: (1) that Defendant supposedly "switched" from an earlier Coinbase wallet, while withholding that none of those funds went to either the 935B wallet or 54E3 wallet; and (2) that witness testimony established that Defendant had used an "unhosted" wallet, while withholding that it was *not* the 935B wallet or 54E3 wallet. Opening Br. 17. The government does not defend its decision to withhold that vital context from the Magistrate Judge.

---

[3] This individual identified himself as a "fixer," Opp. 9 n.4, with respect to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ That has nothing to do with the issues here.

6

*Second*, the government says that the recent $2 million transfer out of the 935B wallet shows "only . . . that someone other than [Mr. Goldstein] accessed that wallet while he was detained." Opp. 12. It is unclear what the government means by this sentence. The fact that "someone other than" Mr. Goldstein made a $2 million transfer out of the 935B wallet of course shows that "someone other than" Mr. Goldstein *owns that wallet*. As explained in the declaration of cryptocurrency expert Jason Trager, a transfer out of a cryptocurrency wallet requires the use of a private key, which is held only by the owner. ECF No. 81-1, ¶ 15. And ownership of the wallets is the only factual basis for the Monitoring Condition.

Perhaps the government means to suggest — although it cannot quite bring itself to say so directly — that Mr. Goldstein might *share* ownership of the wallet with the person who made the $2 million transfer while Mr. Goldstein was incarcerated. Of course, that was not the basis for the government's *ex parte* detention motion and the Magistrate Judge made no such findings. But in any event, as Mr. Trager explained in his declaration, "shared ownership of cryptocurrency wallets is strongly disfavored and very uncommon." *Id.* ¶ 26. And in the rare circumstances where a wallet is co-owned, there are public indicia of co-ownership not present here. *Id.* ¶¶ 29-30. The government does not even attempt to respond to any of these points.

*Third*, the government says that the messages between Mr. Goldstein and the third parties show "only that he needed someone else to provide the public address" for the wallets. Opp. at 12. Again, the government's meaning is unclear. The fact that Mr. Goldstein "needed someone else to provide the public address" of the wallets shows that he does not own the wallets — otherwise he would know the public address himself. And the government does not respond to the point that these messages also show Mr. Goldstein asking third parties to verify transfers into the wallets, which would be unnecessary if he owned (or even co-owned) the wallets.

7

*Fourth*, the government continues to argue that "the timing of recent transfers suggests that one or more of the transfers may have been done by or at the direction of" Mr. Goldstein. Opp. at 13. (The government presumably does not include the recent transfer that occurred while Mr. Goldstein was incarcerated.) Thus, the government points out that the 935B wallet was empty at the time of the Indictment, but then later was funded with millions of dollars, noting that funds were transferred out of the wallet shortly after the government filed its motion to strike Mr. Goldstein's motion concerning the Hawthorne Street property. (The government similarly notes that a small amount of funds were transferred into the 54E3 wallet and a fraction of the wallet's contents were transferred out on the day Mr. Goldstein filed his *pro se* motion.) But the government has *never* explained how the use of the wallets when Mr. Goldstein was appealing the property substitution order suggests that he owns the wallets. What was he attempting to accomplish? Why would he add money to the wallets rather than emptying them? Why would he withdraw much less than the full balance of the wallets? The government has no answers.

But again, it does not matter. The inference the government sought to draw is undermined by the fact that, as explained by Mr. Trager, the 935B wallet *repeatedly* went through indistinguishable periods in which it was empty, then funded. ECF No. 81-1, ¶¶ 32-33. Yet the government withheld that fact in its *ex parte* detention motion, intentionally giving the Magistrate Judge the misimpression that the activity in the wallet was highly unusual. *See* Opening Br. 15-17. The government makes no attempt to address that history in its opposition.

*Finally*, recognizing that it can no longer defend the basis for the Monitoring Order, the government makes a new argument about the 935B and 54E3 wallets. The government now says that the fact that Mr. Goldstein made payments to the third parties who own these wallets "reinforces his risk of flight" because it shows his "connection to individuals — possibly abroad

8

— who have controlled tens of millions of dollars in cryptocurrency through an unhosted wallet." Opp. 12; *see also id.* at 14 (alleging that Mr. Goldstein "previously coordinated with gambling and possibly foreign contacts regarding transfers into the wallet"). This is more nonsense. The only "connection" between Mr. Goldstein and the individuals who own these wallets is that he owed them money, and paid the money he owed them into their cryptocurrency wallets at their request. The government makes no attempt to explain how these transactions present a risk of flight. As Mr. Trager explains in his declaration, a cryptocurrency wallet is like a bank account. The fact that Person A might pay a debt owed to Person B by transferring money to a bank account owned by Person B that already contained a large sum of money does not make Person A a flight risk. And in any event, the government knew about those transactions at the time of Mr. Goldstein's initial appearance, but did not raise them with the Magistrate Judge or request any additional release condition based on them.

II.     **THE GOVERNMENT'S NEWLY ASSERTED BASES FOR THE MONITORING CONDITION LACK MERIT.**

Unable to rely on its prior assertions that Mr. Goldstein owns the 935B and 54E3 wallets, the government now principally argues that the Monitoring Condition is justified by Mr. Goldstein's prior use of cryptocurrency. Opp. 7-10. However, all that information was known to the government at the time of Mr. Goldstein's initial appearance, and yet the government did not see the need to bring any of it to the Magistrate Judge's attention, let alone request a release condition based on it. For that reason, the Magistrate Judge's order imposing the Monitoring Condition only cited these allegations in passing and did not principally rely on them. In any event, the government's allegations regarding Mr. Goldstein's historical use of cryptocurrency do not remotely justify the Monitoring Condition.

9

*First*, the government says that Mr. Goldstein's "criminal conduct involved significant use of cryptocurrency, which he also concealed from the Government." Opp. 7. This is a wild overstatement. The charges in the Indictment amount to the allegation that Mr. Goldstein failed to check a box on his tax returns *prior to 2022* acknowledging that he used at least one dollar in cryptocurrency. Those allegations say nothing about the issues directly relevant to this appeal: Did Mr. Goldstein violate his release conditions by using cryptocurrency and does he currently have control over significant amounts of cryptocurrency. And characterizing the Indictment as charging Mr. Goldstein "with concealing millions of dollars in cryptocurrency transactions from the IRS," Opp. 7, is wildly inaccurate. Contrary to the government's suggestion, Mr. Goldstein was not required to disclose *any* particular cryptocurrency wallet or transaction in filing his taxes. And the government does not allege that Mr. Goldstein used cryptocurrency to commit any crime, a fact that distinguishes this case from those cited by the government in which the courts have imposed stringent release conditions based on cryptocurrency. Opp. 23-24.

*Second*, as explained in the supplemental declaration of cryptocurrency expert Jason Trager (attached herein as Exhibit A), the government's attempts to make Mr. Goldstein's prior use of cryptocurrency appear nefarious are highly misleading. Thus, the government suggests that Mr. Goldstein attempted to hide his prior cryptocurrency transactions using Binance, "a foreign-based cryptocurrency platform that prohibited U.S. residents from maintaining accounts." Opp. 8. In fact, as Mr. Trager explains, Binance is the most utilized cryptocurrency exchange in the world, and it provides significant benefits to users that have nothing to do with criminal activity. Trager Supp. Decl. ¶¶ 12-15. The government suggests that there was something improper about Mr. Goldstein's use of a VPN to access Binance, but in fact Binance expressly encourages U.S. customers to access the platform through a VPN. *Id.* ¶ 14. As Mr.

Trager explains, as a general matter VPN usage is not suspect and in fact is encouraged by the U.S. government. *Id*. ¶¶ 7-8. Finally, the government suggests that Mr. Goldstein's use of unhosted wallets is suspicious, but cryptocurrency and cybersecurity professionals frequently *recommend* the use of unhosted wallets for security reasons. *Id.* ¶¶ 19-20.

*Third*, the government cites Mr. Goldstein's alleged historical use of three other cryptocurrency wallets: the 34DF wallet, the 0524 wallet, and the B351 wallet. Again, the government knew about all of these wallets at the time of Mr. Goldstein's initial appearance. The government does not allege recent transactions in these wallets. The 34DF wallet has been inactive since December 2022, and the 34DF and B351 wallets have been inactive since 2024. The government does not allege that Mr. Goldstein has attempted to use these wallets while on release — indeed, the government has no evidence to dispute Mr. Goldstein's assertion that he no longer controls them.[4] And in any event, those two wallets contain about $22,000 *combined*, Trager Supp. Decl. ¶¶ 27-28, not nearly enough to pose a flight risk.[5]

In imposing the Monitoring Condition, the Magistrate Judge appeared to rely on the proposition that it was possible that those wallets contained millions or even hundreds of millions of dollars. Release Hrg. Tr. 33:10-15 ("I just have no idea of what Mr. Goldstein's financial worth is. It could be zero, it could be negative, it could be hundreds of millions. I just don't know, and I have no way to know that."); Release Order 6 ("Given Mr. Goldstein's extensive past use of cryptocurrency, the Court finds it likely that Mr. Goldstein has access to funds that have yet to be identified, and which he might use to flee from prosecution in this

---

[4] Mr. Goldstein correctly did not disclose these two wallets to Pretrial Services, Opp. 10, precisely because he does not own or control them.
[5] The government itself admits that the B351 wallet currently contains only about $15,000 worth of cryptocurrency and that at the time of the arguments before the Magistrate Judge, the 34DF wallet contained only approximately $2,150 of cryptocurrency. Opp. 8, 10.

11

case."). That was a critical finding, because again it meant that Mr. Goldstein might have access to massive assets that he could use to flee. But it was simply wrong. As explained by the defense expert, the amount contained in any cryptocurrency wallet is a matter of public record. ECF No. 81-1, ¶ 12. And in any event, Mr. Goldstein has now disclosed all financial records to Pretrial Services as a condition of his release.

Like the Magistrate Judge, the government essentially throws up its hands, suggesting that it is impossible to know whether Mr. Goldstein has access to significant amounts of cryptocurrency, so the Court should simply assume that he does. That is wrong, both factually and legally. The government goes on at great length and detail about Mr. Goldstein's historical use of crypto wallets — how much they held, what they were used to purchase, and where those funds have gone. The government's visibility into Mr. Goldstein's finances after years of scrutiny is exceptional. The result is that the government identified three dormant cryptocurrency wallets that contain approximately $22,000. The very fact that it is able to provide so much exceptional detail about Mr. Goldstein's past access to cryptocurrency belies its bald assertion that it is impossible for the government to know whether he has secret massive holdings now.

The government's position also inverts the burden of proof by suggesting that the defense should be required to prove that Mr. Goldstein *does not* have access to cryptocurrency, which is impossible for him to do. A finding that the government has satisfied its burden based on this proposed assumption would upend the law and enact essentially a *per se* rule requiring intrusive computer monitoring conditions in any case where the defendant has ever held cryptocurrency.[6]

---

[6] The prosecution similarly errs in its sweeping scary references to "encrypted messaging platforms." *E.g.*, Opp. 26. Almost every messaging tool — including the basic messaging tool on every iPhone, iMessage — is encrypted. The federal government encourages "all audiences" to use end-to-end encrypted messaging applications to protect sensitive information. Trager Suppl. Decl. ¶ 10. Indeed, the government has recently announced its strong support for Apple's

12

### III.  THE MONITORING CONDITION IS UNWARRANTED.

In light of "suspicio[ns]" that Mr. Goldstein had used cryptocurrency accounts in violation of his release conditions, the Magistrate Judge avowedly imposed the Monitoring Condition as part of an effort to make it "as difficult as I can" for Mr. Goldstein to flee. Release Hrg. Tr. 33:16-19. As explained in the defense opening brief, this was legal error. The Court may impose only "the least restrictive . . . combination of conditions" that will reasonably assure the defendant's appearance. 18 U.S.C. § 3142(c)(1)(B).

Applying the correct legal standard, the Monitoring Condition is not remotely warranted. The only new allegations proffered by the government regarding Mr. Goldstein's release conditions since his initial appearance are the recent transactions in the 935B and 54E3 cryptocurrency wallets. As explained above, the evidence overwhelmingly shows that Mr. Goldstein is not the owner of those wallets. With its original argument in tatters, the government now suggests that the Monitoring Condition is necessary because Mr. Goldstein used cryptocurrency in the past and allegedly failed to check a box on his tax returns. As discussed above, all of that was well known to the government at the time of the initial appearance and the government's description of these allegations is wildly overstated.

But in any event, those allegations do not support the Monitoring Condition. Mr. Goldstein is subject to a host of other release conditions, including new conditions imposed by the Magistrate Judge on February 13 that Mr. Goldstein does not challenge. Mr. Goldstein has surrendered his passport and his travel outside the DMV region is subject to the approval of

---

resistance to foreign governmental efforts to directly review encrypted messages. *See Apple Appeals to Overturn UK Government's 'Back Door' Order, FT Reports*, Reuters (Mar. 4, 2025), https://www.reuters.com/technology/apple-appeals-overturn-uk-governments-back-door-order-financial-times-reports-2025-03-04. The government in this case is relying on countless messages sent on such platforms, which it secured with no unusual difficulty through subpoenas to the participants.

13

Pretrial Services. He is prohibited from opening any new accounts without Pretrial approval. He is required to disclose all financial records to Pretrial. He is not permitted to use cryptocurrency.

In light of all these conditions, there is just no basis for the government's assertion that the Monitoring Condition is also necessary to reasonably assure Mr. Goldstein's appearance. Mr. Goldstein is a well-known and respected member of the Bar who has spent several years engaging with the government on these allegations. When Mr. Goldstein was indicted, he remained in the jurisdiction and voluntarily surrendered days later without the government seeking his arrest. In light of all this, it is just not credible to say that nothing less restrictive than the Monitoring Condition will assure Mr. Goldstein's appearance.

That is particularly true in light of the extreme burdens imposed by the Monitoring Condition. In addition to unnecessarily limiting Mr. Goldstein's access to electronic devices — making it impossible for him to use his laptop at all, because he is permitted only two devices — the Monitoring Condition also risks disclosing an array of attorney-client privileged information. That is especially true because this case of course involves allegations about cryptocurrency — not least through the litigation of this very motion.

Pretrial Services has advised the defense that the Monitoring Condition would allow Pretrial Services to view communications between Mr. Goldstein and his counsel that include the word "cryptocurrency." That concern will continue to arise indefinitely, given the Indictment's allegations that Defendant did not mark on his taxes the acknowledgment that he had used cryptocurrency. Further, the monitoring may extend *far* more broadly, as Pretrial Services understandably does not disclose its scope, to avoid evasion by those under its supervision.

The government's response that this is not a "legitimate concern," Opp. 29, because Pretrial Services is an arm of the federal judiciary, is simply wrong. Any forced disclosure of

14

privileged secrets to any third party is a serious concern. Moreover, any time Pretrial Services became concerned about "apparent violations of the condition[s]," Opp. 29, it would presumably be obligated to provide material to the government, essentially leaving to Pretrial the determination whether to disclose privileged defense communications to the prosecution.

Moreover, the very fact that Defendant's devices are being broadly monitored inevitably raises privacy and privilege concerns for anyone else who would seek legal advice from Defendant. *See* Opening Br. 25. The government again incorrectly asserts that disclosures to Pretrial Services do not matter. Opp. 29. But this problem is broader. Third parties are unfamiliar with the details of how the Monitoring Condition operates. So it is inevitable that they will seriously hesitate to consult with Defendant on legal questions — whether for a fee or *pro bono*.

The government's final argument is essentially that "it could be worse," because the Court could forbid Defendant from using electronic devices at all. Opp. 30. That simply reflects the government's mistaken view that the statute authorizes the Court to impose the most — as opposed to the *least* — restrictive conditions possible.[7]

---

[7] Two other matters will be addressed in separate submissions. First, relying on grand jury testimony, the government has alleged that Mr. Goldstein sought to bribe his assistant using Bitcoin, relying on grand jury testimony. Opp. 15-18; Release Opp. 8-9. That is the subject of Defendant's parallel Emergency Motion to Compel. Second, the defense has recently learned that the serious misrepresentations addressed in this proceeding are part of a broader pattern of the government making false statements to the Court. Those falsehoods will be addressed by the defense's forthcoming motion for an evidentiary hearing.

                    Respectfully submitted,

                    <u>/s/ *Jonathan I. Kravis*</u>
                    _____

Jonathan I. Kravis (*pro hac vice*)
Stephany Reaves (Bar No. 19658)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500E
Washington, DC 20001
(202) 220-1100
Jonathan.Kravis@mto.com
Stephany.Reaves@mto.com

Adeel Mohammadi (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
Adeel.Mohammadi@mto.com

*Attorneys for Defendant Thomas Goldstein*

Dated: March 10, 2025