IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION


UNITED STATES OF AMERICA,     *

       *

     Plaintiff,     *

       *

    v.     *     CRIMINAL NO. LKG-25-6

       *

THOMAS C. GOLDSTEIN,     *

       *

     Defendant.     *

       *


**DEFENDANT THOMAS C. GOLDSTEIN'S
<u>MOTION TO COMPEL</u>
<u>DISCLOSURE OF *BRADY* & GRAND JURY MATERIALS</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...........................................................................................................1

FACTUAL & PROCEDURAL BACKGROUND .......................................................2

ARGUMENT ...............................................................................................................5

    I.     THE COURT SHOULD COMPEL THE PRODUCTION OF WITNESS TRANSCRIPTS AND INTERVIEW REPORTS BECAUSE THE GOVERNMENT'S SUMMARIES ARE INSUFFICIENT TO MEET ITS *BRADY* OBLIGATIONS. ....................................................................................5

    II.    THE COURT SHOULD COMPEL DISCLOSURE OF THE GRAND JURY TRANSCRIPTS BECAUSE MR. GOLDSTEIN CAN SHOW A PARTICULARIZED NEED...............................................................................10

        A.    The Government should be compelled to disclose grand jury materials demonstrating that it improperly instructed the grand jury. ...................................................................................................11

        B.    The Court should compel the government to disclose any summaries of transcripts that it presented to the grand jury. .......................................14

        C.    The defense has a particularized need for evidence that would support a motion to dismiss the Indictment. ..............................................15

    III.    WHETHER UNDER *BRADY* OR RULE 6(E), THE COURT SHOULD COMPEL DISCLOSURE OF EXCULPATORY INFORMATION NOW.........16

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Brady v. Maryland*,
    373 U.S. 83 (1963)................................................................5

*Douglas Oil Co. v. Petrol Stops Northwest*,
    441 U.S. 211 (1979)................................................11, 17, 18

*In re Grand Jury Proceedings,*
    *GJ–76–4 & GJ–75–3*, 800 F.2d 1293 (4th Cir. 1986).....................10, 11

*Monroe v. Angelone*,
    323 F.3d 286 (4th Cir. 2003) .........................................6

*United States v. Abdallah*,
    911 F.3d 201 (4th Cir. 2018) .........................................5

*United States v. Alter*,
    482 F.2d 1016 (9th Cir. 1973) .......................................14

*United States v. Bravo-Fernandez*,
    239 F. Supp. 3d 411 (D.P.R. 2017)...................................12

*United States v. Caro*,
    597 F.3d 608 (4th Cir. 2010) .........................................5

*United States v. Cote*,
    929 F. Supp. 364 (D. Or. 1996) .....................................12

*United States v. Diaz,*
    236 F.R.D. 470 (N.D. Cal. 2006).....................................14

*United States v. FedEx Corp.*,
    No. 14-380, 2016 U.S. Dist. LEXIS 6155 (N.D. Cal. Jan. 19, 2016).....................11

*United States v. John Doe., Inc. I*,
    481 U.S. 102 (1987)................................................11

*United States v. Kilpatrick*,
    575 F. Supp. 325 (D. Colo. 1983)...................................15

*United States v. King*,
    628 F.3d 693 (4th Cir. 2011) .....................................5, 6

*United States v. Mahoney*,
    495 F. Supp. 1270 (E.D. Pa. 1980) ................................14, 16

*United States v. Martinez,*
  2021 WL 1784614 (E.D. Va. May 5, 2021) ...................................................5

*United States v. McGowan,*
  423 F.2d 413 (4th Cir. 1970) .....................................................................17

*United States v. Naegele,*
  474 F. Supp. 2d 9 (D.D.C. Jan. 30, 2007)...............................................15

*United States v. Park,*
  319 F. Supp. 2d 1177 (D. Guam 2004).......................................................7

*United States v. Sells Engineering, Inc.,*
  463 U.S. 418 (1983)..................................................................................11

*United States v. Stevens,*
  771 F. Supp. 2d 556 (D. Md. 2011) ..........................................................11

*United States v. Way,*
  No. 1:14-CR-00101-DAD-BAM, 2015 WL 8780540 (E.D. Cal. Dec. 15,
  2015) ..........................................................................................................15

*United States v. West,*
  2008 WL 11417413 (E.D. Mo. May 28, 2008) .........................................15

*United States v. Woody's Trucking, LLC,*
  No. CR 17-138-BLG-SPW, 2018 WL 457781 (D. Mont. Jan. 17, 2018) ............14

**FEDERAL STATUTES**

18 U.S.C. § 3292 ...............................................................................................3

18 U.S.C. § 3500 .............................................................................................18

26 U.S.C. § 6041A(a) & (e)............................................................................13

**STATE RULES**

Rule 5(f).......................................................................................................2, 17

Rule 6(e)...............................................................................................10, 14, 16

**RULES - OTHER**

Fed. R. Crim. P. 6 ...............................................................................10, 13, 18

Fed. R. Crim. P. 6(e)(3)(E)(i), (ii)..............................................................10, 12

**FEDERAL REGULATIONS**

26 C.F.R. 1.6045-5(a)(1)................................................................................................13

<u>**INTRODUCTION**</u>

Despite repeated defense requests, the government continues to withhold critical exculpatory material that the defense needs to prepare for trial.  The government's disclosures to date make clear that numerous witnesses made statements favorable to the defense in grand jury testimony and witness interviews.  Rather than disclose the underlying transcripts and interview reports, however, the government has (with a few exceptions) chosen instead to provide the defense with inadequate summaries of these witness statements.  These summaries lack both the context and detail necessary to meaningfully assist the defense.  Whatever the merits of this approach in other cases, the use of summaries in this case does not meet the government's *Brady* obligations.  The case is simply too complex, and the exculpatory witness statements too numerous and critical for the government to rely on summaries alone.  And the government has articulated no justification for its decision to withhold these critical witness transcripts and interview reports when the government will have to produce them eventually anyway as Jencks material.

Separately, the government has also failed to produce the instructions, and any summaries of testimony, that it provided to the grand jury that returned an indictment against defendant Thomas Goldstein, along with clerical materials about the actions of the grand jury.  The charges in the indictment rest on convoluted legal theories and glaring factual omissions which suggest that the government improperly instructed the grand jury on the law, and potentially misled the grand jury on the state of the evidence presented to prior grand juries.  Mr. Goldstein has a particularized need for these transcripts to support a motion to dismiss the indictment based on legally erroneous grand jury instructions.

Finally, Mr. Goldstein has a good faith basis to believe that the government asked numerous witnesses about irrelevant, intimate information—for no other purpose than to prejudice

the grand jury against him. Because misconduct in the grand jury can be a basis to dismiss the indictment, the Court should also order disclosure of the relevant transcripts. In support of this motion, counsel states:

## FACTUAL & PROCEDURAL BACKGROUND

On January 16, 2025, the grand jury returned an Indictment charging Mr. Goldstein with offenses principally relating to federal income taxes for the 2016-2021 tax years. ECF No. 1. Mr. Goldstein was arraigned and pleaded not guilty to all charges on January 27, 2025. ECF No. 4. That same day, the Court ordered the government "to produce in a timely manner all exculpatory evidence to the defendant." ECF No. 5 (Jan. 27, 2025, Rule 5(f) Order.)

As discussed in other defense motions, *see* Motion to Dismiss Allegation Concerning Employees; Motion to Invalidate Section 3292 Orders; Motion to Dismiss for Failure to Allege Affirmative Act; Motion to Dismiss Counts 15-19; and Motion for a Bill of Particulars, many of the allegations in the Indictment rest on novel and implausible legal theories. As a result, on February 17, 2025, the defense sent the government a discovery letter requesting specific information concerning the allegations in the Indictment. *See* Exhibit A. Among the categories of information requested in the defense discovery letter were witness statements and testimony concerning the following topics.

**Employee work.** The Indictment alleges that Mr. Goldstein committed the crime of tax evasion because four particular employees of his law firm Goldstein & Russell did not perform sufficient work. In particular, the Indictment alleges that (a) these employees performed "little to no work" and therefore did not qualify as "bona fide" employees of the firm; (b) it was legally improper for the firm to deduct all or part of the salaries and health insurance premiums of these employees as business expenses; and (c) Mr. Goldstein caused the firm to deduct the expenses

anyway with the intent to violate tax laws. As discussed in the defense motion to dismiss these allegations, either this novel theory of evasion by underemployment is not a crime under the tax evasion statute or the statue is unconstitutionally vague as applied to this case. And as discussed in the defense motion to strike orders tolling the statute of limitations under 18 U.S.C. § 3292, this theory is also inconsistent with the contemporaneous evidence showing that three of these employees did perform actual work for the firm, while the fourth went on unpaid medical leave very shortly after her start date with the permission of the firm's benefits manager.

**Redirected income.** The Indictment alleges that Mr. Goldstein committed the crime of tax evasion when three payments for work performed by his law firm were redirected to sources other than the firm's bank account. As discussed in the Section 3292 motion, this theory too is highly implausible in light of the legal obligation of these payors to disclose payments to the firm in Forms 1099-NEC that are filed with the IRS and sent to the firm. Shockingly, the firm's accountants appear not to have understood this legal obligation. As one of them (wrongly) advised a firm office manager, payors that were "companies don't need to issue 1099s to G&R for services," and that 1099s received by the law firm were sent "by mistake" so the accountants "don't keep them." ECF No. 112-1, at 15.

**Mischaracterized transactions.** The Indictment alleges that Mr. Goldstein caused the firm to mischaracterize eight payments between 2016 and 2019. This allegation too is highly implausible. It was the firm office managers, not Mr. Goldstein, who communicated with the firm's accountants about the characterization of firm expenditures. The Indictment does not allege that Mr. Goldstein affirmatively instructed the firm office managers to tell the accountants to mischaracterize the transactions at issue. And the eight transactions identified in the Indictment

3

were cherrypicked from numerous firm expenditures that Mr. Goldstein expressly instructed the office managers to characterize as personal.

On March 11, 2025, the defense wrote the government to specifically request grand jury transcripts in support of anticipated motions. *See* Exhibit B. On March 17, 2025 in response, the government "decline[d] to produce . . . the grand jury transcripts." *See* Exhibit C. The government then failed to respond to the February 17, 2025 letter for over eleven weeks. Instead, the government sent the defense letters purporting to summarize favorable information provided by witnesses in interviews and grand jury testimony. Those letters are attached under seal as Exhibits D-F, H. The letters purport to summarize favorable information disclosed by 33 different witnesses, including all four of the employees, five office managers, and all of the payors of the allegedly mischaracterized payments. The fourth letter attached the witness statements and grand jury transcripts of employees of the accounting firm that prepared the tax returns at issue.

On April 16 and April 30, 2025, the defense sent the government discovery letters explaining the deficiencies in the government's purported *Brady* disclosures. *See* Exhibits G, I. The letter explained the inadequacy of providing summaries in lieu of actual statements—that providing bulleted information, lacking timing and context, through the government's lens is not sufficient for the defense to make meaningful use of the information. The defense provided specific examples, reiterated below, of the questions the government's disclosures raised, which would have been avoided by simply disclosing the statements themselves. And that is setting aside the fact that the *Brady* disclosures could have come months sooner had the government not chosen to filter information through its tangled summaries. In response on May 1 and May 8, 2025, the government responded that it "will not disclose" the requested statements because, it believes, it does not have to. *See* Exhibits J, K. On May 9, 2025, the government finally responded to the

defense's February 17, 2025 letter, reaffirming that it would not disclose the requested materials. *See* Exhibit L. The defense responded again, on May 12, 2025, reiterating Mr. Goldstein's request for all exculpatory material. *See* Exhibit M. As of the time of this filing, the government has not produced the requested documents.

## ARGUMENT

**I.** **THE COURT SHOULD COMPEL THE PRODUCTION OF WITNESS TRANSCRIPTS AND INTERVIEW REPORTS BECAUSE THE GOVERNMENT'S SUMMARIES ARE INSUFFICIENT TO MEET ITS *BRADY* OBLIGATIONS.**

Under *Brady v. Maryland*, the government has an obligation to disclose "evidence favorable to an accused" when "the evidence is material either to guilt or to punishment." *United States v. Caro*, 597 F.3d 608, 619 (4th Cir. 2010) (quoting *Brady*, 373 U.S. 83, 87 (1963)). Favorable evidence is "material" if there is a reasonable probability that it would change the outcome of the proceeding. *Id.* The government's *Brady* obligations include exculpatory statements made by witnesses before the grand jury and in law enforcement interviews. *See, e.g.*, *United States v. Martinez*, 2021 WL 1784614, *16 (E.D. Va. May 5, 2021) (concluding that grand jury transcripts constituted *Brady* material).

As the Fourth Circuit has held, the government has a *Brady* obligation to disclose witness testimony based on a defendant's "plausible showing" that exculpatory material exists. *United States v. King*, 628 F.3d 693, 702-04 (4th Cir. 2011); *see also United States v. Abdallah*, 911 F.3d 201, 217-219 (4th Cir. 2018) (reversing conviction where defendant made showing that documents "plausibly contained materially favorable evidence" yet the district court neither compelled disclosure nor reviewed *in camera*). In *King*, the Fourth Circuit reversed a criminal defendant's conviction due to the government's failure to disclose exculpatory grand jury testimony in advance of trial. Notably, the government refused to produce a potential witness's testimony and rebuffed

the district court's suggestion to disclose the testimony "out of an abundance of precaution," trusting its own judgment that the grand jury testimony "contained no exculpatory information." 628 F.3d at 698. The defendant was later convicted at trial without having any opportunity to review the transcript, and without the district court conducting *in camera* review. *Id*. at 698, 702.

On appeal, the Fourth Circuit recognized that a *Brady* claim typically requires a defendant to demonstrate (1) "the existence of evidence favorable to the accused"; (2) "that the government suppressed the evidence" and (3) "that the suppression was material." *Id*. at 701 (citing *Monroe v. Angelone*, 323 F.3d 286, 299 (4th Cir. 2003)). But the Court of Appeals also recognized a problem created entirely by the government: "a defendant cannot demonstrate that suppressed evidence would have changed the trial's outcome if the Government prevents him from ever seeing that evidence." *Id*. at 702. Concluding that the district court had erred in suggesting, but not compelling, disclosure, the Fourth Circuit explained that in this circumstance, "a defendant need only 'make some plausible showing' that exculpatory material exists." *Id*. at 703 (citation and internal quotation marks omitted). Such a showing was sufficient to, at a minimum, trigger *in camera* review to ensure the transcripts were not exculpatory and material. *Id*.

Here, Mr. Goldstein has more than enough support for a "plausible showing" that grand jury transcripts and witness interview memos contain exculpatory information. As set forth above, based on the theories of liability charged in the Indictment, it is very likely that numerous witnesses made exculpatory statements in interviews and in grand jury testimony. For example, any statement by one of the alleged "underemployed" firm employees, or any other witness, concerning work that the employee performed or intended to perform for the firm would be exculpatory. Similarly, any statement by the counterparties to the redirected transactions to the effect that they understood—or that they did not understand—their legal obligations concerning

the Form 1099-NEC would be exculpatory.  Any statement by the firm office managers concerning Mr. Goldstein's lack of involvement in characterizing firm expenditures, or any instance in which he instructed them to characterize a transaction as a personal expenditure, or the fact that he never instructed them to mischaracterize a transaction, would be exculpatory.  And any statement by a witness that they did not comply with the same tax requirements that Mr. Goldstein is now charged with violating would also be exculpatory.  The defense has reason to believe that numerous witnesses have made statements along these lines.  Obviously, these statements are critical to the preparation of Mr. Goldstein's defense.

Rather than disclose the grand jury transcripts and interview memos for these witnesses, the government has disclosed little more than its own limited summaries of exculpatory information—without the context or detail the defense needs to use them effectively.  Whatever its merits in other cases, this approach is plainly inadequate here.  As discussed above and in other defense motions, several of the government's theories of liability are both novel and convoluted. Those theories are also particularly dependent on the testimony of key fact witnesses, including the "underemployed" employees, the firm office managers, and the counterparties to the alleged mischaracterized transactions.  Under these circumstances, the government's efforts to summarize the exculpatory portions of the testimony of the witnesses wrenched from the context of the testimony as a whole results in confusing descriptions that fall short of the disclosures required by *Brady*.  *See United States v. Park*, 319 F. Supp. 2d 1177, 1179 (D. Guam 2004) (concluding that "[s]ummaries of conversations prepared by the government" are inadequate under *Brady* because "summaries invariably involve a process of interpretation and characterization" and because "context, emphasis, and subtle distinctions may not be precisely captured by summaries").

A few examples illustrate why the government's summaries are inadequate. For instance, the government alleges that in 2018 Mr. Goldstein won almost $1,000,000 while gambling abroad, but then failed to report it as income and misrepresented its source in disclosures to IRS agents. Yet the government disclosed in a March 24, 2025 *Brady* letter that according to Employee 4, Mr. Goldstein told her that he "brought back to the United States a large amount of cash, which he told [Employee 4] he was borrowing from a friend for taxes." This statement is clearly exculpatory, as it is directly inconsistent with the government's allegation that the cash constituted poker winnings. However, the letter does not disclose *when* Mr. Goldstein made this statement to Employee 4—before or after the trip, before or after he picked up the cash, etc. Nor does the letter disclose any other details Employee 4 recalls about the conversation that would corroborate her recollection. The letter does not mention whether other persons witnessed the conversation, or whether Mr. Goldstein told her that he was borrowing the money from a friend for taxes more than once. And while the government later disclosed that Employee 4 made this statement in a text message, that resolves only one of many outstanding questions. In short, the summary includes none of the context or detail that would allow the defense to assess or use this information at trial.

As another example, a set of allegations—also dating back to 2018—consist of the confusing assertion that four people employed with Goldstein & Russell did "little or no work," and therefore Mr. Goldstein's failure to report their salaries and benefits as personal expenses misrepresented his business tax liability. Again in the government's March 24 letter, a disclosure about one of the employees, Employee 3, appears to summarize a colloquy between the government and Employee 3 regarding the amount of work she performed. Yet the summary omits the full exchange, making it impossible to evaluate this information. The summary claims that Employee 3 "initially" stated that she worked approximately 20 hours per week on average, but

8

also that she "initially" stated that on some occasions she worked 40 hours per week, and after "after further review of the documents that she produced," Employee 3 stated that she "in fact worked 10 hours per week at G&R." It is unclear whether Employee 3 retracted her earlier statements, or whether she was clarifying variances in her schedule. The summary also does not reveal the circumstance under which Employee 3 reviewed additional documents, nor whether the government asked questions in a leading manner in an attempt to elicit statements favorable to its case. Furthermore, testimony or exhibits demonstrating that the witnesses *had* performed work for the law firm, or intended to, is exculpatory.

As a final example, one set of charges in this case relate to the claim that Mr. Goldstein willfully underreported income, even though the other entities paying Mr. Goldstein—his clients— should have known they had an obligation to complete a tax form that would have been disclosed to Mr. Goldstein's accountants. The government's April 4, 2025 *Brady* letter discloses that Law Firm 2 "did not issue Forms 1099 early on to everyone." The letter further discloses that Law Firm 2 reported that "the firm started issuing Forms 1099 to everyone at the suggestion of their accounting firm." But here, again, critical context is missing. When did Law Firm 2 receive this "suggestion" from their accounting firm? When did the firm start issuing Forms 1099? What does it mean, in terms of payments to Mr. Goldstein, to say that the firm started issuing Forms 1099 "to everyone"?

The government's attempt to defend its witness statement summaries in its discovery letters only highlights the inadequacy of this approach in this particular case. The government suggests that because "the purpose of the *Brady* rule . . . is to ensure a miscarriage of justice does not occur," it need not address any of the concerns raised by the defense. *See* Exhibit J. Indeed, the government asserts that it has gone "above and beyond" by disclosing a handful of transcripts—

while withholding dozens more that the government has already admitted contain *Brady* material. The government also reiterates that *Brady* "is a trial right," contending that Mr. Goldstein's objections are "premature" because he has not yet gone to trial without the benefit of these materials. All of this, of course, ignores the reality that the parties must prepare for trial now— and the defense cannot do so without the witness statements and grand jury instructions underlying the government's convoluted allegations.

The government's reliance on acontextual summaries is particularly unwarranted here in light of the fact that, as discussed further below, the government has articulated no justification whatsoever for withholding these materials.

## II.  THE COURT SHOULD COMPEL DISCLOSURE OF THE GRAND JURY TRANSCRIPTS BECAUSE MR. GOLDSTEIN CAN SHOW A PARTICULARIZED NEED

Federal Rule of Criminal Procedure 6 codifies the traditional rule of grand jury secrecy. "The Rule, however, includes a number of exceptions under which the secrecy may be broken and disclosure made." *In re Grand Jury Proceedings, GJ–76–4 & GJ–75–3*, 800 F.2d 1293, 1298 (4th Cir. 1986). As relevant here, "[t]he court may authorize disclosure—at a time, in a manner, and subject to any other conditions that it directs—of a grand-jury matter: (i) preliminarily to or in connection with a judicial proceeding; [and] (ii) at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury[.]" Fed. R. Crim. P. 6(e)(3)(E)(i), (ii).

The Supreme Court has described the standard for disclosure as "a strong showing of particularized need," specifically, that "[1] the material they seek is needed to avoid a possible injustice in another judicial proceeding, that [2] the need for disclosure is greater than the need for continued secrecy, and that [3] their request is structured to cover only material so needed." *In re Grand Jury Proceedings*, 800 F.2d at 1298 (quoting *Douglas Oil Co. v. Petrol Stops Northwest*,

441 U.S. 211, 222 (1979); *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 443 (1983)).

Importantly, "the standard for establishing a right to disclosure under Rule 6(e) is not an excessive one but rather 'is a highly flexible one, adaptable to different circumstances and sensitive to the fact that the requirements of secrecy are greater in some situations than in others.'" *In re Grand Jury Proceedings*, 800 F.2d at 1299. District courts have "wide discretion . . . in evaluating whether disclosure is appropriate." *United States v. John Doe., Inc. I*, 481 U.S. 102, 116 (1987). Disclosure is appropriate here.

**A.**     **The Government should be compelled to disclose grand jury materials demonstrating that it improperly instructed the grand jury.**

As courts in this district have noted, in addition to its role in determining whether there is probable cause for an offense, "the grand jury serves as the protector of citizens against arbitrary and oppressive government action." *United States v. Stevens*, 771 F. Supp. 2d 556, 566 (D. Md. 2011) (citation and internal quotation marks omitted). Because of this, "where a prosecutor's legal instruction to the grand jury seriously misstates the applicable law, the indictment is subject to dismissal if the misstatement casts 'grave doubt that the decision to indict was free from the substantial influence' of the erroneous instruction." *Id.* at 567 (citation omitted). For example, in *Stevens*, the defendant moved to compel disclosure of grand jury transcripts and exculpatory information. *Id.* at 560. The court reviewed the transcripts and determined that the government had, in fact, incorrectly instructed the grand jury. *Id.* at 564. The court then dismissed the indictment, because "even in the absence of willful prosecutorial misconduct, a defendant is entitled to dismissal of an indictment where actual prejudice is established." *Id.* at 568 (alteration omitted) (citation and internal quotation marks omitted).

Courts in other jurisdictions have similarly concluded that the risk of an erroneous legal instruction justifies disclosure of grand jury transcripts, in support of an argument that there is a

defect in the indictment.  For example, courts have ordered disclosure where "defendants contend that the indictment must be dismissed because it is based on flawed instructions that 'substantially influenced the grand jury's decision to indict.'"  *United States v. Bravo-Fernandez*, 239 F. Supp. 3d 411, 415 (D.P.R. 2017) (citation omitted).  Similarly, courts have found a defendant showed a particularized need where indictment suggested the government misunderstood the law.  *United States v. FedEx Corp.*, No. 14-380, 2016 U.S. Dist. LEXIS 6155 (N.D. Cal. Jan. 19, 2016); *see also United States v. Cote*, 929 F. Supp. 364, 366 (D. Or. 1996) (finding defendant showed particularized need where the indictment failed to allege an essential element of an offense). Because a defendant will typically need access to grand jury transcripts to demonstrate this type of defect, disclosure of grand jury materials is appropriate where "a ground may exist to dismiss the indictment."  Fed. R. Crim. P. 6(e)(3)(E)(ii).  Such grounds exist here.

The defense has a good faith basis to believe that the jury was improperly, or inadequately, instructed because the grand jury returned charges for conduct that does not clearly make out an offense.  In particular, the Indictment charges Mr. Goldstein with tax evasion and related offenses because certain employees of his firm Goldstein & Russell did not (in the government's estimation) perform sufficient work.  The government's convoluted theory is that, because these employees performed "little or no work," ECF No. 1, ¶ 13, the treatment of their salaries and health insurance premiums as business expenses of the firm constituted willful tax evasion by Mr. Goldstein, to the tune of approximately $17,000.  The concept that an employer can be liable for tax evasion because their employee did "little" work, and thus according to the government did not deserve their salary, is a radical expansion of criminal law.  As such, the defense needs to understand what the government told the jury about the parameters of the law.

Similarly, the Indictment alleges three instances in which Mr. Goldstein had third parties who owed fees to his law firm distribute the money in some other way. (This was entirely legal because Mr. Goldstein was his law firm's sole owner, and there is no allegation that he misappropriated the funds.) Instead, the government alleges that those funds should have been reported as income and that Mr. Goldstein was *willful* in not doing so. But the Indictment fails to address that as a matter of law, each of the three payors was required to report any legal fees it paid in a Form 1099-NEC, 26 C.F.R. 1.6045-5(a)(1); *see also* 26 U.S.C. § 6041A(a) & (e), and that Mr. Goldstein reasonably relied on this reporting requirement to capture income from the three payors. Indeed, one of the payors even submitted a 1099-NEC, which Goldstein & Russell's accountants apparently ignored because of their erroneous belief that these were issued "by mistake." ECF No. 112-1, at 15. Given that the Indictment alleges that Mr. Goldstein was willful in not reporting these payments, the defense needs to understand what the government told the grand jury about willfulness and 1099 reporting.

Separately, the Indictment includes broad, detailed, allegations of conduct that goes far beyond what is necessary to charge criminal offenses, but omits obvious and important information that necessarily should have been part of the evidence before the grand jury. For example, the government possesses significant evidence that (1) Mr. Goldstein always directed his employees and agents to record finances and pay taxes in compliance with the law; (2) Mr. Goldstein made affirmative efforts to correctly label his income and expenses as personal or business; and (3) Mr. Goldstein reasonably expected other parties to submit tax documentation for income that the government alleges Mr. Goldstein attempted to hide. The absence of this information in the indictment raises questions not just about the testimony presented to the grand jury, but also how the government explained the *willfulness* requirement in instructing the grand jurors on probable

cause.  Transcripts of the grand jury instructions are likely to demonstrate that the government misstated the law.

Importantly, while Mr. Goldstein has articulated the particularized need above, courts have found that the secrecy protections of Rule 6 do not apply to grand jury instructions, and such instructions can be disclosed without particularized need.  For example, in *United States v. Diaz*, defendants requested "all instructions given to any grand jury that heard evidence in this matter." 236 F.R.D. 470, 477 (N.D. Cal. 2006).  The government did not even oppose the request once brought to the court, and the court "agree[d] that such instructions do not fall within the bar of Rule 6(e) because their disclosure would not reveal the substance or essence of the grand jury proceedings."  *Id*. at 477-78.  *See also United States v. Woody's Trucking, LLC*, No. CR 17-138-BLG-SPW, 2018 WL 457781, at *2 (D. Mont. Jan. 17, 2018) ("[T]he Defendants are not required to show a particularized need for instructions and charges given to the grand jury.") (citing *United States v. Alter*, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973)).  The Court should compel production of these instructions.

> ### B.    The Court should compel the government to disclose any summaries of transcripts that it presented to the grand jury.

Relatedly, disclosure is appropriate "when a showing had been made of 'substantial likelihood of gross or prejudicial irregularities in the conduct of the grand jury.'"  *United States v. Mahoney*, 495 F. Supp. 1270, 1275 n.5 (E.D. Pa. 1980).  Of particular concern are the use of "summaries" to secure an indictment, where "[t]he defendant asserts that almost all the evidence heard by the indicting grand jury consisted of summaries that did not present a fair and accurate portrayal of matters occurring before [earlier] grand jur[ies]."  *Id*. at 1273.  The use of summaries is particularly likely, and problematic, here.  The government spent over four years investigating this case, potentially presenting almost eighty civilian witnesses to the grand jury, in addition law

enforcement witnesses. Given the length of time and the number of witnesses, it is likely that multiple grand juries heard evidence on the allegations against Mr. Goldstein—including multiple allegations that the government abandoned as meritless. If the government did, in fact, use summaries to present testimony to the grand jury that indicted Mr. Goldstein, it is critical to the validity of the Indictment whether those summaries omitted pertinent, exculpatory information.

In disclosing the transcripts and summaries, Mr. Goldstein requests that the government provide the portions of those transcripts and summaries (or comparable clerical records) that would show the dates and schedule of grand jury proceedings. Again, while Mr. Goldstein has a particularized need to understand the scope of time over with a grand jury considered and indicted his case, and whether the government presented grand jurors with summaries in lieu of testimony, courts have found that a defendant "is entitled to inspection of ministerial records regarding the empaneling of grand juries." *United States v. West*, 2008 WL 11417413, at *1 (E.D. Mo. May 28, 2008). The Court should compel production.

### C. The defense has a particularized need for evidence that would support a motion to dismiss the Indictment.

Finally, Mr. Goldstein also has a good faith basis to believe that the grand jury was prejudiced and biased by the government's focus on irrelevant, intrusive information—such as information about Mr. Goldstein's personal relationships, social activities, and intimate partners. Courts have ordered disclosure when the defense presents a credible concern about "possible misconduct" or the "misleading nature" of a presentation to the grand jury. *United States v. Naegele*, 474 F. Supp. 2d 9, 12 (D.D.C. Jan. 30, 2007); *see also United States v. Way*, No. 1:14-CR-00101-DAD-BAM, 2015 WL 8780540, at *3 (E.D. Cal. Dec. 15, 2015) ("Particularized need is more often shown where the defendant becomes aware of specific facts suggesting severe misconduct that jeopardized the independence of the grand jury."); *United States v. Kilpatrick*, 575

F. Supp. 325, 339 (D. Colo. 1983) (ordering disclosure of grand jury transcript after a sufficient showing of prosecutorial misconduct); *United States v. Mahoney*, 495 F. Supp. 1270, 1273, 1277 (E.D. Pa. 1980) (ordering disclosure of grand jury transcript where defendant alleged prosecutorial misconduct in grand jury necessitated dismissal).

Here, the government's disclosure letters strongly suggest that witnesses were questioned before the grand jury about sensitive personal matters that have nothing to do with the charges in the Indictment, including Mr. Goldstein's sexual habits and preferences. Questioning on these topics would serve no purpose other than to bias the grand jury against Mr. Goldstein, and would merit dismissal. The Court should order the government to produce any grand jury transcripts referencing such sensitive personal topics so that the defense can assess the scope of any questioning on these topics and the extent to which the questioning prejudiced the grand jury.

## III.     WHETHER UNDER *BRADY* OR RULE 6(E), THE COURT SHOULD COMPEL DISCLOSURE OF EXCULPATORY INFORMATION NOW

The government's refusal to produce the grand jury transcripts and other exculpatory materials now threatens to delay the start of trial. The government's disclosure letters strongly suggest that the government presented evidence to the grand jury on numerous topics that have no bearing on the charges in this case. The letters show that the government elicited testimony concerning prurient details of Mr. Goldstein's personal life. And the letters show that the government pursued theories of liability that it was unable to substantiate through criminal charges. Once the defense confirms the full range of these prejudicial, irrelevant topics that were explored before the grand jury, the defense intends to file motions before the start of trial to preclude the government from raising them before the jury.

The disclosure letters also suggest that the government intends to call numerous fact witnesses at trial, and review of the grand jury testimony and other Jencks material of those

witnesses will be critical to defense trial preparation. Emphasizing that the *Brady* right is a "trial right," the government's recent discovery letters suggest that it intends to produce this material on December 29, 2025, two weeks before the start of trial and in the middle of the winter holidays. Given the expected volume of the transcripts, and the need to investigate any new information revealed by the transcripts, the defense will not have sufficient time to file the necessary pretrial motions and prepare to examine trial witnesses.

The government has articulated no basis for risking a postponement of the trial date on this basis, despite the Court's warning that "[f]ailure to adhere to [the *Brady*] requirement in a timely manner may result in serious consequences, including, but not limited to, exclusion of evidence, adverse jury instructions, dismissal of charges, contempt proceedings, vacating a conviction, or disciplinary action against the prosecution." ECF No. 5 (Jan. 27, 2025, Rule 5(f) Order.) To avoid derailing the trial schedule, or compromising Mr. Goldstein's due process rights, the defense needs disclosure now.

Under a grand jury analysis, the government likewise must disclose. In *Douglas Oil,* 441 U.S. at 218-19, the Supreme Court outlined the traditional justifications for the secrecy of grand jury proceedings, most of which relate to pre-indictment concerns that do not apply here. There should be no concern that "prospective witnesses would be hesitant to come forward" or that witnesses "would be less likely to testify fully and frankly" in a case where the testimony is already complete. *Id*. at 219. Similarly, in a case whether the defendant is the target of the investigation— and has already been arraigned—there is no risk of disclosing the grand jury's actions to an unknowing suspect, nor of embarrassing an individual who the grand jury had decided not to charge. *See id*. Indeed, "after the grand jury's functions are ended, disclosure is wholly proper where the ends of justice require it." *United States v. McGowan*, 423 F.2d 413, 418 (4th Cir. 1970)

(citation omitted). Grand jury testimony is routinely "made available to [defendants]" in criminal cases, and the need to "impeach a witness, to refresh his recollection, [and] to test his credibility" establish the "particularized need" required for disclosure, per se. *Id.* (citation omitted); *see also* 18 U.S.C. § 3500 (requiring the government to produce "any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified").

Here, the government has not even attempted to argue that any of the purposes of grand jury secrecy are served by withholding the grand jury transcripts at issue here. Nor could it. There is no risk of impacting a sitting grand jury, because the testimony, summaries, and instructions requested are from a grand jury that has already returned an indictment. There is no risk to witnesses, as the government has already disclosed a list of almost eighty witnesses to the defense and has never suggested, nor could it, that any security risk exists in providing the transcripts to defense counsel. There is no risk to other potential defendants because Mr. Goldstein was the target of the investigation. Instead, the government's only reason for withholding these materials is to gain a tactical advantage over the defense in trial preparation. That is not the purpose of Rule 6. "[A]s the considerations justifying secrecy become less relevant, a party asserting a need for grand jury [material] will have a lesser burden in showing justification." *Douglas Oil,* 441 U.S. at 223. The government has not articulated any outstanding reason for secrecy, and Mr. Goldstein easily meets the burden for disclosure.

* * *

For these reasons, and based on any additional evidence and argument before the Court for a hearing on this motion, the Court should order prompt disclosure of all *Brady* materials, including grand jury transcripts, instructions, and summaries documenting the proceedings before the grand jury, and any other statements and materials from witnesses that may be favorable to the defense.

Respectfully submitted,

_/s/ Jonathan I. Kravis_
Jonathan I. Kravis (Bar No. 31556)
Stephany Reaves (Bar No. 19658)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500E
Washington, DC 20001
(202) 220-1100
Jonathan.Kravis@mto.com
Stephany.Reaves@mto.com

Adeel Mohammadi (pro hac vice)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
Adeel.Mohammadi@mto.com

_Attorneys for Defendant Thomas Goldstein_

Dated: May 16, 2025