**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. LKG-25-6** |
| | * | |
| **THOMAS C. GOLDSTEIN,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |

**\*\*\*\*\*\*\***

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S
<u>MOTION FOR BILL OF PARTICULARS</u>**

The United States of America respectfully requests that the Court deny Defendant's Motion for Bill of Particulars ("Motion"), ECF 125. The premise of the Motion—that Defendant "is unable to understand the nature of the charges against him or adequately prepare for trial" (Mot. 5)—is belied by the detailed, 50-page speaking indictment, the Government's substantial production of documents and disclosure of potentially exculpatory statements, and its good faith efforts to address Defendant's requests for clarification. Taken together, this information is more than sufficient for Defendant—an intelligent, sophisticated attorney and former business owner—to prepare for trial and avoid surprises at the trial. Under similar circumstances, courts routinely deny requests for bills of particulars. Given that Defendant already has sufficient information about the charges, the Motion is an improper attempt to "compel the government to describe in detail the manner in which the crime was committed, thereby forcing the prosecution to fix irrevocably the perimeters of its case in advance of trial." *United States v. Stroop*, 121 F.R.D. 269, 272 (E.D.N.C. 1988) (citations and quotations omitted) (denying multiple defendants' motions for bills of particulars). The Motion should be denied.

## **BACKGROUND**

On January 16, 2025, a federal grand jury returned a twenty-two count Indictment against Defendant for violations of federal tax laws and for making false statements on mortgage loan applications. ECF 1. The Indictment is 50 pages long and contains detailed allegations; it is a speaking indictment. As this Court has noted, "the Indictment is supported by, among other things, the Defendant's contemporaneous communications, documented loans that were not disclosed to mortgage lenders, bank and wire records, gambling-related memoranda authored by the Defendant, tax and accounting records and records reflecting the Defendant's spending habits during the relevant period." ECF 108 at 5. The Indictment also provides relevant statutory language and elements for all of the charges against Defendant including those implicated by the Motion.

Nonetheless, Defendant has requested a bill of particulars because he is purportedly "unable to understand the nature of the charges against him or adequately prepare for trial." Mot. 5. To assist the Court in understanding the utter implausibility of Defendant's argument, the Government will summarize the information it has provided Defendant—either through the Indictment or the Government's productions and voluntary disclosures—about the charges and evidence against him. The following discussion is organized by the categories of charges and allegations at issue in the Motion: (1) gambling income for 2016, 2019, and 2020; (2) deductions for employee salaries and health insurance; and (3) tax payment dates.

### I. **Gambling Income**

#### a. **Indictment**

The Indictment alleges copious details about Defendant's failure to report gambling income. Regarding the 2016 tax year, the Indictment alleges that Defendant failed to report

2

millions of dollars in gambling winnings on his tax return (or Form 1040). ECF 1 ¶ 36. The Indictment states that Defendant "falsely reported on his 2016 Form 1040 that his gambling winnings were $13,687,050 whereas, in truth and fact and as he knew, his gambling winnings were more than $17,500,000." ECF 1 ¶ 36. The Indictment explains that Defendant's "under-reporting of his gambling winnings resulted in [Defendant] falsely reporting on his 2016 Form 1040 that his net gambling winnings for 2016 were $2,748,350 whereas, in truth and fact, his net gambling winnings for 2016 were more than $5,000,000." ECF 1 ¶ 36.

The Indictment examines at length certain poker games in which Defendant participated in 2016, as well as Defendant's preparation for those games, the amounts Defendant won, and how Defendant was paid. *See* ECF 1 ¶¶ 25-30. For example, in describing a series of late-2016 poker games against an individual identified as "California Businessman-2," the Indictment alleges that the games "resulted in [Defendant] winning $26,435,000, which California Businessman-2 sent to [Defendant's] Gambling Account in two wire transfers in November and December 2016." ECF 1 ¶ 27. (The "Gambling Account" referenced in the Indictment is a bank account Defendant generally used to send and receive poker-related payments.) The Indictment illustrates the mechanism by which Defendant caused his gambling income to be under-reported in 2016 (and in other years): Defendant "provid[ed] false and incomplete information to [his] Accounting Firm" about that income, ECF 1 p. 37, including by "fail[ing] to provide to the Accounting Firm," or to G&R's firm managers, records for his Gambling Account, ECF 1 ¶ 24(m), (q).

Defendant's underreporting of winnings in 2016 is one of the affirmative acts supporting Count One, which is a tax evasion charge under 26 U.S.C. § 7201. ECF 1 p. 37. And the false items on his tax return resulting from the underreporting supports Count Five, which is a charge for aiding and assisting in the preparation of a false return in violation of 26 U.S.C. § 7206. ECF

1 p. 41. For Count Five, the Indictment specifies that the underreporting of winnings rendered false Line 21 (Other Income), Line 22 (Total Income), and Line 78 (Amount Owed) on his 2016 tax return. ECF 1 p. 41.

Regarding tax year 2019, the Indictment alleges that Defendant fraudulently omitted from his tax return $359,000 in gambling income. ECF 1 ¶¶ 66-67. Although the Indictment does not allege that Defendant was a net winner at gambling in 2019, it does make clear that the failure to report the gambling income rendered false Schedule 1, Line 8 (Other Income) and Line 7a (Other Income from Schedule 1) of Defendant's 2019 tax return. ECF 1 p. 43. And therefore, the failure to report the income supports Count Eleven, another charge for aiding and assisting in the preparation of a false return false return. ECF 1 p. 43.

Regarding tax year 2020, the Indictment alleges that Defendant "caused his 2020 Form 1040 to falsely omit $93,180 in gambling income." ECF 1 ¶¶ 69, 72. As with 2019, the Indictment does not allege that Defendant was a net winner at gambling in 2020, but it does make clear that the failure to report the gambling income rendered false Schedule 1, Line 8 (Other Income) and Line 9 (Total Income) of Defendant's 2020 tax return. ECF 1 p. 44. Accordingly, the failure to report the income supports Count Thirteen, which charges aiding and assisting in the preparation of a false return. ECF 1 p. 44.

### b.  Productions And Voluntary Disclosures

The Government has produced almost 125,000 documents to Defendant pursuant to Rule 16, along with indices and metadata corresponding to the produced documents. The Government's productions to date include voluminous and detailed information about Defendant's gambling and his income from gambling in 2016, 2019, and 2020. The Government has produced to Defendant all of Defendant's bank records collected as part of the investigation. Generally, Defendant and

the group of individuals he played poker with would exchange gambling-related payments via wire, and therefore the vast majority of his wins and losses are reflected in the bank records. The Government also has produced bank records of certain of Defendant's poker opponents and other third parties. Per the Indictment, there were instances when Defendant either asked a third party to pay a gambling debt on his behalf, *see* ECF 1 ¶¶ 43-44, or asked a poker opponent to wire Defendant's winnings to a third party, *see id.* ¶ 46. Although Defendant's bank records would not necessarily reflect such payments, the Government where possible has produced to Defendant bank and other records of the third parties to substantiate the payments. The Government has produced Defendant's and G&R's tax returns, multiple of which do not properly reflect his gambling winnings. The Government has produced contemporaneous communications between Defendant, his poker opponents, and individuals who loaned Defendant money to play poker.

The Government has disclosed to Defendant potentially exculpatory prior statements given by 33 different potential witnesses, many of whom were involved in poker games with Defendant or otherwise have knowledge relevant to Defendant's failure to report gambling income. The Government has disclosed the *entirety* of prior statements for 5 additional potential witnesses, including all representatives of his and G&R's outside accounting firm, which was largely kept in the dark about Defendant's gambling activities, income, and the Gambling Account he maintained. And the Government repeatedly has committed to disclosing all prior statements of trial witnesses pursuant to the Jencks Act in accordance with the Court's Pretrial Scheduling Order. ECF 107 at 2 ("[S]trongly encourag[ing] the Government to produce any Jencks material no later than two weeks before trial is scheduled to commence.").

The Government has made voluntary disclosures to Defendant about his gambling winnings that go above and beyond what is required by Rule 16 and *Brady*. For example, when

Defendant asked for additional information about his gambling wins and losses in 2016, the Government voluntarily disclosed a table detailing transactions reflecting Defendant's receipt of gambling winnings in 2016 (including the counterparty, transaction date, and amount of the winnings) as well the amounts that Defendant paid to individuals who staked or "had a piece" of him in the 2016 games. Ex. 1 (5/8/2025 Poker Transactions Disclosure). (Generally, when a poker player wins a game and pays some of his winnings to individuals who had invested in the poker player's participation in the game, those payments to third parties are not taxable income to the poker player.) This information was all available in bank and other records that the Government produced pursuant to Rule 16, but the Government worked in good faith to address Defendant's concerns by giving him a streamlined summary. The Government also voluntarily disclosed to Defendant an approximation of Defendant's losses in 2016, and details concerning the losses that Defendant paid from the G&R bank account and fraudulently deducted in the same year. Ex. 2 (5/16/2025 Firm Wires Disclosure). Specifically, the Government's May 16, 2025 letter to Defendant stated, "In response to your instant request concerning Defendant's net winnings in 2016, Defendant lost approximately $12 million playing poker that year, and accordingly the Government will prove at trial that Defendant's net gambling winnings for 2016 was more than $5 million." *See* 5/16/25 DOJ Letter 5, Ex. N to Government's Opposition to Defendant's Motion to Compel Disclosure of Brady and Grand Jury Material.

Regarding Defendant's gambling income in 2019 and 2020, in response to a request from Defendant, the Government clarified that "the Indictment does not allege that Defendant was a net gambling winner in those years; the Indictment merely alleges that Defendant willfully failed to report his gross gambling winnings in those years." Regardless, the Government disclosed a table detailing transactions reflecting Defendant's receipt of gambling winnings in 2019 and 2020

(including counterparty, the transaction date, and the amount of the wins). Ex. 1 (5/8/2025 Poker Transactions Disclosure). The totals of those receipts match the allegations in the Indictment concerning how much Defendant won, and failed to report, in 2019 and 2020. *Compare* Mot. 9 (citing ECF 1 ¶¶ 66, 69), *with* Ex. 1 (5/8/2025 Poker Transactions Disclosure). And again, the table was based on information already provided to Defendant pursuant to Rule 16, but was shared in good faith to address Defendant's concerns.

## II. Allegations Related To Current Or Prospective Intimate Partners

### a. Indictment

The Indictment's allegations concerning Defendant's employment of and payments to his current or prospective intimate partners are detailed in the Government's Opposition to Defendant's Motion to Dismiss Allegations Concerning Employees. The Government incorporates that summary here. As relevant to this Motion, the Indictment alleges that "during the 2018 tax year, [Defendant] caused G&R to list as employees four women with whom he was having or pursuing intimate personal relationships. Pursuant to [Defendant]'s instructions, the women were paid salaries by G&R and provided health insurance under G&R's health insurance policy even though [Defendant] knew that they were not eligible for that insurance and performed little or no work. As a result, [Defendant] caused over $8,000 in G&R funds to be used to pay the four women's health care premiums and over $31,000 in G&R funds to be paid to them as salaries. These payments by G&R replaced or added to personal payments [Defendant] was making to the women." ECF 1 ¶ 55. "[A]s a result of [Defendant]'s use of G&R funds to pay for salaries and healthcare premiums for the women whom he placed on G&R's payroll," G&R's expenses and deductions for 2018 were "false[ly] overstate[d] . . . by approximately $40,000." ECF 1 ¶ 56(b). Relatedly, the deductions caused Defendant's 2016 tax return to falsely understate his taxable

income and tax liability. ECF 1 ¶ 58. Using firm funds to pay the women was one of seven affirmative acts of evasion supporting the tax evasion charge for 2016 (Count Three). ECF 1 p. 39. The payments and deductions also support Counts Nine and Ten, which charge Defendant with aiding and assisting in the preparation of false and fraudulent returns for 2018. *See* ECF 1 p. 41. The specific false items on G&R's and Defendant's tax returns for 2018 are listed in a table in the Indictment. ECF 1 p. 42-43.

### b.  Productions And Voluntary Disclosures

The Government's Rule 16 productions contain substantial information concerning Defendant's employment of four women with whom he was involved or pursuing intimate relationships. For instance, the Government has produced communications between Defendant and those women. The Government has also produced: documents related to the onboarding of the women at G&R and enrollment in the health insurance plan; documents reflecting how much the women were paid and when, and how much G&R paid for their health insurance premiums; all conceivable work product created by the women while employed at G&R; bank records of Defendant and, where available, the women that show Defendant's payments to or on behalf of the women—whether before, during, and after their time working at G&R; accounting records reflecting the characterization of G&R salaries and health insurance premiums; and Defendant's and G&R's tax returns, which demonstrate that the payments to or on behalf of the four women were deducted as business expenses.

Relatedly, the Government has disclosed potentially exculpatory statements made by the four women and others (such as the G&R firm manager) who interacted with and/or processed paperwork relating to the women. Some of those statements concern the extent and nature of the assignments that three of the women worked on at G&R. (The fourth woman, as Defendant

concedes, never did any work for G&R despite being paid a salary, receiving health insurance benefits, and being classified by Defendant as a "translator.") Finally, as noted above, the Government repeatedly has committed to disclosing all prior statements of trial witnesses (which may include the four women) pursuant to the Jencks Act in accordance with the Court's Pretrial Scheduling Order. ECF 107 at 2.

### III. Allegations Related To Tax Payment Dates

#### a. Indictment

The Indictment includes five charges for Defendant's willful failure to pay taxes in violation of 26 U.S.C. § 7203 (Counts Fifteen through Nineteen). ECF 1 p. 45. The Indictment alleges that Defendant willfully failed to timely pay his income taxes in 2016, 2017, 2019, 2020, and 2021. ECF 1 p. 45. There is a table in the Indictment listing the reported taxable income for those years, the approximate tax due based on that income, and the payment due date. ECF 1 p. 45. The Indictment likewise contains detailed allegations concerning Defendant's willful failure to pay taxes for each of those years. ECF 1 ¶¶ 37-39 (2016), 49-50 (2017), 68 (2019), 73-74 (2020), 84-85 (2021).

For example, regarding the willful failure to pay the 2016 taxes (Count Fifteen), the Indictment alleges that instead of timely paying his self-reported tax due and owing of $1,679,000, Defendant "spent over $2 million on luxury items, gambling debts, and other personal payments." ECF 1 ¶ 37. Further, the Indictment states that Defendant "specifically acknowledged his choice to spend money on gambling rather than pay his taxes when he wrote to a representative of [an individual identified as] California Businessman-I in or around November 2016, 'I was going to use [hundreds of thousands of dollars in available funds] to pay my personal 2016 taxes, but I'm just paying penalties instead. That's fine, and it's my problem.'" ECF 1 ¶ 37. The Indictment

details how, by March 2018, the IRS began taking steps to collect the 2016 tax debt. ECF 1 ¶ 38. The Indictment alleges that, when asked in 2018 by an IRS Revenue Officer why it had not been paid, Defendant "falsely told the IRS Revenue Officer that his outstanding liability for 2016 was attributable to his receipt of a significant legal fee whereas, in truth and fact, his liability was due principally to his gambling income." ECF 1 ¶ 38. The Indictment explains that "[i]n 2019, [Defendant] entered into a payment agreement for his 2016 and 2017 taxes," ECF 1 ¶ 38, and that Defendant "failed to completely pay his 2016 tax liability until 2021," ECF 1 ¶ 39. Per the Indictment, Defendant paid his 2016 tax liability with money he borrowed from a litigation funder so that he could lift tax liens on one residence and purchase a new residence. ECF 1 ¶¶ 95-96.

Regarding the willful failure to pay the 2017 taxes (Count Sixteen), the Indictment alleges that instead of timely paying his self-reported tax due and owing of $1,037,595, Defendant "spent hundreds of thousands of dollars on luxury items, gambling debts, and other personal payments." ECF 1 ¶ 49. The Indictment explains that Defendant "failed to completely pay his 2017 tax liability until 2021." ECF 1 ¶ 50. As with his tax liability for 2016, Defendant paid his 2017 tax liability with money he borrowed from a litigation funder so that he could lift tax liens on one residence and purchase a new residence. ECF 1 ¶¶ 95-96.

Regarding Defandant's willful failure to pay the 2019 taxes (Count Seventeen), the Indictment alleges that instead of timely paying his self-reported tax due and owing of $512,522, Defendant "spent over $50,000 on luxury items and other personal payments," and "paid over $550,000 for gambling debts." ECF 1 ¶ 68. The same is generally true of the willful failure to pay the 2020 and 2021 taxes (Counts Eighteen and Nineteen). ECF 1 p. 45. The Indictment says that Defendant's self-reported tax due and owing for 2020 was over $945,000, he failed to pay it by the deadline, failed to make estimated tax payments, and failed to pay the taxes when he submitted

10

his individual tax return, for which he got an extension, in October 2021. ECF 1 ¶ 73. Instead, Defendant "spent over $500,000 on luxury items and other personal payments," and "paid over $1,000,000 for gambling debts." ECF 1 ¶ 73. According to the Indictment, Defendant did not pay his 2020 tax liability until December 2022. ECF 1 ¶ 74. As to the 2021 charge, the Indictment says that Defendant's self-reported tax due and owing for 2021 was over $1,139,000, he failed to pay it by the deadline, and failed to make estimated tax payments. ECF 1 ¶ 85. Instead of timely paying the taxes, Defendant "spent over $800,000 on luxury items and other personal payments." ECF 1 ¶ 85. Defendant ultimately paid his tax liability when he filed his tax return (which by then was overdue) in October 2022. ECF 1 ¶ 85.

### b. Productions And Voluntary Disclosures

The Government has produced significant documentation supporting and contextualizing the willful failure to pay counts in the Indictment. For instance, the Government has produced Defendant's tax returns, which on their face reflect his self-reported tax due and owing for the relevant years. The Government has also produced: Defendant's bank and credit card records, which show his extensive spending on luxurious items, travel, and women while he owed and should have been paying taxes; communications in which Defendant made admissions about his failure to pay, including the email described above in which Defendant wrote "I was going to use [hundreds of thousands of dollars in available funds] to pay my personal 2016 taxes, but I'm just paying penalties instead. That's fine, and it's my problem," Ex. 3 (PROD-USA-0065068)[1]; documents related to the IRS's efforts to collect on Defendant's 2016 taxes including all statements

---

[1] Although this document indicates that the email was sent on September 4, 2021, that appears to be an error, perhaps related to the mechanics of how G&R produced documents to the Government. From the context, including the references to an upcoming election and potential future poker games in 2017, it is reasonable to conclude that this email was sent in Fall 2016, not September 2021. The Government will work with Defendant to address this potentially erroneous date and other similar issues throughout G&R's productions.

by the Revenue Officer involved in those efforts and the resulting payment plan; documents and communications related to Defendant's eventual repayment in 2021 of the 2016 and 2017 tax liabilities, which were satisfied so that he could lift tax liens on his residence and purchase a new one. The Government's disclosure of potentially exculpatory statements included evidence about Defendant's attitude toward timely payment of taxes and other matters that are related to the willful failure to pay charges.

Unlike Defendant's requests for additional information about his gambling winnings and employment of current or prospective intimate partners, to this point Defendant has not requested additional information on "what amounts [he] was supposed to pay and when he was supposed to pay them." Mot. 12. Indeed, the Government first learned of the purported "particularity problem" (Mot. 12) when the Motion was filed. Had Defendant asked the Government to clarify the issues or answer the questions raised in the Motion, the Government would have worked in good faith to address the requests. Specifically, in relation to when he was supposed to pay taxes and how much, the Government could have referred Defendant to the table in the Indictment listing the reported taxable income for the pertinent tax years, the approximate tax due based on that income, and the payment due date. ECF 1 p. 45. It also could have referred him to publicly available information about the dates on which tax returns and payments were due for each of the charged tax years. *See, e.g.*, 2016 Form 1040 Instructions 7, 74, Internal Revenue Service (Dec. 15, 2016) (listing filing and payment deadlines), *available at* https://www.irs.gov/pub/irs-prior/i1040gi--2016.pdf (last visited June 18, 2025).

## ARGUMENT

In a federal criminal case, "[t]he indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged and must be signed by an attorney for the government. It need not contain a formal introduction or conclusion. . . . For each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated." Fed. R. Crim. P. 7(c)(1).

"A defendant is entitled to a bill of particulars when an indictment fails to adequately inform the defendant of the charges against [him]," or "if certain portions of the indictment are so general that they do not advise a defendant of the specific acts that []he must defend against." *United States v. Mosby*, 22:cr-00007-LKG, 2022 WL 1120073, at *3 (D. Md. Apr. 14, 2022). On the other hand, "[a]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which she must defend, and, second, enables her to plead an acquittal or conviction in bar of future prosecutions for the same offense."[2] *Id.* at *2 (quoting *United States v. Brandon*, 298 F.3d 307, 310 (4th Cir. 2002)) (alterations omitted). "[T]he decision to grant or deny a motion for a bill of particulars is within the sound discretion of the trial court." *United States v. Cuong Gia Le*, 310 F. Supp. 2d 763, 781 (E.D. Va. 2004).

"A bill of particulars is not to be used to provide detailed disclosure of the government's evidence in advance of trial." *United States v. Automated Med. Labs., Inc.*, 770 F.2d 399, 405 (4th Cir. 1985). Likewise, "a defendant is not entitled to compel the government to describe in detail

---

[2] The Motion does not argue that the charges are so general that Defendant would be unable to plead double jeopardy to bar future prosecutions for the same offenses. And such an argument would fail given the highly detailed nature of the Indictment, as well as the "entire record" of this case including the Government's productions and voluntary disclosures. *See United States v. Am. Waste Fibers Co.*, 809 F.2d 1044, 1047 (4th Cir. 1987) ("When a Double Jeopardy bar is claimed, the court must examine not just the indictment from the prior proceeding but the entire record.").

the manner in which the crime was committed, thereby forcing the prosecution to fix irrevocably the perimeters of its case in advance of trial." *Stroop*, 121 F.R.D. at 272 (citations and quotations omitted). "The proper scope and function of a bill of particulars is . . . to minimize surprise, to enable movant to obtain such facts as are needed to prepare his defense, and to preclude a second prosecution for the same offense." *Id.* "[I]t is incorrect to require . . . that the indictment must enumerate every possible legal and factual theory of defendants' guilt." *United States v. Am. Waste Fibers Co., Inc.*, 809 F.2d 1044, 1047 (4th Cir. 1987).

In evaluating a request for a bill of particulars, courts generally consider whether any "essential detail[s] . . . may have been omitted from the indictment. *United States v. Anderson*, 481 F.2d 685, 690 (4th Cir. 1973), *aff'd*, 417 U.S. 211 (1974) (quotations and citations omitted). Importantly, courts also look beyond the indictment to "informal and formal discovery" provided to a defendant by the Government. *See United States v. Taylor*, No. CRIM.A. 3:04CR227, 2005 WL 2298170, at *4 (E.D. Va. Sept. 21, 2005). "[I]f the indictment—and information provided by the Government through full discovery—is sufficient to enable a defendant to obtain necessary information about the nature of the charges against her, so that she may prepare for trial, a bill of particulars is unnecessary." *Mosby*, 2022 WL 1120073, at *3 (collecting cases and citing 1 Charles Alan Wright, *Federal Practice and Procedure* 5129 at 437 (1982) ("If the needed information is in the indictment, then no bill of particulars is required. The same result is reached if the government has provided the information called for in some other satisfactory form.")); *see United States v. Wang*, No. CR TDC-24-0211, 2025 WL 50520, at *10 (D. Md. Jan. 8, 2025) ("Such information . . . does not necessarily need to come in the form of a bill of particulars and may instead be provided through discovery.").

The legal standard is no different in criminal tax cases. In *United States v. Toliver*, for example, the defendant requested a bill of particulars identifying "information necessary to establish the amount and source of the allegedly taxable income." 972 F. Supp. 1030, 1041 (W.D. Va. 1997). The defendant "relie[d] on precedent more liberally granting bills of particulars in tax cases, due to their complexity." *Id.* The court, however, denied the motion for a few reasons. First, the court observed that the Government had "already disclosed to Toliver its intended method of proof and has provided an estimate of the amount of omitted income. The indictment informed Toliver of the alleged source of the income, his actions in the concealment scheme, and the time period during which his actions allegedly occurred." *Id.* at 1042. That was "sufficient to allow him to prepare an adequate defense." *Id.* (citing *United States v. Pottorf*, 769 F. Supp. 1176, 1183 (D. Kan. 1991) (refusing to grant a bill of particulars as to tax evasions counts where indictment provided the tax years at issue, the specific actions of the defendant and the elements of the offense)). Second, the court noted that the Government had "opened its investigative files to allow the defense to review its materials," and "[s]uch a policy further reduces the need for a bill of particulars." *Id.*

## I.    A Bill Of Particulars Relating To Defendant's Gambling Income Is Unnecessary

The Court should not order the Government to disclose more information about Defendant's gambling income in 2016, 2019, and 2020. The Indictment in this case is lengthy and detailed, and includes an extensive recitation of Defendant's poker activities from 2016 and on. It identifies specific amounts of poker winnings that were not reported and the effect of the failure to report on Defendant's tax returns (such as the specific lines that were false). It quotes from contemporaneous communications reflecting Defendant's poker strategies. It identifies the location and dates of many of the poker games, and the participants. It describes Defendant's

preparation for poker games and opponents, the amounts Defendant won or lost at games, and how Defendant was paid any winnings. The Indictment specifically alleges that Defendant hid his poker income from his accountants by, among other things, not providing them access to his Gambling Account and lying about his poker income. The Indictment provides relevant statutory language and elements for the charges related to Defendant's gambling income in 2016, 2019, and 2020.

Subsequent to the Indictment, the Government produced pursuant to Rule 16 substantial documentation—including bank records reflecting poker-related payments—underlying the Indictment's allegations about unreported gambling income. And in a good faith attempt to address Defendant's remaining questions and concerns, the Government voluntarily disclosed multiple charts that provided even more details about the specific transactions comprising Defendant's unreported poker winnings. Given the extent of information in the Indictment and produced or disclosed by the Government, Defendant cannot credibly complain that he will be surprised at trial, or that he lacks sufficient information to prepare.

Indeed, Defendant possesses more information about these charges than the defendants in tax cases cited in the Motion. For example, in *United States v. Goldstein*, the defendants were charged with materially understating their income in 1964 and 1966. 56 F.R.D. 52, 56 (D. Del. 1972). The indictment apparently listed the dollar amount of their underreporting but not the specific items comprising that amount. *See id.* Accordingly, the court ordered the Government to disclose "the date, amount, character, and source" of unreported income[3] in those years. *Id.* In this case, between the Indictment and the Government's productions and disclosures, Defendant already has that information. The Government has disclosed tables summarizing the details of the

---

[3] The *Goldstein* decision on its face says that the Government must disclose these details about "*un*reportable income which was allegedly received by the defendants . . . but was unreported," (emphasis added), but in context it is likely that the Court meant to write "reportable income which . . . was unreported." *See id.*

transactions (including the dates, amounts, and counterparty or source) underlying the Indictment's allegations about Defendant's unreported gambling income. The Indictment contains some of the same information and also additional details about the poker games and opponents with which Defendant was involved. The Indictment and subsequent disclosures clearly explain that the "character" of these unreported amounts was poker winnings. Similarly, Defendant already possesses the types of information that the court in *United States v. DeGroote* observed had been ordered disclosed via bills of particulars in other tax cases—that is, the basic facts concerning the allegedly unreported income and payments. *See* 122 F.R.D. 131, 141 (W.D.N.Y. 1988) (noting that in "specific items" cases such as this one,[4] courts have granted motions seeking "particular items and amounts of allegedly unreported income, together with the sources from which each item was derived, disclosing when, where, how and by whom payment was made to each of the defendants, and specifying the deductions and costs allowed and/or disallowed against such income.").

Defendant's argument that he has insufficient information to identify "the specific amounts of net gambling income (including both wins and losses)" for 2016, 2019, and 2020 (Mot. 2) does not justify granting the Motion. As to 2016, the argument is untrue. The Government has identified for Defendant the amounts that it understands Defendant won, lost, and paid to stakers (or people who "had a piece" of Defendant) in 2016. In the Government's May 16, 2025 letter, it wrote that "concerning Defendant's net winnings in 2016, Defendant lost approximately $12 million playing poker that year, and accordingly the Government will prove at trial that Defendant's net gambling winnings for 2016 was more than $5 million." To be fair, the Government voluntarily disclosed

---

[4] The Government's method of proof in this case is the specific items method, as it has previously told Defendant. *See United States v. Manfredi*, 628 F. Supp. 608, 638 (W.D. Pa. 2009) (denying as moot request for bill of particulars as to the method of proof in light of Government's proffer that it used specific items method).

this information on the same day that Defendant filed the Motion, and Defendant may not have reviewed it by the time of filing. Regardless, Defendant's request for additional information about his gambling income (whether gross or net) for 2016 should be denied on the merits, or as moot in light of the Government's disclosure.

As to 2019 and 2020, Defendant's argument ignores the nature of the charges against him. For those two years, the Indictment is not alleging that Defendant was a net winner in gambling or poker. That is, unlike 2016, the Indictment does not allege that Defendant's failure to report his gambling income gave rise to an additional tax due and owing. It merely alleges that Defendant willfully failed to report his *gross* gambling winnings in those years. ECF 1 ¶¶ 67, 72. Individuals are required to report their gambling winnings on their tax returns even if they lost more than they won.[5] Accordingly, for 2019 and 2020, the Indictment and the Government's subsequent disclosures detail the facts underlying Defendant's wins, but not losses, in those years. And the losses will not be relevant at trial because for those years, the Indictment only charges Defendant for aiding and assisting in the preparation of false returns—and not tax evasion, which requires proving a tax due and owing. In other words, even if Defendant were to prove that he lost more than he won in 2019 or 2020, the jury could still convict him for omitting the winnings.

Regarding whether and the extent to which Defendant was staked in the 2019 and 2020 games, the Government is not aware of anyone staking or having a piece of Defendant in those games. More broadly, unless Defendant was staked 100% in those games—such that he would have had to pay all of his winnings from the games to other individuals—he would still have gambling winnings that he was required to, but did not, report. In any case, the Government's

---

[5] IRS Publication 525 at 31 (2016) ("You must include your gambling winnings in your income on Form 1040[.]"), *available at* https://www.irs.gov/pub/irs-prior/p525--2016.pdf (last visited June 18, 2025).

voluminous productions pursuant to Rule 16 provides Defendant with more than enough information to ascertain his losses and any staking arrangements in those years.

In sum, Defendant has sufficient information about his gambling income to avoid surprise and to prepare for trial, and his Motion should be denied on this point.

## II. A Bill Of Particulars Related To Defendant's Employment Of Current Or Prospective Intimate Partners Is Unnecessary

The Court should not order the Government to disclose more information Defendant's employment of current or prospective intimate partners and fraudulent deduction of payments made to those women through G&R. The Indictment explains these allegations and charges at length, and provides relevant statutory language and elements for the charges. As most relevant here, the Indictment states how much Defendant paid to or on behalf of the women through the law firm (including their salaries and health insurance premiums), alleges that Defendant caused the payments to be deducted as business expenses on G&R's 2018 tax return, and explains that the resulting, falsely understated income for G&R flowed through to, and rendered false, Defendant's individual tax returns. The Indictment lists the specific lines on G&R's and Defendant's tax returns for 2018 were false because of the improper deductions. The Indictment provides enough context on Defendant's relationships with the women to support a finding that the payments were not ordinary and necessary business expenses. The Government's Rule 16 productions and subsequent disclosures (including of potentially exculpatory statements) shed even more light on the personal and employment relationships between Defendant and the women and how much (if any) work they did at the law firm. Taken together, this is sufficient information to avoid surprise at the trial and to allow Defendant to prepare for it.

Defendant appears to be seeking confirmation that *some* of the salary and health insurance premium payments were appropriately deducted because three out of the four women did *some*

work. But as noted in Defendant's motion, paying the women with G&R funds was one of multiple bases for charging Defendant with tax evasion and aiding and assisting in the preparation of false returns in 2018. Mot. 11. Therefore, at trial, the Government will be required to prove only that the deduction of those payments caused G&R's and Defendant's tax returns to be materially false, and/or gave rise to a substantial tax due and owing. And the Government will carry that burden at trial. It will not be required to prove—nor must the Indictment state—the precise amount of income that was unreported as a result of the deductions. *See United States v. Davis*, 369 F. App'x 456, 458 (4th Cir. 2010) ("Because the Government was not required to allege or prove the precise amount of additional tax due and owing at trial . . . we find that an exact amount was not required to be set forth in the indictment.") (citations omitted); *United States v. Tarwater*, 308 F.3d 494, 504 (6th Cir. 2002) ("Section 7206 is a perjury statute that criminalizes lying on any document filed with the IRS. It does not require the prosecution to prove the existence of a tax deficiency, exact amounts of unreported receipts or income, or an intent to evade taxes."). Regardless, as explained above, there is sufficient information in the Indictment and the Government's productions and disclosures to permit a reasonable factfinder to decide that even the entirety of the payments were not ordinary and necessary business expenses. And relatedly, Defendant possesses sufficient information on these charges that he will not be surprised at trial and he can adequately prepare for the trial.

### III. A Bill Of Particulars Related To Tax Payment Dates Is Unnecessary

The Court should not order the Government to disclose more information about "the specific dates on which the Indictment alleges he should have paid his 2016, 2017, 2019, 2020, and 2021 tax bills" nor the amounts he should have paid. Mot. 2, 13. There is a table in the Indictment with this exact information:

| COUNT | TAX YEAR | TAXABLE INCOME (Reported on Tax Return) | APPROXIMATE TAX DUE | PAYMENT DUE DATE |
|---|---|---|---|---|
| 15 | 2016 | $4,350,019 | $1,690,527 | 04/18/2017 |
| 16 | 2017 | $2,707,866 | $1,037,595 | 04/17/2018 |
| 17 | 2019 | $2,004,734 | $512,522 | 07/15/2020 |
| 18 | 2020 | $2,941,485 | $947,137 | 05/17/2021 |
| 19 | 2021 | $3,675,863 | $1,139,488 | 04/18/2022 |

ECF 1 p. 45. Defendant has requested the Government to disclose information that has been readily available in the publicly filed Indictment for almost half of a year. Defendant does not dispute that any of these figures or dates are correct. To the contrary, Defendant's Motion confirms that the Indictment states correctly the 2019 and 2020 due dates despite that they were delayed by IRS. *Compare* Mot. 12 n.3*, with* ECF 1 p. 45. The presence of this table in the Indictment obviates the need for any particulars and counsels in favor of denying the Motion. The Indictment's inclusion of relevant statutory language and elements for the willful failure to pay counts under 26 U.S.C. § 7203 further undermines the request for a bill of particulars.

Defendant misses the mark in referencing his payment plan with the IRS, and his eventual payment of his tax liabilities. Defendant was legally required to pay his taxes in full on the dates specified above regardless of whether he got an extension to file his tax return.[6] When he refused to pay on the original due date for the filing of his tax return—and instead decided to spend his

---

[6] *See* 26 C.F.R. § 16151-1(a) (requiring that self-reported tax liability "be paid to the internal revenue officer with whom the return is filed at the time fixed for filing the return (determined without regard to any extension of time for filing the return)"); *id.* § 1.6081-4(c) ("An automatic extension of time for filing a return . . . will not extend the time for payment of any tax due on such return.").

money on poker, luxury items, and international travel with intimate partners—he violated 26 U.S.C. § 7203. Defendant feigns indignation at the notion that "he is criminally liable for failure to pay his taxes *quickly enough*," Mot. 12 (emphasis in original), but such conduct is a crime. Section 7203 says "[a]ny person required under this title to pay any estimated tax or tax . . . who willfully fails to pay such estimated tax or tax . . . *at the time or times required by law or regulations*, shall . . . be guilty of a misdemeanor. 26 U.S.C. § 7203 (emphasis added). There is no exception in the statute for individuals who eventually paid the taxes they owe. Nor is there an exception for individuals who lack the financial wherewithal to timely pay their taxes. *See United States v. Tucker*, 686 F.2d 230, 233 (5th Cir. 1982) ("A taxpayer is obligated to conduct his financial affairs in such a way that he has cash available to satisfy his tax obligations on time. As a general rule, financial ability to pay the tax when it comes due is not a prerequisite to criminal liability under s 7203.").

Defendant's reliance on the payment plan also should fail as a factual matter. Indeed, Defendant did not even start to pay his 2016 or 2017 tax liabilities until an IRS Revenue Officer began taking steps to collect the debt in 2018. And the payment plan for those years was not in place until 2019. Even assuming a willful failure to pay charge would be improper while a payment plan was in place,[7] Defendant would have no excuse for refusing to even start to pay his 2016 and 2017 tax liabilities until the IRS caught up with him and demanded that he pay. And there was *no* payment plan for the other years in which Defendant willfully failed to pay his taxes, so his argument is irrelevant to the counts pertaining to 2019 through 2021 (Counts Seventeen through Nineteen of the Indictment).

---

[7] Defendant's argument that the willful failure to pay charges are unprecedented or inappropriate are addressed in the Government's Opposition to Defendant's Motion to Dismiss Counts 15 Through 19.

Finally, it is striking that Defendant—who is intelligent and sophisticated, owned and operated his own business for years, and argued tax-related issues at the U.S. Supreme Court—is telling this Court that he does not know when to pay his taxes or how much to pay. It is even more striking because the Indictment and the Government's productions and disclosures have provided Defendant with a detailed roadmap of the evidence and allegations underlying the willful failure to pay charges, including his own acknowledgment of his obligation to pay taxes. Defendant has more than enough information to avoid surprise and to prepare for trial. His Motion should be denied on this point and all the others.

## **<u>CONCLUSION</u>**

For all the reasons stated above, the Government respectfully requests that the Court deny Defendant's Motion for Bill of Particulars, ECF 125.

<div style="margin-left:40%">

Respectfully submitted,

Kelly O. Hayes
United States Attorney
/s/
_____
Patrick D. Kibbe
Assistant United States Attorney
District of Maryland

Emerson Gordon-Marvin
Hayter Whitman
Trial Attorneys
Department of Justice—Tax Division

</div>