**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. LKG-25-6** |
| | * | |
| **THOMAS C. GOLDSTEIN,** | * | |
| | * | |
| **Defendant** | * | |
| | * | |
| | ******* | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION
TO DISMISS ALLEGATIONS CONCERNING EMPLOYEES**

The United States of America respectfully requests that the Court deny Defendant's Motion to Dismiss Allegations Concerning Employees ("Motion"), ECF 122. The charge at issue in Defendant's Motion—Count Three of the Indictment—is a straightforward, commonsense application of the tax evasion statute, 26 U.S.C. § 7201. Defendant is charged with willfully evading taxes in 2018 through various means, including by using his law firm, Goldstein & Russell, P.C. ("G&R"), to pay current or prospective intimate partners and deducting the payments as business expenses. ECF 1 at 39. In doing so, Defendant fraudulently underreported G&R's income, and consequently his own income and tax liability. The statute is not unconstitutionally vague because ordinary people would understand that Defendant's alleged conduct was illegal, and because any risk of arbitrary enforcement is speculative. For decades, federal courts have consistently rejected vagueness challenges to tax evasion charges, and there is no reason to treat Defendant's challenge differently. Further, many of the Motion's arguments are factual defenses to willfulness that should be left for the jury to resolve. The Motion should be denied.

**BACKGROUND**

**I. Defendant's Relationship With, And Employment Of, The Four Women**

A brief summary of Defendant's relationship with, and employment of, the four women at issue in the Motion is necessary to contextualize the allegations in the Indictment and the parties' arguments. Although Defendant "accepts as true the Indictment's allegations that [he] 'was involved in, or pursued, intimate personal relationships' with the employees at issue and that he made personal payments to them," Mot. 4-5, the basic facts about those relationships and their employment at G&R are relevant and must be explained, *see Holder v. Humanitarian L. Project*, 561 U.S. 1, 18-19 (2010) (vagueness inquiry requires examining "the particular facts at issue").

**A. Woman-1**

In October 2017, Defendant met Woman-1, then a recent college graduate, on a dating website for individuals seeking to receive or provide financial support as part of an intimate personal relationship.[1] He paid her $500 for their first meeting, and they began an intimate personal relationship. In 2017, while in that relationship, Defendant sent to Woman-1 a series of payments through Venmo and PayPal that together totaled over $10,000.

Defendant hired Woman-1, purportedly as a full-time employee, on February 2, 2018. Her annual salary was $45,000. Defendant told Woman-1 that she was expected to be in the office when Defendant was. Despite the fact that other G&R attorneys worked from the office at the time and thus presumably could have utilized Woman-1's assistance, Defendant did not introduce Woman-1 to other employees at the law firm besides the firm manager, who helped Woman-1 (and other new hires) with onboarding and enrolling in G&R's health insurance. Woman-1 did not have a job title. Defendant did not instruct her to work a certain number of hours per week, nor

---

[1] In one or more of his dating website profiles, Defendant described himself as "interested in a long-term relationship" and stated that he would provide "a generous allowance."

ask her to track her time. Woman-1 typically worked a few hours a day, for a few days a week, but she did not work full days or full workweeks. While employed at G&R, Woman-1 and Defendant occasionally engaged in physical intimacy at the G&R office.

Defendant assigned Woman-1 a few discrete projects during her time at G&R. For example, Woman-1 started and did most of the work on a project—later completed by Woman-2 (as discussed below)—to summarize information on potential commercial clients that G&R might solicit depending on the outcome of a U.S. Supreme Court case involving American Express. (The Court's ruling, however, did not end up opening the door for additional plaintiffs.) The project entailed creating a Word document that compiled contact and background information on the general counsels for the commercial entities. To make the document, she copied and pasted information, such as biographies and company overviews, from the potential clients' websites or elsewhere on the internet. Woman-1 also created a corresponding Excel document with contact information for the same potential clients, and organized it into geographical regions in anticipation of future attempts by Defendant to meet with the clients. Another related project assigned to Woman-1 was designing a website to be used in connection with soliciting potential clients should the American Express case resolve favorably.

Overall, the project took Woman-1 only a few hours over a few days to complete these assignments. For example, although Woman-1 may have collected the information about potential commercial clients over the course of a week, working a few hours a day, the entire project took her less than one full day. As for the website project, Woman-1 worked on that project for less than an hour.

Despite the limited work hours and projects assigned to Woman-1, Defendant paid her as a full-time employee in February and March 2018. Defendant concedes this. *See* ECF 116 at 17, Motion to Invalidate Certain Orders Suspending the Statute of Limitations.

On March 14, 2018, Woman-1 suffered a medical emergency at G&R's office, lost consciousness, and was hospitalized. Defendant terminated Woman-1 on March 29, 2018.

During Woman-1's time at G&R, Defendant caused the firm to pay her $7,312 in salary and to pay $1,605 in health insurance premiums on her behalf. These payments were deducted as business expenses on G&R's 2018 Form 1120S.

**B. Woman-2**

Defendant met Woman-2, a former model, in 2016 at a poker game hosted by a California businessman. Defendant was playing in the game, and Woman-2 had been hired by the host to act as a server and masseuse. Soon after, Defendant and Woman-2 began dating. While in that relationship, Defendant sent payments of $5,000 to Woman-2 in May, June, and August of 2016. Also in 2016, Defendant opened and funded a joint bank account with Woman-2, who spent more than $79,000 from the bank account before it was closed in December 2016. Defendant and Woman-2 broke up in late 2016 but stayed in contact, sometimes traveling together and sometimes sharing physical intimacy.

In early 2018, Defendant offered Woman-2 a job at G&R, which she accepted. Defendant told Woman-2—who had no college degree or experience doing research—that she would be doing research. At the time, she did not have health insurance. Defendant made clear that she would be paid directly by G&R and that she would receive health insurance as part of her employment, which she found appealing.

4

Before Woman-2 joined the firm, on April 17, 2018, the G&R firm manager emailed G&R's insurance broker with questions related to hiring two people—ultimately, Woman-2 and Woman-3 (discussed next)—"to do some research for us, possibly on an hourly basis." Ex. 1 at -342 (PROD-USA-0177341). The firm manager asked, "1. Would our current health insurance be valid in California?" and "2. Under what circumstances are we required to give them benefits? We are mostly thinking about hours per week worked, but perhaps there are other factors." The firm manager relayed these two questions on behalf of Defendant.

On April 18, 2018, the insurance brokers replied. As to the first question, they answered that the plan was valid in California. *Id.* at -341. As to the second question, they wrote:

> An employer is generally required to treat all like employees the same. Any employee working on average 30 hours per week qualify [sic].
>
> Your current plan is not set up to insure employees working part-time. The ACA sets the 30 hour threshold. [Your health insurance company] will allow you to insure employees who work as few as 17½ hours. Your current contract would need to be amended to include part-time (less than 30 hours).

*Id.* This information was relayed to Defendant.

Two days later, on April 20, 2018, Defendant sent the firm manager an email titled "New payroll" that listed Woman-2's and Woman-3's names and personal and bank deposit information. Ex. 2 (PROD-USA-0044963). In the email, Defendant wrote that the women were "[b]oth FTEs at $26,000 / year," meaning full-time employees with a $26,000 annual salary. Later that day, the G&R firm manager had Woman-2 and Woman-3 added to payroll at that salary, telling an outside bookkeeper, "Tom just let me know that we've hired two new employees." Ex. 3 (PROD-USA-0064353).

Also that same day, the firm manager contacted Woman-2 to welcome her to G&R and to request that she complete paperwork for payroll and health insurance. *See* Ex. 4 (PROD-USA-0246373). On April 23, 2018, Woman-2 responded with an email attaching the health insurance

paperwork, which she had partially completed. *See id.* Although Woman-2 had filled in certain personal information and listed her occupation as "research," the paperwork did not state how many hours she was required to work each week, or her salary. *See id.* The paperwork was subsequently completed by someone else at G&R who, in line with Defendant's statements, marked that Woman-2 would be working "full time" for an annual salary of "$26,000." Ex. 5 (PROD-USA-0018784). Defendant never told Woman-2 how many hours she needed to work, or that she should track how many hours she worked. Woman-2 never went to G&R's office while working for the firm.

In total, Defendant gave Woman-2 only two assignments while working at G&R. Combined, the assignments took her less than two days total to complete. One assignment was to finish the project, started by Woman-1, summarizing information on potential commercial clients that G&R might solicit depending on the outcome of the American Express case. Woman-2 spent at most five hours on the assignment and emailed it to the firm manager on April 24, 2018. *See* Ex. 6 (PROD-USA-0061026); Ex. 7 (PROD-USA-0060792). The other assignment was to review information on potential commercial clients in various regions of the country and to identify the best cities in which to meet the clients. Defendant sent her that assignment on the evening of May 10, 2018, and she returned the finished project the next day. *See* Ex. 8 (PROD-USA-0061408); Ex. 9 (PROD-USA-0060790).

Notably, however, just a few weeks after she was hired, Defendant gave her a substantial raise. In particular, on May 9, 2018, Defendant directed the firm manager to increase her annual salary from $26,000 to $50,000—which was more than Defendant paid the firm manager. Defendant, in an apparent reference to the pending Supreme Court case involving American Express, said, "She's going to work a bunch more as we ramp up AmEx for the next couple of

months." Ex. 10 (PROD-USA-0059364). However, after May 10, 2018, Defendant appears never to have given Woman-2 another assignment, and she did no work for G&R in June or July of 2018.

During Woman-2's time at G&R, Defendant caused the firm to pay her $10,949 in salary and to pay $1,987 in health insurance premiums on her behalf. These payments were deducted as business expenses on G&R's 2018 Form 1120S.

**C. Woman-3**

Defendant met Woman-3 in early 2018 on a on a dating website for individuals seeking to receive or provide financial support as part of an intimate personal relationship. After their first meeting, he paid her $500. During 2018, Defendant funded at least two trips (to Los Angeles and Portland, Oregon) with Woman-3. Defendant permitted Woman-3 to make certain purchases with his credit card. In the first half of 2018, Defendant attempted to pursue a physically intimate relationship with Woman-3, but she told him that she was not interested in such a relationship with him.

Early on, Defendant learned that Woman-3 suffered from various medical issues and did not have good health insurance. On April 17, 2018, Defendant asked Woman-3 if she wanted "a regular, research type job that would have health benefits and taxes." Ex. 11 (PROD-USA-0286657). Woman-3 asked about the focus of the research, the hours it would require, and whether the job could be done remotely versus in the office. *Id.* Defendant said the job would be "on the road" with the "hours flexible." *Id.* He continued, "an example would be 10 hours at $50/hour" and soon added, "I guess actually if there was insurance then nominally you'd have to do 20 hours. But it could all be worked out." *Id.*

When Woman-3 replied, "Do we need to start with 20 hrs / week for insurance?" Defendant responded, "Nominally you may actually be full time. I'm not sure. But you can ignore that. My

expectation will be 10 hours." *Id.* Regarding the focus of the research, Defendant suggested that Woman-3 could either "look[] up information about a lot of companies" or "research[] materials about a fight between Oracle and Google in depth." *Id.* (At the time, Defendant was counsel for Google in a copyright appeal to the Supreme Court.) Woman-3 chose the latter.

Defendant sent the aforementioned communications, via text message, the same day that G&R's firm manager asked the insurance brokers about the minimum number of hours employees would need to work to qualify for health insurance. They replied that employees needed to work on average 30 hours per week to qualify for the existing health insurance plan. Ex. 1 (PROD-USA-0177341). After learning this information from the firm manager, Defendant emailed him two days later, on April 20, 2018, that Woman-3 and Woman-2 would be hired as full-time employees. Ex. 2 (PROD-USA-0044963). The firm manager onboarded Woman-3 and enrolled her in G&R's health insurance plan. Defendant never told Woman-3 that he expected her to work full time or anything more than 10 hours—the number of hours she actually worked per week while employed by G&R.

At G&R, Woman-3 had a single assignment: building a spreadsheet of articles concerning the Google copyright case that assessed whether they were friendly or hostile to Google, collected notable quotes, and identified the authors and their contact information. Woman-3 then made a shorter list of the top articles and a corresponding spreadsheet containing only the authors' contact information. Email traffic and metadata indicate that Woman-3 finished her work on the assignment on or about August 7, 2018. *See* Ex. 12 (PROD-USA-0286865).

During the course of Woman-3's employment at G&R, Defendant sent sexually suggestive text messages and videos to her. When Defendant and Woman-3 traveled together to Portland in

April 2018—after Woman-3 started at G&R—they shared a hotel room.[2] Defendant asked Woman-3 if she would be physically intimate with him but she declined. During that trip, Defendant also told Woman-3 that if people asked how they knew each other, she should say that she was a law student working as a law clerk at G&R, when in fact she was neither a law student nor a law clerk.

During Woman-3's time at G&R, Defendant caused the firm to pay her $9,388 in salary and to pay $2,912 in health insurance premiums on her behalf. These payments were deducted as business expenses on G&R's 2018 Form 1120S.

### D. Woman-4

In late 2017, Defendant met Woman-4, a former model, on a dating website for individuals seeking to receive or provide financial support as part of an intimate personal relationship. They subsequently began an intimate personal relationship. As part of the relationship, Defendant transferred money to Woman-4 on a periodic basis—at the same time Defendant had unpaid tax obligations due and owing to the IRS.

In 2018, Defendant and Woman-4 went on multiple international trips, which Defendant funded.[3] In September 2018, Defendant and Woman-4 went on a trip to Bali, Indonesia. During the trip, Woman-4 was injured in a moped accident and required stitches. Woman-4 did not have

---

[2] Defendant paid at least $623 for the hotel at $592 for plane tickets for Woman-3 to travel with him to Portland. Defendant spent this money while willfully refusing to pay his 2017 tax liability of approximately $1.037 million.

[3] For example, Defendant paid for Woman-4 to travel with him and various other women to Bali as part of the trip described in this paragraph. The itinerary for that trip included champagne toasts, massages, and helicopter and sailing tours. The group stayed at the St. Regis Bali Resort, which cost Defendant at least $14,560. In October 2018, Defendant also paid for Woman-4 to travel with him to Hong Kong (from which Defendant returned to the United States carrying almost $1 million in cash as described in the Government's Opposition to Defendant's Motion to Suppress Statements. As with the trip for Woman-3 to Portland, Defendant was choosing to fund lavish international travel with Woman-4 and others while willfully refusing to pay his 2017 tax liability.

health insurance at the time, which Defendant knew. In Bali, Defendant offered to hire Woman-4 at G&R so it could pay for her health insurance. On October 1, 2018, Defendant directed the firm manager to add Woman-4 to payroll (with a salary of $40,000/year) and to the firm's health insurance plan. Ex. 13 (PROD-USA-0060134).

In early October 2018, as Woman-4 worked to complete paperwork necessary to be listed as an employee at G&R and to receive health insurance, she posed a series of questions to Defendant. In particular, she asked Defendant, via text message, "Ok what's my occupation for the employee form?" and "What should I put in annual salary / hourly wage?" Ex. 14 at -213 (PROD-USA-0175157). Defendant replied:

> Your occupation is translator. Monthly pay is correct. Part time. 30 hours per week. $30/hour. (So you will get some from the firm, and the rest from me directly; it's just to have enough to qualify for insurance.)

*Id.* Woman-4 followed Defendant's directions and returned the paperwork to the firm manager, who placed Woman-4 on the firm's payroll and enrolled her in the firm's health insurance effective October 1, 2018.

The relationship between Defendant and Woman-4 often turned tumultuous. For example, in early November 2018, text messages show that they were arguing about, among other things, the extent of financial support Defendant was giving Woman-4. Ex. 14 at -253-55 (PROD-USA-0175157). On November 5, 2018, the firm manager emailed G&R's outside bookkeepers and insurance brokers to report that Woman-4's work at G&R had ended. On November 26, 2018, the firm manager emailed the insurance brokers a form cancelling Woman-4's health insurance, but later that day the firm manager asked that the form not be processed because Woman-4 wanted to retain the health insurance. Although the form already had been processed by the insurance brokers, the firm manager asked to "rescind the termination of [Woman-4], which we sent

prematurely today." Ex. 15 (PROD-USA-0192418). Woman-4 was returned to active enrollment in the health insurance plan.

On December 26, 2018, the firm manager again emailed the insurance brokers to say that Woman-4 had "been on unpaid leave" since November and asked to confirm that "it is not a problem that she is not being paid." Ex. 16 (PROD-USA-0177708). One of the insurance brokers replied that "CareFirst does not specify the length of time an employee can be covered while on leave of absence (paid or unpaid)" and, if they asked CareFirst, the insurer would likely say the employer could decide. *Id.* The representative responded that G&R should "set an expectation and put it in writing," and recommended giving Woman-4 three months of unpaid leave and removing her from the firm's health insurance if she did not "return to work by that date." *Id.* Defendant never disclosed to the insurance brokers the nature of his relationship with Woman-4 or that she was not obligated nor expected to do any work. G&R kept Woman-4 on its health insurance plan.

On March 7, 2019, the G&R firm manager wrote to the insurance brokers that G&R was "going to remove [Woman-4] from our plan. . . . Can you confirm that she will have coverage through the end of the month, even if the last day worked is today." Ex. 17 (PROD-USA-0192505). Shortly after, the insurance brokers removed her from the health insurance. But then on April 3, 2019, the firm manager emailed Woman-4:

> Tom has told me that we are going to put you back on the healthcare plan and that you are going to reimburse us for the monthly premium ($545/month). This means we will rehire back as an employee of the firm, though technically you will be on unpaid leave.
>
> Will all of your personal info be the same as when we hired you and you filled out the BMLL form, which is attached? If so, I will fill out a new form and get it to our insurer right away. Please let me know if you have any questions.

Ex. 18 (PROD-USA-0046844). Woman-4 confirmed her information and the firm manager added

her, once again, to the health insurance. *Id.* A few weeks later, Defendant paid over $260 for

Woman-4 to stay at a hotel across the street from his office in Bethesda, Maryland.

Except for this brief period in Spring 2019, Woman-4 remained on G&R's health insurance

plan through the rest of 2019. During that year, Woman-4 also traveled with Defendant. In January

2019, Defendant flew her to Hong Kong, where they shared a luxury hotel room, and he arranged

for a Rolls Royce to pick her up from the airport. Similarly, in February 2019, Defendant traveled

with her to the United Arab Emirates.

In August 2019, Defendant and Woman-4 attended Burning Man[4] together. One night

there, an altercation ensued between Defendant and Woman-4 and prompted intervention from an

unofficial Burning Man "sheriff," who visited their campsite. Although Woman-4 never reported

the incident to official law enforcement, the event caused her to end her relationship with

Defendant. On October 31, 2019, Woman-4 sent an email to both Defendant's G&R account and

a general information account maintained by G&R and monitored by the firm managers. The email

referenced the incident at Burning Man and also alluded to Defendant "lying" about Woman-4

working at G&R. Ex. 19 (excerpted document) at -312 (PROD-USA-0175312). Woman-4

attached various documents to the email including screenshots of text messages that her and

Defendant exchanged during an argument. *Id.* In text messages sent by Defendant—who, as noted,

directed Woman-4 to list her position with G&R as a "translator—Defendant derided Woman-4

---

[4] According to its website, Burning Man "is a global ecosystem of artists, makers, and community organizers who co-create art, events, and local initiatives around the world. Most recognizably, tens of thousands of Burners gather annually to build Black Rock City, a participative temporary metropolis in the Nevada desert." Available at https://burningman.org/about/ (last visited May 26, 2025).

for having "[n]o job" and "[n]o skills," and for not being able to "speak English." Ex. 19

(excerpted document) at -319, -334 (PROD-USA-0175312).[5]

Around the same time, Woman-4 contacted the G&R firm manager by phone and

proceeded to rant about Defendant, and specifically referenced the topics of insurance and taxes.

The firm manager notified Defendant about the call by texting him, "She sounded distressed when

she called. Something about her insurance and taxes." Ex. 20 (PROD-USA-0247884). The firm

manager told Defendant that Woman-4 was still on the firm's health insurance plan, and asked

Defendant whether Woman-4 should be kept on the insurance. *Id.* Defendant responded, "I

suppose [she should be kept on]. I feel bad cutting off someone having some sort of psychotic

event." *Id.*

A couple weeks later, on November 11, 2019, Defendant sent a text message to the firm

manager stating "Cancel [Woman-4]'s health insurance industry [sic] January 1, 2020. Thank

God." Ex. 21 (PROD-USA-0247884). The firm manager provided Defendant with the paperwork

necessary to remove Woman-4 from the health insurance plan, but Defendant forgot to complete

it. Ex. 22 (PROD-USA-0247884). In early March 2020, Woman-4 sent Defendant a series of angry

emails. Shortly after, Defendant gave the completed paperwork to the firm manager, who sent it

to the insurance brokers, removing Woman-4 from the health insurance plan effective April 1,

2020.

Throughout the time period that Defendant had Woman-4 listed as a G&R "employee,"

Defendant never asked her to perform any work for G&R. In addition, Defendant never told any

---

[5] The exact timing of these messages is not perfectly clear, but from context—for example, the reference to the Burning Man incident—they appear to have occurred between August and October of 2019. Although Woman-4 separately produced to the Government a 155-page document of text messages exchanged between March 2018 and February 2024, that document contains large gaps in the messages, and does not include the messages exhibited here.

of the G&R attorney's that she was an "employee." In fact, Woman-4 never did any work for G&R. Although her first language was Russian, she has never worked as a translator (including for G&R) and has never been trained or certified as a translator.

The law firm paid Woman-4 $4,320 in salary, and paid $9,426 in health insurance premiums on her behalf. These payments were deducted as business expenses on G&R's Form 1120S for 2018 through 2020.

## II. The Grand Jury Indictment

On January 16, 2025, a federal grand jury returned a twenty-two count Indictment against Defendant for violations of federal tax laws and for making false statements on mortgage loan applications. ECF 1. The Indictment includes various allegations concerning Defendant's relationship with, and employment of, the four women at issue here.

For example, in its introductory paragraphs, the Indictment alleges that "[b]etween 2016 and 2022, [Defendant] was involved in, or pursued, intimate personal relationships with at least a dozen women, transferring hundreds of thousands of dollars to them from his financial accounts or joint bank accounts he set up with the women, and paying for travel and other expenses for many of them." *Id.* ¶ 11. It alleges that Defendant caused "four women to be nominally 'hired' as employees of G&R at various points during 2018." *Id.* ¶ 12.

The Indictment continues that, although Defendant caused these four "women to be listed and paid as 'employees' of G&R during 2018 and covered under the G&R health insurance policy, the women performed little or no work for the firm and therefore did not qualify for health insurance under the terms of G&R's health insurance policy." *Id.* ¶ 13. "[Defendant] caused the full salary and insurance premium payments to these women—which added to or replaced his personal payments to them—to be deducted as G&R business expenses, thereby falsely reducing

his taxable income." *Id.* Further, in a paragraph summarizing Defendant's tax crimes, the Indictment states that "[Defendant] used tens of thousands of dollars of G&R funds in 2018 to pay health insurance premiums and full salaries to women, despite the fact that the women were not entitled to insurance coverage and performed little or no work for G&R and the payments were actually personal in nature." *Id.* ¶ 24(j).

> The Indictment's recitation of Defendant's 2018 tax misconduct states:
>
> [Defendant] caused G&R to list as employees four women with whom he was having or pursuing intimate personal relationships. Pursuant to [Defendant's] instructions, the women were paid salaries by G&R and provided health insurance under G&R's health insurance policy even though [Defendant] knew that they were not eligible for that insurance and performed little or no work. As a result, [Defendant] caused over $8,000 in G&R funds to be used to pay the four women's health care premiums and over $31,000 in G&R funds to be paid to them as salaries. These payments by G&R replaced or added to personal payments [Defendant] was making to the women.

*Id.* ¶ 55. The Indictment alleges that as a result, Defendant caused "the false overstatement of G&R's expenses and deductions by approximately $40,000" comprising payments to or on behalf of women "who were not bona fide employees and who did not qualify for G&R's health insurance." *Id.* ¶ 56. Based on those allegations and others relating to 2018, the Indictment charges that "[Defendant] falsely understated on his Form 1040 his taxable income and tax due and owing, and thereby evaded a substantial amount of the income tax due and owing by him for 2018." *Id.* ¶ 56.

The payments to these women in 2018 were among seven affirmative acts the Indictment alleges in support of Count Three (Tax Evasion—2018 Tax Year). *Id.* at 39.

## ARGUMENT

The tax evasion statute is not unconstitutionally vague as applied to Defendant because ordinary people can understand that tax evasion is illegal and that the statute prohibits a person from evading taxes by falsely deducting personal expenses as business expenses.  Because Defendant's Motion implicates both the vagueness doctrine and the rules concerning deducting business expenses, the legal standards for both are outlined below.

### I.  Legal Standards

#### a.  Vagueness Doctrine

A criminal indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). "A count may allege that . . . the defendant committed [the offense] by one or more specified means." *Id.* "For each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated." *Id.*

"Due process requires that a criminal statute provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal." *United States v. Sun*, 278 F.3d 302, 309 (4th Cir. 2002) (quoting *Buckley v. Valeo*, 424 U.S. 1, 77 (1976)). "Thus, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Id.* (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). "[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *Id.* (quoting *United States v. Mazurie*, 419 U.S. 544, 550 (1975)). Where the Government "must prove that a defendant intended to violate the law to obtain a conviction, [such a requirement] eliminat[es] any genuine risk of

holding a person criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Hsu*, 364 F.3d 192, 197 (4th Cir. 2004) (quoting *Sun*, 278 F.3d at 309).

Federal courts—including the U.S. Supreme Court, the Fourth Circuit, and district courts within the Fourth Circuit—consistently reject vagueness challenges to criminal tax statutes, including the tax evasion statute at issue here, 26 U.S.C. § 7201. *See United States v. Ragen*, 314 U.S. 513, 523-24 (1942) (rejecting vagueness challenge where "mode of evasion" was "intentional deduction of dividends in the guise of compensation for personal services"); *United States v. Chikata*, 427 F.2d 385, 390-91 (9th Cir. 1970) ("Insofar as we can determine, the only cases considering [whether the tax evasion statute is vague] have held the statute constitutional."); *United States v. Maclean*, 227 F. App'x 844, 855-56 (11th Cir. 2007) (tax evasion charges not unconstitutionally vague merely because IRS did not formally assess tax deficiency); *United States v. Coppola*, 425 F.2d 660, 661-62 (2d Cir. 1969) (tax evasion charges not unconstitutionally vague merely because the same proof could also establish violations of other statutes); *United States v. Pringle*, No. 617CR137ORL37KRS, 2017 WL 4297245, at *3 (M.D. Fla. Sept. 28, 2017) (tax evasion charge not unconstitutionally vague where indictment listed each affirmative act of evasion and when it occurred); *United States v. Brodnik*, 710 F. Supp. 2d 526, 555 (S.D.W. Va. 2010) (overruling vagueness challenge to tax evasion charges and noting "[w]hether Defendants' non-qualified deferred compensation plan was legitimate or was created to evade the payment of income taxes is a question of fact for a jury."); *United States v. Miller*, No. 3:09-CR-00014, 2009 WL 10678134, at *2 (S.D. Iowa Oct. 27, 2009) (tax evasion charges not unconstitutionally vague where indictment "stated the primary manner in which [defendant] committed the offense"); *United States v. Kritt*, No. CRIM.A. 1:09-0067, 2009 WL 6567103, at *6 (S.D.W. Va. Nov. 19,

2009) ("Defendant's assertions do not present issues which can be resolved as a matter of law."), *rep. and rec. adopted*, No. 1:09-CR-00067-02, 2010 WL 2331061 (S.D.W. Va. June 8, 2010).

Defendant's Motion does not cite any case sustaining vagueness challenges to the tax evasion statute. To the contrary, the Motion acknowledges that the statute has been applied in the Fourth Circuit to a wide range of conduct including preparing and executing false loan documents, making false statements to IRS agents to conceal income, and failing to report substantial personal benefits received from an employer like housing, travel, and tuition. Mot. 8.

### b. Deductible Business Expenses

The law is clear that only "ordinary and necessary expenses" can be deducted from a corporation's income. *See Ragen*, 314 U.S. at 517; *Brodnik*, 710 F. Supp. 2d at 552. The Internal Revenue Code provides that "[t]here shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including . . . a reasonable allowance for salaries or other compensation for personal services actually rendered." 26 U.S.C. § 162.

An expense is "ordinary" if it is "common to the business community of which it is apart." *Loewy Drug Co. of Baltimore City v. United States*, 232 F. Supp. 143, 148 (D. Md. 1964), *aff'd*, 356 F.2d 928 (4th Cir. 1966). An expense is "necessary" if "there are business ends to be served, and . . . there was an intention to serve those business ends [] by means of the questioned expenditure." *Id.* In *Loewy Drug Co. of Baltimore City v. United States*, this Court held—in a decision affirmed by the Fourth Circuit—that payments to the widow of a company's longtime president were not "ordinary and necessary" business expenses because "no such business purpose existed." *Id.* Instead, "the dominant, if not the sole, reason for the payments was to provide for the financial needs of [the widow]." *Id.*

18

In criminal tax prosecutions, juries are commonly instructed on the definition of tax law terms—including "ordinary and necessary"—to help apply the law to the evidence. *See United States v. Mikutowicz*, 365 F.3d 65, 70-71 (1st Cir. 2004) (finding no error in instructing the jury on the definition of ordinary and necessary business expenses, and collecting cases in which juries were instructed on other tax-specific definitions).

## I. Ordinary People Understand That Tax Evasion Is Illegal

The tax evasion statute states that "[a]ny person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall . . . be guilty of a felony." 26 U.S.C. § 7201. The elements of tax evasion are (1) willfulness; (2) an additional tax due and owing; and (3) an affirmative act constituting an evasion or attempted evasion of the tax. *Sansone v. United States*, 380 U.S. 343, 351 (1965). In *Spies v. United States*, the Supreme Court provided a non-exhaustive list of conduct that could support a tax evasion charge: "keeping a double set of books, making false entries of alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal." 317 U.S. 492, 499 (1943).

Around the same time as its *Spies* decision, the Supreme Court also held that mischaracterizing dividend payments as payments for services and then deducting those payments as business expenses can constitute tax evasion. *Ragen*, 314 U.S. at 523-24. The appellate court had ruled that if "a statute permits a reasonable deduction, [then] a criminal prosecution" may pursue only a completely false deduction and cannot be based on the theory that the "amount paid was unreasonable." *Id.* at 522. The Supreme Court reversed, stating:

> If, as the opinion below suggests, the only question that can properly be submitted
> to the jury is whether the entire deduction is fabricated, an unconscionable taxpayer

> can immunize himself from the criminal sanctions for tax evasion by the simplest of expedients. He need only find a legitimate item of deduction and then pad it as much as his purpose requires. By transforming the question 'Should any deduction have been made?' into 'Was the deduction made in excess of a reasonable allowance?' he can, if the theory accepted below be correct, largely destroy the deterrent effect of a penal statute passed by Congress.

*Id.* at 522-23. This concern squarely applies to the present facts. And even if appellate courts had not addressed the legality of a scheme like Defendant's, he would "have fair notice of its illegality" given "established principles of tax law" concerning permissible business deductions. *See United States v. Russell*, 804 F.2d 571, 575 (9th Cir. 1986) ("If it is clear beyond any doubt that a scheme is illegal under established principles of tax law, then participants have fair notice of its illegality even if no appellate court has explicitly so ruled."); *United States v. Ingredient Technology Corp.*, 698 F.2d 88, 96 (2d Cir. 1983) (holding that where general principles of law are clear, "of course it is immaterial that there is no litigated fact pattern precisely in point") (citation omitted).

Here, Count Three of the Indictment charges Defendant with tax evasion in 2018 for, among other things, improperly deducting G&R's payments to or on behalf of the four women with whom he was involved in or pursuing intimate personal relationships. ECF 1 ¶¶ 13, 56(b); *id.* at 39. This is a simple and uncontroversial charge. The payments were not ordinary and necessary business expenses, but rather personal expenses made for Defendant's benefit. They were not "ordinary" because it is not "common" in the legal community to funnel support payments to current or prospective intimate partners through a law firm. *See Loewy Drug*, 232 F. Supp. at 148. They were not "necessary" because the facts surrounding their hiring and employment do not evince a genuine "intention to serve [the law firm's] business ends." *See id.* As in *Loewy Drug*, the "dominant, if not the sole, reason for the payments was to provide for the financial needs" of the four women, and to incentivize continuing or initiating intimate personal relationships with Defendant. *See id.*

20

Even under a slightly different interpretation of the phrase "ordinary and necessary," the payments would still not be deductible.  For example, in *Actavis Labs., FL, Inc. v. United States*, the court defined "ordinary expenses" as those that are "customary or usual within a particular trade, business, or industry, or relates to a common or frequent transaction in the type of business involved," and "necessary expenses" as those that are "appropriate and helpful to the operation of the taxpayer's business."  161 Fed. Cl. 334, 352 n.11 (2022), *aff'd*, 131 F.4th 1345 (Fed. Cir. 2025).  The payments to the women were not "ordinary" because it is not "customary or usual" in the legal community to pay current or prospective intimate partners through a law firm as if they were employees, and such an arrangement does not "relate[] to a common or frequent transaction in the" legal field. *See id.*  And the payments were not "necessary" because their hiring was not "appropriate" in light of their relationships with Defendant and because there is scant evidence that the women were "helpful to the operation" of G&R. *See id.*

Therefore, it was improper to deduct the payments as business expenses. And because the Indictment alleges that Defendant deducted the payments as part of his scheme to willfully evade the assessment of income taxes for 2018, the deductions are appropriately included as part of the tax evasion charge. This concept should not be complicated, especially for an intelligent, highly sophisticated attorney like Defendant. Business owners in the United States know that business expenses can be deducted only if they are both ordinary and necessary. Indeed, as the Supreme Court noted in a tax evasion case over 80 years ago:

> The statutory specification of permissible deduction here in question is of long standing. For years thousands of corporations have filed income tax returns in accordance with the direction to deduct 'a reasonable allowance for salaries or other compensation for personal services actually rendered,' and there has not been any apparent general confusion bespeaking inadequate statutory guidance. A finding of unconstitutional uncertainty in this section of the act as applied here would be a negation of experience and common sense.

*Ragen*, 314 U.S. at 524. Defendant cannot credibly claim ignorance of the long-standing rules concerning permissible deductions. *See, e.g.*, Ex. 23 (PROD-USA-0061404) (Defendant stating a payment made by G&R was "a personal distribution not a business expense [s]o it doesn't get deducted"). Nor can he credibly claim ignorance of the fact that willfully breaking these rules constituted tax evasion.

The personal nature of the payments to the four women is substantiated by the evidence concerning the origin of Defendant's relationships with the women and how they came to be G&R employees. Defendant's relationships with the women were not based solely on mutual attraction; they were also transactional. They were based on an explicit or implicit agreement that Defendant would financially support the women during the relationships. Defendant met three out of the four women on dating websites for individuals seeking to receive or provide financial support as part of an intimate personal relationship, and started making payments to or on behalf of all four women prior to providing them G&R salaries and benefits. Defendant then used the salary and health insurance premiums paid by G&R to supplement or replace the payments he previously was making to or on behalf of the women. ECF 1 ¶ 12. For example, in explaining the offer of "employment" and compensation to Woman-4, Defendant explained "you will get some from the firm, and the rest from me directly; it's just to have enough to qualify for insurance." Ex. 14 at -213 (PROD-USA-0175157).

Defendant's relationships with the women while they were on G&R's payroll underscores that the payments were personal. Defendant continued to engage in physical intimacy with at least two of women despite becoming their employer and supervisor. Similarly, Defendant continued to pursue physical intimacy with Woman-3 once she was on G&R's payroll. He sent her sexually suggestive text messages and materials, and directly propositioned her during a trip they took to

Portland—all while she was employed at G&R. This conduct suggests that the women were not, as Defendant claims, "hired[] in good faith[] to work for G&R." Mot. 5. Instead, it further supports that Defendant used G&R to funnel personal payments (which were ultimately deducted as business expenses and reduced Defendant's tax liability) to the women so they would continue or initiate intimate personal relationships with him.

Defendant's deceptive conduct betrays an illicit motive in hiring the four women. For example, Defendant generally did not announce their hiring or introduce them to attorneys or employees at G&R except for the firm manager responsible for onboarding. After Defendant learned that employees would qualify for G&R's health insurance plan only if they worked 30 hours per week or more, Defendant falsely characterized Woman-2 and Woman-3 as "FTEs," or full-time employees, despite that knowing that they were working anywhere near 30 hours per week. In fact, just days before claiming that Woman-3 was a full-time employee, Defendant specifically instructed her that she needed to work just ten hours per week, texting, "Nominally you may actually be full time. I'm not sure. *But you can ignore that*. My expectation will be 10 hours." Ex. 11 (PROD-USA-0286657) (emphasis added). Defendant's instruction that she "ignore" the actual (but to him, "nominal[]") health insurance eligibility requirement highlights both his understanding of that requirement and his flagrant disregard for it.

While Woman-3 was on G&R's payroll, Defendant also suggested that she represent to third parties that she was a law student working as a law clerk at G&R, when in fact she was not a law student and not a law clerk there. If Defendant believed Woman-3 were an ordinary or necessary employee, then he would not have needed to give her a fake title and role.

Regarding Woman-2, when increasing her salary from $26,000 to $50,000, Defendant falsely told the firm manager that "[s]he's going to work a bunch more as we ramp up AmEx for

the next couple of months." Ex. 10 (PROD-USA-0059364). In truth, he had her do only one more

short task, which she completed a few days after he doubled her salary. Defendant's assurance that

she would "work a bunch more" in "the next couple months" calls into question the notion that her

salary was based on her work previously done and not merely their relationship.

Meanwhile, Defendant's deception regarding Woman-4's employment was foundational:

Defendant and Woman-4 knew that she was never going to do any work for G&R, but they created

false documents declaring that she was a "translator" despite a clear inability to perform that role.

Woman-4 herself understood that there was not any expectation of work. At the same time that

Defendant was paying for Woman-4's health insurance as a so-called "employee" on purported

"unpaid medical leave," both he and she confirmed this was a lie. *See* Ex. 19 (excerpted document)

at -319, -322 (Defendant stating she had "[n]o job" and "no skills," to which Woman-4 responded

she had "worked at restaurants, babysitter, bottle girl promo girls, model, assistant at medical

office, v[i]rtual technology services and even hustle on uber," but *not* mentioning work as a

translator). His April 2019 request that Woman-4 "reimburse" G&R for her insurance premiums

further underscores that she was not an employee and G&R's payments for her insurance were not

an ordinary and necessary business expense.

Ordinary people can understand that Defendant's conduct is prohibited by the tax evasion

statute. *See Sun*, 278 F.3d at 309. Ordinary people would assume that they are not allowed to use

their company as a vehicle to supplement financial arrangements with current or prospective

intimate partners, funnel personal payments to those partners through the company, misrepresent

the nature and extent of those partners' employment and work (including by creating false

documents), and then deduct the payments as ordinary and necessary business expenses. Ordinary

people understand that they cannot lie about their romantic partner's eligibility for health

insurance, pay the premiums for that insurance, and then deduct those premiums as ordinary and necessary business expenses. And ordinary people know that they cannot concoct a fake, no-show job for a romantic partner and then deduct their salary as a business expense.

It is even less plausible to suggest that "business people as knowledgeable as" Defendant would be ignorant of the illegality of his scheme. *See Sun*, 278 F.3d at 309. Therefore, this prong of the vagueness test counsels in favor of denying the Motion.

## II. Any Risk Of Arbitrary Enforcement Is Speculative

Defendant's claim that the tax evasion statute encourages arbitrary enforcement is unfounded. Notably, proving tax evasion requires establishing willfulness, meaning that a defendant voluntarily and intentionally violated a known legal duty. *Cheek v. United States*, 498 U.S. 192, 200-01 (1991). Intent or willfulness requirements "tend[]to defeat any vagueness challenge based on the potential for arbitrary enforcement." *United States v. Kimble*, No. CRIM. WDQ-13-035, 2015 WL 4164820, at *17 (D. Md. July 8, 2015), *aff'd*, 855 F.3d 604 (4th Cir. 2017) (quotations and citations omitted); *United States v. Kim*, 808 F. Supp. 2d 44, 55 (D.D.C. 2011) ("[T]he willfulness requirement in the statute effectively eliminates any concerns that Defendant may have been subject to arbitrary enforcement."). The willfulness requirement also "establish[es] minimal guidelines to govern law enforcement" such that the tax evasion statute does not "permit a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (quotations and citations omitted). To the contrary, the statute criminalizes only *willful* misconduct, and the Government must prove willfulness to secure a conviction.

Defendant's suggestion that the allegations at issue present "a prime example of arbitrary enforcement," Mot. 10-11, ignores the scope of the tax evasion charge for 2018. The illicit

payments are only one of seven affirmative acts of evasion listed in Count Three of the Indictment, which also lists (1) using funds and assets of G&R to pay personal gambling debts, (2) diverting G&R fees to a third party to pay personal gambling debts, (3) causing false and incomplete information to be provided to G&R's outside accountants, (4) causing the preparation, signing, and filing with the IRS of a false and fraudulent Form 1120S for G&R, (5) causing the preparation, signing, and filing with the IRS of a false and fraudulent Form 1040 for himself and his wife, and (6) making false statements to IRS representatives about the funds brought back from Hong Kong. ECF 1 at 39. Accordingly, Count Three alleges that the payments to the women were just one aspect of a broader pattern of conduct relating to 2018 that, when taken together, constitute willful tax evasion.

At most, Defendant raises hypothetical, speculative concerns about arbitrary enforcement. This Court, however, need not decide whether a tax evasion charge based solely on the improper deductions would be appropriate, or whether the tax evasion statute would be implicated by Defendant's hypotheticals about hiring acquaintances, Mot. 9, or paying a premium for American-made machinery, Mot. 10. Those contrived scenarios are inconsistent with "the particular facts at issue" here. *See Holder*, 561 U.S. at 18-19. Moreover, speculative concerns about arbitrary enforcement do not render a statute unconstitutionally vague. *See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 503 (1982) ("The language of the ordinance is sufficiently clear that the speculative danger of arbitrary enforcement does not render the ordinance void for vagueness."). Therefore, this prong of the vagueness test also counsels in favor of denying the Motion.

### III. The Jury, Not The Court, Is The Proper Audience For Defendant's Arguments

Finally, although it is styled as a vagueness challenge, much of Defendant's Motion amounts to challenging the sufficiency of evidence supporting his willfulness in committing tax evasion. In other words, Defendant is effectively "asserting that he had no basis for knowing and believing that the method as alleged in the Indictment could be regarded as an attempted evasion of the requirement to pay income taxes." *Kritt*, 2009 WL 6567103, at *6. On the other hand, Defendant is not asserting "that there is anything vague about the legal requirement to pay income taxes," *id.*, or about the "ordinary and necessary" analysis required for determining if expenses can be deducted.

Factual defenses to willfulness, however, "do not present issues which can be resolved as a matter of law." *See id.* "Rather, [Defendant's] assertions are for a jury's consideration in determining whether he acted willfully in . . . the alleged attempted evasion of income taxes." *See id.* Juries are commonly asked to determine whether a defendant's tax misconduct was willful. *See, e.g.*, *United States v. Iskander*, 407 F. 3d 232, 241 (4th Cir. 2005) ("[T]he taxpayer's subjective beliefs regarding his ignorance of the law or his misunderstanding of the law is a question for the jury." (quotations omitted)).

The Court should reject Defendant's request that allegations be stricken from the Indictment for another, related reason. Even ignoring the relevance of the allegations to Count Three of the Indictment, Defendant's payments to or on behalf of the women are relevant to other counts not at issue in the Motion. For example, the payments tend to show Defendant was willfully failing to pay his taxes, in violation of 26 U.S.C. § 7203, and instead choosing to spend money on personal matters. *See supra* notes 1-2. Therefore, the payments would be relevant to Counts Fifteen

through Nineteen of the Indictment, and the jury should be entitled to hear and consider that evidence at trial.

In sum, Defendant's attack on the "willfulness" proof with respect to Count Three is premature. That proof is properly weighed by the jury.

## **CONCLUSION**

For all the reasons stated above, the Government respectfully requests that the Court deny Defendant's Motion to Dismiss Allegations Concerning Employees, ECF 122.

Respectfully submitted,

Kelly O. Hayes
United States Attorney
/s/
_____
Patrick D. Kibbe
Assistant United States Attorney
District of Maryland

Emerson Gordon-Marvin
Hayter Whitman
Trial Attorneys
Department of Justice—Tax Division