# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. LKG-25-6** |
| | * | |
| **THOMAS C. GOLDSTEIN,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

**DEFENDANT THOMAS C. GOLDSTEIN'S**
**CONSOLIDATED REPLY IN SUPPORT OF HIS MOTIONS TO (1) INVALIDATE**
**CERTAIN ORDERS SUSPENDING THE STATUTE OF LIMITATIONS AND (2)**
**<u>DISMISS COUNTS 1, 5, 6, AND 15 AS BARRED BY THE STATUTE OF LIMITATIONS</u>**

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION....................................................................................... 1

II.   THE GOVERNMENT'S EXTENDED ARGUMENT THAT PERIODS OF
      INTERNATIONAL TRAVEL MUST BE PROVED AT TRIAL IS UNDISPUTED
      AND SUPERFLUOUS............................................................................. 2

III.  THE COURT SHOULD REJECT THE GOVERNMENT'S POSITION THAT
      SECTION 3292 ALLOWS IT TO MISREPRESENT THE DEFENDANT'S
      CONDUCT AND CULPABILITY. ......................................................... 3

      A.    The Government's Position Is Irreconcilable with the Statute. ............... 3

      B.    There Is No Support for the Government's Position. ............................ 6

IV.   A HEARING IS WARRANTED WITH RESPECT TO THE FIRST TOLLING
      ORDER. ............................................................................................... 8

V.    A HEARING IS WARRANTED WITH RESPECT TO THE SECOND
      TOLLING ORDER................................................................................. 12

      A.    The Second Declaration and Application Contain Material Falsehoods. ............. 12

      B.    The Second Order Is Not Saved by the Application's Discussion of
            Alleged Offenses in 2018............................................................. 14

      C.    The Second Tolling Order Is Not Saved by the Third Order.................. 17

            1.    The Effective Date of the Third Tolling Order Does Not Moot the
                  Validity of the Second Order............................................ 17

            2.    The Second Tolling Order Is Not Saved by the Later Correction of
                  the Second Declaration. .................................................. 18

            3.    There Is No Merit to the Government's Assertion that the Court
                  Should Not Hold An Evidentiary Hearing But Instead Should
                  Accept Its Bald Assertions That It Corrected The Errors In Good
                  Faith. ........................................................................ 19

            4.    It Makes No Difference Whether the Second Declaration and
                  Application Hypothetically Could Have Relied Instead on the
                  Subset of Funds That Remained in Montenegro.......................... 22

VI.   THE GOVERNMENT'S REMAINING ARGUMENTS IN OPPOSITION TO
      HOLDING AN EVIDENTIARY HEARING LACK MERIT............................ 24

      A.    The Government's Reliance on the Grand Jury Indictment Is Misplaced. ........... 24

      B.    The Government's Alternative Narrower Rules Lack Merit As Well. ............... 25

      C.    There Is No Merit to the Sweeping Effort to Narrow Discovery of
            Relevant Grand Jury Testimony............................................... 26

VII.    THE GOVERNMENT'S OTHER CATEGORICAL REPRESENTATIONS
        THAT MR. GOLDSTEIN ENGAGED IN CRIMINALITY ARE HIGHLY
        MISLEADING AND REINFORCE THAT A HEARING IS WARRANTED................27

VIII.   CONCLUSION ...................................................................................................28

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Franks v. Delaware*,
  438 U.S. 154 (1978) .................................................................................................21, 22

*United States v. Bogucki*,
  316 F. Supp. 3d 1177 (N.D. Cal. 2018) ................................................................ 20

*United States v. Neill*,
  952 F. Supp. 831 (D.D.C. 1996)................................................................................20, 25

*United States v. Ratti*,
  365 F. Supp. 2d 649 (D. Md. 2005) ......................................................... *passim*

*United States v. Wilson*,
  249 F.3d 366 (5th Cir. 2001) ........................................................................... 7

**FEDERAL STATUTES**

18 U.S.C. § 3292 ............................................................................................... *passim*

26 U.S.C. § 6531 .................................................................................................. 1, 2

31 U.S.C. § 5322 .................................................................................................... 9

**OTHER AUTHORITIES**

Black's Law Dictionary (11th ed. 2019) ........................................................... 3

I.    __Introduction__

Defendant Thomas Goldstein has moved to invalidate certain orders tolling the statute of limitations under 18 U.S.C. § 3292 (ECF No. 116) (the 3292 Motion) and to dismiss various charges under the statute of limitations (ECF No. 121) (the Statute of Limitations Motion). The government has responded to the latter motion by arguing that the limitations period was extended under 26 U.S.C. § 6531 by Mr. Goldstein's overseas travel. The parties agree that the Court should decide the validity of the tolling orders now, whereas the jury should decide the period of international travel at trial.

Regarding the tolling orders, the government does not dispute that its applications and declarations contained significant falsehoods. But the government argues that Mr. Goldstein has no remedy. It reasons that the only relevant questions under Section 3292 are whether (1) the grand jury was investigating an offense; (2) a request was made to a foreign government; and (3) it reasonably appears that evidence of the offense would be located in the foreign jurisdiction *if* it in fact did occur. The government maintains that it may therefore lie to the Court about whether the defendant in fact committed the offense. The United States has apparently never before taken such a breathtaking position, and unsurprisingly no court has adopted it. This Court should not be the first.

For the reasons set forth *infra*, the Court should (1) hold an evidentiary hearing; (2) order discovery that includes the relevant grand jury testimony; (3) determine that the tolling orders are invalid; (4) hold that none of the 2016 and 2017 offenses are subject to tolling under those orders; and (5) invite the parties to submit their proposed calculations of the periods of overseas travel the government would be required to prove at trial.  As an experienced attorney, Mr.

1

Goldstein requests that the Court grant him permission to participate personally in the hearing on this motion, as it has previously.

## II.    The Government's Extended Argument that Periods of International Travel Must Be Proved at Trial Is Undisputed and Superfluous.

The government's consolidated opposition begins with 15 pages of responses to arguments that the defense does not make. The defense motion to dismiss under the statute of limitations is brief, straightforward, and properly framed. The offenses now at issue are, on their face, outside the applicable statute of limitations. It is therefore incumbent upon the government to prove that an applicable exception applies.  Because the government refused numerous defense requests (both pre-indictment and post-indictment) for the government's statute of limitations calculation, the defense could not have anticipated the government's position on the interaction between Section 3292 and Section 6531.  The government's opposition takes the position that the Court should rule on the validity of the Section 3292 orders now, and that the sufficiency of its proof on the length of international travel should be decided at trial. The defense agrees.

The government's angry rhetoric—decrying the defense's "tactic," ECF No. 136 ("Opp."), at 13, and its "unprecedented invitation to weigh the sufficiency of the evidence now," *id.* at 21—completely misstates the defense's position.  So does the government's argument that it was not required to plead the statute of limitations in the Indictment, *id.* at 14-15, and that the defense motion cannot function as a request for summary judgment on the factual question of the length of Mr. Goldstein's time abroad, *id.* at 16. The defense never suggested that the Court should adjudicate the period of international travel under Section 6531 now.

Given the foregoing, the "core of the statute of limitations dispute" is obviously *not* Mr. Goldstein's international travel under Section 6531. *Contra* Opp. 13. Rather, the issues that

actually require the Court's immediate attention relate to the defense's motion to invalidate the orders extending the statute of limitations under Section 3292. The question immediately before the Court is whether the defense is entitled to an evidentiary hearing on that request. For the reasons that follow, under well-settled principles applying the governing statute, the answer is yes.

**III.    The Court Should Reject the Government's Position That Section 3292 Allows It To Misrepresent the Defendant's Conduct and Culpability.**

**A.    The Government's Position Is Irreconcilable with the Statute.**

The 3292 Motion detailed multiple falsehoods in the government's applications and declarations in seeking tolling orders. The motion explained why those falsehoods were material—*i.e.*, they were reasonably likely to have influenced the court's decision to grant tolling. *See* Black's Law Dictionary (11th ed. 2019) (defining "material" as "[h]aving some logical connection with the consequential facts; of such a nature that knowledge of the item would affect a person's decisionmaking.").

Importantly, the government does *not* defend the truth of its representations. Rather, it argues that Section 3292 renders those falsehoods irrelevant as a matter of law. It is no overstatement to say that the government's position is that it may lie without sanction in a 3292 application and accompanying *sworn* declaration regarding the defendant's conduct and culpability. On the government's view, it is required to tell the truth only about whether (1) the grand jury was investigating an offense, (2) it had submitted an application to a foreign government, and (3) evidence would reasonably be located abroad *if* the defendant had actually committed the offense. The government reasons that those are the only criteria for issuance of a tolling order under Section 3292, and thus the only matters that could be material as a matter of law.

3

The government thus maintains (with emphasis in original) that "*none* of" the falsehoods identified in the defense motion and conceded by the government is "relevant" because "[t]hey do not alter the fact that the grand jury was investigating whether Defendant had committed tax and other crimes. Nor do they alter the fact that (1) an official request for evidence of an offense had been made to Montenegro, and (2) it reasonably appeared at the time of the request that this evidence was in Montenegro."  Opp. at 32 (emphasis in original).; *see also id.* at 2 (Section 3292 "requires only" that the application set forth that information); *id.* at 30 ("Whether exculpatory information might exist, whether a crime occurred, whether a grand jury might not indict, whether a petit jury might acquit, or whether a court might conclude a crime was not committed *are all irrelevant*." (emphasis added)). Indeed, the government comes out and expressly rejects the proposition "that a 3292 application was invalid because the government *knew* or should have known that the defendant was innocent of an offense under investigation." *Id.* at 33 (emphasis added).

The implications of the government's position are obvious and alarming. Government attorneys and agents would be free to grossly mislead courts about the state of their investigations and the underlying facts. Courts would issue orders under a profound misunderstanding of the case and the Defendant's culpability.

Thankfully, and unsurprisingly, the government's position lacks the slightest merit. The argument that the government is allowed to lie in an *ex parte* sworn declaration answers itself. Further, the point of Section 3292 is to extend the limitations period for offenses currently under investigation. It would make no sense for it to be irrelevant whether the government already knew that the defendant had not committed that very offense.

The government's reading of the statutory text is also a *non sequitur*. Section 3292 requires that the government demonstrate a reasonable likelihood that evidence of the offense is located abroad. If the government falsely describes the offense, that will not be true. The fact that the grand jury is investigating that offense — perhaps because the government has misled it too, by withholding all the relevant exculpatory evidence — is not sufficient to trigger tolling. Nor is it sufficient that evidence would be located abroad if the offense had in fact not occurred. The Court must make its own independent determination that the supposed evidence of the offense would exist. It also makes no sense that the statute requires proof that evidence of the offense was located abroad *at the time* of the application, if it makes no difference whether the offense actually occurred *at all*.

To pick just one example: Contrary to the Applications' assertions, it was not likely at the time that the request for assistance would uncover evidence that Mr. Goldstein willfully concealed the Montenegrin accounts, given that at the time of the application the government was in possession of evidence conclusively showing that he never concealed them in the first place. *See infra* Section IV. The government's misrepresentations to the contrary in its application and declaration thus render the tolling orders invalid.

Ultimately, the government's sweeping claim that it may lie about the defendant's culpability — to the point of knowingly falsely accusing him of a crime — very strongly reinforces that a hearing is warranted. It appears that the government operated under an unprecedented and deeply troubling view of the law in crafting the applications and declarations, raising the concern that the government may have made other false or highly misleading allegations. The opposition avowedly states that the government intentionally withheld "*myriad*

other facts" that were exculpatory. Opp. at 42 (emphasis added); *see also id.* at 46. It is essential

that the Court review and hear evidence on the scope of this misconduct.

      **B.**      **There Is No Support for the Government's Position.**

      The defense is not aware of the United States ever taking the shocking position advanced

by the opposition, and is confident that no court has ever endorsed anything like it — whether

under Section 3292 or in any related context. The government argues to the contrary that its

position "is so common sense that courts recognize it in passing." *Id.* at 30-31. That is a

backhanded acknowledgment that no court has ever held any such thing. The rulings that the

government cites merely state truisms such as that the alleged offenses must be set forth in the

application and that the statute's purpose is to allow prosecutors additional time to investigate.

*Id.* None could remotely be read to suggest that it makes no difference whether the government

lies in tolling applications.

      The other rulings invoked by the government elsewhere in the opposition are inapposite

as well.  In *United States v. Ratti*, 365 F. Supp. 2d 649 (D. Md. 2005), the government

represented in a tolling application that it had submitted two separate requests for overseas legal

assistance, when it actually had only submitted one. The Court upheld the tolling order because

the inaccuracy had absolutely no effect. No reasonable judge would have deemed it relevant

whether a second application had been filed, given that one unquestionably had and that was all

that was necessary.

      Although it upheld the tolling order, the Court in *Ratti* took care to specifically warn the

Maryland U.S. Attorney's Office that it must pay considerably greater attention to ensuring that

its applications under Section 3292 are truthful. The Court expressed its "concern" and

cautioned: "In the future, the government will have to pay far greater attention to the

requirements of Section 3292 than it did in its 1999 application to Judge Williams." *Id*. at 658. In *Ratti*, the error was nowhere near as significant as the falsehoods in this case. The "only real deficiency" there was "an oversight" in not including a formal "verification." *Id.* Given that the applications here show dramatically *less* concern with the truth — to the point of claiming that it is legally irrelevant — it is essential that the Court hold a hearing and moreover expressly reject the government's position that it may lie about the defendant's culpability. (*Ratti* is also consistent with the general concern that prosecutors are regularly abusing the Section 3292 process. *See* 3292 Motion at 30 n.7.)

The government also misreads *Wilson*. That case merely concerned a dispute over whether the government had made the overseas legal request. The court concluded: "An evidentiary hearing need not be set as a matter of course, but only if the motion alleges facts that, if proved, would require the grant of relief." *United States v. Wilson*, 249 F.3d 366, 372 n.3 (5th Cir. 2001) (citation and internal quotation marks omitted). That simply means that the defendant must allege facts on which he could prevail, a standard that is easily met here. Nothing in that language, or *Wilson* more broadly, suggests that material misrepresentations by the government about the defendant's culpability do not warrant an evidentiary hearing.

The government also cites cases holding that a reviewing court should defer to an initial determination that a tolling application satisfies the "preponderance of the evidence" standard. Opp. at 48 (citation and internal quotation marks omitted). That makes perfect sense: There is no particular reason to second guess an earlier judge's assessment of the identical application. But this case is of course radically different. *Only* this Court has been fully advised of the scope of the government's falsehoods and grossly misleading statements. And *only* this Court will have the benefit of the evidence developed at a contested hearing.

**IV.**    **A Hearing Is Warranted with Respect to the First Tolling Order.**

Contrary to the government's claim that "Defendant primarily contests the validity of the Second Order," Opp. at 22, the First Tolling Application and Declaration rested almost entirely on falsehoods. That Application related to a request for assistance from Montenegro for Mr. Goldstein's banking records. Because Mr. Goldstein has made a sufficient showing that the Application depended on materially false and misleading statements, a hearing is required. In its opposition, the government concedes that it withheld information from the Court. In particular, the government did not advise the Court of the undisputed fact that, upon opening the Montenegrin bank accounts, Mr. Goldstein promptly instructed the law firm's manager to tell the outside accountants to disclose the accounts for tax purposes. The manager in turn forwarded that instruction. The accountants inexplicably failed to follow it. *See* 3292 Motion at 2-3, 10-12.

Critically, the government now *concedes* that it was aware of this information, and that it knowingly withheld this information from the Court in the First Application and Declaration. Opp. at 42. In a lengthy interview with Agent Accardi before the First Application and Declaration were submitted, Mr. Goldstein accurately described the facts and produced the relevant correspondence. Mr. Goldstein's counsel also described the events and documents in detail at a subsequent meeting with the government that Agent Accardi attended. *See* 3292 Motion at 2-4.

The government nonetheless argues that it was entitled to withhold this information from the Court because it was immaterial to the First Application that Mr. Goldstein had directed that the accounts be disclosed. The government reasons that the First Application "never alleged Defendant had 'purposefully' or 'intentionally' failed to report his foreign accounts. Rather, they stated that he had failed to report the accounts (a fact Defendant concedes), that the grand jury

was investigating his failure to do so, and that the official request sought evidence of those accounts." Opp. at 41. This argument fails for two independent reasons.

First, it confuses materiality with the question whether the government outright lied. Mr. Goldstein's culpability was *material* because the nondisclosure of the accounts was a central premise of the First Application, which sought information related to those very accounts. Further, in order to qualify for tolling under Section 3292, the Application *had* to describe Mr. Goldstein's failure to disclose the accounts as purposeful. An application under Section 3292 must describe how the evidence sought from overseas relates to a particular "offense." The only relevant offense is the "willful" failure to disclose overseas bank accounts. *See* ECF No. 116-4, ¶ 1 (First 3292 Application citing 31 U.S.C. § 5322). If the Application had accurately explained that the accounts were not disclosed *despite* Mr. Goldstein's instructions, the Application would have been legally insufficient on its face because it would not have described an alleged offense.

Second, and in any event, the government's contention that the First Application and Declaration did not describe Mr. Goldstein's conduct as purposeful is completely inaccurate. That is presumably why the government's opposition never quotes the contents of either document.

In fact, the obvious import of the First Application was the false claim that Mr. Goldstein willfully failed to disclose the accounts:

- The First Application (ECF No. 116-4, ¶ 1) explained that the grand jury was investigating Mr. Goldstein's supposed *willful* failure to disclose the accounts: "A grand jury duly impaneled in this District has been conducting an investigation of Goldstein . . . [for] willfully failing to file a report [sic] the ownership or control

of, or signatory authority, or other authority over, a foreign financial

account . . . .”

- The First Application (ECF No. 116-4, ¶ 4) then described Mr. Goldstein as having *concealed* the accounts, which is by definition intentional conduct: “[T]he investigation to date has revealed, in substance and in part, that Goldstein has concealed from the United States his ownership of assets exceeding $10,000 maintained in foreign financial accounts and the income that flowed through those accounts.”

- The First Application (ECF No. 116-4, ¶ 7) then described Mr. Goldstein as having concocted a false excuse for not disclosing the accounts, which could matter only if he needed an excuse in the first place: “During the course of the Government’s investigation, Goldstein made various statements to an agent from the Internal Revenue Service where he indicated, in substance, that he was unaware of the FBAR filing requirement. Goldstein, however, was previously involved in a United States Supreme Court case that addressed FBAR-related issues, with an amicus brief listing him as an attorney for the amici.”

- Agent Accardi’s accompanying Declaration (ECF No. 116-4, at 10-11) described Mr. Goldstein’s failure to disclose the accounts as suggesting a nefarious scheme to hide his income: “Goldstein’s failure to properly report the UCB accounts on FBARs and his tax returns reinforces [the] suspicion” that he “may have used the UCB accounts to further hide his income.”

The government next argues that none of this matters because it is sufficient as a matter

of law that “the grand jury was investigating potential FBAR violations.” Opp. at 42. But the fact

of the grand jury's investigation is only one of the statutory requirements. The statute also requires the government to show by a preponderance that evidence of the offense is located abroad. Here, there could be no evidence of a willful FBAR violation located abroad because the government was already in possession of exculpatory evidence conclusively showing that no willful violation occurred. And it seems entirely likely that the grand jury was investigating this question only because the government withheld from it the exculpatory evidence showing that Mr. Goldstein ordered that the accounts be disclosed.

The government finally argues that its false statements were irrelevant because Mr. Goldstein was not indicted for any offense related to the nondisclosure of the accounts. Opp. at 41. This argument could have merit only if the government were to concede that the First Tolling Order was completely ineffective with respect to *any* offenses — or at least offenses relating to the 2016 and 2017 tax years, which are the charges that would implicate the statute of limitations. For those offenses, the First Application relied exclusively on the false nondisclosure allegations. But because the government instead argues that the First Tolling Order was valid with respect to every tax year, *see id.* at 28-29, then the Court must hold a hearing to determine the Order's validity.[1]

Because the First Application and Agent Accardi's accompanying Declaration intentionally describe Mr. Goldstein as having purposefully concealed the Montenegrin accounts,

---

[1] The government also notes in a passing parenthetical that the "potential FBAR violations . . . were never cured," Opp. at 42, but omits both (1) that there is no reason to believe Mr. Goldstein knew that was true; and (2) that the failure to correct the FBAR omissions resulted directly from deeply troubling conduct by the prosecution. The government told the law firm's outside tax preparer in an interview that Mr. Goldstein had overseas bank accounts beyond those in Montenegro. That was an outright lie, not remotely based in any fact. The tax preparer later explained in interviews with the government that — given that Mr. Goldstein insisted to the contrary that the only overseas accounts were in Montenegro — he was never comfortable with filing FBAR disclosures, no doubt because he feared being prosecuted. *See* Exhibit A, ¶ 33.

11

because that representation was false, and because it was material, a hearing into the validity of the First Tolling Order is warranted.

## V.     A Hearing Is Warranted with Respect to the Second Tolling Order.

### A.     The Second Declaration and Application Contain Material Falsehoods.

The Second Application sought tolling with respect to an application to Montenegro for assistance with respect to the banking records of Foreign Gambler 3. This Application relied on the same false and misleading statements relating to the disclosure of the Montenegrin accounts, as well as others.

The Second Application represented that the government was investigating "whether Goldstein routed payments from other law firms and clients, or gambling winnings, through [Foreign Gambler 3's Montenegrin] accounts back to himself in order to conceal income that should have been reported to the IRS." ECF No. 116-5, ¶ 14. As it relates to offenses in 2016 and 2017, the Application cited two categories of alleged conduct by Mr. Goldstein.

First, it repeated the same misleading statements from the First Application regarding Mr. Goldstein's supposed concealment of the Montenegrin accounts. The Second Declaration also added (ECF No. 116-5, at 13 n.1) the misleading assertion that a review of the firm's emails "indicates that personnel from Goldstein's firm informed his outside accountants of one or more of the UCB accounts."  This statement was highly misleading because that same correspondence reveals, yet the Declaration does not mention, that the law firm staff informed the accountants only at Mr. Goldstein's express instruction.

Second, the Second Application asserted that Mr. Goldstein falsely told IRS investigators (including Agent Accardi) that funds he received from Foreign Gambler 3 via the Montenegrin accounts in 2016 were a "loan[] from" Foreign Gambler 3. ECF No. 116-5, ¶ 13. The government concedes (as it must) that this representation was entirely false. Opp. at 38. Mr.

Goldstein never said any such thing. Moreover, well before the government submitted the

Second Application, Mr. Goldstein's counsel in a meeting with the prosecution team precisely

detailed the accounting of all those funds.

The defense motion detailed how Agent Accardi's Second Declaration falsely

represented that Mr. Goldstein attempted to evade income taxes on a fee paid to Mr. Goldstein

through Foreign Gambler 3 by the government of Malaysia. This was a principal justification in

the Second Declaration for tolling the limitations period while the government sought the bank

records of Foreign Gambler 3:

> Additionally, the investigation has revealed that income due and owing to Goldstein was
> sent by certain foreign officials in Malaysia to [Foreign Gambler 3]. As a result of the
> relationship between Goldstein and [Foreign Gambler 3], records from UCB for [Foreign
> Gambler 3's] accounts will help the U.S. authorities assess whether Goldstein conspired
> with [Foreign Gambler 3] to have income due and owing to Goldstein to be directed or
> filtered through [Foreign Gambler 3]—using [Foreign Gambler 3's] UCB account(s). . . .
> In addition, records relating to the deposits into the [Foreign Gambler 3] account(s) will
> show whether Goldstein utilized the account(s) to divert additional fees from his law
> firm, or otherwise receive income that was not reported to the IRS.

ECF No. 116-5, at 15-16.

The 3292 Motion explained that this paragraph was deeply misleading. In fact, as the

government knew, Mr. Goldstein expressly instructed the accountants to disclose this payment

on the law firm's tax returns, a payment that occurred in foreign bank accounts and that would

have been entirely invisible to the IRS had Mr. Goldstein not instructed his accountants to

disclose it. This conduct is the *exact opposite* of the scheme Agent Accardi falsely described to

evade taxes.

The 3292 Motion explained that this particular falsehood strongly reinforces the need for

discovery and live testimony. Almost always, the tolling applications at issue here track the

assertions of the Agent Accardi's declarations. But curiously, the Second Application does not

include the falsehood about the Malaysian funds. By contrast, and just as curiously, Agent

Accardi's Second Declaration does not include the falsehood about Mr. Goldstein claiming that

funds he received from Foreign Gambler 3 in 2016 were a loan. This left that allegation without

any supporting proof, in violation of the plain requirements of Section 3292. Because the

differences between the Second Application and Second Declaration were almost certainly

knowing and intentional, it is also likely that the falsehoods were knowing and intentional as

well. Importantly, the government *does not dispute* the inferences that the defense would draw

from these materials. It therefore cannot seriously maintain that a hearing is inappropriate.

The government attempts to bury this issue in two sentences on page 45 of its opposition,

but what it does say strongly reinforces that a hearing is warranted. The government does not

dispute that it knew at the time of the Second Declaration that Mr. Goldstein "had alerted his

accountants to the transaction." Opp. at 45. It asserts that this fact was immaterial because it

"would not have changed [the] fact" that "Defendant received [the money] abroad without it ever

touching his U.S. bank accounts." *Id.* But as just explained, the Declaration's claim was *much*

broader and it rested purely on fiction. Agent Accardi indicated that there had been a scheme by

which Mr. Goldstein sought to use Foreign Gambler 3 to avoid his taxes. To withhold from the

Court that Mr. Goldstein in fact directed that these exact funds be included in his income, while

describing the facts as an effort to *conceal* that income, was grossly misleading.

### B.     The Second Order Is Not Saved by the Application's Discussion of Alleged Offenses in 2018.

The government argues that the Second Tolling Order (although not the First) is saved in

its entirety because the Second Application accurately describes an investigation into distinct

conduct by Mr. Goldstein relating to funds he received in 2018. The government explains that a

"core purpose" of the foreign assistance request underlying the Second Application was "to

14

investigate whether these funds were in truth taxable income." Opp. at 24.[2] That argument fails

as a matter of law. The government repeatedly recognizes as it must that under Section 3292

tolling extends only to particular "offenses." *See supra* at 9. Any tolling that attached to that

2018 conduct would therefore not relate to the offenses at issue in these motions, which allegedly

occurred in 2016 and 2017. *See, e.g.*, ECF No. 116-5, ¶ 12 (Second Application expressly

distinguishing the funds Mr. Goldstein received via Montenegro "in October 2016" from those

received on "September 25, 2018").

In any event, tolling does not attach to the alleged 2018 offenses either. The

government's principal *reasons* for why it expected that there would be relevant evidence

relating to the 2018 offenses in Mr. Goldstein's banking records *in Montenegro* were its

falsehoods relating to 2016. They are set forth in paragraphs 18 and 19 of Agent Accardi's

Second Declaration (ECF No. 116-5, at 14), which falsely represents (1) Mr. Goldstein wrongly

failed to declare the 2016 funds that came through the Montenegro accounts as income; and (2)

purposefully failed to disclose the Montenegrin accounts.[3]

---

[2] *See also id.* ("Defendant received millions of dollars from Gambler 3 in 2018 but did not report *this money* as income" (emphasis added)); *id.* at 25 (addressing "records' relevance to Defendant's failure to report *2018 cash* as income" (emphasis added)); *id.* at 25 n.6 ("Moreover, despite the first two Applications' inaccurate statements that Defendant said the 2016 transfers were loans and did not report them as income . . ., the Second and Third Applications accurately summarized Defendant's claim that the *2018 funds* were loans—and the ongoing investigation into *whether that was true*." (emphasis added)); *id.* at 28 ("The First Application and Declaration . . . . showed that the official request would elicit evidence of tax crimes because the official request sought Defendant's UCB records, he had received more than 860,000 into his UCB accounts *in 2018*, he had not reported that money as income, and he previously had underreported his gambling income.); *id.* at 31 ("*Setting aside the 2016 inaccuracies*, the alleged falsehoods (which do not exist) are irrelevant for the simple reason that they have no bearing on the requirements of 3292 or the validity of the tolling orders." (emphasis added)).

[3] The government also conflates two different sets of money that Mr. Goldstein received in 2018. He received roughly $1 million in cash that he brought into the United States and properly declared from Hong Kong. The government maintains that this was gambling income, not a loan from Foreign Gambler 3. Those funds, however, had nothing to do with any Montenegro bank

At times, the government mistakenly suggests that tolling under Section 3292 applies to all the charges it combines under particular "statutes." *E.g.*, Opp. at 41-42; *see also id.* at 10 (chart listing statutory charges). That is not correct. The tolling provision addressing international travel does apply broadly to all the tax charges. By contrast, Section 3292 extends tolling only to particular offenses. Insofar as the Indictment charges multiple ways to prove a particular count of the Indictment (such as tax evasion in 2016), the tolling order would apply only to the allegations that are addressed by the application and resulting order. The fact that the government is awaiting those documents from overseas is no justification to extend the limitations period for unrelated allegations. The fact that the government later combines them into a single count of the indictment makes no difference.

A hypothetical illustrates the point. Imagine that an indictment contains a single count charging multiple distinct forms of tax evasion in 2016. Only one relates to a business transaction in Montenegro. The government then secures a tolling order with respect to a request for foreign assistance for records of that transaction. That tolling order would not apply to the

---

account. So there is no reason to believe that evidence relating to the offense would be located in Montenegro.

It also bears noting that the government continues to *wildly* overstate its proof of this offense. The government admits that prior to the trip abroad, Mr. Goldstein explained to his traveling companion in writing that he was going to retrieve the cash as a loan. Despite an extensive investigation, the government has no evidence that he gambled at all on this brief trip, much less that he made $1 million gambling. The government's allegation thus rests entirely on the assertion — which it repeats here without qualification — that Mr. Goldstein told a customs officer upon arriving that the cash was gambling winnings from Macau. But the government omits that the officer has explained that he merely has a "*vague recollection*" of Mr. Goldstein saying — in a conversation that occurred roughly seven years ago and is not memorialized anywhere — that the money was from gambling. That obviously is nowhere near sufficient to establish proof beyond a reasonable doubt, yet it is the government's only proof. Furthermore, the government seems to have completely manufactured the claim that the officer recalled Mr. Goldstein said he won the money in Macau.

unrelated allegations of evasion. By contrast, the limitations period on all the allegations would be extended for the period of the defendant's international travel.

**C.      The Second Tolling Order Is Not Saved by the Third Order.**

The government asserts that the Third Tolling Order absolves it of the consequences of the falsehoods in the Second Tolling Application and Agent Accardi's Second Declaration, precluding an evidentiary hearing. That is not correct.

**1.      The Effective Date of the Third Tolling Order Does Not Moot the Validity of the Second Order.**

The government argues that the validity of the Second Tolling Order makes no difference because the Third Tolling Order covers the same period of time. Opp. at 10. This is simple misdirection. On April 1, 2025, the defense moved to invalidate the First and Second Tolling Orders because the corresponding Applications and Declarations contained the relevant falsehoods. ECF No. 112. At that earlier point in time, the defense was focused on securing sanctions for the government's misrepresentations. *Id.* at 30.

Subsequently in May 2025, the defense separately moved to dismiss various charges under the Statute of Limitations. ECF No. 121. That motion invited the government to specify whether it would seek to invoke an exception to the six-year limitations period and "contend that these charges are timely based on the statutory tolling provision for obtaining foreign evidence." *Id.* at 1. Now that the government has invoked the Third Tolling Order for the first time, the defense in turn specifies that it believes that Order is invalid as well.

This is no surprise at all. The government has no theory for how, if the Second Order is invalid, then the Third Order could be sustained. Quite the opposite. Its entire point is that both rest on essentially identical assertions, such that they rise or fall together: "The Third Application sought to toll the limitations periods based on the same April 5, 2024 official request (seeking

17

Gambler 3's UCB records) as the Second Application, expressly incorporated the Second

Application, and reiterated its same general reasons for seeking the records." Opp. at 39; *see also*

*id.* 40 ("the Third Application . . . depended on the Second Application and the same general

bases").

**2.     The Second Tolling Order Is Not Saved by the Later Correction of the Second Declaration.**

Alternatively, the government argues that the Third Tolling Order necessarily determined

that the falsehoods of the First and Second Applications were immaterial. It reasons that the

Third Application contained a footnote that corrected certain falsehoods of the Second

Application. That argument fails for multiple reasons.

Most obvious, the Third Application did not remotely correct the government's earlier

misstatements. In particular, the Third Application further misled the Court by falsely suggesting

that only Mr. Goldstein's staff was involved in advising the accountants to disclose the accounts.

Nor did the Third Application correct the false representation about the funds from Malaysia.

The Application also did not retract any of the other false allegations discussed *infra*.

Further, there is every reason to believe that in issuing the Third Tolling Order, the Court

simply considered the technical question whether the government had submitted an application

and had described evidence that was potentially relevant to an offense. Indeed, it seems likely

that the Court relied entirely on the Application's description of the 2018 conduct, which would

not extend tolling to the 2016 and 2017 offenses.

There is no reason to believe that the Court evaluating the Third Application also

considered the question whether the falsehoods in the prior applications invalidated the prior

tolling orders. The Application did not ask the Court to consider the implications of the

falsehoods. To the extent the Court gave any thought to that issue, it would have been aware that

18

the question of the falsehoods' materiality could and would be litigated in a later contested motion to invalidate the Orders. Contrary to the government's representation that it "stressed" that it had made the errors, Opp. at 40, the Third Application discusses the issue in one footnote that is five sentences long. Even that footnote mischaracterized the falsehoods as essentially trivial and requiring no extended discussion or consideration. In turn, nothing in the Third Tolling Order mentions materiality. The Court granted the tolling application the day after it was submitted — in stark contrast, for example, to the extended briefing on this motion.

In any event, the government's position cannot be reconciled with the manner in which Section 3292 Orders are reviewed. The very nature of these proceedings is that the Court makes a preliminary determination that Section 3292 is satisfied and grants a tolling order, which is then reviewed post-indictment.  Even if the Court had considered the validity of the prior tolling orders in evaluating the Third Application, that *ex parte* determination would not preclude adversarial testing through an evidentiary hearing. The government cites no authority in support of its contrary position.

        **3.**      **There Is No Merit to the Government's Assertion that the Court Should Not Hold An Evidentiary Hearing But Instead Should Accept Its Bald Assertions That It Corrected The Errors In Good Faith.**

The government argues that the limited corrections of the Third Application were significant because it submitted them promptly upon learning of those errors. This ignores, of course, the falsehoods that were not corrected, including those that the government admits were purposeful, such as the assertions of Mr. Goldstein's supposed concealment of the Montenegrin accounts and that he concealed the income from Malaysia.

But even as to the falsehoods addressed by the Third Application, the government's argument fails for two other reasons. First, although the government's affirmative *bad faith* in intentionally misleading the Court is surely relevant, *see, e.g.*, *Ratti*, 365 F. Supp. 2d at 657

(indicating that even if an inaccuracy was not necessary to the application, a tolling order could be invalidated upon a "showing of bad faith on the Government's part"); *United States v. Bogucki*, 316 F. Supp. 3d 1177, 1183 (N.D. Cal. 2018) (hearing warranted where defense allege that government acted in "bad faith"), its *good faith* does not save an otherwise defective Section 3292 Tolling Order. As discussed below, the government does not actually argue otherwise. *See infra* at 22 (citing Opp. at 37). Indeed, no Court has ever imported a "good faith exception" into the tolling regime. The relevant question is whether the statutory requirements are met. Section 3292 contains no exception under which an essential element is missing, yet the government proceeded in a good-faith but mistaken belief that it was satisfied. For example, if no application to a foreign government had been made, tolling does not apply; it makes no difference that the government innocently thought it had. *See United States v. Neill*, 952 F. Supp. 831 (D.D.C. 1996). The government previously conceded this point in this District in *Ratti*. *See* 365 F. Supp. 2d 649 (government did not rely on application's good faith incorrect assertion that application had been made to Romania).

Second, in any event, the government cannot establish its good faith through mere assertion. Having put in issue whether it acted promptly, the government must prove the point through an evidentiary hearing. That is particularly true given the utter vagueness of its claims. The government never states, for example, when and how it supposedly discovered the falsehoods. To the contrary, it seems to suggest that its statement that it "promptly alerted the court," Opp. at 39, means nothing more than that it submitted the correction "long before indictment," *id.* at 3, and within three months, *id.* at 41. That is dramatically different from disclosing the falsehood promptly *upon recognizing it*. The government also maintain that it operates in "good faith" as a matter of law so long as it does not lie about anything other than the

basic, formal requirements of Section 3292, reasoning that nothing else is "material" under the statute. *Id.* at 40.

Nor does the government explain why it waited until it submitted a further application to correct them. Further, the motion has raised a concrete reason to believe that the falsehoods corrected by the Third Application were instead intentional from the outset. *See supra* at 13-14 (describing the unexplained inconsistency between the Second Application's false representation of the supposed "loan" and the Second Declaration's false representation that Mr. Goldstein concealed funds from Malaysia from the IRS).

Relatedly, there is no merit to the government's argument — which it promptly abandons — that the Court should resolve this motion under the stringent standard for holding hearings seeking to challenge search warrants under *Franks v. Delaware*, 438 U.S. 154 (1978). *See* Opp. at 36-37. There is some surface similarity between the two contexts, in the limited sense that both Section 3292 and *Franks* involve the use of evidentiary hearings to determine the validity of earlier court orders.

But the similarity ends there. *Franks* is a non-statutory doctrine that applies the Fourth Amendment, which critically includes a "good faith exception." Section 3292 specifies particular statutory requirements that must be met, and nothing in the language of the statute suggests a good faith exception. Further, the invalidation of a search warrant is an extreme and limited remedy that results in the exclusion of probative evidence, and thereby undermines the court's truth-seeking function. By contrast, as discussed, the invalidation of a tolling order has no evidentiary consequence. It merely subjects the relevant "offense" presumptively to the ordinary limitations period. Finally, *Franks* is resolved under the Fourth Amendment's extremely lenient

21

"probable cause" standard, whereas Section 3292 requires that the government make a showing by a preponderance of evidence.

Thus, although the government's opposition nominally asks this Court to be the first to import *Franks* to the Section 3292 context, it never actually follows through. As the government explains, an essential element under *Franks* is that "the false statement was made knowingly and intentionally, or with reckless disregard for the truth." Opp. at 37 (citation and internal quotation marks omitted). But the government immediately acknowledges that this requirement does *not* apply under Section 3292. *See id.* (discussing *Ratti*).

The government nonetheless contends that the defense itself recognizes the *Franks* standard applies to Section 3292 because the word "material" appears in both the motion and decisions applying *Franks*. Opp. at 37 n.10. This argument is without merit. Given that no court has extended *Franks* to this context and that the government itself does not actually propose to do so, it would be surprising if the defense did.

> **4.    It Makes No Difference Whether the Second Declaration and Application Hypothetically Could Have Relied Instead on the Subset of Funds That Remained in Montenegro.**

In a single sentence, the government seemingly suggests that the Second Application *could have* been based on the assertion that Mr. Goldstein had not reported as income the small portion of the 2016 funds that remained in the Montenegrin bank. Opp. at 39. But even if that were theoretically true, the relevant point is that the Application *was not* based on that assertion. Instead, the Application (1) falsely asserted that Mr. Goldstein had not paid taxes on any of the 2016 funds, (2) in support of the further false assertion that he had claimed that all the funds were a loan. A tolling order that rests on falsehoods cannot be later sustained by inventing a new, *post hoc* rationale that the government did not in fact advance at the time. Such a rule would negate the requirement that supporting evidence be presented at the time of the application. Nor

22

is there any reason to believe that the grand jury in this case was in fact considering this theory at that time.

In any event, if this theory had been advanced in the Second Application, it would have been just as misleading as the First Application. The government was aware, but failed to disclose, that Mr. Goldstein was not at fault. The accountants had — directly contrary to Mr. Goldstein's express instructions — ignored the Montenegrin accounts. That is why the accountants reported the income that was transferred to the law firm's U.S. account but ignored the money that remained in Montenegro. There was no reason to believe that Mr. Goldstein knew that had occurred. The Second Application also did not acknowledge that as soon as Mr. Goldstein became aware of the issue, his counsel immediately disclosed it to the government and offered to pay the outstanding taxes.

The fact that the government made a similar assertion in a single sentence in a footnote in the Third Application, *see* ECF No. 116-3, at 2 n.1, makes no difference. The government waived any argument that the Third Tolling Order can be saved on that basis. To the contrary, it has expressly acknowledged that the Second and Third Applications rise and fall together. *See supra* at 17-18. The Third Tolling Order has the same effective date as the Second, so it obviously cannot rely on claims that did not appear in the second application and declaration. The government elsewhere disparages passing references that are similar to this sentence in a footnote as merely providing "context." Opp. at 45-46. The government specifically referenced this fact about funds remaining in Montenegro not as an independent basis to grant tolling but instead to minimize the significance of the actual, false statement in the Second Application that Mr. Goldstein had not paid taxes on any of the money, which supported the further false allegation that Mr. Goldstein had claimed that the funds were a loan.

23

## VI.    The Government's Remaining Arguments in Opposition to Holding an Evidentiary Hearing Lack Merit.

Most of the government's remaining points are strawmen, attacking arguments that the defense obviously never made and citing nothing in the motion to which it is supposedly responding.[4] The few arguably responsive arguments it does make are meritless.

### A.    The Government's Reliance on the Grand Jury Indictment Is Misplaced.

The government asserts that no evidentiary hearing is warranted because, "[i]n making his argument that Special Agent Accardi knew he did not commit crimes, Defendant appears to forget that a Grand Jury in the District of Maryland in fact indicted him for his tax crimes." Opp. at 30; *see also id.* at 35 (characterizing the motion as reflecting "nothing more than Defendant's disagreements with the Indictment"). But the grand jury *did not* indict Mr. Goldstein on *any* the principal issues about which the applications and declarations contain false and grossly misleading assertions: (1) the failure to disclose the Montenegrin accounts; (2) not reporting the 2016 funds deposited into the firm's account as income; (3) claiming that those funds were a "loan"; (4) concealing income received from the government of Malaysia. *See supra* Sections I & II. On the government's own position that the grand jury's view of the evidence is relevant to whether Agent Accardi made knowingly falsely representations, it strongly reinforces that he did.

---

[4] *See, e.g.*, Opp. at 32 ("***First***, to the extent Defendant is arguing that a § 3292 application must show that offenses were committed and thus must provide the reviewing court any exculpatory information . . . ." (citing nothing)); *id.* at 33 ("***Second***, to the extent Defendant is arguing that a § 3292 application must establish probable cause to believe a crime has been committed . . . ." (citing nothing)); *id.* ("***Third***, to the extent that Defendant argues the alleged falsehoods are material because, if the court had known the truth, then it would have concluded that no crimes had been committed . . . ." (citing nothing)); *id.* at 35 ("***Fourth***, that [sic] Defendant argues that the alleged falsehoods themselves were *not* relevant to § 3292 but, if the court had broader context, then it would have found non-credible the parts of the Declarations that *were* relevant." (citing nothing) (emphases in original)).

**B.      The Government's Alternative Narrower Rules Lack Merit As Well.**

In a last-ditch effort to avoid a hearing, the government argues that the applications can be sustained on the basis of theories that they do not even contain, and indeed that there is no basis to believe were being investigated by the grand jury. For example, it suggests that the grand jury could have investigated whether Mr. Goldstein was willfully blind to his accountants' failure to disclose the Montenegrin accounts, and that the government could have made that assertion in an application and accompanying sworn declaration. Opp. at 42. But such *post hoc* rationalizations are irreconcilable with the statutory requirement that the application and accompanying proof themselves satisfy Section 3292. Even this newly minted theory is wildly implausible given Mr. Goldstein's instruction to disclose the account — a fact that would need to have been disclosed to the Court in the application at the very least. Nor could it satisfy the statute in any event, because the Montenegrin bank would not have had any documents that were relevant to that potential offense, which relates entirely to Mr. Goldstein's disclosure of the already-opened accounts to the IRS in the United States.

The government similarly errs in seemingly arguing that in every tax investigation a Section 3292 order seeking "bank[ing] records" that are located abroad is *per se* valid. Opp. at 26 (citation and internal quotation marks omitted). No Court has ever adopted such a rule, which has nothing to recommend it. *Contra id.* (analogizing to *Neill*, 952 F. Supp. 831, in which the application sought banking records but the only dispute was over whether there was an ongoing tax investigation, not whether the banking records were relevant if so). Once again, the government's proposed rule would authorize prosecutors to lie freely about the defendant's culpability. Nor could such a rule be reconciled with Section 3292: the statute requires that the government prove that records relevant to the "offense" are located abroad and that the request

25

be "reasonably specific" in establishing that relationship. Innumerable tax offenses — including many that are alleged in this case — have no relationship to foreign bank accounts.

### C.    There Is No Merit to the Sweeping Effort to Narrow Discovery of Relevant Grand Jury Testimony.

The government does not dispute that the defense would be entitled to discovery in advance of any evidentiary hearing. The government would be required to disclose materials that tend to contradict the assertions of the tolling applications and declarations, as well as the government's further defenses of the Orders' validity (such as that the government acted in complete good faith and acted promptly to correct any errors).

The government addresses the scope of discovery only insofar as it objects to the disclosure of certain grand jury testimony. *See* Opp. at 49-50. But its position is difficult to discern. The government does not dispute the motion's showing that this is the archetypical context in which discovery of grand jury material is appropriate. *See* 3292 Motion at 26-29. Its discussion of the standards applicable to the entirely distinct claim that there was grand jury misconduct, *see* Opp. at 49-50, is thus irrelevant.

But the government nonetheless seems to argue that disclosure should not be required of testimony that "is not impeachment material," *id.* at 49, which the defense understands to mean material that would not specifically undermine the testimony of a witness. That is obviously incorrect. The government must disclose evidence that contradicts its assertions in either the Applications or the Declarations. That may all be "impeachment" material, because the defense intends to examine Agent Accardi, who wrote the Declarations and who almost surely was involved in drafting the Applications as well. But the government cannot withhold evidence undermining statements that appear in the Applications on the ground that it does not specifically "impeach" Agent Accardi.

VII.    **The Government's Other Categorical Representations That Mr. Goldstein Engaged in Criminality Are Highly Misleading And Reinforce That a Hearing Is Warranted.**

The tolling applications contain multiple sweeping assertions that Mr. Goldstein engaged in criminality by hiring employees who did little to no work; misattributing personal payments as deductible business expenses; and causing income not to be reported by diverting payments from his law firm. *See* 3292 Motion at 13-26. The motion demonstrated that these claims were wildly overstated. With respect to each, the government failed to advise the Court that there was substantial reason to doubt Mr. Goldstein's culpability. *See id*.

The government accuses the defense of "contort[ing] 3292 beyond recognition by demanding [sic] an exculpatory information requirement totally absent from the statute." Opp. at 22. Relatedly, it asserts that the motion would "flip[] the law on its head to require that the government prove a crime has occurred before it can even seek evidence of that crime." Both arguments are obviously inaccurate. The defense's straightforward position is that the government cannot lie to or grossly mislead the Court. Before the opposition, one would have thought that was uncontroversial. *See supra* at 3-5.

Generally, an application under Section 3292 need not address exculpatory evidence. It will accurately represent that the grand jury was investigating certain conduct or that the government suspects that the target may have committed an offense. Representations like that can reasonably and accurately be made without stating that there is contrary evidence, much less identifying it.

But if the government instead *chooses* to support an application with a categorical and unqualified claim that the target engaged in specific illegal activity, it cannot do so through false and misleading statements to the Court. The reason is obvious: The whole point of the

27

government making the categorical representation is that it represents to the Court a much higher degree of confidence, which in turn will be much more persuasive.

Of note, the government itself seemingly recognizes that it is sometimes appropriate to identify exculpatory evidence in order to avoid misleading the Court by overstating the extent of its proof. For example, the applications assert that cash Mr. Goldstein brought into the United States was gambling income not a loan based *entirely* on a customs officer's avowedly "vague recollection" of an unrecorded statement by Mr. Goldstein in their interaction at the airport six years ago. *See supra* at 16 n.3. But the government apparently recognized that it was obligated to advise the Court in the application that in fact Mr. Goldstein told his traveling companion *in advance* that he would be going to retrieve that cash as a loan. Similarly, the government acknowledges that it was appropriate for it to describe Mr. Goldstein's supposed relationships with his employees as "alleged." Opp. at 44.

Particularly with respect to the allegations regarding expenses and income of the law firm, the government does not seriously attempt to defend the accuracy of the sweeping claims of the applications and declarations. Instead, it dismisses those statements as merely providing context. Opp. at 45-46. Thus, at the very least, the government has abandoned any reliance on these allegations as support for the tolling orders. Nonetheless, the fact that the government so readily crafted its applications and declarations in such a misleading fashion reinforces that an evidentiary hearing is appropriate.

## VIII.  Conclusion

The government's material misrepresentations in the 3292 applications and declarations is part of a broader pattern in this case.  As set forth in prior defense filings, the government's *ex parte* detention motion also included inaccurate representations regarding Mr. Goldstein's alleged conduct.  And in subsequent filings concerning Mr. Goldstein's release conditions, the

government misrepresented a witness's grand jury testimony to suggest inaccurately that the witness had accused Mr. Goldstein of attempting to bribe the witness. The Court has thus far found it unnecessary to address these issues. At a later date, the defense anticipates seeking a trial remedy from the Court based on this conduct.

Respectfully submitted,

/s *Jonathan I. Kravis*
Jonathan I. Kravis (Bar No. 31556)
Stephany Reaves (Bar No. 19658)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500E
Washington, DC 20001
(202) 220-1100
Jonathan.Kravis@mto.com
Stephany.Reaves@mto.com

Adeel Mohammadi (pro hac vice)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
Adeel.Mohammadi@mto.com

*Attorneys for Defendant Thomas Goldstein*

Dated: July 2, 2025