# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL NO. LKG-25-0006 |
| THOMAS C. GOLDSTEIN, | REDACTED |
| Defendant. | |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO PERMIT HIM TO SELL THE HAWTHORNE PROPERTY

The United States of America respectfully requests that the Court deny Defendant's motion to permit him to sell his D.C. home. Dkt. 168. The *lis pendens* is valid because Defendant's D.C. home is a tainted asset. But for the Defendant's false statements to a mortgage lender, as outlined in Count Twenty-Two of the Superseding Indictment, he would not have been able to repay his debt to the Funder and, per the agreement between the Funder and Defendant, he would have lost his interest in the D.C. home. However, even if the Court believes that his D.C. home is not tainted, a *lis pendens* does not constitute a seizure of a property. Instead, it is merely a notice to third parties of the government's interest in that property. As such, the *lis pendens* does not encumber Defendant's Sixth Amendment right to counsel, and any challenge is premature.[1] Even if the secured bond were removed from the house, the *lis pendens* must remain to give the public, including any potential buyers, notice of the government's interest in the property.

On the conditions of release, the applicable statutory factors weigh heavily in favor of keeping Defendant's D.C. home as collateral for his appearance bond. Defendant has not shown

---

[1] Defendant has now jettisoned the argument from his initial motion to review condition of release (Dkt. 30) that the government's potential forfeiture of his D.C. home should be limited to the scope of the remaining mortgage.

that he needs to sell his D.C. home to pay his counsel. Lastly, tainted funds may not be used to pay defense counsel. Thus, a *Farmer* hearing is unwarranted.[2]

## BACKGROUND

On January 16, 2025, a federal grand jury returned a twenty-two count Indictment charging Defendant with various tax crimes and for making false statements on mortgage applications, including an application to mortgage lender NFM Lending ("NFM"). Dkt. 1. The same grand jury later returned a Superseding Indictment charging Defendant with the same crimes but included additional allegations relevant to those crimes. Dkt. 159. At his initial appearance and arraignment, on January 27, 2025, Chief Magistrate Judge Sullivan ordered that Defendant be released on certain conditions. Dkt. 6. Importantly, among those release conditions, Chief Judge Sullivan ordered Defendant "execute a bond or an agreement to forfeit upon failing to appear as required . . . [for] 100% interest" in Defendant's D.C. home in Washington, D.C. at 4323 Hawthorne St., N.W. *Id.* The same day, Defendant complied with that order. Dkt. 8. He and Amy Howe, his wife and co-property owner, executed the appearance bond and agreement to forfeit Defendant's D.C. home if he "fail[ed] to appear as required for any court proceeding[.]" *Id.*

Two days later, on January 29, 2025, Defendant began his series of attempts to modify those release conditions. He requested that the Court substitute his D.C. home, as forfeitable, with three properties in South Carolina owned, not by Defendant, but by family members. Dkt. 18. The

---

[2] If the Court concludes that Defendant is entitled to a *Farmer* hearing, the government submits that the Court should conduct a thorough review to determine whether Defendant truly is without funds to pay his attorneys, and whether he has hidden any assets. Such review would best include an analysis of Defendant's personal and business bank account statements, his credit card statements, his payment application history (*e.g.*, Venmo, PayPal, CashApp), outstanding receivables from his law firm clients, cryptocurrency accounts, and an appraisal of all his assets, including real estate and business assets to which he has title or shares. Defendant must also share this information with the government such that it can conduct its own analysis and potentially "present evidence that [Defendant] has other substantial assets with which to hire an attorney." *United States v. Wingerter*, 369 F. Supp. 2d 799, 809 n.21 (E.D. Va. 2005) (citing *United States v. Farmer*, 274 F.3d 800, 805 (4th Cir. 2001)).

same day, Chief Judge Sullivan rejected Defendant's request because keeping Defendant's D.C. home "as the property subject to forfeiture under the appearance bond [] is necessary to reasonably assure that Mr. Goldstein will appear for all future proceedings in this case." Dkt. 19 at 1.

Less than a week later, on February 5, 2025, the Defendant launched his next attempt to substitute the South Carolina properties as collateral to assure his appearance. Dkt. 30. Filing *pro se*, the Defendant put forth some of the same arguments as in his instant motion. First, without support, the Defendant argued that he needed to use the equity in his D.C. home to pay his defense counsel. Second, he requested that the Court limit the scope of the government's forfeiture allegation as to his D.C. home because "Mr. Goldstein and his wife purchased the Hawthorne Street property outright in early 2021" as opposed to using the funds from the NFM mortgage. *See id.* at 8. The Court ordered that the government respond within two days. Dkt. 31.

The government timely responded and thoroughly explained the relevant 18 U.S.C. § 3142(g) factors supporting Chief Judge Sullivan's decision. Dkt. 34. The Court held a hearing on February 14, 2025 on this matter and, again, ruled that the Defendant's D.C. home must remain as collateral for his appearance bond and that the motion to limit the forfeiture allegations in the Indictment are not properly before the Court. Dkt. 76. On the denial of the Defendant's motion to review the Chief Magistrate Judge's ruling, the Court weighed the § 3142 factors as to the Defendant. *Id.* Importantly, the Court concluded that 1) "the benefit of posting the Washington, D.C. residence is not determined so much by the market value of that property, as by the value that the Defendant places on the property[]" and 2) "the Defendant has not shown that he will not have sufficient funds to hire counsel, unless the Court allows the substitution [of] the South Carolina properties as collateral." *Id.* at 6-7. Indeed, these rulings were without prejudice, allowing Defendant to revisit the issue after providing financial information and allowing "the court and

Pretrial and the government . . . a chance [to] look at it, so we have a better idea of what's going on." Dkt. 75 (Hrg. Tr. 36:15-19).

Nearly two months after the pretrial motions were fully briefed and after the government superseded on the Indictment, the Defendant filed the instant motion on August 29, 2025. In his motion, the Defendant largely repackages his prior arguments. Each claim hinges on Defendant's factually and legally incorrect assertion that the Defendant's D.C. home was not purchased with the proceeds of his unlawful activity. Because the Defendant would not have this property but for the false statements charged in Count Twenty-Two of the Superseding Indictment, the *lis pendens* on the property is lawful, his D.C. home should be used as collateral to secure the Defendant's continued appearance, and the proceeds may not be used to pay his counsel.

## **ARGUMENT**

### I.    **Defendant's D.C. Home is Tainted Because It Is Proceeds of His False Statements, as Charged in Count Twenty-Two of the Superseding Indictment.**

"To obtain forfeiture, the Government must establish by a preponderance of the evidence a nexus between the property for which it seeks forfeiture and the crime." *United States v. Jones*, 622 F. App'x 204, 207 (4th Cir. 2015); *see also* Fed. R. Crim. P. 32.2(b)(1)(A). "Section 982(a)(2) requires the forfeiture of any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of certain enumerated offenses," including false statements on a loan application in violation of 18 U.S.C. § 1014. *United States v. Farkas*, 474 F. App'x 349, 359 (4th Cir. 2012).

Courts across the country agree that "proceeds" in the criminal forfeiture context is property a defendant would not have had "*but for*" the criminal conduct in the offense of conviction. *Jones*, 622 F. App'x. at 207 (4th Cir. 2015) (emphasis added); *United States v. Shah*, 84 F.4th 190, 252 (5th Cir. 2023) ("The analytical inquiry" to determine if money generated as

part of a federal healthcare offense are gross proceeds subject to forfeiture "is whether the defendant would have received the property 'but for' his criminal conduct"); *see also United States v. Warshak*, 631 F.3d 266, 330–333 (6th Cir. 2010) (all proceeds of defendant's business are forfeitable because the business was "permeated with fraud"; but even if a part of the business was legitimate, the proceeds of that part are nevertheless forfeitable if the legitimate side of the business would not exist but for the "fraudulent beginnings" of the entire operation); *United States v. Horak,* 833 F.2d 1235, 1242–43 (7th Cir. 1987); *see United States v. DeFries,* 129 F.3d 1293, 1313 (D.C. Cir. 1997) (applying the "but for" test to the forfeiture of proceeds from a RICO conspiracy); *United States v. Ivanchukov,* 405 F. Supp. 2d 708, 712 (E.D. Va. 2005).

Courts routinely order forfeiture of property in cases where defendants borrowed money to purchase property and then repaid the lender with illicit proceeds. In *United States v. Casperson*, for example, the defendant and his wife jointly purchased an apartment by making a down payment (consisting of untainted funds) and paying the balance with a mortgage. 275 F. Supp. 3d 502, 503 (S.D.N.Y. 2017). The defendant then subsequently obtained home equity lines of credit on the same apartment. *Id.* at 504. The defendant repaid substantial portions of both the mortgage and lines of credit using illicit proceeds of his crimes (securities and wire fraud). *See id.* at 503-04. After a preliminary order of forfeiture was entered, the defendant's wife "filed a third-party petition asserting that she holds an indivisible right in the Apartment as an owner by tenancy by the entirety, and also that her interest in that property was superior to that of [the defendant] at the time of his offense." *Id.* at 504. In rejecting the wife's petition, the court held that "the Government acquired an interest in the Apartment to the extent of the sum [the defendant] used to pay off the Apartment's mortgage." *Id.* (citing *United States v. Pole No. 3172, Hopkinton*, 852 F.2d 636, 639

(1st Cir. 1988) (finding that "the interest acquired as a result of mortgage payments made with the proceeds of drug transactions should be forfeitable")).

Although the parties did not identify any cases concerning repayment of lines of credit with illicit proceeds, the court found that such instruments "are similar to mortgages for the purposes here at issue, and thus the use of crime proceeds to pay off a [line of credit] secured by real property results in the Government's acquisition of an interest in the real property to the extent of the payment." *Id.* The court further observed that "it is well established that if a defendant uses crime proceeds to purchase real property, the Government's interest in the proceeds carries over to an interest in the real property; for similar reasons, a defendant may not convert crime proceeds into 'clean' funds simply by taking out a [line of credit] and repaying it using crime proceeds." *Id.* In sum, the court held that "the Government's interest in the Apartment was equal to the sum of the amount of the mortgage that [the defendant] paid off and the balance of the [lines of credit] that he satisfied using crime proceeds." *Id.* at 504-05.

A more recent example is *United States v. Karasarides*, in which the court ordered forfeiture of a property that the defendant initially purchased through a "land contract," meaning the seller financed the defendant's purchase of the property and held title to the property until the defendant repaid the debt. ECF 338 at 2-3, 5:21-cr-00259-DCN (N.D. Ohio Apr. 25, 2024) (ordering forfeiture of 2231 Dunkeith Drive). After the defendant was convicted of various illegal gambling, tax, and other offenses at trial, the jury found that the property should be forfeited in part because the defendant repaid the seller over time with illicit proceeds of his crimes. *Id.* at 2. And in another prosecution resulting from the same investigation (of illegal gambling businesses in Northeast Ohio), the court ordered forfeiture of property—consistent with the defendant's plea

agreement—the mortgage of which was repaid using illicit proceeds. *See United States v. Saris*, ECF 45 at 2-3, 5:22-cr-00502 (May 14, 2024) (ordering forfeiture of 2548 Clydesdale Street).

Cases in the civil forfeiture context support the same proposition. In *U.S. v. 2121 Kirby Drive, Unit 33, Houston, TX*, the government sought forfeiture of various properties that allegedly constituted or derived from the proceeds of crimes (including securities and wire fraud) committed by Enron Corp.'s former CEO and Board Chairman. No. CIV.A. H-06-3335, 2007 WL 3378353, at *1 (S.D. Tex. Nov. 13, 2007). The government's complaint "point[ed] to alleged transactions where the illicit funds were used to pay down the outstanding mortgage on Defendant Real Property." *Id.* at *5. In rejecting a motion to dismiss filed by the wife of the former CEO, the court held that "the detailed facts set forth in the Complaint establish a reasonable belief that the Government will be able to show by a preponderance of the evidence that the properties are subject to forfeiture." *Id.* at *4.

Another, similar case is *United States v. Real Prop. & Premises*, 657 F. Supp. 2d 1060 (D. Minn. 2009). There, the at-issue property was not "originally purchased with the proceeds of fraud," but the alleged wrongdoer had funded improvements to and paid taxes on the property using illicit proceeds of fraud. *Id.* at 1066. The court relied on a host of cases establishing "that the Government may seek forfeiture of the property in part, to the extent that tainted funds were used therein," *id.* (collecting cases), and rejected a motion to dismiss the forfeiture complaint, *id.* at 1069.

The case law, as applied here, makes clear that Defendant's D.C. home is forfeitable. But for the Defendant's false statements charged in Count Twenty-Two of the Superseding Indictment, his D.C. home would not have been available to him. As previously described, on numerous occasions the Defendant intentionally omitted his $15 million private and federal tax debt from

mortgage applications. First, he omitted his debt from two applications that he submitted to FSM. Dkt. 159 ¶ 95. FSM later denied his applications after it discovered his omitted federal tax debt. Second, the Defendant intentionally omitted his more than $15 million debt from the Funder to obtain funds to purchase his D.C. home. As a condition of a loan from the Funder, the Defendant was *required* to obtain a mortgage on the D.C. home and to use the proceeds of that mortgage to repay the Funder. Dkt. 159 ¶ 97. Third, to obtain that mortgage and repay the Funder, the Defendant knowingly omitted his more than $15 million debt from the NFM application. *See* Dkt. 159 ¶¶ 100-103. Each and every one of these false statements are incorporated in Count Twenty-Two. If Defendant had not obtained the mortgage and repaid the Funder, then per their contract, the Funder had the legal right to require Defendant to transfer a deed of trust in the D.C. home to the Funder.[3] Therefore, if it were not for Defendant's fraud on NFM, he would have lost his interest in the D.C. home, which the government seeks to forfeit.

This conclusion is consistent with the line of cases in which courts have held that property is forfeitable if its purchase was funded by debt that a criminal repaid with illicit proceeds. As noted above, those cases involved various types of debt—traditional mortgages, lines of credit, and land contracts—that were satisfied with illicit proceeds. Although Defendant's loan from the Funder is not a traditional mortgage, in relevant part it functioned the same way: the Funder provided money to Defendant, and Defendant had to repay the Funder or risk losing interest in the

---

[3] The evidence at trial, related to the government's forfeiture allegations, will show by a preponderance of evidence that the Funder would have taken Defendant's interest in the D.C. home if Defendant had not repaid the Funder with proceeds of the mortgage. For example, the April 26, 2021 contract between the Funder and Defendant required him to "deliver [a] signed deed[] of trust" for the D.C. home "in favor of [the Funder] as beneficiary" within three business days of executing the contract. Further, the contract stated that if Defendant did not repay the Funder and had not caused the proceeds of the mortgage to be applied to his outstanding balance within 6 months, then Defendant would "cause, at [Defendant]'s expense . . . the deed of trust on the residence . . . to be recorded." Defendant, however, failed to deliver a deed of trust for the D.C. home to the Funder within three days of the contract's execution. The Funder had to repeatedly contact Defendant to request the deed of trust, which Defendant did not provide until August 2021. The Funder's insistence that Defendant deliver the deed of trust referenced in the contract is strong contemporaneous evidence that if Defendant could not repay the Funder, it could and would have taken his interest in the D.C. home.

D.C. home. Further, in this case, it is not difficult to ascertain the extent to which Defendant's interest in the D.C. home is forfeitable or tainted. *See United States v. Little,* No. 2:12-CR-539-CDJ-1, 2016 WL 1255626, at *2-3 (E.D. Pa. Mar. 31, 2016) (ordering forfeiture of substitute property instead of residence where defendant paid mortgage with tainted and untainted funds that could not be "divided without difficulty"). The evidence at trial will show the exact amount of illicit proceeds that Defendant took from NFM and paid to the Funder to retain ownership interest of the D.C. home.

Moreover, proceeds do not cease being proceeds just because they change form; even indirect proceeds are forfeitable. *United States v. Tartaglione*, 815 F. App'x. 648, 651-652 (3d Cir. 2020) (defendant convicted of 53 fraud and tax evasion counts indirectly obtained benefits of the crime when she caused mental health clinic that she headed to make payments to contractors performing work on property owned by an LLC she controlled); *United States v. Betancourt*, 422 F.3d 240, 251 (5th Cir. 2005) (if defendant buys a lottery ticket with criminal proceeds, the lottery winnings are traceable to the offense even though the value of the ticket appreciated enormously when it contained the winning number); *United States v. Hawkey*, 148 F.3d 920, 928 (8th Cir. 1998) (if property is subject to forfeiture as property traceable to the offense, it is forfeitable in full, including any appreciation in value since the time the property became subject to forfeiture; the reason for the appreciation does not matter). Therefore, even if the Court deems Defendant's interest in the house as representing indirect proceeds of the false statements to NFM, it does not affect the forfeitability of the D.C. home.

The Defendant's argument relies merely on chronology: he purchased the D.C. home before he received the fraudulently obtained mortgage from NFM. However, the Defendant fails to analyze, or even mention, the but for analysis. Defendant also fails to grapple with the line of

cases in which courts found property forfeitable when it was financed with debt that the criminal repaid with illicit proceeds. Instead, he attempts to present a basic proposition as "convoluted" and "attenuated." Dkt. 168, at 10. Simply put, the Defendant would not have been able to keep his D.C. home without obtaining the mortgage from NFM, using false statements, as charged in Count Twenty-Two. It is tainted.

## II.    The *Lis Pendens* on the Defendant's D.C. Home is Valid.

### a.    The *lis pendens* should remain because Defendant's D.C. Home is a Tainted Asset.

The United States's interest in a property "vests in the United States upon commission of the act giving rise to forfeiture under this section." 21 U.S.C. § 853(c); *see United States v. Jarvis*, 499 F.3d 1196, 1203 (10th Cir. 2007) (explaining the "relation-back provision" of § 853(c)). Assets "constituting, or derived from, any proceeds" of the crime "shall be forfeited" upon conviction. 18 U.S.C. § 853(a). And the government may, under § 853(e), "restrain [such] assets prior to trial in order to ensure the availability of the *tainted property* in the event of the defendant's conviction." *Jarvis*, 499 F.3d at 1203 (emphasis added).

Here, the Superseding Indictment alleges, under 18 U.S.C. § 982(a)(2) and 21 U.S.C. § 853(p), that the D.C. home constitutes proceeds of Defendant's crime. Defendant committed that crime in 2021 when he made false statements to NFM, as charged in Count Twenty-Two. By lying to NFM, Defendant ensured he would continue to own his home and the Litigation Funder would not take it. The government's interest in the D.C. home therefore vested when he made those false statements in 2021. *See, e.g.*, *Jarvis*, 499 F.3d 1203 (explaining how § 853 applies to a tainted asset).

In his motion, Defendant admits (because he must) that the government may restrain tainted assets prior to trial. Dkt. 168, at 7 (citing *United States v. Chamberlain*, 868 F.3d 290, 294

(4th Cir. 2017)). The *lis pendens* is therefore valid. *See, e.g.*, *Jarvis*, 499 F.3d at 1203 (explaining

that the government may record a *lis pendens* on tainted assets). In fact, it is not even a restraint.

> **b. Even if the Court believes that the Defendant's property is not tainted, a *lis pendens* does not amount to a seizure.**

Filing a *lis pendens* does not amount to the seizure of a property. *United States v. Bohning*,

321 F. App'x. 855, 858 (11th Cir. 2009) (filing a *lis pendens* does not affect defendant's property

interest enough to implicate Due Process and it did not violate defendant's Sixth Amendment right

to counsel because the property was subject to forfeiture; defendant not entitled to a hearing); *Diaz*

*v. Pataki*, 368 F. Supp. 2d 265, 274 (S.D.N.Y. 2005), *aff'd sub nom. Diaz v. Paterson*, 547 F.3d

88 (2d Cir. 2008) ("Courts have held that the filing of a *lis pendens* does not even constitute a

seizure . . . ."); *United States v. Register*, 182 F.3d 820, 837 (11th Cir. 1999) (*lis pendens* does not

constitute a 'seizure' and does not affect property interest enough to implicate the Due Process

Clause); superseded by rule on other grounds as stated in *United States v. Warner*, 498 F.3d 666

(7th Cir. 2007); *Aronson v. City of Akron*, 116 F.3d 804, 811–12 (6th Cir. 1997) (in a federal civil

rights case involving a state RICO action, court reasoned that because lis pendens is not a taking,

filing *lis pendens* without prior notice did not violate defendant's due process rights); *United States*

*v. Buholtz*, 2011 WL 4100918, at *2 (E.D. Tex. Aug. 31, 2011) ("[T]he Court does not believe that

the filing of a *lis pendens* is a seizure . . . ."). Instead, it is simply a "notice that the government

has claimed an interest in a property." *United States v. Balsiger*, 910 F.3d 942, 951 (7th Cir. 2018);

*see also United States v. Reg.*, 182 F.3d 820, 836 (11th Cir. 1999) (explaining that a *lis pendens* is

neither a seizure nor a restraint of the property) (citing *United States v. James Daniel Good Real*

*Property,* 510 U.S. 43, 54 (1993)).

The *lis pendens* filed on the Defendant's D.C. home does not amount to a seizure, or even

a restraint, of the property. It is simply a notice to third parties of the government's interest in the

property. It does not impinge on Defendant's Sixth Amendment rights, and his averment that he has run out of money does not grant him a right to have it removed.

Similarly, the Defendant's citation to *United States v. Chamberlain*, 868 F.3d 290 (4th Cir. 2017) is inapposite. Indeed, *Chamberlain* disallows the pretrial restraint of substitute assets. There, the government sought and obtained a restraining order "pursuant to 21 U.S.C. § 853(e)(1)(A), to prevent the sale of a piece of real property owned by Defendant and his wife with an estimated value of $200,000." *Id.* at 293. The facts of the case have nothing to do with a *lis pendens* which does not prevent the sale of a property. Even if the Court finds that the Defendant's D.C. home is an untainted substitute asset (which it is not), it still should not order the government to lift the *lis pendens*.

### c. The Government's *Lis Pendens* Is Consistent with D.C. Law

Defendant's argument to the contrary misconstrues the facts and the law. As discussed above, the D.C. house is a tainted asset under § 853 because his current possession of it "derived from" his lies to NFM—which ensured the Litigation Funder did not take his home—and the Government's interest in that the home "vest[ed]" when he lied to NFM. *See* 18 U.S.C. § 853. That the government may file a *lis pendens* on tainted assets is uncontroversial.

Meanwhile, D.C. Code § 42-1207 explains that a *lis pendens* is only effective "if the underlying action or proceeding directly affects the title to . . . or asserts a[n] . . . other ownership interest in real property situated in the District of Columbia[.]" D.C. Code § 42-1207(b). Under § 853, the government has a clear ownership interest in the house, and that interest vested in 2021. The government provided notice in its Superseding Indictment and Bill of Particulars that it intends to seek forfeiture of Defendant's D.C. home upon conviction. Moreover, the government has alleged in multiple filings, including this one, and in open court that Defendant's D.C. home

constitutes proceeds of his criminal acts. The government clearly has "assert[ed] a[n] ownership interest"—which already vested—in the property.

Defendant's citations to various cases examining *substitute* assets (instead of tainted ones) are therefore irrelevant. *See* Mot. 16-17, Dkt. 166 (citing *Jarvis*, *United States v. Boyer*, 58 F. Supp. 3d 173 (D. Mass. 2014), and others).

Defendant cites to *Garcia v. Tygier*, a case in which a party to a civil action in Fairfax County did not "claim in that action that the residence was conveyed to appellees in violation of the statutes prohibiting fraudulent or voluntary transfers." 295 A.3d 594, 603 (D.C. 2023). Here, the government makes clear that but for the Defendant's criminally false statements in Count Twenty-Two, he would not have his D.C. home. It is subject to forfeiture and directly at issue here.

## III.   The Court Should Continue to Require the Defendant to Post His D.C. Home as Collateral for his Appearance Bond.

The Court and Chief Magistrate Judge Sullivan were both correct to require the Defendant to post his D.C. home as collateral. As when the Defendant previously challenged his conditions of release (Dkt. 30), the § 3142 factors continue to weigh strongly against Defendant's request.

### a.   The § 3142 Factors Weigh Against Defendant's Request to Exchange the South Carolina Properties for His D.C. Home.

Defendant still misunderstands the import of the § 3142(g) factors. He states that "[n]one of the statutory factors . . . supports the proposition that the Hawthorne Property *alone* can reasonably assure Mr. Goldstein's appearance." Dkt. 168, at 16 (emphasis in original). Whether his D.C. home alone is sufficient to assure his continued appearance is irrelevant. Instead, it should be a component, among others, that will assure his appearance. *See* 18 U.S.C. § 3142(c)(1)(B) (if release on personal recognizance or unsecured appearance bond "will not reasonably assure the appearance of the person as required," the Court "shall order the pretrial

release of the person . . . subject to the least restrictive further condition, or *combination of conditions*, that such judicial officer determines will reasonably assure the appearance") (emphasis added). The government submits that Defendant's D.C. home must be used as collateral to secure his appearance bond.

i.  <u>The Nature and Circumstances of the Offenses Charged</u>

As explained in prior filings, the nature and circumstances of the offenses charged support Chief Magistrate Judge Sullivan's and this Court's decisions to require the Defendant to post his D.C. home as collateral to ensure that Defendant will continue to appear at future hearings and trial. A federal grand jury charged the Defendant with twenty-two felony counts of tax crimes and making false statements to mortgage lenders. The Defendant hid millions of dollars in income from the IRS, lied to an IRS Revenue Officer about the source of his income, and concealed millions in cryptocurrency transactions from the IRS. Moreover, as the Defendant admits himself, he "was long aware of the government's investigation and possibility that he may be charged." Dkt. 168, at 16. Despite this knowledge, his crimes continued.

Importantly, the Superseding Indictment alleges that the Defendant made false statements to each and every private or institutional lender to secure funds to finance the purchase of his D.C. home in Washington, D.C. The government notified the Defendant that the government will seek forfeiture of his D.C. home because it constitutes or is derived from "proceeds" directly or indirectly traceable to his crimes. Again, but for his false statements to NFM, the Defendant would not have been able to repay Parabellum and keep his interest in the D.C. home. Now, the Defendant

14

is attempting to substitute as collateral the properties of third parties rather than the property that he only owns because of false statements.

The Defendant claims that there has been no indication that "Mr. Goldstein has even contemplated fleeing and intends on doing anything other than vigorously disputing the charges brought against him at trial." *Id.* However, Defendant's crimes involved significant international travel and contacts. Some of those international contacts included wealthy gamblers and those who funded his multi-million-dollar poker games. Indeed, the Defendant protests that he does not have sufficient funds to pay his lawyers, but he was able to borrow millions for his poker games. Defendant's ties to gamblers and individuals in other countries, and his extensive international travel, mean that he is better equipped than the average defendant to leave the United States to avoid the serious felony charges he faces here. ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ Posting the D.C. home as collateral is necessary to mitigate the very real risk of Defendant fleeing the country.

    ii.   <u>The Weight of the Evidence Against Defendant</u>

The weight of the evidence supports the posting of his D.C. home as collateral. The Court recognizes, and the Defendant appears to agree, that "this case will involve tens of thousands of documents regarding the alleged offenses and almost 80 witnesses." Dkt. 168, at 17. Specific to the allegations in Count Twenty-Two regarding the Defendant's false statements to NFM, as well as the allegations of false statements to other lenders, to finance the purchase of his D.C. home,

the government plans to establish that the Defendant owed over $15 million at the time when he submitted the relevant mortgage applications by calling witnesses from two of his creditors. The government plans to introduce documentary evidence through those witnesses confirming the existence of the debt, including promissory notes and bank records. It will also introduce the Defendant's own written statements confirming the existence of the multi-million-dollar debt. Then, the government will introduce the mortgage applications, signed by the Defendant. These applications explicitly ask the Defendant to disclose his all of his debts and liabilities and warn the Defendant of the potential criminal penalties for lying on a mortgage application. The government will present evidence that he conducted this entire fraud while knowing that he was under federal investigation. Lastly, as described above, the government will present evidence showing that the Funder bargained for and protected its right to take possession of the D.C. home if Defendant could not repay the debt with proceeds of the NFM mortgage.

The Defendant appears to believe that by simply filing pretrial motions, which the government has opposed, he has called into question the weight of the evidence. This is false. The government presented testimony and evidence to support the allegations set forth in the 53-page superseding indictment to a federal grand jury and it voted that there was probable cause to believe that these federal tax crimes and false statements were committed. Now, the government will prove to a petit jury that those same allegations are true beyond a reasonable doubt—and that the D.C. home is forfeitable by a preponderance of evidence.

iii.   The History and Characteristics of Defendant

The Defendant's history and characteristics support the need to post his D.C. home as collateral. The Superseding Indictment alleges, in detail, that the Defendant spent the majority of the last decade hiding income from the federal government and making false statements to

16

government agents and private institutions. As the Defendant reminds the Court, he is "a well-respected member of the bar[.]" Dkt. 168, at 17. Arguably, however, the specter of losing that status and reputation in the event of a conviction makes it more likely that the Defendant would flee rather than face the evidence at trial and the consequences of his willful criminal conduct.

Together with his ability to obtain high value loans from wealthy individuals and experience with financial institutions abroad, the Defendant has the ability to leave the country, live comfortably, and avoid capture. *See, e.g., United States v. Remarque*, PX-19-039, 2020 WL 1983927, at *1-*4 (D. Md. Apr. 27, 2020) (denying appeal of Chief Magistrate Judge Sullivan's pretrial detention order based on, among other things, defendant's "significant international ties"); *United States v. Fombe*, DKC-19-452-1, 2023 WL 6200018, at *2 (D. Md. Sept. 22, 2023) (denying motion for review of Chief Magistrate Judge Sullivan's pretrial detention order because, among other reasons, defendant had overseas contacts and had demonstrated "the wherewithal to flee, using false documentation, and to travel to myriad foreign countries"); *United States v. Raji*, SAG-20-00369, 2021 WL 825981, at *1-*2 (D. Md. Mar. 4, 2021) (denying motion to reconsider pretrial detention where defendant had the "'motive, means and contacts' to flee and assume another identity either in the United States or abroad"). The Defendant's history and characteristics

indicate that he poses a risk of flight. This Court should continue to ensure that the Defendant post his D.C. home to secure his appearance bond as a condition of his release.

      **b.  No New Developments Justify Substituting the South Carolina Properties for His D.C. Home.**

The Defendant argues that there have been new developments in his life since the Court initially denied his request to substitute the South Carolina properties for his D.C. home to secure his appearance bond.

*First*, as the Court requested, he provided additional information about his financial status to Pretrial Services and the Court. Notably, although the Court explained at the February 14, 2025 hearing that the Defendant could "revisit the issue sometime after [the Defendant] provides the financial information that's been ordered by the Court and both the Court and Pretrial and the government have had a chance [to] look at it, so we have a better idea of what's going on[,]" (Dkt. 75 Hr'g Tr. 36:15-19), the government never received this information. As a result, it cannot verify the information provided in the Defendant's declaration, filed under seal. Nonetheless, the Defendant claims that he no longer has $250,000 in checking accounts, exhausted his retirement accounts, has no income, and has over $7 million in debt.

However, the $7 million in debt includes private debt that the Defendant knowingly omitted from the mortgage application that is the subject of Count Twenty-Two of the Superseding Indictment. The extent of his debt is irrelevant; what matters is whether he has assets (regardless of whether a creditor might hope to collect them) with which he could pay his attorneys. The Superseding Indictment makes clear that Defendant spent years *not paying his debts*. It is hard to see how they suddenly would impede his ability to spend money now. The government respectfully submits that the Court, even if it were to factor his debts into its analysis, should closely scrutinize

whether Defendant's self-serving use of his debts in this context affects the credibility of other representations he or his counsel have made to secure the requested relief.

Separately, Defendant previously claimed that the equity in the South Carolina properties exceeded that of his D.C. home. *See* Dkt. 18, at 2-3. In part because each of the properties is owned free and clear by various family members. *Id.* If Defendants' family members are willing to post their residences as the security for his appearance bond (risking their homes), then it would seem equally viable for them to help pay Defendant's counsel by seeking loans against those properties.

*Second*, the Defendant has already committed two violations of his conditions of release. The first violation was brought to light by the government. On February 9, 2025, it filed an *ex parte* motion to revoke the Defendant's release order alleging that the Defendant failed to disclose his ownership of two cryptocurrency accounts to his Pretrial Services officer and transferred funds from those accounts without obtaining approval from Pretrial. Dkt. 35. Chief Judge Sullivan held a hearing and ordered the Defendant temporarily detained. Dkt. 42. Indeed, later, the Court reversed its ruling, explained that it was "no longer convinced, by clear and convincing evidence, that Mr. Goldstein violated his conditions of release," and released the Defendant. Importantly, the Court explained that it "is highly suspicious that Mr. Goldstein has used cryptocurrency while on conditions of release" and that he "has not disproven the Government's allegations that he violated his conditions of release." Dkt. 64. As a result, Chief Magistrate Judge Sullivan added more specific conditions of release addressing these concerns. Dkt. 62.

Defendant's Pretrial Services Officer noticed the second violation on or around August 11, 2025. Upon reviewing the Defendant's bank statements for the month of July 2025, he noticed that the Defendant conducted an online wire transfer of $50,000 from his G&R business checking account to his personal checking account. Defendant claimed that this transfer occurred to cover

general living expenses. Though the government is not disputing Defendant's claim, it is another example of funds accessible to Defendant for his personal use, including paying his attorneys. To date, Defendant has not provided any explanation to the government about the original source of these funds, why the funds are available to him for his personal use, and whether there are additional funds in G&R bank accounts that the Defendant could use for personal expenditures. Instead of accepting responsibility for this violation, Defendant asserts in a footnote that he "obviously was not attempting to conceal the transfer" and his failure to disclose it "was obviously an innocent mistake." Dkt. 168, at 2 n.1. Those conclusions are not so "obvious" to the government given the extensive litigation concerning Mr. Goldstein's conditions of release and prior violation of the conditions.

*Third*, the Defendant states that he has a "clearer picture of the costs associated with his defense" as described in a sealed *ex parte* declaration from his counsel. At the outset, his counsel told the government the exact amount they are charging for "doing the trial work,"[4] so it is unclear why his counsel's entire declaration was submitted *ex parte* (rather than merely privileged portions about specific costs associated with privileged defense strategy). Now, the government has not had an opportunity to review primary records submitted to Pretrial Services and the Court as well as Defendant's counsel's representation to the Court about the total cost associated with the defense. As a result, it is impossible for the government to accurately assess whether the Defendant has sufficient funds to pay his attorneys, or if counsel's representation to the government about their fees was accurate.

Assuming counsel's representation to the government was accurate, Defendant's sale of his D.C. home will not cover his legal fees. In his motion and declaration, the Defendant explained

---

[4] It is unclear whether "trial work" encompasses the work by defense counsel from the day the Defendant was indicted through trial or if it only includes defense counsel's work to prepare for and represent the Defendant at trial.

that he holds approximately $600,000 in equity in his D.C. home—which is far less than what he will owe in fees to his attorneys. Dkt. 166, at 13. This is particularly odd because mortgaging the South Carolina properties (while continuing to post his D.C. home as collateral for his appearance bond) would more than cover his legal fees.

*Fourth*, Defendant explains that his wife now wants to sell the property to access her share of the equity and that the bond is "unjustly" tying her to the property. *Id.* at 16. However, Defendant has only himself to blame. "By intentionally failing to disclose millions of dollars in private debts to the mortgage lenders, and apparently failing to alert his wife to that decision, he gambled that he would not get caught. That turned out to be a losing bet, and now he has been charged with multiple counts of making false statements to mortgage lenders." Dkt. 34 at 13. As noted previously, however, if the Court orders forfeiture of Defendant's D.C. home and the evidence confirms that Defendant's wife was ignorant of his crimes, the government would not object to allowing Defendant's wife to remain in the D.C. home for a reasonable period of time while she arranges alternative housing. *See Casperson*, 275 F. Supp. 3d at 505.

These new developments are not a basis for substituting the South Carolina properties for the Defendant's D.C. home as collateral for his appearance bond. The Court should deny the Defendant's request.

**IV.    The Defendant Has No Sixth Amendment Right to Use Criminal Proceeds to Pay His Counsel and He Is Not Entitled to a *Farmer* Hearing.**

The Supreme Court has ruled that criminal defendants have no right to use tainted property to pay counsel. *Caplin & Drysdale v. United States*, 491 U.S. 617, 626 (1989) ("A defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the attorney of his choice. A robbery suspect, for example, has no Sixth Amendment right to use funds he has stolen from a bank to retain an attorney to defend him if he is apprehended."); *see also United States v. Monsanto*, 491 U.S. 600, 616 (1989) (rejecting Sixth Amendment challenge to pretrial restraining order restricting defendant's use of forfeitable property); *Kaley v. United States*, 571 U.S. 320 (2014) (defendant was not entitled to a hearing on an asset freeze to challenge grand jury's probable cause determination related to the underlying crime); *United States v. Farmer*, 274 F.3d 800, 802 (4th Cir. 2001) (citing *Caplin* and stating "any Sixth Amendment right to obtain counsel of choice does not extend beyond the individual's right to spend his own legitimate, nonforfeitable assets."). Moreover, "no lawyer, in any case, has the right to accept stolen property, or ransom money, in payment of a fee." *Caplin & Drysdale, Chartered*, 491 U.S. at 626 (1989).

In *Farmer*, the Fourth Circuit "set forth two prerequisites that must be satisfied to obtain a pretrial hearing: first, the defendant must show that he has no other available assets with which to pay counsel; and second, he must make a prima facie showing that the seized assets are not subject to forfeiture." *United States v. Byrd*, 153 F. Supp. 3d 851, 856 (D. Md. 2015). "A *Farmer* hearing is not required unless the defendant makes a preliminary showing that assets were improperly seized. *United States v. Cohen*, 2015 WL 2261661, at *31 (D. Md. May 7, 2015), *aff'd in part, appeal dismissed in part*, 888 F.3d 667 (4th Cir. 2018); *see also United States v. Park,* 825 F.Supp.2d 644, 646 (D.Md.2011) (interpreting *Farmer* as requiring a hearing when the defendant

22

"demonstrates that he has no other assets available with which to retain counsel, and defendant makes a prima facie showing that the restrained property is not subject to forfeiture"); *United States v. Ziadeh,* 230 F.Supp.2d 702, 704 (E.D.Va.2002) (denying defendant a hearing because he had not shown "that the government has (1) seized or restrained all of the defendant's assets and (2) that some of those assets are not subject to forfeiture").

The Defendant is not entitled to a *Farmer* hearing. First, as explained above, the government has not seized his D.C. home. Neither the *lis pendens* nor the appearance bond amount to a seizure. Instead, the *lis pendens* is simply a notice (including to potential buyers of the D.C. home) of this pending action and its relationship to the Defendant's D.C. home. Further, Defendant's D.C. home is collateral for his appearance bond. Prior to sentencing, it would only be forfeited if the Defendant fails to appear. Second, the property is a tainted asset. But for the Defendant's false statements to NFM, he would not have been able to repay the Funder, and would have lost title to the D.C. home. As a result, this Court should not and need not hold a *Farmer* hearing.

## <u>CONCLUSION</u>

For all the reasons stated above, the Government respectfully requests that the Court deny Defendant's motion in full.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

/s/ _____
Adeyemi Adenrele
Assistant United States Attorney
District of Maryland

Sean Beaty
Senior Litigation Counsel
Department of Justice—Tax Division

Emerson Gordon-Marvin
Hayter Whitman
Trial Attorneys
Department of Justice—Tax Division