IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CRIMINAL NO. LKG-25-6 |
| | * | |
| THOMAS C. GOLDSTEIN, | * | |
| | * | |
| Defendant. | * | |
| | ******** | |

DEFENDANT THOMAS C. GOLDSTEIN'S REPLY IN SUPPORT OF HIS
MOTION TO PERMIT HIM TO SELL THE HAWTHORNE PROPERTY
<u>IN ORDER TO FUND HIS DEFENSE</u>

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ...................................................................................................1

I.     THE HAWTHORNE PROPERTY IS NOT TAINTED. ...................................3

II.    THE *LIS PENDENS* VIOLATES FEDERAL AND D.C. LAW.......................8

     A.    The Government Lacks Authority to File the Notice Under Federal Law. ............8

     B.    The *Lis Pendens* Violates D.C. Law. ..................................................10

III.   THE COURT SHOULD REMOVE THE APPEARANCE BOND ON THE HAWTHORNE PROPERTY. ....................................................................10

     A.    There Is No Reason Why Substituting the South Carolina Properties Would Not Reasonably Assure Mr. Goldstein's Appearance at Trial...................11

     B.    The Government's Remaining Arguments Are Unconvincing. ...........................13

CONCLUSION..................................................................................................15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CONSTITUTIONAL PROVISIONS**

Fifth Amendment ................................................................................................9

Sixth Amendment ........................................................................................ passim

**FEDERAL CASES**

*Aronson v. City of Akron*,
    116 F.3d 804 (6th Cir. 1997) ....................................................................9

*Diaz v. Pataki*,
    368 F. Supp. 2d 265 (S.D.N.Y. 2005).....................................................9

*Luis v. United States*,
    578 U.S. 5 (2016)...........................................................................1, 3, 10

*Pater v. City of Casper*,
    646 F.3d 1290 (10th Cir. 2011) ...............................................................9

*United States v. 2121 Kirby Drive, Unit 33, Houston, TX*,
    No. CIV.A. H-06-3335, 2007 WL 3378353 (S.D. Tex. Nov. 13, 2007) ...........6

*United States v. Balotin*,
    No. 3:19-cr-191-MMH-JBT, 2023 WL 2264181 (M.D. Fla. Feb. 28, 2023)..10

*United States v. Balsiger*,
    910 F.3d 942 (7th Cir. 2018) .........................................................10

*United States v. Capoccia*,
    503 F.3d 103 (2d Cir. 2007)............................................................4

*United States v. Caspersen*,
    275 F. Supp. 3d 502 (S.D.N.Y. 2017)......................................5, 6, 7

*United States v. Chamberlain*,
    868 F.3d 290 (4th Cir. 2017) (en banc) ....................................3, 5, 8

*United States v. Doost*,
    No. CR 24-417-4 (CKK), 2025 WL 1555157 (D.D.C. June 2, 2025).............13

*United States v. Gonzalez-Lopez*,
    548 U.S. 140 (2006).........................................................................1

*United States v. Hernandez Cerrato*,
    No. 1:23-cr-00419-MJM-1, 2024 WL 1329296 (D. Md. Mar. 28, 2024), aff'd
    as modified, 2024 WL 1532748 (D. Md. Apr. 9, 2024) .................................11

*United States v. Jarvis*,
    499 F.3d 1196 (10th Cir. 2007) .................................................................8, 10

*United States v. Karasarides*,
    Case No. 5:21-cr-259 (N.D. Ohio Apr. 25, 2024) .............................................6

*United States v. Pole No. 3172, Hopkinton*,
    852 F.2d 636 (1st Cir. 1988).......................................................................6, 7, 8

*United States v. Queri*,
    679 F. Supp. 2d 295 (N.D.N.Y. 2010)..............................................................9

*United States v. Real Prop. & Premises*,
    657 F. Supp. 2d 1060 (D. Minn. 2009)..............................................................7

*United States v. Register*,
    182 F.3d 820 (11th Cir. 1999) ..........................................................................9

*United States v. Saris*,
    Case No. 5:22-cr-502 (N.D. Ohio May 14, 2024) .............................................6

*United States v. Schwab*,
    No. 3:25-cr-30 (SVN), 2025 WL 1752310 (D. Conn. June 25, 2025) ............13

**FEDERAL RULES**

Fed. R. Crim. P. 32.2(b)(1)(A)....................................................................................4

**FEDERAL STATUTES**

18 U.S.C. § 981(a)(1)(C) .............................................................................................7

18 U.S.C. § 982(a)(2).............................................................................................3, 4, 7

18 U.S.C. § 982(b)(1) ..................................................................................................8

18 U.S.C. § 1014..................................................................................................3, 4, 7

18 U.S.C. § 3142 .......................................................................................................13

18 U.S.C. § 3142(c)(1)(B) ......................................................................................2, 11

18 U.S.C. § 3142(g).....................................................................................................12

21 U.S.C. § 853(c) .....................................................................................................10

21 U.S.C. § 853(p) ...................................................................................................8

21 U.S.C. § 853(p)(2) ..............................................................................................9

**STATE STATUTES**

D.C. Code § 42-1207(b) ........................................................................................10

## INTRODUCTION

Mr. Goldstein's motion (ECF No. 166) makes clear that the two forms of relief he seeks—an order that the government remove the *lis pendens* on the Hawthorne Property and an order substituting the South Carolina Properties for the Hawthorne Property in his appearance bond—are necessary to vindicate his "fundamental" Sixth Amendment right to fund his defense. *See Luis v. United States*, 578 U.S. 5, 11 (2016) (plurality op.); *United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006). Mr. Goldstein's declaration and the financial statements submitted to Pretrial Services establish that the Hawthorne Property is the only asset available to pay for counsel, an expert witness, and other costs to defend this complex tax case. Without access to his share of the Hawthorne Property's equity, the cost of his defense dwarfs his minimal other assets, to the order of more than 20-to-1.[1] In addition, the encumbrances on the Hawthorne Property are fundamentally unfair to Mr. Goldstein's wife, who wants to sell the property so that she can use her share of the sale proceeds to support herself.

The government's opposition does not meaningfully dispute either of these points. The government does not allege, for example, that the costs of Mr. Goldstein's defense are unreasonably high, or that he has some other asset that he can use to pay those costs. Nor does the government offer any meaningful response to Mr. Goldstein's wife's predicament, other than

---

[1] The government's unjustified refusal to take steps to permit Mr. Goldstein from funding his defense by selling the Hawthorne Property is only the latest in its attempts to interfere with the defense's ability to present its case. The government has recently argued, for example, that Mr. Goldstein should be barred from addressing the Court at upcoming hearings. ECF No. 158. Separately, in February, after the government secured his detention without an evidentiary hearing based on demonstrably incorrect allegations, Mr. Goldstein's counsel from the investigation promptly provided both contrary evidence and a detailed explanation of its relevance; still, the government refused to take action, and instead insisted that Mr. Goldstein personally file a motion for a hearing, *pro se*, from isolation in a maximum security detention facility—knowing that doing so promptly would be impossible. *See generally* ECF No. 80; ECF No. 163, at 13-14.

the unhelpful judgment that he has "only himself to blame."  ECF No. 175 ("Opp.") 21.  Instead, the government raises a series of objections that have no legal or factual support.

On the *lis pendens*, the government asserts that the Hawthorne Property is a tainted asset based on a convoluted theory that has never been adopted by any court.  Unlike the properties at issue in the cases cited by the government, the Hawthorne Property was *not* purchased using a mortgage allegedly tainted by a false statement.  Nor was the mortgage paid off using allegedly tainted funds.  Rather, it is undisputed that (a) funds provided by the Litigation Funder were used to purchase the Hawthorne Property, (b) the proceeds of the mortgage charged in the Superseding Indictment was used to pay the Litigation Funder, and (c) the Superseding Indictment charges Mr. Goldstein with no crime arising out of the loan obtained from the Litigation Funder.  So what is the connection to the Hawthorne Property?  The government speculates that had the Litigation Funder not been paid, the Litigation Funder would have sought a judgment against Mr. Goldstein and foreclosed on the Hawthorne Property.  But it can point to no prior instance where a court has ever accepted that such an attenuated nexus to the property at issue can justify post-conviction forfeiture, let alone pretrial restraint of that property.

On the appearance bond, the government raises a series of arguments that misunderstand the legal standard and distract from the central question before the Court:  Is an appearance bond on the Hawthorne Property *uniquely* necessary to "reasonably assure" Mr. Goldstein's appearance at trial?  *See* 18 U.S.C. § 3142(c)(1)(B).  In other words, would no other "le[ss] restrictive" pretrial release conditions—like an appearance bond on the South Carolina Properties—reasonably assure Mr. Goldstein's presence at trial?  *See id.*  The government's opposition merely rehashes the allegations in the Superseding Indictment while offering no convincing reason to believe that Mr. Goldstein's appearance can be reasonably assured *only*

through an encumbrance on the Hawthorne Property.  Nor does the government even attempt to explain how an appearance bond on the Hawthorne Property, an untainted asset that is necessary to fund Mr. Goldstein's defense, can be squared with the Sixth Amendment.

The government also attempts to justify the appearance bond on the Hawthorne Property by repeating the thoroughly discredited allegation that Mr. Goldstein engaged in cryptocurrency transactions in violation of his release conditions.  In this regard, its opposition is just the latest in a series of false and reckless statements that the government has made about uncharged conduct.  The Court previously declined to address this issue, but because the government now relies on it to defend an appearance bond encumbering the only asset available to Mr. Goldstein to fund his defense, the Court should address it now.  The defense incorporates the arguments set forth in its motion appealing the monitoring condition and reply (ECF Nos. 80 & 87), and requests that the Court schedule an evidentiary hearing on this issue.

## I.    THE HAWTHORNE PROPERTY IS NOT TAINTED.

The government does not attempt to argue that the Hawthorne Property is forfeitable as a substitute asset (Opp. 4-10), and for good reason: forfeitable assets may be restrained prior to trial only if they are tainted—substitute assets cannot be so restrained.  *United States v. Chamberlain*, 868 F.3d 290, 294 (4th Cir. 2017) (en banc).  Instead, the government relies on a convoluted chain of reasoning to argue that the Hawthorne Property is a tainted asset, though it does not cite a single case to support its expansive and attenuated theory.  And because its theory of taint fails, Mr. Goldstein has a Sixth Amendment right to use the Hawthorne Property—an untainted asset—to fund his defense.  *See Luis*, 578 U.S. at 10 (plurality op.).

As relevant here, a "tainted" asset is "property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of" the charged offense.  18 U.S.C. § 982(a)(2).  The offense invoked by the government to justify pretrial restraint of the Hawthorne

Property is Count 22 of the Superseding Indictment, which alleges false statements in connection with a loan application to NFM Lending on September 29, 2021.  Opp. 7-8; *see also* ECF No. 173 (government's recently filed Bill of Particulars confirming that its forfeiture theory rests on Count 22 alone); ECF No. 159, at 51.[2]  But it is undisputed that Mr. Goldstein never spent the proceeds of the NFM loan on the Hawthorne Property, and therefore the Hawthorne Property was not "derived from" the proceeds allegedly obtained as a result of the offense charged in Count 22.  Indeed, the government does not dispute that Mr. Goldstein purchased, closed on, and moved into the Hawthorne Property six months *before* the NFM loan.  To avoid this

---

[2]     The government now seems to argue that its forfeiture allegation can be based on other alleged false statements made in connection with other loan applications (apart from the application to NFM Lending) simply because Count 22 "incorporate[s]" the other paragraphs of the Superseding Indictment.  *See* Opp. 8; ECF No. 159, ¶ 118.  The government provides no authority to support this sweeping proposition, which is unsurprising—it is incorrect.  The forfeiture statute on which the government relies permits a court, "in imposing sentence on a person convicted of a violation of" 18 U.S.C. § 1014 to "order that the person forfeit to the United States any property constituting, or derived from, proceeds obtained directly or indirectly, as the result of *such violation*." 18 U.S.C. § 982(a)(2) (emphasis added); *see also* Fed. R. Crim. P. 32.2(b)(1)(A) (requiring a court to "determine whether the government has established the requisite nexus between the property *and the offense*" (emphasis added)).  In other words, it is only the specific violation of 18 U.S.C. § 1014 charged in Count 22 that can result in forfeiture of the proceeds of that offense.  *See also United States v. Capoccia*, 503 F.3d 103, 110 (2d Cir. 2007) ("[W]here the government has alleged discrete violations of a statute that does not criminalize a scheme, conspiracy, or enterprise, the government is not entitled to forfeiture of proceeds from uncharged violations regardless of whether they and the charged violations are part of a common scheme.").

The only false statements in violation of 18 U.S.C. § 1014 charged in Count 22 are in connection with the September 29, 2021 NFM Lending application.  *See* ECF No. 159, at 51. Therefore, the government cannot justify its pretrial restraint of the Hawthorne Property using alleged false statements made in connection with any other loan instrument, like the loan Goldstein & Russell ("G&R") obtained from the Litigation Funder (which is not charged in any count).  *Contra* Opp. 8.  In any event, the alleged false statement to the Litigation Funder is legally insufficient to constitute an offense.  The Superseding Indictment does not allege that Mr. Goldstein's purported failure to disclose his personal debts to the Litigation Funder was material. Nor does the Superseding Indictment even allege that Mr. Goldstein was required to disclose those debts, as the counterparty to the lending agreement was G&R, not Mr. Goldstein himself. In a *Brady* letter, the government disclosed that the Litigation Funder was unsure whether Mr. Goldstein was required to disclose his personal debts for this very reason.

straightforward result, the government relies on a convoluted, multi-step series of hypotheticals and counterfactuals.  *See* Mot. 10 (outlining the five steps in the government's theory).

Thus, the government alleges that the NFM funds were used to repay the Litigation Funder, who had six months earlier loaned G&R funds in return for a "pledge [of] certain receivables potentially due in specified court cases and other legal matters."  ECF No. 159, ¶ 97.  The government speculates that "if it were not for Defendant's" September 29, 2021 loan application to NFM Lending, "he would have lost his interest in the [Hawthorne Property]" to the Litigation Funder.  Opp. 8.  This is because, according to the government, had the Litigation Funder's loan to G&R not been paid back, it would have foreclosed on the Hawthorne Property because it "had the legal right to require Defendant to transfer a deed of trust in the [Hawthorne Property] to the [Litigation] Funder."  *Id.*  And the government further speculates that it can "show by a preponderance of evidence that the [Litigation] Funder would have taken Defendant's interest in the [Hawthorne Property] if Defendant had not repaid" G&R's loan from "the [Litigation] Funder with proceeds of the mortgage."  *Id.* at 8 n.3.[3]

The government's assertion that this convoluted series of hypotheticals and counterfactuals transforms the Hawthorne Property into a tainted asset even though the Hawthorne Property was not purchased using proceeds obtained from the crime charged in Count 22 has no legal support.  As an initial matter, the cases relied on by the government do not even concern pretrial restraint of property; instead, those cases address *post-trial* forfeiture, which is subject to a different standard under *Chamberlain*, *see* 868 F.3d at 294.  But in any

---

[3]     In its conclusory speculation that the Litigation Funder "would have taken Defendant's interest" in the Hawthorne Property, *Id.* at 8 n.3, the government fails to address the fact that at the relevant time, the property was owned only by Mr. Goldstein's wife, and that he had no interest in the property.

event, each of the government's cases involves the use of tainted funds to pay for the property itself, converting the tainted funds into a tainted interest in the property.  By contrast, here, the proceeds of the NFM loan charged in Count 22 were *not* used to purchase the Hawthorne Property.  Instead, those funds were used to pay off G&R's loan from a third party, the Litigation Funder, whose alleged connection to the Hawthorne Property is that the Litigation Funder *could have* foreclosed on the property if Mr. Goldstein had not paid off G&R's debt.

Take the government's lead case, *United States v. Caspersen*, 275 F. Supp. 3d 502 (S.D.N.Y. 2017).  There, the defendant used tainted funds to pay off both a mortgage and a series of home equity lines of credit (HELOCs)[4] on an apartment he co-owned with his wife.  For starters, that case is wildly inapposite: the court entered an order of forfeiture after the defendant pleaded guilty to the underlying charges, and only after the defendant *consented* to the post-conviction forfeiture of his apartment pursuant to a plea agreement.  *See* Consent Preliminary Order of Forfeiture as to Specific Properties/Money Judgment, *Caspersen*, Case No. 16-cr-414, ECF No. 19, at 2 (S.D.N.Y. July 6, 2016); *see also* Order, *Caspersen*, ECF No. 35, at 1 (S.D.N.Y. Dec. 5, 2016).  The defendant's wife filed a third-party petition asking the court to determine her interests in the apartment (and not that of the defendant's).

In denying the wife's claim over the apartment, the *Caspersen* court relied on the settled proposition that because the defendant paid the apartment's mortgage and HELOCs with crime proceeds, and because "the Government had an interest in those funds at the time he made the

---

[4]    The government emphasizes that *Caspersen* involved a defendant using tainted funds to pay off HELOCs in addition to a mortgage.  *See* Opp. 5-6.  This emphasis is misplaced.  While it is true that the NFM loan was also characterized as a "home equity loan," *see* Mot. 9 & Ex. B, at 2, the relevant inquiry is not what the source of the funds were, but rather how they were used. In *Caspersen*, the funds were used to pay off the apartment's mortgage and HELOCs, rendering the apartment tainted to the extent of those payments.  Here, the NFM funds were used to pay off G&R's obligation to the Litigation Funder, not towards funding the Hawthorne Property.

payments," the government continued to have an interest "equal to the sum of the amount of the mortgage that [the defendant] paid off and the balance of the HELOCs that he satisfied using crime proceeds." *Caspersen*, 275 F. Supp. 3d at 504-05 (citing *United States v. Pole No. 3172, Hopkinton*, 852 F.2d 636, 639 (1st Cir. 1988)). But *Caspersen* provides no support for the government's position here that proceeds from the NFM loan used to pay an obligation to the Litigation Funder (and not towards the Hawthorne Property) rendered the property forfeitable.

The same is true for the government's other authorities. Each involved the use of tainted funds to pay down a mortgage or similar loan on the property at issue, wherein the defendant applied the tainted funds towards equity in that property. *E.g.*, *United States v. 2121 Kirby Drive, Unit 33, Houston, TX*, No. CIV.A. H-06-3335, 2007 WL 3378353, at *5 (S.D. Tex. Nov. 13, 2007) ("[T]he illicit funds were used to pay down the outstanding mortgage on Defendant Real Property."); Preliminary Order of Forfeiture, ECF No. 338, *United States v. Karasarides*, Case No. 5:21-cr-259 (N.D. Ohio Apr. 25, 2024) (ordering forfeiture of property that defendant paid off using illicit funds); Preliminary Order of Forfeiture, ECF No. 45, *United States v. Saris*, Case No. 5:22-cr-502 (N.D. Ohio May 14, 2024) (ordering forfeiture of property, pursuant to a plea deal, where the illicit funds were used to pay off the mortgage).[5] But these authorities are categorically inapposite because here, Mr. Goldstein did not use the proceeds of the NFM loan to

---

[5]    The government also relies on *United States v. Real Prop. & Premises*, 657 F. Supp. 2d 1060, 1066-68 (D. Minn. 2009) (civil forfeiture case), in which the court held that tainted funds used to pay for a property's renovations and taxes rendered the property forfeitable "to the extent that tainted funds were used therein." That provides no support to the government's theory here. Putting aside that that case involved the application of a different statutory standard, *compare* 18 U.S.C. § 982(a)(2) (permitting forfeiture of property "constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of [the] violation" of 18 U.S.C. § 1014), *with id.* § 981(a)(1)(C) (permitting forfeiture of property "which constitutes or is derived from proceeds traceable to" certain offenses), the nexus between the property in that case and tainted funds used for that property's renovations and taxes is obvious.

pay towards the Hawthorne Property, which he and his wife purchased six months earlier with all cash.  Those proceeds instead went to the Litigation Funder.

## II.    THE *LIS PENDENS* VIOLATES FEDERAL AND D.C. LAW.

### A.    The Government Lacks Authority to File the Notice Under Federal Law.

Because the Hawthorne Property is not a tainted asset, it is subject to the statutory requirements applicable to the forfeiture of substitute assets under 21 U.S.C. § 853(p).  *See* 18 U.S.C. § 982(b)(1) (adopting the provisions of 21 U.S.C. § 853(p)); *United States v. Jarvis*, 499 F.3d 1196, 1205 (10th Cir. 2007).  That statute does not permit the government to restrain substitute assets like the Hawthorne Property prior to trial.  *Chamberlain*, 868 F.3d at 294.

The government's contention that it is entitled to circumvent *Chamberlain* by restraining the Hawthorne Property through a *lis pendens* (rather than a forfeiture action), Opp. 12, is without merit.  The government does not dispute that the *lis pendens* has the practical effect of stripping Mr. Goldstein of his ability to sell the property and fund his defense.  *See* Goldstein Decl. ¶ 4.  And the government can point to no authority—statute or judicial precedent— permitting it to file a *lis pendens* on substitute property.  In fact, the principal case the government cites in its brief (Opp. 10-11) held exactly the opposite: that a *lis pendens* was improper, and that the federal criminal forfeiture statute provides the government with no authority to seek a *lis pendens* against substitute property.  *See Jarvis*, 499 F.3d at 1204-06.

Indeed, the government's argument simply ignores the numerous cases Mr. Goldstein cited that hold precisely the opposite: that the government is *not* permitted to file a *lis pendens* on substitute property.  *See* Mot. 7 (citing cases).  The forfeiture statute provides the government with no such authority to do so.  Moreover, if the government is correct, its position would yield the absurd result that federal law permits it to file a *lis pendens* on *any* property owned by any defendant—even if that property had zero connection to the charged offense—so long as the

government has included any forfeiture allegation in the indictment.  *See* 21 U.S.C. § 853(p)(2) (permitting the "forfeiture of any other property of the defendant" as substitute property).

The government also disputes whether a *lis pendens* is a "seizure," Opp. 11, though this is a distinction without legal relevance here.  It is undisputed that the *lis pendens* has the practical effect of preventing Mr. Goldstein from selling the property, which is precisely the government's object in filing the notice.  That is enough to trigger the Sixth Amendment analysis because Mr. Goldstein is being deprived of his ability to pay for counsel of his choice.

Still, the government goes on to cite a line of cases that it claims supports its position that the *lis pendens* is not a "seizure."  Opp. 11.  But not only is the proposition for which it cites these cases disputed, *see, e.g.*, *United States v. Queri*, 679 F. Supp. 2d 295, 297 (N.D.N.Y. 2010) (a "*lis pendens,* especially one filed by the United States of America, practically speaking, denudes the subject property of its alienability." (citation modified)), most of the government's cases concern the separate issue of a property owner's Fifth Amendment due process rights (and not a defendant's Sixth Amendment right to counsel).  *E.g.*, *United States v. Register*, 182 F.3d 820, 837 (11th Cir. 1999) (holding that a *lis pendens* "does not affect property interests to an extent significant enough to implicate the Due Process Clause of the Fifth Amendment"); *Aronson v. City of Akron*, 116 F.3d 804, 811-12 (6th Cir. 1997); *Diaz v. Pataki*, 368 F. Supp. 2d 265, 274 (S.D.N.Y. 2005) ("Courts have held that the filing of a lis pendens does not even constitute a seizure *for the purpose of the Due Process Clause*."[6] (emphasis added)).[7]  Courts have recognized the critical distinction between the *lis pendens* analysis under the Fifth versus

---

[6]     The government's quotation from *Diaz v. Pataki* misleadingly omits this italicized language.  *See* Opp. 11.

[7]     Some courts have gone the opposite way and concluded that *lis pendens* notices do trigger due process protections.  *E.g.*, *Pater v. City of Casper*, 646 F.3d 1290, 1297 (10th Cir. 2011) (explicitly disagreeing with the Eleventh Circuit's decision in *Register*).

the Sixth Amendment.  *See United States v. Balotin*, No. 3:19-cr-191-MMH-JBT, 2023 WL

2264181, at *6 (M.D. Fla. Feb. 28, 2023).  In fact, even one of the government's own authorities

recognizes that there may be "circumstance[s] where a *lis pendens* operates to infringe on a

defendant's right to choice of counsel" under the Sixth Amendment.  *United States v. Balsiger*,

910 F.3d 942, 951 (7th Cir. 2018).

    **B.    The *Lis Pendens* Violates D.C. Law.**

        Finally, the government's opposition (Opp. 13-14), only confirms that the *lis pendens*

violates D.C. law because the Hawthorne Property is an untainted asset.  As the government

acknowledges, the D.C. Code states that a *lis pendens* is only effective "if the underlying action

or proceeding directly affects the title to . . . or asserts a[n] . . . other ownership interest in real

property."  D.C. Code § 42-1207(b).  The government can only have a pretrial interest in tainted

property under the so-called relation-back doctrine.  *See* 21 U.S.C. § 853(c) (stating that the

government's interest "vests . . . upon the commission of the act giving rise to forfeiture under

this section").  But substitute property has no equivalent relation-back provision, *see Jarvis*, 499

F.3d at 1204, and so the government has no interest in substitute property prior to conviction.

**III.    THE COURT SHOULD REMOVE THE APPEARANCE BOND ON THE
          HAWTHORNE PROPERTY.**

        Like the *lis pendens*, the appearance bond on the Hawthorne Property impermissibly

prevents Mr. Goldstein from using the only asset available to him to fund his defense in violation

of his Sixth Amendment right to counsel of his choice.[8]  *See Luis*, 578 U.S. at 10 (plurality op.).

The government says nothing whatsoever about this—likely because it has no answer.

---

[8]        The government's assertion that it "never received" financial information from Mr.
Goldstein, Opp. 18, is surprising.  Mr. Goldstein's counsel spent months answering numerous
emails from the government asking approximately 25 invasive questions covering topics ranging
from Mr. Goldstein's travel to the division of labor between Mr. Goldstein and his attorneys.
*See* Mot. 6, 19.  The government was also served with Mr. Goldstein's declaration, along with its

In addition, for the reasons set forth in Mr. Goldstein's motion, the appearance bond on the Hawthorne Property is not the "least restrictive . . . condition" that will assure his appearance at trial. 18 U.S.C. § 3142(c)(1)(B). An appearance bond secured by the South Carolina Properties owned by Mr. Goldstein's family, in combination with Mr. Goldstein's other conditions of release, is more than sufficient to secure his appearance. The government's opposition does nothing to rebut that showing.

A.    **There Is No Reason Why Substituting the South Carolina Properties Would Not Reasonably Assure Mr. Goldstein's Appearance at Trial.**

The Bail Reform Act requires the Court to impose only the "least restrictive" condition or set of conditions that will "reasonably assure the appearance of the [defendant] as required." 18 U.S.C. § 3142(c)(1)(B). For the Court to maintain the appearance bond on the Hawthorne Property, it must conclude, therefore, that the bond on that specific property—as opposed to the South Carolina Properties—is "*necessary* to 'reasonably assure' [Mr. Goldstein's] appearance." *United States v. Hernandez Cerrato*, No. 1:23-cr-00419-MJM-1, 2024 WL 1329296, at *3 (D. Md. Mar. 28, 2024) (emphasis added), *aff'd as modified*, 2024 WL 1532748 (D. Md. Apr. 9, 2024). Mr. Goldstein's motion makes it amply clear that the Hawthorne Property is not *uniquely* necessary to ensure his appearance at trial, and that substituting in the South Carolina Properties would reasonably assure his appearance. *See* Mot. 12-14.[9]

---

exhibit, which go through with specific details Mr. Goldstein's full financial information, including his assets, his liabilities, his income, and his expenses. At this point, it is difficult to imagine what further information the government may need.

[9]    The government misreads Mr. Goldstein's motion as arguing that the statute requires a showing that an appearance bond on "his D.C. home alone"—as opposed to a combination of conditions of release—"is sufficient to assure his continued appearance." Opp. 13. Of course, the statute authorizes the court to impose either a single "condition" or a "combination of conditions." 18 U.S.C. § 3142(c)(1)(B). But in all cases, the condition(s) must be the "least restrictive" possible to "reasonably assure" the defendant's appearance. Thus, the question is not

In arguing otherwise, the government reflexively invokes Mr. Goldstein's alleged "international travel and contacts," points to his supposed "ability to leave the country," and recycles the allegations in the Superseding Indictment. Opp. 15-17. But the government's opposition on this score is a distraction. The question before the Court is narrow: Is the appearance bond on the Hawthorne Property (as opposed to the South Carolina Properties) *uniquely* necessary to ensure Mr. Goldstein's appearance at trial? The government fails to explain why the alleged risk of Mr. Goldstein's flight can *only* be addressed by an appearance bond on the Hawthorne Property.[10] In discussing the Section 3142(g) factors, the government ignores that each of its concerns would be adequately—if not better—addressed by an appearance bond on the South Carolina Properties, which have a collective estimated value of over $2.1 million, far exceeding the approximately $600,000 in equity that Mr. Goldstein holds in the Hawthorne Property. *See* Mot. 13 & n.11.

In fact, nowhere does the government even attempt to justify its position that the Hawthorne Property is uniquely necessary to assure Mr. Goldstein's appearance, and that the South Carolina Properties would not adequately (or better) accomplish that goal. The government has wisely abandoned its prior argument about Mr. Goldstein's supposed

---

whether the Hawthorne Property is "sufficient" to assure Mr. Goldstein's appearance, Opp. 13, but whether that property (and that property in particular) is *necessary* to ensure his appearance.

[10]     To be clear, from Mr. Goldstein's perspective, that risk is zero. As discussed in his opening motion, Mot. 15, neither the government nor Pretrial Services requested a request from Mr. Goldstien to travel abroad this past spring to attend his child's graduation, ECF No. 117, and the Court promptly granted that request, ECF No. 118. Had Mr. Goldstein intended anything other than complying with the terms of his pretrial release and appearing at trial to defend himself, he could have used that opportunity while he was abroad with his passport to flee—but he obviously did not. In light of the numerous pretrial motions Mr. Goldstein has filed that demonstrate the serious flaws with the government's case and its defiance of binding Supreme Court precedent, *see, e.g.*, ECF Nos. 116, 119, 120, 121, 122, 125, 126, & 127, Mr. Goldstein fully intends to appear at trial and defend himself against the government's charges.

"emotional" connection to the Hawthorne Property (as opposed to the South Carolina

Properties), *see* Mot. 13-14 (quoting ECF No. 34, at 11), given that his whole purpose in filing

the present motion is to sell the Hawthorne Property.  *See also* Mot. 14 (explaining further

reasons why arguments about a supposed "emotional" connection to the Hawthorne Property

does not survive scrutiny).  The government has also abandoned its prior argument that

substitution of the South Carolina Properties would "shift" the consequences of non-appearance

to "innocent third parties," *i.e.*, Mr. Goldstein's relatives who own the South Carolina Properties.

*See* ECF No. 34, at 5.  This is equally unconvincing because the question before the Court is

whether substitution of the appearance bond would reasonably assure Mr. Goldstein's

appearance.  As Mr. Goldstein pointed out in his motion, if the South Carolina Properties were

substituted for the Hawthorne Property, Mr. Goldstein's failure to appear would "deprive his

close loved ones, including his aged father and stepmother, of their properties," Mot. 14—a

strong incentive for Mr. Goldstein to appear.  In fact, federal courts consistently find pretrial

release secured by appearance bonds on a relative's property to satisfy Section 3142's

requirements.  *See, e.g.*, *United States v. Schwab*, No. 3:25-cr-30 (SVN), 2025 WL 1752310, at

*7 (D. Conn. June 25, 2025); *United States v. Doost*, No. CR 24-417-4 (CKK), 2025 WL

1555157, at *4 (D.D.C. June 2, 2025).

## B.    The Government's Remaining Arguments Are Unconvincing.

In addition to rehashing the Superseding Indictment's allegations, the government offers

two additional arguments about the appearance bond.  Neither is persuasive.

First, the government suggests that because Mr. Goldstein's relatives are willing to offer

the South Carolina Properties as a substitute for the appearance bond on the one hand, it would

be "equally viable" for them to mortgage those properties on the other hand and gift the proceeds

to Mr. Goldstein for him to pay his defense costs.  Opp. 19; *see also id.* at 21.  The purported

equivalence the government draws between those two propositions is surprising; they have radically different economic implications for Mr. Goldstein's relatives. Offering the South Carolina Properties for an appearance bond would encumber those properties pending Mr. Goldstein's trial, and once Mr. Goldstein appears at trial results in no cost to his relatives. Mortgaging those properties to pay Mr. Goldstein's defense costs, by contrast, would result in a transfer of value and force his relatives to eat those costs, which they are unable to do.

Next, the government falsely claims that Mr. Goldstein has "committed two violations of his conditions of release." Opp. 19. The first purported violation concerns the allegation that Mr. Goldstein transferred funds using cryptocurrency accounts in violation of his release conditions. This allegation—which the government first invoked on an *ex parte* basis (ECF No. 40) to detain Mr. Goldstein for four days before retreating from its position at the hearing on Mr. Goldstein's release motion—has been thoroughly discredited. Mr. Goldstein has produced contemporaneous communications supported by an expert declaration conclusively showing that those cryptocurrency accounts do not belong to him. ECF No. 80, at 10-15. And as the government disclosed only on the morning of his release hearing, transactions occurred in one of those accounts *while Mr. Goldstein was detained*. *Id.* at 10. The government's continued reliance on this completely discredited allegation does it no help. The Court previously declined to address the merits of this issue on Mr. Goldstein's appeal of the monitoring condition. ECF No. 108, at 4. Because the government continues to rely on this demonstrably false allegation, the Court should do so now.

As for the second, Mr. Goldstein fully acknowledged the technical violation resulting from a failure to alert Pretrial Services in advance of his moving funds between two accounts (both of which Pretrial Services was monitoring through statements Mr. Goldstein provided to

14

them), and both Pretrial Services and the Court have concluded that further action is not warranted.  *See* Mot. 2 n.1.  The government has failed to show why an apparent technical violation—discovered through Mr. Goldstein's compliance in providing Pretrial Services his bank account statements—has any connection to Mr. Goldstein's request for substitution or demonstrates that an appearance bond on the South Carolina Properties would not reasonably assure Mr. Goldstein's presence at trial.

## **CONCLUSION**

The Hawthorne Property is the only asset that Mr. Goldstein can use to fund his defense in this complex case.  The *lis pendens* and the appearance bond are impermissibly preventing him from selling the house to pay for his defense in violation of the Sixth Amendment.  The *lis pendens* also violates federal and D.C. law because the Hawthorne Property is not a tainted asset—the government's convoluted argument to the contrary has no legal support.  And the appearance bond on the Hawthorne Property is not the least restrictive condition that would assure Mr. Goldstein's appearance, in light of his consistent compliance with his many other conditions of release and his family's offer to substitute the South Carolina Properties as security for his appearance.  For these reasons, the defense requests that the Court: (i) order the government to remove the notice of *lis pendens* filed with the D.C. Recorder of Deeds; and (ii) substitute the South Carolina Properties for the Hawthorne Property as the property securing Mr. Goldstein's appearance.  In the alternative, if the Court believes that additional information about Mr. Goldstein's financial condition is necessary to resolve this motion, then the defense requests that the Court schedule a pretrial adversary *Farmer* hearing.

Respectfully submitted,


/s *Jonathan I. Kravis*
Jonathan I. Kravis (Bar No. 31556)
Stephany Reaves (Bar No. 19658)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500E
Washington, DC 20001
(202) 220-1100
Jonathan.Kravis@mto.com
Stephany.Reaves@mto.com

Adeel Mohammadi (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
Adeel.Mohammadi@mto.com

*Attorneys for Defendant Thomas Goldstein*

Dated: September 26, 2025