**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. LKG-25-06** |
| **THOMAS C. GOLDSTEIN,** | |
| **Defendant.** | |

---

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE* TO PRECLUDE EVIDENCE OF UNCHARGED MISCONDUCT

At trial, the government plans to admit evidence—through testimony and documents—of relevant, admissible uncharged conduct. That evidence is admissible because it is (i) direct or circumstantial evidence of Goldstein's willfulness; (ii) inextricably intertwined with the crimes charges or adding critical context; or (iii) probative of Goldstein's motive, knowledge, or absence of mistake, or lack of accident in his evasion of, and failure to pay, taxes. As explained below, this evidence demonstrates—whether before, during, or after the charged period—that Goldstein had one overarching scheme to intentionally misrepresent his gambling winnings and losses to his accountants, law firm employees, mortgage lenders, and IRS representatives.

### BACKGROUND

#### A. Summary of Charges in the Superseding Indictment

Defendant is one of the most prolific United States Supreme Court litigators in the country. From 2016 until his retirement in or around March 2023, he was the sole owner of the law firm of Goldstein & Russell, P.C. ("G&R") which specialized in appellate litigation, including briefing and arguing cases before the Supreme Court on behalf of its clients. Dkt. 161, ¶ 2. As the sole owner, Defendant was the final decisionmaker on most significant G&R decisions. *Id.* at ¶ 3.

Although Goldstein made hundreds of thousands of dollars each year as the 100% owner of G&R, during the same period, he also was an ultrahigh-stakes poker player, whose gross winnings surpassed $60,000,000 in private games between 2016 and 2022. *See, e.g., id.* at ¶ 29, 54, 55, 58, 66, 70.

Despite his legal acumen and reputation, Goldstein—among other things—engaged in a scheme to (i) evade the assessment of taxes on his millions of dollars in gambling income, (ii) falsely deduct millions in gambling debts and other personal expenses as G&R business expenses, and (iii) divert to other bank accounts hundreds of thousands of dollars in legal fees due to be paid to G&R. To hide his scheme, Goldstein made false statements to IRS representatives, his own G&R colleagues and employees, his accountants, and mortgage lenders. *Id.* at ¶ 95, 97, 103.

**B. Goldstein Created an Environment in which Only He Knew the Financial Status of G&R.**

To effectuate his scheme, the Superseding Indictment alleges that Goldstein created an environment at G&R in which he was the sole person, during the charged period, who knew, understood, and made final decisions related to G&R's finances, health insurance coverage, accounting, bookkeeping, and tax reporting. *Id.* at ¶ 3. Although "firm managers" had some responsibilities related to record-keeping, these individuals were, generally, recent college graduates with no bookkeeping or accounting experience. *Id.* at ¶ 4. Indeed, their role was better characterized as Defendant's personal assistant because, at times, they were also responsible for collecting Defendant's "dry cleaning, getting service performed on [his] motor vehicles, and coordinating maintenance and other work done on [his] residence." *Id.* At trial, the government expects that Defendant's G&R partners will testify that they, too, generally were not

knowledgeable about G&R's finances and tax reporting requirements. In fact, despite their partner title, these attorneys were employees of G&R, not part owners of the firm. *Id.* at ¶ 3.

Independent of being the sole individual at G&R with full access and knowledge of its financial and tax records, Defendant showed an expertise in tax law. Over the course of his career, he drafted and filed briefs as well as argued before the Supreme Court on matters related to tax law. *See, e.g.,* Ex. 1, Petition for a Writ of Certiorari, *Centerior Energy Corporation*, et al. *v. Jerome R. Mikulski,* et al., No. 07-961 (U.S. Jan. 2008); Ex. 2, *United States of America v. Clintwood Elkhorn Mining Company,* et al., No. 07-308 (U.S. Feb. 2008).

As a result of his legal knowledge and acumen (including on taxes), people sometimes sought Goldstein's expertise for informal tax advice. For example, in 2016, Goldstein played a series of poker matches against California Businessman-2 that resulted in Goldstein winning nearly $26.5 million. Dkt. 161, ¶ 27. Prior to these games, in 2014, the California Businessman-2 thought so much of Goldstein's tax knowledge that California Businessman-2 organized a meeting between Goldstein and one of his employees responsible for his business and personal tax compliance matters to discuss how to reduce his taxable gambling income. At trial, the government expects that the representative for California Businsessman-2 will testify that, during that meeting, Goldstein counseled the California Businessman-2's representative to organize a standalone entity overseas with a foreign account to receive gambling wins and losses. That representative understood Goldstein's suggestion to be, in sum, that California Businessman-2 could reduce his taxes through offshore accounts because the IRS would not be able to accurately assess his gambling income.

Through the structure he created at G&R, Goldstein's independent knowledge of tax law, and G&R's lack of in-house accountants, Goldstein covertly operated his scheme. *Id.* at ¶ 4.

### C. Even When Goldstein Hired Outside Accountants, He Intentionally Misled Them.

For periods of time, Goldstein hired outside accountants for G&R but still hid his gambling income from them. In 1999, William Caldwell and his firm Caldwell & Company began doing the bookkeeping for G&R's predecessor firm, Goldstein & Howe. At trial, the government anticipates that Caldwell will testify that, among other things, (1) Goldstein knew gambling income had to be reported to the IRS; (2) although Goldstein informed him that he hosted informal poker games at his residence, Caldwell assumed that these poker games were social gatherings as opposed to ultrahigh stakes games at which Defendant was playing for hundreds of thousands of dollars; (3) in 2012, an IRS Revenue Agent ("RA") audited one of Defendant's previous tax returns relating to, among other things, his gambling winnings, and advised Caldwell and Goldstein on proper gambling record keeping and accounting; and (4) also in 2012, Goldstein fired Caldwell for not asking for and adequately reporting Goldstein's gambling income.

After firing Caldwell, Defendant hired a new outside accounting firm to continue to perform accounting and tax-preparation services for G&R. *Id.* at ¶ 5. The Superseding Indictment is replete with examples where, as with Caldwell, Defendant failed to inform or intentionally misled his new accountants, causing them to incorrectly report his gambling and business income to the IRS. *See, e.g., id.* at ¶ 33 ("Goldstein never emailed or otherwise provided the ledger [of his gambling transactions for the 2016 tax year] to G&R's firm manager or the Accounting Firm."); *Id.* at ¶ 43 ("[H]e did not tell anyone at G&R or the Accounting Firm that he had diverted the G&R [$250,000] fee to his Gambling Account, or that he had used it to satisfy a personal poker debt.").

**D. Goldstein Made False Statements to Various Mortgage Lenders, Including G&R's Litigation Funder.**

Not only did Goldstein hide his gambling income from his firm managers, outside accountants, and his own G&R partners, but he also intentionally omitted his $15 million gambling debt from mortgage applications while searching for a new home in D.C. in 2021. First, he omitted his debt from two applications that he and his wife submitted to First Savings Mortgage Corporation ("FSM"). Dkt. 159, ¶ 95. FSM later denied his applications after it discovered undisclosed tax liens on Defendant's Maryland home. Second, Defendant intentionally concealed his more than $15 million debt from a Litigation Funder to obtain funds to purchase his D.C. home. *Id.* at ¶ 97. As a condition of a loan from the Litigation Funder, Goldstein was required to obtain a mortgage on the D.C. home and to use the proceeds of that mortgage to repay the Funder. *Id.* Third, to obtain that mortgage and repay the Funder, Defendant knowingly omitted his more than $15 million debt from the NFM Lending ("NFM") loan application. *See* Dkt. 159 at ¶¶ 100-103.

**E. Indictment and the Government's September 12, 2025, Notice**

As a result of this overarching scheme, on January 16, 2025, a federal grand jury returned a 22-count Indictment charging Defendant with four counts of tax evasion, in violation of 26 U.S.C. § 7201 (Counts One through Four); ten counts of aiding and assisting the preparation of false and fraudulent tax returns, in violation of 26 U.S.C. § 7206(2) (Counts Five through Fourteen); five counts of willful failure to pay taxes, in violation of 26 U.S.C. § 7203 (Counts Fifteen through Nineteen); and three counts of false statements on a loan application, in violation of 18 U.S.C. § 1014 (Counts Twenty through Twenty-two). Dkt. 1. On August 7, 2025, the same federal grand jury returned a Superseding Indictment with the same twenty-two counts, adding certain allegations. Dkt. 159. The government is prepared to start trial as scheduled on January 12, 2026.

On September 12, 2025, four months before the scheduled trial date, the government provided a letter to counsel for Defendant, styled as a Rule 404(b) notice (the "Letter"). The Letter, attached as a sealed exhibit to Defendant's *Motion in Limine* (Dkt. 210), explained that the "United States may seek to admit at trial evidence that, while uncharged, is intrinsic to the crimes charged in the Superseding Indictment" and "[m]uch of [the evidence] is also direct evidence of Defendant's *mens rea* for the charged offenses." Dkt. 210, Ex. A. The government provided the Letter to streamline the trial by ensuring that Defendant had an opportunity to dispute the government's position on the admissibility of the various categories of evidence noted within the Letter before trial.

These categories of evidence included the following uncharged conduct:

- Testimony from Caldwell regarding his firm's preparation of Goldstein's personal tax returns and tax returns for G&R between 1999 and 2012, Goldstein's failure to tell Caldwell about his significant gambling income, Goldstein's firing of Caldwell, and the IRS RA's advice to Caldwell and Goldstein on proper gambling record keeping (**Category 1 – "Caldwell Evidence"**);

- Testimony and documentary evidence describing conduct prior to and during the charged period in the Superseding Indictment showing Defendant understood taxes, tax reporting, including the proper reporting of gambling wins and losses (**Category 2 – "Defendant Understood Taxes Evidence"**);

- Defendant's failure to timely file and pay taxes for the tax years before and after the charged period and to report gambling winnings before the charged period (**Categories 3, 4, 6 – "Pattern of Failure to Pay and Report Taxes Evidence"**);

- Evidence related to Defendant's misclassification of G&R financial transactions before, during, and after the charged period (**Category 7 – "Misclassification of Financial Transactions Evidence"**);

- Defendant's false statements to the Litigation Funder about his private gambling debt to obtain funds to purchase his D.C. home, pay his tax debt, and sell his Chevy Chase home (**Category 10 – "False Statements to Litigation Funder Evidence"**); and

- Evidence that Defendant failed to timely file and pay his Maryland state tax obligations during the charged period, continued to play high stakes poker after the charged period, and use a SCOTUSblog employee for his personal benefit **(Categories 5, 8, 9).**

Every category of evidence is admissible at trial because it is intrinsic to the Superseding Indictment, it is probative of a permitted use under Rule 404(b), and there is little to no danger of unfair prejudice or jury confusion. However, the government plans to admit some of this evidence, only if Goldstein "opens the door."

## ARGUMENT

**I.  The Government Provided Proper Notice to Goldstein of Its Intent to Admit Potential Rule 404(b)(2) Evidence.**

### a. The Government's Letter Satisfies Rule 404(b)(3).

Under Rule 404(b)(3), in a criminal case, the government must:

(A) [P]rovide reasonable notice of [other crimes, wrongs, or acts] evidence that the prosecutor intends to offer at trial, so that the defendant has a fair opportunity to meet it;

(B) articulate in the notice the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose; and

(C) do so in writing before trial--or in any form during trial if the court, for good cause, excuses lack of pretrial notice.

Fed. R. Evid. 404(b)(3). Indeed, the 2020 amendments to Rule 404(b)(3) "make clear that the government now must 'articulate in the notice the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose.'" *United States v. Abarca*, 61 F.4th 578, 580–81 (8th Cir. 2023); *see also* Fed. R. Evid. 404(b) advisory committee notes, 2020 Amendments ("The earlier requirement that the prosecution provide notice of only the 'general nature' of the evidence was understood by some courts to permit the government to satisfy the notice obligation without describing the specific act that the evidence would tend to prove, and without explaining the relevance of the evidence for a non-propensity purpose.").

Although few courts have opined on the sufficiency of the content of a 404(b) notice subsequent to the 2020 amendments, those which have, recognize that an "introductory paragraph" noting that "[t]his evidence will be introduced for the purpose of showing defendant's motive, preparation, plan, intent, absence of mistake, and lack of accident[]" is "sufficient to put defense counsel on notice." *United States v. Chapman*, 2024 WL 1661158, at *2 (D. Nev. Apr. 17, 2024); *see also United States v. Childress*, 2021 WL 2972868, at *6 (W.D. Va. July 14, 2021) ("Childress objects to the admission of this evidence because the government has not adequately shown the theory on which they intend to introduce this alleged 404(b) evidence, but, rather, have listed all the bases on which 404(b) evidence is admissible. […] Because the government is not yet aware what defenses Childress will present, there is no need for the government, at this stage of the litigation, to limit the purposes for which they intend to introduce the 404(b) evidence, so long as they have a clearly articulated, non-character reason for introducing this evidence. Further, the court is not aware of any case law that suggests that 404(b) evidence may only be presented for one purpose enumerated in the rule."). In *Chapman*, specifically, the court held that "[a]lthough the government could have been more specific and offered more detailed explanations for each item, the introductory paragraph in its letter is sufficient to put defense counsel on notice." *Id.*

Moreover, several circuits recognize that Rule 404(b) notice provided to Defendant four months before trial is clearly reasonable. *See United States v. Watson*, 409 F.3d 458, 465–66 (D.C. Cir. 2005) (finding no reversible error where defendant did not demonstrate prejudice flowing from forty-eight-hour 404(b) notice); *see also United States v. White*, 816 F.3d 976, 984–85 (8th Cir. 2016) (finding the government's one-week 404(b) notice reasonable under the circumstances); *United States v. Preciado*, 336 F.3d 739, 745 (8th Cir. 2003) (concluding that the government's one-week 404(b) notice was reasonable and timely under the circumstances); *United States v.*

*Blount*, 502 F.3d 674, 678 (7th Cir. 2007) (finding that the government's 404(b) notice was timely when it occurred a week before trial).

The government's Letter complied with Rule 404(b)(3). First, the timing of the written notice was beyond reasonable. The government provided the notice four months ahead of the January 12, 2026, trial date. Second, the notice articulated the permitted purpose for which the government intends to offer the evidence. Importantly, the government explained that it believes that each category of evidence is, in fact, intrinsic to the Superseding Indictment and, therefore, not 404(b) evidence. The government, nonetheless, out of an abundance of caution, provided notice under Rule 404(b). This gave Goldstein the opportunity to argue to the Court—as he has— that the evidence is extrinsic to the Superseding Indictment. The timing and content of the government's Letter ensured that Goldstein has a "fair opportunity to meet" that evidence at trial. *See* Fed. R. Crim. Pro. 404(b)(3)(B). On the first page of the notice, the government explained that "if the Court views the evidence as neither intrinsic nor direct evidence," the acts described may also be admissible for one of the permitted uses under Rule 404(b)(2). Dkt. 210, Ex. A.

On the introductory page, the government asserted—and still argues—that the categories of evidence noted within the Letter are intrinsic. But the Letter also explains the likely non-propensity purposes for which the government would introduce the evidence at trial. Although it did not, specifically, mention or cite a single Rule 404(b)(2) permitted use for each category, the Letter does explain the relevance of each category of evidence and a sufficient reason why the evidence is admissible.

Defendant cites to *United States v. Hall*, 858 F.3d 254, 266 (4th Cir. 2017) to assert that the government's notice is deficient. However, nowhere in *Hall* is the sufficiency of a Rule 404(b) notice addressed. Instead, generally, *Hall* describes the government's burden to establish the Rule

404(b) permitted purpose for admissibility. *Hall* is irrelevant and the government's notice is sufficient.

### b. Even if the Government's Letter Was Insufficient, This Response Qualifies as Proper Supplementation.

The Advisory Committee's Note to the 2020 Amendment also states that "in many cases, notice is provided when the government moves *in limine* for an advance ruling on the admissibility of Rule 404(b) evidence." Fed. R. Evid. 404(b), Advisory Committee's Note to 2020 Amendment. Several courts, including within the District of Maryland, have reiterated that the government's notice of 404(b) evidence through its motion *in limine* briefing is sufficient to satisfy the Rule 404(b)(3) requirements. *United States v. Akins*, No. CR RDB-24-0255, 2025 WL 2720003, at *5 (D. Md. Sept. 24, 2025) (providing notice for the first time of potential 404(b) evidence in the form of a motion *in limine*); *United States v. Dupree*, No. CR 22-275 (CKK), 2024 WL 2110137, at *4 (D.D.C. May 10, 2024) ("Here, the Government's instant motion satisfies its obligation to provide a reasonable, pre-trial written notice."); *Hart v. BHH, LLC*, No. 15cv4804, 2019 WL 1494027, at *3 (S.D.N.Y. Apr. 4, 2019) ("The Government has given Chandler sufficient notice of its intention to introduce the Crips Evidence to prove Chandler's motives and opportunity, and the reasoning in support of those purposes, through the Government's briefing on these motions *in limine.*").

If this Court finds that any of the evidence summarized in the government's September 12, 2025, Letter is not intrinsic but rather Rule 404(b) evidence and determines that the Letter was insufficient to function as a Rule 404(b) notice, then the Court should construe this Response Motion as a supplement. As noted below, the government identifies, specifically, the permitted purpose under Rule 404(b)(2) for the admissibility of each category of evidence. Further, as of the date of this filing, the parties are approximately two months from the beginning of trial. Two months is beyond reasonable notice.

## II. Evidence Summarized in the Government's September 12, 2025, Letter Is Admissible Either Because It Is Intrinsic to the Superseding Indictment or Permitted Under Rule 404(b)(2).

### a. Legal Framework

Rule 404(b) prohibits the introduction of evidence of other acts only when it is offered for the purpose of proving the defendant's character. Fed. R. Evid. 404(b); *see also United States v. Lightly*, 616 F.3d 321, 351 (4th Cir. 2010). Rule 404(b) only applies, however, to evidence of acts that are *extrinsic* to the conduct being prosecuted. *United States v. Cooper*, 482 F.3d 658, 663 (4th Cir. 2007). Evidence that is intrinsic to the story of the crime does not fall under Rule 404(b). *Id.* Acts are intrinsic to the conduct being prosecuted "when they are [i] inextricably intertwined or [ii] both acts are part of a single criminal episode or [iii] the other acts were necessary preliminaries to the crime charged." *United States v. Chin*, 83 F.3d 83, 88 (4th Cir. 1996).

"Evidence is inextricably intertwined with the evidence regarding the charged offense if it forms an integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted." *Lightly*, 616 F.3d at 352 (quoting *United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007)); *Chin*, 83 F.3d at 88. Evidence of Goldstein's knowledge of the tax laws prior to committing the tax crimes charged in the Superseding Indictment—regardless of *when* he acquired that knowledge—is *a priori* intrinsic evidence of Goldstein's willfulness (a requisite element of the tax crimes charged). Thus, the government may offer evidence of uncharged conduct when it is "necessary to complete the story" of the charged offenses or "explains the relationship of parties or the circumstances surrounding a particular event." *Basham*, 561 F.3d at 327; *see also United States v. Al-Suqi*, 581 F. App'x 212, 215 (4th Cir. 2014).

The Fourth Circuit has been clear that Rule 404(b) is ultimately a "rule of inclusion," and trial courts should admit evidence unless it is offered solely to prove criminal disposition. *United States v. Queen*, 132 F.3d 991, 994 (4th Cir. 1997) (emphasis added); *United States v. Lespier*, 725 F.3d 437, 448 (4th Cir. 2013) ("Rule 404(b) is an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove only criminal disposition.").

Thus, evidence of other wrongs should be admitted to prove, among other things, "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b); *United States v. Hooper*, No. 21-4220, 2022 WL 1184181, at *3 (4th Cir. Apr. 21, 2022). "In fact, the Fourth Circuit has noted that the reasons which justify 404(b) evidence are not limited to those explicitly stated in the rule but are almost 'infinite' in number." *United States v. Childress*, No. 7:21-CR-00011, 2021 WL 2972868, at *6 (W.D. Va. July 14, 2021) (citing *United States v. Watford*, 894 F.2d 665, 671 (4th Cir. 1990) ("This court has held that Rule 404(b) is an inclusive rule that allows admission of evidence of other acts relevant to an issue at trial except that which proves only criminal disposition."); *United States v. Masters*, 622 F.2d 83, 86 (4th Cir. 1980).

Ultimately, evidence of other wrongs is admissible under Rule 404(b) when the court finds that it is "(1) relevant to an issue other than the general character of the defendant, (2) necessary to prove an essential claim or element of the charged offense, and (3) reliable." *United States v. Sterling*, 680 F.3d 233, 246 (4th Cir. 2017). "Additionally, Rule 403 demands that the evidence's probative value not be substantially outweighed by its unfair prejudice to the defendant." *Id.* at 246-47. "Relevance" is a low evidentiary threshold; it is defined for these purposes to include any evidence that is "sufficiently related to the charged offense." *United States v. Rawle*, 845 F.2d 1244, 1247 n.3 (4th Cir. 1988); *United States v. Barnett*, 63 F. App'x 643, 646 (4th Cir. 2003).

Whether evidence is "necessary" under Rule 404(b) "must be appraised in the light of other evidence available to the government." *United States v. Mark*, 943 F.2d 444, 448 (4th Cir. 1991). "That the evidence [is] not critical to the prosecution's case . . . does not render it unnecessary for purposes of Rule 404(b), as *Sterling*'s second prong focuses on whether the evidence is necessary in the sense that it is probative of an essential claim or an element of the offense." *United States v. Rooks*, 596 F.3d 204, 211-12 (4th Cir. 2010). Relevant evidence is not necessary if the existing evidence is "so strong" as to be "unassailable." *Id.* The third element, "reliability," requires proof only by a preponderance of the evidence. *Huddleston v. United States*, 485 U.S. 681, 685 (1988) (finding that "extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct").

A court may not refuse to admit relevant evidence pursuant to Rule 404(b) unless "its probative value is *substantially* outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403 (emphasis added). For evidence to be unfairly prejudicial, it must be so confusing that its value is diminished or so emotional that it "tends to subordinate reason . . . in the factfinding process." *Queen*, 132 F.3d at 997.

Evidence is not unfairly prejudicial merely because the evidence is damaging to a defendant's case because "highly probative [evidence] invariably will be prejudicial to the defense." *United States v. Bell*, 901 F.3d 455, 465 (4th Cir. 2018) (citing *United States v. Basham*, 561 F.3d 302, 326 (4th Cir. 2009) (internal quotation marks and citation omitted)). Evidence of prior criminal conduct is admissible when it "did not involve conduct any more sensational or

disturbing than the crimes with which [the defendant] was charged." *United States v. Byers*, 649 F.3d 197, 210 (4th Cir. 2011) (quoting *United States v. Boyd*, 53 F.3d 631, 637 (4th Cir. 1995)).

Further, the Fourth Circuit acknowledges the ability of this Court to eliminate any potential prejudice from the evidence admitted, through its instructions to the jury. *See id.* However, limiting jury instructions explaining the purpose for admitting evidence of prior acts and advance notice of the intent to introduce prior act evidence provide additional protection to defendants. *Queen*, 132 F.3d at 998; *United States v. Johnson*, No. 21-4126, 2022 WL 4376082, at *2 (4th Cir. Sept. 22, 2022); *United States v. Imariagbe*, 679 F. App'x 261, 262–63 (4th Cir. 2017) ("[A]ny danger of unfair prejudice was minimized by the court's limiting instructions."); *United States v. White*, 405 F.3d 208, 213 (4th Cir. 2005) ("[A]ny risk of such prejudice was mitigated by a limiting instruction from the district court clarifying the issues for which the jury could properly consider [the Rule 404(b)] evidence.").

> **b. The Caldwell Evidence is intrinsic to the Superseding Indictment and, in the alternative, is admissible to show knowledge, absence of mistake, or lack of accident.**

The Caldwell Evidence is intrinsic to the tax evasion charges in the Superseding Indictment. In order to sustain a conviction under § 7201, the government must prove that Defendant: (1) owed a substantial income tax liability; (2) attempted in any manner to evade or defeat the payment of that tax; and (3) did so willfully. *United States v. Sookyeong Kim Sebold*, 547 F. App'x 278, 279–80 (4th Cir. 2013); *United States v. Wilkins,* 385 F.2d 465, 472 (4th Cir. 1967). The Supreme Court defined "willfulness" in the criminal tax context as a "voluntary, intentional violation of a known legal duty." *Cheek v. United States,* 498 U.S. 192, 201 (1991); *see also Akins*, 2025 WL 2720003, at *4. The government's burden of proving knowledge of a legal duty "requires negating a defendant's claim of ignorance of the law or a claim that because of a

misunderstanding of the law, he had a good-faith belief that he was not violating any provisions of the tax laws." *Cheek*, 498 U.S. at 202.

"Evidence is intrinsic if it directly proves the charged offense." *United States v. Crim*, 451 F. App'x 196, 203 (3d Cir. 2011); *United States v. Green,* 617 F.3d 233, 248–49 (3d Cir. 2010); *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000) (explaining that evidence is inextricably intertwined with the charged offense it is "directly probative of the charged offense, arises from the same events as the same offense . . . or completes the story of the charged offense.")

The Caldwell Evidence is intrinsic to the charged offenses because it is directly probative of willfulness. The government expects that Caldwell's testimony will explain that Goldstein knew his tax reporting and recordkeeping obligations for gambling income. Not only did Goldstein understand these reporting obligations during the period when Caldwell was Goldstein's and G&R's accountant, but certainly by 2012 when Goldstein fired Caldwell and the IRS RA advised Goldstein and Caldwell on proper gambling record keeping practices. This evidence is especially important because it highlights what Goldstein *did not do* when he hired his new accountants: give them records of his prolific high-stakes gambling, report that gambling on his tax returns, or even *tell* them about his gambling at all. These glaring omissions demonstrate his willful failure to report his gambling income, as well as his longstanding scheme to hide his gambling and evade taxes on it, both of which are core aspects of the charged conduct.

The Caldwell Evidence is also intrinsic because it completes the story of the Superseding Indictment. To conceal his scheme, Goldstein created an environment of secrecy at G&R and hid the extent of his gambling and gambling income from his employees and his accountants. To accurately and completely describe that scheme as well as Goldstein's longstanding failure to

report his gambling winnings—and, when he did report them, wildly understate them—to his accountants, the government must introduce the Caldwell Evidence.

Further, in tax cases, the Fourth Circuit has held that the government may introduce evidence of uncharged tax misconduct, including in years before the charged period, if such misconduct involved the same or similar series of transactions as the charged conduct. *See, e.g.*, *United States v. Sutherland*, 921 F.3d 421, 430 (4th Cir. 2019) (false 2007 return admissible as intrinsic evidence in prosecution for filing false returns for 2008 through 2010); *Al-Suqi*, 581 F. App'x at 215 (uncharged tax return prepared in same manner as charged tax returns admissible as intrinsic evidence); *United States v. Lee*, 60 F. App'x 425, 427 (4th Cir. 2003) (in a prosecution for filing false refund claims with the IRS, evidence of 96 federal tax returns and 55 state income tax returns not charged in the indictment admissible).

Even if the Court determines that the Caldwell Evidence is not intrinsic, it is admissible under Rule 404(b) to show knowledge, absence of mistake, or lack of accident. "At bottom, all evidence of 'intrinsic acts offered as direct proof of the crime charged will, by definition, satisfy Rule 404(b).'" *United States v. Shin*, 2022 WL 153184, at *4 (S.D.N.Y. Jan. 15, 2022) (quoting *United States v. Nektalov*, 325 F. Supp. 2d 367, 372 (S.D.N.Y. 2004)) (holding that "evidence concerning the origins of the payroll tax evasion scheme prior 2010 is likely admissible as *direct* evidence, [and] by definition, this evidence would also satisfy Rule 404(b)."). Again, the Caldwell Evidence shows that Goldstein understood his tax reporting obligations. Moreover, Goldstein's defense will be, in part, that he was ignorant to the tax laws. The Caldwell Evidence will be critical to the government's ability to refute this defense.

Lastly, the probative value of the Caldwell Evidence is substantial while it presents little to no danger of unfair prejudice or confusing the jury. As already described, its value is important for

the government to show Defendant's willfulness to evade taxes and his lack of ignorance or knowledge as to his tax reporting obligations. Simply because the Caldwell Evidence is highly probative does not, in turn, make it unfairly prejudicial. *Bell*, 901 F.3d 455 at 465.

Defendant claims that this would waste the jury's time and require "another series of minitrials" because "the defense will be forced to present evidence putting these transactions in context" and will require the jury to sift through evidence concerning a variety of transactions that were not charged[.] Def's Mot. at 17. This argument is as misleading as it is moot. The government does not intend to prove up a litany of transactions from the prior tax years while Caldwell was responsible for Goldstein's and G&R's tax returns. Instead, the government is most focused on testimony from Caldwell related to Goldstein's knowledge of tax laws and his tax reporting obligations. The Caldwell Evidence is admissible because it is intrinsic, permitted under Rule 404(b), and any speculative jury confusion is moot.

### c. The Defendant Understood Taxes Evidence is intrinsic to the Superseding Indictment and, in the alternative, is admissible to show knowledge, absence of mistake, or lack of accident.

Like the Caldwell Evidence, evidence that Defendant understood taxes is intrinsic and goes to Defendant's willfulness to evade taxes and false tax reporting. His legal briefs (Exs. 1, 2), email exchanges between Defendant and G&R employees regarding the classification and tax implications of various payments from G&R accounts (*see, e.g.,* Ex. 3), notices from the IRS explaining Defendant's tax obligations and penalties for not meeting those obligations (*See* Ex. 4), and testimony regarding these topics as well as tax advice provided to California Businessman-2's representative all show that Defendant understood taxes and tax reporting, specifically, reporting gambling income.

Exs. 1 and 2 are two briefs from 2008 in which Defendant was appellate counsel representing clients before the United States Supreme Court. The "Question Presented" in both briefs signal Goldstein's detailed knowledge of the Internal Revenue Code. *See, e.g.,* Ex. 1 at 3 ("Whether a lawsuit that turns critically on the proper construction of the Internal Revenue Code and that seeks to recover overpaid income taxes on the basis of reports required by federal tax law "aris[es] under" federal law, 28 U.S.C. §§ 1331, 1340, or is completely preempted.").

His email exchange with A SCOTUSblog employee between January 21 and January 28, 2014 (Ex. 4) further demonstrates that Defendant specifically knew and understood the distinction between deductible business expenses and non-deductible personal expenses. An important facet of Defendant's scheme was his use of G&R's business account to pay his personal gambling debts. *See, e.g.,* Dkt. 161, ¶¶ 63-65. Further, like the RA's instructions to Goldstein and Caldwell in 2012 regarding gambling income, the IRS's notices to Goldstein explaining his outstanding tax debt and the penalties accruing because of nonpayment also put him on notice about his tax obligations. Though uncharged, this evidence goes to Defendant's willfulness to evade taxes.

Testimony on these matters and his advice to California Businessman-2's representative in 2014 to create a foreign company and bank account solely for the purpose of recording gambling wins and losses all also prove his willfulness to evade taxes. Further, this testimony is important to complete the California Businessman-2 story. In 2016, Goldstein played a series of poker matches against California Businessman-2 resulting in Goldstein winning nearly $26.5 million. Dkt. 161 ¶ 26. Later, Goldstein failed to report those gambling winnings on his 2016 Form 1040. *Id.* at ¶ 30. To tell the full story, the government must explain how and when Defendant and California Businessman-2's representative met. California Businessman-2 organized the meeting to learn legal tax reduction strategies from Goldstein. Instead, Goldstein's suggestion mirrored his

own later tax evasion: Goldstein eventually set up offshore bank accounts in Montenegro, funneled millions of dollars through them, and wholly failed to tell his accountants about the money (in 2016), or lied to them and others—including the IRS—by claiming that it was "loans" in 2018. The jury cannot understand the full story of his evasion scheme without understanding how that very scheme mirrored one he was proposing as early as 2014.

Even if the Court determines that the Defendant Understood Taxes Evidence is not intrinsic, it is admissible under Rule 404(b) to show knowledge, absence of mistake, or lack of accident. Lastly, the Defendant Understood Taxes Evidence is probative to show Defendant's willfulness to evade taxes and his lack of ignorance or knowledge as to his tax reporting obligations. Any unfair prejudice is minimal and can be further minimized by the Court's limiting instruction.

### d. The Pattern of Failure to Pay and Report Taxes Evidence is admissible as intrinsic as circumstantial evidence of willfulness and, in the alternative, is admissible to show absence of mistake and lack of accident.

The Fourth Circuit has recognized that a "pattern of failing to pay over taxes for an extended period of time" is circumstantial evidence of willfulness. *United States v. Lord*, 404 F. App'x 773, 779 (4th Cir. 2010). Other circuits agree that "[i]n cases involving violations of federal tax laws such as tax evasion, "[a] defendant's past taxpaying record is admissible to prove willfulness circumstantially." *United States v. Ringwalt,* 213 F.Supp.2d 499, 506 (E.D. Pa. 2002) (quoting *United States v. Bok,* 156 F.3d 157, 165 (2d Cir. 1998)); *see also United States v. Johnson,* 893 F.2d 451, 453 (1st Cir. 1990) (unindicted acts of tax fraud that occurred subsequent to the indicted acts admissible in tax evasion prosecution to show intent and absence of mistake when defense based on defendant's reliance on advice of friend); *United States v. Daraio*, 445 F.3d 253, 264 (3d Cir. 2006) (admitting evidence of "defendant's past taxpaying record" to show willfulness)

(quoting *United States v. Ringwalt*, 213 F. Supp. 2d 499, 506 (E.D. Pa. 2002)); *United States v. Upton*, 799 F.2d 432,433 (8th Cir. 1986) ("Evidence of [defendant's] questionable compliance with tax laws, both in the years prior to and subsequent to [the years of the charged conduct] is probative of willfulness in the present context.").

For example, in *United States v. Ringwalt,* the district court admitted defendant's tax returns from previous years, which did not pertain to the charged offense. 213 F. Supp. 2d 499, 509 (E.D. Pa. 2002). The court held that, "in light of the defendant's theory that the inaccuracies in the 1994 and 1995 returns were the result of mistake or the fault of the accountants, the tax returns from the earlier years were probative on the issues of common scheme or plan as well as willfulness." *Id.* The court noted that the defendant's tax returns for the earlier years "showed the existence in those prior years of the identical scheme and plan to evade income taxes that was used by defendant in 1994 and 1995[.]" *Id.*

The case law cited by the Court in *Daraio* included cases holding that evidence of a defendant's compliance—or failure to comply—with tax laws both in the years prior, and subsequent, to the years of the conduct charged in the indictment was probative of the crucial element of willfulness. *See e.g., Upton*, 799 F.2d 432 (8th Cir. 1986); *United States v. Bok*, 156 F.3d. 157, 165 (2d Cir. 1998) (deeming admissible evidence of defendant's failure to file tax returns for years before and after those included in the indictment to show intent to engage in tax evasion).

Prior to the charged period, Defendant failed to timely pay his full federal income taxes due and owing between 2013 and 2015. Based on his reasoning for firing Caldwell and the various IRS notices that he received, Defendant knew that these taxes were due but still failed to pay. After the charged period, for tax years 2022 through 2024, Defendant also did not timely file and still has not filed personal income tax returns. Indeed, he made partial payments for these tax years but,

instead of paying the full tax due, he spent millions of dollars on personal expenses. This evidence is indirect inculpatory evidence of willfulness. Further, given that the defense theory at trial will be based on claimed errors by accountants and others, Goldstein's knowing failures to timely file and pay his taxes are also admissible as Rule 404(b) evidence of absence of mistake and lack of accident.

Defendant's failure to file and pay his taxes during the tax years 2013 through 2015, and 2022 through 2024 are necessary to complete the charged story. Tax years 2013 through 2015 are the years immediately after Defendant fired Caldwell and hired his new accountants. Dkt. 161 at ¶ 5. During those years, Defendant had significant gambling winnings and losses, sought to borrow $10 million from California Businessman-1 to fund those gambling activities, and still owed nearly $20 million to California Businessman-1 by 2022. *Id.* at ¶¶ 8-9.

Moreover, if Goldstein's defense is (as currently anticipated) that he did not act willfully but rather mistakenly, the United States may offer evidence that—even after Goldstein was advised by IRS criminal investigators in October 2020 that he was the subject of a criminal investigation— Goldstein failed to file required returns with the IRS for tax years 2022, 2023, and 2024. Indeed, Goldstein's failure to file a return for tax year 2024—due to the IRS no later than October 15, 2025—when he had a legal obligation to do so is not only proof of his willful choice to deprioritize his tax obligations, but it is also a separate crime that directly violates his conditions of pretrial release in this case. Dkt. 62 ("The defendant must not violate any federal, state, or local law while on release.").

This Pattern of Failure to Pay and Report Taxes Evidence, again, is highly probative of Defendant's willfulness to evade taxes. Indeed, there is a chance of unfair prejudice in that the jury could believe that Defendant should be convicted for years in which he failed to pay or report his

taxes, though was uncharged. However, any unfair prejudice or jury confusion can be resolved by the jury instructions and a limiting instruction upon the admission of this evidence.

> ### e. False Classification of Financial Transactions Evidence is admissible as intrinsic evidence and, in the alternative, absence of mistake, knowledge, and intent.

The intentional misclassification of financial transactions is also intrinsic to the Superseding Indictment and, thus, admissible. *United States v. Aldridge*, 455 F. App'x 589, 594 (6th Cir. 2012) ("Rule 404(b) does not apply here because each of the instances cited by the appellant constitutes evidence of a single criminal episode or at the very least a continuing pattern of illegal activity—here evading taxes [and] is inextricably tied to defendant's general pattern of concealment[.]"); *United States v. Harding*, 104 F.4th 1291, 1297 (11th Cir. 2024) ("The charged offenses were not isolated acts but were instead part of a series of transactions involving the same principal actors, in the same roles, employing the same modus operandi. We explained that other transactions connected with charged offenses have long been used to show a general pattern, the necessary criminal intent, or the guilty knowledge of the defendant." (internal quotations omitted)); *see also United States v. Mancuso*, 444 F.2d 691, 695 (5th Cir. 1971) (same); *United States v. Johnson*, 262 F.R.D. 410, 416 (D. Del. 2009) ("Contrary to Defendants' position, an alleged pattern of concealing income, demonstrated by the tax return evidence as a whole, serves as direct proof that Defendants possessed the requisite fraudulent intent for the crimes charged.").

On numerous occasions, both outside and inside the charged period, Defendant falsely misclassified certain transactions in the same manner as the charged scheme. For example, in 2015, Defendant received a $200,000 payment of a personal gambling debt to the G&R account. However, he told his new accountants that it was a loan repayment, as opposed to income. On another occasion, in 2019, he received payment of another poker debt into his G&R account. This

time, he told his firm manager (who communicated with his new accountants) that the funds were another loan repayment. While these transactions include different payees or payors, the scheme is the same: Goldstein intentionally misled his accountants and firm managers and falsely classified these transactions for his tax benefit. As a result, these transactions are part of the same large scheme and series of transactions involving the same people and pattern of conduct as the charged tax crimes. They are intrinsic and admissible.

Even if the Court finds that the False Classification of Financial Transactions Evidence is not intrinsic, it is still admissible under Rule 404(b) to show Defendant's knowledge of the scheme, his intent to implement it, and the absence of mistaken misclassifications. Further, these transactions are highly probative for these same reasons. Separately, the evidence is not *unfairly* prejudicial. The evidence is narrowly tailored to Goldstein's charged scheme and it is admissible.

### f. Defendant's False Statements to Litigation Funder Evidence is intrinsic, admissible, and, in the alternative, probative of the existence of Defendant's scheme.

In the winter and spring of 2021, Goldstein and his wife were searching for a new home in D.C. However, given his $15 million gambling debt and approximately $3 million tax debt, it was unlikely that he would receive a mortgage from a traditional lender. So, he falsely omitted these debts from the loan application he submitted to First Savings Mortgage and omitted the gambling debt from the loan application he submitted to NFM. Dkt. 161, ¶¶ 92-96, 100-103. However, to purchase his D.C. home and pay off his tax debt, Goldstein requested a total of $5.6 million from the Litigation Funder. *Id.* at ¶ 97. To ensure that he would receive the loan from the Funder, Goldstein "never told the Funder about [the] more than $15 million that he owed in personal debts[]" despite his representation that "he had fully and accurately represented his financial condition to [the Funder], and ha[d] not made any material omission[.]" *Id.*

Defendant's false representations to the Funder are intrinsic to the Superseding Indictment. Though uncharged, the allegations are in the Superseding Indictment, part of a single criminal episode, and complete the story between Counts 20 and 22. If the Court determines Goldstein false statements to the Funder are not intrinsic, they are admissible to prove Defendant's motive to make false statements to NFM. As a condition of a loan from the Litigation Funder, the Defendant was required to obtain a mortgage on the D.C. home and use the proceeds of that mortgage to repay the Funder. *See id.* Because he was rejected by FSM for not disclosing his tax debts, Goldstein knew that if he disclosed his $15 million gambling debt to NFM, he would not obtain the mortgage needed to repay the Funder. So, he lied. And those lies, in part, explain his motive for the lies charged in Count 22.

These false omissions are probative of Defendant's intent to make false representations to NFM. Separately, there is no concern of unfair prejudice or jury confusion. In fact, without this context, the jury would likely be more confused about from whom Goldstein obtained the funds to purchase his D.C. home, pay his tax debts, remove the tax lien on his Chevy Chase house, and sell that house. The false statements to the Funder are admissible.

III.    **If Defendant "Opens the Door," the Government May Move to Admit Certain Categories of Evidence on Re-Direct, Cross-Examination of Defendant's Witnesses, or in the Government's Rebuttal Case.**

The government does not intend to introduce evidence that Defendant (i) failed to timely file and pay his Maryland state taxes, whether inside or outside of the charged period, (ii) continued to play high stakes poker after the charged period, and (iii) used a SCOTUSblog employee for his personal benefit. However, if Defendant posits a defense at trial that he complied with his state tax obligations, received no income from gambling after the charged period, or introduces evidence that The SCOTUSblog employee did not conduct personal tasks for Defendant or tasks unrelated

to the charitable mission of the entity, the government may present this evidence for impeachment purposes.

Separately, the Superseding Indictment alleges that between 2016 and 2022, Goldstein placed four women with whom he was having or pursuing romantic relationships on G&R's payroll and health insurance even though he knew none were eligible under the firm's insurance policy. *See id.* at ¶¶ 11-13. As a result of Goldstein's fraud, between 2018 and 2019, the health insurer and G&R paid thousands of dollars in medical claims and health insurance premiums, respectively. *See id.* at ¶¶ 65, 68, 70. This sham employment arrangements caused Goldstein's accountants to deduct those payments as business expenses and falsely underreport Goldstein's income. *See id.* at ¶ 13.

To prove these allegations, the government will show that Defendant engaged in personal, non-platonic relationships with these women. As noted above, the existence of these relationships is alleged within the Superseding Indictment, are necessary to complete the story related to Counts 3 and 9 through 13 and, thus, are intrinsic. The government may also introduce evidence of the nature of Goldstein's relationships with these women as proof of his motive to provide these sham jobs with health insurance, despite each of them being ineligible.

However, the government does not plan on unnecessarily introducing the irrelevant and salacious details of these relationships, unless Goldstein continues to assert—as he has already done in earlier briefing—that his relationships with these women were platonic. If so, the government may have to prove the existence of these relationships with deeply personal communications, photographs, videos, payment records and travel records. Similarly, this evidence would be admissible either as intrinsic evidence or to show motive.

## CONCLUSION

For the reasons set forth above, the Defendant's Motion *in Limine* to Preclude Evidence of Uncharged Misconduct (Dkt. 210) should be denied. The United States respectfully requests that this Court admit evidence related to:

- Testimony from Caldwell regarding his firm's preparation of Goldstein's personal tax returns and tax returns for G&R between 1999 and 2012, Goldstein's failure to tell Caldwell about his significant gambling income, Goldstein's firing of Caldwell, and the IRS RA's advice to Caldwell and Goldstein on proper gambling record keeping;

- Testimony and documentary evidence describing conduct prior to and during the charged period in the Superseding Indictment showing Defendant understood taxes, tax reporting, including the proper reporting of gambling wins and losses;

- Defendant's failure to timely file and pay taxes for the tax years before and after the charged period and to report gambling winnings before the charged period;

- Evidence related to Defendant's misclassification of G&R financial transactions before, during, and after the charged period;

- Defendant's false statements to the Litigation Funder about his private gambling debt to obtain funds to purchase his D.C. home, pay his tax debt, and sell his Chevy Chase home; and

- If Defendant opens the door, evidence that Defendant failed to timely file and pay his Maryland state tax obligations during the charged period, continued to play high stakes poker after the charged period, and use a SCOTUSblog employee for his personal benefit.

Dated: November 14, 2025

Respectfully submitted,

Kelly O. Hayes
United States Attorney

/s/    *Adeyemi Adenrele*
Adeyemi Adenrele
Assistant United States Attorney
District of Maryland

Sean Beaty
Senior Litigation Counsel
Trial Attorney
Department of Justice—Tax Division

Emerson Gordon-Marvin
Hayter L. Whitman
Trial Attorneys
Department of Justice—Tax Division