IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>THOMAS GOLDSTEIN,<br><br>Defendant. | CRIMINAL NO. LKG-25-0006 |

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S NEWEST DISCOVERY RELATED ACCUSATION

Once again, defendant Thomas Goldstein has accused the government of misconduct.[1] And, once again, a review of the relevant facts and applicable law shows that Goldstein's accusation is at best baseless, and at worst a cynical attempt to pressure the prosecution team to drop felony charges that already have been proven at trial.

First, Goldstein's claim that the government failed to disclose exculpatory statements by his former tax preparer, Walter Deyhle, is wrong because *there were no such statements* and consequently *there were no notes of such statements*. Goldstein's accusation derives from the assumption that Mr. Deyhle must have said something exculpatory in a recent meeting with the government. Ex. 1, 2/4/2026 Tr. 108:5-9 (Goldstein's counsel arguing, "There is no way that guy was shown that email, and he didn't say anything that was inconsistent with his prior statements"). But Goldstein's assumptions is insufficient to support a *Brady* violation. There was no favorable evidence for the government to disclose or to suppress.

---

[1] Goldstein's many baseless allegations of prosecutorial misconduct—and demands for sanctions—in this case should frame the Court's analysis of Goldstein's instant motion. *See, e.g.*, Dkts. 89, 97, 116, 234; *see also* Gov't Sur-Reply to Emerg. Mot. for Grand Jury Testimony, Dkt. 102 at 6-10, 12-14 & n.4. In short, Goldstein's filing history is further proof that his newest accusations are merely part of his litigation strategy.

1

Second, even if Goldstein were correct that Mr. Deyhle had expressly recanted or disclaimed the accuracy of his prior statements and testimony when he saw the October 2017 emails[2] (DX317 and GX148, attached as Exhibits 3 and 4)—and again, he did not—the nondisclosure of such a statement would not be material. Goldstein was able to thoroughly cross-examine Mr. Deyhle about superficial inconsistencies between his prior statements to the government and grand jury (when, without the benefit of being refreshed on the email, he generally recalled that Goldstein told him the poker winnings for 2016 verbally), and the fact that he was on the emails. Indeed, that inconsistency was made clear to the jury in the first few questions of his cross-examination.

Third, the overall context of Goldstein's accusation makes clear he is not genuinely concerned about discovery, but rather is disappointed he could not ambush and surprise Mr. Deyhle with the email at trial. The government has reason to believe that Goldstein's newest *Brady* accusation is an attempt to persuade the government to drop the felony charges against Goldstein. This further undermines the accusation's authenticity.

## FACTUAL BACKGROUND

**I.     October 2017 Emails Between Goldstein and Deyhle**

Goldstein's newest *Brady* accusation concerns an email that Goldstein sent to Mr. Deyhle on October 17, 2017. In the email, Goldstein initially reported that in tax year 2016, he had poker winnings of $27,185,050, and poker "losses and distributions" of $24,436,700. DX317. Then, at Mr. Deyhle's request, Goldstein followed up with a further breakdown of the "losses and

---

[2] The October 2017 emails are DX317 and GX148. DX317 is attached to this filing as Exhibit 3, and GX148 as Exhibit 4.

distributions" and stated that "$13,498,00 is losses" and the "rest is distributions" (to his poker investors). GX148.[3]

The government laid out the history of the email chain in its brief in compliance with the Court's February 4, 2026, Order. Dkt. 395. Both versions (DX317 and GX148) were initially produced by G&R to the government on or around April 30, 2024. Dkt. 395 at 1. The government then produced the emails back to Goldstein as part of its discovery obligations after the indictment was returned on January 16, 2025. Dkt. 395 at 2. As part of its discovery obligations, on April 18, 2025, the government also produced to Goldstein prior statements and grand jury testimony of Mr. Deyhle. Dkt. 395 at 2.

## II. Government Identified DX317 on Goldstein's Exhibit List

The government did not identify DX317 or GX148 as potential exhibits for trial until after it began. When the government provided the Court with its trial exhibit list on January 9, 2026, neither of the documents were on it. On January 12, 2026, Goldstein disclosed his trial exhibit list, which included DX317. Dkt. 395 at 3.

On January 23, 2026, as part of his review of documents on Goldstein's list and his preparation for Mr. Deyhle's testimony, prosecutor Sean Beaty identified DX317 as a relevant exhibit. Dkt. 395 at 4. The same day, the prosecution team searched its discovery database for any further written communications between Goldstein and Mr. Deyhle connected to DX317 about the 2016 poker figures and identified GX148. Dkt. 395 at 4. On January 27, 2026, the government

---

[3] As the evidence has shown at trial, however, Goldstein recently told a longtime acquaintance—and believed to be true—that he "won a total of about $50 million" playing poker in 2016, and "personally cleared about $12 million" from his big heads-up matches that year. Joint Stipulation #1, ¶ 7.

3

provided Goldstein with a copy of that document (with the GX148 stamp) and added it to the government's trial exhibit list. Dkt. 395 at 4.

On January 28, 2026, both the government and Goldstein submitted briefs regarding the now-mooted motion to quash trial subpoenas to representatives of *The New York Times*. The government's brief observed that Goldstein had reported only the poker winnings (approximately $27 million) in 2016 that he had repatriated to the U.S.—and not the winnings that he had left with Paul Phua, a nominee in Asia. Dkt. 376 at 3. Goldstein's brief later the same day confirmed that he was aware the government had discovered the email. Dkt 378 at 3 ("[T]he government has finally discovered that the theory it opened on . . . is factually untenable, as Mr. Goldstein expressly disclosed" $27,185,050 of poker winnings in 2016 "via email to [Gelman].").

### III. Government Showed the Emails to Deyhle

January 28, 2026, was also the day when the prosecution team first showed the email to Mr. Deyhle during a virtual meeting over Microsoft Teams. The meeting's attendees were identified in the government's prior submission on this issue. Dkt. 395 at 5-6. As detailed in that submission, by the time the meeting began, the prosecution team was operating under the assumption that Mr. Deyhle's prior statements about Goldstein reporting the numbers verbally resulted from his best (if inaccurate) recollection. Dkt. 395 at 6. Accordingly, during the meeting, the prosecution team did not challenge Mr. Deyhle about his prior statements on the issue, and instead simply walked through a math demonstration (similar to the one at trial) with Mr. Deyhle about the numbers in the email and their consistency with what was reported on Goldstein's 2016 tax return.

No one from the prosecution team recalls Mr. Deyhle making any statements during the January 28 meeting about his prior recollection or statements, or about having a new or different

recollection. Dkt. 395 at 7. None of the prosecutors took notes during the meeting, and the IRS-CI Special Agent who witnessed the meeting was instructed (consistent with the prosecution team's practice throughout this case) that he needed to record Mr. Deyhle's statements only if they were substantially different than prior statements such that they potentially impacted his credibility. Dkt. 395 at 7.

### IV. Goldstein Vigorously Cross-Examined Mr. Deyhle on the Emails and his Prior Statements

At trial, Goldstein's cross-examination of Mr. Deyhle focused first and foremost on the perceived inconsistency between his prior statements that Goldstein had communicated the 2016 poker figures verbally, and his trial testimony walking through the figures Goldstein provided by email and explaining how they related to what was on the tax return.

**CROSS-EXAMINATION**

BY [DEFENSE]:

Q. Let me make sure I have this right. Yesterday I heard you testify that Mr. Goldstein e-mailed you his 2016 poker winnings and losses in October of 2017. Did I hear that right?

A. Yes.

Q. Mr. Deyhle, that testimony is completely inconsistent with everything you told the government and the grand jury before the start of this trial; agree?

A. I don't recall that.

Q. Okay. Before the defense disclosed that October 2017 e-mail as an exhibit, you told the government and the grand jury that Mr. Goldstein gave you the numbers orally in the January 2017 meeting, didn't you?

A. That's what I believed at the time.

Ex. 1, 2/4/2026 Tr. 35:4-19.

Goldstein's cross-examination highlighted over and over again that Mr. Deyhle's prior statements and testimony had not referenced the October 2017 emails, and that Mr. Deyhle generally had recalled—before being refreshed with the emails—that Goldstein provided the poker figures verbally. Ex. 1, 2/4/2026 Tr. 37:13-19 ("Q: At that time [in October 2020], you told the government that Mr. Goldstein just gave you the 2016 gambling numbers verbally; right?"), 38:3-8 ("Q: When you were interviewed in October of 2020, you told the government something completely different about that meeting, didn't you?"), 38:11-16 ("Q: You didn't know the e-mail existed until the defense disclosed it as a trial exhibit; right?"), 39:1-6 ("Q: You did not know before this moment that you had falsely told the IRS in October 2020 that Mr. Goldstein disclosed those gambling numbers to you verbally only at the January meeting?"), 39:11-15 ("Q: In that [October 2020] interview, you said you were told the winnings and losses amounts verbally. You said that right?"), 40:19-25 ("Q: You did not mention the October 2017 email in that interview, did you?"), 41:25-42:13 ("Q: The story I heard you tell today is that you were interviewed by the government multiple times in this investigation, and you said all of those things that we went over that were not true, and then all of a sudden, you just saw this email. Do I have that right?"), 42:16-21 ("Q: You told the story over and over and over again about this January meeting where Mr. Goldstein supposedly just gave you the numbers orally, and all of that was false; correct?"), 42:22-43:2 ("Q: In other words, the recollection that you provided to the government and to the grand jury on multiple occasions was just totally false; right?"), 43:5-8 ("Q: The truth is that when the IRS came to you in October 2020, you knew that you had to find a way to make this Mr. Goldstein's fault. That's what happened here; right?"), 56:10-12 ("In the grand jury, you testified that you got the gambling numbers verbally from Mr. Goldstein; right?"), 57:4-58:3 (Goldstein's counsel reading into the record Mr. Deyhle's grand jury testimony that he "ultimately g[o]t figures

6

from Mr. Goldstein for the 2016" "verbally"), 58:7-11 ("Q: In fact – this one is my favorite – you told the grand jury under oath, was that your impression was that Mr. Goldstein didn't want to send you an e-mail about his gambling winnings. You told the grand jury that; right?"), 59:8-10 ("Q: In the grand jury, you told the grand jury he never sent you an email?"), 60:7-14 ("Q: It was only after the defense disclosed that as a trial exhibit in this trial, that you suddenly had a completely different recollection about your conversations with Mr. Goldstein; is that right?"), 66:21-24 ("Q: You agree with me that this email is inconsistent with what you testified to under oath in the grand jury?"), 76:5-9 ("So when you told the grand jury and told the government that Mr. Goldstein never provided you with the gross number, that wasn't true; right?"),

Goldstein's cross-examination then turned to "exploring a *Brady* violation." Ex. 1, 2/4/2026 Tr. 64:6-11. Mr. Deyhle could not clearly remember when he was first shown the October 2017 emails in meetings with the government—and suggested the first time may have been in 2025 although it was not until after trial started in January 2026. But he was clear that the government did not "ask [him] how this email was inconsistent with everything that [he] had previously [stated] about [his] conversations with Mr. Goldstein." Ex. 1, 2/4/2026 Tr. 66:6-9. Mr. Deyhle also flatly denied being asked "about whether this email was inconsistent with your testimony under oath in front of a federal grand jury." Ex. 1, 2/4/2026 Tr. 66:10-13. Mr. Deyhle also recalled that—whenever the meeting with the government happened—it was the "only meeting [he] had with the government where [he] discussed this email." Ex. 1, 2/4/2026 Tr. 66:25-67:4.

All told, almost half of Goldstein's cross-examination of Mr. Deyhle focused on the October 2017 emails, Mr. Deyhle's prior statements about how he received the 2016 poker figures from Goldstein, and how those figures were reported on Goldstein's tax return for 2016.

**V.    Goldstein ASSUMES that Deyhle MUST Have Made Inconsistent or Exculpatory Statements to the Government**

During breaks in Mr. Deyhle's cross-examination, Goldstein argued that there *must* have been a *Brady* violation because Mr. Deyhle *must* have made inconsistent or exculpatory statements to the government in a meeting before his testimony. Goldstein argued, for example, "the idea that the witness said nothing in that conversation that was inconsistent with his prior sworn grand jury testimony is *unfathomable*. It is *impossible*. It is *impossible*. . . . *There is no way* that guy was shown that email, and he didn't say anything that was inconsistent with his prior statements." Ex. 1, 2/4/2026 Tr. 108:5-9. Goldstein even speculated about the specific inconsistent statement that Mr. Deyhle must have made. He suggested that Mr. Deyhle would have told the government something like "Oh, it looks like I got it wrong when I told the grand jury that Mr. Goldstein never gave me these numbers." Ex. 1, 2/4/2026 Tr. 108:10-13. And, Goldstein argued, "if he said that in a meeting, that is exculpatory information, and we were entitled to it well in advance of him taking the stand." Ex. 1, 2/4/2026 Tr. 108:14-16.

The government responded that Mr. Deyhle was first shown the October 2017 emails during a January 28, 2026 meeting. Dkt. 395 at 5-7. The government conducted a math demonstration that confirmed what Mr. Deyhle had said all along—that Goldstein provided the numbers. *Id.* at 6-7. No one from the prosecution team recalls Mr. Deyhle making any statements about his prior recollection, or about having a new or different recollection. *Id.* 7. Thus, no notes were taken of Mr. Deyhle's statements during the January 26, 2026 meeting. Dkt. 395 at 7. The government also clarified that although Mr. Deyhle made statements to the government during meetings on December 28, 2025, January 30, 2025, and January 31, 2025, he was not shown the October 2017 emails in *any* of those meetings and those emails were not discussed during the meetings. Dkt. 395 at 2-4, 7-8. Indeed, the government had not even discovered the October 2017

8

emails until January 23, 2026—after the trial had begun and almost a month after the December 28, 2025, meeting. Dkt. 395 at 4.[4]

## LEGAL FRAMEWORK

Under the Due Process Clause, the prosecution is required to disclose evidence favorable to an accused upon request, "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *United States v. Higgs*, 663 F.3d 726, 734–35 (4th Cir. 2011) (citing *Brady v. Maryland,* 373 U.S. 83, 87 (1963)). The Supreme Court has made clear that "[t]here is no general constitutional right to discovery in a criminal case, and *Brady* did not create one." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). The Fourth Circuit has repeatedly upheld this principle. *See, e.g.*, *United States v. Caro*, 597 F.3d 608, 619 (4th Cir. 2010) ("We have often noted that *Brady* requests cannot be used as discovery devices."); *United States v. Wolf*, 860 F.3d 175, 192–93 (4th Cir. 2017) (same); *United States v. Woods*, 515 F. App'x 222, 223 (4th Cir. 2013) (same).

To establish a *Brady* violation, the defendant must demonstrate three things: "'(1) the evidence at issue must be favorable to the defendant, whether directly exculpatory or of impeachment value; (2) it must have been suppressed by the state, whether willfully or inadvertently; and (3) it must be material.'" *United States v. Bros. Const. Co. of Ohio*, 219 F.3d 300, 315–16 (4th Cir. 2000) (quoting *Spicer v. Roxbury Correctional Inst.*, 194 F.3d 547, 555 (4th Cir.1999)).

There is no *Brady* violation if (A) the evidence is available to the defense from other sources, or (B) the defense already possesses the information. *See United States v. Roane,* 378 F.3d

---

[4] Based on recent events (both stated and unstated in this brief), the government is increasingly concerned that Goldstein's instant *Brady* allegations are disingenuous and contrived solely to extract a favorable plea offer.

9

382, 402 (4th Cir.2004); *Fullwood v. Lee,* 290 F.3d 663, 686 (4th Cir.2002) ("The *Brady* rule does not compel the disclosure of evidence available to the defendant from other sources, including diligent investigation by the defense." (internal quotation marks omitted)). Relatedly, "[n]o due process violation occurs as long as *Brady* material is disclosed to a defendant in time for its effective use at trial." *United States v. Smith Grading and Paving, Inc.,* 760 F.2d 527, 531 (4th Cir.), *see also United States v. Pollack,* 534 F.2d 964, 973 (D.C. Cir. 1976) ("Disclosure by the government must allow the defense to use that favorable material effectively in the preparation and presentation of its case[.]") (citing *United States v. Elmore,* 423 F.2d 775, 779 (4th Cir.1970)).

Finally, while "the term '*Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory [or impeachment] evidence," "there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 281 (1999); *see also United States v. Bagley,* 473 U.S. 667, 677 (1985) (Supreme Court precedent does not "require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict." (internal quotation marks omitted)).

## ARGUMENT

### I. There Was No Favorable Evidence To Disclose

*Brady* is inapplicable because there was no favorable evidence to disclose to Goldstein. First, as explained above, Mr. Deyhle never made any inconsistent or exculpatory statements to the government. That was true even after being shown (for the first time on January 28, 2026) the emails with Goldstein dating back to October 2017. Goldstein assumes that Mr. Deyhle must have, upon seeing the October 2017 emails, expressly recanted, disclaimed the accuracy of his prior

10

statements, or spouted an entirely new narrative inconsistent with his old one. That is speculation, and it is false. Neither confronted with nor reminded of his past statements, Mr. Deyhle made no statements about his prior recollection or about a new or different one on January 28.

Second, Goldstein already had access to Mr. Deyhle's prior statements and testimony (which were featured heavily during his cross-examination) and the October 2017 emails that contradicted Mr. Deyhle's prior statements that Goldstein orally provided the final numbers. In fact, the government only discovered that the October 2017 emails were relevant when Goldstein included them on *his own exhibit list* in January 2026. The government can only assume Goldstein included DX317 on his exhibit list—well before the government's January 28 meeting with Mr. Deyhle—*precisely because* he knew that it showed Mr. Deyhle's memory and prior statements about how he received the information were wrong. Goldstein alluded to his knowledge of DX317 in his opening statement by referencing the mistake (which did not materially affect Goldstein's net gambling income for 2016) that Mr. Deyhle made in entering the numbers from the emails. Ex. 2, 1/15/26 Tr. 62:13-63:5 ("But it turns out the accountant didn't ask the right questions, *didn't put it down on the tax return correctly*, didn't go over the return with Mr. Goldstein before it was filed.").

Third, all of the *Brady* factors assume that there was some undisclosed evidence. *See Bros. Const. Co. of Ohio*, 219 F.3d at 315–16 ("(1) *the evidence at issue* must be favorable to the defendant, whether directly exculpatory or of impeachment value; (2) *it* must have been suppressed by the state, whether willfully or inadvertently; and (3) *it* must be material.") (emphasis added). If there is no "evidence at issue," then it could not have been "suppressed," and it could not have been "material." *See id.* If there is no favorable evidence to disclose, then there can be no *Brady* violation. For that exact reason, there was no *Brady* violation here.

To start: to the extent there was impeachment material, Goldstein *already had it*. That material is the October 2017 emails in DX317, showing that Deyhle made an (immaterial) error entering the numbers on Goldstein's return and that his past statements that he received the numbers orally were wrong. There was nothing to suppress because Goldstein had it, knew about it, and put it on his exhibit list.

Further, the January 28, 2026, meeting further confirmed that the October 2017 emails were—aside from their superficial impeachment value—extraordinarily *unfavorable* to Goldstein. During the math demonstration, the government showed that the numbers in the October 2017 emails aligned with the poker figures reported on Goldstein's 2016 tax return. This is a critical distinction: the discovery that Mr. Deyhle had, in fact, received the numbers from Goldstein in writing was ***inculpatory*** (and devastating to Goldstein's defense). Goldstein's decision to disclose DX317 as a trial exhibit led the government to the precise proof it needed to show that the numbers reported on Goldstein's 2016 tax return were derived ***directly*** from the false information that Goldstein provided—in writing—to Mr. Deyhle. As demonstrated at trial, (1) the ***net*** gambling income Mr. Deyhle reported on Goldstein's 2016 tax return (GX54) was identical to the net number Goldstein provided to Mr. Deyhle, (2) the gambling winnings and losses reported on pages 33 and 34 of the 2016 return could be arithmetically linked to the information Goldstein provided to his tax return preparer, and (3) the gross losses and distributions number ($24,436,700) Mr. Deyhle received from Goldstein comes directly from the October 2017 version of Goldstein's poker journal, which overstated Goldstein's losses and distributions by $3,070,000.

The October 2017 emails changed the narrative from a "he said vs. he said" battle of credibility and memory to a smoking gun: Goldstein lied point-blank to Mr. Deyhle, feeding him patently false numbers from the cooked books of his own secret, 'revised' gambling ledger.

12

Moreover, Mr. Deyhle did not say, as Goldstein speculated, "Oh, it looks like I got it wrong when I told the grand jury that Mr. Goldstein never gave me these numbers." Ex. 1, 2/4/2026 Tr. 108:10-13. There was nothing to disclose. But, as explained below, even if Mr. Deyhle had said that and even if the government did not disclose it, this still would fall well short of the materiality requirement because Goldstein *already knew* about the inconstancies and thoroughly explored them during Mr. Deyhle's cross-examination at trial.

## II.     Any Nondisclosure Was Immaterial

Nondisclosure of evidence rises to the level of a *Brady* violation only where the evidence is "material." *See Bros. Const. Co. of Ohio*, 219 F.3d at 315–16. That is, unless "the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict," there is not a "real *Brady* violation." *Strickler*, 527 U.S. at 281.

Here, there is no credible argument that the government's nondisclosure of Mr. Deyhle's *nonexistent* statements during the January 28, 2026, meeting was material. As laid out above, the central focus of Mr. Deyhle's cross-examination was the inconsistency between the existence of the October 2017 emails and his prior statements and testimony that he was given the poker numbers verbally. The jury got to see this cross-examination and evaluate Mr. Deyhle's credibility in explaining (repeatedly) that his prior statements were based on his imperfect recollection, which was refreshed after seeing the October 2017 emails. If there were one takeaway for the jury from the cross-examination of Mr. Deyhle, it would be that Mr. Deyhle previously said that Goldstein provided the poker figures verbally, and later realized—after seeing the October 2017 emails— that there were written communications on the topic.

Even if the Court accepts Goldstein's speculation and assumes the worst (which it should not)—that Mr. Deyhle expressly recanted or disclaimed the accuracy of his prior statements during

13

the January 28, 2026, meeting, and the government failed to disclose it—there would still be no *Brady* violation. That is because, again, the jury was fully informed of the arguable inconsistency between Mr. Deyhle's prior statements and testimony and that which he delivered at trial. Goldstein also knew almost one week prior to Mr. Deyhle testifying that the government had discovered the October 2017 emails after trial began and clearly was prepared to cross-examine him on the arguably inconsistencies.

What's more, the government told Goldstein and the Court—prior to the conclusion of Mr. Deyhle's cross-examination, precisely what had transpired regarding showing Mr. Deyhle the October 2017 emails and his (non-exculpatory) statements surrounding it. After that explanation, Goldstein continued to cross-examine Mr. Deyhle in the afternoon session on February 4, 2026 about the October 2017 emails and their relationship to Goldstein's 2016 tax return. If there was anything exculpatory about what Mr. Deyhle could have said in the meeting with the government, Goldstein had ample opportunity to highlight it in his cross-examination later in the day. Of course, there is nothing exculpatory about merely reviewing documents with a witness, and so there was nothing to highlight—further underscoring the immateriality of any nondisclosure.

In sum, this is a classic example of a *Brady* claim that must fail because "the evidence [wa]s available to the defense from other sources or the defense already possesse[d] the information. *See Roane*, 378 F.3d at 402; *Lee*, 290 F.3d at 686. Goldstein already possessed the evidence, put that evidence *on their exhibit list*, and *opened* on it. Thus, "[n]o due process violation occur[red]" because any "*Brady* material [wa]s disclosed to a defendant in time for its effective use at trial." *Smith Grading and Paving, Inc.*, 760 F.2d at 531, *see also Pollack*, 534 F.2d at 973.

14

### III. Goldstein Is Not Really Concerned About *Brady*

The Court should also consider the *Brady* accusation's context, which reinforces that Goldstein is not genuinely concerned about a discovery violation.

First, Goldstein and his lead counsel clearly were disappointed that the government found the October 2017 emails and used them affirmatively against him during the direct examination of Mr. Deyhle. Goldstein knew about the emails before the government had identified them—perhaps long before—and was prepared to ambush Mr. Deyhle on the stand. That did not happen. What happened instead was much more helpful—the witness testified with the benefit of reviewing relevant documents including the October 2017 emails. Although Goldstein was not able to ambush Mr. Deyhle, he was able to thoroughly and vigorously cross-examine him. Goldstein's disappointment that he could not surprise Mr. Deyhle does not a *Brady* violation make.

Second, the government is concerned that Goldstein is weaponizing the *Brady* accusation to pressure the government to offer him a favorable plea deal. But the government is not intimidated. It enforces the law without fear or favor, and will not buckle under false allegations about its conduct, whether couched as *Brady* or otherwise. The evidence is coming in and the jury will make its decision. The government is not playing Goldstein's games, nor should the Court. There was no *Brady* violation.

## CONCLUSION

The government respectfully requests that the Court find there was no *Brady* violation relating to the October 2017 emails or Mr. Deyhle's statements to the government on January 28, 2026.

                                                    Respectfully submitted,

                                                    Kelly O. Hayes
                                                    United States Attorney

Dated: February 8, 2026                   /s/_____
                                                    Hayter L. Whitman
                                                    Trial Attorney
                                                    Department of Justice—Criminal Division

                                                    Sean Beaty
                                                    Senior Litigation Counsel
                                                    Emerson Gordon-Marvin
                                                    Trial Attorney
                                                    Department of Justice—Criminal Division

                                                    Adeyemi Adenrele
                                                    Assistant United States Attorney
                                                    District of Maryland