IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

_____

UNITED STATES OF AMERICA　　　　)
　　　　　　　　　　　　　　　　)
　　　　Plaintiff,　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　vs.　　　　　　　　)Case Number
　　　　　　　　　　　　　　　　)8:25-cr-00006-LKG-1
THOMAS C. GOLDSTEIN　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　Defendant.　　　　　　　)

TRANSCRIPT OF JURY TRIAL - DAY 5
BEFORE THE HONORABLE LYDIA K. GRIGGSBY
UNITED STATE DISTRICT JUDGE
TUESDAY, JANUARY 20, 2026 at 9:00 a.m.

APPEARANCES:

On Behalf of the Plaintiff:

　　　　UNITED STATES ATTORNEY'S OFFICE - DOJ
　　　　BY:　ADEYEMI ADENRELE, ESQUIRE
　　　　　　SEAN BEATY, ESQUIRE
　　　　　　SEAN GORDON-MARVIN, ESQUIRE
　　　　　　HAYTER WHITMAN, ESQUIRE
　　　　36 South Charles Street, Suite 400
　　　　Baltimore, Maryland 21201
　　　　(410) 209-4800

On Behalf of the Defendant:

　　　　MUNGER, TOLLES & OLSON, LLP
　　　　BY:　STEPHANY REAVES COUPER, ESQUIRE
　　　　　　ADEEL MOHAMMADI, ESQUIRE
　　　　　　JONATHAN I. KRAVIS, ESQUIRE
　　　　　　SARAH WEINER, ESQUIRE
　　　　601 Massachusetts Avenue NW, Suite 5E
　　　　Washington, DC 20001
　　　　(202) 220-1126

- - -

ALSO PRESENT:
　　　　　　THOMAS C. GOLDSTEIN, DEFENDANT
　　　　　　JIMMY MENDOZA, PARALEGAL
　　　　　　ROBERT RESTO, PARALEGAL
　　***COMPUTER AIDED TRANSCRIPTION OF STENOTYPE NOTES***

I N D E X

**GOVERNMENT'S TESTIMONY:**

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| BOB SAFAI | 21 | 70 | 82 | 88 |
| KEVIN RUSSELL | 89 | 149 | 166 | * |
| MOLLY RUNKLE | 169 | 227 | * | * |

– – –

**DEPUTY CLERK:** All rise. The United States District Court for the District of Maryland is now in session. The Honorable Lydia Kay Griggsby presiding.

**THE COURT:** Good morning, everyone. Please be seated. Counsel and Mr. Goldstein, welcome back. I hope you had a restful long weekend. Today we begin the second week of trial. We will be continuing with the government's case in chief this week, and I believe on yesterday the parties and the Court received witness lists for today. And we have several witnesses that the government intends to present.

The Court is also in receipt of a motion filed by the government, I believe, on yesterday that relates to an evidentiary issue. I have also received the defense's response to that motion, and I'm prepared to resolve it if the parties want to talk about that either now or later today.

With that, I will ask if there are any preliminary issues for the defense beyond the motion?

**MR. KRAVIS:** No. Thank you, Your Honor.

**THE COURT:** Anything for the government?

**MR. ADENRELE:** Nothing beyond the motion, Your Honor. My colleague will be arguing -- is prepared and will be arguing it.

**THE COURT:** Mr. -- Mr. Whitman, come on forward.

**MR. WHITMAN:** Good morning, Your Honor.

**THE COURT:** Good morning.

**MR. WHITMAN:** Hayter Whitman on behalf of the United States. I apologize for submitting yet more briefing in this case, but these are important issues to the government. There are two main issues that we've referenced in our brief.

The first is this issue of 20 -- of Mr. Goldstein's gambling in the year 2022. On Thursday there was an objection to questions of Mr. Alec Gores about a poker match that took place in 2022. During the objections, as we read the transcript, counsel for Mr. Goldstein said that testimony about poker matches in 2022 was out or excluded under the Court's Rule 404(b) order.

We went back and looked at all the briefing and we spelled it out in our motion, but that was never ruled on. There was never any ruling about keeping out poker. And the only reference, I think, that Your Honor made was about poker maybe in 2024 or later. 2022, though, is important because it really is part of the charged period. Mr. Goldstein --

**THE COURT:** Explain why that is, Counsel. And I think you may be going there. Explain why that is, in terms of the chronology of the case, I think those facts are important, because 2021, as I read it, is the last tax year for the willful failure to pay charge.

But why is 2024 also relevant -- I mean, 2022 also relevant from the government's perspective?

**MR. WHITMAN:** Because Mr. Goldstein did not pay --

you are right that the last year charged is 2021.  But because Mr. Goldstein did not pay the taxes either for 2020 or 2021 until the end of the year 2022, evidence of Mr. Goldstein preferring other creditors or spending money on things other than his taxes in 2022 before he paid off those taxes is relevant to willfulness.

We've laid out the cases showing that when someone spends money on things other than their taxes, it's relevant to willfulness.  I do agree, as we made reference to before, that the crime of failure to pay is complete on the day when the payment was due.  However, that does not mean that the payment -- the poker and luxury spending after that date is irrelevant.

To the contrary, you can imagine a situation where Mr. Goldstein missed his payment in 2021 and completely stopped spending money on poker and really saved up to be able to pay off his taxes.  Clearly that situation would be a different situation than if he were gambling tens of millions of dollars instead of paying it to the IRS.

So for those reason -- that -- so the chronology is --

**THE COURT:**  What's the date on which Mr. Goldstein satisfied the taxes due for 2020 and 2021?

**MR. WHITMAN:**  2021.  He paid the taxes due on October 16th of 2022.  And then for 2020, he paid the taxes due on December 8th of 2022.

So what the government is asking is certainly that any gambling that Mr. Goldstein did, either he won money and he didn't pay it to the IRS or he could have saved the money instead of losing it and paid the IRS.

So certainly any gambling up to the date of him paying the 2020 taxes, which, again, was December 8th of 2022, is relevant and should come in.

THE COURT: All right. Anything else you want to say on that point?

MR. WHITMAN: Yes. Is that -- sorry. Right. And so in the 20 -- and just to be clear, the 2021 taxes were due on April -- April 18th of 2022.

So, even that crime was not complete until that day. But again, we have this issue of not paying until much later in the year.

The other thing I'll say is that we asked the Court in our pretrial briefing to not allow Mr. Goldstein to rely on his subsequent payment of the taxes at the end of 2022 as evidence of willfulness, and the Court did not see it our way on that one and is allowing Mr. Goldstein to rely on his repayment of the taxes on 20 --

THE COURT: No. I said he couldn't rely on it to argue that somehow the case was improper.

MR. WHITMAN: Right. But he is allowed to argue it for willfulness. So, our position, just at a very simple

level, if Mr. Goldstein is allowed to argue, yes, I paid my taxes at the end of 2022 and, therefore -- as the opening statement indicated, quite expressly, and therefore, I'm not willful or therefore, it weighs on my willfulness.

And certainly, the government should be able to respond with its own evidence of willfulness in 2022 before he paid the taxes.

So, unless the Court has questions about that argument, I can talk about the door opening issue.

**THE COURT:** We can talk about the door opening issue. I will say that we've, obviously, all we've heard now, in terms of the defense's position with regards to the accountant is an opening statement, which, of course, is not evidence. I've instructed the jury that that is the case. I'll instruct the jury of that again at the end of the trial.

So I understand why we're talking about this. But in terms of the Court making evidentiary rulings, there's no evidence in the case right now about the accounting firms from anybody, particularly the defendant. As I've said earlier, the defense has a right to put on their case.

Their theory may be very different than the government's. That doesn't mean there is no boundaries to it, but, you know, the defense views this case differently than the government does on the issue of willfulness.

So they're going to view evidence about the accounting

firms very differently than the government.

I think a lot of these issues -- well, a couple things. One, I think the government will probably put on the accountants as part of their case. They're on the list. So we'll hear a little bit about what happened with the tax returns, what information the accountants knew or whatever in that context. And Mr. Goldstein's counsel will have a chance to cross-examine.

That might be the first place where I think some of this other -- some of these other things we're talking about may come up. And then the Court will have to listen, I guess in that context on cross, to see if something comes up that opens up the government's ability to address these issues further on redirect.

A lot of this sounds like it's probably going to come up if and when Mr. Goldstein puts on his case and maybe presents evidence about willfulness as relates to the accountants and maybe that he provided accurate information and they made the errors.

So some of the things the government is talking about, like evidence about how Mr. Goldstein used accountants later on, I think after the period charged in this case, as showing some kind of pattern perhaps of how he deals with accountants, that type of thing would come up, I think, only if there was evidence presented by the defense to suggest, again, that

Mr. Goldstein, you know, was just relying on them and the government felt that that really wasn't what was going on.

I think I'd have to hear that first, and then we'd talk about that. There's a rebuttal case, obviously, the government can put on at the end. Some -- I'm not suggesting all of this is stuff we need to wait until the end. But some of this just seems like it depends on evidence that certainly is not in front of the jury, and I don't know what Mr. Goldstein is going to say or Mr. Goldstein's counsel is going to say about those issues, if anything.

But anyway way, go ahead.

**MR. WHITMAN:** Your Honor, that's totally understood. We have laid out in the motion what we think was said, what was said during opening statement and why we think that opens the door. But I appreciate what Your Honor is saying. I think what's -- and we're going to --

**THE COURT:** I don't think the opening statement opens the door. They'd have to -- if there's evidence in front of the jury, I mean, people say lots of things in statements, so there has to be evidence in front of the jury.

And if there's evidence that the Court allows in, either by the government's request or by the defense's request, I think that's the time to talk about whether the additional things the government is asking for are appropriate to come in, are they relevant, are they probative. I really can't decide

that without hearing what the evidence is.

MR. WHITMAN: We understand that, Your Honor. And so I think, what -- we'll be fine with reraising this at a time when we're closer in time to, you know, testimony that will introduce facts along the lines of what was said in opening.

I do think, again, on the issue of the 2022 gambling, that's a relatively straightforward issue and one that I just think we've been ships passing in the night, because, you know, they have moved on post, you know, poker after the charged period, but this is really in the charged period.

And for purposes of witnesses who we have coming in, including the folks who have moved to quash, as well as there was just the witness whose testimony the other day was cut off because of this issue.

So on the issue of gambling in 2022, we think that's one that should be resolved as soon as Your Honor is ready.

THE COURT: Is there anything other than gambling in 2022 that's at issue in terms of the government's, I guess, position on willfulness or evidence of willfulness?

MR. WHITMAN: Certainly, for the same reason that his poker playing would be relevant, his luxury spending and personal experiences in 2022 up to the date of him paying off the taxes, again, on December 8th of 2022, would be relevant.

But with your Court's prior order on the Rule 404(b) motion, allowing in evidence of personal experiences for

willfulness purposes, I didn't see the same lack of clarity in the record in terms of what was objected to last Thursday. So we would certainly say that his spending in 2022 is relevant to his willfulness and, as part of that, part and parcel of that, is his spending tens of millions of dollars playing poker is also relevant to willfulness.

**THE COURT:** All right. Thank you, Counsel.

**MR. WHITMAN:** Thank you, Your Honor.

**THE COURT:** I'd give the defense the opportunity, if they wish, to be heard in response to the motion.

**MS. WEINER:** Thank you, Your Honor. It sounds like we can all rest on the papers with respect to the 2022 to 2024 failure to file or failure to pay, so I'll focus on the 2022 gambling.

**THE COURT:** If you could speak a little bit more directly in the mic to make sure that everybody can hear you.

**MS. WEINER:** Yes. Sorry.

As we explained in our papers, first and foremost, we think the government's motion is untimely, both because this Court ruled at the motions in limine hearing that gambling after the indictment, if at all -- or sorry -- gambling in the post-indictment period as to post-charge period would be relevant only if at all on cross-examination.

Also, the government conceded in their papers that, quote, it did not intend to introduce evidence that Mr. Goldstein

continued to play high-stakes poker after the charged period until Mr. Goldstein posited a defense at trial that he received no income from gambling after the charged period.

Of course, the defense has not yet posited that defense, and so we think this -- that the Court has already ruled that this sort of evidence on direct examination is inappropriate. It's not only a forfeiture problem, it's also a 404(b)(3) notice problem, because the government, until its filing on Sunday, had never articulated its theory for why this uncharged misconduct is relevant to the elements of the charged conduct. And that's notice, under 404(b)(3), they're required to give before trial absent good cause.

The next thing I'd like to address is that the government's theory of the case is that the crime, a failure to pay, was complete on the day the taxes were due. And also, the government has said repeatedly that ability to pay is not an element of the offense. So what Mr. Goldstein was or wasn't spending his money on is not relevant.

Now, the government has tried again to get this Court to reconsider its position that Mr. Goldstein can put on as evidence to disprove willfulness the fact that he eventually paid his taxes. That evidence is critical to the defense because it supports the inference that, on the day his taxes were due, Mr. Goldstein believed that deciding to pay his taxes later with penalties and interest in compliance with the civil

tax regime would mean that on that day he was not committing a crime. Eventual payment of his taxes is relevant to that issue, but the other things he was spending money on in 2022 is not relevant on the government's own theory of the case.

And finally, as we explain in our papers, poker isn't -- the fact that Mr. Goldstein may have been paying poker in 2022 is not the same as luxury spending, because, as the government has noted, poker can either create losses or winnings. And in fact, when Mr. Goldstein did win enough in 2022, he did pay his taxes at the end of '22 as you just heard the government explain to you.

If the government wants to talk about personal spending in 2022, we will have that fight during the course of trial. As the Court knows, the defense takes the position that much of the government's evidence on this is going to be cumulative and prejudicial. We are prepared to deal with that on an evidence-by-evidence basis.

But the government just does not need evidence that Mr. Goldstein was spending -- was playing poker in 2022 to make the point that he was spending money on things other than paying his taxes. They have dozens and dozens and dozens of exhibits of pictures Bentleys and condos and travel itineraries on their lodged exhibit list.

I'll stop there and ask if the Court has any questions.

**THE COURT:** No other questions at this time, Counsel.

Thank you very much.

MS. WEINER: Thank you, Your Honor.

THE COURT: And thank you for getting the papers in so quickly in response.

Anything further from the government before the Court addresses the motion?

MR. WHITMAN: Thank you, Your Honor. Just very quickly, we heard again the phrase the "charge conduct" or the "charged time period." I just would refer the Court to the streamlined indictment for trial, which is as Docket 337-2. And at page 30, paragraph 79 of that indictment, there's an allegation in the indictment that he paid his taxes in December '22 -- 2022. And that's the taxes for 2020.

And then on page 33 of the streamlined indictment, at paragraph 91, it alleges that Mr. Goldstein paid his 2021 taxes in October 2022.

So again, this is within the allegations in the indictment. It's within the charged time period. This is not -- the statement that was referenced from the government's brief about poker outside the charged time period just doesn't apply to this. We have raised this argument, including in response to the motions to quash, which were publicly filed and it's in the indictment, the argument that Mr. Goldstein spent money on gambling instead of his taxes.

And then, again, I would just reiterate, it's unfair if

they're able to say I paid off my taxes in 2022 and the jury is left with the impression that that's all that happened, is Mr. Goldstein got right with the IRS and got right with the government, when actually, the story is much more complicated than that.

But that's all we have to say, Your Honor, unless you have questions.

THE COURT:  No further questions.  But thank you, Counsel, for your arguments.  And thank you to all counsel for the quick turnaround and the briefing on this issue, which I view as a motion to clarify.

So I think in light of that, and in light of the conversation we have had last week, with regards to the evidence, I'm going to allow the government to file the motion. I don't think it's untimely and to the extent it is, I think there's a good cause.

I mean, this really seems to come down to the chronology of the case, the period for which the government is charging, in this case, willful failure to pay taxes, and what evidence is relevant to that.  Everyone agrees on the core facts, as I understand it now, that with regards to unpaid taxes for 2020 and 2021, all those taxes were paid by December 8 of 2022, as I understand it now.

And so the question is:  Is that window between, I guess, roughly April of 2022, when Mr. Goldstein's '21 taxes were due,

and December, when the tax -- all taxes were satisfied, is that a window that has relevance to this case?

Both parties argue that it does for different reasons. The defense argues that it does because it goes to show Mr. Goldstein ultimately made good, paid the taxes, complied with his obligations, paid the penalties and interest. And that's an important fact for the defense. I just heard the defense say that.

The government says it's important because it's during that window of time that Mr. Goldstein allegedly engaged in other activities where he uses money for purposes other than repaying his taxes, whether that be poker, lavish spending or whatever.

I think we agree that how he spent his money during that time period is relevant to this case for all of the reasons I just said. The poker playing is a part of that. If he's playing poker, he's choosing to spend money on poker games himself, I guess. He may have received winnings or losses during that period. And how he spent the money that he may have won during that period also would seem relevant to his decision whether to use those funds to help satisfy his tax debts or for some other purpose.

I think in that narrow window the evidence is relevance generally can come in for both sides, to the extent you want to use it. The poker playing, in particular, if it's before

December 8 of '22, I think can come in. If he won money, I guess that can come in. If he lost money, that can come in. And then the jury can assess itself whether or not that shows evidence of willfulness.

The fact that Mr. Goldstein settled up and resolved his tax obligations by December 8, 2022, can also come in, and whatever steps he took to resolve that can come in with the IRS leading up to that.

So the Court's ruling is that the poker stuff can come in up to December 8, 2022. As I think I already ruled, the spending can come in. Also, Mr. Goldstein can introduce evidence about his payment of taxes in October and December of 2022 with penalties and interest to show that he wasn't willfully violating the law. So that's the Court's ruling.

Any questions about that first from the government? Then I'll hear from the defense.

**MR. WHITMAN:** Not from the government, Your Honor. Thank you.

**THE COURT:** Anything from the defense?

**MS. WEINER:** No, Your Honor. Thank you.

**THE COURT:** All right. That takes care of that issue. Let me check in with our courtroom deputy.

Any other preliminary issues before we have the jury?

**MR. ADENRELE:** Nothing from the government.

**THE COURT:** Okay. Who do we anticipate having today

as witnesses, Counsel?

MR. ADENRELE: We will have Bob Safai, Mr. Kevin Russell, as well as Molly Runkle.

THE COURT: Okay. And you anticipate that --

MR. ADENRELE: If we can get through all of those, maybe one more, but --

THE COURT: Okay. I think I mentioned, the Court is going to have to leave at 4:00-ish today --

MR. ADENRELE: That's correct.

THE COURT: -- and that's why we are starting early. So I'll check in and see where we are in the three o'clock hour and see where we can naturally break.

MR. ADENRELE: Absolutely.

THE COURT: All right. So three witnesses today. Any other issues that we need to address before we have the jury?

MR. ADENRELE: Nothing from the government.

THE COURT: Okay.

Mr. Kravis, anything from you? Good morning.

MR. KRAVIS: Not from the defense. Good morning, Your Honor. Not from the defense. Thank you.

THE COURT: All right. We're checking to see if everyone is here. And if we're ready to go, we're just going to get started. If not, I will let you know in just a moment. And, Counsel, do you have a binder for your first witness?

**MR. ADENRELE:** No, Your Honor. I know we may have said about the presence of the binders. All the exhibits should be with Your Honor already with the exhibit binders, hard copies that we've provided.

**THE COURT:** Okay. It would be helpful to have the ones you're pulling for this witness. I have that, but it's kind of hard to pull a thousand pages while I'm sitting here.

**MR. ADENRELE:** Okay. I mean, we'll certainly -- I mean, as Your Honor knows, it will be on screen, and we're more than happy to provide the binder afterwards, if needed. However --

**THE COURT:** Well, I would ask for one for the other witnesses today and going forward.

**MR. ADENRELE:** All right. All right. Will do, Your Honor.

**MR. KRAVIS:** Your Honor, I have a binder of possible defense exhibits for the witness --

**THE COURT:** Okay. You want --

**MR. KRAVIS:** -- if you want me to pass them out now.

**THE COURT:** Yeah. If you hand it up now, just save me time. Thank you, Counsel. And, of course, you can make a note of that once we get on the record. Thank you very much.

**MR. KRAVIS:** Thank you, Your Honor.

**THE COURT:** Please rise of the jury.

(Whereupon, the jury entered the courtroom at 9:23 a.m.)

**THE COURT:** Please be seated, everyone.

Members of the jury, good morning. Welcome back. I hope you had a pleasant long holiday weekend. Today we will continue with our trial with the government's case in chief. I anticipate that you will hear from several witnesses today during the course of the trial.

As is my practice, we will take a couple of breaks throughout the day. You'll take a morning break in about an hour, hour and a half or so we'll break from lunch sometime in the noon hour, and then there will be a break in the afternoon.

I do anticipate that we will finish up in the four o'clock hour today. That's why we're starting a little early today. But I will keep you advised of our time of adjournment a little later today. With that, welcome back.

Is the government prepared to call its next witness?

**MR. ADENRELE:** The government is prepared. The government now calls Mr. Bob Safai.

**THE COURT:** Very good.

Good morning, Mr. Safai. If you want to come all the way towards me, and you're going to go over to the witness stand. Once you enter the courtroom, come on forward and then over here to your left. Please remain standing once you are there, and the courtroom deputy will swear you in.

- - -

BOB SAFAI, after having been duly

sworn, was examined and testified as follows:

- - -

**DEPUTY CLERK:** And please state and spell your name, first and last name for the record.

**THE WITNESS:** Bob Safai, B-o-b, S-a-f-a-i.

**DEPUTY CLERK:** Thank you.

**THE COURT:** Counsel?

**MR. ADENRELE:** Thank you, Your Honor.

DIRECT EXAMINATION

**BY MR. ADENRELE:**

**Q.** Good morning, Mr. Safai.

**A.** Good morning.

**Q.** Sir, how old are you?

**A.** Sixty-four.

**Q.** And can you tell the jury a little bit about your educational and professional background?

**A.** I attended USC. After college, I got into the commercial real estate business, and I own a company called Madison Partners.

**Q.** And when did you --

**DEPUTY CLERK:** Will you please speak directly into the microphone. Yes.

**THE WITNESS:** Okay. Want me to say that again?

**DEPUTY CLERK:** Yes, please.

**THE WITNESS:** And I own a company called Madison

Partners.

**BY MR. ADENRELE:**

**Q.** All right. And where do you live?

**A.** Hidden Hills, California.

**Q.** Do you play poker, sir?

**A.** Yes, I do.

**Q.** Why don't you tell the jury a little bit about some of the individuals that you play poker with.

**A.** I've been fortunate enough to pay with titans of the industry, famous actors, Tobey Maguire, Ben Affleck, Kevin Hart. Those kind of guys.

**Q.** Some names that we recognize there?

**A.** I think so.

**Q.** And how long have you been playing poker with this group?

**A.** Well, the group evolves. It started many years ago. So probably 25 years ago. But it's evolved into different people and different players that come and go.

**Q.** All right. Have you been involved with the group the entire 25 years?

**A.** I would say yes.

**Q.** All right. And what type of poker do you play?

**A.** Primarily, no limit poker.

**THE COURT:** What was that, sir?

**THE WITNESS:** Primarily --

**THE COURT:** Can you speak -- I'm going to --

THE WITNESS: Primarily, no limit poker.

MR. ADENRELE: That's perfect.

THE COURT: I'm going to ask both counsel and the witness to speak directly into the microphone. And you can move that mic around, Mr. Safai, and make it more comfortable for you so we can all hear you, including the jury.

THE WITNESS: Okay.

BY MR. ADENRELE:

Q. Now, Mr. Safai, do you know Mr. Goldstein?

A. Yes, I do.

Q. When did you meet him?

A. I can't tell you the exact date, but many years ago in Las Vegas.

Q. Can you give us a rough time period?

A. Maybe 15, 16 years ago.

Q. And how did you meet him?

A. I met him through another acquaintance.

Q. Do you remember the name of that acquaintance?

A. I don't. I don't want to speculate.

Q. Have you played poker with Mr. Goldstein?

A. Yes, I have.

Q. When did you start playing with Mr. Goldstein?

A. I can't tell you the exact date, but better part of over ten years ago.

Q. All right. Ten years ago, so 2016, 2015. Is that about

right?

A.    Probably a little before that, yeah.

Q.    Who was responsible for initiating or setting up those games that you played against Mr. Goldstein around 2015, 2016?

A.    Those games are usually initiated by a phone call by one party or another.

Q.    Do you remember specifically, though, in the games you played against Mr. Goldstein, who was responsible for initiating the games?

A.    Well, since he was from out of town, generally he was.

Q.    Now, immediately prior to these games, did Mr. Goldstein tell you anything about who else he had played poker against?

A.    The poker community is small.  They generally know the gossip.  I had heard who he had played before, yes.

Q.    Got it.  And who did you hear that he played before?

A.    Many people, but specifically Alec Gores.

Q.    What did you learn about who won or lost those games against Alec Gores?

A.    He won a considerable amount of money.

Q.    When you say "he," who?

A.    Tom Goldstein.

Q.    Do you remember how much you learned he won from Alec Gores?

A.    I was told about 50 million.

Q.    About 50 million?

**A.**    Forty, 50 I don't -- you know, again, I don't remember exact numbers.

**Q.**    It was a high number?

**A.**    It was pretty high, yes.

**Q.**    Now, how would you describe Mr. Goldstein's playing style?

**A.**    Aggressive and erratic at times.

**Q.**    How would you describe your playing style?

**A.**    Exactly the same.

**Q.**    A good match?

**A.**    Evenly matched, yes, at the time.

**Q.**    Now, when you played Mr. Goldstein in 2015, '16, where did those games actually occur?

**A.**    Different spots, sometimes in Santa Monica in an apartment.  A couple of times we played at the W, his residence.  Different venues.

**Q.**    And why did you agree to play against Mr. Goldstein?

**A.**    Because I thought I could win.

**Q.**    Did you win?

**A.**    Yes, I did.

**Q.**    Let's back up a little bit before we talk about that exactly.  How many -- did you play one game or did you play a series of games?

**A.**    No.  It was a series of sessions over a period of time.

**Q.**    And how did you determine -- between you and Mr. Goldstein, how did you determine when the matches would

stop?

A.   Everybody determines their own stop loss.  Sometimes it would just be, okay.  I'll buy another bullet, which is another, you know, buy-in, and then I'm going to stop or some time would lapse and we said we'd play for a certain amount of hours and that would be it.

Q.   And you used the term "stop loss."  Did I get that right?

A.   I did use that.

Q.   Okay.  What does that mean?

A.   That means, if I was going to buy in for a million and I said I was going to buy in for a million, that's all I'm going to play.

Q.   By if you lost more than a million, you just wouldn't -- it wouldn't be possible?

A.   I would just say I bought another million.

Q.   Now, in the games with Mr. Goldstein, did you have a stop-loss figure?  Do you remember?

A.   Did I?

Q.   Did you or Mr. Goldstein have a stop-loss figure?

A.   We didn't determine that up front, no.

Q.   Now, those -- that series of games, who won those games?

A.   He won a few.  I won more.

Q.   Now, on that basis, about how much did you win?

A.   Somewhere between 16 and $20 million.  I don't know the exact number, honestly.

**Q.** Now, after each game, was Mr. Goldstein paying you for his losses after each of those games?

**A.** Yes.

**Q.** Did -- at some point, did he not pay the full amount after each of those losses?

**A.** Yes. The last losing session, I think he ran out of money.

**Q.** And we'll take about that shortly. For the losses that he paid, where did he send those funds?

**A.** He wired them to my gambling account, generally.

**Q.** All right. Now, I'd like to direct your attention to what's been previously marked as Exhibit 15.3.

Mr. Safai, what is this?

**A.** I think this is a copy of my bank statements from a gambling account.

**Q.** And did you provide these records to the government?

**A.** As requested.

**Q.** What's the purpose of having a separate gambling account?

**A.** For me, I own a lot of assets, so I keep everything separate. And this account delineated my poker and gambling, whether it was Las Vegas or poker.

**Q.** And is that important for you for tax purposes?

**A.** It's important to keep things in order, yes.

**Q.** Let's look at a few transfers here.

**MR. ADENRELE:** If we can go to page 26 of Exhibit

15.3, Mr. Safai's gambling account, Mr. Resto.  And let's zoom in on the November 14, 2016 transfer.

**BY MR. ADENRELE:**

Q.   Do you see that there, sir?

A.   Yes, I do.

Q.   All right.  And what are we looking at?

A.   It's a payment.

Q.   All right.  What date is the payment?

A.   November 14th, I believe, yes.

Q.   All right.  What's the amount of that payment?

A.   $1.24 million.

Q.   And who is it from?

A.   Tom Goldstein.

Q.   There's another payment on November 21st.  Do you see that?

A.   Yes, I do.

Q.   Now, how much is that payment?

A.   275,000.

Q.   And who is it from?

A.   Howe Russell.

Q.   Now, it says "Howe Russell," but is it your understanding that that was from Mr. Goldstein?

A.   That is my understanding, yes.

Q.   And why do you under -- why did you believe that?  Why was that your understanding?

**A.**    Because it was from him.

**Q.**    Did he tell you it was coming from him?

**A.**    Yeah.  He -- we knew it was from him.  He told us that.

**Q.**    Does Howe Russell say anything to you in relation to Mr. Goldstein?

**A.**    Correct.  I believe that's his firm.

                **MR. ADENRELE:**  Now, let's go down to page 28 of the same exhibit.  Let's zoom in on December 9, 2016.  Thank you.

**BY MR. ADENRELE:**

**Q.**    Do you see that, sir?

**A.**    Yes.

**Q.**    What's the date of this transaction?

**A.**    December 9th.

**Q.**    And how much is it?

**A.**    3.5 million.

**Q.**    And who is it from?

**A.**    Tom Goldstein.

**Q.**    Now, each of these payments, are they payments towards Mr. Goldstein's losses?

**A.**    That's correct.

**Q.**    Now, I'm going to show you what's been marked as Exhibit 40.  Sir, what is this document?

**A.**    It looks like the amount of payments that were made when there were losses.

**Q.**    All right.  What does it -- now, have you reviewed this

chart before?

**A.** Yeah.

**Q.** When did you review it?

**A.** When you showed it to me.

**Q.** That's a good answer.

Can you confirm that it's accurate and consistent with your understanding?

**A.** It looks like it. It's accurate to my understanding, yes.

**Q.** Now, there -- now, it stops there at February 1st of 2018. Do you see that?

**A.** February 1, 2018. Yes, it does.

**Q.** Now, there were additional payments that Mr. Goldstein provided to you beyond that; is that right?

**A.** That's correct.

**Q.** And we'll talk about that in a little bit.

MR. ADENRELE: But let's go up to the top of the chart and we can zoom in at the top. Just on date, amount paid and a few of the rows right below. That's fine.

**BY MR. ADENRELE:**

**Q.** Just to describe the chart here a little bit, the date column, what does that mean to you?

**A.** When the monies got paid.

**Q.** And, now it could mean the date that a check was written; is that right?

**A.** We generally don't operate in checks. We operate in

wires.

Q.   And as we look at this chart, it could also mean the date that the money actually was received into your account?

A.   That's correct.

Q.   Now, the next column it says "amount paid."  Do you see that?

A.   Yes, I do.

Q.   What does that mean?

A.   The amount that was received in the previous games.

Q.   All right.  And the last column?

A.   I guess that's the amount I collected.

Q.   Now, over this period of time, I think you referenced this already, but you lost in some games as well to Mr. Goldstein?

A.   Yes.  Yes, I did.

Q.   Now, even with those losses, was it your understanding that the losses in poker games were applied to the debt that he owed you?

A.   Can you restate that?  I'm not sure if I understand the question.

Q.   Sure.  Whenever you lost a game against Mr. Goldstein, did you consider that as a way in which he could deduct the amount that he owed you?

A.   I think you're asking me to opine the taxes.

Q.   Not about taxes, just as a layman's term?

A.   No.  Yeah.  You would deduct it from your losses.  That's

what we did.  That's why we kept records like this.

**Q.**   Now, even with the losses --

       **MR. ADENRELE:**   If we can go down to the bottom of that chart.

**BY MR. ADENRELE:**

**Q.**   Now, even the losses, did Mr. Goldstein eventually pay you the full amount that he owed you?

**A.**   Everything, but the last loss.

**Q.**   Let's talk about that.

**A.**   Okay.

**Q.**   When was your final match against Mr. Goldstein?

**A.**   I think it was either Labor Day or a -- yeah.  I think in May.  In May.

**Q.**   Labor Day of which year?

**A.**   I think it was 2017.

**Q.**   How did that match come about?

**A.**   I was in my home at the desert.  Tom was in town, wanted to play, and I went to the W to play.

**Q.**   When you say "your home in the desert," where are we talk --

**A.**   La Quinta.  La Quinta, California.

**Q.**   I'm sorry?

**A.**   In La Quinta, California.

**Q.**   And for these matches around Labor Day in 2017, how long did those matches last or how did long did that match last?

**A.** It was a two-day event. We played in the W, if I recall correctly, the first day and then we played in Santa Monica the second day.

**Q.** Who won those games?

**A.** I did.

**Q.** How much did you win?

**A.** Roughly $6 million.

**Q.** $6 million in two days?

**A.** Correct.

**Q.** It was a couple good days for you?

**A.** It happens.

**Q.** What did you say? I'm sorry. I didn't hear you.

**A.** It happens. I mean, sometimes you have a good day.

**Q.** Indeed.

Now, for those losses, how did Mr. Goldstein pay you or in what increments was he paying you?

**A.** Well, initially, he --

**Q.** Well, actually, let me back -- I'm sorry. Let me back up.

Did he pay you the full amount?

**A.** Not at the time of the loss.

**Q.** How did he pay you?

**A.** He started paying me installments.

**Q.** And what was the value of those installments or the amount of the installments?

**A.** Well, per your chart, initially it was about $100,000 a

month.

**Q.** All right. Now, to be clear, you said per my chart --

**A.** Well --

**Q.** -- do you -- per your memory?

**A.** This is correct. Yes.

**Q.** And why did he not pay you the full 6 million all at once?

**A.** He just didn't have it.

**Q.** How did you know that?

**A.** He told me.

    **MR. ADENRELE:** You can take the chart down.

**BY MR. ADENRELE:**

**Q.** Now, do you remember him making efforts to pay -- to pay you the $6 million?

**A.** Yes, he did make efforts.

**Q.** And that's, in part, by the $100,000 over -- you know, every now and again that he paid; is that right?

**A.** That is absolutely correct.

**Q.** All right. Did he ever send you any photos of himself attempting to pay?

    **MR. KRAVIS:** Objection.

    **THE COURT:** Do you wish to be heard, Counsel?

    **MR. KRAVIS:** Yes, Your Honor. Thank you.

    (Whereupon, an off-the-record discussion was held outside the presence of the jury follows:)

    **THE COURT:** Mr. Kravis, do we have you on?

**MR. KRAVIS:** Yes. Thank you, Your Honor.

**THE COURT:** All right. Just a second. Make sure we have all the government counsel on.

Counsel, are you on?

**MR. ADENRELE:** I'm on, Your Honor.

**THE COURT:** Okay.

All right. Mr. Goldstein, are you on?

**THE DEFENDANT:** (Indicating thumbs up.)

**THE COURT:** All right. Go ahead, Mr. Kravis.

**MR. KRAVIS:** Your Honor, at this point we object on relevance under prejudice grounds.

**MR. ADENRELE:** Your Honor, I can't hear.

**THE COURT:** I'm sorry. Just a second. Counsel is not able to hear. Just a moment.

Can you hear us now, Counsel?

**MR. ADENRELE:** I can hear you loud and clear. However, not so much Mr. Kravis.

**THE COURT:** Mr. Kravis, try it again.

**MR. KRAVIS:** Your Honor, at this point, we object on relevance and prejudice grounds. I did not object to the earlier questions about the amount of money that Mr. Goldstein owed, the payment in installments, not paying it all right away. But at this point, it seems like now we're getting into representations from Mr. Goldstein to Mr. Safai about the particulars of what was going on with the money. And at this

point, I just don't think this is relevant to any of the --
it's just not relevant to any of the issues in this case.

THE COURT: All right. Thank you. So the objection is relevance.

Counsel for the government?

MR. ADENRELE: Yeah. I'm not sure what Mr. Kravis is talking about. In this case, there are loans that Mr. Goldstein owes, one of which is to Mr. Safai. We have mortgage fraud charged in this case, an important -- and relevant. Obviously, it's critical for the government's case to show that Mr. Goldstein's paying on this -- and owed it up until the time that he signed the mortgage application. So that's critical for the case.

On top of that, obviously, they're showing here in the case that Mr. Goldstein's paying down debts of poker while he owes outstanding tax bill. Both of those issues are critical to the case, and we have to be able to explore that.

On top of that, before Mr. Kravis objected, we hadn't even heard the witness's answer. So I'm not sure how we can even say that it's irrelevant before we hear the answer.

THE COURT: Anything further, Mr. Kravis?

MR. KRAVIS: Your Honor, I would just note, I want to be clear about this, if they're asking Mr. Safai about the facts of the payments, when Mr. Goldstein made the payments, how much he owed him at any given time, what the facts are, we

don't have any objection to that.

My point is that when they start asking questions about things Mr. Goldstein said to Mr. Safai, at that point, that's not relevance --

**THE COURT:** Okay. It may also be hearsay.

Go ahead, Mr. -- counsel for the government?

**MR. ADENRELE:** Well, it's not -- I'm sorry. It's not hearsay, Your Honor, because statements against a party opponent. It's Mr. Goldstein's statements to Mr. Safai that we are allowed to bring as the government against Mr. Goldstein. So they're not hearsay statements.

However, further than that, the government's not constricted to trying -- to putting on its case only to facts and dates and numbers. We are allowed by color and context to these numbers, and that's why we have witnesses. Otherwise, there wouldn't be witnesses at all. We could simply just put up documents through 902(11) certs and not have a trial. That's the purpose of this trial. And that's why Mr. Safai's testimony is very relevant.

**THE COURT:** All right. Thank you, Counsel. I think I understand the objection and the government's position.

As to relevance, I think this line of questioning is relevant. That's a pretty broad standard. I don't see any situation where the Court would exclude it. Right now, based upon the balance I would typically do, I'm going to allow the

questions and we'll see where we are.

And, Mr. Kravis, you can come back if you continue to have a concern.

MR. KRAVIS: Got it. Thank you, Your Honor.

THE COURT: Objection overruled.

MR. KRAVIS: Thank you.

(Whereupon, discussion concluded.)

BY MR. ADENRELE:

Q. All right. Mr. Safai, let's get back to where we are.

Now, we talked about efforts from Mr. Goldstein to pay back the $6 million. Did I hear that right?

A. That's what I heard last, yes.

Q. All right. And did he ever send you any photos of himself showing himself attempting to pay you the money back?

A. Yes.

Q. Can you tell us about that?

A. Showed a photo of himself at the bank.

Q. And why did he send that you photo?

MR. KRAVIS: Objection.

THE COURT: Let's come to the headsets.

(Whereupon, an off-the record discussion was held outside the presence of the jury as follows:)

THE COURT: Mr. Kravis, are you on?

MR. KRAVIS: Yes, Your Honor.

THE COURT: All right. Let's make sure we have

government counsel.

Counsel, can you hear us?  Can you hear the Court?

**MR. ADENRELE:**  Yes.

**THE COURT:**  Okay.

All right.  Go ahead, Mr. Kravis.

**MR. KRAVIS:**  Okay.  Now the objection is lack of foundation and calls for speculation.  How would Mr. Safai know why Mr. Goldstein sent a photo?  If they want to ask him about words that Mr. Goldstein spoke, obviously, that's different.

**MR. ADENRELE:**  But, of course --

**THE COURT:**  Go ahead, Counsel.

**MR. ADENRELE:**  But, of course, Your Honor, Mr. Safai, one, in response to this question could say, "Mr. Goldstein told me he sent me the photo for this reason."  However, if not, I could simply change the question and ask Mr. Safai, what was your understanding as to why he sent you the photo?

**THE COURT:**  You can ask about his understanding and what he knew.  So I think the question can be rephrased and that will get around the objection, and we'll see what the response is.

**MR. ADENRELE:**  Thank you, Your Honor.

**MR. KRAVIS:**  Thank you, Your Honor.

**THE COURT:**  All right.  Thank you, Counsel.

(Whereupon, discussion concluded.)

**BY MR. ADENRELE:**

Q.   All right.  Mr. Safai, what was your understanding as to why Mr. Goldstein sent you that photo?

A.   To determine that he was at the bank.

Q.   Was that strange to you?

A.   A little bit.

Q.   Why?

A.   Because I don't go to banks.

Q.   Is --

        THE COURT:  I'm sorry.  Mr. Safai, I'm going to need you, again, to speak right on that microphone so we can hear you.

        THE WITNESS:  I'm sorry, Judge.

        THE COURT:  You're fading out a bit.  Thank you.

        THE WITNESS:  Okay.

BY MR. ADENRELE:

Q.   All right.  Now, what was your reaction when you started to receive the $100,000 installment payments over time as opposed to the full $6 million?

A.   I was disappointed, but he was making an effort, so...

Q.   Why were you disappointed?

A.   Because I have a code in which I play and gamble and I run my life.  So I pay vendors and everything in 48 hours.  It's a well-known fact about me.  That's all.

Q.   And did you have concerns that Mr. Goldstein was not following that type of code?

MR. KRAVIS: Objection.

THE COURT: Let's come to the headsets, Counsel.

(Whereupon, an off-the record discussion was held outside the presence of the jury as follows:)

THE COURT: Mr. Kravis, can you hear the Court?

MR. KRAVIS: Yes, Your Honor.

THE COURT: Mr. Goldstein, are you on?

THE DEFENDANT: (Indicating thumbs up.)

THE COURT: Counsel from the government, can you hear the Court?

MR. ADENRELE: Yes, Your Honor.

THE COURT: Okay. Go ahead, Mr. Kravis.

MR. KRAVIS: Okay. Your Honor, this is what I was concerned about. Now we are way beyond the facts of the payments, the fact that money is outstanding.

The question I heard was whether Mr. Safai had concerns about whether Mr. Goldstein was living by Mr. Safai's code. I don't know what relevance this has to anything in the trial. I think this is also now speculation on the witness's part about whether Mr. Goldstein's conduct lives up to Mr. Safai's personal code.

And I think it is incredibly prejudicial because this is, in effect, the government asking the witness to comment on the general propriety of Mr. Goldstein's behavior with respect to the payments beyond the facts of when the payments were made

and for how much.

THE COURT:  Thank you, Counsel.

Counsel for the government, go ahead.

MR. ADENRELE:  Your Honor, the witness is simply responding to his reaction -- or to providing his reaction to receiving $100,000 payments over time as opposed to the $6 million.  I'm not sure how it could possibly be speculation when the witness's own code about -- about paying within 48 hours.  It's his code.  How could he be speculating as to what his thoughts are to Mr. Goldstein's behavior?  It could not possibly be speculation.

THE COURT:  All right.  I think -- I think the issue is not just so much speculation, but again, how this is relevant to the charges.  We've got on the record in the evidence the nature of the payments, how they were made, the witness's understanding as to why they were made and the way they were.  I think we've covered that ground.

I do think now we are getting not only into speculation, but also to things that aren't really relevant to the charges.

So I'm going to sustain the objection.

Thank you, Counsel.

MR. KRAVIS:  Thank you, Your Honor.

MR. ADENRELE:  Thank you, Your Honor.

(Whereupon, discussion concluded.)

BY MR. ADENRELE:

**Q.** All right. Mr. Safai, after Mr. Goldstein failed to pay the full $6 million at once, what next steps were taken?

**A.** He started making the payments, about $100,000 a month.

**Q.** Did you do anything to ensure that he would continue to -- that he would continue to make payments?

**A.** We had a discussion about signing a promissory note, which he did very expeditiously.

**Q.** I'm sorry. I didn't hear the end of that.

**A.** He did very expeditiously, he came and signed the promissory note.

**Q.** All right. And why did you --

        **THE COURT:** I'm sorry, Counsel. Again, Mr. Safai, we're going to have to move that mic a little closer to you. You are fading out and I'm afraid the jury is not able to hear everything you're saying.

        **THE WITNESS:** All right. Can you hear me now?

        **THE COURT:** Yes. Thank you.

**BY MR. ADENRELE:**

**Q.** Okay. And whose idea was it to create the promissory note?

**A.** Mine.

**Q.** Why did you believe it was important? Let's back up just to make sure the jury understands. What is a promissory note?

**A.** It's a lien agreement in which you pay an amount of money that you owe.

**Q.** And were promissory notes something that are relatively common in your line of work?

**A.** In my line of work, yes. In the poker world, no.

**Q.** And again, whose idea was it to create the promissory note?

**A.** Mine. Mine.

**Q.** And why did you believe it was important?

**A.** In case anything happened to either one of us.

**Q.** Have you ever created a promissory note ever with any other of your poker competitors?

**A.** We never have, no.

**Q.** Have any of your poker -- any people who played poker against you, have they provided you a promissory note to make sure that you paid your losses?

**A.** That would never happen.

**Q.** Why not?

**A.** Because I pay my losses in 48 hours.

**Q.** Did the promissory note eventually lead to Mr. Goldstein paying the full amount that he owed?

**A.** He didn't pay the full amount, no.

**Q.** All right. I'd like to direct your attention to Exhibit 15.1.

      **MR. ADENRELE:** Let's zoom in on the top portion. Thank you, Mr. Resto.

**BY MR. ADENRELE:**

**Q.** Sir, what is this?

**A.** This is the promissory note you're alluding to.

**Q.** What is the date of this promissory note?

**A.** August 21, 2018.

**Q.** And what is the amount required to be paid?

**A.** $6 million.

**Q.** What's the interest rate on this promissory note?

**A.** One percent.

**Q.** In your line of work, is that a high or a low interest rate?

**MR. KRAVIS:** Objection.

**THE COURT:** Let's come to the headsets.

(Whereupon, an off-the-record discussion was held outside the presence of the jury as follows:)

**THE COURT:** Mr. Kravis, can you hear the Court?

**MR. KRAVIS:** Yes, Your Honor.

**THE COURT:** Mr. Goldstein?

**THE DEFENDANT:** (Indicating thumbs up.)

**THE COURT:** Counsel for the government, can you hear the Court? Can you hear the Court, Counsel?

**MR. ADENRELE:** I can hear, Your Honor.

**THE COURT:** We can't hear you. Try your mic. Okay. Try it again.

**MR. ADENRELE:** Can you hear me?

**THE COURT:** Yes.

All right.  Go ahead, Mr. Kravis.

**MR. KRAVIS:**  Your Honor, I don't know what the relevance is of asking this witness to compare the interest rate in a promissory note for a gambling debt to the interest rate that he would typically charge for his work.

I also, again, think that this is prejudicial, because now it's starting to invite the jury to draw conclusions, not about the facts of the payments or the timing, but about Mr. Goldstein's behavior and that's not -- that's not proper.

**THE COURT:**  All right.  Thank you.  The objection is relevance.

Counsel for the government, go ahead.

**MR. ADENRELE:**  Yeah.  This is the problem with objecting too early.  So it will become evidently clear that this is a low interest rate, generally.  I suspect that, on cross, whoever is going to cross for the defense team, will attack Mr. Safai's credibility with respect to whether he liked or disliked Mr. Goldstein.

What I'm simply trying to show here is that a low or an extremely low interest rate is exceedingly reasonable despite Mr. Goldstein not paying back the $6 million that is owed on the debt to Mr. Safai.  And Mr. Safai knows, of course, about interest rates because that's his business.

**THE COURT:**  Okay.  And how is this relevant to the charges in the case?

**MR. ADENRELE:** Well, it's --

**THE COURT:** Go ahead, Counsel.

**MR. ADENRELE:** I'm sorry.

**THE COURT:** Go ahead.

**MR. ADENRELE:** It's relevant again because -- well, just to be clear, it's relevant to the credibility of this witness. It's showing that he doesn't hate Mr. Goldstein. Instead of --

**THE COURT:** Okay. Well, then, I think you can ask the witness direct questions about his attitudes towards Mr. Goldstein if that's where you're going. I'm not -- I'm just -- I'm not following how the -- we have in the record that there was a loan. Mr. Goldstein had trouble repaying, so a promissory note was prepared.

This is not in the practice of the witness. He said that. He's never done it. He's never had one done to him. That's already in. Now, we're talking about the terms of the loan and I'm not exactly clear why.

**MR. ADENRELE:** Again, I just want to be clear. And I'm not -- if Your Honor is going to sustain the objection, I understand, but I just want to make the record clear.

**THE COURT:** Please go ahead.

**MR. ADENRELE:** That it is relevant to the credibility of this witness is a one percent interest rate on a loan of $6 million exceptionally low and is showing how reasonable it

is of Mr. Goldstein despite Mr. Goldstein not paying him the $6 million.

THE COURT: Okay. I'm going to sustain the objection now. If there's issues on cross that go to the witness's attitude towards Mr. Goldstein, I'm open to revisiting the issue on direct -- redirect by the government.

Thank you.

MR. KRAVIS: Thank you, Your Honor.

(Whereupon, discussion concluded.)

MR. ADENRELE: Let's go to the bottom of this document. I'm sorry. Page 4 at the bottom.

BY MR. ADENRELE:

Q. And whose signatures do you see there at the bottom? Oh, let's scroll up a little bit. And whose signature do you see there, Mr. Safai?

A. Tom Goldstein.

Q. All right. And let's go down to the bottom. We see additional signatures. Whose are those?

A. That's Donna Alexander, the notary.

Q. And who is that?

A. She's a person who was a notary who was in my office.

Q. In this promissory note, what was your understanding of the amount that Mr. Goldstein was supposed to be paying in installments over time?

A. $25,000 or 25,000 or 30,000 applied toward principal,

5,000 was interest.

MR. ADENRELE: All right. Let's go all the way up to the top of the document on page 1. And let's go down. Let's go to paragraph 1 and we can zoom out paragraph 1.

BY MR. ADENRELE:

Q. And we see monthly payments there. Do you see that?

A. Yes, I do.

Q. All right. And if we can just identify that, as I read it, 30,000. And you've provided a much more detailed explanation. But again, here does the document identify 30,000 as monthly payments?

A. Yes, it does.

MR. ADENRELE: Now, let's go back to Exhibit 15.3. These are your bank records again. Let's go down to page 53.

BY MR. ADENRELE:

Q. There's a September 5th transaction. Do you see that, sir?

A. Yes.

Q. How much is that for?

A. 30,000.

Q. And who is it from?

A. Tom Goldstein.

Q. What is this $30,000 for?

A. For the monthly payment.

Q. Let's go to page 22. March 30th?

**A.**   Yes.

**Q.**   Do you see that transaction?

**A.**   Yes, I do.

**Q.**   And what is that?

**A.**   Payment.  $30,000 payment for the month.

**Q.**   And what is that for?

**A.**   The payment for the promissory note.

**Q.**   And is that from Mr. Goldstein?

**A.**   Yes.

**Q.**   Now, let's go to page 24 of the same exhibit.  April 30th, do you see another transaction there?

**A.**   Yes.

**Q.**   Who is that from?

**A.**   Tom Goldstein.

**Q.**   And what is it for?

**A.**   For the monthly payment.

**Q.**   Now, during this period of time, while Mr. Goldstein was paying you, what did you learn about whether he was continuing to play poker?

            **MR. KRAVIS:**  Objection.

            **THE COURT:**  Let's come to the headsets, Counsel.

      (Whereupon, an off-the record discussion was held outside the presence of the jury as follows:)

            **THE COURT:**  Mr. Kravis, are you on?

            **MR. KRAVIS:**  Yes, Your Honor.

**THE COURT:** Mr. Goldstein?

**THE DEFENDANT:** (Indicating thumbs up.)

**THE COURT:** Counsel for the government? Just need a moment. Counsel, can you hear us?

**MR. ADENRELE:** Can you hear me, Your Honor?

**THE COURT:** Yes. Can you hear us?

**MR. ADENRELE:** I can hear you.

**THE COURT:** Okay. Go ahead, Mr. Kravis.

**MR. KRAVIS:** Okay. So, I see at least two problems here. The first problem is, what did you learn about whether Mr. Goldstein was continuing to play poker calls for hearsay. Unless he has personal knowledge, like he attended the games or he's going to testify that Mr. Goldstein made a statement to him that's an admission of a party opponent, there's no foundation for this question. It calls for hearsay.

The second thing is, I don't think this is relevant, and I think this is prejudicial. I think now the government is trying to elicit from Mr. Safai that Mr. Goldstein was continuing to play poker during a time when he owed Mr. Safai some money and Mr. Safai may have feelings about that. That's not relevant to any of the charges in this case and it's prejudicial.

**THE COURT:** Thank you. So I hear two objections. One is hearsay, the other is relevance.

Counsel for the government?

MR. ADENRELE: Again, my friend identified a number of exceptions that it is not hearsay. Of course, we have not heard the extent of them.

Two, we just had an argument this morning, a few minutes ago, about playing poker in 2022. Your Honor, as I heard the ruling, allowed that in. And Mr. Safai can now speak about whether he knew or didn't know whether Mr. Goldstein was playing poke in 2022. Again, obviously, this is not as good as --

THE COURT: I think the poker playing is relevant to some of the charges in the case in 2022. I guess I'm trying to understand how that comes in through this witness and what we're actually asking him.

He can talk about games that he played with Mr. Goldstein in 2022. If he had any, he knows about that. I don't know how we know he knows about what else Mr. Goldstein was doing in 2022.

MR. ADENRELE: I'm sorry. But if he knows -- if I ask, do you know whether Mr. Goldstein was playing poker during this time period and he says yes. If the next question is, did you learn that because someone told you, then that's a question that calls for hearsay --

THE COURT: Well, I guess --

MR. ADENRELE: -- but him simply telling us what his knowledge is, Your Honor, does not --

**THE COURT:** I'm not arguing on the hearsay point. I guess I'm really stuck on the relevance of it. In the context of this witness, what can we say? He can talk about poker playing in 2022 that he was involved with Mr. Goldstein. That's what he's been talking about in terms of the earlier years.

So, if he's still involved in 2022, he can talk about that. I'm not really sure about what he may have heard, how that even --

Go ahead. Go ahead, Counsel.

**MR. ADENRELE:** But I haven't asked the witness how -- what he heard. I simply asked him, do you know if Mr. Goldstein was playing poker during this time period where he owed you money.

**THE COURT:** Where he owed the witness money.

**MR. ADENRELE:** Exactly. That is deeply relevant, Your Honor. As we discussed --

**THE COURT:** All right. I'm going to allow you to ask that question. I think if we're going to get into how you knew it, you're going to have all kinds of hearsay issues, and we're going to be right back up here.

So if it's anything more than a yes-or-no answer, we're going to be back on the husher trying to sort out the hearsay part. Again, if he has personal knowledge because he played with Mr. Goldstein or something like that, obviously, he can

speak with that. But what he may have heard from other people, I think we're going to have problems.

MR. ADENRELE: Absolutely, Your Honor. And I was not planning on asking that question.

THE COURT: All right. Let's see how it goes. Thank you, Counsel.

(Whereupon, discussion concluded.)

BY MR. ADENRELE:

Q. Again, Mr. Safai, what did you learn about Mr. Goldstein's poker playing during the time period where he was supposed to be paying you --

MR. KRAVIS: Objection.

THE COURT: Let's come back to the husher.

(Whereupon, an off-the record discussion was held outside the presence of the jury as follows:)

THE COURT: All right. Before we -- before you go, Mr. Kravis, make sure we have everybody on the line. Do we have counsel for the government? Just a moment. Can you hear us, Counsel?

All right. Go ahead, Mr. Kravis.

MR. KRAVIS: Your Honor just said that my colleague can ask a yes-or-no question and that's it. The very first question was, "What did you learn?"

Again, there -- my colleague has the rules of evidence exactly backwards. He doesn't get to elicit the substance and

then go back and try to figure out how the witness knows. There has to be a foundation for the testimony before he can elicit it.

And here, he has not laid any foundation beyond hearsay for anything the witness knows. In fact, the witness just testified that he never played poker with Mr. Goldstein himself after the 2017 matches.

The question that was just asked is also in direct contravention of the express instructions the Court gave on the last objection.

**THE COURT:** Counsel for the government?

**MR. ADENRELE:** Your Honor, I can ask the witness, did you --

**THE COURT:** You're going to ask the witness: Do you know whether Mr. Goldstein played poker? I guess in 2022, is the year you're asking about. That's what you can ask the question and he can answer yes or no.

I think if he answers yes, we're going to have to figure out how he knows it, which is probably going to have hearsay problem since, as I understand the evidence, he wasn't involved in those matches. He stopped playing in 2017.

**MR. ADENRELE:** No problem. Thank you, Your Honor.

**THE COURT:** Let's see how it goes.

**MR. ADENRELE:** All right. Thank you.

(Whereupon, discussion concluded.)

BY MR. ADENRELE:

Q.   Mr. Safai, did you know whether Mr. Goldstein was playing poker during the time period that he was supposed to be paying you?

A.   I didn't know at the beginning.  I don't believe he was playing at the beginning, but later on I heard he was playing.

Q.   All right.  Let's move on to a different topic.

Did you receive any payments from third parties on behalf of Mr Goldstein?

A.   I did.

Q.   Who?

A.   Tobey Maguire.

Q.   Who is Tobey Maguire?

A.   Famous actor.  Spider-Man.

Q.   Let's go to Exhibit 15.4.

Mr. Safai, what is this?

A.   This is, I believe, an e-mail regarding the promissory note.

Q.   And who is the e-mail from?

A.   From me to Tom.

Q.   Let's go down to the first part of this e-mail at the bottom.

All right.  Now, who is this e-mail from?

A.   From my assistant.

Q.   And when is it dated?

**A.** June 8, 2021.

**Q.** What's the e-mail about?

**A.** I believe it's about a payment that we were applying towards the promissory note.

**Q.** All right. Now, there's a reference to $500,000 applied to months 33 to 48 in full. What's that $500,000 in reference to?

**A.** I believe it's the payment that Tobey made.

**Q.** Now, you also talk about -- in the last paragraph you talk about a buyout. Do you see that?

**A.** Yes.

**Q.** What does that mean?

**A.** I had approached Tom to give a discount to buy out of the promissory note.

**Q.** And why did you do that?

**A.** Because ever since I didn't collect it, the promissory note was like a black cat. I'm very superstitious and -- I'm very superstitious. And so I was losing. I was like, I got to get this off my back. And so I was willing to do a discount with Tom just to be done with it.

**Q.** Did he buy it out?

**A.** He did not.

**Q.** Let's move up to the top of the e-mail. Actually, I'm sorry. Let's do the middle of the e-mail there briefly.

In response, what does Mr. Goldstein say?

**A.** He said, "Thanks so much. Can you let me know what the payments were made before the chart starts?"

**Q.** And this chart is in reference to?

**A.** The promissory note chart. It's a schedule with the promissory note.

**Q.** And what does that schedule show?

**A.** That he paid 30,000 a month when it started. But as your chart previously showed, he had paid $100,000 a month to start.

**Q.** Let's go up to the top e-mail. What do you see in response?

**A.** If you remember, you said that was not included. Please call me -- or call me.

**Q.** All right. When you say "that was not included," what are you referring to?

**A.** The original payments that were made by the first, I believe, it's six months.

**Q.** All right. Let's move back to Exhibit 15.3. But before we do that, once --

        **MR. ADENRELE:** You can take that down.

**BY MR. ADENRELE:**

**Q.** Did you receive any payments from any other third parties on behalf of Mr. Goldstein for the note?

**A.** You got to be more clear than that.

**Q.** Sure. Let's go to Exhibit 15.3. And this is your bank statement. Let's go to page 34. We see a March 7 transfer

there.  Do you see that?

A.    Yes.

Q.    Okay.  And how much is that for?

A.    There's two.  One is for 2.5 million.  One is for 500,000.

Q.    All right.  Now, the $500,000 one, who is that from?

A.    Napoli Shkolnik.

Q.    Have you heard of Napoli Shkolnik before?

A.    Before I got the payment?

Q.    Sure.

A.    No.

Q.    Had you heard it after you got the payment?

A.    Yeah.  I got the payment.

Q.    All right.  And what was your understanding of who was providing this payment, or who was this payment on behalf of?

A.    On behalf of Tom Goldstein.

Q.    And how did you know that?

A.    Because he told me.

Q.    And was it your understanding that it was towards paying down the $6-million debt?

A.    Yes.

Q.    Or paying down the debt that he owed you for poker?

A.    Yeah.  This wasn't referencing the promissory note. This -- I believe before it.

Q.    Now, have you ever heard of posting before?

A.    Yes.

**Q.** And what is posting?

**A.** By its definition, it's putting up money prior to playing a game. It's generally --

**Q.** I'm sorry. I interrupted you.

**A.** I can elaborate. It's generally done in an effort to either cap your losses and/or if someone doesn't think you're going to pay. So they would rather have the money up front and put the cap on losses.

**Q.** Now, was this payment -- just to be clear, as you understood the payment, was it for posting prior to any games that you were going to have with Mr. Goldstein?

**A.** We never posted. We went by honor.

**Q.** And so this could not have been for posting prior to a game?

**A.** To a game?

**Q.** Prior to you playing Mr. Goldstein?

**A.** Not that I recall.

**Q.** Now, earlier you mentioned that you eventually transferred the debt, the $6 million promissory note -- or let me back up.

Eventually, did Mr. Goldstein pay the full $6 million from the promissory note?

**A.** He didn't personally.

**Q.** Okay. Did you eventually transfer the note to someone else?

**A.** Yes. It was purchased by a friend of ours named Eddie

Ting.

Q.   All right.  And why did you do that?

A.   Just to get the black cat off of my back.  I just wanted to be done with it.

Q.   So to be clear, did Mr. Goldstein himself ever pay you the full 6 million?

A.   By definition, no, because I sold the debt.

Q.   To someone else?

A.   Yes.  Eddie Ting.

Q.   Do you remember when you transferred that note?

A.   I honestly don't.

Q.   Do you remember what year?

A.   I do not.

Q.   Was it in 2023?

A.   Very much it could have been, yes.

Q.   Was it in 2022?

A.   I don't know the exact date.

Q.   Was it before -- you think it might have been in 2023?

        **MR. KRAVIS:**  Objection.

        **THE WITNESS:**  I don't know the exact date.

        **THE COURT:**  Counsel, do you want to come to the headsets?

     (Whereupon, an off-the record discussion was held outside the presence of the jury as follows:)

        **THE COURT:**  Mr. Kravis, you're on.

Do we have government counsel?

Counsel for the government, can you hear me?

Okay. Mr. Goldstein, thumbs up.

All right. Go ahead, Counsel.

**MR. KRAVIS:** He's now said three times he doesn't know. I mean, I gave them a couple of chances at this, but now we're just speculating, and there's no foundation. He said he doesn't know.

**THE COURT:** All right. So asked and answered and lack of foundation.

Go ahead, Counsel.

**MR. ADENRELE:** Just to be clear, usually -- usually, asked and answered is when we are on cross-examination and we might object, but that's fine. We're more than allowed to identify to see if it jogs the witness's memory to determine if he, in fact, doesn't remember or doesn't -- if, in fact, he doesn't remember or doesn't know, we'll find out. But he said he personally didn't know, but he also said 2023, so...

**THE COURT:** Okay. So I think he's answered that. Are you going to try to refresh him with a document to help him recall the date or where are we going?

**MR. ADENRELE:** No. I'm going to ask him one more time and then we can move on.

**THE COURT:** All right. Counsel, I think we need to move on. I'll let you ask the question one more time.

Thank you very much, Counsel.

            MR. KRAVIS:  Thank you, Your Honor.

                    (Whereupon, discussion concluded.)

BY MR. ADENRELE:

Q.    Mr. Safai, did you transfer the note in 2022?

A.    That could have been the date, correct, I transferred the note.

Q.    Who did you transfer it to?

A.    To Eddie Ting.

Q.    Who is Eddie Ting?

A.    He's another poker player, gambler, who is a friend of mine.

Q.    And roughly, how much did Mr. Goldstein owe you around the time that you transferred the note?

A.    I think it was a little, close to $3 million.

Q.    I would like to direct your attention to Exhibit 431.

            MR. ADENRELE:  I have hard copies as well.

            THE COURT:  You can give it to the deputy.  Thank you.

      Is the purpose of this to refresh or are you calling it up?

            MR. ADENRELE:  No.  It's just simply to show to the witness.

            THE COURT:  Do you want to be heard?

            MR. KRAVIS:  I object.

**THE COURT:** All right. Let's go on the headsets.

**MR. KRAVIS:** Can we have it taken down, please?

**THE COURT:** Let's have it taken down. And, Howard, can you pass up the document so I can see what we're talking about? Thank you. Let's go to the headsets.

(Whereupon, an off-the record discussion was held outside the presence of the jury as follows:)

**THE COURT:** Mr. Kravis?

**MR. KRAVIS:** Your Honor, this clearly is not like an exhibit, like a document that was produced by a party. This is something that was created by the government. The defense had no advanced notice of this. We had previously agreed that we would give each other advance notice for demonstratives or some reason for business records so we would have a chance to review them and confirm their accuracy before they're used in front of the jury and court. This is something the government created. We have never seen it until just now. I've had no opportunity to check and see whether we agree that this is accurate or whether we think it misrepresents anything.

The government previously told us they would give us advanced notice before they used this kind of thing. I've never seen this before.

**THE COURT:** All right. Counsel for the government?

**MR. ADENRELE:** Thank you, Your Honor.

**THE COURT:** Go ahead. And you've got to speak a

little louder.  I can't hear you.  Go ahead.

MR. ADENRELE:  There has been a few times now where the government has created demonstrative evidence.  We did with Mr. Gipson's testimony.  There were a number of actual charts that went up.  I don't hear an issue then.  They provided the the --

THE COURT:  What is the purpose of this document?

MR. ADENRELE:  The purpose of this document is going to show multiple payments over time by Mr. Safai by Mr. Goldstein -- to Mr. Safai and identified --

THE COURT:  Under the promissory note?

MR. ADENRELE:  That's correct.  And these are all from his bank records which is Exhibit 15.3.  It also identifies the promissory note which we have shown already here in court.  It identified two additional payments of $30,000 which are --

THE COURT:  I don't know why are we showing this to the witness who has testified to all of this?

MR. ADENRELE:  But now I think this is a Rule 611 chart which is inadmissible under cases most recently in the U.S. --

THE COURT:  How is it coming in through this witness?  He's testified to many of the facts.  I understand that.

Go ahead.

MR. ADENRELE:  And, therefore, and that's exactly why

it should be able to come in.

**THE COURT:** But he didn't create the document. The government did.

**MR. ADENRELE:** No. And I'm not representing they created the document. He's seen this document and now that its --

**THE COURT:** He's reviewed this document before?

**MR. ADENRELE:** He's reviewed this document, and we just jointly reviewed the information on the document actually.

**THE COURT:** Mr. Kravis, anything else you want to say?

**MR. KRAVIS:** Your Honor, again, we had an agreement that we would give advanced notice of these things so we could verify their accuracy. I have never seen this before.

**MR. ADENRELE:** I'm happy to --

**THE COURT:** So here is what I'm going to do. You need to explain what the document is. This is not a document that the witness created. You can walk through it with him, and I'll give the defense latitude on cross.

And if you need some time, Mr. Kravis, we'll take some time. All right. Let's try to get this part wrapped up. I'd like to give the jury a break, you know, before eleven o'clock -- all right -- because they probably have to go to the bathroom.

**MR. ADENRELE:** I probably do, too.

**THE COURT:** Okay. We probably all do. All right. Thank you, Counsel.

(Whereupon, discussion concluded.)

**THE COURT:** Counsel for the government?

**MR. ADENRELE:** Thank you, Your Honor.

**BY MR. ADENRELE:**

**Q.** If we can go back to Exhibit 431. Actually, if we can publish it for the jury.

**THE COURT:** Did you call it 431 now?

**MR. ADENRELE:** I'm sorry.

**THE COURT:** Thank you.

**MR. ADENRELE:** Thank you.

**BY MR. ADENRELE:**

**Q.** Mr. Safai, what is this document?

**A.** It looks like the payments on the promissory note.

**Q.** Have you seen it before?

**A.** Yes.

**Q.** And again, you just identified, it looks like the payments on the promissory note. Do I hear that right?

**A.** That is correct.

**Q.** And have you reviewed this document before your testimony today?

**A.** Yeah. Recently saw it.

**Q.** Have you confirmed that it's accurate and consistent with your bank records and testimony?

**A.**   Seems so.

MR. ADENRELE:   Thank you.  One moment.

THE COURT:   Counsel?

MR. ADENRELE:   Guess our technology is back. Thank you.  Pass the witness.

THE COURT:   Thank you very much, Counsel. Mr. Kravis, do you wish to cross-examine the witness?

MR. KRAVIS:   Your Honor, as we discussed, may we have a -- our mid-morning break here and then pick up with cross?

THE COURT:   That seems reasonable.  Why don't we allow the jury to take its mid-morning break and have some coffee.

Please rise for the jury.

(Whereupon, the jury exited the courtroom at 10:22 a.m.)

THE COURT:   Please be seated.

Invite the witness, if you wish, you may step down at this time and take a break.  You may step down and take a break.  Go ahead and step down and exit the courtroom.

MR. ADENRELE:   If we may just give the witness the instruction that, obviously, he cannot speak to --

THE COURT:   Right.  Of course, we are now proceeding to cross-examination, so you're not able to consult with the government.

THE WITNESS:   Okay.

THE COURT:   Okay.  Thank you.

THE WITNESS:  How long is the break for?

THE COURT:  I'm sorry?

THE WITNESS:  How long is the break for?

THE COURT:  We'll let you know in just a moment.  Okay.  But you can go ahead and step out of the courtroom.

(Whereupon, the witness stepped off the witness stand and out of the courtroom.)

THE COURT:  Mr. Kravis, about how long would you like to have before we start with cross?

MR. KRAVIS:  Could we have 15 minutes?  I know that's longer than we usually take.  I just, as we discussed at the bench before --

THE COURT:  Of course.  We'll take 15, so we'll come back in whatever 15 minutes is, Counsel.  I think that's 10:38 by my math.  We'll see you then.

MR. KRAVIS:  Thank you, Your Honor.

DEPUTY CLERK:  All rise.  This Honorable Court stands in recess for 15 minutes.  Thank you.

(Whereupon, a recess was taken from 10:24 until 10:38 a.m.)

MR. BEATY:  All rise.  This Honorable Court now resumes in session.

THE COURT:  Please be seated, everyone.

Mr. Kravis, are we ready to proceed to cross-examination?

MR. KRAVIS:  Yes.  Thank you, Your Honor.

THE COURT:  Let's have Mr. Safai return to us,

please, and retake his seat the witness stand.

Sir, you may just go ahead and take your seat and make yourself comfortable. And I will remind you that you remain under oath.

Counsel, are we ready to have the jury rejoin us?

**MR. ADENRELE:** Yes, Your Honor.

**MR. KRAVIS:** Yes, Your Honor.

**THE COURT:** All right. They'll be here in just a moment.

Please rise for the jury.

(Whereupon, the jury entered the courtroom at 10:39 a.m.)

**THE COURT:** Please be seated.

Mr. Kravis, your witness.

**MR. KRAVIS:** Thank you, Your Honor. May I approach the witness with a binder?

**THE COURT:** You may.

CROSS-EXAMINATION

**BY MR. KRAVIS:**

**Q.** Good morning, Mr. Safai.

**A.** Good morning.

**Q.** I just handed you a binder. It's got a few documents in it that I might ask you about this morning. They'll also appear on the screen, if that's easier for you.

Mr. Safai, I want to start by just asking you about a couple of those charts that you were shown on direct

examination.  Okay?

**A.**    Sure.

**Q.**    Let's a start with Government's Exhibit 431.  Now, Mr. Safai, you were shown this chart by the government on direct examination; right?

**A.**    Correct.

**Q.**    And I think I heard you testify that you yourself did not actually prepare this chart.  Did I hear that right?

**A.**    That is correct.

**Q.**    It was the government that prepared this chart; right?

**A.**    That is correct.

**Q.**    And I think you said the government showed it to you.  Do I have that right?

**A.**    Correct.

**Q.**    And you were relying on the government to accurately summarize the records here; right?

**A.**    That's correct.

**Q.**    Okay.  There's some stuff missing from this chart, isn't there?  Well, let's take a look together.

**A.**    Yes.

**Q.**    First, you can see here on the far left the chart says that Mr. Goldstein signed the promissory note on August 21st, 2018.  That's on the far left.  Do you see that?

**A.**    I do see that.

**Q.**    And, then, do you see how the next box over says,

"November 2018 to December 2020, nine payments on the Safai note"?  Do you see that?

A.   Yes.

Q.   I want to take a look at your bank records because I think there might be some payments missing on this chart.  So I'm going to direct you to Government's Exhibit 15.3.  It's in the binder in front of you.  Is it okay if you look at the binder while we view this on the screen?

A.   That's fine.

Q.   And I'm going to direct your attention to page BS-68 in Government's Exhibit 15.5.  Can you tell me when you're there?

A.   Say that again.  B?

Q.   BS-68.

A.   Six-eight?

Q.   Yeah.  The numbers are in the bottom right corner.

A.   Got it.  Got it.

Q.   Okay.  Do you see there at the top, there's a payment of $30,000 on September 5?  This is going to be September 5 of 2018.  Do you see that?

A.   Hold on a second.

Q.   It's also on the screen in front of you, if that's easier.

A.   Yeah.  I see it.

Q.   Okay.  And that's a payment from Goldstein & Russell.  Do you see that?

A.   Correct.

Q.   That's Mr. Goldstein's law firm; right?

A.   That's my understanding.

Q.   Okay.  So is this is a payment on September 5, 2018 of $30,000 to you from Mr. Goldstein; right?

A.   That's correct.

Q.   Okay.  This payment is not on the chart the government showed you, is it?

A.   I don't -- I honestly don't know.

Q.   Let's take a look again.

        MR. KRAVIS:  Can we have back Government Exhibit 431, please?

        THE WITNESS:  I didn't count the payments.  I don't know, so...

BY MR. KRAVIS:

Q.   No.  No.  Mr. Safai, I'm just asking you a different question, which is, this is a payment, what I -- we just saw in the bank records.  It's a payment from September of 2018; right?

A.   That's correct.

Q.   And if you look at Government's Exhibit 431, there's no payments listed on here from September of 2018; right?

A.   It starts in November, correct.

Q.   Right.  So you would agree with me, there -- on the chart the government showed you, that you're relying on the accuracy of the government, there's no payment?  That September 2018

payment, the government didn't put that on here, did they?

A.   It seems to be not included on this chart, if that's what you are saying.

Q.   Yes.

A.   Correct.

Q.   Let me show you another one.  Can you go back to those bank records, Government's Exhibit 15.3?

A.   15.3.

Q.   I'm going to direct your attention to BS-70.  That's two pages later.

A.   BS-70?

Q.   Yes.  In Government's Exhibit 15.3.

A.   Okay.

Q.   And we got it on the screen for you also, if that's easier.

A.   Yeah.  It's easier.

Q.   All right.  I'm going to direct your attention to the top of the page.  Do you see there, there's a $30,000 wire on October 1 of 2018?

A.   I see it.

Q.   You see that?

A.   Yes, I do.

Q.   That's from Thomas Goldstein; right?

A.   That's correct.

Q.   That's another payment that Mr. Goldstein made to you;

right?

**A.** That is correct.

**Q.** Okay. Let's go back to Government's Exhibit 431. That payment is also not on the chart; right?

**A.** It's not part of that box, correct.

**Q.** Right. So the chart that, you know, you said the government -- you relied on the government to have it accurate, the payment's not on there; correct?

**A.** Correct.

**Q.** Okay. I just want to ask you one more thing about this chart. Do you see how there's a box there that says "November 2018 to December 2020"? Do you see that?

**A.** Yes.

**Q.** And then you see how there's, like, nine little yellow circles there? Do you see that?

**A.** Yes.

**Q.** And do you see how the circles, they're all, like, kind of the same size on this chart?

**A.** Yes.

**Q.** One of these payments is actually much larger than the others, isn't it?

**A.** I do not --

**Q.** Well, again, I don't want to make you guess. Let's go back to the bank records. I'm going to show you -- if you could turn back to Exhibit 15.3.

**A.** Which page?

**Q.** BS-33. I've also got it on the screen, if that's easier for you. This is a payment from May 29. Do you see that?

**A.** Yes.

**Q.** And if you look in the top left corner of the document, do you see it says, "This is a payment from May 1, 2020 to May 31, 2020"? Do you see that?

**A.** Yes. Yes.

**Q.** Okay. So you understand that this May 29 payment is a payment from May 29, 2020; right?

**A.** Appears so.

**Q.** And this is another payment from Mr. Goldstein; right?

**A.** Yes.

**Q.** This is a payment for $200,000; right?

**A.** Correct.

**Q.** This payment is larger than those other $30,000 payments; right?

**A.** Yes.

**Q.** And if you turn back with me to Government's Exhibit 431, you would agree with me, when you look at those nine payments and you look at the little circles, the government's exhibit doesn't say anything about the $200,000 payment being larger than all the others, does it?

**A.** The balloon isn't larger, correct.

**Q.** Right. All right. Now, let's take a look at the other

government exhibit you were shown, the other chart.  This is Government Exhibit 40.

Mr. Safai, you remember looking at this one on direct examination, too?

A.   Yes.

Q.   And I think you said this chart was also one that was prepared by the government?  Do I have that right?

A.   Yes, you do.

Q.   And in this case as well, you rely on the government to get everything accurate in these charts?

A.   I didn't review them closely.  Yes.

Q.   Mr. Safai, this chart, poker payments, this does not tell the whole story, does it?

A.   I don't know what you mean.

Q.   Well, Mr. Goldstein continued making numerous payments to you after February 1 of 2018 that are not on this chart; is that true?

A.   I don't know.

Q.   Okay.  Well, let me just show you.  Again, I don't want you to guess.  I'll show you.

A.   Yeah.  Yeah.  Yes.

Q.   Let's go back to the bank statements.  I'm going to direct your attention to page 2 of the bank statements.  I'm going to take you back to Government's Exhibit 15.3.  And let me direct your attention actually, to page 4.  So this one has BS-19, is

in the bottom right-hand corner.

**A.**   Okay.

**Q.**   Okay.  Do you see on December 3rd of 2018, there's a $30,000 wire that you received from Thomas Goldstein?  Do you see that?

**A.**   Yes.

**Q.**   All right.  Can you go back to Government's Exhibit 40, please.

**A.**   BS-40?

**Q.**   Yes.  That December 3rd, 2018 payment of $30,000 is not on the chart the government showed you, is it?

**A.**   Doesn't appear so.

**Q.**   All right.  Let me take you back to the bank statements, Government's Exhibit 15.3 again.  I'm going to ask you to take a look at the page that is BS-21 of the bank statements.  We'll put it on the screen for you, too.

And do you see there, there's a payment on January 10 of 2019 in the amount of $30,000 from Mr. Goldstein to you?

**A.**   I see it.

**Q.**   All right.  I'm going to direct your attention back to the chart, Government's Exhibit 40.  That December 2019 payment for -- excuse me -- that January 2019 payment for $30,000, also not on the chart the government showed you.  Do I have that right?

**A.**   Appears so.

**Q.** I'm not going to walk you through the entire bank statement, Mr. Safai, but the fact of the matter is, there's over half a million dollars that Mr. Goldstein paid you after February 2018 that is not on this chart; right?

**A.** Appears so.

**Q.** Now, Mr. Safai, you use an accountant to handle tax issues relating to your gambling wins and losses; right?

**A.** Correct.

**Q.** You rely on the accountant's expertise to figure out how to treat that stuff, gambling wins and losses?

**A.** Correct.

**Q.** When you and Mr. Goldstein were playing each other during this time period, and paying each other back and forth, you were not sending, like, 1099s to each other, were you?

**A.** That's correct. We were not.

**Q.** In your experience, it's very uncommon in the poker community for losing players to send out 1099s to the winners; right?

**A.** Correct.

**Q.** Now, you were asked some questions about a gambling bank account. Do you remember those questions?

**A.** Yes.

**Q.** Mr. Safai, early in your poker career you would sometimes pay your gambling losses out of your company's bank account; right?

**A.** I don't recall that I did it out of that. I did it through an entity called a separate property account. But yes, they're all my accounts.

**Q.** Right. And you're the sole owner of that business, and so you can make personal payments out of the account; right?

**A.** I am the sole owner, yes.

**Q.** Yeah. And you didn't think there was anything wrong with that, did you?

**A.** As long as you claim it, no problem, I was told.

**Q.** Finally, Mr. Safai, you were asked some questions about Mr. Goldstein's games against a fellow named Alec Gores from late in 2016. Do you remember that?

**A.** I do.

**Q.** So just to be clear on this, you were not actually, like, present when Mr. Goldstein and Mr. Gores played each other. Do I have that right?

**A.** That's correct. I was not.

**Q.** Okay. And so, like, you know, how much money Mr. Goldstein won off of Mr. Gores, you don't have any firsthand knowledge of that; right?

**A.** No, not as present --

**Q.** Right.

**A.** -- if that's what you're asking.

**Q.** And you do not know whether Mr. Goldstein had investors in the game he played against Mr. Gores. Is that fair to say?

**A.**   No.  That's not fair to say.

**Q.**   Mr. Goldstein had investors?

**A.**   I was told he had.

**Q.**   And do you know how many investors he had?

**A.**   I do not.

**Q.**   Do you know who the investors were?

**A.**   I do not.

**Q.**   Do you know how much money the investors got out of those Gores winnings?

**A.**   I don't know how to break down those.

**Q.**   Now, you don't have any reason to believe that Mr. Goldstein had investors in the games he played against you, do you?

**A.**   I don't think he did.

**Q.**   And when Mr. Goldstein goes into a poker game, and he's got no investors, and he loses the money, those losses are all on him; right?

**A.**   That's correct.

**Q.**   Thank you, Mr. Safai.  That's all I have for you.

**A.**   You're welcome.

         **THE COURT:**  Thank you very much, Mr. Kravis.
    Does the government wish to do any redirect?

         **MR. ADENRELE:**  Absolutely, Your Honor.  Thank you.
                    REDIRECT EXAMINATION
**BY MR. ADENRELE:**

**Q.**   Mr. Safai, good morning again.

**A.**   Good morning.

           **MR. ADENRELE:**   If we could put up chart 491.
Exhibit 491.   I'm sorry.   Chart 431.

**BY MR. ADENRELE:**

**Q.**   Mr. Safai, if I heard correctly, there were a number of
questions about how large bubbles were.   Did you hear that?

**A.**   Yes.

**Q.**   And how many bubbles there were?

**A.**   (Nods heads up and down.)

**Q.**   Let's look at the bubbles that are here.   On the -- the
chart identifies a March 30, 2021 payment.   Do you see that?

**A.**   On the bubble?

**Q.**   Yes.

**A.**   Yes.

**Q.**   Do you remember that payment?

**A.**   I'd have to reference a document to remember it.

           **MR. ADENRELE:**   All right.   Give me one second.   If we
can go to Exhibit 15.3.   If we can go down to page 22.   If we
can zoom in on the March 30 transaction there.

**BY MR. ADENRELE:**

**Q.**   All right.   Mr. Safai, do you see that document?   Do you
see that transaction?

**A.**   Yes.

**Q.**   What date is that?

**A.** March 30th.

**Q.** What year?

**A.** 2021.

**Q.** All right. And if we can go to page 20. And, again, who is this from?

**A.** Tom Goldstein.

MR. ADENRELE: All right. If we can go down to page 24.

**BY MR. ADENRELE:**

**Q.** And do you see an April 30 payment there?

**A.** Yes, I do.

**Q.** Who is this from?

**A.** Thomas Goldstein.

**Q.** Is this -- I think you identified that this said Goldstein & Russell or was from Goldstein & Russell; is that right?

**A.** That's right.

**Q.** What is Goldstein & Russell?

**A.** I believe that's Tom's firm.

**Q.** So does this payment describe a payment -- and, again, this is a payment on the debt, on the poker debt to you?

**A.** This is correct.

**Q.** But it's coming from Mr. Goldstein's law firm?

**A.** Seems to be.

**Q.** Again, did Mr. Goldstein eventually pay -- did he ever pay

the full $6 million that he owed you?

**A.** Not the full amount, no.

**Q.** And how much did he owe at the point when he trans -- when you transferred the $6 million promissory note over to Mr. Ting?

**A.** Around 3 million, if I recall.

**Q.** And let's go over to Exhibit 40. And I believe on -- when you -- initially, when I was asking you questions, didn't you say that there were additional payments after February 1, 2018?

**A.** There was.

**Q.** And that was clear?

**A.** Yes.

**MR. ADENRELE:** No additional questions. Thank you.

**THE COURT:** Thank you very much, Counsel.

Have all questions been asked of the witness?

Does the government have additional questions of the witness?

**MR. ADENRELE:** I'm sorry, Your Honor. I'm sorry. Just a couple additional questions.

**THE COURT:** All right. Go ahead.

**MR. ADENRELE:** Thank you.

**BY MR. ADENRELE:**

**Q.** Now, on cross-examination from our friend, you used -- I think you identified that you use a separate account for your gambling?

**A.** I do have a separate account.

**Q.** And we looked at that account?

**A.** Correct.

**Q.** I think you also were asked if you ever used a business account to pay any gambling debts or pay any gambling losses. Did I hear that right?

**A.** You did. I believe so.

**Q.** And what was your answer to that?

**A.** I said, I don't recall if I had, but I really don't recall that I had, but I generally do not. I have a separate property account. In the beginning, I created the gambling account specifically for gambling.

**Q.** Now, whichever account you use for gambling, did you provide those -- as a matter of course, provide those accounts to your accountants in order to be able to pay your taxes?

**A.** A hundred percent.

**Q.** And specifically for your gambling account, do you provide that to your accountants to -- in order to pay your taxes?

**A.** Yes.

**Q.** I think you also mentioned you have assistants who work for you?

**A.** Yes.

**Q.** All right. Do your assistants have access to those accounts?

**A.** Yes.

MR. ADENRELE: No further questions. Thank you.

THE COURT: Thank you very much, Counsel.

MR. KRAVIS: Your Honor, may I briefly recross?

THE COURT: Yes. Very briefly. Go ahead, Mr. Kravis.

MR. ADENRELE: Objection, Your Honor. May we approach?

THE COURT: Yes.

(Whereupon, an off-the record discussion was held outside the presence of the jury as follows:)

THE COURT: We can go on the headsets.

All right. Do we have Mr. Kravis?

MR. KRAVIS: Yes, Your Honor.

MR. ADENRELE: Mr. Goldstein?

THE DEFENDANT: (Indicating thumbs up.)

THE COURT: Counsel for the government? Can you hear us?

MR. ADENRELE: I can hear you.

THE COURT: All right. So the request is to recross. What's the concern?

Go ahead, Counsel.

MR. ADENRELE: In terms of I'm not sure on which basis Mr. Kravis is able to recross here. We've had direct, recross and redirect. I'm not sure, in my redirect questions, the scope of Mr. Safai was direct, so I'm not sure on what

basis Mr. Kravis is allowed --

THE COURT: Well, okay. Let's hear what Mr. Kravis has to say.

MR. KRAVIS: One of the answers that the government elicited on redirect is inconsistent with a prior statement of Mr. Safai's. All I'm doing on recross is confronting him with that prior statement, and then I will later complete the impeachment with the IRS agent who interviewed him.

THE COURT: All right.

MR. ADENRELE: Your Honor, again, my redirect was within the scope of Mr. Kravis' cross. Simply to get up here and impeach him on something, I mean, probably immaterial, but that is not a reason to be able to do another cross-examination of this witness on another matter.

THE COURT: All right. Thank you, Counsel.

Mr. Kravis, anything else you want to say? And the Court's going to rule.

MR. KRAVIS: No. Thank you, Your Honor.

THE COURT: I'm going to give the defense a little latitude to give a recross. It's in discretion of the Court.

Thank you, Counsel.

MR. ADENRELE: Thank you, Your Honor.

(Whereupon, discussion concluded.)

RECROSS EXAMINATION

BY MR. KRAVIS:

**Q.** Just one more question for you, Mr. Safai.

**A.** Sure.

**Q.** I just want to make sure I have this clear. Early in your poker career, when you first started playing poker, did you pay poker losses out of your company bank account?

**A.** I do not recall doing that.

**Q.** Mr. Safai, do you remember being interviewed by the IRS in February of 2024?

**A.** Yes.

**Q.** And do you remember telling the IRS in that interview that you fully owned your company and that you were initially paying poker debts with your company account?

**A.** I don't recall that.

          **MR. KRAVIS:** Okay. Thank you, Mr. Safai.

          **THE COURT:** Thank you, Counsel.

     I believe all questions have been asked of this witness. We're going to allow the witness to step down at this time.

     Thank you.

          **THE WITNESS:** Thank you.

          **THE COURT:** You may be excused. Thank you for your time and testimony.

                         (Witness excused.)

                              - - -

          **THE COURT:** Is the government prepared to call its next witness?

MR. BEATY: Yes, Your Honor. I believe our next witness should take us through the afternoon lunch.

THE COURT: Do you want to get started now?

MR. BEATY: I would.

THE COURT: All right.

MR. BEATY: The United States calls Kevin Russell.

THE COURT: Thank you very much.

Mr. Russell, good morning. If you want to come all the way towards me, and then you're going to step over to the witness box which will be to your left. Please remain standing and the courtroom deputy will swear you in.

- - -

KEVIN RUSSELL, after having been duly sworn, was examined and testified as follows:

- - -

DEPUTY CLERK: Thank you. You may be seated. Please adjust the microphone, speak directly into the microphone and state and spell your first and last name for the record.

THE WITNESS: Kevin Russell. K-e-v-i-n. R-u-s-s-e-l-l.

DEPUTY CLERK: Thank you.

THE COURT: Counsel for the government?

DIRECT EXAMINATION

BY MR. BEATY:

Q. Good morning, Mr. Russell.

**A.**  Good morning.

**Q.**  You are the Russell in Goldstein & Russell?

**A.**  Yes.

**Q.**  Tell the jury a little bit about you yourself, please.

**A.**  I am an attorney.  I grew up in Michigan.  Went to law school, clerked for a couple years, including on the Supreme Court.  Worked in the Department of Justice in the civil rights division for about nine years and then went into private practice with Tom.

**Q.**  Where were you educated?

**A.**  Yale Law School and University of Michigan undergrad.

**Q.**  When did you become an attorney?

**A.**  I graduated in 1994, I believe.  It's been a while.

**Q.**  Are you still an attorney?

**A.**  I am.

**Q.**  And in what area of the law do you practice?

**A.**  I specialize in appeals in the federal courts and U.S. Supreme Court.

**Q.**  You said -- you mentioned the name "Tom."  Who is Tom Goldstein?

**A.**  He is my former partner at Goldstein & Russell.

**Q.**  And is that how you knew him?

**A.**  I had met him before I became partners, but, yeah, that's principally how I know him.

**Q.**  How long have you known him?

**A.** I worked at the firm -- I started at the firm in 2005. I met him a couple years before then.

**Q.** Who is Amy Howe?

**A.** Amy is Tom's wife and his former partner, my former partner at the law firm.

**Q.** And how long have you known Ms. Howe?

**A.** Since 2005.

**Q.** Again, you worked at a firm called Goldstein & Russell?

**A.** Correct.

**Q.** And tell the jury how you came to work for Goldstein & Russell?

**A.** There came a time, when I was working at the Department of Justice, I decided I wanted to move on, go into private practice. I wanted to continue to do appellate work. I had met Tom in relation to a case a couple years before where he was representing a private party. I was intervening on the case on behalf of the government.

I knew that he had a specialized appellate practice, including in the Supreme Court, and I reached out to him to get advice about where I could do that kind of work. And so happened that they were looking to hire somebody at that time.

**Q.** And we've talked about the firm Goldstein & Russell. But how did that name of the firm change over the years?

**A.** So when I joined the firm, it was Goldstein & Howe, Amy Howe. After I joined the firm, about a year later, Tom left

the firm to go to work for a firm called Akin Gump. And we renamed the firm, Howe & Russell.

At some period, Tom came back and rejoined the firm. And we changed the name to Goldstein, Howe & Russell. And then Amy left the firm to work full time for SCOTUSblog and we renamed the firm Goldstein & Russell.

Q. So let's talk about that iteration, Goldstein & Russell. In what area of law did Goldstein & Russell primarily practice?

A. As I've continued to do, it was federal appeals and then the U.S. Supreme Court.

Q. What is appellate practice like versus trial practice?

A. So it is dealing with, as the name implies, appeals. And we did appeals on a variety of subject matters: Civil cases, criminal cases, civil rights cases, security frauds cases. All kinds of things.

Q. And was the practice primarily domestic clients or international clients?

A. Primarily domestic. Later -- in later years, Tom had, I understood, some international clients that he helped with, although I don't know that they were doing appeals for them.

Q. Okay. You mentioned international clients. How many Russian-speaking clients did Goldstein & Russell have?

A. I'm not aware of any.

Q. How many cases did Goldstein & Russell handle in Russia?

A. I'm not aware of any.

**Q.** And what, if any, need did Goldstein & Russell have for a Russian translator?

**A.** I'm not aware of any.

**Q.** Okay. I'd like to show you Defense Exhibit 216.

**MR. BEATY:** And, Your Honor, I have a copy if you'd like.

**THE COURT:** Thank you.

**MR. KRAVIS:** Objection.

**THE COURT:** Let's come to the headsets, Counsel.

(Whereupon, an off-the record discussion was held outside the presence of the jury as follows:)

**THE COURT:** Mr. Kravis, are you on?

Mr. Kravis, can you --

**MR. KRAVIS:** Yeah. I'm sorry. Yes, Your Honor.

**THE COURT:** Okay. Mr. Goldstein?

**THE DEFENDANT:** (Indicating thumbs up.)

**THE COURT:** Counsel for the government?

**MR. BEATY:** I'm here.

**THE COURT:** All right. Mr. Kravis, go ahead.

**MR. KRAVIS:** Okay. So first, with the apologies for the interruption of the objection. The government provided us with some exhibits last night, and we reviewed them and gave our objections. They did not provide us with one in advance.

The witness on the stand is not on this e-mail. And I believe that this e-mail concerns the four employees that were

the subject of prior motions practice before the trial began.

I believe where we left that issue is that the Court was going to defer ruling on the admissibility of that evidence until we got in to the trial. We're continuing to object to it for all of the reasons set forth in our pretrial filings. I didn't object to the few questions about the Russian cases and so on. But if the government is going to start introducing evidence on this topic, we object, and we want to be heard on it.

THE COURT: All right. Counsel, there's a lot going on. First of all, what is this document?

MR. BEATY: Your Honor, this is the defendant's own document that they put on their exhibit list. To have any objection to this document now is silly. This is their document. It wasn't a government's document. They wanted it in trial, they get it. And we said, expressly, that we would give copies of all of the government's exhibits, the government's exhibits that we were going to use. It's -- didn't even cross our mind that using the defendant's exhibits would be a problem because they want them in.

Putting that aside --

THE COURT: All right. All right. Talk a little quieter on the mic because the jury can hear you. How is it coming in through this witness?

MR. BEATY: It's very straight forward, Your Honor.

I'm going to put this on in front of the witness, and he's going to testify as to what he knew about Mr. Goldstein's paying a translator $300 --

THE COURT: Okay. All right. But I'm, again, trying to understand how the document comes in to the witness. The author is Mr. Goldstein. Jon Levitan is the recipient. That's not who's on the stand. So how does the document come in through this witness?

MR. BEATY: Well, the question is simply, Your Honor, they're not arguing against the admissibility of this --

THE COURT: I'm asking you.

MR. BEATY: No. I understand.

The question is simply, if you don't want me to show it, Your Honor, I can just ask him these questions. But I think, in fairness to the jury, they should be able to see it. I think this objection is improper insomuch it is their own document, their own evidence.

THE COURT: All right. Well, you can ask the witness questions about what he knew about what was going on at the firm as it relates to, I guess, the hiring -- I'm not sure actually what you're asking.

MR. BEATY: Yep. It's exactly that, Your Honor. He has now testified that there was no need for a Russian translator as far as he knew. And the question is: What did he know about their being -- the accountants asking a question

about this person's wage being set at $30 an hour and that they would be working 30 hours a week?

I'm not getting into anything about the relationship. I'm not getting into anything beyond that. It's just, you're a partner at the firm. Did you know that they had a Russian-speaking translator, purportedly?

**THE COURT:** All right. Mr. Kravis?

**MR. KRAVIS:** Your Honor, we continue to object to this line of evidence. We filed motions on this.

I also just want to respond briefly on the exhibit list issue. I mean, as the Court, I'm sure, is well-aware, putting a document on an exhibit list is not the same thing as agreeing to its admissibility, certainly not with any witness who testifies at the trial.

On this particular issue, the defense did not document on its exhibit list because we weren't sure how the Court was going to rule on the admissibility of the evidence on this subject in light of the pretrial motions. But I let him -- I did not object to the first few questions. But further questions in this area, use of the document, we object for the reasons set forth in our pretrial motions.

**THE COURT:** All right. All right. I think I got it, Counsel.

Number one, I don't see how this document comes in through this witness, at least not now. If the witness worked at the

firm, he was a partner, you can ask him about what went on at the firm and about who they employed and why. We're not going to get into personal relationships with anyone right now. But the facts about who they employed and what they did, I think are okay.

Mr. Kravis, we'll have you back as we go forward and see where we are.

MR. KRAVIS: Thank you, Your Honor.

MR. BEATY: Thank you, Your Honor.

THE COURT: All right. And you need to tell your client, Counsel, to ask to approach the witness before they start walking across the room with water. Okay. He needs to ask me because I don't know what's going on.

MR. BEATY: Yes, Your Honor.

THE COURT: All right. Thank you.

MR. BEATY: Thank you.

Thank you, Your Honor.

(Whereupon, discussion concluded.)

BY MR. BEATY:

Q. Mr. Russell, what do you recall about Mr. Goldstein hiring a translator in October of 2018 for $30 an hour?

A. I'm not aware of that happening.

Q. Who was Mr. Levitan?

A. He was our office manager for a while.

Q. What was Mr. Levitan's role at the firm?

**A.** So the office manager would deal with kind of logistics of running the business, dealing with bills, paying bills, dealing with the landlord, interfacing with the accountants. Things of that nature.

**Q.** Okay. What did you know about Mr. Goldstein having a translator who was going to work at the firm, as of October of 2018, 30 hours per week?

**A.** I was not aware of that.

**Q.** What did you know as a partner of the firm about somebody working, that -- earning $900 a week as a translator?

**A.** I was not aware of that.

**Q.** Let's move on. How smart is Mr. Goldstein?

**A.** He's very smart.

**Q.** How sharp is his intellect?

**A.** He's a very keen intellect.

**Q.** How many people have you met who are smarter than Mr. Goldstein?

**A.** Oh, I meet a lot of very smart people in my business, but he's a very smart man.

**Q.** How quick of a study was he?

**A.** Quick a study, did you say?

**Q.** Yeah. How quick of a study?

**A.** He was very adept at picking up things quickly.

**Q.** How many times did you find yourself having to reexplain something to Mr. Goldstein until he finally understood it?

**A.** I mean, it could happen on occasion, but it was not common.

**Q.** And how secure did Mr. Goldstein appear to be in his own intellect?

**A.** He was very confident.

**Q.** Is it fair to say Mr. Goldstein often regarded himself as the smartest man in the room?

**MR. KRAVIS:** Objection.

**THE WITNESS:** I have no --

**THE COURT:** Let's -- I'm sorry. We need to go to the headsets.

(Whereupon, an off-the record discussion was held outside the presence of the jury as follows:)

**THE COURT:** Mr. Kravis, we have you on?

**MR. KRAVIS:** Yes. Thank you, Your Honor.

**THE COURT:** Just a moment. Do we have the government?

**MR. BEATY:** Yes, Your Honor.

**THE COURT:** All right. Mr. Goldstein, thumbs up?

**THE DEFENDANT:** (Indicating thumbs up.)

**THE COURT:** All right. Go ahead.

**MR. KRAVIS:** Your Honor, I didn't object to the first few questions about Mr. Goldstein's intelligence, but asking the witness to speculate about whether Mr. Goldstein thought that he himself was the smartest person in the room, that's

just speculating. There's no foundation for that.

I also think this is now both cumulative and prejudicial. The phrase "smartest person in the room" has a, I think, a distinctly pejorative ring to it. They got what they -- they got what they needed here. They should move on.

THE COURT: All right. Thank you. I tend to agree. Anything from the government?

MR. BEATY: Your Honor, I'm not asking to speculate. I'm asking, based on his own interactions and things that Mr. Goldstein said, what he perceived. I think he's allowed to do that under 701(a).

THE COURT: I think he is, and he has done so. Let's move on.

Objection sustained.

(Whereupon, discussion concluded.)

BY MR. BEATY:

Q. How skilled was Mr. Goldstein as a Supreme Court advocate?

A. He was very skilled.

Q. And how gifted was he as a writer?

A. He was quite a good writer.

Q. How impressive was Mr. Goldstein's ability to understand complex legal issues?

A. Very impressive.

Q. And how often did Mr. Goldstein struggle to understand foundational principles of the law?

**A.** Not very often.

**Q.** How many times did Mr. Goldstein say to you he just could not understand the plain text of the law?

**A.** I do not recall him ever saying that.

**Q.** And how many times did Mr. Goldstein just throw up his hands and proclaim that he could not understand a statute?

**A.** I don't recall that ever happening.

**Q.** What kind of access did Mr. Goldstein have to legal research tools?

**A.** He had access to the general tools that people use in the legal profession, yeah.

**Q.** And what kind of access did Mr. Goldstein have to some of the brightest minds in the legal community?

**A.** I mean, he had a handful of partners and a couple of associates that he could rely on. All of them were very talented.

**Q.** What role did Mr. Goldstein have in teaching others the law?

**A.** So he founded the Supreme Court litigation clinic at Stanford and Harvard Law Schools and was an instructor in them for many years.

**Q.** And how competent was he as a professor of the law?

**A.** I thought he was very competent.

**Q.** Now, we've talked about the law, but could Mr. Goldstein also work the toaster oven?

**A.** As far as I know, he could.

**Q.** Was he any sort of fragile genius who only excelled at the law?

**A.** No.

**Q.** Based on your perceptions, what you saw, did Mr. Goldstein also appear competent in other areas of his life?

**A.** Yes.

**Q.** Could he walk and chew gum at the same time?

**A.** I'm not sure I ever witnessed it, but I assume he could.

**Q.** Did you ever see Mr. Goldstein fail at anything to which he set his mind to do?

**A.** I can't -- nothing comes to mind.

**Q.** Let's talk about the firm a little bit more. Who owned Goldstein & Russell, the firm?

**A.** Tom.

**Q.** What percentage of Goldstein & Russell did you, Kevin Russell, own from 2011 to 2022?

**A.** None. Tom was the sole owner of the firm.

**Q.** And where geographically were Goldstein & Russell's offices, let's say, from 2013 to 2022?

**A.** I'm a little fuzzy on the dates. There was a period in which we were in Friendship Heights and that when that lease ran out, I think in -- I can't remember. But at some point we moved to Bethesda.

**Q.** Friendship Heights, is that D.C. or Maryland?

**A.** Maryland, I think. It's close to the border, but I think it was Maryland.

**Q.** And from which states do you hold a Bar license?

**A.** D.C. and Maryland.

**Q.** And from which state did Mr. Goldstein hold the license to practice law while he was at the firm?

**A.** I believe D.C. and Maryland.

**Q.** Now, where do you work now?

**A.** I work from home.

**Q.** For what firm?

**A.** Russell & Woofter is the name of the firm.

**Q.** When did Mr. Goldstein leave the practice of law?

**A.** 2023.

**Q.** What did he tell you about why he was leaving the practice of law?

**A.** At the time, he said that he had kind of grown tired of the practice of law and was going to do some other things.

**Q.** Switching topics a little bit, I want to cast your memory back to when you first come to work for Mr. Goldstein and his wife. Who hired you?

**A.** Tom did.

**Q.** I'm sorry. Who?

**A.** Tom.

**Q.** What was your title or role at the firm when you were hired?

**A.** My title was partner, and I worked as a partner at the firm.

**Q.** And who set your salary?

**A.** Tom.

**Q.** Now, while Mr. Goldstein was the owner of the firm, who made all of the hiring decisions?

**A.** Tom did in consultation with Amy and me and then the other partners later on.

**Q.** Who had the authority to fire employees?

**A.** Tom.

**Q.** Who was the rainmaker of the firm?

**A.** Tom.

**Q.** And the jury may have heard that term, but what does that term, "rainmaker," mean to you?

**A.** He brought in most of the clients.

**Q.** Who assigned cases to the attorneys at the firm?

**A.** So the cases that Tom brought in, he would figure out who should work on them. We also -- the other partners in the firm would bring in cases, and we typically worked on the cases that we brought in.

**Q.** And who negotiated the fees for those cases?

**A.** Typically the lawyer who brought in the case.

**Q.** Who oversaw all of the firm's loans and financing?

**A.** Tom.

**Q.** Who or what is Parabellum?

**A.** My understanding is that it is a litigation finance firm.

**Q.** And what role did Parabellum have in financing Goldstein & Russell's operations?

**A.** I don't know very much. I understand that they were involved to some extent and may have provided a lot of credit or loan to the firm at some point.

**Q.** What role did you have in negotiating terms of any line of credit with Parabellum?

**A.** None.

**Q.** What, if anything, do you know about Mr. Goldstein obtaining a personal loan from Parabellum?

**A.** I was unaware of that.

**Q.** How many personal loans did you take from Parabellum?

**A.** None.

**Q.** I'm sorry. How many?

**A.** None.

**Q.** Now, turning back to your time at Goldstein & Russell for that period of 2011 to 2022, who had sole responsibility for the financial decisions of the firm?

**A.** Tom.

**Q.** Who decided what bills would be paid?

**A.** Tom, I suppose, in conjunction with the office manager.

**Q.** Can you think of any major decision for the firm in which Mr. Goldstein was not involved?

**A.** Not at -- no truly major decision, no.

**Q.** I'm sorry. You --

**A.** I said no truly major decision.

**Q.** How many times did Mr. Goldstein not get his way?

**A.** In matters of the firm?

**Q.** Yes.

**A.** I'm not aware of any.

**Q.** How many times did the Goldstein & Russell staff disobey Mr. Goldstein's orders?

**A.** I'm not aware of that happening.

**Q.** Now, comparatively, what was Amy Howe's role at the firm?

**A.** So Amy was a partner at the firm. She was also very involved in the clinics and the running of SCOTUSblog until the point where she left the firm to go work exclusively for SCOTUSblog.

**Q.** And tell the jury what is SCOTUSblog?

**A.** It is a blog. It started off as a blog, but it's a website that covers the U.S. Supreme Court collected for time -- still collects, I think, the briefs filed in the cases. It provides stories covering the arguments and the opinion hand downs and things like that.

**Q.** So how did Mr. Goldstein and Ms. Howe divide the practice of law and of running SCOTUSblog?

**A.** When I joined the firm, they were just doing both. Later on, as the firm grew, as the blog became bigger and more sophisticated, they brought on some staff to work exclusively

for the blog. And as I said before, eventually Amy went to work exclusively at the blog.

Q. Roughly, when, did Ms. Howe distance herself from the firm and focus primarily on SCOTUSblog?

A. I believe 2011.

Q. To your knowledge, did the firm Goldstein & Russell ever represent Mr. Goldstein personally in any legal matter?

A. I'm not aware of that.

Q. Did the firm ever represent Ms. Howe personally in any legal matter?

A. I'm not aware of that.

Q. Before we move on, please help the jury with a sense of the size of the law firm Goldstein & Russell. How many attorneys were there generally over time?

A. When I joined, it was Tom, Amy and me and an office manager. I think at its height, we had five partners, two associates, a paralegal and an office manager.

Q. Who is Sarah Harrington?

A. She was another partner who joined the firm.

Q. Who is Daniel Woofter?

A. He was hired as an associate and became a partner just before the firm closed.

Q. How many paralegals did you say Goldstein & Russell had at any one time?

A. One.

Q. And how many office managers did the firm have at any one time?

A. One.

Q. Generally, how long did the office managers stay with the firm?

A. Typically, two years or so.

Q. And again, just broadly, how recently had these kids graduated from college?

A. They typically had just graduated or maybe had been out for a year or two.

Q. Now, the jury has heard some of these names. But what role what did Molly Runkle, Andrew Hamm, Jon Levitan and Angie Gou have at Goldstein & Russell?

A. They were all office managers.

Q. How many of those office managers had prior experience running an office?

A. I don't remember any of them having that.

Q. How many of the office managers had an accounting or finance background?

A. I don't recall that any had.

Q. Who is in charge of hiring the office managers?

A. Tom with the help of -- typically, the outgoing office manager would help, you know, go through resumes and make recommendations, but it was ultimately Tom's decision.

Q. And what was your understanding of the financial benefit

to the firm of hiring college kids right out of school?

**A.** They were less expensive and we probably got some young people who were very bright and more enthusiastic than if we had hired somebody more senior at that time.

**Q.** What, if anything, did you as a partner of the firm say to Mr. Goldstein about the need to hire more experienced, more professional office manager?

**A.** I just recall on one occasion when we were hiring a new office manager and the firm had gotten bigger, suggesting that we could think about hiring somebody who might stick around for longer and have more experience.

**Q.** And why did you recommend hiring a more experienced, more professional office manager?

**A.** I thought that, you know, it would help with having to go through the turnover all of the time, and it would help make sure that, you know, we had a more experienced person doing things. We had had a couple of problems with our 401(k), for example, compliance that maybe somebody who had been more experienced would not have had those difficulties with.

**Q.** What, if anything, did Mr. Goldstein do after you gave him that advice?

**A.** He did not hire a more experienced person.

**Q.** Let's switch topics a bit. What insight did you have into the firm's cash flow while Mr. Goldstein was in charge at Goldstein & Russell?

**A.** Typically, none. There were a couple of occasions when -- or at least one, earlier on, I think before this time period that we're talking about, when I was asked to delay getting paid my regular wages because we had a cash flow issue but, typically, I didn't have much insight.

**Q.** Okay. You said a lot there, so let's unpack that a little bit. How many times did Goldstein & Russell experience cash shortages?

**A.** I only recall specifically that one that I just mentioned.

**Q.** Okay. And we're going to come to that. But when there was a cash crunch, who would decide which creditors to pay and when?

**A.** Tom.

**Q.** And you mentioned a time that you -- you experienced or you were -- you experienced or were part of a cash crunch. Tell the jury about that, please.

**A.** I just think there was a period, again, I think it was before 2011, where there was just a cash flow issue and Tom asked if I could wait a couple weeks to get my usual paycheck, and I was like fine, and I got paid in a couple weeks.

**Q.** How often did Goldstein & Russell partner with other law firms?

**A.** Depends a little bit what you mean by partner. With almost all of our cases we were -- we worked with, you know, we're doing these appeals, and we were working with the law

firm that had represented the client in the trial court.  So pretty much every case we partnered in that sense.

Q.    Who or what was Robbins Geller?

A.    Robbins Geller is a plaintiff's side law firm.  Does a lot of securities fraud litigation, among other things.  And they brought us a series of appeals while I was there to do.

Q.    And who or what was Napoli Shkolnik?

A.    It is a plaintiff side -- I think they focus on mass torts -- firm.  And there was a similar situation where we had done a number of appeals on a number of occasions.

Q.    Okay.  So how does business with these firms work?  Who is paying who?

A.    So, typically, the law firm hires us and the law firm pays us to do the appeal.

Q.    Now, to your knowledge, how many times did Goldstein & Russell borrow money from a law firm called Robbins Geller?

A.    I'm not aware of any time.

Q.    And how many times did Goldstein & Russell borrow money from a law firm called Napoli Shkolnik?

A.    I'm not aware of that ever happening.

Q.    To your knowledge, how many times did Mr. Goldstein personally borrow money from Robbins Geller?

A.    I'm not aware of that ever happening.

Q.    And how many times did Mr. Goldstein personally borrow

money from Napoli Shkolnik?

**A.** I'm not aware of that ever happening.

**Q.** Okay. Let's switch topics again.

Have you ever played poker with Mr. Goldstein?

**A.** Yes.

**Q.** Who taught you how to play poker?

**A.** I think Tom may have.

**Q.** And when you first joined Mr. Goldstein's firm, how often would the firm host poker nights?

**A.** A few times a year.

**Q.** How high were the stakes in those games?

**A.** I don't recall that being -- having money stakes. I think we just played tournaments.

**Q.** Now, at some point, did Mr. Goldstein start playing higher stakes?

**A.** I understand that he did.

**Q.** Okay. Tell the jury how you know that.

**A.** I just remember him telling me on occasions that it wasn't a particular secret that he, you know, got interested in poker and was playing in poker games for money.

**Q.** Was the company PokerStars also a client of the firm?

**A.** It was at one time.

**Q.** That's the company that first hosted the World Series of Poker?

**A.** Possibly. I don't know.

**Q.** Who brought in PokerStars as a client?

**A.** Tom.

**Q.** Who is Paul Phua, spelled P-h-u-a?

**A.** He was a client of the firm who hired us to help him when he was prosecuted for -- my understanding was, prosecuted for running an illegal gambling operation out of a casino -- or out of a hotel in Las Vegas.

**Q.** What's your best recollection as to whether Mr Phua became a client of Goldstein & Russell?

**A.** My recollection is pretty vague, but I think maybe 2014, 2015, something like that.

**Q.** And in what line of business was Mr. Phua, as you understood it?

**A.** I understood that he owned, you know, gambling interests around the world.

**Q.** How many times did you meet Mr. Phua?

**A.** I never him.

**Q.** I'm sorry?

**A.** I never him.

**Q.** What was your understanding of Mr. Phua's connection to the country Montenegro?

**A.** I don't recall knowing that he had a connection. Well, actually, no. I think maybe at some later point Tom mentioned going there to meet with him. I think maybe he had some gambling operations there.

**Q.** What, if anything, did Mr. Goldstein tell you about whether he had ever played poker with someone named Kevin Hart?

**A.** He never said that he had.

**Q.** What, if anything, did Mr. Goldstein tell you about whether he had become acquaintances with someone named Tobey Maguire?

**A.** I have a vague recollection that he mentioned meeting him.

**Q.** To your understanding, was Mr. Goldstein's connection to Mr. Maguire personal or professional?

**A.** Again, my recollection is very vague, but I think it was personal.

**Q.** What, if anything, did Mr. Goldstein say to you about whether he ever represented Mr. Maguire as a client?

**A.** I don't recall him saying that.

**Q.** Now, at some point while you were working together, did you grow concerned about Mr. Goldstein's poker activities?

**MR. KRAVIS:** Objection.

**THE COURT:** Let's come to the headset, Counselor.

(Whereupon, an off-the record discussion was held outside the presence of the jury as follows:)

**THE COURT:** Mr. Kravis, are you on?

**MR. KRAVIS:** Yes, Your Honor.

**THE COURT:** Mr. Goldstein?

**THE DEFENDANT:** (Indicating thumbs up.)

**THE COURT:** We have counsel for the government,

Mr. Beaty? Just a moment.

Counsel, can you hear us?

MR. BEATY: I can. Sorry. I lost the headset.

THE COURT: That's okay.

Let's go ahead. Mr. Kravis?

MR. KRAVIS: My objection is relevance and prejudice. I don't know what this witness's concern or a lack of concern about Mr. Goldstein's poker playing has anything to do with the charges in the indictment.

THE COURT: Counsel for the government?

MR. BEATY: Well, I think everyone knows what the poker playing has to do with the charges in the indictment. The testimony will develop. Mr. Goldstein told Mr. Russell that he was deep in debt, and then said he was going to stop playing poker. It's directly relevant to what Mr. Gold -- Russell then knew.

THE COURT: Mr. Kravis?

MR. KRAVIS: Okay. I still don't get it. If he wants to ask whether Mr. Goldstein told Mr. Russell that he was in debt at a particular period of time, that may or may not be relevant depending on the time period and the nature of the debt. If Mr. Goldstein told Mr. Russell that he was going to stop playing poker, that's not relevant to anything. It just doesn't have to do with any of the tax charges.

THE COURT: All right. Counsel, you can ask him

about the debt. I'm not really sure about the poker playing. I tend to agree with the defense.

MR. BEATY: Thank you, Your Honor.

THE COURT: All right. Thank you.

(Whereupon, discussion concluded.)

BY MR. BEATY:

Q. Mr. Russell, what did Mr. Goldstein tell you about the debts he had accrued in connection with playing poker?

A. I believe he told me -- there came a time, back in 2011 when the firm owed me a fair amount of money out of a contingency that we had gotten, and Tom asked for some time to pay it off. I believe at that time he mentioned it was necessary because he had -- had some significant poker losses. I don't recall if he said at that time that he owed money, but that's what I recall.

Q. Based on that conversation, what was your understanding of how deep in debt Mr. Goldstein was in connection to poker?

A. I did not --

MR. KRAVIS: Objection.

THE COURT: All right. Let's come to the headsets.

(Whereupon, an off-the record discussion was held outside the presence of the jury as follows:)

THE COURT: Mr. Kravis?

MR. KRAVIS: I'm here. Thank you, Your Honor.

THE COURT: Mr. Goldstein?

THE DEFENDANT: (Indicating thumbs up.)

THE COURT: Counsel for the government?

All right. Go ahead, Mr. Kravis.

MR. KRAVIS: Okay. Well, now my objection is both vagueness and relevance. The witness just testified to a conversation that occurred in 2011. His understanding about Mr. Goldstein's debts in 2011 is not relevant to anything in this case. That is years before the charged time period.

If the question is about a later time period, then I think there's no foundation because the only testimony he's given about conversations with Mr. Goldstein about a poker debt is well before the charged time period. We just heard it.

THE COURT: All right. Thank you. Before I hear from the government, I do think the chronology is important and also just for clarity with the jury in terms of what we're talking about.

Mr. Beaty, go ahead.

MR. BEATY: Your Honor, he testified about a conversation Mr. Goldstein had. The question now is simply what -- rounding out that conversation. He's already talked about it. But the question was --

THE COURT: Well, when did the conversation happen? Did it happen in 2011?

MR. BEATY: It did happen in 2011.

THE COURT: Okay. Then I'm not understanding how

it's relevant.

MR. BEATY: Your Honor, it goes to establish, as again the next question will -- might impact and jump to the next question. But the next question is: What did Mr. Goldstein tell you? Now that he's had this, what did Mr. Goldstein tell you he was going to do, and what he said in 2011, which goes to his willfulness in the later years because --

THE COURT: Okay. I think we need to get into the timeframe of the charges. We're now a decade before that, from what I'm hearing -- or, you know -- well, up to a decade before that.

So, if this conversation was 2011, I agree with the defense and we should move forward.

MR. BEATY: Thank you Your Honor. Appreciate it.

MR. KRAVIS: Thank you.

THE COURT: Thank you.

(Whereupon, discussion concluded.)

BY MR. BEATY:

Q. Okay. So let's turn back to -- then to the operations of Goldstein & Russell. Who is responsible for the daily finances of the office? Paying the bills, taking in checks, et cetera.

A. The office manager.

Q. I'm sorry?

A. The office manager.

Q. What kind of access did you have to the Goldstein & Russell bank accounts?

A. I think it varied over time. I believe I was like a signer on the account for some periods. But typically, I didn't -- if I had access to actually looking at the records or anything, I didn't do it.

Q. For how many of the Goldstein & Russell accounts did you not have signatory authority?

A. I mean, to my knowledge, there was only two accounts, and then I eventually heard about a third one. But the operating account and the IOLTA account. I believe that when we moved to Bethesda, I have a vague recollection of -- we were setting up accounts at a new bank, and I think I was a signer for both of those accounts.

Q. Okay. What kind of access did Mr. Goldstein have to the firm's bank accounts?

A. I presume he had open access to them.

Q. Were there any firm accounts to which Mr. Goldstein did not have access?

A. I'm not aware of any.

Q. Now, as an attorney barred by the State of Maryland, you're required to follow Maryland's ethics rules?

A. Correct.

Q. Are you familiar with the term "IOLTA"?

                MR. KRAVIS: Objection.

THE COURT: Let's come to the headsets, Counsel.

(Whereupon, an off-the record discussion was held outside the presence of the jury as follows:)

THE COURT: Mr. Kravis?

MR. KRAVIS: I'm here, Your Honor.

THE COURT: Mr. Goldstein, thumbs up.

THE DEFENDANT: (Indicating thumbs up.)

THE COURT: Mr. Beaty?

All right. Go ahead, Mr. Kravis.

MR. KRAVIS: Your Honor, asking this witness about legal ethics rules regarding IOLTA accounts is improper. This is effectively undisclosed expert testimony. The government is trying to elicit opinions from the witness about legal ethics rules and how they apply to IOLTA accounts. If this government wanted to do that through this witness, they had to disclose them as an expert, and then we would have disclosed a rebuttal expert.

THE COURT: All right. Mr. Beaty, where are we going with IOLTA testimony?

MR. BEATY: Your Honor, Mr. Russell was the -- I think it's called the -- I'm struggling to find the word -- is the reporting attorney for the IOLTA account. And the question is simply: What was your understanding, and what were the restrictions as -- and, again, I'm not asking for his legal testimony. I'm asking for what was his understanding of what

he was allowed to do with the IOLTA account.

THE COURT: What he was allowed to do with it based on what?

MR. BEATY: Yes, Your Honor.

THE COURT: His role as what?

MR. BEATY: As the -- what he or the firm was allowed to do. The point is, what money goes in there. And it is something that is expressly charged in the indictment. It's what's --

THE COURT: All right. But the basis for him being able to respond is, what? His personal knowledge from serving in that role as the firm's IOLTA person?

MR. BEATY: Entirely based on that.

THE COURT: All right. Then I think you can lay that out a little bit more clearer. I'm not even sure that's clear to me or the jury. And then the question has to be based upon his personal experience and knowledge, not an expert.

MR. BEATY: Can do.

THE COURT: All right. Thank you.

MR. BEATY: Thank you, Your Honor.

(Whereupon, discussion concluded.)

BY MR. BEATY:

Q. Mr. Russell, what is the term "reporting attorney" in conjunction with an IOLTA account? What is that?

A. So that is -- just somebody has to fill out a piece of

paper every year identifying to the Maryland Bar the account number for the firm's IOLTA account.

Q.   Okay.  And as the reporting attorney, did you have to familiarize yourself with the role or how the IOLTA account could be used?

A.   I'm sorry.  Can you say that again?

Q.   Sure.  As the reporting attorney, did you also have to be familiar with how the IOLTA account was to be used?

A.   I don't think so.  I think the reporting obligation was simply filling out this form and saying what the account number was.

Q.   Then let's change questions a little bit.  How often did you deposit your own personal funds into the Goldstein & Russell IOLTA account?

        MR. KRAVIS:  Objection.

        THE COURT:  Let's come to the headsets, Counsel.

    (Whereupon, an off-the record discussion was held outside the presence of the jury as follows:)

        THE COURT:  Mr. Kravis, are you on?

        MR. KRAVIS:  I'm on.

        THE COURT:  Mr. Goldstein?

        THE DEFENDANT:  (Indicating thumbs up.)

        THE COURT:  Mr. Beaty?

    Go ahead, Mr. Kravis.

        MR. KRAVIS:  The objection is relevance.

THE COURT: Mr. Beaty, the objection is relevance. Why is it relevant? Go ahead.

MR. BEATY: Because the evidence will show that Mr. Goldstein did, in fact, do it and the jury should be able to hear --

THE COURT: Do what? Do what?

MR. BEATY: Did put his own personal funds through the IOLTA account. There was even a reference to it in the opening statement. I know how Your Honor feels about that in terms of opening doors. But the evidence will show that Mr. Goldstein did put it through. And thus, it's fair to ask, you know, why, what happened there. And part of what the jury can hear under the general 401 probative standard is whether anybody else did it and Mr. Russell didn't.

THE COURT: So you're asking Mr. Russell whether he did this. He says no. Then where are we going after that?

MR. BEATY: I'll ask him why he didn't.

THE COURT: Why he personally did not do that?

MR. BEATY: Yeah. Why personally.

THE COURT: Mr. Kravis, anything else from you?

MR. KRAVIS: I still don't think it's relevant. One person did something. One person didn't do something. That's not probative of any fact in dispute in the case.

THE COURT: All right. I'm going to allow the questioning.

Thank you, Counsel.

MR. BEATY: Thank you.

(Whereupon, discussion ended.)

BY MR. BEATY:

Q. Mr. Russell, how often did you deposit your own personal funds into the Goldstein & Russell IOLTA account?

A. Never.

Q. Why not? From your -- why did you personally not do that?

A. I would have no reason to.

Q. Now, how did the office managers reconcile the firm's bank accounts with the firm's books and records?

A. I mean, I wasn't involved in that. I know that they interfaced with the accountants.

Q. What kind of software did they use, if you know?

A. I believe they had QuickBooks.

Q. And who from your firm was charged with making sure that the bank reconciliation was done correctly?

A. The reconciliation between QuickBooks and the bank accounts?

Q. Yes, sir.

A. I assume the office manager or I would say the accountants. I'm not sure.

Q. Sitting here today, you just don't know?

A. I just don't know.

Q. Now, again, what role did you have in the interactions

between the office managers and the outside accountants at Gelman, Rosenberg and Freedman?

**A.** I don't recall that name, and I don't recall having any interactions with the accountants.

**Q.** Okay. How often did you open up the QuickBooks and review the accounting entries?

**A.** I don't believe I ever did.

**Q.** Okay. Fair to say we should be asking somebody else about that?

**A.** Yes.

**Q.** I'm sorry?

**A.** Yes.

**Q.** And again, how often did you make any changes to the QuickBooks records?

**A.** I don't recall ever doing that.

**Q.** But stepping back, as a partner of the firm, why was it important to keep track of the money coming into the firm?

**A.** You needed to keep track in order to be able to fill out your taxes, pay your bills.

**Q.** Why would diverting client payments to a personal bank account make it more difficult for the accountants?

**A.** It's just one more thing to keep track of.

**Q.** How many times did you personally direct a client of Goldstein & Russell to make a payment to your personal bank account?

**A.** Never.

**Q.** And why?

**A.** The money was owed to the firm, not to me.

**Q.** How many times did you tell a client to pay you in cash?

**A.** Never.

**Q.** How many times did a client offer to pay you, Kevin Russell, in cash?

**A.** Never.

**Q.** How many times did you enter the country with a duffle bag full of cash?

**A.** Never.

**Q.** How many times did you direct a client to pay someone else instead of making a payment to the firm?

**A.** Never.

**Q.** And why not?

**A.** Wouldn't be any reason to.  It would complicate the accounting.

**Q.** Now, I just asked you about bringing a lot of cash in from another country.  Who is the only person you know who did that?

**A.** I recall Tom recounting bringing in a duffle bag full of cash.

**Q.** When you say "recounting," Tom told you he did it?

**A.** Yes.

**Q.** I'm sorry?

**A.** Yes.

**Q.** Now, where was Mr. Goldstein coming from when he brought a bunch of cash in from overseas?

**A.** I don't recall exactly. I believe it was from Asia.

**Q.** How much cash are we talking about?

**A.** It was many hundreds of thousands of dollars.

**Q.** Did you personally see the cash?

**A.** No.

**Q.** How much, if any, of the firm's assets were held in cryptocurrency?

**A.** I'm not aware of any.

**Q.** And how many of the firm's clients offered to pay in cryptocurrency?

**A.** I wouldn't have been privy to those conversations, but I'm not aware of any.

**Q.** None of your clients did?

**A.** Not to me.

**Q.** What, if anything, did Mr. Goldstein tell you about whether he personally began buying or holding cryptocurrency?

**A.** I don't recall him ever discussing that.

**Q.** Now, we've talked about income a little bit. So now let's talk about expenses. Other than what Mr. Goldstein said he could not pay you, what insight, if any, did you have into Mr. Goldstein's personal finances?

**A.** Personal finances?

**Q.** Personal finances.

**A.** Not much. I mean, I was aware of some of his spending, but I had no insight into his bank accounts or anything like that.

**Q.** To the extent you had insight into his spending, was that because you saw him with a thing or saw him buy a service?

**A.** Yes.

**Q.** What kind of access did you have to Mr. Goldstein's firm credit card statements?

**A.** I did not have access to it.

**Q.** How often did you review the credit card billing records for the firm to determine whether any purchase was business or personal?

**A.** I did not do that.

**Q.** Who was responsible for doing that?

**A.** I assume the office manager.

**Q.** What kind of car did the firm provide for you?

**A.** It did not provide a car.

**Q.** What, if any, car did the firm provide for Mr. Goldstein?

**MR. KRAVIS:** Objection.

**THE COURT:** Let's come to the headsets, Counsel.

(Whereupon, an off-the record discussion was held outside the presence of the jury follows:)

**THE COURT:** Mr. Kravis, are you on?

**MR. KRAVIS:** I'm here.

**THE COURT:** Mr. Goldstein?

THE DEFENDANT: (Indicating thumbs up.)

THE COURT: All set, Mr. Beaty?

Mr. Kravis, go ahead.

MR. KRAVIS: The objection is relevance and prejudice. This is an issue that the government explored at length in its investigation, whether it was somehow improper to treat one of Mr. Goldstein's -- a particular vehicle as a business expense. The government never charged it. They didn't include it in any 404(b) notice. It's completely improper to start getting into that now.

THE COURT: Mr. Beaty?

MR. BEATY: Your Honor, it's just part of the -- part of understanding the lifestyle, but more -- and it's not particularly prejudicial. It's a Tesla and it's not that special. It's just he's the only person at the firm who had one and that's why it's relevant.

THE COURT: Okay. So what are you asking this witness to say?

MR. BEATY: What kind of car did he have and did anyone else drive it? That's it.

MR. KRAVIS: If it's a firm car, then I don't see why it's relevant to Mr. Goldstein's spending. I mean, the whole theory of the lifestyle evidence is that Mr. Goldstein was spending money on things other than paying his taxes. If this is a firm car, not even that.

**THE COURT:** All right. Counsel, keep the volume down a little bit so that the jury is not hearing us. I think I understand the issue. I'm going to allow the questioning, and the defense can make that point on cross.

**MR. BEATY:** Thank you, Your Honor.

**THE COURT:** Thank you.

(Whereupon, discussion concluded.)

BY MR. BEATY:

**Q.** What, if any, car did the firm provide Mr. Goldstein?

**A.** I recall that there was a point at which I was told that the firm had rented or leased a Tesla that Tom was driving.

**Q.** You said a Tesla?

**A.** Correct.

**Q.** Do you know which model it was?

**A.** I believe it was a Model S.

**Q.** Who, besides Mr. Goldstein, did you see operate that Model S Tesla?

**A.** I don't recall seeing anybody else.

**Q.** And then what was your understanding of who was paying for that Tesla?

**A.** My understanding was that it was the firm.

**Q.** Now, notwithstanding the cash crunch that you had told us about, would you describe Mr. Goldstein, based on your own perceptions, as poor?

**A.** No.

**Q.** How many times did Mr. Goldstein express concern that he could not make ends meet?

**A.** I don't recall him ever saying that.

**Q.** How many times --

THE COURT: Mr. Russell, I'm sorry. I'm going to need you to speak up a little bit more loudly and speak directly into the microphone. Thank you.

BY MR. BEATY:

**Q.** How many times did Mr. -- did you observe Mr. Goldstein forego something that he wanted because he didn't have the money?

**A.** I don't recall that.

**Q.** How many times did Mr. Goldstein say he could not afford his groceries or mortgage?

**A.** I do not recall him ever saying that.

**Q.** And how many times did Mr. Goldstein tell you, "I'm broke"?

**A.** I don't recall him ever saying that.

**Q.** Now, switching topics again. What kind of insight do you have into the firm's annual profitability while Mr. Goldstein was at the firm?

**A.** I don't, in general, know. It may be in some random year he may have mentioned that we had a good year or a bad year. I don't ever recall there being a bad year, but he may have mentioned something along those lines.

**Q.** Who interfaced, who interacted with the firm's outside accountants, Gelman, for the preparation of the firm's tax returns?

**A.** I'm don't have any knowledge. I assume it was the office manager and Tom.

**Q.** It was not you?

**A.** It was not me.

**Q.** Sorry?

**A.** It was not me.

**Q.** Who chose Gelman as Goldstein & Russell's outside accountant?

**A.** I don't know.

**Q.** What role did you have in doing that?

**A.** None.

**Q.** And again, how often did you interact with the law firm's outside accountants?

**A.** Never, as far as I can recall.

**Q.** And who was ultimately responsible for making sure that any taxes owed by the firm were paid?

**A.** Tom.

**Q.** Who?

**A.** Tom.

**Q.** Do you know whether Goldstein & Russell was a passthrough entity or a standalone entity for taxes?

**A.** I believe it was a passthrough.

**Q.** And was Goldstein & Russell a cash basis or accrual basis?

**A.** I don't know.

**Q.** Who signed Goldstein & Russell's partnership returns each tax year?

**A.** I don't know.

**Q.** It wasn't you?

**A.** It wasn't me.

**Q.** Who swears under the penalties of perjury that your firm, Russell & Woofter's, annual tax returns are accurate and true?

**A.** I believe it is me and my partner.

**Q.** Tell us a little bit about the e-mail system that Goldstein & Russell had while you were a member of that firm.

**A.** We just had an Outlook e-mail system. There was some server somewhere that it was run on.

**Q.** Start with the basics. What was the e-mail domain after the "@" symbol that Goldstein & Russell used?

**A.** Well, it changed when the firm names changed. It was always, basically, the firm name. So it was Goldstein & Russell.com.

**Q.** And who was the e-mail service provider?

**A.** I don't know.

**Q.** What program did you use to access e-mails on your computer?

**A.** Outlook.

**Q.** And again, was that through a web portal of Outlook or was

that just residing on your computer, an app?

**A.** It was on my computer. I believe we had access through a website, too, but I did not use it.

**Q.** Okay. Let's look together at Government's Exhibit 12.

**MR. BEATY:** Would you like a copy?

**THE COURT:** Yes.

**MR. KRAVIS:** Objection.

**THE COURT:** Let's come to the headsets, Counsel.

**MR. KRAVIS:** Can we take the exhibit down?

**MR. BEATY:** Sure.

(Whereupon, an off-the record discussion was held outside the presence of the jury as follows:)

**THE COURT:** Mr. Kravis, are you on?

**MR. KRAVIS:** I'm present.

**THE DEFENDANT:** (Indicating thumbs up.)

**THE COURT:** Mr. Goldstein's thumb is up. Mr. Beaty, go ahead -- I'm sorry. Mr. Kravis, go ahead.

**MR. KRAVIS:** My objection is lack of foundation. This is -- the using this document with this witness.

**THE COURT:** All right. Well, let's start with Mr. Beaty. What is the document?

**MR. BEATY:** Your Honor, this is a document that was produced by Munger Tolles. It is a draft e-mail that was in Mr. Goldstein's outbox.

Now, the government expressly put this on its list and we

identified this for Mr. Kravis and -- but what we explained is, if he was going to have an objection to this exhibit, we were going to have to call somebody from Munger Tolles to authenticate if the document -- I understand now that they're not saying it's a problem with -- a problem with authenticity, but they are -- but we were told that there was no objection to this exhibit.

THE COURT: All right. So this is a draft e-mail drafted by whom? Mr. Goldstein?

MR. BEATY: Yes, Your Honor. And it's in -- and it was in his out file -- or -- excuse me -- in his drafted folder or his deleted file when it was produced to the United States.

The questions are simple. There are statements of a party opponent, Mr. Goldstein, that are in here. And the question is simply, what Mr. Russell knew about those statements.

THE COURT: Well, has Mr. Russell ever seen this document before?

MR. BEATY: I don't think anyone other than Mr. Goldstein has, Your Honor. I mean, we can -- we would -- well, the only other way to do this was, we would have to call somebody from Munger Tolles to testify that they produced it, and then it would be admitted as a statement of party opponent. I mean, this is a longstanding problem.

But it is, in of itself, admissible. And because it is admissible, there's nothing -- once it is admissible, there's

nothing wrong with having another witness look at a exhibit and say, "I knew this.  I didn't know that."

THE COURT:  Mr. Kravis?

MR. KRAVIS:  So, I mean, I don't agree with that last part.  There's no dispute to the authenticity of the exhibit. We're not saying they have to call somebody from the firm to authenticate that it came from the e-mail account.

My objection is using it with this particular witness. The witness has never seen this document before, and so I don't think it's appropriate to start questioning him about it.

If the government has some concerns about how to get in the document in light of its status, you know, we can figure that out.  But I don't think it's appropriate to just start asking a witness questions about statements in a document he's never seen before.

THE COURT:  All right.  Well, I do think there's an issue about the foundation that's coming through the witness. So you can either lay that foundation to explain why this witness can talk about the e-mail or you can just ask him, based upon his role as a partner in the firm, whether he knows about the topics in here.  All right.  Now I don't see how it's coming in through the witness.

MR. BEATY:  May I clarify?  Just Clarify?

THE COURT:  Yes.  Please.

MR. BEATY:  So two questions.  One -- first of all, I

just have to make the point that we were expressly told there was to objection to it and this is changing that. Things change, that's fine. But I don't want to be here later if the government reassess a new objection to something when we had an agreement.

Two, we will have to figure out how to put it through.

Three, my suggestion, Your Honor, is I won't publish it to the jury. I would like to be able to put it on the stand -- put it on in front of the witness and ask him what he knew about various topics in it. And I think that's a fair compromise here.

THE COURT: All right. Mr. Kravis?

MR. KRAVIS: Nobody is changing their position on anything. They asked me if we were disputing the authenticity of the exhibit, and I said no. They never asked me if they could put the document in front of Kevin Russell.

THE COURT: All right.

MR. BEATY: That's absolutely not true.

THE COURT: All right. Counsel -- Counsel.

MR. BEATY: I'm pulling up the right now --

THE COURT: Counsel, that's not going to solve the issue right now. The question for the Court is, Mr. Kravis, do you have an objection to the witness reviewing the document, not publishing it to the jury, but reviewing the document during the government's next line of questioning?

MR. KRAVIS: If the document is not being published to the jury through this witness, then I do not have an objection to it.

THE COURT: All right. So you can show the witness the document, Mr. Beaty. We're not going to publish it and it's not coming in through this witness, at least at this point because there's not sufficient foundation.

MR. BEATY: I understand that, Your Honor. I will also show you the e-mail that we received from their attorney, Mr. Mohammadi saying that there was no objection to this.

THE COURT: All right. Well, for now, I will just accept that it's your representation, and you can show the document later.

MR. BEATY: Thank you, Your Honor.

THE COURT: All right. Thank you, Counsel.

MR. BEATY: Will the clerk help make sure that's not published?

THE COURT: Yes. It's not going to be published. You're just going to hand it up or put it on the screen so the witness can see it.

MR. BEATY: Thank you, Your Honor.

THE COURT: All right. Thank you.

(Whereupon, discussion concluded.)

THE COURT: Oh, and actually, Mr. Beaty, let's come back on for just one more second.

(Whereupon, an off-the record discussion was held outside the presence of the jury as follows:)

THE COURT: All right.

MR. BEATY: Ten minutes.

THE COURT: We are into twelve o'clock, so we can we wrap this up in ten minutes or so, and then we'll break for lunch?

MR. BEATY: Got you.

THE COURT: All right. Mr. Kravis, you're okay with that schedule?

MR. KRAVIS: Yes. Thank you, Your Honor.

THE COURT: All right. Thank you.

(Whereupon, discussion concluded.)

BY MR. BEATY:

Q. Okay. Mr. Russell, are you still able to see a document on your screen?

A. Yes.

Q. Okay. What, if any, work did Mr. Goldstein do -- or your firm, for that matter -- do for a company called POM Wonderful?

A. I recall doing at least one and I think two appeals for POM Wonderful, the firm doing it, not me.

Q. And what, if anything, did you know about Mr. Goldstein having a line of credit with people called the Resnicks?

A. I was not aware of that.

Q. Do you know who the Resnicks were?

**A.**   I believe they are the owners of POM Wonderful.

**Q.**   What do you recall about whether Mr. Goldstein was doing work in an FTC case, Federal Trade Commission case, for POM Wonderful?

**A.**   So I think that was one of the appeals.  There was a case brought against POM Wonderful by the FTC, and I think we handled the appeal in the D.C. circuit.

**Q.**   And what did Mr. Goldstein tell you about the fact he was doing free legal work for the Resnicks?

**A.**   I don't recall him ever mentioning that.

**Q.**   What, if anything, do you know about how large of a line of credit Mr. Goldstein had with the Resnicks?

**A.**   I was not aware that he had one.

**Q.**   Okay.  Showing you paragraph 3 of Exhibit 12 marked only for the witness.

     What, if any, discussions did you have with Mr. Goldstein regarding the taxes he was going to owe for 2016?

**A.**   I don't recall having any conversation.

**Q.**   What did you -- based on your conversations, your interactions with Mr. Goldstein, what was his understanding of his obligations to report gambling wins?

          **MR. KRAVIS:**  Objection.

          **THE COURT:**  Let's come to the headsets, Counsel.

     (Whereupon, an off-the record discussion was held outside the presence of the jury as follows:)

THE COURT: Mr. Kravis, do we have you?

MR. KRAVIS: Yes, I'm here.

THE COURT: Mr. Goldstein, thumbs up.

THE DEFENDANT: (Indicating thumbs up.)

THE COURT: Mr. Beaty?

All right. Go ahead, Mr. Kravis.

MR. KRAVIS: My objection is to the question about what Mr. Goldstein's understanding was as lack of foundation and calls for speculation. If they want to ask about specific statements that Mr. Goldstein made to Mr. Russell on a particular topic, those statements might be admissible as an admission of a party opponent. But asking the witness what Mr. Goldstein's understanding was about a particular issue is not proper.

THE COURT: All right. Counsel?

MR. BEATY: We didn't need to come to the husher for this. Judge, I expressly asked, what did he say to you that indicated? And I'll continue to ask that question that way.

THE COURT: All right. Well, you need to ask it in terms of what was said to the witness. You can ask what the witness understood. You can't ask the witness to read Mr. Goldstein's mind.

MR. BEATY: Yes, Your Honor. Thank you.

THE COURT: All right. Thank you.

(Whereupon, discussion concluded.)

**BY MR. BEATY:**

**Q.** What, if anything, did Mr. Goldstein tell you about his understanding of the tax ramifications of gambling losses?

**A.** I don't recall ever asking a conversation about it with him.

**Q.** Okay. What, if anything, did Mr. Goldstein tell you about his understanding of the ramifications for gambling winnings?

**A.** I don't recall ever having a conversation with him about it.

**Q.** What, if anything, did Mr. Goldstein say to you about needing to participate in a high-stakes poker match at the end of 2016 for tax reasons?

**A.** I don't recall any such conversation.

**Q.** What, if anything, do you recall about Mr. Goldstein participating in a high-stakes poker match at the end of 2016?

**A.** I don't recall ever knowing anything about it.

**Q.** And what, if anything, did Mr. Goldstein tell you about a match against someone named Alec Gores?

**A.** I don't recall him ever mentioning that.

**Q.** I'm showing you also, again only for the witness, paragraph 6 through 8. Just, for the benefit of the record, it's 6 through 8 of Government's Exhibit 12.

What, if anything, did Mr. Goldstein tell you about the fact that he had $800,000 in Asia?

**A.** I don't recall him ever mentioning it.

**Q.** Based on your knowledge, what, if any, bank accounts did Mr. Goldstein have in Asia?

**A.** I have no knowledge.

**Q.** What bank accounts did the firm have in Asia?

**A.** I'm not aware of it having any accounts in Asia.

**Q.** You eventually learned that there was an issue about there being a bank account in Montenegro?

**A.** Yes.

**Q.** And there was a question about that being reported on tax returns?

**A.** Yes.

**Q.** Well, with respect to Asia, was there any concern that those -- those funds, that account had not been disclosed?

**A.** As I said, I wasn't aware of any account in Asia.

**Q.** What, if anything, did Mr. Goldstein tell you as of 2016 about his decision to use money in Asia to play poker rather than pay his taxes?

**A.** He never mentioned that.

**MR. BEATY:** Those are all of my questions, Your Honor. I pass the witness.

**THE COURT:** Thank you very much, Counsel. We're in the noon hour. I think now might be a good time to take the lunch break, Mr. Kravis?

**MR. KRAVIS:** Yes. Thank you, Your Honor.

**THE COURT:** Okay. And then, after the jury breaks

for lunch, we'll begin your cross-examination. I'm going to excuse the jury at this time for lunch.

Please rise for the jury.

(Whereupon, the jury left the courtroom at 12:07 p.m.)

THE COURT: Please be seated. Also invite, Mr. Russell, if you want to step down at this time, you may. And since you will be on cross, you should not communicate with the government at this time. All right. You can step away and enjoy your lunch.

MR. BEATY: Can we just take one hour, Your Honor? Is that --

THE COURT: Let me -- let's get the witness out of the room first.

MR. BEATY: Sorry.

(Whereupon, the witness stepped down from the witness stand and left the courtroom.)

THE COURT: So next up is Mr. Kravis' cross-examination. Is an hour sufficient for lunch?

MR. KRAVIS: Oh, that's fine for us. Yes, Your Honor.

THE COURT: All right. You'll be ready to go, Mr. Beaty?

MR. BEATY: I'm sorry, Your Honor. The only reason I was asking in front of the witness -- I apologize and I won't do it again -- it's because then we're in this awkward position

if someone has to tell the witness, okay, be back in an hour. And I don't want it -- having the Court just instructed him that the government won't talk to him, I don't want to be the guy to go out and then talk to him.

THE COURT: All right. Well, the person can tell him what time to be back.

MR. BEATY: Thank you, Your Honor.

THE COURT: That's okay.

All right. Are we ready to break for lunch? We'll see everyone back at 1:08.

MR. BEATY: Thank you.

MR. KRAVIS: Thank you, Your Honor.

DEPUTY CLERK: All rise. This Honorable Court stands in recess until 1:05. Thank you.

(Whereupon, a lunch recess was taken from 12:08 until 1:10 p.m.)

DEPUTY CLERK: All rise. This Honorable Court now resumes in session.

THE COURT: Please be seated, everyone, and welcome back from lunch. I think where we left things was the defense was ready to cross-examine Mr. Russell. Is that where we are?

MR. KRAVIS: Yes, Your Honor.

THE COURT: The government is standing up. What happened?

MR. BEATY: Nothing happened. Good news. Not bad

news.

THE COURT: Okay. I'll take good news. Go ahead.

MR. BEATY: I knew you would. Your Honor, the parties have reached a factual stipulation. We don't --

THE COURT: Oh, this is wonderful news.

MR. BEATY: I thought so.

THE COURT: You're underselling yourself. Go ahead.

MR. BEATY: So the question is, just how does Your Honor typically want that handled? Do we put it on the ELMO and read it in? Do you want us to file it with the Court formally?

THE COURT: You reached a stipulation, so is it one or multiple ones?

MR. BEATY: I has multiple paragraphs. It's only one document.

THE COURT: Okay. Usually, I read it to the jury when you're ready. Is this something we want to do today?

MR. BEATY: I don't know about today, but certainly not right now, but I just wanted to make sure.

THE COURT: Okay. So we'll read it and get it in. And if you could just, at some point, provide the Court with a copy of whatever it is so I know what's going on.

MR. BEATY: I have it right now, Your Honor.

THE COURT: Okay. And it's one stipulation at this time?

**MR. BEATY:** Yes, Your Honor. The only other issue, Your Honor, is you mentioned, I think on Thursday, Your Honor has the hard stop still. Is it at 4:30; is that correct?

**THE COURT:** It's really a little bit closer to 4:00, but yes.

**MR. BEATY:** Closer to 4:00. Well, that's exactly why we're asking because we wanted to make sure. So we think that this witness and the next will probably take us right up to 4:00, so we'll contact our witnesses and let them know that we think it will probably just go through Ms. Runkle today.

**THE COURT:** Okay. Very good. And we'll touch base in the three o'clock hour to see where we are.

**MR. BEATY:** Thank you, Your Honor.

**THE COURT:** All right. Thank you. That's the stipulation.

Mr. Kravis, you concur with the representations from the government about the stipulation, this joint stipulation of facts?

**MR. KRAVIS:** We do have a stipulation. I didn't see the particular document they handed up to the Court. I'm sure they have it right, but...

**MR. BEATY:** This is the signed copy here.

**THE COURT:** Thank you, Howard.

**MR. KRAVIS:** Yeah. Right. Yep. Very good.

**THE COURT:** Okay. Well, at some point, I will read

it in when we're ready and, of course, the jury will have a copy of this once it's in evidence.

Counsel?

**MR. ADENRELE:** Your Honor, a much less important issue, but earlier this morning Your Honor requested binders for the witnesses. This morning, Your Honor requested binders for exhibits for each witness. I just want to make sure that we're doing what Your Honor would like us to do here.

So, before we started trial, we provided a bunch of binders with exhibits in them. Would Your Honor like us to still print additional witness binders or would it help if we get some of those binders back so we don't have to print all of the exhibits all over again?

**THE COURT:** Well, we've gone through the binders you gave the Court. But typically, the practice is, when you call a witness, to present the exhibits you're going to pull up. If this were a case with like 50 documents, I wouldn't make a fuss. This case has thousands of documents. And so me trying to go back and figure out what you're talking about is not helpful.

And, also, we do have some evidentiary issues. It is helpful to the Court to be able to see everything, frankly, before we get started so I kind of know what's going on.

So yes, that is my request. That's my typical practice.

**MR. ADENRELE:** Okay. So okay. Well, we will print

additional binders for the witnesses then.

THE COURT: All right. Thank you very much, Counsel.

MR. ADENRELE: Thank you.

THE COURT: Are we ready to have our witness rejoin us at this time?

MR. KRAVIS: Defense is ready.

THE COURT: All right. Let's have Mr. Russell come back in and take his seat.

Mr. Russell, you can go ahead and take your -- retake your seat on the witness stand and make yourself comfortable. And I will remind you that you are under oath.

Please rise for the jury.

(Whereupon, the jury entered the courtroom at 1:16 p.m.)

THE COURT: Please be seated, everyone.

Members of the jury, welcome back from your lunch break.

Mr. Kravis, your witness.

MR. KRAVIS: Your Honor, may I approach?

THE COURT: You may.

CROSS-EXAMINATION

BY MR. KRAVIS:

Q. Good afternoon, Mr. Russell.

A. Good afternoon.

Q. I want to start by asking you about some of the nice things you said about Mr. Goldstein on direct examination. I think I heard you describe Mr. Goldstein as smart, intelligent,

quick on the uptake. Do you remember that?

**A.** Yes.

**Q.** Mr. Russell, fair to say you would say those same nice things about many of the attorneys that you worked with at Goldstein & Russell?

**A.** Yes.

**Q.** And you would say many of those same nice things about lots of the other members of the Supreme Court bar?

**A.** Yes.

**Q.** You'd say those same nice things about lots of other appellate practitioners here in the Washington, D.C. legal community?

**A.** Yes.

**Q.** Okay. Now, just to be clear, when you were asked about Mr. Goldstein's legal acumen in particular, like you, Mr. Goldstein was an appellate specialist; right?

**A.** Correct.

**Q.** And as an appellate specialist, like you, Mr. Goldstein would argue cases on appeal in the federal courts of appeals and the United States Supreme Court; right?

**A.** Correct.

**Q.** Mr. Goldstein was not like a tax specialist; right?

**A.** Correct.

**Q.** He might learn about a specific tax issue if it came up in a particular case he was working on; right?

**A.** Correct.

**Q.** But as a general matter day to day, Mr. Goldstein did not specialize in tax matters; fair to say?

**A.** Fair to say.

**Q.** And to your knowledge, Mr. Goldstein never worked on an appellate case that involved the tax rules around reporting gambling winnings, did he?

**A.** I'm not aware of any.

**Q.** And to your knowledge, Mr. Goldstein never worked on an appellate or a Supreme Court case involving the tax rules around like reporting cryptocurrency; right?

**A.** I'm not aware of any.

**Q.** Let me ask you about the office managers. I think you testified on direct examination that the role of the office managers was to help with logistical issues around the firm.

Did I hear that right?

**A.** Yes.

**Q.** And the office managers were typically recent college graduates; right?

**A.** Right.

**Q.** Now, I think I heard Mr. Beaty describe them as kids at one point. But just to be clear, the office managers were graduates of schools like Harvard and Stanford University; right?

**A.** Correct.

Q.   They -- and hiring recent college graduates to the law firm gave them an opportunity to see firsthand what a career in the law was like; right?

A.   Correct.

Q.   And many of them actually did end up going onto law school; right?

A.   Right.

Q.   Mr. Beaty asked you on direct examination about how these were typically two-year jobs.  Do you remember that?

A.   Yes.

Q.   But Mr. Beaty never asked you why.  The reason why is because a bunch of them decided they wanted to go to law school; right?

A.   Right.

Q.   And many of the office managers ended up going to schools like Harvard Law School; right?

A.   Correct.

Q.   Several of them ended up clerking for federal judges; right?

A.   Yes.

Q.   I think at least one of them actually came back and worked at the firm while she was in law school; right?

A.   Correct.

Q.   And the office managers were enthusiastic and smart, and they worked hard; right?

**A.** Yes.

**Q.** And you were not, like, excluded from the firm manager hiring process, were you?

**A.** No.

**Q.** And you never raised a specific objection to any particular office manager that the firm hired, did you?

**A.** No.

**Q.** Now, you were asked on direct examination about a conversation that you had with Mr. Goldstein about hiring more experienced office managers. Do you remember that?

**A.** Yes.

**Q.** Okay. First of all, this was like a single two-minute conversation; right?

**A.** Correct.

**Q.** This wasn't like you bringing this up over and over and over again with Mr. Goldstein; right?

**A.** Correct.

**Q.** This wasn't like, I'm going to leave the firm unless you start hiring some more experienced people. It wasn't like that, was it?

**A.** It was not.

**Q.** And the particular issue that prompted you to raise this issue with Mr. Goldstein involved a mistake that was made with respect to your retirement account; right?

**A.** I don't know if that was what prompted it, but that was in

the back of my mind as part of it.

**Q.** Right. What was in the back of your mind, when you raised this with Mr. Goldstein, was an error that one of the office managers had made about your -- some funds going into your retirement account; right?

**A.** That was part of it, yes.

**Q.** It wasn't about, like, tax paperwork, that kind of thing, was it?

**A.** Correct.

**Q.** And by the way, I think I heard you testify on direct examination, you were not particularly familiar with the firm finances. Is that fair to say?

**A.** That is fair to say.

**Q.** And to be clear, that was fine with you; right?

**A.** Yes.

**Q.** It wasn't like Mr. Goldstein was, like, excluding you from discussions about the firm finances. It wasn't like that, was it?

**A.** It was not.

**Q.** You never asked for access to firm financial documents and were refused. That never happened, did it?

**A.** That never happened.

**Q.** And you were asked about whether you had access to the firm QuickBook accounts. Do you remember that?

**A.** Yes.

Q. Do you even know, Mr. Russell, who kept the firm QuickBook accounts?

A. I believe it was the office manager.

Q. Do you know whether it was, in fact, the accountant -- the outside accounting firm GRF that kept the QuickBooks?

A. It's possible.

Q. Okay. But either way, you also never saw Mr. Goldstein going into the QuickBooks, did you?

A. I don't believe so.

Q. Okay. And just to clarify the roles of who was doing what at the firm, the office managers were responsible for handling the logistics of the firm; right?

A. Correct.

Q. But Goldstein & Russell had an outside company that handled accounting and bookkeeping for you; right?

A. That was my understanding.

Q. That firm is called GRF; right?

A. I don't -- I never knew the name.

Q. Okay. But regardless of the name, your understanding was that there was another outside company, not the office managers, but another outside company that was responsible for the firm bookkeeping; right?

A. Correct.

Q. And just to be clear, you personally are not aware of any time when Mr. Goldstein told an office manager to mislabel a

personal expense as business income -- or business expense, are you?

**A.** I'm not aware of any of such thing.

**Q.** You're not aware of any time when Mr. Goldstein told the outside accounting firm to mislabel a personal payment as a business expense, are you?

**A.** I am not aware.

**Q.** And you are not personally aware of any time when Mr. Goldstein tried to hide firm income for tax purposes, are you?

**A.** I'm not aware of any such instance.

**Q.** Let me ask you a little bit about the office. The sort of culture or structure of the office was pretty informal; fair to say?

**A.** Fair.

**Q.** Invoicing, for example, was pretty -- especially in the early days, was pretty informal at the firm; right?

**A.** Yes.

**Q.** Invoices might be sent by either the office manager or one of the attorneys working on the case; right?

**A.** Correct.

**Q.** Fair to say that, particularly in the early days, the firm did not have like a systematic process for issuing and tracking invoices; is that fair?

**A.** Correct.

**Q.** And Mr. Goldstein himself was not particularly reliable when it came to sending out invoices, generally; is that fair to say?

**A.** Yes.

**Q.** In fact, on cases where Mr. Goldstein was involved, the invoices would often have to get handled by another attorney because Mr. Goldstein was focused on the actual legal work; true?

**A.** Sometimes, yes.

**Q.** Okay. I want to talk with you for a minute now about Mr. Goldstein's schedule. Mr. Goldstein, while you were practicing law together, was a very busy man; is that fair?

**A.** Yes.

**Q.** He was the person who was primarily responsible for bringing business in to the firm; right?

**A.** Yes.

**Q.** He was typically the lead lawyer on the firm's biggest and most significant cases; right?

**A.** Yes.

**Q.** He had firm clients all over the country, and in some instances, all over the world; right?

**A.** Yes.

**Q.** Mr. Goldstein was also involved with SCOTUSblog; right?

**A.** Yes.

**Q.** I think, as you told us this morning, SCOTUSblog was like

a blog that was devoted to covering the Supreme Court; right?

A.    Yes.

Q.    Mr. Goldstein was the founder of that blog; right?

A.    Yes.

Q.    And he continued to remain involved with the content and the operation of the blog; right?

A.    Yes.

Q.    Mr. Goldstein's also taught a legal clinic at Harvard Law School; right?

A.    Yes.

Q.    And he also taught a legal clinic at Stanford Law School; right?

A.    At times -- different times, but yes.

Q.    And all of that, the business development, the clients, the clinic, that required a lot of travel; right?

A.    Yes.

Q.    Mr. Goldstein traveled a lot; right?

A.    Yes.

Q.    And Mr. Goldstein was also frequently asked to give talks or sit on panels about the Supreme Court; right?

A.    Yes.

Q.    And sometimes those commitments involved travel as well; right?

A.    Yes.

Q.    All right.  I just want to ask you a couple of other

things -- a couple of other topics that came up this morning. You were asked about Mr. Goldstein's poker playing.  I think I heard you say on direct that it was not a particular secret around the firm that Mr. Goldstein played poker for money.  Did I hear that right?

**A.**	Yes.

**Q.**	You were also asked a few questions about a firm car, the Tesla.  Do you remember that?

**A.**	Yes.

**Q.**	Do you have any knowledge about the tax treatment of that car?

**A.**	No.

**Q.**	Do you know, for example, whether Mr. Goldstein was personally responsible for 75 percent of that car for tax purposes?

**A.**	I have no knowledge.

**Q.**	Oh, one other thing on this.  You were asked this morning about a conversation you had with Mr. Goldstein when he retired from the practice of law; right?

**A.**	Yes.

**Q.**	And you testified, in particular, that Mr. Goldstein told you that he had made the decision to leave the law; right?

**A.**	Yes.

**Q.**	I just want to sort of get some context for that conversation.

Mr. Goldstein told you that he was deciding to leave the law because the Supreme Court had become too conservative for him; right?

A. I believe so.

Q. During the time that Mr. Goldstein was at the firm, the firm handled a lot of, like, plaintiff-side cases; right?

A. Yes.

Q. And the firm also handled a lot of cases that involved progressive causes; right?

A. Yes.

Q. There was a case that involved a challenge to the legitimacy of an attorney general appointed by President Trump; right?

A. Yes.

Q. And Mr. Goldstein told you that he was deciding to leave the law because the Supreme Court, in his view, had just become too conservative for his practice; right?

A. Yes. That was part of it.

Q. You were asked some questions about funds being paid into a personal bank account. Do you remember that?

A. Yes.

Q. And I think you testified that you never had the experience of having income from a client get paid into your personal bank account. Did I hear that right?

A. Yes.

**Q.** I just want to clarify a few things here. You were not the owner of the law firm Goldstein & Russell; right?

**A.** Correct.

**Q.** That was Mr. Goldstein; right?

**A.** Yes.

**Q.** He was 100 percent owner of the law firm; right?

**A.** Yes.

**Q.** And so it would be fair to say that you and Mr. Goldstein were situated differently when it came to firm income; right?

**A.** Yes.

**Q.** And the point I'm getting at here is, you and the other attorneys at the firm got a salary; right?

**A.** Yes.

**Q.** But Mr. Goldstein, as the owner of the firm, he was entitled to all the firm profits; right?

**A.** Yes.

**Q.** So this thing about how you would treat client payment versus how Mr. Goldstein would treat a client payment, it's a little bit of an apples-and-oranges situation; fair?

**A.** Fair.

**Q.** Also, do you know what a Form 1099 is?

**A.** I think so.

**Q.** You might get them reporting income that's been paid to you over the course of the year; right?

**A.** Yes. Yes.

**Q.** You might get one for, like, your mortgage or something like that?

**A.** Right.

**Q.** Okay. Do you know whether the firm's clients had a legal obligation to send the firm and the IRS a Form 1099 reporting their legal payments every year?

**A.** I believe that they do. I'm not a tax specialist.

**Q.** You were asked on direct examination about a particular client of the firm, Mr. Paul Phua. Do you remember that?

**A.** Yes.

**Q.** And I think you testified that Mr. Goldstein handled a case for Mr. Phua in Las Vegas. Do I have that right?

**A.** Yes.

**Q.** What happened in that case?

**MR. KRAVIS:** Objection, Your Honor. Relevance.

**THE COURT:** Can we come to headsets, Counsel?

(Whereupon, an off-the record discussion was held outside the presence of the jury follows:)

**THE COURT:** Mr. Kravis, are you on?

**MR. KRAVIS:** Yes. I can hear you.

**THE COURT:** Mr. Beaty, are you on?

We're still waiting for Mr. Beaty.

Mr. Goldstein, thumbs up? Okay.

**THE DEFENDANT:** (Indicating thumbs up.)

**MR. BEATY:** Thank you. Yes.

THE COURT: All right. If we could just state objection and not state what it is in front of the jury, that would be helpful.

Go ahead, Mr. Beaty.

MR. BEATY: Oh, Your Honor. This is a plain attack on the government that has nothing to do with the facts in this case. Mr. Phua was arrested for operating an illegal gambling operation in his hotel room. And ultimately, Mr. Goldstein was successful in having that case dismissed because there was some challenge to the government's evidence.

But that has nothing -- specifically, the FBI cut a wire to get in there. None of that has to do -- it's not comparative to the facts in this case, and all it does is lay the seed of something that has nothing -- it's just completely irrelevant here.

THE COURT: All right. Thank you. The objection is relevance.

Mr. Kravis?

MR. KRAVIS: Thank you, Your Honor. So the relationship between Mr. Goldstein and Mr. Phua is directly relevant in this case because there are two occasions on which Mr. Phua lent Mr. Goldstein a substantial sum of money. The government is claiming that those payments were income, like legal fee payments.

The evidence is actually going to show that those were

loans from Mr. Phua to Mr. Goldstein. A reasonable juror might ask the question, well, like, why is this guy, Mr. Phua, lending Mr. Goldstein these large sums of money. And the answer is because Mr. Goldstein and Mr. Phua had a very close relationship because Mr. Goldstein obtained a very consequential win for him in a very high-stakes criminal case in Las Vegas.

I'd also point out that I think the government did open the door to this a bit, because they asked about this particular case on direct examination. That said, if the government's concern is with eliciting details about the facts of the case, I can jump to the outcome of the case and the consequences that Mr. Phua was facing.

I think that kind of makes our point without getting into the details with this witness of the particular Fourth Amendment issue in that case.

**THE COURT:** Okay. And how is this witness knowledgeable about the facts of the case and the outcome?

**MR. KRAVIS:** It was a case that the firm was working on while he was working there, and so he was aware of the case and the out -- I think he testified on direct examination that he was aware of this.

**THE COURT:** So he didn't work directly on it, but members of the firm did?

**MR. KRAVIS:** Correct.

THE COURT: All right. Anything else from the government?

MR. BEATY: Your Honor, I'm glad that we're jumping just to the meat of it. Was there a favorable outcome? I have no objection to that. And I think he did already say he got a favorable thing, so I don't have a problem with that.

In terms of the closeness between he and Mr. -- between Mr. Goldstein and Mr. Phua, you know, he can ask if he knew, but I'm not aware of there being anything there. So that's where I'm at.

THE COURT: All right. Thank you, Counsel. I think we can proceed, Mr. Kravis, with your question.

MR. KRAVIS: Thank you, Your Honor.

(Whereupon, discussion concluded.)

BY MR. KRAVIS:

Q. Just to go back to where we were, Mr. Russell, the case that Mr. Goldstein worked on for Mr. Phua, that was happening while you were at Goldstein & Russell; right?

A. Yes.

Q. It was a case out in Las Vegas; right?

A. Correct.

Q. It was a criminal case; right?

A. Correct.

Q. And Mr. Phua was one of the defendants charged in that criminal case in Las Vegas; right?

**A.** Yes.

**Q.** And Mr. Goldstein obtained a successful result for Mr. Phua in that case; right?

**A.** Yes.

**Q.** The criminal charges against Mr. Phua were dismissed as a result of Mr. Goldstein's work on that case; right?

**A.** That's my understanding.

      **MR. KRAVIS:** Your Honor, may I have just one moment, please?

      **THE COURT:** You may.

      **MR. KRAVIS:** Thank you, Mr. Russell. I have no further questions.

      **THE COURT:** Thank you very much.

   Counsel, is there any redirect from the government?

      **MR. BEATY:** Very briefly, Your Honor.

REDIRECT EXAMINATION

**BY MR. BEATY:**

**Q.** Now, good afternoon, Mr. Russell.

   It was not a secret that Tom Goldstein was playing high-stakes poker around the law firm?

**A.** At various times, correct.

**Q.** In 2017, was it, for example, Mr. Goldstein was playing poker still?

**A.** I don't know the timing. So there came a time when he said that he had stopped, and there came a time when I

understood him to have started again.  But I don't recall the exact dates.

Q.   Okay.  Notwithstanding that, insomuch as it was not a secret, that it was not something that he was hiding from anyone at the firm; is that correct?

A.   So there may have been a period in which he was playing when he had said he had stopped.  And if he was doing that, then that would have been a secret because I didn't know about it.

Q.   Notwithstanding that, the question you were posed on cross-examination was about whether Mr. Goldstein directed any classifications.  If he was talking about poker with his colleagues, was there any reason he wouldn't have disclosed these to his accountants, these gambling wins?

A.   I don't know any reason.

Q.   Are you aware of whether Mr. Goldstein failed to disclose gambling winnings to his own accountants?

A.   I'm not aware one way or the other.

Q.   Would it surprise you?

A.   I guess so, yes.

Q.   And with respect to 1099s, do you remember those questions?

A.   Yes.

Q.   If Mr. Goldstein received a 1099 in relation to poker, would you have expected him to give that to his accountants?

**A.** Yes.

**Q.** Finally, on cross-examination you mentioned that Mr. Goldstein was unreliable with respect to invoicing?

**A.** Yes.

**Q.** Was he unreliable, in your mind, in any other aspect of his career or of his life?

**A.** He was not particularly diligent about running the business, and so he could not always be counted on to make things -- so, for example, the reason we moved to Bethesda is because he forgot to renew the lease in our Friendship Heights offices, so things like that.

**MR. BEATY:** No further questions, Your Honor.

**THE COURT:** Thank you very much, Mr. Beaty.

Have all questions been asked of the witness?

**MR. KRAVIS:** Yes. Thank you, Your Honor.

**THE COURT:** All right. Mr. Russell, thank you very much for your testimony your time today. You may be excused. Have a good afternoon.

(Witness excused.)

- - -

**THE COURT:** Is the government prepared to call its next witness?

**MR. GORDON-MARVIN:** We are, Your Honor. First, I'd like to bring up a copy of the binder for you.

**THE COURT:** Very good.

Thank you.

MR. GORDON-MARVIN: The United States calls Molly Runkle.

THE COURT: Ms. Runkle, if you'd come all the way towards me. And once you come into the well of the courtroom, you're going to go over to the witness stand and please remain standing and the courtroom deputy will swear you in.

- - -

MOLLY RUNKLE, after having been duly sworn, was examined and testified as follows:

- - -

DEPUTY CLERK: Thank you. You may be seated. Please adjust the microphone and speak directly into it. And state and spell your first and last name for the record.

THE WITNESS: Molly, M-o-l-l-y. Runkle, R-u-n-k-l-e.

THE COURT: Counsel for the government?

DIRECT EXAMINATION

BY MR. GORDON-MARVIN:

Q. Good afternoon. What was your job in 2016?

A. I was firm manager at Goldstein & Russell and deputy blog manager for SCOTUSblog.

Q. When you were a firm manager for Goldstein & Russell in 2016, how many times did Mr. Goldstein tell you about winning millions of dollars playing poker?

**A.** Never.

**Q.** How many times did he ask you to help him track his poker transactions?

**A.** Never.

**Q.** Let's rewind a bit. Could you tell us about your educational background starting with college?

**A.** I attended Northeastern University where I received a bachelor's in political science. I graduated in 2015. I have a law degree as well from Stanford Law school. I graduated in 2020.

**Q.** When you were at Northeastern, what, if any, training in classes did you have on accounting?

**A.** None.

**Q.** You said you graduated in 2015. What did you do between Northeastern and law school?

**A.** I worked at Goldstein & Russell and SCOTUSblog.

**Q.** What were the approximate dates?

**A.** October 2015 to July 2017.

**Q.** When you were applying for law school, was Mr. Goldstein one of your recommenders?

**A.** Yes.

**Q.** Briefly, what did you do after law school?

**A.** I worked at Goldstein & Russell at first as a law clerk, I guess, until I passed the bar and then as an attorney.

**Q.** And then after that, what were the next few things you did

in your career?

**A.** I clerked for Judge Cornelia Pillard on the D.C. Circuit for one year, and then I clerked for Judge Randolph Moss on the D.C. District Court for one year.

**Q.** Did Mr. Goldstein support your legal career?

**A.** Yes.

**Q.** How?

**A.** He helped my application process to law school. He wrote a letter. He was a resource. If I wasn't sure what I wanted to do next in my career, he was someone I could talk to, was a sounding board. He helped with getting my clerkships. He called judges on my behalf.

**Q.** You mentioned the clerkships in the D.C. District Court and D.C. Circuit Court of Appeals. Are those competitive?

**A.** Yes.

**Q.** How competitive?

**A.** Very. They're only -- they are something only the very top law students in the country are competitive for.

**Q.** Going back to Goldstein & Russell, how did you first learn about that position?

**A.** Through a mentor of mine named Justice Goodwin Liu on the California Supreme Court.

**Q.** Why did he recommend that you apply to work at Goldstein & Russell?

**A.** Because at that time I was still deciding whether or not I

wanted to go to law school. I wasn't ready yet. And Justice Liu thought that that could be a good place for me to learn about whether I wanted to be a lawyer or not and it was a prestigious opportunity.

Q. When -- well, to rewind a moment, you said it was a prestigious opportunity. What made it a prestigious opportunity?

A. SCOTUSblog is a prestigious -- or at least was a prestigious legal blog, and Goldstein & Russell was an appellate boutique firm highly regarded for its Supreme Court practice.

Q. When you were applying, what, if any, skill requirements were there?

A. I think it was pretty general, things like being detail oriented, being able to work in a fast-paced environment, an interest in law, things like that.

Q. Were there any requirements related to accounting or bookkeeping?

A. No.

Q. You mentioned that you started in October 2015. When you started, where was the firm located?

A. Bethesda, Maryland.

Q. And what were your titles at G & R and at SCOTUSblog?

A. It was firm manager at Goldstein & Russell and deputy blog manager at SCOTUSblog.

**Q.** As firm manager, what were your major responsibilities?

**A.** They varied. I would help with things like payroll, health care, retirement, basic tasks like opening mail and answering the phone. I also served as Tom Goldstein's personal assistant.

**Q.** Was helping pay bills one of those responsibilities?

**A.** Yes.

**Q.** What would you do for that?

**A.** Regular bills would come in, for example, like our internet bill. I would get it in the mail or I would receive it online, and then I would pay it either online or with a check.

**Q.** If you're paying it with a check, would you sign in your own name or someone else's?

**A.** I would sign in Tom Goldstein's name.

**Q.** Who authorized you to do that?

**A.** Mr. Goldstein.

**Q.** Was helping out with the accounting and bookkeeping part of your responsibilities?

**A.** No.

**Q.** Did you have a responsibility or a rule interfacing between the law firm and outside accountants?

**A.** I'm sorry. Could you repeat that?

**Q.** What was your role, if any, interacting between the law firm and outside accountants?

**A.** Oh, outside accountants. I was responsible for, sort of, passing messages between the two. So, for example, if Mr. Goldstein had a question for the accountants, he might ask me to ask the accountants. If the accountants needed documents from Mr. Goldstein to do taxes, they would perhaps ask me to send them to them. And then throughout the year, I would collect any tax documents that came in through the mail and scan and send them to the tax preparers when the time came.

**Q.** And when you were having these interactions, was this on behalf the law firm, SCOTUSblog, or Mr. Goldstein personally, or all of these?

**A.** All.

**Q.** You also mentioned serving as, sort of, personal assistant to Mr. Goldstein. What would you do in that capacity?

**A.** Most of it involved booking travel, flights, hotels, trains, his personal driver. It would also sometimes involve maybe purchasing items such as if he wanted to upgrade to the new iPhone. And then there were just, sort of, random tasks I would do if he asked me to.

**Q.** When you were doing personal tasks for him that required purchases, would you use a personal credit card, or his personal credit card, or a firm credit card?

**A.** I would ask him whether the purchase should be made on a firm or personal credit card, and he would answer, and I would do as instructed.

**Q.** Would you also sometimes send wires on behalf of him personally?

**A.** Yes.

**Q.** And how would you know if you were sending a wire that was for him personally versus for the firm?

**A.** The same. Either he would have told me, or if he didn't, I would ask firm or personal, and then proceed accordingly.

**Q.** If -- withdrawn.

Let's shift to your training for that role. To do all these kinds of tasks, what training were you given?

**A.** It was primarily hands-on training with my predecessor, Andrew Hamm. He would sit with me at the desk and sort of day-to-day tasks came up, he would walk me through how to do them.

**Q.** Approximately, how long did that training last?

**A.** Maybe a couple of weeks more intensive, but Andrew stayed on at the blog. So if something came up in the meantime, I would also ask him for help throughout my time at the firm.

**Q.** What training, if any, did you receive on accounting or bookkeeping?

**A.** None.

**Q.** What kind of written guidance or manuals did you have?

**A.** There was a document that contained passwords and other relevant information.

**Q.** So there was no other written manuals or instructions?

**A.**    No.

**Q.**    Speaking of that document that contained, kind of, reference information and passwords, did it also include bank account information and wire information?

**A.**    I believe so.

**Q.**    What bank accounts did you have access to as firm manager?

**A.**    There was a Citibank firm account, a Citibank blog account, Tom's personal Citibank account.  Those were the main ones.

**Q.**    Whom did you report to in your roles at Goldstein & Russell and SCOTUSblog?

**A.**    Primarily Thomas Goldstein, but sometimes to the other attorneys.

**Q.**    What percentage of the time was to Mr. Goldstein?

**A.**    Ninety-five percent.

**Q.**    For the other ten percent with other attorneys, with whom -- or rather, on what would you be reporting to them?

**A.**    Sorry.  Could you repeat that?  And there?

**Q.**    When you were interacting with the other attorneys, what would you be working with them on?

**A.**    Oh, I did some occasional paralegal tasks for them.  So if they needed help just reading through a brief, checking for typos, I might do that.  Or if they had a question about their health care or retirement, they would ask me and I would ask the relevant vendor.

**Q.** What was the firm culture like?

**A.** Great. Collegial. Everyone was really smart. Everyone was really passionate about the work they were doing. It was small. We all got along really well. It was an excellent place to work.

**Q.** What was Mr. Goldstein like?

**A.** He's brilliant. He is quiet, kind of reserved. He is an excellent mentor. He is direct. He is -- he was a good boss.

**Q.** How aware was he at any given moment of the firm's finances?

**A.** I'm sorry. I'm having some trouble -- yeah.

**Q.** How aware was he at any given moment of the firm's finances?

**A.** He was aware of the firm's finances.

**Q.** He had a sense of the money coming in and out at any given time?

**A.** For the most part.

**Q.** I think at one point you mentioned invoicing. What was your role with respect to invoices?

**A.** An attorney would ask me to prepare an invoice for a client, and then I would send the invoice or the attorney would, depending on the client.

**Q.** Would you prepare an invoice if someone had not asked you to?

**A.** No.

Q.   Can you describe what an invoice would typically look like?

A.   It was a piece of paper and had our firm's name on it and a date and an amount, and it might have had a description of the type of work.

Q.   Who are you typically sending those invoices to?

A.   Clients.

Q.   And are those clients, say, plaintiff law firms or individual people?

A.   It could have been either or it could have been businesses.

Q.   When you were sending an invoice to a, say, plaintiff firm, where would you direct payment for that invoice?

A.   I believe it normally would have been the firm's Citibank account.

Q.   So the firm bank account?

A.   Yes.

Q.   What, if any, instances do you recall of asking a plaintiff's firm to send money directly to Tom -- to Mr. Goldstein's -- sorry -- personal bank account?

A.   I don't recall such a time.

Q.   Do you recall Mr. Goldstein ever instructing you to do that?

A.   No.

Q.   When another law firm sent money to the firm, what would

you have assumed it was for?

**A.**   Legal work that we did.

**Q.**   If another law firm sent money to Goldstein & Russell, and it was actually for a personal payment, would you have known that unless someone told you?

**A.**   No.

**Q.**   You mentioned your role in taxes.

        **MR. GORDON-MARVIN:**   I would like to turn to Exhibit 586 on the second page.

**BY MR. GORDON-MARVIN:**

**Q.**   Here, there's an e-mail from you to Walter Deyhle sent on March 1, 2016.  Can you see that?

**A.**   Yes.

**Q.**   Who is Walter Deyhle?

**A.**   He worked at the accounting firm.

**Q.**   How early in your time at the firm was this e-mail?

**A.**   I had started in October of 2015, so five months or so.

**Q.**   What were you asking Mr. Deyhle or telling him?

**A.**   It looks like I was sending him tax-related documents, and asking him what else he needed to prepare our taxes for that year.

**Q.**   And if we go up to his e-mail back to you, what did he tell you to provide?

**A.**   1099s and W-2s for income, a 1098 for mortgage interest, and a list of charitable contributions.

**Q.** Now, if we go to the top of the first page, zooming in here, what's the date of this e-mail?

**A.** March 25, 2016.

**Q.** And what do you say in it?

**A.** What did I say?

**Q.** Yeah.

**A.** "Hi, Walter. Attached are the documents you requested. I will get you charitable contributions either later today or on Monday. Please let me know if I'm missing anything here. Thanks so much, Molly."

**Q.** Was there a document attached to this e-mail?

**A.** It appears so.

**Q.** What was the name of that attachment?

**A.** Tom and Amy Personal Tax Documents 2015.

**Q.** Let's turn to that attachment. Exhibit 550. If we zoom in on the top portion of this W-2, right in the center there's a box E, employee's name, address and ZIP code. Can you see that?

**A.** Yes.

**Q.** What address is listed here?

**A.** 3908 Rosemary Street, Chevy Chase, Maryland 20815.

**Q.** What address was that?

**A.** I believe that is his home -- or was his home address.

**Q.** So, if you were working at the law firm, how were you receiving a Form W-2 sent to Mr. Goldstein's personal address?

**A.** Either Mr. Goldstein or his wife would have handed it to me or Andrew Hamm would have gotten it from the house.

**Q.** How would Andrew Hamm have gotten it from the house?

**A.** Andrew Hamm regularly was performing work at Tom and Amy's house. Sometimes he brought mail back.

**Q.** When you say he was performing work, what type of work are we talking about?

**A.** During part of the time there, Tom was upgrading his house, adding things like smart-home features, and Andrew would go there and supervise that kind of work, for example.

**Q.** This was a personal work?

**A.** Yes.

 **MR. GORDON-MARVIN:** If we go to the next page. And one more. Apologies, Mr. Resto.

**BY MR. GORDON-MARVIN:**

**Q.** Here, if we zoom in on the top portion, it's titled "A Mortgage Interest Statement." It says "2015 Form 1098." Can you see that?

**A.** Yes.

**Q.** Looking on the left-hand side, to what address was this document sent?

**A.** Also to the Rosemary Street house.

**Q.** So I'd like to shift. We were just looking here at the 2015 forms that you provided to Mr. Deyhle. I'd like to shift to 2016. Let's look at Exhibit 577.

If we zoom in on the top e-mail here, who is this e-mail from?

**A.** Myself.

**Q.** To who?

**A.** Walter Deyhle.

**Q.** On what date did you send it?

**A.** March 13, 2017.

**Q.** What's the subject?

**A.** Taxes.

**Q.** And what did you say in your e-mail?

**A.** "Hi, Walter. I think this is all of the personal tax info I received for them recently. Is this everything you need, parens, other than the charitable info, which I will get you shortly, closed parens?

**Q.** I'll stop you there. So you say here, everything I received from them recently." Would you have omitted something if it were just a little older?

**A.** No.

**Q.** Where did you keep those tax documents when you received them from Mr. Goldstein or his wife or from Mr. Hamm?

**A.** I kept all tax documents I received in a cardboard box I kept under my desk.

**Q.** And then what would -- you request in this e-mail, what would you do with those documents when it came to tax time?

**A.** I would scan them and send them to the accountants.

Q. So here, are there documents attached?

A. Yes.

Q. Could you read off the names of those attachments?

A. Read them?

Q. Yes.

A. Form 1099-G 2016, MD assessment notice, 1099-INT 2016, 1099-DIV 2016, 2016 mortgage interest statement.

Q. So let's look through these individual forms. We turn to Exhibit 567. If we zoom in here on the top portion.

This is a 2016 Form 1098 mortgage interest statement. Can you see that on the right?

A. Yes.

Q. Who is it sent to?

A. Tom and Amy.

Q. At what address?

A. The Rosemary Street house.

Q. And now, if we go to Exhibit 568 and we zoom in here on the top half, who is -- where is this document from?

A. The State of Maryland, Department of Assessments and Taxation.

Q. Where was this document sent?

A. To the Rosemary Street house.

Q. Now, if we go to Exhibit 569, and zooming in again on the top half of this, is an interest income Form 1099-INT for 2016. Can you see that?

**A.** Yes.

**Q.** Who sent this document?

**A.** The State of Maryland Comptroller.

**Q.** Was this also sent to Mr. Goldstein's house?

**A.** Yes.

**Q.** Now, if we turn to Exhibit 570, here, this is a 1099 Dividends for 2016. Can you see on the right-hand side where it says "Putnam Investments"?

**A.** Yes.

**Q.** Then I just want to look at one last document, the last one you attached, Exhibit 571. If we zoom in on the top half here and scroll up slightly, this is a Form 1099-G for 2016. Can you see that?

**A.** Yes.

**Q.** Where is it from?

**A.** The Comptroller of Maryland.

**Q.** And, now, where was it sent?

**A.** To the Rosemary Street house.

**Q.** If we go back to Exhibit 577. If you look at the top, we just went through five attached documents. They're listed here. Were any of those from Wells Fargo?

**A.** No.

**Q.** Were any of them from someone named Alec Gores?

**A.** No.

**Q.** Do you recall being given a 1099 for 2016 worth more than

$26 million?

**A.** No.

**Q.** Do you recall receiving a 1099 from Wells Fargo for Mr. Goldstein's personal account?

**A.** I wouldn't recall either way.

**Q.** Shifting to another portion of taxes, the signing and filing of them, I'd like to show you Exhibit 595. If we look at just the top two e-mails here and zoom in, there's an e-mail right below the word "please" sent on June 21, 2016 at 10:36 a.m. Can you see that?

**A.** Yes.

**Q.** What did you say in that e-mail?

**A.** "Dear Tom, I received our corporate tax returns for filing for both firm and blog. The only payment due is $822 to California. Can I go ahead and sign all of these documents for you and make that payment to California?"

**Q.** What did Mr. Goldstein say back?

**A.** "Please."

**Q.** What did you take him to mean by that?

**A.** That I should sign all of those documents for him and make that payment to California.

**Q.** Turning to the 2016 taxes, I'd like to show you Exhibit 578. What's the date of this e-mail?

**A.** April 13, 2017.

**Q.** Who is it from?

**A.** Myself.

**Q.** To whom?

**A.** I guess someone named Tammy, CC'ing Walter Deyhle.

**Q.** And she has the same e-mail address domain as Mr. Deyhle?

**A.** Yes. Oh, Jill Leonard is also CC'd.

**Q.** Who is Jill Leonard?

**A.** She was another person who worked at the accounting firm.

**Q.** What did you say in the first sentence of your e-mail?

**A.** "Dear Tammy, please find attached the various E-filing documents for Goldstein & Russell and SCOTUSblog. Please let me know if you require anything further to get our taxes filed."

**Q.** What's the title of the document that you attached to the e-mail?

**A.** "2016 E-file tax doc signed."

**Q.** Let's look at that document, Exhibit 572. If we zoom in here on the top part, this is the "Form 8879, IRS E-file Signature Authorization Form" dated for 2016. Can you see that?

**A.** Yes.

**Q.** What's the name of the corporation?

**A.** Goldstein & Russell, PC.

**Q.** If we scroll down slightly, there is an officer's signature and date. Can you see that at the bottom?

**A.** Yes.

**Q.** Do you recognize the handwriting for the date?

**A.** Yes.

**Q.** Whose handwriting is it?

**A.** Mine.

**Q.** Does that also mean that this is you signing on Mr. Goldstein's behalf?

**A.** Likely.

**Q.** Would you have signed this without his authorization?

**A.** No.

**Q.** Without his explicit instruction to do so?

**A.** No.

**Q.** I'd like to shift topics a little bit.  Are you familiar with Universal Capital Bank?

**A.** Yes.

**Q.** Is that called UCB for short?

**A.** Yes.

**Q.** To your knowledge, where was UCB located?

**A.** Montenegro.

**Q.** Broadly, what was your experience with UCB?

**A.** I helped Tom open a personal and firm bank account with UCB.

**Q.** Let's look at Exhibit 633 on page 11.  If we zoom in on the bottom e-mail here, who sent this first e-mail at the bottom?

**A.** Milos Pavlovic.

**Q.** On what date?

**A.** September 19, 2016.

**Q.** To whom?

**A.** To Mr. Goldstein.

**Q.** Were you CC'd on this e-mail?

**A.** No.

**Q.** In the first sentence, he says, "Please find attached standard settlement instructions, SSI, for your personal international account with UCB."

**A.** Yes.

**Q.** In mid-September 2016, do you recall Mr. Goldstein mentioning any major financial wins?

**A.** I'm sorry. What was that?

**Q.** In mid-September 2016, do you recall Mr. Goldstein mentioning any huge financial victories?

**A.** No, not that I can recall.

**Q.** Do you know what triggered this first e-mail?

**A.** No.

**Q.** Do you know where Mr. Goldstein was on the planet in the week or two prior to this e-mail?

**A.** No.

**Q.** If we go to the bottom of page 9 here, this is an October 10, 2016 e-mail from Lindita Ulic to you; is that right?

**A.** Yes.

Q. In the last body of line of this e-mail, she says, "Also, please advise on which address we should send the visa card for Mr. Goldstein." Can you see that?

A. Yes.

Q. If we scroll up one e-mail. Where did you tell her to send that visa card?

A. To the Hotel Hermitage in Monte Carlo in Monaco.

Q. Do you know what the visa card was for?

A. It was a credit card, I guess.

Q. Or a debit card for a bank account?

A. Yeah. I don't know.

Q. But you don't know specifically why Mr. Goldstein said he wanted that card?

A. Oh, no.

Q. If we go to the bottom of page 6, zooming in on this e-mail sort of long, detailed body paragraph here, this is again from Lindita Ulic to you. It's dated October 13th. Can you see that?

A. Yes.

Q. In the first sentence, she says, "According the Montenegrin legislation, it is necessary for all clients to have to domestic and international accounts."

A. Yes.

Q. A few sentences later, on the second line, she says, "The international account is a multi-currency account."

**A.** Yes.

**Q.** And then she says, "All transfers in domestic market have to be to or from domestic accounts."

**A.** Well, some of that was left out, but yes.

**Q.** And "all international transfers have to be to or from the international account." Is that right?

**A.** Yes.

**Q.** So you mentioned helping to set up with a personal account and a firm account at UCB. I'd like to turn to that firm account. Let's look at Exhibit 574. Zooming in on the bottom here, you sent an e-mail on October 14, 2016 at 10:00 p.m.

**A.** Yes.

**Q.** What did you ask in that e-mail?

**A.** I said, "Hi, Tom, can you answer these few questions to open the firm Montenegro account?"

**Q.** What was your first question?

**A.** "Reason for account opening."

**Q.** What was your last question?

**A.** "Name of person who recommended the bank to you."

**Q.** And what did Mr. Goldstein say in response to those questions?

**A.** For Montenegro clients. Five transfers. $200,000. $100,000 balance. No shares. Petros Stafis.

**Q.** So when he said that "for Montenegro clients," what did you understand that to mean?

**A.** The reason for account opening.

**Q.** Legal clients, some other type of clients?

**A.** They would have been legal clients.

**Q.** Do you know who those clients were?

**A.** No.

**Q.** Did Mr. Goldstein ever tell you?

**A.** Not that I can recall.

**Q.** Do you know who Petros Stafis is?

**A.** No.

**Q.** So, then, turning to Exhibit 579 on the first page, here, right below the UCB logo, it says "application for account opening." Can you see that?

**A.** Yes.

**Q.** And if we scroll down a bit, what did you list as the reason for the account opening?

**A.** "For Montenegro clients."

**Q.** After you had helped Mr. Goldstein set up these two accounts, did you end up conducting transactions through them?

**A.** Yes.

**Q.** Let's turn to Exhibit 594. Zooming in on this, what is it?

**A.** An e-mail from Tom to myself dated October 13, 2016.

**Q.** What's the title?

**A.** "Wires."

**Q.** What did he tell you to do?

A. "Please wire 50K from Montenegro to the firm. Please wire 50K from Montenegro to Keith Gipson." And then he provides the bank account information.

Q. Who is Keith Gipson?

A. I don't know.

Q. Then if we turn to Exhibit 633 on the bottom of the fifth page and we zoom in on that bottom e-mail, also on October 13th, in your own words, broadly, what did you say?

A. So it looks like there was a delay in sending money to the UCB account, but it looked like I thought we had sent it. There should be 200K in the domestic account and that we needed to wire some of that money. And then it looks like I provided the wire information, although I can't see that.

Q. And if we scroll up one e-mail, in her first line, how much money did Ms. Ulic say was in the account?

A. 180,000 euros.

Q. Now, if we go at the very first page of this at the top, what did you tell her?

A. "Attached are the wire request forms and an invoice from G & R. Please let me know when the wires will go out."

Q. And what are the names of the attachments?

A. UCB invoice from firm, UCB Wire Request, G & R, UCD wire request Gipson.

Q. If we go to page 2 of this, this is the first attachment. Is this kind of what a typical invoice looked like?

**A.** Yes.

**Q.** It's on Goldstein & Russell letterhead?

**A.** Yes.

**Q.** What's the date of it?

**A.** October 14, 2016.

**Q.** Who is Goldstein & Russell invoicing here?

**A.** Thomas Goldstein.

**Q.** Do you know why the law firm was sending an invoice to Mr. Goldstein?

**A.** No.

**Q.** How much was the invoice for?

**A.** $50,000.

**Q.** If we go to the third page and we zoom in on the top half, top left, who is the ordering customer?

**A.** Thomas Goldstein.

**Q.** And in the middle, how much money was being requested?

**A.** $50,000.

**Q.** Looking down there at the beneficiary, who was the recipient?

**A.** Goldstein & Russell PC.

**Q.** And, then, if we look at the remittance information slightly further down, what did you write?

**A.** "To capitalize the firm."

**Q.** What does that mean?

**A.** I don't know.

**Q.** Who would have told that you write that?

**A.** Thomas Goldstein.

**Q.** There's a signature here. Whose signature is that?

**A.** The date is mine, so the signature is also likely mine.

**Q.** But you signing for Mr. Goldstein?

**A.** Yes.

**Q.** If we go to page 4. This is another request. Looking at the beneficiary, who is this for?

**A.** Keith Gipson.

**Q.** And looking at the remittance information further down, what did you write here?

**A.** "For the purpose of payment of a debt."

**Q.** Who would have told you to write that?

**A.** Thomas Goldstein.

**Q.** Do you know what the debt was?

**A.** No.

**Q.** Did he ever tell you?

**A.** Not that I can recall.

**Q.** Let's look at another transaction on Exhibit 593. In the middle here, there's an e-mail sent at 10:40 a.m. Can you see that?

**A.** Yes.

**Q.** What did you ask in this e-mail?

**A.** "Hi, Tom. Do you expect money to come in soon for payroll? I'll run it early next week, and I'm pretty sure we

don't have enough right now."

Q.   Was that a common thing?

A.   More common for the blog, but it happened sometimes.

Q.   Happened sometimes for what?

A.   The firm or the blog.

Q.   If we go up one e-mail, you then followed up and said, there was roughly $100,000 in the firm account.  And then if we go up again one e-mail.  Who sent the top e-mail?

A.   Mr. Goldstein.

Q.   On what date?

A.   October 21, 2016.

Q.   What did he say in the first two sentences?

A.   "Have the Montenegro bank wire in $85,000 to the firm account.  You have to stay on them because they are incompetent."

Q.   In the last sentences, what did he say?

A.   "And I have more money coming in."

Q.   Do you know where all this money was coming from?

A.   I don't know.

Q.   If we turn to Exhibit 634, and we look at the top e-mail.  This is dated October 23, 2016.  What did you say in this e-mail?

A.   "Hi, Lindita.  We need to send out another wire to Goldstein & Russell for 85K as soon as possible.  The request form and invoice are attached, and sent hard copies via FedEx

to arrive on Monday.  Please confirm the receipt of the request and inform me when the wire will go out.  Again, we need this completed as promptly as possible."

Q.   What's the name of the first attachment?

A.   "UCB Invoice from Firm 10/21/16."

Q.   And what's the name of the second attachment -- or rather, the third attachment?

A.   "Request for Payment - 2/10/21/16."

Q.   Let's look at those attachments.  Can we go to page 2.
     This is another invoice from the law firm to Mr. Goldstein?

A.   Yes.

Q.   For how much?

A.   $85,000.

Q.   And if we look at page 3, what is this?

A.   A request.

Q.   For a wire of how much?

A.   $85,000.

Q.   And again, did you know why the firm was invoicing Mr. Goldstein for these payments?

A.   No.

Q.   I'd like you to look at one last transaction.  If we go to Exhibit 584.  Look at the -- just top e-mail here.  What's the date of this e-mail?

A.   October 25, 2016.

**Q.** And what did you say in the body of the e-mail?

**A.** "Hi, Lindita. We have another wire request. The documents are attached. This is also urgent. Please execute at your earliest convenience."

**Q.** And what are the names of the two attachments?

**A.** "UCB Wire Request, G & R 10/25, UCB Invoice from Firm 10/25/16."

**Q.** Let's look at the first attachment, Exhibit 551. What is this?

**A.** It's an invoice.

**Q.** To whom?

**A.** Thomas Goldstein.

**Q.** For how much?

**A.** $750,000.

**Q.** On what date?

**A.** October 25, 2016.

**Q.** Do you know where Mr. Goldstein got $750,000?

**A.** No.

**Q.** Do you know why the firm was invoicing him for $750,000?

**A.** No.

**Q.** Let's look at Exhibit 552. And this is -- what is this?

**A.** The request.

         **MR. GORDON-MARVIN:** Now, we scroll down. Keep going down.

**BY MR. GORDON-MARVIN:**

**Q.** This is also -- who is signing?

**A.** I'm not sure if that's me or Mr. Goldstein.

**Q.** And these requests were all sent to UCB on October 25, 2016?

**A.** Which all?

**Q.** Sorry. The ones we were just looking at, the last two. This one for 750,000?

**A.** I thought it was just the one for $750,000 --

**Q.** Thank you.

**A.** -- on October 25.

**Q.** So just that one was sent on October 25?

**A.** Unless I'm missing something.

**Q.** I'm merely being inarticulate. Why don't we go back for a moment here to Exhibit 584.

     **MR. GORDON-MARVIN:** 584. Thank you, Mr. Resto.

**BY MR. GORDON-MARVIN:**

**Q.** Zooming in again, on what date did you send this e-mail with the $750,000 request?

**A.** October 25, 2016.

**Q.** Okay. I want to look at one more document here. Exhibit 592. If we zoom in on the bottom e-mail here, on what date did you send this e-mail?

**A.** October 26, 2016.

**Q.** What did you say?

**A.** "They processed the wire, paren, apparently, if I say it's

urgent, they get on it, end paren, and there is now, without accounting for payroll or rent or anything, 889.2K in the account."

Q.    "889.2K," meaning what?

A.    Dollars.

Q.    $889,200?

A.    Oh, yes.

Q.    That same day, what did Mr. Goldstein write back to you?

A.    "Please send" -- oh.  He e-mailed me, "Please send the following out:  200K to Andrew Robl.  Same instructions as before.  200K to DCI.  200K to the Resnick entity, same as before.  Payoff the firm card.  Pay down 50K on the line."

Q.    Did he say whether these wires were personal or business payments?

A.    Not in this e-mail.

Q.    Did he tell you why this -- he was having you send these particular wires directly after receiving the Montenegro money?

A.    I don't recall.

Q.    I'd like to talk about a different aspect of the UCB firm account.  If we turn to Exhibit 117.  If we look at the bottom e-mail here, on what date did you send this e-mail?

A.    December 28, 2016.

Q.    Who did you send it to?

A.    Jill Leonard and Walter Deyhle.

Q.    What was the subject line?

A. "Few things."

Q. What was the first thing that you flagged for them?

A. That the firm has a bank account with Universal Capital Bank in Montenegro that we had opened that year.

Q. Would you have e-mailed this to the accountants on your own or would someone have needed to tell you to do this?

A. Someone probably told me.

Q. Who would that be?

A. Tom. Mr. Goldstein.

Q. And here, you're flagging only the firm bank account; is that right?

A. It appears so.

Q. If Mr. Goldstein had also told you to tell them about the personal bank account, would you?

A. Like -- probably.

Q. If we go up one e-mail here. What did Mr. Deyhle write back?

A. "Thanks, Molly. We will need the following for the foreign bank account: Bank name and address, account number, highest balance during 2016. Thanks."

Q. Do you recall replying to this e-mail?

A. No, I don't.

Q. Is it possible you forgot to reply to it?

A. It's possible.

Q. Was this in between holidays?

**A.** It was.

**Q.** Which holidays?

**A.** Christmas and New Year's. And my birthday.

**Q.** The most important of the holidays?

So this is an e-mail at the firm's Montenegro bank account. Did Mr. Goldstein ever tell you about accounts that he and the firm had in Asia?

**A.** Not that I can recall.

**Q.** Did he ever tell you to disclose any accounts in Asia?

**A.** Not that I can recall.

**Q.** I'd like to shift topics slightly and talk about interactions with Wells Fargo. If we go to Exhibit 636 on the first page at the bottom, this is an e-mail also dated September 28, 2016. Can you see that?

**A.** Yes.

**Q.** You say, "Hi, Vic. I found the attached information. Tom's personal international account is" -- you list off a series of numbers. And then you list an intermediary institution. Can you see that?

**A.** Yes.

**Q.** What is the bank name of that intermediary institution?

**A.** "BG Bank. Open joint. Stock Company."

**Q.** And if we look up just one e-mail right here, kind of sandwiched against yours, who sent this e-mail?

**A.** Mr. Goldstein.

**Q.** On what day?

**A.** December 28.

**Q.** In the second sentence, what did he say?

**A.** "I need to get the wire to Montenegro by Friday so it can be distributed this year for tax purposes."

**Q.** So when he says "get the wire to Montenegro," what is he effectively saying?

**A.** I'm not sure.

**Q.** Given the discussion we just had about Montenegro, is he saying send the wire to UCB?

**A.** Likely.

**Q.** He also says "so it can be distributed this year for tax purposes."

**A.** Yes.

**Q.** What did he tell about why he needed to send it in 2016 specifically for tax purposes?

**A.** I don't recall anything about this.

**Q.** Do you know why it mattered to send it that year for tax purposes?

**A.** No.

**Q.** Do you know what his tax purpose was?

**A.** I don't. Sitting here, no.

**Q.** Had he ever talked to you about how, as a cash-basis taxpayer, he needed to distribute certain poker winnings and losses to be able to offset his income in a particular year?

**A.** No, not that I can recall.

**Q.** If we go to Exhibit 637 in the middle, someone at Wells Fargo, Vic Sidhu e-mails you; is that right?

**A.** Yes.

**Q.** This is on what date?

**A.** December 29th.

**Q.** So the very next day?

**A.** Yes.

**Q.** In the first sentence, he says, "Hope everything went well yesterday for Mr. Goldstein." Is that right?

**A.** Yes.

**Q.** If we scroll up one e-mail, that same what did you write?

**A.** "Should I respond and tell him you weren't able to get it out on time, but thanks for his help?"

**Q.** So this is a reference to the wire we were talking about in the last e-mail?

**A.** It appears so.

**Q.** And who did you send that e-mail to?

**A.** I don't think it says, but I assume Mr. Goldstein.

**Q.** Based on the "from" line?

**A.** Yes.

**Q.** What did he say back?

**A.** "Yes, please."

**Q.** Now, if we go to Exhibit 626 on the fifth page. If we look at the bottom e-mail here sent on December 29th, what did

you say in the first sentence?

A.    "Unfortunately, Tom was not able to get the wire out on time, but he appreciates all of your help."

Q.    And then what did you talk about in the second sentence?

A.    That we were interested in moving all of our current bank accounts over to Wells Fargo from Citibank and asking if they could help us with that.

Q.    Why were you interested in doing that?

A.    I don't remember.

Q.    So this is in December 2016 that you're looking to switch to bank accounts at Wells Fargo for the firm?

A.    It seems so.

Q.    Taking a step back here, did Mr. Goldstein ever explain to you why he had received north of $800,000 through UCB?

A.    Not that I can recall.

Q.    Did he ever tell you how much money he made playing poker in 2016?

A.    No.

Q.    Did he even tell you that he was playing high-stakes poker in 2016?

A.    I had a sense that Tom played poker.  I didn't know for how much or what his winnings were or anything like that.

Q.    When you say you had a sense, did he tell you?

A.    I don't recall a specific conversation.  It's just known that Tom plays poker.

Q.   So had you inferred that he might be playing poker?

A.   Yes.

Q.   I'd like to go to Exhibit 18 on the second page.  In this first e-mail, if we can make it larger, broadly, what are you telling Tom -- Mr. Goldstein here?

A.   I'm telling him the balances for that month, probably after we paid payroll and rent, and telling him we needed to move some money to the blog, otherwise we wouldn't have enough.

Q.   And in fact, the blog will run negative?

A.   Yes.

Q.   If we go up to the next e-mail from the previous page, what date is this e-mail sent?

A.   December 21, 2016.

Q.   From whom?

A.   Mr. Goldstein.

Q.   Initially, it says "move 50K to the blog.  Thanks."  Is that right?

A.   Yes.

Q.   And then, after that, what does he tell you?

A.   "At some point, tell me two things from the firm and personal accounts for 2016:  How much we sent to Wells Fargo versus how much came from it.  How much we sent in wires, 40K or more, to individuals like Dan Bilzerian."

Q.   When she says "the firm accounts," what is he referencing?

A.   I see just "firm account."  I assume at that point he's

just talking about the Citibank account for the firm.

Q. The Goldstein & Russell firm Citibank account?

A. Yes.

Q. And when he says "personal accounts," which accounts is he referencing?

A. I would assume also his personal Citibank account.

Q. In his first question, "how much we sent to Wells Fargo versus how much came from it," a moment ago we talked about a few days after this you looking to set up a firm Wells Fargo account. So what Wells Fargo account is he referencing here?

A. I believe it would have been his personal Wells Fargo account.

Q. Did you have access to that account?

A. I don't believe so.

Q. He also says, "how much we sent in wires, 40K or more, to individuals like Dan Bilzerian."

A. Yes.

Q. At the time, did you know who Dan Bilzerian was?

A. I had a sense of who Dan Bilzerian was, although, at the time I sent this e-mail, I don't recall how much I knew about him.

Q. Did you have any sense of what united, a group of people, called individuals like Dan Bilzerian?

A. Sitting here, I don't remember.

Q. If Mr. Goldstein had told you that there are people with

whom he won and lost millions of dollars playing poker, would you have remembered that?

A.   Yes.

Q.   If we scroll up one e-mail here, this is now sent on December 27, 2016?

A.   Yes.

Q.   Is that directly between two holidays and your birthday again?

A.   Yes.

Q.   What do you say in this e-mail?

A.   "Hi Tom, quick question on this.  So it's hard for me on Citibank to distinguish between wires to Wells Fargo versus wires sent to your personal account because they have the same name.  Can I log in to the Wells Fargo account to find those?"

Q.   So can you, in your own words, sort of elaborate on what the challenge is that you're encountering here?

A.   I believe that I am having a hard time telling which wires were to Tom's Wells Fargo account versus to his personal Citibank account, maybe because they both were named Thomas Goldstein, but I'm not sure on that.

Q.   And so then in this last sentence, you're asking if you can log into his personal Wells Fargo account?

A.   It appears so.

Q.   If we look at the e-mail directly above this, it's on that same day, did Mr. Goldstein give you access to his personal

Wells Fargo account?

**A.** No.

**Q.** What did he say instead?

**A.** "I think we have to request all the old statements. I'd just search your e-mail for wire Wells."

**Q.** Did you ever get access to his personal Wells Fargo account?

**A.** I don't recall.

**Q.** If you had gotten access to a personal Wells Fargo account with millions and millions of dollars running through it, would you have noticed?

**A.** Yes.

**Q.** Would you have remembered?

**A.** Yes.

**Q.** If we go up a little ways further and zoom out actually for a moment, yeah, looking at the second from top e-mail, what did you say here?

**A.** "As far as money coming in from Wells, you would have always done that. Do you know the rough dates you did those? If not, I'll look at all incoming deposits from your name and tease out which were personal versus Wells."

**Q.** That's on what date?

**A.** December 27th.

**Q.** If we scroll up slightly, later that day you then sent a follow-up e-mail?

**A.** Yes.

**Q.** In this e-mail what did you explain?

**A.** I attached a document. I said, "Attached are all the Bilzerian people, all the times you told me to wire the Wells account from the firm with approximate dates, and the three times the firm received money from you. Whether those three came from your personal or Wells, I can't tell. Let me know if you think I've missed anything here. I have also attached a general breakdown for wires this year from Jill."

**Q.** You have two attachments here. What are their titles?

**A.** "Wires from Wells and Bilzerian, etc, 2016," "G & R Wires."

**Q.** Now, speaking of the general breakdown from Jill of firm wires, let's look at her e-mail on this Exhibit 581. If we can zoom in on her e-mail here, what date was this e-mail sent on?

**A.** December 22, 2016.

**Q.** What's the name of the document she attached?

**A.** "G & R Wires."

**Q.** And that's the one that you then attached yourself in your e-mail?

**A.** I believe so.

**Q.** What did Ms. Leonard explain in this e-mail?

**A.** That there wasn't an easy way for her to isolate or report of only wires. Our bank might have been able to do it, but she gave us a report giving some of the information.

**Q.** Looking at the second paragraph, what does she explain is on the second tab of this Excel spreadsheet?

**A.** "Outgoing legal fee payments."

**Q.** Let's look at that spreadsheet, Exhibit 555. This is a screenshot of that Excel spreadsheet. What tab are we on at the bottom?

**A.** "Legal fees."

**Q.** And looking at column H, what are the names of people listed in the "legal fees" column?

**A.** Thomas Dwan, Blitz Nevada, Thomas Dwan, Andrew Robi. That looks like a case name, LA versus Patel. Roger Sipple. Alfred DeCarolis. Freeh, Sporkin & Sullivan, LLP. Wire to the 1988 trust. Cebusal (sp) International wire out. Andrew Robl. October bank debits. Wire to 1988 Trust. Wire to Andrew Robl. Wire to Bob -- I think it's Safai. But that might be an L at the end.

**Q.** So earlier we looked at a wire Mr. Goldstein had you send to Andrew Robl. Is it possible this is just a typo?

**A.** Yes.

**Q.** And at the bottom, you mentioned this wire to Bob Safai. Do you know who Bob Safai is?

**A.** No.

**Q.** Did Mr. Goldstein ever mention anything about him?

**A.** I don't recall either way.

**Q.** And these are all listed as legal fees?

**A.** Well, that's what the tab is.

**Q.** Now, going back to Exhibit 18, looking at the top e-mail here, back on December 27, 2016, you attach that same exact spreadsheet we were just talking about?

**A.** I did.

**Q.** Do you know why Mr. Goldstein wanted you to find all of the wires sent over $40,000 to people like Dan Bilzerian?

**A.** No.

**Q.** Did he explain to you why that was important to do at the end of 2016?

**A.** I don't recall either way.

**Q.** You had a back and forth with him over a few days here in December; is that right?

**A.** Yes.

**Q.** In fact, you were working on this between Christmas and New Year's and your birthday?

**A.** Apparently, yes.

**Q.** Was this something that seemed important to Mr. Goldstein?

    **MS. REAVES:** Objection.

    **THE COURT:** Let's come to the headsets.

    (Whereupon, an off-the record discussion was held outside the presence of the jury as follows:)

    **THE COURT:** Do we have counsel for Mr. Goldstein? Mr. Goldstein, thumbs up.

    **THE DEFENDANT:** (Indicating thumbs up.)

THE COURT: Counsel for the government? All right. You are on.

Go ahead, Counsel.

MS. REAVES: Thank you, Your Honor.

Your Honor, I would largely not object to government's questions, but this pretty clearly calls for speculation of whether this was important to Mr. Goldstein or why it was important to Mr. Goldstein. I think she's testified to what he has communicated, but she can't speculate as to the importance.

THE COURT: All right. Thank you. The objection is speculation.

Counsel for the government?

MR. GORDON-MARVIN: I think the witness can speak to her own lay impression from interacting with Mr. Goldstein about whether it was something that mattered to him. If it ends up being speculation, I'd be happy to have it struck. But I think she can speak to her own personal knowledge and impression.

THE COURT: Well, I think, then, you need to rephrase the question because you're asking her right now to speculate what's in Mr. Goldstein's head.

So, if you want to ask her what she thought, you can ask her what she thought.

MR. GORDON-MARVIN: Sure. Happy to, Your Honor.

THE COURT: All right. Thank you.

(Whereupon, discussion concluded.)

**BY MR. GORDON-MARVIN:**

Q.   Did you think that this was an important project to Mr. Goldstein?

A.   I don't remember how I thought about this.

Q.   After you sent this e-mail to Mr. Goldstein, did he reply to it, to your knowledge?

A.   I don't remember.

Q.   Did you ever come to you and tell you, I looked at the G & R's wire spreadsheet and we've got over a million dollars in personal payments misclassified as legal fee expenses?

A.   No, not that I can recall.

Q.   I'd like to shift to Exhibit 3.  Looking at the top of this page, what's the title of this e-mail?

A.   "File."

Q.   Who's it from?

A.   Mr. Goldstein.

Q.   Who is it sent to?

A.   Tom.Goldstein@protonmail.com.

Q.   Do you remember ever e-mailing with that Tom.Goldstein@protonmail.com e-mail account?

A.   Not that I can recall.

Q.   Looking at the subject name "File," do you know what this e-mail is about?

A.   It looks like he's e-mailing himself a file.

**Q.** And what's the name of the attachment to that file?

**A.** "Amounts."

**Q.** Did Mr. Goldstein ever tell you about his ProtonMail e-mail address?

**A.** I don't recall.

**Q.** Let's look at that attachment, Exhibit 2, Amounts.docx. Looking at this, there's a column here on the left-hand side. It's got some bold titles. There are four of them. What are those titles?

**A.** "Funded, Returned, In, Out."

**Q.** And what are the dates -- in what year are the dates under these columns -- these headers?

**A.** They're all in 2016.

**Q.** Looking -- first of all, Stewart Resnick is listed a number of times. Do you know who that is?

**A.** No.

**Q.** There's also -- Alec Gores is listed twice. Do you know who that is?

**A.** No.

**Q.** Then there's Mr. Andrew Robl listed. Do you know who that was?

**A.** No.

**Q.** But we were talking about wires with him earlier?

**A.** Yes.

**Q.** Going further down under the out column, there's Bob

Safai?

**A.** Yes.

**Q.** Next to another 12/31/16 date is Keith Gipson?

**A.** Yes.

**Q.** Keith Gipson then appears again under 12/9/16; is that right?

**A.** Yes.

**Q.** And if we scroll further down, here, four up from the total, is a 10/13/16 entry, also for Keith Gipson?

**A.** Yes.

**Q.** For how many dollars?

**A.** 50,000.

**Q.** And what does it say in brackets next to them?

**A.** "Come up with date."

**Q.** Occasionally, this document, on the right-hand side, says "Share from Alec Gores." Do you see that?

**A.** Yes.

**Q.** Do you know what that means?

**A.** No.

**Q.** If we look up a few lines from the bottom, there's an 11/30/16 entry with two question marks. Do you see that?

**A.** Yes.

**Q.** What's the number next to it?

**A.** 1,100,000.

**Q.** And who is -- what is listed in the text next to that?

**A.**   "Lauren from ring game, November 19?"

**Q.**   Do you know what this document is about?

**A.**   No.

**Q.**   When you were working at Goldstein & Russell, did you ever seen a document like this?

**A.**   Not that I can recall.

**Q.**   I'd like to compare this document to the exhibit that you had attached, the G & R wires document.  It's Exhibit 557.  And if we remove the highlighting for a moment from this top exhibit, looking at this, five lines from the bottom, there's a 10/26/16 entry for Andrew Robl.

   **MR. GORDON-MARVIN:**  Can we zoom in on that?

   **MS. REAVES:**  Objection.

(Whereupon, an off-the record discussion was held outside the presence of the jury follows:)

   **THE COURT:**  Ms. Couper, do we have you?

   All right.  Mr. Goldstein?

   **THE DEFENDANT:**  (Indicating thumbs up.)

   **THE COURT:**  Counsel for the government?

   All right.  Go ahead, Counsel.

   **MS. REAVES:**  And, Your Honor, I'm not sure if this is a mistake, but the government identified this -- the G & R wires documents, which is the Excel spreadsheet we were just looking at, that had been sent by GRF.  The document that they have on the screen is a different document that was attached.

And so I don't know if -- I don't think we've shown this second document to the witness yet. And I just want to make sure that the record was clear, what we're talking about.

THE COURT: All right. Counsel, do you concur?

MR. GORDON-MARVIN: She is entirely right, and I'll fix that right now.

THE COURT: All right. All right. Let's clean up the record. Thank you, Counsel.

(Whereupon discussion concluded.)

BY MR. GORDON-MARVIN:

Q. All right. Rewinding a moment here and undoing the split screen.

MR. GORDON-MARVIN: Apologies, Mr. Resto. Let's go back and look at that Exhibit 581. And, in fact, as I reorient myself here, let's look at Exhibit 18. Sorry, Mr. Resto.

BY MR. GORDON-MARVIN:

Q. So look at the top e-mail, there were two documents attached. The first one is titled "Wires from Wells and Bilzerian, et cetera, 2016"; is that right?

A. Yes.

Q. Let's look at that document, Exhibit 557. In column A, in rows 1 through 10, what types of things have you listed?

A. I list Thomas Dwan, Blitz NV, Andrew Robl, Roger Sipple, Alfred DeCarolis, firm, and Bob Safai. Some more than once.

Q. And then in columns C and D, what are the headers?

**A.** Date, Amount, respectively.

**Q.** And these are transactions you identified by going through your e-mail?

**A.** I'm not sure if it was by going through my e-mail.

**Q.** Well, you didn't have access to the personnel Wells Fargo account, did you?

**A.** No, I don't think so.

**Q.** Now, I'd like to compare this document, remove the highlighting, with the one we were looking at a moment ago, Exhibit 2. If we go to the bottom of Exhibit 2 and zoom in, five rows up from the bottom, there's is a 10/26/16 transfer from Andrew Robl -- or to Andrew Robl for $200,000. Can you see that?

**A.** Yes.

**Q.** Looking at the wires from Mr. Bilzerian, et cetera, Exhibit 557 here on top, is there any October 2016 payment to Andrew Robl listed?

**A.** No.

**Q.** Now, looking again at the bottom, Exhibit 2, here, if we go up quite aways to the top sections, there's also a 7/20/16 returned amount of $100,000 to Stewart Resnick. Can you see that?

**A.** Yes.

**Q.** Is -- looking now at the top document here, that spreadsheet you had created regarding individuals like Dan

Bilzerian, is there a July 20, 2016 transaction with Stewart Resnick or the 1988 trust?

A.    No.

Q.    So those two transactions don't appear on this spreadsheet you had made; correct?

A.    Correct.

Q.    Now, keeping Exhibit 2 here on bottom, let's look at Exhibit 556, that list of G & R wires from Ms. Leonard.  If we look at -- we scroll over to the left here of this list, and we look at row 27, there's a general journal entry dated 10/31/2016.  Can you see that?

A.    Yes.

Q.    Who is that to?

A.    Wired to Andrew Robi, who I assume is Andrew Robl.

Q.    For how much?

A.    $200,000.

Q.    And if we go back on Exhibit 2 here to the bottom, this 10/26 transaction, how much is it for?

A.    $200,000.

Q.    With Andrew Robl?

A.    Yes.

Q.    Now, if we go back up on Exhibit 2 to the July transaction with Stewart Resnick, it's highlighted, and we scroll to row -- row 20 -- we had you leave it here -- on row 21 of the top document that you're looking at, do you see a general journal

entry for 7/31/2016?

**A.** I do.

**Q.** What is it titled?

**A.** "Wire to the 1988 trust."

**Q.** For how much?

**A.** $100,000.

**Q.** Do you know who owned the 1988 trust?

**A.** No.

**Q.** Do you know if that's Stewart Resnick?

**A.** No.

**Q.** I would like to move from these two exhibits. Let's look at another exhibit, Exhibit 21. Zooming in on the top of this, who is this to and from?

**A.** Mr. Goldstein.

**Q.** What's the title of this e-mail?

**A.** "Amounts Doc."

**Q.** What's attached to it?

**A.** A document called Amounts.

**Q.** And what date was it sent on?

**A.** October 13, 2017.

**Q.** Were you CC'd on this e-mail?

**A.** I don't think I was working at the firm anymore at this point.

**Q.** Is anyone else CC'd on this e-mail?

**A.** No.

**Q.** Let's look for a moment at that attachment, Exhibit 451. Is it similar to the previous Exhibit 2 that we were looking at?

**A.** It appears to be.

**Q.** Zooming out for a second here, the -- under the out section, couple lines down, there's a 12/31/16, if we zoom in, transaction with a person named Dan Cates for $750,000 in bold. Can you see that?

**A.** Yes.

**Q.** What does it say in the brackets to the right?

**A.** "Last Manila trip."

**Q.** Did Mr. Goldstein ever tell you about gambling for hundreds of thousands of dollars in the Philippines?

**A.** Not that I can recall.

**Q.** And taking a step back, there are transactions here in the millions of dollars. Did he ever tell you about winning millions of dollars in poker?

**A.** No, not that I can recall.

**Q.** Did he ever tell you about losing millions of dollars in poker?

**A.** No.

**Q.** Did he ever tell you a specific wire that he was having you send was for a poker loss?

**A.** No, I don't think so.

**Q.** How many times did he ask you to record his gambling

activity?

**A.** Never.

**Q.** How many times did he ask you for help trackings his gambling account?

**A.** Never.

**Q.** How many times did he ask you to talk to the accountants about his poker transactions?

**A.** I don't recall ever doing that.

**Q.** If he had asked, would you have done it?

**A.** Yes.

**Q.** Speaking of accounting, do you recall a time that there was a challenge with a retirement account?

**A.** Vaguely.

**Q.** Let's look at Exhibit 597. If we zoom in on the top part of this e-mail, who is this from?

**A.** Myself.

**Q.** To whom?

**A.** Mr. Goldstein.

**Q.** What do you say in the first paragraph of your e-mail?

**A.** "This is regarding my mistake with submitting Kevin's retirement contribution late. There are two paths it seems like we can take."

**Q.** What do you explain in the first paragraph?

**A.** "That the first option is to apply for relief under the Department of Labor's voluntary fiduciary correction program.

If we did that, we would use their calculator to determine the lost interest to submit to Kevin's account. Then TA, which I believe is Transamerica would submit that IRS form. In that case, it seems like we would submit $404.01 to Kevin, pay an excise tax, which I believe would be 15 percent of that amount, but I wasn't totally sure about that. And a $500 fee to the IRS. Under that option, if the IRS approved how we did it, then we would get a letter saying that we're fine and they wouldn't audit on that issue."

Q. So under this first path, you have to submit some paperwork to the IRS?

A. Well, it looked like we applied for something under -- to the Department of Labor and then Transamerica submits something to the IRS, I think.

Q. So Transamerica submits the paperwork to the IRS?

A. That's what it looks like.

Q. And you might have to pay a $500 fee to the IRS?

A. That's what I said.

Q. And then you would need to see if the IRS approves this proposal?

A. Right.

Q. Scrolling down a bit, what did you say in the last paragraph of your e-mail?

A. "Unfortunately, at this point, I am trying as hard as I can, but the issue is now too technical and legal for me to

know how to proceed.  I also don't know how the fact that we are leaving TA would affect any potential IRS action.  Please let me know how to proceed.  Again, I'm incredibly sorry for this mistake."

Q.   How stressful was this for you?

A.   Sitting here, I don't have much of an independent recollection of this event, but I've seen text messages suggesting that I found this very stressful.

Q.   You lost sleep over it?

A.   I was staying up late, I guess.

Q.   Had you received any training on this type of thing?

A.   No.

Q.   How well-equipped did you feel for the bookkeeping and tax side of your job?

A.   That depends on -- there's different parts of it.  Sending documents to the accountants, for example, I felt comfortable doing.  Something more high level like this, I felt uncomfortable doing.

Q.   When you were preparing to leave Goldstein & Russell and go to law school, did you have an opinion about what type of person should be hired to replace you?

A.   Yes.

Q.   What did you think?

A.   I thought that there would be benefits to hiring somebody who had more experience than I did in HR or taxes or something

like that.

**Q.**   Did you tell that to anyone?

**A.**   Yes.  Mr. Goldstein.  Andrew Hamm and I also had conversations about this.

**Q.**   When you told that to Mr. Goldstein, what did he say?

**A.**   My recollection of this conversation is pretty vague, but we hired a recent college graduate, so...

**Q.**   Did he take your advice?

**A.**   No.

**MR. GORDON-MARVIN:**  A moment to confer with counsel? We have no further questions at this time.  Thank you.

**THE COURT:**  Can you repeat that, Counsel?  State it again on the record.

**MR. GORDON-MARVIN:**  We have no further questions, now, Your Honor.

**THE COURT:**  Thank you very much.

Does the defense wish to cross-examine the witness?

**MS. REAVES:**  Yes, Your Honor.

**THE COURT:**  Okay.  I think, given that it's about three o'clock.  I think the witness and the jury could use a break, so I'm going to invite the jury to step down for its afternoon break at this time.

Please rise for the jury.

(Whereupon, the jury exited the courtroom at 2:59 p.m.)

**THE COURT:**  Please be seated.  Ms. Runkle, if you

want to step down and take a break at this time, you may as well. And since you're now on cross, you should not consult with government counsel. Please take your time.

(Whereupon, the witness stepped off the witness stand and out of the courtroom.)

THE COURT: All right. Counsel, when we come back, we will have the cross for Ms. Runkle and any redirect.

How long are you thinking on cross at this point?

MS. REAVES: I think probably 45 minutes to an hour.

THE COURT: Then that's probably going to take me to the time I'm going to have to leave. We may have to call her back if there's any redirect. All right. Why don't we take five minutes and we'll come back?

DEPUTY CLERK: All rise. This Honorable Court stands in recess for five minutes.

(Whereupon, a recess was taken from 3:00 until 3:09 p.m.)

DEPUTY CLERK: All rise. This Honorable Court resumes in session.

THE COURT: Please be seated, everyone. I believe we're now ready to cross-examine the witness. Before she joins us, Counsel, if we could find a natural pause point at about 3:59, so that we can pause for today, I'm going to need to instruct the jury before I take the bench or leave the bench, rather, so you can let me know.

All right. Let's have the witness back, please.

Ms. Runkle, you can just come right on back and retake your seat in the witness stand and make yourself comfortable. And I'll remind you that you remain under oath.

THE WITNESS: Thank you, Your Honor.

THE COURT: All rise for the jury.

(Whereupon, the jury entered the courtroom at 3:11 p.m.)

THE COURT: Please be seated.

Counsel for the defense?

MS. REAVES: Thank you, Your Honor. Your Honor, may I approach with a binder?

THE COURT: You may.

CROSS-EXAMINATION

BY MS. REAVES:

Q. Hi. Good afternoon, Ms. Runkle.

A. Good afternoon.

Q. I want to start just making sure we're clear on a few important points. Mr. Goldstein never instructed you to hide information from the accountants; right?

A. Correct.

Q. And Mr. Goldstein never instructed you to withhold information from the accountants; right?

A. Correct.

Q. There was never a time when you knew that something was a personal payment from Mr. Goldstein and he instructed you to instead have it classified as a business expense; right?

**A.** Correct.

**Q.** Now, I want to make sure that we're all clear on what your role was when you were a firm manager at Goldstein & Russell. Okay?

So you were the firm manager for about two years, which included the calendar year 2016; right?

**A.** Yes.

**Q.** And your responsibilities were primarily administrative; right?

**A.** Yes.

**Q.** So you did things like paying bills, opening mail, answering the phone and basic paralegal tasks?

**A.** Yes.

**Q.** Now, the government asked you questions about whether you had any accounting or financial experience. Do you remember those questions?

**A.** Yes.

**Q.** Your role was not accounting for Goldstein & Russell; right?

**A.** Correct.

**Q.** And you were also Mr. Goldstein's personal assistant?

**A.** Yes.

**Q.** Now, instead of you performing any accounting or bookkeeping services, the firm hired outside accountants for accounting, bookkeeping and tax preparation; correct?

**A.** Yes.

**Q.** All right. And the firm that handle the accounting, bookkeeping and tax preparation was called GRF; right?

**A.** Yes.

**Q.** Now, your role was to act as kind of a go-between between the firm and the accounting firm; is that right?

**A.** Yes.

**Q.** Now, you mentioned on direct a couple of people you worked with. Mr. Walter Deyhle was one of the people you worked with?

**A.** Deyhle, Dale, yes.

**Q.** And more often, you worked with someone named Jill Leonard; is that right?

**A.** Yes.

**Q.** Now, part of your role, the things that you did at Goldstein & Russell included making personal payments for Mr. Goldstein; right?

**A.** Personal payments --

**Q.** So, as Mr. Goldstein's personal assistant, sometimes he would ask you to make payments that were personal to him; is that right?

**A.** Yes.

**Q.** And you had access to both firm and personal bank accounts for Mr. Goldstein; right?

**A.** Yes.

**Q.** And the government, I think, asked you about some

questions on direct about whether or not Mr. Goldstein would tell you is it firm or personal; is that right?

A.   Yes.

Q.   Now, I just want to be clear, your job was not to classify any transactions as firm or personal in the firm's accounting records; right?

A.   No.

Q.   So, when you say you asked Mr. Goldstein firm or personal, you're talking about which bank account that you would use or which credit card you would use, a firm one or a personal one; is that right?

A.   Yes.

Q.   And because you sometimes made personal payments for Mr. Goldstein, he didn't hide the fact that sometimes he asked you to make personal payments; right?

A.   No.

Q.   And I want to be clear about another thing related to the accounting records.  Now, your understanding is the accounting records for Goldstein & Russell for the time when you were at the firm were the records in a spreadsheet in QuickBooks; is that right?

A.   I assumed that's what GRF -- GFR -- GRF did.

Q.   Okay.  And to be clear, you're assuming, because at no point in time were you the person responsible for QuickBooks; right?

**A.** Correct.

**Q.** Like the entire time it was the accounting firm that was responsible for maintaining the accounting records in QuickBooks; right?

**A.** Yes.

**Q.** And so it was the accounting firm that had control over the QuickBooks records, where, if there were any classifications of income or deductions or legal fees, the accounting firm had control over that. That wasn't your job?

**A.** I assume so. That wasn't my job.

**Q.** Now, I think you got some questions on direct about how much you knew about what Mr. Goldstein won or how much he played in poker; right? Do you remember those questions?

**A.** I do.

**Q.** But it wasn't a secret to you that Mr. Goldstein played poker; right?

**A.** No.

**Q.** And it wasn't your job to track Mr. Goldstein's poker wins, losses or transactions; right?

**A.** No.

**Q.** Now, we talked about how it's the accountants who had control over the QuickBooks records. Now, from time to time, did the accountants reach out to you to ask about whether a certain line in the accounts was business related or personal? Do you remember that?

**A.** They probably did. I'm drawing a blank on a specific time, though.

**Q.** Okay. If the accounting firm reached out to you to ask for this information, you would ask Mr. Goldstein?

**A.** Yes.

**Q.** And Mr. Goldstein would tell you?

**A.** Yes.

**Q.** And you would relay that information back to the accounting firm?

**A.** Yes.

**Q.** But the accountants were the ones tracking whether or not they needed additional information to make sure the records were correct?

**A.** I would hope so.

**Q.** Now, the government also asked you some questions on direct about Mr. Goldstein's understanding of firm finances. Do you remember that?

**A.** Yes.

**Q.** Okay. And I think you said something to the effect of, Mr. Goldstein was generally aware of the firm finances; right?

**A.** Yes.

**Q.** Now, you know that he was generally aware because one of the things Mr. Goldstein would do is ask you to update him on the balances in various bank accounts; right?

**A.** That's correct.

Q.    And I think the government showed you some e-mails where you're providing Mr. Goldstein with the balances in the bank accounts; right?

A.    Correct.

Q.    And then based on those balances, he might give you instructions on how to wire money, or what to do with payments; is that right?

A.    Yes.

Q.    Okay.  But when you testified that Mr. Goldstein was generally aware of firm finances, you don't remember any time that Mr. Goldstein was sitting down and reviewing every line of the QuickBooks records; right?

A.    I don't recall such a time.  I wouldn't have been there if he did, probably.

Q.    Okay.  So you have no knowledge of whether or not GRF ever asked Mr. Goldstein to review the QuickBooks accounting records for their accuracy?

A.    I don't know that either way.

Q.    Okay.  And you didn't have control of QuickBooks.  Do you know whether Mr. Goldstein had control over QuickBooks?

A.    I doubt it, but I don't know for sure.

Q.    Now, Mr. Goldstein traveled a lot for work?

A.    Yes.

Q.    Okay.  Traveled around the country and traveled around the world?

**A.** Yes.

**Q.** So you would say that most of your communications with Mr. Goldstein were via e-mail?

**A.** That's probably right.

**Q.** All right. Now, I want to talk about there's a set of documents the government showed you on direct examination relating to some spreadsheets at the end of December 2016. Do you remember those questions?

**A.** I do.

**Q.** Okay. I want to pull up the documents and walk through some of that so we make sure that we're on the same page.

**MS. REAVES:** So could we have Government's Exhibit 18.

**BY MS. REAVES:**

**Q.** All right. And just to reorient everyone, at the bottom of the page Mr. Goldstein is reaching out to you. He's asking you to tell him two things: From the firm and personal accounts for 2016, how much we sent to Wells Fargo versus how much came from it, and how much we sent in wires 40,000 or more to individuals like Dan Bilzerian. Do you see that?

**A.** Yes.

**Q.** Okay. And you remember talking with the government about this document on direct examination; right?

**A.** Yes.

**Q.** Okay. So I just want to start with being clear about the

ask. Mr. Goldstein wasn't asking you, hey, can we review our 2016 accounting records for tax purposes; right?

**A.** No.

**Q.** Okay. And the request that Mr. Goldstein made, for you to tell him how much we sent in wires, 40,000 or more, to individuals like Dan Bilzerian. Now, at the time, you knew that Dan Bilzerian was a friend of Mr. Goldstein's; right?

**A.** I probably knew that by that point.

**Q.** Okay. And you didn't know the reason behind Mr. Goldstein sending this e-mail; right?

**A.** I don't recall anything about this e-mail.

**Q.** Okay. Sitting here today, you don't remember anything about this e-mail or the attachments; right?

**A.** That's correct.

**Q.** All right. But it's fair to say at the time, you had some idea where you were able to pull together a list of people like Dan Bilzerian; is that right?

**A.** It would seem so.

**Q.** Now, I want to look at, if we go back up to the top of the document and we see the attachments, the From, Sent, To, Subject and Attachments.

So as you discussed on direct, you go back, you try to get some information about wires that had been sent, and you send this e-mail back to Mr. Goldstein; is that right?

**A.** Yes.

Q.   Okay.  And the attachments you send, one is titled "Wires for Wells and Bilzerian, et cetera, 2016"; is that right?

A.   Yes.

Q.   And the other is called "G & R Wires"; is that right?

A.   Yes.

Q.   Okay.  Neither of these documents are titled Goldstein & Russell's 2016 Tax Information; right?

A.   Correct.

Q.   The titles of these documents don't make it apparent that there is all of the firm's accounting records here; right?

A.   Right.

Q.   And I want to talk about how you pulled together the information that you used to send these documents back to Mr. Goldstein.  Okay?

     Now, the government showed you -- I don't know what if the government showed you this.

     I want to turn to Government's Exhibit 583.  All right.  So in Government's Exhibit-583, this is you sending an e-mail to Jill Leonard at the accounting firm, with the subject line "Wires."  Do you see that?

A.   I do.

Q.   Okay.  And you were sending this e-mail to kind of try to gather the information about wires that Mr. Goldstein had asked for; is that right?

A.   Yes.

**Q.** Okay. And in this e-mail you say, "Hi, Jill. Tom wants a list of all the wires that the firm sent or received this year. Is this something you are easily able to do?" Do you see that?

**A.** Yes.

**Q.** Okay. Now, when you send this e-mail to Jill at the accounting firm, you didn't tell Jill that Mr. Goldstein was trying to review all of the firm records for accounting purposes; right?

**A.** Apparently not.

**Q.** There is nothing here saying, Hey, Mr. Goldstein is looking to double-check any of the classifications before you use this for tax purposes; right?

**A.** That's not in this e-mail.

**Q.** Okay. You're just asking her about what are all of the wires the firm sent; right?

**A.** Yes.

**Q.** Okay. And the government showed you a document that Ms. Leonard sent back to you. Do you remember that e-mail?

**A.** Could you show it to me?

**Q.** Sure.

**MS. REAVES:** Let's pull up -- it's Government's Exhibit 575.

**MR. GORDON-MARVIN:** Objection.

**THE COURT:** Let's go to the headsets, Counsel.

(Whereupon, an off-the record discussion was held outside

the presence of the jury follows:)

THE COURT: Do we have defense counsel on the line?

MS. REAVES: Yes, Your Honor.

THE COURT: All right. Government counsel, are you here?

MR. GORDON-MARVIN: (Nods heads up and down.)

THE COURT: Mr. Goldstein, thumbs up. Mr. Goldstein can't hear. Okay.

All right. Go ahead, Counsel.

MR. GORDON-MARVIN: It's actually last-minute objection, just a clarification. I think just as Ms. Reaves helped me get to the right document, she's looking for 581.

MS. REAVES: I think I have a different version of the same document. So I'm okay with going forward with the one I have.

THE COURT: All right. She said she knows the document. Thank you.

(Whereupon, discussion concluded.)

MS. REAVES: All right. Could we have the document back on the screen, please?

BY MS. REAVES:

Q. Okay. So to be clear, the government showed you a different version of this. But do you recognize that it's the same e-mail?

A. Yes.

**Q.** Okay. And in this e-mail, the government went through Ms. Leonard's explanation of each of the tabs in the G & R Wires document that Ms. Leonard sent back to you. Do you remember that?

**A.** I don't think we reviewed each of the tabs.

**Q.** Okay. So in the second paragraph of this e-mail, it says, the first tab as deposits and legal fee income. Do you see that?

**A.** Yes.

**Q.** All right. And so you can tell from this e-mail that, generally, Ms. Leonard is explaining to you the contents of the G & R Wires document. Do you see that?

**A.** Yes.

**Q.** All right. Point is, you didn't forward Ms. Leonard's e-mail to Mr. Goldstein; right?

**A.** I don't know.

**Q.** Okay. The government didn't show you an e-mail where you were forwarding Ms. Leonard's e-mail with this context to Mr. Goldstein; right?

**A.** Not that I can recall.

**Q.** Okay. And then when we were looking back at Government's Exhibit 18, if we go back to it briefly. Now, in Government's Exhibit 18, you see that one of the attachments is a G & R Wires document that Ms. Leonard had sent to you; right?

**A.** I do.

**Q.** Okay. But when you send that document back to Mr. Goldstein, you don't include any of that context that Mr. -- Ms. Leonard had sent to you; is that right?

**A.** Seems that way.

**Q.** Okay. And as far as you know or can recall, there was no separate conversation you had with Mr. Goldstein explaining what the G & R Wires spreadsheet was; right?

**A.** I have no independent recollection of any of this.

**Q.** Okay. And the government hasn't shown you an e-mail where you are providing that context that Ms. Leonard gave you to Mr. Goldstein?

**A.** I don't think so.

**Q.** Okay. And so when you received that e-mail with the G & R wires from Ms. Leonard, you never asked Mr. Goldstein to double-check the classifications in that spreadsheet; right?

**A.** Not that I can recall.

**Q.** Right. And Ms. Leonard never asked you to do that; right?

**A.** Again, not based on the e-mails I've seen.

**Q.** Okay. And the government hasn't showed you any e-mail, or Ms. Leonard, or anyone from the accounting firm asked you to have Mr. Goldstein actually look at and check the classifications in her G & R Wires document?

**A.** I don't think so.

**Q.** Okay. And, in fact, you don't know whether Mr. Goldstein ever looked at either of the documents that you attached to

your e-mail; right?

**A.** I guess not.

**Q.** You never discussed this document, these spreadsheets with Mr. Goldstein?

**A.** I don't remember either way.

**Q.** And I think the government pointed out on direct that there's no response from Mr. Goldstein; right? In this e-mail string?

**A.** I think that's right.

**Q.** Okay. And you haven't seen any other e-mail where Mr. Goldstein is responding and saying, hey, I got this e-mail. I reviewed the spreadsheets; right?

**A.** Yes.

**Q.** Okay. All right. And I think you mentioned at a point during the government's direct examination that, like, this is right -- coming up on the holidays; right?

**A.** Yes.

**Q.** And your birthday?

**A.** Correct.

**Q.** And so this is -- in the week that's after Christmas, before New Year's, you yourself missed an e-mail; right?

**A.** It seems that way.

**Q.** Okay. And it's possible that Mr. Goldstein missed an e-mail as well?

**A.** Of course.

**Q.** Now, the government showed you some documents on direct examination that I think you said that you had never seen before, and walked you through the documents with the spreadsheets. I want to do a similar thing. Okay?

**A.** Okay.

**Q.** All right.

**MS. REAVES:** So first, I want to pull up -- to make sure that we're all oriented of what I'm talking about, I want to pull up Government's Exhibit 3.

**BY MS. REAVES:**

**Q.** All right. And Government's Exhibit 3 is an e-mail that Mr. Goldstein sent to himself, subject line "File, attachments amounts." Do you remember the government asking you questions about this?

**A.** Yes.

**Q.** Okay. Have you ever e-mailed a document to yourself?

**A.** Yes.

**Q.** Now, I want to -- now look at the amount spreadsheet -- I'm sorry -- not spreadsheet. Let's point out -- can you read what the attachment says there?

**A.** Amounts.docx.

**Q.** And .docx, what does that mean to you? What type of document is that?

**A.** A Word document.

**Q.** All right. So let's pull up the Word document that was

attached to this e-mail, which is Government's Exhibit 2.

All right.  Now, Government's Exhibit 2, as you testified to on direct, you never seen before; right?

**A.**  Not that I can recall -- well, I've seen it recently, but...

**Q.**  Outside of this case, you hadn't seen this before; right?

**A.**  Not that I can recall.

**Q.**  Okay.  So you don't know when this was created?

**A.**  No.

**Q.**  You don't know how this was created?

**A.**  No.

**Q.**  You know, based on the attachment name, that this was a Word document, not actually a spreadsheet; right?

**A.**  Yes.

**Q.**  But you don't actually have other context for this document; right?

**A.**  No.

**Q.**  So you can't speak to Mr. Goldstein's intent or what he was doing with this document; right?

**A.**  No.

**Q.**  Now, I want to compare the entries in this document to some of the documents that the government showed you.

**MS. REAVES:**  So if we pull up next to this Government's Exhibit 557.

**BY MS. REAVES:**

**Q.** So on the left side we have the amounts Word document that the government showed you that was attached to Mr. Goldstein e-mail. Okay?

**A.** Yes.

**Q.** And then on the right side, this is the wires for people, like Dan Bilzerian, Excel spreadsheet that you had attached to your e-mail. Okay?

**A.** Yes.

**Q.** And the government asked you questions about comparisons between these two documents. Okay. All right. And I want to ask you some similar questions. Now, these two documents don't match up; right?

**A.** Correct.

**Q.** There's different information in both the documents?

**A.** Yes.

**Q.** So, for example, if we look at your spreadsheet has an April 26 wire to Tom Dwan. And if we -- all right. Now, April 26 wire to Tom Dwan. If we look at the wires Word document list and we scroll, go to the next page, right, there is no such entry for Tom Dwan; right?

**A.** There were entries for Tom Dwan. I didn't have a chance to look at the dates for each.

**Q.** Right. But so the -- if you look at the -- go back to the first page.

Do you notice that the dates that are going out are in

reverse chronological order?

**A.** Yes.

**Q.** Okay. So if we go back to the second page.

**A.** Thank you.

**Q.** Thank you. So if there are an April 26 wire to Tom Dwan, it would have been listed in this spreadsheet; right?

**A.** I don't know if it would have been listed in that spreadsheet.

**Q.** It's not on both spreadsheets; right?

**A.** Correct.

**MS. REAVES:** Could I have the Court's indulgence briefly?

**THE COURT:** Yes.

**MS. REAVES:** Sorry. Just one more moment.

**BY MS. REAVES:**

**Q.** Now, I want to look at the second spreadsheet, the one that was from -- that was sent from Jill Leonard. Okay?

**A.** Okay.

**MS. REAVES:** So let's turn to -- the spreadsheet is Government's Exhibit 555.

**BY MS. REAVES:**

**Q.** All right. So in Government's Exhibit 555, this is the spreadsheet that Ms. Leonard sent you back when you asked for wires. Do you remember that?

**A.** Yes.

**Q.**   And it has multiple tabs on it.  The first one is income, legal fees, distributions, loans and SCOTUSblog.  Do you see that?

**A.**   Yes.

**Q.**   If we look at the second tab that's legal fees, I want to compare entries on this spreadsheet to the ones in Mr. Goldstein's list of wires.  All right?

**A.**   Okay.

**Q.**   So  now both -- if you look at line 3, there is a payment to Tom Dwan.  Do you see that?

**A.**   I do.

**Q.**   And the payment to Tom Dwan is April 30, 2016.  Do you see that?

**A.**   Yes.

**Q.**   Let's go back to Government's Exhibit 3.  Now, when we look at Government's Exhibit 3, again, going back to the second page, there is no April 30th payment from Tom Dwan.

**A.**   Correct.

**Q.**   Right?  All right.  Let's go back to the spreadsheet. Now, the spreadsheet has a payment to Blitz Nevada.  That's on line 4.  That's also April 30th.  Do you see that?

**A.**   Yes.

**Q.**   And it's for $85,000?

**A.**   Yes.

**Q.**   Let's go back to Mr. Goldstein's list of wires.

Now, the Blitz Nevada, $85,000, has a different date; right?

A. Yes.

Q. It's April 28th, not April 30th?

A. Correct.

Q. Let's go back to the spreadsheet you got from the accountants at GRF. Let's look at -- we can look at the line for Roger Sipple. It's line 18. It says, July 31, 2016. Do you see that?

A. Yes.

Q. All right. And then there's also, below that, a July 31, 2016 payment to Al DeCarolis. Do you see that?

A. Yes.

Q. Let's go back to the wire list in the Word document, into the first page of it. Now, neither the Roger Sipple or the Al DeCarolis payments are on July 31st; right?

A. Correct.

Q. Both of those payments have different dates from what was in the spreadsheet?

A. Yes.

Q. Let's look at another example. Now, the government pointed out that the spreadsheet that you received from the GRF accountants had some payments to Stewart Resnick or the 1988 Trust. Do you remember questions about that?

A. Yes.

**Q.** And so I want you to go -- let's look at the -- the wire to the 1988 Trust is line 21, right, and we see one of those payments. We see another one on line 26?

**A.** Yes.

**Q.** October 31, 2016, wire to the 1988 Trust?

**A.** Yes.

> **MS. REAVES:** Can we scroll all the way up and down?

**BY MS. REAVES:**

**Q.** Let's go back to Mr. Goldstein's spreadsheet. Now, when we see the wires at the top to the Stewart Resnick, those are different dates; right?

**A.** Sorry. I forgot the -- was it July 31st?

**Q.** Well, let's do them one at a time. Okay? So let's go back to the GRF spreadsheet. So the first one we have is July 31, 2016. It's for $100,000?

**A.** Yes.

**Q.** Let's go back to the wire list. There is no payment from July 31st for $100,000; right?

**A.** Correct.

**Q.** Earlier the government asked you about the amount, but they didn't ask you about the date on that line; right?

**A.** I don't remember exactly what the government asked me.

**Q.** But it's fair to say that there is no July 31st payment to Stewart Resnick for $100,000; right?

**A.** Correct.

**Q.** And going back to the GRF spreadsheet, the second line that we see on the GRF spreadsheet is October 31st, wire to the 1988 Trust. Do you see that?

**A.** Yes.

**Q.** And if we go back to the list of wires, now, the GRF spreadsheet had an entry for $200,000; right?

**A.** Yes.

**Q.** And it was October 31st?

**A.** Yes.

**Q.** Now, we don't see that date or that amount on this wire list that Mr. Goldstein had; right?

**A.** Correct.

**Q.** So we just went through several examples. But point is, the entries on this wire list do not match that GRF spreadsheet that was attached to your e-mail; right?

**A.** Correct.

**Q.** And so just looking at the two documents, you can't assume that one is related to the other; right?

**A.** I don't know how they're or if they're related.

**Q.** And you have no idea whether Mr. Goldstein even opened up any of these spreadsheets that you sent to him?

**A.** No, I don't know.

**Q.** The government also asked you questions about how you gathered the information that you used to put together the wire list. Do you remember those questions?

**A.** Yes.

**MS. REAVES:** Can we go back to your wire list? I think that's Government's Exhibit 557.

**BY MS. REAVES:**

**Q.** I just want to make sure that we're totally clear on this document. This is the document that you created when Mr. Goldstein asked for wires to people, like the Bilzerian folks?

**A.** Yes.

**Q.** And to be clear, when you're listing in this document to a person or from a firm or a person, this is not about how any transactions are classified in the Goldstein & Russell accounting records; correct?

**A.** No. I didn't have access to the accounting records.

**Q.** So what we're looking at here is just a list of which bank accounts were used and these were wires from the firm bank account; right?

**A.** That's my understanding.

**Q.** That doesn't mean that you were communicating these should be classified as firm expenses; right?

**A.** No.

**Q.** And, in fact, if we go back to your e-mail, which is Government's Exhibit 18, right, in Government's Exhibit 18 you explain, okay. This is how I did this for the firm. Do you see at the top?

**A.** Yes.

**Q.** "Attached are all the Bilzerian people. All the times you told me to wire the Wells account from the firm, approximate dates and the three times the firm received money from you. Whether these came from your personal or Wells, I can't tell. Let me know if I've missed anything here." And then at the bottom, you say, "I'll start on personal now." Do you see that?

**A.** Yes.

**Q.** And so the government asked you questions about how, oh, you must have used this via e-mail because you didn't have access to a personal account. Do you remember that?

**A.** Yes.

**Q.** But you did have access to at least one of Mr. Goldstein's personal accounts; right?

**A.** I did.

**Q.** And this is not communicating anything about whether the transactions themselves should be classified as personal or business related; right?

**A.** Correct.

**Q.** Now, on the topic of whether things are personal and business related, we talked about how sometimes Mrs. Goldstein would ask you to make a personal payment from something that -- from the firm account. Do you remember those questions?

**A.** A personal payment from the firm account?

**Q.** Mr. Goldstein might ask you to make a payment for personal purposes, and he would tell you which account to use, but that's separate from how it should be classified in the accounting records; right?

**A.** Yes. That was just asking whether which card or bank account I should use.

**MS. REAVES:** So if we pull up Jill Leonard's spreadsheet again. This is Government's Exhibit 555.

**BY MS. REAVES:**

**Q.** Now, one of the pavements that we talked about a couple of times were $25,000 payments to Thomas Dwan. Do you remember that? And this is on line 10 of the spreadsheet and then line 3 of the spreadsheet. Do you see that?

**A.** Yes.

**Q.** And in this GFR -- sorry -- in this accounting spreadsheet, both of those wires to Thomas Dwan are listed in the legal fees tab; right?

**A.** Yes.

**Q.** And your role in any classifications would have been communicating with the accountants to make sure the classifications were correct; right?

**A.** No.

**Q.** Let me rephrase. If there was a question about whether these classifications were correct, the accountants would have needed to ask you, so that you could then get the information

and tell it back to them; right?

**A.** I would have asked Tom and then, whatever Tom told me, I would have told the accountants.

**Q.** Okay. And focusing on these transactions to Tom Dwan, Mr. Goldstein actually had told you specifically that these were personal payments?

**A.** I don't recall.

**MS. REAVES:** Okay. So I want to pull up, this is Defense Exhibit 300.

**MR. GORDON-MARVIN:** Objection.

**THE COURT:** Let's come to the headsets.

(Whereupon, an off-the record discussion was held outside the presence of the jury follows:)

**THE COURT:** All right. Do we have counsel for Mr. Goldstein? Can you hear us? Okay. Mr. Goldstein?

**THE DEFENDANT:** (Indicating thumbs up.)

**THE COURT:** Counsel for the government? Go ahead.

**MR. GORDON-MARVIN:** Objection. This is, again, self-serving hearsay.

**THE COURT:** Meaning what? The question is eliciting self-serving hearsay?

**MR. GORDON-MARVIN:** I believe the document she's about to pull up is going to be statements by Mr. Goldstein himself to Ms. Runkle. If Mr. Goldstein wants to take the

stand and testify as to these documents, he's welcome to do so. But otherwise, this is self-serving hearsay.

THE COURT: All right. Let's hear from counsel because I am not sure exactly where we are.

Go ahead.

MS. REAVES: Yes, Your Honor. So there is no self-hearing -- self-serving hearsay. But what -- I mean, we briefed this before. This not hearsay. This is about instructions that Mr. Goldstein was giving to Ms. Runkle about how to classify these payments. It was information that she had, instructions to communicate to the accountants at GRF. It's not for the truth of the matter asserted. It's for the fact that Mr. Goldstein communicated this information.

THE COURT: Is there a document you're pointing -- going to --

MS. REAVES: Yes.

THE COURT: Tell me the number.

MS. REAVES: It's Defense Exhibit 300.

THE COURT: All right. Thank you.

MR. GORDON-MARVIN: Is it possible to put that on the screen just for the parties, not the jury, for a moment so we can all look at it together.

MS. REAVES: And, Your Honor, I think it's at the back of your binder.

THE COURT: At the back of my book? All right. I'm

going to see if the courtroom deputy can pull up -- it's Defense 300 just for counsel, not for the jury.

And I'm looking at an e-mail? You said Defense 300, an e-mail?

**MS. REAVES:** Yes, Your Honor.

**THE COURT:** May 5, 2016? Is that the right one?

**MS. REAVES:** Yes, Your Honor.

**MR. GORDON-MARVIN:** Is it possible to pull this up on the screen so the parties can see it? Because what you're looking at is not an e-mail with that date.

**THE COURT:** All right. Mr. Cook, can you pull up the document so that everyone but the jury can see?

I can't understand what's being said. Do we have the document up on the screen? Because I don't see it.

**DEPUTY CLERK:** I have the screen placed for the government. They have to put it on.

**THE COURT:** Okay. So can someone pull up the document so we can see it?

**MS. REAVES:** Yeah.

**THE COURT:** Okay. That's the same document I have in front of me. An e-mail from Mr. Goldstein to Mr. Runkle, subject "Wires, May 5, 2016." Is this not it?

**MS. REAVES:** This is it.

**THE COURT:** All right.

**MS. REAVES:** And so in this document, Mr. Goldstein

instructs Ms. Runkle to make a wire to -- for $25,000 to Thomas Dwan. And then in response, Ms. Runkle asked "from our personal?" Mr. Goldstein provides her instructions in response, says, "Firm a fine because it will be a distribution either way."

And so this is her instruction about -- this is Mr. Goldstein's instruction about how to categorize this payment. It's not hearsay because it's not for the truth of the matter asserted since the instruction is directed.

**THE COURT:** Okay. So what's the concern from the government?

**MR. GORDON-MARVIN:** So this entire document can't be relevant unless it's taken initially for the truth of the matter asserted that this is, you know, going to treated in distribution and it's personal in the statement by Mr. Goldstein. His definition is self-serving hearsay.

**THE COURT:** I'm hearing two things. One concerning about relevance and then the hearsay, and I'm not following the connection between the two. This is a document. Ms. Runkle is one of the parties to the conversation. We have had a number of e-mails pulled up during her testimony that she's talked about instructions and guidance she's gotten from Mr. Goldstein, and what she did and what she understood. So this looks like another example of that. I'm not following the rest of it.

**MR. GORDON-MARVIN:** I think the point here is that defense counsel is relying on Mr. Goldstein's statements. I would just return here to, like, the whole function of this e-mail is to basically smuggle in his own statements and his own instructions.

**THE COURT:** So you want -- you're opposed to the document, but you're not opposed to counsel asking the witness what instructions she received from Mr. Goldstein? I'm not --

**MR. GORDON-MARVIN:** Sure. Yes.

**MS. REAVES:** So, Your Honor, the witness has already testified, and it's reasonable, that she doesn't remember a specific instruction from May 2016. The government has shown a number of documents that have instructions, directives back and forth, including Mr. Goldstein's words. And this is not -- there is no rule saying because it's self-serving, it no longer --

**THE COURT:** Well, there's no rule because to say it's helpful, but what is it that you're -- how is the defense intending to use the document to get around the hearsay concern?

**MS. REAVES:** So it isn't hearsay because the truth of the matter asserted would be, in fact, whether it is personal distribution of a business expense. We were using it for the instruction that it was a distribution.

So the reason this is not hearsay is it's for the

instruction for the classification, not for the underlying facts of the actual payment.

THE COURT: Okay. The fact that Mr. Goldstein provided an instruction to Ms. Runkle?

MS. REAVES: Yes.

THE COURT: All right. I think it can come in. I will note that it's 3:52, so I'm not sure about how much further we're going to get. Do you want to you call this up now? Do you want to break and bring her back in the morning and start here?

MS. REAVES: So I think it probably makes sense to do this document and then I can pause.

THE COURT: All right. Okay. The objection is overruled. Thank you.

(Whereupon, the discussion concluded.)

BY MS. REAVES:

Q. All right. Ms. Runkle, so we're pulling up Defense Exhibit 300 on the screen. Okay? Defense Exhibit 300 is an e-mail from -- at the bottom it starts with an e-mail from Mr. Goldstein to you, with the subject "Wires." Do you see that?

A. Yes.

Q. Okay. And it says, "Please wire 25,000 to Thomas Dwan again." Do you see that part?

A. Yes.

**Q.** Right. And you follow up and you ask, "From firm or personal"; right?

**A.** Yes.

**Q.** Okay. And as you testified earlier, when you're asking firm or personal, you're asking about which bank account should you use; right?

**A.** Yes.

**Q.** Okay. And then Mr. Goldstein responds and says, "Firm is fine because. It will be a distribution either way."

**A.** Yes.

**Q.** Right? Okay. And so Mr. Goldstein is saying there, firm is fine because this is a personal distribution either way. It does not matter which account you use because it's going to be classified as a personal distribution.

**A.** Can you say that again?

**Q.** Mr. Goldstein's response is, "Firm is fine because it will be a distribution either way."

**A.** Yes.

**Q.** Do you see that?

Okay. And so what Mr. Goldstein told you was that this would be a distribution, so it didn't matter if it was personal or firm?

**A.** I guess that's -- yeah. Yes.

**Q.** Okay. And then are you familiar with what a distribution is?

**A.** Somewhat.

**Q.** Okay. So a distribution means that because Mr. Goldstein was the owner of this firm, if he took money out of the firm or used it for personal purposes, that was a distribution to him.

**MR. GORDON-MARVIN:** Objection.

**THE COURT:** Let's come to the headsets, Counsel.

(Whereupon, an off-the record discussion was held outside the presence of the jury follows:)

**THE COURT:** All right. And I will say, I think we're getting beyond what the instruction was to try to have the witness interpret what distributions are.

But let's hear from the government.

**MR. GORDON-MARVIN:** The witness basically just said she's not familiar with what a distribution is. The witness is testifying, not defense counsel. And the defense counsel is now explaining the concept.

**THE COURT:** All right. Counsel for the defendant?

**MS. REAVES:** Yes, Your Honor.

Her testimony was that she doesn't know at all, was that she's general aware. I think the government has asked a lot of leading questions, even on direct. I think we should have leeway to do the same because part of her job involved communicating whether or not something was a distribution.

**THE COURT:** Okay. Well, this sounds like we're getting, again, beyond the instruction that she received from

Mr. Goldstein. That's the reason that I allowed the document to come up through this witness. She's testified about the instruction. We've read back the back and forth, that's before the jury. Now we're looking to talk about what she may understand distributions to be and tax treatment issues. I think we're way beyond the reason why the Court allowed the document to come in. And I think this witness probably doesn't have anything to about those topics.

MS. REAVES: Okay. Then -- I understand the Court's ruling. I'd ask to just ask one follow up because distribution is one of the tabs in the spreadsheet that she received from GRF. And I just want to be able to point that out in the documents that we have before us, and then I'll be done.

THE COURT: Okay. Well, we will do that and then we will pause until tomorrow morning. Thank you, Counsel.

(Whereupon, discussion concluded.)

BY MS. REAVES:

Q. Okay. So Mr. Goldstein's response is, "Firm is fine because it will be a distribution either way"; right?

A. Yes.

Q. Okay. If we go back one more time to the spreadsheet that you got from Ms. Leonard, the G & R wire spreadsheet; right? And you see that there's a tab in the spreadsheet that's labeled for distributions; right?

A. Yes.

**Q.**   Okay.  And so you were aware at the time that distributions was a classification that GRF might ask you about to communicate -- that GRF might ask you a question about so that you could clarify with Mr. Goldstein?

**A.**   I guess so based on this, but I don't specifically remember them asking me to do so.

          **MS. REAVES:**  Okay.  I think that this might be a good time to pause.

          **THE COURT:**  Thank you very much, Counsel.

     I'm going to first address the jury.

     I promised you we would wrap up around four o'clock today, and we're very close to the four o'clock hour.  But before the Court allows the jury to step down, a few parting words.

     First, again, a gentle reminder not to discuss the case with your fellow jurors or anyone else while you are on your break this evening.  Please do not conduct any independent research about the case, read news articles about the case, or do any research on the internet or social media about the case, or again, discuss the case in any way electronically or in person.

     With that, I want to wish the jury a very good evening. We'll see you back here tomorrow morning, and we'll continue at 9:30.

     Please rise for the jury.

     (Whereupon, the jury exited the courtroom at 3:57 p.m.)

**THE COURT:** Please be seated, everyone.

I'm also going to invite Ms. Runkle, you may step down for the evening. We will have you back tomorrow. Have a good evening.

**THE WITNESS:** Thank you, Your Honor.

(Whereupon, the witness left the witness stand and the courtroom.)

**THE COURT:** And, Counsel, again, I want to thank you for your hard work in moving through the witnesses today. We will resume the cross-examination of Ms. Runkle in the morning, and then we'll deal with any redirect of that witness.

Will the government have additional witnesses to call tomorrow?

**MR. ADENRELE:** The government will have multiple additional witnesses to call tomorrow.

**THE COURT:** Okay. And that list will be provided to defense at what time?

**MR. ADENRELE:** Certainly by five o'clock.

**THE COURT:** All right. And I'd appreciate a courtesy copy. That's been very helpful to the Court. You've been doing that, so thank you very much.

I have two minutes. Anything we need to talk about that can't wait until tomorrow morning?

**MR. GORDON-MARVIN:** I think, if I may, Your Honor, just one clarification. Your Honor had, initially last week,

told us that the Court would end today at 4:30. I think the witness has a flight currently booked for the morning. May we or our victim witness coordinator at least communicate with her to arrange her travel and change it, if necessary?

**THE COURT:** To rearrange her travel? Yes. That's appropriate.

**MR. GORDON-MARVIN:** Thank you.

**THE COURT:** Anything else? All right. Anything -- we start at 9:30.

**MR. ADENRELE:** Indeed.

**THE COURT:** All right.

**MR. ADENRELE:** Thank you, Your Honor.

**THE COURT:** Anything from the defense?

**MR. KRAVIS:** No. Thank you, Your Honor.

**THE COURT:** All right. So we'll begin tomorrow morning with the -- continuing the cross for Mr. Runkle. Any redirect, and then we'll move to the next witnesses the government wishes to call. And I understand I'll get an e-mail around 5:00 p.m. with those names.

**MR. ADENRELE:** Absolutely.

**THE COURT:** All right. Counsel, have a good evening. See you in the morning. We are adjourned.

(Proceedings concluded at 4:00 p.m.)

- - -

C E R T I F I C A T E

I, KIMBERLY A. BURSNER, Federal Official Court Reporter in and for the United States District Court for the District of Maryland, do hereby certify, pursuant to 28 U.S.C. §753, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

*Kimberly Bursner*

_____

Kimberly A. Bursner
Registered Professional
Reporter & Federal
Official Court Reporter