IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION
_____

UNITED STATES OF AMERICA        )
                                )
     Plaintiff,                 )
                                )
          vs.                   )Case Number
                                )8:25-cr-00006-LKG-1
THOMAS C. GOLDSTEIN             )
                                )
     Defendant.                 )


TRANSCRIPT OF JURY TRIAL – DAY 7
BEFORE THE HONORABLE LYDIA K. GRIGGSBY
UNITED STATE DISTRICT JUDGE
THURSDAY, JANUARY 22, 2026 at 9:23 a.m.


APPEARANCES:


On Behalf of the Plaintiff:


        UNITED STATES ATTORNEY'S OFFICE – DOJ
        BY:   ADEYEMI ADENRELE, ESQUIRE
              SEAN BEATY, ESQUIRE
              SEAN GORDON-MARVIN, ESQUIRE
              HAYTER WHITMAN, ESQUIRE
        36 South Charles Street, Suite 400
        Baltimore, Maryland 21201
        (410) 209-4800


On Behalf of the Defendant:


        MUNGER, TOLLES & OLSON, LLP
        BY:  STEPHANY REAVES COUPER, ESQUIRE
             ADEEL MOHAMMADI, ESQUIRE
             JONATHAN I. KRAVIS, ESQUIRE
             SARAH WEINER, ESQUIRE
        601 Massachusetts Avenue NW, Suite 5E
        Washington, DC 20001
        (202) 220-1126


                        - - -
ALSO PRESENT:
            THOMAS C. GOLDSTEIN, DEFENDANT
            JIMMY MENDOZA, PARALEGAL
            ROBERT RESTO, PARALEGAL
    ***COMPUTER AIDED TRANSCRIPTION OF STENOTYPE NOTES***

Case 8:25-cr-00006-LKG   Document 436   Filed 02/24/26   Page 2 of 254

2

```
                        I N D E X
```

**GOVERNMENT'S TESTIMONY:**

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JONATHAN LEVITAN | * | 47 | * | * |
| DANIEL WOOFTER | 42 | 67 | 74 | 75. |
| GARY LIBBIN | 77 | 89 | 97 | * |
| WILLIAM CALDWELL | 101 | 126 | 133 | * |
| KARIME FOY | 135 | 146 | 167 | 178 |
| ALFRED DeCAROLIS | 182 | 202 | 210 | * |
| YVETTE PARRISH | 214 | * | * | * |

**DEPUTY CLERK:** All rise. This Honorable Court is now in session. The Honorable Lydia Kay Griggsby presiding.

**THE COURT:** Good morning, everyone. Please be seated. Today we continue with the trial in this matter and the government's case in chief. My understanding, based upon information provided by the government, is that we will have several witnesses to hear from today, starting with Mr. Levitan. I believe we've got to finish his cross and any redirect, and then several other witnesses will also be before the jury today.

I did receive some information formally through chambers that parties have requested that we meet at nine o'clock, so I was here. I think I was the only one here in the courtroom. But if you do want to start early, if you want the jury to be here, we need to do that the day before. So, obviously, I need to instruct the jury about what time to be here. We need to reach that agreement before we leave. I'm certainly happy to come in with fair notice if we have preliminary matters so we can get started right at 9:30.

But anyway, we're here now and so welcome back. I hope we can make good progress today. I know there's a lot of work to be done. I'm going to first ask if there are any preliminary matters from either side, then I'd like to get an update from the defense about the approximate length of the

cross-examination.

Let's start with preliminary matters.  I saw someone on the government's side moving.

Mr. Beaty, good morning.

**MR. BEATY:**  Good morning, Your Honor.  I haven't had a chance to speak with Mr. Kravis or the defense team on this. We had an idea this morning about the snow storm, and so we wanted to float it now so we could think about it and cogitate on it during the day.  Given where, it looks like, we're going to be with the weather forecast, we were curious whether Your Honor would entertain shifting the testimony for next week by a day.  So effectively, we would agree to just not sit on Monday -- it's probably going to be a snow day anyway -- and then plan to sit Tuesday through Friday instead.

**THE COURT:**  Okay.  I can't sit on Friday.  I have other proceedings.

**MR. BEATY:**  Okay.

**THE COURT:**  But, you know, we can start on Tuesday. But the reason why I don't sit on Fridays is because I have other cases on my docket, so I have other things scheduled for that Friday.

**MR. BEATY:**  Understood.  I wanted to float it.  But I -- in terms of knowing -- you know, again, I just -- we don't want to be in a position where we're wrangling witnesses or trying to figure out whether witnesses are going to be here.  I

hate to give up a day of trial, but I'd almost rather have a date certain that we know we're going to plan to go on Tuesday, weather pending, then trying to get people here for Monday. But we can --

THE COURT:  Well, I can't predict the weather, Counsel.  As we discussed, I think it's going to impact availability.  And keep in mind, you know, we have jurors coming from across the area.

So, based upon the forecast, I think Monday is not looking very good.  I don't know about Tuesday.  But, again, folks will check in.  The jury will get instructions.  We're going to have a late start if we do start on Tuesday because of the weather, would be my guess.

MR. BEATY:  Okay.

THE COURT:  So that's kind of where we are.  But right now -- and I will double-check, but I believe I have proceedings scheduled for next Friday, and I don't think I'll be able to work around them, but I will let you know.  If they're not on my calendar, then I'm happy to sit.  But right now, I can't do that.

MR. BEATY:  Thank you, Your Honor.  That was it.

THE COURT:  Okay.  Mr. Kravis?

MR. KRAVIS:  Nothing from the defense.  Thank you, Your Honor.

THE COURT:  All right.  What are we looking at in

terms of cross today?

**MS. REAVES:**  Your Honor, definitely less than 90 minutes.  Going to try to do an hour.  But I think --

**THE COURT:**  So we're down from 90 to maybe an hour?

**MS. REAVES:**  Yes.

**THE COURT:**  Okay.  Well, that's --

**MS. REAVES:**  The goal is an hour, but I think I told the government and the witnesses, because I think the witness is trying to get out -- I didn't speak to the witness, but less than the 90 minutes.

**THE COURT:**  Okay.  All right.

All right.  Well, I think we had a few jurors still waiting to arrive.  Because it's not quite 9:30, I'm going to step down until they're ready.  And so hopefully we'll be ready to start in about five or ten minutes.

**DEPUTY CLERK:**  All rise.  This Honorable Court stands in recess for five minutes.

(Whereupon, a recess was taken from 9:28 until 9:41 a.m.)

**DEPUTY CLERK:**  All rise.  This Honorable Court now resumes in session.

**THE COURT:**  Please be seated, everyone.  I have one update about the jury.  We have one juror that has not reported in yet, Juror Number 13.  It is 9:41, so there's two options.  One is to wait a little bit longer; or, two, is to excuse the juror and to proceed.  We have attempted to contact the

juror this morning and not received an answer with the phone calls.

What's the pleasure of counsel?

**MR. ADENRELE:** May I just confer with my --

**THE COURT:** Of course.

**MR. ADENRELE:** Just a quick clarification. I believe we know the answer to this. But when you say Juror Number 13, do you mean the current 13 or who was the former 13?

**THE COURT:** I think it's the current 13; is that correct?

**DEPUTY CLERK:** Yes.

**THE COURT:** The current 13.

**MR. ADENRELE:** Okay. Thank you, Your Honor.

**MR. KRAVIS:** I can tell the Court where the defense is now, if that would be helpful.

**THE COURT:** Sure.

**MR. KRAVIS:** We would just ask for five more minutes. I know the witness who is here now has travel issues, really trying to get out. I know we want to make progress. We're already down one juror. I think just a couple more minutes, and then we'd be prepared to agree to excuse them.

**THE COURT:** All right. Well, that would be basically 9:50.

**MR. ADENRELE:** The government agrees.

**THE COURT:** All right. Well, I'm going to step down

until 9:50.  And if we do not have the other juror, I assume we're ready to begin without that person?

**MR. ADENRELE:**  Yes, Your Honor.

**MR. KRAVIS:**  Yes, Your Honor.

**THE COURT:**  All right.

**DEPUTY CLERK:**  All rise.  This Honorable Court stands in recess for five minutes.

(Whereupon, a recess was taken from 9:43 until 9:55 a.m.)

**DEPUTY CLERK:**  All rise.  This Honorable Court now resumes in session.

**THE COURT:**  Please be seated, everyone.  Good news. We do have all of our jurors ready to join us.  At this time, I'll invite Mr. Levitan to please retake his seat in the witness stand.

Good morning.  You can go ahead and take a seat in the witness stand and make yourself comfortable.  And I will remind you that you remain under oath.

Counsel, are we ready to have the jury?

**MR. ADENRELE:**  Government is ready.

**MR. KRAVIS:**  Defense is ready.

**THE COURT:**  All right.

Please rise for the jury.

- - -

JONATHAN LEVITAN, after having been duly sworn previously, recalled for further testimony, was examined

and testified as follows:

(Whereupon, the jury entered the courtroom at 9:57 a.m.)

**THE COURT:**  Please be seated, everyone.  Members of the jury, good morning and welcome back.  It's nice to see you again today.

We will continue with the government's case in chief today.  I do anticipate that you will hear from a number of witnesses.  And as is our practice, we will take breaks periodically throughout the day, probably midmorning and then around the noon hour for lunch.

With that, is the defense prepared to present their cross-examination of the witness?

**MS. REAVES:**  Yes, Your Honor.

May I approach with a binder?

**THE COURT:**  You may.

**MS. REAVES:**  Thank you.

CROSS-EXAMINATION

**BY MS. REAVES:**

Q.   All right.  Good morning, Mr. Levitan.

A.   Good morning.

Q.   I want to start with where the government left off.

**MS. REAVES:**  So could we pull up Government's Exhibit 226, please.  Two-two-six.

**BY MS. REAVES:**

Q.   All right.  So do you remember when the government showed

you this document yesterday?

**A.** I do.

**Q.** Okay. So we were talking about how this is an official IRS document; right?

**A.** Yes.

**Q.** And do you remember there were lots of questions about how you were the person who acts at the direction of Mr. Goldstein; right?

**A.** Yes.

**Q.** And the government was going through each of the lines of this document to show all of the information that you must have given at the direction of Mr. Goldstein; right?

**A.** Yes.

**Q.** And we even went through the bank account line. Do you remember the government walking you through, under column A, each of the bank accounts that were listed on this?

**A.** I do remember that.

**Q.** All right. And I think one of the things that the government was pointing out was specifically the account numbers that are listed next to the bank accounts; right?

**A.** It was either me or the government, yes.

**Q.** All right. And remember, there were questions about how the account number for Mr. Goldstein's personal Wells Fargo isn't listed on this document that the government says you did at the direction of Mr. Goldstein? Do you remember that?

**A.** I remember questions about that, yes.

**Q.** Okay. Do you actually remember this document?

**A.** I don't remember filling it out.

**Q.** Do you remember Mr. Goldstein specifically directing you to fill out this document?

**A.** I don't remember any specific conversations about it.

**Q.** Do you remember Mr. Goldstein telling you which bank accounts to put on this document?

**A.** I don't remember any -- any specific conversation -- any such conversations, no.

**Q.** Do you remember when this document was submitted to the IRS?

**A.** I don't. It was during my tenure, I'm sure, but I don't specifically remember.

**Q.** Do you know where this actual document even was submitted to the IRS?

**A.** I don't remember, no.

**Q.** Let's scroll down and look at the date and signature portion on the next page. Do you see where it says, "your signature" at the bottom?

**A.** I see that.

**Q.** Do you see where it says, "date"?

**A.** Yeah.

**Q.** Okay. Are those columns filled out?

**A.** They are not.

Q.    Okay.  So, in fact, do you know if this version of the document was ever submitted to the IRS?

A.    I don't know one way or the other.

Q.    Okay.  And did the government show you any document that shows that this is the information that the IRS had?

A.    I don't remember seeing any such document.

Q.    Now, the government also spent a long time on text messages you had back and forth with Mr. Goldstein.

     Do you remember that?

A.    Yes.

Q.    I just want to go back to a couple of them.

          MS. REAVES:  So, if we pull up -- this is Government's Exhibit 1057 at page 240.  The date is February 23 of 2019.  So page 240 of the document.

BY MS. REAVES:

Q.    Okay.  So starting at February 23, 2019, one of the things the government focused on was, you on the left telling Mr. Goldstein on the right, "They took money again from Wells personal, so please watch the Citi personal."

     Do you see that at the bottom?

A.    Yeah.  I would just point out that I'm on the right and Tom was on the left.

Q.    Okay.  All right.  So you are on the right and Tom is on the left?

A.    Yes.

**Q.**    What you all are doing here, is you're communicating about, like, how much money is in bank accounts; right?

**A.**    That's what it looks like, yes.

**Q.**    Okay.  And you notice that "they took money from Wells personal," you understand that to mean that the IRS took money from Wells personal; right?

**A.**    That's what I understand looking at it now, yes.

**Q.**    Okay.  So clearly the IRS is aware that Mr. Goldstein had a personal bank account at Wells Fargo; right?

**A.**    I can't speak to what the IRS was aware of, but...

**Q.**    But you understand this to mean that the IRS was taking money from Mr. Goldstein's personal Wells Fargo account; right?

**A.**    That's what I understand it to mean, yes.

**Q.**    All right.  And then do you see this reference of field tuition?

**A.**    I do.

**Q.**    Okay.  That meant that Mr. Goldstein was also trying to pay his kid's school tuition; right?

**A.**    Yes.

**Q.**    Now, the government pointed out that Mr. Goldstein paid other bills while he had debt to the IRS.  Do you remember that?

**A.**    I'm sorry.  Could you repeat the question?

**Q.**    The government also pointed out that Mr. Goldstein paid bills in addition having debt to the IRS; right?

**A.**   Yes.

**Q.**   But to be clear, during this entire period, Mr. Goldstein was also paying on his debt to the IRS; right?

**A.**   I don't specifically remember during this period.  I know, you know, we talked about one check yesterday.

**Q.**   Right.  So let's go to that check that we talked about. So same exhibit on page 245.  This is March 12th of 2019.  All right.  And in the March 12, 2019, "we see wires coming now. Just confirming that I should send to Resnick 271K." Mr. Goldstein says "yes"; right?

**A.**   Yes.

**Q.**   Okay.  And then you respond in the next message, "So the IRS check still is not showing as withdrawn so it will clear." All right.  And Mr. Goldstein says "sweet"; right?

**A.**   Yes.

**Q.**   So what is happening here is that you all have already sent a check for $400,000 to the IRS; right?

**A.**   Based on context, yes.  I don't specifically remember, but yes.

**Q.**   Okay.  And when you said "wires come in," you're telling Mr. Goldstein that there is additional money in the bank account so he can send the check to the Resnicks; right?

**A.**   Yes.  That's a fair reading of my text.

**Q.**   Now, I know you don't remember the specifics from many years ago how much money Mr. Goldstein spent or exactly how

much money Mr. Goldstein spent.  But is it consistent with your recollection that Mr. Goldstein paid about a million dollars in taxes in 2018?

**A.**    I can't speak with any specificity.

**Q.**    Would it surprise you to find out that Mr. Goldstein paid over a million dollars in taxes in 2018?

**A.**    No.  It wouldn't surprise me.

**Q.**    And would it surprise you to find out that Mr. Goldstein paid over a million dollars in taxes in 2019?

**A.**    I left in the middle of 2019, so I can't say with any specificity.

**Q.**    Okay.  So, it's fair to say, if we're asking specifically about what you know about Mr. Goldstein's tax payments during this period, we can't just pick out specific examples from your text messages to understand his payment history over that period; right?

**A.**    Yeah.  If the question is, do I have a specific memory of exactly how much was spent, the answer is no.

**Q.**    Right.  So looking at individual text messages you had with Mr. Goldstein, doesn't give us the full picture of Mr. Goldstein's efforts to pay his taxes over this period; right?

**A.**    That's fair.

         **MS. REAVES:**  We can take this document down.

**BY MS. REAVES:**

**Q.**    So to be clear, when you were working as firm manager, Mr. Goldstein never instructed you to hide information from the accountants at GRF; right?

**A.**    I don't remember any such instruction.

**Q.**    Mr. Goldstein never instructed you to withhold any information from the accountants at GRF?

**A.**    I don't remember any such instruction.

**Q.**    Okay.  And then there were a bunch of times yesterday where we talked about payments that you made for Mr. Goldstein and how they were classified.  There was no time when Mr. Goldstein -- there was no time when you knew that a payment was a personal payment and Mr. Goldstein told you to call it a business payment anyway; right?

**A.**    I don't remember that.

**Q.**    And the government asked you some questions at the beginning about Mr. Goldstein's reputation as a lawyer.  Do you remember those questions?

**A.**    I do.

**Q.**    Okay.  Mr. Goldstein was an appellate specialist; right?

**A.**    He was.

**Q.**    He was not a tax specialist?

**A.**    As far as I know, yes.

**Q.**    And just to be clear, "yes" meaning --

**A.**    Yes.

**Q.**    -- he did not have a tax specialty?

**A.**   Yes.   That's what I intended.

**Q.**   And the government also asked you about the financial aspect of your role as firm manager.   Do you remember those questions?

**A.**   I do.

**Q.**   And I think at some point you said something to the effect of you had -- you had a bit of an internal bookkeeping role. Do you remember that?

**A.**   Yes.

**Q.**   Do you know if bookkeeping is a term of art for accounting?

**A.**   I don't know one way or the other.

**Q.**   All right.   So I want to be clear about what your internal role was.   You were not the person who was responsible for maintaining the firm's accounting records that were used for tax purposes; right?

**A.**   No.

**Q.**   Okay.   That was the job of the accountants at GRF; right?

**A.**   Yes.

**Q.**   So when you say you had an internal bookkeeping role, what you did was you kept track of bills that needed to be paid; right?

**A.**   Yes.

**Q.**   Or sometimes you kept track of checks that you had sent out so that you could tell Mr. Goldstein whether or not they

had cleared; right?

**A.**    Yes.

**Q.**    Right?  But the actual accounting for the firm was handled by GRF?

**A.**    That's right.

**Q.**    And so the taxes, tax preparation for the firm was also handled by GRF; right?

**A.**    Yes.

**Q.**    Now, the government walked us through a couple of examples on direct examination of times when a woman named Jill Leonard from the accounting firm reached out about some of these accounting records.

Do you remember those questions?

**A.**    I do.

**Q.**    All right.  And for example, there was a spreadsheet we looked at where you pointed out that there were several items listed as "TG personal."  Do you remember that?

**A.**    I do.

**Q.**    And what does "TG personal" mean?

**A.**    It meant that they were -- were personal expenses that we had sent from the firm's account, personal expenses for Tom.

**Q.**    Okay.  And so TG personal, you telling that to Ms. Leonard is you communicating to the accounting firm that there are personal expenses for Mr. Goldstein within the Goldstein & Russell firm transactions; right?

**A.**    Yes.

**Q.**    Okay.  And then it was up to the accountants to make sure that that was accurately reflected in the accounting records?

**A.**    Yeah.  I guess it -- it would be more accurate to say it wasn't up to me.

**Q.**    Okay.  So you don't know who it was up to, but you know that, when the accountants asked you for information, you would go get the information that you knew; right?

**A.**    Yes.

**Q.**    Okay.  If you needed to ask Mr. Goldstein, you would ask Mr. Goldstein?

**A.**    Yes.

**Q.**    Mr. Goldstein would answer?

**A.**    Yes.

**Q.**    And you would relay that information back to the accountants; right?

**A.**    Yes.

**Q.**    But it was not your job to make sure that it was accurate; right?

**A.**    Accurate --

**Q.**    Let me rephrase.  It was not your job to make sure that the records themselves were accurate; right?

**A.**    Correct.

**Q.**    Because it was the accountants who had the job of maintaining and asking any questions about those records?

**A.** Yes, as far as I knew.

**Q.** And when we say "TG personal," sometimes we've seen the language that something should be classified as a personal distribution. Do you remember that?

**A.** I remember it vaguely. I'm not sure we talked about it yesterday, but I remember it vaguely.

**MS. REAVES:** Okay. So I want to pull up -- this is Defense Exhibit 11. It might not be in the binder, but we're going to pull it up on the screen. It's a very quick one.

**BY MS. REAVES:**

**Q.** All right. So this is an e-mail sent from Mr. Goldstein to you. The subject looks like "invoice number," and then the text is "wireless from the firm, but track it as a personal distribution. Thanks." Do you see that?

**A.** I do.

**Q.** Okay. And what does this mean to you?

**A.** As I read it now, it means that I should wire the money from the firm's account at Wells Fargo and mark it as a personal distribution.

**Q.** Okay. And so a personal distribution is a way of saying that this is a personal payment for Mr. Goldstein even if it came from the firm's bank account; right?

**A.** Yes.

**Q.** And I want to look at a couple of the documents the government walked through yesterday about this process of you

assisting the accountants in identifying personal transactions. Okay?  So I want to start with the -- this is Defense Exhibit 318.

All right.  So in Defense Exhibit 318 -- and I apologize -- the government might not have shown this yesterday -- we have an e-mail at the bottom from Mr. Goldstein to you.  Subject is "accounting contacts."  And at the very bottom you write, "our accountants need addresses and W-9s for some wires that we made this year."  Do you see that?

A.    I do.

Q.    Okay.  And so what has happened here is that the accountants, someone, Jill Leonard or someone else from the accounting firm, has reached out to you to ask for addresses and tax information for wires that you had made that year; right?

A.    Looks right.

Q.    Okay.  And Mr. Goldstein responds to you, "Pasha, Ryan and Bob were personal."  Do you see that?

A.    I do see it.

Q.    Okay.  So a couple things that are happening here.  Number one, Mr. Goldstein is communicating to you that wires being made are personal payments; right?

A.    Yes.

Q.    That's not a secret; right?

A.    Based on the e-mail, no.

**Q.** Okay. And you would have then communicated that information back to the accountants?

**A.** Yeah. I think we talked about that yesterday.

**Q.** All right. And the reference to W-9s is asking about tax documents; right?

**A.** As I sit here to -- yeah. Yes.

**Q.** Okay. Because if they're not personal, the accountants want to send out tax documents for payments that weren't personal; right?

**A.** I assume that's why they needed it.

**MS. REAVES:** I want to look at another one. Let's go to Defense Exhibit 261 and let's go to the very bottom. Sorry. The next page.

**BY MS. REAVES:**

**Q.** All right. So if we look at this document at the bottom, the subject is "1099 firm." It's from Jill Leonard to you. Jill Leonard is the person at the accounting firm; right?

**A.** Yes.

**Q.** All right. And she's saying, "Hi, Jon. The 1099s for the blog are in production now. For the firm, I'm still waiting on FEINs for the below vendors. I just wanted to be sure you were aware of the status." Do you see that?

**A.** I do.

**Q.** Okay. And, then, let's look at your response.

All right. You respond, "Hi Jill. I'm still waiting to

hear back from Bulkemp and Brookfield.  PE Entertainment was TG personal."  Do you see that?

A.    I do.

Q.    Okay.  So again, this is just an example of this process where the accountants reach out to see if they need to provide the tax information and you make clear that something is TG personal; right?

A.    Yes.

Q.    Right.  If she had asked you about any other transactions, you would have asked -- you would have answered her; right?

A.    Yes.

Q.    And you say here, "I'm still waiting to hear back from two entities."  If you had questions and weren't sure about something, you could reach out to Mr. Goldstein; right?

A.    Yes.

Q.    And Mr. Goldstein would answer your questions?

A.    Yes.

Q.    Now, let's look at one more example.  This is DX 268.

        **MS. REAVES:**  Two-six-eight.  And let's go to the very bottom, please.

**BY MS. REAVES:**

Q.    Okay.  So this is another example of a document the government -- I think the government did show you this one on direct examination.  And you see at the bottom Ms. Leonard reaches out to you, "Hi, Jon.  I wanted to check in regarding

the below wires that were made from the firm's checking account in 2018.  Are any of the below payments for consulting or legal fees?  If so, we should do a 1099."

Do you see that?

A.    I do.

Q.    Okay.  And then your response, "They're all TG personal except for Lieff Cabraser."  Do you see that?

A.    I do.

Q.    Okay.  So this was the process by which the accountants had to reconcile the records and make sure that if something was TG personal, the accountants were the ones who would go back and put that in the records; right?

A.    I guess -- I mean, I would say I didn't know exactly what happened on the accountants' end.

Q.    Fair.  But on your end, on behalf of Goldstein & Russell, when they asked for information, you communicated it back to them; right?

A.    Yes.

Q.    And it was the accountants' job to do whatever they needed to do with the accounting records and then the tax records; right?

A.    That was my understanding at the time.

Q.    Okay.  And just to be totally clear, when we say "TG personal," we're talking about Tom Goldstein?

A.    Correct.

**Q.** All right. Thank you.

A few of these documents had references to 1099s. And I'm not asking about specific knowledge about 1099s. But, in general, you were talking to Ms. Leonard about 1099s because they were tax documents; right?

**A.** Yeah.

**Q.** These were tax documents that she needed to send out for business payments?

**A.** I'm not sure my knowledge at the time was that sophisticated, but I understand that to be what 1099s are for now.

**Q.** Okay. Because Ms. Leonard would ask you for what is their address and what is their identification number for these documents; right?

**A.** Yes.

**Q.** Okay. And then, from your time working at the firm, 1099s were also tax forms that you would receive at the Goldstein & Russell office; right?

**A.** Yeah. As I said, I don't specifically remember, but I'm sure we did receive 1099s.

**Q.** Okay. And you're aware that 1099s are documents that go both to the individual people and to the IRS?

**A.** Yes.

**Q.** The government asked you some questions about a payment that Mr. Goldstein had you wire to the Napoli law firm in 2017.

Do you remember those questions?

**A.**    I do.

**Q.**    All right.  I want to look -- this is going to be a different thread -- or a similar thread of what the government showed you yesterday.  This is Defense Exhibit 532, and we'll pull up on the screen.

All right.  So Mr. Goldstein e-mails you and says, "Please wire 175,000 to Napoli."  Do you see that?

**A.**    I do.

**Q.**    Okay.  And he also says, "We've sent them money recently." Do you see that?

**A.**    I do.

**Q.**    Okay.  So nowhere in this e-mail does Mr. Goldstein say whether this is a business or a personal expense; right?

**A.**    I don't see it there.

**Q.**    Right?  In this e-mail he doesn't actually even say which bank account you should use to wire the money; right?

**A.**    That's right.

**Q.**    He actually says, "We've sent them money recently."  Do you see that?

**A.**    I do.

**Q.**    Right?  And, in fact, the firm had sent Napoli money recently from Mr. Goldstein's personal bank account; right?

**A.**    I don't know.

**Q.**    Okay.  So you don't know one way or the other; right?

**A.** Yeah. As I said, I didn't send that prior payment.

**Q.** All right. But in terms of what Mr. Goldstein has communicated to you, you have no knowledge of Mr. Goldstein ever saying, oh, this should be a business payment; right?

**A.** No, I don't remember.

**Q.** And the government then, I think, pointed this out to you on the spreadsheet that they showed.

**MS. REAVES:** So I want to pull out the spreadsheet, which is GX 1080.

**BY MS. REAVES:**

**Q.** All right. Do you remember looking at this spreadsheet yesterday?

**A.** I do.

**Q.** All right. And so -- and do you remember that, I think, this letter had asked you to clarify information in the spreadsheet?

**A.** I remember talking about that, yes.

**Q.** All right. And then, this is how we end up with several lines marked as personal TG and other lines where there's address information?

**A.** Yes.

**Q.** All right. And then the government went to the miscellaneous tab.

**MS. REAVES:** Can we go to the miscellaneous tab?

**BY MS. REAVES:**

Q.   All right.   There are a number of payments in this miscellaneous tab; right?

A.   I see them, yes.

Q.   Okay.   The government pointed out one.   The one payment to Napoli; right?

A.   Yes.

Q.   Now, did Ms. Leonard ask you specifically to check anything about this payment to Napoli and how it should be categorized?

A.   I don't remember if she did or not.

Q.   Okay.   The government didn't show you any document where Ms. Leonard was asking you, Okay.   Can you tell me how we should categorize this payment to Napoli; right?

A.   I don't remember that.

Q.   Switching gears a little bit.   Do you remember the government asked you some questions about a bank account that Mr. Goldstein had in Montenegro?

A.   I do.

Q.   All right.   And when you joined the firm, it wasn't a secret that Mr. Goldstein had a bank account in Montenegro; right?

A.   No.

Q.   It was listed in that list of firm information, along with birthdays and passwords and everything else; right?

A.   It was in the passwords document.

Q.   I want to look at Defense Exhibit 242.

          MS. REAVES:   Okay.  And if we go to the bottom -- if I could see both pages and then go to the bottom.

BY MS. REAVES:

Q.   All right.  So Defense Exhibit 242, this is you sending an e-mail to Ms. Leonard.  Ms. Leonard is the accountant at the GRF accounting firm; right?

A.   Correct.

Q.   Okay.  And in September of 2018, you're telling Ms. Leonard, "Today we received a wire for 999,000 and some more dollars from UCB, a Montenegrin bank that Tom and the firm holds accounts in.  The money is a loan to Tom and should not be reported as income."

     Do you see that?

A.   I see it, yes.

Q.   Okay.  You have no reason to believe that this information that you're providing to Ms. Leonard is inaccurate; right?

A.   No, I don't.

Q.   And in terms of additional information about any documentations of loans or anything like that, you wouldn't go looking for that on your own; right?

A.   No, I wouldn't.

Q.   Right?  If there needed to be documentation about any loans, then the accountants would have needed to ask you for that; right?

**A.** I suppose.

**Q.** If the accountants had asked you for documentation, would you have asked Mr. Goldstein about that?

**A.** Yes, I would have.

**Q.** Okay. But to your recollection, the accountants never asked you and never suggested you needed documentation for this to be a loan?

**A.** To my recollection, no.

**Q.** I also want to talk about the bag of cash the government brought up yesterday. Do you remember that?

**A.** I do.

**Q.** Okay. So Mr. Goldstein, in 2018, brought back a lot of money from Hong Kong; right?

**A.** Yes.

**Q.** And I think you said on direct that Mr. Goldstein told you this money was a loan; right?

**A.** As far as I remember, yes.

**Q.** And, in fact, before you went on the trip, Mr. Goldstein asked you to see if you could set up a bank account in Macau. Do you remember that?

**A.** I remember him asking me to try to set up a bank account in Macau at some point. I can't tell you exactly whether it was this trip or another trip. I can't speak to the exact time -- timeline.

**Q.** Okay. But you do remember that Mr. Goldstein, at some

point, wanted to set up a bank account in Macau?

**A.**    I remember that, yes.

**Q.**    All right.  And he wasn't able to do that?

**A.**    Yeah.  I remember we couldn't do it.

**Q.**    Okay.  And so, then, coming back from Macau, he had to bring it back in cash?

**A.**    I can't speaking to exactly the order of operations and why, but --

**Q.**    But you know that he had tried to get a bank account at some point?

**A.**    Yes.

**Q.**    All right.  And in terms of this money that Mr. Goldstein brought back, obviously, he told you about it; right?

**A.**    He did.

**Q.**    He had you tell the bank about it?

**A.**    Yes.  He asked me to do so.

**Q.**    Okay.  You all met up together and brought this money in to a bank; right?

**A.**    Yes, we did.

**Q.**    And the bank counted the money?

**A.**    Yes, they did.

**Q.**    The bank made a record of the money?

**A.**    I'm not sure I remember seeing any record, but I would assume they did.

**Q.**    Generally, when you deposit money in a bank, that ends up

in your bank statement; right?

**A.**    Generally, yes.

**Q.**    And the accountants were also made aware of this money that came from Hong Kong; right?

**A.**    I think I remember saying yesterday that I notified them.

**Q.**    All right.  And going back just briefly to the Macau bank account -- attempt to get a Macau bank account.  Do you remember any other trip that Mr. Goldstein took to Macau in 2018?

**A.**    I can't remember the -- the years, you know, during my tenure.  I -- it wouldn't surprise me that there were more of those -- more than one Macau trip, but I can't say with any -- like 100 percent certainty.

**Q.**    Okay.  Now, let's talk about when you made the accountants aware of this bank account -- not this bank account, I'm sorry -- about this Hong Kong cash that you brought back.  Okay?

        **MS. REAVES:**  So let's go to Defense Exhibit 290.  Now, let's go to the very bottom of it.  Okay.  And I just want to look at this bottom portion.

**BY MS. REAVES:**

**Q.**    All right.  So in Defense Exhibit 290, in addition to Mr. Goldstein telling you about this cash from Hong Kong and having you contact the bank about this cash from Hong Kong, Mr. Goldstein specifically asked you to reach out to the

accountants to make sure that they knew about this cash from Hong Kong; right?

**A.**    He asked me to reach out to Walter, who was at GRF, yes.

**Q.**    All right.  And I think the government showed you a version of this message yesterday.  Do you remember that?

**A.**    I do.

**Q.**    Okay.  And so Mr. Goldstein says, "Can you make sure that Walter, the accountant, understands the following, please?  We got a one million transfer into the account in Montenegro. That was a loan.  I brought back 960,000 from Hong Kong.  That was a loan.  I got 500,000 in income from Malaysia that went to someone else overseas as loan repayment and never cam into our bank account.  So we need to record it as income, even though there isn't a record of it happening."

Do you see all that?

**A.**    I do.

**Q.**    Okay.  And then you followed up and communicated all of this information to Walter at the accountant GRF; right?

**A.**    I think I remember seeing an e-mail on that yesterday where I did.

**MS. REAVES:**    All right.  So not this e-mail.  Let's switch to Defense Exhibit 265.  Okay.  And again, just looking at the bottom of 265.

**BY MS. REAVES:**

**Q.**    Now, this is you in December of 2018 e-mailing Walter, the

accountant at GRF; right?

**A.** Yes, it is.

**Q.** Okay. And the subject is "TG income and loans"; right?

**A.** Yes.

**Q.** "Hi Walter. You may be aware of some/all of this, but we just wanted to make clear the nature of some 2018 transactions for Tom." Do you see that?

**A.** I do.

**Q.** Okay. And so, again, you tell him that the money that came from Montenegro was a loan; right?

**A.** Yes.

**Q.** You tell him that the cash that was deposited in the bank account after being brought from Hong Kong was in Mr. Goldstein's personal Wells account and that was also a loan; right?

**A.** Yes.

**Q.** Okay. And you tell him that Mr. Goldstein got this $500,000 in income that went to someone else overseas as a loan repayment. Do you see that?

**A.** I see it.

**Q.** Okay. Now, I want to ask about that for a second now. What did you understand that last portion to mean, that he got 500,000 in income from Malaysia that went to someone overseas as a loan repayment? What did that mean?

**A.** I don't really know if I knew what it meant at the time.

I kind of just copy and pasted Tom's -- Tom's e-mail and sent it to Walter.

Q.   Okay.  But so, to be clear, the words on the page that Mr. Goldstein had you communicate was that there was money that came in as a loan repayment; right?

A.   Yes.

Q.   Right?  Okay.

A.   I'm sorry.

Q.   And that this -- I'm sorry.  That there was money that came in as income; right?

A.   Yes.  That's right.  Sorry.

Q.   And this income was not reflected in the bank accounts; right?

A.   Yeah.  That's what it looks like.

Q.   And this income went to someone else as a loan repayment?

A.   Yes.

Q.   But because it's not in the bank accounts, Mr. Goldstein wanted to make sure that the accountants still knew about it; right?

A.   I think that's a fair reading, yes.

Q.   And this actually -- you copied and pasted Mr. Goldstein's words into your e-mail to the accountants; right?

A.   More or less.  I'm sure I rewrote it a little bit, but yes.

Q.   Okay.  And I want to look up at Mr. Deyhle's response.

Okay.  Mr. Deyhle says, "Makes sense, but I will need more details later.  Thanks."  Do you see that?

**A.**    I do.

**Q.**    Do you have any recollection of Mr. Deyhle following up to get more details later?

**A.**    I don't.  I don't have any such recollection.

**Q.**    Has the government showed you any document where Mr. Deyhle followed up to get more details later?

**A.**    I don't think so.  No.

**Q.**    Would it surprise you to learn that Mr. Deyhle forgot about this until the IRS showed up in 2020?

**A.**    I can't speak to that.

**Q.**    Just a few more questions.

So another thing the government asked you about was a time when Mr. Goldstein asked you about deferring payroll taxes, whether it was possible to defer payroll taxes.  Do you remember that?

**A.**    I do.

**MS. REAVES:**  Let's go back to -- this is Government's Exhibit -- Government's Exhibit 1075.  All right.  And I want to start at the bottom.

**BY MS. REAVES:**

**Q.**    Now, to orient us, this is you reaching out to an accountant at GRF in addition to the contact that you all had for Paychex; right?

A.    Yes, it is.

Q.    And Paychex was the company that handled the payroll for employees of Goldstein & Russell; right?

A.    Yep.  Yes, it was.

Q.    So the people who make sure that people at Goldstein & Russell get paid?

A.    Yeah.  Fair enough.

Q.    All right.  And so you're saying, "Hi, Jill and Casey.  We have run into some unexpected financial problems and are wondering if there's any way to defer the taxes for payroll being taken out of our accounts tomorrow.  I know it's a long shot."  Do you see that?

A.    I do.

Q.    All right.  So a couple things here.  This is talking about payroll taxes; right?

A.    Yes.

Q.    This e-mail has nothing to do with Mr. Goldstein's income taxes; right?

A.    I'm not a tax expert, but I think that's fair.

Q.    Okay.  Because payroll taxes are the taxes that come out of people's paychecks; right?

A.    Yes.

Q.    And to be clear, what Mr. Goldstein had asked you to do was to ask the accountants if this was possible; right?

A.    Yeah.  That's what I remember saying from the text

yesterday or the e-mails.

**Q.** Okay. And essentially, the government had you summarize the accountant's response, and then they went through the response. But essentially, they said no; right?

**A.** Yeah.

**Q.** Okay. And the only option, instead of deferring payroll taxes, was to have a highly compensated employee defer their own paycheck. Do you remember that?

**A.** I remember seeing that in Jill's e-mail, yes.

**Q.** Okay. So that would be something like Mr. Goldstein saying, "I won't get paid so that we can save some money"; right?

**A.** Yeah. Or one of the other partners probably.

**Q.** All right. But to be clear, at the end of the day, you all followed the accountant's advice; right?

**A.** As far as I can remember, yes.

**Q.** Now, I think -- you got a bunch of questions on direct examination about the scope of your job, that some of it included personal tasks for Mr. Goldstein and some of it was more Goldstein & Russell focused. Do you remember that?

**A.** That's right.

**Q.** All right. And then some of the personal tasks included things like booking travel for Mr. Goldstein; right?

**A.** Yes, although that sort of blurred the line between personal because there was work travel, too.

**Q.**    So there was work travel and personal travel?

**A.**    Yeah.

**Q.**    Okay.  And then you would also do tasks for Mr. Goldstein's legal work itself?

**A.**    Yeah.  And the rest of the firm's legal work.

**Q.**    All right.

        **MS. REAVES:**  So I want to pull up Defense Exhibit 221.

**BY MS. REAVES:**

**Q.**    Now, one of your responsibilities as the firm manager was to pay invoices; right?

**A.**    Yes, it was.

**Q.**    Okay.  And this particular invoice, this is dated October 13th of 2017.  Do you see that?

**A.**    I see that up there, yes.

**Q.**    All right.  And I -- this is an example of what would have been happening at Goldstein & Russell on October 13th of 2017. Can you tell me what this invoice is?

**A.**    It is an invoice from the printers that we use.  So Supreme Court briefs have to be printed and delivered in like a stack.  And so we hired this company, Wilson-Epes, to print them and deliver them to the Court.

**Q.**    Okay.  Is it your understanding that the briefs would be printed on the day that the briefs are due to the Court?

**A.**    The day or the day before.  They would be delivered on the

day that they were due.  I don't know exactly when they were printed.

Q.   All right.  So essentially, from this document -- I know it's hard to remember so long ago -- but on October 13th or maybe the day before, there was a big Supreme Court brief due to the Court; right?

A.   I can't say whether or not the invoices were dated when they -- the date the briefs were due, but there was an invoice sent on Chat date, invoice dated for October 13th.

Q.   Okay.  Would it surprise you if the invoice date reflected the date that the brief was actually filed and submitted?

A.   It would not surprise me.

Q.   And the government walked through some of the travel arrangements you made for Mr. Goldstein.  Do you remember that?

A.   Yeah.  I remember seeing some.

Q.   All right.

     MS. REAVES:  I want to pull back a couple more examples in Government's Exhibit 1057.

BY MS. REAVES:

Q.   And while we're pulling that up, do you remember the government asking you at one point like about a train ticket Mr. Goldstein had you book?

A.   I do remember that.

Q.   Okay.  You also had to book flights for Mr. Goldstein sometimes?

**A.**    I did.

**Q.**    All right.  So let's go to pages 16 to 17.  I want to look at October 10th.  All right.  So do you see that on October 10th you were booking flights from LAX to ORD?

**A.**    I think those flights are dated for October 10th.  I think it, based on the date I'm seeing on page 16, I probably booked it on October 8th.

**Q.**    Okay.

**A.**    Sorry.

**Q.**    But on October 10th, this is a flight that Mr. Goldstein had from LAX to ORD?

**A.**    Yes.  He asked me to book him on that flight.

**Q.**    Okay.  Do you know what LAX is?

**A.**    It's the airport in Los Angeles.

**Q.**    And ORD?

**A.**    Pretty sure it's O'Hare in Chicago.

**Q.**    Okay.  So Mr. Goldstein, on October 10th, had a flight from Los Angeles to Chicago; right?

**A.**    Yes.

**Q.**    All right.  Let's look at pages 18 to 20 of this.  All right.  Let's look at the flights that were booked on October 13th.  Now, if we go back one page, do you see that, on October 12, 2017, we see the date on the first page?

**A.**    I do.

**Q.**    Okay.  And then on the second page, we see United has

New York to Milan on Friday.  Leaves at 6:25 p.m.  Do you see that?

**A.**   I do see it.

**Q.**   Okay.  And so you were also booking flights for Mr. Goldstein to go to Milan that same Friday?

**A.**   I don't see the exact date of the flight for these, but I was -- I was looking at flights to Milan.

          **MS. REAVES:**  Can we go to the next page just briefly?  One more page.  Okay.

**BY MS. REAVES:**

**Q.**   Now, looking through these text messages, I know there's a lot of back and forth, including about how to use mileage for buying the tickets.  But bottom line is, you were coordinating it so that Mr. Goldstein could get to Europe this week; right?

**A.**   Yeah.  That's fair from looking at the texts.

**Q.**   Okay.  Do you remember that October -- that this week in October of 2017 was when Mr. Goldstein's tax returns were due for 2016?

**A.**   I don't remember exactly when his tax returns were due.

**Q.**   Okay.  Would it surprise you if Mr. Goldstein was traveling all over the world when his tax returns for 2016 were due?

**A.**   Tom traveled a lot when I worked for him, so I guess it wouldn't surprise me at any particular point during my tenure whether he was traveling all over the world or not.

**Q.** Okay. And when you helped working on coordinating tax information with the accountants, would it surprise you if -- or are you ever aware of Mr. Goldstein sitting down and reviewing his taxes with the accountants?

**A.** Sitting down with me and what?

**Q.** And reviewing the tax return before it was signed?

**A.** If he did, I don't remember that happening.

**Q.** Do you remember the accountants asking you to sit down with Mr. Goldstein to review everything in the tax return before it was signed?

**A.** I don't remember any such instruction.

**Q.** Now, last question, just going back to Government's Exhibit 226. 226. So we started talking about this document. And I think we've established you don't know whether or not this was actually submitted to the IRS; right?

**A.** I don't know as I sit here today. No.

**Q.** You don't know whether this document was actually used by anyone; right?

**A.** I can't tell you.

**Q.** You don't know if there are other versions of this document that have additional or different information?

**A.** I don't know.

**Q.** You don't know whether Mr. Goldstein had already given the IRS his bank account information; right?

**A.** I don't know.

**Q.** Okay. So, for all these questions the government asked about, for example, you didn't know how many millions Mr. Goldstein made in poker; right? Do you remember those questions?

**A.** I remember the questions, yes.

**Q.** Okay. And you don't know if you saw documentation about any loans; right?

**A.** I remember those questions.

**Q.** Okay. But sometimes you don't know something just because you didn't need to know it; right?

**A.** Because I didn't need to know it?

**Q.** Right.

**A.** I can't speak to why or why not I didn't know something, but all I can tell you is I didn't know.

**Q.** Okay. And it may be that you were never asked about these specific things; right?

**A.** It may have been.

**Q.** It may be that no one asked you to ask Mr. Goldstein about these things?

**A.** It could have been, yes.

**Q.** Okay. So big picture, the fact that you don't know something, that doesn't mean that Mr. Goldstein was lying about it?

**A.** I'm not sure I can answer that question. I mean, I can just say what I did and didn't know.

**Q.** Right. So you can't speak to what Mr. Goldstein did or didn't know?

**A.** That's right, I cannot speak to what Tom did or did not know.

**MS. REAVES:** No further questions.

**THE COURT:** Thank you very much, Ms. Reaves. Does the government wish to do any redirect?

**MR. ADENRELE:** The government doesn't have any additional questions.

**THE COURT:** All right. Then I believe all questions have been asked of the witness; is that correct?

All right. Thank you so very much for your testimony and time today. You may be excused.

**THE WITNESS:** Thank you, Your Honor.

**THE COURT:** Have a good afternoon -- or good morning, rather.

(Witness excused.)

- - -

**THE COURT:** Is the government prepared to call its next witness?

**MR. GORDON-MARVIN:** We are, Your Honor. Would you like to take the break now or after the witness?

**THE COURT:** Well, let's talk on the headset and see what we're looking at.

(Whereupon, a discussion was held outside the presence of

the jury.)

THE COURT: All right. Government counsel? Counsel for the government, are you on? Okay.

Mr. Kravis?

MR. KRAVIS: Yes, Your Honor.

THE COURT: All right. Mr. Goldstein, thumbs up.

Okay. What are we looking at in terms of direct for the next witness?

MR. GORDON-MARVIN: I think, at most, 30 minutes.

THE COURT: For your direct. All right. Can you try to press through, do the direct and maybe break at cross? Is there any objection to that?

MR. KRAVIS: That's fine for the defense.

THE COURT: All right. All right.

All right. Let's have the witness, and we'll break after direct.

(Whereupon, discussion concluded.)

MR. GORDON-MARVIN: The United States calls Daniel Woofter.

THE COURT: Thank you.

Is there a binder for this witness, Counsel?

MR. GORDON-MARVIN: There is not. There are no documents.

THE COURT: Okay.

Good morning. If you want to come all the way towards me

into the well of the court, and then you're going to take a seat over at the witness stand, but please remain standing first so the deputy can swear you in.

- - -

DANIEL WOOFTER, after having been duly

sworn, was examined and testified as follows:

- - -

**DEPUTY CLERK:**  Thank you.  You may be seated.  Please adjust the microphone, speak directly into it and state and spell your first and last name for the record.

**THE WITNESS:**  Daniel Woofter, D-a-n-i-e-l, W-o-o-f-t-e-r.

DIRECT EXAMINATION

**BY MR. GORDON-MARVIN:**

**Q.**   Good morning, Mr. Woofter.  What do you for a living?

**A.**   I'm an attorney.

**Q.**   Where do you currently work?

**A.**   Russell & Woofter, LLC.

**Q.**   And where did you work before Russell & Woofter LLC?

**A.**   Goldstein & Russell.

**Q.**   What was Goldstein & Russell's bread and butter?

**A.**   Appellate and Supreme Court litigation.

**Q.**   How was it regarded in the legal community?

**A.**   Very highly.

**Q.**   When did you start at Goldstein & Russell?

**A.**    September 2018.

**Q.**    What was your title when you started?

**A.**    Associate.

**Q.**    What does that mean?

**A.**    I worked with the partners on their cases at their direction.

**Q.**    Where was the firm located?

**A.**    Bethesda, Maryland.

**Q.**    Who got most of Goldstein & Russell's legal clients?

**A.**    Tom Goldstein.

**Q.**    How did he do that?

**A.**    I believe, largely reputation.

**Q.**    What was his reputation?

**A.**    Very high in the legal community.

**Q.**    What made his reputation very high?

**A.**    His top-notch legal work before the Supreme Court over a course of two-and-a-half decades or so, I believe.

**Q.**    What specifically made that legal work top-notch?

**A.**    Tom changed the profession.  He went out and he got clients and did top-notch legal work, winning big Supreme Court cases for them.

**Q.**    How detail oriented was he in that work?

**A.**    In his legal work?  Extremely.

**Q.**    Are you familiar in appellate advocacy with the term "oralist"?

**A.**    I'm sorry.  Can you say that again?

**Q.**    Are you familiar with the term "an oralist" in appellate --

**A.**    Oralist?  Yes.

**Q.**    How is that spelled?

**A.**    O-r-a-l-i-s-t.

**Q.**    What is an oralist?

**A.**    Someone who argues cases before the court, I believe, is what you're asking.

**Q.**    How effective was Mr. Goldstein as an oralist?

**A.**    Very.

**Q.**    What made him so effective as an oralist?

**A.**    That's a hard question to answer.  He was direct.  He was well-structured in his responses.  He listened to questions when they were being asked by the justices.  He had overarching legal theories about the case that tied all the knots together.

**Q.**    How persuasive was he?

**A.**    I think he was persuasive.

**Q.**    How charming could he be?

        **MR. KRAVIS:**  Objection.

        **THE COURT:**  Let's come to the headsets, Counsel.

(Whereupon, a discussion was held outside the presence of the jury.)

        **THE COURT:**  Do we have the government?

        **MR. GORDON-MARVIN:**  Yes.

THE COURT:  Mr. Kravis, are you on?

MR. KRAVIS:  Yes, Your Honor.

THE COURT:  Go ahead.

MR. KRAVIS:  I object on relevance and prejudice grounds.  I let this go on for a while, the questions about him being an oralist and a great advocate and so on and so forth.  But I don't think this line of inquiry is appropriate.  Now I think we're really just getting into improper character evidence.

THE COURT:  All right.  Counsel for the government, the concern is relevance and character evidence.

MR. GORDON-MARVIN:  I think this is squarely relevant.  Mr. Goldstein stands accused of, among other things, lying to a revenue officer and an IRS CI, and presenting a highly effective facade.  Whether or not he could be charming or persuasive, I think is directly relevant to that and makes whether or not they thought he was telling the truth more credible.  It goes directly to that set of facts.

THE COURT:  As to this witness's view of that?  I'm not really following.  This is someone who practiced with Mr. Goldstein as an associate.

MR. GORDON-MARVIN:  Yes.  So I think he would be directly equipped to talk to this.

THE COURT:  All right.  Mr. Kravis, anything else from you?

**MR. KRAVIS:** I just want to add one point. This is not how this works. A false statement charge has nothing to do with whether the person who was told the statement believed the statement. What the government has to prove is that Mr. Goldstein made a statement and that statement was false. How charming he is has nothing to do with that.

**THE COURT:** Okay. Thank you.

Do I have counsel for the government?

**MR. GORDON-MARVIN:** Sorry. Come again, Your Honor? I apologize.

**THE COURT:** All right. Just making sure you're still here.

**MR. GORDON-MARVIN:** I'm very sorry.

**THE COURT:** I think we've covered ground in terms of how this witness viewed Mr. Goldstein and his legal practice, and we've gone far enough.

The objection is sustained.

**MR. GORDON-MARVIN:** All right. Thank you, Your Honor.

(Whereupon, discussion concluded.)

BY MR. GORDON-MARVIN:

Q.   How many people worked at the firm when you were there?

A.   Somewhere around eight, I believe.

Q.   Who owned the firm?

A.   Tom.

**Q.**    How were you paid?

**A.**    I was on salary.  I received a W-2.

**Q.**    How many times did you have legal fees owed to the firm paid to a personal bank account?

**A.**    I was never in a position to receive legal fees for the firm.

**Q.**    How many times did you receive payment in cash?

**A.**    Same -- same answer.

**Q.**    Is that none?

**A.**    Yeah.  Never.

**Q.**    How many times were you paid in cryptocurrency?

**A.**    Never.

**Q.**    Did there come a time when you learned that Mr. Goldstein had clients abroad?

**A.**    Yes.

**Q.**    Where did you understand those clients to be?

**A.**    Asia and I believe, also, Central and South America.

**Q.**    Do you recall where in Asia?

**A.**    China, but that's -- I believe he had a client from China, is what I knew.

**Q.**    When you say "China," are you speaking specifically about Macau or somewhere else?

**A.**    Mainland China is, as far as I understand, where that client is from.

**Q.**    Do you recall him having legal cases or a legal case in

Macau?

**A.**  Yes.

**Q.**  Roughly, when was that?

**A.**  Sometime before the pandemic and after I started.  So I started in September 2018 and the shutdown was March 2020.  And it was, I think, somewhere in 2019, would be my guess.

**Q.**  What was Mr. Goldstein doing for that client in Macau?

**A.**  He was assisting with a criminal legal defense and assisted in getting an acquittal.

**Q.**  The outcome of the criminal legal defense was an acquittal?

**A.**  As I recall.

**Q.**  And at what level was that?  Trial?  Appellate?

**A.**  I'm pretty sure it was a trial, though I was -- you know, I don't -- I'm not for sure.

**Q.**  Is there anything about Mr. Goldstein's role in helping a client in Macau get acquitted in a criminal trial that stood out to you?

**A.**  I'm sorry.  Can you say that one more time?

**Q.**  What, if anything, stood out to you about Mr. Goldstein's role in helping a client in Macau, in a criminal trial, get an acquittal?

**A.**  Mr. Goldstein doesn't practice law in foreign jurisdictions at the trial level very often, or did not at the time, if ever.

**Q.** Did there come a time when you heard about Mr. Goldstein carrying a large amount of cash back into the United States?

**A.** Yes.

**Q.** Roughly, when was that?

**A.** Sometime around then or thereafter, but still before the pandemic.

**Q.** Where did you understand him to be coming from?

**A.** I understood him to be coming from Macau.

**Q.** About how much cash was it?

**A.** I recall it being told -- being told that it was about $900,000.

**Q.** When you say you recall it being told, who did you hear this from?

**A.** This was all in a conversation that was happening outside my office, and people were laughing and joking about Tom coming back with $900,000 in cash that he had stuffed in the overhead bin.

**Q.** Who all was in that conversation?

**A.** I recall Jon -- our office manager at the time, Jon Levitan. I recall Tejinder Singh, who was -- had the office to the left of me and my office was right outside of that, and I recall Tom.

So I -- there may have been others coming in and out during that time, but I recall it being the three and then me joining in.

**Q.** So Mr. Goldstein was a part of the conversation?

**A.** Uh-hum.

**Q.** What did Mr. Goldstein say to you about the cash?

**A.** He joked that the next time a client wanted to pay him that much in cash, he'd send me to go get it. And I said that would be a terrible idea because I would give it up at the first sign of trouble.

**Q.** Did he ever send you to get cash like that?

**A.** No.

**Q.** What did you understand from that conversation the cash to represent?

**MR. KRAVIS:** Objection.

**THE COURT:** Let's come to the headsets, Counsel.

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:** Do I have counsel for the government? Can you hear me?

Mr. Kravis, can you hear me?

**MR. KRAVIS:** Yes, Your Honor.

**THE COURT:** Mr. Goldstein's thumb is up. Go ahead.

**MR. KRAVIS:** Your Honor, I think we've got to be a little more precise than this. The witness just testified that there are multiple people in the conversation. If he's testifying about something he heard Mr. Goldstein say, that might be admissible as a statement of a party opponent.

But if he heard something that someone else in the conversation said, that's hearsay. And just asking him about his overall understanding from the conversation is blurring those lines. It calls for hearsay. It's improper.

**THE COURT:** All right. Counsel, the concern is hearsay.

Go ahead.

**MR. GORDON-MARVIN:** As a first matter, Mr. Goldstein is a part of the conversation. Mr. Goldstein could have corrected any incorrect statement. By being a part of the conversation and standing there and letting someone say something, he's effectively adopting that statement to the extent that someone else is saying it and he's related in this conversation. That's step one.

Step two is that I'm happy to rephrase, but I really think this is not hearsay. This is a statement of a party opponent even if it's happening in the context of a conversation.

**THE COURT:** Even if someone else made the statement that was in the conversation?

**MR. GORDON-MARVIN:** If Mr. Goldstein is present and doesn't, you know, contradict it or, you know, address it in some way, then at that point he's adopting it.

**THE COURT:** All right.

Anything else from Mr. Kravis?

**MR. KRAVIS:** We object as an adopted admission. I

agree with the admission of a party opponent as to Mr. Goldstein's own statements.  But I think the questions here have to be more precise given the witness's prior answers.

THE COURT:  All right.  Repeat the question to the Court, Counsel.

MR. GORDON-MARVIN:  The question was:  What did he understand the cash to represent?

THE COURT:  Can you ask him what did he understand Mr. Goldstein to state the cash represented or based on Mr. Goldstein's statements --

MR. KRAVIS:  I would ask the question just be:  What did Mr. Goldstein say?  Asking about his understanding based on a conversation is calling for hearsay.

MR. GORDON-MARVIN:  So I'm happy to break this down into multiple questions about what did Mr. Goldstein say, what did other people say, did Mr. Goldstein ever correct them or interject that that was inaccurate.  I'm happy to break it down that way.

THE COURT:  You're going to have to break it down that way to get around any hearsay concerns given that there were multiple folks in the conversation.

So I'm going to let you continue.

Mr. Kravis, if you're not happy, we'll come back.

MR. KRAVIS:  Thank you, Your Honor.

THE COURT:  All right.

(Whereupon, discussion concluded.)

**BY MR. GORDON-MARVIN:**

**Q.**   From what Mr. Goldstein said about the cash, what did you understand it to represent?

      **MR. KRAVIS:**   Objection.

      **THE COURT:**   Let's come to the headsets.

(Whereupon, a discussion was held outside the presence of the jury.)

      **THE COURT:**   Counsel for the government, can you hear me?

      **MR. GORDON-MARVIN:**   Yes.

      **THE COURT:**   All right.  Mr. Kravis?  Mr. Goldstein?

      **MR. KRAVIS:**   I'm here.

      **THE COURT:**   All right.  Go ahead.

      **MR. KRAVIS:**   It's not proper to be asking these questions in terms of his understanding.  We should be getting facts.  What did Mr. Goldstein say?

      **THE COURT:**   Counsel for the government?

      **MR. GORDON-MARVIN:**   We're now talking directly about what Mr. Goldstein said and what he inferred from that.  If Mr. Kravis is concerned about the inference of a highly intelligent attorney in a conversation about what he's being told, like they can draw that out on cross of like, well, that was an inference.  This is a contestation now about, you know, the strength of the evidence, not about relevance.

**THE COURT:** All right. I thought earlier the witness testified about comments that Mr. Goldstein made and his remarks back. So I assume that's what we're talking about now in terms of the statements?

**MR. GORDON-MARVIN:** Correct.

**THE COURT:** Okay. Go ahead, Mr. Kravis.

**MR. KRAVIS:** I think he's asking about something different now.

**THE COURT:** All right. Am I misunderstanding, counsel for the government?

**MR. GORDON-MARVIN:** I think we're both not following Mr. Kravis at this point.

**THE COURT:** Okay. All right. Well, I heard testimony from the witness about comments that Mr. Goldstein made, other people being around that conversation, including the witness, the witness responding back and making a comment.

So I think my understanding is now we're talking about whatever Mr. Goldstein said; is that correct? Counsel for the government?

**MR. GORDON-MARVIN:** And what he understood it to mean, yes.

**THE COURT:** All right. All right. So just I think you need to ask the question: Based on what Mr. Goldstein said, what did you understand it to mean?

**MR. GORDON-MARVIN:** I believe that was my question.

THE COURT:  Okay.

MR. GORDON-MARVIN:  I'm happy to ask it again.

THE COURT:  All right.  Let's just ask it again.
Thank you.

MR. GORDON-MARVIN:  Thank you.

(Whereupon, discussion concluded.)

BY MR. GORDON-MARVIN:

Q.   Based on what Mr. Goldstein said, what did you understand the cash to represent?

A.   Based on the fact that Mr. Goldstein -- I understood Mr. Goldstein to be coming from Macau and that he told me that the next time a client wanted to pay him that much in cash, he'd send me, I assumed that was payment for assisting with the defense in Macau.

Q.   I'd like to shift topics slightly.  Aside from talking about that cash, did Mr. Goldstein ever mention to you having any accounts in Asia?

A.   Not to me.

Q.   Did he ever mention having bank accounts in Asia?

A.   No.

Q.   I'd like to shift topics again.  Where are you licensed as an attorney?

A.   Maryland, Massachusetts, New York and the District of Columbia.

Q.   Are you familiar with what's called an interest on

lawyer's trust account?

**A.** Yes.

**Q.** What's the acronym for that?

**A.** IOLTA.

**Q.** Does your current firm have one?

**A.** Yes.

**Q.** Did Goldstein & Russell have one?

**A.** Yes.

**Q.** By the way, whose money can be put in an IOLTA account?

**A.** Client's funds or like retainer funds that have not yet been earned through legal work.

**Q.** Have you ever placed your own money in an IOLTA account?

**A.** If I ever did, it would have been just when Kevin and I were starting the new firm.  If we needed to -- I can't recall if we had to put some small amount to open our accounts in Wells Fargo, but that would have been the only time.

**Q.** So aside from the possibility of that initial kind of account opening deposit, have you ever placed your own money in an IOLTA account?

**A.** No.

**Q.** Why not?

**A.** Because that account is a trust account maintained and required by the state bar for -- to protect legal funds that are unearned or client funds.

**Q.** What could happen to you if you did put your own money in

the account?

**MR. KRAVIS:**  Objection.

**THE COURT:**  Let's go to the headsets.

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:**  Counsel for the government, are you on?

**MR. GORDON-MARVIN:**  Certainly, Your Honor.

**THE COURT:**  Mr. Kravis, are you on?

**MR. KRAVIS:**  Yes, Your Honor.

**THE COURT:**  And Mr. Goldstein, thumbs up.

I think we've covered this territory before, but go ahead, Mr. Kravis.

**MR. KRAVIS:**  So, Your Honor, I did not object to the questions about the witness's personal knowledge or personal experience with the IOLTA accounts.  But questions about like what could happen to you if X, what could happen to you if Y, calls for speculation.  I think there's a lack of foundation there.  I think it's undisclosed expert testimony.  And I think his views about this subject are also not relevant.

**THE COURT:**  All right.  Counsel for the government?

**MR. GORDON-MARVIN:**  First of all, this is entirely based on his own experience as an attorney in Maryland and at Goldstein & Russell with IOLTA accounts.

Second, we're not asking for him to opine on the propriety of anything that Mr. Goldstein or anyone else did.  We're

asking for his own personal understanding of what the risks are with placing his own money in an IOLTA account.  This is not expert opinion.

THE COURT:  Anything further from the defense?

MR. KRAVIS:  No, Your Honor.

THE COURT:  All right.  I'm going to allow this last question.  But I think, if we're going to explore all the consequences, I'm going to agree with the defense.

MR. GORDON-MARVIN:  And I want to flag one thing, Your Honor.

THE COURT:  Yes.

MR. GORDON-MARVIN:  I'm going to move from this to his own personal experience with a real estate transaction, but I won't be asking more general questions about IOLTA accounts after this question.

THE COURT:  All right.  Very good.  Thank you.

MR. GORDON-MARVIN:  Thank you.

(Whereupon, discussion concluded.)

BY MR. GORDON-MARVIN:

Q.   What could happen to you if you did put your own money in a IOLTA account?

A.   My understanding, from taking professional responsibility at law school and the professional responsibility part of the bar, is that you can be subject to attorney discipline and disbarment.

**Q.** Have you ever bought property in the United States?

**A.** Yes.

**Q.** Where?

**A.** I own -- I am selling -- I own a home in Maryland, and I own one townhome investment property in D.C.

**Q.** When did you buy that townhome in D.C., roughly?

**A.** I believe sometime before or short -- yeah, sometime before the pandemic, I believe, sometime, but after I joined the firm. Maybe 2019 or so.

**Q.** So while you were working at the law firm of Goldstein & Russell?

**A.** Yes. While I was at Goldstein & Russell. It may have been during the pandemic. I can't remember exactly when I purchased that property.

**Q.** How did you pay for the property when you purchased it?

**A.** About 25 percent down cash and then the rest in a mortgage.

**Q.** When you say "about 25 percent down cash," are we talking about a bag of cash or a electronic transfer?

**A.** A wire. A wire from my checking account into the title company's account.

**Q.** So it was a wire from your checking account to the title company's account for closing?

**A.** Yes.

**Q.** At any point in that process, did you put your --

**A.**    I'm sorry.  I just -- I want to be accurate.  I can't remember.  It's possible that some of the money was through the kind of IRS exchange you can do if you sell one investment property, which I used to own in Rhode Island, and then invest that cash within six months of the sale in the other.

So some of the cash may have come from there, but I think it all come directly from my account.

**Q.**    So setting aside the money that might have come through that IRS process, the rest of the money came from your personal bank account and went directly to the title company's account for closing?

**A.**    That's right.

**Q.**    How much money, if any, did you put into Goldstein & Russell IOLTA account?

**A.**    None.

**Q.**    When you were at the firm, did you ever have a chance to drive any of Mr. Goldstein's cars?

**A.**    Yes.

**Q.**    Which cars?

**A.**    I had the pleasure of driving his 2020 Bentley Continental convertible while we were preparing for the *Google versus Oracle* oral argument in Jackson Hole.

**Q.**    Jackson Hole where?

**A.**    Wyoming.

**Q.**    What color was the car?

**A.**   Dark green, like almost black/forest green.

**Q.**   How did you enjoy it?

**A.**   It's the nicest car I am likely ever to have driven in my life.

          **MR. GORDON-MARVIN:**  No further questions.

          **THE COURT:**  Thank you very much.

     Does defense wish to cross-examine the witness?

          **MR. KRAVIS:**  Yes, Your Honor.  Could we take our --

          **THE COURT:**  Yeah.  We're going to take a break.

     All right.  I think this is a good time for the jury's morning break.

     Please rise for the jury.

     (Whereupon, the jury exited the courtroom at 11:03 a.m.)

          **THE COURT:**  Please be seated, everyone.  I'll invite the witness, if you want to step down for just a moment, you may step down at this time.  And I remind you, no contact with the government because you're now on cross-examination.  Please go ahead and step out.

     (Whereupon, the witness left the witness stand and the courtroom at 11:04 a.m.)

                              - - -

          **THE COURT:**  Mr. Kravis, about how long do you anticipate on cross?

          **MR. KRAVIS:**  I'm thinking, like, 15 minutes.

          **THE COURT:**  Okay.  Very good.  That sounds great.

Why don't we take five, and then we will come back and have the jury.

**MR. KRAVIS:**  Thank you.

**DEPUTY CLERK:**  All rise.  This Honorable Court stands in recess for five minutes.

(Whereupon, a recess was taken from 11:05 until 11:14 a.m.)

**DEPUTY CLERK:**  All rise.  This Honorable Court now resume in session.

**THE COURT:**  Please be seated, everyone.  Are we ready to have the witness rejoin the witness box?

Please feel free to take your seat, and I will remind you, you remain under oath.

**DEPUTY CLERK:**  All rise for the jury.

(Whereupon, the jury entered the courtroom at 11:17 a.m.)

**THE COURT:**  Please be seated, everyone.

Mr. Kravis?

**MR. KRAVIS:**  All right.  Thank you, Your Honor.  May I approach?

**THE COURT:**  You may.

CROSS-EXAMINATION

BY MR. KRAVIS:

Q.   Good morning, Mr. Woofter.

A.   Good morning.

Q.   I want to start by asking you about this bag of cash. Okay?

**A.**   Okay.

**Q.**   Now, you were asked some questions on direct examination about a time when Mr. Goldstein brought a bag of cash back from overseas.  Do you remember that?

**A.**   Yes.

**Q.**   And I think what I heard you say a moment ago was that you assumed that that money was payment for some legal work that Mr. Goldstein had done in Macau.  Did I hear that right?

**A.**   Yes.

**Q.**   And the legal work you were talking about in Macau was this criminal trial; right?

**A.**   Yes.

**Q.**   I remember you saying it struck you as a little unusual because Mr. Goldstein was an appellate lawyer who didn't typically do trial work.  Do I have that right?

**A.**   Yes.

**Q.**   All right.  And just to be clear, the words that you heard Mr. Goldstein speak were not "this money is payment for a legal fee for the work in Macau"; right?

**A.**   I do not recall Tom saying that to me.

**Q.**   Right.  You were making an assumption about what the money was based on some other information; right?

**A.**   Yes, or perhaps, having heard it from someone, but I don't recall.

**Q.**   My point is:  You don't recall hearing that from

Mr. Goldstein; right?

**A.** That is correct.

**Q.** All right. And I think what I understood you to say was, that you did hear Mr. Goldstein, in this conversation about the bag of cash, reference a client; right?

**A.** Correct.

**Q.** And I think I heard you say you were also aware of the legal work in Macau; right?

**A.** Correct.

**Q.** And I think what I understood you to say was -- or based on that, you were making an assumption that the cash in the bag was for the payment for the legal work in Macau. Am I getting this right?

**A.** Yes.

**Q.** All right. Mr. Goldstein brought the bag of cash into the country in October of 2018; right?

**A.** I do not remember.

**Q.** Do you have any reason to doubt that it was in October of 2018?

**A.** No, except that it seems pretty shortly after I started at the firm, but it's equally plausible that that's exactly when it happened.

**Q.** When was the legal work in Macau?

**A.** I thought it was around the same time.

**Q.** Mr. Woofter, the legal work in Macau was five months

later, wasn't it?

A.    I don't recall.

Q.    That criminal trial that stood out to you because, you know, Mr. Goldstein is an appellate lawyer.  He's not a criminal specialist.  It was in a foreign country.  Do you remember saying all that?

A.    Yes.

Q.    That trial was in February of 2019, wasn't it?

A.    I don't recall.

Q.    Okay.  If it was in February of 2019, that would be like over four months after Mr. Goldstein brought the cash back; right?

A.    I don't recall.

Q.    And the government didn't ask you about any of these dates on your direct, did they?

A.    No.

Q.    Let me ask you about the IOLTA thing.  I think I heard you testify a moment ago that you understand an IOLTA account, basically, to be an account where client funds are deposited. Do I have that right?

A.    Yes, client or unearned fees.

Q.    And I think you were asked some questions about whether you yourself had ever deposited money into an IOLTA account. Did I hear that?

A.    Correct.

Q.    And you said no, you'd never done that; right?

A.    Correct.

Q.    I think maybe when you were asked those questions you were assuming that you were being asked if you had ever deposited money in an IOLTA account as an attorney.  Do I have that right?

A.    I wasn't actually assuming about whether I was being asked if I did it personally for myself or as an attorney for myself.

Q.    Well, let me just cut to the chase here.  You can deposit funds into an IOLTA account if you are the client; right?

A.    I actually don't know that, but I -- perhaps.  I see no reason -- you know, it's their trust account as much as -- yeah.

Q.    Right.  You just -- an IOLTA account is like a client trust account; right?

A.    Uh-huh.

Q.    Right?

A.    Uh-huh.

Q.    And so as you sit here, you cannot think of any reason why you, as a client, could not deposit money into an IOLTA account; right?

A.    That's right.

Q.    Are you aware of any legal rule that would prevent you from being a client of the firm Goldstein & Russell?

A.    Accounting for conflicts, I can't think of on the spot,

not -- no.

Q.   And the same for Mr. Goldstein; right?  You, on the spot, can't -- other than like conflict issues, you can't think of any legal rule that would prevent Mr. Goldstein from being a client of Goldstein & Russell; right?

A.   Right.

Q.   Okay.  Let me ask you just a little bit about the firm finances.

Goldstein & Russell had an outsourced accounting practice; right?

A.   Can you say that one more time?

Q.   Yes.  Let me ask it a better way.

Goldstein & Russell outsourced its accounting work; right?

A.   That's my understanding.

Q.   Do you know the name of the firm the accounting work was outsourced to?

A.   No.

Q.   Fair to say, you were not deeply involved in the firm finances?

A.   I was not involved in the firm finances.

Q.   And that was just fine with you; right?

A.   That was fine with me.

Q.   Right.

A.   My paycheck was never late.

Q.   And to be clear, you yourself are not aware of any time

when Mr. Goldstein asked an office manager to classify a personal payment as a business expense, are you?

**A.** No.

**Q.** You're not aware -- you yourself are not aware of any time when Mr. Goldstein asked those outside accountants to classify a personal payment as a business expense, are you?

**A.** No.

**Q.** You're not personally aware of any time when Mr. Goldstein asked the firm office manager to try to hide firm income, are you.

**A.** No.

**Q.** And you're not personally aware of any time when Mr. Goldstein asked the outside accountants to try to hide firm income, are you?

**A.** No.

**Q.** You were asked some questions on direct examination about Mr. Goldstein's attention to detail. Do you remember those?

**A.** Vividly.

**Q.** And I think what I heard you say was that Mr. Goldstein was -- paid attention to details when it came to his legal work. Did I hear that right?

**A.** Yes.

**Q.** And by the legal work, you're talking about the briefs and the oral arguments and so on and so forth; right?

**A.** Yes. The details of the cases he was working on.

Q.   Fair to say that Mr. Goldstein was not particularly detailed when it came to the firm finances?

A.   Correct.

Q.   In fact, Mr. Goldstein was notorious around the firm for having trouble getting his invoices out; right?

A.   Yes.

       MR. KRAVIS:  Could I have just a moment, please?

       THE COURT:  Yes.

BY MR. KRAVIS:

Q.   Just one final question for you, Mr. Woofter.  We were talking about that bag of cash.

     If it is, in fact, the case that Mr. Goldstein brought the bag into the country in October 2018, and the legal work that you were thinking of in Macau was months later, in February of 2019, is it possible that your assumption about what that cash was is incorrect?

A.   Yes.

       MR. KRAVIS:  Thank you.

       THE COURT:  Thank you very much, Mr. Kravis.

     Does the government wish to do redirect?

       MR. GORDON-MARVIN:  Very briefly.

       THE COURT:  All right.

                   REDIRECT EXAMINATION

BY MR. GORDON-MARVIN:

Q.   On that last point, Mr. Woofter, talking about the bag of

cash and the timing of it versus this trial in February of 2019 in Macau.  Earlier, when you were talking about IOLTA accounts, I think you mentioned something called a retainer; is that right?

**A.**    Correct.

**Q.**    What is a retainer?

**A.**    A retainer is a payment for legal work that you have not yet done yet.  So it is a payment the client makes to enter a contract with the attorney who is agreeing to take upon the case.  And then, once the work is being done or done, you can earn that money and move it over from your IOLTA account into your own account, your operating account.

**Q.**    So when is that money given to the attorney relative to the legal work?

**A.**    It -- before.  Before the legal work is completed.

**MR. GORDON-MARVIN:**  No further questions.

**THE COURT:**  Thank you very much.

Have all questions been asked of the witness?

**MR. KRAVIS:**  May I recross just to one question on that point?

**THE COURT:**  Yes.  I'll allow it.

RECROSS-EXAMINATION

**BY MR. KRAVIS:**

**Q.**    Mr. Woofter, just to be perfectly clear about this, you don't have any first-hand knowledge about any advanced retainer

that was paid to Mr. Goldstein for that work in Macau, do you?

**A.**    No.

    **MR. KRAVIS:**  Thank you.

    **THE COURT:**  Thank you very much.

Have all questions been asked of the witness?

    **MR. GORDON-MARVIN:**  Yes, Your Honor.

    **MR. KRAVIS:**  Yes, Your Honor.

    **THE COURT:**  Very good.

And thank you very much for your time and testimony.  You may step down and be excused.  Have a wonderful day.

                (Witness excused.)

                        - - -

    **THE COURT:**  Is the government prepared to call its next witness?

    **MR. BEATY:**  We are, Your Honor.  The United States calls Gary Libbin, L-i-b-b-i-n.

May I approach?

    **THE COURT:**  You may.

Mr. Libbin, if you want to come all the way towards me into the well of the court.  Then you'll go to your left and please remain standing by the witness box.  The courtroom deputy will swear you in.

                        - - -

        GARY LIBBIN, after having been duly sworn, was examined and testified as follows:

- - -

**DEPUTY CLERK:**  Thank you.  You may be seated.  Please speak into the microphone, speak directly into it and state and spell your first and last names for the record.

**THE WITNESS:**  Gary Libbin.  G-a-r-y.  Last name is L-i-b, as in boy, b, as in boy, i-n, as in Nancy.

**DEPUTY CLERK:**  Thank you.

DIRECT EXAMINATION

**BY MR. BEATY:**

**Q.**  Good morning, sir.  Where do you work?

**A.**  I work for the Internal Revenue Service.

**Q.**  What's your title?

**A.**  I am an internal revenue agent.

**Q.**  What role did you have in the IRS's examination of Mr. Goldstein's 2010 tax return?

**A.**  I was the one responsible for auditing or examining his 2010 tax return.

**Q.**  Tell the jury a little bit about yourself, please.

**A.**  I have been working at the Internal Revenue Service for 21 years, all as a revenue agent.  I have a Master's in accounting, and I'm also a CPA.

**Q.**  Where are you from?

**A.**  I grew up in Connecticut, met my wife at the University of Maryland.  And since she's a local, I'm now from Maryland.

**Q.**  When did you join the IRS?

**A.**    In 2004.

**Q.**    What positions have you held at the IRS?

**A.**    I have been internal revenue agent the entire time.

**Q.**    What is an IRS examination of a tax return?

**A.**    In short, it is the attempt to ascertain the validity of the tax return as it has been filed.  Any audit -- we use "audit" and "examination" somewhat interchangeably -- is taking a document, whether it's a financial statement or a tax return, and, through a series of procedures and tests, trying to determine whether or not it is accurate.

**Q.**    You said that the term "examination" and "audit," those can be used interchangeably?

**A.**    At the IRS they are used interchangeably.  Yes.

**Q.**    Now, as a revenue agent, what kind of records do you keep regarding the steps you take in your examination or audit?

**A.**    So we would have a case file outlining a number of administrative procedures that are common to all cases.  There would be documents around the individual issues being reviewed. There would be typically interview notes.  There would be an activity record explaining all of the sort of context and steps that were taken.  And then ultimately a report, copy of a return, et cetera.

**Q.**    Okay.  Well, let's all look at Government's Exhibit 82 together.  Please tell the jury what we're looking at here.

**A.**    Yes.  So this is the activity record from the audit of

Mr. Goldstein. So it lays out the sort of basic timeline and broad high-level steps that were taken during the course of the audit.

Q. Okay. I'm going to focus in on those two dates. What do those two dates, April 19, 2012 and June 7, 2012, tell you about when this audit began and ended?

A. So the audit began on April 19th. It was resolved, at least at my level, on June 7th.

Q. Is that some sort of speed record?

A. It is about as fast as that can be done. It is not unheard of. In order for an audit to be completed that quickly, it would require that the taxpayers respond promptly and provide all of the information promptly, which they did in this case. It is not impossible, but it is not common.

Q. We're going to come back to this in a moment.

In your IRS examinations, what is a "lead sheet"?

A. A "lead sheet" is the term we use for sort of the summary of a particular issue or set of administrative procedures. It will describe, in the case of an issue, the law that's involved, the facts that were found and reference other documents that may have been observed as part of the audit.

Q. And what, if any, lead sheets did you use in your examination of Mr. Goldstein's 2010 tax return?

A. So there would be a standard sweep of administrative procedures lead sheets and then individual ones for each of the

issues that would have been examined in that case.

**Q.** Well, how many of the lead sheets in your examination related to gambling?

**A.** There would have been one related to gambling.

**Q.** Have you seen that before?

**A.** Yes.

**Q.** And is that part of your IRS file?

**A.** Yes.

**Q.** Let's look together at Government's Exhibit 86.

Please tell the jury what we're looking at.

**A.** So this is the summary of review of issues relating to potential gambling winnings. It indicates that there were none that were reported on the original return. And during the course of the exam, there was discussion and documents reviewed, but we were unable to substantiate the specific amount of gambling winnings.

**Q.** Okay. You said a lot there, so let's unpack it. But most importantly, for whom was this a gambling lead sheet?

**A.** It was part of my case, and it was in reference to Mr. Goldstein.

**Q.** So let's focus on the first piece here.

What kind of research had you done regarding Mr. Goldstein when you were first assigned to his examination?

**A.** Standard for any case. We review a combination of documents that are available to the IRS, as well as any public

source information.  So that would have included reports to the IRS of income, of various other transactions, as well as internet research for anything that was readily available about Mr. Goldstein.

Q.   Why did you look at Mr. Goldstein's law firm's web page?

A.   Any time someone is in business, we will try to understand their income sources and their lifestyle and how that may affect the information that's reported on the return.

Q.   And we see a reference in the second sentence to CTRs. What are those?

A.   Those are documents filed with the government when someone has large cash transactions, either withdrawals or deposits, commonly with banks, but often casinos or other entities that deal in cash.

Q.   What's the threshold for the preparation of the currency transaction report?

A.   $10,000.

Q.   I'm sorry?

A.   $10,000.

Q.   Now, what was the significance to you of knowing that Mr. Goldstein played poker and that he had had currency transaction reports exceeding $10,000 in Las Vegas?

A.   It appeared likely that he would have had some gambling winnings.  It would be fairly uncommon for someone to gamble extensively and never win anything.  So having significant cash

reports, as well as the information that it was in Vegas and at casinos, would indicate that there likely could have been potential winnings.

Q.    Okay.  So let's turn back to page 1 of Government's Exhibit 82.

When did you conduct this research regarding Mr. Goldstein's poker playing?

A.    When the case was opened.  The acronym PCA refers to precontact analysis.  That's the work that we do when we are beginning the case, evaluating it, evaluating the potential areas of concern to determine the scope of the audit.

Q.    And then armed with the information you found, how did you first attempt to contact Mr. Goldstein about the IRS's examination?

A.    All audits are required to begin with written notification.  So that is, as noted there, the Letter 2205-A is a standard letter issued to indicate the beginning of an audit. And included with it are a publication concerning taxpayer rights and a notice about the Privacy Act.

Q.    So let's look down at the context portion here.  Can you help us decode what you wrote on your activity record for April 21, 2012, please?

A.    Yes.  The taxpayer husband, in this case Mr. Goldstein, called and left a message on Saturday, 4/21.

Q.    That's right after, two days after the notice is issued?

**A.**   Yes.

**Q.**   And that's "LM" means left voicemail?

**A.**   Yes.

**Q.**   Or left message?

**A.**   Correct.

**Q.**   Looking at the notes in the red box, please tell us what happens on April 23, 2012?

**A.**   So on the next business day, the RA, meaning me, the revenue agent, called back.  I left a message.  Mr. Goldstein called me back.  Again, spoke with the taxpayer husband.  He indicated that his CPA was going to be serving as a power of attorney.  One of the core rights established by Congress is that taxpayers have the right to representation in IRS matters.

So we discussed the type of documents that would be needed and how to obtain and complete the 2848, which is the IRS power of attorney form.

**Q.**   Almost a few more bars on discussed docs needed.  What does that mean?  What were you referring to?

**A.**   So in any audit, the next step after initial contact is we would set up an appointment and send out a formal information document request, which would lay out the types of records that we would be reviewing or requesting to review in the course of the examination.  In this case, for example, with respect to the gambling question, we would have discussed the need for records showing any wins or losses that occurred during the tax

year.

Q.    And again, what did Mr. Goldstein say he was going to do with respect to representation in the exam?

A.    He was going to have his CPA, his accountant, serve as his representative for the audit.

Q.    I'm going to zoom out a bit more.

When did you meet with Mr. Goldstein's representative?

A.    On May 25th of 2012.

Q.    And can you tell from this who his representative was?

A.    Yes.  It was William Caldwell.

Q.    Let's all look at Government's Exhibit 84 together.

Please tell the jury what we're looking at?

A.    So this is the initial portion of the interview questions and notes from the initial interview.  Whenever we're working a case, we will typically have an outline of an interview that we would want to conduct with either the taxpayer or the representative.  And it indicates that Mr. Caldwell was present and the taxpayers were not.

Q.    And let's -- looking at page 4 of Government's Exhibit 84, tell the jury about this part of your discussion with Mr. Goldstein's representative, please.

A.    So I asked a number of questions about potential gambling winnings and losses.  The answers from the representative were fairly short and vague.  It did not convey that he had a deep knowledge of how that was handled.

**Q.**   Why were you asking these questions?

**A.**   One of the -- based on the information that was available, it seemed likely that there was potential unreported gambling monies, and we were trying to determine whether or not there were records of potential winnings and whether or not there was unreported income.

**Q.**   And again, what did you perceive about whether Mr. Goldstein's representative, Mr. Caldwell, was familiar with Mr. Goldstein's gambling activity?

**A.**   It appears that he had some records from him and a limited amount of information.

**Q.**   Let's turn back to Government's Exhibit 86.

What did Mr. Goldstein's power of attorney tell you about why Mr. Goldstein had failed to report any gambling winnings for tax year 2010?

**A.**   The documentation that he provided showed that there were substantial losses.  And so -- and there was no particular records of wins in that year.  At the time -- so gambling winnings are required to be reported, but gambling losses may also be deducted to the extent of winnings.

It happened in 2010, as long as there were sufficient losses in that year, it would not have impacted the amount of tax.  However, that was new that year and not scheduled to continue in subsequent years.  And so we had a discussion about the need for more robust recordkeeping with respect to wins and

losses because there would be potential tax effects in other years.

Q.   Looking at that first highlighted section in the second paragraph, what had been the quality of Mr. Goldstein's records regarding his gambling activity?

A.   There were some notes or other information showing some significant losses in that year that appeared to be, at least at the time, more than would plausibly have come in in winnings, based on what was available.

Q.   But were the records sufficient?

A.   No.

Q.   And then, looking at that second highlighted section, the bottom of that second paragraph, tell us what you meant in that highlighted section.

A.   Right.  So there was a conversation about the need to keep detailed records about all wins and losses, because all wins are reportable and that the losses are only deductible up to extent of winnings, as well as the fact that, at the time, he -- years subsequent to 2010, there would have been potential tax ramifications even if the losses exceeded the wins based on the tax law at the time.

Q.   Again, how did the 2010 limitations then specifically affect your determination of whether to correct Mr. Goldstein's tax return for 2010?

A.   Right.  So in 2010, it was the case for that year

specifically that itemized deductions and personal exemptions were not phased out as a function of adjusted gross income. Gambling winnings would increase adjusted gross income, while gambling losses would be treated as an itemized deduction.

And so if, for example, someone had $1,000 of winnings and $100,000 of losses, in 2010 specifically, it would have had no affect. However, in other years, it would have reduced their other deductions, even though the losses offset the wins.

**Q.** How much did it matter to you that the IRS did not have any evidence of substantial poker wins for 2010?

**A.** That is critically important. The fundamental responsibility for proving income in an audit falls on the government, whereas the responsibility for proving deductions falls on the taxpayer. In the absence of clear evidence of specific income, it is difficult to add additional income.

**Q.** If Mr. Goldstein had provided records of substantial poker wins in 2010, how would that have impacted your analysis?

**A.** Had there been credible documentation of specific wins and losses, then those would have been included.

**Q.** Based on the evidence you had, that had been provided to you, what did you ultimately conclude?

**A.** I concluded that there was not sufficient documentation to increase income by a specific amount, but that there was a need for improved recordkeeping and reporting requirements moving forward.

MR. BEATY: Okay. Last exhibit. Let's look at Government's Exhibit 102 together.

BY MR. BEATY:

Q. And we're looking now at page 2. Please tell the jury what we see.

A. So this would be a cover letter included with an audit report where we say, you know, enclosed is the audit report. Please respond by a certain date and advising them of their rights. It also includes a publication along with it.

Q. And who sent this notice?

A. I did.

MR. BEATY: And if we split the screen, page 3, Government's Exhibit 102.

BY MR. BEATY:

Q. How was the IRS's examination of Mr. Goldstein's tax return for 2010 ultimately resolved?

A. The taxpayers were due a small refund.

Q. And from your own experience, how frequently does an examination of a taxpayer's return actually result in a refund to the taxpayer?

A. It happens sometimes. It is not frequent, but it is not uncommon. As revenue agents, our job is to determine the correct amount of tax, not maximize tax for the government. And so if a taxpayer has overstated their tax liability, then it is our job to correct it to reduce it. And if it is

unstated, it is corrected to increase it.

MR. BEATY:  No further questions, Your Honor.  I pass the witness.

THE COURT:  Thank you very much.

Does the defense wish to cross-examine the witness?

MR. KRAVIS:  Yes, Your Honor.

May I approach?

THE COURT:  You may.

CROSS-EXAMINATION

BY MR. KRAVIS:

Q.   Good morning, Mr. Libbin.

A.   Morning.

Q.   The audit that you performed of -- on Mr. Goldstein's 2010 tax return was very quick; right?

A.   That is correct.

Q.   It was about -- I think I heard you say, "This is about as fast as it gets"; right?

A.   That is correct.

Q.   And the only way you could do it so quickly was because Mr. Goldstein responded promptly; right?

A.   Correct.

Q.   And Mr. Goldstein provided the information you needed promptly; correct?

A.   Correct.

Q.   Now, this audit actually resulted in Mr. Goldstein getting

a refund; right?

**A.** Correct.

**Q.** And the reason for that is because -- or one reason for that is because the documentation that you were provided showed substantial gambling losses for Mr. Goldstein for the year in question; right?

**A.** I would not characterize the gambling losses as leading to the refund.

**Q.** But Mr. Goldstein -- let me rephrase.

You received documentation showing substantial gambling losses; right?

**A.** Correct.

**Q.** And the -- just to take a step back here, the way this works is, in a particular tax year, the taxpayer can use gambling losses to offset gambling winnings; right?

**A.** That is correct.

**Q.** And because you had the documentation of the substantial gambling losses, you did not conclude that there was money owed on gambling winnings for that year; right?

**A.** That is correct.

**Q.** You have been a revenue agent for, it's like 21 years?

**A.** Correct.

**Q.** And as a revenue agent, you have between ten and twenty taxpayers under audit at any given time; right?

**A.** It's a rough ballpark.  This is correct.

**Q.**   You've done hundreds of audits; right?

**A.**   Correct.

**Q.**   Could be a thousand?

**A.**   Sure.

**Q.**   This audit happened 14 years ago; right?

**A.**   Correct.

**Q.**   You were first interviewed by the government team in this case in July of 2025.  Does that sound about right to you?

**A.**   Yes.

**Q.**   So the first time anyone talked to you about what happened in this audit, it was like 13 years after the audit had happened; right?

**A.**   From this team?  Yes.

**Q.**   Now, I think you told me that when -- or I think I heard on direct examination that when the audit kicked off, you had an initial phone conversation with Mr. Goldstein.  Do I have that right?

**A.**   Correct.

**Q.**   And then after that, you did not have any direct communications with Mr. Goldstein; right?

**A.**   Correct.

**Q.**   You went through Mr. Goldstein's power of attorney; right?

**A.**   Correct.

**Q.**   The power of attorney was an accountant named Mr. Caldwell; right?

**A.** Correct.

**Q.** And the whole point of the power of attorney -- well, let me ask you this: You mentioned on direct that you gave Mr. Goldstein instructions about how to complete the power of attorney form; right?

**A.** We discussed the need to complete it and what, you know -- it would be a standard conversation, like, here are the boxes, here's what is entailed, yes.

**Q.** And the whole point of this power of attorney thing is so that you can communicate directly with the accountant about the taxpayer's tax issues; right?

**A.** Yes. It is to both protect the taxpayer's privacy so that we are not disclosing information to someone who is not authorized, and for them to represent the views of the taxpayer so that the taxpayer does not have to come in themselves.

**Q.** And so beyond that initial introductory phone call with Mr. Goldstein, all of your direct communications were with Mr. Caldwell; right?

**A.** Correct.

**Q.** Other than that initial call, you did not have any direct communications with Mr. Goldstein; correct?

**A.** Verbally, no.

**Q.** Right. You didn't have any phone calls with him other than that; right?

**A.** Correct.

Q.    And you didn't have any meetings with him, face-to-face meetings other than that; right?

A.    Correct.

Q.    I think this would have been a little bit too early, but you didn't do any Zooms or anything like that; right?

A.    I don't think there were any, but yes.

        MR. KRAVIS:    All right.    Now, could we take a look at Government's Exhibit 86, please?

BY MR. KRAVIS:

Q.    Mr. Libbin, I think I heard you say on direct examination that this is something called "a lead sheet."    Do I have that right?

A.    Correct.

Q.    And this is the lead sheet for the tax audit that we've been talking about here?

A.    Correct.

Q.    All right.    I want to direct your attention to the conclusion box at the top there.    Do you see that?

A.    Yep.

Q.    Okay.    So this reads, "Conclusion:    Because the IRS has no evidence of any specific wins, the issue will not be changed." Do you see that?

A.    Correct.

Q.    And then it says, "Taxpayer was educated as to the recordkeeping and reporting requirements for gambling wins and

losses."  Do you see that?

**A.**    Yes.

**Q.**    Okay.  So this is a little weird, but when you say "taxpayer was educated," you're referring to a conversation that you had with Mr. Caldwell; right?

**A.**    That is correct.

**Q.**    In other words, you did not have a face-to-face meeting with Mr. Goldstein where you said these things, educating about recordkeeping and reporting requirements; right?

**A.**    Correct.

**Q.**    This is something you said to Mr. Caldwell, the accountant; right?

**A.**    As his representative, yes.

**Q.**    Okay.  And just to state the obvious, you were not present for any follow-up conversation between Mr. Caldwell and Mr. Goldstein; right?

**A.**    That is correct.

**Q.**    So you do not know exactly what Mr. Caldwell told Mr. Goldstein about any of this coming out of your meeting; fair?

**A.**    That is fair.

**Q.**    When you met with Mr. Caldwell, you did not provide him with any specific documents on how to report gambling winnings; right?

**A.**    I'm not sure what you mean.

**Q.**    When you had this meeting with Mr. Caldwell --

          **MR. KRAVIS:**  Can we leave that up, actually?

**BY MR. KRAVIS:**

**Q.**    When you had this meeting with Mr. Caldwell, you talked with him about this issue, but you didn't give him specific documents explaining what you were discussing here, did you?

**A.**    Prior to the meeting, he would have also received a copy of the document request asking for specific records.

          I'm not quite sure what -- what you would expect -- I'm just not sure I understand the question.

**Q.**    Just to make sure I'm clear, you did not provide Mr. Caldwell with any specific documents with your explanation about these recordkeeping and reporting requirements; is that true?

**A.**    I don't recall.

**Q.**    All right.  Mr. Libbin, were you interviewed by the IRS in this case?

**A.**    Was I interviewed by the IRS?

**Q.**    By the IRS.  Yeah.  Were you interviewed?

**A.**    No.  I'm not even sure what that means.

**Q.**    You were not -- you were not interviewed in connection with this investigation?  The investigation that led to this case, you were interviewed; right?

**A.**    I don't recall.

**Q.**    You don't recall participating in an interview with

Special Agent Andrew Accardi on July 25, 2025?

**A.**    Oh, yes.

**Q.**    You were interviewed; right?

**A.**    Yes.

**Q.**    And in that interview, you said that you would not have provided any specific documents with your explanation to Mr. Caldwell, didn't you?

**A.**    If that's what his notes said, I trust that that's the case.

**Q.**    All right.  You probably didn't tell Mr. Caldwell about any specific provisions in the IRS code; right?

**A.**    I would expect that a CPA would know that all income is taxable unless otherwise specified.

**Q.**    Right.  I understand.  But I'm not asking about what you thought Mr. Caldwell knew.  I'm asking you about what you told Mr. Caldwell.  In this conversation that you had with Mr. Caldwell, not Mr. Goldstein, Mr. Caldwell, you did not cite any specific provision of the revenue code, did you?

**A.**    I do not recall from, as you said, 13 years ago, whether I specifically included the code section in the discussion of the need to report gambling winnings or whether it was a general discussion of this is something that needs to happen.

**Q.**    I mean, that's fair.  This was a long time ago; right?

**A.**    Correct.

**Q.**    You've done like hundreds of audits since then; right?

**A.**    Yes.

**Q.**    You've met with countless powers of attorney; right?

**A.**    Yes.

**Q.**    All since the time that this happened; right?

**A.**    Correct.

**Q.**    And with all the reporting requirements and everything, you did not refer Mr. Goldstein for criminal prosecution, did you?

**A.**    No.

        **MR. KRAVIS:**    Thank you.  I have no further questions.

        **THE COURT:**    Thank you very much.  Is there any redirect from the government?

        **MR. BEATY:**    Just one question.

                        REDIRECT EXAMINATION

**BY MR. BEATY:**

**Q.**    Thank you for your patience, Mr. Libbin.  Going back to Government's Exhibit 82, you had a call with Mr. Goldstein on April 23, 2012?

**A.**    Correct.

**Q.**    You discussed documents that were going to be needed in the audit?

**A.**    That is correct.

**Q.**    And what did those audits -- and how did those documents relate to gambling records?

**A.**    So, it would have been a request for specific records of

gambling wins and losses because that was what was one of the issues that was under examination, and we were trying to determine whether or not there were unreported gambling winnings.

**Q.**   You told Mr. Goldstein you're going to need records of his wins and losses?

**A.**   Correct.

          **MR. BEATY:**  No further questions, Your Honor.  Thank you.

          **THE COURT:**  Thank you very much, Counsel.

     Have all questions been asked of the witness?

          **MR. KRAVIS:**  Yes.  Thank you, Your Honor.

          **THE COURT:**  All right.  And thank you so much, Mr. Libbin, for your testimony and time.  You may step down and be excused at this time.

     Have a good afternoon.

                         (Witness excused.)

                              - - -

          **THE COURT:**  Counsel, we are close to noon.  Might this be a good time for the lunch break, and then we'll resume in about an hour.  Any objection?

          **MR. BEATY:**  No objection, Your Honor.

          **MR. KRAVIS:**  No, Your Honor.  Thank you.

          **THE COURT:**  All right.  I'm going to invite the jury to step down for its lunch break at this time.

Please rise for the jury.

(Whereupon, the jury exited the courtroom at 11:58 a.m.)

**THE COURT:**  You may be seated.  And before we break for lunch, can I get some idea of what the afternoon will look like from the government's point of view?

**MR. ADENRELE:**  Indeed, Your Honor.  After we get back, we'll have Mr. Caldwell, who shouldn't be very long.  Obviously, 40 minutes on direct.  We, obviously, cannot estimate cross.  And we'll have subsequent witnesses after that.

**THE COURT:**  Caldwell and who else?

**MR. ADENRELE:**  And we'll probably do Karime Foy after that.  Your Honor knows Mr. Foy very well.  And then we have a few other witnesses after that, but, you know, we'll see where we're at.

**THE COURT:**  All right.  So why don't we come back at 1:00, and we'll turn to the next witness.

Enjoy your lunch.

(Whereupon, a lunch recess was taken from 11:59 a.m. until 1:05 p.m.)

**DEPUTY CLERK:**  All rise.  This Honorable Court now resumes in session.

**THE COURT:**  Please be seated, everyone, and welcome back from lunch.

I believe we were up to the government's next witness.  Is

that correct, Mr. Beaty?

**MR. BEATY:**  It is, Your Honor.

**THE COURT:**  All right.  Are we ready to have the jury?

**MR. BEATY:**  We are, Your Honor.

**THE COURT:**  Let's do that, and then you can call your next witness.  Do you have materials?

**MR. BEATY:**  I do.

**THE COURT:**  Just come and bring it up.  I find them very helpful.  Thank you.

Please rise for the jury.

(Whereupon, the jury entered the courtroom at 1:07 p.m.)

**THE COURT:**  Please be seated, everyone.

Members of the jury, welcome back from your lunch break.

Counsel for the government, are you prepared to call your next witness?

**MR. BEATY:**  We are, Your Honor.  The United States calls William Caldwell.

**THE COURT:**  Mr. Caldwell, if you want to come all the way towards the well of the court towards me.  You'll then step to your left to the witness box and please remain standing once you are there.

- - -

WILLIAM CALDWELL, after having been duly sworn, was examined and testified as follows:

                              - - -

**DEPUTY CLERK:** Thank you.  You may be seated.  Please adjust the microphone.  Speak directly into it.  State and spell your first and last name for the record.

**THE WITNESS:** My name is William, W-i-l-l-i-a-m, Caldwell, C-a-l-d-w-e-l-l.

                     DIRECT EXAMINATION

**BY MR. BEATY:**

**Q.**   Good afternoon, Mr. Caldwell.  You were a tax return preparer for Mr. Goldstein and his law firm?

**A.**   Yes.

**Q.**   And you worked for Mr. Goldstein for more than a decade ending in 2012?

**A.**   Correct.

**Q.**   I'm sorry?

**A.**   Yes.

**Q.**   If you could just pull the microphone a little or scooch up to it.  Thank you.

      Based upon your interactions with Mr. Goldstein, by 2012, what was your understanding of how familiar Mr. Goldstein was with his obligation to timely pay his taxes each year?

**A.**   Oh, I think he was fairly convinced, fairly -- he had a good grasp of that.  We would have frequent conversations around quarterly, year endings and whether or not a quarterly payment was necessary.

**Q.**    And based on your interactions with Mr. Goldstein by 2012, what was your understanding of how familiar Mr. Goldstein was with his obligation to report gambling winnings and losses?

**A.**    I don't know if it was 2012 or 2013 that we would be -- but there was an audit in between there, and it came up during an audit.  And I know that, as a result of the audit, he was familiar with the tax requirements of gambling.

**Q.**    And then, based on your own interactions with Mr. Goldstein, by the end of 2012 or 2013, how familiar -- what did you understand about how familiar Mr. Goldstein was with the importance of keeping clear gambling records?

**A.**    Once again, it came up during the audit, and it was addressed during the audit.

**Q.**    And you've mentioned that there was an IRS audit.  Is that the audit for Mr. Goldstein's tax return for tax year 2010?

**A.**    Yes.

**Q.**    And how, if at all, did that audit relate to Mr. Goldstein's gambling income and losses?

**A.**    Well, it wasn't a key factor of that audit, and it came up during the audit.

**Q.**    Tell the jury a little bit about yourself, please.

**A.**    I am a -- I'm a CPA.  I operate in Montgomery County.  And I have been one -- I have been one for 30 some years now.

**Q.**    Where were you educated?

**A.**    University of Minnesota.

Q.    And you said the acronym CPA.  What is a CPA?

A.    A certified public accountant.

Q.    And are you still a CPA?

A.    Yes, I am.

Q.    At one point did you own your own company?

A.    Yes.  I did own my own company from 2001 through two years ago.

Q.    Now, what, if any, medical problems have you had in the recent past?

A.    I had a brain bleed last summer, and it resulted in me being hospitalized for a couple of months.  And I still have some difficulties with my right hand and occasional word recall.  It's not cognitive difficulty, but it does take me some time to come up with the right word.

Q.    How has that affected your memory of events in the past?

A.    It hasn't affected my memory.  It has not.

Q.    It has -- has not?

A.    Has not affected my memory.

Q.    And generally, how is your memory with respect to your interactions with Mr. Goldstein?

A.    It was a long time ago, and so I have a few clear memories of it and a lot of no memory at all with respect to, you know, what we talked about or what we did.

Q.    Okay.  Well, let's do our best today.

How did you first come to work with Mr. Goldstein and his

law firm?

A.    He was referred to me through an associate that he knows. And we started working with Tom and Amy and, I believe, formed his first company.

Q.    Who hired you?

A.    Tom.

Q.    Now, when you take on new clients, what do you tell them about the importance of keeping separate records for business expenditures versus personal expenditures, business versus personal?

A.    We talk about that and --

Q.    Why?

A.    Pardon me?

Q.    Why do you talk about that?

A.    Well, what we describe to our clients is the clearer we can have this division between work and business, the easier it is for us as the preparers to keep track of those expenses then and prepare the returns.  Otherwise, it takes us more time, and, therefore, it costs them more money.

Q.    Are you familiar with something called an accountant's compilation report?

A.    Yes.

Q.    What is an accountant's compilation report?

A.    It is an accountant taking the figures that are provided to them by our clients and putting them in a form of a

financial statement.

**Q.** I'm going to show you what's been marked as Government's Exhibit 105. What role did your firm have in preparing this document?

**A.** We prepared this document.

**Q.** And looking at this together, for what period of time did this report cover?

**A.** This report was prepared for the year ended, the 11 months ended from January 1, 2012 to November 30, 2012.

**Q.** How often would you prepare an accountant's compilation report for Mr. Goldstein's firm?

**A.** We would prepare reports monthly for his company, but they would not be in this form, that they wouldn't -- they didn't have an -- this is called an opinion. And they would not have my opinion on it. They would just be a balance sheet and an income statement.

**Q.** Tell the jury, if you will, about these two caveats contained in the first and second paragraphs of the accountant's compilation report, please.

**A.** When an accountant prepares a financial statement like this one, they come in three flavors. There are a compilation which is this, which means that I take the statements provided by my client, for example, his bank statements, and I organize them in the form of financial statements like this opinion was attached to. And -- but I'm telling the user of the financial

statements, as well as the owner of the business, that we haven't -- all we've done is organize them in the form of a financial statement.  We haven't looked at them in depth or are making any judgment about them.  And that's called compilation.

The other two flavors of this are a review and an audit. Reviews are where I take these financial -- these financial statements that have been prepared by someone else, not me or my own term -- or my own firm on this, and we do -- we look at them for reasonableness.  So we might compare, you know, last year, there was -- they made this amount of money, this year they're making more or less, and would ask the question, why has it changed?  And so we're looking at it from a bigger picture point of view, but we're looking a little deeper into it.

And then an audit is the -- where I'm looking, basically, at most of the transactions that happened and making an evaluation and a determination whether or not they are legitimate and they're in the right category and those kind of things.

So this is the least amount of view, eyeball views on it. And reviews are a step deeper.  And then audits are a couple of steps deeper.

Q.   Let's turn to page 8 of Government's Exhibit 105.  Pulling that up on the screen.

Could you tell the jury what this is, please?

**A.**   This is known by a number of different names, and so that's what often makes it confusing.

QuickBooks, which is our software that we use, refers to this as a profit & loss statement.  And so that means that over the course, from January to end of November in 2012, this is the amount of money that the company has earned, as well as the expenses that the company has paid out.  And the expenses are then broken down to a variety of different types of expenses.

**Q.**   And are the profit & loss statements part of those financial statements that we saw on page 7 of Government's Exhibit 105?

**A.**   I'm sorry.  Can you repeat that?

**Q.**   Sure.

Is a profit & loss statement, like this, part of those financial statements that were described in the accountant's compilation report?

**A.**   Yes.  Yes.  They are one financial statement of a group of financial statements on it.

**Q.**   Okay.  And I want to focus on that top left corner on page 8 of Government's Exhibit 105.  We see the words "cash basis."  What did that mean with respect to Mr. Goldstein's firm?

**A.**   Some businesses are cash basis and other -- or they could be accrual basis.  In a cash basis statement, set of financial statements, it is literally the amount of money that has come

in during the year.

So you could add up all of the bank accounts from January to November, all of the deposits, and summarize all of those deposits, and all of those would have amounted to the number that was included under the Income line.

Q.   Okay.

A.   Whereby, accrual sets of financial statements are more of money earned in a particular year rather than cash received. So the difference would be that if -- a law firm might have earned money, but they might not have been paid for it yet.  So their clients hadn't paid them for that amount of money.  So then those would -- if we counted them that way, instead of the amount of money that was deposited in their account, it would be the amount of money that they earned during that year.  And some of that money that they've earned might -- they might not receive until the next year.

But in that -- in this particular case, he was -- he's cash basis, as most small law firms are.

Q.   Let's also look, sir, at page 10 of Government's Exhibit 105.  We're seeing a balance sheet.  What is that?

A.   Balance sheets are, if you think about it, they're divided into assets, which are things that you own or a liability, as you see further down, and that's what you -- things that -- monies that you owe to other people.  And then equity is the difference between things that you own and what you -- other

things that you owe, and that's the value of the -- the basis of the value of the company.

**Q.**   And again, this is part of those financial statements that you saw -- that we saw referred to in the accountant's compilation report?

**A.**   Correct.

**Q.**   And how often would you or your firm provide Mr. Goldstein with a balance sheet and a profit & loss statement?

**A.**   Well, probably period -- probably monthly.  However, if we don't have all of the information for any one particular month, it wouldn't be issued until we did have that information.  So it could be periodic throughout the year, but always at the end of the year.

**Q.**   Let's also look at page 11 of Government's Exhibit 105. And I'm just going to zoom in here on the first quarter.

What -- just tell the jury, what are we looking at here? What is this document?

**A.**   Well, this -- what we're looking at is the basis of the revenue for the 2012 first quarter, which is January, February, and March.

So, for example, I just mentioned that if you added together all of the bank statements for each month, together that would be the amount of -- that would be the -- how much the company earned -- deposited during the year.  This is a listing of the bank deposits by quarter for the first quarter

of 2012.

Q.    And again, how would Caldwell & Company compile the income information for Mr. Goldstein's firm?

A.    It would be from the bank statements.  We would get the bank statement -- company bank statements for each quarter or each month and add them up.  And this would be the detail off of the bank statement.

Q.    Because this is not an income statement for Mr. Goldstein personally, would these reflect Mr. Goldstein's personal bank accounts?

A.    No.  This would be only the company bank accounts.

Q.    Okay.  Let's switch topics a little bit.  What are estimated payments to the IRS?

A.    The IRS insists on being paid periodically throughout the year.  They don't want you or a small business waiting until December to make that tax payment for items.

So what would happen is that the IRS would say, you know, you can either pay us through withholding of your -- of your paycheck, and -- but if you're not making -- if your income is not being generated by a paycheck, then you would have to make an estimated payment so that the withholding through the year would come through withholdings and estimated payments.

Q.    How often are estimated payments due to the IRS?

A.    Quarterly.

Q.    And again --

THE COURT:  Excuse me, Counsel.  Mr. Caldwell, could you make sure you're speaking directly into the microphone?

THE WITNESS:  I'm sorry.

THE COURT:  Your voice is loud, but we're -- it's hard for us to hear if you're not on the mic.  Thank you.

THE WITNESS:  Basically, quarterly.

BY MR. BEATY:

Q.    That's how often, quarterly -- that's how often estimated payments are required to be paid to the IRS?

A.    Yes.

Q.    Okay.  Again, why are these quarterly estimated payments required?

A.    Because you're not getting -- because small business owners generally are not getting paid a substantial salary, and, therefore, there's a gap between what they're going to owe because they're taxed on their business profits as opposed to their withholding from their paycheck.

Q.    So based on your work with Mr. Goldstein and his company, describe for the jury Mr. Goldstein's history of making required quarterly estimated payments during that time, while you were working together.

A.    I'm sorry.  Could you repeat the question?

Q.    Sure.  Describe how often or what you recall about Mr. Goldstein making required quarterly estimated payments while you worked together, please.

**A.**    We would have a conversation about them and make a determination of whether or not we had the -- either we had the ability to make them be the amount of cash, or we needed to make them because expenses may have exceeded income coming in in any one particular quarter.

**Q.**    Let's look together at Government's Exhibit 1106.  And I'm going to show you the second page of that document.  I'm starting with your e-mail on April 11, 2012.

At that time, April 11, 2012, what tax return were you working on for Mr. Goldstein?

**A.**    Well, these -- we would be working on both tax returns.  Both the company tax return as well as his personal tax return.

**Q.**    And for what tax year?

**A.**    2011.

**Q.**    Now, if we look at Number 3 on your e-mail, how much had Mr. Goldstein already paid in 2011 as an estimated payment towards his taxes?

**A.**    $300,000.

**Q.**    And how much of that had gone to the IRS versus the State of Maryland?

**A.**    250 to the IRS and 50,000 to Maryland.

**Q.**    And then if we look at that next sentence, what kind of information are you trying to obtain from Mr. Goldstein that we see in that highlighted section?

**A.**    Well, I'm letting him know that we are -- we've been

working on his returns, and I think "still some scrubbing to do" means we still have some payments that we need to properly classify.

And the only thing that I had, was asking him for, was the amount of federal estimated -- estimate that he made personally, which is where federal estimates would have been made.

Q.    Okay.  So Mr. Goldstein had made a quarterly estimated payment in August.  Is that what your -- am I understanding that correctly?

A.    Correct.

Q.    Again, given that Mr. Goldstein had made a quarterly payment in August of 2011, how certain were you that Mr. Goldstein understood his obligation to make quarterly estimated statements?

A.    I mean, I don't remember having a conversation with him about this, but I think we were speaking the same language with the same vocabulary, and I think that Tom understood what estimates were.

Q.    Now, what happens if a taxpayer does not make quarterly -- these required quarterly estimated payments?

A.    He's required to pay a penalty, underpayment penalty, as well as there would be interest on it as well.

Q.    And, generally, when are tax returns due?

A.    In this particular case, they were going to be due for

2011 on April the 15th, 2012.

Q.   And if the taxpayer needs more time to get their return filed, what can they do?

A.   They can file an extension.

Q.   Now, when a taxpayer receives an extension to file their tax return, how does that affect the date on which the taxes are actually due?

A.   Well, it doesn't affect the date the taxes are actually due because it's an extension to file, not an extension to pay.

Q.   In your practice, if a client told you that they did not have all the money they owed to the IRS on the due date, what options would you explore with them?

A.   First, we would talk about borrowing the money, if it was possible to borrow the money, through a line of credit or something like that.  And then we would talk about what the penalties might be if we just can't -- if we don't have the cash to do this and how soon we -- you know, the quicker we get the return filed, the less the penalties are.  So we would talk about that.

Q.   Why was it so important, in your mind, for the taxpayer to pay on time, even in full -- in full, even if they had to borrow the money?

A.   Because the interest on borrowing the money was generally less than the penalties charged to the IRS.

Q.   Again, based on your time and experience working with

Mr. Goldstein, on a scale of zero to 100, how certain are you that Mr. Goldstein understood his obligation to pay his taxes on time?

A.    I think Tom understood his way -- the way of -- the need to pay his taxes on time.

Q.    That's a hundred?

A.    Yeah.   That's a hundred.

Q.    Okay.   Let's switch topics again.   I'd like to show you what's been marked as Government's Exhibit 101.   I'll pull that up on the screen.   And I'm splitting this screen between pages 10 and 11 of Government's Exhibit 101.

      What role did you have in preparing Mr. Goldstein's 2010 tax return?

A.    I worked with a team of people that I supervise and we prepared the return, and then you'll see my signature at the bottom.

Q.    So let's focus just on the income section, page 10 of Government's Exhibit 101.

      Please tell the jury the kind of information that you reported on line 7 through 22 of Mr. Goldstein's 2010 tax return.

A.    Well, the IRS wants the income that all taxpayers earn separated into different amounts and recorded on different lines.   In Tom and Amy's case, you know, they earned $182,509 in wages.   Between interest and dividends, they had another

$7,100 of income.

They had received refunds from Maryland in the prior years, so we had to pay tax on those refunds received, state refunds received of $9,800.  We had a small Schedule C, which is a self-employed -- for self-employed individuals of $2,000 and we reported that income.  Some losses from capital gains of about $2,500.  And you'll see those all with the minus signs in front of them.

And then his rental real estate -- or the line 17 is S Corporation income of which he and Amy owned the S Corporation, and it reported 2,400,000 of income.

Q.   Now, we see there is a highlighted line at 21.  What, if any, questions did your firm's tax organizer for tax year 2010 ask about gambling income?

A.   It is on our organizer, which is a document that we send to our clients, that just basically has last year's income in it just to remind them about what they might have earned this year.  And we didn't have any -- we didn't report any income.

Q.   Okay.  Did there come a time when you learned or that when Mr. Goldstein mentioned to you that he was playing poker?

A.   Yes.

Q.   Tell us what you remember about that conversation, please.

A.   It was in the middle of the year, and I remember having a friendly conversation, not -- as friends more than as accountant and business owner.  You know, it was that line

where, you know, you're asking about their families and what they're doing during the summar and those kind of things.

And he mentioned that he was attending some poker parties, and I found that intriguing and had a brief conversation about it. But I didn't think it was a big deal, and I thought they were kind of more like friendly parties that you read about and didn't think twice about it. And so then --

Q. Let me stop you there. So based on that, that conversation, the one that you recall, what was your understanding of the stakes for the games of the poker that Mr. Goldstein was playing at that time?

A. Yeah. I didn't have an understanding about the stakes of the game. I thought they were friendly.

Q. Now, if Mr. Goldstein had told you he had won, let's just say, $1,000 or more of gambling income in 2010, what would you have done?

A. I would have done then what -- I mean, basically what I should have done is had a conversation with him about the stakes, but I didn't. I -- you know, I just thought they were dollar-hand kind of parties on this.

But if it -- if I had known the stakes on it, I would casually have mentioned the rules regarding poker winnings and how that they're only taxable to the extent that they exceed poker losses, and we would have gone from there.

Q. And if Mr. Goldstein had told you he had had net winnings

in that year, again, let's just say of $1,000, where on his tax return would you have reported the net or the gambling winnings?

A.    Well, if -- now, we're going on a scenario that was hypothetical at this moment.

Q.    Correct.

A.    So I would have said to him, do you have losses more than $1,000 and to which I would have expected the answer to be yes, because a lot of people play poker and a lot of people lose at poker.  And would have said that, well, if you have losses more than gambling winnings, they would not show up on this form.

Q.    Okay.  Let's jump forward in time to April of 2012.  Do you recall whether you received notice that the IRS was auditing Mr. Goldstein's tax return for 2010?

A.    Say again, please.

Q.    Sure.  We're in April of 2012.

A.    Okay.

Q.    Do you recall whether you received notice that the IRS was auditing Mr. Goldstein's 2010 tax return?

A.    Yes.  I remember getting notice that they were auditing the return.  I don't remember exactly when it was.

Q.    And what was your role in that audit?

A.    To handle -- to handle that audit and to assist the -- assist Tom and the IRS in, you know, getting to the right answer.

**Q.** How did the issue of gambling arise during the 20 -- the IRS's audit of Mr. Goldstein's 2010 tax return?

**A.** It arrived at the tail end of the audit. So I had already met with the attorney or met with the auditor, answered all of his questions, provided him with all of the information that he needed. And then, at the tail end, when we were expecting resolution, he -- the question got raised about gambling.

**Q.** Okay. By the time of this audit, so now we're talking April 2012, what had Mr. Goldstein told you about winning or losing thousands of dollars in poker?

**A.** It had not come up until then.

**Q.** Now, what, if anything, did Revenue Agent Libbin remind you about having Mr. Goldstein keep better gambling records?

**A.** Well, when the agent raised the questions about gambling -- and I do not remember what the conversation was between Tom and I at that time. But I do know that, in order for me to have resolved the case on this, that we would have had to have a conversation about, you know, what gambling winnings and losses that he had.

I do remember that it turned out that Tom had more gambling losses than gambling winnings for this audit purpose. And, therefore, it was -- it ended up not being a factor in the audit.

**Q.** What did you tell Mr. Goldstein about your discussions with Revenue Agent Libbin regarding the need to keep better

records of his poker wins and losses?

**A.**    I have seen the report, the audit reports, recently on this, and the agent said, you know, that I had said to him --

MR. KRAVIS:  Objection.  Objection.

THE COURT:  Let's come to the headsets, Counsel.

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT:  All right.  Mr. Kravis, are you on?

MR. KRAVIS:  Yes, Your Honor.

THE COURT:  Mr. Goldstein's thumb is up.

Mr. Beaty -- just a moment.  We don't have the government.

Can you hear us now, Mr. Beaty?

MR. BEATY:  Yes, Your Honor.

THE COURT:  All right.  Mr. Kravis, go ahead.

MR. KRAVIS:  Your Honor, I did not object to the initial question because it was asking about this witness's conversations directly with Mr. Goldstein.  But what I heard the witness say and he started to answer was "I've recently read the agent's report and the agent says that I said."  I don't think he actually remembers the conversation.  I think he's now testifying about something he read in someone else's document.

THE COURT:  All right.  Thank you.

Mr. Beaty?

MR. BEATY:  Yeah.  My question was not directed to

elicit that.  It was to ask him what he -- I'm happy to just make sure I'm restating the question correct.

THE COURT:  Well, I think you need to make clear that you're asking what he says -- he believes he said, not what's in the report.

MR. BEATY:  Sure.

THE COURT:  All right.  Let's try the question again and clarify for the witness.  Thank you.

MR. BEATY:  Thank you, Your Honor.

(Whereupon, discussion concluded.)

BY MR. BEATY:

Q.   Putting aside what you've read elsewhere, what's your best recollection about whether you had a discussion with Mr. Goldstein about, hey, you got to keep better records about poker wins and losses?

A.   I don't remember having a direct.

Q.   Okay.  Based on your general experience with auditing -- excuse me -- with representing taxpayers in audits, how often would you not go back and tell your client what you had discussed?

A.   I would never.  I mean, I would always go back and tell like the client what we discussed.

Q.   And do you have any reason to believe you did not do that here?

A.   No.  I have no reason to believe we did not.

**Q.**    Okay.  It's just been a long time?

**A.**    It has been a long time.

**Q.**    Showing you what's been marked as Government's Exhibit 102, do you remember this letter or do you recognize this letter?

**A.**    I recognize this letter.

**Q.**    This is from the revenue agent, Mr. Libbin?

**A.**    Yes.

**Q.**    Just tell us what this is, your best understanding, please.

**A.**    It is Agent Libbin's forwarding his -- his opinion, the IRS's opinion on what the return -- the conclusions that they reached during the audit.

**Q.**    And if we took a look at page 2 of Government's Exhibit 102, what are we looking at here?

**A.**    This is the -- there is really -- these are items that the agent needs to communicate from the IRS regarding, if they disagree with the opinions listed on the following page, their rights.

**Q.**    And it looks like the IRS resolved this audit between May and June of 2012?

**A.**    Yes.

**Q.**    Pretty fast?

**A.**    Yeah.  That is pretty fast.

**Q.**    Let's look at lines -- excuse me -- page 3, line 16.

What was the ultimate outcome of the IRS's audit of Mr. Goldstein's 2010 tax return?

**A.** They refunded him money.

**Q.** And how much did he get back?

**A.** It looks like $1,484.

**Q.** Showing you Government's Exhibit 104. What does this notice tell us?

**A.** That he has a refund due of $1,484.

**Q.** This is the IRS actually paying him the refund he was owed?

**A.** Yes. Or I don't know whether paying him the refund or we've applied it to the following tax year.

**Q.** And again, when did this happen based on the date on the letter?

**A.** It looks like the date of the notice is August 6, 2012.

**Q.** So the last exhibit. I show you what's been marked as Government's Exhibit 97. And we're splitting the screen between pages 38 and 39.

What role did you have in preparing Mr. Goldstein's tax return for this year?

**A.** This is his personal tax return, and we prepared it in -- and filed it in October -- October the 9th, 2012.

**Q.** Okay. And so when did you prepare this return in relation to the conclusion of the audit?

**A.** It would have been after the conclusion of the audit.

**Q.** Focusing just on the income section, who provided the information that you reported on lines 7 through 22 of Mr. Goldstein's 2011 tax return.

**A.** It could be a variety of people. I don't know the answer to that.

**Q.** Okay. Well, what, if any, questions did your firm's tax organizer for tax year 2011 ask about gambling income?

**A.** It would have been the same questions.

**Q.** So even after the IRS's audit in spring of 2012, what, if anything, did Mr. Goldstein tell you in the fall of 2012 about whether he had gambling wins or losses for that year, for tax, year 2011?

**A.** We didn't report anything, and I don't remember any conversation about it, to tell you the truth.

**Q.** If Mr. Goldstein had told you that he had gambling income in 2011, where would you have put it on the return?

**A.** On line 21.

**Q.** How did your professional relationship with Mr. Goldstein end?

**A.** That conversation I remember.

**Q.** Well, tell us about it, please.

**A.** Tom called me up and told me he was discharging me as his accountant.

**Q.** How did he communicate it?

**A.** Say again?

Q.    How did he communicate this to you?

A.    Via telephone.  And told me that he needed an accountant who was going to give him more than I had given him and that I had -- you know, he had had a conversation with me, which I reported to him that I remembered and to you that I remembered, about gambling winnings and that I hadn't asked any follow-up questions on it.  And, you know, and I agreed with him and --

Q.    Okay.  So Mr. -- your understanding was Mr. Goldstein discharged you because he was unhappy with you; is that fair?

A.    He was unhappy with how I had performed my role as an accountant.

Q.    And how was that connected to the gambling records or the gambling reporting issue?

A.    That he expected and deserved an accountant who he could have these conversations with and would follow up on them and, you know, remind him and -- about, you know, and ask him the questions about gambling and whether or not -- and I didn't -- I hadn't done that and so.

Q.    So who did Mr. Goldstein criticize for not following up with him regarding the gambling activity?

A.    He criticized me and my firm on that.

Q.    And who did Mr. Goldstein criticize for not knowing that he had to keep clear records of his poker wins and losses?

A.    I don't remember whether or not that clear wins of his poker wins and losses came into play in that conversation.

MR. BEATY:   No further questions, Your Honor.

THE COURT:   Thank you very much, Counsel.

Does the defense wish to cross-examine the witness?

MR. KRAVIS:   Yes.   Thank you, Your Honor.

May I approach?

THE COURT:   You may.

Thank you, Howard.

CROSS-EXAMINATION

BY MR. KRAVIS:

Q.   Good afternoon, Mr. Caldwell.

A.   Good afternoon.

Q.   You were asked some questions a moment ago about paying taxes on the day that they're due.  Do you remember that?

A.   Yes, I do.

Q.   And I think what I heard you say is that a taxpayer has an obligation to pay their tax bill on tax day; right?

A.   Yes.

Q.   And that's -- it's usually April 15th?

A.   Yes.

Q.   And I think I heard you testify that sometimes a taxpayer will take an extension on filing their tax return; right?

A.   Correct.

Q.   And if a taxpayer takes an extension on filing their tax return, it means that they do not have to file the return on April 15th.  They can file at some later date.  Do I have that

right?

**A.**    That's correct.

**Q.**    But I think I heard you testify that a taxpayer who takes an extension, it's an extension of your time to file, not an extension of your time to pay.  Did I hear that correctly?

**A.**    Correct.

**Q.**    In other words, even if you take an extension on the filing of your tax return, you still have to pay your tax bill on April 15.  Am I getting that right?

**A.**    That's correct.

**Q.**    And in your experience as an accountant, sometimes your clients just cannot pay the full tax bill on April 15; fair?

**A.**    Fair.

**Q.**    And when that happens, you will discussion options with them; right?

**A.**    Correct.

**Q.**    One option that you'll discuss with your clients is to take a loan to pay their taxes; right?

**A.**    Correct.

**Q.**    And in your experience, sometimes clients do that; right?

**A.**    Sometimes, yes.

**Q.**    And I think I heard you say on direct examination that one reason a client might do that is because they might be able to get a better interest rate on the loan than the IRS is going to charge them.  Did I hear that right?

**A.**    That's correct.

**Q.**    And if a client can't get a loan, another option is that they can pay late; right?

**A.**    Correct.

**Q.**    Sometimes they could negotiate like an installment or payment plan with the IRS; right?

**A.**    Yes.

**Q.**    Or they could just, you know, make the tax payment late after it's due; right?

**A.**    Correct.

**Q.**    And I think I heard you testify that if a client choses that, to go that route, they pay late through an installment plan or something else, they're going to have to pay penalties and interest; right?

**A.**    Correct.

**Q.**    But you never told Mr. Goldstein, look, if you don't pay all the money now, if you go on an installment plan or you pay late with penalties and interest, you're committing a federal crime.  You never told him that; right?

**A.**    No.  I never said a federal crime.

**Q.**    In fact, you probably never said that to any of your clients, have you?

**A.**    That's correct, I never have.

**Q.**    Yeah.  Let me ask you about the audit.

    You, I think, testified that the gambling stuff came up, I

think you said, at the tail end of the 20 -- the tail end of the audit. Do I have that right?

A. That's my recollection, yes.

Q. The audit was mostly about other stuff, and gambling came up at the end?

A. Correct.

Q. And the issue, that you recall, with respect to gambling and the audit was that Mr. Goldstein was obligated to pay taxes on his net gambling winnings in a particular year. Do I have that right?

A. You have that correct.

Q. And just to make sure we're all speaking the same language, net gambling winnings is like the wins minus the losses; right?

A. Correct.

Q. So just to give you a really basic example, if I won $100,000 in a poker game one year, and then in that same year I lost $50,000, my net gambling winnings are $50,000; right?

A. Correct.

Q. The net is the wins minus the losses; right?

A. Correct.

Q. And in this audit, the issue was whether Mr. Goldstein had net gambling winnings in the particular year; right?

A. Correct.

Q. In other words, in that year, did Mr. Goldstein have

gambling winnings that were more than his gambling losses; right?

A.   Correct.

Q.   And you discussed that issue with Mr. Goldstein; right?

A.   I don't remember the exact -- what was discussed and what was not.

Q.   In any event, you recall that being the issue that came up in the audit; right?

A.   Yes.

Q.   And you do not recall any discussion with Mr. Goldstein about any other gambling issue; right?

A.   Correct.

Q.   Now, I think you were asked some questions about how you would do the tax reporting if you were given certain gambling information.  Do you remember those questions?

A.   Yes.

Q.   Okay.  I just want to make sure I heard you correctly.

So I think what I heard you say is, if Mr. Goldstein told you that he had won a bunch of money playing poker games, the next question you would ask him is, well, did you lose a bunch of money playing poker this year; right?

A.   Correct.

Q.   And I think I heard you say on direct examination poker players sometimes lose money; right?

A.   That's a correct statement.

Q.    And I think the jury has heard a thing or two about that.

And the reason that you would ask Mr. Goldstein that question is because, in terms of reporting the net gambling winnings, he would be allowed for that year to subtract the losses from the wins; right?

A.    Correct.

Q.    And I think what I heard you say is, if you had that conversation with Mr. Goldstein, and he told you, "I won more than I lost," then you would report the net gambling winnings on the tax return.  Do I have that right?

A.    Yes.

Q.    And if Mr. Goldstein told you, I lost more than I won, there would be no net gambling winnings to put on the tax return.  Do I have that right?

A.    That's correct.

Q.    That's your understanding of how this works; right?

A.    Yes.

Q.    Now, at some point, Mr. Goldstein told you that he had made the decision to start working with another accountant; right?

A.    Yes.

Q.    And in particular, he told you he wanted an accountant who would ask more follow-up questions; right?

A.    Yes.

Q.    And in all fairness looking back, your view is that you

should have asked Mr. Goldstein more questions about his gambling; right?

**A.**    Yes.

**Q.**    After all, that's what Mr. Goldstein paid you to do; right?

**A.**    Yes.

**Q.**    And it made sense to you that a busy man like Mr. Goldstein would want an accountant who would put together the pieces on his taxes; right?

**A.**    Yes.

            **MR. KRAVIS:**    Can I have just a moment, please?

            **THE COURT:**    Yes.

            **MR. KRAVIS:**    Could we pull up the tax return, the one that we were looking at a moment ago?  I think it was a government exhibit.  The 20 -- doesn't matter.  The 2010 return.

      Can I get the exhibit number?  This is it.  Okay.  Great.

      Right.  And can we go to the line that mentions the -- I think it's line 21.

      Sorry.  I don't think this is the right document.  I'm looking for the tax return.

      Can I have Government's Exhibit 101, page 10, please?

      This is it.  Can we zoom in on line 21, please?

**BY MR. KRAVIS:**

**Q.**    Just to make sure I have this right, Mr. Caldwell, line 21

is the line that lists other income.  Do I have that right?

**A.**    Correct.

**Q.**    And so going back to our conversation earlier, if Mr. Goldstein had told you that he was a net gambling winner in a particular year, this is the line where you would write the net gambling income?

**A.**    Yes.

            **MR. KRAVIS:**  Thank you, Mr. Caldwell.

            **THE COURT:**  Thank you very much.

      Any redirect from the government?

            **MR. BEATY:**  Very briefly.

                          REDIRECT EXAMINATION

**BY MR. BEATY:**

**Q.**    We were talking about line 21.  If -- imagine in that tax year Mr. Goldstein had told you he won $26 million and lost $21 million, you would have had at least a net number on there?

**A.**    Yes.

**Q.**    If Mr. Goldstein had received a 1099 telling -- for a $26 million poker win, what would you have expected him to do with that document?

**A.**    Give it to me.

            **MR. BEATY:**  Thank you very much, sir.

            **THE COURT:**  Have all questions been asked of the witness?

            **MR. KRAVIS:**  Yes.  Thank you, Your Honor.

THE COURT:  Well, Mr. Caldwell, thank you very much for your time and testimony.  You may step down and be excused.  Have.

A good afternoon.

(Witness excused.)

- - -

THE COURT:  Is the government prepared to call its next witness?

MR. ADENRELE:  Indeed, Your Honor.  The government calls Officer Karime Foy.

THE COURT:  Thank you.

Mr. Foy, if you could come all the way towards me and to the well of the courtroom, and then go over to your left, the witness box, please.  And please remain standing and the deputy will swear you in.

- - -

KARIME FOY, after having been duly sworn, was examined and testified as follows:

- - -

DEPUTY CLERK:  Thank you.  You may be seated.  Please adjust the microphone, speak directly into it.  Thank you.  State and spell your first and last name for the record.

THE WITNESS:  My name is Karime Foy.  Karime is spelled K-a-r-i-m-e.  Last name is spelled, F-o-y.

DIRECT EXAMINATION

BY MR. ADENRELE:

Q.    Good afternoon, Officer Foy.

A.    Good afternoon.

Q.    With which law enforcement agency are you employed?

A.    I'm employed with the United States Customs and Border Protection.

Q.    And what is your title?

A.    I'm an officer.

Q.    How long have you been an officer with Customs and Border Protection?

A.    I've been an officer for 14 years now.

Q.    And how long have you been with Customs and Border Protection overall?

A.    Fourteen years.

Q.    So you've been an officer the entire time?

A.    The entire time, yes, that's correct.

Q.    What are your general duties and responsibilities as an officer with CBP?

A.    My duties is to uphold the United States law.  I process passengers that comes into the United States and protect the country.

Q.    What locations have you worked as a CBP officer?

A.    I -- my -- I work at two port of entries.  One port where I'm at now, it's Atlanta International Airport.  And a second port I work is at Dulles International Airport.

Q.    Roughly, how many passengers do you process every year?

A.    I normally process about a thousand a day, so roughly over 200,000 passengers.

Q.    When did you work at Dulles Airport?

A.    I worked at Dulles International Airport February of 2016, and I left Dulles International Airport on March of 2019.

Q.    And what was your role there?

A.    I was an officer.

Q.    Where in the airport at Dulles International Airport did you work?

A.    I worked in various locations.  My primary location is the prime -- primary inspection, and I work seldomly in secondary inspection.

Q.    Can you tell the jury what primary inspection is?

A.    Primary inspection is the first port of -- first contact with all the passengers that comes into the United States.

Q.    And what happens usually at the primary inspection location?

A.    At the primary inspection area, we ask a few questions and determine if a passenger is good to come into United States or need to be sent to secondary for additional inspection.

Q.    Do all passengers coming in on an international flight through Dulles Airport go through primary inspection?

A.    That is correct.

Q.    Now, you mentioned secondary inspection.  Can you tell the

jury what secondary inspection is?

**A.**   Secondary inspection is where we go look into more in depth in the inspection.  If they're bringing in -- if they're declaring money or declaring food or inadmissible to the United States, we actually do that in secondary inspection.

**Q.**   And over the course of your time working at Dulles, about how much time did you spend working in the primary inspection location versus secondary inspection?

**A.**   I work about 95 percent in primary inspection, about 5 percent in secondary.

**Q.**   Have you ever met Mr. Thomas Goldstein?

**A.**   Yes, I have.

**Q.**   When?

**A.**   I met him on October 25, 2018.

**Q.**   Where?

**A.**   At Dulles International Airport.

**Q.**   Was the encounter memorable?

**A.**   Yes.

**Q.**   Why?

**A.**   That was the only time I ever counted close to a million dollars.

**Q.**   Where?

    Actually let's go to Exhibit 348.  Officer Foy, what is Exhibit 348?

**A.**   This be is the secondary inspection area.

**Q.**    Is this exactly the way it looked the day you met Mr. Goldstein?

**A.**    Other than the chairs, yes.

**Q.**    Where in this room did you meet Mr. Goldstein?

**A.**    I encounter -- I met him at my counter, the custom counter.

**Q.**    All right.  Is there somewhere on this photo -- is there -- well, there are -- one, there are multiple counters on this photo; is that right?

**A.**    That is correct.

**Q.**    Which one of these counters, if you remember, did you meet Mr. Goldstein?

**A.**    It will be the counter with the C on it.

**Q.**    This one here?

Why was Mr. Goldstein in secondary inspection?

**A.**    According to the referral, he was there for -- to fill out a FinCEN.

**Q.**    And what is that?

**A.**    A FinCEN is a form where, if anyone is bringing in currency over $10,000 or more, have to be filled out.

**Q.**    Can you describe the interaction that you had with Mr. Goldstein?

**A.**    Yes.  When I gather his documents, his passport, I looked into the text database to figure out why he was there.  And when I saw him -- when I saw what he was referred for, I

proceed to call him up to the counter to ask him questions about the money and how much he was bringing in.

At that point, when he told me how much he was bringing in, I had to find a witness officer to count the money because it was over $100,000.

Q.    And did you eventually count the money?

A.    Yes, I did.

Q.    Where did you count it?

A.    I count it in a secure room in our secondary inspection area.

Q.    All right.  Let's go to page 4 of Exhibit 348.

Officer Foy, what is this?

A.    That is the area where we counted the money.  It's the room that we counted the money.

Q.    And where is this room in comparison to the first photo that we just saw?

A.    It's almost directly behind of the counter.

Q.    How did you count the money?

A.    I -- we -- actually we -- a witness officer, we -- he had bundles of stacks of $100,000 stacks.  And he had a few that was actually not bundled up.  So we count it that way.

Q.    How was Mr. Goldstein carrying the money?

A.    I'm not sure if it was in a duffel bag or a carry on, but he was carrying it on his person with him.

Q.    Okay.  And so when you took him to the back to count the

money, did you attempt to count it on the money counter at all?

**A.**    Initially, we tried to count it, but the machine was actually sticking so we had to manually count it.

**Q.**    All right.  And if you can just walk us through how you manually counted it.

**A.**    We count each stack, each bundle, and then we'd separate them by a 100,000, and then we counted them then in denominations.

**Q.**    And who took the cash out of the bag?

**A.**    That would be Thomas Goldstein.

**Q.**    What were the denominations of the cash that you counted?

**A.**    It was mostly $100 bills.  He had some fifties and some twenties and I guess a few ones or something like that he had, if I can recall.

**Q.**    And after you counted it all, how much cash did you -- how much cash was in the bag?

**A.**    It was $968,000.

**Q.**    Now, while you were back there, did you ask Mr. Goldstein any questions?

**A.**    Yes.  I ask him, after we were finished counting the money, I was just asking him in curiosity why, why would he travel with that much amount of money.

**Q.**    And what did he say?

**A.**    He said he won it.  He won it through gambling and the money was too large for him to wire it, so he just brought it

with him.

**Q.**    And after that, what happened?

**A.**    He gathered all of his money, put it back in his bag and we walked outside for him to actually fill out a form, FinCEN 105 Form.

When he was finished -- when he finished with the form, I closed out his referral and he was free to go.

**Q.**    Now, if we back up just a couple, a second here, in this photo, do you see the table there in the middle of the room?

**A.**    Yes.  Yes.

**Q.**    Is this the table where the cash was counted?

**A.**    That's correct.

**Q.**    Now, how much, when the cash was laying on the table, how much of the table did it fill up?

**A.**    It completely filled up the whole table.

        **MS. REAVES:**  Objection, Your Honor.

        **THE COURT:**  Let's come to the headsets.

    (Whereupon, a discussion was held outside the presence of the jury.)

        **THE COURT:**  Ms. Reaves, are you on?

        **MS. REAVES:**  Yes, Your Honor.

        **THE COURT:**  All right.  Let's wait for government counsel.  Do we have the government?

        **MR. ADENRELE:**  I'm here, Your Honor.

        **THE COURT:**  All right.  Mr. Goldstein?  Thumbs up.

All right.  Go ahead, Counsel.  Ms. Reaves?

**MS. REAVES:**  Your Honor, there's a lack of foundation for this.  I think if Your Honor remembers from our suppression hearing, these photos are from last year.  They're not from the actual encounter.

And so for the government to ask the officer to testify about how much of this table it took up of and if it's the same table, I don't think there is a foundation for the government to be asking those questions, given that these aren't photos from the actual incident.

**THE COURT:**  All right.  Thank you, Counsel.

Counsel for the government?

**MR. ADENRELE:**  Thank you, Your Honor.  I mean, there's absolutely a foundation.  The witness has already testified that this appears to be the exact same table that he counted the money on.  He's talked about the fact that he counted the money.  That's certainly a foundation.  And we discussed what parts of this table the money was laying and how much that it took up.  It's certainly foundation.

**THE COURT:**  All right.  I think you can be clear on your questioning about that this photo is not the photo of the event.  I think that's clear to the jury.

**MR. ADENRELE:**  I'll absolutely clarify that.  I'll absolutely clarify that.

**THE COURT:**  Okay.  Because, otherwise, I think the

testimony is misleading.

MR. ADENRELE:  Will do, Your Honor.

THE COURT:  All right.  Anything else from the defense?

MS. REAVES:  No, Your Honor.

THE COURT:  Okay.  Thank you.

(Whereupon, discussion concluded.)

BY MR. ADENRELE:

Q.   Again, Officer Foy, similar to the first page of this exhibit, do you remember when we talked about the first page?
     Let's go back to the first page of this exhibit.

A.   The secondary inspection area?

Q.   That's right.

A.   Yes.

Q.   All right.  Again, now this isn't a photo of the exact same day that you met Mr. Goldstein?

A.   That is not the exact same photo.

Q.   However, is it the same room?  Is it the same room?

A.   It's the same room, yes.

Q.   All right.  Let's go back to exhibit number -- page 4 of this exhibit.  Again, this isn't a photo of the exact same day that you met Mr. Goldstein?

A.   That isn't the exact same day, exact same room.

Q.   Now, is this the -- I'm sorry.  Go ahead.

A.   That is the exact same room.

**Q.** Now, is this the exact same table that you counted the cash on?

**A.** That is the exact same table, yes.

**Q.** Now, this table, when you laid -- when Mr. Goldstein laid the cash on the table, how much of the table was full with cash?

**A.** It was the entire table.

**Q.** And you mentioned that the cash was banded. How was it banded?

**A.** They had large rubber bands around the stacks of $100,000.

**Q.** All right. Now, you mentioned that, after you counted the cash, Mr. Goldstein then filled out a form?

**A.** Yes.

**Q.** All right. And what was that form?

**A.** It was a FinCEN 105.

**Q.** And what is that?

**A.** That is the form where, if you are traveling, if you're bringing in any currency over $10,000, you have to fill out.

**Q.** And what happened next?

**A.** Next, after?

**Q.** After he filled out the form.

**A.** After he filled out the form, I told him he was good to go.

**MR. ADENRELE:** All right. Let's go to Exhibit 349. Zoom in at the top.

BY MR. ADENRELE:

Q.   What is this?

A.   That is our check secondary inspection report.

Q.   And are you responsible -- were you responsible for making sure that the information in this report was reflective of your interaction with Mr. Goldstein?

A.   The only part in this report that I'm accountable for is the remarks at the bottom, secondary officer information, the referral.

Q.   All right.

MR. ADENRELE:   And let's go all the way down to the bottom of this document.   I'm sorry.   The next page at the bottom.   And let's zoom in here.

BY MR. ADENRELE:

Q.   All right.   What does this section say?

A.   Comments.   History.

Q.   And what did -- are you -- again, were you responsible for including this information?

A.   I am responsible for entering that information in the comments history.

Q.   All right.   Is it generally consistent with your interaction with Mr. Goldstein?

A.   That is correct.

Q.   Now, what it does not say here is that Mr. Goldstein told you that the nearly $1 million in cash was gambling income?

**A.**    That is not there, yes.

**Q.**    And why not?

**A.**    Because when someone is referred to you to fill out a FinCEN 105, all we do is have them fill out the form, and they're good to go.  If it's more than $100,000, we have to verify the amount the correct so we put it in the system.

**Q.**    And so mostly what you're interested in is the amount of money?

**A.**    That's correct.

          **MR. ADENRELE:**  No further questions.  Thank you, Your Honor.

          **THE COURT:**  Thank you very much, Counsel.

     Is there any cross-examination from the defense?

          **MS. REAVES:**  Yes.  One second.  I have a binder.

     May I approach?

          **THE COURT:**  You may.

          **THE WITNESS:**  Thank you.

          **THE COURT:**  Thank you, Howard.

                    CROSS-EXAMINATION

**BY MS. REAVES:**

**Q.**    All right.  Good afternoon, Officer Foy.

**A.**    Good afternoon.

**Q.**    So you have been a Customs and Border Protection Officer for around 14 years; right?

**A.**    That is correct.

Q. Okay. And in those 14 years, I think you said on direct examination that you screened thousands of passengers; right?

A. That is correct.

Q. A thousand passengers a day?

A. About. Roughly, yes.

Q. And probably 200,000 passengers in your career?

A. That is -- yes.

Q. Okay. In your interaction with Mr. Goldstein was a -- for a few minutes almost eight years ago; right?

A. Seven years ago, yes.

Q. All right. It was in 2018?

A. Yes.

Q. October of 2018?

A. Yes. Correct.

Q. All right. And your testimony today is that you remember specifically that Mr. Goldstein said that this was money he won gambling; right?

A. That is correct.

Q. All right. And you're saying that it -- you remember that because you've never seen that much money before; right?

A. Yes.

Q. And seeing that much money made his statements unforgettable to you; right?

A. Yes. Is that -- repeat again.

Q. Seeing that much money is memorable? It's unforgettable?

**A.**    Yes.  Well, yes.

**Q.**    And so you remember what he said?

**A.**    I remember some of it -- I only ask a few questions.  And so it wasn't like we had a dialogue back and forth, asking questions.  So it was memorable to me that -- when I asked the question, what he told me, I remember that.

**Q.**    Okay.  So because it was so much money, and because you asked these questions and he told you about gambling, it was memorable and you remember what he said?

**A.**    Yes.

**Q.**    Okay.  Unforgettable?

**A.**    Well, it was unforgettable the first -- when Special Agent Accardi called me six months after the incident, it was memorable then.  But five years or five and a half years, six years, I tend to forget because I process so many passengers.  But when Special Agent Accardi -- the government actually showed me what I told Special Agent Accardi, then it starts coming back -- started coming back to me.

**Q.**    Okay.  So I want to walk through this so that everyone knows what we're talking about.  Okay?

**A.**    Okay.

**Q.**    So you interacted with Mr. Goldstein for about 13 minutes in October of 2018; right?

**A.**    That's correct.

**Q.**    Okay.  And that was seven or eight years ago, somewhere in

between there; right?

A.    That's correct.

Q.    And Mr. Goldstein is one of 200,000 passengers that you have interacted with as an officer; right?

A.    Yes.  But I -- like I said, I only work five percent a time in secondary inspection, so I don't have as much passenger interactions with those thousand passengers.  Those are primary inspection -- inspection area.  So the five percent of the times I work there, I have a recollection of some of the stuff that I worked, that I did in secondary inspection.

Q.    Okay.  So I'm trying to do some quick math here. Five percent of 200,000.

      But point is, thousands of passengers that you have interacted with in your time as an officer; right?

A.    Yes.

Q.    Okay.  And your testimony today that this is memorable because of the amount of money, and specifically, Mr. Goldstein's words are memorable because of the amount of money; right?

A.    Yes.  And reason -- the reason is memorable because I remember asking the witness officer, why would someone be traveling with that amount of money on him?

Q.    Okay.  All right.

A.    Yes.  That's why.

Q.    So let's talk about that.  All right?

So you were interviewed for this case, this criminal case, in May of last year; right?

A.    Yes.

Q.    So May of 2025?

A.    Correct.

Q.    And you were interviewed by one of the agents who is over here, as well as some of the prosecutors who are over here; right?

A.    Yes.

Q.    And in the first interview you had with them, it was almost two hours that you were on the phone with them; right?

A.    That's correct.

Q.    I think it was a video call; right?

A.    Correct.

Q.    All right.  And so you all talked through all of the details of what you remembered about this incident; right?

A.    Yes.

Q.    Okay.  And they asked you all sorts of information -- all sorts of questions about what you remembered about Mr. Goldstein's statements; right?

A.    That is correct.

Q.    All right.  And when the government interviewed you in May of last year, you told them you did not recall any mentions of gambling; right?

A.    That is correct, because it's been -- it was -- like I

said before, it was five years -- six -- five years before I interacted.  So I had no recollection of what happened then until Special Agent Accardi showed me what I told him.

Q.    Okay.  So we're going to get to that.  Right?

So in this meeting, May 22 of 2025, you had no memory of anything about gambling; right?

A.    That's correct.

Q.    All you remembered was that it was a lot of money; right?

A.    Correct.

Q.    And you had been able to look up Mr. Goldstein in the CBP system so that you could find that record the government showed you about this incident; right?

A.    Yes.

Q.    Okay.  And this point about it being gambling money that Mr. Goldstein picked up in Macau, that was an important point to the investigators; right?

A.    Was -- yes, as -- yes.  The gambling part, yes.

Q.    Right.  So they kept asking you, and you don't remember anything about gambling; right?

A.    Yes.

Q.    And you had mentioned there were some other -- there was supposed to be another officer working with you way back in October 2018, but you couldn't remember who that person was; right?

A.    That is correct.

**Q.** That person hadn't been recorded on any of the forms; right?

**A.** Correct.

**Q.** So they couldn't find that person to see if they remembered this thing about gambling; right?

**A.** I assume they couldn't find a person, but...

**Q.** Okay. And so you left that interview with no memory about anything about gambling. And they called you back a week later and you had another interview with the investigator and the government team about this statement or whatever statements Mr. Goldstein made; is that right?

**A.** That's correct.

**Q.** All right. So on May 29 of 2025, again they ask you, hey, do you remember anything about Mr. Goldstein saying something about gambling; right?

**A.** Yes.

**Q.** And you still didn't remember anything about gambling; right?

**A.** I didn't remember, no.

**Q.** They had you -- let me take a step back.

They looked up on Google a picture of Mr. Goldstein; right?

**A.** I'm not sure.

**Q.** Do you remember them showing you a photograph of Mr. Goldstein?

**A.** I'm not -- I can't recall, no.

**MS. REAVES:** The Court's indulgence?

**THE WITNESS:** I remember they ask me if I remember how he looked.

**BY MS. REAVES:**

**Q.** So you remember them asking you questions about how he looked?

**A.** Yes.

**Q.** Okay. You don't remember them showing you images of Mr. Goldstein from a Google search?

**A.** Possibly. They probably did.

**Q.** Okay. And after the government showed you Google images of Mr. Goldstein, you stated the image of Mr. Goldstein did not trigger any additional memory of the encounter. Do you remember that?

**A.** Don't remember that, no.

**Q.** Okay. But you remember you had this interview with Agent Accardi where they were asking you about whether you had any additional memories of the encounter with Mr. Goldstein?

**A.** Yes.

**Q.** Okay. And you're also aware where the photo came from, talking about Mr. Goldstein's description or looking at a photo, that didn't jog your memory of anything about Goldstein?

**A.** Not at the time, no.

**Q.** It didn't jog your memory about anything related to

gambling?

**A.**    No, not at the time.

**Q.**    All right.  And so, finally, the agent, sitting over here, and the government in this case, showed you a picture of Agent Accardi's Post-It note; right?

**A.**    Yes.

**Q.**    Now, you had never seen this Post-It note before?

**A.**    I'd never seen it before.

**Q.**    You did not write this Post-It note?

**A.**    I did not.

**Q.**    You only vaguely remembered even speaking to Agent Accardi in 2019?

**A.**    Well, I -- I remembered, but not at that time, in May, that I spoke to him until they showed me the -- the note that I told him.

**Q.**    Okay.  To be clear, in the May 29, 2025 interview, you told Agent Accardi and the government that you only vaguely recall the call you had with Special Agent Accardi in 2019; right?

**A.**    Yes.

**Q.**    Okay.  And so after that, after the first interview didn't work, after the images of Mr. Goldstein didn't work, after you weren't able to find another officer who remembered this, then they showed you Mr. Goldstein's notes and everything came back at that point; right?

**A.**    Yes.

**Q.**    Correction:  They showed you Agent Accardi's notes --

**A.**    That is correct.

**Q.**    -- and the memory came back at that point?

**A.**    Agent Accardi notes was from my -- my mouth, so it was what I told him.

**Q.**    Okay.  And to be clear, when you say "Agent Accardi's notes was from your mouth," you mean you were not with Agent Accardi in 2019 when he talked to you; right?

**A.**    No.  I was on the phone with him.

**Q.**    Okay.  So you didn't -- and this was a phone call, not a video call?  You didn't see him?

**A.**    No, I did not see him, no.

**Q.**    You didn't see what he was writing down?

**A.**    No.  No.

**Q.**    And just as in the May -- two May interviews, the government specifically asked you, "Hey, did he say something about gambling?  Did he say something about Macau?"  Do you remember whether Agent Accardi asked you specifically about gambling or about Macau in that call in 2019?

**A.**    They asked me if I remember anything about gambling but not Macau.

**Q.**    Okay.  So back even in 2019 they asked you if you remembered something about gambling?

**A.**    In 2019 they asked me if I remember anything about the

encounter. And that is I didn't get it and I was like I'm not sure. But then I think back like they told me he was bringing amount of close to a million dollars and I -- I remembered and I told him what he told me, what Thomas Goldstein told me.

Q. Okay. So all of this memory of what Mr. -- you say Mr. Goldstein told you is what came back to you after you saw what Agent Accardi wrote down in the second interview with the government last year; right?

A. Yes. And -- yes.

Q. Okay. Now, I think you said at the beginning of your testimony that U.S. Customs and Border Protection is a law enforcement agency; right?

A. That is correct.

Q. And when people are coming through customs and border protection, a couple things you are looking for. Number one, sometimes you are looking to see if somebody is eligible to enter the United States; right?

A. That is correct.

Q. Okay. You also might be screening for whether they have something that has to be declared before it can come into the country; right?

A. That is correct. That is correct.

Q. But because of a law enforcement role, your job is to pay attention to details; right?

A. Yes. We supposed to pay attention to details.

Q.    Okay.  And part of the purpose of declaring something like money is that you're trying to make sure that money isn't being brought in for some illegal purpose; right?

A.    But that is not why we -- when someone is referred to fill out a form, we just focus on the money.  We don't focus on why they're bringing it in and stuff like that, because it's a form that we have, they must fill out so we can send it to another agency.

Q.    So --

        MS. REAVES:  Court's indulgence.

BY MS. REAVES:

Q.    Your testimony is that, for filling out this form, you don't need to know why they brought it in?  That's not something you're focused on?

A.    No.  We're not focused on that.

Q.    You don't need to know what they're using the money for?

A.    Not if -- the only time we would be focused on those kind of things is, if another agency put out a TECS lookout and we need to get additional information, we will put that into -- we will ask more questions and put that into the TECS database.

Q.    So you don't need to know where they got the money?

A.    No, we don't.

Q.    Okay.  So we just talked about the interview you had with Special Agent Accardi and some of the government prosecutors over here in May 22 of last year.  Do you remember that?

**A.** Yes.

**Q.** Okay. Do you remember telling them, when completing the CMIR -- that's the form we're talking about; right?

**A.** Correct.

**Q.** "When completing the CMIR, CBP officers ask the passengers questions, including why they are bringing the money into the country, what the money is for and where they got the money." Do you remember that?

**A.** I remember that, yes.

**Q.** Okay. And because, in fact, CBP officers should be getting as much information as possible into the system for investigative purpose; right?

**A.** If another agency actually asks for more information. FinCEN we don't really go in depth with that. It's just money. But anything other like drugs or -- what's the word I'm looking for? When somebody trying to smuggle someone into the country and stuff like that --

**Q.** Okay.

**A.** We try to get more information on that.

**Q.** To be clear, when you were talking to Agent Accardi and the prosecutors over here about Mr. Goldstein's case, no one was talking about smuggling drugs into the country; right?

**A.** No.

**Q.** Mr. Goldstein hadn't been referred for any other reason; right?

**A.**    No.    Just the money.

**Q.**    The reason -- correct.    The reason Mr. Goldstein went through secondary screening is because he declared the money as required; right?

**A.**    That is correct.

**Q.**    And so in the context of that conversation, you told Agent Accardi that, "when completing this financial form, CBP officers ask the passengers questions, including why they are bringing the money into the country, what the money is for and where they got the money and that you try to get as much information as possible into the system for investigative purposes."

You told them that; correct?

**A.**    Not -- I told them that, when passengers are referred, we actually we need -- some officers might ask additional questions like to get more information, but I did not say I actually do that.

**Q.**    Officer Foy, your testimony today is you did not tell Agent Accardi and the prosecutors here that the routine questions that you ask during a secondary encounter include who is the money for and why you are bringing it in?

**A.**    I did tell them that, but it was not exactly that way. But it's in that line of asking questions, but it's for officers that will ask -- some officers will ask other questions than more than others.    It's just we don't really

focus on those kind of questions with FinCEN.

Q.   Okay.  Again, the conversation you were having with Agent Accardi and the government in this case was not about passengers in general.  You were talking about the encounter with Mr. Goldstein where all he had to do was report the money to you; right?

A.   Yes.

Q.   Okay.  And so in that conversation about you screening Mr. Goldstein, you said that routine questions are, where is the money from, what is the money for; right?

A.   Yes.

Q.   That's what you told the government last year?

A.   Apparently I did.  Yes.

Q.   Now, the reason it's important to ask questions and to document the details is because you might be called to testify about what happened years ago; right?

A.   Well, now I know that's why I need enter enough information.  But before, I mean, we just actually just ask questions and we put in certain information there.

Q.   Right.

A.   We put in all of the information that we -- if we encounter unless another agency want specific answers to questions.

Q.   Okay.  I mean, that's fair.

A.   Yeah.

Q.   But the point is the details sometimes matter; right?

A.   It does.

Q.   And you might not know until years later which details matter; right?

A.   Yes.

Q.   And if we look at the report that you actually did complete -- let's look up Government Exhibit 349.

Now, this is the secondary inspection report that you completed; right?

A.   That is correct.

Q.   So when we talk about getting details into the system, you put it into a computer, but this is the printout of the details that you input into the computer; right?

A.   Yes.  Most of the information there is generated by the system.

Q.   Okay.  But let's talk about a couple things.  When you first got up testifying, you were able to rattle off the date of this incident.  Do you remember that?

A.   Correct.

Q.   You knew it was October 25th of 2018; right?

A.   Correct.

Q.   You don't remember that from seven, eight years ago just happening to do it off of your memory; right?

A.   That's correct.  I didn't remember because it was such a long time ago.

Q.    You remember it because you wrote it down?

A.    That's correct.

Q.    And just how looking at a photo of Mr. Goldstein or hearing the description of Mr. Goldstein doesn't remind you of exactly what happened, you know Mr. Goldstein's name because it's also on this form; right?

A.    That is correct.

Q.    All right.  And so the details that are actually put into this form are details that we know that you entered at the time you saw Mr. Goldstein; right?

A.    That is correct.

Q.    All right.  And so let's look at the second page.

      Now, you had an opportunity to document the details about your encounter with Mr. Goldstein; right?

A.    Yes.  But like I said before, we don't have to put in -- we only focus on the FinCEN and we let a passenger go.

Q.    Okay.  I understand that's your testimony today.  I also understand that you've admitted you told the agents a year ago that you routinely ask what the money is for, where it's coming from and why they have it; right?

A.    Yes.

Q.    If those were questions that you asked, you could have put that information into this form at the time you saw Mr. Goldstein; right?

A.    I could have, but it didn't need to be.

Q.    All right.  And there is other information in this form that doesn't need to be there; right?

A.    Like?

Q.    So, for example, you said subject is a lawyer; right?

A.    Yes.

Q.    There's no rule that says you need to put a person's occupation into the comments section of the form; right?

A.    There is no rule for -- to not put -- let an officer -- not let officer put in what he needs to put in into the system. They could put in whatever they want.

Q.    But the things that you put in as a law enforcement officer are the things that are important; right?

A.    The important thing is the passenger name, date of birth, passport information.  What we did with them is the most important things.

Q.    Okay.  So is the passenger name, date of birth, passenger information, all of that is in the top part of the form; right?

A.    That is correct.

Q.    There are boxes for those specific things?

A.    Yes.

Q.    Right?  This box reflects the additional information that you thought was important to document; right?

A.    That's correct.

Q.    And in addition to situations like this where you have to testify, the purpose of putting it into the system is also to

benefit other CBP officers; right?

**A.**    Yes.  But like I said, we only put more information in if another agency or someone put a lookout on the other passenger.

**Q.**    Again, what you told the government last year was that you try to get as much information as possible into the system for investigative purposes; right?

**A.**    Yes.  But I mean, investigative purposes, I don't remember saying investigative purposes.

**Q.**    Okay.  And so your testimony today is that Mr. Goldstein came through and told you that he had a million dollars of cash in gambling and that wasn't an important enough detail that you needed to put in this form.  That's what your testimony is?

**A.**    Repeat that question again.  I'm sorry.

**Q.**    Your testimony is Mr. Goldstein came through with almost a million dollars in cash; right?

**A.**    Correct.

**Q.**    That's documented in the form; right?

**A.**    Yeah.  That's correct.

**Q.**    Mr. Goldstein is a lawyer; right?

**A.**    He gave me a card.  I don't know for sure if he was a lawyer or not.  Anybody could lie.  Well, I deal with this every day.  Everybody lie to us in our face, so I do not know.

**Q.**    Okay.  That's fair.  You've documented in this form that Mr. Goldstein is a lawyer; right?

**A.**    Yes.  Because he gave me a card.

**Q.**    Right.  You even documented the name of his law firm?

**A.**    It was on the card.

**Q.**    You documented the address of his law firm?

**A.**    It was on the card.

**Q.**    Right.  But you did not say anything about him supposedly bringing in this money because of gambling?

**A.**    No, I did not.

**Q.**    Now, just to be perfectly clear, there is nothing illegal about bringing cash into the country; right?

**A.**    There is nothing illegal about that.

**Q.**    And Mr. Goldstein filled out the initial declaration form and gave it to the primary screening Customs and Border Protection agents; right?

**A.**    That is right.

**Q.**    Okay.  And so that's how you all knew that he was carrying this money; right?

**A.**    That is correct.

**Q.**    He didn't seem nervous?

**A.**    No.  When he came to me, he wasn't nervous.  No.

**Q.**    He didn't seem scared?

**A.**    No.  He wasn't scared when he came to me.

**Q.**    You had no reason to believe he was committing a crime?

**A.**    Yeah.  No reason.

**Q.**    He voluntarily allowed you to count this money for him?

**A.**    That is correct.

**Q.** Last thing.

The government showed you some photographs on direct examination about the screening area at Dulles; right?

**A.** Correct.

**Q.** When's the last time you worked as a CBP officer at Dulles?

**A.** In 2019.

**Q.** Okay. And to be clear, the government clarified that those photos weren't the exact same photos as -- those weren't for the exact same day as the incident, actually, with Mr. Goldstein; right?

**A.** Just that arrangement of the chairs was different.

**Q.** All right. And to be clear, the photos the government showed you were taken last year; right?

**A.** Apparently. I'm not sure.

**Q.** You don't know when those photos were taken?

**A.** No.

**Q.** So you don't know if the table that they asked you to talk about is, in fact, the table that existed in 2018; right?

**A.** Well, I know the table looked exactly -- that room looked exactly the same way when I was there.

**Q.** It matches your memory from seven, eight years ago?

**A.** Yes.

**Q.** Okay. But you have not worked at Dulles Airport since 2019?

**A.** That is correct.

**MS. REAVES:** No further questions. Thank you.

**THE COURT:** Thank you very much, Counsel.

Is there any redirect from the government?

**MR. ADENRELE:** Yes, Your Honor.

REDIRECT EXAMINATION

**BY MR. ADENRELE:**

**Q.** Officer Foy, good afternoon again.

**A.** Good afternoon.

**Q.** Now, you mentioned the term "TECS lookout" a number of times. I'm not sure we got a definition of that term. What is that?

**A.** It's just a database that we communicate through other agencies and our CBP officers.

**Q.** Okay. And what's the purpose of the database?

**A.** To input information -- well, import our finding of what we was looking for.

**Q.** All right. Are individuals in the TECS lookout suspected of committing crimes or under some sort of suspicion?

**A.** So most -- most TECS lookout is actually assumption of someone committing a crime or about to do something.

**Q.** Now, was Mr. Goldstein was -- I think you mentioned there was not a TECS lookout for Mr. Goldstein on the day that you interacted with him?

**A.** I do not recall -- no, it wasn't a TECS lookout for

that -- Thomas Goldstein.

Q.    All right.  Now, in situations where you do have a TECS lookout, let's say, for someone suspected of bringing in drugs into the United States, would you be more interested in the source of bulk cash that they're bringing in?

A.    That would be correct.

Q.    All right.  And would it be more likely that you would have written their answers as to the source --

MS. REAVES:  Objection.

THE COURT:  I think we have an objection.  Let's come to the headsets, Counsel.

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT:  All right.  Ms. Reaves, we have you.

MS. REAVES:  Yes.

THE COURT:  Mr. Goldstein.  Do we have counsel for the government?

MR. ADENRELE:  I'm here, Your Honor.

THE COURT:  Okay.  Ms. Reaves, go ahead.

MS. REAVES:  Leading.  I'd ask him to ask open-ended questions.

THE COURT:  Okay.  The objection is leading.  Can we rephrase the question?

MR. ADENRELE:  More than happy to.

THE COURT:  All right.  Thank you.

(Whereupon, discussion concluded.)

**BY MR. ADENRELE:**

Q.    If an individual was suspected of bringing in bulk cash from a known illicit source, what would you have written about that source in the --

A.    If they have a TECS lookout or --

Q.    -- in the form that we look at -- if they had a TECS lookout?

A.    I would ask more in-depth questions about, well, where is he bringing the money, how -- why -- what is he using it for, and other information like that.

Q.    All right.  Now, let's talk about -- we talked -- you received a lot of questions about the days that you met with the government, and how many times, and so on and so forth.  Do you remember that?

A.    Yes.

Q.    I believe I had heard, and maybe then it was changed, but at first, there was mention of the first time being in 2025. Do you remember that question?

A.    Yes.

Q.    All right.  Was that the first time you met with the government?

A.    That was not the first time.

Q.    All right.  When was the first time that you met with an IRS agent or spoke to an IRS agent?

**A.**    I encounter Special Agent Accardi on April of 2019.

**Q.**    All right.  And about how many months was that after your interaction with Mr. Goldstein?

**A.**    That was roughly six months.

**Q.**    And during that conversation with Special Agent Accardi, what did you tell him -- what did you relay to Special Agent Accardi about what Mr. Goldstein told you was the source of the cash that he was bringing in in October 2018?

**A.**    It was -- it was, again, it was gambling -- from gambling.

**Q.**    Now, did you expect that Special Agent Accardi may have been taking notes during that conversation?

**A.**    No.  I don't expect him to take notes, no.

**Q.**    Okay.  Well, do you expect that an IRS agent, who is speaking with you, might be taking a note or two about the conversation that you're having?

**A.**    Well, at the time, I didn't know.  I just trying to recall the whole situation, and I just told him what I -- was told to me.

**Q.**    Right.  Well, you weren't taking notes.  But would you expect that he may have been taking a note or two about the conversation?

**A.**    I guess he did, yes.

**Q.**    All right.  Well, when you speak to a federal agent on the phone, it's not unreasonable to believe they might take a note or two about the conversation; right?

MS. REAVES:  Objection.

THE COURT:  Headsets.

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT:  Ms. Reaves, we have you.  Mr. Goldstein. Do we have counsel for the government?

Counsel, do we have you?

Counsel?

MR. ADENRELE:  I'm here, Your Honor.

THE COURT:  All right.

Okay.  Ms. Reaves, please go ahead.

MS. REAVES:  Thank you, Your Honor.  So I let it go for a few more questions.  All of his questions are still leading.  I'd ask him to ask open-ended questions.

THE COURT:  Okay.  The objection is to the form of the question.

Counsel, can we ask open-ended questions?

MR. ADENRELE:  Sure, Your Honor.  Thank you.

THE COURT:  Thank you.

(Whereupon, discussion concluded.)

BY MR. ADENRELE:

Q.   All right.  And when was the next time that you spoke to a member of the government team or another IRS agent?

A.   It was in May of 2025.

Q.   All right.  And how much time had passed since you

interacted with Mr. Goldstein at that point?

**A.**    2018.  About seven years, six and a half years.

**Q.**    And I believe you were asked some questions about your lack of memory about exactly what Mr. Goldstein told you at that point?

**A.**    Yes.

**Q.**    And what did you say that Special Agent Accardi showed you to help jog your memory?

**A.**    In the beginning, I was like, I'm not sure.  But then after the meeting, I start thinking about it and I was, like, Okay.  I kind of remember.  Everything started coming back to me at that point.

**Q.**    Now, just as a general matter, if you're thinking about something that happened six or seven years ago, what types of things do you generally look to to help you jog your memory?

**A.**    Anything that's memorable.  Like they had an incident, like, three -- three months before then.  And I had a heart attack, so I remember things about that incident.  So that was memorable to me, too, as well.  So I remembered a lot.  Not everything, but mostly everything.

**Q.**    I'm sorry to hear that.

**A.**    It's all right.

**Q.**    Now, subsequent to that, the conversation that you had in 2025, you've spoken about your meeting or your incident with Mr. Goldstein again; is that right?

A.    Yes.

Q.    And when was that?

MS. REAVES:  Objection, Your Honor.

THE COURT:  Headsets.

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT:  All right.  Ms. Reaves.  Mr. Goldstein. Counsel for the government?

MR. ADENRELE:  I'm here.

THE COURT:  All right.  Go ahead, counsel for Mr. Goldstein.

MS. REAVES:  I just want to make sure that the government isn't trying to elicit a prior consistent statement about the suppression hearing, because the points that I impeached him about were about the May 2019 interviews, and we've also gotten into the April 2019.  But there's no basis in terms of the rules of impeachment to do a prior consistent statement about the suppression hearing.

THE COURT:  So your concern is about a reference to the suppression hearing?

MS. REAVES:  Yes.

THE COURT:  All right.  Counsel for the government?

MR. ADENRELE:  And that's exactly what I'm going to do now.  Under 801(d)(1)(E), the witness -- obviously, there were plenty of opportunities on cross in which the witness's

inconsistencies, or alleged inconsistencies were attacked with respect to what he remembered and what he said to the government. As a result of that, under 801(d)(2)(B) -- or sorry -- (d)(1)(B), I'm now allowed to bring up, certainly, prior testimony as to these statements in order to prove his consistency.

So that's exactly what I'm planning to do.

**THE COURT:** And your position is the testimony at the suppression hearing qualifies?

**MR. ADENRELE:** Absolutely.

**THE COURT:** All right. Anything further from the defense?

Go ahead, Counsel.

**MS. REAVES:** Yes, Your Honor. The way the rule works is temporal. I didn't say that today -- I did not say that his testimony today was the first time he's ever said that. And we discuss the fact that he had remembered this as of the May 29 -- May 29, 2019 meeting.

And so the April statements that he allegedly made to Officer Accardi, those are prior consistent statements to the May 22, which I -- and 29, which I impeached him on. But the subsequent hearing is not prior to the May 2019, which is -- I'm sorry -- was not prior to May 2025, which is the statement where he has gotten out testimony saying that is when he started remembering this.

THE COURT: So the concern is the hearing was after that date, May 2025?

MS. REAVES: Yes. Yes.

THE COURT: All right.

MS. REAVES: And I didn't say that this was the first time he's ever made that statement, and so it's improper to provide a consistent statement with something that came in --

MR. ADENRELE: Your Honor, that's --

MS. REAVES: -- after the last year.

THE COURT: Let her finish first.

MR. ADENRELE: I thought she did. My apologies.

THE COURT: All right. So just a chronology, the hearing was after the statements that the defense referenced during your cross?

MS. REAVES: Yes.

THE COURT: That's your position?

All right. Go ahead, Counsel.

MR. ADENRELE: Respectfully, I just think that's a misunderstanding of the rule. The rule clearly says that -- well, one, I want to make sure what the inconsistent statement that's being alleged is that -- I'm not sure my friend has identified that. But the inconsistent statement that was alleged on cross, that Mr. Goldstein told Agent Foy that the cash was gambling winnings, and that he said gambling winnings one time and then forgot another time.

As a result of that, I am now able to -- and as the rule says, "to rebut an expressed or implied charge that the declarant recently fabricated it" -- which isn't the point here -- "or acted from a recent improper influence or motive."  But the second part of the rule is important here, "to rehabilitate the declarant's credibility as a witness when attacked on another ground."

That's exactly what happened here.  And now, as a result, I'm allowed to elicit his prior consistent statement.

**THE COURT:**  All right.  I'm going to allow the question.  I'm also going to allow the defense, if they want to do recross afterwards.

Objection overruled.

**MS. REAVES:**  Thank you, Your Honor.

(Whereupon, discussion concluded.)

BY MR. ADENRELE:

Q.   All right.  As we were saying, Officer Foy, this isn't the first time -- this isn't -- we spoke about two prior times where you discussed Mr. Goldstein's statement to you about the cash being gambling winnings; right?

A.   Yes.

Q.   And you spoke about this another time after that -- or did you speak about this another time after that?

A.   Yes.  In October.

Q.   And were you in this courthouse?

**A.**    I was in this courthouse, not the same courtroom but same courthouse.

**Q.**    Oh, you were in a courtroom?

**A.**    Yes.

**Q.**    All right.  And was I there?

**A.**    Yes, you were.  You was.

**Q.**    Were you under oath at the time?

**A.**    I was under oath.

**Q.**    And you swore to testify truthfully?

**A.**    That is correct.

**Q.**    And at that time, did I ask you whether, on October 25, 2018, Mr. Goldstein told you that the cash was gambling winnings?

**A.**    Repeat it again.  I'm thinking about something else.

**Q.**    I'll say it again.  At that time, did I ask you the question whether Mr. Goldstein told you, on October 25, 2018, that the nearly million dollars in cash that he brought in was gambling winnings?

**A.**    Yes.

**Q.**    And what did you say?

**A.**    I said yes.  He -- that was the statement that he give to me.

          **MR. ADENRELE:**  Thank you.

          **THE COURT:**  Thank you very much.

     Have all questions been asked of the witness?

**MS. REAVES:**  Just briefly?

**THE COURT:**  Okay.

**MS. REAVES:**  Could I have the husher just briefly?

RECROSS-EXAMINATION

**BY MS. REAVES:**

**Q.**   I just want to make sure that we're clear on the chronology.  All right?

So your encounter with Mr. Goldstein was October 25th of 2018; right?

**A.**   That is correct.

**Q.**   Okay.  And this time that the government is talking about that you testified that Mr. Goldstein said "gambling winnings," that was this past October; right?

**A.**   That's correct.

**Q.**   Okay.  So that was after the May meeting when you met with the -- Agent Accardi and the government and you didn't remember anything about this; right?

**A.**   At the beginning, I didn't remember, yes.

**Q.**   Okay.  And it was after that second meeting where they tried a bunch of different ways to get you to remember.  And eventually, you saw Officer Agent Accardi's notes; right?

**A.**   Yes.

**Q.**   Okay.  And after that at the hearing with these -- with this agent and the government, that's when you also still remembered that Mr. Goldstein specifically said it was gambling

money?

**A.**   Yes.   When I went -- I went -- I saw the notes, then it started coming back to me.

        **MS. REAVES:**   Okay.   Thank you.

        **THE COURT:**   Thank you very much, Counsel.

    Have all questions been asked of the witness?

        **MR. ADENRELE:**   No further questions from the government.   Thank you.

        **THE COURT:**   All right.   Agent Foy, thank you very much for your time and testimony.   You may step down and be excused.

    Have a good evening.

        **THE WITNESS:**   You, too.   Thank you.

                        (Witness excused.)

                        - - -

        **THE COURT:**   Counsel, we're just about at the three o'clock hour.   I think perhaps the afternoon break might be appropriate at this point.   Any objection?

        **MR. ADENRELE:**   No objection from the government.

        **THE COURT:**   All right.   I'm going to invite the jury to step down for its afternoon break.

    Please rise for the jury.

    (Whereupon, the jury exited the courtroom at 2:56 p.m.)

        **THE COURT:**   Please be seated.

    And Counsel, before we take a brief break, just want to

get a sense of what the rest of the afternoon will look like.

Counsel for the government?

**MR. ADENRELE:** Your Honor, next we have Al DeCarolis, and then we'll have Yvette Parrish, Revenue Officer Yvette Parrish.

**THE COURT:** I'm sorry. What was that second name?

**MR. ADENRELE:** Revenue Officer Yvette Parrish.

**THE COURT:** Okay. How long on direct for the next witness?

**MR. ADENRELE:** Should be fairly short.

**MR. WHITMAN:** About 20 minutes, Your Honor.

**THE COURT:** All right. Why don't we take five, and then we'll get started.

**DEPUTY CLERK:** All rise. This Honorable Court stands in recess for five minutes.

(Whereupon, a recess was taken from 2:58 until 3:11 p.m.)

**DEPUTY CLERK:** All rise. This Honorable Court now resumes in session.

**THE COURT:** Please be seated, everyone.

I believe we are at the point of our next witness coming, so are we ready for the jury?

**MR. WHITMAN:** Yes, Your Honor.

**THE COURT:** Is defense ready for the jury?

**MR. KRAVIS:** Oops, sorry. Yes, Your Honor.

**THE COURT:** Okay. Let's have the jury join us, and

you can call your next witness.

Please rise for the jury.

(Whereupon, the jury entered the courtroom at 3:13 p.m.)

THE COURT:  Please be seated, everyone.

Is the government prepared to call its next witness?

MR. WHITMAN:  Yes, Your Honor.  The government calls Mr. Al DeCarolis.

THE COURT:  Thank you.

Good afternoon, you want to come all the way in to the courtroom towards me.  Keep coming towards me, and then you're going to go to your left over to the witness stand.  And please remain standing and the courtroom deputy will swear you in.

— — —

ALFRED DeCAROLIS, after having been duly sworn, was examined and testified as follows:

— — —

DEPUTY CLERK:  You may be seated.  Please watch your step as you will.  And if you would please speak loudly and clearly to the microphone.  The microphone is adjustable. State your name for the record and spell each name.

THE WITNESS:  Alfred, A-l-f-r-e-d.  DeCarolis. D-e-C-a-r-o-l-i-s.

DEPUTY CLERK:  Thank you.

THE COURT:  Counsel?

DIRECT EXAMINATION

**BY MR. WHITMAN:**

**Q.**   Good afternoon, Mr. DeCarolis.

Could you please introduce yourself to the jury and tell them a little bit about your background?

**A.**   With regards to profession?

**Q.**   Let's just start it this way.

Where do you live, Mr. DeCarolis?

**A.**   My residence is Miami Beach, Florida.

**Q.**   Where did you grow up?

**A.**   Pittsburgh, Pennsylvania.

**Q.**   Do you play poker?

**A.**   Yes.

**Q.**   When did you start playing poker?

**A.**   Probably when I was 25 years old.

**Q.**   How old are you today?

**A.**   Sixty-eight.

**Q.**   Can you tell the jury a little bit about how you started out playing poker and learned it?

**A.**   Yeah.  I moved to Las Vegas, Nevada, when I was 29 years old in hopes of playing poker for a living.  And before that, I had worked in construction sales in New Mexico.  And before that, I played basketball in New York for two years.  And the monies that I made in those years, I went to Las Vegas and tried to learn to play poker.

**Q.**   What type of poker, if any, did you focus on when you

started?

**A.**    In the beginning, it was a game called Seven-Card Stud, but eventually No-Limit Hold'em.

**Q.**    Did you eventually become a professional poker player?

**A.**    I would not say I was a top professional poker player.  I would say, in the last 20 years, taking pieces of good players and playing in games with businessmen, I've been a winning poker player.

**Q.**    Do you understand whether there is any difference in terms of tax reporting for professional poker players versus amateur poker players?

**A.**    My understanding, from my accountants and being in the gaming industry for the majority of my adult life, that at least in my viewpoint and what I do is I have a segregated gambling account.  And when I play and I win, monies are wired into my account.  And when I lose, monies are wired out of my account.

I reconcile those numbers monthly.  And at the end of the year, I sit with my accounting firm.  We come up with a number if I won or lost.  And when I have a winning year, I pay 41 percent to the Internal Revenue Service, minus my expenses if I travel to play.

**Q.**    Have there been years where on your tax return you've classified yourself as a professional poker player?

**A.**    On my income tax returns, because I have other sources of

revenue, I file as occupation as an investor.  But I have a schedule -- I think a Schedule C or D, which is gambling wins and losses, which is reported to the Internal Revenue Service.

Q.    Have you played poker and Texas Hold'em against some of the world's best players?

A.    Yes.

Q.    Can you give us a few names of the best poker players you've played in matches with?

A.    In ring games?

Q.    Sure.

A.    Doyle Brunson, Phil Ivey, Andrew Robl, Tom Dwan, Antonio Esfandiari.

Q.    Have you played poker with celebrities?

A.    Yes.

Q.    Can you name a few celebrities who you've played poker with over the years?

A.    Leonardo DiCaprio, Tobey Maguire, Ben Affleck, Todd Phillips, who's a director, Ron Meyer, who was president of Universal Studios, Gabe Kaplan.

Q.    Do you know the defendant, Thomas Goldstein?

A.    Yes.

Q.    How did you meet Thomas Goldstein?

A.    I met Tom, I would say, maybe in 2014 or 2015.  It was probably in a poker game.

Q.    Do you recall what type of poker game, whether it be in a

house or a casino?

A.    Most of the games that I play in are high-stakes games, are private games with business people.

Q.    Do you recall who introduced you to Mr. Goldstein?

A.    I think I original -- when I actually really originally met Tom may have been at Dan Bilzerian's home in a private game.

Q.    Who is Dan Bilzerian?

A.    He's an influencer, trust funder, was in the poker -- playing poker for many years in our private games.

Q.    When you say "influencer," what does that mean?

A.    Like in one of those Instagram guys, you know, who makes posts and stories about his lifestyle.

Q.    Okay.  What was your initial impression of Mr. Goldstein?

A.    Tom was actually very quiet at the table.  I mean, I knew who Tom was.  I knew he was a Supreme Court lawyer.  Got to know him.  Had a few conversations with him.  Obviously, very intelligent.  I never really interacted with Tom outside of poker.  I'm sure probably a few times maybe.  I can't recall. I may have had conversation with him outside of a poker game.

Q.    Can you tell the jury what your impression was of Mr. Goldstein as a poker player when you all first met?

A.    Very aggressive, a losing poker player in ring games.

Q.    Have you heard of games or series of games where Mr. Goldstein won lots of money?

**A.**    Yes.

**Q.**    Have you invested or had a piece of Mr. Goldstein in any games or series of games where he won lots of money?

**A.**    Not ring games, but heads-up games.

**Q.**    Against who have you invested in Mr. Goldstein to play poker?

**A.**    Alec Gores and Andrew Beal.

**Q.**    When did you invest in Mr. Goldstein to play against Alec Gores?

**A.**    I don't know the exact date, but I think it probably nine or ten years ago, something like it.  Maybe 216 (sic).

**Q.**    Do you recall, approximately, how much as an investor you understood Mr. Goldstein to have won against Mr. Gores?

**A.**    I want to say it was in the 20 to $30 million range.

**Q.**    Have you played in games personally with Mr. Goldstein over time?

**A.**    Yes.  Ring games.

**Q.**    Have you ever played Mr. Goldstein in a heads-up or a one-on-one game?

**A.**    Not that I recall.

**Q.**    Do you recall playing any games of poker with Mr. Goldstein in the year 2016?

**A.**    Repeat the question.

**Q.**    In the year 2016 or thereabouts, do you recall playing any games with Mr. Goldstein in poker?

**A.**    I've played in ring games with Tom.  I don't recall the exact years.  I know I've played in a ring game, or games, with Tom at Alec Gores house.  And at my home in Costa Rica, I played in a ring game.

**Q.**    And, Mr. DeCarolis, there's -- if it's helpful, there's a little bottle of water up there, which is just for you.  So if you want to drink it, it's totally fine.

          **MR. WHITMAN:**  Could we pull up Exhibit 257, please, Mr. Resto?

**BY MR. WHITMAN:**

**Q.**    Do you see Government Exhibit -- do you see this document on the screen, Mr. DeCarolis?

**A.**    Yes.

**Q.**    What is this document?

**A.**    This is an incoming wire from Tom for -- into my gambling account for $196,600.

**Q.**    What is the date of that wire?

**A.**    07/06/2016.

**Q.**    So July 6, 2016?

**A.**    Correct.

**Q.**    What was this wire from Mr. Goldstein to you for?

**A.**    It would have to be for a poker gambling transaction.

**Q.**    Do you see, about halfway down the document as it's reflected on the screen, where it says "originator"?

**A.**    Yes, I do.

**Q.**   What does it say after originator on this document?

**A.**   Howe Russell, PC.

**Q.**   Do you know what Howe Russell, PC is?

**A.**   Well, I do now.

**Q.**   What is Howe Russell, PC?

**A.**   A law firm that Tom was associated with, I think.

**Q.**   Does this document reflect the last four digits of the bank account that this payment came from?

**A.**   Yes.  1678.

**Q.**   Have you, Mr. DeCarolis, ever served as an attorney for Mr. Goldstein?

**A.**   No.

        **MR. WHITMAN:**  Could we, please, Mr. Resto, go to exhibit --

        **THE WITNESS:**  Excuse me?

        **MR. WHITMAN:**  Sorry.  I was talking to Mr. Resto. Sorry.

        **THE WITNESS:**  Oh.

        **MR. WHITMAN:**  Could we go to Exhibit 259?

**BY MR. WHITMAN:**

**Q.**   Do you see the document in front you on the screen, Mr. DeCarolis?

**A.**   Yes, sir.

**Q.**   What is this document?

**A.**   It's an incoming wire from Tom.

**Q.** What is the date of this wire?

**A.** 12/1/16.

**Q.** So December 1, 2016?

**A.** Correct.

**Q.** What was this wire payment for?

**A.** Again, would be a poker transaction where Tom was wiring me money.

**Q.** What types of poker transactions could this represent?

**A.** It could have been a ring game, or it could have been a heads-up match.

**Q.** Do you see where it says "originator" about halfway down this document as reflected on the screen?

**A.** Yes, I do.

**Q.** What does it say after "originator" on this document --

**A.** Tom --

**Q.** -- from December?

**A.** Thomas C. Goldstein.

**Q.** Is there the last four digits of the bank account that this wire payment came from?

**A.** 3796.

**Q.** Does that appear to be a different bank account than the one we discussed in the prior document from earlier in 2016?

**A.** It looks that way.

**Q.** Around this time, in 2016, were you investing in Mr. Goldstein in his games against Alec Gores?

**A.**    Yes.

**Q.**    Can you tell the jury how you invested in Mr. Goldstein and the games against Alec Gores?

**MR. WHITMAN:**  And we can take that document down, Mr. Resto.

**THE WITNESS:**  How I invested?

**BY MR. WHITMAN:**

**Q.**    Yes.

**A.**    Tom would text me and say, I'm going to play Alec.  Would you like a percentage of me in the match?

**Q.**    Did you end up having a percentage of Mr. Goldstein in the match?

**A.**    Yes.

**Q.**    Why did you invest in Mr. Goldstein to play against Mr. Gores in 2016?

**A.**    I thought he was a better player.

**Q.**    You thought who was a better player?

**A.**    Yes.  Yes.

**Q.**    Sorry.  You thought who was a better player?

**A.**    Tom.

**Q.**    Did that turn out to be correct, at least as to those matches in 2016?

**A.**    He won overall, yes.

**Q.**    Do you know an individual named Bob Safai?

**A.**    Bob Safai?  Yes, very well.

**Q.** Have you ever invested in Mr. Goldstein playing matches against Bob Safai?

**A.** No.

**Q.** Would you have invested in Mr. Goldstein in heads-up matches against Bob Safai had he asked?

**A.** No.

**Q.** Why not?

**A.** I thought they were a pretty -- I would think they were a pretty even match, two very aggressive players. I didn't think there was any clear favor.

**Q.** Back to Mr. Gores for a moment. Is Mr. Gores, to your understanding, a professional poker player?

**A.** No.

**Q.** What, if any, connection do you have today to the country Costa Rica?

**A.** I have -- I have done development there, and I have two high-end luxury home rentals, a hotel. I don't know all the -- and I've sold a lot of land over the years.

**Q.** Have you hosted poker trips to Costa Rica?

**A.** Two or three, yeah.

**Q.** Do you recall a poker trip to Costa Rica in or around March of 2022?

**A.** Yes.

**Q.** Did you invite Mr. Goldstein on that trip to Costa Rica?

**A.** Yes.

**Q.**    Can you name a few of the other individuals who attended the trip to Costa Rica?

**A.**    Yes.

**Q.**    Could you just give us a couple examples of names of folks who also attended?

**A.**    Andrew Robl, Edwin Ting, Chamath Palihapitiya, Andrew Beal, Marcus Ryu.  Oh, and Tom.

**Q.**    Who is Andy Beal?

**A.**    Andy Beal is a banker from Dallas, Texas.

**Q.**    Does Andy Beal play poker?

**A.**    Yes.

**Q.**    What is Andy Beal's reputation in the high-stakes poker world?

**A.**    As a very wealthy man who enjoys playing poker at the highest stakes.

**Q.**    Do you know of anyone, personally, who has lost more money playing poker than Andy Beal?

**A.**    No.

**Q.**    Do you have any discussions with Mr. Goldstein about Mr. Beal prior to the trip to Costa Rica in about March of '22?

**A.**    Yes.

**Q.**    Can you tell the jury about those discussions?

**A.**    It really wasn't discussions.  I just told him that Andrew Beal would be coming to my house to play in a ring game.  And Tom was invited.

**Q.**    Have you heard of a book being published about Mr. Beal and his poker playing?

**A.**    Yes.

        **MR. KRAVIS:**  Objection.

        **THE COURT:**  Let's come to the headsets, Counsel.

    (Whereupon, a discussion was held outside the presence of the jury.)

        **THE COURT:**  All right.  Do we have Mr. Kravis?  Mr. Kravis, are you on?

        **MR. KRAVIS:**  Yes, Your Honor.

        **THE COURT:**  All right.  Mr. Goldstein, thumbs up.  Counsel for the government?

    Okay.  Go ahead, Counsel.

        **MR. KRAVIS:**  Okay.  So my understanding was that these questions were now about poker playing in 2022, which I understand the Court has ruled is relevant to the willful failure to pay misdemeanors.  But a book written about some person that Mr. Goldstein may have played poker with seems like hearsay and irrelevant.

        **THE COURT:**  All right.  So relevance and hearsay.  Counsel for the government?

        **MR. WHITMAN:**  I think it's relevant because we're just previewing who Andy Beal is.  And I think the evidence will show that Mr. Goldstein was intensely interested on meeting this individual and then winning tens of millions of

dollars from him.  That said, I am not going to quote the book and I'm happy to drop it and move on to the rest of my questions, Your Honor.

THE COURT:  All right.  Why don't we move on.

(Whereupon, discussion concluded.)

BY MR. WHITMAN:

Q.   Did you host people at your property for that poker trip in 2022 to Costa Rica?

A.   Yes.

Q.   Were there a number of poker players and their families staying at your house?

A.   Andrew Beal, Andrew Rubl, Edwin Ting, Marcus Ryu, Chamath Palihapitiya.  Yeah.  Some were there with their families, yep.

Q.   Was Mr. Goldstein staying at your house for that trip?

A.   No.

Q.   Was Mr. Safai on the trip in March of 2022?

A.   No.

Q.   Do you know why Mr. Safai did not come on the trip to Costa Rica?

A.   I extended him an invitation, and he declined.

Q.   Did he say anything about why he declined?

MR. KRAVIS:  Objection.

THE COURT:  Let's go to the headsets, Counsel.

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT:  All right.  Mr. Kravis, are you on?

MR. KRAVIS:  Yes, Your Honor.

THE COURT:  Mr. Goldstein, thumbs up.  Mr. Whitman?

All right.  Go ahead, Mr. Kravis.

MR. KRAVIS:  I think the objection is hearsay.  What did Mr. Safai tell you about X.  Mr. Safai has already testified in this trial, by the way.

THE COURT:  All right.  Objection is hearsay.  Mr. Whitman?

MR. WHITMAN:  I'll move on.  That's fine.

THE COURT:  All right.  We're going to on.

MR. WHITMAN:  Thank you, Your Honor.

(Whereupon, discussion concluded.)

BY MR. WHITMAN:

Q.   Can you just describe to the jury the types of poker games that were going on on this trip?

A.   In what regard?

Q.   Were there ring games?

A.   Ring games.

Q.   The jury has heard the phrase, but can you give us a brief explanation of what a ring game is?

A.   Yeah.  A ring game is any time there's more than five people playing.  Five or under would be called a short-handed game.  Five or more would be a ring game.

Q.   Were there heads-up poker games going on on this trip to

Costa Rica?

**A.**    Yes.  Yes.

**Q.**    Do you recall any specific poker players who were playing in heads-up games on the trip?

**A.**    Yes.

**Q.**    Like who?

**A.**    Marcus Ryu played Andrew Beal heads-up.

**Q.**    Do you know, from your experience playing in these games, whether Mr. Beal has a preference for heads-up or ring games?

**A.**    Heads-up.

**Q.**    Did Mr. Goldstein and Mr. Beal know each other before the trip to Costa Rica in March of 2022?

**A.**    Not to my knowledge.

**Q.**    Did you introduce the two of those gentlemen in Costa Rica?

**A.**    Yes.

**Q.**    Can you tell us about that introduction between Mr. Goldstein and Mr. Beal?

**A.**    It could have been at sunset cocktails, the opening day that everybody arrived.  Andy -- I told Andy this is Tom Goldstein and this is Andrew Beal.  Andy asked me who Tom was. And I told him his background as a lawyer and that he had played in ring games with us over the years.

**Q.**    Do poker -- in the high-stakes poker world, are there many individuals who would like the opportunity to play poker

against Mr. Beal?

**A.**   Yes.

**Q.**   Why?

**A.**   He's a losing player, and he'll play high-stakes that you want to play.  He does win, but, I mean, he's playing against pretty good players.

**Q.**   Following the trip to Costa Rica in 2022, do you know whether Mr. Goldstein and Mr. Beal played poker and heads-up poker in 2022?

**A.**   I know they played.  I don't know if they played in '22.  They probably did.  They played several times.

**Q.**   And have you invested in Mr. Goldstein in matches against Mr. Beal subsequent to the trip to Costa Rica?

**A.**   Before Costa Rica?

**Q.**   After.  I said subsequent.

**A.**   Oh.  Oh, after.  Subsequent.  Yes.

**Q.**   From having invested in Mr. Goldstein against Mr. Beal, do you have any understanding of whether Mr. Goldstein was successful in matches against Mr. Beal?

           **MR. KRAVIS:**  Objection.  Sorry.

           **THE COURT:**  Come to the headsets.

    (Whereupon, a discussion was held outside the presence of the jury.)

           **THE COURT:**  All right.  Mr. Kravis, do we have you?

           **MR. KRAVIS:**  Yes, Your Honor.

THE COURT: Mr. Goldstein, thumbs up.

Mr. Whitman? Okay.

Go ahead, Mr. Kravis.

MR. KRAVIS: So under the government's theory of admissibility, I think these questions should be limited to 2022. I think the theory is that the poker playing in '22, while Mr. Goldstein owed money and taxes, is relevant to the willful failure to pay.

I think there were poker games that went beyond 2022, and I don't think those are relevant because, by the end 2022, Mr. Goldstein's taxes were paid off.

So I would just ask that, if we're going to do more questions about Mr. Goldstein and Mr. Beal playing poker with each other, that we limit it to 2022.

THE COURT: All right. Mr. Whitman?

MR. WHITMAN: That's fine with me, Your Honor.

THE COURT: Okay. And I think you need to be a little bit clearer in your questions about the timing, too.

MR. WHITMAN: Thank you Your Honor.

THE COURT: All right. Thank you.

(Whereupon, discussion concluded.)

BY MR. WHITMAN:

Q.   Mr. DeCarolis, do you remember, approximately, how long after the trip to Costa Rica it was when you invested in games between Mr. Beal and Mr. Goldstein?

**A.**   I don't know the exact date, but I definitely had a piece or invested with Tom playing Mr. Beal.

**Q.**   Was it -- I'm just looking for an approximate -- an approximation here as to how long after Costa Rica you began to invest in Mr. Goldstein against Mr. Beal?

**A.**   It could have been late '22-'23.  It's not like they -- I think they -- I'm trying to recall.  I don't think they played many times.  I think maybe they played a handful of times.

**Q.**   In the games where you invested in Mr. Goldstein against Mr. Beal, was Mr. Goldstein successful?

**MR. KRAVIS:**  Objection.

**THE COURT:**  Come to the headsets.

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:**  All right.  Mr. Kravis, are you on?

**MR. KRAVIS:**  Yes, Your Honor.

**THE COURT:**  Mr. Goldstein?  Mr. Whitman?

**MR. WHITMAN:**  Yes, Your Honor.

**THE COURT:**  Okay.  Please go ahead, Mr. Kravis.

**MR. KRAVIS:**  I'm sorry.  I thought we just did this.  Like the questions have to be limited to 2022.  And if this guy doesn't know when the games were, then I think we've got to move on.

**THE COURT:**  All right.  We do need to limit the time to 2022.  The Court ruled on that a couple days ago.  It needs

to be clear in your questioning that you're talking about 2022. And if you ask it in the question, hopefully that will allow the witness to focus on 2022. Otherwise, I'm going to have to start striking what he's saying. He's going beyond the scope.

MR. WHITMAN: Thank you, Your Honor.

THE COURT: All right. Thank you.

(Whereupon, discussion concluded.)

BY MR. WHITMAN:

Q. How long after the trip to Costa Rica is it your understanding that Mr. Goldstein and Mr. Beal started playing in games together?

A. Again, I don't know the exact date, but I would say within a 4 to 12-month period.

Q. Okay. And were you investing in Mr. Goldstein in that period that you just mentioned?

MR. KRAVIS: Objection.

THE COURT: All right. Go to headsets, Counsel. Let's come to the headsets.

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT: All right. Mr. Kravis, do we have you?

MR. KRAVIS: Yes, Your Honor.

THE COURT: Mr. Goldstein? Mr. Whitman?

I'm going to start. We got to stick to 2022. You cannot ask open-ended questions about how long, what do you think,

because the witness, obviously, is talking about 2022 and beyond. So if it's -- 2022 is fine. If it's beyond that, it's not okay. And there can't be confusion about that in terms of the testimony. Otherwise, I'm going to strike the testimony because I can't figure out what he's talking about. So you need to ask the questions for 2022.

**MR. WHITMAN:** Understood, Your Honor. He just testified, I think, that it was three to -- three months to a year after the trip when they started playing games. So that's why I was trying to ask him at that point.

**THE COURT:** Well, Counsel, your questions have to be limited to 2022. So anything you want to ask him about what happened during the games has to be what happened in 2022.

If that's not clear, then we're going to -- I'm not going to allow the line of questioning because it's confusing, number one, to the jury beyond the evidentiary issues that we've talked about before.

Mr. Kravis, anything from you?

**MR. KRAVIS:** Nothing further. Thank you, Your Honor.

**THE COURT:** Anything further from the government?

**MR. WHITMAN:** No, Your Honor. Thank you.

**THE COURT:** All right. Thank you.

(Whereupon, discussion concluded.)

**BY MR. WHITMAN:**

Q.   How do you work with your accountants and tax preparers to

give them the information about your gambling and your poker playing in a given year?

A.    Like I said earlier, I -- all monies that I win on private games are wired into a segregated gambling account.  And when I lose, those monies are wired out.  At the end of every month, I reconcile.  At the end of the year, when I do my taxes for other sources of revenue in gambling, we break it down.  I give them my gambling wins, my expenses, and I pay taxes on that amount.

Q.    Do you understand it's your -- your role in the process is to provide your accountants and tax preparers with the information about your gambling so that they can help you report it?

A.    Yes.

        MR. WHITMAN:  Moment to confer, Your Honor?

        THE COURT:  Of course.

        MR. WHITMAN:  No further questions, Your Honor.

        THE COURT:  Thank you very much, Mr. Whitman.

    Does the defense wish to cross-examine the witness?

        MR. KRAVIS:  Yes.  Thank you, Your Honor.

    May I approach?

        THE COURT:  You may.

                    CROSS-EXAMINATION

BY MR. KRAVIS:

Q.    Good afternoon, sir.

**A.**   Hi.

**Q.**   I think I heard you testify a moment ago that you have a segregated bank account that you use for your gambling.  Do I have that right?

**A.**   Correct.

**Q.**   But maintaining a segregated bank account for the gambling winnings and loss, as you understand it, that's not legally required; right?

**A.**   I don't know the law.

**Q.**   In fact, when you started out playing poker, you did not really have a system for tracking your wins and losses; right?

**A.**   Yeah.  At that time, I was playing small amounts, no.

**Q.**   In fact, I think you used to keep a -- like a safe deposit box for your gambling activity?

**A.**   When?

**Q.**   When you were younger?

**A.**   Yeah.  If I was playing in casinos, I would keep chips so, you know, I would go play small amounts of money.

**Q.**   And at the end of the year, you would know how much money you made or lost from gambling based upon what was in the safe deposit box; right?

**A.**   No.  I kept journal also.

**Q.**   I just want to make sure I'm clear.  When we're talking about the time period when you were using the safe deposit box, at the end of the year you would know how much money you made

or lost based on what was in the safe deposit box; right?

**A.**    I wouldn't use the safety deposit box at the end of the year because, at that time, I used to play Black Jack and stuff like that.  I was a losing player so, in the beginning, the first ten years of my career, I was a losing player, so I actually went broke.

**Q.**    Right.  But I'm just focused on the safe deposit box.

**A.**    Yeah.

**Q.**    And I'm just wondering if, during this time period when you were using it, you would know how much money you made or lost based on what was in the safe deposit box at the end of the year?

**A.**    No.

**Q.**    Okay.  Do you remember being interviewed by the IRS in this in February of 2024?

        **THE COURT:**  Sorry.  Counsel, do you wish to be heard?  Excuse me.

        **MR. WHITMAN:**  Oh.

        **THE COURT:**  I thought I heard an objection.

    Do you wish to be heard?

        **MR. WHITMAN:**  I'll let him ask the next question.

        **THE COURT:**  All right.  Okay.  Go ahead.

**BY MR. KRAVIS:**

**Q.**    Okay.  Do you remember being interviewed by the IRS in February of 2024?

**A.** Interviewed for what?

**Q.** In connection with this investigation.

**A.** Oh, yeah. Yeah. Yeah.

**Q.** Yeah. Yeah.

**A.** In California, yeah. Correct.

**Q.** Yeah. Right. You were interviewed by the IRS and there were some lawyers there and you talked about all this?

**A.** Yeah. Yeah. Correct.

**Q.** Okay. Do you remember in that interview saying that, in this time period when you were using the safe deposit box, at the end of the year, you would know how much money you made or lost based on how much money was still in the safe deposit box?

**A.** I don't recall.

**Q.** Okay. Now, today, you do it differently; right?

**A.** Today, I do what differently?

**Q.** Keeping track of your gambling.

**A.** Oh, yeah. Yeah. Yeah.

**Q.** Yeah. And today, I think I heard you say you treat yourself as a professional poker player for tax purposes; right?

**A.** For tax purposes, yes. I have a segregated gambling account.

**Q.** And you work with your accountant to figure out what you owe in taxes every year from any gambling winnings that year; right?

**A.**    That's correct.

**Q.**    And I think I heard you say on direct that you sit down with your accountant every year to go over that information with them.  Did I hear that right?

**A.**    Yes.  Yes.

**Q.**    And I think the government asked you about you provide information about your gambling winnings and losses to your accountant.  Did I hear that right?

**A.**    Yes.

**Q.**    When you do that, are you providing your accountant with 1099s or something else?

**A.**    No.  What I do is I take my bank account and, like I said earlier, monies in, monies out.  And at the end of the year, if it's a positive figure, that's strictly for gambling; or if I'm in a casino and I play Black Jack, that's included; or, say, sports betting, that's all included.  I come up with a sum figure, and then that's what we report to the Internal Revenue Service and I pay 41 percent minus -- oh, my expenses.

**Q.**    And you don't use the 1099s because in the poker community, it is very rare to send out 1099s for winnings and losses; right?

**A.**    I've never sent a 1099.

**Q.**    All right.  Now, you had a share of Mr. Goldstein in his games against a fellow named Alec Gores in 2016; right?

**A.**    Alec Gores, yes.

**Q.** And just so we're all clear on what these words mean, you were an investor in Mr. Goldstein for those games; right?

**A.** That would be correct.

**Q.** So Mr. Goldstein is the one that's actually playing the games against Mr. Gores; right?

**A.** Correct.

**Q.** And as an investor, if Mr. Goldstein wins, you get a certain percentage of the wins; right?

**A.** Correct.

**Q.** And if Mr. Goldstein loses, you're on the hook for a certain percentage of the losses; right?

**A.** I would pay Mr. Goldstein, yep.

**Q.** Now, in the particular games we're talking about, Mr. Goldstein won; right?

**A.** Correct.

**Q.** And so you got -- as an investor, you got a share of those winnings; right?

**A.** That's correct.

**Q.** And I think you know some of the other people who were investors in Mr. Goldstein for those games against Mr. Gores; right?

**A.** Correct.

**Q.** But you do not know all of the people who were investors in Mr. Goldstein for those games, do you?

**A.** No.

Q.    Do you know a guy by the name of Paul Phua?

A.    Who?

Q.    Paul Phua?

A.    Yes.  Yes.

Q.    He's a rich Asian gambler; right?

A.    Yes.  I've played him.

Q.    You do not know if Mr. Phua had a share of Mr. Goldstein in the matches against Mr. Gores in 2016, do you?

A.    No.

Q.    Now, I couldn't help but notice that on direct examination, you were not shown any, like, written contract or written agreement for this investment that you had in Mr. Goldstein's matches against Mr. Gores.

      Did you have like a written contract with him for that?

A.    Verbally or -- verbally.

Q.    Verbally, like an oral agreement?

A.    Yeah.  Verbally.  There's probably some text messages.

Q.    Based on your experience, a professional poker player and as a -- just an investor in games, is that often how these kinds of investor arrangements are made, verbally or through text messages?

A.    At the highest level stakes poker, your word is pretty sacred.  It's probably better than a contract.  So either you take a person's word or that person is guaranteed by somebody.

Q.    And, I mean, I notice on one of these wires, we can be

talking about, for these investments, like millions of dollars; right?

A.    Correct.

Q.    And even in those situations where you're an investor in a game and there is, you know, potentially millions of dollars on the line, in your experience, players will make those kinds of agreements without formal written contracts; right?

A.    Correct.

Q.    Now, you were shown some wires that went from Mr. Goldstein to you back in 2016.  Do you remember that?

A.    That's correct.

Q.    Just to be clear on this, you do not know how those wires were treated by Mr. Goldstein's accountants for tax purposes; right?

A.    No.

Q.    Okay.

        MR. KRAVIS:  Can I just have one moment, please?

        THE COURT:  You may.

BY MR. KRAVIS:

Q.    Just to clarify on that.  You mentioned that you sit down with your accountants at the end of each year to go over your gambling numbers; right?

A.    Yes.

Q.    You don't know what conversations, if any, Mr. Goldstein had with his accountants about the wires that you were shown on

direct examination?

**A.** No.

**MR. KRAVIS:** Okay. Thank you. I have no further questions.

**THE COURT:** Thank you very much, Mr. Kravis.

Is there any redirect from the government?

**MR. WHITMAN:** A few questions, Your Honor.

REDIRECT EXAMINATION

**BY MR. WHITMAN:**

**Q.** You were asked questions by the defense about how common 1099s are in the high-stakes poker world. Do you remember that?

**A.** Yes.

**Q.** If you had received a 1099 for a $26 million win against Mr. Alec Gores, would that be among the information that you would provide to your accountants or your tax preparers?

**A.** Yes.

**Q.** Do you remember questions by the defense about how there may not be formalized documents memorializing staking or piece arrangement?

**A.** Yes.

**Q.** Have you ever received a loan that you never had to pay back?

**A.** Have I -- repeat that.

**Q.** Have you ever received a loan from someone that you didn't

have to pay back?

**A.**    I received loans, but I've always paid them back.

**MR. WHITMAN:**  Nothing further.

**THE COURT:**  Thank you very much.

Have all questions been asked of the witness?  It appears to.

**MR. KRAVIS:**  Oh, sorry.  Thank you.  No further questions.  Thank you.

**THE COURT:**  All right.  Well, thank you, sir, very much for your time and testimony.  You may step down and be excused.

Have a good evening.

(Witness excused.)

- - -

**THE COURT:**  Is the government prepared to call its next witness?

**MR. GORDON-MARVIN:**  We are, but may we actually speak over the husher?

**THE COURT:**  Okay.

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:**  All right.  Do we have government counsel?  Mr. Kravis?

**MR. KRAVIS:**  Yes.

**THE COURT:**  Mr. Goldstein?

All right.  Go ahead.

**MR. GORDON-MARVIN:**  I expect direct will take an hour or a little more.  Given that we put it directly at the 5:00 p.m. mark, uncertainty about the weather this coming Monday, and the fact that --

**THE COURT:**  I need you to speak more directly in the microphone.

**MR. GORDON-MARVIN:**  Sure.  I expect direct to take approximately an hour, perhaps a little more.  My concern here is that there's the weather on Monday.  This witness is from Texas and then should be flying back at some sort of unknown date.  She is a government employee.  I'm wondering how long the defense cross is anticipated to take.

**THE COURT:**  Well, that's a question for the defense to answer.

Mr. Kravis?

**MR. KRAVIS:**  Sorry.  Just one moment.

**THE COURT:**  Sure.  Take your time.

**MR. KRAVIS:**  I mean, I think our cross is probably going to be between 30 minutes and an hour, depending on how much -- depending on what comes up on direct.

**THE COURT:**  We're not going to get done with the witness today.

**MR. KRAVIS:**  Okay.

**THE COURT:**  It's four o'clock.  The government is

saying an hour.  If it's 30 for -- I mean, that takes us to 5:00, and then probably another hour to get through cross and redirect.  We're not going to get done today.

So do you want to call the witness and get started?

**MR. GORDON-MARVIN:**  May I have a moment to confer with --

**THE COURT:**  All right.

**MR. GORDON-MARVIN:**  Thank you.

Yes.  We'll call her.

**THE COURT:**  All right.  Very good.  Thank you.

(Whereupon, discussion concluded.)

**MR. GORDON-MARVIN:**  United States calls Revenue Officer Yvette Parrish.

**THE COURT:**  Thank you very much.

**MR. GORDON-MARVIN:**  And I have a binder for Your Honor.

**THE COURT:**  Wonderful.  Thank you.

Revenue Officer, if you'll come all the way towards me through the gate and keep coming towards me, and then you're going to go to your left to the witness stand.  And please remain standing, the courtroom deputy will swear you in.

- - -

YVETTE PARRISH, after having been duly sworn, was examined and testified as follows:

- - -

**DEPUTY CLERK:** Thank you. You may have a seat in the witness box. Watch your step as you enter.

**THE WITNESS:** Thank you.

**DEPUTY CLERK:** You're welcome. And if you would please speak loudly and clearly into the microphone. The microphone is adjustable.

**THE WITNESS:** Okay.

**DEPUTY CLERK:** State your name for the record and spell each name.

**THE WITNESS:** Okay. Yvette Parrish. Y-v-e-t-t-e. Parrish, P, as in Paul, a-r-r-i-s-h.

**DEPUTY CLERK:** Thank you.

DIRECT EXAMINATION

**BY MR. GORDON-MARVIN:**

**Q.** Good afternoon. Are you familiar with the defendant, Thomas Goldstein?

**A.** I'm sorry. I can't hear you.

**Q.** Are you familiar -- are you familiar with the defendant, Thomas Goldstein?

**A.** Yes.

**Q.** How?

**A.** Mr. Goldstein came in to my inventory as a revenue officer.

**Q.** What do you mean by that?

**A.** His case was assigned to me for collection for some

balance -- for a balance that was unpaid for his 2016 tax liability.

Q.    Roughly, how large was that balance?

A.    That balance was over a million dollars.

Q.    When you were working as a collections officer on that case, how many times did he tell you that he made much of his money in 2016 playing poker?

A.    That was never mentioned.

Q.    How many times did he ask you if he could spend money on poker instead of paying his taxes?

A.    That was never mentioned either.

Q.    Let's rewind a bit.  Where do you work?

A.    I am a revenue officer -- I'm a supervised revenue officer for the Internal Revenue Service.

Q.    Is that on the civil or criminal side of the IRS?

A.    The civil side.

Q.    When did you start as a revenue officer?

A.    I started in 2006.

Q.    What was your title in 2018?

A.    Revenue officer.

Q.    Broadly, what do you do as a revenue officer?

A.    As a revenue officer, my responsibilities are to collect unpaid tax liabilities, promote compliance, and educate the taxpayers on their responsibilities of paying and filing their returns timely.

Q.    How many cases would you carry at a time as a revenue officer?

A.    It really depends upon your grade.  At that time, I was a grade 12.  So my case load ranged from 50 to 60 cases.

Q.    How hectic is that?

A.    I'm sorry.  I didn't --

Q.    How hectic is that?

A.    Pretty hectic.

Q.    What are the typical steps you would take to collect as a revenue officer?

A.    As a revenue officer, the typical steps to collect include doing, once the case is assigned to your inventory, you have to do an initial -- excuse me -- an initial analysis.

Q.    And then after that?

A.    After that, then there are steps that we take to collect the balances or educate the taxpayer and secure unfiled returns.

Q.    When in this process, if ever, would you meet with the taxpayer?

A.    During this process, we are required to meet with the taxpayer at least once.  But you know, it just kind of depends on the progression of the case.

Q.    And what is your ultimate goal during this process?

A.    I'm sorry.  I didn't hear you.

Q.    What is your ultimate goal during this process?

**A.**    My ultimate goal is to collect the balance, if there are balances that are owed.  Also, secure the unfiled returns.  In addition, to educate the taxpayer on their responsibilities for being -- for having those delinquencies and to secure the unfiled returns and promote estimated tax compliance for the future year.

**Q.**    If the taxpayer is cooperative, how do you work out payment?

**A.**    If the taxpayer is cooperative, it depends upon the case. But in most cases, if they are unable to pay upon initial contact, we could possibly set them up on an installment agreement.

**Q.**    And if the taxpayer were uncooperative or nonresponsive, what would you do?

**A.**    If the taxpayer is unresponsive, then there are different actions that we could take.  But one of them is to file a notice of federal tax lien, issue levies.  We can also look to summons and seize property.

**Q.**    When you take these actions, are you required to record them anywhere?

**A.**    Yes.

**Q.**    Where?

**A.**    Into our internal database, which we call it the ICS system or the integrated data -- debtor -- excuse me -- integrated collection system.  I'm sorry.  ICS.

**Q.**    Shifting back to Mr. Goldstein, where were you based in 2018?

**A.**    I was based out of the Washington, D.C. post of duty.

**Q.**    When you were assigned his case, what was your first set of steps?

**A.**    What was -- I'm sorry.  Can you repeat that?

**Q.**    What was your first step when you were assigned his case?

**A.**    Once I was assigned the case, I had to perform the initial analysis.

**Q.**    What did that entail?

**A.**    The initial analysis is basically a background of Mr. Goldstein's case which would entail looking at previously filed returns, if there were other liabilities that weren't currently on the system, and to just do an analysis because, as a field revenue officer, we have to make sure that we're safe first, and we also have different ways to verify if it was safe to go out into -- to make the field visit.

**Q.**    Let's look at Exhibit 19, page 1.  What is this?

**A.**    This is the history from Mr. Goldstein's case.

**Q.**    The ICS history?

**A.**    Correct.  I'm sorry.

**Q.**    If we go to page 2, about halfway down there's a section that says initial analysis.  Can you see that?

**A.**    Yes.

            **MR. GORDON-MARVIN:**  And apologies, Mr. Resto.  If we

scroll up slightly to the action date.

**BY MR. GORDON-MARVIN:**

Q.    What's the action date here?

A.    March 20, 2018.

Q.    What does that mean?

A.    That's the date that I input the history for the initial analysis.

Q.    About partway down in the list at the top is something titled BMF/IMF on-line.  Can you see that?

A.    Yes.

Q.    What is that?

A.    That's basically an internal analysis.  It's just showing that I reviewed the history of Mr. Goldstein's case to see what my plan of action was for securing full pay of the liability of the amount that he owed.

Q.    It says a little way's down initial assign date.  What was the date it was assigned?

A.    The case was assigned to my inventory on March 10, 2018.

Q.    And lower down it says FV by.  What does that mean?

A.    Field visit by 4/26/2018.

Q.    What is a field visit?

A.    The field visit is when we make an actual attempt or go to the taxpayer's address of record to promote compliance.

Q.    And if we rewind for a moment to page 1 and lower down, there, about right in the middle is an action date as well,

March 20, 2018.  It says letter 1058-A with an accrual date. What is this referring to?

A.    The Letter 1058 is our final notice and demand.

Q.    Demand for what?

A.    For payment.

Q.    And who is it mailed to?

A.    It was mailed to Thomas Goldstein.

Q.    Below that it says included MODS 30/2016 12.  What does that mean?

A.    That is the tax year.  The 2016 is the tax year that the balance was on for collection.

Q.    If we turn to Exhibit 648, what is this?

A.    This is the same form.  It's a Letter 1058, final notice and demand.

Q.    If we look at the bottom of page 2, under the "failure to pay penalty" section, what does the last paragraph say here?

A.    The last paragraph is "we charge the penalty for each month or part of a month the payment is late.  However, the penalty can't be more than 25 percent in total."

Q.    And then if we go to the very top of page 3, if we zoom in on that first bullet, what does this first bullet point say?

A.    "The due date for payment of the tax shown on a return generally is the return due date, without regard to extensions."

Q.    Now, if we go to page 4, here at the top, what was the

unpaid amount from prior notices?

**A.**    The unpaid amount was $1,797,836.73.

**Q.**    How much did Mr. Goldstein owe in total?

**A.**    The amount that was owed in total was $1,871,763.52.

**Q.**    What tax year was all this for?

**A.**    This was for 2016.

**Q.**    Turning back to Exhibit 19, page 3.  If we zoom in on this first kind of block of text, so there's sort of a wall of text here.  Did you write all of this yourself manually or did you copy and paste it from somewhere?

**A.**    This information was copied from another internal database.

**Q.**    Looking at the kind of first line where it says "BNFOL, last return filed," that's a reference to the 2016 return?

**A.**    Yes.

**Q.**    Looking a little bit further down, about halfway down, there's a line that starts "exempt."  Can you see that?

**A.**    I'm sorry.  Oh, exempt, yes.

**Q.**    Over it, it says "total INC 15,408,857."  What does that mean?

**A.**    That's the total income that was reported on the 2016 tax return.

**Q.**    And then it says "Tax/TPR."  Does that stand for tax per return?

**A.**    Correct.  Yes.

Q.    And how much tax was listed on the return as being owed?

A.    $1,679,649.

Q.    Now, earlier you mentioned, when you do the initial analysis, you look at information in the IRS systems about the returns.  Do you look at the actual return normally?

A.    No, I don't.

Q.    How common in 2018 were million-dollar tax cases for you in the D.C. region?

A.    It's pretty common.

Q.    In this case, did you look at Mr. Goldstein's actual filed 2016 return?

A.    No, I did not.

Q.    Do you know what in particular he had reported as his income sources?

A.    No, I did not.

Q.    In more recent years, are you familiar with the requirement that a taxpayer report cryptocurrency transactions?

A.    I'm sorry.  Can you repeat that?

Q.    In more recent years, has the IRS required taxpayers to whether or not they have cryptocurrency transactions?

A.    Not in -- not during this time.  We are now.

Q.    And if someone nowadays reports having cryptocurrency transactions, how does that --

        MS. REAVES:  Objection, Your Honor.  Objection.

        THE COURT:  Come to the headsets.

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT:  All right.  Ms. Reaves, are you on?

MS. REAVES:  Yes.

THE COURT:  Do we have counsel for the government? Just a moment.

Okay.  Go ahead, Counsel.

MS. REAVES:  Thank you.  The objection is relevance. This officer just testified that at the time that she was working with Mr. Goldstein, there was no cryptocurrency reporting requirement.  And the government's question, I believe, was about right now, which is also not an issue in this case.  A couple of years charged that are relevant to cryptocurrency, and I don't think that this revenue officer had any interaction with Mr. Goldstein during those charged years.

THE COURT:  Thank you, Counsel.  The objection is relevance.

Counsel for the government?

MR. GORDON-MARVIN:  Well, as Ms. Reaves just noted, there are multiple years charged where, among the things charged is that Mr. Goldstein did not check the check box for cryptocurrency.  And the cryptocurrency that he transacted in was nearly a million dollars.

The relevance here is that by not checking that, he would have been effectively hiding his income.  And that has a direct

impact on the IRS's ability to understand how much tax a taxpayer owes. And she is an IRS employee who can talk directly to that impact. This is incredibly relevant, and it's very helpful for the jury to hear this from someone who works at the IRS.

THE COURT: Okay. But she's talking about years today. Go ahead.

MR. GORDON-MARVIN: I am not asking her to opine or speak to those specific prior years. But she can talk about the years generally, which include the years in which he did not check the box. If you'd like me to make that clearer.

THE COURT: Well, I think, one thing, the question needs to be more clear because the chronology is not clear.

MR. GORDON-MARVIN: Sure.

THE COURT: That's my first point.

Anything else from the defense?

MS. REAVES: No, Your Honor.

THE COURT: Your objection is noted.

Sustained in part. Thank you, Counsel.

(Whereupon, discussion concluded.)

BY MR. GORDON-MARVIN:

Q. Revenue Officer Parrish, you mentioned a moment ago that, in 2016 or 2018, when you were working on this case there was not a check box for cryptocurrency; is that right?

A. Correct. Yes.

Q.   One was later added?

A.   Correct.  Yes.

Q.   When there was that check box in 2020 and 2021, if a taxpayer had checked that box, how would that affect your collections activity in that time period?

A.   Now, since that's been added to our process, we have to investigate it, if there is cryptocurrency, and secure additional information because that's considered a levy source.

Q.   What do you mean by "levy source"?

A.   So a levy source is basically a way in which a taxpayer receives funds or there's been some transaction that indicates that it's a way that they're either getting funds or funds are going out.

     MR. GORDON-MARVIN:  Let's turn to page 12 of this document, Mr. Resto.  If we zoom in on the top part here.

BY MR. GORDON-MARVIN:

Q.   Here, there's an action date listed of March 26, 2018 and a system date listed of March 28, 2018.  Can you see that?

A.   Yes.

Q.   What do those two different dates mean?

A.   The action date is the actual date that the field visit occurred in which I met with Mr. Goldstein.  And the system date is the date that I actually input the information into the system.

Q.   If we scroll down here a little bit, and you note here,

"RO made FV."  That's field visit?

**A.**    Correct.

**Q.**    On 3/26 and input history is later?

**A.**    Correct.

**Q.**    Scrolling down even further on this page.

      **MR. GORDON-MARVIN:**  Apologies, Mr. Resto, can we go to the next page.

**BY MR. GORDON-MARVIN:**

**Q.**    Here in the middle of the page, there's a section titled "cause and cure."  Can you see that?

**A.**    Yes.

**Q.**    What is the cause and cure section?

**A.**    The cause and cure section is the area in which communication had occurred with, in this case, Mr. Goldstein as to how the liability or the balance occurred.  And we also try to discuss ways of resolution.

      **MR. GORDON-MARVIN:**  If we scroll down further.

**BY MR. GORDON-MARVIN:**

**Q.**    The very bottom here, it starts out "RO made FV to the address of record."

      Just summarizing this paragraph, what happened when you initially arrived at the residence?

**A.**    When we initially arrived at the residence, I was with my -- my manager at the time.  And we do -- occasionally, we do what we call ride-alongs where they have to ride with us.  And

so we arrived at the address of record. And when we got there, Mrs. Howe answered the door and she asked us -- well, she didn't invite us in. She just talked to us through the door and stated that her husband was not there. And she just asked us to wait a minute and she phoned him on the telephone.

Q. What happened next?

A. After that, she came back to the door and she asked us if we could wait because he was on his way from returning home from out of town.

Q. Did he eventually return home?

A. Yes. Yes, he did.

Q. If we go to the next page, page 14 at the top. Where did you, then, interact with Mr. Goldstein?

A. I'm sorry. Can you --

Q. Where did you interact with Mr. Goldstein?

A. We interacted -- our next interaction was inside of his home.

Q. Who all was present for that?

A. It was myself; my manager at the time, Mr. Timothy Hartigan; Mr. Goldstein, obviously, and Mrs. Howe.

Q. During this interaction, if you look down two lines, Mr. Goldstein gave you an initial payment; correct?

A. I'm sorry. Can you -- sorry.

Q. Looking down two lines, did you secure or not secure partial payment from the balance?

**A.**    Yes, I did secure a partial payment.

**Q.**    How much money did Mr. Goldstein give you?

**A.**    He gave me a check for $500,000.

**Q.**    Looking at that number, is that $500,000 or $100,000?

**A.**    It's --

        **MR. GORDON-MARVIN:**  Could we zoom in more, Mr. Resto?

        **THE WITNESS:**  Which page?  Oh, I'm sorry.  I apologize.  I secured a payment of 100,000.  I apologize.  I was looking at the wrong line.

        **MR. GORDON-MARVIN:**  If we can remove the highlighting.

**BY MR. GORDON-MARVIN:**

**Q.**    Looking down, a few paragraphs down, there's a paragraph that starts "RO discussed the balance."  Can you see that?

**A.**    Yes.

**Q.**    Can you read that for us?

**A.**    "RO discussed the balance.  And Mr. Goldstein indicated that was an unusual circumstance, as he received a large payment from a case.  He indicated he has a high-profile case of which he typically argues in the Supreme Court."

**Q.**    So let's break this down a little bit.

    First, on that first part, it says "the balance."  What is that a reference to?

**A.**    Can you repeat that?  I'm sorry.  It's kind of hard --

**Q.**    When -- in the first sentence it says "the balance," what

is that a reference to?

**A.** The balance is the amount that's owed for the 2016 tax return.

**Q.** And in that second sentence, what did he explain was his profession?

**A.** He indicated that he was an attorney.

**Q.** And where did he say the large amount of income and tax that he received in 2016 came from?

**A.** From a high-profile case.

**Q.** When he said "case," what did you take that to mean?

**A.** I took it to mean that it was -- he was an attorney and that it was a case that he was defending or arguing with the Supreme Court.

**Q.** So a legal case?

**A.** A legal case, yes.

**Q.** When he told you that his large 2016 income came from a big legal case, did you take him at his word?

**A.** Yes, I did.

**Q.** Why?

**A.** Because I assumed he was telling the truth.

**Q.** During that conversation, did he ever ask you why he owed money for 2016?

**A.** No, he did not.

**Q.** Did he ever say that the amount that he owed -- had indicated as owing on his tax return was wrong?

**A.**    No, he did not.

**Q.**    During this initial field visit and interaction with Mr. Goldstein, who all was present again?

**A.**    It was myself; my manager, Mr. Hartigan; Ms. Howe, and Mr. Goldstein.

**Q.**    During this conversation, how many times did Mr. Goldstein mention gambling?

**A.**    It was never mentioned.

**Q.**    How many times did he mention poker?

**A.**    It was never mentioned.

**Q.**    In all your interactions with Mr. Goldstein, how many times did he tell you about winning or losing millions of dollars playing poker?

**A.**    That was never mentioned.

**Q.**    If he had told you about winning or losing millions of dollars playing poker, what would you have done?

**A.**    I would have investigated further to make a determination and to try to secure additional information, because, again, that would have been another levy source.

**Q.**    So looking down here for a moment, there's -- right above where the highlighted paragraph is right now, the paragraph directly above, the last sentence of that paragraph starts "RO asked at that time if he could secure a loan."  Is that right?

**A.**    Yes.

**Q.**    What did he say back?

**A.**    "And he indicated that he could possibly and will attempt to secure a loan."

**Q.**    And, in fact, he actually committed, in the sentence before, to something called an IA.  What is an IA?

**A.**    An IA is an installment agreement.

**Q.**    And how much did he also commit to paying within 2018?

**A.**    500,000.

**Q.**    And the remainder?

**A.**    I'm sorry.  I didn't hear you.  And the remainder would be paid off by the end of the year.  I'm sorry.  It's kind of hard --

**Q.**    That's the remainder on the 2016 tax balance?

**A.**    I'm sorry.  It's kind of hard to -- it's kind of muffled.

**Q.**    I apologize.  I'll try to enunciate better.

**A.**    No worries.

**Q.**    When did he say he would try to pay off the remainder of the 2016 tax balance?

**A.**    By the end of the year, 2018.

**Q.**    Now, if we were -- look below, the paragraph that's currently not highlighted, directly down, starts "RO discussed him making ES payments"?

**A.**    Yes.

**Q.**    What is the -- "ES payments" mean?

**A.**    ES payments mean estimated payments.

**Q.**    What are those?

**A.**    Estimated payments are payments that we require if a taxpayer is -- if they owe, to try to help them -- to prevent them from owing in the future -- in the future.  So if they make estimated tax payments, it will reduce their balance or either the amount will be paid when they file their return.

**Q.**    Looking at that same paragraph, going forward two sentences, there's a sentence that starts, "and he indicated that 2017 was unusual and not representative of all years."

Can you see that?

**A.**    Yes.

**Q.**    Is "the 2017" a typo?

**A.**    Yes.  That should had been '16.  I'm sorry.

**Q.**    And looking at the next sentence, what did he tell you about representative years for his income?

**A.**    He indicated that in 2015 and 2017, they were better representations of his income for those years.

**MR. GORDON-MARVIN:**  Could we remove the highlighted, Mr. Resto?

**BY MR. GORDON-MARVIN:**

**Q.**    Directly below that paragraph, there's a sort of long string of texts that starts, "the CIS secured was as follows."

Do you see that?

**A.**    Yes.

**Q.**    What's a CIS?

**A.**    A CIS is a collection information statement.

Q.    Is there an associated IRS form with that?

A.    Yes.  It's 433-A, as in apple.

Q.    And looking down a bit, there's a line that starts "TP banks with."  Can you see that?

A.    Yes.

Q.    What banks did he tell you about?

A.    He indicated that he banked with Citibank, Wells Fargo, Universal Capital Bank.

Q.    Now, looking further down, there's also a line that lists some vehicles.  Can you see that?

A.    Yes.

Q.    What are the three vehicles listed here?

A.    The three vehicles listed are a 2010 Subaru, a 2012 Mercedes Benz, and a 2016 Bentayga.

Q.    Do you know what Bentayga is?

A.    No.  No, I don't.  I'm sorry.

Q.    Now, if you look at the very bottom here, it says, "RO informed and provided the 927 to request the following."

      Can you see that?

A.    Yes.

Q.    Bullet Number 3 here says, "EST taxes."

A.    That's estimated taxes.

Q.    And what does that whole line mean?

A.    The estimated taxes, as I stated earlier, are taxes that we require that they make to prevent them from owing in the

future.  And in this case, it was calculated from the 2015 and 2017 tax years.

Q.    And on what interval was he to pay those quarterly taxes?

A.    We recommend quarterly payments of estimated tax payments.

Q.    Now, if we go to page 15, looking at the top two paragraphs here, in that second paragraph, it starts "RO informed."

      Can you see that?

A.    Yes.

Q.    And you mentioned a previous Form 2848 for Mr. Caldwell. That's a 2848?

A.    A Form 2848 is our form for representation for a power of attorney.

Q.    And so who is Mr. Caldwell to you?

A.    Mr. Caldwell was previously listed on prior years as his power of attorney.

Q.    Looking at the second half of that sentence, what did Mr. Goldstein tell you about why he let Mr. Caldwell go?

A.    He indicated that he let him go as he filed his prior returns incorrectly.

Q.    When, if ever, did Mr. Goldstein tell you about a prior audit involving Mr. Caldwell and his failure to report gambling income?

A.    That was never mentioned.

Q.    A few lines down, it says, "plan of action."  First line,

"File NFTO immediately."  What does that mean?

A.    The notice of federal -- excuse me -- the notice of federal tax lien is a public notification that we file when a taxpayer owes the government money.

Q.    And during this whole first interaction, was there anything Mr. Goldstein said that struck you as odd?

A.    Can you repeat that?

MS. REAVES:  Objection.

THE COURT:  Let's go to the headsets, Counsel.

(Whereupon, a discussion was held outside the presence of the jury.)

MR. GORDON-MARVIN:  I'm happy to rephrase.

THE COURT:  All right.  Let me hear from the defense first.

Go ahead, Mr. Reaves.

MS. REAVES:  Okay.  The objection is two parts.  One, it's a vague question.  And I know that he's saying he's going to rephrase.

Two, I think the government is about to elicit testimony that there's a lack of foundation for because just a few days ago, the government disclosed an e-mail from this officer saying she doesn't -- let me take a step back.

I think the government is trying to elicit testimony that Ms. Parrish remembers Mr. Goldstein being glad that they were from civil IRS instead of criminal IRS because the government

very recently disclosed the memo in which she told them that.

But the government also disclosed the memo a year before that where Ms. Parrish said she doesn't remember anything about that. Someone else told her that. They should talk to the other person about it.

And so I understand that ordinarily I could just impeach a person, but because the statement is that the government is trying to elicit someone else's hearsay in the first place, and I don't know whether or not that other person is going to testify so it also becomes a confrontation clause problem, I think it's inappropriate for the government to do there because it's eliciting essential hearsay. And the only way to impeach on it is to acknowledge that this other person's hearsay is part of her supposed testimony.

**THE COURT:** Okay. So there's a form concern and there's also a hearsay concern.

**MS. REAVES:** And a confrontation clause.

**THE COURT:** And a confrontation clause.

Okay. Counsel for the government?

**MR. GORDON-MARVIN:** So I'm asking her if she recalls Mr. Goldstein saying anything to her that struck her as odd. I'm happy -- as to the form, I totally follow. I'm happy to rephrase. I think as in the content, in the first place, at best that's a hearsay statement of a party opponent, which is this entire document and it's all admissible.

To the extent that there's a confrontation clause concern, the witness is on the stand.  They can cross-examine her on this.  They can examine her memory.  They can try to challenge her or impeach her.  We have given them the documents to do that.  There is no deeper issue here.

**THE COURT:**  All right.  Anything further from the defense?

**MS. REAVES:**  Yes.  I just want to make sure that I'm clear because I'm not sure I was.  The issue is multiple levels of hearsay.

Obviously, I'm not arguing that Mr. Goldstein's statements are admissible.  There's a party opponent exception.

The issue is that the government knows that this witness testified that she doesn't remember this statement at all, but that her supervisor, Timothy Hartigan, is the one who remembers this.

And for me to be able to impeach her on that, I would have to draw out this other person's hearsay.  So it's multiple layers of hearsay problem.  And unless the government is going to have that other person testify, that is the confrontation clause problem because, really, this witness is relaying the statements of --

**THE COURT:**  All right.  So that's Mr. Timothy Hartigan.  All right.

Go ahead, Counsel.

**MR. GORDON-MARVIN:** So I think Ms. Reaves is misstating the documents produced. There is a document from -- I actually don't remember when, but sometime, like, over a year ago where Ms. Parrish e-mailed us and said, you know, I didn't remember this, but my supervisor reminded me of X.

We interviewed her recently. We asked her, "Do you remember anything that Mr. Goldstein said to you that struck you as odd?" And she remembered this independently.

We didn't ask her, oh, did Mr. Hartigan tell you X. This is her own independent memory, which if she remembers, she remembers. And if they want to impeach on that, they can impeach on that by saying, well, you don't remember at this point and now you do.

**THE COURT:** All right. I think I got it. So we're going to clean up the form of the question. I'm going to allow you to ask the question. It's 4:36. We need to find a breaking point today at 5:00 so I can let the jury -- admonish the jury and talk about weather issue for next week.

**MR. GORDON-MARVIN:** Understood, Your Honor. Thank you.

**THE COURT:** All right. Thank you.

(Whereupon, discussion concluded.)

BY MR. GORDON-MARVIN:

Q. Returning to what we were talking about, Revenue Officer Parrish, did Mr. Goldstein ask you any questions or did he not

ask you any questions during that interaction?

**A.**    He did not ask me any questions.

**Q.**    Do you recall him saying anything during that initial interaction about what part of the IRS you were from or do you not recall that?

**A.**    Yes, I do.

**Q.**    And what did Mr. Goldstein say or ask?

**A.**    Mr. Goldstein asked me if I was from CI.

**Q.**    When you say "CI," what is that?

**A.**    Criminal investigation.

**Q.**    How many people in your time as a revenue officer have asked you if you were from CI?

**A.**    I've never been asked that.

**Q.**    Except for Mr. Goldstein?

**A.**    Correct.

**Q.**    I would like to shift topics slightly.  If we go to page 15.  I'm -- we are at page 15.  So bear with me a moment while I navigate.

        **MR. GORDON-MARVIN:**  If you can scroll down, Mr. Resto.

**BY MR. GORDON-MARVIN:**

**Q.**    Here we are right in the middle, and there's an action date 3/28/2018.  Can you see that?

**A.**    Yes.

**Q.**    A little bit below it says, "Lien name, Thomas C.

Goldstein and Amy L. Howe."  Can you see that?

**A.**    Yes.

**Q.**    What is this whole action listing off?

**A.**    This is where the notice of federal tax lien was filed against Mr. Goldstein and Ms. Howe.

**Q.**    When it said "MD UCC Real Property," what property was this lien filed against?

**A.**    This means that the lien was filed against Mr. Goldstein and Ms. Howe for personal -- if they have any personal assets.

**Q.**    At what address?

**A.**    At the address of 3908 Rosemary Street in Chevy Chase, Maryland 20815.

**Q.**    And now if we go to page 16, looking at that first full entry, "option date 5/21/18," what does the second line say?

**A.**    "No response from Mr. Goldstein."

**Q.**    What did you do in response to his lack of response?

**A.**    I issued a levy.  I issued levies.

**Q.**    Going further down, I'm looking at this entry, "Action date 5/21/2018."  To where did you issue levies?

**A.**    The levies were issued to the State of Maryland, Wells Fargo Bank, Alec Gores, Goldstein & Russell, PC, SCOTUSblog, Delaware Corp., and Syracuse University.

**Q.**    Now, first of all, the second one you mentioned, Wells Fargo Bank, NA, that's North America?

**A.**    Yes.

Q.    Why did you levy Wells Fargo Bank?

A.    I levied Wells Fargo Bank as a levy source.

Q.    How did you identify that as a potential levy source?

A.    It was listed, as all of these were listed, on another internal program that we have called -- we called it IDRS, which is Integrated Data Retrieval System.

Q.    What does that program show you?

A.    That program shows us a list of incomes, wages, if there are wages, or a 1099 income that's reported to or reported on a taxpayer.

Q.    So it tells you if something's like a W-2 or a 1099?

A.    Yes, it does.

Q.    Does it tell you, however, where on the taxpayer's Form 1040 they reported that specific income?

A.    No.  It does not show that.

Q.    So let's look at an example levy.  If we go to Exhibit 649 on the second page.  Is this an example of a Form 668-A?

A.    Yes, it is.

Q.    Here, to whom is it issued?

A.    This is issued to Wells Fargo Bank.

Q.    And for what individuals was it issued?

A.    This was issued for Mr. Thomas Goldstein and Amy Howe.

Q.    At what address?

A.    At 3908 Rosemary Street, Chevy Chase, Maryland 20815.

Q.    When you issue a levy to a bank, are you doing it based on

a particular bank account or based on a particular person?

**A.**    It's based on a person.

**Q.**    And looking directly below there, names and address, there's a section identifying numbers.  What do you list there?

**A.**    That's their Social Security numbers.

**Q.**    If we look down, this particular return is dated for -- has interest and penalties calculated to what date?

**A.**    March 21, 2019.

**Q.**    So this is quite a ways forward from where we were just talking about in early 2018?

**A.**    Yes.

**Q.**    Okay.

        **MR. GORDON-MARVIN:**  If we go back to the first page of this document.  Can we scroll down?

**BY MR. GORDON-MARVIN:**

**Q.**    Here at the bottom, how much money came from Wells Fargo for this particular levy or this particular time, rather?

**A.**    This levy, we received $726.16.

**Q.**    When there's a levy in place, what amount do you end up getting from that levied source?

**A.**    The amount that we get depends upon the amount that's in the account at the time the bank receives the levy.

**Q.**    So now going back to Exhibit 19 on page 16.

        **MR. GORDON-MARVIN:**  If we zoom back in on that same area listing off the levies -- can we scroll down a bit,

Mr. Resto?

**BY MR. GORDON-MARVIN:**

Q.    Here, a little bit further down, one of the entities listed is Goldstein & Russell, PC.  So we were talking about you issuing a levy to Wells Fargo.  Here you're also identifying a levy sent to Goldstein & Russell, PC.

Was that levy for wages or for what?

A.    That levy was for wages that were for Mr. Goldstein.

Q.    We were talking about Wells Fargo Bank a moment ago -- actually, withdrawn.

Are you familiar with what's known as a notice of alter ego?

A.    Yes, I am.

Q.    What is a notice of alter ego?

A.    A notice of alter ego is when we have two or more entities or individuals and businesses that are operating, doing the same business, and it's hard to determine one from the other. So it's almost like they're one individual or one business.

Q.    Did you ever issue a notice of alter ego for Mr. Goldstein and his law firm in this case?

A.    No, I did not.

Q.    So, when you were issuing levies, were you always issuing them for money owned by Mr. Goldstein or owed to Mr. Goldstein personally?

A.    Yes.

**Q.** Did you ever try to levy or seize funds that belonged to the law firm Goldstein & Russell?

**A.** No.

**Q.** So I notice on here right above Goldstein & Russell there's a person listed Alec Gores. Can you see that?

**A.** Yes.

**Q.** How did you identify Alec Gores as a potential levy source in 2018?

**A.** That was also listed on our IDRS system.

**Q.** What information did you see associated with Alec Gores?

**A.** It was wages or a 1099. I'm not sure exactly which one.

**Q.** If you had seen a 1099 from Mr. Gores, knowing that Mr. Goldstein was an attorney, what would you have assumed it was for?

**A.** Legal services.

**Q.** So he had been paid legal fees?

**A.** Yes.

        **MR. GORDON-MARVIN:** If we go to page 23, at the bottom, looking at that last action date.

**BY MR. GORDON-MARVIN:**

**Q.** What are you summarizing here?

**A.** In this particular entry, there was no additional contact from POA since receiving the check in his office.

**Q.** So what were you going to do in response?

**A.** I'm sorry. I can't --

Q.   What were you planning to do in response to the lack of contact?

A.   I was going -- my next plan of action was to levy, issue levies again.

Q.   Now, if we skip to page 25 at the bottom.  Looking at that -- first of all, what's the action date of this?

A.   12/6/2018.

Q.   So December 6, 2018?

A.   Uh-hum.

Q.   The very bottom says "TP has generated an additional BAL due for 2017.  R updated the case and issued the L 1058."

What does that mean?

A.   That means that Mr. Goldstein incurred additional balances for 2018, additional liabilities, and I issued the 1058, which is the final notice and demand for that year.

        MR. GORDON-MARVIN:  So let's look at that Exhibit 647, page 4.  If we go to the last page.  Sorry, Mr. Resto.

BY MR. GORDON-MARVIN:

Q.   For the tax period 2017, what was the total amount Mr. Goldstein owed?

A.   $1,109,850.14.

Q.   So now going back to Exhibit 19, if we look at page 26, right in the middle there is a remittance secured for 2016 for $29,000 -- $29,140.89.

What can you see that?

**A.**    Yes.

**Q.**    It says, "Remarks:  Part pay."  What does that mean?

**A.**    It means there was a partial pay, that the liability was not fully paid.

**Q.**    And then if we skip again to page 27 at the bottom, look at that last action date.  This is December 6, 2018.

Who did you receive contact from on this day?

**A.**    From Wells Fargo.

**Q.**    What did they tell you?

**A.**    The representative indicated that a payment was mailed in the amount of $954,119.02 on 11/23/2018.

**Q.**    So you're getting the contact on December 6, but they're telling you they mailed this payment to you in November of 2018?

**A.**    Yes.

**Q.**    What was this payment counted toward?

**A.**    This payment was for his 2016 tax balance.

**MR. GORDON-MARVIN:**  Your Honor, I think this might be a good moment to break for everyone.

**THE COURT:**  Thank you, Counsel.

Mr. Kravis, did you have your hand up?

**MR. KRAVIS:**  We have no objection to breaking.

**THE COURT:**  Okay.  All right.  So we're close to five o'clock.

I'm going to first thank the witness for her testimony

today.  We will have you back when we resume.  You may step down at this time and enjoy your evening.

(Witness excused.)

- - -

**THE COURT:**  And to our jurors, I want to certainly thank you for your attention and patience today.

A few additional things I want to talk about before we depart.  There's a rumor there might be snow next week.  And as you know, we will not sit tomorrow.  So our next day back together would be Monday.

I believe all jurors have received instructions from the courtroom deputy about how to address any inclement weather on Monday.  I'm just going to read a bit of that back to you to make sure we're all aware of that.

Jurors should listen to announcements, specifically pertaining to the federal courthouse here in Greenbelt. They'll be made on WTOP radio, 103.5 FM, 103.9 FM and 107.7 FM. You can also call our switchboard at (301) 344-0660 and pick option number 9.  And you will find out whether there has been any announcement about -- that may impact your jury duty due to the weather.

I believe you also have a chart about the different options and how you are to respond.  We will follow whatever status the court announces on Monday in terms of trial.  If the court is closed, obviously, we will not meet.  If there's

instructions that the court will open at a later time, you are to report at that time.

So again, just dial in to the switchboard or listen to the radio to get those instructions in terms of how we will proceed. If we are delayed beyond Monday, the same thing will apply on Tuesday. But for now, I'm going to hope to see you early next week as we resume trial.

I'm also going to remind you again, please do not discuss the case with anyone, including your fellow jurors during the weekend. Please do not do any independent research about the case and please do not address any -- you know, any research or issues about the case before -- I'm sorry -- at this time. Pardon me.

With that, I'm going to invite the jury to step down and have a great weekend.

**DEPUTY CLERK:** Please rise for the jury.

(Whereupon, the jury exited the courtroom at 4:52 p.m.)

**THE COURT:** Please be seated, everyone.

And Counsel, I have one housekeeping item. This is a request from the news media that has been following this case. There is a request that the Court post the exhibits that come into trial on the court's website, so they can actually -- or anyone in the public can review those documents.

I have done so in another high-profile case, so we do have the ability to do that. I wanted to see if there are any

concerns, objections from counsel before we decide whether or not to grant the request.

**MR. ADENRELE:** No objection, Your Honor.

**THE COURT:** Come to the mic. Come to the mic. Come to the mic.

**MR. ADENRELE:** No objection from the government. But only one small caveat. I just want to, of course, ensure that any exhibits that we have are properly redacted if we're going to make -- open them to the public. There may have been a few exhibits here and there that maybe a small e-mail address or something like that slipped through.

But with that caveat, no other --

**THE COURT:** All right. Well, I would encourage the government to make that review as promptly as possible because they're also in evidence in the case.

**MR. ADENRELE:** Absolutely.

**THE COURT:** Okay.

Mr. Kravis, what are your thoughts?

**MR. KRAVIS:** So I agree with the redactions. I have an additional concern, which is the Court may have noticed there is some times when the government introduced like hundreds of pages of text messages as a single exhibit and then used just a few of the pages in court. We haven't been giving them a hard time about that.

But in terms of what gets posted on-line, some of those

text message exchanges have some very personal information that has absolutely nothing to do with the case and was not used as evidence in the case.

So I would ask that the government verify to submit for those exhibits amended versions that include only the pages that were used in court.

**THE COURT:** Okay. Well, typically what the Court simply does is produce what is introduced in trial. So that's what we do. So if we make the information available, it comes in as it's admitted in the case. So certainly redactions of personal information, that should be fixed. But we don't really alter what the exhibit is. So if there is an objection to the Court doing this, then I will note that objection.

**MR. KRAVIS:** Okay. Well, in that case, we object because, as I said, there are -- and it's not an objection to all of it. But there are some exhibits where the government chose to introduce hundreds of pages of text messages. And they didn't tell us in advance which messages they were using in all cases. And we didn't give them a hard time about that. So it's fine for purposes of trial.

But we do object to those hundreds of pages of text messages now all being made publicly available. There are some really sensitive personal stuff in there that involves Mr. Goldstein, his family and witnesses that has not been redacted and nothing to do with this case.

THE COURT:  All right.  Well, I hear an objection.  So at this time, we will forego posting exhibits on the court's website.  I'm sure we'll hear more from the public about that, and I'll come back to the parties and let you know.

Yes, Counsel?

MR. ADENRELE:  And just, I'm not sure if it's feasible.  I guess, one, Mr. Kravis said he hasn't been giving us a hard time about that.  I don't believe that's true.  But having said that, if there is a middle ground, the government is happy to only allow the pages that were referenced in the testimony to be public.  However, we certainly believe the entire documents have been admitted into evidence.  That's already done.  So we're happy to look over --

THE COURT:  Right.  It just makes a housekeeping issue for the Court.  We're not trying to figure out which version we're putting on the website.  All we're doing is being transparent about the trial.

So if evidence comes in, it goes up on the website.  That's a lot of extra work for us.  And if we get it wrong, we're going to have additional concerns.

So either it goes up or not.  If you want to think about it, that's fine.  This is not an unusual request.  We have done this in cases where there is a lot of attention.  It's not just the press.  It's for the public as well.  So I hear the concerns.

We can talk about it again when we come back and see if we're still concerned or if there is a reasonable way for us to move forward. But we cannot, as the Court, take on trying to edit exhibits. We just produce whatever has been introduced in the case.

MR. ADENRELE: Absolutely understand that, Your Honor. Just one other point that the government has here and it's a separate matter from making exhibits public.

The parties have reached a stipulation, as Your Honor knows, in this case. We're just trying to get a sense of when would be best to read that stipulation into the record.

THE COURT: Well, if we're ready to do it, we can do it anytime. I think where we left things was, you wanted to do it along the lines of when the evidence was coming in relevant to the stipulation. I don't know. If not, I say let's do it first thing when we come back and just get it in.

MR. ADENRELE: And just to be clear -- I know other judges do it this way. I believe Your Honor does it the same way. Read the stipulation into the record in front of the jury. That's my understanding.

THE COURT: Yep. That's how we'll do it. So if you just bring it to my attention and have a copy, because I don't know where the version is that I had before with all the paper, and I'm happy to read that in. And I think we have an instruction already in the jury instructions about

stipulations.

MR. ADENRELE: Fantastic. Thank you, Your Honor.

THE COURT: Okay.

All right. Anything else before we break, Mr. Kravis?

MR. KRAVIS: Not from the defense. Thank you, Your Honor.

THE COURT: Okay. And it may be a longer break than usual. We will follow whatever the court's position is in terms of Monday and/or possibly Tuesday. You can, obviously, reach chambers via e-mail. We will still be working either way. So if something pops up, feel free to reach out to us through e-mail.

Again, I want to thank everyone for their hard work and the progress we've been able to make thus far. And I guess I wish you a happy weekend and safety in the snow. See you next week.

DEPUTY CLERK: All rise. This Honorable Court stands in recess.

(Proceedings concluded at 4:59 p.m.)

- - -

C E R T I F I C A T E

I, KIMBERLY A. BURSNER, Federal Official Court Reporter in and for the United States District Court for the District of Maryland, do hereby certify, pursuant to 28 U.S.C. §753, that the foregoing is a true and correct transcript of

the stenographically-reported proceedings held in the above-entitled matter and the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

*Kimberly Bursner*

_____
Kimberly A. Bursner
Registered Professional
Reporter & Federal
Official Court Reporter