IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

_____

UNITED STATES OF AMERICA          )
                                  )
      Plaintiff,                  )
                                  )
          vs.                     )Case Number
                                  )8:25-cr-00006-LKG-1
THOMAS C. GOLDSTEIN               )
                                  )
      Defendant.                  )

TRANSCRIPT OF JURY TRIAL - DAY 8
BEFORE THE HONORABLE LYDIA K. GRIGGSBY
UNITED STATE DISTRICT JUDGE
WEDNESDAY, JANUARY 28, 2026 at 11:40 a.m.

APPEARANCES:

On Behalf of the Plaintiff:

        UNITED STATES ATTORNEY'S OFFICE - DOJ
        BY:   ADEYEMI ADENRELE, ESQUIRE
              SEAN BEATY, ESQUIRE
              SEAN GORDON-MARVIN, ESQUIRE
              HAYTER WHITMAN, ESQUIRE
        36 South Charles Street, Suite 400
        Baltimore, Maryland 21201
        (410) 209-4800

On Behalf of the Defendant:

        MUNGER, TOLLES & OLSON, LLP
        BY:   STEPHANY REAVES COUPER, ESQUIRE
              ADEEL MOHAMMADI, ESQUIRE
              JONATHAN I. KRAVIS, ESQUIRE
              SARAH WEINER, ESQUIRE
        601 Massachusetts Avenue NW, Suite 5E
        Washington, DC 20001
        (202) 220-1126

                        - - -

ALSO PRESENT:
            THOMAS C. GOLDSTEIN, DEFENDANT
            JIMMY MENDOZA, PARALEGAL
            ROBERT RESTO, PARALEGAL (after lunch break)
      ***COMPUTER AIDED TRANSCRIPTION OF STENOTYPE NOTES***

I N D E X

**GOVERNMENT'S TESTIMONY:**

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| VIVEK RAJKUMAR | 43 | 55 | 61 | * |
| TOBIAS MAGUIRE | 66 | 77 | 84 | * |
| YVETTE PARRISH | 85 | 113 | 182 | 190 |

– – –

**DEPUTY CLERK:** All rise. This Court is now in session. The Honorable Lydia Kay Griggsby is presiding.

**THE COURT:** Please be seated, everyone. It is still morning. Welcome back to counsel and Mr. Goldstein. I know it's been several days since we were last together due to both not sitting on Friday and the weather. Today we will, of course, continue with trial and the presentation of the government's case in chief.

In a moment I will talk with the government about the order of how we're going to proceed. The Court also understands there are several preliminary matters that we need to address. Several motions have been filed with the Court during the break, and I believe the parties are prepared to discuss at least some of them.

Just, for the record, I'm going to note that, on January 24th, the defendant filed a motion to exclude allegations and evidence of uncharged acts of tax evasion.

On January 26th, the defendant also filed a motion for relief related to the government's discovery violations.

On January 27th, the defendant filed a motion to limit presentation of cumulative evidence. There are also several ex parte matters before the Court, which I will not mention in this setting, but that the Court also needs to address probably today or in the coming days before we move forward with some of the witnesses. I understand from communications to my chambers

that the parties are prepared to address at least some of the motions that have been filed.

Mr. Kravis, why don't we start with you.

MR. KRAVIS: Thank you, Your Honor. I think, from our perspective the most trial sensitive motions here are the ones that concern the uncharged alleged acts of evasion and the discovery motion. And so, if it will please the Court, I'd like to address those two and maybe in that order, if that's okay.

THE COURT: Okay. And just let me clarify. I don't know that the government has responded to the uncharged act motion.

Have you filed something? I don't have it.

MR. WHITMAN: No, we have not, Your Honor, but we're ready to address it.

THE COURT: You're prepared to address it? All right.

MR. ADENRELE: And then the same for the discovery motion as well as the motion for cumulative evidence.

THE COURT: All right. Well, we'll see if we can resolve them. If the Court's not clear, I may ask for some paper. Yes?

MR. ADENRELE: I apologize. The first two we're prepared to argue today, motion for cumulative evidence. I think we will try and get a written response, and we will be

able to argue them substantively.

THE COURT:  So which motions, the motion regarding the uncharged acts you're prepared to address?

MR. ADENRELE:  Indeed, 366 and 367.

THE COURT:  All right.  Very good.

Mr. Kravis, go ahead.

MR. KRAVIS:  So the uncharged acts motion is about this.  As the Court is aware, the government chose to proceed through a speaking indictment in this case.  The speaking indictment alleges specific acts of tax evasion for 2016. They're laid out in Count One.

Last week in the government's presentation of evidence, particularly through Mr. Levitan, and then I think we got some of this through Officer Parrish, the government started eliciting the testimony about alleged acts of evasion that are not charged in the indictment.

So just to give the Court one example, the government started asking Mr. Levitan about a form that I think cross-examination established was never actually filed with the IRS, but a form asking for the identification of certain assets in connection with collection activity and whether there were particular bank accounts that were omitted from the form.

There were text messages that the government introduced between Mr. Levitan and Mr. Goldstein about the timing of certain levies by the IRS in connection with certain other

payments.  And if the Court -- the Court may recall, we raised this at the end of the day after Mr. Levitan's testimony.  And what I heard the government say was, look, if it's relevant to as an act that evades collection, then we're entitled to introduce evidence on it.  And I don't think that's right.

I think there are several cases on this.  *McKee* is one from the Third Circuit.  There is the Gorsuch opinion, then Judge Gorsuch, that we cite, United States versus *Farr*.  I think the rule on this is pretty clear that, when the government chooses to proceed through a speaking indictment and the speaking indictment lists out the particular acts of evasion that are alleged, the government then cannot then ask the jury to start -- cannot ask the jury to convict based on other alleged acts of evasion that are not listed in the indictment and that likely were not presented to the grand jury.

The particular problem is one of constructive amendment. I would also note that, in this case, the government did not provide 404(b) notice on any of that.  So it's not even like a situation where the government told the defense in advance of trial these are uncharged acts and we want to introduce them for some other purpose to put the defense on notice about what they're going to face at trial.

We had no idea until Wednesday and Thursday that the government had these other alleged acts of evasion that it was

intending to introduce at trial and, I guess, ask the jury to convict based on.

The last point I would make here is that the government's position is also completely inconsistent with the jury instructions that the parties agreed upon and filed with the Court before the start of trial.  As we noted, the parties agreed to a jury instruction on Count One that tells the jury that the government's required to prove that Mr. Goldstein committed at least one of the affirmative acts that is alleged in each count and that they must be unanimous on that.

That jury instruction does not leave room for asking the jury to convict based on additional uncharged unnoticed acts that the government just starts introducing at trial.  The relief we're asking for here, there will be relief later in the form of jury instructions, but for right now the government should not be allowed to continue presenting evidence of uncharged unnoticed acts of evasion.

**THE COURT:**  All right.  Thank you.  Mr. Kravis, before you sit down, I just want to confirm a few things for the record.

The defense has provided, I think, an excerpt from the second superseding indictment which lists the relevant acts for Count One.  I'm just going to read them to make sure we are all on the same page and also get the government's point of view.

I'm reading from your motion, but I think they're also in

paragraph 109 of the second superseding indictment.  The acts, and this relates to Count One, using funds and assets of G & R to pay personal gambling debts in specific instances identified in the indictment.

Second, providing false and incomplete information to the accounting firm.

Third, making false and misleading statements that the indictment specifies to an IRS revenue officer in March of 2018.

Fourth, making false and misleading statements to IRS representatives that the indictment specifies in October of 2020.

Fifth, transferring at least $960,000 in personal funds into G & R's IOLTA account in March 2021 to shield the funds from collection by the IRS.

Next, using foreign individuals and foreign bank accounts to receive income in a manner specified by the indictment.  G, causing the preparation, signing and filing of the IRS of false and fraudulent Form 1120s for G & R.

And lastly, causing the preparation, signing and filing with the IRS of a false and fraudulent Form 1040 for himself, meaning Mr. Goldstein, and Mr. Goldstein's wife.

So these are the acts, I believe, that are alleged in the second superseding indictment as they relate to Count One.

I take it you agree that evidence related to these acts

can come in.  You're arguing that the evidence, some of the evidence from last week was not delineated here and that's your concern.

MR. KRAVIS:  That's correct.  Exactly right.

THE COURT:  And my last question for you, I did take a look at *McKee* and some of the other cases cited.  Some of those cases are out of circuit.

So what's your view on why the Court should follow *McKee* and some of the other cases that the defense is relying on?

MR. KRAVIS:  Right.  So, first of all, I would note that the defense did not find any contrary authority on this.  So we did not find any cases suggesting that there is a contrary view in another jurisdiction.  In terms of why the Court should follow these cases, the answer is that these cases are right in their analysis because they are honing in on the constructive amendment issue.

The particular issue that these cases are discussing is that, when the government starts introducing alleged acts of evasion at trial that are not listed anywhere in the indictment, there is a noticed concern to the defense, but there is also a concern about constructive amendment that the grand jury may not have been presented with that evidence.  The grand jury may not have been asked to decide whether the evidence that the government is presenting at trial is, in fact, an act of evasion to the level of probable cause.

And then there becomes a concern that the defendant -- the government is asking the jury to convict the defendant based on a theory of liability that was not presented to the grand jury. We think *McKee* and the other cases have this point right. We have not found authority for a contrary proposition, and I don't really even understand what the argument on the other side would be, because any presentation of evidence of uncharged acts of evasion is going to raise the constructive amendment issue. I just don't think there is any way around that.

**THE COURT:** Thank you very much, Mr. Kravis. That was helpful.

Is the government prepared to respond to the defense's motion? Mr. Whitman, good morning.

**MR. WHITMAN:** Good morning, Your Honor.

Hayter Whitman on behalf of the United States. I think we can short circuit this a little bit by agreeing that the government will not ask the jury to vote and to find Mr. Goldstein culpable for any acts of evasion that are not listed in the indictment, the ones that Your Honor just read through.

Further, I think the jury instructions, which the parties do need to work on these a little bit, but not on this issue, is -- will make clear that not only do they have to find one of these affirmative acts of evasion in the indictment, but they

have to do so after the statute of limitations date.

So I think the jury will be very well-instructed on here are the affirmative acts of evasion, you have to find one of them, and you have to find one of them that happened after the date applied by the statute of -- that matters under the statute of limitations as we submitted in our briefing.  As --

**THE COURT:**  Okay.  I guess just to get to the point, I think the concern right now, though, is what evidence can come in.  Of course, the Court can construct and instruct and may need to do so to address the concern, but we're still presenting the government's case in chief.

So I think the defense is raising the concern about additional testimony of acts that fall outside the scope of what's in the superseding indictment.

Is the government still planning to introduce such evidence?

**MR. WHITMAN:**  I think along the lines of what we introduced through Mr. Levitan, yes, because that was just evidence -- first of all, the tax evasion charge in Count One, it says right in the indictment, is from 20 -- the evasion was from 2016 to 2021.  So, again, at least temporally, we are not speaking about anything that happened before or after the time period alleged.

Further, all of the questions that were asked of Mr. Levitan, at least the ones that have been highlighted by

the defense, were part of the story of one of the affirmative acts of evasion about misleading the revenue officer in March of 2018.

So the idea that we cannot -- the government cannot introduce evidence about Mr. Goldstein's communications with his firm managers or how he was dealing with his finances right at the time where he was subject to a collections case, that's pure willfulness evidence, so --

**THE COURT:** Well, I guess I'm still not clear. The Court walked through I think there are eight delineated affirmative acts for Count One. Do you agree with the list that I went through a moment ago? I'm reading this from the second superseding indictment.

**MR. WHITMAN:** Yes, Your Honor.

**THE COURT:** All right. So we have the list. I hear your point that the government is only going to support an instruction that tethers this particular charge to the list, but you're also telling me that the government intends to continue to introduce evidence that's about actions that are not listed here. And I'm trying to understand on what basis the government can do that.

I hear the willfulness thing. But in terms of tax evasion and the affirmative act element, these are the acts that the government has identified. So I'm not sure why you're introducing other acts and for what purpose because they can't

be 404(b) at this point, I guess, if they aren't in the notice, which we talked about I think three weeks ago.

**MR. WHITMAN:**  Well, we've -- you're right.  It's intrinsic, Your Honor, to the charges that we have.  And although we agree with these specific acts being the alleged affirmative acts of evasion, the indictment is obviously much more detailed than these acts.  And so the government should be able to present evidence supporting that, when Mr. Goldstein committed these affirmative acts of evasion, that he was acting willfully.

And I believe that's what was happening through Mr. Levitan was not introduction of some new evidence.  First of all, anything that happened in the grand jury as to witnesses who have testified, the defense will have seen through our disclosers.

But while we agree that these are the alleged acts of evasion, we don't -- we wouldn't agree that we are limited somehow to only proving those acts because there's a whole story here of willfulness, and the parties have known for months or longer that this was going to be a trial mostly about willfulness.

And so the government should be able to put on its evidence.  I -- you know, and we can -- we are more than happy to talk about how to address any acts that they, you know, are concerned about in the jury instructions, whether it be in the

jury instructions at the end or if they want to discuss an instruction that comes in.

I think, more typically, the instruction would be read after the introduction of the act that, you know, of -- assuming this was 404(b), which we don't think it is, this is really just everything we elicited from Mr. Levitan is part of the story about how Mr. Goldstein, from 2016 through 2021 as alleged in the indictment, acted willfully.

And even if they didn't speak to specifically one of these eight sentences, they nonetheless -- the evidence we elicited, nonetheless supports a finding of willfulness by the jury. And that's a classic fact issue, and we can fight out whether he was willful or not. But to prevent the government from even introducing evidence of willfulness, I don't think is the right answer here.

**THE COURT:** All right. Let me just ask you one final question. This goes back to something that the Court raised right before we began the trial when the Court did grant the government's motion to dismiss several of the counts in the case. That happened, I think, right as we were getting ready to pick the jury.

And because of the nature of this now second superseding indictment, it's very detailed and I agree, there are a lot of different facts and a lot of different allegations. I will say even the Court is a little unclear about what is still in the

case and what's out of the case, if anything.

So I do -- can you give the Court some better understanding of what allegations you feel are out of the case now, in light of the motion to dismiss, or do you believe everything that's in there is still in the case, just maybe used for other counts?

**MR. WHITMAN:** It's certainly closer to the latter, Your Honor. It is our understanding, and I know the defense has raised certain areas where they think that maybe, because of the motion to dismiss, it's changed, the government's position is that the same evidence comes in.

Again, we haven't -- there is tax charges for every year that there have previously been tax charges for. And so, to the extent we were going to, whether under an evasion or under a false return theory, present that evidence, again, as we mentioned when we were discussing the motion to dismiss, we don't think the scope of admissible evidence has changed since then.

**THE COURT:** Okay. And my last question is on the willfulness element or similar elements, but the other tax charges. This other conduct that you're talking about that the government is seeking to introduce, does it speak only to tax evasion or to some of the other charges in the case as well?

**MR. WHITMAN:** I think it would speak to all of the tax counts in the case really. Because if Mr. Goldstein has --

let's just take an example of the form that we talked about and that Mr. Levitan reviewed and that, as defense noted, they were able to do a thorough cross-examination on it.  But let's just talk about that form.

The idea that in -- and let's just say, 2018 or 2019, that Mr. Goldstein is working with his firm manager to fill out a form with the understanding that it may or may not be submitted to the IRS and is, you know, not putting on the form one of his poker accounts, which is what the testimony was, that is relevant both to evading taxes in 2016.

It is also relevant to willfulness in failing to report his gambling winnings because it shows -- and again, I wouldn't put this as other evidence.  It's really just part of the story.  It shows the jury -- and they can have counter arguments to this, but it shows the jury that Mr. Goldstein knew what he was doing was wrong at the time and he did it anyways, which is willfulness.

And so I do think that the evidence cited by the defense in their motion would go not only to willfulness for 2016 tax evasion, but the other tax counts.

**THE COURT:**  All right.  And my last question, I think one of the concerns the defense is also raising -- and Mr. Kravis will correct me if I'm misunderstanding that -- is more of an issue of notice.  We did talk about the 404(b) notice a couple of weeks ago, and the Court ruled on certain

aspects of that. But there seems to be some concern that some of the evidence coming in was not noticed and there's some concern there.

What's the government's response to that concern?

**MR. WHITMAN:** Well, first of all, intrinsic evidence doesn't -- there is no notice requirement for that. But to the extent there was, anyone reading the indictment, the very detailed indictment, would come away with the feeling that, even just as the 2016, they would come away reading that this was a scheme that lasted five years and that Mr. Goldstein was trying to hide his gambling winnings from the government during those five years. And that one aspect of that would be filling out an IRS form or directing someone to fill out an IRS form that leaves off the existence of a gambling account.

**THE COURT:** All right. Thank you very much, Mr. Whitman.

**MR. WHITMAN:** Thank you, Your Honor.

**THE COURT:** Mr. Kravis, anything further from you?

**MR. KRAVIS:** I just want to make two brief points here. The first is, I want to make sure the timing is correct. So the interview with the IRS collections officer that is charged in the indictment and that the Court is -- that the jury is hearing about now was in 2018. Mr. Levitan was the office manager in 2019.

So the idea that the communications between Mr. Goldstein

and Mr. Levitan are relevant to this allegation about the false statements to the collections officer, it's just not true.  It doesn't line up.  The government has never made that argument before.

The argument that I heard from the government today, this argument of "tells the story," he just keeps saying "tells the story" over and over again, this is a classic 404(b).  This is -- the argument is not that the evidence shows that Mr. Goldstein was like directly aware of the particular illegal rule that he's accused of violating.

The government's argument is, based on these other uncharged acts, the jury can infer something about Mr. Goldstein's state of mind.  That is a classic example of the sort of notice that the defense is entitled to under Rule 404(b) before the government can introduce it at trial.

And if the government had done that, if they provided notice, the Court can be sure we would have filed a motion on this, and we would have asked to be heard before any of this stuff was done in front of the jury.

I now hear the government saying that they're allowed to pick anything that Mr. Goldstein did between 2016 and 2020, and they can just pull that out and present evidence of it and argue that it shows Mr. Goldstein's willfulness and state of mind whether it's mentioned in the indictment or not.

That's completely and totally improper.  I'm not even sure

how the Court would instruct the jury on what to do with that evidence at this point. We are already in a pretty confusing spot here because we have the charges that were dismissed right before the start of trial, and there is already a lot of evidence in the case that is uncharged conduct and the jury is going to have to figure out how to sort all of that out.

The idea that the government is now just allowed to start presenting any evidence in this four-year time period that they think shows an intent to evade, it is totally improper and is exactly the kind of scenario that Rule 404(b) was designed to prevent.

**THE COURT:** Thank you very much, Mr. Kravis, and thank you, Mr. Whitman, for your arguments as well.

I think this is a situation where there are a couple different things colliding together.

One, of course, is the concern that both parties have that this case is about willfulness. There is a lot of evidence the parties are going to rely upon that show willfulness.

I think the challenge in this case does somewhat come from the indictment being dismissed in part very close to trial. I appreciate the government's point of view that didn't really change much, but it's a little unclear. And I think that's part of the challenge in terms of why we are having this conversation.

In terms of the motion, I think it's a grant in part and

deny in part.  I think the defense is right.  Certainly the government cannot rely upon affirmative acts that are not set forth in the indictment for purposes of pursuing their tax evasion count.

I think we'll be able to address that particular point of law in connection with the jury instructions and the parties will have to argue as to whether or not those particular affirmative acts have been proven in the case.  That's typically what we do in these types of cases.

As to the other part of it, some of the other evidence that's coming in, I did hear the Levitan testimony.  I understand the defense's concern.  It didn't -- that testimony didn't trouble me in terms of being irrelevant.  I think it is relevant potentially to willfulness for the alleged tax charges.

So I don't think there is any problem there from my point of view.  Obviously, the defense can argue differently in connection with how they want to deal with that evidence.

But globally, I don't think it's appropriate for the Court to say that the government can't introduce any facts or evidence beyond the specific allegations here.  The question will be for what purpose.  And I'm sure that the defense will object, and we'll have to have a conversation and I may very well agree with the defense.  But without knowing what all is coming in, it's a little hard for the Court to make a judgment.

I don't have a concern about Levitan from my perspective. I do have a bit of concern, like the defense, about what the universe looks like and making sure that we are not getting into a situation where we have prejudicial evidence coming in that really is not related to any of the charged counts in the case.

So I'm going to grant in part and deny in part. I'm going to permit the defense, of course, to object as these issues come up. And I'll rule on a case-by-case basis, which I think is the more appropriate thing to do in connection with this type of an issue.

So again, granted in part and denied in part without prejudice to the defense to raise concerns as the evidence comes up.

Any questions on the defense's motion? Mr. Kravis?

**MR. KRAVIS:** Nothing from the defense. Thank you, Your Honor.

**MR. WHITMAN:** No, Your Honor.

**THE COURT:** All right. What's the next motion we are ready to talk about today?

**MR. ADENRELE:** The government is prepared to argue the discovery motion in ECF 367.

**THE COURT:** Why don't we hear from Mr. Kravis first. And I have read the papers carefully on this one.

Mr. Kravis?

**MR. KRAVIS:** So, Your Honor, last, I think it was, Wednesday evening so we were well into the government's case in chief, the defense received some e-mails, not from the government, but from GRF pursuant to a subpoena that the Court approved previously in an ex parte proceeding.

Among those e-mails was a critical piece of evidence in the case that was never disclosed to the defense by the government. And we attached it as an exhibit. We discussed it in the motion. I'm sure the Court is familiar with it, and I'm sure the Court understands why the defense believes this is a critical piece of evidence.

And if it had been timely disclosed, we would have used it. We would have used it in our trial preparation. We would have opened on it. And it may have affected the questions that we would have asked some of the witnesses who have already testified here. The evidence was not only discoverable Jencks material, it was Brady material.

It was this -- the agent writing to a witness saying, "I can't find that the evidence that shows that Mr. Goldstein did it." And the witness is writing back saying "that's because that evidence doesn't exist."

We have not -- we have proposed remedies that the Court -- we think the Court should consider and that we think are proportional here.

The first one is I think the government should be ordered

to answer our questions about what is going on here.  We have asked the government three different times, have you searched -- for every law enforcement agent who worked on this case -- have you searched their e-mails, have you searched their text messages, any messaging apps for discoverable material?

The government -- I have asked the government three times. They refuse to answer that question.  They just keep saying we are good.  You have everything you need.  And at this point, given the state of the record and where we are, I don't think that's -- I don't think that's good enough anymore.

THE COURT:  Mr. Kravis, is that you attached to the motion, Exhibit A is the e-mail of the main one, I think, we are talking about.  Were there other e-mails that the defense also discovered that you believe resulted in a violation or just this one?

MR. KRAVIS:  There were several, yes.  There were several e-mails that GRF produced to us that I think are plainly Jencks material.  They are substantive communications with a trial witness about the witness's testimony and they're memorialized in the e-mail itself.  We chose to highlight this one because I think this is the -- I think this is the clearest example and I think this is the one that rises to the level of a Brady issue, not just a Jencks issue.

Given where we are, given that the trial has already

started, we are already in the government's case. In addition to answering our questions about this, we think a couple other remedies are appropriate. We think the jury should be instructed that they can draw an adverse inference based on what happened here. And we think a supplemental opening statement is appropriate.

And we've cited cases where the Court has granted relief in circumstances similar to this where critical evidence is disclosed to the defense in the middle of trial.

**THE COURT:** Thank you very much, Mr. Kravis. I don't have any questions. I did read your papers carefully.

**MR. KRAVIS:** Thank you, Your Honor.

**THE COURT:** Counsel for the government?

**MR. ADENRELE:** Thank you, Your Honor. A couple things. Your Honor has the e-mail. First thing here is the defense's characterization of those e-mails seems wildly off base here.

**THE COURT:** Let's start with some basic facts just to make sure I know what the government's position is. Does the government agree that it did not produce this e-mail, Exhibit A, to the defense?

**MR. ADENRELE:** As I understand it, this e-mail was not produced to the defense through our, you know, through our Brady, Giglio and Jencks review. However, the content and substance of this e-mail has long been known to the defense.

The content of the e-mail -- and the reason I say it's mischaracterized is because the defense is claiming that this is an e-mail from Agent Accardi to Mr. Shuman in which Agent Accardi is saying, "we can't find the export, these Excel files which are used to reconcile whether certain expenditures from G & R are personal expenses or business expenses to G & R."

That's just -- that's not what the e-mail is saying at all.  One, at the end of the e-mail, Agent Accardi says he hasn't completed his review yet.  So, of course, that doesn't tell us whether he eventually found it.  But Your Honor knows very well that these documents were produced, and we've already talked about these set of documents in trial already.  With Mr. Levitan, we walked through --

**THE COURT:**  I just want to make sure I understand what you are saying.  The government agrees the e-mail was not produced by the government to the defense; is that correct?

**MR. ADENRELE:**  Correct.  That's correct.

**THE COURT:**  Okay.  I know they say they got it through a third party.  All right.  Because I'm just looking at the elements.  Do you agree that this document is favorable to the defense or no?

**MR. ADENRELE:**  We agree that the document is favorable, but when we jump down to the element of materiality that's where this is critical here.  The information within the

document has well been known to the defense.  It's not new information.  As a result of that, it's not Brady material at all.  The materiality does not exist.  The information has long been known.

The defense actually opened on this type of information because they keep saying over and over again that there is no e-mail from Mr. Goldstein in which he's directly saying to an accountant that they need to mischaracterize as particular -- or misclassify a particular expenditure.

**THE COURT:**  Well, isn't it material to them being able to establish that with evidence?  I mean, I think that's their point and this is evidence to support their theory of the case, so...

**MR. ADENRELE:**  But it can't be because, again, the content of this e-mail has been well-known to the defense over and over and over again, and so they --

**THE COURT:**  And how -- why is the government take -- and why do you take that position, based on what?

**MR. ADENRELE:**  Yeah.  So because, one, initially, they were -- part of their point here is that Mr. Goldstein never directly communicated to a particular accountant to say "go ahead and mischaracterize an expenditure."  Sure.  They have talked about that tons of times.  And the government actually isn't even rebutting that.

The issue here is that he's not providing the requisite

information to his firm managers to be able to properly communicate to the accountants how these expenditures should be classified.  That's consistently been our argument here.  And then, obviously, aside from that, we think there are direct lies to the firm managers and to the accountants, which we also will argue and continue to bring out with witnesses, but the issue here --

THE COURT:  Yeah.  But I think the defense is saying -- and just to stick on materiality, I think what they are going to say is that this is important.  They would have used this e-mail in their opening statement.  This would have linked their argument directly to the lead case agent who was investigating these charges well before the indictment was brought.  It would have been a much bigger bang for the buck.

MR. ADENRELE:  Understood that, Your Honor.  I understand that.  But the problem is -- and that's why I'm bringing up the fact that this e-mail is mischaracterized. They are claiming that it's saying that Agent Accardi simply could not find and never could find any of these Excel spreadsheets in which there are reconciliations of the classification of expenditures.

That's absolutely not true.  One, again, Agent Accardi says he hadn't finished reviewing the production, and eventually, they do find these types of spreadsheets, and we've talked about these spreadsheets at trial.  And so the way that

this e-mail is being characterized is wildly inconsistent if we just read it. And so that's just not true.

But on top of that, the proper reading of it also shows that the defense has had the information that's mentioned in the e-mail with respect to these Excel spreadsheets for a long time. They've been talking about it at trial. They talked about it in opening. I asked Mr. Levitan often about tons of questions around these types of reconciliations.

And so the -- one, the issue is the e-mail is mischaracterized. But even on a proper reading of the e-mail, it is simply not new information. Therefore, it is not material. Therefore, it is not Brady. And therefore, there is no discovery violation whatsoever.

Even we look at this through a Jencks analysis, Jencks material only needs to be turned over, according to the Jencks Act, only needs to be turned over until after direct examination of a particular witness.

Now, indeed in this district, we want to make sure and produce Jencks material early. And we have done so and Your Honor knows there is over 30, maybe over 40 transcripts of grand jury material that's been turned over. This e-mail is about Mr. Shuman. Mr. Shuman has not taken the stand yet. And so the fact that they have it now, it's certainly early enough to make sure that we have complied with our Jencks requirements. But on top of that, there can't be any prejudice

because Mr. Shuman has not taken the stand yet.  There is multiple days for him to review one e-mail.

And I will also put forth, if this is the strongest e-mail -- I assume it is the strongest e-mail that they have because it's the only one that they have attached.  If this is the strongest e-mail, then we can understand how weak the other ones must be.

We received their letter on January 20th.  We produced 110 e-mails the next day.  All of those e-mails really weren't even Jencks material at all.  They weren't Brady material at all. We simply produced them out of an abundance of caution simply because we wanted to make sure that we get everything over, and we identified in our cover e-mail that it was out of an abundance of caution.  But we didn't need to produce them at all, to be honest with you, but we did anyway.

And so, again, if this is the e-mail that they are attaching to their motion, it simply does not rise to the level of Brady.  It is Jencks, sure, because it's a document written by a witness that we will call.  It was certainly not a Jencks violation because the witness has not taken the stand yet, and they have not made the allegation that it's Giglio because it is not just not Giglio.

And so, you know, I can rest there.  One other point here. With respect to the relief that they are requesting, again, because it's not Brady and it's not Jencks or at least it's not

a Jencks violation, we should just deny all of this straight up.  But they particularly have cited to the *Gaines* case here.

This is a case that, first, was with Judge Gallagher and then eventually moved to Judge Abelson.  But the facts of that case specifically had to do with cell phones that literally either were destroyed or I think were, you know -- another AUSA, obviously, in our district tried the case.

But in that case the texts just -- there were text messages that simply were not available at all to be produced in that case.

And as a result of that, eventually Judge Abelson agreed, I think one, to a spoliation instruction, but also an instruction that a jury could take an adverse inference in relation to.  Of course, here, there is no spoliation issue.  There is no destruction because they have the e-mail.  They produced it or they provided it as an exhibit.

And so there is really -- the two cases are not analogous whatsoever.  So, as a result of that, the government requests that the Court deny all of their suggestions here.

THE COURT:  Thank you very much, Counsel.

MR. ADENRELE:  Thank you very much, Your Honor.

THE COURT:  That was helpful.

Mr. Kravis, anything further from you particularly on whether this particular information is material?

MR. KRAVIS:  Yes, Your Honor.  I think this is a

classic example of confusing a theory with evidence to support the theory. As the Court knows from the opening statement and what it's heard at trial, the defense is stuck sort of trying to prove a negative.

There are these transactions. The transactions have been mischaracterized. And then we are stuck trying to argue that there is no evidence that Mr. Goldstein was responsible for the mischaracterizations.

And as the Court has seen from the testimony and questions of the witnesses, you are trying to prove a negative of what happened ten years ago. This is direct evidence. This is the guy who is in charge of keeping the books saying Mr. Goldstein was not involved in this, and there was no reconciliation process.

I think the government tried to suggest with Ms. Runkle's testimony that there was this process that GRF and the law firm would go over the transactions. This is the guy who was in charge of that division saying in 2016 that was not happening. This is a critical direct piece of evidence. We would have opened on it, and it would have factored into -- it would have factored into our defense. On the timing of -- or approach the defense.

On the timing of the disclosure, I think this is clearly Brady material. I also think it's very misleading for the governments to say well, it's Jencks and the guy hasn't

testified yet.  They gave us the Jencks material for the accountants in April.  And they did that because the government told us that they recognized that the accountants were going to be a critical issue in the case.  And so they gave us all of that Jencks material like ten months ago.

It's very misleading for the government -- and the government did not tell the defense at that time, oh, look, there is other Jencks material for these witnesses, but we are not going to give it to you right now.  It was very misleading for the government to make a Jencks disclosure and then come in later and argue that they were entitled to withhold another document because, technically, their Jencks obligation doesn't kick in until Mr. Shuman hits the stand.

I did want to note that I heard the point about spoliation.  While that's not something we are talking about here, I think the Court is aware that that is also an issue that the defense is going to raise in this case when it comes to GRF.

**THE COURT:**  Thank you very much, Mr. Kravis.

**MR. KRAVIS:**  Thank you, Your Honor.

**THE COURT:**  Anything further from the government?  I see movement over at your table.

**MR. ADENRELE:**  I'm sorry.

**THE COURT:**  I'm learning to read the room.  Go ahead.

**MR. ADENRELE:**  I'm sorry, Your Honor.  I have a

problem not talking more.

I think I have made my point here.  Again, it's just simply not Brady material.  The information has been made clear.  The information has been known.  My friend talked about this coming out during Molly Runkle's testimony.  I really was talking about Mr. Levitan's testimony in which these spreadsheets were talked about ad nauseam.

Again, Mr. -- Agent Accardi's own e-mail says that he hadn't finished reviewing the information.  Of course, he found it because we presented evidence about this at trial.  And so, again, the government would ask that the Court deny each and every request in this motion from the defense.

Thank you.

**THE COURT:**  All right.  Thank you very much, Counsel.  And thank you, Mr. Kravis.  I'm going to start with Brady, because I think that's the area where there would be potential need for the Court to provide some type of relief to the defense.  As parties are aware, the Court advised the government of its Brady obligations at the very beginning of this case, and those directions still control as we are in trial.

To the extent that additional Brady material is discovered by the government, that remains an obligation to provide it to the defense.

As defense notes in their brief, in the Fourth Circuit the

Court can find a Brady violation when three circumstances are present.

First, the undisclosed information was favorable to the defendant either because it's exculpatory or impeaching.

Second, the information was material.

And third, the prosecution knew about the evidence and failed to disclose it.

I think there is agreement that elements one and three have been met here.

Firstly, the government acknowledges that it did not disclose the particular e-mail that we're discussing today from one of the accountants for Mr. Goldstein and Special Agent Accardi until very recently, I believe after trial began.

I think that, in my reading, I think we can also agree that the information is favorable to Mr. Goldstein. It's at least potentially exculpatory because it does seem to support his defense, which is that he was not directly involved in some of the alleged or any of the alleged errors on his tax returns, that his accountants had the responsibility for preparing those documents and that any errors were due to their error and not his.

He also argues that communication with the accountants was primarily through his firm office managers. And he points to this e-mail as providing support for both of those positions. And I think there is some language in here that arguably does

provide support for those points of view.  Obviously, the parties may read the e-mail differently.

So I'm inclined to agree that it's favorable to Mr. Goldstein.  And the question really comes down as to whether it is material.  I think it's fair to say that Mr. Goldstein's defense is not news.  We've heard about this during opening argument.

And so to some extent, he's already been able to present argument that he was not responsible for the errors.  These were accounting errors from his accounting firm or maybe miscommunications with his office manager.  That was argued during opening statement.

It's also been implied through some of the cross-examination, so I agree with the government that the overall theory or the information in that level is not new.  But this is information directly coming from the lead case agent to the accountant.  That accountant, yes, will be called later, and so, for Jencks purposes, I don't think there is a problem.

But this is really, I agree, direct evidence, at least from the defense's point of view, as to why they have support for their defense in this case.  I do think it touches on materiality from my point of view.  It's not perhaps the strongest case, but I think there's enough here that this will be material to the defense's case.  And, therefore, all three

elements of a Brady violation have been met here.

That turns to what the Court should do in terms of a remedy. And there is a lot of discretion in terms of what the Court can do here. We're already a couple weeks into trial. Mr. Shuman, who is the witness that is on this e-mail, has not yet testified, so there will be some opportunity for the defense certainly to address and remedy this concern through their cross-examination once he is called up and examined by the government.

I don't think something like doing another opening statement makes any sense in this case. There will be an opportunity at the end of the trial for both parties to make closings, and they certainly can address evidentiary issues at that time based upon what evidence comes in.

This looks to me like something that may further support Mr. Goldstein's defense. And while I do think it's material, I don't think there is any need for any remedy other than, A, allowing Mr. Goldstein to, obviously, have latitude on cross-examination when we get to Mr. Shuman. Certainly, they can address this issue in their closing statements.

I will be open to an instruction about what happened to the jury. I think that can come at the end of trial given that it -- this document was not turned over until very recently. I think it's dated from January of 2024. So it's, obviously, been in the possession of the government for well over a year.

So I think an instruction would be appropriate.

So I'm going to grant in part and deny in part the motion. I am going to find a Brady violation with regards at least to the e-mail attached to the motion. I think the remedy here is a combination of the defense's broad latitude on cross-examination, any closing statements and an instruction to the jury that I will work out with the parties as we move forward.

Are there any questions on the Court's ruling on this motion?

**MR. ADENRELE:** Yes. Just one question, Your Honor. I want to make sure I understand. With respect to any instruction given to the jury, is Your Honor saying that we will give an instruction or that we can argue about whether we will and what that may look like later?

**THE COURT:** I think an instruction is probably appropriate, but I think we need to work out what the language is going to be first.

**MR. ADENRELE:** Okay. All right. Thank you.

**THE COURT:** Mr. Kravis?

**MR. KRAVIS:** Only one point at this time, Your Honor, which is, in addition to latitude in questioning the witness, we'd also ask for latitude questioning the case agent who's on the e-mails about this when that -- when the agent testifies.

**THE COURT:** When he's called up to testify at trial?

**MR. KRAVIS:** Right.

**THE COURT:** Is that questioning you want to do in the presence of the jury, or are you talking about voir diring the agent?

**MR. KRAVIS:** No. I'm talking about in the presence of the jury. And if there -- if it would be helpful to the Court, we can, you know, go through what we plan to ask -- we'd ask the case agent questions on that, of course, but before the jury comes in so that there is no overstepping that.

**THE COURT:** I think that would be helpful. Anything further from the government?

**MR. KRAVIS:** Nothing further, Your Honor. Thank you.

**THE COURT:** All right. Thank you, Counsel.

Are there other motions that we can address today?

**MR. ADENRELE:** Not at this time from the government's perspective.

**MR. KRAVIS:** We did file the motion last night on the cumulative evidence issue. I think that one is a little bit less pressing because the parties have been discussing stipulations and the various ways we might handle this issue. I'm sorry. They said they wanted time to respond to it. Never mind.

**THE COURT:** All right. So we'll defer that until the government has a chance to respond. There are also a few ex parte motions I would like to talk to the government about

separately, not right in this session.  And we can do that maybe in a moment when we break.

I do want to give a couple updates on the jury.  All jurors are present, except Juror Number 13, who was unable to get here due to weather conditions.

So the Court would be inclined to excuse this juror unless there is objections from counsel.  I don't have the impression that the jurors want to come back today or going forward. Everyone else is here.

Any thoughts from counsel?

**MR. ADENRELE:**  Just to --

**THE COURT:**  Juror 13.

**MR. ADENRELE:**  Just so I understand the count, right now we have three alternates.  That would push us down to two; is that right?

**THE COURT:**  Correct.

**MR. ADENRELE:**  Then the government does not have any objection excusing Juror 13.

**THE COURT:**  Okay.  Mr. Kravis?

**MR. KRAVIS:**  No objection from the defense.

**THE COURT:**  All right.  So I'm going to excuse that juror.  Let me talk to the courtroom deputy just for a moment. All right.  So the Court is going to excuse Juror 13.

It's about 12:30.  How do we want to proceed today?  I know there are several witnesses, and then we can figure out

whether -- the jury has been here since 11:00.  Should I send them to lunch or should we get started?  Kind of want to know where we are.

Mr. Beaty, good afternoon.

**MR. BEATY:**  Good afternoon, Your Honor.  We have three witnesses that we think we can probably still get through this afternoon.

My suggestion and my request is the -- we have two out-of-town witnesses.  Technically, all three are out of town, but one is a government employee.

What we'd like to do is call Mr. Rajkumar because he has a very early flight, and he's been here for days waiting to testify.  We'd like to get the second witness from California up and off the stand and then turn back to special agent -- excuse me -- Revenue Officer Parrish.

So we know that we have a witness on the stand.  We are asking that we delay her testimony so we can get --

**THE COURT:**  Remind me.  Were we still on direct with Ms. Parrish?

**MR. BEATY:**  We were.

**THE COURT:**  Okay.  So she's still coming back for direct?

**MR. BEATY:**  Yes, Your Honor.

**THE COURT:**  All right.  Mr. Kravis, any concerns about going out of order?

**MR. KRAVIS:**  No objection.

**THE COURT:**  All right.  I think I'm going to have to say something to the jury to just explain that because that will be unusual, but I have no objection, understand that.  All right.  So three witnesses.

Are we ready to go, or do we want to pause?  And how do you want to proceed?

**MR. BEATY:**  We have one of the witnesses here.  We're ready to go.  So, if Your Honor is good, they would be, I think, 25 to 30 minutes on direct.  I don't -- we will find out on cross, but Mr. Rajkumar.

**THE COURT:**  All right.  I'm inclined to get started. I may have to give the jury a break.  I'm not sure they have had lunch.  So we may need to take a late lunch break if we are going to start now.

**MR. BEATY:**  Okay.

**THE COURT:**  Mr. Kravis?

**MR. KRAVIS:**  That's fine with the defense.

**THE COURT:**  All right.  Why don't I step down now for a moment and make sure the jury is ready.  And when we come back, we'll begin.

**DEPUTY CLERK:**  All rise.  This Honorable Court stands in recess for two minutes.

(Whereupon, a recess was taken from 12:28 until 12:33 p.m.)

**DEPUTY CLERK:**  All rise.  This Honorable Court now

resumes in session.

THE COURT:  Are we ready to have the jury?

MR. BEATY:  Yes, Your Honor.

THE COURT:  Very good.

Please rise for the jury.

(Whereupon, the jury entered the courtroom at 12:36 p.m.)

THE COURT:  Please be seated.  Members of the jury, good afternoon and welcome back.  I hope that you were safe, warm and well during our winter weather.  And I'm so delighted to see you back with us here today.

Today we will continue with trial with the presentation of the government's case in chief.  I do expect that you will see several witnesses this afternoon, and we will finish up around the five o'clock hour as usual today.

Because of our weather delay, it's possible that the government may call a few other witnesses before you hear again from Ms. Parrish, who was on the stand I believe on last Thursday.  But she will also be presenting further testimony to you, I believe, a little later in the afternoon.

With that, again, I want to welcome you back, and I will invite the government to call its next witness.

MR. BEATY:  Thank you, Your Honor.  United States calls Vivek Rajkumar.

THE COURT:  Counsel, is there a book for this witness?

**MR. BEATY:** Yes, Your Honor.

**THE COURT:** Good afternoon. If you want to come towards me, and then you will go over to your left towards the witness box. Please remain standing. The courtroom deputy will swear you in.

- - -

VIVEK RAJKUMAR, after having been duly sworn, was examined and testified as follows:

- - -

**DEPUTY CLERK:** Thank you. You may be seated. Adjust the microphone so you can speak directly into it. Scoot up close. State and spell your first and last name for the record, please.

**THE WITNESS:** Vivek Rajkumar. V-i-v-e-k. R-a-j-k-u-m-a-r.

DIRECT EXAMINATION

BY MR. BEATY:

Q. Good afternoon, sir.

A. Good afternoon.

Q. Tell the jury a little bit about yourself, please.

A. I'm a 39-year-old professional poker player and have been playing poker for a pretty long time.

Q. Well, where do you live?

A. I live in Las Vegas.

Q. Where did you grow up?

**A.**   I grew up in Singapore and Seattle.

**Q.**   And where were you educated?

**A.**   Seattle, in University of Washington.

**Q.**   What did you study?

**A.**   Computer science.

**Q.**   And how did you convert to becoming a professional poker player?

**A.**   I'm sorry.  What was the question?

**Q.**   How did you become a professional poker player?

**A.**   I just started playing on-line, lost and then won and then started playing at the casinos.

**Q.**   And how long have you been a professional poker player?

**A.**   I think a better part of about 20 years.

**Q.**   Could you slide the microphone up?

**A.**   I'm sorry.  Yeah.  The better part of 20 years.

**Q.**   Have you ever played poker with or against Tom Goldstein?

**A.**   Yes.

**Q.**   Do you recall how you first came to meet Mr. Goldstein?

**A.**   I don't.

**Q.**   How many times do you think you've met him in person?

**A.**   Maybe a dozen times.

**Q.**   And how many of those occasions were poker games and how many of those were just social events?

**A.**   Maybe half and half.

**Q.**   Where geographically were the bulk of your poker games

with or against Mr. Goldstein?

**A.**    Probably both Vegas and LA.

**Q.**    How close of a friendship would you say you developed with Mr. Goldstein?

**A.**    Reasonably friendly, you know, friendly, friendly acquaintance, like we've grabbed coffee, lunch a couple times.

**Q.**    Well, for example, have you ever been to one another's homes?

**A.**    No.

**Q.**    Now, in the parlance of poker, what kind of matches did you play with or against Mr. Goldstein?  Heads-up?  Ring games?

**A.**    Yeah.  It was multi-player games.

**Q.**    And what is your best recollection of when you first -- what is your best recollection of when you first played poker with or against Mr. Goldstein?

**A.**    I can't remember the first time.

**Q.**    Well, tell us what you do remember about that first couple games with him.

**A.**    You know, he was an unpredictable player, I would say, you know, definitely capable of, you know, bluffing and whatnot and hard to put on a hand, a smart player, but, you know, wasn't afraid to gamble.

**Q.**    When did you last play poker with or against Mr. Goldstein?

**A.**    I don't remember.

Q.    How many times have you invested or bought a piece of a player's action in a poker game?

A.    Not Tom.  Somebody else.

Q.    You've never invested in Mr. Goldstein?

A.    As far as I can remember, no.

Q.    How do you keep records of your gambling wins and losses each year?

A.    Go through my bank account statements, you know, figure out like which are wins and losses, and I also keep records on my phone.

Q.    Through text messages?

A.    No.  Just like on my notepad.  Yep.

Q.    And net-net, how much are you up or down against Mr. Goldstein?

A.    I think based on the transfers that, you know, I've gone over with you, I would guess I'm up two to 300,000, lifetime, against Tom.

Q.    Now, how many times did you demand that Mr. Goldstein deposit or post funds with an intermediary before a game?

A.    I can't remember any.

Q.    How unusual would it be for a player to have to post or -- you know, to post for safekeeping before a game?

A.    Yeah, not that common.

Q.    And what is the customary practice with respect to settling up with another player after a match?

**A.**    Usually just, you know, send wires or whatnot within a few days or a couple weeks.

**Q.**    How would you and Mr. Goldstein settle up after a poker match?

**A.**    Yeah.  Usually just like sending wires back and forth.

**Q.**    Has Mr. Goldstein ever provided you legal services for which he charged you?

**A.**    No.

**Q.**    And to the extent you made payments to Mr. Goldstein, how much of those payments were for legal fees versus poker losses?

**A.**    Yeah.  As far as I can remember, it's all just, you know, poker gambling, you know, transfers.

**Q.**    At some point, you received a subpoena to produce records of your financial interactions with Mr. Goldstein?

**A.**    Yes.

**Q.**    I'm sorry?

**A.**    Yes.

**Q.**    Could you speak up a little bit?

**A.**    Yes, I did.

**Q.**    Thank you.

Okay.  Let's look together at page 1 of Government's Exhibit 356.  You worked with your attorney to produce redacted copies of your bank statements.  Is that fair to say?

**A.**    Yes.

**Q.**    And this is your Wells Fargo bank account?

**A.** Yes.

**Q.** And for what kind of transactions did you use this account?

**A.** Poker wins and losses were part of this account.

**Q.** Was this a separate gambling account or was this a bank account you used for everything?

**A.** A bank account I used for everything.

**Q.** And to whom would you give these bank records in terms of preparing your tax returns each year?

**A.** I'm sorry. What do you mean?

**Q.** Would you give these records to your accountant?

**A.** Sometimes, yeah, or we would just like go over them in person together. Yeah.

**Q.** Let's look at page 7 of Government's Exhibit 356. We see that on February 21, 2017 you deposited $100,000 into your Wells account. Do you see that?

**A.** Yep. Yes.

**Q.** And let's also look at page 243 of Government's Exhibit 4. I'll represent to you it's a bank statement for Mr. Goldstein for this same period. Do you know who Lance Gettler is?

**A.** No.

**Q.** If you look at page 247 of Government's Exhibit 4, do you see that there is also a withdrawal made at the same time, amount, $100,000?

**A.** Yes.

Q.   So let's split the screen then between Government's Exhibit 356, page 7 and Government Exhibit 4, page 247.

How does this transaction relate to poker with Mr. Goldstein?

A.   It's been a while, so, you know, I can't say for sure. But I believe that this was a, you know, it had to be like poker related.

Q.   How did -- or you see it's a withdrawal.  How was this actually done?  Was this cash taken out of the bank?  Was it a cashier's check?

A.   I think wires show up, you know, when the sender, receiver.  So I think this was, again to the best of my recollection, probably a cashier's check deposited to my account.

Q.   Okay.  Let's jump ahead to September of 2019.  Let's look at another transaction.  I'm going to look at page 18 of Government's Exhibit 356.

Do you see another $100,000 withdrawal on September 11, 2019.  Do you see that?

A.   Yes.

Q.   Again, how did this wire in September of 2019 relate to poker with Mr. Goldstein?

A.   Is this a wire out from -- you know, out from him?

Q.   This is a withdrawal from your account, it appears.

A.   Right.  Withdrawal from my account or his account?

**Q.**    From your account.

**A.**    Oh, from my account.  So, yeah, my best guess is that this was a poker-related thing, you know, some loss of money that was sent to him.

**Q.**    Who instructed you to send the money to Goldstein & Russell's bank account?

**A.**    I think I got wire info from Tom and then sent it.

**Q.**    What, if anything, do you remember Mr. Goldstein saying about why he wanted you to send it to his firm account, rather than his personal account?

**A.**    There wasn't any reason.

**Q.**    Let's jump ahead to November 15, 2019.  Let's look at another transaction.  Looking at page 31, Government's Exhibit 356.  See now a deposit into your account on November 15, 2019.  Are you with me?

**A.**    Is it deposit to my account?

**Q.**    Do you see that?

**A.**    Yeah.  Yes.

**Q.**    Was did this $90,000 deposit into your account in November of 2019 relate to poker with Mr. Goldstein?

**A.**    Again, I can't recall any specific game that this was in, but my best guess is that it was part of some multi-player poker match and this was a win of mine.

**Q.**    Again, why did Mr. Goldstein wire your winnings to you from his law firm bank account?

A.    I don't know.

Q.    Let's look a month later, December 2, 2019.  We are looking at page 38, Government's Exhibit 356.  Do you see a $130,000 transaction on December 2, 2019?

A.    Yes.

Q.    Okay.  Same question.  This is a deposit into your account.  How does this relate to poker with Mr. Goldstein at that time?

A.    Again, I don't recall any specific game since it's been a while, but my best guess is that this was part of a poker game and this was a win of mine.

Q.    So, in 2019, it looks like you lost $100,000 to Mr. Goldstein, but won 220,000; is that correct?

A.    If that was the sum of the previous transactions, then yes.

Q.    Ninety plus 130?

A.    Yeah.  Yeah.  And then minus 100, I guess.  Yeah.

Q.    You were up against Mr. Goldstein $120,000 for 2019?

A.    Yeah.  That sounds right.

Q.    At some point in early 2020, did you agree to loan money to Mr. Goldstein?

A.    2020, yes, I believe so.

Q.    Tell the jury what you remember about how you came to loan money to Mr. Goldstein.

A.    That's a 200K transfer; right?

**Q.** Tell us what you remember.

**A.** Yeah. Yeah. So in 2020, Tom asked for a short-term loan of 200,000. I provided it to him.

**Q.** What did he say about -- what did Mr. Goldstein say about why he needed the money?

**A.** I don't recall the full conversation, but I think it had to do with his work possibly.

**Q.** So what did you decide to do with respect to loaning Mr. Goldstein the money he asked for?

**A.** I wired it to him. 200,000.

**Q.** Let's look at Government's Exhibit 356, page 48.

How does this relate to the loan that you made to Mr. Goldstein in March of 2020?

**A.** Yeah. This is the loan I provided to him March 2020.

**Q.** How close of friends were you and Mr. Goldstein at this time?

**A.** Somewhat, you know, friendly enough, like we played poker a couple of times and -- yeah. So -- yeah, reasonable friend.

**Q.** Why did you agree to loan him $200,000?

**A.** You know, he had been honorable in other games before. If he had debt, he paid it. And he asked for some short term, you know, just some short-term help. It wasn't supposed to be long term. And so, you know, given that he had been honorable in other situations, I decided to help him for a few weeks.

**Q.** How much did this affect your personal cash flow to loan

Mr. Goldstein $200,000?

**A.**    I think it affected it some, yeah.

**Q.**    You could still pay your rent?

**A.**    Yeah.  Yeah.  Yeah.  Like life was okay.

**Q.**    Do you remember when Mr. Goldstein said he was going to pay you back?

**A.**    I think it was like a couple of months, but I don't remember the exact time.

**Q.**    In your mind, how short term or long was this going to be?

**A.**    Maybe two to three months.

**Q.**    Let's look at page 52 of Government's Exhibit 356.

We see a $200,000 deposit on May 6, 2020?

**A.**    Yes.

**Q.**    What is this transaction?

**A.**    This is the repayment of the loan.

**Q.**    Let's talk about one last poker transaction in February of 2021.  Showing you Government's Exhibit 355.  Please tell us what we are looking at?

**A.**    This is me asking a friend of mine, long-term friend, Jason Somerville, to send 100,000 to Goldstein & Russell, PC, on my behalf.

**Q.**    Who is Jason Somerville?

**A.**    Just like a long-term poker friend of mine.

**Q.**    Now, sitting here today, what do you remember about why you asked Mr. Somerville to send money to Mr. Goldstein or his

firm on your behalf?

A.    I don't remember why this was sent or if those -- this was even for me.  It could have been I was doing like a third-party transfer on behalf of like somebody else.  So this one, I'm not very sure about.

Q.    Okay.  Maybe a better question.  What made you confident that Mr. Somerville would send money to Mr. Goldstein on your behalf as you requested?

A.    Oh, I've had financial dealings with Jason for several years.  And, you know, this isn't like out of the norm.

Q.    Okay.  I'm going to zoom out a little bit.

    We can see all there is to this e-mail is your one sentence; is that right?

A.    Yes.

Q.    You did not include wire transfer information to Mr. Somerville for this transfer?

A.    Yes.

Q.    It is correct that you did not?

A.    I did not, yeah.

Q.    Are you familiar with a company called Run It Up, Inc.?

A.    Yes.  That's Jason Somerville's company.

Q.    And if there was 1 $100,000 payment to Mr. Goldstein's account from a company called Run It Up, Inc. in February of 2021, is it likely that Mr. Somerville complied with your e-mail?

**A.**    Yes.

        **MR. BEATY:**  No further questions, Your Honor.

        **THE COURT:**  Thank you very much.

    Does the defense wish to cross-examine the witness?

        **MR. KRAVIS:**  Yes.  Thank you, Your Honor.

    May I approach?

        **THE COURT:**  You may.

                        CROSS-EXAMINATION

**BY MR. KRAVIS:**

**Q.**    Good afternoon, sir.

**A.**    Good afternoon.

**Q.**    You don't have to worry about the binder for now.

**A.**    Okay.

**Q.**    I'm not even sure we'll need it.

    Now, you were asked some questions on direct examination about some transactions between you and Mr. Goldstein.

    Do you remember that?

**A.**    Yes.

**Q.**    Just to be clear, you do not have a specific recollection of any of these transactions.  Is that fair to say?

**A.**    Yes.  I can't -- you know, there is no one game that I can trace any of these transactions to.  It's not like, oh, there was a game in LA that I lost this I paid.  So yeah, I don't have any specific recollection.

**Q.**    And some of these transactions were many years ago; right?

**A.**    Correct.

**Q.**    I think you were shown transactions from 2017, so that's like eight years ago; right?

**A.**    Correct.

**Q.**    You've probably engaged in like hundreds of gambling-related transactions since that time; right?

**A.**    Yeah.  Definitely tons of games, you know, throughout the last ten years.

**Q.**    All right.  Now, I want to ask you about a couple of the payments in particular.  And I want to start with -- do you remember there was a $100,000 payment from you to Mr. Goldstein in 2017?  Do you remember that?

**A.**    Uh-hum.  Yes.

**Q.**    And I think you testified that your best guess was that that payment would have been gambling related.  Did I hear that right?

**A.**    Correct.

**Q.**    But just to sort of ask you what you meant by that, it is possible that the payment could have been gambling related, from your perspective, but could have been something different from Mr. Goldstein's perspective; right?

**A.**    Can you expand on that or give me an example?

**Q.**    Yeah.  Yeah.  Let me do that.  I want you to suppose for me that Mr. Goldstein lends a guy named Andrew $100,000.  Okay?  And then you play in a poker game with Andrew, and Andrew wins

$100,000 off of you.  Are you with me?

**A.**    Yes.

**Q.**    It is possible, is it not, that Andrew might ask you, instead of you paying me the 100,000, and then I'll pay Mr. Goldstein back, why don't you just go ahead and send the 100,000 right to Mr. Goldstein.  That could happen; right?

**A.**    That's -- yeah.  Third-party transfers are possible.

**Q.**    What is -- I heard you use that term on direct.  What is a "third-party transfer"?

**A.**    Basically -- and this is very common in the gambling world and poker, so it's not -- you know, it's not an uncommon thing. Basically, somebody owes somebody -- let's say Person A owes Person B, and then Person C is kind of in the middle to kind of effectuate it.  And then A and C just like settle amongst themselves later on.

**Q.**    And so in my example, the fellow Andrew would be asking you to send the $100,000 from the poker game to Mr. Goldstein as a third-party transfer to settle the debt; right?

**A.**    Yeah.  That's -- yeah.  In this example, it's possible.

**Q.**    And in that scenario, from your perspective, what you would be paying Mr. Goldstein is a gambling loss; right?

**A.**    Yeah.

**Q.**    And from Mr. Goldstein's perspective, the money that he's receiving is a loan repayment; right?

**A.**    Yeah.  I guess so.

Q.    And I think you told me that this is -- these kinds of third-party transfers are pretty common in the poker world; right?

A.    Correct.

Q.    It's entirely possible that's what happened here; isn't it?

A.    Again, I -- you know, there was -- a lot of these games have like drinking around them.  It's been a few years, so I don't have specific instances, but it is possible that this could have happened.

Q.    All right.  Let me ask you about the payment from 2021. Do you remember that one?

A.    Yes.

Q.    That one is also $100,000.  That's the one that involved the e-mail with Mr. Somerville; right?

A.    Yes.

Q.    Okay.  You were not particularly confident about what was happening with this transaction; right?

A.    Yes.  The reason was I stopped playing a lot of poker, you know, 2020 onwards.  So 2021, I'm -- yeah, I -- you know, I'm -- I can't put that like a specific game.

Q.    It's entirely possible that this was also the kind of third-party transfer we were talking about; right?

A.    Yes.  It's possible.

Q.    It's possible you were making this payment on behalf of a

guy named Tom Dwan; right?

**A.**    That is a possibility.  Yeah.

**Q.**    You know who Tom Dwan is; right?

**A.**    Yes.

**Q.**    He's another poker player in these circles that you play in; right?

**A.**    Yes.

**Q.**    That $100,000 that we saw the e-mail about, it's possible that that was a payment on behalf of Mr. Dwan; right?

**A.**    Yeah.  It's possible.

**Q.**    The payment, that $100,000 payment, by the way, that came from Mr. Somerville's company; right?

**A.**    Correct.

**Q.**    The company is called Run It Up; right?

**A.**    Correct.

**Q.**    You didn't think there was anything improper about Mr. Somerville sending the payment to Mr. Goldstein through his company account, did you?

**A.**    No.  I just -- you know, I just asked Jason.  He has it through his company.  You know, whether it came from his personal or his company didn't -- you know, I didn't think anything of it.

**Q.**    Just to sort of state the obvious here, you don't have any knowledge about how Mr. Goldstein's accounting firm characterized these transactions in the books and records of

the law firm, do you?

**A.**    No idea.

**Q.**    By the way, you use an accountant; right?

**A.**    Correct.

**Q.**    And you rely on the expertise of your accountant to help you figure out the tax treatment of your gambling wins and losses over the year; right?

**A.**    Correct.

**Q.**    As a poker player, you do not send out 1099s, do you?

**A.**    No.

**Q.**    I heard you mention on direct examination that there was a time when you lent Mr. Goldstein some money.  Do you remember that?

**A.**    Correct.

**Q.**    I didn't see the government show you like a written loan contract or a written agreement on direct examination.  Did you see any document like that?

**A.**    No.

**Q.**    Does any document like that exist?

**A.**    For the loan?

**Q.**    Right.

**A.**    No.

**Q.**    So you were willing to lend Mr. Goldstein $200,000 without any kind of formal written contract?

**A.**    Correct.

**Q.** Why were you willing to do that?

**A.** Again, you know, in games that we had played in, when he had debts, from my recollection at that time, he had settled them. He had a pretty good reputation. And so this was in the same range of like the amounts that, you know, you could lose or win in games. And he said it was going to be a few weeks, and so I decided to make the loan.

  **MR. KRAVIS:** Thank you. I have no further questions.

  **THE COURT:** Thank you very much.

  Does the government wish to do any redirect?

  **MR. BEATY:** Very briefly, Your Honor. Thank you.

REDIRECT EXAMINATION

**BY MR. BEATY:**

**Q.** While we are speculating on anything that could have happened, let's talk about Andrew. So, in Mr. Kravis' example, maybe Mr. Goldstein loaned money to Mr. Andrew, and then Mr. Andrew won money from you. And so he asked you to indirectly repay Mr. Goldstein.

  Is that what you understood him to be asking?

**A.** In the example, yeah.

**Q.** Okay. And so if that were true, then we would also see a wire transfer based on this loan to Andrew from Mr. Goldstein at some point, theoretically?

**A.** It's possible. But sometimes these things happen without transfers. Like, you know, it could just be a guarantee or a

vouch.  You know, that's just done like -- again, like informally without -- you know, the same way that the loan was like informal, it could just be like word of mouth kind of like a vouch or a guarantee.

Q.    Sure.  So all of these could be done sort of off the books; right?

A.    Correct.

Q.    And so it's super important to keep clear records of what happened?

A.    Correct.

Q.    And give those records to your accountant?

A.    Yeah.  I guess, when you're doing taxes, you want to give everything to the CPA.

Q.    And you don't want to inflate your losses or your staking payments; right?

A.    No.

Q.    Doing that, say, by $3 million, would be a bad thing?

A.    Yes.

Q.    Sure would.

        MR. BEATY:  Thank you.  No further questions.

        THE COURT:  Thank you very much.  Have all questions been asked of the witness?

        MR. KRAVIS:  Yes.  Thank you, Your Honor.

        THE COURT:  Mr. Rajkumar, thank you very much for your testimony.  You may step down and be excused.

Have a good afternoon.

(Witness excused.)

- - -

THE COURT:  Is the government prepared to call its next witness?

MR. BEATY:  I think given the timing, Your Honor, a lunch break now would be best.

THE COURT:  You want to take a break?

Mr. Kravis, any objection?

MR. KRAVIS:  No objection.

THE COURT:  All right.  Well, members of the jury, I'm going to invite you to step down for your lunch at this time.  We will reconvene in one hour at 2:04 p.m.

Please rise for the jury.

(Whereupon, the jury exited the courtroom at 1:04 p.m.)

THE COURT:  Please be seated.

Counsel, before we break, I understand we have two witnesses on tap after the lunch break starting around 2:00.  All right.  So we'll see everyone back at 2:04.  Enjoy your lunch.

MR. KRAVIS:  Thank you.

I'm sorry, Your Honor, before -- I'm sorry.  I apologize. The Court had mentioned taking up some ex parte matters.  I don't know if the Court had in mind the motions that were filed recently around the *New York Times* article.

I just wanted to flag that, on that issue, the defense does want to be heard.  The motion was not filed like under seal or ex parte or anything, and the motions discuss limitations on the scope of examination of witnesses which, obviously, directly affects Mr. Goldstein's constitutional rights.

And so I just wanted to make sure that --

**THE COURT:**  You're happy to respond to that.  I would ask you to do it promptly.  And I will have separate conversations with the government about it at this point.

**MR. KRAVIS:**  Thank you, Your Honor.

**THE COURT:**  All right.  Let's -- yes, Mr. Beaty.

**MR. BEATY:**  The only other matter, Your Honor, is we do have more good news.  We have a second stipulation.  I knew you'd like this.

**THE COURT:**  This is good.  This is good.

**MR. BEATY:**  That's what I'm here for.

So what we'd ask is we'll present that to the Court, and then we would ask that you read the first and second stipulation at the end of the day.

**THE COURT:**  Okay.  Very good.

**MR. BEATY:**  Thank you, Your Honor.

**THE COURT:**  I'll see you at two o'clock.

**DEPUTY CLERK:**  All rise.  This Honorable Court stands in recess for one hour.)

(Whereupon, a lunch recess was taken from 1:06 until 2:06 p.m.)

**DEPUTY CLERK:** All rise. This Honorable Court now resumes in session.

**THE COURT:** Good afternoon. Please be seated, everyone.

Counsel, are we ready to have the jury rejoin us?

**MR. ADRENELE:** Yes, Your Honor. The government is ready.

**THE COURT:** Mr. Kravis?

**MR. KRAVIS:** Yes, Your Honor.

**THE COURT:** All right. Let's have the jury.

(Whereupon, the jury entered the courtroom at 2:10 p.m.)

**THE COURT:** Please be seated, everyone. Members of the jury, welcome back from your lunch break.

Is the government prepared to call its next witness?

**MR. GORDON-MARVIN:** We are, Your Honor. The United States calls Tobias Vincent Maguire.

**THE COURT:** Mr. Maguire, if you come all the way towards me into the well of the courtroom, and then if you'll go over to your left and please stand by the witness box and the courtroom deputy will swear you in.

– – –

TOBIAS V. MAGUIRE, after having been duly sworn, was examined and testified as follows:

– – –

**DEPUTY CLERK:** Please adjust the microphone. Speak directly into it. State and spell your first and last name for the record.

**THE WITNESS:** Tobias Maguire. T-o-b-i-a-s. M-a-g-u-i-r-e.

DIRECT EXAMINATION

**BY MR. GORDON-MARVIN:**

**Q.** Good afternoon, Mr. Maguire. Are you familiar with the defendant, Thomas Goldstein?

**A.** I am, yes.

**Q.** How are you familiar with him?

**A.** I met Tom through poker circles.

**Q.** At some point, did you enter a professional agreement with Mr. Goldstein to represent you in a matter?

**A.** I did, yes.

**Q.** What was that matter?

**A.** The -- to help me collect a debt that someone had owed me.

**Q.** Who owed you the debt?

**A.** Andy Beal.

**Q.** Approximately, how much money did Mr. Beal owe you?

**A.** He owed me personally around $7.8 million.

**Q.** Once you had hired Mr. Goldstein, did Mr. Beal eventually pay that debt?

**A.** I'm sorry?

**Q.** After hiring Mr. Goldstein, did Mr. Beal eventually pay

67

that debt to you?

**A.**   Yes.  Yes.

**Q.**   How much did you pay Mr. Goldstein for his services as an attorney?

**A.**   $500,000.

**Q.**   And to whom did Mr. Goldstein have you send that payment?

**A.**   Bob Safai.

**Q.**   Let's take a step back for a moment.  What's your primary profession?

**A.**   Actor.

**Q.**   What are a few roles you're known for?

**A.**   I'm most known for Spider-Man movies.

**Q.**   Outside of acting, have you also made money in other ways?

**A.**   I'm sorry?

**Q.**   Outside of acting, have you also made money in other ways?

**A.**   Yes.

**Q.**   Is one of those ways poker?

**A.**   Yes.

**Q.**   How did you become familiar with poker?

**A.**   I believe as a child I played lots of games, and I think I initially learned poker when I was a kid.

**Q.**   Over time, did you start playing in more formal settings?

**A.**   Yeah.  Formal meaning I would go to casinos or play in home games, if that's more formal.

**Q.**   When you played in home games, are those ring games or

heads-up games?

**A.**    Both.

**Q.**    Have you played in high-stakes heads-up games?

**A.**    I have.

**Q.**    Are you familiar with -- you said his name earlier -- but Andy Beal?

**A.**    I am.

**Q.**    Who is Mr. Beal?

**A.**    He is -- he lives in Texas.  He's a banker.  A man.

**Q.**    So recognizing Mr. Beal as a Texas banker and man, have you had opportunity to play poker with him?

**A.**    I have.

**Q.**    I'd like to turn to Government Exhibit 34.1, page 1.  If we zoom in on the middle here, there is a text message from December 20, 2019.  Can you see that?

**A.**    Yeah.

**Q.**    Who is this text conversation between?

**A.**    Me and Andy Beal.

**Q.**    In the gray text on the left, what did Mr. Beal say?

**A.**    I'm seeing two gray -- oh, one just went yellow.

**Q.**    Can we actually skip that text.  If we go down one text?

**A.**    "I lose 15,630,000 poker."

**Q.**    What is Mr. Beal saying in this text message?

**A.**    This was the result of our heads-up poker session where he lost that amount and I won that amount.

**Q.** How much of that amount was owed to you personally?

**A.** Fifty percent.

**Q.** After Mr. Beal confirmed that he owed you this much money, what did he do?

**A.** After -- you mean as it related to the money?

**Q.** Yes.  For example, did he promptly pay you or did he not?

**A.** He did not promptly pay me.

**Q.** Instead, what did he do?

**A.** He offered to pay a fraction of what he owed.

**Q.** How did you respond?

**A.** I did not accept.

**Q.** After Mr. Beal refused to pay you, did you eventually end up discussing the issue with Mr. Goldstein?

**A.** I did.

**Q.** I'd like to turn to Exhibit 351, page 1.  What is the date of this top text message?

**A.** February 17, 2020, 6:08 p.m.

**Q.** What did Mr. Goldstein write in the first text message?

**A.** "Hey, it's Tom Goldstein.  I get to NYC at noon eastern tomorrow.  At that point, I can make most anything work.  I think in 15 minutes I can explain what I'm thinking.  Thanks."

**Q.** At some point after this initial conversation, did you hire Mr. Goldstein to help you collect the debt?

**A.** Yes.

**Q.** If we turn to the next page, were you, in relation to this

case, eventually subpoenaed by the grand jury for documents?

**A.**    Yes.

**Q.**    And when you were subpoenaed, did you hire an attorney to help you respond?

**A.**    Yes.

**Q.**    Did you and that attorney go through your communications with Mr. Goldstein and redact attorney-client privileged communications?

**A.**    Yes.

**Q.**    And is that what we're seeing here at that the bottom of the screen?

**A.**    Yes.

**Q.**    If we turn to Exhibit 34.1, page 2, if we zoom in on that middle text message, what is the date of the middle text message?

**A.**    The August 3, 2020.

**Q.**    And who is this message between?

**A.**    Me and Andy.

**Q.**    "Andy" being Andy Beal?

**A.**    Oh, yeah.  Andy Beal.

**Q.**    What did you say in this text message?

**A.**    "Thank you, Andy.  My lawyer's name is Tom Goldstein. You've consulted a lawyer about this, so he says it's not permissible for him to talk to you directly."

**Q.**    If we now turn to Exhibit 35, page 4, this is an e-mail

thread from the next day, August 4, 2020.  Can you see that?

**A.**    Uh-hum.

**Q.**    And if we scroll down slightly, could you read off the first two paragraphs?

**A.**    "Here is my thinking about a fee as well as my proposal. I think I should be paid in the following scenarios.  One, my firm invests a significant amount of work in the project and you decide simply to accept Andy's offer in hours" --

**Q.**    And you can pause there actually?

**A.**    Okay.

**Q.**    When he said "my firm," in that paragraph, what did you understand "my firm" to reference?

**A.**    His firm, law firm.

**Q.**    And then if we go to the very next paragraph, that third paragraph that begins "if you agree."  Can you see that paragraph?

**A.**    Yep.

**Q.**    There's a sentence about halfway through that begins "in this scenario."  Can you see that?

**A.**    Come up.  Yeah.

        **MR. GORDON-MARVIN:**  It's actually one sentence before that.  Apologies, Mr. Resto.

**BY MR. GORDON-MARVIN:**

**Q.**    Could you read off that sentence that begins "in this scenario, I think"?

**A.**    "In this scenario, I think it's fair for you just to pay our hourly rates, which are going to average around $800.  So in a 30-hour scenario, when you collect 2.6 million, you would only pay around 24,000."

**Q.**    When he wrote, "our hourly rates," what did you understand him to be referring to?

**A.**    Of him and whoever his colleagues would be.

**Q.**    Colleagues where?

**A.**    In his firm.

**Q.**    If we go to page 3, if we zoom in here on this middle paragraph and area, this is an e-mail sent on November 3, 2020. Who sent the e-mail?

**A.**    Tom Goldstein.

**Q.**    From what e-mail address?

**A.**    It says TGoldstein@Goldstein&Russell.com.

**Q.**    And broadly, what is he suggesting here or proposing?

**A.**    Broadly?

**Q.**    Yeah.  Could you summarize what he's saying?

**A.**    Let me read it first, if that's okay.

It's a proposal or, as he said, "a revised proposal."

**Q.**    For his fee arrangement?

**A.**    Yeah.

**Q.**    If we go to page 2, looking at the top two e-mails.

          **MR. GORDON-MARVIN:**  If we could scroll down just a bit, Mr. Resto.

**BY MR. GORDON-MARVIN:**

**Q.**    So looking at the lower of these two e-mails, it's sent on November 3, 2020 at 5:33 p.m. from TM.  Can you see that?

**A.**    Uh-hum.  Yes.

**Q.**    Who is TM?

**A.**    That would be me.

**Q.**    And in the second line of your e-mail, what did you ask?

**A.**    "For clarity, the dollar amount for your time up until now would be?"

**Q.**    And looking at the e-mail above, what did Mr. Goldstein write in reply?

**A.**    "Nothing significant.  I think the total time I've spent looking at this problem and talking to you and to Andy's lawyer is probably 25 hours, and I had someone in my office do a day's work so capped at 40K."

**Q.**    When he says "Andy's lawyer," who do you understand Andy to be?

**A.**    Andy Beal.

**Q.**    Now, going to page 1, in this top e-mail, this is a continuation of the discussion of the proposal.  What is the date of this e-mail?

**A.**    March 9, 2021.

**Q.**    I'd like to now shift to Exhibit 350.1.  If we scroll up very slightly.  This is an incoming wire notification.  Can you see it?

**A.**    Yeah.

**Q.**    What's the date of the wire?

**A.**    6/4/2021.

**Q.**    How much is the wire for?

**A.**    $7,815,000.

**Q.**    Who sent the wire?

**A.**    Andy Beal.  Oh, wait.  Just doublechecking this.

**Q.**    If you look at "originator" toward the bottom.

**A.**    "Originator, Beal bank."  That would be Andy Beal.

**Q.**    What did this payment represent?

**A.**    What he owed me personally of that money that I -- that we were talking about.

**Q.**    Of the outstanding poker debt?

**A.**    Yeah.

**Q.**    If we go to the next page, and we zoom in here on the middle, under "electronic credits," this is your bank statement showing that credit coming in; is that right?

**A.**    Yeah.

**Q.**    Now, if we return to Exhibit 33.1, page 1, this is an outgoing wire request.  Can you see it?

**A.**    Yes.

**Q.**    What is the date of the wire being sent?

**A.**    6/7/2021.

**Q.**    So a few days after that incoming wire from Mr. Beal?

**A.**    Yes.

Q.    How much money were you transferring in that wire?

A.    $500,000.

Q.    And if we scroll down, to whom were you sending that money?

A.    Bob Safai.

Q.    Now, going to the next page, this is the confirmation of the wire report.  And then going to the next page, looking toward the middle, what does this show?

A.    It says "domestic wire $500,000."

Q.    On June 8, 2021?

A.    Yeah.

Q.    Why were you sending this wire to Mr. Safai?

A.    That was a payment for Tom Goldstein.

Q.    And who told you to send it to Mr. Safai?

A.    Tom Goldstein.

Q.    If we turn to Exhibit 34.1 and we go to page 7.  There is a set of text messages above and below June 8, 2021.  Can you see these?

A.    Yep.

Q.    In the very top message, what did you say?

A.    "Thank you.  I will get wires out tomorrow."

Q.    And in the following text message, what did you say?

A.    What did I say?  My next one?

Q.    Yeah.

A.    "Meaning Al, Safai for you, parentheticals, and Bosko's.

**Q.** By the way, who is Al?

**A.** Al, I know him as Big Al.

**Q.** Otherwise known as Al DeCarolis?

**A.** Yeah.

**Q.** Turning to the messages, the message sent on June 8, 2021, what did you say in that message?

**A.** "I signed wires Bosko, Al and to Bob, to pay you, obviously in parenthesis.  Thank you, Tom.  Good result."

**Q.** And when you say "to pay you, obviously," do you mean to pay Mr. Goldstein his legal fee?

**A.** Yes.

**Q.** At the time of these transactions, did you have any debts to Mr. Safai?

**A.** No.

**Q.** How about, other than the legal fee, to Mr. Goldstein?

Other than the legal fee you owed Mr. Goldstein, did you owe him any other money?

**A.** Did I owe Tom any other money?  No.

**Q.** During and after this interaction, did Mr. Goldstein ever give you a form W-9?

**A.** I don't recall that, no.

**Q.** Did he ever ask you for a Form 1099?

**A.** I don't recall that, no.

**MR. GORDON-MARVIN:**  A moment?

No further questions at this time.

THE COURT:  Thank you very much, Counsel.

Does the defense wish to cross-examine the witness?

MS. REAVES:  Yes, Your Honor.

CROSS-EXAMINATION

BY MS. REAVES:

Q.    Hi, Mr. Maguire.

A.    Good morning.

Q.    So the government asked you questions about specific legal work that Mr. Goldstein did for you; right?

A.    Yes.

Q.    Now, you were Mr. Goldstein's client for that matter of trying to get repayment on the poker debt from the end of 2020 through 2021; is that right?

A.    Sorry.  Would you repeat that?

Q.    Sure.  I can break it down.  So in some of the e-mails the government showed you when you first reached out to Mr. Goldstein about the legal matter, that was at the end of 2020.  And then the government showed you e-mails where it was 2021 that you were actually paid by Mr. Beal.  Do you remember that?

A.    Yes, it was.

Q.    Okay.  So this was an extended period of time that you were working with Mr. Goldstein?

A.    It was, yeah.

Q.    And during this period of time back then, it was also a

time when you were in regular communication with Mr. Goldstein about other things in your life; right?

**A.**   We were in communication, yeah.

**Q.**   I'm not going to get into any of the details.  But is it fair to say that your interactions with Mr. Goldstein weren't just about this one legal payment that was due to -- due from Mr. Beal?

**A.**   Correct.

**Q.**   And the work that Mr. Goldstein did for you, we saw some of it documented in e-mail, but there wasn't a formal contract that all wrote up for that work; right?

**A.**   Correct.  I don't recall.  No.

**Q.**   Now, obviously, the issue that you hired Mr. Goldstein to help you with was that there were some delays in payment after a poker match; right?

**A.**   Yeah.  I mean, not just delays.

**Q.**   There was a refusal to pay?

**A.**   Yeah.

**Q.**   Okay.  The point that I'm trying to get at is typically poker players try to settle up pretty quickly; right?

**A.**   Yes.

**Q.**   But it is a thing that happens that sometimes there are -- there's is a delay between when a person loses at a poker match and when they actually pay the person that the money is due to; right?

**A.**    Yes.

**Q.**    And I think you said that, even though it was about $15 million that Mr. Beal said he owed to you, not all of that was even your share of the poker winnings; right?

**A.**    Correct.

**Q.**    Now, on direct you testified that Mr. Goldstein asked you to send his legal fee to someone else, a third party, to pay off Mr. Goldstein's debt.  Do you remember that?

**A.**    Yes.

**Q.**    Okay.

**A.**    Wait.  I'm sorry.  Do you mind repeating that?  There were just a few words that I wasn't quite sure.

**Q.**    Sure.  So on direct examination, the government asked you questions about how you paid Mr. Goldstein.  Do you remember that?

**A.**    Yes.

**Q.**    And instead of sending payment directly to Mr. Goldstein, you sent it to someone named Mr. Safai; right?

**A.**    Yes.

**Q.**    Okay.  My question is:  In the poker world, is it common to have kind of a three-way transaction where, if there are two people who are owed money, one person sends money to the third person to settle a debt?

**A.**    Yeah.

**Q.**    Right.  So, in the situation we had here, it's also common

in the poker world that, if you owed Mr. Goldstein money and Mr. Goldstein owed Mr. Safai money, what happened was you just sent it directly to Mr. Safai?

**A.** I mean, that -- I did send it to Safai on Tom's request.

**Q.** Right. Of course.

**A.** But I didn't know if he owed money to Bob or not, so I can't answer that part of it.

**Q.** Fair. But that kind of transaction where a, in the poker world, one person owes money to a third person, you might ask someone who owes you money to help you settle the debt by sending it to them directly?

**A.** Yes.

**Q.** Okay. Now, the amount of money that was owed to you by Mr. Beal and the amount of money that was owed to Mr. Goldstein by you, we're talking about hundreds of thousands or even millions of dollars; right?

**A.** Yes.

**Q.** And in the poker world during some circles that you might be in, sometimes people are willing to transfer that kind of money without having a formal written contract; right?

**A.** Uh-hum. Yes.

**Q.** You might be willing to transfer that amount of money with a verbal agreement; is that right?

**A.** Yes.

**Q.** You might only have documented it in a text message;

right?

**A.** Yes.

**Q.** And so whether it's a payment for something related to poker or even a loan to someone you know, it is possible that someone would transfer that amount of money without formally writing it out into a contract?

**A.** Yes.

**Q.** And the government asked you some questions about the e-mails back and forth between you and Mr. Goldstein. Do you remember those?

**A.** Yeah.

**Q.** And in the e-mails, Mr. Goldstein said, my firm is doing work on this; right?

**A.** Yes.

**Q.** So it wasn't a secret that Mr. Goldstein's law firm was working on your case; right?

**A.** Right.

**Q.** And I believe we also saw a text message where you were telling Mr. Beal that you had hired Mr. Goldstein; right?

**A.** Yes.

**Q.** And my understanding -- is it correct that you also told some other poker players who would do their shares that you had hired Mr. Goldstein?

**A.** Yes.

**Q.** So it wasn't a secret, even among the parties to the legal

issue that you had, that Mr. Goldstein was doing legal work for you?

A.    Correct.

Q.    Now, do you have an accountant?

A.    Yes.

Q.    And does your accountant handle your bookkeeping?

A.    Yes.

Q.    Does your accountant handle your tax preparation?

A.    Yes.

Q.    I think even in the payment that you sent to Mr. Safai on behalf of Mr. Goldstein, is there a company that you use, a business company that you use to make transfers like that?

A.    Same.  My accountant, business manager firm, one in the same, that sent that or that prepares the wire for me.

Q.    Okay.  So you rely on them, the accountant, the business manager firm, to know the rules for tax purposes; right?

A.    Yes.

Q.    And the government asked you some questions about whether you asked for -- Mr. Goldstein asked for a W-9.  Do you remember that?

A.    Yes.

Q.    You rely on your accountant to tell you whether or not you need any tax documents, like a W-9 or a 1099; right?

A.    Yes.

Q.    And if you knew that Mr. Goldstein was supposed to fill

out a W-9 so that you could send a 1099, you would have asked for that from Mr. Goldstein?

A.   Yes.  You mean, if I had been informed or advised to do so?

Q.   Right.  Right.

A.   Yeah.

Q.   So, if your accountant said, "Hey, these are tax documents that we need to fill out to document this legal fee payment," you would have filled out those documents; right?

A.   Correct.  Yes.

Q.   But to be clear, you never discussed the -- the documents with Mr. Goldstein one way or the other?

A.   I don't recall ever discussing that.

Q.   And Mr. Goldstein never told you not to send any tax documents that would show that you had paid him this legal fee?

A.   Correct.

Q.   And Mr. Goldstein never told your accountant not to send the tax documents that would show you had paid this legal fee?

A.   I mean, that was never reported to me.  I don't -- they're not me so I can't say.

Q.   That's fair.  You're not aware of any conversation --

A.   Correct.

Q.   -- Mr. Goldstein had with your accountant saying "don't send me any tax documents about this"; right?

A.   Correct.  Yes.

**MS. REAVES:** No further questions. Thank you.

**THE WITNESS:** Thank you.

**THE COURT:** Thank you very much, Counsel. Does the government wish to conduct any redirect?

REDIRECT EXAMINATION

**BY MR. GORDON-MARVIN:**

**Q.** Mr. Maguire, a moment ago you were discussing relying on your accountant for tax preparation help. Have you ever intentionally given your accountant millions of dollars in false items?

**A.** No.

**Q.** Have you ever tried to trick your accountant into filing a tax return that falsely reported your gambling winnings?

**A.** No.

**MR. GORDON-MARVIN:** Okay. No further questions.

**THE COURT:** Thank you very much. Have all questions been asked of the witness?

**MS. REAVES:** Yes, Your Honor.

**THE COURT:** All right. Very good. Mr. Maguire, thank you very much for your testimony and time. You may step down and be excused.

Have a good afternoon.

**THE WITNESS:** Thank you. You, too.

(Witness excused.)

- - -

THE COURT: Is the government prepared to call its next witness?

MR. GORDON-MARVIN: Yes, Your Honor. We call Yvette Parrish.

THE COURT: Thank you very much.

- - -

YVETTE PARRISH, after having been duly sworn previously, recalled for further testimony, was examined and testified as follows:

- - -

THE COURT: Revenue Officer Parrish, you can go ahead and take your seat as you have already been sworn in. I will remind you that you remain under oath. Please be seated.

THE WITNESS: Thank you.

THE COURT: Good afternoon.

THE WITNESS: Good afternoon.

THE COURT: Counsel for the government?

DIRECT EXAMINATION, Continued

BY MR. GORDON-MARVIN:

Q. Welcome back, Revenue Officer Parrish.

A. Thank you.

Q. I'd like to kind of rewind to where we were talking about last Thursday.

MR. GORDON-MARVIN: Can you turn to Exhibit 19, page 14. Actually, go back one more page. Apologies,

Mr. Resto.  And one more.

**BY MR. GORDON-MARVIN:**

**Q.**  So, if we look at the top here, this is the action date, March 26, 2018.  System date March 28th.  This is the initial field visit that we've been talking about last week and the notes from it.  Can you see this?

**A.**  Yes.

**Q.**  At this field visit that you did with you and your supervisor to Mr. Goldstein's house, had you told Mr. Goldstein and his wife in advance that you would be coming or was this unannounced?

**A.**  This was -- it was unannounced.

**Q.**  And is there a term for when it's unannounced?

**A.**  Just field visits, yes.

**Q.**  Is it sometimes called a "cold call"?

**A.**  Yes.  A cold call, yes.

**Q.**  Was the cold call a typical practice then or was it a typical practice to notify them in advance?

**A.**  It was typical practice at that time.

**Q.**  To do a cold call?

**A.**  Yes.

**Q.**  And during this meeting, Mr. Goldstein told you that the cause was large 2016 tax balance was a really large legal fee from a big case; is that right?

        **MS. REAVES:**  Objection.

THE COURT:  Let's go to the headsets.

MR. GORDON-MARVIN:  I'm happy to redraw.  We can go to the document.

THE COURT:  Well, let me just hear what the concern is first.

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT:  Ms. Reaves, are you on?

MS. REAVES:  Yes, Your Honor.

THE COURT:  Mr. Goldstein?  Thumbs up.  Counsel for the government?

Okay.  Go ahead.  Let me hear the objection.  Go ahead, Counsel.

MS. REAVES:  I just want to make sure that the government is asking open-ended questions and not leading the witness specifically about one of the affirmative acts alleged in the indictment.  I want to make sure that Ms. Parrish's testimony is clear.

THE COURT:  Counsel for the government?

MR. GORDON-MARVIN:  I'm happy to rephrase.  That's what I was going to say.

THE COURT:  All right.  Thank you.

(Whereupon, discussion concluded.)

BY MR. GORDON-MARVIN:

Q.   If we go to page 14, if you're looking toward the middle

of the page, there is a paragraph that begins "RO discussed the balance."  Can you see that?

**A.**    Yes.

**Q.**    What did Mr. Goldstein tell you about the cause for his large 2016 tax balance?

**A.**    He indicated that it was an unusual circumstance as he received a large payment from a case.  He indicated he was a high -- I mean, it was a high profile case of which he typically argued in the Supreme Court.

**Q.**    So, when he told you he argued in the Supreme Court and had gotten a large payment from a case, what did you understand the case to be?

**A.**    An attorney.  I mean, he was an attorney and it was a private case.  I didn't inquire.

**Q.**    So is that to say you understood it to be a payment from a legal case or from something else?

**A.**    Yes, from a legal case.  Yes.  I'm sorry.

**Q.**    During this initial 2016 interaction, how many times did Mr. Goldstein tell you that he did not actually owe taxes for 2016?

**A.**    He never said that.

**Q.**    How many times did he tell you that he had a large poker loss in Asia that caused him to have no taxable income for 2016?

**A.**    I never knew anything about that.

**Q.**   So I want to skip forward here to page 39.  If we look toward the middle here, so a long list of things and above that it says "action date 3/12/19.  System date 3/13/2019."  Can you see that?

**A.**   Yes.

        **MR. GORDON-MARVIN:**  Scrolling down for a bit and then going to the next page.  If we scroll down further here.  And now go to the next page.

**BY MR. GORDON-MARVIN:**

**Q.**   Looking at the top of this page, there's a paragraph that begins "FV to the office of POA."  Can you read off this paragraph?

**A.**   Yes.  "Field visit to the office of POA Walter Deyhle. Met in the conference room with Mr. Goldstein, Mr. Russell, who was authorized to sit in on the meeting."

**Q.**   So this was a different field visit, this one in March of 2019?

**A.**   Correct.

**Q.**   I want to shift to Defense Exhibit 455.  What is this?

**A.**   This is an appointment letter.

**Q.**   And if we scroll down a bit, what's the date of the appointment?

**A.**   3/12/2019.

**Q.**   What's the address listed here?

**A.**   3908 Rosemary Street, Chevy Chase, Maryland, 20815.

Q.    From the ICS history we were just looking at, where did the meeting end up actually occurring?

A.    At his home.  I can't -- I don't know which meeting this is.  I'm sorry.

Q.    We'll switch back to the field visit notes in a moment. But if we go further down, what was the topic of this meeting?

A.    The topic of this meeting was to discuss unpaid taxes that he owed.

Q.    And under this section titled "unpaid amounts you owe," what does paragraph C say?

A.    "If you are unable to pay the full amount you owe, please bring proof of income, expenses, assets and liabilities.  These items will help us to determine your ability to pay and to discuss alternative payment arrangements, such as an installment agreement and offer in compromise or a temporary delay of collection action."

Q.    If a person brought to a meeting with you proof of private debts they owed, how would that affect your determination of their ability to pay?

A.    That would affect my determination by doing an analysis of the documents that they provided.

Q.    And what effect might that have, if any, on a subsequent installment agreement?

A.    It would help to determine what amount they would be able to pay, which includes calculating their income minus their

expenses to get their ability to pay.

Q.    Now, if we go to the next page.  Looking here at the bottom, what were the tax periods that you wanted to discuss during this meeting?

A.    Tax years 2016 and 2017.

Q.    So now as of the date of this letter, how much money total did Mr. Goldstein owe now for his 2017 taxes?

A.    For -- the total is $2,030,396.35 for 2016 and 2017.

Q.    Is that the total for both years or just one?

A.    Yes.  I'm sorry.  Yes.  For both years.

Q.    And so for 2017, specifically, how much did he owe for just that year?

A.    $1,135,713.23.

Q.    How -- for 2016, how much did Mr. Goldstein owe in accrued penalties as of the date of this letter?

A.    As of the date of this letter, the accrued penalty was $179,966.79.

Q.    How much did he owe in accrued interest toward 2016?

A.    $89,859.68.

Q.    So I'd like to switch back to Exhibit 19 to where we were on page 41.  Zooming back out on that top paragraph, the letter we were looking at a little bit ago had identified the Rosemary Street address as the location of the visit.  But looking at the top paragraph, where was the visit held?

A.    This meeting was held at Mr. POA Walter Deyhle's office.

Q.    Looking down to the third paragraph, which begins "he indicated," what did Mr. Goldstein say was the reason he was unable to pay his 2017 taxes?

A.    He indicated that he was in a current predicament because he worked for the country of Malaysia in a legal capacity and now they have a new government and have refused to pay the funds that they owed him.

Q.    How many times did he tell you that part of his predicament was that he had spent millions of dollars on poker in 2017?

A.    I didn't know anything about that.

Q.    If we look down to the paragraph now that's the -- right in the middle that begins "RO discussed."  Can you see that?

A.    Yes.

Q.    Two sentences in, it says, "RO asked what he has done to ensure he will not owe in the future or to liquidate some expenses."  Can you see that?

A.    Yes.

Q.    Why were you asking about what he's done to ensure he won't owe in the future or to liquidate expenses?

A.    So as to not accumulate additional taxes.

Q.    I'd like to switch to Exhibit 92.  Looking at the next page, if we zoom in for a moment here on the top left, what is this document?

A.    This is the Form 433-A.

**Q.**  And what is that otherwise known as?

**A.**  A collection information statement.

**Q.**  What is the revision date listed on the top left corner?

**A.**  February 2019.

**Q.**  If we switch -- if we scroll down actually, and then we go to the next page.  Looking at the top of this page, there's section titled "personal bank accounts."  Can you see that?

**A.**  Yes.

**Q.**  What personal bank accounts did Mr. Goldstein disclose to you?

**A.**  Citibank, Wells Fargo and Bank of Montenegro.

**Q.**  How many bank accounts in Asia did he disclose to you?

**A.**  I'm sorry.  I didn't --

**Q.**  How many bank accounts in Asia did he disclose to you?

**A.**  In Asia?  None.

        **MR. GORDON-MARVIN:**  And if we go to -- actually, if we scroll down for a moment here.  Now, if we go to the next page.  Sorry, page 5.  My apologies, Mr. Resto.

**BY MR. GORDON-MARVIN:**

**Q.**  Zooming me in on the top here, there's a section five "monthly income and expenses."  Who filled in the numbers for this section?

**A.**  I did.

**Q.**  Where did you get the information?

**A.**  From Mr. Goldstein.

Q.   Looking first on the total income side, how much is listed under Section 31 under income?

A.   The -- oh, other income, zero.

Q.   If Mr. Goldstein had told you that he won $250,000 playing poker in the previous month, where would you have recorded that?

A.   Under other income.

Q.   Looking on the expenses side of the section here, if Mr. Goldstein had a mortgage, where would you have listed that?

A.   Under 36, housing and utilities.

Q.   And so if he had a mortgage under 36 housing utilities, the 10,000, what does that refer to?

A.   That refers to the amount of the mortgage payment plus any utilities that he may have paid for the month.

Q.   And that's on a monthly basis?

A.   Correct.

Q.   If Mr. Goldstein had other private debts, on what lines would you have listed those, if he had told you?

A.   If there were other expenses, it would be under the other expenses.

Q.   Would that include recurring payments on a private debt?

A.   That's where it would go, but not necessarily that it would be allowable.

Q.   Well, if he told you, for example, that he had a $10 million debt that he was sometimes paying on, would you

have listed his payments there?

A.    Oh, yes.

Q.    How many times did he mention having a $6 million debt that he was making $30,000 payments on?

A.    Never.

Q.    Looking here at line 43, child/dependent care, what was Mr. Goldstein's reported monthly child care expenses?

A.    $14,000.

Q.    I'd like to switch back to Exhibit 19, page 41.  Going back to that middle paragraph that began "RO discussed 2018."

A.    Uh-hum.

Q.    About halfway through you wrote, "After reviewing CIS, he pays nanny 6K a month and children's tuition of $8,100 a month"; correct?

A.    Correct.

Q.    What did you write after that?

A.    "I informed him that I would not allow the $14,000 a month for schooling and the nanny and he understood and stated he will solicit assistance from relatives to help eliminate the costs."

Q.    When you write "you will not allow," what does that mean?

A.    That means that that amount could not be included as an expense on the 433-A.

Q.    And that's not included to do what?

A.    It's not allowed.  It's not -- that means it's not

included in the calculation to determine his ability to pay.

**Q.**   And what type of agreement would that ultimately affect?

**A.**   I'm --

**Q.**   What agreement would that ultimately affect?

**A.**   The agreement with that, if it's not allowed, it would reduce -- that amount would not be included.  So it would increase the amount that he would be able to pay towards his liability.

**Q.**   Conversely, if he had recorded other large private debts to you --

          **MS. REAVES:**  Objection.

          **MR. GORDON-MARVIN:**  Would that have charged his --

          **MS. REAVES:**  Objection.

          **THE COURT:**  There is an objection.

     (Whereupon, a discussion was held outside the presence of the jury.)

          **THE COURT:**  Ms. Reaves?  Mr. Goldstein?  Counsel for the government?

     All right.  Go ahead, Counsel.

          **MS. REAVES:**  Thank you, Your Honor.  So I've been trying to wait to see where the government is going.  We object because we're running into the same problem as before, that the government seems to be eliciting information about uncharged affirmative acts of evasion of collection that were neither in the indictment nor in the 404(b) motion.

The government is asking a number of questions suggesting that Mr. Goldstein did something wrong in terms of the disclosures he made on the 433-A form.  It's the exact same issue that we had with the questions the government asking about a bank account that he did, in fact, disclose and the government suggested he didn't.

And so we object because this is not a charged act.  It's not in the 404(b) notice, and the jury has no understanding of what is in or out, and we object on those bases.

THE COURT:  Thank you, Counsel.  So I think the -- basically, the objection is admissibility.  This is about uncharged conduct.

What's the government's response?

MR. GORDON-MARVIN:  Well, a few responses.  To start out just as a technical matter, this would be an omission.  An omission is not an affirmative act.  So I think that whole point doesn't really apply here legally.  But setting aside that legal distinction, I think there is a number of things that this is relevant to.

In the first place, this makes it far more likely and it's, therefore, conditionally relevant, to the fact that he didn't previously, in the 2018 meeting, disclose to Revenue Officer Parrish any of his poker.  Right.  If this were actually something that he had mentioned consistently and she perhaps just overlooked it one time, then we might expect to

see it here.  It's not mentioned here.  That's point one.

Point two, is that kind of fast-forwarding the whole theory of the government's case is that Mr. Goldstein effectively hid from the IRS, including Revenue Officer Parrish and then IRS CI and from his own accountants the extent of his gambling in 2017 through 2021.  That directly affects him causing the filing of false returns in each of those years that did not report his gambling winnings.

So this also makes it much more likely and is, therefore, relevant to the fact that he was hiding his poker from his accountants and causing him to file false returns.

I think the third thing here then is that our ultimate alleged affirmative act of evasion for 2021 -- for 2016 is his use of the IOLTA account.  Right.  That's an act of evasion of a payment where he's trying to avoid the IRS seizing money from him by using it.

The fact that he's hiding all of this from RO Parrish further reinforces his willfulness and intent when he eventually used that account.  This is all charged conduct.  It's squarely intrinsic.  It all goes directly to willfulness on a number of different levels.

And then the final level here is that this discussion about what types of expenses she would and would not allow also goes directly to his willful failure to pay.  You know, she's effectively telling him, hey, even for the type of expense, it

is functionally required for, you know, an American citizen who has children, child care and education, there is a limit on that. And that directly applies when we get to it to his willful failure to pay and his intentional choice to preference other payments and other expenses way beyond paying the IRS and paying his taxes.

So I think it's not only intrinsic, but it's extraordinarily relevant to a number of different charges.

**THE COURT:** Thank you, Counsel.

Anything further from the defense?

**MS. REAVES:** Just briefly, Your Honor. The government, the two alleged affirmative acts that relate to this witness are a March 2018 statement to this witness and the government is now saying transfer of money to IOLTA account even though that was long after this witness was working on Mr. Goldstein's collections case. And all of this other information in between that the government is alleging relates to evasion, I think the relevance of it is a long stretch and the material is this order of inclination that should have been charged as 404(b) evidence that the government was going to include it in its allegations here.

**THE COURT:** All right. I'm sorry. Go ahead, finish your sentence.

**MS. REAVES:** Thank you, Your Honor.

**THE COURT:** All right. I think I got it. I'm

hearing from the government both tethering of the evidence to elements of some of the tax charges as well as to the issue of willfulness.  I think it's sufficient.

Objection overruled.

MR. GORDON-MARVIN:  Thank you, Your Honor.

(Whereupon, discussion concluded.)

BY MR. GORDON-MARVIN:

Q.    Returning to where we were, Ms. Parrish, if, conversely, Mr. Goldstein had disclosed significant other debts that he had to make payments on, how would that have affected his installment agreements?

A.    If he had disclosed, it would -- you said how would -- I'm sorry.  Repeat the question.

Q.    If he had disclosed other debts that he was required to make recurring payments on, how would that have affected the installment agreement amount?

A.    It would have reduced the amount that he would have been able to pay.

Q.    And would that have affected the amount you had required him to pay?

A.    Yes.

Q.    When you tell a taxpayer a certain expense is not allowed, if that taxpayer ignores you and keeps doing the same expense, what would you do in response?

A.    One of the actions would be to issue levies, if they

hadn't been done, summons for additional information or look to seize property.

**Q.**   And that's what would happen if the taxpayer ignored you and kept spending?

**A.**   Correct.

**Q.**   When you had this discussion with Mr. Goldstein in the highlighted passage, what did he say in response?

**A.**   He indicated that he would -- he understood and that he would solicit assistance from relatives to help eliminate the costs.

**Q.**   During this meeting, how many times did Mr. Goldstein tell you that he was continuing to spend money playing poker?

**A.**   Never.

**Q.**   If you had learned that he was spending money playing poker, what would you have done?

**A.**   I would have inquired more to find out where the funds were coming from that could have possibly been a levy source. And depending on what the circumstances were, I would, obviously, inform him that I couldn't include that as far as -- I mean, as far as part of calculating the expenses.  And I would, obviously, ask him, you know -- I mean, can't tell him what to do, but I would recommend that he not do that and pay his liabilities.

**Q.**   Looking two paragraphs down, it's a paragraph that starts "RO inquired."  Can you see that?

**A.** Yes.

**Q.** The last line says, "Vintage 2016 sold to reduce expenses." Can you see those?

**A.** Yes.

**Q.** What is this little section in the three lines about the Subaru, the Mercedes and the Bentayga about?

**A.** That's indicating the types of vehicles that Mr. Goldstein owned.

**Q.** If Mr. Goldstein had continued to owe taxes and had come back to you and said "Well, actually I'd like to buy a new Bentley," what would you have done?

**A.** I would have discouraged it and told him that that wasn't a -- probably the right thing to do because of the liabilities.

**Q.** And if you then found out that he had ignored you despite being disallowed and had done that, what might you have done with that Bentley?

**A.** I would have seized it.

**Q.** I'd like to shift topics slightly. If we turn to page 19 -- sorry -- Exhibit 19, which is the exhibit we're on, page 33. Looking here toward the bottom, the fourth paragraph from the bottom begins, "RO also discussed the EST tax payments." Can you see that?

**A.** Yes.

**Q.** What are you describing in this paragraph?

**A.** In this paragraph I'm describing the estimated tax

payments.

Q.    And then going down two paragraphs to the paragraph that begins "RO informed."  The second half of that says "and if government goes into furlough, that he must continue to make ES payments of 90K and monthly voluntary payments."

A.    Correct.

Q.    What -- what were you saying there?

A.    I was basically trying to give Mr. Goldstein a plan of action.  So, even if the government had shut down during that time, he still had an obligation to make his estimated tax payments.

Q.    And speaking of estimated tax payments, if we go to the top of page 42, looking at this very top paragraph from this March 2019 meeting, what did you tell Mr. Goldstein and his power of attorney in that first sentence?

A.    That Mr. Goldstein should be paying $42,000 per month and he needed to make estimated tax payments for January and February totaling a total of $84,000.

Q.    Looking at the last sentence in this paragraph, what did you say?

A.    In this -- in that paragraph?

Q.    Yeah.  The sentence begins "POA asked if."

A.    "POA asked if he should make payments quarterly, and RO informed him that he should make them monthly to allow less strain on quarterly payments, and he agreed."

Q.    If we go to page 51, looking at the bottom here, there's an action date of April 25, 2019.  Can you see that?

A.    Yes.

Q.    What did you note in the first line of that history?

A.    That Mr. Goldstein made the estimated payments as planned for 2019.

Q.    Last week we discussed an installment agreement briefly. Could you just explain what an installment agreement is.

A.    An installment agreement is an amount that a taxpayer is required to pay after an analysis has been performed.

Q.    And I'm realizing I omitted something here, so we're going to rewind for a moment.  Bear with me.  If we go back to exhibit -- this exhibit, page 54 at the top, there's an action date here of May 21, 2019.  Can you see that?

A.    Yes.

Q.    It says, "RO reviewed CIS and the results are as follows." Is that right?

A.    Yes.

Q.    Right below that it says, "standards effective date March 25, 2019."  What does that mean?

A.    That's the date that I got the beginning of the financial statement.

Q.    When you say "the beginning of the financial statement," are you referring to the 433-A?

A.    433-A, yes.  I'm sorry.

Q.    And then below that, what information had you entered into the ICS history?

A.    The State of Maryland, because every location has different standards, so I have to put where the taxpayer resides.  Oh, I'm sorry.  And the county was Maryland -- I mean, Montgomery County.  The number of vehicles was two.

Q.    Wait.  In pausing here for a second, just there's a large section below that that starts, "food, clothing, MISC" and it goes all the way down to other expenses.  What is that section?

A.    I'm sorry.  I didn't hear what you said.

Q.    So there's a section here that begins "food, clothing and miscellaneous" and then it lists various items.  It says "claimed".  It says "allowed."  And it goes all the way through "other expenses."  Can you see that?

A.    Yes.

Q.    What is this section?

A.    This information is -- it comes through the 433-A, the collection information statement, and it's highlighting the expenses that were used to calculate their ability to pay.

Q.    And so looking at this, for example, on the child/dependent care, how much money had he claimed again?

A.    He claimed 14,000.

Q.    And how much were you allowing him?

A.    1,000.

Q.    Now, if we turn back to exhibit -- to page 58.

MR. GORDON-MARVIN: Page 58. Yes, this exhibit. Sorry. I'm not communicating very well with Mr. Resto, which is the awkward that's happening here. Entirely my fault.

BY MR. GORDON-MARVIN:

Q. Looking at this, in the middle here there's an action date May 22, 2019. Can you see that?

A. Yes.

Q. A little bit below, it says "systemic history, action approved, routine IA." What does that mean?

A. That's the type of installment agreement that Mr. Goldstein qualified for.

Q. What type of installment agreement was that?

A. A routine installment agreement.

Q. I'd like to shift to Exhibit 91 on the third page. What is this?

A. This is the form 433-D.

Q. And in layman's terms what is it?

A. It's an installment agreement.

Q. Looking in the kind of dead center here it says, "kind of taxes, 1040" and then "tax periods." What are the tax periods for which this installment agreement apply?

A. For 20 -- tax year 2016 and 2017.

Q. And as of May 21, 2019, how much total did Mr. Goldstein owe in taxes?

A. $1,247,565.65. I'm sorry.

Q.   I think last week we had looked at a levy payment of $954,000.  Do you recall that?

A.   Yes.

Q.   So has that been counted towards this outstanding balance?

A.   That 954,000 was prior to -- was prior to this balance.

Q.   So the number had gone down because it was counted?

A.   Correct.

Q.   If we scroll down to the bottom of this page.  The -- at the very bottom it says, "agreement examined and approved by." Who was it examined and approved by?

A.   Timothy Hartigan.

Q.   Now, a little bit up it says, "your signature, date and title."  Can you see that?

A.   Yes.

Q.   And then going further up, there's a blank area that says, "your signature."

A.   Yes.

Q.   When you finalize an installment agreement, is the taxpayer required to sign it?

A.   It depends on the type of installment agreement.  Some of them require signatures and some don't.

Q.   Would this one had required a signature?

A.   No.

Q.   I'd like to go to page 7 of this document.  What is this?

A.   This is the official document to indicate to Mr. Goldstein

that there is an installment agreement in place.

Q.    What is the date of the document?

A.    The date of the document was 5/22/19.

Q.    And how much was his first payment to be?

A.    His first payment was $10,689.

Q.    And for future payments, how much were they?

A.    Future payments of $20,000.

Q.    Now, if we go to the very next page, look in the middle here, to what tax years did this installment agreement apply?

A.    2016 and 2017.

Q.    And now, rewinding back to the page we were just on, page 7, there's a section at the bottom here titled "conditions of this agreement"?

A.    Yes.

Q.    What does the condition that's the second from the bottom say?

A.    "While this agreement is in effect, you must pay any federal taxes you owe on time."

Q.    And so that refers to future tax periods?

A.    Correct.

Q.    Going to page 8 at the top, what does the very first bullet say?

A.    If you don't meet the, I guess the conditions -- I can't -- that hole is there.  The conditions of this agreement, we'll cancel it, and it may collect the entire amount you

owe -- owe. It's hard to read. I'm sorry. I can't read where that hole is. If you don't meet the conditions of this agreement, we'll cancel it and may collect the entire amount you owe by levy on your income, bank accounts or other assets or by seizing your property.

Q. So in conjunction with the condition we were looking at just a moment ago about the requirement to pay federal tax payments on time, what could happen if federal taxes were not paid on time?

A. Some of the conditions would be issuing levies on the bank accounts, other assets and/or seizing property.

Q. And what does the very next bullet here say, the second bullet?

A. "We may cancel the agreement at any time if we find that collection of the tax is in jeopardy."

Q. Looking down two bullets there's a -- well, it begins "if the agreement defaults." What does "default" mean?

A. Default means that, if the payments are not made timely or if you or if the taxpayer accrues additional liabilities.

Q. When a default occurs, who would the IRS assign to deal with the installment agreement and the taxpayer and the unpaid debt?

A. If the default occurs, it would come back to -- depending on other things, it would come back to the original revenue officer or get assigned back to the field.

Q.    So it would be assigned to some revenue officer to collect?

A.    Correct.

Q.    When is your work effectively done in a collections case?

A.    My work is done once the -- if it's an installment agreement, once that's finalized, then my work is done with the taxpayer.

Q.    So, if we turn back to Exhibit 19, page 59, there's an action date at the top here, May 31, 2019.  Can you see that?

A.    Yes.

Q.    What happened in this notation?

A.    I received a call from Mr. Deyhle regarding -- about a wage garnishment.

Q.    And what did you do in response?

A.    I informed him that the letter was mailed out to stop the wage garnishment since that installment agreement had been approved.

Q.    And looking down at the next two entries from June 8, 2019, what occurred?

A.    The case was closed.

Q.    What did that mean for you personally?

A.    For me, it meant that I was done with the case.

Q.    Where are you currently based as a revenue officer?

A.    Houston, Texas.

Q.    When did you move to Texas?

**A.**    In July of '20.

**Q.**    When you were working on this case in Washington, D.C., did you keep your files electronically or physically or both?

**A.**    We -- at this time, we kept them hard copies.

**Q.**    When you left and went to Texas, what happened to your hard copy of the case file?

**A.**    We sent it to closed case files.

**Q.**    Where is that?

**A.**    In New York.  They keep changing the spot, so I don't know.  It was New York at this time.

**Q.**    You don't even know where it is?

**A.**    I'm sorry?

**Q.**    You don't even know physically where it's located?

**A.**    No, I don't.

**Q.**    When your case file goes to New York, how much control do you have over what happens to it?

**A.**    No control.

**Q.**    If we go to the bottom of this page, this is the last page, page 59.  In this whole 59-page history, how many times did Mr. Goldstein tell you about playing poker?

**A.**    Never.

        **MR. GORDON-MARVIN:**  No additional questions at this time.

        **THE COURT:**  Thank you very much, Counsel.

        Counsel, it might make sense to take a brief break for the

jury at this point.  It's almost 3:30.  And then we'll resume with the cross-examination.  I'm going to invite the jury to step down for their afternoon break.

Please rise for the jury.

(Whereupon, the jury exited the courtroom at 3:21 p.m.)

THE COURT:  Please be seated.  And I'll also invite -- Ms. Parrish, if you want to step down and stretch, you may do so at this time.

MR. GORDON-MARVIN:  Your Honor, could you just remind the witness of the rule.

THE COURT:  Yes, of course.  At this time, we're on cross-examination, so no communication with the government.

THE WITNESS:  Okay.

THE COURT:  You can feel free to step out of the courtroom.  Yes.

(Whereupon, the witness left the witness stand and left the courtroom at 3:21 p.m.)

THE COURT:  Before we break, what can we expect in terms of cross-examination in terms of length?

MS. REAVES:  I'd estimate at least an hour.  I hope not much longer than that.

THE COURT:  Okay.  So an hour or so.  So that may take us close to the end of today.

MS. REAVES:  I do think probably, yes.

THE COURT:  Okay.  And any redirect from the

government?  And then I would like to talk about a few housekeeping matters before we break, including the *New York Times* issue, as well as the ex parte matters with the government.

Why don't we step down for five minutes?

**MR. ADRENELE:**  Thank you, Your Honor.

(Whereupon, a recess was taken from 3:22 until 3:31 p.m.)

**DEPUTY CLERK:**  All rise.  This Honorable Court now resumes in session.

**THE COURT:**  Please be seated, everyone.

Can we have our witness return to us, please?

You can just come retake your seat on the witness stand as you are already under oath.

Are we ready to have the jury join us?

**MR. ADRENELE:**  Yes, Your Honor.

**MR. KRAVIS:**  Yes, Your Honor.

**THE COURT:**  All rise for the jury.

(Whereupon, the jury entered the courtroom at 3:34 p.m.)

**THE COURT:**  Please be seated.

Counsel for the defense?

**MS. REAVES:**  Thank you, Your Honor.

May I approach?

**THE COURT:**  You may.

CROSS-EXAMINATION

**BY MS. REAVES:**

**Q.**   Hi, Ms. Parrish.

**A.**   Hi.

**Q.**   So you work on the civil side of the IRS; right?

**A.**   Correct.

**Q.**   You don't work on the criminal side of IRS?

**A.**   Correct.

**Q.**   And the government asked you a bunch of questions about what information Mr. Goldstein told you about his income.  Do you remember those questions?

**A.**   Yes.

**Q.**   Okay.  Like poker income; right?

**A.**   Correct.

**Q.**   And they also asked questions about what Mr. Goldstein told you about private debt.  Do you remember that?

**A.**   Yes.

**Q.**   Now, those may be questions you would like answered in the collections process, but you're aware that Mr. Goldstein isn't charged with failure to disclose any information on the 433-A form; right?

**A.**   Repeat that.  I'm sorry.

        **MR. GORDON-MARVIN:**  Objection.

        **MS. REAVES:**  You're aware that Mr. Goldstein is not charged --

        **THE COURT:**  I heard an objection, Counsel.  Let's come to the headsets.

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT: All right. Do we have counsel for the government? All right. Mr. Reaves? Mr. Goldstein?

Go ahead, Counsel, for the government.

MR. GORDON-MARVIN: I think this absolutely lacks foundation. There's been no establishment of whether Ms. Parrish is aware of any of the charges in this case. She's just a fact witness.

THE COURT: All right. So the objection is lack of foundation?

MR. GORDON-MARVIN: Correct.

THE COURT: All right. Ms. Reaves?

MS. REAVES: So I understand that she's a fact witness. I think we've had a number of discussions today about the fact that the government is going to elicit information that it believes goes to willfulness, but knows that they cannot argue that those facts are actually things that the jury can convict on.

I think that we should be allowed to ask questions to make clear to the jury which parts of Ms. Parrish's testimony are actually relevant to the charged offenses and to the charge of affirmative acts.

THE COURT: Okay. And how does the question do that?

MS. REAVES: So I'm asking whether she is aware that

a number of the questions she was just asked about are not actually related or are not actually conduct that's charged in the indictment. She could answer yes or no whether she knows, but I think it's fair to ask the question.

**THE COURT:** All right. Thank you. I'm going to allow the question.

Objection overruled.

(Whereupon, discussion concluded.)

**BY MS. REAVES:**

**Q.** Thank you, Ms. Parrish.

So you are aware that Mr. Goldstein is not charged in this case with failure to disclose any information that you were requesting for him on the 433-A form; right?

**A.** I don't understand the question. Repeat that.

**Q.** Okay. So you were asked questions about, for example, if there was additional information that you might have put down on a 433-A form if you had it; right?

**A.** Correct.

**Q.** And this is the collections information form that allows you to decide how much a taxpayer should be -- would be required to pay towards their outstanding taxes; right?

**A.** Correct.

**Q.** My question is: You're aware that Mr. Goldstein is not charged with providing you false information or incomplete information on that 433-A; right?

**A.**    Yes.  I'm -- I don't -- I don't know -- I didn't know anything about any additional income so --

**Q.**    And the question is:  Did you know that he's not charged with providing you any incomplete or false information on that form?

**A.**    No, I don't.

**Q.**    You don't know one way or the other?

**A.**    Correct.

**Q.**    All right.  And are you aware that he is not charged with providing any false or incomplete information in that March meeting in 2019 with his power of attorney?

**A.**    Correct.

**Q.**    Now, the government asked you a number of questions about what would have happened if Mr. Goldstein had provided you different information during your collections process.  Do you remember that?

**A.**    Yes.

**Q.**    I want to talk to you about what actually happened with Mr. Goldstein's taxes.  Okay?

**A.**    Okay.

**Q.**    All right.  And so I'm going to start with 2016, because 2016 is the only year when Mr. Goldstein is charged with tax evasion.  Okay?

**A.**    Okay.

**Q.**    All right.  So I want to pull up, this is Government's

Exhibit 73.

Now, do you see Government's Exhibit 73 on the screen?

A.    Yes.

Q.    And at the top it says "Internal Revenue Service account transcript"?

A.    Correct.

Q.    You've seen documents like this before?

A.    Yes.

Q.    Right.  So this is the Internal Revenue Service's account, their record of the payments that a taxpayer has made towards their taxes; right?

A.    Correct.

Q.    And it also includes the amount of money that they're charged in taxes, whether for taxes, penalties or interest; is that right?

A.    Correct.

Q.    And we see that the date on this form in the bottom right corner says "as of August 22, 2022."  Do you see that?

A.    Yes.

Q.    And then for this form, in the top left corner, top left middle, it says "tax period December 31, 2016."  Do you see that?

A.    Yes.

Q.    So this account transcript is the IRS record of Mr. Goldstein's charges and payments for his 2016 taxes; right?

**A.**    Correct.

**Q.**    And then, if we see at the bottom of this first page still it says, "account balance." Do you see that at the top?

**A.**    Yeah.

**Q.**    And the account balance is zero. Do you see that?

**A.**    Yes.

**Q.**    So that means that Mr. Goldstein has paid his 2016 taxes in full?

**A.**    Yes.

**Q.**    I want you to take a chance to look at some of the next page. So let's scroll to just page 2 right now. All right. And so that we can kind of understand how this works, there is a bar that says "transactions" and then a bunch of information beneath that. Do you see that?

**A.**    Correct.

**Q.**    So to orient us, there is a column that says "explanation of transaction." Do you see that?

**A.**    Yes.

**Q.**    All right. And then there is a date and an amount. Do you see that, too?

**A.**    Yes.

**Q.**    And so below that is the history of what happened in the tax case, what date and what amount; right?

**A.**    Correct.

**Q.**    Question about the first entry is tax return filed and the

date is November 27, 2017.  Do you see that?

**A.**    Correct.

**Q.**    So, if Mr. Goldstein electronically filed his tax return in October of 2017, is it still possible that the date reflected on this would say November?

**A.**    No.  It would say October, whenever the return was received.

**Q.**    Okay.  So, if there is -- maybe ask this a different way. If there is a delay between when the return is sent and when the IRS receives that, would that explain a discrepancy between dates on the IRS record and when the taxpayer submitted it?

**A.**    I don't think I'm following you.  The date that -- that's on here would reflect the date that it was actually received by the IRS.

**Q.**    Okay.  So let's set aside the particular date.  The information that I want you to focus on here is it says, "tax return filed" and then there is a large number on the right-hand side.  What is that number?

**A.**    $1,679,649.

**Q.**    And what that reflects is the amount of money that the taxpayer owes at the time that their return is received by the IRS; is that right?

**A.**    Correct.

**Q.**    And if we go back to looking at the broader document, if we go back to looking at this broader document, there are a

number of other entries below that.  Do you see that?

A.    Yes.

Q.    So we have an entry that says W-2 or 1099 withholding?

A.    Uh-hum.

Q.    Right?  And then there's a date and there's an amount reflected there?

A.    Correct.

Q.    Okay.  So is that date and amount, that's the amount that was withheld from taxes and then applied to the taxes?

A.    Correct.

Q.    All right.  And then we see another entry that says penalty for not prepaying taxes.  Do you see that?

A.    Yes.

Q.    And then on the right-hand column, we see a figure of $39,393.  That's a penalty that was assessed for not prepaying taxes; right?

A.    Correct.

Q.    Okay.  And then we see a couple others.  There's another penalty for late payment of tax and an interest charge for late payments.  Do you see both of those figures?

A.    Yes.

Q.    So, if a taxpayer does not pay on tax day, essentially, they will be assessed penalties and interest; right?

A.    Correct.

Q.    And that becomes part of what they have to pay towards

their taxes; right?

**A.**   Correct.

**Q.**   Okay.  So I want to -- one other point on this to make sure we understand, and then we're going to go through this in a little bit more detail.

So when we see positive numbers here, the positive numbers are charges that the IRS is assessing saying the taxpayer needs to pay these; right?

**A.**   Correct.

**Q.**   And then the negative numbers are, whether it's a credit or a payment, the negative numbers are payments towards the taxes; right?

**A.**   Correct.

**Q.**   All right.  So I want to stay on the 2016 tax return, again because this is the tax evasion year.

**MS. REAVES:**  And I'm also going to pull up, just as a demonstrative, this is going to be Defense Exhibit 790.  And if we could do both at the same time, let me know if it's possible, Mr. Mendoza.  If it's not, then we'll see.

**MR. GORDON-MARVIN:**  Objection.

**THE COURT:**  Come to the headsets.

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:**  Do we have Ms. Reaves?

**MS. REAVES:**  Yes.

THE COURT:  Mr. Goldstein?

Counsel for the government, go ahead.

MR. GORDON-MARVIN:  I believe the demonstrative they're about to pull up is one that the witness has literally never seen before, and it's omitting a number of important data points from the account transcript.

So there's -- unless I'm missing something, there's a huge lack of foundation and this document should not be shown to the witness until she has established all of it is accurate.

THE COURT:  All right.  So -- go ahead.  Go ahead, Counsel.

MR. GORDON-MARVIN:  I'm happy to let them show it to just her and have them compare it against the account transcript and walk through it with the witness first.  But it shouldn't be shown to the jury until they've established its accuracy and walked through all of it with her.

THE COURT:  All right.  So the concern is lack of foundation and also concerns about the accuracy of the exhibit.

Response from the defense?

MS. REAVES:  Yes, Your Honor.  So as the foundation, the exhibit is based off of this account transcript and this witness is more than qualified to discuss the information that we're going to walk through in the account transcript.

I know she hasn't seen it before.  It's because the defense doesn't have the benefit of speaking to all of the

government witnesses in advance.

But I don't think this is any different from a number of the demonstrative exhibits that the government has used with witnesses that they provided to us very shortly in advance of testimony.  We also had questions about the accuracy of them, and the Court determined that that was appropriate for cross-examination.

I would also say we provided this to the government earlier.  They said that there was -- they believed there was an error.  I did identify one, provided them a corrected one, and they haven't raised any other concerns about accuracy.  I don't know what concerns they think they have, but I think, on redirect, if they want to, they could address that.

THE COURT:  All right.  Thank you.

Anything further from the government?

MR. GORDON-MARVIN:  Yeah.  I think there's a real disconnect here.  The fact that the witness might, hypothetically speaking, have the ability to assess a chart and then speak to its accuracy, vis-a=vis an account transcript, it's different from the fact that this witness has not looked at this chart.

THE COURT:  All right.

MR. GORDON-MARVIN:  There has not been a foundation established for this chart's accuracy.  It has to be established first --

THE COURT: Okay. Thank you. I think, again, we can use the account statement, which is already up on the screen and published to the jury. You can walk through the account statement with the witness. She can look at your exhibit. But until you walk through it, I'm not going to let you publish it to the jury.

MS. REAVES: Sure. Thank you.

THE COURT: All right. Thank you.

(Whereupon, discussion concluded.)

BY MS. REAVES:

Q.   So, Ms. Parrish, what I want you to do is I want you to keep the account transcript up. And we'll keep it up on the screen. And if you look in your binder, there is a physical piece of paper that's a chart that I want you to take out and look at and walk through with me. Okay?

A.   This?

Q.   Yes.

A.   Okay.

Q.   All right. So what I want to do is I want to talk through --

MS. REAVES: And, Mr. Mendoza, if we could just make the account transcript itself bigger. We don't need the split screen right now.

BY MS. REAVES:

Q.   Okay. So I want to walk through some of the information

on the account transcript, and I want to have you compare it to that chart that you have in front of you.  Okay?

**A.**   Okay.

**Q.**   All right.  So the chart in front of you, it's for the 2016 tax year history.  Do you see that?

**A.**   Yes.

**Q.**   And then on the vertical Y axis, there are amounts of money.  Do you see that?

**A.**   Yes.

**Q.**   And then on the X axis, there is a red horizontal line that shows you dates and times.  Do you see that?

**A.**   Yes.

**Q.**   And then what I want to walk through with you are some particular dates that are reflected in the 2016 tax history.  Okay?

**A.**   Okay.

**Q.**   So we already talked about the fact that the -- when the tax return was received by the IRS, Mr. Goldstein is assessed over $1.6 million in taxes.  Do you see that?

**A.**   Yes.

**Q.**   And then on the same day, November 27th of 2017, he was also assessed a penalty for not prepaying taxes, a penalty for late payment of taxes and interest charged for late payment.  Do you see that?

**A.**   Yes.

Q.    And in the chart that you have -- I'm sorry.   Let me make sure I'm totally complete -- there was also on the same day, on November 27th of 2017, there was a reduced or removed penalty for not prepaying taxes of minus $2.28.   Do you see that?

A.    Uh-hum.

Q.    So on November 27th of 2017, all of those charges were assessed against Mr. Goldstein; right?

A.    Yes.

Q.    And when I say "all of those charges," I mean the taxes due, two sets of penalties, interest and then a little bit of a adjustment to the penalty.   Do you see that?

A.    Yes.

Q.    And then do you see that on your chart we have marked the amount of money due to the IRS if you look on the graph that you have in front of you?

A.    Yes.

Q.    Right?   For November 27, 2017, we have marked 1.8 million, a little bit more than that, for taxes, penalties and interest. Are you following me?

A.    Yes.

Q.    Now, before that, Mr. Goldstein had about $28,000 withheld and provided to the IRS; right?

A.    Yes.

Q.    And so you see that -- an entry before that on April 15, 2017, and it's also on our account transcript, April 15, 2017.

There is a $28,515 payment; right?

**A.**    That's the withholding, yes.

**Q.**    Withholding, yes.  Okay.  And the withholding means that this is money that was taken out in advance that is being sent to the IRS; right?

**A.**    Yes.

**Q.**    So I just want to make sure that you're following me here. So the graph that you have in front of you shows the tax payments and the penalties, interest or taxes assessed based on the information in this transcript.  Okay?

**A.**    Uh-hum.

**Q.**    You understand that?

**A.**    Yes.

**Q.**    All right.  So let's go to the next entry.  If we go to the next page on page 3, I want to talk about some of the specific payments that came up in your direct examination with the government.

So, if you remember, and it was a few days ago, but you testified that, when you went to Mr. Goldstein's house in March of 2018, he wrote you a $100,000 check.  Do you remember that?

**A.**    Yes.

**Q.**    Okay.  And so looking at this IRS transcript, the second line here says "payment."  I know it says "levy," but if we look at the date and the amount, we see that this is the $100,000 check that Mr. Goldstein wrote and gave to you on the

date of your first visit; right?

**A.**    Correct.

**Q.**    And then if you look again at my graph, March 26, 2018, we have labeled that there was a $100,000 payment.  Okay.  Do you see that?

**A.**    On March -- yes.

**Q.**    All right.  Going back to the account transcript, the next payment we see, we see a bunch of zeroes where various things were happening in the IRS.  But the next time we see actually a credit or a debit is July 5th of 2018.  Do you see that?

**A.**    Yes.

**Q.**    So if we look at July 5th of 2018, it looks like there was a levy where $11,000 779 -- I'm sorry -- $11,779.93 was taken out of Mr. Goldstein's bank accounts; is that right?

**A.**    Yes.

**Q.**    And then we also see that, soon after that, there was a representative appointed for Mr. Goldstein's case.  Do you see that?

**A.**    Yes.

**Q.**    All right.  "Appointed representative," that's referring to the power of attorney who was working on Mr. Goldstein's case; right?

**A.**    Correct.

**Q.**    And that was Mr. Deyhle?  You don't remember the name.  It was his accountant; right?

**A.**    Yes.

**Q.**    Now, if you look again at my graph, it's hard to see the difference because it's of the amount of money we're talking about, but there are two bars -- sorry.  I'm going to go back to -- going back to the account transcript.  Okay?

**MS. REAVES:**    And can I see the whole page 3, please?

**BY MS. REAVES:**

**Q.**    So, in general, I want to make sure that the jury understands that what's happening here is March 26, 2018 was when you started your case by talking to Mr. Goldstein; right?

**A.**    Correct.

**Q.**    And then, after that, there is a period where you issued some levies; right?

**A.**    Correct.

**Q.**    And you issued some levies even though he had provided this $100,000 check; right?

**A.**    Repeat that please.

**Q.**    You issued levies even though he had provided a $100,000 check; right?

**A.**    Correct.

**Q.**    Because that was only partial payment; right?

**A.**    Correct.

**Q.**    So, even if he was cooperative, if he only has a partial payment, you still needed to levy his accounts; right?

**A.**    Not necessarily.

Q.   Okay.  Well, in this case, you still decided to levy his accounts; right?

A.   Correct.

Q.   All right.  And then we're seeing that a number of these are either levy payments or other payments that happen in 2018. Do you see that?

A.   Yes.

Q.   So, for example, we see in -- on July 18, 2018, there was a 27,000, a little bit more than $27,000 levy?

A.   Correct.

Q.   All right.  The next one, we see a miscellaneous payment for $50,000?

A.   Correct.

Q.   All right.  And miscellaneous payment here was another check that you had received?

A.   It could have been.  I don't know if I posted that or not.

Q.   Okay.  But it's not listed as a levy?

A.   No, it says "miscellaneous payment."

Q.   Okay.  The next is a levy payment of $247?

A.   Correct.

Q.   The next is a levy payment of $29,140.89?

A.   Correct.

Q.   The next, we see a payment of almost a million dollars; correct?

A.   Correct.

**Q.** And that was in 2018?

**A.** Yes.

**Q.** Now, I want you to go back to the graph we have. And do you see on the graph we have marked there is a $50,000 payment from August of 2018?

**A.** Yes.

**Q.** And we also have marked almost a million-dollar payment from December of 2018?

**A.** Correct.

**Q.** And then you can see in the graph that what's happening is, as Mr. Goldstein is making these payments or as you're levying his accounts his balance is going down; right?

**A.** Correct.

**Q.** And like a million-dollar payment is pretty significant; right?

**A.** Say that again.

**Q.** A million-dollar payment is pretty significant?

**A.** It's crazy what --

**Q.** Is pretty significant?

**A.** Oh, yeah. I didn't hear you. Yes.

**Q.** Let's keep looking at the account transcript from the IRS. Now we're in 2019 and we see about a $9,000 -- a little bit more than $9,000 that was levied?

**A.** Yes.

**Q.** All right. We see about $5,000 a little bit later in that

month that was levied?

**A.**    Yes.

**Q.**    Okay.  And then can we go to page 4 of this document?  All right.  We see another miscellaneous payment for $9,498.  Do you see that?

**A.**    Yes.

**Q.**    Now, you mentioned on direct examination, I think the government showed you a portion of your account transcript where you were essentially saying Mr. Goldstein no longer needed to garnish his wages.  Do you remember that?

**A.**    Say that again.

**Q.**    Towards the end of the government's direct examination, they showed you some notes where you were saying to his employer or his power of attorney that they could stop garnishing his wages; right?

**A.**    Correct.

**Q.**    But is it possible that this miscellaneous payment was at least one way of garnishing his wages?

**A.**    I can't say yes or no.  I don't -- I can't verify what that miscellaneous payment is.

**Q.**    You don't remember off the top of my head?

**A.**    In 2018, no.

**Q.**    Right.  Okay.  All right.  The next payment we see is a miscellaneous payment for $400,000.  Do you see that?

**A.**    Yes.

Q.   That's, again, a pretty large payment towards Mr. Goldstein's tax debt; right?

A.   Correct.

Q.   And this is in March of 2019?

A.   Correct.

Q.   And then if you look again at the graph that I have in front of you when we have that $400,000 payment, Mr. Goldstein's balance towards 2016 goes down again significantly; right?

A.   Yes.

Q.   Okay.  Because $400,000 had been paid; right?

A.   Right.

Q.   And then we see a number of more levy payments.  All of these are in 2019.  Do you see that?

A.   Yes.

Q.   Now, at the bottom of this page on the third from the bottom, it says installment agreement established.  Do you see that?

A.   Correct.

Q.   All right.  And the date is May 22nd of 2019; right?

A.   Correct.

Q.   All right.  And that date corresponds with the documents the government showed you about Mr. Goldstein entering into an installment agreement on May 22nd of 2019.  Do you see that?

A.   Yes.

Q.    Okay.  And so as of May 22, 2019, you had credited all of the payments, whether levies or these miscellaneous payments, towards what Mr. Goldstein owed in taxes; right?

A.    Correct.

Q.    All right.  And at that point, given those payments and the other information you had, you were willing to put Mr. Goldstein on an installment agreement; right?

A.    Correct.

Q.    Now, let's look at the next page.

      All right.  So, after that installment agreement is established, May 22nd of 2019, do you notice that we no longer see any levy payments on this; right?

A.    Correct.

Q.    Is it consistent with your experience that, after a taxpayer enters into an installment agreement, you no longer need to levy their account; right?

A.    Correct.

Q.    Because they're on the installment agreement?

A.    Correct.

Q.    Right?  And then we see that, in fact, for the rest of this page, there are a number of negative $20,000 entries.  Do you see that?

A.    Yes.

Q.    Okay.  And that was because Mr. Goldstein had agreed to pay $20,000 a month towards his tax debt; right?

**A.**    Correct.

**Q.**    We also see towards the bottom of this sheet that there start to be like a combination of descriptions that one is penalty for late payment of tax and payment.  Do you see that?

**A.**    Yes.

**Q.**    Right?  And they seem kind of to be matched together. It's plus 20,000, minus 20,000.  Do you see that?

**A.**    Yes.

**Q.**    So at this point in time, Mr. Goldstein is being assessed penalties and paying off the penalties; right?

**A.**    Correct.

**Q.**    And if we go to page 6 -- page 6 continues on where Mr. Goldstein is being assessed the penalty and pays the penalty.  Do you see that?

**A.**    Yes.

**Q.**    All right.  And he's also charged some interest for a late payment.  We see, I think it's line 196?

**A.**    Yes.

**Q.**    And actually there are several other charges below where he's being charged interest for a late payment and then paying all that interest?

**A.**    Yes.

**Q.**    Do you see that?

**A.**    Yes.

**Q.**    I want to focus on -- this is the -- almost the last page,

but a couple of dates in this last page.  So do you see that on -- if we go back to page 6 briefly.

Okay.  Do you see that on March 8th of 2021 there is a payment for $20,000?

A.    Uh-hum.

Q.    Did you know that in March of 2021 Mr. Goldstein was buying a house?

A.    I'm sorry?

Q.    Did you know that in March of 2021 Mr. Goldstein was buying a house?

A.    No, I did not.

Q.    Okay.  Regardless, I want you to count how many payments Mr. Goldstein makes after that March date in 2021.  We can do it together.  So we see one payment in April of 2021 for $20,000?

A.    Uh-hum.

Q.    Is that right?

A.    Yes.

Q.    Okay.  And then let's turn to the last page.  And then we see one payment in -- it's still in April of 2021 for a little less than $20,000; right?

A.    Yes.

Q.    Okay.  And then, after that, we see an entry that says "refund issued"; right?

A.    Yes.

Q.    And refund issued -- or it's actually in a couple places, but essentially this means Mr. Goldstein had finally gotten to the point where he had paid off his tax debt, penalties and interest and the IRS was giving him back $42; right?

A.    Repeat that?

Q.    So at the point when the refund was issued, that's because Mr. Goldstein had paid off his taxes, his penalties and his interest and there was a $42 adjustment that the IRS needed to make; right?

A.    That's what it appears, yes.

Q.    Okay.  So since March 2021, Mr. Goldstein paid a little less than $40,000 that was left over for his 2016 taxes; right?

A.    Yes.

Q.    Right.  And then he was done with his 2016 taxes as of April of 2021?

A.    That's what it looks like.

Q.    Right.  In the IRS account transcript; right?

A.    Yes.

Q.    Now, looking at what we went through in this chart and comparing -- I'm sorry -- in this account transcript and comparing it to the graph that I put in front of you, is there anything inaccurate you see in the graph that I put in front of you?

A.    I was just following along, so I'm assuming it's correct.

MS. REAVES:    Your Honor, I'd ask if we could publish

to the jury.

MR. GORDON-MARVIN:  Objection we ask for.

THE COURT:  Do you want to be heard?

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT:  Ms. Reaves, do we have you?

MS. REAVES:  Yes.

THE COURT:  Mr. Goldstein?  Thumbs up.

Counsel for the government, please go ahead.

MR. GORDON-MARVIN:  I'm not sure I saw this --

THE COURT:  Can you speak directly in the microphone?

MR. GORDON-MARVIN:  Sure, Your Honor.  There are a number of red kind of negative bars.  I'm not sure I caught an explanation of what these negative bars are or which things they correspond to.  Perhaps I overlooked it, but I didn't know --

THE COURT:  You are talking about the bars below the line?

MR. GORDON-MARVIN:  Correct.

THE COURT:  All right.  Ms. Reaves?

MS. REAVES:  I'm happy to ask the witness about those bars if that's what the government's concern is about.

MR. GORDON-MARVIN:  Just tell us what they're supposed to represent.

THE COURT:  Okay.  All right.  And we talked about

the installment agreement, but if you want to go ahead and ask a follow-up, that's fine.

(Whereupon, discussion concluded.)

**BY MS. REAVES:**

**Q.**    All right.  And, Ms. Parrish, the last thing I want to clarify, so if we go back to -- if we go back up to page 6 of the account transcript, do you see this portion we talked about where Mr. Goldstein is paying $20,000 and then being assessed a credit for 20,000 and then paying 20,000 and then being assessed 20,000 again?

**A.**    Yes.

**Q.**    All right.  And do you see that, for example, those dates -- if we go back up to page 5 -- those dates of paying 20,000 and then being assessed 20,000 either penalty and interest, that starts around March of 2020?

**A.**    Yes.

**Q.**    Okay.  When he starts being assessed penalties and then paying them; right?

**A.**    Yes.

**Q.**    Okay.  And do you see -- if you look at the chart that you have in front of you, do you see that, for March 2020, there are some red bars that are below the line?

**A.**    Uh-hum.

**Q.**    And do you see that, so, for example, if we look at March 2020, first there was a negative of $20,000, which means

Mr. Goldstein paid, and then he was assessed the penalty; right?

A.    Yes.

Q.    And then you see that happens again.  There is a negative for the amount that he's paid and then he's assessed the penalty; right?

A.    Yes.

Q.    So do you see that on the chart that you have in front of you what's happening is the chart goes negative when Mr. Goldstein makes his payment pursuant to the installment agreement and then he's assessed the penalty that brings it back to zero.  Does that make sense?

A.    No.  You lost me.

Q.    Okay.  Let me try again.

So if I add 20 and subtract 20, it cancels out to zero; right?

A.    Correct.

Q.    And if I have paid $20,000 to the IRS before they have actually assessed me the penalties, then I will be negative for a little bit; right?

A.    Correct.

Q.    Because I will have paid the IRS money that they haven't charged me yet; right?

A.    Correct.

Q.    So what I'm trying to demonstrate is that, in the period

that you are looking at that's after March of 2020, what's happening is that Mr. Goldstein is paying the 20,000 under his installment agreement, and then he's being charged penalties and that happens repeatedly; right?

**A.**   Right.

**Q.**   Okay.  And do you see that that's what's reflected in the same time period from March 2020 until the end of this time period on this graph in front of you?

**A.**   Uh-hum.

**Q.**   Is that right?

**A.**   Yes.

**Q.**   Do you see anything incorrect in what I'm describing there?

**A.**   I don't see it here.

**Q.**   Okay.  Thank you.

        **MS. REAVES:**  So I'd ask to publish this to the jury.

        **THE COURT:**  Thank you, Counsel.  Can we come to the headsets for just a moment?

    (Whereupon, a discussion was held outside the presence of the jury.)

        **THE COURT:**  We have Ms. Reaves?

        **MS. REAVES:**  Yes.

        **THE COURT:**  Mr. Goldstein?  Counsel for the government?

    I'm just looking at it.  On the $400,000 payment on

March 11th, should that be 2018 or 2019 on your chart?  The last blue box, I think it says March 11, 2018, unless the Court's --

MS. REAVES:  That is an error you caught.

THE COURT:  Okay.  All right.

MS. REAVES:  And to be clear, we're asking this for the demonstrative --

THE COURT:  Okay.  All right.  Just make sure it's clear for the jury.

MS. REAVES:  Okay.

MR. GORDON-MARVIN:  May we?

THE COURT:  Yes, Counsel, go ahead.

MR. GORDON-MARVIN:  One objection here.  I think this is a profoundly misleading chart in the sense that I think Ms. Reaves is trying to suggest that Mr. Goldstein had somehow totally resolved his tax balance and paid this off and his account balance had ended in February of 2020.  And very clearly, the account transcript shows that that's not true and it goes through 2021.

THE COURT:  All right.  Thank you, Counsel.  The objection is noted.  I'm going to allow the exhibit to come in and the government can make those notes when they do further examination of the witness.  Thank you.

(Whereupon, discussion concluded.)

MS. REAVES:  All right.  So can we have -- this is

Defense Exhibit 790 up on the screen, please.

**BY MS. REAVES:**

Q.   So, Ms. Parrish, this is the chart that we were just going through.  I'm not going to go through the whole account transcript again.  Right.  But I want to make sure that we're clear on a few things.

So, first off, that we talked about there was withholding from Mr. Goldstein on tax day in April 15, 2017.  Do you see that?

A.   Correct.

Q.   And then, once the IRS received his tax return, there were taxes, penalties and interest assessed against him; right?

A.   Correct.

Q.   March 26, 2018 was the date of your in-person meeting with Mr. Goldstein when he gave you a $100,000 check; right?

A.   Correct.

Q.   And then once you have the $100,000 check, the balance goes down $100,000; right?

A.   Correct.

Q.   We pointed out there was a $50,000 payment for -- I think it was listed as miscellaneous in August of 2018.  Once you receive that check, the balance goes down; right?

A.   Correct.

Q.   The next payment we see labeled on this chart, and we labeled the big ones, is almost a million-dollar payment in

December of 2018.  Do you see that?

A.    Yes.

Q.    And then, because Mr. Goldstein had paid a million dollars towards his 2016 taxes, his balance went down significantly; right?

A.    Yes.

Q.    Then there is a typo here.  In March of 2019, this should be, we talked about the $400,000 payment that was in the IRS account transcript.  Do you remember that?

A.    Yes.

Q.    And so again, a $400,000 payment made Mr. Goldstein's balance go down significantly; right?

A.    Yes.

Q.    May 22, 2019 was the date of the installment agreement; right?

A.    Yes.

Q.    And after that date, you were no longer levying from Mr. Goldstein's accounts because he was in the installment agreement; right?

A.    Correct.

Q.    And then for the rest of this time period, we saw those $20,000 payments; right?

A.    Yes.

Q.    And then at some point it says zero balance on this.  Do you see that?

**A.**    Yes.

**Q.**    Okay.  Now, that doesn't mean that Mr. Goldstein had finished paying his penalties and interest; right?

**A.**    Correct.

**Q.**    So because we talked about the rest of that, the portion where it goes below in red is Mr. Goldstein's paying and then being assessed more penalties, paying and then being assessed more interest; right?

**A.**    Yes.

**Q.**    But that's a period from about February of 2020 until his last payment in April of 2021, that's where we saw that Mr. Goldstein was making these consistent $20,000 payments; right?

**A.**    Yes.

**Q.**    And then the installment agreement, according that transcript, was over in May of 2021; right?

**A.**    I can't say.

**Q.**    Okay.  We can go back to the transcript to look at it.

**A.**    Because the installment agreement included 2016 and 2017.

**Q.**    So we're going to talk about those.  And actually, we're not going to talk in as much detail, but I want to go to those other years.

So 2016 is the year where Mr. Goldstein is charged with tax evasion.  I want to talk about 2017, 2019, 2020 and 2021, because those are the years where Mr. Goldstein is charged with

willful failure to pay.  Okay?

**A.**    Uh-hum.

**Q.**    Is that a yes?

**A.**    I only had the case up until I closed it in 2019, so I can't speak to after that.

**Q.**    Okay.

        **MS. REAVES:**  The Court's indulgence.

**BY MS. REAVES:**

**Q.**    And I just want to make sure that, speaking to 2016, you're clear overall.  I think the government showed you some figures about the total amount of money that Mr. Goldstein owed on his taxes.  Do you remember that?

**A.**    Yes.

**Q.**    But so, essentially, from the IRS transcript, we know that Mr. Goldstein paid over $2 million in taxes, penalties and interest for 2016; right?

**A.**    Yes.

**Q.**    Now, let's turn to 2017.  Okay?  So I want to pull up -- this is Government's Exhibit 74.  Now, I understand that we're not going to go through this in as much detail.  But again, Government's Exhibit 74, we can tell the tax year because it says "tax period 2017."  Do you see that?

**A.**    Yes.

**Q.**    And we know that his taxes are paid off because the account balance is zero.  Do you see that?

**A.**   Yes.

**Q.**   And if we go to page 2, now, page 2 shows us that, when the return was received by the IRS, Mr. Goldstein owed over a million dollars in taxes; right?

**A.**   Correct.

**Q.**   We see that Mr. Goldstein made a payment on April 15th of 2018 of about $25,000; right?

**A.**   Correct.

**Q.**   And then we see that Mr. Goldstein is charged penalties and interest; right?

**A.**   Yes.

**Q.**   Now, if we go to look at this page and now look at the second page.  All right.  So we saw -- we see a line that says "first levy issued on module."  Do you see is that?

**A.**   Yes.

**Q.**   But there's no actual debit amount on that line; right?

**A.**   Um-hum.

**Q.**   So that means that there were no actual levies that were taken and applied for that entry; right?

**A.**   Correct.

**Q.**   And then if you look at this whole page, we never see any payments that show that there were levies for the 2017 taxes; right?

**A.**   Correct.

**Q.**   We also see that Mr. Goldstein is assessed additional

penalties and additional interest at the bottom for having paid his taxes late; right?

A.    Correct.

Q.    And then Mr. Goldstein's last payment on his 2017 taxes was in April of 2021 for $1,345,200.96; right?

A.    Yes.

Q.    And at the end of this transcript, so he was all paid up on his 2017 taxes; right?

A.    Correct.

Q.    Let's talk about the 2019 taxes.  Okay?

A.    All right.

Q.    So I want to pull up -- this is Government's Exhibit 76. Now, this is the IRS transcript for the 2019 tax year; right?

A.    Correct.

Q.    Again, we can see account balance is zero; right?

A.    Uh-hum.

Q.    And zero means that the taxes are paid off?

A.    Yes.

Q.    If we look at page 2, we can see when the tax return was received by the IRS.  He was assessed over $700,000 in taxes; right?

A.    Yes.

Q.    We see that he makes a number of estimated tax payments?

A.    Um-hum.

Q.    Is that a yes?

**A.**    Yes.

**Q.**    And then you remember the government pointed out that the agreement was that Mr. Goldstein would be paying $42,000 a year -- a month towards these payments; right?

**A.**    Correct.

**Q.**    And we see that there are several of these estimated tax payments; right?

**A.**    I'm sorry.  What was the last?

**Q.**    We see that, in fact, there are several estimated tax payments in the IRS record; right?

**A.**    Correct.

**Q.**    At the bottom line, we see "pending installment agreement"?

**A.**    Yes.

**Q.**    And this is in January of 2021.  Do you see that?

**A.**    Yes.

**Q.**    And so that means that outstanding taxes for 2019 were being wrapped into an installment agreement; right?

**A.**    It says "pending" so it wasn't official.

**Q.**    It wasn't official yet, but there was some communication about creating a new installment agreement?

**A.**    Correct.

**Q.**    And let's go to page 3.  If you look at page 3, we still don't see any levies that were issued against the account for 2019 taxes; right?

**A.**    Because the pending installment agreement was there.

**Q.**    Well, also because, if we look at the top line, in April of 2021 Mr. Goldstein made a payment of $553,295.27; right?

**A.**    Yes.

**Q.**    And it's fair to say that the next negative credits after that are all refunds or credits to the account; right?

**A.**    Yes.

**Q.**    So essentially, with that April 2021 payment of over half a million dollars, Mr. Goldstein paid off his taxes for 2019?

**A.**    I really can't say unless I look at the entire case, so I'm just going off of this.  But I would need additional information to make a valid --

**Q.**    Well, this is the IRS account transcript that shows the history of payments that the IRS has from Mr. Goldstein; right?

**A.**    Correct.

**Q.**    And the way the IRS's official records of payments ends is that Mr. Goldstein made more than a half a million dollar payment and that's the last payment that he's made; right?

**A.**    For what year?  Because I only dealt with him through 2017.  I didn't do 2019.

**Q.**    Sure.

**A.**    I can't officially speak on that.

**Q.**    Right.  Well, I'm just asking you to explain to me, from your understanding working with collections, this is the IRS accounts transcript for 2019; right?

A.    Yes.

Q.    Okay.  And it says it has a zero balance after -- zero balance; right?

A.    I didn't hear the word.

Q.    Mr. Goldstein has a zero balance for his 2019 taxes; right?

A.    Yes.  Correct.

Q.    And there is a more than half a million dollar payment that is the last payment listed in the IRS records?

A.    Yeah.

Q.    Okay.  Let's go to 2020.  This is Government's Exhibit 77. This is for tax year 2020?

A.    Correct.

Q.    And the account balance is zero dollars?

A.    Correct.

Q.    It says "accrued interest of $592.33."  Do you know why there would still be accrued interest listed there?

A.    I don't.

Q.    Let's go to page 2 of this document.  Now, again, the zero balance means that the balance on the account is paid off for 2020?

A.    Yes.

Q.    All right.  When the return was received by the IRS, Mr. Goldstein owed almost a million dollars; right?

A.    Correct.

**Q.** And again, we see some withholding on April 15th of 2021; right?

**A.** Uh-hum.

**Q.** And again, we see penalties at the bottom for late payments?

**A.** Yes.

**Q.** And let's look at page 3, and we see interest charged for late payments?

**A.** Right.

**Q.** But the last payment for Mr. Goldstein's 2020 taxes is in December of 2022 over a million dollars; right?

**A.** Correct.

**Q.** Okay. Finally, we have Government's Exhibit 78, which is the account transcript for 2021. All right. So tax period is this is tax year 2021?

**A.** Yes.

**Q.** All right. Again, account balance is zero?

**A.** Yes.

**Q.** That means it's all paid off?

**A.** Yes.

**Q.** And then let's go to page 2 of this document. Page 2 we see that, when the IRS received Mr. Goldstein's return, he owed over a million dollars in taxes; right?

**A.** Yes.

**Q.** He was assessed additional -- I'm sorry. He paid

withholding on April 15th of 2022?

**A.**    Yes.

**Q.**    And then if we go to page 3, we see a payment of over $1.4 million in October of 2022; right?

**A.**    Yes.

**Q.**    And then we also see that Mr. Goldstein was assessed a number of penalties and interest for having paid late; right?

**A.**    Correct.

**Q.**    Okay.  Thank you.  Appreciate you going through that with me.

**A.**    Um-hum.

**Q.**    So, from looking through all of those account transcripts, in March 26 of 2021, there were no levies issued against Mr. Goldstein's tax debt; right?

**A.**    It doesn't appear.

**Q.**    Now, I want to talk to you a little bit about this Form 33-A (sic.) that is the government showed you a couple of different versions of on direct examination.  Okay?

**A.**    Yes.

**Q.**    Now, this is the collection of information statement; right?

**A.**    Yeah.  Correct.

         **MS. REAVES:**  And if we pull up -- this is Government Exhibit 93 and I want to go to page 16.

**BY MS. REAVES:**

**Q.** So I think you mentioned on direct examination that your files are somewhere in storage for the IRS; right?

**A.** Correct.

**Q.** And so do you recognize that this Government Exhibit 93 is the version of the 433-A that was actually in your files; right?

**A.** Correct.

**Q.** And you see that it's your handwriting on this?

**A.** Yes.

**Q.** And so this is a version that you filled out when you first met with Mr. Goldstein at his house; right?

**A.** Correct.

**MS. REAVES:** So if we -- can I have the whole page, please?

**BY MS. REAVES:**

**Q.** Right. You see that you wrote down that Mr. Goldstein was self-employed; right?

**A.** Yes.

**Q.** And you knew that he was a lawyer?

**A.** Correct.

**Q.** So he was self-employed at his law firm?

**A.** Correct.

**Q.** And then if we go to page -- it's page 15 just because of the way it's scanned. It's the second page of this document. You see there are personal bank accounts listed; right?

**A.** Yes.

**Q.** And Mr. Goldstein disclosed to you that he had bank accounts at Citibank; right?

**A.** Correct.

**Q.** And Wells Fargo; right?

**A.** Yes.

**Q.** And a bank in Montenegro; right?

**A.** Correct.

**Q.** Mr. Goldstein also disclosed to you that he had retirement savings; right?

**A.** Correct.

**Q.** And that some portion of it had been liquidated?

**A.** Yes.

**Q.** So you were aware of Mr. Goldstein having bank accounts at all three of these institutions; right?

**A.** Correct.

**Q.** And I think you said on direct examination that, when you issue a levy to the bank, you give them the taxpayer Social Security number; right?

**A.** Correct.

**Q.** And so that allows the bank to identify any accounts that that taxpayer has at the bank; right?

**A.** Correct.

**Q.** Now, the government also asked you a bunch of questions on direct examination about how many times Mr. Goldstein ever

mentioned that he played poker.  Do you remember those questions?

**A.**    Yes.

**Q.**    Did Mr. Goldstein tell you about charitable donations he had made?

**A.**    No.

**Q.**    Did Mr. Goldstein tell you about spending hundreds of thousands of dollars to fund SCOTUSblog?

**A.**    To fund what?

**Q.**    SCOTUSblog.

**A.**    I don't know what that is.

**Q.**    You don't know what SCOTUSblog is; right?

**A.**    No.

**Q.**    Well, Mr. Goldstein didn't tell you those things or he didn't tell you about poker because you didn't ask about poker; right?

**A.**    Correct.

**Q.**    And even before you talked to Mr. Goldstein, you could have known that Mr. Goldstein played poker; right?

**A.**    No.

**Q.**    Well, you testified that the way you start your investigations is to do an initial analysis of a taxpayer; right?

**A.**    Correct.

**Q.**    And you work for the IRS; right?

**A.** Correct.

**Q.** And so the IRS has access to people's tax returns?

**A.** Correct.

**Q.** And you were going to talk to Mr. Goldstein about his 2016 tax return; right?

**A.** Correct.

**Q.** And when you showed up to talk to Mr. Goldstein about his 2016 tax returns, you didn't tell him this is about your tax returns, but I didn't look at your tax returns; right?

**A.** Did I tell him that?  Is that what you are saying?

**Q.** Yeah.

**A.** No, I did not.

**Q.** So Mr. Goldstein had no way of knowing that you didn't look at his 2016 tax returns before you came to talk to him about his 2016 taxes?

**A.** No.

**Q.** And you certainly could have looked at his 2016 tax returns as part of your initial analysis; right?

**A.** Correct.

**Q.** And in fact, in later years, you've changed your practice so that you do, in fact, look at the tax returns before you go and talk to someone about a collections case; right?

**A.** Correct.

**Q.** And I want to pull up -- this is Government's Exhibit 54. Right.  Government's Exhibit 54 is the IRS version of

Mr. Goldstein's tax return.  Do you see that?

**A.**    Yes.

**Q.**    All right.  And if we look at the wages listed on line 7, right, so on line 7, we see wages, salaries and tips, et cetera.  Do you see that?

**A.**    Correct.

**Q.**    Now, you knew that Mr. Goldstein was a lawyer; right?

**A.**    Yes.

**Q.**    So you understand wages and salaries to refer to legal income; right?

**A.**    Correct.

**Q.**    Then if we look at line 17, in line 17 it mentions S Corporations.  Do you see that?

**A.**    Yes.

**Q.**    And Mr. Goldstein's business is an S Corporation; right?

**A.**    Uh-hum.

**Q.**    Is that correct?

**A.**    Yes.

**Q.**    And you see that there is income listed on the S Corporation line; right?

**A.**    Correct.

**Q.**    And so there is also income listed on Mr. Goldstein's 2021 -- I'm sorry -- 2016 tax return on line 21; right?

**A.**    Yes.

**Q.**    And line 21 says "other income" is over $13.7 million;

right?

**A.**   Yes.

**Q.**   So the tax return that Mr. Goldstein filed with the IRS didn't say that that other income was legal income related to a case; right?

**A.**   Repeat that.

**Q.**   Mr. Goldstein included other income on his tax return separate from his legal income; right?

**A.**   Correct.

**Q.**   All right.  And then if we look at -- this is page 3 -- I'm sorry -- page 33 of the tax return that the IRS has for Mr. Goldstein, and on page 33 it says that that other income was gambling winnings; right?

**A.**   Yes.

**Q.**   Right?  So Mr. Goldstein had every reason to believe that you already knew about over $13 million of gambling winnings that were reported on his tax return when you came to talk to him; right?

**A.**   I can't say what he believed, but --

**Q.**   Okay.  But you never told him that you hadn't looked at this information; right?

**A.**   Correct.

**Q.**   And this was information in the IRS records; right?

**A.**   This is what?

**Q.**   This is information in the IRS records?

**A.**    Yes.

**Q.**    Now, this was last week, but the government also asked you questions about whether you knew that gambling had come up in a prior audit for Mr. Goldstein.  Do you remember that?

**A.**    Correct.

**Q.**    And I think you pointed out in direct examination that Mr. Goldstein even had a prior power of attorney listed because of this prior audit; right?

**A.**    Correct.

**Q.**    So you knew that there had been a prior audit; right?

**A.**    He said he had some challenges prior.  I don't know if that was an audit or not.

**Q.**    So you knew that Mr. Goldstein had had a prior interaction with the IRS where he needed a power of attorney; right?

**A.**    Correct.

**Q.**    And those records were also records that you could have accessed; right?

**A.**    Correct.

**Q.**    And now I want to pull up Government's Exhibit 86.  This is a record from the prior IRS interaction Mr. Goldstein had. Did you attempt to look at the records from that prior investigation?

**A.**    I had no need.  I did not.

**Q.**    Okay.  But if you had looked at those prior records, you would have seen that gambling was something that came up in

that; right?

**A.** If I had pulled it up and it was on here, yes.

**Q.** Again, you didn't tell Mr. Goldstein that you hadn't looked up the prior records so that he -- so that Mr. Goldstein knew that you were unaware of any gambling income; right?

**A.** Repeat the question.

**Q.** You didn't tell Mr. Goldstein that you hadn't looked at the records of the prior audit; right?

**A.** I hadn't because that's not a practice that we do.

**Q.** Okay. But Mr. Goldstein had no way of knowing what your practices were or were not; right?

**A.** I can't say what Mr. Goldstein knew what the practices were or not, but --

**Q.** You didn't tell Mr. Goldstein that your practice is not to look at the prior IRS records; right?

**A.** Correct.

**Q.** And the prior IRS records include that he gambles; right?

**A.** Are you asking me does the prior records --

**Q.** Yes.

**A.** The 2016 showed it, yes. You just showed it to me.

**Q.** Now, the government also asked you questions on direct examination about a 1099 for about $26 million from the Gores Group. Do you remember that?

**A.** From the what?

**Q.** The Gores Group?

**A.** Oh, yes.

**Q.** Okay. And so this is a business that you had investigated as a potential levy source; is that right?

**A.** Correct.

**Q.** And the government pointed out that you weren't aware that the money from the Gores Group was related to gambling. Do you remember that?

**A.** Correct.

**Q.** But the way the 1099s work is that it's the Gores Group that sent this 1099 to the IRS; right?

**A.** Correct.

**Q.** Mr. Goldstein would not have been the person to fill out the 1099 from the Gores Group; right?

**A.** Correct.

**Q.** So whatever the Gores Group said that that money was for, Mr. Goldstein wasn't the one who provided that information to the IRS?

**A.** Correct.

**Q.** Now, I want to talk about -- make sure that we're clear on a couple different periods of time when you interacted with Mr. Goldstein or his power of attorney. Okay?

**A.** Uh-hum.

**Q.** So in March of 2018, that was the meeting with you and your supervisor, Mr. Goldstein, and his wife at their house; right?

**A.** Correct.

**Q.** But after that, Mr. Goldstein or his power of attorney sent you a power of attorney form; right?

**A.** Correct.

**Q.** And then after that, that means that the power of attorney was the person designated to kind of work with you to resolve Mr. Goldstein's collections issue; right?

**A.** Correct.

**Q.** And there were actually two accountants assigned who were working with you on Mr. Goldstein's tax collection; right?

**A.** I just remember Mr. Deyhle. I don't know --

**Q.** Do you remember a Mr. Choi?

**A.** No, I don't.

**Q.** Would it surprise you if you had told investigators in this case that you met with both Mr. Deyhle and Mr. Choi about Mr. Goldstein's tax debt?

**A.** Say that again.

**Q.** Would it surprise you if you told investigators in this case that you met with both Mr. Deyhle and Mr. Choi about Mr. Goldstein's tax debt?

**A.** If I did, it would have been in the history. So I can't -- I don't recall.

**Q.** But do you have any doubt that that's what you told to the investigators in this case?

**A.** Mr. Choi, that doesn't ring a bell.

Q.   Regardless, do you remember that Mr. Deyhle was the person who was supposed to be helping Mr. Goldstein resolve his collections case; right?

A.   Correct.

Q.   And so in the IRS records that the government went through with you, when we see a notation that says "POA," power of attorney, that's referring to Mr. Deyhle; right?

A.   Correct.

Q.   So, for example, I want to pull up -- this is Government's Exhibit 19 on page 17 of it.  We see at the bottom, there's a line that says "RO received form 2848 from POA, Walter Deyhle. He also phoned a couple of times and RO has not been able to speak with him."  Do you see that?

A.   Yes.

Q.   Now, that means that Mr. Deyhle was reaching out to you to talk about Mr. Goldstein's taxes; right?

A.   Correct.

Q.   And if we look at page 19 of the same exhibit, on page 19 we see a note that says -- one second.

        MS. REAVES:  It might be the next page.  Actually go back two pages.  Apologies.  Back one more.  Okay.  I can't find the particular page.

BY MS. REAVES:

Q.   The point is, when you had further field visits with the power of attorney in the power of attorney office, that was

with Mr. Deyhle; right?

**A.**    Correct.

**Q.**    And on, let's say, page 23.  Now, the government talked to you on direct about a period of time where it seemed that Mr. Goldstein, according to the government, hadn't been cooperative.  Do you remember that?

**A.**    No, I don't.

**Q.**    Well, there's a notice in the bottom of your record that the government pointed you to where it says "there has been no additional contact from POA since receiving the check in his office."  Do you see that?

**A.**    Yes.

**Q.**    I just want to be clear that when you say there is no additional contact from POA, you were saying there was no additional contact from Mr. Deyhle; right?

**A.**    Correct.

**Q.**    Now, part of the reason that taxpayers assign a power of attorney, like an accountant, is because accountants can be helpful in allowing the taxpayer to know how to deal with their taxes; right?

**A.**    Yes.

**Q.**    And your initial impression of Mr. Goldstein was that he didn't seem to know a lot about taxes and was more focused on his business; right?

**A.**    I didn't make that assumption.

**Q.** Okay. So do you remember -- again, do you remember talking to investigators and the government in this case about -- do you remember interviews with investigators and the government in this case?

**A.** Investigators or --

**Q.** Yes. An investigator, Agent Andrew Accardi, Special Agent -- a Revenue Agent Chuck Walker, who talked to you about this case in August of 2020?

**A.** I don't remember their names, but briefly.

**Q.** Okay. But you remember talking to --

**A.** Yes.

**Q.** -- a criminal IRS investigator and another revenue officer about Mr. Goldstein in August of 2020?

**A.** Correct.

**Q.** And in August of 2020, you told them you did not get the impression that Mr. Goldstein knows a lot about taxes as he seemed to be more focused on his business. Do you remember that?

**A.** Yes.

**Q.** And in the later meetings that you had with Mr. Deyhle to try to resolve Mr. Goldstein's taxes, you felt like Mr. Deyhle was the one in charge in those meetings; right?

**A.** I felt like he was what?

**Q.** The one in charge.

**A.** Yes.

**Q.**   Mr. Deyhle was a little arrogant about trying to get this all wrapped up?

**A.**   He was what?

**Q.**   A little bit arrogant.

**A.**   I can't say.  I don't --

**Q.**   Do you remember, again, talking to investigators in this case?  You talked to them again in November of 2024.

**A.**   I could have.  I talked to a lot of people.  I don't remember.

**Q.**   This would have been an interview with some of the prosecutors who are sitting over here at the table and also with Agent Accardi again.  Do you remember that?

**A.**   I could have.  I'm going to be honest, I don't remember who I talked to.

**Q.**   It's hard to remember precisely who you talked to?

**A.**   Yes.

**Q.**   Okay.  Well, in that February 2024 interview, you told these investigators that you recalled Mr. Deyhle appearing arrogant about getting the collections activity wrapped up. Does that sound right?

**A.**   Possibly could have said that, to be honest.  That was a long time ago.

**Q.**   It was a long time ago, so it's hard to remember exactly what you said; right?

**A.**   Yes.

**Q.** And it's also hard to remember exactly what other people said; right?

**A.** Well, it depends on what they said.

**Q.** That's fair. In terms of your collections work for Mr. Goldstein, if you needed more information, you could have asked Mr. Deyhle?

**A.** Say that again.

**Q.** In terms of the collections work you were doing while Mr. Goldstein had a power of attorney, you could have asked Mr. Deyhle for that information; right?

**A.** Correct. Correct.

**Q.** So you also didn't ask Mr. Deyhle about whether or not Mr. Goldstein had any gambling activity; right?

**A.** I -- if I had come across it, I would have. Because as a power of attorney, he's stepping in the place of the taxpayer.

**Q.** Right. But my question is, you did not ask Mr. Deyhle about anything --

**A.** No. I did not.

**Q.** -- related to poker; right?

**A.** No. I did not.

**Q.** Or gambling?

**A.** No, I did not.

**Q.** All right. Now, I want to focus on some of the statements that you said that Mr. Goldstein made in that initial March 2018 meeting. Okay?

**A.**    Okay.

**Q.**    So on direct examination, the government asked you questions about the reason for the balance on Mr. Goldstein's 2016 taxes.  Do you remember that?

**A.**    Yes.

**Q.**    So I want to pull it up.  This is Government Exhibit 19 on page 14.  All right.  And the part that the government highlighted today is one, two, three, four paragraphs down, "RO discussed the balance and Mr. Goldstein indicated that it was an unusual circumstance as he received a large payment from a case."  Do you see that?

**A.**    Yes.

**Q.**    Now, what you wrote was the word "balance"; right?

**A.**    Yes.

**Q.**    So you didn't write that this was discussing the source of the income that caused him to have tax liability back in 2016; right?

**A.**    In this particular instance, I talked about what he owed which was the balance.

**Q.**    Right.  Right.  The balance.  So just to make sure we're all clear, the balance is the amount that's left due on my taxes; right?

**A.**    Correct.

**Q.**    Okay.  So that's different from the original amount that is due in taxes or could be different?

**A.**    It could be different, yes.

**Q.**    All right.  And it's different from the amount of taxable income that a person has; right?

**A.**    Could be.

**Q.**    And because your role in the IRS is collections, you don't conduct audits; right?

**A.**    Correct.

**Q.**    And so when you're going to collect the balance for taxpayers, you're focused on how they're going to pay whatever is left due; right?

**A.**    Correct.

**Q.**    Your job is not a portion of the IRS that goes back and figures out whether or not the tax was accurately -- accurately assessed in the first place; right?

**A.**    I don't, but I have depending on the circumstance.

**Q.**    Right.  But in Mr. Goldstein's case, your focus was collecting the balance; right?

**A.**    Correct.

**Q.**    And in order to pay the balance on those taxes, Mr. Goldstein told you he was waiting for money to come in for a big legal case; right?

**A.**    Correct.

**Q.**    This was almost eight years ago; right?

**A.**    Yes.

**Q.**    And I think you said on direct that you have 50 or 60

cases at a time?

**A.** Correct.

**Q.** And you also told the government on direct that can be hectic; right?

**A.** I said what?

**Q.** You told the government on direct examination that can be hectic to have so many cases at once?

**A.** Yes.

**Q.** And so it's hard to remember precisely what a person said eight years ago; right?

**A.** Correct.

**Q.** But what you do remember is that you were focused on asking Mr. Goldstein about how he was going to pay the balance on his outstanding taxes?

**A.** I was focused on that? I'm sorry.

**Q.** Your goal in your conversation with Mr. Goldstein was to ask him how he was going to pay the balance on his outstanding taxes?

**A.** Correct.

            **MS. REAVES:** And I just want to -- can we go back to the record just briefly? This is Government Exhibit 19. Let's go to page 12.

**BY MS. REAVES:**

**Q.** Now, I noticed that a number of times the government was having you read out of your record from before; right?

**A.**    Uh-hum.

**Q.**    And that's because it's hard to remember, again, exactly what happened eight years ago; right?

**A.**    Yes.

**Q.**    And even this, they pointed out at the top that the action date was March 26th?

**A.**    Uh-hum.

**Q.**    And then the system date was March 28th.  Do you see that?

**A.**    Correct.

**Q.**    And essentially, that means that, for whatever reason, you weren't able to input these notes on the day you talked to Mr. Goldstein.  It was put in the system on the 28th; right?

**A.**    Correct.

**Q.**    Now, is there any point in your notes where you document that you discussed with Mr. Goldstein the source of the income for 20 -- for 2016?

**A.**    You mean where he got his income from for 2016?

**Q.**    Yes.

**A.**    No.  He said he was an attorney, so that's what I went by.

**Q.**    Okay.  But your questions were all about how he was going to pay the balance?

**A.**    Correct.

**Q.**    Now, the government also asked you on direct examination about something that you thought was odd that Mr. Goldstein said.  Do you remember that?

**A.** Not really.

**Q.** On direct examination you testified that Mr. Goldstein asked something about whether -- whether you were from the criminal or the civil part of the IRS; right?

**A.** Oh, right.  Yes.

**Q.** And you work on the civil side?

**A.** Yes.

**Q.** And it involves an officer, like you, going to taxpayers who owe the government money; right?

**A.** Correct.

**Q.** Basically, everyone you work with owes late taxes; right?

**A.** Or unfiled returns.

**Q.** And when you go and talk to taxpayers about how to resolve this, there is multiple options for resolving the outstanding debt; right?

**A.** Correct.

**Q.** So you could set up an installment plan?

**A.** Correct.

**Q.** You could levy from bank accounts?

**A.** Correct.

**Q.** You could try to get voluntary payments?

**A.** Correct.

**Q.** Which can include partial payments?

**A.** Yes.

**Q.** And when you talk to all of these taxpayers about this, no

one asks you whether you're from the criminal division; right?

**A.**    No.

**Q.**    Because everyone assumes that this process of figuring out how to pay your taxes is a civil IRS matter; right?

**A.**    Correct.

**Q.**    And you've worked with thousands of taxpayers resolving this as a civil IRS matter; right?

**A.**    Correct.

**Q.**    Now, I want to talk specifically --

**THE COURT:**  Counsel, can we come to the headsets for just a moment, please?

**MS. REAVES:**  Yes.

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:**  Ms. Reaves?

**MS. REAVES:**  Yes.

**THE COURT:**  Mr. Goldstein?  Mr. Kravis?  Government Counsel, it's 4:45.  I just want to get a sense of where we are in terms of cross.  And also I assume the government wants to do redirect.  I'd love to get this witness done today, but I can't hold the jury here much longer.

Where are we?

**MS. REAVES:**  So I'm sorry.  I took a little bit longer than I expected to with the initial diagram.  I think I need probably another 15 minutes.  I can try to cut things a

little bit shorter, but I assume the government needs some time for redirect.

THE COURT:  All right.  What's the government's point on redirect?

MR. GORDON-MARVIN:  I mean, I suppose it depends on what else is covered in the next 15 minutes, but we're looking at at least 10 to 15 minutes for redirect because there has been a number of things said here that need to be addressed. Is there any chance we can have the jury, just today, stay a little bit later?

THE COURT:  We can go a little bit later, but I don't want to go another hour, so...

MR. GORDON-MARVIN:  I don't think any of us do.

THE COURT:  All right.  Because I don't want to cut folks off.  But I'm going to have to cut you off to try to get the witness in.  Let's let the defense try to wrap in the next --

MS. REAVES:  I will try to be efficient.

THE COURT:  All right.  And then we'll see where we are on redirect.

MR. GORDON-MARVIN:  Thank you, Your Honor.

MS. REAVES:  Thank you.

(Whereupon, discussion concluded.)

BY MS. REAVES:

Q.  All right.  The government asked you some questions about

whether Mr. Goldstein had a bank account in Asia.  Do you remember that?

**A.**    Yes.

**Q.**    Do you have any reason to believe that Mr. Goldstein has a bank account in Asia?

**A.**    No.

**Q.**    Have you been shown any documents that would suggest Mr. Goldstein has a bank account in Asia?

**A.**    No.

**Q.**    I want to go -- and I'll try to be a little bit more efficient.  Let's go to Government Exhibit 455.

All right.  Now, this is the -- a copy of a notice that you sent putting Mr. Goldstein on a payment plan; right?

**A.**    Correct.

**Q.**    And at the bottom, it talks about conditions of this agreement and what a taxpayer needs to do in order to comply with the agreement; right?

**A.**    Correct.

**Q.**    Nothing in this notice says that, if you don't comply with this agreement, you are committing a crime; right?

**A.**    No.

**Q.**    All right.  And nothing in this notice says that, if you proceed with an installment plan instead of paying all of your taxes right now, you're committing a crime; right?

**A.**    No.

Q.    Let's go to -- this is Defense Exhibit 748 at page 2.

All right.  So this is a copy of the installment agreement that Mr. Goldstein went on with you.  Do you see that?

A.    Uh-hum.

Q.    And the monthly payment was $20,000 a month.  Do you see is that?

A.    Uh-hum.

Q.    And there is a number of notices in this document that explains to a taxpayer what their obligations are; right?

A.    Yes.

Q.    And it also explains what will happen if they fail to meet those obligations; right?

A.    Yes.

Q.    So if you see -- can we go back to the full document?  In what you need to do immediately, there is a line that says "if you default, you may have to pay a user fee to reinstate it." Do you see that?

A.    Yes.

Q.    It doesn't say that you're going to be charged with a crime if you default; right?

A.    Uh-hum.

        MS. REAVES:  Can we go to the next page?  Actually go back one page, please.  Next page, please.  We see -- I'm sorry.  Let's go to the pages 4 to 5 of this agreement.

BY MS. REAVES:

**Q.** So total failure to pay. Do you see this section at that bottom that says "total failure to pay"?

**A.** Yes.

**Q.** Now, there's a number of things that happen if you fail to pay your debt under this installment plan; right?

**A.** Correct.

**Q.** There's interest that can be assessed up to 25 percent. I'm sorry. There is -- at the top, it says "we assess a one-half percent monthly penalty for not paying the tax you owe by the due date"; right?

**A.** Yes.

**Q.** We also see, it says "we charge the penalty for each month or part of a month the payment is late. However, the penalty can't be more than 25 percent in total." Do you see that?

**A.** Yes.

**Q.** And there is more information about additional penalties that you could receive if you don't pay this on time; right?

**A.** Yes.

**Q.** There is a line that says "the due date for payment of the taxes shown on a return generally is the return due date without regard to extensions." Do you see that?

**A.** Correct.

**Q.** And then on the last page, on page 5, under "interest charges," it says "we are required by law to charge interest when you do not pay your liability on time"; right?

**A.**   Uh-hum.

**Q.**   But none of the disclosures that the IRS sends a taxpayer say -- or none of the disclosers in this installment agreement say, if you pay penalties and interest instead of paying all of your tax liability on the day taxes are due, you've committed a crime; right?

**A.**   Correct.

**Q.**   And to be clear, you never told Mr. Goldstein that the plan of paying on an installment plan with penalties and interest was committing a crime; right?

**A.**   Correct.

**Q.**   You also never told Mr. Goldstein that he needed to stop doing any other spending while he was on this installment plan; right?

**A.**   No.

**Q.**   How many thousands of taxpayers you work with go on installment plans where they end up paying penalties and interest?

**A.**   Quite a bit.  I don't -- maybe over half.

**Q.**   Have you ever advised any of them that, if they don't pay on the day the taxes are due, that they're committing a crime?

**A.**   No.

**Q.**   And I think you said something on direct examination about like it wouldn't have been your place to tell Mr. Goldstein not to buy a car or not to play poker; right?

**A.**    Correct.

**Q.**    Because in the IRS, you don't advise people that, if they spend in other amounts, that they're committing a crime; right?

**A.**    Correct.

**Q.**    And in fact, the purpose of that information sheet that you collected is to determine what amount you think that they can pay; right?

**A.**    Right.

**Q.**    And we saw an example where even you said "even in Maryland, two kids, we're only going to allow $1,000 for child care"; right?

**A.**    Right.

**Q.**    So if they want to spend more than that, what that impacts is they might not have the money at the end of the day to spend more than that; right?

**A.**    Correct.

**Q.**    But your job was determining how much Mr. Goldstein needed to pay to the IRS?

**A.**    Correct.

**Q.**    Right?  Last question I have:  Do you know what kind of bank account an IOLTA account is?

**A.**    No, I don't.

**Q.**    Are you aware of any restrictions on levying particular bank accounts when you have a taxpayer who -- a taxpayer who you are in collections with?

**A.**   Repeat the question.

**Q.**   Are you aware of any restriction on levying any particular type of bank account that a taxpayer has?

**A.**   Yes, I am.

**Q.**   But you don't know what an IOLTA account is; right?

**A.**   Correct.

**Q.**   So in Mr. Goldstein's case, you didn't tell him that you couldn't levy an IOLTA account; right?

**A.**   Correct.

        **MS. REAVES:**  Court's indulgence.

     Thank you, Your Honor.  No further questions.

     Thank you, Ms. Parrish.

        **THE WITNESS:**  You're welcome.

        **THE COURT:**  Thank you very much, Counsel.

     Does the government wish to conduct any redirect of the witness?

        **MR. GORDON-MARVIN:**  Yes.

     If we could go to Government Exhibit 19, page 14.  Can we zoom in on the middle here?

                    REDIRECT EXAMINATION

**BY MR. GORDON-MARVIN:**

**Q.**   Right in the middle, there is the paragraph where you were talking about a little bit ago that said "RO discussed the balance."  Can you see that?

**A.**   Yes.

**Q.** We all talked about this paragraph quite a bit now. Going down one paragraph, the -- in the middle it says "and he indicated that 2017 was unusual and not representative of all years. He indicated 2015 and 2017 would be better representative of his income." When you wrote "and he indicated that 2017," was that a typo?

**A.** No.

**Q.** Sorry. You wrote "and he indicated that 2017," but then you say "he indicated 2015 and 2017"?

**A.** Oh, I'm sorry. Yeah. That should have been '16. I apologize.

**Q.** So he was explaining the 2016 income was unrepresentative because it was much higher?

**A.** Correct.

**Q.** And that was when he was explaining that he had gotten a large payment from a case?

**A.** Correct.

**Q.** Now, I'd like to shift to Exhibit 73. Yeah. Is the 2016 account transcript. At the bottom of page 3. Now, there's this payment you were talking about a little bit ago. It's not labeled levy. It's not labeled miscellaneous payments. It's just labeled payment on -- here, it's labeled 12/14/2018 for $954,119.02. Can you see that?

**A.** Yes.

        **MR. GORDON-MARVIN:** Let's look at -- split screen.

Don't need the split screen actually.  If we can go to Government Exhibit 4, page 433.  Government Exhibit 4, I'm learning we're missing a Government Exhibit 4 on this version of On Queue.  In the meantime, could we go back to Exhibit 19 or -- while someone queues up Government Exhibit 4, on Government Exhibit 19, if we go look at page 27.

**BY MR. GORDON-MARVIN:**

**Q.**   Looking down here and zooming in on this last action date, December 6, 2018, it says "results, a payment was mailed to RO in the amount of $954,119.02 from Wells Fargo."

**A.**   Uh-hum.

**Q.**   Was this a voluntary payment or was it a levy that was coming from Wells Fargo?

**A.**   That was a levy.

**Q.**   Are levies made voluntarily?  Are they paid voluntarily by the taxpayer?

**A.**   No.

**Q.**   If we go back to Government Exhibit 73, page 6.  Looking on the lower half, there is a number of charges for 20,000 or $40,000 that are labeled "penalty for late payment of tax."  This might be sort of self-evident, but when is this penalty applied?

**A.**   The penalties are applied the day after the tax is due.

**Q.**   And what is that penalty applied for?

**A.**   It can be applied for failure to pay timely or it could be

applied for failure to file timely.

Q.   And so here, is it applied for failure to pay timely or to file timely?

A.   It looks like it's failure to pay.

Q.   We have been looking at that chart for a while with the timeline for 2016.  It was only for -- for tax year 2016.  If we can go to Defense Exhibit 455, page 2.

What was the total amount that Mr. Goldstein owed as of the date of this letter?

A.   $894,683.12.

Q.   And that was for tax year 2016?

A.   Yes.

Q.   How much did he owe for 2017?

A.   $1,135,713.23.

Q.   And that number wasn't on that chart, was it?

A.   No.

Q.   His payments or lack thereof toward that number wasn't on that chart, was it?

A.   Correct.

Q.   If we turn to Government Exhibit 76, this is the accounts transcript for 2019.  If we go to the second page here, it shows the tax return filed with a balance due of $700,636.  Can you see that?

A.   Yes.

Q.   There are below that estimated payments in March and

April 2019; correct?

**A.** Correct.

**Q.** That was when you were a collections officer on this case?

**A.** Correct.

**MS. REAVES:** Objection. Just leading.

**THE COURT:** Do you wish to be heard?

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:** All right. Ms. Reaves?

**MS. REAVES:** Yes, Your Honor.

**THE COURT:** Mr. Goldstein? Counsel for the government?

I think I heard leading, but go ahead and say it.

**MS. REAVES:** Yes, Your Honor. I just -- just I understand we're trying to move quickly, but I'd ask the government to ask open-ended questions.

**THE COURT:** Okay. The objection is leading questions. Can you rephrase, Counsel?

**MR. GORDON-MARVIN:** I'm happy to rephrase. I'm also just trying to get the witness and jury out today. But yes, happy to rephrase.

**THE COURT:** All right. Thank you.

(Whereupon, discussion concluded.)

**BY MR. GORDON-MARVIN:**

**Q.** When these payments were made, were you or were you not a

revenue officer assigned to Mr. Goldstein's case?

**A.** Yes, I was.

**Q.** A little bit ago you were talking about a number of payments for that chart that were -- there were payments for that chart that were made in late 2020 and then early 2021. Do you recall that?

**A.** Yes.

**Q.** Are you aware that Mr. Goldstein was told by IRS criminal investigation in October 2020 that he was the subject of a --

    **MS. REAVES:** Objection.

**BY MR. GORDON-MARVIN:**

**Q.** -- target of a criminal investigation?

    **THE COURT:** Please come to headsets, Counsel.

    **MS. REAVES:** Objection.

    (Whereupon, a discussion was held outside the presence of the jury.)

    **THE COURT:** All right. Ms. Reaves, we have you.

    **MS. REAVES:** Okay.

    **THE COURT:** Just a moment. Mr. Goldstein? Do we have the government? Can you hear me, Counsel?

    All right. Go ahead.

    **MS. REAVES:** Okay. So it's still leading. And also there is a lack of foundation. He just asked about the fact that she no longer worked on Mr. Goldstein's case after June of 2019. I understand that we went through the IRS transcripts.

That's different from asking about what her knowledge is of the investigation after that incident.

THE COURT:  All right.  So I'm hearing leading and lack of foundation.

MR. GORDON-MARVIN:  I think it's just a binary question.  I'm happy to rephrase, but either she is aware or she isn't aware.

MS. REAVES:  I think the government doesn't have a good faith basis to believe that she is aware, and this is far beyond just having her read an IRS document.

MR. GORDON-MARVIN:  I mean, this is no different than the series of questions she was just asked on cross about what did or didn't happen long after she --

THE COURT:  All right.  I'm going to let you ask the question.  Break it up so she can respond.  And let's try to move on and get this witness done today, Counsel.  Thank you.

(Whereupon, discussion concluded.)

BY MR. GORDON-MARVIN:

Q.   Are you or are you not aware that in October 2020 Mr. Goldstein was told by IRS criminal investigation that he was the target of a criminal investigation?

A.   No.

Q.   What would you have done if, while Mr. Goldstein owed millions of dollars in taxes, he told you or you learned that he was spending hundreds of thousands of dollars on poker?

**A.**   I would have suggested that he looked for ways to pay his liabilities.

**Q.**   And are there other collections activities you may or may not have taken?

**A.**   Yes.   There were some.   I could have investigated a little more as to his income and how he was paying things.

**Q.**   Would that have affected whether or not you levied him?

**A.**   Yes.

**Q.**   How long have you been a revenue officer?

**A.**   Twenty years.

**Q.**   In your 20 years as a revenue officer, how many taxpayers have asked you if you were from IRS criminal investigation when you showed up at their doorstep?

**A.**   None.

**Q.**   None or do you recall any?

**A.**   Just Mr. Goldstein, besides him.

**Q.**   So only Mr. Goldstein?

**A.**   Correct.

          **MR. GORDON-MARVIN:**  No further questions.

          **THE COURT:**  Thank you very much, Counsel.

     Have all questions been asked of the witness?

          **MS. REAVES:**  Can I just ask one question?

          **THE COURT:**  Very briefly, Counsel.

          **MS. REAVES:**  Thank you.

                    RECROSS-EXAMINATION

**BY MS. REAVES:**

**Q.**   How many of the taxpayers you've worked with are Supreme Court lawyers?

**A.**   Are what?

**Q.**   Supreme Court lawyers?

**A.**   He was the only one.

        **MS. REAVES:**  Thank you.

        **THE COURT:**  All right.  Thank you very much.

    Have all questions been asked of the witness?  It appears so.

    Revenue Officer Parrish, thank you very much for your testimony and time.  You may step down and be excused.

    Have a good evening.

        **THE WITNESS:**  Thank you.

                        (Witness excused.)

                        - - -

        **THE COURT:**  Members of the jury, we are at the five o'clock hour, and so I think it's time for us to allow you to go home for the evening.  Before you do so, a few gentle reminders.

    Again, please do not talk about this case or any of the issues related to the case with anyone, including your fellow jurors.  Please do not read or listen to any news articles about the case on TV or the internet or the radio.  And please do not conduct any independent research about any of the issues

related to the case.

With that, I want to wish you a good evening.  We will look forward to seeing you tomorrow.  You may be excused for the evening.

Please rise for the jury.

(Whereupon, the jury exited the courtroom at 5:04 p.m.)

**THE COURT:**  Please be seated, everyone.  Counsel, thank you very much for your hard work and keeping us close to schedule today.  I know we had a late start, but we were able to get through all of the witnesses.  So I do appreciate your hard work and diligence.

The Court has a few housekeeping matters I would like to address before we break up.  And then I will allow counsel to raise any issues.

First, I wanted to get a sense from the government about our schedule for tomorrow and what we can expect.

**MR. ADRENELE:**  Indeed, Your Honor.  We have several witnesses lined up for tomorrow.  We're trying to schedule maybe one additional one.  Due to weather, we're still working that schedule, but we will provide our expected witnesses to the Court and to the defense.

**THE COURT:**  Okay.  Well, it's after 5:00.  You can't share them right now?

**MR. ADRENELE:**  If you can just give us a chance to get back, regroup.  We'd like to talk about a few.  We're

pretty confident about two.  For sure.  For sure.  And that's Mr. Pacheco and Mr. Salomon.  However, we need to regroup to discuss the additional.

          THE COURT:  Okay.  Then I'm, obviously, going to hear Mr. Kravis say he wants to know sooner rather than later.  So what time can you get that information to the defense?

          MR. ADRENELE:  If you can give us a few hours to make some calls, it would be very helpful.

          THE COURT:  By 7:00 p.m.?

          MR. ADRENELE:  Yes.  That's reasonable.

          THE COURT:  Are you definitely going with the other two you mentioned to the Court?

          MR. ADRENELE:  Yes.  We are going with those other two.

          THE COURT:  And they would be the first two?

          MR. ADRENELE:  We believe that they would be the first two.

          THE COURT:  All right.

          MR. ADRENELE:  But again, we just need to regroup.

          THE COURT:  I think your cocounsel wants to talk to you.

          MR. ADRENELE:  Indeed, yes.  Cocounsel mentioned also Special Agent Nguyen will be tomorrow as well.

          THE COURT:  Okay.  So I'm hearing five witnesses possibly for tomorrow?

**MR. ADRENELE:**  Well, I meant certainly the three that I mentioned.

**THE COURT:**  Okay.

**MR. ADRENELE:**  And we would need to work on a few additional witnesses.

**THE COURT:**  So those three, possibly two more.  We'll see how we go.  We can check in the morning in the terms of the length for direct on the first witness just to get a sense of the day.

And again, if you could also notify the Court of the final list, I'll say by 7:00 p.m., but I believe I think we should get back to getting this done by five o'clock.  I know we are in trial, but it makes a very hard for the defense to prepare and also the Court.

Okay.  My other issue for the parties, there was some request I think via e-mail about availability of the Court for Fridays beginning in February so we can hopefully complete the trial.  I am available the first two Fridays in February and happy to sit for trial to kind of keep things moving.  That's the 6th and 13th, to my knowledge.

So we will sit on those two days and we will inform the jury of that as well.

My last issue was we mentioned earlier this morning the papers that have come in from Mr. Toobin, and I think it's Lee is the other individual.  The government has responded to that.

The defense wishes to file papers.

Is that correct, Mr. Kravis?

**MR. KRAVIS:**  We filed something over the lunch hour.

**THE COURT:**  Okay.  All right.  Well, I haven't read my e-mails so something is in on that.  That's all I need right now from you on that.  I'll take a look at those papers tonight and we'll see where we are.  Those are all the issues I have, save some issues just for the government.

Anything else from the parties we should address jointly?

**MR. ADRENELE:**  Nothing from the government.  Maybe one -- well, one small point.  We wanted to end the day on the stipulations.  I understand the clock ran out on that, but it would be best to start the day off tomorrow or maybe end the day tomorrow --

**THE COURT:**  Let's do it in the morning so we get it done.

**MR. ADRENELE:**  That works for us.

**THE COURT:**  Just remind me in the morning.

**MR. ADRENELE:**  Indeed, Your Honor.

**THE COURT:**  Okay.  All right.  Mr. Kravis?

**MR. KRAVIS:**  Your Honor, we don't have anything at this time.  I did want to flag, because I know the Court mentioned handling some other matters and I know the Court mentioned that it would not have had a chance to look at our filing over the lunch hour.  We do believe that there are

issues in the context of that litigation of the subpoena that affect Mr. Goldstein's constitutional rights. And so, at the appropriate time, we would like to be heard.

THE COURT: You will be heard on it.

MR. KRAVIS: Thank you.

THE COURT: Okay. Thank you, Counsel. Well, those are all the issues that the Court has. I think we've covered all the issues that we need to jointly address. I'm going to invite the defense, if you want to step away and enjoy your evening. I just need a few more moments with the government and then you all can do the same.

MR. KRAVIS: Thank you, Your Honor.

THE COURT: See you in the morning. Have a good evening.

(Whereupon, the defense attorneys and the defendant left the courtroom at 5:09 p.m. and an ex parte sealed portion was conducted as follows with the government:)

THE COURT: For this portion, I'm also going to be sealing the courtroom. So anyone who is not a party for the government will need to step out.

I'm going to invite our court security officer to seal the courtroom doors. Please take your time.

Mr. Cook, are we okay with the feed that's been cut off?

All right. Very good. I believe the courtroom doors are now sealed. So we will go under seal. There were, as the.

THIS PAGE INTENTIONALLY LEFT BLANK

THIS PAGE INTENTIONALLY LEFT BLANK

THIS PAGE INTENTIONALLY LEFT BLANK

THIS PAGE INTENTIONALLY LEFT BLANK

**DEPUTY CLERK:** All rise. This Honorable Court stands adjourned. Thank you.

(Whereupon, the sealed portion was concluded.

- - -

(Proceedings concluded at 5:15 p.m.)

- - -

C E R T I F I C A T E

I, KIMBERLY A. BURSNER, Federal Official Court Reporter in and for the United States District Court for the District of Maryland, do hereby certify, pursuant to 28 U.S.C. §753, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

*Kimberly Bursner*

_____
Kimberly A. Bursner
Registered Professional
Reporter & Federal
Official Court Reporter