IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

_____

UNITED STATES OF AMERICA       )
                               )
    Plaintiff,            )
                               )
       vs.            )Case Number
                               )8:25-cr-00006-LKG-1
THOMAS C. GOLDSTEIN            )
                               )
    Defendant.            )

TRANSCRIPT OF JURY TRIAL – DAY 9
BEFORE THE HONORABLE LYDIA K. GRIGGSBY
UNITED STATE DISTRICT JUDGE
THURSDAY, JANUARY 29, 2026 at 9:35 a.m.

APPEARANCES:

On Behalf of the Plaintiff:

       UNITED STATES ATTORNEY'S OFFICE – DOJ
       BY:   ADEYEMI ADENRELE, ESQUIRE
           SEAN BEATY, ESQUIRE
           SEAN GORDON-MARVIN, ESQUIRE
           HAYTER WHITMAN, esquire
       36 South Charles Street, Suite 400
       Baltimore, Maryland 21201
       (410) 209-4800

On Behalf of the Defendant:

       MUNGER, TOLLES & OLSON, LLP
       BY:  STEPHANY REAVES COUPER, ESQUIRE
           ADEEL MOHAMMADI, ESQUIRE
           JONATHAN I. KRAVIS, ESQUIRE
           SARAH WEINER, ESQUIRE
       601 Massachusetts Avenue NW, Suite 5E
       Washington, DC 20001
       (202) 220-1126

– – –

ALSO PRESENT:
       THOMAS C. GOLDSTEIN, DEFENDANT
       JIMMY MENDOZA, PARALEGAL
       ROBERT RESTO, PARALEGAL

**COMPUTER AIDED TRANSCRIPTION OF STENOTYPE NOTES**

I N D E X

GOVERNMENT'S TESTIMONY:

| *WITNESSES* | *DIRECT* | *CROSS* | *REDIRECT* | *RECROSS* |
|---|---|---|---|---|
| **RICHARD SALOMON** | 42 | 71 | 100 | * |
| **CHARLES PACHECO** | 104 | 119 | 123 | * |
| **SPECIAL AGENT TUAN NGUYEN** | 126 | 172 | 196 | 198 |
| **KATHLEEN BART** | 200 | * | * | * |

**DEPUTY CLERK:** All rise. This Honorable Court is now in session. The Honorable Lydia Kay Griggsby presiding.

**THE COURT:** Good morning, everyone. Please be seated. Today we will continue the trial in this matter with the government's case in chief. The Court understands that there may be a few preliminary matters that we need to address before we have the jury. Is that the case?

**MR. ADENRELE:** That's correct, Your Honor. There are at least two motions and then a separate issue as well, we probably need to resolve before we bring the jury in.

**THE COURT:** All right. Well, let's get started.

**MR. ADENRELE:** Just before we do that, just one point, Your Honor. Yesterday we discussed a Brady issue. The government hadn't had an opportunity to actually provide any written briefing on the issue. I know we argued it orally. I'm not sure if the Court is planning on doing a written order on this, but the government would like to get an opportunity to provide written briefing on this matter. It's important. We just want to make sure that we have our -- we made a full record on the matter?

**THE COURT:** Well, I'm certainly happy to give the parties a chance to fully brief. Let me say a few things. A lot of motions have been filed. The Court asked yesterday whether the government was prepared to address two of them and

they said they were.

So I listened to what the government had to say and then the Court ruled.

As I said three, four weeks ago in terms of this trial, I felt the trial wasn't ready to go forward because there were a number of evidentiary issues that we did not address prior to trial. We addressed a lot of motions, but not issues that I think are important. And so we constantly are having to deal with these issues now. And the Court is happy to do that.

But in order for the Court to be able to resolve the matters, parties either need to brief quickly or work to resolve the issues.

I'm happy to give the government a chance to be heard. I gave the government a chance to be heard yesterday and it didn't seek one. So, you know, filing papers, if you want to file them, you can. The Court's already ruled on the issue. I can't keep going back and going back if you're going to tell me you're ready.

I also am going to ask going forward in terms of motions to exclude, because we've had a lot of briefing on those already, our motions in limine, that the parties seek leave of the Court before you file the papers. So in your papers you need to explain why there's good cause to raise the issue. I'm happy to look at it.

But, you know, every night I'm getting motions on issues

that I think are important.  I'm not suggesting we shouldn't talk about these issues, but many of these issues could have and should have been address prior to trial.

So I'm happy to give the government a chance to file paper.  I'm never going to say you can't be heard.  But the Court has ruled, I'm not going to revisit the issue because I gave the government a chance to be heard yesterday, and you said we were ready to go.

So if you want to file something, that's fine.  I think we'll just issue a short order at this point, just resolving the motion for the reasons the Court stated.

**MR. ADENRELE:**  Understood, Your Honor.  I think, from the government's perspective, because there has been so many papers filed in the case, I figured it might be a better avenue to simply argue the motion orally.

Nonetheless, Your Honor still, as I understand it, there's a pending matter of what needs to be done as a result of Your Honor's ruling.  We plan to file or provide briefing on the actual revenue.

**THE COURT:**  Sure.  Sure.  Excellent.  That will be helpful.  We're going to talk about that later.

**MR. ADENRELE:**  Okay.

**THE COURT:**  And, again, I'm not suggesting that the parties can't be heard.  What I am saying is that many of these issues, if they can't be worked out, it just makes the point

the Court was making earlier about the need to really have more time to address them. It's very challenging trying to address all these issues in the middle of trial, not to mention a very important issue we're going to have to address next week that raises constitutional issues. And so I know things pop up during trial, I appreciate that, but some of these matters really just have to do with evidence that we've known about for some time.

So again, I'm going to allow the parties to be heard. I'm going to ask, particularly Mr. Goldstein's counsel because a number of motions are coming from the defense, explain why you've got good cause to bring it up in your papers. And I certainly will give the government a chance to be heard, but I will expect the government to tell me if you're not ready to argue, that you're not ready.

**MR. ADENRELE:** Just to be clear -- I just want to make sure I'm clear about this. We believe that in the defense's papers they left a very misleading picture of the e-mail that was discussed yesterday. We'd really like the opportunity to correct this record here. We will be filing briefing on it, certainly on the remedy, but also on the matter overall and -- just to make sure the record is clear and correct.

**THE COURT:** Very good.

**MR. ADENRELE:** Thank you.

THE COURT: Okay. I think there were some other motions we need to resolve. Does the government have anything else?

Are we ready for the defense?

MR. ADENRELE: No. There are two motions that need to be resolved. There's the cumulative evidence motion at ECF 375, the motion to exclude at ECF 380.

And then, the defense has raised an issue with respect to certain text messages, I believe, related to a witness that we're going to have today, Rick Salomon, all the issues should be resolved.

THE COURT: I thought there was an issue about Ms. Bart as well. Did I miss --

MR. ADENRELE: Yes. And that's the motion to exclude with respect to Ms. Bart.

THE COURT: Okay. All right. The cumulative evidence motion I thought we were tabling, but I'll hear from the defense on that based on our conversation yesterday.

The text message issue I know we need to address because that relates to someone that will be called by the government today; correct?

MR. ADENRELE: That's correct.

THE COURT: And also, the motion to exclude.

Let me hear from Mr. Kravis. Maybe I misunderstand where we're at.

**MR. ADENRELE:** No. I agree with the Court in terms of where we are on that. The defense did brief the cumulative evidence motion. I heard the government say yesterday they wanted either a chance to respond in writing one more time to address it. We're, obviously, happy to take up the issue whenever the government is ready.

The text messages of Mr. Salomon are related to that issue. There are some messages that were disclosed to us. This would have been Tuesday night, I guess, that relate to -- I think the relevance here is personal spending. We provided copies by e-mail to the Court yesterday evening. There are messages about Mr. Goldstein attending a club. I guess Paris Hilton was at the club one night. There are text messages about going to see Chicago, which I think is a musical.

There's no discussion in the messages of how much any of this costs, of who's actually paying for it, what the things are that are actually being spent. I think this is really just now becoming grossly cumulative.

The government already opened on a villa, a Bentley, a restaurant receipt. They've already done the stuff on the 2022 gambling, which, as I understand it, is also supposed to be relevant to Mr. Goldstein's state of mind. I know their intention is to do more on a watch, additional vacation rentals, a hotel in Bali, a condo in Los Angeles, a hotel in Los Angeles. And now there are text messages about a trip to a

nightclub. Like, this is way, way overboard.

This is evidence that is relevant to four misdemeanor charges. And I think that the evidence at trial has shown there is no way the government is going to win on those charges. Witness after witness has said that Mr. Goldstein was never told that it was a crime to pay late with penalties and interest. This is a classic example of the tail wagging the dog.

The government is taking these four misdemeanor charges, which the government never charges, and they're using it to bring in just a boatload of evidence about Mr. Goldstein's personal lifestyle in the hopes that the jury will just disapprove of that and disapproval of him.

This is a classic example of what the Fourth Circuit has referred to as undue prejudice that comes from evidence about a defendant's personal lifestyle and personal life choices.

I recognize that we filed a motion in limine on this. I recognize that the Court said before trial that some of this was coming in. The government opened on the villa, the car, and the restaurant receipt. We think that's good enough.

Getting into text messages about a time when Mr. Goldstein was at a club with Paris Hilton, or a time when he went to see Chicago, or all the other stuff the government wants to do here, this is way, way overboard and it is unduly prejudicial.

**THE COURT:** And, Mr. Kravis, just to be clear, are

you referring to the text messages that were e-mailed to chambers last night?  So I'm looking at the right document.

MR. KRAVIS:  That's correct.

THE COURT:  All right.  And this looks like something between -- I'm not even sure -- Tom Goldstein and Rick Green?

MR. KRAVIS:  Yeah.  I think Mr. Salomon is going to testify that Rick Green is just the name he used in his phone for his messages.

THE COURT:  Okay.  Because that was my first question.

MR. KRAVIS:  We're not disputing that these are messages between Mr. Goldstein and Mr. Salomon, so --

THE COURT:  And are you objecting to just the three that are in the box or to -- or the several in the box?

MR. KRAVIS:  Yeah.  That's right.  The government provided us on Tuesday evening with certain pages they intended to use from the messages.  Most of the pages we don't object to.  We objected to these particular sets of messages.  The government told us they were standing on them.

I think in fairness to the one, on the last two pages all they want is "Going to The Box Saturday.  Want to come?"

"Sort of hate The Box."

And not any of the stuff that comes after that.

Part of the problem here is we're not getting redacted versions of these messages from the government.  We're getting

just like all of the pages, and then we have to be the ones to identify, I guess, what we think is unduly prejudicial.

We're trying to do that as fast as we can. But my understanding of the Salomon messages is the only possible relevance of any of this is, again, more of the personal spending by Mr. Goldstein.

THE COURT: All right. Thank you.

Let me hear from the government on the text messages because I know that's an issue we need to resolve today.

MR. WHITMAN: Would your Honor prefer --

THE COURT: I want to talk about the text messages, if that's the issue that's coming up today, so we can try to make progress and get the jury in.

I want to also confirm with the government. I'm looking at a document that's marked RS000105 through -- well, various pages up to 280. I'm not sure what the exhibit number is, but am I looking at the right version of the text messages for purposes of our discussion?

MR. WHITMAN: One moment, Your Honor. Could I just hand up the binder that we'll use with the witness today and, then that might make this --

THE COURT: As long as we're all on the same page.

MR. WHITMAN: Absolutely.

THE COURT: Because I just have what counsel e-mailed to chambers last night.

**MR. WHITMAN:** I understand.

**THE COURT:** Which exhibit am I looking for?

**MR. WHITMAN:** You are looking for, Your Honor -- one moment -- it's 401.

**THE COURT:** All right. So Tab 2?

**MR. WHITMAN:** Yes, Your Honor.

**THE COURT:** Okay. Now, this one I see redactions, so --

**MR. WHITMAN:** Right. And that's --

**THE COURT:** Make sure we're working from -- does the defense have the redacted version?

**MR. KRAVIS:** I don't have it.

**THE COURT:** Okay. We need to make sure they have it because otherwise I can't figure out what you all are talking about if you're working from different documents.

**MR. WHITMAN:** Right.

**THE COURT:** Do you have a copy you can give to the defense?

**MR. WHITMAN:** Yes, Your Honor. I just provided one.

**THE COURT:** That's redacted? Okay. I think we're good. I just want to make sure we're all looking at the same document before I start.

**MR. WHITMAN:** Absolutely.

**THE COURT:** Okay. Go ahead, Mr. Whitman.

**MR. WHITMAN:** So, as Your Honor noted, there are

redactions already in the document and that's because when the defense said they objected or thought certain passages were unfairly prejudicial, the government, very quickly, agreed to redact them and, in fact, wasn't even going to show those in the first place.

But what I will say is that the only three -- there's only three remaining messages at issue here, and so I think the first message is in the tab that you're in, and it's on page -- it has 105 in the bottom right corner. It's RS000105.

**THE COURT:** Okay. And where are we?

**MR. WHITMAN:** And there's a message from May 23rd of 2019 from Mr. Goldstein to Mr. Salomon, saying, "Bro, sitting with Paris in a club in NYC. Lol. She's super cool."

So that's the message that we want to show, as the defense got partially right. It is relevant to what Mr. Goldstein was doing instead of paying his taxes, which, in this case, and the other messages we'll talk about, was going out to either clubs -- it wasn't a restaurant. It was a nightclub. But either going out to clubs or going out to a play and taking multiple people to a play and then wanting to meet a celebrity there.

Your Honor, this is not the most important part of our case, to be sure. I do think that it's relevant. And the idea that it's cumulative especially when, yes, there were opening statements, but we really haven't heard much tangible evidence

yet, at least until we read stipulations about Mr. Goldstein's spending.

So certainly at this point the idea that there's been too much information about his spending or what he's focused on besides paying the IRS, I don't think is true.  I would echo --

**THE COURT:**  Can we identify the other comments and then we can hear the argument, just so I'm following factually what's going on?

**MR. WHITMAN:**  Yes.  Please.

**THE COURT:**  I got the one on page 105.

**MR. WHITMAN:**  Okay.  Then on page 146.

**THE COURT:**  Okay.

**MR. WHITMAN:**  And there's a text message along the same lines.  This is May 22.  So we've talked a lot about 2022, but this is a message from Mr. Goldstein to Mr. Salomon saying, "I'm going to take a group of, like, ten people to go see Chicago tonight," which I believe is a musical, although I'm no expert.  "Can you ask Pamela if we can say hi?  Obviously no problem.  If not, everyone is just psyched to see her."

And my questions about that specific text message -- and, again, we've redacted some material below it.

My questions about that would just be, what is Mr. Goldstein telling you?  He's telling you he's at a club or he's going to a play.  Sorry.

And then, who is Pamela?  And Pamela is Pamela Anderson.

And it's just to show, again, what he's spending his time and his focus on rather than paying his taxes in 2022, when he still owed for 2016 and 2017, although I take the Court to be wanting to know the last -- the last at-issue text message, which is on 278 through 279.

These are messages dated September 7, 2022. And again, all these say is, "Going to The Box Saturday. Want to come?"

And Mr. Salomon responds, "Sort of hate The Box."

We have receipts from Mr. Goldstein having gone to The Box a few days later, if not that night, and spending tens of thousands of dollars.

**THE COURT:** What is The Box?

**MR. WHITMAN:** The Box is a nightclub in New York, Your Honor.

**THE COURT:** Oh, okay.

**MR. WHITMAN:** I think the evidence today from Mr. Salomon would be like it's, like, the club to go to in New York. So it's not just any club. He's really -- you know, obviously, it's a nice club.

**THE COURT:** So you want to show that Mr. Goldstein was clubbing at the relevant time period, based on what I'm hearing from what you're saying; is that right?

**MR. WHITMAN:** Yes. I would just add clubbing --

**THE COURT:** Clubbing and going to the theater.

**MR. WHITMAN:** Yes. And trying to hang out with

celebrities.

THE COURT: Okay.

MR. WHITMAN: And I would just say, first of all, it's relevant for the reasons we've spelled out, which is that it's what he's spending his time and money on rather than taxes. But the idea that this is unfairly prejudicial, we had jurors here who I don't think batted an eye at the idea of Tobey Maguire, Spider-Man, testifying.

THE COURT: I don't think it's that the -- well, these celebrities aren't testifying. They're just making references to celebrities.

I guess it's relevant. How probative is it in light of the other evidence, I think, is the bottom line to what the defense is saying. There's other evidence to show what Mr. Goldstein was doing in 2019 and 20 -- I guess up to 2022, looks like from these papers. And I guess, generally speaking, no one disputes he was clubbing and going to the theater. I don't know. Maybe he does.

But I guess the question is whether or not this evidence is necessary for the government to make that point, to speak to his choices, which were to choose those types of expenditures versus paying his taxes, which I think is a fair general point for the government to make.

MR. WHITMAN: I guess we would quibble with the idea that it has to be necessary to our case to introduce relevant

evidence. I mean, as we heard yesterday, I think, in the discussion about the e-mails between the special agent and the accounting firm, you know, I think our argument was along the lines of, well, this has already been in evidence anyways and people have already talked about this from the witness stand.

And I think the response from the defense was something like, well, yeah, but the quantum of evidence still matters. And so in this case, we think it's relevant. We can argue about how probative it is. It's not unfairly prejudicial, but the idea that the defense is --

THE COURT: Well, how probative is it? Because that's what the government needs to explain when I do the balance.

MR. WHITMAN: It's probative, Your Honor, because you can imagine a situation in which Mr. Goldstein, instead of going to nightclubs or instead of going to Chicago and trying to meet celebrities and spending money on those things, he was, you know, saving up or he was foregoing those activities.

I think we heard a juror talk about, in voir dire, about -- so, yes. I think if he was foregoing those activities, that would be a much different case than if he was going out there trying to go to the best club in New York and hang out with celebrities and spending tens of thousands of dollars.

So, if you just look at the counterfactual of what if he hadn't done this, it's a totally different case, and that's why

we think it's probative.

THE COURT: All right. Anything else?

MR. WHITMAN: No. I guess I would just add, I would just echo the concerns that Your Honor expressed in regards to, I think maybe a different motion, but is that this -- we've been litigating, you know, the luxury expenses for a while.

And so I think it's just -- there's no prejudice here. Everyone knew this was going to be part of the case and the idea that the defense has decided it's already too much is -- I don't think there's any basis for that, so nothing further on that, Your Honor.

THE COURT: Thank you very much. Very helpful, Mr. Whitman.

Mr. Kravis, anything further from you? Then I'll rule on this.

MR. KRAVIS: So the only thing I want to note on these particular messages is it doesn't say anything about money. It doesn't say who is paying for The Box. It doesn't say who is paying for the tickets to Chicago. It doesn't say how much it costs. Is doesn't say if the tickets were comped because they know somebody. It doesn't say if there is an admission fee to The Box.

The government, we know, has tons of other evidence with dollar signs on it. We've objected to some of that stuff, too. Some of that stuff has already come in front of the jury. This

is really like the bottom of the barrel. That's it.

THE COURT: Thank you. Yes, Mr. Whitman?

MR. WHITMAN: The only other note I would have is that these -- the two messages related -- there is one message related to The Box and there is one message related to Paris Hilton. Those are either on the dates of or shortly before the dates of. We have receipts of Mr. Goldstein spending money at these places.

So whether or not Mr. Salomon is going to testify to the amount of money spent that night, doesn't mean that his testimony is not corroborative of the fact that Mr. Goldstein was, while owing taxes, in the club spending -- or clubbing, spending tens of thousands of dollars.

THE COURT: All right. Thank you very much. Well, we've talked about this, in the broader sense, a few weeks ago.

Part of the government's case has to do with the choices that Mr. Goldstein made during a period of time when he owed taxes and the government also alleges that he evaded taxes. And that goes to the so-called lifestyle evidence that we've talked about numerous times in this case.

Some of that evidence was raised during the course of the government's opening statement. We've also heard some of it through some of the testimony of the witnesses to date.

These text messages in front of the Court appear to be along the same line and showing what was going on in

Mr. Goldstein's life at the time and how he was choosing to spend his money and the lifestyle that he was living.

I said earlier I think it can come in during the relevant time period to help the government establish willfulness, if they can, in this case and also to demonstrate, again, what was happening. There is some extent a need to show a narrative. I appreciate that.

I think this is along the same lines. The matters in here that kind of concern the Court were already redacted out based upon what I'm seeing here.

I don't see any basis from precluding the government from asking the witness questions related to these tax -- the points the defense makes, I think, is a fair one about they don't speak to money and that can come up on cross-examination.

So I'm going to allow the three texts that we talked about to come in, if the government wants to question the witness about it and the defense can cross-examine. All right. We'll deal with the rest of the motion, later, Mr. Kravis.

Next issue? You want your book back?

**MR. WHITMAN:** I believe that the defense had raised the Katie Bart motion. I don't know.

**THE COURT:** Yes. Ms. Bart. Defendant's motion to exclude testimony?

**MS. WEINER:** Yes, Your Honor. This is --

**THE COURT:** Good morning.

**MS. WEINER:** Good morning. This is ECF 380, just so we're on the same page. We appreciate the Court's patience. I hear you and, in the future, we will talk about good cause for these motions. Good cause for this one, in particular, is that, as the Court knows, shortly before trial the government dismissed a bunch of counts.

We are playing catch-up to try to figure out how those dismissals affect the allegations that are inside and now out of the case. This is a critically important issue, uncharged affirmative acts. As we just discussed yesterday, it goes to Mr. Goldstein's Fifth Amendment right to be charged by a grand jury.

So, if the government is going to start talking about uncharged acts of tax evasion, that raises serious concerns. Because this Court ruled yesterday that the government cannot seek to convict Mr. Goldstein on the basis of uncharged affirmative acts of tax evasion, they need some other theory of relevance to present the allegation that Mr. Goldstein assertedly offered Miss Bart things of value to not cooperate in the IRS's investigation.

Now, what the indictment says is that he offered her those things of value to not share information about Employee Four with the IRS. And as this Court knows, the employee allegations are out as to Counts Four and Five, the false statement allegations.

They're also not relevant to what was the old Count Three any more, tax evasion in 2018, because those allegations have been dismissed.

So, to state the obvious, this bribery allegation is only charged as an affirmative act with respect to 2018. That charge has been -- or that count has been dismissed.

The 2016 tax evasion count, Count One, does not charge, as an affirmative act of evasion, that Mr. Goldstein attempted to dissuade anyone from cooperating with the IRS.

**THE COURT:** Isn't the government just going to argue to the Court again this may go to conduct after 2018 to show willfulness?

**MS. WEINER:** Yes. But willfulness as to what is the question. The thing that he allegedly dissuaded her from sharing was information about the employees. The employees are only relevant to 2018. That is the year in which that employee in question was hired. And so it cannot show willfulness to evade his 2016 taxes, because the information she alleged was dissuaded from sharing is irrelevant to 2016.

The other affirmative acts of evasion, the timeline doesn't line up. So Ms. Bart starts in July of 2019. That's three years after 2016. The only charge here is a tax evasion. The other allegations in Count One is this IRS interview in March 2018. That was before Ms. Bart. There is the October '20 interview with the IRS, but Mr. Goldstein just didn't --

his alleged dissuading of her doesn't have anything to do with that interview because Mr. Goldstein sat for that interview with the IRS.

And then there's this IOLTA allegation. That happened in March of '21, which is two months after Ms. Bart left her employment at G & R in January of '21.

And so the government can't just keep saying willfulness willfulness. They have to connect it. And the point I'd make on this is that, now that this allegation is uncharged conduct, the government needs some sort of theory. This is exactly why 404(b) requires pre-trial notice to the offense, not only of the factual content of the allegation, but also the permitted purpose for which it is offered, and the reasoning behind that purpose, which is why we're shooting in the dark trying to anticipate what their theory of willfulness is going to be. Because the only thing on the paper in the indictment is this 2018 thing that's not at all relevant to 2016.

And even if it were properly noticed, I do want to note that there is a 404 or 404(b) and 403 problem. Because under the balancing, this evidence is way more prejudicial than probative. As we noted in our motion, Ms. Bart essentially recanted on her grand jury testimony. She later said that Mr. Goldstein never said or even implied that she should not cooperate with the IRS investigation.

So there is essentially no probative value to this

testimony, but the government is going to put her on, ask the questions, and then the bell can't be unrung. Well, it planted a seed in the minds of the jury that Mr. Goldstein was evading his 2016 taxes even though that's not charged conduct. And that's precisely the problem, and that's where the Fifth Amendment constitutional problem begins to creep up.

THE COURT: Thank you very much, Counsel. That was helpful.

Is the government prepared to respond to this motion?

MR. WHITMAN: Yes, Your Honor. There is a lot there. Let's just start about whether this was charged conduct or not. Your Honor can look at ECF 337-2 at page 8, paragraph 28. This is not in the context of a tax evasion allegation. This is not in the context of talking about any specific employee. This is in the context of generally describing a year's-long scheme by Mr. Goldstein to evade taxes, file tax returns and fail to pay taxes.

And in paragraph 28 of the -- so it's actually, if you go to 337-2 at 11 is where the specific bullet is that details this allegation about Mr. Goldstein effectually trying to bribe and tamper with his own firm manager starting with --

THE COURT: You're at page 11 because I'm reading --

MR. WHITMAN: Yes. So page 11 is the allegation. I believe it's the second to last bullet there.

THE COURT: Yep. Got you. Go ahead.

**MR. WHITMAN:** And then the reason I mention paragraph 28 on page 8 is because that's the introduction to the general allegations section. So you can see that the bullet related to Ms. Bart is under this general description of the scheme that Mr. Goldstein engaged in for years, so this is certainly charged conduct.

And they also mentioned that this was only -- is only relevant to the information that Ms. Bart may have had about an employee at the firm. That's also false.

In the prior indictment, the reference that I believe the defense is referring to said that, something to the effect of Mr. Goldstein was trying to persuade the firm manager not to provide information about, among other thing, this employee.

The idea that Ms. Bart -- and we'll hear testimony from her today whether or not there is a -- you know, whether or not the Court agrees with the defense on this issue, the idea that Ms. Bart did not have access to or that Mr. Goldstein did not believe that Ms. Bart had access to incriminating information given her role at the law firm with the knowledge of the finances, knowledge of his personal taxes. There is a false return charge during the time period that she was there.

One of the attempted bribes that we'll talk about was with Bitcoin. And obviously, there is a charge in the case related to Mr. Goldstein's failure to report Bitcoin in the year 2020 and 2021. So the -- again, Ms. Bart has a lot of information

that, at the time, especially in the context of the IRS just came knocking at the door to talk to Mr. Goldstein, IRS criminal investigation.

And then what the evidence will show is really a month's-long campaign. This was not isolated. It started with kind of what I'll call gas lighting text messages to Ms. Bart on the day she announced her resignation, but then elevated and escalated over a series of months. Even after it was clear that she was going to leave the firm and she was training her replacement, that he was still, in her own words -- and we'll see the text messages because we don't have to guess. She was actually describing what was going on and her reactions to what was going on in realtime to confidants and friends of hers.

So this was a month's-long campaign to -- whether you call it tamper with, bribe, we won't necessarily use those words today, but we are entitled, I think, to present that evidence.

THE COURT: Well, you didn't charge Mr. Goldstein with bribery, so I don't think we're going to use the bribery.

MR. WHITMAN: That's correct. I'm only using it outside the presence of the jury, Your Honor, but yeah. So and it's just -- it's willfulness because it shows Mr. Goldstein knew that what he had been doing was wrong. That's as to tax evasion, false returns, failure to pay, all of that.

And then it's also just consciousness of guilt. The idea that the government cannot present evidence that, as soon as

Mr. Goldstein found out there was a criminal investigation, that he started making offers to his firm manager that are, at best, highly questionable is relevant. And of course, they can cross Ms. Bart on whether -- on the other things she said in the grand jury transcript or other things that, what Mr. Goldstein didn't tell her.

I did hear, Your Honor, that Ms. Bart had recanted the testimony that's at issue here. Actually, the exact opposite happened, which was that eventually, at the request of Ms. Bart's attorney, the government gave Ms. Bart and her attorney the chance to come in to the government's office and read the testimony that she had given in the grand jury word for word and then let us know if there was any issues with it and there was no issues with it.

So I just need to correct that, because there was certainly no recanting, and it was really the opposite.

And so -- and just on the good cause issue, I appreciate they say that they'll raised good cause in future motions in limine or future motions to exclude. But we've been litigating Ms. Bart and these bribery -- and the offers for almost a year now.

It was not taken out of the indictment when it was streamlined for trial. It shows willfulness. It shows consciousness of guilt. The idea that they're grasping at straws or fumbling around in the dark trying to figure out,

like, are they going to use the evidence that he offered the firm manager Bitcoin after the IRS investigation started? Of course we are, and we've never said anything to the contrary.

And when discussing the motions to dismiss -- the motion to dismiss, we've repeatedly represented to Your Honor, and we believe it to be true, that it has not affected the scope of admissible evidence.

So I'm glad to answer questions, but this is an important issue, and we think the jury at least deserves the chance to evaluate the evidence, of course, subject to cross-examination. The parties can make their arguments and the jury will make their decision.

**THE COURT:** Thank you very much, Mr. Whitman. Also, very helpful. I'm looking at the second superseding indictment, and we have kind of covered this issue, I think, before and more broadly in the case.

This particular factual allegation, of course, bribery is not charged in this case, and the government will not address any information about this by using that term. But the allegation that Mr. Goldstein offered a thing of value to, I guess, it's Ms. Bart, as I now understand, it is as set forth in the indictment. It's part of the general discussion of all the tax charges in the case and support the government believes it has for those tax charges during the period 2016 to 2022. It comes in. The defense can cross-examine and make all the

points that I've heard from defense counsel today.

Motion denied.

And, Mr. Kravis, I'll let you put that on the record, your objection on the record.

**MR. KRAVIS:** Thank you, Your Honor. On this one, we are also going to request a jury instruction at the time of the testimony.

**THE COURT:** At the time of the testimony?

**MR. KRAVIS:** Yes.

**THE COURT:** All right. Then you need to work with the government and come forward with something and I'll look at it.

**MR. KRAVIS:** We will.

**THE COURT:** Okay. Mr. Beaty?

**MR. BEATY:** Good morning, Your Honor.

**THE COURT:** Good morning.

**MS. REAVES:** Your Honor, I'm sorry. Can I interject with one more point while we're --

**THE COURT:** I'm sorry.

**MS. REAVES:** Just on the Katie Bart point, I just want to make sure the Court is aware, as the government just referenced, some of the text messages they intend to introduce involve Ms. Bart speculating and using the words like "bribery." We're going to object to that. If you want to discuss that in advance --

THE COURT: The text message itself has the word bribery in it?

MS. REAVES: Yes. They are a number, numerous text messages where Ms. Bart is speculating as to what Mr. Goldstein is thinking. And the point that Ms. Weiner was making was that, today, Ms. Bart will say that was all speculation. Mr. Goldstein never said anything to that effect.

And so we understand the Court's ruling as to the government being able to elicit the things that Mr. Goldstein did and the things that Mr. Goldstein said --

THE COURT: What I said was the government could not refer to it as bribery because they didn't charge it in the case. So the issue is something that the witness said about using the word bribery?

MS. REAVES: In text messages. I just want to make sure the Court is aware that we are still objecting to that.

MR. WHITMAN: There's --

THE COURT: That's fine. Go ahead, Mr. Whitman.

MR. WHITMAN: There is one text message, Your Honor. It does. It was a contemporaneous text message from Ms. Bart that we would argue was a present sense impression, among other things, and it would be admissible.

However, to -- if Your Honor is okay with us getting the facts in about this -- about these series of escalating offers, the government would be fine with not showing the text message

about bribery.

**THE COURT:** So you're not going to -- you're going to black that out?

**MR. WHITMAN:** I might not even show that text message. I don't know that it's necessary.

**THE COURT:** So it will either be redacted or not shown?

**MR. WHITMAN:** Yes.

**THE COURT:** Ms. Reaves?

**MS. REAVES:** There was also another text message that explicitly says Mr. Goldstein, according to Ms. Bart, is losing his mind about the IRS. The specific concern about messages are the ones where Ms. Bart is speculating about what Mr. Goldstein is thinking specifically with regards to taxes.

And so I can happily work with the government on identifying the portions that we are specifically objecting to. But since we're on the discussion, I just want to make the Court aware of that.

**THE COURT:** All right. Well, is Ms. Bart the first witness we're going to call today?

**MR. WHITMAN:** She is not, Your Honor.

**THE COURT:** Then I'd encourage the parties to try to meet and consult on the text messages and see if you can reach agreement. If not, we'll look at them again before we call her up.

**MS. REAVES:** All right. Thank you, Your Honor.

**MR. WHITMAN:** Thank you, Your Honor.

**THE COURT:** Because I don't have the paper in front of me, so I can't really say anything thoughtful about it.

**MR. WHITMAN:** Understood. We're working on inputting right now. Thank you, Your Honor.

**THE COURT:** Okay. Mr. Beaty?

**MR. BEATY:** Your Honor, this morning I provided two paper copies of the stipulation where we had asked the Court to read it.

**THE COURT:** Yep.

**MR. BEATY:** My question is simple. Would it be okay to also read along on the Elmo so the jury can see it while you're reading it?

**THE COURT:** Well, usually, I just read it to them and tell them they're going to get a copy of it because this is kind of hard to read. It's got charts, but I will do my best. And then they will have a copy with them.

**MR. BEATY:** And then it was because of the charts I thought it might be helpful rather than -- but you can certainly read that -- but that would be --

**THE COURT:** Yeah. I usually just don't do that.

**MR. BEATY:** Okay. I will defer, obviously, then.

**THE COURT:** I guess it's not a matter where I would have a strong view. Is there any objection to having it on the

Elmo?  Just because sometimes they're not really paying attention, I'm really kind of, let's not do that.

**MR. BEATY:**  Well, the thought was, Your Honor, that will help them pay attention if they can see it because they --

**THE COURT:**  The chart is hard to translate when I'm reading it.

**MR. BEATY:**  The chart is hard to do.  And Your Honor had, you know, had a focus of it.  It doesn't have to be me. I'm not trying to own the process.  I just -- it might be help to --

**THE COURT:**  Any objection from the defense?

**MR. KRAVIS:**  No objection.

**THE COURT:**  All right.  So we'll put it up.  So I ask you to put it up or whoever when I'm going to do that as soon as I get in the box.

**MR. BEATY:**  Very well, Your Honor.

**THE COURT:**  Okay.  We've taken care of the stipulations, I think a couple of the motions.  Anything else before we have the jury?

**MR. KRAVIS:**  Nothing from the defense.  Thank you, Your Honor.

**MR. BEATY:**  Nothing from the government.

**THE COURT:**  All right.  Well, let's take two minutes. I'm going to step down, and then we'll see if the jury is ready.  And when we come back, we will begin.

And where are we in the government's case, by the way?

MR. BEATY: We've got witnesses ready to go.

THE COURT: Who is up this morning?

MR. BEATY: Salomon and Pacheco.

THE COURT: So you're going to call them when we come in?

MR. BEATY: Yes, Your Honor.

THE COURT: All right. Very good. Let's take two minutes.

DEPUTY CLERK: All rise. This Honorable Court stands in recess for two minutes.

(Whereupon, a recess was taken from 10:12 until 10:17.)

DEPUTY CLERK: All rise. This Honorable Court now resumes in session.

THE COURT: Please be seated, everyone.

Are we ready to have the jury?

MR. ADENRELE: Yes, Your Honor.

MR. KRAVIS: Yes, Your Honor.

THE COURT: Okay. And I'm going to begin with the stipulations as soon they're seated and I welcome them. So if you want to set up your -- you got that ready to go?

MR. BEATY: We're setting up. And what we'll do is just tap through the page as you are --

THE COURT: Okay. Perfect.

MR. BEATY: Thank you, Your Honor, for indulging.

**THE COURT:** Please rise for the jury.

(Whereupon, the jury entered the courtroom at 10:21 a.m.)

**THE COURT:** Please be seated, everyone. Members of the jury, good morning and welcome back. Today we will continue with the government's case in chief.

Before we continue with the presentation of evidence, the Court has two stipulations of fact that the parties have entered into that I am going to read to you.

We're also going to have them up on your screen so you can read along with me as you wish. You should also be aware, you, will have copies of these stipulations to take back with you to the jury room when you begin your deliberations.

So, if you want to just give me your attention at this time, we're going to start with joint stipulation of fact Number 1, I think is up on the screen at this time.

Okay. And it reads as follows: On July 12 of 2019, Thomas Goldstein sent an e-mail to attorney J.M. In that e-mail, Mr. Goldstein wrote, in pertinent part, "As I also explain and documented, this is also totally and utterly pointless because I have no money. I have a massive tax lien, which is a public record. I owe more than $16 million privately. In addition, I owe around $100,000 in equity in my house."

In tax year 2016, Thomas Goldstein received poker winnings from the following individuals in the amounts noted:

Alec Gores, $26,435,000; Kevin Hart, $200,000; Andrew Robl, $100,000. Gambling winnings, $26,735,000.

In tax year 2016, Thomas Goldstein paid poker losses or made poker staking payments for the following individuals in the following amounts:

Alan Keating, $25,000; Alfred DeCarolis, $1,746,600; Andrew Robl $4,624,700; Anthony Gregg, $60,000; Bob Safai, $6,679,000; Chamath Palihapitiya, $176,000; Dan Bilzerian, $1,408,000; Daniel Cates, $750,000; Edwin Ting, 1,288,000; Keith Gipson, $904,000; Lauren Roberts, $1,400,000; Richard Salomon, $851,000; Roger Sippl, $67,400; Sean Dempsey, $406,000; Thomas Dwan, $550,000; and to an unknown individual, $708,000. Gambling losses or staking payments, $21,643,700.

In tax year 2017, Thomas Goldstein received poker winnings from the following individuals in the following amounts:

Bob Safai, $3,256,500. Total gambling winnings, $3,256,500.

In tax year 2017, Thomas Goldstein paid poker losses or made poker staking payments to the following individuals in the following amounts:

Andrew Robl, $650,000; Bob Safai, $6,794,300; Dan Bilzerian, $100,000; David Choe, $332,700; Michael Baxter, $79,000; Richard Salomon, $200,000; and Thomas Dwan, $680,000. Gambling losses or staking payments, $8,836,000.

In tax year 2018, Thomas Goldstein paid poker losses or

made poker staking payments to the following individuals in the following amounts: Bob Safai, $220,000. Total gambling losses, $220,000.

In tax year 2019, Thomas Goldstein received poker winnings from the following individuals in the following amounts: Jean-Robert Bellande, $250,000. Total gambling winning, $250,000.

In tax year 2019, Thomas Goldstein paid poker losses or made poker staking payments to the following individuals in the following amounts:

Bob Safai, $140,000; Charles Hook, $60,000; Charles Pancheo (sic.), $170,000; and Randall Emmett, $100,000. Total gambling losses or staking payments, $470,000.

In tax year 2020, Thomas Goldstein received poker winnings from the following individuals in the following amounts:

Charles Pacheco, $23,180. Total gambling winnings, $23,180.

In tax year 2020, Thomas Goldstein paid poker lesses or made poker staking payments to the following individuals in the following amounts:

Bob Safai, $210,000; Dan Bilzerian, $100,000. Total gambling losses or staking payments, $310,000.

In tax year 2021, Thomas Goldstein received poker winnings from the following individuals in the following amounts:

Jean-Robert Bellande, $102,000; Alfred DeCarolis, $75,000.

Total gambling winnings, $177,000.

In tax year 2021, Thomas Goldstein paid poker losses or made poker staking payments to the following individuals in the following amounts:

Bob Safai, $119,863; Dan Bilzerian, $20,000; Jean-Robert Bellande, $150,000; Matthew Honig, $220,000; Thomas Dwan, $60,000.  Total gambling losses or staking payments, $569,863.

The parties may present evidence of additional transactions not mentioned in this stipulation.

And that concludes the first stipulation that the Court wishes to share with the jury.

We'll now look at the second joint stipulation of fact. That is now also up on your screen so you can read along with the Court.  And it provides as follows:

On December 19, 2019, Andrew Beal, a businessman based in Texas, played a heads-up poker match in Dallas, Texas against Tobias Maguire.  Mr. Maguire beat Mr. Beal in the match. Mr. Beal owed Mr. Maguire approximately $7 million as a result of the match.  Mr. Beal refused to pay the full amount owed to Mr. Maguire following the match.  Mr. Beal offered to pay Mr. Maguire an amount significantly less than what was owed, but Mr. Maguire refused to agree to accept that as satisfaction of the debt.

In 2020, Mr. Maguire retained Thomas Goldstein and his law firm, Goldstein & Russell, PC to help recover the poker debt

owed to him by Mr. Beal. Mr. Goldstein's efforts on behalf of Mr. Maguire included e-mail communications with the lawyer representing Mr. Beal. Those e-mail communications are contained in Government Exhibit 251.

In one of the e-mails sent in August of 2020, Mr. Goldstein referenced the possibility of Mr. Maguire following a lawsuit to secure full payment of the debt. Government Exhibit 251 at page 31.

As a result of Mr. Goldstein and G & R's legal work for Mr. Maguire, Mr. Beal ultimately agreed to pay Mr. Maguire the full amount owed for the December 2019 match. On June 4, 2021, Mr. Beal caused $7,815,000 to be wired to Mr. Maguire as full payment of the amount owed. Government Exhibit Number 253.

As compensated -- compensation for Mr. Goldstein's and G & R's legal work on his behalf, Mr. Maguire sent $500,000 legal fee that he owed Mr. Goldstein to Bob Safai at Mr. Goldstein's request. Mr. Maguire did not send Mr. Goldstein or G & R a Form 1099 for that legal fee. Mr. Goldstein did not take any steps to prevent Mr. Maguire from sending a Form 1099. Mr. Goldstein did not provide a Form W-9 to or request a Form 1099 from Mr. Maguire.

From January 1, 2022 through December 31, 2022, Thomas Goldstein received poker winnings from the following individuals in the following amounts:

Andrew Beal, $40,474,000; Alec Gores, $1,525,000, and

Antonio Esfandiari, $197,900; Bob Safai, $597,450; Erik Boneta, $1,850,000; Richard Salomon, $1,865,000; Chuck Pacheco, $866,000; Justin Kendred, $70,000.  Total gambling winnings, $47,465,350.

From January 1, 2022 through December 31, 2022, Thomas Goldstein paid poker losses or made poker staking payments to the following individuals in the following amounts:

Andrew Beal, $11,800,090; Kevin Hart, $554,335; Andrew Robl, $405,000; Benjamin Lin, $161,250; Antonio Esfandiari, $452,200; Edward (sic.) Ting, $6,003,000; Erik Boneta, $1,200,000; and Richard Salomon, $5,722,000.  Total gambling losses or staking payments, $26,437,785.

From January 1, 2022 through December 31, 2022, Thomas Goldstein received poker winnings from Mr. Beal on the following dates and in the following amounts:

May 24, 2022, $15 million; August 15, 2022, $2,819,000; August 24, 2022, $185,000; October 3, 2022, $6,890,000; October 14, 2022, $5,390,000; November 10, 2022, $1,860,000; and November 28 of 2022, $8,330,000.

From January 1, 2022 through December 31, 2022, Thomas Goldstein paid poker losses or made poker staking payments to Mr. Beal on the following dates and in the following amounts: June .

15 of 2022, $5 million; in October 5 of 2022, $6,890,000.

The parties may present evidence of additional

transactions not mentioned in this stipulation.

And, again, members of the jury, you will have copies of the stipulations to take back with you to the jury room when you begin your deliberations.

Thank you for your attention to these matters.

At this time, I believe the government is prepared to move forward.

Is the government ready to call its next witness?

**MR. WHITMAN:** Yes, Your Honor.

**THE COURT:** Is the government prepared to call its next witness?

**MR. WHITMAN:** Yes, Your Honor. The government calls Mr. Rick Salomon.

**THE COURT:** Thank you very much.

**MR. WHITMAN:** And the binder that we had previously handed up for Court is for this witness.

**THE COURT:** Very good. Thank you very much, Counsel.

Mr. Salomon, good morning. If you'll come towards me, and then you're going to go to your left to the witness box. And please remain standing and the courtroom deputy will swear you in.

– – –

RICHARD SALOMON, after having been duly sworn, was examined and testified as follows:

– – –

**DEPUTY CLERK:** Please adjust the microphone. Scoot up as far as you can and please state and spell your first and last name for the record.

**THE WITNESS:** Rick Salomon.

**THE COURT:** And could you spell your name, please, for the record?

**THE WITNESS:** Oh. R-i-c-k, S-a-l-o-m-o-n.

**THE COURT:** Thank you very much.

Mr. Whitman.

**MR. WHITMAN:** May I approach to give Mr. Salomon a binder?

**THE COURT:** You may.

**MR. WHITMAN:** Thank you.

**DIRECT EXAMINATION**

**BY MR. WHITMAN:**

**Q.** Good morning, Mr. Salomon.

**A.** Good morning.

**Q.** Where do you live?

**A.** I live now in Las Vegas, Nevada.

**Q.** Where did you grow up?

**A.** I grew up in -- I lived in New Jersey until I was 15, and then I moved to California.

**Q.** Where did you move in California?

**A.** I live in Hollywood.

**Q.** What -- can you tell us a little bit about your

educational history?

A.    My mom died when I was a little kid.  I didn't go to school.  I really went to school until the seventh grade.

Q.    Can you tell us about your professional or work history?

A.    I'm a professional gambler.  I been gambling for over 25 years.

Q.    Just try to speak right in the mic because it --

A.    I've been gambling for over 25 years.

Q.    Thank you.

      What types of gambling?

A.    Mostly poker and sports betting.  I'm most successful in playing poker.

Q.    What types of poker?

A.    I'm very good at heads-up, no-limit hold'em and hold'em pot-limit Omaha.

Q.    When did you learn no-limit hold'em?

A.    Probably when I was a little kid.

Q.    Can you tell us about your journey from learning no-limit hold'em as a little kid to becoming a professional?

A.    I'm 17 years sober.  I was a super-bad drug addict.  And I wasn't sure, but I did spend a lot of time playing poker, you know.  And then I took a year off from my life to clean up my life and get sober.  I didn't gamble at all for one year.  And I really didn't know what I was going to do.

      And then, you know, against everybody's -- like, my

therapist, and all that stuff, like -- I was like, this is the only thing I know how to do. I think I'm very good at playing poker, you know. And I was right. You know what I mean?

The first -- I played, like, the first -- I won 58 times in a row, or something, the first time I went back. So that was probably over a year's stretch, but I never even lost, you know.

Q. And you're still sober today?

A. Correct.

Q. Congratulations.

A. Thank you.

Q. Have you played poker on television?

A. Yes, I have.

Q. Have you played poker in casinos?

A. Yes. Plenty of times.

Q. Have you played poker in private games at people's houses?

A. A lot.

Q. Have you played poker with some of the world's best players?

A. Correct.

Q. Have you played poker with some of the world's wealthiest players?

A. Correct.

Q. Are the wealthiest players always the best players?

A. No. No one would play them.

**Q.** Do you know the defendant, Thomas Goldstein?

**A.** Yes. Very well.

**Q.** How did you meet him?

**A.** Playing poker.

**Q.** Do you know, approximately, when?

**A.** Approximately, like 14, 15 years ago, I think.

**Q.** So, approximately, 2011 or so?

**A.** Correct.

**Q.** What was your impression of Mr. Goldstein as a poker player when you met him?

**A.** My first impression -- he was just a very happy poker player. He has a reputation for definitely being very aggressive, sort of, crazy man, but definitely looks very happy playing. I think Tom is one of the most happy people I've ever seen playing poker.

**Q.** Between 2016 and 2022, were there times where you played against Mr. Goldstein in games of poker?

**A.** Say the dates again.

**Q.** 2016 and 2022.

**A.** Yes. Yep. Of course.

**Q.** Were there times where you or Mr. Goldstein invested in one another to play poker?

**A.** Correct.

**Q.** Did you and Mr. Goldstein, at times, exchange text messages concerning poker?

**A.**   Plenty of times.

        **MR. WHITMAN:**  Could we please, Mr. Resto, pull up Exhibit 391 at page 1.

**BY MR. WHITMAN:**

**Q.**   And this is tab 1 in your binder, Mr. Salomon, if you'd like to look, but we'll pull the messages up on the screen.

        Are these text messages that you produced to the government during the investigation?

**A.**   Yes.

**Q.**   Who are these text messages between?

**A.**   Me and Tom.

        **MR. WHITMAN:**  And could we go back to page 1.

**BY MR. WHITMAN:**

**Q.**   Do you see this message right here, Mr. Salomon, on the screen from, it looks to be, September 5, 2016?

        You might want to look at the screen.  I've done a little...

**A.**   Yeah.  I see it.  Yep.  Perfect.

**Q.**   And what is Mr. Goldstein telling you in this message?

**A.**   That he's been playing -- "I've been training to play Chairman heads-up."  And he's been training for eight months. And Robl and Gipson are his coaches.  And that Paul Phua and Robl have biggest pieces.  And he has a $4 million cap, and he says he has seven and a half percent left.

**Q.**   Who is The Chairman?

**A.** The Chairman is the -- this -- well, they call -- an Asian whale -- well, I don't know who him that well. He doesn't speak good English, but I've played with him a bunch.

**Q.** Did you say "Asian whale"?

**A.** Yeah. Asian whale is somebody who's lost a lot of money playing, gambling.

**Q.** Okay. And let's talk about a few of the other people mentioned in this text message.

There's references to Robl and Gipson. Who are they?

**A.** They're professional poker players, but -- and also, I guess, coaches, too.

**Q.** What about Ivey? Who is Ivey?

**A.** Phil Ivey is considered one of the best poker players in the world.

**Q.** Have you played with Phil Ivey?

**A.** Not that much, but I have.

**Q.** What are your impressions of his game?

**A.** He's arguably one of the bests. Yeah.

**Q.** And if we could look at the next message down at 7:16 p.m. What is Mr. Goldstein telling you in that message?

**A.** He played him once before. He was winning 10 million and then he lost it all. And then -- but he wrote a 40-page memo on everything he does, and so he's been practicing and working on his game.

**Q.** The reference -- on the reference to 40-page memo, is that

consistent with your understanding, sitting here today, of how Mr. Goldstein prepares for big heads-up matches?

**A.** I'd be guessing.

**Q.** Okay. I don't want you to guess.

MR. WHITMAN: Let's go to page 3 of Exhibit 391. And if we could look at these messages right here. If we could call those out, Mr. Resto.

**BY MR. WHITMAN:**

**Q.** Do you see the messages that start with, "Trying to get in there with Alec at HU"?

**A.** Correct. Yep.

**Q.** What does that mean to you?

**A.** He's trying to get in there with Alec Gores and play him some heads-up poker.

**Q.** What about the next text message that starts, "For sure," what did you understand Mr. Goldstein to be telling you?

**A.** For sure, which means 100 percent Robl would guarantee him for $4 million.

**Q.** What is a guarantee in terms of high-stakes poker?

**A.** A guarantee means if Tom doesn't pay or can't pay, someone -- Robl will pay.

**Q.** And what is Mr. Goldstein then saying in the next message down that starts, "Ya he'd"?

**A.** Yeah. A guaranteed for friend, because I have money in Hong Kong and Robl can get it.

Q. What did you understand the reference to Hong Kong to mean?

A. Yeah. Because he has money in Hong Kong and he's -- it's hard to get out of there, probably, and he can get it -- Robl can get it.

Q. And to be clear, when it says "because I have the money in Hong Kong," you understood that to mean Mr. Goldstein had the money in Hong Kong; right?

A. Oh, yeah. That's what he's saying. I didn't, probably, even look into it too much, yeah.

Q. Have you heard of other poker players having money in Hong Kong?

A. Correct.

Q. In what context?

A. Just that it was hard -- it was hard to get money out of Hong Kong.

Q. From poker players?

A. Yeah.

          MR. WHITMAN: Could we go to Exhibit 401 at page 1. Or actually -- sorry -- could we go back to the last one quickly -- or briefly, not quickly.

BY MR. WHITMAN:

Q. Do you see, Mr. Salomon, how there's a number of text messages on the left-hand side of the page, and there doesn't appear to be as many messages on the right-hand side?

**A.** Correct.

**Q.** When you were asked -- when you were subpoenaed for your communications, including your messages with Mr. Goldstein, did you do your best to collect all of the communications that you still had?

**A.** One-hundred percent.

**MR. WHITMAN:** Now, could we please go to three -- I'm sorry -- to 401 at page 1.

**BY MR. WHITMAN:**

**Q.** And that's tab 2 of your binder, Mr. Salomon, if that's helpful.

Are these WhatsApp messages that you produced with Mr. Goldstein?

**A.** Yes.

**MR. WHITMAN:** Could we go to page 12. And could we go to page 13. Sorry.

Sorry, Mr. Resto. I'm talking about the overall -- the larger version of the document.

**BY MR. WHITMAN:**

**Q.** Sorry about that, Mr. Salomon. That's my fault.

Mr. Salomon, could you go to tab 2 of your binder?

**A.** My thing went off.

**Q.** Did you invest in -- let's just talk about the documents for a moment. Did you invest in Mr. Goldstein to play against Mr. Gores in 2016?

**A.** Yes.

**Q.** Do you recall whether Mr. Goldstein was successful in the games against Mr. Gores?

**A.** Yes. He crushed him. Yeah.

**Q.** Do you recall, approximately, how much Mr. Goldstein crushed Mr. Gores by?

**A.** I would be guessing. I would like to see it, but I think around 40 million.

**Q.** Were you eventually paid by Mr. Goldstein for the investment that you had in him against Mr. Gores?

**A.** Yes, I was.

**MR. WHITMAN:** Could we go to Exhibit 753?

**BY MR. WHITMAN:**

**Q.** Is this a bank record that you produced to the government during the investigation?

**A.** Correct.

**Q.** And it's a record for a company called RSTT, Inc. Do you see that?

**A.** Correct.

**Q.** What's RSTT, Inc?

**A.** My gambling corporation.

**MR. WHITMAN:** Could we go to the second page of this exhibit? Could we zoom in on the very last deposit down here?

**BY MR. WHITMAN:**

**Q.** Do you see that there is a deposit in this November bank

statement for $333,000?

**A.** Correct.

**Q.** Do you know, including from reading text messages before you came in today, whether this was a payment from Mr. Goldstein for your investment in him against Mr. Gores?

**A.** I wouldn't know from this paper, but I think that I've seen some more background to where I'm pretty sure it is. Yeah.

**Q.** Okay. Could we please --

So why did you invest in Mr. Goldstein against Mr. Gores?

**A.** He has a very good style against Al Gores. He's super aggressive and Al Gores is not like that and folds too much.

**Q.** Is Mr. Gores a professional poker player?

**A.** No.

**Q.** Have you ever heard anyone refer to Mr. Gores as a professional poker player?

**A.** I think he thought he was for a little while, but I don't think -- I don't know. I don't -- yeah. I mean, he definitely took gambling very seriously. He had a lot of other income and for a while he was winning, but --

**Q.** Besides Mr. Gores, have you heard anyone refer to Mr. Gores as a professional poker player?

**A.** I don't think anyone has ever referred to him as that.

**MR. WHITMAN:** Can we please go to Exhibit 754?

**BY MR. WHITMAN:**

**Q.** Is this a bank record that you produced to the government during the investigation?

**A.** Correct.

**Q.** Also for RSTT, Inc.?

**A.** Correct.

**Q.** For December of 2016; is that right?

**A.** Yes.

        **MR. WHITMAN:** Could we go to page 2 and can we zoom in on the 12/9 deposit right here on the screen.

        Sorry, Mr. Resto, the deposit right above it for Mr. Goldstein.

**BY MR. WHITMAN:**

**Q.** Do you see that deposit into your account on December 9th of 2016?

**A.** Yes, I do.

**Q.** Was that a payment from Mr. Goldstein either for gambling or for a stake that you had in him against Mr. Gores?

**A.** One hundred percent.

        **MR. WHITMAN:** Could we go back to Exhibit 401?

        One moment, Your Honor. I apologize to everyone. This is my fault. So we'll be moving on here shortly.

        Okay. Could we please go to Exhibit 401 at page 63.

**BY MR. WHITMAN:**

**Q.** Do you see there's text messages on this page at Exhibit 401 at page 63 dated September 12, 2017?

**A.** Yep.

**Q.** Do you see there's messages starting here through here where you and Mr. Goldstein are talking about someone named Andy?

**A.** Uh-hum.

**Q.** Do you know who Andy is referred to in these messages?

**A.** Yes. Andy Beal.

**Q.** What was Mr. Goldstein asking you in regards to Beal -- Mr. Beal?

**A.** He's trying to get to play Andy, and he's saying he's cool with Safai coming in.

**Q.** What was your understanding of Mr. Goldstein's poker debts or poker wins against Mr. Safai at this point in time in 2017?

**A.** I know he owed him some money.

**Q.** Why -- what was your understanding of why Mr. Goldstein wanted to get a spot with him and Andy?

**MR. KRAVIS:** Objection.

**THE COURT:** Let's come to the headsets, Counsel.

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:** All right. Mr. Kravis, are you on?

**MR. KRAVIS:** Yes, Your Honor.

**THE COURT:** Mr. Goldstein? Thumbs up. Mr. Whitman?

**MR. WHITMAN:** Yes, Your Honor.

**THE COURT:** All right. Mr. Kravis, go ahead.

**MR. KRAVIS:** So the objection is lack of foundation and hearsay. I kind of let this go on for a while because a lot of this stuff wasn't really in dispute. But asking about his understanding about Mr. Goldstein's state of mind about these various games and players is not proper.

If the witness recalls a specific statement that Mr. Goldstein made to him about these topics, they should ask about that statement, not his general understanding.

**THE COURT:** So it's lack of foundation. Is that the objection?

**MR. KRAVIS:** Lack of foundation. Hearsay. Calls for speculation.

**THE COURT:** All right. Mr. Whitman?

**MR. WHITMAN:** All I was doing was asking him for his understanding of what Mr. Goldstein was texting him. I think we've asked multiple witnesses, both sides. I've asked multiple witnesses about the same issues. That's why I asked it, and I think it's proper.

**THE COURT:** All right. Well, I think it needs to be tethered to the text messages so we know what we're talking about. And are we on -- is this the RS document we looked at earlier today?

**MR. WHITMAN:** Yes, Your Honor.

**THE COURT:** All right. Have you clarified so people understand who the parties are in this text messages and that

this witness is one of them?

MR. WHITMAN: If I haven't, I will once I get on.

THE COURT: Okay. Because I think that's not clear to the jury.

MR. WHITMAN: Thank you, Your Honor.

THE COURT: Thank you, Mr. Kravis.

MR. KRAVIS: Thank you, Your Honor.

(Whereupon, discussion concluded.)

MR. WHITMAN: Could we pull back up, Mr. Resto, Exhibit 401 at 63. Could we call out this message right here from 12:38.

BY MR. WHITMAN:

Q. Mr. Salomon, I haven't asked you. Who is Rick Green?

A. That's me.

Q. Who is Tom Goldstein, PokerStars?

A. That's Tom Goldstein.

Q. Why does it say --

THE COURT: Sorry. Mr. Salomon, I'm going to need you to talk in the mic, and you can pull the mic towards you and make yourself comfortable. You can move it around, but we can't hear you.

THE WITNESS: Okay.

THE COURT: And so I need you to go over the last two questions, because we couldn't hear the response.

THE WITNESS: Okay. Sorry.

**BY MR. WHITMAN:**

**Q.** Do you see how Rick Green is on these messages?

**A.** Yeah. Rick Green is me.

**Q.** Who is the other participant on these messages?

**A.** Tom Goldstein is Tom Goldstein.

**Q.** Why does it say "PokerStars" after Tom Goldstein?

**A.** My understanding is that Tom was the PokerStar's attorney. That's how I met him. I was introduced to him as PokerStar's attorney.

**Q.** Looking at this message at 12:38, what did you understand Mr. Goldstein to be saying or asking you about Mr. Beal?

**A.** He's asking if he could, at some point, get a chance to play with Andy, I think.

**Q.** In reviewing this text message, what is your understanding of why Mr. Goldstein wanted to play Mr. Beal?

**MR. KRAVIS:** Objection.

**THE COURT:** Come to the headsets, Counsel.

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:** Mr. Kravis?

**MR. KRAVIS:** It's the same set of objections, so it --

**THE COURT:** Speak to her.

**MR. KRAVIS:** Same set of objections. Lack of foundation. Calls for speculation. Hearsay. The questions

about what did Mr. Goldstein say to you and what do you understand his words to mean, no problem with that. What do you understand Mr. Goldstein to be in his head, there is no foundation for that. And to the extent that he's getting that information from somewhere other than Mr. Goldstein, it's hearsay.

THE COURT: All right.

Mr. Whitman, talk to her, but come closer so I can hear.

MR. WHITMAN: The witness testified that his understanding of the text message was that Mr. Goldstein wanted to play with Mr. Beal. So I'll follow that up. I followed it with the prior question, but based on this text message when you were reading it, why do you understand -- what was your understanding of why Mr. Goldstein --

THE COURT: I think the issue is you're now getting into Mr. Goldstein's head.

MR. WHITMAN: I was trying to --

THE COURT: Is that the main concern?

MR. KRAVIS: Yes.

THE COURT: All right. I'm going to sustain his second objection. The first question is fine, but the second one is not.

Sorry about the technical issue.

(Whereupon, discussion concluded.)

MR. WHITMAN: Could we please --

THE COURT: Just a moment, Counsel.

MR. WHITMAN: Thank you, Your Honor.

Could we please go to Exhibit 401 at page 64. Could we call out please, Mr. Resto, the message on May 23, 2019.

BY MR. WHITMAN:

Q. Do you see this message, Mr. Salomon, from Tom Goldstein on May 23, 2019?

A. Yes.

Q. What is he communicating to you in this message?

A. He's sitting with Paris Hilton and he likes her. She is cool and she's friendly.

Q. Does he mention anything, one way or the other, about where he is?

A. He's in the club.

Q. Let's fast forward to -- I'm sorry. Is Paris Hilton a celebrity?

A. Yes, she is.

Q. Could we please fast forward to 2022 now and, Mr. Salomon, did Mr. Goldstein eventually get a chance to play against Mr. Beal?

A. In life or at this time?

Q. In life?

A. Oh, yes. He played him a bunch.

Q. Do you know whether he played against Mr. Beal in 2022?

A. I would need to see my phone, but I'm 98 percent sure,

yes.

MR. WHITMAN: Could we please pull up Exhibit 401 at page 95?

BY MR. WHITMAN:

Q. Do you see the messages on the screen here between you and Mr. Goldstein?

A. Yes, I do.

Q. They appear to be on or about May 21, 2022?

A. Correct.

Q. What is Mr. Goldstein telling you in these messages where he says, "Andy says he's capped at 15 million"?

A. He's telling me I have a piece of a poker game. I'm betting on Tom and I have a 20 percent. That means, if he wins or loses, I have 20 percent upside or downside. And the most Andy can lose is 15 million.

Q. What are your messages back to Mr. Goldstein?

A. I agree, and I tell him don't bluff too much. Oh, and then I'm also saying it's -- I guess we were winning at this point. So I'm saying we can only win six so -- it's -- I would prefer to gamble where I can win -- risk more -- where I'm risking less money than I can win and, right now, it looks like it's about 50/50 or even. Andy has more upside than we do.

Q. Why were you investing in Mr. Goldstein against Mr. Beal?

A. I think he's a better poker player than him and with a way better upside, so we could risk five million and win 20 or win

five million and win 30, something of that type.

MR. WHITMAN: Could we go -- move down to on the page a little bit, Mr. Resto. Could we go onto the next page? And could you go down or scroll down a little bit? Keep going.

BY MR. WHITMAN:

Q. Do you see the messages, and this is on or about the same date as the prior ones we talked about, from --

THE COURT: I'm sorry, Counsel. I think there is an issue with the jury.

Mr. Cook, can you go check and see what's going on? He's going to come over to you. Just a moment.

We have an issue with the screens in the jury box we're trying to sort out. So, Counsel, some of the screens in the jury box just stopped working. There are some screens available. The jurors said they can see, not as ideally, but they can still see.

And so, if there is no objection, we can try to get through until the break, and we'll try to have the IT come up and fix the missing screens. Any concerns about that?

MR. KRAVIS: That's fine for the defense, Your Honor.

THE COURT: Mr. Whitman?

MR. WHITMAN: That's fine, Your Honor.

THE COURT: Okay. So we'll just deal with that now. We'll get it fixed during the break. Thank you for bringing that to our attention.

Mr. Whitman?

MR. WHITMAN: Thank you.

BY MR. WHITMAN:

Q. Do you see, Mr. Salomon, these messages from Mr. Goldstein that appear on the screen here?

A. Correct.

Q. And do you see a reference to Tobey?

A. Yep. Yes, I do.

Q. Can you just tell the jury your understanding of whether Mr. Goldstein had served as Mr. Maguire's lawyer?

A. Yes. He helped him get paid from Andy. Yes.

Q. What is Mr. Goldstein telling you where he says "somebody is in his ear"?

A. Somebody is telling him, like, hey, that's the guy that sued you or talked -- was Tobey's lawyer or whatever it is, something. I don't know.

Q. And then there is a few messages --

MR. WHITMAN: If you scroll down just a bit, Mr. Resto.

BY MR. WHITMAN:

Q. -- where Mr. Goldstein is sending you plus signs followed by numbers. Do you see that?

A. Correct. Yep.

Q. What is your understanding of what Mr. Goldstein is trying to communicate in those messages?

**A.** At 7:26 we're up 4 million, at 8:48 we're up 4.7 million and it's a lunch break, so I must be in California. He's in Dallas.

**MR. WHITMAN:** Your Honor, can we go to the husher for a moment?

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:** Of course. We are at the husher. Mr. Whitman, do we have you?

**MR. WHITMAN:** Yes, Your Honor.

**THE COURT:** Mr. Kravis?

**MR. KRAVIS:** Yes, Your Honor.

**THE COURT:** Mr. Goldstein's thumb is up.

Go ahead, Mr. Whitman.

**MR. WHITMAN:** I hate to do this, Your Honor, but with the issues we've had with exhibits, what I really don't want to do is show anything that we have agreed to redact.

So I think, if we are going to take a break, it might be make sense, before we go into the next set, to take that break so that we can ensure that nothing is shown to the jury that we have agreed to redact.

**THE COURT:** All right. So we need a break to redact the documents? Is that what you are telling me?

**MR. WHITMAN:** No. I have the documents redacted. It's just a matter of making sure that we have the right

version to show the jury.

THE COURT: Okay. Well, how much time do you need to break to do that?

MR. WHITMAN: I don't think that long. We can also keep going until the natural break. That will be fine. And I just won't -- I will just make sure we stay away from those documents.

THE COURT: Well, I'm happy to break if we need to break. I'm just not sure how long you need.

MR. WHITMAN: It won't take me more than five minutes, but I'm just suggesting that, if the jury was going to get a break anyways shortly, that we might as well just take it now just to make sure we can finish our examination and there won't be any issues with redactions.

THE COURT: Okay. Well, my intention was to just break for lunch since we got a late start. It should be at 12:00. So we can break now and try to reconvene and then go a little after 12:00 if that's what you're suggesting. Or do you want to just go up to 12:00 and then break at that point when they take lunch? We missed our mid-morning break because we didn't get started until 10:30.

MR. WHITMAN: Okay. Thank you, Your Honor. I'm glad to keep going, and we'll just make sure we don't show the redacted pages.

THE COURT: All right. Mr. Kravis?

MR. KRAVIS: No objection.

THE COURT: Okay. Thank you.

(Whereupon, discussion concluded.)

MR. WHITMAN: Could we please, without showing -- or could we please go to Exhibit 401 at page 105? Can you please zoom into this message?

BY MR. WHITMAN:

Q. Do you see these messages from May 26, 2022?

A. Yes.

Q. And what is Mr. Goldstein telling you in this message?

A. He's going to go to the Broadway show Chicago, and he's going to bring ten people, and he's asking if he can stay with my ex-wife.

Q. Is Pamela a reference to Pamela Anderson?

A. That's correct.

Q. Is she a celebrity?

A. Yes, she is.

MR. WHITMAN: Could we please go to Exhibit 400 at page 1?

THE COURT: Come to the headset.

MR. WHITMAN: Your Honor. Yeah. Thank you.

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT: Mr. Kravis, do we have you?

MR. KRAVIS: Yes. Thank you, Your Honor.

THE COURT: Mr. Goldstein's thumbs up.

Mr. Whitman?

MR. WHITMAN: I apologize, Your Honor.

THE COURT: You got some technical issues?

MR. WHITMAN: Yes. It's my fault.

THE COURT: Okay. So do we need to take our break and have them go to lunch now, which is really early or you need like five minutes?

MR. WHITMAN: In five minutes we can deal with this.

THE COURT: All right. We'll take a break for five minutes and see where we are.

Mr. Kravis, any concerns?

MR. KRAVIS: No, Your Honor.

THE COURT: All right. Thank you.

MR. KRAVIS: Thank you.

(Whereupon discussion concluded.)

THE COURT: Members of the jury, I think this might be a good time for your morning break, so I'm going to invite you to step down and stretch and have some coffee.

Please rise for the jury.

(Whereupon, the jury exited the courtroom at 11:12 a.m.)

THE COURT: Please be seated. Mr. Salomon, if you want to step down and stretch, you can step down right now as well while we take our break. Feel free to step down and step out of the courtroom. And we'll let you know when we're ready

to have you back.

THE WITNESS: Thank you.

(Whereupon, the witness left the witness stand and the courtroom at 11:13 a.m.)

THE COURT: All right. So we'll pause so the government can work on its exhibits. I think IT is also here to check the screens. And we'll take five right now and see where we are.

MR. WHITMAN: Thank you, Your Honor.

THE COURT: Okay. Thank you.

(Whereupon, a recess was taken from 11:13 until 11:28 a.m.)

DEPUTY CLERK: All rise. This Honorable Court now resumes in session.

THE COURT: Please be seated, everyone. Does the government have its exhibits ready to go now?

MR. WHITMAN: Yes, Your Honor.

THE COURT: All right. Are our screens working for the jurors now?

DEPUTY CLERK: Yes.

THE COURT: Is the husher working?

DEPUTY CLERK: Yes.

THE COURT: Okay. Are we ready to have the jury? Let's have the witness retake his seat. We'll have the jury, and I'm hoping we can try to wrap up, you know, in the beginning -- top half of the twelve o'clock hour at the latest,

at least with direct, so they can take a lunch break.

MR. WHITMAN: I'm hoping to be done in less than ten minutes, Your Honor.

THE COURT: That will be fantastic. Then we will see where we are, Mr. Kravis.

All right. And the witness is already under oath.

MR. WHITMAN: Your Honor, we do have one more short witness that we may be able to squeeze in after this, but we're happy to discuss that following.

Okay. Well, let's see what the defense wants -- let's get through the direct and then we'll talk. All right.

MR. WHITMAN: Thank you.

THE COURT: Please rise for the jury.

(Whereupon, the jury entered the courtroom at 11:30 a.m.)

THE COURT: Please be seated, everyone. Members of the jury, welcome back from your break.

Mr. Whitman?

MR. WHITMAN: Thank you, Your Honor.

BY MR. WHITMAN:

Q. Mr. Salomon, I'm showing you what's been marked as Exhibit 400 at page 1. Do you recognize this document?

A. Yes, I do.

Q. What is this document?

A. These are deposits from -- from Tom from --

Q. Deposits -- sorry. Go ahead.

A. From gambling.

Q. From -- including poker?

A. Correct.

Q. Are all of these payments from Mr. Goldstein to you in the year 2020 related to poker?

A. This looks like the year 2022; right?

Q. 2022, yeah.

A. Yeah. This is all gambling related.

Q. I'm showing the same page, Exhibit 1 of -- Exhibit 400.

Do you see that there are totals for the amounts paid by Mr. Goldstein to you in 2022 for poker?

A. Correct.

Q. What is the total amount of money that Mr. Goldstein paid you related to poker in the year 2022?

A. $5,772,000.

Q. Why do you keep track of your gambling income like this?

A. For my taxes.

Q. Can you give us a little more color?

A. To just keep records of all of gamblings and winnings so at the end of the year I can show what I won or what I've lost, and -- that way I can do my taxes.

Q. Who were you showing that information to?

A. I have my assistant and my tax accountant do all that.

Q. Have you ever, at the end of the year, decided to inflate your losses by millions of dollars in order to reduce your

taxable income?

**A.** No.

**Q.** Why not?

**A.** Could get in trouble.

**Q.** Does page 2 of Exhibit 400 also have the payments that you made to Mr. Goldstein in the year 2022 related to poker?

**A.** Yeah. This is me paying him, yep.

**Q.** What are the total amounts that Mr. Goldstein -- or that you paid Mr. Goldstein for poker in the year 2022?

**A.** 1,865,000.

**Q.** Did Mr. Goldstein ever tell you that he was in tax debt throughout your entire relationship?

**A.** I don't think so. I'd be guessing.

**Q.** Is it fair to say, you don't remember a conversation like that?

**A.** I don't remember. Correct.

**Q.** Did you ever see Mr. Goldstein choose not to buy something or choose not to do something because he wanted to pay his taxes?

**A.** I don't think I ever had a tax conversation with him.

**MR. WHITMAN:** Okay. No further questions, Your Honor.

**THE COURT:** Thank you very much, Mr. Whitman. Does the defense wish to cross-examine the witness?

**MR. KRAVIS:** Yes. Thank you, Your Honor. May I

approach?

THE COURT: You may.

CROSS-EXAMINATION

BY MR. KRAVIS:

Q. Good morning, Mr. Salomon.

A. Good morning.

Q. I want to start with one of the exhibits you were shown on direct examination.

MR. KRAVIS: Could we have Government's Exhibit 391, please.

BY MR. KRAVIS:

Q. Mr. Salomon, I think you testified a moment ago that these are some messages between you and Mr. Goldstein. Did I hear that right?

A. That's correct.

Q. And these are messages that came from your phone; is that right?

A. Yes.

Q. And you produced these messages to the government; is that right?

A. Correct.

Q. And I think I heard you say a moment ago that when you were collecting the messages, you did your best to give the government everything you had; right?

A. Correct.

Q.   Now, you may have noticed, there are -- almost all of the messages appear on the left side of the screen.  Do you see that?

A.   Uh-hum.

Q.   That's -- the left side of the screen is Mr. Goldstein's side of the conversation?

A.   Uh-hum.

Q.   And so there's like almost no messages on the right side of the screen; right?

A.   Okay.

Q.   Is it possible that the reason that happened, even though you're doing your best, it's because you might have some kind of, like, disappearing messages setting on your phone or something like that?

A.   Yeah.  It looks that way.

Q.   You know what I'm talking about when I say "disappearing messages setting"?

A.   I don't know about disappearing messages, but it looks like maybe I erased some.

Q.   But just to be clear, you're doing that to protect your own personal privacy; right?

A.   Correct.

Q.   You're not doing it to try to, like, hide anything or anything like that?

A.   No.

MR. WHITMAN:  Objection.

BY MR. KRAVIS:

Q.  All right.  Now, let me ask you about --

THE COURT:  Counsel, there's an objection.  Can we come to the headsets, please?

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT:  Mr. Whitman, can you hear me?

Mr. Whitman, can you hear the Court?

MR. WHITMAN:  Can you hear me?

THE COURT:  Yes.  Can you hear the Court?

Just a moment.  Can you hear the Court now?

MR. WHITMAN:  Yes, Your Honor.

Okay.  Mr. Kravis?

MR. KRAVIS:  Yes, Your Honor.

THE COURT:  Okay.  Mr. Goldstein?

All right.

Mr. Whitman, go ahead.

MR. WHITMAN:  I think, as I heard the testimony, he didn't confirm one way or another whether he had actually deleted these versus whether it was an automatic deletion process.  And then for the defense to suggest that he was somehow deleting them to avoid embarrassment or to protect his personal information, first of all, that's belied by the fact that there are many messages that they have objected to and

that we redacted showing embarrassing personal, potentially intimate details.

So there's no foundation. It's irrelevant.

And I get that they can point out that there's no messaging on the right side, but then to lead him to a point of suggesting that he actually deleted these to protect himself is contrary to the record, and I just don't think it's appropriate.

THE COURT: I think I'm hearing relevance and lack of foundation.

All right. Mr. Kravis?

MR. KRAVIS: Okay. First of all, it's their exhibit and they pointed out on direct examination that there are a bunch of messages missing here. I think I'm entitled to explore with the witness that that's not the result of any nefarious conduct by Mr. Goldstein or by the witnesses, for that matter.

The witness's answers to these questions are what they are. I asked him, do you think you have an automatic deletion feature? And he said, "No. I think I deleted the text messages." And I asked him, "You're not trying to hide anything?"

I think I'm allowed to explore why the government's document looks the way it does. And, in particular, I think I'm allowed to try to rebut any suggestion that we might be

missing these messages through some fault of Mr. Goldstein or through some wrongdoing by the witness.

THE COURT: All right. Thank you.

Anything further, Mr. Whitman?

MR. WHITMAN: If the Court is inclined to allow them to go down this route, and I don't think it's appropriate, but if it is, I think at least they should have to ask him, to be clear for the jury, Do you remember deleting any messages between you and Mr. Goldstein to protect your personal privacy?" or however the leading questions came in, because I just don't think the witness is -- the testimony supports that he, like, made a choice to delete these messages.

THE COURT: All right. Okay. The objection is overruled to the extent you're objecting to the line of questioning. I think it's fine. Let's try to clarify whether the witness deleted them themselves or automatically deleted. I'm not really clear. Let's try that again. All right? Thank you.

MR. KRAVIS: Okay. Thank you, Your Honor.

MR. WHITMAN: Thank you, Your Honor.

(Whereupon, discussion concluded.)

BY MR. KRAVIS:

Q. All right. Just one or two more questions on this and then we will move on.

Did I hear you say a moment ago that you think it's

possible that your messages are not here because you might have deleted them?

A.   Correct.

Q.   Do you have, like, a specific recollection of doing that or do you think that's just how it might have happened?

A.   I think I saw something before where I had -- where I responded, so I think maybe -- yeah.

Q.   Okay.  But either way, I think you said a moment ago, you did your level best to produce what you had in your possession to the government when the government asked for it; right?

A.   Correct, 100 percent.

Q.   You weren't trying to hide anything about your communications with Mr. Goldstein?

A.   No.

Q.   Okay.  That's all I'm asking.

        MR. KRAVIS:  Can we look at the message on the first page of Exhibit 391, the message at 2:02 p.m.  It's the third message down.

        Can we zoom in on that?

BY MR. KRAVIS:

Q.   All right.  Now, Mr. Salomon, I want to direct your attention to the third line.  Do you see where it says, "Paul Phua and Robl have the biggest pieces?"  Do you see that?

A.   Yes, I do.

Q.   So, first of all, who is Paul Phua?

**A.** Paul Phua is an Asian casino owner.

**Q.** Who is Robl?

**A.** Andrew Robl is a professional poker player.

**Q.** All right. And is your understanding that this is a text message from Mr. Goldstein about his poker games against a fellow named Chairman?

**A.** Yes, it is.

**Q.** All right. What do you understand Mr. Goldstein to mean when he says, "Paul Phua and Robl have the biggest pieces?"
What are pieces?

**A.** Pieces are percentage of the match. So, yeah, they have the biggest pieces of the match, which is the biggest percentage of the match.

**Q.** And when you say "percentage of the match," you mean that if Mr. Goldstein wins some money off of Chairman, Paul Phua and Mr. Robl are going to get some of that money. Is that the idea?

**A.** Yeah. Yep. Or a majority of the money, yes.

**Q.** And these kinds of arrangements are relatively common in high-stakes poker games; right?

**A.** Correct.

**Q.** And that would particularly be the case for somebody like Mr. Goldstein playing against somebody like Chairman; right?

**A.** Well, yeah. Paul Phua, like you would have to give him a big piece to be able to play the Chairman.

**Q.** Paul Phua is kind of like a gatekeeper to the Chairman; right?

**A.** Correct.

**Q.** If you want to play -- if you're a poker player, and you want to play against Chairman, you got to go against Paul Phua; right?

**A.** Most of the time, correct.

**Q.** And most of the time when you go through Paul Phua to set up a game with Chairman, you're going to have to give Paul Phua a piece of that game; right?

**A.** A hundred percent, yeah.

**Q.** Meaning that if you go in, Paul Phau sets up the game for you against Chairman. You go into that game and you win a bunch of money, Paul Phua is getting a piece of those winnings; right?

**A.** Yep.

**Q.** Let's turn to page 3. I want to direct your attention to the three messages that start about two-thirds of the way down that says -- actually, let's start with the one that says, "Trying to get in there with Alec HU."

**MR. KRAVIS:** Highlight that to the rest of the page. Great.

**BY MR. KRAVIS:**

**Q.** All right. Mr. Salomon, do you see these messages?

**A.** Yes, I do.

Q. And your understanding, I think, was that these are messages from Mr. Goldstein about trying to set up a match with a fellow named Alec Gores; right?

A. Correct.

Q. And you see there it says, "Trying to get in there with Alec HU." Do you see that?

A. Yes.

Q. Alec is a reference there to Alec Gores; right?

A. Yes.

Q. HU is heads-up; right?

A. Yes.

Q. Heads-up is like one on one; right?

A. Correct.

Q. All right. And then the next message is, "For sure Robl guarantees me for 4 million no problem."

Do you see that?

A. Yes.

Q. Robl here is the guy we were talking about earlier, Andrew Robl; right?

A. Correct.

Q. What does it mean when he says, "Robl guarantees me for 4 million no problem"?

What do you understand that to mean?

A. He guarantees him if Tom loses up to 4 million, Robl will pay.

Q.   And --

A.   Also, it says -- right below that it says -- this is part of a ring game, I guess -- "assume Robl gets in, won't guarantee him otherwise.  No incentive."

So he's trying to play Alec Gores heads-up, but we're playing a ring game.  And Robl has to play in the ring game to get in there.  So that's the only way he's going to guarantee him.  If Robl gets to play in there -- this is -- they're not -- this isn't for a heads-up match.  This is for the introduction to start playing.

Q.   All sounds pretty complicated, huh?

A.   Yeah.

Q.   The next line down is, Mr. Goldstein says, "Yeah.  He guaranteed that for anything."  Do you see that?

A.   Correct.

Q.   And then the next sentence is, "Because I have the money in HK and Robl can get it."  Do you see that?

A.   Yes.

Q.   Do you understand HK here to refer to Hong Kong?

A.   Yes.

Q.   You were asked some questions by the government about this message on direct.  So I just want to be a clear about this.  Paul Phua, the guy we were talking about earlier, he's in Hong Kong; right?

A.   I would assume it would be Paul playing in Hong Kong.

Q.   The message here doesn't say anything about a bank account in Asia, does it?

A.   No, it doesn't.

Q.   We just saw a moment ago a bunch of wire transfers going back and forth between you and Mr. Goldstein.

Do you remember seeing those exhibits?

A.   Yes.

Q.   As best you can recall, you've never received a wire transfer from Mr. Goldstein from a bank account in Asia, have you?

A.   No.

Q.   And to the best you can recall, Mr. Goldstein's never asked you to send money to a bank account that he has in Asia, has he?

A.   No.

Q.   The reason we could see those bank records a moment ago is because you produced them to the government; right?

A.   Correct.

Q.   If Mr. Goldstein had ever done a transaction with you involving a bank account in Asia, the government would know about it; right?

A.   Correct.

Q.   And I think you told me a moment ago that what you think this means is that Paul Phua might be holding the money for Mr. Goldstein.  Did I hear that right?

**A.** It's possible, yeah. Or it's Paul's money. I don't know. I think -- I don't know. They had some sort of gambling relationship. And usually Paul stakes a lot of people, so I don't -- it's not really my business, but...

**Q.** Understood.

**A.** Yeah.

**Q.** Understood.

I think I heard you refer to Paul Phua on direct examination as a whale. Did I hear that right?

**A.** Incorrect.

**Q.** Okay. Did I hear you use the term "whale"?

**A.** Correct. About the Chairman.

**Q.** Ah, Chairman. Thank you. I'm sorry. You're exactly right. Can you remind me, what is a whale?

**A.** A whale it a gentleman or could be a female. Someone that's lost a lot -- tremendous amount of money playing in the casino or playing poker.

**Q.** And in your experience as a professional poker player, sometimes when you play against a whale and you win a whole bunch of money, there can be some delays before the whale pays you; right?

**A.** Correct.

**Q.** Sometimes delays are up to a couple of months?

**A.** Yep. Yes.

**Q.** All right. Now, let's talk about the Gores' match. You

had a share of Mr. Goldstein for his poker games against Mr. Gores in late 2016; right?

A.   Yes.

Q.   And so just to remind everybody about what that means, it means that if Mr. Goldstein went into that match and he won money, then you would be entitled to a certain percentage of the winnings; right?

A.   Correct.

Q.   And by the same token, if Mr. Goldstein went into that match with Gores and he lost some money, you would be on the hook for a part of the losses; right?

A.   Correct.

Q.   That's what it means to invest or have shares in another poker player playing in a game; right?

A.   Yes.

Q.   And you've participated in these kinds of arrangements yourself; right?

A.   One hundred percent.

Q.   You've invested in other poker players when they play; right?

A.   Yes.

Q.   And you, yourself, have sold shares or had other people invest in you when you play; right?

A.   Yes.

Q.   And when you are the investor, you're investing because

you think the player you're investing in is going to win; right?

A. Yes.

Q. That's why you invested in the games against Alec Gores -- that's why you invested in Mr. Goldstein for the games against Alec Gores because you thought Mr. Goldstein could win; right?

A. Correct.

Q. All right. Now, I want to show you some of your messages with Mr. Goldstein about that arrangement.

MR. KRAVIS: Could we have Government's Exhibit 401, please.

BY MR. KRAVIS:

Q. And I'd like to direct your attention to the page that is labeled RS50 in the bottom right corner. You can have it in the binder or you can look on the screen, whatever is easier for you.

MR. KRAVIS: Can we have the message, the 9 November 2016 6:04 message?

BY MR. KRAVIS:

Q. I think we got this out on direct examination, but just to be clear, these are messages between you and Mr. Goldstein; right?

A. Yes.

Q. And the message we're looking at is from November 9, 2016; right?

**A.** Yes.

**Q.** And Mr. Goldstein writes, "Do you want a piece of me v Gores." Do you see that?

**A.** Yes.

**Q.** You understood this to be Mr. Goldstein offering you to have a share or an investment in his poker games against Mr. Gores; right?

**A.** Correct.

**Q.** And then you see where it says 3 million cap? Do you see that?

**A.** Yes.

**Q.** What do you understand that to mean?

**A.** That's the max amount he could lose.

**Q.** And so the idea is that the cap is like a limit on the -- it's an agreed-upon limit on the amount of money that Mr. Goldstein can lose going into the game.

Do I have that right?

**A.** Correct.

**Q.** And then if we skip ahead --

**MR. KRAVIS:** Could I have to page 53, RS53, please?

Directing your attention to the top of the page -- if we could have maybe like the first half of the page. Yeah.

**BY MR. KRAVIS:**

**Q.** Mr. Goldstein writes to you on November 18, "Playing Gores tomorrow. Can you talk?"

Do you see that?

**A.** Yes.

**Q.** And you write, "I got three percent Gores."

Do you see that?

**A.** Correct.

**Q.** That is you saying that you have agreed to take a three percent share Mr. Goldstein in his heads-up poker games against Mr. Gores; right?

**A.** Yes.

**Q.** And then the next thing -- and Mr. Goldstein said yes; right?

**A.** Correct.

**Q.** And then you say, "most can lose 90K." Do you see that?

**A.** Yes.

**Q.** And what you're saying there is, your understanding is with this three percent share, the most you can lose out of this is $90,000; right?

**A.** Yep.

**Q.** And just do a little quick math here, three percent of 3 million, the number we saw earlier is 90,000; right?

**A.** Yes.

**Q.** So the game is capped at 3 million. You got three percent. The most you're on the hook for is 90 grand.

Do I have that right?

**A.** Yes.

MR. KRAVIS: And then if we can go down to the message that starts at 1541. Can I have the one right above that, please?

**BY MR. KRAVIS:**

Q. You write here, "That mean I can buy more"; right?

A. Uh-hum.

Q. What you're doing here is you're asking Mr. Goldstein if you can get a larger share of the game; right?

A. Yup.

Q. And Mr. Goldstein responds and he says, "Unfortunately not." Do you see that?

A. Yep.

Q. And then Mr. Goldstein says, "For sure would give it to you first. Paul Phua starts out with 60."

Do you see that?

A. Yes.

Q. And Paul Phua is the guy we were talking about earlier; right?

A. Yup.

Q. And you understand Mr. Goldstein is telling you that he cannot sell you a greater share of his match against Mr. Gores; right?

A. Yes.

Q. And in particular, he's telling you he can't sell you a greater share because Paul Phua has a share that starts out

with 60; right?

**A.** Correct.

**Q.** What do you understand Paul Phua "starts out with 60" to mean?

**A.** He has 60 percent of the match.

**Q.** And to state the obvious, you've got three percent, Paul Phua has got 60 percent. Sixty percent is a big share of the match; right?

**A.** Yes.

**Q.** And that kind of arrangement is common when a player like Mr. Goldstein is going up against a player like Mr. Gores; right?

**A.** That's a big piece. And obviously, it's -- yeah. I don't know if it's common, but it's this situation.

**Q.** And just to be -- the reason I mention this is, Mr. Gores has a lot of money; right?

**A.** Yes. Correct.

**Q.** And 3 million -- I mean, maybe not to you. But 3 million as a limit is a significant amount of money; right?

**A.** Sure.

**Q.** And Mr. Goldstein himself does not have the financial wherewithal to back himself in a game where he's on the line for up to $3 million; right?

**A.** I really don't know. That's a question I can't answer.

**Q.** Well, just to back up for a second, I think you testified

a moment ago that you have both invested in poker games and then had other people invest in you; right?

A.    What we haven't talked about is a lot of times you're given pieces because it's political or if someone is controlling or something like that.  So yeah.  He's indebted.  He's a state deal.  He does -- it's not -- every deal is different, but a lot of times I'm giving someone a piece because they're helping me get in or do something like that, so...

Q.    So just to -- I think I understand what you are saying, but just to unpack it a bit.  You're saying there are a lot of different reasons why a poker player might give out an investment or a share to another person.  Am I hearing that right?

A.    Correct.

Q.    And you said that one reason is it might be political.  Do I have that right?

A.    A hundred percent.  So back up to the Chairman, yeah, he couldn't -- I don't think he could play Chairman unless you were given a big piece.  But also Paul Phua made sure he got paid, too.  So it wasn't just -- you know, Chairman is hard to get money from.  So it's like, there is a bonus to giving this guy a big piece.  You're going to get paid.

Q.    Another reason why you might sell shares or invest yourself in a poker game is to offset some of your own risk;

right?

**A.** A hundred percent.

**Q.** And another reason is you might need financial backing to get into the game; right?

**A.** A hundred percent.

**Q.** In other words, you might need someone else or some other people --

**A.** In most cases, yeah.

**Q.** -- to guarantee you so that, if you lose the money, the other person knows you're good for it; right?

**A.** Yes.

**Q.** And I think I heard you mention this, but, 60 percent is a pretty big share for one of these kinds of games; right?

**A.** Yes.

**Q.** And I think you testified on direct that Mr. Goldstein ended up winning -- it was over like $26 million from Mr. Gores; right?

**A.** Correct. I think there was two matches and I think he won more than that.

**Q.** So would it surprise you if Mr. Phua ended up winning like more than like $10 million out of this game?

**A.** According to this writing, he won way more than that.

**Q.** We've been talking about these arrangements between poker players in terms of the investments and so on. Am I right that, in the world of high-stakes poker, there is a limited

circle of folks who will enter into these kinds of arrangements with each other? Is that fair to say?

**A.** Correct.

**Q.** Like, for example, we saw Mr. Robl's name down here a couple of times; right?

**A.** Correct.

**Q.** And those people will enter into these arrangements, investment arrangements and so on, back and forth with each other, across a bunch of different games; right?

**A.** Correct.

**Q.** And these people might also play against each other and win and lose against each other; right?

**A.** Correct.

**Q.** There could be situations where, within this group of folks who play high-stakes poker, people owe each other like millions of dollars at any one time; right?

**A.** Yep.

**Q.** In your experience, poker players in the world of high-stakes poker do not create formal written contracts for the money they owe each other; right?

**A.** It happens very rarely.

**Q.** In fact, it's much more common that these kinds of things are arranged just through text message or maybe even just a conversation; right?

**A.** Text. I text everything.

Q.   What is the most money that you yourself have ever been owed from one of these poker investments without having a written contract?

A.   At least $50 million.

Q.   And sometimes with these small groups of players owe each other money across various games, the players can choose to like cancel out or swap debts rather than exchanging the money back and forth; right?

A.   It happens.

Q.   Let me give you one example of what I'm talking about.

       MR. KRAVIS:  Can we look at RS 52 on this exhibit? And can we take a look, zoom in on like the five messages that start on 14 November 2016.  Keep going.  Can we go a little further down.  Okay.

BY MR. KRAVIS:

Q.   This is a text message exchange between you and Mr. Goldstein on November 4, 2016; right?

A.   Correct.

Q.   Mr. Goldstein writes, "Let me know if you want to sell a piece tonight"; right?

A.   Correct.

Q.   And you understand that to mean Mr. Goldstein is asking if you want to sell a share of yourself in a game you're playing; right?

A.   Yes.

**Q.** And you write back "you got ten"; right?

**A.** Um-hum.

**Q.** And you're telling Mr. Goldstein you're going to give him ten percent of the game; right?

**A.** Yes.

**Q.** And then if you look a little further down, on the 15th you write, "lose 667"; right?

**A.** Yes.

**Q.** In other words, you're telling Mr. Goldstein, you had a ten percent share of me. I lost. Is this $667,000?

**A.** Yes, it is.

**Q.** All right. And then if you go down to the next message, yeah, that's good. Just the one message is good. Mr. Goldstein writes "Cool. I will get it to you. I had a piece of Robl that he'll give you. I'll pay the game then pay you." Do you see that?

**A.** Yes.

**Q.** And when Mr. Goldstein writes, "I had a piece of Robl that he'll give you," you understood that to mean that Mr. Robl owed Mr. Goldstein money from some other match where Mr. Goldstein invested; right?

**A.** No. I think that -- I think Robl played in a game that we played in, and he had a piece of him and Robl won and then he just like transferred that.

**Q.** I see. Okay. So in the game that -- where Mr. Goldstein

had a share of you, you think Mr. Goldstein also had a share of Mr. Robl?

**A.** Correct.

**Q.** And Mr. Robl won some money that night and you lost some money; right?

**A.** Correct.

**Q.** And so the arrangement here is, instead of Mr. Robl paying Mr. Goldstein and then Mr. Goldstein paying you, the money is going to go straight from Mr. Robl to you; right?

**A.** Robl to me, correct.

**Q.** And the idea is it's just a little more efficient to do it this way. It just reduces the number of transactions; right?

**A.** It's the same game. Definitely. That happens all the time.

**Q.** Yeah. This kind of thing happens all the time; right?

**A.** Uh-hum.

**Q.** And sometimes it might also happen that poker players owe each other money from different games and they choose to just cancel out the debts; right?

**A.** I think -- I don't know. I'm guessing, but yeah. For sure that happens a lot.

**Q.** Yeah. Let me give you an example. Now, when I did an example yesterday, I accidentally used the name of a witness in the case. So I'm going to be a little bit more careful this time.

Let's say you're playing poker against a guy a named Ted. Okay? And let's say you win a million dollars off of Ted. All right? And then the next week, you and Ted play in another game, and Ted wins a million dollars off of you. Okay? In that circumstance, the common way to settle it is to just cancel out the million dollars that you each owe each other; right?

**A.** Yeah.

**Q.** In other words, instead of you sending Ted a wire for a million dollars and Ted sending you a wire back for a million dollars, you just cancel it out and call it square; right?

**A.** Correct.

**Q.** And when that happens, by the way, the transactions do not appear in the bank records; right?

**A.** Correct.

**Q.** There's no wires going back and forth because just canceled it out; right?

**A.** In that circumstance, yes. The one you just named, yup.

**Q.** You just mentioned a 60 percent share that Mr. Phua had in the -- of Mr. Goldstein in the Gores' match. Is it possible that Mr. Phua and Mr. Goldstein just swapped out a debt?

**A.** Sure.

**Q.** Now, the Gores' matches we saw were in November and December of 2016; right?

**A.** One more time.

**Q.** Sorry. The Gores' matches, where Mr. Goldstein played Mr. Gores, those were happening in November and December of 2016; right?

**A.** I'd have to look at my texts, but I think so. Sounds right.

**Q.** Okay. Well, the reason I was asking was just it's possible that the kind of, you know, debt canceling each out thing we were talking about, like with you and Ted, it could straddle calendar years; right?

**A.** It could.

**Q.** Yeah. So like, for example, if you won a million dollars off of Ted on December 28, 2016, and then Ted won a million dollars off of you on January 3, 2017, you might agree to cancel out the debts and it's happening in two different years; right?

**A.** Correct.

**Q.** Do you know somebody named Tango?

**A.** Yes, I do.

**Q.** Who is Tango?

**A.** He's an Asian Whale.

**Q.** Do you know whether Mr. Goldstein played Tango in late 2016?

**A.** I don't know that.

**Q.** Okay. You said, though, that those -- those whales sometimes take months to pay off; right?

**A.** Correct.

**Q.** Now, you were asked --

**MR. KRAVIS:** We can take this down. Thank you.

**BY MR. KRAVIS:**

**Q.** You were asked by the government about some text messages involving celebrities. Do you remember that?

**A.** Yes.

**Q.** Do you remember there is a text message where Mr. Goldstein says he sees somebody named Paris at a club?

**A.** Yes.

**Q.** The Paris is Paris Hilton; right?

**A.** Correct.

**Q.** You know Paris Hilton personally; right?

**A.** Correct.

**Q.** And Mr. Goldstein knows that you know Paris Hilton personally; right?

**A.** Yes.

**Q.** And so Mr. Goldstein there is texting you because he sees somebody you know while he's out one night; right?

**A.** Yes.

**Q.** Now, we also saw a text about somebody named Pamela. Do you remember that?

**A.** Yeah. I see. That's my ex-wife. Yeah.

**Q.** That's what I was going to ask. The Pamela is Pamela Anderson; right?

**A.** Um-hum.

**Q.** And Pamela Anderson is your ex-wife; right?

**A.** Um-hum.

**Q.** Mr. Goldstein knows that Pamela Anderson is your ex-wife; right?

**A.** One hundred percent.

**Q.** You two have been, you know, together at an event with Mr. Goldstein on at least one occasion; right?

**A.** Uh-hum.

**Q.** So in that message Mr. Goldstein is asking if he can say hi to your ex-wife; right?

**A.** Correct.

**Q.** In your experience in life, do you know people who are like kind of obsessed with meeting celebrities and stuff like that?

**A.** Yep.

**Q.** Is Mr. Goldstein one of those people?

**A.** No.

**Q.** Is Mr. Goldstein even remotely one of those people?

**A.** I don't think so.

**Q.** You mentioned a moment ago that you have an accountant; right?

**A.** Correct.

**Q.** You rely on the accountant to help provide you with advice on how to handle your gambling wins and losses when it comes to

taxes; right?

**A.**   Sometimes, yeah.

**Q.**   You are a professional poker player; right?

**A.**   Correct.

**Q.**   And you rely on the advice of your accountant; right?

**A.**   Correct.

**Q.**   When it comes to tax documents in your experience, it is very uncommon for poker players to send each other 1099s for winnings and losses; right?

**A.**   I don't know if anyone has ever done that.  People have suggested it and it's frowned upon.

**Q.**   Why is it frowned upon?

**A.**   I don't know.  It just is.  I really don't know the answer, but I know people who got pissed one night.  Look, that the guy is trying to give me a 1099.

**Q.**   Right.  And just to state the obvious, Mr. Salomon, you don't know anything about Mr. Goldstein's taxes; right?

**A.**   I don't.

**Q.**   You don't know anything about Mr. Goldstein's communications with his accountants, do you?

**A.**   None.

**Q.**   You don't know anything about the process Mr. Goldstein's accountants use to prepare his tax returns, do you?

**A.**   Zero.

        **MR. KRAVIS:**  All right.  Thank you, Mr. Salomon.

That's all I have.

THE COURT: Thank you very much, Mr. Kravis.

Is there any redirect from the government?

MR. WHITMAN: Very briefly, Your Honor.

THE COURT: Very good.

REDIRECT EXAMINATION

BY MR. WHITMAN:

Q. Good afternoon now, Mr. Salomon. Do you recall questions from the defense about the lack of text messages on one side of the exhibit versus the other side of the exhibits?

A. Yes.

Q. This was -- and so do you recall ever deleting any message from your phone regarding or with Mr. Goldstein after having received a grand jury subpoena in the case?

A. One hundred percent, no.

Q. Did you produce messages to the government as part of the investigation that were potentially embarrassing to you?

A. Did I -- one more time?

Q. I'll say it a different way. Were there text messages that you produced to the government -- and I'm not asking about what they say -- but that were explicit in nature?

A. Some of them, yeah.

Q. Nonetheless, you decided to produce those to the government in response to the subpoena?

A. I had no choice.

**Q.** You were not trying to hide anything?

**A.** No.

**Q.** I think you testified about the gambling relationship between Paul Phua and Mr. Goldstein being none of your business. Did I hear that correctly?

**A.** Correct.

**Q.** Do you know one way or the other what percentage Paul Phua had in Mr. Goldstein in regards to the Alec Gores' games in 2016?

**A.** Just what he said. But I don't know.

**Q.** Do you know whether Paul Phua -- I'll start over.

Do you know for a fact whether Paul Phua had any stake in Mr. Goldstein for those games?

**A.** I -- yeah. It could be -- no. I don't know for a fact.

**Q.** You were asked questions about loaning money in the context of poker and whether there was contracts associated with that. Do you recall that line of questioning?

**A.** For gambling debts owed or something, yes.

**Q.** I think you mentioned a $50 million gambling debt that was owed to you at some point in time?

**A.** Correct.

**Q.** Were you paid that money?

**A.** Yes.

**Q.** Have you ever given -- have you ever loaned money, in the context of poker or otherwise, where you didn't require the

person to pay it back?

**A.**   No.

**Q.**   Has anyone ever loaned you money, in the context of poker or otherwise, where they didn't require you to pay it back?

**A.**   No.

**Q.**   Have you interacted with Paul Phua?

**A.**   Isn't that a gift and not a loan?

**Q.**   You're putting me on the spot.  It may be.

But have you interacted with Paul Phua?

**A.**   Yeah.  I have some interactions with him.

**Q.**   Does -- do you know what he does for a living?

**A.**   He's a casino owner.

**Q.**   Have you ever heard of Paul Phua loaning someone money and never requiring them to repay it?

**A.**   Not -- I wouldn't be surprised, but I've definitely never heard of it.

**Q.**   Does Paul Phua seem like the kind of individual who wants his debts to be repaid?

**A.**   Yes.  Most people want their debts to be repaid.

        **MR. WHITMAN:**  Nothing further.  Thank you, Your Honor.

        **THE COURT:**  Thank you very much.  Have all questions been asked of the witness?

        **MR. KRAVIS:**  Yes.  Thank you, Your Honor.

        **THE COURT:**  Very good.  Mr. Salomon, thank you very

much for your time and testimony.  You may step down and be excused.

Have a good afternoon.

(Witness excused.)

- - -

THE COURT:  Counsel, can we come to the husher for just a moment?

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT:  Mr. Kravis, are you on?

MR. KRAVIS:  Yes, Your Honor.

THE COURT:  Mr. Goldstein?  Do we have counsel for the government?  All right.  I believe there was another witness the government wanted to squeeze in.  It's a little after 12:00.  What's your pleasure?

MR. ADENRELE:  I don't expect them to be longer than 15 minutes on direct examination.

THE COURT:  Who is the witness?

MR. ADENRELE:  His name is Chuck Pacheco.

THE COURT:  All right.  Mr. Kravis, what are you thinking about potential cross at this point?

MR. KRAVIS:  Five minutes.

THE COURT:  All right.  Let's try to squeeze him in then.

MR. ADENRELE:  Thank you.

THE COURT: Let's call the next witness.

(Whereupon, discussion concluded.)

THE COURT: Is the government prepared to call its next witness?

MR. ADENRELE: Indeed, Your Honor. The government calls Mr. Chuck Pacheco.

THE COURT: Very good.

MR. ADENRELE: If I may approach?

THE COURT: You may.

Good morning. If you want to come all the way towards me into the well of the courtroom, and then you will step to your left over to the witness box and please remain standing. The courtroom deputy will swear you in.

- - -

CHARLES PACHECO, after having been duly sworn, was examined and testified as follows:

- - -

DEPUTY CLERK: Please adjust the microphone all the way up. State and spell your first and last name for the record.

THE WITNESS: Charles Pacheco. C-h-a-r-l-e-s. P-a-c-h-e-c-o.

THE COURT: Counsel?

MR. ADENRELE: Thank you, Your Honor.

DIRECT EXAMINATION

**BY MR. ADENRELE:**

Q. Mr. Pacheco, feel free to scoot in a little bit. You want to get close to the microphone. There you go.

Good afternoon. Mr. Pacheco, how old are you?

A. Fifty-six.

Q. And what do you do for a living?

A. I'm a talent manager and a professional gambler.

Q. And when you say "professional gambler," what kind of game do you mostly play?

A. Mostly poker.

Q. When did you start playing poker?

A. In the early '90s.

Q. Where?

A. Los Angeles.

Q. Where do you live now?

A. Beverly Hills.

Q. When you started playing poker in Los Angeles, did you play in private games or were you playing in casinos, mostly?

A. Mostly casino.

Q. And at the time when you started playing, what were, generally, the stakes? How much money was at risk?

A. A couple-hundred dollars.

Q. Did you eventually start to play in private games?

A. Yes, I did.

Q. Around when?

**A.** Well, in the late '90s played private games, and then continued playing for bigger stakes in the early 2000s.

**Q.** And who introduced you to these private games?

**A.** Tobey Maguire. My friend Tobey.

**Q.** And how do you know Tobey Maguire?

**A.** We're like childhood friends.

**Q.** Did Mr. Maguire -- well, let's back up.

What does it mean to take a stake in another individual playing poker?

**A.** Essentially, you're part of the risk of the player playing. His liability in a game or a match, or something.

**Q.** Has Mr. Maguire ever taken any stake in any poker games that you've played?

**A.** Of me?

**Q.** Yes.

**A.** Yeah. At times.

**Q.** And have you ever taken a stake in any games that Mr. Maguire has played?

**A.** Yes, I have.

**Q.** Who is Andy Beal?

**A.** Poker buddy, a friend of ours.

**Q.** And which -- what is your relationship with Mr. -- oh. Let me -- I'm sorry.

Was Mr. Beal one of the individuals in the group of poker players that you would play with in L.A.?

**A.**    Not often, but ideally.  But not often.

**Q.**    And who were some of the other individuals in this group of poker players that you played with in L.A.?

**A.**    You want their names or --

**Q.**    Sure.  Just a -- maybe a few names.

**A.**    Alec Gores, Gabe Kaplan, Rick Salomon, Tobey Maguire.

**Q.**    That works.

**A.**    Okay.

**Q.**    What's Mr. Beal's reputation in the poker community?

**A.**    A lot of fun to play with.

**Q.**    Has he lost a lot?

**A.**    Yeah.  I would say so.

**Q.**    Have you played Andy Beal?

**A.**    I have, yeah.

**Q.**    When?

**A.**    Specifically, I wouldn't know the date, but I played with him a couple of times.

**Q.**    All right.  And has Mr. Maguire ever played Andy Beal?

**A.**    Yes, he has.

**Q.**    Have you ever taken a stake in Mr. Maguire playing Andy Beal?

**A.**    Yes, I have.

**Q.**    About how much money have you earned from taking stakes in Mr. Maguire playing Andy Beal?

**A.**    Specifically, I wouldn't be able to declare that.

**Q.** Over 5 million?

**A.** Yes.

**Q.** Over 10 million?

**A.** Yeah. Yes.

**Q.** Let's switch gears a little bit.

As a general matter, how do you keep track of your gambling winnings and losses?

**A.** At the end year or --

**Q.** Sure.

**A.** Basically, I have a business attorney that comes up with a spreadsheet, and then we label all the income in-and-outgoing wires, and he submits that to the accountant.

**Q.** And do you have a separate account for your gambling winnings, or do you sometimes keep it in your personal account sometimes?

**A.** I tend to co-mingle it often, but most -- mostly now my personal.

**Q.** And you said you have an accountant who prepares your taxes at the end of the year?

**A.** Yes.

**Q.** Do you provide your bank statements to that accountant?

**A.** It all goes to my lawyer and then he gives it to them, yeah.

**Q.** So you make sure that all of your bank statements are provided to your accountant?

**A.** Correct.

**Q.** And why do you do that?

**A.** That's what they -- that's what's asked of me to do, so...

**Q.** Do you understand that it's important to provide all of your bank statements to your accountant or to act in -- in order for your accountant to accurately prepare your tax returns?

**A.** Yes.

**Q.** Have you ever inflated your losses in order to reduce your taxable income falsely?

**A.** No, I have not.

**Q.** Have you ever omitted tens of millions of dollars of gambling winnings --

**MR. KRAVIS:** You know what? Objection.

**BY MR. ADENRELE:**

**Q.** -- that you provided to your accountant?

**MR. KRAVIS:** Objection.

**THE COURT:** I'm sorry. I have an objection. Counsel, let's come to the headsets.

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:** All right. Mr. Kravis, are you on?

**MR. KRAVIS:** Yes, Your Honor.

**THE COURT:** Mr. Goldstein's thumb is up.

Do we have counsel for the government?

MR. ADENRELE: I'm on.

THE COURT: All right. Go ahead, Mr. Kravis.

MR. KRAVIS: So the objection is relevance and prejudice. I didn't object when they were doing some of this, but it's really not appropriate for the government to be calling one of these witnesses after another and just keep asking them if they have done the things that they allege that Mr. Goldstein did. This is just, like, not appropriate.

THE COURT: All right.

MR. ADENRELE: It -- sorry.

THE COURT: Go ahead.

MR. ADENRELE: Let me respond, Your Honor.

THE COURT: Go ahead.

MR. ADENRELE: This is nothing different than the defense each -- for almost each and every poker witness, they asked the same questions. And it's always about, do your accountants handle all of this for you? Do you have accountants who do this for you? Do you rely on them to get it right?

The defense has been doing that this entire trial. As a result, the government is more than entitled to rebut that with our own questions with these poker players.

THE COURT: All right. Anything else from Mr. Kravis?

MR. KRAVIS: I'm doing it on cross because they're

doing it on direct.

MR. ADENRELE: Okay. Well, I'm not going to do the whole "who does it first."

THE COURT: Counsel -- Counsel, let the Court talk.

MR. ADENRELE: I'm sorry, Your Honor.

THE COURT: I think we've covered this. The government may ask questions in this area sufficiently. Let's move on.

MR. ADENRELE: And I was planning to move on.

THE COURT: All right.

MR. ADENRELE: Thank you, Your Honor.

THE COURT: Objection is sustained in part. Thank you.

MR. ADENRELE: Thank you.

(Whereupon, discussion concluded.)

BY MR. ADENRELE:

Q. All right. Let's switch gears a little bit.

Do you know Mr. Goldstein?

A. I do.

Q. When was the first time you met him?

A. I think it was about 210, 211 -- 2011. Sorry.

Q. And what was the context in which you met Mr. Goldstein?

A. It was a poker game in a casino.

Q. Did you know he was a lawyer?

A. I did, yeah.

**Q.** Was Mr. Goldstein at any point your lawyer?

**A.** He was, yes. Yeah, he was, yeah.

**Q.** Is that a yes?

**A.** Yes.

**Q.** And just in a broad sense, if you could tell us -- if you could tell the jury the nature of his representation of you, why he was representing you?

**A.** There was a previous indictment. A bunch of guys that I was friends with -- still am friends with -- were part of a gambling case. My name appeared on a wiretap. And so some of my friends that were using Tom as a lawyer, I also used him as a lawyer for that.

**Q.** And at some point, did he stop becoming your lawyer -- or stop being your lawyer?

**A.** For that, yes.

**Q.** He stopped doing legal work for you?

**A.** I have asked him legal questions, so I don't know the specifics of --

**Q.** Let's do it this way. Back when he was representing you, did you pay him?

**A.** I did.

**Q.** And how much did you pay him?

**A.** I think it was 50,000.

**Q.** Okay. And around when was this?

**A.** 2012.

**Q.** Have you ever paid him again for legal services?

**A.** I have not.

**Q.** Have you ever discussed the nature of the representation of the facts around that representation with Mr. Goldstein since then?

**A.** For 2012?

**Q.** Correct.

**A.** No.

**Q.** Now, any future transactions that you've had with Mr. Goldstein, what were the nature of those transactions?

**A.** Gambling.

**Q.** Have you witnessed Mr. Goldstein playing other individuals in poker?

**A.** I have, yes.

**Q.** Have you ever played Mr. Goldstein in poker?

**A.** One on one, no.  Within a group, yes.

**Q.** And what do you call those types of -- those games -- those types of games?

**A.** A ring game.

**Q.** All right.  Are you aware of Mr. Goldstein playing Alec Gores?

**A.** Yes.

**Q.** When?

**A.** I think it was -- I couldn't -- I don't remember the exact date.  Sorry.

Q.   That's all right.

Were you there when it occurred?

A.   I stopped by once, yep.

Q.   Was it in 2016?

A.   I believe so.  Again, I don't want to be pinned to the exact date.

Q.   Sure.

A.   Yeah.

Q.   Are you aware of Mr. Goldstein playing an individual known as "The Chairman"?

A.   No.

Q.   Are you aware of Mr. Goldstein playing an individual known as "Tango," also in 2016?

A.   No.

Q.   When was the first time that you played against Mr. Goldstein?

A.   I believe it was 2011.

Q.   Do you remember playing Mr. Goldstein in 2019?

A.   Specifically, the date, no.  But have we played in ring games?  Yes.

MR. ADENRELE:  Okay.  Let's go to Exhibit 353.1.

BY MR. ADENRELE:

Q.   All right.  Mr. Pacheco, what is this?

A.   My bank statement.

Q.   And how do you know that?

**A.** Because it's got my corporate account there.

**Q.** All right. And what's the date range for the bank statement?

**A.** March 1, 2019 to March 31, 2019.

**Q.** All right. Let's go down to page 2, and zoom in on this wire here.

Okay. Mr. Pacheco, what is this?

**A.** That is an incoming wire.

**Q.** Okay. From whom?

**A.** Goldstein & Russell.

**Q.** And what is the date?

**A.** March 4.

**Q.** And what is the amount of the wire?

**A.** 170,000.

**Q.** And what is the reason that you received this wire from Mr. Goldstein?

**A.** Gambling.

**Q.** All right. Now, at some point in time, were you keeping track of wins and losses for other poker players?

**A.** In general, or --

**Q.** Well, let me back up. Have you ever hosted any poker games?

**A.** Yes. Yes, I have.

**Q.** When you hosts those poker games, do you keep track of the wins and losses of individuals at the poker game?

A.    For the game, yes.

Q.    Has Mr. Goldstein ever attended any of those games?

A.    Yes.

Q.    Any games that you hosted?

A.    Yes.

MR. ADENRELE:  All right.  Let's go to Exhibit 353.2.

BY MR. ADENRELE:

Q.    Mr. Pacheco, what is this?

A.    A text thread.

Q.    Okay.  Text between whom?

A.    Tom and myself.

Q.    And Mr. Goldstein is on the -- or -- sorry.

You're on the right side and Mr. Goldstein is on the left side; is that right?

A.    Yeah.

Q.    Tell us a little bit about what this text thread is about.

A.    This is a text clarifying a transaction and percentage of a poker result.

Q.    And just to be clear, you provided this text message to the government in response to one of our subpoenas?

A.    Yes.

Q.    And you said this is related to a poker transaction.  If we go down, it says -- there's a message there that says, "I wish to send Andy 1.4, not 1.6."  Do you see that?

A.    Yeah.

**Q.** And who is the Andy being referred to here?

**A.** Andy Beal.

**Q.** If you go all the way down to the bottom, there's a text from Mr. Goldstein reading ".886 my way." Do you see that?

**A.** I do.

**Q.** What does that mean?

**A.** That means that I would owe him to send him that.

**Q.** And owe him how much?

**A.** I'm sorry?

**Q.** Owe him how much?

**A.** 886,000.

**MR. ADENRELE:** Let's go back to Exhibit 353.1. I believe down to page 5, page 6. Actually, just go down one more page. One more page. One more movement. Let's zoom in on this wire.

**BY MR. ADENRELE:**

**Q.** And that's page 4 we're on there. And what's the date of this wire?

**A.** December 21st.

**Q.** And how much is it?

**A.** $886,029.

**Q.** And who is it to?

**A.** Thomas Goldstein.

**Q.** Is this wire consistent with the text message we just reviewed?

A. Yes.

Q. Again, why are you sending Mr. Goldstein $886,000?

A. I'm sorry?

Q. Why are you sending Mr. Goldstein $886,000?

A. It's correlated to that text, so it's a result of a amount of money that he's owed from a poker score.

Q. When was the last time you spoke to Mr. Goldstein?

A. Maybe a year ago.

MR. ADENRELE: Let's go to Exhibit 314.

BY MR. ADENRELE:

Q. Mr. Pacheco, what is this?

A. It's a WhatsApp thread.

Q. Is this from your phone?

A. Yeah.

Q. And what's the date?

A. January 11, 2025.

Q. What is this -- what do these two notes here say -- well, let me back up. At some point, were there numerous text messages between you and Mr. Goldstein here?

A. Yeah.

Q. And what does the bottom note say there?

A. "Thomas Goldstein updated the message timer. New messages will disappear from this chat 24 hours after they are sent except when kept. Tap to change."

Q. What does that mean?

**A.** There is a function, I guess, that you can tap and change if you want to keep the message or not.

**Q.** And is this a function that you change or a function that Mr. Goldstein changed?

**A.** This would indicate Tom changed that.

**Q.** Do you know when the indictment --

**A.** I could change on my end do you mean?

**Q.** I'm just asking, based on what we read here, this is a function that you changed or one that Mr. Goldstein changed?

**A.** No. This is prompted from Tom's phone to mine.

**Q.** And do you know whether the indictment was filed five days after this text message?

**A.** No.

      **MR. ADENRELE:** Thank you. No further questions.

      **THE COURT:** Thank you very much. Does defense wish to cross-examine the witness?

      **MR. KRAVIS:** Very briefly, Your Honor.

      **THE COURT:** All right. Very good.

                  CROSS-EXAMINATION

**BY MR. KRAVIS:**

**Q.** Good afternoon, Mr. Pacheco.

**A.** How are you?

**Q.** I want to just start where the government ended. Do you remember seeing a notification about some text messages between you and Mr. Goldstein? Do you remember that exhibit?

**A.** Yeah.

**Q.** Do you remember seeing that the date on the exhibit is January of 2025?

**A.** Of the last thing I looked at?

**Q.** Yeah. Right. Right. Right. Yeah. Okay.

Do you remember the government asking you about how there used to be all those text messages there? Do you remember that?

**A.** Yes.

**Q.** Okay. You were interviewed by the government in this case in February of 2024; right?

**A.** Yeah.

**Q.** Did the government subpoena your text messages from Mr. Goldstein?

**A.** Then?

**Q.** Yeah.

**A.** I don't think so.

**Q.** Did they ask you for the messages between you and Mr. Goldstein when they interviewed you in February of 2024?

**A.** I don't remember that.

**Q.** Suffice to say, if the government had served you with a subpoena for the text messages, you would have given it to them; right?

**A.** Yes.

**Q.** If the government had asked, you probably would have just

voluntarily produced them; right?

A. Yes.

Q. And that was February 2024; right?

A. Yes.

Q. Thanks.

You were shown some transactions a moment ago between you and Mr. Goldstein. Do you remember that?

A. Yes.

Q. And I think we saw one of the transactions was some money that was going from Mr. Goldstein's law firm account. Do you remember seeing that?

A. Yes.

Q. And that transaction was going to your company's business account; right?

A. Yes.

Q. You sometimes use your business account for gambling transactions; right?

A. Yes.

Q. Okay. I think you heard -- I think I heard you testify on direct examination that you got some accountants that you work with to do your tax stuff. Do I have that right?

A. Yes.

Q. That you rely on the advice of your accountants when it comes to reporting your gambling wins and losses, things like that?

**A.** Yeah. It's a two-step thing with my lawyer and the accountant, but yes.

**Q.** And you don't know anything about Mr. Goldstein's taxes, do you?

**A.** I do not.

**Q.** You don't know anything about Mr. Goldstein's communications with his accountants about his taxes, do you?

**A.** I don't.

**Q.** You don't know anything about the bookkeeping in Mr. Goldstein's law firm, do you?

**A.** I don't.

**Q.** Let me ask you just more thing. In your experience, poker players can win and lose significant amounts of money to each other; right?

**A.** Yes.

**Q.** You've played in games probably that involved like hundreds of thousands of dollars. Is that fair to say?

**A.** Yes.

**Q.** And sometimes it gets as high as millions of dollars; right?

**A.** Yes.

**Q.** And in your experience in the high-stakes poker community, poker players don't tend to enter into written contracts with each other for these kinds of debts, do they?

**A.** No.

Q.   You live in California; right?

A.   I do.

Q.   Have you ever tried to like take a legal action to recover a poker debt or anything like that?

A.   I have not.

Q.   Do you know if you even could do that in California?

A.   I don't think I can actually.

Q.   Finally, Mr. Pacheco, in your line of work, do you get to know a fair number of celebrities?

A.   I do.

Q.   In your experience, are there some people in this world who are very focused on like meeting celebrities and getting to know celebrities?

A.   Yes.

Q.   Is Mr. Goldstein one of those people?

A.   No.

        MR. KRAVIS:  Thank you, Mr. Pacheco.

        THE COURT:  Thank you very much, Mr. Kravis.

Any redirect from the agreement?

        MR. ADENRELE:  Just one question.

                    REDIRECT EXAMINATION

BY MR. ADENRELE:

Q.   Mr. Pacheco, have you ever lied to your accountant about millions of dollars in gambling winnings?

A.   I have not.

MR. ADENRELE:  Thank you.

THE COURT:  Thank you very much.  Have all questions been asked of the witness?

MR. KRAVIS:  Yes.  Thank you, Your Honor.

THE COURT:  Thank you for your testimony and time. You may step down and be excused.

Have a good afternoon.

(Witness excused.)

- - -

THE COURT:  And Counsel, I think this might be a good time to allow the jury to take their lunch break.  It is 12:36.

Please rise for the jury.

(Whereupon, the jury exited the courtroom at 12:36 p.m.)

THE COURT:  Please be seated.  Counsel, before we break for lunch, I wanted to get a sense of what the afternoon is looking like from the perspective of the government.

MR. ADENRELE:  Indeed, Your Honor.  We have three witnesses on deck, Special Agent Nguyen, Katie Bart, and we may get to Special Agent McDonald as well.

THE COURT:  McDonald?

MR. ADENRELE:  Indeed.

THE COURT:  What was the name of the first witness? I'm sorry.

MR. ADENRELE:  Special Agent Nguyen.

THE COURT:  Thank you.  For the first witness, what's

your sense about length of direct, roughly?

MR. ADENRELE: About an hour, hour and 15 minutes.

THE COURT: So we'll get started with that witness when we come back. We'll see what the defense wants to do on cross, and we'll see how far we can get.

MR. ADENRELE: Absolutely. Thank you, Your Honor.

THE COURT: We'll be back at 1:38. Enjoy your lunch.

DEPUTY CLERK: All rise. This Honorable Court stands in recess for one hour.

(Whereupon, a lunch recess was taken from 12:38 until

1:40 p.m.)

DEPUTY CLERK: All rise. This Honorable Court now resumes in session.

THE COURT: Please be seated, everyone, and welcome back from the lunch break. The Court understands that the government has several additional witnesses to call this afternoon; is that correct?

MR. BEATY: It is, Your Honor.

THE COURT: Are we ready to get started?

MR. BEATY: Yes, we are.

THE COURT: All right. Are we ready for the jury?

MR. ADENRELE: Yes, Your Honor.

THE COURT: Okay. Let's have the jury. And then Nguyen is first?

MR. BEATY: Yes, Your Honor.

DEPUTY CLERK:  All rise for the jury.

(Whereupon, the jury entered the courtroom at 1:43 p.m.)

THE COURT:  Please be seated, everyone.

Members of the jury, welcome back from your lunch break.

Is the government prepared to call its next witness?

MR. GORDON-MARVIN:  We are.  We call Special Agent Quoc Tuan Nguyen.

THE COURT:  Thank you very much.

Special Agent, if you'll come forward towards me and then move to your left towards the witness box and please remain standing.  Once you are there, the courtroom deputy will swear you in.

                           - - -

QUOC TUAN NGUYEN, after having been duly sworn, was examined and testified as follows:

                           - - -

DEPUTY CLERK:  Thank you.  You may be seated.  Please adjust the microphone, slide all the way up, please.  And state and spell your first and last name for the record.

THE WITNESS:  Quoc Tuan Nguyen.  First name, Q-u-o-c, space T-u-a-n.  Last name Nguyen.  N-g-u-y-e-n.

                    DIRECT EXAMINATION

BY MR. GORDON-MARVIN:

Q.   Good afternoon, Special Agent Nguyen.

A.   Good afternoon.

**Q.** Where do you work?

**A.** I'm a special agent with IRS Criminal Investigation.

**Q.** How long have you worked at IRS Criminal Investigation?

**A.** Since August 2011.

**Q.** Broadly, what do you do in that role?

**A.** I investigate federal criminal tax violations and related financial crimes.

**Q.** What training have you had for that role?

**A.** I completed six months of training at the Federal Law Enforcement Training Center in Glynco, Georgia.

**Q.** And have you had training since then?

**A.** I have.

**Q.** Broadly, what type of training?

**A.** We have annual training within our own field office and I have several certifications in blockchain tracing. And for my role as somebody who testifies at trials, I have annual training.

**Q.** You mentioned blockchain tracing. What is that?

**A.** That is tracing cryptocurrency transactions.

**Q.** And what current units are you with?

**A.** Internally with the IRS, I am currently assigned to the Western Cyber Crime Unit. In addition to that, I am also a task force officer as part of the FBI Cyber Crimes Task Force.

**Q.** And very generally, what do you do in that work?

**A.** I investigate financially motivated cyber crime.

Q.   And to be clear, did you have any involvement in this case before it was indicted?

A.   I did not.

Q.   You only recently became involved?

A.   Correct.

Q.   Once you became involved, did you have an opportunity to review emails and documents produced by the law firm Goldstein & Russell, PC to the Grand Jury?

A.   I have.

Q.   Did that include e-mails and document metadata provided by the law firm?

A.   Yes.

Q.   Did you also have an opportunity to review documents produced by other custodians, involving Coinbase and Binance.com?

A.   Yes.

Q.   I'd like to shift to a couple of the Goldstein & Russell e-mails.

          MR. GORDON-MARVIN:  Let's look at Exhibit 3 and Exhibit 2.  And if we zoom in on the top part of Exhibit 3.

BY MR. GORDON-MARVIN:

Q.   So this is the -- on top, we have the e-mail, Exhibit 3, and then the attachment, Exhibit 2, below.

     The jury has seen this before, but just to refresh everyone, it's an e-mail sent from whom?

**A.** This is an e-mail from Mr. Tom Goldstein at tgoldstein@goldsteinrussell.com to tom.goldstein@protonmail.com.

**Q.** And what's the subject?

**A.** The subject is file.

**Q.** What's the attachment?

**A.** The attachment is called amounts.docx.

**Q.** What does this e-mail list as the date sent?

**A.** The date sent was January 22, 2017.

**Q.** So we've been looking here at Exhibit 2 and its attachment -- oh, sorry -- Exhibit 3, the e-mail, and its attachment, Exhibit 2.

**MR. GORDON-MARVIN:** I'd like to now look at a chart, Exhibit 432. If we zoom in on this chart just a little bit.

**BY MR. GORDON-MARVIN:**

**Q.** Special Agent Nguyen, did you make this chart?

**A.** I did not.

**Q.** However, have you had a chance to review it?

**A.** I have.

**Q.** Have you compared it to the underlying data provided by Goldstein & Russell for these e-mails and documents?

**A.** I have.

**Q.** To the best of your knowledge, is this a true and accurate summary of the information from those e-mails and documents?

**A.** It is.

Q.   So looking here at the first set of two exhibits,
Exhibits 3 and 2 in green, we have columns for exhibit type,
the attached to document.

     Here, Exhibit 2, to what exhibit was Exhibit 2 attached?

A.   Exhibit 2 was attached to Exhibit 3, which is the e-mail
above.

Q.   And then looking at the next column, we have the
Subject/Attachment Name.  So what was the name of the document
Exhibit 2?

A.   The attachment was called "Amounts.docx."

Q.   And what was the name of -- or the subject of the e-mail
to which it was attached?

A.   The name of the e-mail was "File."

Q.   Now, there's an original folder path.  We'll come back to
that.

     Looking at the far right-hand side, we were just looking
at this e-mail, Exhibit 3, and the date sent on -- listed on
the e-mail was January 23, 2017; is that right?

A.   Correct.

Q.   However, there's also this date created column.  Where did
this information come from?

A.   That came from the metadata of the production that the law
firm produced.

Q.   And I notice, looking down this chart, all of the -- all
three of these e-mails have a date created around September 3

or September 4, 2021; is that right?

A.    Correct.

Q.    Nonetheless, the date sent actually listed by the e-mails for the first two differs, for Exhibits 3 and 21?

A.    I'm sorry.  Could you repeat that?

Q.    The date sent, in the final column for Exhibits 3 and 21, differs from the date created; is that right?

A.    Yes.  That's correct.

Q.    Okay.  Now, I'd like to go back to this original folder path.  If we remove the highlighting and look just at Exhibit 3 here on the original folder path -- first of all, what is the original folder path?

A.    The original folder path is where that e-mail was stored, and that's based on the metadata.

Q.    So here, at the very beginning of it, it says "tgoldstein@goldsteinrussell.com -- goldsteinrussell1.onmicrosoft.com.pst."

I think we're familiar with the tgoldstein e-mail address, but what is a personal storage table, or PST?

A.    A PST is a type of file format.  It's a personal storage table.  And it's -- particularly, it's a file format used to store e-mails, and it's more -- in particular, it's a type of format that Microsoft uses to store their e-mails.

Q.    So then looking further in the kind of series of the long path for this folder path, it repeats that.  It says "primary,"

and then it has a backslash, "top of information store/sent items."

What is the top of information store?

**A.** Top of information store is the name of the folder that Microsoft calls it. That's a name that Microsoft uses to store e-mails.

**Q.** And so looking within that folder here at the final portion of this metadata, where was this particular file stored within Mr. Goldstein's e-mail?

**A.** The sent items folder.

**Q.** And then looking down in Exhibit 2, where was that ultimately stored within the PST?

**A.** It is stored in the sent items, but there's a backslash file, meaning that it's stored in the sent items along with the e-mail called "File."

**Q.** Now, looking at Exhibit 2 here, what was the date on which Exhibit 2, the attachment titled "Amounts.docx," was created?

**A.** It was created December 22, 2016.

**Q.** On what date was it actually e-mailed and attached to this e-mail?

**A.** The e-mail was sent January 23, 2017.

**MR. GORDON-MARVIN:** Now, I'd like to look at another two exhibits, split screening them, which are Exhibits 21 and 451.

If we zoom in on the very top of Exhibit 21 on top.

**BY MR. GORDON-MARVIN:**

Q.   Who is this e-mail to and from?

A.   It is an e-mail from Mr. Tom Goldstein to Mr. Tom Goldstein.

Q.   And what does it list as the date sent?

A.   The date sent was October 13, 2017.

Q.   What's the subject line of the e-mail?

A.   The subject line was Amounts.doc.

Q.   And what was attached to it?

A.   The attachment was called "Amounts.docx."

Q.   And so looking back again at Exhibit Number 432, the metadata chart.

       MR. GORDON-MARVIN:   Zoom in here on the blue two rows.

**BY MR. GORDON-MARVIN:**

Q.   This is the two documents we were just looking at?

A.   Correct.

Q.   And, here again, for the e-mail, Exhibit 21, subject line Amounts.doc, what was the date -- looking at this chart for the metadata, what was the date on which it was sent?

A.   It was sent October 13, 2017.

Q.   And despite when it was actually sent, what is the date created in the metadata?

A.   Of the e-mail or the attachment?

Q.   Of the e-mail.  Thank you.

**A.** The e-mail was created September 3, 2021.

**Q.** And where was that e-mail ultimately stored within the PST?

**A.** It was stored in the inbox.

**Q.** In what subfolder?

**A.** In a folder called personal.

**Q.** And then looking down at the attachment, Exhibit 451, titled "Amounts.docx," what was the date created of that document?

**A.** The date created was December 22, 2016, the same as Exhibit 2.

**Q.** And they also have the same file name?

**A.** Correct.

**Q.** Now, I want to look at another e-mail here, which is Exhibit 12. If we zoom in on the very top of Exhibit 12 here, what date does this list as the date sent?

**A.** September 4, 2021.

**Q.** To whom is it object ostensibly sent?

**A.** It was sent to craig.cooper@wonderful.com.

**Q.** What's the subject?

**A.** The subject was "The line."

**Q.** Does this document list any "From" line?

**A.** It does not.

**Q.** And going back to the metadata chart, if we look at Exhibit 432, looking at the gray row at the bottom, does this

refer to the e-mail we were just looking at?

**A.** It does.

**Q.** What is listed as both the date created and the date sent for this particular e-mail?

**A.** Both September 4, 2021.

**Q.** And where was that e-mail stored within the PST?

**A.** It was stored in a folder called deleted Items.

**Q.** And so if we go back to that e-mail for a moment, let's take a look at it again. If we zoom in on the first few paragraphs.

So the sent is September 4, 2021, but the very first paragraph says, "I hope all is well. Lots of nervous here about the election. We basically have turned off the coverage in our house."

Did I read that right?

**A.** Yes.

**Q.** And then if be look down two paragraphs, there's a paragraph that starts, "I'm writing about a specific dilemma, taxes. There is no carryforward for gambling losses. So the fact that I lost on the funds from the line in 2016 will be no help when we win in 2017. In effect, I have to collect twice as much in 2017 as my share of the winnings versus 2016 because the 2017 winnings are taxed in full."

Did I read that right?

**A.** Yes.

Q. And then looking at very next paragraph, it says, "As a result, there's a huge imperative in getting in another big heads-up game in 2016."

If we look down to the next paragraph, what does that paragraph that begins "so that's" -- what does it say?

A. "So that's what we've arranged. There will be a heads-up match against Alec Gores sometime between Saturday and Tuesday."

Q. And then, what does the very next paragraph after that say?

A. "The good news is that we have $800,000 still in Asia from the last one million to post for the game. I was going to use that -- part of that to pay my personal 2016 taxes, but I'm just paying penalties instead. That's fine, and that's my -- that's fine, and it's my problem."

Q. So scrolling back up to the top of this page for a moment, even though the sent date says September 4, 2021, this e-mail talks about an upcoming election, nerves about the election, and looking to arrange another heads-up game against a person named Alec Gores in 2016; is that right?

A. Yes.

Q. So I'd like to look at a couple more e-mails here.

MR. GORDON-MARVIN: If we look at Exhibit 544 and split screen that with Exhibit 521. If we zoom in for a moment on the top.

**BY MR. GORDON-MARVIN:**

Q.   Now, this is an e-mail from Jon Levitan.  What does it say as the sent date?

A.   The sent date was February 22, 2019.

Q.   Did you have a chance to review the metadata for this e-mail as well?

A.   Yes.

Q.   And what month and year did that say was the date created?

MR. MOHAMMADI:  Your Honor, objection.

THE COURT:  Let's come to the headsets.

(Whereupon, a discussion was held outside the presence of the jury as follows:)

THE COURT:  All right.  Do we have counsel for the government?  And counsel for Mr. Goldstein, can you hear me?

MR. MOHAMMADI:  Yes.  Yes.  Sorry, Your Honor.

THE COURT:  All right.  Mr. Goldstein, thumbs up.

All right.  Go ahead, Counsel.

MR. MOHAMMADI:  Your Honor, this goes beyond the scope of the expert disclosure that was disclosed to us several months ago.  There is no mention of any of these kinds of e-mails.  The other e-mails they've mentioned, but this e-mail here is not an expert disclosure.

So the objection is that it's beyond the scope of the disclosure.

THE COURT:  Which document are we talking about so

the record is clear?

**MR. MOHAMMADI:** This document, the February 22, 2019 e-mail.

**THE COURT:** So Government 544?

**MR. MOHAMMADI:** I don't know what the exhibit number is. I'm sorry, Your Honor.

**THE COURT:** All right. Government 544. Outside the scope is the objection?

**MR. MOHAMMADI:** Correct, Your Honor.

**THE COURT:** Counsel for the government?

**MR. GORDON-MARVIN:** There's been literally no opinion given. There is no expert testimony here at all. He's simply reading off the "from" and the date sent and then stating what the meta data was that Goldstein & Russell had self-provided. There is literally no expert opinion here.

**THE COURT:** Okay. So the --

**MR. GORDON-MARVIN:** And in fact, what we noticed, just to be clear, was the expert opinion is about Binance.com and ProtonMail.

**THE COURT:** All right.

**MR. GORDON-MARVIN:** Nothing that's even been said so far is an expert opinion.

**THE COURT:** So just to be clear, the Special Agent did not prepare the chart that we've been talking about, but he reviewed it. And you are saying that the metadata reflected on

that chart about this e-mail is something that he's testifying about now; correct? Or did I misunderstand you?

MR. GORDON-MARVIN: As a factual matter, he's asking as like a human teleprompter. Right. He's just reading out the information that is in the data that they gave us. There has been no opinion provided at all.

THE COURT: And did he review all this data himself?

MR. GORDON-MARVIN: Yeah.

THE COURT: Including e-mail?

MR. GORDON-MARVIN: Yes.

THE COURT: Objection overruled.

(Whereupon, discussion concluded.)

BY MR. GORDON-MARVIN:

Q. All right. So I think I just asked you in what month and year was the date, created date for this e-mail, according to the meta data?

A. September 2021.

Q. I'd like to look at one more set here. This is Exhibit 536 and Exhibit 524. If we zoom in here on the top of the e-mail, who is this e-mail from?

A. Jon Levitan.

Q. And what is the date sent of this e-mail, according to the e-mail itself?

A. February 25, 2019.

Q. And what date, according to the date created and the meta

data, was it?

A.   Also, September 2021.

Q.   I'd like to move to a different topic.  If we return to Exhibit 3 and we zoom in here for a moment, so this is the e-mail we were first looking at, the "To" line is to whom?

A.   The "To" was to tom.goldstein@protonmail.com.

Q.   Are you familiar with protonmail.com?

A.   I am.

Q.   What is ProtonMail?

A.   It is an e-mail service, service provider based in Switzerland.

Q.   Where is the data stored?

A.   The data is stored in Switzerland.

Q.   What types of encryption does ProtonMail use?

A.   ProtonMail uses two types of encryption.  It uses end-to-end encryption for the transmission of the data, and it uses zero access encryption for the storage of the data.

Q.   Can you just elaborate a little bit on what "end-to-end encryption" means?

A.   End-to-end encryption means that it's encrypted during the transmission of the data and only the two end users can decrypt the data to read the data.

Q.   Now, here we have the e-mail, but who produced the e-mail in this case?

A.   I believe the law firm did.

Q.    So we have the data from one side of that transaction?

A.    Correct.

Q.    And you also mentioned "zero access encryption."  What does that mean?

A.    Zero access encryption means that the data is encrypted locally on the device before it is stored on ProtonMail's servers, so, therefore, ProtonMail cannot read the data even if it wanted to.

Q.    So Proton itself can't even access the data?

A.    Correct.

Q.    How many times have you ever heard of anyone successfully decrypting encrypted ProtonMail data without the encryption key?

A.    None, to my knowledge.

Q.    If someone lost their password and didn't have a recovery account for their ProtonMail e-mail, what would that mean for the contents of their e-mail?

A.    That it's going to be forever encrypted and nobody would be able to read it.

Q.    Where again is ProtonMail based?

A.    In Switzerland.

Q.    So I'd like to shift to another topic for a moment here. Let's turn to Exhibit 8.1.  If we zoom in on the very top of this exhibit.  Can you see at the top left there is a DocuSign envelope ID?

A.    Yes.

Q.    What are the last five digits of that DocuSign envelope ID?

A.    A5CCB.

Q.    And now, if we go to page 8 and we zoom in here at the top, the certificate of completion on the envelope ID, what are the last five digits of this DocuSign envelope ID?

A.    The same, A5CCB.

Q.    And now, if we scroll down to the signer then section, in the middle who is listed?

A.    Mr. Thomas Che Goldstein.

Q.    Using what e-mail address?

A.    Tgoldstein@goldsteinrussell.com.

Q.    What are the viewed and signed dates on the right-hand side?

A.    Both February 24, 2021.

Q.    And now in the middle, there is a little thing that says "Using IP Address."  Can you see that?

A.    Yes.

Q.    What's an IP address?

A.    And IP --

        MR. MOHAMMADI:  Your Honor, objection.

        THE COURT:  Let's come to the headsets.

    (Whereupon, a discussion was held outside the presence of the jury as follows:)

THE COURT:  Do we have counsel for Mr. Goldstein?

MR. MOHAMMADI:  Yes, Your Honor.

THE COURT:  Mr. Goldstein?  Do we have government counsel?  Can you hear us?

Okay.  Go ahead, Counsel.

MR. MOHAMMADI:  Your Honor, the objection is this is undisclosed expert testimony here.  So the government has disclosed the special agent will testify about IP addresses in general.  But specifically here, he's offering, I believe the government will be presenting the testimony of Special Agent Nguyen to establish that this IP address is tied to specific locations, and that's not part of the expert disclosure that was disclosed to the defense several months ago.

So the objection is outside the scope.

THE COURT:  Outside of the scope of the disclosure.

Counsel for the government?

MR. GORDON-MARVIN:  I'm slightly confused.  I just asked him, what's an IP address?  That's not an opinion.  It's a fact question, and I think it's well within the scope of all of this.  Then I think, as to this particular document, all we're about to do is look at this document and the numbers listed on it and then compare them to another document that the government is offering into admission, which is the Verizon IP address information.  I'm not asking him for an opinion here.

It's literally just, what does this say? What does that say? There is no opinion.

THE COURT: All right. Anything further from the defense?

MR. MOHAMMADI: Your Honor, the point that the government is trying to elicit from the witness is the IP address is tied to particular locations. So I'm familiar with the document that they're talking about, the Verizon location chart. And implication that the government is trying to draw is that this is a physical location that is tied with the IP address. And so -- Your Honor, sorry. Just one second.

THE COURT: Yeah.

MR. MOHAMMADI: So that's the point that the government is trying to offer for this document, which is outside the scope of the expert, expert disclosure, Your Honor.

THE COURT: All right. Anything -- go ahead, Counsel.

MR. GORDON-MARVIN: Yeah. I think the key word that he just used was "implication." There might have been "inference" in there, too. I think the word is "implication." That's an inference that the jury can draw.

All we're going to do is put up two documents and look at the IP addresses on the two of them.

THE COURT: All right.

MR. GORDON-MARVIN: If the jury draws the inference,

well, that's probably common sense, but that's not an expert opinion.

THE COURT: All right. Well, first of all, I don't think we've even gotten there yet with the question that I heard. I think the question is fine. The inquiry seems to be fine so far. I'm happy to hear the defense once I actually hear what the witness has to say. But thus far, I don't see any basis for the objection, and I don't see that it's outside the scope of anything at this point.

Objection overruled.

MR. MOHAMMADI: Thank you, Your Honor.

(Whereupon, discussion concluded.)

BY MR. GORDON-MARVIN:

Q. So a moment ago, I asked what you -- what is an IP address? You started to answer. So what is an IP address?

A. An IP address is an internet protocol address. It is a unique number assigned to every device connected to the internet, and it allows your device to communicate with websites that you're visiting on the internet. It allows for the relay of information.

Q. If you were going to sort of make that a metaphor into the normal human experience of the real world, what's an IP address like?

A. An IP address is similar to a home address.

Q. Now, what is the IP address listed here?

A.   The IP address listed here is 96.255.84.162.

Q.   And looking just above, there is a signature, a series of signature events for Amy Louise Howe.  Can you see that?

A.   Yes.

Q.   What IP address is listed for her events?

A.   The same, 96.255.84.162.

Q.   And now, if we go to page 19 of this document, if we zoom in on the top here for a moment.  This is titled a "DocMagic Esign Certificate."  Can you see that?

A.   That yes.

Q.   Here, there is a list of signers.  Who is the middle signer?

A.   Mr. Thomas Che Goldstein.

Q.   Using what e-mail address?

A.   Tgoldstein@goldsteinrussell.com.

Q.   Looking over to the last two columns, on what date did he -- date and time did he start viewing here?

A.   March 8, 2021 at 9:36 and 52 seconds a.m.

Q.   And what time did he complete?

A.   Approximately, one minute later at 9:37 a.m.

Q.   And now, if we scroll down a little bit, can you see a series of events listed here?

A.   Yes.

Q.   What IP address is listed for those events for Mr. Goldstein?

**A.** The same as above. 96.255.84.162.

MR. GORDON-MARVIN: Now, if we jump back to page 8, if we go to the next page, page 9. One more. Now, if we go to Exhibit 781.

**BY MR. GORDON-MARVIN:**

**Q.** If we zoom in on this just for a moment, at the top it says "Verizon case number." Can you see this?

**A.** Yes.

**Q.** What is this document?

**A.** These are records from Verizon.

**Q.** For what IP address?

**A.** For IP address 96.255.84.162.

**Q.** And looking down at the customer information section, to what physical location was that IP address assigned?

**A.** This IP address was assigned to 3908 Rosemary Street, Chevy Chase, Maryland.

**Q.** Was this the same IP address that we were just looking at on those DocuSign and DocMagic documents?

**A.** Yes.

MR. GORDON-MARVIN: And now, let's go to Exhibit 9.1. If we go to page 16, if we zoom in here on the top.

**BY MR. GORDON-MARVIN:**

**Q.** This is another DocMagic Esign certificate. Can you see this?

**A.** Yes.

Q. Who is listed as the middle signer?

A. Mr. Thomas Che Goldstein.

Q. On what date did he view and complete this document?

A. March 1, 2021, at 1:54 p.m.

Q. What e-mail address did he use for this?

A. Tgoldstein@goldsteinrussell.com.

Q. If we scroll down for a moment, what IP address did Ms. Howe use for all of these events?

A. The same one. 96.255.84.162.

Q. And if we go to the next page, if we zoom in here in the middle, what IP address did Mr. Goldstein use for all of his events?

A. The same. 96.255.84.162.

Q. And looking at a little over a third of the way down the screen, there's an event on March 1, 2021, at 1:55:30 p.m. Can you see that?

A. Yes.

Q. What, looking to the far right column, was the event completed then?

A. Uniform Residential Loan Application signed by Thomas Che Goldstein.

Q. And this was still using the same IP address, 96.255.84.162?

A. Correct.

Q. I'd like to shift topics. Are you familiar with Coinbase?

**A.** I am.

**Q.** What is Coinbase?

**A.** It is a cryptocurrency exchange based in the U.S.

**MR. GORDON-MARVIN:** Let's put up exhibit stamped as 1329.X.

**BY MR. GORDON-MARVIN:**

**Q.** Can you see this?

**A.** Yes.

**Q.** What is this a screenshot of?

**A.** This is a screenshot of Coinbase records relating to Mr. Goldstein's Coinbase account.

**Q.** On what date was this account created, looking at row 5?

**A.** June 1, 2020.

**Q.** What physical address was listed?

**A.** 3908 Rosemary Street, Chevy Chase, Maryland.

**Q.** What e-mail address was used?

**A.** Tom.goldstein@gmail.com.

**Q.** Have you had an opportunity to review the underlying data produced by Coinbase for Mr. Goldstein's Coinbase account?

**A.** I have.

**Q.** After reviewing that data, did you have an opportunity to create an analysis of it, summarizing his transactions in each year?

**A.** Yes.

**MR. GORDON-MARVIN:** I'd like to go to Exhibit 434,

page 1. If we zoom in here on the Fiat deposit section over to 2020.

**BY MR. GORDON—MARVIN:**

**Q.** So what is this table showing that we're currently looking at?

**A.** This is a summary of Mr. Goldstein's Coinbase account activity.

**Q.** Walk through the meaning of various things here just to start out --

**A.** Okay.

**Q.** -- it says --

**A.** Sorry. Go ahead.

**Q.** My apologies. It says, "Fiat deposits." What does that mean?

**A.** Fiat deposits means that any type of deposits into the account that is not cryptocurrency, so Fiat deposits are traditional currency like the U.S. dollar.

**Q.** So in 2020, how many Fiat traditional U.S. dollar deposits did Mr. Goldstein make into his cryptocurrency account with Coinbase?

**A.** One transaction for $25,000.

**Q.** Now, looking down to the next line, there's a -- it says, "Cryptocurrency transfers from third parties." What does that mean --

**A.** It means these are cryptocurrency transfers into

Mr. Goldstein's account that are from other people, not Mr. Goldstein's other cryptocurrency account at Binance.

Q. And how many of those transactions did he have in 2020?

A. He had nine transfers into the account for $491,646.77.

Q. And I want to pause on that number. So these are the cryptocurrency transfers; correct?

A. Correct.

Q. So is this 4,000 -- 491,000 number, is that actual U.S. dollar Fiat currency, or is that like an equivalent amount?

A. That is an equivalent amount based on the spot rate that Coinbase used.

Q. So it's not literally U.S. dollars?

A. No. He received actual cryptocurrency.

Q. And what is a spot rate?

A. A spot rate is essentially the exchange rate.

Q. Who provided the exchange rate for these transactions?

A. Coinbase.

Q. So when you have done this number as the total number, how have you come to that number?

A. That is just using Coinbase's own records. The cryptocurrency multiplied by the exchange rate or the spot rate.

Q. And that's the spot rate at the time of each of those individual nine transactions?

A. Correct.

Q. What was, effectively, the equivalent total of dollar value of these ten transactions coming into Mr. Goldstein's account?

A. $516,646.77.

Q. And now in the next section, it says, "Cryptocurrency swaps within Coinbase account."

What's a cryptocurrency swap?

A. A cryptocurrency swap is when you exchange -- you sell one cryptocurrency for another. You swap one cryptocurrency for another. For example, if you sell your Bitcoin and buy ether.

Q. And how many times did Mr. Goldstein do that in 2020?

A. Fifty-four times.

Q. Now, looking down at the next section, it says, "Fiat withdrawals." What does that mean?

A. It means that withdrawal -- non-cryptocurrency withdrawals from the account. So whenever he took U.S.D. out of the account.

Q. So took hard U.S. currency out of the account?

A. Correct.

Q. And if he's doing a withdrawal, is that like he's walking up to an ATM? How does --

MR. MOHAMMADI: Objection, Your Honor.

THE COURT: Go to headsets.

(Whereupon, a discussion was held outside the presence of the jury as follows:)

THE COURT: All right. Counsel for Mr. Goldstein, are you on?

MR. MOHAMMADI: Yes, Your Honor.

THE COURT: Mr. Goldstein, are you on? Do we have the government?

Go ahead, Counsel.

All right. Go ahead, Counsel.

MR. MOHAMMADI: Just a point of clarification, Your Honor, and the basis of the objection, is there's lack of foundation. So the document clearly says "Mr. Goldstein's Coinbase account activity." There's no way that this special agent or counsel know that any of the activity was done by Mr. Goldstein.

So I would ask that counsel rephrase the questions to make clear that when he asks Mr. Goldstein did X, Mr. Goldstein did Y. It's not Mr. Goldstein, we know. There's no foundation for that. It's the account activity that's demonstrated by the records in the account.

THE COURT: So the objection is making reference to Mr. Goldstein as the one making the withdrawals?

MR. MOHAMMADI: That's right. And lack of foundation.

THE COURT: And lack of foundation.

Counsel for the government?

MR. GORDON-MARVIN: I guess two things. I'm a little

confused by the lack of foundation point. We've established that this was an account created with Mr. Goldstein's e-mail address registered to his home address, so it -- one would think that's Mr. Goldstein.

Setting aside the foundation point, I'm happy to rephrase. I don't have any strong preference on how I ask these questions. I'm actually just trying to help the jury understand what a Fiat withdrawal is.

THE COURT: All right. Well, if you're willing to rephrase that, I think that can resolve the concern.

MR. GORDON-MARVIN: Sure.

THE COURT: Thank you.

MR. MOHAMMADI: Thank you, Your Honor.

(Whereupon, discussion concluded.)

BY MR. GORDON-MARVIN:

Q. When Coinbase lists a -- or what you summarize as a Fiat withdrawal here, what does that actually mean?

A. It means that Mr. Goldstein transfer U.S.D. out of the account.

Q. Is that with a wire? Is that with an ATM? How is that done?

A. It is a wire.

Q. And then there are also cryptocurrency transfers to third parties. What does that mean?

A. That means that that is when Mr. Goldstein sent

cryptocurrency to other people, and that does not include transfers to other accounts that he owns.

Q.   How many cryptocurrency transfers did he make in 2020 to other parties?

A.   Sixteen transfers.

Q.   For how much money?

A.   $520,805.53.

Q.   And looking at the next line, Total Withdrawals and Transfers, how many, combined, Fiat withdrawals and cryptocurrency transfers were conducted with this account in 2020?

A.   Eighteen total transactions for $541,805.53.

Q.   And just to be clear, that's -- that number is based on the kind of spot rate and equivalent U.S. dollar value of the cryptocurrency that was used; is that right?

A.   That is partially based on the Fiat withdrawals.  The Fiat withdrawals are just the exact amount.  And then the 520,000 is based on the spot rate, yes.

Q.   I notice here that the total deposits and transfers is quite a bit lower than the total withdrawals and transfers. How is that possible?

A.   Because there were fluctuation in the account.  The cryptocurrency is volatile.  And there were -- yeah.  I think it's based on the fluctuation in the account.

Q.   So sort of like stocks, sometimes the value goes up,

sometimes it goes down?

**A.** Correct.

**Q.** Are you familiar with Binance?

**A.** I am.

**Q.** Are you familiar with Binance.com and Binance.us?

**A.** I am.

**Q.** What's the difference between Binance.com and Binance.us?

**A.** Binance.com is a cryptocurrency exchange based outside of the U.S. And in 2019, Binance.com set up an entity called Binance.us for U.S. customers.

**Q.** So after 2019, what was Binance.com's policy as to people in the United States?

**A.** Binance.com prohibited U.S. users from using Binance.com.

**Q.** In 2021, just to sharpen that point, what was Binance.com's approach to people in the U.S.?

**A.** Binance.com wanted U.S. users to use Binance.us.

**Q.** And, in fact, would it allow U.S. users if it knew they were based in the U.S.?

**A.** No.

**Q.** How would it identify and prohibit U.S. users from the Binance.com platform?

**A.** Primarily, based on IP geolocation.

**Q.** Are you familiar with what's called KYC?

**A.** Yes.

**Q.** What is KYC?

**A.**     KYC stands for "know your customer."  It is part of any bank's compliance.  Under anti-money laundering laws, banks and cryptocurrency exchanges are required to collect identifying information on their customers, such as ID, Social Security number and things like that.

**Q.**     In early 2021, what type of KYC information did Binance.com collect?

**A.**     It did not collect any.

**Q.**     Are you familiar with what's called a virtual private network?

**A.**     I am.

**Q.**     Is there an acronym for that?

**A.**     It's called a VPN.

**Q.**     What is a VPN?

**A.**     A VPN creates secure tunnels for you to get on-line, so it essentially creates a buffer between your home internet provider and the websites you are visiting on-line.  One of the features of a VPN is that you can mask your location and your IP address.

**Q.**     When you say "mask your location and your IP address," what does that mean?

**A.**     So in a typical internet connection, if you were just to connect on-line via your home internet or Fios or anything like that, if you were to go to a site like Google, Google can see your IP address and figure out that you are in Maryland.

But in a VPN, when you're connecting through a VPN, you can -- you first connect to the internet through your home internet service provider, in this case through Verizon. Once you're connected on-line, then you connect to your VPN service. And once you connect to your VPN service, depending on the service you're using, they can give you a list of 20 to 50 countries where you can connect from.

So you can say I want to connect through -- to the internet from Malaysia, from Singapore, from London. And so, once you connect through the VPN, all Google will see is that you're connecting through this IP address out of London or Malaysia or anything like that.

Q. So taking that information and then thinking about Binance.com's early 2021 policy prohibiting U.S. users in its KYC collection, if someone was based in the U.S., but still wanted to create a Binance.com account in early 2021, how could they do that?

A. You would use a VPN. You can connect to the VPN and say that I want to connect through a country outside of the U.S. and then go to Binance.com.

Q. Have you had an opportunity to review Binance.com records in this case?

A. I have.

Q. Let's go to Exhibit 464.X. I'm showing you a screenshot of a Binance.com report?

**A.** Yes.

**Q.** At the bottom, there are a number of different Excel tabs. Can you see that?

**A.** Yes.

**Q.** In what format -- it might be implicit, but in what format does Binance.com typically produce records?

**A.** In Excel spreadsheet.

**Q.** Looking here at this first tab, what information is listed for the e-mail address of the person that made this account?

**A.** Tom.Goldstein@gmail.com.

**Q.** Looking down to row 14, what KYC information is listed?

**A.** Nothing. It's all blank.

**Q.** In fact, looking over at Columns E and F, so effectively Row 4, Columns E through G, first name, last name and user nationality, what information is listed?

**A.** Nothing. All blank.

**Q.** Let's go to page 2 of this document. Now we're looking at the tab "Approved Devices." Can you see that?

**A.** Yes.

**Q.** What is the name of the device that was approved twice for use with Binance.com?

**A.** TG iPhone.

**Q.** And what's a -- Withdrawn.

Let's go to page 3 of this document. What are we looking at here?

**A.** This is the access log. So any time you log into Binance or you do anything on the platform, it logs your IP address to figure out where you're logging in from, and it logs what you did on the platform.

**Q.** And this is the data -- was this data provided by Binance or by someone else?

**A.** This was provided by Binance.com.

**Q.** So here, there's a Column E "Real IP." Can you see that?

**A.** Yes.

**Q.** What is that column?

**A.** That is the IP that the person used to access the platform.

**Q.** And then there is a column just to the right of that called "F Geolocation." What is that?

**A.** That is where the IP resolved to based on Binance's internal systems.

**Q.** So this is what Binance.com thinks the IP address is?

**A.** Correct.

**Q.** Did you have a chance to review all of this IP address data?

**A.** I did.

**Q.** Did you also compare it to other proprietary IP address data?

**A.** I did.

**Q.** Let's go to Exhibit 435. If we look here, there are a

number of columns.  We'll work through.  Column 1, "IP address per Binance.com."  Where did the data in this column come from?

A.   That came from the Binance access log we just looked at.

Q.   And then what do "Date First Observed" and "Last Observed" mean?

A.   First observed means that that's the first that IP address appeared in the access log.  And the last observed means that it was the last time it appeared.

Q.   What does "number of operations conducted" mean?

A.   It means the number of times that IP address appeared in the log.

Q.   And then, in the next column, it says "Geolocation per MaxMind."  What is MaxMind?

A.   MaxMind is a data analytics company and they specialize in IP geolocation.

Q.   So they have their own dataset of what they think the location of an IP address is?

A.   Correct.

Q.   Looking at this column, who pulled the information to supply the locations for this column?

A.   I did.

Q.   And so each of these individual rows, there's an IP address and then there's the geolocation per MaxMind?

A.   Correct.

Q.   Now, looking at the next column over, it says "ISP per

MaxMind." What does ISP mean here?

**A.** ISP means internet service provider and that means that, according to MaxMind, for example, this very first IP was either leased or owned by a company called M247 Euro.

**Q.** And then there are others that go back to DataCamp?

**A.** Correct.

**Q.** In fact, all of the IP addresses from February 6, 2021 at the top to near the bottom, on May 21, 2021, resolve to what two hosts?

**A.** M247 Euro or DataCamp.

**Q.** Are you familiar with those two entities?

**A.** I am.

**Q.** What are they?

**A.** They are data centers in abroad that are commonly known as they lease service space to VPNs.

**Q.** Looking at all of this data from February through May 2021, how do you conclude Mr. Goldstein accessed Binance.com?

**A.** He used a VPN to access his Binance.com account.

**Q.** In fact, also to create it?

**A.** Correct.

**Q.** Now, I do notice here, right below that, in June 2021 there is a single location entry for Los Angeles, California, with host Papa?

**A.** Binance's protocols were not perfect.

Q.   So sometimes you could get on even if you weren't supposed to be able to?

A.   Correct.

Q.   I'd like to go to Exhibit 433.  If we zoom in on this, did you create this chart?

A.   I did not.

Q.   However, did you have a chance to review it and compare it to the underlying records from Coinbase and Binance.com?

A.   I did.

Q.   Is it true and accurate, to the best of your knowledge?

A.   Yes.

Q.   So we'd seen earlier when the Coinbase account was created in June 2020.  When was the Binance.com account created?

A.   February 6, 2021.

Q.   And when was the last outgoing transaction with that Binance.com account?

A.   May 24, 2021.

Q.   Let's go back to Exhibit 434, page 2.  What is this?

A.   This is a summary of the activity in Mr. Goldstein's Binance account.

Q.   This is from effectively February through May of 2021?

A.   Yes, for three -- roughly three months.

Q.   Looking at this document, how many cryptocurrency transfer did Mr. Goldstein receive from third parties in his Binance.com account in 2021?

A. Ten.

Q. The number here that's next to it, is that number literal U.S. dollars for the amount or is that also the equivalent dollar value of the cryptocurrency?

A. It's the equivalent based on Binance's spot rate.

Q. So how much, based on Binance's spot rate, did those ten transactions add up to?

A. $972,850.09.

Q. And that's the value of the cryptocurrency Mr. Goldstein received in that three-month period?

A. Correct.

Q. Now, looking at the next set, how many cryptocurrency swaps did Mr. Goldstein conduct within his Binance account?

A. Fifty-seven.

Q. How many peer-to-peer trades?

A. The peer-to-peer trades are trades or swaps with other Binance users as opposed to your swapping with Binance itself.

Q. How many did he conduct?

A. Two.

Q. So how many total swaps and trades did he conduct?

A. Fifty-nine.

Q. And now, looking at the next section, the middle says "cryptocurrency transfers to third parties." How many did Mr. Goldstein conduct in 2021 with his Binance.com account?

A. Eighteen for $317,471.84.

Q. And then how many cryptocurrency transfers did he make from his Binance.com account to his Coinbase account?

A. Twelve.

Q. For how much equivalent U.S. dollar value?

A. $673,865.08.

Q. And based on Binance's spot rate, what was the total value of all of these withdrawals and transfers?

A. $991,336.92.

Q. And I notice, again, that number is a little bit bigger than the total deposits and transfers. Why is that?

A. The fluctuation in crypto prices.

Q. So now, if we go back to the first page and look here at 2021 for his Coinbase account, shifting back to his Coinbase account, how many Fiat deposits did Mr. Goldstein make directly into the Coinbase account?

A. Two for $75,000.

Q. And how many cryptocurrency transfers did he receive from third parties?

MR. MOHAMMADI: Your Honor, objection.

THE COURT: Go to the headsets.

(Whereupon, a discussion was held outside the presence of the jury as follows:)

THE COURT: All right. Counsel for the government, are you on? Counsel for Mr. Goldstein?

MR. MOHAMMADI: Yes, Your Honor.

THE COURT: Mr. Goldstein's thumb is up. Go ahead.

MR. MOHAMMADI: Your Honor, this is the same objection as last time, and I thought we had talked about this. Is the lack of foundation in saying that Mr. Goldstein was the one that conducted any of these transactions.

THE COURT: All right. So I guess the objection is to the phrasing of the questioning.

Counsel for the government?

MR. GORDON-MARVIN: Again, I think the foundation is extraordinarily strong at this point. Right. Like this is his e-mail account. It's registered to his home address. In fact, this is the first time I'm ever hearing that there's any sort of notional argument that somehow this is actually a case of mistaken identity. This strikes me as, frankly, a little bit absurd.

THE COURT: All right. I think the foundation has been laid to connect the account to Mr. Goldstein, and the defense can, obviously, seek to undermine that on cross-examination.

The objection is overruled.

MR. MOHAMMADI: Thank you, Your Honor.

(Whereupon, discussion concluded.)

BY MR. GORDON-MARVIN:

Q. So going back down to the very next line, how many cryptocurrency transfers did Mr. Goldstein receive from third

parties in 2021?

**A.** Seventy-eight.

**Q.** For what equivalent dollar value amount?

**A.** $2,920,961.37.

**Q.** And then how many cryptocurrency transfers did he make from his Binance.com account to his Coinbase account in the U.S.?

**A.** Twelve.

**Q.** For how much dollar value amount?

**A.** $662,448.03.

**Q.** And I notice, as we're talking about this, that the dollar value amount here on the transfers in the Binance account is a little different from the one we were looking at in the Binance chart?

**A.** Correct.

**Q.** Why is that?

**A.** Because Binance and Coinbase had different spot rates.

**Q.** And so all this is based on their spot rates, not some outside number?

**A.** Correct.

**Q.** In total in 2021, how many transfers and deposits did Mr. Goldstein conduct or receive?

**A.** Ninety-two.

**Q.** For how much total U.S. dollar value equivalent?

**A.** 3,658,409.04 -- 40 cents.

Q. And skipping down a bit to Fiat withdrawals, how much money did Mr. Goldstein withdraw from that account?

A. Fifteen transactions for $701,200.

Q. And were some of those transactions to his own bank account?

A. I believe they were all to his benefit.

Q. Now, looking down one row below, how many transactions did he conduct to transfer cryptocurrency to third parties in 2021?

A. Eighty-seven.

Q. For how much total dollar value amount?

A. 2,942,538.91.

Q. All told, what was the approximate value of the total withdrawals and transfers he conducted through his Coinbase account in 2021?

A. $3,643,738.91.

MR. GORDON-MARVIN: A moment to confer with counsel.

And just for the record, Your Honor, we'd offer in as well the underlying documents for these two accounts. That's Exhibits 464 and 1329.

THE COURT: 464 and 1329?

MR. GORDON-MARVIN: Yes.

THE COURT: There are no objections?

MR. MOHAMMADI: No objection.

THE COURT: Very well.

MR. GORDON-MARVIN: Thank you.

THE COURT: All right. Thank you, Counsel, very much. I think this might be a good time to take a brief break before we do cross-examination of the witness.

I'm going to invite the jury to step down for a break at this time.

Please rise for the jury.

(Whereupon, the jury exited the courtroom at 2:41 p.m.)

THE COURT: You may be seated.

And, Special Agent, if you want to step away for just a moment, you may. You'll be on cross when you come back, so please do not communicate with the government while you're on your break.

(Whereupon, the witness left the witness stand and the courtroom at 2:42 p.m.)

THE COURT: And, Counsel, before we break, about how long do we anticipate on cross?

MR. MOHAMMADI: Your Honor, about 30, 40 minutes.

THE COURT: All right. Very good.

MR. MOHAMMADI: An estimate.

THE COURT: Okay. When we come back, we'll do the cross and we'll see where we are. Let's take five.

(Whereupon, a recess was taken from 2:42 until 2:52 p.m.)

DEPUTY CLERK: All rise. This Honorable Court will now resumes in session.

THE COURT: Please be seated, everyone. We have our

special agent rejoin us.

MS. WEINER: Your Honor -- Your Honor, excuse me. Could I briefly address something before we bring the special agent back in?

THE COURT: Of course. Do you want to come to the podium?

MS. WEINER: Sure.

As we discussed this morning, defense counsel and counsel for the government has come to an agreement on a contemporaneous instruction we'd ask the Court to give at the conclusion of Ms. Bart's testimony. I just wanted to raise it now because it seems like we may roll right into her testimony without taking a break.

THE COURT: Okay. So do we have the language?

MS. WEINER: Yes, ma'am.

THE COURT: Can I see it?

MS. WEINER: Sure.

THE COURT: Thank you.

Are these all the same thing? I have three sheets of paper.

MS. WEINER: Yes, Your Honor. I just printed a couple copies. I wasn't sure if your deputy wanted one.

THE COURT: All right. So this is what you want the Court to provide to the jury after the Bart's testimony?

MS. WEINER: Our thought was that the best time to do

it would be at the conclusion of her testimony after she's left the witness box to instruct the jury -- to read this instruction to the jury.

**THE COURT:** All right. Let me read it out to make sure we're all comfortable.

You have heard evidence about Mr. Goldstein offering items of value to Ms. Bart in October 2020 through January 2021, as well as evidence about the timing of her departure from the firm.

Mr. Goldstein is not charged with any crime in connection with the offers made -- he made to Ms. Bart during that time period or her departure from the firm. The offers are not an affirmative act of evasion alleged in support of Count One of the indictment, tax evasion for 2016. Therefore, even if you find that the offers were made, that is not sufficient to prove an affirmative act of evasion as required by Count One.

This evidence may be considered by you only to the extent that it bears upon whether Mr. Goldstein willfully violated the tax laws as alleged in Counts One through Thirteen, tax evasion, false returns, and willful failure to pay.

You may not consider testimony on this topic as any kind of reflection on Mr. Goldstein's character.

Everybody's comfortable with that?

**MR. WHITMAN:** Yes, Your Honor.

**THE COURT:** Yes. All right. I'm happy to read it,

just for my need, please, to do that at the conclusion, and I think this should also be included in our charge conference when we get to the final instructions as well.

Okay. Are we ready to --

MS. WEINER: Thank you, Your Honor.

THE COURT: Are we ready to have the special agent rejoin us?

MR. BEATY: We are.

THE COURT: Okay.

Special Agent, you can go ahead and take your seat back in the witness box and make yourself comfortable. I'll remind you, you are already under oath.

Please rise for the jury.

(Whereupon, the jury entered the courtroom at 2:57 p.m.)

THE COURT: Please be seated.

Counsel for Mr. Goldstein?

MR. MOHAMMADI: Your Honor, may I approach with the binders?

THE COURT: You may.

CROSS-EXAMINATION

BY MR. MOHAMMADI:

Q. Okay. Good afternoon, Agent Nguyen.

A. Good afternoon.

Q. Is it agent or special agent?

A. Either one.

Q. Okay. Agent is fine?

A. Yes.

Q. Great. Let me just ask you a couple questions to understand a little bit more about your role in this case. Is that okay with you?

A. Yes.

Q. Okay. So you're an IRS special agent; is that right?

A. Correct.

Q. But you're not an investigator on this case, on Mr. Goldstein's case; is that right?

A. No.

Q. Right. You weren't, like, the one who collected evidence or, like, spoke to witnesses or, like, the investigation part of it; right?

A. No.

Q. And, in fact, I think I might have heard you say that you only recently joined the case; is that right?

A. Yes.

Q. To the extent that you know anything about the case, any facts about the case, it's because the government -- some of the folks who are seated on my right -- they told you about the case; is that right?

A. Correct.

Q. And that's helpful. Okay. Let me ask you some questions about some of the things I heard you say in your testimony,

just to unpack a little bit.

So I think I heard you testify about VPNs; is that right?

**A.** Yes.

**Q.** And just to remind me, what does a VPN stand for?

**A.** Virtual private network.

**Q.** And then I think you also testified about another acronym. An IP address; is that right?

**A.** Correct.

**Q.** And remind me, please. What is an IP address?

**A.** Internet protocol address.

**Q.** One more time.

**A.** Internet protocol address.

**Q.** Internet protocol address. Okay.

So one of the things I think I heard you say is that using a VPN can make a user's location look different than where he or she is physically located; right?

**A.** Yes.

**Q.** That's like the whole point of a VPN. It's to route your internet through a different server; is that right?

**A.** Yes.

**Q.** And when you see someone's IP address, it doesn't necessarily tell you where that person is physically located; right?

**A.** Which IP address?

**Q.** Well, I guess, the IP address that shows up when you --

the example we're talking about, like Google see this, or some other server sees this?

**A.** Yes. It's possible using geo IP data, you can figure out where the person is located.

**Q.** Just to make sure I'm understanding. So if someone's -- if you see someone's IP address, I think what we're seeing is that it would be a mistake to assume that that person's physical location is the same as the IP address; right?

**A.** Well, I mean, if -- for example, if you see an IP address and MaxMind says it's in Maryland, and yet you see that it's Verizon Fios, then that's more likely that that person is actually in Maryland because Verizon Fios is a legitimate ISP and it doesn't provide a VPN service. But if you see an IP address that says the person is in Italy, and you see an ISP that you never heard of before, you know, it's -- with some more research, you can figure out that that ISP provides a VPN service.

**Q.** Right. I think you and I might be saying the same thing. I just want to make sure, like 100 percent.

So I think the question I have is that, like, if you just see somebody's IP address, like it would be -- you can't just assume that that person -- that IP address is their physical location. You have to ask, like, where were they actually? And there might be some things that you --

**A.** You would have to do some research, yes.

Q.   Right.  Right.  Great.

I think I heard, maybe, that you testified a little bit about some of the reasons that people use VPNs; is that right?

A.   Yes.

Q.   There are some very legitimate reasons that people you use VPNs; is that right?

A.   Correct.

Q.   A big one is, like, security; right?

A.   Correct.

Q.   I'm going to ask you about something.  So I have -- you know, I've heard about this happening.  I'd like want to see if you've heard about this, too, is that sometimes, like, using Netflix, there's some shows that are available in some countries and not available in other countries.  And so sometimes people use VPNs to, like, look at the shows that are in other countries that they can't access because those shows are not available in the United States.

Have you heard about that happening?

A.   I have, yes.

Q.   Yeah.  And so people use VPNs for that purpose as well; right?

A.   Yes.  I'm not sure that works anymore, but yes.

Q.   Okay.  Got it.  Sure.

You would agree that using a VPN is, like, pretty common; right?

A. Yes.

Q. Great. Great.

Okay. Let's talk a little bit about the cryptocurrencies that we've talked about as well.

Do you remember what we were talking -- the government was asking you some questions about Binance.com. Do you remember that?

A. Yes.

Q. Binance.com is the world's largest cryptocurrency exchange; is that right?

A. Yes.

Q. Now, I think I heard you testify that in 2019 Binance.com changed its policies so that U.S.-based consumers would no longer be allowed to access its platform directly; is that right?

A. Correct.

Q. So imagine that you live in the United States and you have a Binance.com account. You wouldn't be able to access that Binance.com account just normally; right?

A. Well, I think their policy is more than access. It's -- you cannot create a Binance.com account on top of that.

Q. Got it. But to enable to, like, access or create an account, you have to use a VPN; right?

A. To circumvent, yes.

Q. Right. And I just state the obvious here, but there is no

law that says that you can't use a VPN to access Binance.com; right?

A.    Not that I'm aware of.

Q.    And then the other cryptocurrency exchange that I think we talked about was Binance.com -- I'm sorry.  We talked about Binance.com, but Coinbase.  Do you remember that?

A.    Yes.

Q.    Coinbase, just to make sure we're on the same page, it's a United States-based cryptocurrency exchange; is that right?

A.    Correct.

Q.    As opposed to Binance.com, which is an overseas-based cryptocurrency exchange; is that right?

A.    Correct.

Q.    I want to ask you about some terms.  Have you heard of the terms "centralized and decentralized exchange"?

A.    Yes.

Q.    Okay.  I think I understand what they are, but let me just ask you and you tell me if I've got it right.  So a centralized exchange is where there's a company that maintains the exchange records, so like Binance and Coinbase are centralized exchanges; is that right?

A.    Correct.

Q.    Okay.  And then, by contrast, decentralized exchanges are like just peer to peer.  So there is like no central company that maintains those records; is that right?

A. I think it's more than just records. I think they don't maintain the private key. So they can't access your wallets.

Q. Got it. And that's not what Coinbase or Binance.com are; right?

A. No. Coinbase and Binance are centralized in that they act as the custodian.

Q. Right. And then by being centralized platforms, by being the custodians, they maintain those records; right?

A. They maintain the records and they hold custody of your crypto.

Q. And if you needed to get those records, you could get those records from Binance.com or Coinbase; right?

A. Correct.

Q. And I think the government made some charts, and you might have testified that you didn't make the charts, but you looked at them and you approved of them. But the reason you were able to make those charts is because, when you wanted to -- when the government wanted to, Binance.com and Coinbase could pull those records for them; is that right?

A. Correct.

Q. To your knowledge, the government subpoenaed Mr. Goldstein's records for Binance and Coinbase; is that right?

A. That, I don't know. I don't know how they obtained the records. I assume subpoena.

Q. Right. But we have the records and that's the way you were able to make the charts; is that right?

A. Correct.

Q. And the government never, to your knowledge, subpoenaed Mr. Goldstein for any additional cryptocurrency records; is that right?

A. I don't know the answer to that.

MR. MOHAMMADI: I'd like to pull up, please, Government Exhibit 433.

THE WITNESS: Is it in the binder?

BY MR. MOHAMMADI:

Q. It's not in the binder, but we can look on the screen. I think you'll be able to see it. Do you see it in front of you?

A. Yes.

Q. Great. Do you remember seeing this chart when the government asked you some questions here?

A. Yes.

Q. I just want to make sure I get the timeline right. So this time -- according to this timeline, the Coinbase account was created in June of 2020; is that right?

A. Correct.

Q. And the Binance.com account was created in February of 2021; is that right?

A. Correct.

Q. To your knowledge, there's no other accounts that predate

June 2020; is that right?

A.    Not to my knowledge.

Q.    So there is like no accounts in 2019; is that right?

A.    Not to my knowledge.

Q.    Got it.

        MR. MOHAMMADI:    Could we please pull up Government Exhibit 434?

BY MR. MOHAMMADI:

Q.    Okay.  Do you see, Agent Nguyen, what it says on the very top?  Do you mind reading the name of the document?

A.    "Mr. Goldstein's Coinbase account activity."

Q.    This is -- you have no way of knowing whether Mr. Goldstein actually made these transactions; right?

A.    I know it's his account.

Q.    Right.  It's an account that's registered to him, but you don't know if he was the one who was actually pressing the buttons; right?

A.    I'm sorry.  I'm just trying to think of the IP addresses. I think the -- some of the IP addresses matches the IP addresses on his Binance account.

Q.    But the Binance.com account was the one where you said he used the VPN; right?

A.    Correct.

Q.    Okay.  But -- that's fair.  That's fair.  Do you see that the only year that Mr. --

MR. MOHAMMADI: Actually, Mr. Mendoza, do you mind going to the page that has the Binance records? I'm sorry. I think I might have misspoken here. Yes. This page. Yes. This page.

BY MR. MOHAMMADI:

Q. Do you see here that Mr. Goldstein -- the only year that Mr. Goldstein had a Binance account is 2021; is that right?

A. That was the only year where transactions happened occurred, but the account, I believe, is still active.

Q. I understand. That's a helpful point. So it could be the case that the account still exists, but it's dormant. Is that the point that you're making?

A. Yes.

Q. Got it. Do you see at the bottom there where it says "cryptocurrency transfers to Mr. Goldstein's Coinbase account" and then "total withdrawals and transfers"?

A. Yes.

MR. MOHAMMADI: And the one below as well, Mr. Mendoza.

BY MR. MOHAMMADI:

Q. I just want to make sure I understand what this is saying here. So is the point here that Mr. -- that the account records show there was a transfer from Mr. Goldstein's Binance account to Mr. Goldstein's Coinbase account or multiple transfers, I should say, in the amount of $673,000 and change?

**A.** Correct.

**Q.** And the total amount of withdrawals and transfers in the Binance account is close to a million dollars, $991,000; is that right?

**A.** I'm sorry. Can you repeat that?

**Q.** The total amount of withdrawals and transfers listed is about a million dollars, 991,000; is that right?

**A.** Correct.

**Q.** Now, Binance.com, again, is the foreign exchange; right?

**A.** Correct.

**Q.** And Coinbase is the domestic -- U.S.-based exchange; right?

**A.** Correct.

**Q.** So I think what this is telling us is that roughly two-thirds of the money, the cryptocurrency in Mr. Goldstein's Binance account, was actually ultimately transferred to the United States-based Coinbase; right?

**A.** Correct.

**MR. MOHAMMADI:** I'd like to please pull up now Exhibit 464.

**BY MR. MOHAMMADI:**

**Q.** Do you remember that the government showed you this document on direct exam?

**A.** Yes.

**Q.** And you said I think this is the records that came from

Binance.com; right?

**A.** Yes.

**Q.** And Binance, just so we're on the same page, is the foreign-based account; right?

**A.** Yes.

**Q.** Now, these records show us that the e-mail address listed is Tom.Goldstein@gmail.com; is that right?

**A.** Yes.

**Q.** And they list a mobile telephone number; right?

**A.** Yes.

**Q.** And you don't have any reason to believe that that's not Mr. Goldstein's cell phone number; is that right?

**A.** I don't know one way or the other.

**Q.** Right. I guess one of the points from this is that this is a record created from Binance.com that lists Mr. Goldstein's e-mail address and a phone number that we think belongs to Mr. Goldstein; is that right?

**A.** Correct.

**Q.** How did the government get this document?

**A.** From Binance.

**Q.** From Binance.com. So the government issued a subpoena to Binance, and Binance was able to connect this record to Mr. Goldstein to be able to respond to the subpoena; is that right?

**A.** Yes.

Q. Okay. Agent Nguyen, I think I'd like to change gears just a little bit and talk about some other things that we were talking about with the government earlier.

So do you remember when the government asked you some questions about encryption technology?

A. Yes.

Q. I think I heard you say that ProtonMail uses -- ProtonMail is an e-mail platform; is that right?

A. It's an e-mail service provider, yes.

Q. And I think I heard you say that ProtonMail uses something called end-to-end encryption; is that right?

A. Yes.

Q. Encryption technology, like end-to-end encryption is extremely common; right?

A. Yes.

Q. It's, would you say, industry standard to use end-to-end encryption?

A. I don't know it's industry standard, but I know a lot of messaging apps use end-to-end encryption.

Q. And if a messaging app didn't have end-to-end encryption, that would be a security vulnerability; right?

A. Yes.

Q. So, for example, like when I send a message on my iPhone, iMessages or my WhatsApp account, it's encrypted end to end; right?

**A.** I know WhatsApp is end-to-end encryption. I'm not sure about iPhone messages.

**Q.** Got it. And platforms offer encryption -- end-to-end encryption for security purposes; right?

**A.** Yes.

**Q.** Because you don't want intruders reading your private messages; is that right?

**A.** Correct.

**Q.** And I think I also heard you say that ProtonMail employs another type of encryption called Zero-Access encryption. Do I have that right?

**A.** Yes.

**Q.** Zero-Access encryption means that the service provider cannot access the e-mail; is that right?

**A.** Yes.

**Q.** So in the case of ProtonMail, that would mean that the company, ProtonMail, can't access the contents of messages received from a ProtonMail account; right?

**A.** They can access it, but it will be encrypted so they can't view the data.

**Q.** They can't view it. They can't read it. They don't know what it says; is that right?

**A.** Correct.

**Q.** Now, you would agree with me that, when an electronic message is sent from one person to another person, a copy of

the message is sent -- is stored in the account of the sender and a copy of the message is stored in the account of the recipient; is that right?

**A.** Yes.

**Q.** So if I send you an e-mail, a copy of the message is stored in my sent box and a copy is in your inbox; right?

**A.** Yes.

**Q.** Let's talk about a few examples, if it's okay with you, in descending order of how secure contents of messages are.

So first, I'd like to give you an example and ask for your opinion. If both the sender and the recipient are using ProtonMail accounts, then both copies of the message will have Zero-Access encryption; is that right?

**A.** Yes.

**Q.** So just to take an example, if I send an e-mail from my ProtonMail account, adeelm@protonmail.com, I send it to you, agentn@protonmail.com, then both the sent version and the received version are Zero-Access encrypted; is that right?

**A.** Correct.

**Q.** That's pretty secure because we're both using ProtonMail accounts; is that right?

**A.** Yes.

**Q.** That's not true if we're not both using ProtonMail accounts; is that right?

**A.** Yes.

**Q.** So the second example I'd like to give you is, if I send an e-mail to your ProtonMail account, AgentN@protonmail.com, but I send it from my Gmail account, the sent version of the message in my Gmail account is not zero access encrypted; is that right?

**A.** The Gmail version is not, yes.

**Q.** And that's because only one side of the communication is zero access encrypted, the one that's in your inbox; is that right?

**A.** That's correct.

**Q.** And this is a less protected, less secure way of sending and receiving communications than ProtonMail to ProtonMail; is that right?

**A.** Correct.

**Q.** This is like a less effective way of keeping it protected; is that right?

**A.** Correct.

**Q.** Now, let me do a third example, is if neither of the sender nor the recipient are using a ProtonMail account -- following me?

**A.** Yep.

**Q.** So, for example, if I send an e-mail from my Gmail account and I send it to your Gmail account, in that case there is no zero access encryption; is that right?

**A.** Correct.

Q.   And this would be an even less protected way, an even less secure way of sending and receiving messages; is that right?

A.   Correct.

Q.   Because neither the sender nor the recipient are using zero access encryption; is that right?

A.   Correct.

Q.   Okay.  I know this is long.  But the fourth one, if that's okay with you -- just my last example.

As a fourth for example is if I ask another person to log on to my computer and send a file for me -- and, again, there's no ProtonMail, so it's neither the Gmail -- it's just Gmail to Gmail, and I ask a second person to go log on and send a message for me, that's an even less secure way; right?

A.   I'm sorry.  I don't understand that scenario.

Q.   So the scenario is that if I ask another person to log on to my computer and send a message from my Gmail to your Gmail, that's an even less secure way of sending a message; right?

A.   So, if you were to give somebody your password to log on to send --

Q.   Exactly.  Right.

A.   Correct.

Q.   Okay.  And like, this is less secure because there's no zero access encryption, and also, I'm given my password to somebody else; right?

A.   Correct.

Q.   Like, you might say it's, like, the opposite of zero access because I've literally given somebody access; is that right?

A.   Full access.

Q.   Yeah.  It's like -- it's like the rock bottom of security; is that right?

A.   Correct.

Q.   Okay.  I'd like to show you some documents now, and I think these are documents that the government has already shown you, at least some of them.

MR. MOHAMMADI:  Mr. Mendoza, do you mind pulling up Government Exhibit 3?  And if you wouldn't mind splitting the screen so we have Government Exhibit 2 as with will.  And if you could just zoom in to e-mail header information.

BY MR. MOHAMMADI:

Q.   Okay.  Just to make sure we're all on the same page, do you remember reviewing this e-mail a few minutes ago with the government?

A.   I do.

Q.   This is an e-mail that's sent from tomgoldstein@goldsteinrussell.com; right?

A.   Yes.

Q.   And it's sent to tom.goldstein@protonmail.com; is that right?

A.   Correct.

Q.   And this e-mail attaches the exhibit on the right, which is a list of poker wins, poker losses, and poker stakes.

Do you see that on the right?

A.   I don't know what they are, but it's that document, yes.

Q.   It's that document, right.

And this was sent on January 22, 2017.  Do you see that?

A.   Yes.

Q.   And then the attachment is called "Amounts.docx"?

A.   Correct?

Q.   This appears to be an instance where Mr. Goldstein e-mailed himself a file sent from his work e-mail to his ProtonMail e-mail; is that right?

A.   Yes.

Q.   Now, because this e-mail was sent from Mr. Goldstein's Goldstein & Russell e-mail account, not his ProtonMail account, this e-mail is not subject to zero access encryption, at least on the sent side; is that right?

A.   Assuming his law firm does not use zero access.

Q.   Right.  And you have no reason to believe that the law firm used zero access; right?

A.   I don't have any belief -- reason to believe so.

Q.   Right.  If you wanted to, you could find a version of this e-mail that exists in the work e-mail account; right?  It's not zero access encrypted?

A.   Yes.

MR. MOHAMMADI: And if you look at the very bottom, Mr. Mendoza, do you see that GR0061?

BY MR. MOHAMMADI:

Q. GR stands for Goldstein & Russell. So the reason that we have this document is that Goldstein & Russell produced the version that was sent; is that right?

A. Correct.

Q. So going back to, like, my four examples. I think this falls into the second bucket that we were talking about a short while ago. This is where the receiving e-mail is a ProtonMail account, but the sending e-mail is a non-ProtonMail account; is that right?

A. Yes.

Q. Okay. Thank you for your patience with this. The next example I'd like to show you is --

MR. MOHAMMADI: Mr. Mendoza, could we get Defense Exhibit 339, and its attachment, Defense Exhibit 340?

BY MR. MOHAMMADI:

Q. So I think you saw this e-mail before. Do you remember?

A. Yes.

Q. This is similar document on the right where this is a document that's attaching a list of poker wires on the right.

And do -- you remember seeing both these documents; is that right?

A. Correct.

Q.   Okay.  The "From" line, whose is the message from?

A.   Tgoldstein@goldsteinrussell.com.

Q.   And who is it to?

A.   Tgoldstein@goldsteinrussell.com.

Q.   And what is the attachment called?

A.   "Amounts.docx."

Q.   And you see that neither the sender nor the recipient are ProtonMail accounts; is that right?

A.   Correct.

Q.   Okay.  So this is, I think, the third bucket that we talked about a short while ago where neither the outgoing nor the incoming message are zero access encrypted; is that right?

A.   Correct.

Q.   Okay.  Last thing.  We talked a short while ago about how it would be the least secure way to access an account by just, like, hand it over, access to my account to somebody else; right?

A.   Correct.

Q.   So, for example --

     MR. MOHAMMADI:  Mr. Mendoza, would you mind pulling up Government Exhibit 1057?  And if you wouldn't mind going to page 23 and 24.

BY MR. MOHAMMADI:

Q.   You'll note that this is -- the text message threads here are dated October 13, 2017.  And this is a message thread

between Mr. Goldstein and his office manager, Mr. Levitan, Jonathan Levitan.

MR. MOHAMMADI: Mr. Mendoza, would you mind blowing up the section on the right side that says "In my most recent items and Word." A little bit farther down. And then go down three. That's the one. Thank you. That's the one, yep.

BY MR. MOHAMMADI:

Q. Agent Nguyen, would you mind just reading out loud for us starting on the left, which is what Mr. Goldstein is writing?

A. "In my most recent items in Word, there's a document called figures or something. It has just columns of numbers. Please e-mail that to me from my own account."

Q. Great.

And then the response?

A. "Just sent it. Can you confirm that it's the right one?"

Q. Great.

And then the response to that?

A. "That's the one. TY."

Q. TY. And TY, "thank you," probably; right?

A. Yes.

Q. Got it. You'll note that this is dated October 13, 2017, which is the same as the e-mail that we saw a short while ago. Do you remember that?

A. Can I see the date again?

Q. Yeah.

MR. MOHAMMADI: Mr. Mendoza, would you mind if we show the date again? Yep.

THE WITNESS: Correct.

BY MR. MOHAMMADI:

Q. So if someone asks a second person to go access their computer, open up their recent files and send them a document called figures or something, and then you ask them to e-mail them to me from my own account, that's not a very secure way of handling a file; right?

A. No, it's not.

Q. In that situation, not only is the person not using zero access encryption, they literally just handed over access to that file to somebody else; is that right?

A. Correct.

MR. MOHAMMADI: May I please have a moment, Your Honor?

Mr. Mendoza, would you mind if we just pull up the previous document, so Defense Exhibit 339 and then Defense Exhibit-340?

BY MR. MOHAMMADI:

Q. So to go back, Agent Nguyen, I think what we were just talking about is that Mr. Goldstein asked somebody else to send this document, which is where -- those messages; is that right?

A. This document, I'm not sure. It's the same date but --

Q. Well, it's the same date; right?

**A.** It's the same date, correct.

**Q.** Right. So this would be like the least secure way of sending a message; right?

**A.** Correct.

**Q.** Right. The rock bottom of security?

**A.** Correct.

**Q.** Is to just, like, give the document to somebody else and allow them to access it and send it; is that right?

**A.** Correct.

**Q.** Okay. Great.

    **MR. MOHAMMADI:** I think that's all for me.

Thank you, Agent.

Thank you, your Honor.

    **THE COURT:** Thank you very much, Counsel.

Is there any redirect from the government?

    **MR. GORDON-MARVIN:** Just very briefly.

    **THE COURT:** All right.

    **MR. GORDON-MARVIN:** Let's go to Exhibit 781. 781. Sorry.

                    REDIRECT EXAMINATION

**BY MR. GORDON-MARVIN:**

**Q.** We were looking at this earlier. Looking at this Verizon file, what's the IP address listed on it?

**A.** 96.255.84.162.

**Q.** Looking at the very bottom section, what is the name of

the customer for this?

**A.** Amy Howe.

**Q.** The very bottom of that, what's the user name?

**A.** Howe Goldstein.

**Q.** And to what physical address did Verizon assign this IP address?

**A.** 3908 Rosemary Street, Chevy Chase, Maryland.

**MR. GORDON-MARVIN:** And now let's go to the raw version of Exhibit 464, the Coinbase account. Sorry. 1329.

**BY MR. GORDON-MARVIN:**

**Q.** Just pausing here for a moment, looking at the Coinbase CSV file, what section of the CSV file are we looking at here?

**A.** The events.

**Q.** And what is the third column of this file?

**A.** IP.

**MR. GORDON-MARVIN:** And if we do a control F to find a sequence in this file.

**BY MR. GORDON-MARVIN:**

**Q.** Now pausing here for just a second, this is that same IP address, 96.255.84.162?

**A.** Correct.

**MR. GORDON-MARVIN:** Let's hit "Find" next.

**BY MR. GORDON-MARVIN:**

**Q.** So here it is appearing in row 2709?

**A.** Yes.

Q.   For the user sending money?

A.   Correct.

Q.   In October 2020?

A.   Correct.

MR. GORDON-MARVIN:  Let's click "Find" next again. Let's just click it five more times.  Keep going.  More.  Let's just keep clicking.

Okay.  We can that pause.

BY MR. GORDON-MARVIN:

Q.   These are all different events using that IP address?

A.   Correct.

MR. GORDON-MARVIN:  No further questions.

THE COURT:  Thank you very much, Counsel.

Have all questions been asked of the witness?

MR. MOHAMMADI:  Your Honor, briefly, just one question?

THE COURT:  Very quick, Counsel.

MR. MOHAMMADI:  Do you mind if we pull up, Mr. Mendoza, Exhibit 781.  That's Government Exhibit 781.

RECROSS-EXAMINATION

BY MR. MOHAMMADI:

Q.   Agent Nguyen, do you see here where it says March 24, 2021 and then all these dates going down, March 1st, March 1st, March 1st, March 1st and then March 8th going down?  Do you see all that?

**A.** Yes.

**Q.** And you see the IP addresses listed are all the same; is that right?

**A.** Yes.

**Q.** Right. So the person who accessed this IP address on this date from this IP address was located in the same location on March 24th, March 1st and March 8th; is that right?

**A.** Yes.

**Q.** They correspond to the same location?

**A.** Correct.

    **MR. MOHAMMADI:** Thanks very much.

    **THE COURT:** Thank you very much, Counsel.

Special Agent, thank you very much for your time and testimony. You may step town and be excused.

Have a good afternoon.

    **MR. GORDON-MARVIN:** Follow-up, Your Honor. But can I ask one last question just to clarify here? I apologize.

    **THE COURT:** I think I've been very generous, Counsel.

    **MR. GORDON-MARVIN:** Okay.

    **THE COURT:** All right. Special Agent, you may be excused.

                (Witness excused.)

                       - - -

    **THE COURT:** Is the government prepared to call its next witness?

MR. WHITMAN: Yes, Your Honor. May I bring a binder for the Court as well as the witness?

THE COURT: Please. Thank you.

MR. WHITMAN: The government calls Ms. Bart. Ms. Kathleen Bart.

THE COURT: Thank you very much.

Ms. Bart, if you want to come all the way in towards me and then you're going to go to your left to the witness box. Please remain standing and the courtroom deputy will swear you in.

- - -

KATHLEEN BART, after having been duly sworn, was examined and testified as follows:

- - -

DEPUTY CLERK: Thank you. You may be seated. Please adjust the microphone, scooch your chair all the way up. Speak directly into the microphone. State and spell your first and last name for the record.

THE WITNESS: Sure. My first name is Kathleen. K-a-t-h-l-e-e-n. I go by Katie. K-a-t-i-e. My last name is Bart. B-a-r-t.

DIRECT EXAMINATION

BY MR. WHITMAN:

Q. Good afternoon, Ms. Bart.

A. Good afternoon.

**Q.** How old are you?

**A.** Thirty.

**Q.** Where do you live?

**A.** Washington, D.C.

**Q.** Where did you grow up?

**A.** Troy, Michigan.

**Q.** Can you tell us a little bit about your educational background?

**A.** Sure. I have a bachelor's in public policy from the University of Chicago and a high school degree as well.

**Q.** What do you do for a living?

**A.** I am an operations director at an appellate law firm.

**Q.** What's the name of the appellate law firm?

**A.** Gupta Wessler.

**Q.** What does your job at the law firm entail?

**A.** Sure. So I supervise three legal assistants, their workloads, and then I also basically handle any communications with our vendors, so our accountants, our building and work with the principals on any operation speeds, like real estate or running the Harvard Clinic and other matters like that.

**Q.** Did you use to work at a different law firm?

**A.** Yes. Before this, I worked at Alden Law Group, which is an employment law firm, for about three and a half years. And then, prior to that, I worked at Goldstein & Russell.

**Q.** Before we go more in depth into your testimony today, I

want to ask, did you enter into an agreement with the government back in around February of 2024?

**A.** Yes.

**Q.** Can you tell the jury your understanding of that agreement?

**A.** It was an immunity agreement to cooperate with the IRS regarding this investigation and that any information I provided wouldn't be used against me, indirectly or directly, in any prosecution.

**Q.** Were there any requirements of you as part of that agreement?

**A.** Just to tell the truth and -- yeah, just to tell the truth and be honest and cooperative with the investigation.

**Q.** Have you and I met multiple times before today?

**A.** Yes.

**Q.** What, if anything, has the government told you or representatives of the government told you during your meetings as parts of the investigation?

**A.** Always just to continue to be honest to the best of my memory.

**Q.** Have you tried to always be honest to the best of your memory?

**A.** Yes.

**Q.** Have you -- are there any other agreements with the government in between the government and you about your

testimony or what might come of it besides the immunity agreement?

**A.** No.

**Q.** Has anyone from the government promised you anything regarding your testimony?

**A.** No.

**Q.** Let's go back to the University of Chicago. I think you just testified you graduated from there?

**A.** Yes.

**Q.** Tell us what, if any, accounting or bookkeeping classes you took while at the University of Chicago?

**A.** None.

**Q.** Did you get any hands-on accounting or bookkeeping training while you were at the University of Chicago?

**A.** No.

**Q.** Can you tell the jury what you did after graduating from the University of Chicago in 2018?

**A.** Sure. I was a civil liberties fellow at the ACLU of Michigan. I focused on a data project about bail reform and some other discrete legal and political matters.

**Q.** Why did you pick that job?

**A.** I had a focus in college and a passion for civil rights and for Michigan itself, so I was at that the University of Michigan following the Flint Water Crisis and other things that the ACLU of Michigan was doing at the time. It was really an

exciting opportunity for me to be there and work with those people.

Q. What, if any, accounting or bookkeeping experience or training did you receive at the ACLU?

A. None.

Q. What did you do next after leaving the ACLU?

A. I accepted a job with Goldstein & Russell as their firm manager, as well as the second title or position I had was a deputy blog manager for SCOTUSblog.

Q. Approximately, when did you join Goldstein & Russell as firm manager and the deputy SCOTUSblog manager?

A. July 2019.

Q. When you started at Goldstein & Russell in July of 2019, can you tell the jury what your long-term plans were as it related to legal work?

A. So I wanted to complete the two-year position and then move on to law school. I was interested in attending Wayne State University and going into public defense.

Q. You mentioned two years. What is the reference to two years about?

A. In the job description, it just generally -- the expectation was that firm managers would stay for at least two years, and it was a position designed to prepare people for law school.

Q. Who did you report to at Goldstein & Russell?

**A.** I reported to Tom, as well as all of the other firm partners and also the blog manager and the editor. So almost everyone at the firm, I would say, I reported to.

**Q.** If everyone at that time firm, though, was asking you to do something at once, including Mr. Goldstein, who did you answer first?

**A.** I guess it would just depend on the ask.

**Q.** Who owned Goldstein & Russell while you worked there?

**A.** My understanding is that Tom owned it.

**Q.** Besides the firm manager or your position, was the most knowledgeable at Goldstein & Russell about its finances?

**A.** No one at the firm, other than maybe myself and Tom, that I knew of.

**Q.** Can you tell the jury about your responsibilities as a firm manager?

**A.** Sure. So I think responsibilities included, you know, tracking our bank account, so income coming in, making sure that our finances were sort of in order for making payroll. I communicated with our vendors quite a bit, so our payroll representatives, our tax representatives.

I was also Tom's, I would say, executive assistant, so any of his personal requests would also come to me. And I would occasionally go to his house and make sure that we picked up his mail and also sort of do that and made sure that any bills were paid for both the firm and Tom and Amy's personal bills as

well.

And there were probably other things, like office management responsibilities, you know, whether it was stocking snacks to -- if anything came up with the building, that would probably go through me.

Q.   Let's talk for a moment about the executive assistant role.  Did you know that, when you applied to Goldstein & Russell, the role would include those types of duties?

A.   Yes.  It was included as one of the job description bullets for like arranging travel and things like that.  I think I wasn't aware of the full extent of it, but it was included in the job description.

Q.   You've mentioned a couple things you would do as part of your executive assistant role.  Are there any other examples that you can give the jury?

A.   Paying the mortgage and all other bills, depositing checks to their personal accounts, going to the house and -- any time maybe they were out of town, there might be something at the house that needed to be done.  If their housekeeper couldn't do it, I would visit and take care of it, such as returning a car when the lease was up or other matters like that.

Q.   What responsibilities did you have with regard to Mr. Goldstein's taxes?

A.   So I was, you know, the person who put them together with Tom and the accountants as well.

**Q.** Who else at Goldstein & Russell helped you with working on Mr. Goldstein's individual income taxes?

**A.** No one at the firm.

**Q.** What responsibilities did you have at the law firm for bookkeeping?

**A.** For bookkeeping, if any bills were paid or coming in or we had any receipts, I would scan those and file them. And then I also believe that I was sending some of them to accountants at times. But in terms of like QuickBooks or something like that, I wasn't involved in that part of it.

**Q.** Do you recall any instance in which Mr. Goldstein asked you, hey, I want to sit down and review my tax returns for this year?

**A.** Not that I can recall. It could have been that he asked me or I asked him when we were reviewing the tax organizer, but I don't recall something like that.

**Q.** Were you trained at Goldstein & Russell when you first got there?

**A.** Yes. There was a two-week training period where my predecessor showed me the ropes and took me through most of the things that would come up.

**Q.** Who was your predecessor?

**A.** Jon Levitan.

**Q.** Can you describe the nature of the training beyond what you already told us?

**A.** Sure. I don't remember all of it, but I think it was just running through everything that could come up and sort of making visits to the different places that I'd have to go, the back, the house, and just discussing different -- you know, it was kind of like a shadowing process.

So, if things were coming through on his end, he'd talk me through how he would deal with them, sort of explain some of the major things that we'd be expected to do, like running parts of the clinic or other things like that, but yeah.

**Q.** Did you take notes during your training at Goldstein & Russell?

**A.** Yes.

**Q.** Okay. I'm going to show Exhibit 599, which should be tab 1 in your binder, but, Ms. Bart, we'll pull up the relevant portions for you. As always, feel free to look at your binder.

Do you see the document marked Exhibit 599?

**A.** Yes.

**Q.** What is this document?

**A.** This is part of my notes from training.

**Q.** How can you tell?

**A.** I have seen this before, and I provided it as part of the subpoena. So it also has just -- it just looks like kind of my scratch notes from training with different passwords, things like that.

**Q.** Do you recall writing notes on a number of different

topics in this document when you first started?

**A.** Yes.

**Q.** Okay. Let's go through a few. This is on page 1 of Exhibit 599.

Do you see the language that's called out on the document on the screen?

**A.** Yes.

**Q.** Can you tell the jury what you meant when you were writing this?

**A.** I can tell you what it says. This is an IOLTA -- a note on IOLTA accounts. And it says that -- that only Tom can move money from the IOLTA account to other accounts.

**Q.** Do you know what an IOLTA account is?

**A.** Yes. It is a bank account for attorneys and law firms to hold money that is not yet earned by the firm. And I think there are other purposes, but I'm not familiar with all of them.

**Q.** Do you recall any attorneys at Goldstein & Russell, while you were working there, asking you to help transfer their personal funds into the Goldstein & Russell IOLTA account?

**A.** Personal funds? Like --

**Q.** For example, do you recall an attorney saying, "I have money in my personal bank account. I would like to put it in the IOLTA account"?

**A.** Not that I can recall.

Q. Let's go to page 3 of Exhibit 599, the same notes document that you were taking when you started at Goldstein & Russell.

Do you see the sections here or notes here for accounts payable and accounts receivable?

A. Yes.

Q. Why were you writing this information down?

A. I think I was just trying to write down everything that I was being told as I was -- it was a lot of information for two weeks of training, so just --

Q. Do you see the references to sign as Tom's name, sign as yourself?

A. Yes.

Q. Can you tell the jury what those notes mean?

A. So for the firm, eventually, I was made a signer. So when it came to signing checks or wiring funds, I was able to do that on behalf of the firm.

But then for personal matters, I was not a signer at Tom's and Amy's personal bank. So like, if we were depositing a check or something like that, there was a signature that I was taught how to sign Tom's initials.

Q. Who taught you how to sign Tom's initials?

A. Jon.

Q. How often did you sign things in Mr. Goldstein's name while you were acting as firm manager at Goldstein & Russell?

A. I would say it came up at least a couple of times a month,

maybe less. It's hard to remember exactly.

Q. Let's go to page 5 of the same exhibit, 599.

Do you see the text called out on the screen here, Ms. Bart?

A. Yes.

Q. Can you tell us what you're writing here? Summarize it for us.

A. Just summarizes that Tom has a Wells Fargo account that the firm manager's don't have access to, and that we didn't -- it just was reminding that we didn't have access to it in case he had asked us to do something with that account, like transfer money or print a statement. Jon told to me to just remind him that we don't have the login.

Q. Do you recall at any point during your employment at Goldstein & Russell gaining access or being granted access to the personal Wells Fargo account ending in 3796?

A. Not that I recall.

Q. Did you send and receive text messages and e-mails with Mr. Goldstein while you were firm manager?

A. Yes.

Q. How often?

A. Mostly every day.

Q. Let's look at Exhibit 493 at page 3. And this is tab 2 of the binders.

Do you see this e-mail chain, Ms. Bart?

**A.** Yes.

**Q.** Let's start at the e-mail on the bottom on January 21, 2020, at 10:53 a.m.

Do you see that e-mail?

**A.** Yes.

**Q.** Who sent the e-mail?

**A.** I sent it.

**Q.** To who?

**A.** To Tom.

**Q.** What are you asking Mr. Goldstein?

**A.** I am asking for contact information for four different individuals -- five different individuals so that I could prepare -- help the accountants prepare 1099s.

**Q.** Can you tell from the context of this document whether you are asking Mr. Goldstein about financial transactions that he had had with these individuals in the prior year?

**A.** Yes. It would have been for 2019.

**Q.** Do you know who Vivek Rajkumar is?

**A.** No, I don't think so.

**Q.** Did Mr. Goldstein ever tell you, that you can recall, who Vivek Rajkumar is?

**A.** Can you repeat the question?

**Q.** As far as you can remember, did Mr. Goldstein ever tell you who Vivek Rajkumar is?

**A.** Not that I recall.

**Q.** Do you see how there's a second e-mail on January 22, 2020, from you to Mr. Goldstein?

**A.** Yes.

**Q.** What are you saying in that e-mail?

**A.** Just asking, again, if he has any contact information for these individuals, and getting a more explicit deadline for it for Friday.

**Q.** Let's look at the same exhibit, 493. This callout goes from pages 2 to 3.

Do you see the e-mail that starts at that bottom of page 2 of the document and goes up to the top of page 3?

**A.** Yes.

**Q.** Who is this e-mail from?

**A.** It's from Tom.

**Q.** What's the date?

**A.** January 24.

**Q.** What's he telling you?

**A.** He says Vivek is repaying a loan, and the Resnicks are personal distributions, and he doesn't recognize the other names.

**Q.** What about the text in the parentheses there in the middle?

**A.** Oh, there should be inbound money from him.

**Q.** What is Mr. Goldstein communicating to you about the nature of payments to and from Vivek Rajkumar in the year 2019?

A.    My understanding now is that he's saying the money that --
the money that we had paid him, that there should be inbound
money from him as well.

Q.    What about -- what is Mr. Goldstein communicating about
the nature of those payments?

A.    That they're a loan.

Q.    You also exchanged text messages with Mr. Goldstein nearly
every day; is that fair?

A.    Yes.  About.

Q.    Let's look at Exhibit 17.2 at page 1.  This is tab 3 of
the binder.

      Do you see this text message, Ms. Bart, on the screen?

A.    Yes.

Q.    Did you produce your text messages to the government
during the investigation?

A.    Yes.

Q.    Were there many of them?

A.    Yes.

Q.    And you understand we've created some excerpts for us and
the jury to look at today?

A.    Yes.

Q.    Can you tell us the date of this message?

A.    June 5, 2020.

Q.    Who is the message from?

A.    From Tom.

Q.   What does Mr. Goldstein tell you in the text column?

A.   He says to please wire 100K from the firm, for the firm, to Mike McGuinness.

Q.   What is your understanding reading that text message about the nature of the payment that he's asking you to make to Mr. McGuinness?

A.   It's for the firm, and that -- so I would just go into our Wells Fargo and send the money to Mike McGuinness as a firm payment.

Q.   Do you know who Michael McGuinness is -- or Mike McGuinness is?

A.   No, I don't.

Q.   Do you recall Mr. Goldstein ever telling you who Mike McGuinness is?

A.   Not that I recall.

Q.   Was it common that Mr. Goldstein would either tell you that a payment was for the firm or a personal distribution?

A.   Yes, it was common.

Q.   What is the difference between those, as far as you understand?

A.   So a firm payment would be -- from the firm would be on the business side of things and then the personal payments were separate personal matters.

Q.   Do you understand whether that difference has any relevance to the work that you did with the accounting firm to

prepare Mr. Goldstein's and the law firm's taxes?

**A.** Yes.

**Q.** What is that understanding?

**A.** That we were trying to make sure that it was clear which payments were firm or personal.

**Q.** Did you understand that was important for tax purposes?

**A.** Yes.

**Q.** Let's go Exhibit 17.1 at page 1.

Do you see these messages on this screen, Ms. Bart?

**A.** Yes.

**Q.** What's the date of these?

**A.** August 17, 2020.

**Q.** What does Mr. Goldstein tell you in the top message?

**A.** "Please send 100K again from firm to Mike McGuinness."

**Q.** From reading this text message, what is your understanding of the nature of the payment that Mr. Goldstein is asking be sent to Mr. McGuinness?

**A.** A firm payment.

**Q.** Let's look at Exhibit 492 at page 1.  This is tab 5 of the binders.

Do you see this e-mail in front of you, Ms. Bart?

**A.** Yes.

**Q.** What's the date of this e-mail?

**A.** July 8, 2020.

**Q.** What's the subject?

A.    "Howe Goldstein personal taxes."

Q.    Who sent the e-mail?

A.    I did.

Q.    Who did you send it to?

A.    Faith Weston.

Q.    Who is Faith Weston?

A.    She is an accountant at GRF CPA.

Q.    What was the purpose of your sending this e-mail?

A.    Communicating to her which tax documents we had ready for Tom and Amy's personal taxes.

Q.    Are there attachments to this e-mail?

A.    Yes.

Q.    Do the attachments all have a date in them or a year?

A.    Yes.  2019.

Q.    Let's go down on the same page.  Do you see we're still on the same document, the same e-mail, Exhibit 492, but we're a little bit further down, and what you wrote?

      Do you see that?

A.    Yes.

Q.    And you've listed a brief description of some of the attachments to the e-mail?

A.    Yes.

Q.    What is attachment Number 6, per your e-mail here?

A.    A receipt from Wynn Encore.  "You may not need this, but they sent it to us."

Q. Let's go to 481 at page 1. It's tab 6 of your binder. What is this document, Ms. Bart?

A. This is a receipt in summary of total cash that Wynn Las Vegas received from Tom Goldstein in 2019.

Q. Best you can recall, how did you get this document?

A. I believe Tom gave it to me.

Q. Do you recall any discussion with Mr. Goldstein about this document?

A. I think there was a brief discussion, but I don't remember what was said.

Q. Why did you send this document to the accounting firm?

A. I don't remember exactly.

Q. Do you recall Mr. Goldstein asking you to send it to the accounting firm?

A. It's possible that he did, yes.

Q. Sitting here today, do you remember that?

A. No, I don't remember.

Q. Besides this document, this receipt, Exhibit 481 at page 1, have you ever seen -- I'll rephrase. Besides this document, 481 at page 1, have you ever, while you were working at Goldstein & Russell, seen a document detailing Mr. Goldstein's poker wins or poker losses or any other gambling?

A. Not while I was in my capacity as firm manager.

Q. What about just during the time period while you were at

Goldstein & Russell?

**A.** I don't -- I don't recall if I did or didn't.

**Q.** Has Mr. Goldstein ever asked you to help him report wins or losses in poker?

**A.** Not that I recall.

**Q.** Has he ever asked you to help keep the books or records of how much he won at poker or gambling?

**A.** No.

**Q.** If Mr. Goldstein had asked you, hey, can you help me keep track of my poker or my gambling, what would you have done while you were firm manager?

**A.** I can't really say what I would have done. I probably would have, you know, probably would have done it, if asked.

**Q.** Has Mr. Goldstein ever -- so putting aside 481, Exhibit 481 at page 1, has Mr. Goldstein ever given you records to send to the accounting firm about his poker or about his gambling?

**A.** I think this was the only record.

**Q.** What was your reaction to seeing this record in realtime?

**MS. REAVES:** Objection, Your Honor.

**THE COURT:** Let's come to the headsets.

(Whereupon, a discussion was held outside the presence of the jury as follows:)

**THE COURT:** Ms. Reaves, do we have you?

**MS. REAVES:** Yes.

THE COURT: Mr. Goldstein, thumbs up. Mr. Whitman?

MR. WHITMAN: Yes, Your Honor.

THE COURT: All right. Go ahead, Counsel.

MS. REAVES: I'm just wondering if the government has a proffer for what it believes this witness is going to respond to that. I worry that it calls for speculation about Mr. Goldstein's state of mind or Mr. Goldstein's spending habits that go to direct issues that should be left for the jury, and that would be unfairly prejudicial coming from this witness.

THE COURT: All right. Thank you. Mr. Whitman?

MR. WHITMAN: I think, Your Honor, that the witness will testify that it was interesting to see the document. So I'm not trying to get into his state of mind. I'm just asking what the witness's reaction is and I think that's relevant.

THE COURT: Go ahead, Ms. Reaves.

MS. REAVES: If that's the answer, then my objection is relevance. I assume the government will follow up and ask why it was interesting and it all leads to the same area, but I don't see how that goes to any of the tax or mortgage counts that we're addressing at this trial.

THE COURT: Mr. Whitman, anything else from you?

MR. WHITMAN: No, Your Honor.

THE COURT: All right. I'm going to allow him to ask the question, and then she'll answer and that's going to be it.

**MR. WHITMAN:** Thank you, Your Honor.

(Whereupon, discussion concluded.)

**BY MR. WHITMAN:**

Q.   Ms. Bart, what was your reaction to seeing this document back when you first got it?

A.   I recall that I believed that he had won $10,000 and thought that was just kind of interesting or cool.  Yeah.

Q.   Reading the document today, is your impression about what happened in the underlying transaction any different?

A.   I think I -- I think that I figured it out after reading it, but maybe my first impression was that it was income.

Q.   And after reading it fresh?

A.   That rather it's money that the casino received from Tom.

Q.   Let's go back to your July 8th e-mail, Exhibit 492. That's tab five and we're still on page 1.  We're back to the list of attachments that you sent to the accounting firm in July 8th of 2020.  Are you with me?

A.   Yes.

Q.   What is the first attachment that you reference here?

A.   "Tax prep organizer."

Q.   Let's look at that document, which is Exhibit 490, and it's tab seven of your binder.  This is page 3 of Exhibit 490. Do you recognize this document?

A.   Yes.  This is a cover letter to the organizer.

Q.   Who was it sent by?

**A.** GRF CPAs and Advisors.

**Q.** Who is that?

**A.** Those were our personal and firm accountants.

**Q.** Were there any accountants or bookkeepers working within Goldstein & Russell?

**A.** No.

**Q.** What's the date of this letter?

**A.** January 2020.

**Q.** Who is the letter addressed to?

**A.** Thomas C. Goldstein and Amy L. Howe.

**Q.** If we go down a little bit in the letter, do you see there's a section on the first page -- sorry -- on the third page called "tax services"?

**A.** Yes.

**Q.** What tax returns did this letter relate to?

**A.** 2019 federal and state individual income tax returns.

**Q.** Going a little bit further down, still on page 3, still on the same paragraph, can you summarize for the jury what the highlighted language says?

**A.** "To assist you." So a summary is just we're providing you with a tax organizer or checklist to help the accountants prepare the taxes.

**Q.** What about this highlighted portion of the sentence?

**A.** It's saying that, providing them with a completed tax organizer helps them not overlook important information for

complete and accurate returns.

Q. Still on page 3 of the exhibit, but page 1 of the letter, do you see the paragraph that's pulled up here?

A. Yes.

Q. What does the -- can you summarize for the jury the first sentence of that letter of that paragraph?

A. They're asking to return the information by March 23, 2020 to ensure returns are completed by April 15th.

Q. What about the sentence that's now highlighted in the same paragraph?

A. If we couldn't make that deadline, they'll assume that they would -- that we wanted them to prepare an extension.

Q. And who is "we" in this sentence?

A. "We" is the accounting firm.

Q. What about this highlighted portion of the letter?

A. This would be an extension to file the returns, but taxes would need to be paid -- estimated taxes would need to be paid with the extension request.

Q. Still on Exhibit 490, the letter from January 2020, and now we're still on page 3. Do you see this paragraph that's been pulled out?

A. Yes.

Q. Can you tell the jury or summarize for the jury what it says in the first sentence of that paragraph?

A. "You are confirming that you will furnish us with all

information required for preparing your returns."

Q.   Who is "you" in this context?

A.   Tom and Amy.

Q.   Same page, Exhibit 490, page 3, can you tell the jury or summarize for the jury what this sentence that's highlighted is saying?

A.   "We will not audit or verify the data that you submit."

Q.   Okay.  We're on the same document.  We're on pages 3 and crossing onto page 4.  This is tab seven and we've pulled out language from the bottom of page 3 and the top of page 4.  Do you see that, Ms. Bart?

A.   Yes.

Q.   What is this letter saying about the tax consequences related to Bitcoin or virtual currency?

A.   That it's property for U.S. federal tax purposes.

Q.   What about the sentence that crosses from page 3 of the exhibit onto page 4?

A.   It says "if you have virtual currency activity during the tax years, you may be subject to tax consequences."

Q.   What does the letter say about who provides the accounting firm with complete and accurate information regarding virtual currency transactions?

A.   Tom and Amy.

Q.   Let's go down to page 4 of the same document.  Do you see this paragraph that's -- and this is page 2 of the letter.  Do

you see this paragraph on the screen?

**A.** Yes.

**Q.** What does it say about who is responsible for the accuracy and completeness of information and records provided to the accounting firm?

**A.** Tom and Amy.

**Q.** According to this letter, whose final -- who has final responsibility for the income tax returns?

**A.** Tom and Amy.

**Q.** According to this letter, who should review the tax returns carefully before filing them?

**A.** Tom and Amy.

**Q.** We will go down to page 6 of the same document, Exhibit 490. This is, again, tab seven. Whose names are typewritten at the bottom of this page?

**A.** Tom and Amy.

**Q.** Is there a date written?

**A.** Yes.

**Q.** What's the date?

**A.** March 3, 2020.

**Q.** Whose handwriting is that?

**A.** That's my handwriting.

**Q.** Whose signature is above your handwriting there?

**A.** That is Tom's signature, but I signed it.

**Q.** Did you understand or believe that you had authorization

to sign this document on behalf of Mr. Goldstein?

**A.** Yes.

**Q.** Let's look at the tax organizer that's part of the same exhibit, Exhibit 490. This is page 1 of Exhibit 490. Do you recognize this document?

**A.** Yes.

**Q.** Can you tell the jury what a tax organizer is?

**A.** It's a list of questions relating to things that might come up in a tax filing.

**Q.** Who is this tax organizer addressed to?

**A.** Tom and Amy.

**Q.** Who is it -- or it says, I guess, "from" up there?

**A.** From. Sorry. Yes.

**Q.** So this is from Mr. Goldstein and Ms. Howe?

**A.** Yes. To the accountants.

**Q.** Do you see this called out from the bottom of page 1 of Exhibit 490?

**A.** Yes.

**Q.** What does it say in the text above the signature lines?

**A.** "This information is true, correct and complete to the best of my or our knowledge."

**Q.** Whose signature appears next to taxpayer signature?

**A.** It's Tom's signature that I signed.

**Q.** Did you believe or understand that you had authorization to sign Mr. Goldstein's name to this document?

A.   Yes.

Q.   What's the date written here?

A.   March 5th.

Q.   Do you recall going through various questions with Mr. Goldstein in person that were posed by the tax organizer?

A.   Yes.

Q.   Do you recall where you did that?

A.   In Tom's office.

Q.   How did you fill out the answers on the tax organizer if you didn't know them yourself?

A.   If I didn't know them myself, I was asking Tom or accountants different questions.

Q.   Let's go to page 16 of Exhibit 490.  This is, again, tab seven.  Do you see this is a page of questions?

A.   Yes.

Q.   This is page 5 of 5 of questions; right?

A.   Yes.

Q.   Can you tell the jury what the second or the last question on this page says?

A.   "Did you or your spouse sell, acquire or exchange Bitcoin or other virtual currencies or engage in any sales or exchanges denominated in Bitcoin or other virtual currencies?"

Q.   Do you recall reviewing this specific question with Mr. Goldstein while you were talking about the tax organizer?

A.   I don't recall reviewing this specific question with him.

**Q.** What is the answer given in response to this question?

**A.** No.

**Q.** Other than you or Mr. Goldstein, is there anyone else who could have written that?

**A.** No.

**Q.** And just to back up a moment, do you see -- what's the date on this document?

**A.** March 5th.

**Q.** Okay. Let's go on to Exhibit 17.6 at page 1, and this is at tab eight of the binder. Do you see these messages, Ms. Bart, between you and Mr. Goldstein?

**A.** Yes.

**Q.** What's the date of these messages?

**A.** June 1, 2020.

**Q.** What's Mr. Goldstein asking you?

**A.** He is asking me to figure out how to set up a Coinbase account and link it to his Wells personal account so that he could use Bitcoin.

**Q.** Do you recall Mr. Goldstein ever asking you for help with Bitcoin or providing you records relating to cryptocurrency before the date of June 1, 2020?

**A.** No.

**Q.** What is going on in the second two messages here that are pulled up on the screen?

**A.** He is asking for the Coinbase login. And I'm telling him

that it's his e-mail and what his password is.

Q.   Let's go to page 3 of the same exhibit, which appear to be text messages a little bit later that same day, June 1.

Do you see that?

A.   Yes.

Q.   What is Mr. Goldstein telling you here?

A.   That it's working great, running great.

Q.   And what was your response?

A.   I liked the message.

Q.   This is -- I'm now showing you Exhibit 118 at page 3. This is tab 9 of the binders.

Were you still working at Goldstein & Russell in January of 2021?

A.   Yes.

Q.   Do you recall helping fill out a similar letter, as we looked at, for the prior year?

A.   I don't recall.

Q.   Would it help refresh your recollection to see the e-mail to which this letter was attached?

A.   Yes.

MR. WHITMAN:   So without showing it to the jury, Your Honor, I would just ask that the witness be able to review tab 14 of the binder, which is GX 137, and then let us know --

BY MR. WHITMAN:

Q.   And let us know when you've finished reading that.

A.    Yes.

Q.    Does GX 137 refresh your recollection as to whether you had any role in regards to this January 2021 letter?

A.    Yes, it does.

Q.    Can you explain, briefly, what your role was there?

A.    So I was in the process, in January, of training a new firm manager, Angie Gou.  And she sent the tax organizer back to the CPA, so I probably was training her through the process.

Q.    Let's just go relatively quickly through a few of these passengers.

So on page 1 of the same letter, do you see that there is similar language that we reviewed for the 2019 letter, but now it's talking about the 2020 taxes?

A.    Yes.

Q.    Also on page 3 of Exhibit 118, do you see there's another warning about how an extension of time to file returns does not mean that estimated -- that taxes are not due on the due date?

A.    Yes.

Q.    Page 3 of the same letter, do you see that again the accounting firm is asking Mr. Goldstein and Ms. Howe to furnish the accounting firm with all information required for preparing the returns?

A.    Yes.

Q.    There's similar language in this Exhibit 118, the 2020 retention letter, about virtual currency or Bitcoin?

**A.**   Yes.

**Q.**   Similar language in this letter about whose responsibility it is to provide accurate and complete records to the accounting firm?

**A.**   Yes.

**Q.**   Is there also similar language about whose final responsibility it is to file accurate tax returns?

**A.**   Yes.

**Q.**   Whose responsibility was it, per this letter?

**A.**   Tom and Amy.

**Q.**   Are there signatures at the bottom of this letter Exhibit 118 at page 1?

**A.**   Yes.

**Q.**   Whose names are typewritten at the bottom of this letter?

**A.**   Tom and Amy.

**Q.**   Who signed -- or whose signature appears above Mr. Goldstein's name?

**A.**   It's Tom's signature.

**Q.**   Do you know who signed it?

**A.**   I don't know.

**Q.**   Who could it have been?

**A.**   Either myself or Angie.

**Q.**   What's the date written on the bottom of this letter?

**A.**   January 22, 2021.

**Q.**   Okay.  When did you first learn about a federal criminal

investigation into Mr. Goldstein?

**A.** When IRS agents showed up to our Bethesda office in the fall of 2020.

**Q.** Tell us about that.

**A.** I got a call from our security desk. I was the only person in the office. During COVID, I'd go in once or twice a week to get the mail and just do other things like that. And she let me know that there was some agents downstairs. And I let her know to send them up.

**Q.** What happened next?

**A.** I gave Tom a call and let him know they were coming upstairs.

**Q.** Then what happened?

**A.** They came in, and I let them know I was the only person there. They were asking to see Tom.

**Q.** And then what happened?

**A.** I can't recall exactly where Tom was, but he wasn't close by, so they decided to come back later.

**Q.** Later when?

**A.** Sometime in the evening.

**Q.** Of the same day?

**A.** Of the same day, yeah.

**Q.** Were you still there when the IRS agents came back?

**A.** Yes.

**Q.** What do you recall about what happened when they came

back?

A.   They went to the conference room with Tom and just had a meeting.

Q.   Were you there for the entire -- were you at the office, not in the meeting -- but were you at the office for the entirety of the meeting?

A.   I don't remember.  I think I left before they concluded. But, yeah, I don't recall exactly.

Q.   So that night when you go home and you're off work, tell the jury about your reaction to what you had experienced.

A.   Dread, and feeling like -- at that point, you know, considering whether or not I wanted to keep working at the firm.

Q.   Had you already been having second thoughts about how long you wanted to work at the firm?

A.   Yes.

Q.   And what happened next?

A.   I get the days mixed up a little bit between that day and the next day, so I'm not sure if you have anything that can --

Q.   What was -- did you talk to any of the partners or lawyers at the law firm about your future following the IRS visit?

A.   It was either -- I think it was the next day, I sent a resignation letter, but it could have -- I think it was the next day, but it could have been the same day.

Q.   Why did you decide to send a resignation letter?

**A.** I just wanted them to understand that I was -- I wanted to make sure everyone knew there were five partners and I had a boss at the blog as well, and it felt like the professional way to resign.

**Q.** Was this a big decision for you?

**A.** Yes.

**Q.** Had you ever quit a job before?

**A.** No.

**Q.** In any way, did you consider the visit by the IRS agents in October 2020 validating?

**MS. REAVES:** Objection.

**THE COURT:** Come to the headsets.

(Whereupon, a discussion was held outside the presence of the jury as follows:)

**THE COURT:** Ms. Reaves?

**MS. REAVES:** Yes, Your Honor.

**THE COURT:** Mr. Goldstein? Mr. Whitman?

**MR. WHITMAN:** Yes, Your Honor.

**THE COURT:** Okay. Go ahead, Ms. Reaves.

**MS. REAVES:** So objection is leading, but I'm -- my concern is that the next set of questions are calling for speculation about Mr. Goldstein's state of mind.

I think the government needs to ask a more specific question that's relevant at the case to get at whatever point they're trying to get at. But if they're trying to elicit her

feelings about whether or not Mr. Goldstein was engaged in inappropriate or illicit activity, then that's -- that's not an appropriate question because that would be entirely based on speculation and unfairly prejudicial.

THE COURT: All right. Mr. Whitman, where are we going with questioning?

MR. WHITMAN: I'll move on, Your Honor. I take the point of the defense, and I'm glad to just move on.

THE COURT: All right. Very good. Thank you.

MR. WHITMAN: Thank you.

(Whereupon, discussion concluded.)

BY MR. WHITMAN:

Q. What role, if any, did the visit by IRS agents to Goldstein & Russell's offices in October of 2020 have on your decision to announce your resignation?

A. It had some role.

Q. What, if anything, did you tell the people at Goldstein & Russell about how long you would stay at the firm after announcing your retirement -- resignation? A little early.

A. Anywhere from two weeks through the end of the year.

Q. Why did you offer that?

A. I wanted to give them an opportunity to find a replacement and to make sure that everything was in order.

Q. How did Mr. Goldstein react to you announcing your

resignation after the IRS visit?

A.   I'd sent it via e-mail, so I think he started texting me and potentially tried to call me.

Q.   How many text messages do you remember receiving from Mr. Goldstein in the day or two that followed your announcement?

A.   A handful.

Q.   I'm going to show Exhibit 497.2.  This is tab 10 of the binder at page 1.

     Do you see the text messages on the screen, Ms. Bart?

A.   Yes.

Q.   Are these text messages that Mr. Goldstein sent you on October 15 of 2020?

A.   Yes.

Q.   Do you see what the timestamp says after the first message?

A.   1758.

Q.   Do you understand that's a reference to 5:58?

A.   Yes.

Q.   What does Mr. Goldstein tell you?

A.   He's asking if we can chat.  He's saying that he's not angry.  He adores -- or "We adore you," and "this has turned into something awful for you.  I feel like the situation must have pushed you over an edge and I feel terrible about that. I'd appreciate a chance to talk.  Please do talk to me.  I'm

crushed. You're so good at your job," et cetera.

Q. Did he continue to send you messages after these that are pictured on the screen?

A. Maybe.

Q. Same exhibit, page 2, do you see a series of messages between you and Mr. Goldstein on October 15, 2020?

A. Yes.

Q. What do you tell him at 6:09, or 1809, that night?

A. I said we could talk in the morning.

Q. Why did you say that?

A. This was a really hard decision for me and I wanted to be firm in my decision and just needed some time to, you know, make sure that I didn't change my mind.

Q. Did Mr. Goldstein give you time before talking in the morning, or did he keep texting you?

A. He kept texting me.

Q. What did he say next?

A. "Did I do something here? I'm completely lost."

Q. And are the two messages under that along the same lines in terms of content and tone as the prior messages we've looked at from Mr. Goldstein?

A. Yes. He's very upset. And he wants to talk about it tomorrow.

Q. What do you say here at the bottom at 6:13 p.m. on October 15, 2020?

A. I say I'd be happy to chat through ways to improve the job or why it's not working for me tomorrow.

Q. Did you make any recommendations to Mr. Goldstein about who the firm should hire next?

A. I don't know if Tom was in the call, but there was at least a call with some firm members where I recommended hiring somebody more -- with more experience.

Q. More experience in what way?

A. I suggested maybe somebody with an MBA or business management experience.

Q. Do you recall whether your replacement at Goldstein & Russell had that type of experience?

A. She did not.

Q. Let's go to page 3 of Exhibit 497.2. A few more messages from Mr. Goldstein on this page?

A. Yes.

Q. What is Mr. Goldstein telling you in the second message at 6:16 on October 15th?

A. He says, "We have gone from you expressing no concerns to quitting and saying we will talk in a scheduled meeting, so I must have done something horrible personally to you."

Q. What was your reaction to reading these texts that night?

A. I was trying to think just to take some of the emotion out of it and respond just that this was a very personal decision for me.

Q. What or whose emotions were you trying to take out of it?

A. Tom's was pretty emotional, but I do think it came out of left field for him.

Q. What came out of left field for him?

A. My resignation.

Q. And what do you say at the very bottom of this callout of Exhibit 497.2 at page 3 about the notice you wanted to give?

A. I wanted to give as much as possible.

Q. Did Mr. Goldstein continue to text you that night?

A. I don't remember.

Q. Sorry?

A. I don't remember.

Q. Do you see these messages that I've pulled up on the screen here at page 4 of Exhibit 497.2?

A. Yes.

Q. Do you see these are messages from that same night, October 15th of 2020?

A. Yes.

Q. Are the messages from Mr. Goldstein on this page of the document consistent in tone and substance as the prior messages we had looked at on the other pages?

A. Yes. He's expressing that -- yes, they're consistent. He's upset, but he wants to know why I'm doing this.

Q. Do you see the time stamp under the last message in this chain here?

**A.**   Yes.  1829.

**Q.**   And if we just go back up to page 1 of Exhibit 497.2, do you see again the time stamp where this conversation that we've pulled up began?

**A.**   Yes.  1758.

**Q.**   So all of this conversation happened in about an hour -- a half an hour or so after work that day?

**A.**   Yes.

        **MR. WHITMAN:**  I think we should go to the husher, Your Honor, because I understand there may be an objection.

        (Whereupon, a discussion was held outside the presence of the jury as follows:)

        **THE COURT:**  Do we have counsel for Mr. Goldstein, Ms. Reaves, Mr. Goldstein?  Mr. Whitman, are you on?

        **MR. WHITMAN:**  Yes, Your Honor.

        **THE COURT:**  All right.  Before we get to the objection issue, I notice we're going on five o'clock, so we need to figure out a time to break for this witness.  I'm not sure if we're going to get through your direct or not today.

        **MR. WHITMAN:**  I think we can probably make progress in the next 11 or so minutes, so I would propose we go to at least 4:45 and then break for the day.

        **THE COURT:**  And you'll need more direct on Monday?

        **MR. WHITMAN:**  I may need a little bit more, Your Honor.

THE COURT: Okay. Let's hear the objection.

MS. REAVES: I don't know what document the government is about to show, so I -- I told the government in advance that I may object to the document that he has.

THE COURT: Oh, okay.

MS. REAVES: But he hasn't told me which one.

THE COURT: So it's an anticipated objection. What's the issue, Mr. Whitman?

MR. WHITMAN: So the issue is that I understand that the defense is going to object to Exhibit 497.3 at page 1. That's tab 12 of Your Honor's binder.

THE COURT: These are more text messages between Ms. Bart and Mr. Levitan?

MR. WHITMAN: Yes, Your Honor. And our position -- I'll let the Court read them, but our position is these are present sense impressions and then existing mental, emotional or physical conditions.

THE COURT: Ms. Reaves?

MS. REAVES: Yes, Your Honor. So my objection is particularly the first message. But in general, the government is asking this witness to speculate as to Mr. Goldstein's state of mind.

They've just asked a lot of questions about her personal feelings with quiting her job. But particularly, the statement "Tom stalled about three weeks to throw off the IRS" is pure

unfairly prejudicial speculation.  And the government isn't allowed to ask a question of a witness of "what was Tom thinking" or "what was Tom trying to do."  They shouldn't be able to introduce it through a text messages.

THE COURT:  Mr. Whitman?

MR. WHITMAN:  This is Ms. Bart at the time describing the events that she is experiencing more acutely than anyone else at the law firm.  These are her own mental -- her mental impressions or her mental or mental conditions.  These are present sense impressions.

As to relevance, it's clearly relevant because Mr. Goldstein is telling her -- and by the way, this is an admission here in the third text where it says, "he mentioned that it would look suspicious to the IRS."

So this is, as I was telling Your Honor earlier kind of the middle stage of this intimidation campaign against the witness.  And the government thinks it should be able to ask the witness questions about what she was writing.

THE COURT:  I think you can ask the witness questions about what she was thinking and why she said these things.  That's fine.  And we'll cross.  The defense can point out that she's not in Mr. Goldstein's head.  I think the questions are fine.  The document is fine.

Objection overruled.

MR. WHITMAN:  Thank you, Your Honor.

**MS. REAVES:**  Your Honor, just one --

**THE COURT:**  Yes.  Go ahead, Ms. Reaves.

**MS. REAVES:**  The government said about ten more minutes.  I'm wondering if we went until 5:00 if the government could actually finish their direct so that we don't -- so we can just start out fresh on Monday?

**MR. WHITMAN:**  I don't know, frankly.  I would like to think I can.  On the other hand, I do want to regroup, this is an important witness, and figure out what, if anything -- and if I could try to do that at the end of today, but what, if anything, we still need to cover or not cover.  So I can do my best, but if we're keeping the jury from --

**THE COURT:**  All right.  Well, while we're talking about it, we could keep going.  I'll check in with you at five o'clock and we'll see where we are.

**MR. WHITMAN:**  Thank you, Your Honor.

**THE COURT:**  All right.  Thank you.

(Whereupon, discussion concluded.)

**BY MR. WHITMAN:**

Q.  Did Goldstein & Russell eventually post a listing for your replacement?

A.  Yes.  I think -- yes.

Q.  I'm showing Exhibit 497.3 at page 1.  Do you see these messages, Ms. Bart?

A.  Yes.

**Q.** Who are you exchanging text messages with?

**A.** Jon Levitan.

**Q.** What are you telling him in the first sentence of the first message?

**A.** That I'm posting the job position.

**Q.** Which job position?

**A.** The firm manager position.

**Q.** What do you say next to Mr. Levitan?

**A.** That when I quit, he mentioned that it would look suspicious to the IRS.

**Q.** We'll get to that in a moment. It's my highlighting that's confusing the issue. But I'm just asking about the second sentence in the first text message that starts "Tom stalled."

**A.** To throw off the IRS.

**Q.** What did you mean by that?

**A.** Probably what it says. That if somebody was departing the firm, that it would look like I had some information.

**Q.** So let's now look at the third message, which you mentioned a moment ago. What are you telling Mr. Levitan that Mr. Goldstein said to you?

**A.** I'm telling him that Tom said that it would look suspicious to the IRS to post my job right away.

**Q.** Do you recall Mr. Goldstein saying that to you?

**A.** I don't recall outside of what this message says.

Q. Were you generally honest with Mr. Levitan?

A. Yes. Honest, but also I think both of us had similar -- well, I can't speak for him, but I think he was somebody who understood the job. And so maybe I could vent to him.

Q. When you say "understood the job," it seemed like you maybe wanted to say a little more?

A. It's a difficult job, and lots of things come up that you have to deal with kind of on your own.

Q. Is that why you're confiding in Mr. Levitan about these issues?

A. Yes.

Q. What are you saying in the last text message here on the screen on November 11, 2020, Exhibit 497.3?

A. It says "like I knew something."

Q. What did you mean by that?

A. I don't remember.

Q. As you read these text messages, does it appear to you that "like I knew something" was told to you by Mr. Goldstein?

MS. REAVES: Objection. Leading.

THE WITNESS: I don't -- yeah.

(Whereupon, a discussion was held outside the presence of the jury as follows:)

THE COURT: Ms. Reaves, Mr. Goldstein, Mr. Whitman?

MR. WHITMAN: Yes, Your Honor.

THE COURT: All right. I think I heard leading, but

I wasn't sure.

MS. REAVES: Yes. Leading. The testimony was that she doesn't remember what she meant. I don't think there is anything else to ask about it. And the government's question is leading.

THE COURT: Mr. Whitman?

MR. WHITMAN: I think I heard leading in the question as well, Your Honor, so I'll move on.

THE COURT: All right. Very good.

(Whereupon, discussion concluded.)

BY MR. WHITMAN:

Q. At this point in time, what were you -- what was your -- what were you thinking about the ongoing IRS investigation?

A. Thinking about it, I thought that -- I don't think I had a specific thought about it, other than it was adding additional work for me to kind of respond to it.

Q. By November of 2020, did you get the impression that the IRS investigation was somehow affecting Mr. Goldstein?

MS. REAVES: Objection.

THE COURT: Headsets.

(Whereupon, a discussion was held outside the presence of the jury as follows:)

THE COURT: All right. Ms. Reaves?

MS. REAVES: I'm sorry, Your Honor.

THE COURT: Mr. Goldstein, Mr. Whitman?

MR. WHITMAN: I'm here.

THE COURT: All right. Go ahead, Counsel.

MS. REAVES: Again, the concern is asking questions to speculate about Mr. Goldstein's state of mind. That's the issue in this case. The government objected to us putting in information about state of mind. They shouldn't be asking witnesses about it.

THE COURT: Mr. Whitman, call for speculation is what the defense is saying.

MR. WHITMAN: I'm pretty sure the question was couched in the terms of what Ms. Bart's impression was or what she could tell as the firm manager. I'm not sure there is many people at that point in time who would better be able to understand or perceive whether the IRS investigation was affecting Mr. Goldstein.

So I think there is foundation. I think I asked it in a way that's appropriate and I think it should be answered.

THE COURT: So what are you trying to get at, Mr. Whitman?

MR. WHITMAN: That -- that, again, this whole time period Mr. Goldstein is making increasing offers and this campaign with regard to the firm manager, and so it's relevant to link his perceived behavior, as far as she knows, and to understand for the jury that this was a very stressful time for him that turned into the decisions that we'll see in a few

minutes with subsequent documents.

THE COURT: Well, you can only ask her what she thought and what she perceived. You can't ask her what was in Mr. Goldstein's head.

MR. WHITMAN: Absolutely.

THE COURT: Let's try the question again. I'll hear from defense if you still have concerns.

MR. WHITMAN: Thank you, Your Honor.

(Whereupon, discussion concluded.)

BY MR. WHITMAN:

Q. By November of 2020, had you seen any change in terms of Mr. Goldstein's demeanor or otherwise?

A. It's hard to differentiate the investigation in my resignation, but yes, I think there were some changes in our interactions.

Q. Can you describe those?

A. We were both working really hard to respond to the IRS investigation, so there was more communications on how to go about that. And then I think, you know, there were also just more in-person communications than there had been since COVID.

Q. You mentioned the working in relation to the IRS investigation. Can you just describe what your role was in terms of the IRS investigation after you knew it began?

MS. REAVES: Objection.

(Whereupon, a discussion was held outside the presence of

the jury as follows:)

THE COURT:  Ms. Reaves?

MS. REAVES:  Yes, Your Honor.

THE COURT:  Mr. Goldstein?  Mr. Whitman?

MR. WHITMAN:  Yes, Your Honor.

THE COURT:  Okay.  Go ahead, Ms. Reaves.

MS. REAVES:  We need Mr. Whitman to ask a more specific question because Ms. Bart was involved in any privileged information in terms of responding to the subpoena. And so I want to make sure that her response does not provide any information protected by privilege.

THE COURT:  So the concern is about the scope of her response not getting into privileged information.

Is there a way you can clarify that in your questioning?

MR. WHITMAN:  Absolutely.

THE COURT:  Okay.

MR. WHITMAN:  I would ask for a little leeway to lead just to ask basically was she involved in the process, without any specifics, of collecting documents and producing them to the IRS.  And if that's okay with Your Honor and defense counsel, I would just ask to lead a little bit on that because I think this is an important point.

THE COURT:  Ms. Reaves?

MS. REAVES:  Okay.  Thank you.

THE COURT:  All right.  Let's try that.

(Whereupon, discussion concluded.)

**BY MR. WHITMAN:**

Q.   After the IRS visited Goldstein & Russell offices in October of 2020, you were involved in collecting documents and producing them in response to subpoenas; is that right?

A.   At some point, yes, Tom asked for my help.

Q.   As best you can recall, were you still helping collect and produce documents after December 31 of 2020?

A.   I don't think so.  I think the majority of it was done in December.  So Angie started in January and we were working on training her, so.  And I had started a new job in early December, so I think -- I feel like the majority of it was done around mid-December, early December.

Q.   What was your new job?

A.   I was a bread baker in the mornings.

Q.   And what did you do in the afternoons or evenings?

A.   I would go from the bakery to Goldstein & Russell.

Q.   Have you heard of Tobey Maguire?

A.   Yes.

Q.   Who do you understand Tobey Maguire to be?

A.   An actor.

Q.   Do you know him from any particular movies or works of art?

A.   Spider-Man.

Q.   I would like to go next to what's tab 17 of the binders.

This is DX or Defense Exhibit 791.

Ms. Bart, do you see this document on the screen?

A.  Yes.

Q.  Does it look like messages between you and Mr. Goldstein in December of 2020?

A.  Yes.

Q.  Let's go to page 2 of DX 791.

Who sent this message?

A.  Tom.

Q.  What is he saying to you in the first sentence?

A.  He's letting me know that he's going to L.A. Thursday through Saturday, and that he has flights and his driver -- or he has flights already booked and attached -- or maybe he wanted me to book them.

Q.  Can you tell what type of car Mr. Goldstein wanted you to get for him on this trip?

A.  Yes.  He sent me a Turo and Airbnb link for the car and house.

Q.  Then what does he say?

A.  "This is for firm.  Please open a Tobey Maguire matter."

Q.  While you worked at Goldstein & Russell, what, if anything, did you know about Mr. Goldstein's relationship with Mr. Maguire?

A.  I understood them to be friends.  And he mentioned that he was helping Tobey out with -- as like a life coach.

Q.    What did you understand that to mean?

A.    I didn't fully understand it.  I just, you know -- I think we had a pleasant conversation about it, and I said that that was cool.

Q.    How do you interpret this message from Mr. Goldstein where he says, "Please open a Tobey Maguire matter"?

A.    I think this would be in FreshBooks to open a matter, and then I'd probably put those -- the car and the Airbnb onto the expenses for that matter and the plane.

Q.    Do you remember Mr. Goldstein ever providing you any documentation or evidence that Mr. Maguire had paid him for any legal work at any point while you were at Goldstein & Russell?

A.    Not that I remember.

Q.    Did Mr. Goldstein ever tell you that he and the law firm were helping Mr. Maguire collect on a poker debt from a billionaire in Texas?

A.    Not that I recall.

Q.    Would you have remembered that?

A.    A lot was going on during that period.  I think I would remember that, but --

Q.    You think you would?

A.    I think I would, yes.

Q.    When did you eventually leave Goldstein & Russell?

A.    I think my last day was the end of January of 2021.

Q.    About how long was that in months after you announced your

resignation?

**A.**   Three and a half months.

**Q.**   Did the firm hire a replacement during those three and a half months?

**A.**   Yes.

**Q.**   As best you can recall, when did the replacement join the firm?

**A.**   I think in January, she joined.  She joined remotely first and then came in person, maybe December.

**Q.**   Remind the jury, what was your replacement's name?

**A.**   Angie Gou.

**Q.**   Did you train Ms. Gou when she arrived at the firm?

**A.**   Yes.

**Q.**   Can you tell us about the training you provided Ms. Gou?

**A.**   I think it was about three or four weeks.  This was also to account for -- I was still working my other full-time job, so I wanted to make sure it was a bit after longer training for her.  So we would -- you know, similar to how Jon trained me, I would just go through all of the responsibilities, shadowing. As things came up, I would show her how I responded to different items.

**Q.**   What, if anything, did you train Ms. Gou on in terms of signing documents on behalf of Mr. Goldstein?

**A.**   I assume I walked her through what Tom's signature looks like.  We didn't have, like, an electronic signature that we

used, so I showed her how to sign his name.

Q.   During the three months between -- let's start back this way.

Did you receive an annual bonus at the end of 2019 for your work at Goldstein & Russell?

A.   Yes.

Q.   Do you recall what that bonus was?

A.   No.  Maybe around $5,000, sounds -- somewhere in there.

Q.   Do you recall how you received that bonus?

A.   Via payroll, direct deposit.

Q.   Was the -- who wrote the check, as far as you can remember?

A.   It's direct -- so the same as I would get paid, always through direct deposit.  I think Sarah -- I don't remember 2019 versus 2020, but I was told what the bonuses would be and I was the one working with the payroll vendors to apply those to each person's end-of-year check.

Q.   Did you also get a bonus going back one more year at 2019, the first year you worked at Goldstein & Russell?

A.   You ask -- I think you asked about 2019 first.

Q.   Well, then I'll ask about 2020.

A.   Okay.  Yeah.  So both years, yes.

Q.   How -- was there -- was it about the same amount?

A.   I think probably the second year was higher since I worked a full year and -- but I don't remember the amounts.

Q.   Do you recall whether other firm managers -- or did you ever learn that other firm managers had gotten annual bonuses?

A.   I don't remember.  I may have -- yeah.  I may have talked to Jon about it at some point, but I don't recall.

Q.   What, if anything, did Mr. Goldstein offer to you in January of 2021?

A.   In January?  I can't remember specifically.  From my resignation period through January, I could list some things.

Q.   Let's do that.

A.   Okay.  At least twice he had come to my desk and told me to set up a Coinbase account, encouraged me to do that so that he, you know, could give me Bitcoin.  He mentioned that when a case payment or settlement came in, that I might receive $10,000.

There was point where I was ordering him Apple headphones and he told me that I should get a pair for myself.

And there was a point where we discussed, like, student loans and student loan forgiveness, whether the firm could forgive student loans and he told me to look into it.

Q.   When you say he was talking about opening a Coinbase account, whose Coinbase account would that be?

A.   Mine.

Q.   Did Mr. Goldstein, as far as you can remember, ever offer you Bitcoin prior to announcing your resignation from Goldstein & Russell?

**A.** No.

**Q.** Did Mr. Goldstein ever offer you Bitcoin over e-mail or text message?

**A.** No.

**Q.** How did he offer you Bitcoin?

**A.** At my desk.

**Q.** Do you recall if it was one Bitcoin? Multiple?

**A.** I don't know. He just told me to -- he suggested that I should download the app, but he didn't -- I didn't do that, so there was no discussion of how much, if any.

**Q.** Had you ever heard of any other firm managers at Goldstein & Russell being offered Bitcoin by Mr. Goldstein?

**A.** No.

**Q.** Had Mr. Goldstein or the firm offered to make student loan payments on your behalf prior to announcing your resignation, as far as you can remember?

**A.** As far as I can remember, no, but it was more just a discussion of the possibility.

**Q.** What about the bonuses when a case came in, had you ever been offered that while at Goldstein & Russell prior to your announcing your resignation?

**A.** No.

**Q.** What about the expensive headphones? Have you been offered expensive headphones by Mr. Goldstein or Goldstein & Russell, the law firm, prior to announcing your

resignation there?

**A.** Not headphones.

**Q.** Did Mr. Goldstein stop offering you Bitcoin after the post -- after you all at Goldstein & Russell posted for your replacement or posted the job?

**A.** I'm not super clear on the timeline. Even looking back, it's surprising to me that it was only three weeks. It felt like long -- like -- I just learned that now.

So I'm not incredibly clear on the whole timeline of it. But yeah, I believe so. I couldn't say with complete certainty of the timeline.

**Q.** Do you recall whether anyone else was around in any of the instances or -- I'll restart that.

Do you recall whether anyone else was in earshot of your conversation any of the times when Mr. Goldstein came to your desk to offer you Bitcoin?

**A.** No.

**Q.** No, you don't recall or --

**A.** Oh, sorry. I -- no one else was in earshot.

**Q.** This may be an -- okay. Sorry.

**THE COURT:** Headsets.

(Whereupon, a discussion was held outside the presence of the jury as follows:)

**THE COURT:** All right. Ms. Reaves, Mr. Goldstein, can you hear the Court?

MS. REAVES: Yes.

THE COURT: Mr. Kravis, can you hear us? Mr. Whitman?

MR. WHITMAN: Yes, Your Honor.

THE COURT: All right. Go ahead.

MR. WHITMAN: I think we're already after 5:00. I just think we have enough questions where we're going to be here for 15 more minutes, potentially, if we keep going. I don't think I will get it streamlined, and so when we come back, it will be a very short period of time. But I do think, unless we're willing to go to, like, 5:15, that we probably should break for the day, or that would be my suggestion.

THE COURT: All right. Ms. Reaves?

MS. REAVES: I'll defer to the Court.

THE COURT: All right. Can you get it done in 15 minutes or you really want more time to think through where you are?

MR. WHITMAN: I think it would be more helpful to think through where we are --

THE COURT: All right.

MR. WHITMAN: -- because then that might actually reduce the amount of time.

THE COURT: All right. So we're going to pause now. We'll have to come back on Monday and finish up the direct on this witness, and then we will do any cross and redirect. The

Court understands there's several other witnesses, at least one other, we did not get to today, so we'll talk about that once the jury is out.

So I'm going to -- can you hear me, Counsel?  I'm going to allow the jury to go home for the weekend.  I'm also going to inform the jury that we will sit, regardless of whether the government is open on Monday, so they're aware of that.  And we will reconvene on Monday at 9:30.

**MS. REAVES:**  Your Honor?

**THE COURT:**  Yes.

**MS. REAVES:**  The last thing, though, we thought we'd be at the end of the witness, but we'd still ask that the Court give the instruction.

**THE COURT:**  You want me to do that today?

**MS. REAVES:**  Yes.

**THE COURT:**  What's the government's position?

**MR. WHITMAN:**  Your Honor, that was not the agreement.  We would ask for it to be read at the end of the testimony.  That was certainly the agreement that I had with a member of their team who was actually negotiating this.  I just think we should wait until the end of it.

We're going to continue delving into this issue.  Hopefully, it won't take 15 minutes, but I do not see the problem with waiting to give that instruction.

**THE COURT:**  All right.  I thought that was at the end

of all the testimony.

MR. WHITMAN:  That's what I thought, Your Honor.

THE COURT:  Okay.  So that's what we're going to do.  Yes.  Go ahead, Counsel.

MS. REAVES:  Just to make our position clear.  The concern, the point of the jury hearing this instruction is because the jury is hearing prejudicial information that they don't know the purpose for.  And so if we wait multiple days for the weekend, it's not going to have the same effect because it's not going to be contemporaneous.

THE COURT:  Okay.  Anything else from the government?

MR. WHITMAN:  It's -- no.  We just think it's too early.  We can finish the testimony and then give the instruction.

THE COURT:  All right.  I'm going to follow the original guidance I got from counsel.  I'll give the instruction at the end of the witness's testimony.  Anything else before we come off?

MR. WHITMAN:  No, Your Honor.

MS. REAVES:  No, Your Honor.

THE COURT:  All right.  Thank you very much.

(Whereupon, discussion concluded.)

THE COURT:  All right.  Counsel and members of the jury, I think this might be a good time to break for today.  It is 5:03, and so I'm first going to invite the jury to step

down.

But before I do so, a few gentle reminders, again, not to talk about this case or anything you heard about the case with anyone, to include your fellow jurors during your break. Please do not read or listen to any news reports or social media about this case or the issues in the case. And do not do any independent research about the issues related to the case.

We will reconvene on Monday at our regular time regardless of whether the government is open or closed, so we'll see you back here on Monday.

And with that, I want to wish a great weekend and a good evening.

Please rise for the jury.

(Whereupon, the jury exited the courtroom at 5:04 p.m.)

THE COURT: Please be seated, everyone.

And I'll invite our witness, Ms. Bart, you can step down and we'll see you back here on Monday as well.

Have a good weekend.

(Whereupon, the witness left the stand and the courtroom at 5:05 p.m.)

THE COURT: Before we depart, the Court has a few housekeeping items in terms of our schedule for next week and potentially the week after that. We will sit on Fridays as we discussed previously.

So we'll be back here on Monday morning and go the full

week next week and the week after that.

As I indicated, the Court will proceed whether or not there is any partial or total shut down of the government. We'll be here at 9:30. That's our plan. Yes.

Also, Counsel, I wanted to mention I think you may be aware the Court has set a hearing on the *New York Times* article matter for next Thursday at 9:00 a.m. And the defense has also, I believe, requested to be heard.

So we'll have both parties here, as well as the third parties present, for that discussion. And my hope is to rule at the conclusion of that hearing.

I wasn't sure. Does the government want to file any more paper? I know the defense filed some paper yesterday. Did the government want to formally respond to the confrontation clause arguments, et cetera?

**MR. BEATY:** Can I have 24 hours and file something no later than tomorrow?

**THE COURT:** Yeah. That would be fine. I think it would be helpful just to round out the papers to have everything in. And we'll have everyone here on Thursday morning to sort that particular issue out.

Let's see. I'm reading my notes right now. I would like to get a better sense of what the schedule is kind of looking like for next week, particularly on Monday, Mr. Beaty, since we did not get through all of our list today. What are you

thinking?

**MR. BEATY:** Our witness, the last witness today was local, so, fortunately, that person can still come back. I think we're still well on track to hopefully wrap up on Thursday. That's my hope. We'll -- you know, we'll continue to work at that, but we have out-of-town witnesses flying in for Monday, so we'll provide -- we're going to confirm that and provide that list by four o'clock on Sunday. Is that appropriate?

**THE COURT:** Mr. Kravis, is that sufficient for you? I know you're not happy about it.

**MR. KRAVIS:** Well, I just want to be clear about this. I'm really thinking of my staff here, because the binders and everything, we got to put those together the night before because we don't know who the witnesses are. We don't know what the exhibits are.

So on a Sunday -- during the week, everybody is working late. It's trial. I get it. On Sunday, the later we get the notice, the later my team has to be in the office on Sunday night.

**THE COURT:** Understood. I'm going to suggest this. Because it is a weekend, get a list out by four o'clock tomorrow. And if there are updates, you can let the defense know. We already have a list of some of the people. I think we kind of know where we're going. Ms. Bart is going to be

back. You had McDonald. I guess they're coming back as well. I'm not sure.

MR. BEATY: And that's exactly what I was -- why I was asking. That's fine, Judge.

THE COURT: All right.

MR. BEATY: We'll do our best. You know, I don't know that we're going to call McDonald on Monday because we have to reshuffle. That's the only reason I was asking for more time, but I'll tell him our best estimate as of tomorrow at 4:00.

THE COURT: If you can kindly update if that changes so the defense is aware before we walk into the courtroom.

MR. BEATY: I can do that.

And then there was one issue, and Mr. Kravis and I haven't had a chance to confer since then. I know that there was a question of, if we weren't going to wrap up by Friday, the 6th, then the government had agreed that Mr. -- one of their experts has a scheduling problem for the next week. And the government agreed that, if it looked like we weren't going to be done or if it needed to be done, that Mr. Goldstein's expert could testify during the government's case in chief.

So we're continuing to work on these things, and we'll continue to have these discussions.

THE COURT: I appreciate the effort there. I do also want to flag that next week we'll have to talk about motions

practice at the conclusion of the government's case, so just keep that in mind in terms of -- I'm sure there should be no motions from the government's point of view.

**MR. BEATY:**  No motions, right.

**THE COURT:**  But in any event, I suspect, in this case there will be paper, so I just want to flag that.  And, you know, we'll see what the timing is and whether we can take care of that at the end of next week.  But that might need to precede any case by the defense.

So I just want to flag that as well.

**MR. BEATY:**  Understood.

**THE COURT:**  All right.  Anything else from the government's perspective?

**MR. BEATY:**  Nothing, Your Honor.  Thank you for your patience today.

**THE COURT:**  Okay.  Mr. Kravis?

**MR. KRAVIS:**  No.  I did want to say, I do appreciate the government's courtesy on the expert witness.  We didn't have a chance to talk about it.  I appreciate the fact that they're willing to schedule him during their case if we're not done before Friday.

**THE COURT:**  Very good.  And I also want to thank all counsel and those supporting this case.  You've been working very hard.  I think we're in week three.  I'm losing track. We've been working very hard, as well as the court staff.  So I

want to thank you for your hard work.

I know the day does not end when we leave the courtroom, so I do appreciate your willingness to keep this case moving forward and to address issues with the Court promptly.

At that, I'm going to wish you a peaceful Friday, hopefully, and a nice weekend.  We'll see everybody back on Monday morning.

Until then, we are adjourned.

**MR. ADENRELE:**  Thank you, Your Honor.

**MR. KRAVIS:**  Thank you, Your Honor.

**DEPUTY CLERK:**  All rise.  This Honorable Court stands adjourned.  Thank you.

(Proceedings concluded at 5:10 p.m.)

- - -

C E R T I F I C A T E

I, KIMBERLY A. BURSNER, Federal Official Court Reporter in and for the United States District Court for the District of Maryland, do hereby certify,  pursuant to 28 U.S.C. §753, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

*Kimberly Bursner*

_____
Kimberly A. Bursner
Registered Professional
Reporter & Federal
Official Court Reporter