IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

_____

UNITED STATES OF AMERICA        )
                                )
      Plaintiff,                )
                                )
          vs.                   )Case Number
                                )8:25-cr-00006-LKG-1
THOMAS C. GOLDSTEIN             )
                                )
      Defendant.                )

TRANSCRIPT OF JURY TRIAL – DAY 10
BEFORE THE HONORABLE LYDIA K. GRIGGSBY
UNITED STATE DISTRICT JUDGE
MONDAY, FEBRUARY 2, 2026 at 9:42 a.m.

APPEARANCES:

On Behalf of the Plaintiff:

        UNITED STATES ATTORNEY'S OFFICE – DOJ
        BY:   ADEYEMI ADENRELE, ESQUIRE
              SEAN BEATY, ESQUIRE
              SEAN GORDON-MARVIN, ESQUIRE
              HAYTER WHITMAN, ESQUIRE
        36 South Charles Street, Suite 400
        Baltimore, Maryland 21201
        (410) 209-4800

On Behalf of the Defendant:

        MUNGER, TOLLES & OLSON, LLP
        BY:  STEPHANY REAVES COUPER, ESQUIRE
             ADEEL MOHAMMADI, ESQUIRE
             JONATHAN I. KRAVIS, ESQUIRE
        601 Massachusetts Avenue NW, Suite 5E
        Washington, DC 20001
        (202) 220-1126

                        – – –

ALSO PRESENT:
            THOMAS C. GOLDSTEIN, DEFENDANT
            JIMMY MENDOZA, PARALEGAL
            ROBERT RESTO, PARALEGAL (after lunch)

    ***COMPUTER AIDED TRANSCRIPTION OF STENOTYPE NOTES***

I N D E X

**GOVERNMENT'S TESTIMONY:**

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **KATHLEEN BART** | 13 | 24 | 86 | 94 |
| **ROMAN HERNANDEZ** | 101 | 136 | 156 | * |
| **ANGIE GOU** | 162 | 205 | 239 | * |

– – –

**DEPUTY CLERK:**  All rise.  This Honorable Court is now in session.  The Honorable Lydia Kay Griggsby presiding.

**THE COURT:**  Good morning, everyone.  Please be seated.  Counsel, welcome back.  I hope you had a good and restful weekend.

Today we will continue the trial on this matter.  I believe we're on week three by my count, and we are continuing the government's case in chief.

The Court understands that we will hear from several witnesses today that the government intends to present.  And later today, I will reach out and assess where we are in terms of the presentation of evidence.

Based upon our discussion last week, the Court anticipates we might wrap up the government's case sometime around Thursday and we'll see.  And I know we have some weather between now and then as well, so we'll see where we are.

Over the weekend, the Court received two items I just want to recognize and acknowledge for the record.  First, the Court did receive a letter from the defense on January 31st related to contact they wish to make with a news publication.  And the Court has no concerns with that, but I'm happy, if you want to address it further, Mr. Kravis, you may.

The Court also received a sealed filing from the United States on February 1st, which I will also carefully review.  Happy to talk about that matter as well.  I think the charge

conference might be the appropriate place, but certainly happy to talk about it if the government wants to say anything further. And I will note, it was very helpful. I have looked through the papers so thank you for sharing that.

Those are all of the items I have.

Are there any preliminary issues from either side? Counsel for -- let's go with the government first, since they're closer to the podium.

Good morning.

**MR. ADENRELE:** Good morning, Your Honor. And, indeed, we filed our motion for reconsideration yesterday evening. Nothing further to say on that now and nothing else preliminarily from the government at this time.

**THE COURT:** All right. Very good.

Mr. Kravis?

**MR. KRAVIS:** I'll try to get to the podium faster next time.

There was just one preliminary matter I wanted to raise to the Court. It does relate to the witness that's currently on the stand.

As the Court may recall, the parties had prepared a joint contemporaneous instruction for the Court to give when this witness is finished testifying.

Based on the testimony that we heard on Thursday, the defense reached out to the government to ask to include one

additional item in the contemporaneous instruction.  The additional item is some communications about payments to an individual named Michael McGuinness.

This is not -- the payments to Mr. McGuinness were in the government's 404(b) notice.  They're not charged in the indictment.  We don't have any objection to the testimony or the documents coming in, but we do think that that should also be added to the contemporaneous instruction just to make clear that this is not a -- this is not a charged act similar to the other topics that we put in the instruction.

I understand the government proposes -- excuse me -- opposes adding that to the instruction.  We printed out copies both ways for the Court, but I think that is an issue that we would ask the Court to take up because it affects --

**THE COURT:**  Can I see the language?  I know I saw the language on the agreed-upon one last week, and I'm not sure if I know where that is right now, but I definitely don't have the defense's language.  And if -- does someone have the version we discussed last week as well?

**MR. KRAVIS:**  I do.  May I approach?

**THE COURT:**  So defense proposed instruction, is this the original?

**MR. KRAVIS:**  No.  The one that is labeled "alternative proposed instruction" is the instruction that we agreed to on Thursday.  The one that is labeled "defense

proposed instruction" is the one that we are asking for here. The key difference is that the defense proposed instruction includes the reference to the McGuinness -- the McGuinness transaction which came out from the witness on Thursday afternoon.

**THE COURT:** All right. So I'm reading it very quickly. Can you point me to the language? I'm seeing a reference to Mr. McGuinness, looks like, about third or fourth sentence down. "Mr. Goldstein is not charged with any crime in connection with the payments he made to Mr. McGuinness."

**MR. KRAVIS:** Right. So the difference here is the Court will see the alternative instruction, the one we had been talking about before we heard the McGuinness' testimony, does not mention Mr. McGuinness and it does not mention the false statement counts in particular.

The one that I handed up this morning that is labeled "defense proposed instruction" includes a reference to Mr. McGuinness in the first sentence, and then it includes some additional language at the back of the instruction that specifically mentions the false statement counts, just to make clear, that the McGuinness transaction is not a charged offense with respect to those transactions.

**THE COURT:** Right.

**MR. KRAVIS:** And again, the reason we're asking for it is because the McGuinness transaction is not mentioned in

the indictment.  It was included in the government's 404(b) notice, and so we did sort of hash it out on that motion in limine.

**THE COURT:**  Thank you.  Mr. Whitman?

**MR. WHITMAN:**  Good morning, Your Honor.  Hayter Whitman for the United States.

**THE COURT:**  Good morning.

**MR. WHITMAN:**  The government opposes the additional instructions that have been added.  As Your Honor knows, we reached agreement relatively quickly last week to a simple straightforward instruction as to the offers of Bitcoin and other items of value to Ms. Bart.

The -- it's true that the payments to Mr. McGuinness were not falsely classified.  At the end of the day, it's still part of the case certainly that Mr. Goldstein, before the IRS criminal investigation began, I think the evidence showed through Ms. Bart that, before the investigation began, he made -- he directed Ms. Bart to pay those funds to Mr. McGuinness from the law firm and said that they were payments for the firm.

And obviously, the defense is free to cross-examine and say, well, these ended up being classified correctly after the IRS CI investigation started or went overt.  But I don't think that, every time the defense has a point that they want to make on cross-examination, that we then need to incorporate it into

a long instruction that we give to jury.

Certainly, I think at the -- you know, maybe we can revisit at the end of the case if the defense has, you know, instructions that they want to limit for purposes of limiting evidence that came in.  But it just can't be that, every time they have an issue with the testimony, that there is a longer instruction given to the jury at the end of that testimony.

And it is -- it really is part of the charges in the case because the government has charged Mr. Goldstein with misleading his firm managers, his accountants, et cetera, in regards to the classification of payments.  So, even if the payment wasn't eventually deducted wrongly, that it's relevant to the case and it's part of the case.

**THE COURT:**  All right.  Thank you, very much, Mr. Whitman.

Well, last week the parties did agree to an instruction that you asked the Court to give at the conclusion of, I believe, it's Ms. Bart's testimony.  And the Court was happy to do so.  I do give some instructions when necessary, but, obviously, we'll do a long list of instructions at the end of trial with the benefit of the full understanding of the evidence.

I don't see any reason to deviate from the plan we had last week.  I'm happy to give the instruction as agreed to by the parties.  We'll have an opportunity, during the charge

conference, to talk about these issues and other issues in terms of what the final instructions are to the jury.  So at this time, I'm going to remain with my commitment to do the instruction everyone agreed to.

Mr. Whitman?

**MR. WHITMAN:**  May I -- I know we said there was no further issues to raise.  I do anticipate Ms. Bart will be here momentarily to testify.  There is one final document that the government intends to show Ms. Bart that I understand that the defense is going to object to.  So I said figure, if we can get that argument out of the way now, it might streamline the testimony of Ms. Bart.

**THE COURT:**  I'll need to see the document.

**MR. WHITMAN:**  Sure.  It's -- if you still have your binder.

**THE COURT:**  I probably have it somewhere, but where that is is a good question --

**MR. WHITMAN:**  I can hand you up a copy, too, Your Honor.

**THE COURT:**  It would be easier.

**MR. WHITMAN:**  Okay.  Great.

**THE COURT:**  I've got a big pile back here.

So these are text messages it looks like?

**MR. WHITMAN:**  Yes, Your Honor.  These are text messages in January of 2021, right before Ms. Bart finally left

the law firm, Goldstein & Russell.  They are text messages between Ms. Bart and Mr. Levitan, who was a prior firm manager. And they are Ms. Bart's present-sense impressions and retelling of what's happening in realtime, which is Mr. Goldstein is offering her Bitcoin and these other items of value every time --

**THE COURT:**  I thought we discussed maybe different text messages, but the same issue last week, and I said it could come in.

**MR. WHITMAN:**  I would agree with that ruling, Your Honor.  I just want to make sure we don't interrupt the witness's testimony with objections.  But that certainly would be our position.

**THE COURT:**  Okay.  So present-sense impression.  And I said she had to testify based on what she understood and, obviously, couldn't speak to what Mr. Goldstein had in his head.

**MR. WHITMAN:**  Right.  And these are statements of what she believed, so...

**THE COURT:**  Mr. Kravis, do you want to talk about that -- or Ms. Reaves?

**MS. REAVES:**  Just briefly, Your Honor.  We understand the Court's ruling.  We just wanted to make sure that the record was clear on the specific text messages at issue. Because, when we discussed this last week, you didn't have the

specific text messages in front of you.

Our concern with this is not the portion that Ms. Bart has already testified to are the things that Mr. Goldstein -- she says Mr. Goldstein did in terms of making offers of particular items. The portion we're objecting to is Ms. Bart's speculation that, for example, the phrase "this tax doc must be getting to him." She is making speculation about what is inside Mr. Goldstein's head.

And then later on there's speculation about how Mr. Goldstein should be spending his money. We think that's substantially more prejudicial than it is probative. We just wanted to make that clear for this message as well.

**THE COURT:** Thank you. And your objections are noted for the record. I think, for the same reasons I said last week, the texts can come in. She can speak to what she understood. Obviously, on cross-examination, the points Ms. Reaves just made would be important points to make in terms of your examination of the witness.

Anything else, Mr. Whitman?

**MR. WHITMAN:** No, Your Honor.

**THE COURT:** Okay. Anything else from the defense?

**MS. REAVES:** No, Your Honor. Thank you.

**THE COURT:** Are we ready to have the jury?

**MR. WHITMAN:** Yes, Your Honor.

**THE COURT:** And is Ms. Bart our current witness; is

that correct?

**MR. WHITMAN:**  Yes, Your Honor.

**THE COURT:**  Okay.  She can come on.  She's already on the stand so let's have her.

**MR. WHITMAN:**  Okay.

**THE COURT:**  Is she here?

**MR. WHITMAN:**  Yep.

**THE COURT:**  And I believe we're still on direct, Mr. Whitman?  You had about 15 or 20 minutes to go?

**MR. WHITMAN:**  Yes, Your Honor.  Exactly.

**THE COURT:**  Okay.  And then we'll have the cross.

**MR. WHITMAN:**  And, Your Honor, I do have one more additional document for Ms. Bart that we had not previously handed up to the Court that I'm glad to do so now.

**THE COURT:**  That would be great.  You can just come on up.

Miss Bart, you can go ahead and take your seat in the witness box.  Good morning.  Make yourself comfortable.  Thank you.  And I will remind you, you remain under oath.

**DEPUTY CLERK:**  All rise for the jury.

- - -

KATHLEEN BART, after having been duly sworn previously, recalled for further testimony, was examined and testified as follows:

- - -

(Whereupon, the jury entered the courtroom at 9:57 a.m.)

**THE COURT:** Please be seated.

Members of the jury, good morning and welcome back. Hope you had a pleasant and warm and safe weekend.

Today we will continue the trial in this matter with the presentation of the government's case in chief. I do anticipate that you will hear from several witnesses today, and I will keep you informed of our schedule as the day proceeds. At this time, I just want to say good morning.

And Mr. Whitman, if you're ready, we can proceed with the examination of Ms. Bart.

**MR. WHITMAN:** Yes, Your Honor. May I actually approach Ms. Bart with her binder?

**THE COURT:** You may.

**MR. WHITMAN:** Thank you.

DIRECT EXAMINATION, Continued

**BY MR. WHITMAN:**

Q. Good morning, Ms. Bart.

A. Good morning.

Q. Have we talked since you got off the stand last Thursday?

A. No.

Q. Do you recall when we left off we were talking about Mr. Goldstein offering you Bitcoin and other items of value after you announced your resignation from Goldstein & Russell?

A. Yes.

Q.    And just to remind the jury, your position at the time was firm manager and deputy -- firm manager of Goldstein & Russell?

A.    Yes.

Q.    And what was your title as to SCOTUSblog?

A.    Deputy blog manager.

Q.    We'll get back to the Bitcoin and the offers in a moment, but I just want to make sure we have a few timeline things straight.

        MR. WHITMAN:  So could we please pull up, Ms. Tice, Exhibit 17.6?

BY MR. WHITMAN:

Q.    And that's tab 8 in your binder, Ms. Bart.

        MR. WHITMAN:  Ms. Tice, could we call out the first two text messages on the screen here?

BY MR. WHITMAN:

Q.    Ms. Bart, do you recall reviewing these messages on Thursday?

A.    Yes.

Q.    What is the date of these messages?

A.    June 1, 2020.

Q.    Prior to receiving this message from Mr. Goldstein, did you know whether or not he was using Bitcoin or cryptocurrency?

A.    No, I did not know.

        MR. WHITMAN:  Okay.  Could we please go to GX or Government Exhibit 490?

**BY MR. WHITMAN:**

**Q.**   That's tab 7 of your binder, Ms. Bart.

          **MR. WHITMAN:**   And, Ms. Tice, if we could pull up everything from the from column to the date.

**BY MR. WHITMAN:**

**Q.**   Ms. Bart, do you recall looking at this document on Thursday?

**A.**   Yes.

**Q.**   This is the 2019 tax organizer that you helped fill out?

**A.**   Yes.

**Q.**   What is the date on the signatures at the bottom there?

**A.**   March 5, 2020.

**Q.**   This was a few months before the text messages we just looked at where Mr. Goldstein asked you to help him use Bitcoin?

**A.**   Yes.

          **MR. WHITMAN:**   Could we please go to page 16 of this document and call out the last -- exactly.

**BY MR. WHITMAN:**

**Q.**   Do you recall, Ms. Bart, me asking you questions about this last question on this page of Exhibit 490?   It's page 16.

**A.**   Yes.

**Q.**   At this point in time, in March of 2020, did you know whether Mr. Goldstein was or was not using Bitcoin or cryptocurrency?

**A.**    I don't believe so, no.

**Q.**    You don't believe you knew?

**A.**    I don't think so.  Not that I recall.

**Q.**    How, then, would you help fill out this form if you didn't know whether Mr. Goldstein was using cryptocurrency?

**A.**    We went over some questions that I didn't know the answer to in his office.  I don't know for certain whether this was or wasn't one of those questions.

**Q.**    Would you have checked "No" in response to this question without having first confirmed it or asked Mr. Goldstein?

**A.**    I don't know where I would or wouldn't have.  I can't remember.

**Q.**    Okay.  Let's go forward to talk about the day in October of 2020 when IRS criminal investigation agents visited Goldstein & Russell.

Do you recall testifying about that on Thursday?

**A.**    Yes.

**Q.**    And I think you testified you were a bit hazy on the exact date of when that happened; is that fair?

**A.**    Yes.  The 14th or the 15th, maybe.

         **MR. WHITMAN:**  Could we please pull up, Ms. Tice, Exhibit 497.4?

**BY MR. WHITMAN:**

**Q.**    And this is tab 18 of your binder, Ms. Bart.

         **MR. WHITMAN:**  And for the Court, this is the new

document that I just handed up.  This is perfect.

**BY MR. WHITMAN:**

**Q.**   Do you see the date of these text messages, Ms. Bart?

**A.**   Yes.  October 14th.

**Q.**   Who are these text messages between?

**A.**   Myself and Tom.

**Q.**   Can you tell the jury what is going on in these text messages on October 14th of 2020?

**A.**   It looks like Tom is asking who was visiting our office. And I sent him a photo of one of the business cards that I was given.

**Q.**   Who gave you the business card?

**A.**   Andrew Accardi.

**Q.**   Who is that?

**A.**   He's a special agent.

**Q.**   Was this the day, October 14th, 2020, when IRS CI agents visited Goldstein & Russell?

**A.**   Yes.

**Q.**   What was your impression of the IRS special agents that you met that day?

**A.**   They were polite.  They were asking if Tom was there, and he wasn't.  And so they arranged to come back.  It didn't make that much of an impression of them other than just talking about logistics.

**Q.**   Were they threatening in any way?

18

**A.**   No.  They were friendly.

**Q.**   Could you even tell if they had firearms on them?

**A.**   I don't think I looked.

**Q.**   Did they bust down the door of the law firm?

**A.**   No.  I -- the security desk called me and I let them come up.

**Q.**   After that day, October 14th of 2020, have you subsequently sat for interviews with IRS criminal investigation agents?

**A.**   Yes.

**Q.**   Have they always been respectful and professional?

**A.**   Yes.

**Q.**   Let's fast-forward from October of 2020 to the end of your time at Goldstein & Russell in January of 2021.  Okay?

**A.**   Okay.

**Q.**   Do you recall if Mr. Goldstein was offering you Bitcoin and other items of value in January of 2021?

**A.**   I don't recall specifically.

        **MR. WHITMAN:**  Could we please pull up Exhibit 17.5?

**BY MR. WHITMAN:**

**Q.**   That's tab 13 in your binder, Ms. Bart.

        **MR. WHITMAN:**  Could we please -- this is perfect. Read my mind again.

**BY MR. WHITMAN:**

**Q.**   All right.  Do you see who these messages are between?

**A.** Yes.

**Q.** Who?

**A.** Myself and Jon Levitan, who was the firm manager prior to my tenure.

**Q.** What is the date of these messages?

**A.** January 21, 2021.

**MR. WHITMAN:** And can we highlight the first message at the top for Ms. Bart?

**BY MR. WHITMAN:**

**Q.** What did you write to Mr. Levitan?

**A.** Can you repeat the question?

**Q.** What does your -- what did you tell Mr. Levitan in this text message?

**A.** It says, "He's losing it. This tax stuff must be getting to him because he keeps offering me money."

**Q.** What did you mean when you said "He's losing it"?

**A.** I don't know exactly what I meant. I just know that I felt uncomfortable in the situation. And that was my impression of his -- maybe my own feelings about the situation and our interactions.

**Q.** Who is the "he" in this text?

**A.** Tom.

**Q.** What did you mean by the second sentence of this message?

**A.** What I meant at the time was that I kept having what I felt were uncomfortable interactions with Tom after I had

already resigned the position and while I was trying to leave.

**Q.**    Was it clear at this point in time, in January of --
January 21, 2021, that you were, in fact, going to leave
Goldstein & Russell?

**A.**    It was clear to me, yes.

**Q.**    Let's look at the next message that you sent.  It looks
like 7:32 on January 21, 2021.

        **MR. WHITMAN:**  Could we highlight that message,
Ms. Tice?

**BY MR. WHITMAN:**

**Q.**    Are you, in this message, Ms. Bart, detailing some of the
things that Mr. Goldstein offered you?

**A.**    Yes.

**Q.**    A moment ago you testified that you weren't sure about the
timeline.  Does this refresh your recollection as to whether
Mr. Goldstein was still offering you these items in January of
2021?

**A.**    The text is sent in January of 2021, but I don't know if
that means that an offer was made that day, or if I'm texting
Jon about it later for certain.

**Q.**    What are the items that you list there in that text
message?

**A.**    Bitcoin, student loan payments, a 10K bonus when a big
case comes in, expensive headphones.

**Q.**    Then what do you say?

**A.**   I say, "every time he sees me."

**Q.**   Does Mr. Levitan respond to the messages that you sent him on January 21, 2021?

**A.**   Yes.

        **MR. WHITMAN:**   Could we just highlight all of Mr. Levitan's messages?

**BY MR. WHITMAN:**

**Q.**   Could you summarize for the jury what you understood Mr. Levitan to be saying?

**A.**   He said it was bizarre and that -- he asked whether Tom should be saving money.

**Q.**   How did you interpret Mr. Levitan's comment about "shouldn't he be saving money"?

**A.**   We both worked at the firm while there were tax payments due, so I think we had the same understanding, that there should be, you know -- "shouldn't he be saving money," was just the comment that he made.  But I don't know what he meant by it.

        **MR. WHITMAN:**   Could we go to page 2 of this exhibit, and zoom in on those messages?

**BY MR. WHITMAN:**

**Q.**   Do you see these are further messages that you sent back to Mr. Levitan that same day?

**A.**   Yes.

**Q.**   And this is page 2, just for the record, of Exhibit 17.5.

Can you tell the jury what you meant in the first message on this page?

A.   Just saying that it was very uncomfortable.  Our interactions were tense on my end, and just uncomfortable.

Q.   Are you referencing there, among other things, the offers of Bitcoin and other items?

A.   Yes.

MR. WHITMAN:  Could we go to the next -- highlight the next text from you.

BY MR. WHITMAN:

Q.   And you say, "LOL saving."  What does that mean?

A.   What it says, I think, just that, you know, in this situation, I found some of this just kind of frustrating.  I don't know how else to interpret those two words.

Q.   Okay.  But just for the record, "LOL" stands for?

A.   Oh.  Like, it stands for "laugh out loud," but it's more -- more of like a dark humor, I would say.

Q.   Were you being sarcastic?

A.   Yes.

MR. WHITMAN:  Could we go to the next text message?

BY MR. WHITMAN:

Q.   Can you read that text message for us, Ms. Bart?

A.   Yes.  "Putting money aside for taxes.  Nah."

Q.   Who are you talking about in that message?

A.   Tom.

**Q.**    Why are you referencing taxes in that message?

**A.**    Because there was a tax investigation and money that we owed the IRS.

**Q.**    By this point in time, as far as you can recall, had Mr. Goldstein ever given you records of cryptocurrency transactions?

**A.**    Not that I can recall.

**Q.**    By this point in time, in January of 2021, do you recall Mr. Goldstein ever having asked you to help him keep track of or report his use of cryptocurrency?

**A.**    Not that I recall.

**Q.**    By this point in time, in January of 2021, had Mr. Goldstein ever asked you to work with the outside accounting firm, Gelman, to help track and report his use of cryptocurrency?

**A.**    Not that I recall.

**Q.**    Ms. Bart, did you ever decide to accept the offers of Bitcoin, student loan payments, or a large bonus from Mr. Goldstein?

**A.**    I didn't accept any of them.

**Q.**    Why not?

**A.**    I don't think any of them were -- although they were mentioned, I don't know that, like -- there wasn't really, like, a transfer at any point that I had to really reject.  I just sort of ignored the comments and moved it along.

**Q.**    Was your interpretation that Mr. Goldstein, by offering you Bitcoin, was trying to keep you at the law firm?

**A.**    I didn't know what his intentions were.

**Q.**    What was your understanding, though, or what did you believe his intentions were in making the offers of Bitcoin?

**A.**    It's hard to remember what I thought six years ago, but I remember feeling -- I don't remember thinking too much into what he was offering it for, other than feeling like it was something that I shouldn't accept because there was an ongoing investigation, and that I also didn't want any Bitcoin, personally.

**Q.**    Did you end up --

          **MR. WHITMAN:**  Actually, a moment to confer, Your Honor?

     No further questions at this time.

          **THE COURT:**  Thank you very much, Mr. Whitman.

     Does the defense wish to cross-examine the witness?

          **MS. REAVES:**  Yes, Your Honor.

          **THE COURT:**  Ms. Reaves?

          **MS. REAVES:**  May I approach?

          **THE COURT:**  You may.

          **MS. REAVES:**  Thank you.

                     **CROSS-EXAMINATION**

**BY MS. REAVES:**

**Q.**    Good morning, Ms. Bart.

**A.**    Good morning.

**Q.**    I want to start where the government left off and make sure that we all have enough context behind what was happening and how you experienced your time at the firm.  Okay?

**A.**    Sure.

**Q.**    So the government asked you a bunch of questions about how Mr. Goldstein reacted when you resigned from the firm.

Do you remember that?

**A.**    Yes.

**Q.**    And the reality is the position as firm manager ended up not being a really good fit for you; right?

**A.**    Correct.

**Q.**    And you were also firm manager during the COVID-19 pandemic; right?

**A.**    Yes.

**Q.**    So that means a lot of the times you were working at Goldstein & Russell, you were by yourself; right?

**A.**    Yes.

**Q.**    Or working remotely and not actually interacting with people in the office; right?

**A.**    Correct.

**Q.**    So the job felt a little bit isolating in that period?

**A.**    Yes.

**Q.**    Even in terms of when you first met Mr. Goldstein, because he traveled so much, you didn't meet him in person before you

started at the firm; right?

**A.** Correct.

**Q.** And it took a couple weeks before you -- to meet him, even after you started the firm?

**A.** Yes. I think so. We may have attended a dinner together about two weeks in, but our first conversation was probably in September, I would say.

**Q.** And you had started in July of 2019?

**A.** Yes.

**Q.** When you first applied to the job, I think you said you had worked at, like, a civil rights organization beforehand; right?

**A.** Yes.

**Q.** And you were really more interested in the SCOTUSblog position; right?

**A.** Yes.

**Q.** And so you had a role as deputy SCOTUSblog manager that was part of your job; right?

**A.** Correct.

**Q.** But the bigger part of your job was this administrative and executive assistance role; right?

**A.** Yes.

**Q.** I don't want to get into too many personal details, but at the time, you also had some undiagnosed medical conditions that caused some fatigue; right?

**A.**    Correct.

**Q.**    And it also caused memory issues?

**A.**    Yes.  That's right.

**Q.**    So that on top of an already demanding job, it was a pretty stressful environment for you?

**A.**    Yes.

**Q.**    Now, you didn't tell Mr. Goldstein that you found the job isolating or stressful; right?

**A.**    Correct.

**Q.**    And, typically, the firm manager job is a two-year commitment; right?

**A.**    Yes.

**Q.**    So the people who you replaced, your predecessors, all of them had done at least two years at the firm; right?

**A.**    Yes.

**Q.**    So when you tell Mr. Goldstein that you are quitting, you were leaving before -- months before he expected you to leave; right?

**A.**    Yes.

**Q.**    Now, the government also asked you about whether the criminal investigation, the agents who came in, whether they left an impression on you.

        Do you remember that?

**A.**    Yes.

**Q.**    Now, they didn't have their guns out and didn't knock down

the doors; right?

**A.**    Right.

**Q.**    But for you, having criminal investigators, federal agents, come to your workplace and question your boss, that was a little bit unnerving; right?

**A.**    Yes.

**Q.**    And it was an uncomfortable enough experience that it helped you make the decision to quit a job you already didn't like; right?

**A.**    Correct.

**Q.**    Now, the government showed those text messages that, when the IRS shows up that night, you decide to quit your job and -- I'm sorry --

**A.**    Yeah.  It was the next day.

**Q.**    The next day.  Okay.  So the next day, you tell kind of the whole office that you're resigning the job; right?

**A.**    All of my bosses, yes.

**Q.**    You don't have a conversation with Mr. Goldstein specifically about it in advance?

**A.**    Correct.

**Q.**    And you sent this letter in writing; right?

**A.**    Correct.

**Q.**    So when the government shows these text messages, this is his response to receiving your written letter of resignation; right?

**A.**    Yes.

**Q.**    And I want to pull up --

        **MS. REAVES:**  Can we pull up Government's Exhibit 497.2, please?  497.2.

**BY MS. REAVES:**

**Q.**    We talked a bunch about these text messages, or you and the government talked about them.

        **MS. REAVES:**  Can we go up to the next page at 18.13.

**BY MS. REAVES:**

**Q.**    I just want to talk about what Mr. Goldstein is actually say to you; right?

**A.**    Uh-hum.

**Q.**    So, for example, this message at 5:13, it says 1813, Mr. Goldstein says, "The people who work with me are beyond important.  You are one of the most balanced and measured people I know.  I feel that I somehow must be responsible for this, but I don't know what or how or what I can do to help."

    Do you see that?

**A.**    Yes.

**Q.**    So what Mr. Goldstein was saying was, I care about the people who work with me; right?

**A.**    Uh-hum.

**Q.**    Is that yes?

**A.**    Yes.

**Q.**    Okay.  And that he felt responsible for whatever reason

you wanted to quit; right?

**A.** Yes.

**Q.** And clearly, he wanted to know what your reason was for quitting; right?

**A.** Right.

**Q.** And you've talked a little bit about your predecessors in terms of firm managers.

Most firm managers probably care about what Mr. Goldstein thinks; right?

**A.** I don't know the answer to that.

**Q.** Most firm managers take the job because they are interested in going to law school; right?

**MR. WHITMAN:** Objection.

**THE COURT:** Do you want to be heard?

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:** Mr. Whitman, are you on?  Mr. Whitman, are you on?

**MR. WHITMAN:** Yes, Your Honor.

**THE COURT:** Ms. Reaves?

**MS. REAVES:** Yes.

**THE COURT:** Mr. Goldstein?

All right.

Go ahead, Mr. Whitman.

**MR. WHITMAN:** It's just speculation, Your Honor.

There was a prior question about what the other firm managers did or why they did it, and she said, "I can't answer that question."  And then we went into talking about most firm managers.

I would just ask that the questions be properly targeted towards the thing that the witness knows as opposed to what the other firm managers at Goldstein & Russell did.

**THE COURT:**  Thank you.

Ms. Reaves?

**MS. REAVES:**  I can rephrase.

**THE COURT:**  Okay.  Very good.

(Whereupon, discussion concluded.)

**BY MS. REAVES:**

**Q.**   So the idea behind the firm manager job is that it's a way to get experience in case you might want to go to law school; correct?

**A.**   Correct.  That's how it was set up.

**Q.**   And that's why you took the firm manager job in the first place; right?

**A.**   Correct.

**Q.**   And you know that the people who were firm managers before you, several of them ended up becoming lawyers; right?

**A.**   Yes.  All of them, to my knowledge.

**Q.**   Most of them, maybe all of them, ended up going to prestigious law schools; right?

**A.**    Yes.

**Q.**    And for the firm managers, you are aware that Mr. Goldstein writes recommendations for people to go to law school; right?

**A.**    Correct.

**Q.**    So part of the stress of the firm manager position is sometimes that a firm manager is hoping, at the end of the job, that you are going to get a recommendation letter from Mr. Goldstein for law school?

**A.**    I didn't experience stress for that reason.

**Q.**    Because you weren't interested in going to a prestigious law school; right?

**A.**    I was interested to going to a really good law school in Detroit.

**Q.**    Right.  But you wasn't worried about a fancy credential? You were looking for a really good law school for becoming a really good lawyer; right?

**A.**    I wasn't at the job for the recommendation.

**Q.**    And so in terms of -- let's put it this way.  For you, you decided that it wasn't important to your career to stay at the law firm for the full two years?

**A.**    That's not what happened.

**Q.**    But you didn't stay for the full two years?

**A.**    I didn't decide because it wasn't important to my career.

**Q.**    So what I'm getting at is you understood that when you

sent this resignation letter to Mr. Goldstein, it was a surprise to him?

A.    Yes.

Q.    And the government also showed some messages where you talked to another one of your colleagues about how Mr. Goldstein did not post the position for a few weeks.

Do you remember that?

A.    Yes.

Q.    And in the message I think we saw last week, you said something to the effect of Mr. Goldstein was worried that quitting could look suspicious.

Do you remember that?

A.    That's what the message said, yes.

Q.    Again, when we're thinking about the context for here, the IRS had shown up without warning; right?

A.    Correct.

Q.    They didn't call in advance and tell you, hey, can we set up a meeting with Mr. Goldstein; right?

A.    Right.

Q.    And Mr. Goldstein had come in and had a meeting with them for hours, talking to them about his side of the story; right?

A.    Yes.

Q.    When Mr. Goldstein is trying to ask you why you are quitting your position, you even told him you weren't quitting because of the IRS visiting; right?

**A.** That wasn't my main reason, yes.

**Q.** And assume that, in that meeting with the IRS, that Mr. Goldstein had done nothing wrong with his taxes, you understand that it could still be unnerving and you could still be worried about how it looks for an employee to quit right after the IRS shows up; right?

**A.** Yeah. I agree with -- yep. I think that would be unnerving for him.

**Q.** So when you wrote in that message that there was something about "throwing off the IRS," that was just your assumption; right?

**A.** I think that was venting and could be a tad dramatic in a text message between friends.

**Q.** Okay. And so when you were venting with your friend, you didn't mean that as some sort of statement about what Mr. Goldstein had said or done?

**A.** No, I didn't.

**Q.** I think you also mentioned in the text messages the government just showed you, that you were venting again with Mr. Levitan. So I want to look at those. It's Government Exhibit 17.5.

Now, here again, in the first message you say something about what you think Mr. Goldstein is thinking; right?

**A.** Exactly. Yes.

**Q.** But to be clear, Mr. Goldstein never said that he was

offering you anything because of the tax stuff; right?

**A.** Right. He never attached any reasoning to it.

**Q.** Okay. And when you describe this as "venting," I think you told the government on direct that you don't actually remember the timeline of when Mr. Goldstein offered you anything in particular; right?

**A.** Not exactly.

**Q.** And when you said "he keeps offering me money every time he sees me," should we take that literally or was that also venting?

**A.** I wouldn't take that literally. I think "every time he sees me" would be incorrect.

**Q.** And to be clear, I think you've said a couple times that this interaction was making you uncomfortable; right?

**A.** Correct.

**Q.** But you never told Mr. Goldstein that this was making you uncomfortable?

**A.** Correct.

**Q.** And just one other clarification. When you say that Mr. Goldstein had offered Bitcoin, did he say a specific amount of Bitcoin?

**A.** I don't remember. I think the prompt was more to download Coinbase which is where you could receive Bitcoin.

**Q.** All right. So there was no time when Mr. Goldstein said "I'm going to give you like X amount of money via Bitcoin";

right?

A.    I don't think he ever attached a monetary value to it, that I remember.

Q.    The government also asked you questions last week about these conversations happening when no one else was in earshot. Do you remember that?

A.    Yes.

Q.    Okay.  Just to make sure that we're clear, this was still the COVID-19 pandemic; right?

A.    We were the only two in the office.

Q.    Okay.  So he wasn't pulling you aside secretly to talk about this; right?

A.    Right.

Q.    And he didn't tell you not to tell anyone else about it; right?

A.    Right.

Q.    And the reason why you were even having these conversations in person is because, after the IRS visited, you all started physically working in the office together; right?

A.    Correct.

Q.    And what you were physically working on was helping Mr. Goldstein respond to the IRS; right?

A.    Yes.

Q.    So you were helping Mr. Goldstein provide documents to the IRS?

A.    Yes.

Q.    And even though you had resigned because of this work and the other work that you still at the firm, you were working really hard during this period; right?

A.    Yes.

Q.    And in legal jobs at Goldstein & Russell and not the ones that you know of, it's not uncommon to receive a bonus for when you are working really hard at work; right?

A.    Correct.

Q.    Now, I think that you have testified to this, but I just want to make sure that we're a hundred percent clear.  When you've talked about Mr. Goldstein's text messages, the offers he made to you, how you felt uncomfortable, you do not know Mr. Goldstein's intentions in any of that; right?

A.    Right.

Q.    And Mr. Goldstein never said that you shouldn't talk to the IRS?

A.    Correct.

Q.    Mr. Goldstein never said you shouldn't provide information to the IRS?

A.    Correct.

Q.    You, in fact, you have talked to prosecutors and investigators multiple times over the past few years; right?

A.    Correct.

Q.    You talked to them in 2021, right after you left; right?

**A.**    Yes.

**Q.**    You talked to them a few times in 2024?

**A.**    If that's -- yes, that sounds right.

**Q.**    You talked to them at the end of last year?

**A.**    Yes.

**Q.**    To be fair, we also talked once before; right?

**A.**    Correct.

**Q.**    Mr. Goldstein didn't do anything to interfere with you talking to the government; right?

**A.**    Right.

**Q.**    And looking back, your impression of those text messages that the government highlighted where you are talking about what you think Mr. Goldstein is thinking, that is your speculation; right?

**A.**    Correct.

**Q.**    Thank you.  I appreciate that.

I want to talk about the actual job that you did while you were at Goldstein & Russell.  Okay?

**A.**    Okay.

**Q.**    Now, focusing on the financial aspect of your job, I think one of the things you did was paying pills for Mr. Goldstein or for the firm; right?

**A.**    Yes.

**Q.**    So you helped pay his mortgage?

**A.**    Yes.

Q.   And sometimes he would ask you to wire funds to one party or another?

A.   Yes.

Q.   And one of the things you did to help Mr. Goldstein keep up to date was you would tell him what the balances were in different bank accounts; right?

A.   Yes.

Q.   Now, you were asked some questions on last Thursday about your opinion that the firm manager should have had business or accounting experience.  Do you remember that?

A.   Yes.

Q.   Now, understanding that there were some financial aspects to your job, your job was not actually the bookkeeping or accounting; right?

A.   Correct.

Q.   So the accountants at GRF were hired for bookkeeping and accounting for -- at least when you started that was the arrangement; right?

A.   Yes.

Q.   And around June of 2022, June of 2020, you found a different bookkeeper at Bench.  Do you remember that?

A.   Yes.

Q.   But even when Bench became the bookkeeper, the accountants at GRF were still responsible for accounting and for tax preparation; right?

**A.**    Yes.

**Q.**    And when we talk about accounting versus bookkeeping versus the financial aspect of your role, you were not responsible for maintaining QuickBooks; right?

**A.**    Right.

**Q.**    And QuickBooks are where the actual firm's accounting records were; right?

**A.**    I believe so.  I don't know if I ever saw those records.

**Q.**    Okay.  And you didn't see them because you weren't the one maintaining them; right?

**A.**    Right.

**Q.**    So you would provide bank statements or other information to the accountants at GRF; right?

**A.**    Yes.

**Q.**    And then the accountants at GRF, you assume, are the ones who handled the QuickBooks accounting records?

**A.**    Yes.

**Q.**    And then -- so it's fair to say, if you didn't have the QuickBooks accounting records, you weren't the ones responsible for providing the QuickBook accounting records to GRF for tax preparation; right?

**A.**    Yes.

**Q.**    So in terms of the official firm accounting records in -- that were used for taxes preparation, that was all handled by GRF?

**A.** Yes.

**Q.** Now, because you never saw the QuickBook records, you didn't personally check the classifications that the accountants made in the QuickBook records; right?

**A.** Not that I recall. I don't remember ever seeing any P&L or anything like that.

**Q.** Okay. And because you were not maintaining the QuickBook records -- or maybe not because of that, but you don't recall a time when GRF had you have Mr. Goldstein review the QuickBook records that are used for tax purposes.

**A.** I don't remember that happening.

**Q.** Now, I want to talk again about the time when you all switched from using GRF for all of the in-house bookkeeping to using Bench for in-house bookkeeping?

**A.** Sure.

**Q.** Okay? Now, the idea of switching to Bench was yours; right?

**A.** Yes.

**Q.** And the reason you wanted to switch to Bench was that you felt like you needed a better way to keep track of things and to communicate with the accountants; right?

**A.** Right.

**Q.** Because, even though it was GRF's job to do the bookkeeping, you felt like that process wasn't going smoothly enough?

**A.** Yes.

**Q.** And Goldstein & Russell was also spending a lot of money to have GRF do the bookkeeping; right?

**A.** Right.

**Q.** And the program that you have found or the accountants that you had found at Bench would save money, and the hope would be that they do a better job at bookkeeping than GRF was doing?

**A.** Yes.

**Q.** And when you identified Bench as an alternative bookkeeping service, you actually informed Mr. Goldstein that this was what the firm should do; right?

**A.** I think so.

**Q.** I want to pull up -- this is Government Exhibit 17.3. Do you see Government Exhibit 17.3? It's July 14th of 2020. You were sending a message to Mr. Goldstein. Do you see that?

**A.** Yes.

**Q.** Okay. And in it you say, "I did a trial of an accounting website called Bench that is $40 a month that I believe will save us money on accounting bills. Pulls all info. We have an account manager who does all bookkeeping, compares checks, produces tax reports. We currently pay GRF around 40,000 a year. We are all going to meet with our accountants to delegate new responsibilities if we go ahead with it. You are welcome to join. Is it okay if I put the first month on our

credit card?"

Do you see that?

A.    Yes.

Q.    And so I just want to break this down a little bit.  So you have identified a bookkeeping service to replace the bookkeeping that GRF was doing; right?

A.    Yes.

Q.    And this was going to be $400 a month instead of $40,000 a year?

A.    Well, yeah, whichever portion of the 40,000 was bookkeeping.

Q.    And in this you're saying "I've already even tried it out"; right?

A.    Correct.

Q.    And when you're saying, "we are all going to meet with the accountants to delegate new responsibilities," who were the "we are all going to meet with the accountants"?  Who were you talking about there?

A.    I don't know who the "we" is.  Tom and I hadn't, like -- there was an early interaction where he emphasized to me that should always put "we" instead of, like, "I."

Q.    Okay.

A.    Yeah.

Q.    Okay.  But to be clear, in this text message, you're inviting Mr. Goldstein to join if he wants to; right?

**A.**    Yeah.  If we go ahead with it, yes, correct.

**Q.**    But he's not deeply involved in this process of deciding how the accountants are going to handle bookkeeping; right?

**A.**    Right.

**Q.**    And the service that you are hiring Bench for was supposed to replace the things that GRF was already doing; right?

**A.**    Yes.

**Q.**    So Bench was supposed to be doing all of the bookkeeping; right?

**A.**    Based on this text alone, you know, I don't really remember what happened after this or how it went, to be honest.

**Q.**    That's fair.  But based on this text and your understanding, the expectation was Bench -- the purpose of hiring bookkeepers was so that they could handle bookkeeping for the firm; right?

**A.**    Yes.

**Q.**    And that it wouldn't be your job to handle bookkeeping for the firm?

**A.**    Right.

**Q.**    We also talked -- or you talked with the government last week --

            **MS. REAVES:**  We can take this exhibit down.  Thank you.

**BY MS. REAVES:**

**Q.**    -- about the fact that sometimes Mr. Goldstein had you

make personal -- or payments for him, some of which were personal; right?

**A.** Right.

**Q.** And there are a couple names that you knew that if you're sending money to these people, these were personal payments; is that right?

**A.** Yes.

**Q.** So you recognized that a couple named Stewart and Linda Resnick, payments to them were personal payments?

**A.** That one, I don't remember if it was firm or personal.

**Q.** Okay. Recognizing that this was a long time ago -- one second.

Now, do you remember talking to IRS investigators in March of 2021?

**A.** Yes.

**Q.** Okay. And March of 2021 was just a couple months after you left this role at Goldstein & Russell?

**A.** Yes.

**Q.** And do you remember telling investigators that Mr. Goldstein had personal loans that included paying the Resnicks and Mr. Safai?

**A.** Yes. Now I remember. Correct.

**Q.** So point is --

**A.** Yes.

**Q.** -- you knew that at times you were making personal

payments for Mr. Goldstein; right?

**A.**    Yes.

**Q.**    And if the accountants at GRF had asked you about personal payments for Mr. Goldstein, and you already knew that they were personal, you would tell them that; right?

**A.**    Yes.

**Q.**    Mr. Goldstein never told you to hide the fact that a payment was a personal payment?

**A.**    Right.

**Q.**    And part of your role was communicating with Mr. Goldstein and the accountants about whether payments were personal or business related; right?

**A.**    Right.

**Q.**    So I just want to show some examples of that.

        **MS. REAVES:**    So if we pull up, this is DX 6 on page 2.  All right.  And if we go to the -- sorry.  Page 3.

**BY MS. REAVES:**

**Q.**    All right.  At the top Mr. Goldstein says, "We need to treat 10K on the firm card as a personal distribution.  I had to use it when I couldn't find the gold card."

    Do you see that?

**A.**    Yes.

**Q.**    Okay.  So this is just an example of Mr. Goldstein saying, I spent money on the firm card, but it was for me personally, so we should tell that to the accountants; right?

**A.** Yes.

          **MS. REAVES:** And if we pull up DX 280.

**BY MS. REAVES:**

**Q.** DX 280, at the bottom we see this is kind of how the process could work. Then afterwards you e-mailed Jill at GRF to say, "Tom told me that he took a 10K personal distribution of the firm credit card when he lost his personal card while traveling."

     Do you see that?

**A.** Yes.

**Q.** Okay. And so sometimes this is how it worked, that you would specifically communicate to the accountants, hey, this is a personal distribution; right?

**A.** Yes.

**Q.** Now, another way sometimes that you communicated with the accountants about personal distributions was the accountants would reach out to you with questions; right?

**A.** Yes.

**Q.** Now, I think you already said that you never -- you don't remember reviewing the entire QuickBooks spreadsheet for accuracy; right?

**A.** Yes. I don't have any memory of any of that, no.

**Q.** Okay. But sometimes they could reach out and ask about specific items on the tax returns; right?

**A.** That sounds right.

**Q.** And I misspoke. Specific items in the accounting records?

**A.** Yes.

**Q.** All right. So I want to look at another example. This is DX 276.

**MS. REAVES:** That -- 276. Okay. And if we go to page 4.

**BY MS. REAVES:**

**Q.** All right. So if we look at the e-mail header at the top of page 4, you see there's Bernadette Languy is e-mailing you and copying Ian Shuman?

Do you see that?

**A.** Uh-hum.

**MS. REAVES:** And if we could highlight the whole box. Yes.

**BY MS. REAVES:**

**Q.** Okay. And usually you had worked with someone named Jill at GRF; right?

**A.** Right.

**Q.** At some point, it switched to more often being either Ian Shuman or Bernadette Languy?

**A.** Yes.

**Q.** And so these are still GRF accountants reaching out to you about specific things in the accounting records; right?

**A.** Right.

**Q.** And so just another example, when they asked you questions

about specific things, you would respond, "Hi, Bernadette.
Citibank to Thomas Goldstein is a personal distribution";
right?

A.    Yes.

Q.    Okay.  And so the accountants kind of reached out to
you -- you don't know when or why they reached out to you, but
when they reached out to you, you provided the information that
they needed; right?

A.    Yes.  I hope so.

Q.    That's fair.

        MS. REAVES:  I want to look at another example.  This
is DX 248.  And if we go to the bottom page, page 7.  Sorry.
Page 6.  Maybe page 5.  The first e-mail.

BY MS. REAVES:

Q.    All right.  And so this is a message from you to the
accountants at GRF and also copying the person that replaced
you at Goldstein & Russell; right?

A.    Right.

Q.    And the subject is "1099 report ready from Bench."  Do you
see that?

A.    Yes.

Q.    Okay.  And to make sure that everyone understands what
happened in 2020, so the first half of 2020 GRF was responsible
for bookkeeping for Goldstein & Russell; right?

A.    Right.

**Q.** And then as we talked about, for the second half of 2020, you all switched to Bench for bookkeeping; right?

**A.** Right.

**Q.** And so in the 2020 taxes -- or for the 2020 accounting, there was a combination of work from Bench and a work from GRF; right?

**A.** Yes.

**Q.** And so in this, you've gotten information from Bench about a 1099 report, and you're reaching out to GRF to try to make sure that all of the information that needs to be sent is sent; right?

**A.** Right.

**Q.** Okay. And a 1099 is a tax document; right?

**A.** Yes.

**Q.** It's a tax document that's sent to both someone that a party that Goldstein & Russell was paying and also to the IRS; right?

**A.** Yes.

**Q.** And it documents the payments that were made if those payments were business related; right?

**A.** Right.

**Q.** And so another context in which the accountants sometimes asked you about payments in the Goldstein & Russell records was when they were trying to figure out whether they needed to send out these 1099 documents; right?

**A.**   Yes.

**Q.**   And so, for example, if we go up to -- well, let's read this e-mail.  You say, "Hi, Bernadette.  We have the 1099 report for July to December ready.  We will be working through it tomorrow and anticipate any W-9s and tax IDs you may need."

So that's you saying, we have the list of business payments.  We're going make sure that the tax documents are sent out; right?

**A.**   A list of payments and maybe part of working through it was determining if they were personal or business.

**Q.**   Okay.  And what you're doing is, you are collecting tax information for business expenses so that you can give that to GRF to actually send out the tax documents; right?

**A.**   Right.

**Q.**   And if we go up to see the response.

**MS. REAVES:**   Let's go to page -- can you scroll up one page?  Two pages.  Sorry.  One more page up.  Go to page 1 of the document.

**BY MS. REAVES:**

**Q.**   Okay.  And so, for example, if we look at your response in this middle e-mail later in January 2021, you say, "update: This expense should be categorized as a personal distribution. So no 1099 needed."

Do you see that?

**A.**   Yes.

Q.    Okay.  So this is another example of how if you knew that someone was a personal distribution, you'd tell them that you don't need to send this tax document that we send when it's a business payment; right?

A.    Right.

Q.    Okay.  But even in the context of this conversation about 1099s, GRF never asked you to go through every entry of the accounting records to make sure business versus personal was labeled correctly?

A.    Right.  I don't remember ever doing that.

Q.    Now, since you started at the firm in 2019, were you involved in helping GRF prepare the 2019 taxes?

A.    Yes.

Q.    Okay.  Do you recognize the name Chuck Pacheco?

A.    Sorry.  Say it again.

Q.    Do you recognize the name Chuck Pacheco or Charles Pacheco?

A.    I don't think so.

Q.    Okay.  Do you know about any payments that Mr. -- that were made from Goldstein & Russell to Mr. Pacheco?

A.    I don't recognize the name.

Q.    All right.  And the government hasn't shown you any document that shows Mr. Goldstein telling you that that was a business expense or a personal expense?

A.    I don't recall if the government has or hasn't shown me a

document like that over the last four years.

Q.    Okay.  Well, you haven't seen one --

A.    Not today.

Q.    -- in court where Mr. Goldstein is saying how to categorize that expense; right?

A.    Right.

Q.    And we also haven't seen in court any document or e-mail where GRF is asking you how to categorize that expense?

A.    I don't recall seeing anything like that, no.

Q.    Okay.  Now, I think on direct examination you said something to the effect of you helped Mr. Goldstein put together his taxes.

     Do you remember that last week?

A.    Yes.

Q.    Now, I just want to be totally clear.  When you testified that you helped him put together his taxes, what you mean is that you helped provide documents to the accounting firm at GRF; right?

A.    Right.

Q.    You're not saying that you remember actually reviewing like a completed tax return with Mr. Goldstein?

A.    I don't think I did, no.  Not that I recall.

Q.    And Mr. Goldstein never told you not to pass something along to the accountants for financial or tax purposes?

A.    No.  He never did.

**Q.** Now, the government asked you some questions about a specific tax organizer book last week, and they showed it this morning. So I also want to ask you some questions about that. Okay?

**A.** Sure.

**MS. REAVES:** Now, can we pull up Government's Exhibit 490.

**BY MS. REAVES:**

**Q.** All right. So this is the tax organizer that we've looked at a couple of times; right?

**A.** Yes.

**Q.** And it's for tax year 2019; right?

**A.** Yes.

**Q.** And you are the one, I think you said, who actually signed this document on Mr. Goldstein's behalf; right?

**A.** Yes.

**Q.** Now, last week they went through some language in the engagement letter that's attached to this, and I want to talk through a little bit more of that.

**MS. REAVES:** So if we can go to page 3 at paragraph 3.

**BY MS. REAVES:**

**Q.** I think the government talked to you about this language that, if we start in the middle, "If we are unable to complete the returns, we will assume that you want us to prepare an

extension of time to file your returns."

Do you see that?

A.   Yes.

Q.   And I think the government also pointed out that taxes are still due with the extension.

Do you remember that?

A.   Yes.  They pointed that out.

Q.   But nowhere in this engagement letter does it say that if you pay late, with penalties and interest, you are committing a crime; right?

A.   I don't remember that being part of the letter.

Q.   And you don't remember the accountants at GRF ever telling you if Mr. Goldstein files an extension, pays late with penalties and interest, he's committed a crime; right?

A.   Yeah.  We are never told that.

Q.   The government also pointed out, if we look at paragraph 4 of this, that in paragraph 4 the engagement letter says, "We will not audit or verify the data you submit," starting in the middle, "although we may ask you to clarify it or furnish us with additional data."

Do you see that?

A.   Yes.

Q.   Now, are you aware of whether or not "audit or verify" means something specific for accountants?

A.   I'm not aware.

**Q.** Do you know what "audit or verify" means in the context of a tax return?

**A.** No, I don't.

**Q.** But to be clear, this engagement letter was about the preparation of taxes for 2019; right?

**A.** Right.

**Q.** And this is because part of Goldstein & Russell's engagement with GRF was for them to do tax preparation services; right?

**A.** Right.

**Q.** But as we discussed, GRF was also responsible for actually maintaining the bookkeeping for Goldstein & Russell as well; right?

**A.** Yes. That's correct.

**Q.** Thank you.

Now, I want to talk a little bit more about cryptocurrency. So I think the government started out with trying to make sure that we are clear about the time line of cryptocurrency, and I want to go back to that.

So this tax organizer that you filled out was in March of 2020; right?

**A.** Yes. That's when it was signed, so yes.

**Q.** And then the text messages the government showed you where Mr. Goldstein asked you to set up a Bitcoin account for him was after that; right?

**A.**    Right.

**Q.**    So setting up the Bitcoin account was in June of 2020?

**A.**    Yes.

**Q.**    And you have no knowledge of Mr. Goldstein having any cryptocurrency in 2019; right?

**A.**    Right.

**Q.**    And 2019 is the year that that tax organizer was about?

**A.**    Yes.

**Q.**    And the government -- no one has showed you a tax -- shown you a tax organizer for 2020 or 2021; right?

**A.**    Right.

**Q.**    In 2020 -- for the taxes of 2020, that was the year where you left in January 2021; right?

**A.**    Right.

**Q.**    So you weren't really involved in helping prepare the taxes -- provide information to GRF for the taxes for the 2020 tax return; right?

**A.**    Right.  Yes.

**Q.**    In --

**A.**    Sorry.  I would have started to probably during 2020 and -- but I wasn't there by the time it was prepared, yes.

**Q.**    And by the 2021 tax return, you were long gone; right?

**A.**    Right.

**Q.**    I think -- I'm not sure if the government showed it to you on not on direct, but I want to pull up --

58

MS. REAVES: This is Government's Exhibit 137.

BY MS. REAVES:

Q.    So you started to say, I think, that you may have started helping prepare information to give to GRF; right?

A.    Yes.

Q.    And in this e-mail, it's from your replacement to the accountants at GRF, and the subject is "2020 tax organizer agreement."

Do you see that?

A.    Yes.

Q.    But the tax organizer agreement, again, was the engagement letter, not the tax organizer itself; right?

A.    Right.  Just agreeing that they would do our taxes again.

Q.    And let's go, actually, to that exhibit, the attachment to this, which is Government's Exhibit 118.

Now, in Government's Exhibit 118 -- and I think the government did show you this because the pages are backwards; right?  The bottom page is scanned in as page number 4, if we could look at that?

A.    Yes.

Q.    So if we see --

MS. REAVES: Can we go to page number 4, please.

BY MS. REAVES:

Q.    So this is a 2020 tax organizer.

MS. REAVES: If we go to page number 3.

**BY MS. REAVES:**

**Q.**   You can see that what is attached was just the engagement letter; right?

**A.**   Right.

**Q.**   Now, do you have any independent memory of actually reviewing this engagement letter with Mr. Goldstein in January 2021?

**A.**   No independent memory.

**Q.**   And there is a little bit of language about cryptocurrency in this that I think the government pointed out.

        **MS. REAVES:**   So I want to go to page 2.

**BY MS. REAVES:**

**Q.**   If you see at that the top, it says, "If you had virtual currency activity during the tax year, you may be subject to tax consequences associated with such transactions."

        Do you see that?

**A.**   Yes.

**Q.**   But the engagement letter does not say there is a box to check on your tax return if you have engaged in any cryptocurrency transactions; right?

**A.**   Right.

**Q.**   And you don't recall any other e-mail specific to 2021 where Mr. Goldstein is told there is a box to check on your tax return about whether you have engaged in cryptocurrency transactions?

**A.**    The 2019?  You said 2021?

**Q.**    So this engagement letter we are looking at is in 2021 for 2020 taxes; right?

**A.**    Right.

**Q.**    So this is a year after the tax organizer that the government and that I showed you; right?

**A.**    Right.

**Q.**    So my question is, there is no tax organizer or e-mail or document showing that Mr. Goldstein was asked about cryptocurrency for the purposes of his 2020 taxes; right?

**A.**    I think I'm just confused by the question.

**Q.**    Sorry.  Bad question.

        We already talked about the 2019 tax organizer.

        Do you remember that?

**A.**    Yes.

**Q.**    And in the 2019 tax organizer, the government pointed out that the box that said "no cryptocurrency" was checked; right?

**A.**    Right.

**Q.**    And you already established that at the time you filled that out, that was before you helped Mr. Goldstein create his Bitcoin account; right?

**A.**    Right.  But I don't remember if I checked it or not.

**Q.**    Correct.  Right.

        So my point is all of that is about 2019; right?

**A.**    Right.

61

Q.    I'm asking for the purposes of 2020 and 2021.  Okay?

A.    Yes.

Q.    For 2020 and 2021, you have no knowledge of even a tax organizer where someone asked does Mr. Goldstein have cryptocurrency; right?

A.    I have no memory of that.  Right.

Q.    And neither party has shown you any tax organizer or e-mail that would show that Mr. Goldstein was actually asked those specific questions; right?

A.    Right.

Q.    I want to shift a little bit and talk about some foreign bank accounts that Mr. Goldstein and Goldstein & Russell had during your time at the firm.  Okay?

A.    Okay.

Q.    Now, you are aware that Mr. Goldstein and the firm had a bank account in Montenegro; right?

A.    Right.

Q.    And you were not aware of Mr. Goldstein having any other foreign bank accounts; right?

A.    Right.

Q.    You don't remember making any transfers for Mr. Goldstein from some other Asian bank account; right?

A.    Right.

Q.    Now, you are also aware that the accountants at GRF had -- strike that.

You are also aware that one of your predecessors, Ms. Runkle, had told the accountants at GRF about these bank accounts back in 2016?

A.   How am I aware of it?  Maybe, but if you wouldn't mind refreshing my memory on how I am aware of that.

Q.   Sure.  So the reason it came up was because one of the questions the IRS had when they came in October of 2020 was a failure to report these foreign bank accounts.

Do you remember that?

A.   I don't really remember why they showed up in October of 2020, like I wasn't sitting in on the meeting.  I just helped Tom compile documents responsive to the subpoena.

Q.   That's fair.

So, again, understanding this is a long time ago, I want to go back to that interview you gave with the investigators in this case in March of 2021.  Okay?

A.   Okay.

Q.   Now, in March of 2021, you told Agent Accardi and Agent Walker that the bank accounts in Montenegro were opened by Ms. Runkle in 2016.

Do you remember that?

A.   I don't remember that, but yes, that's probably what I told them.

Q.   Okay.  And I know it's, again, hard to remember, but would it surprise if you also told them that Ms. Runkle had informed

the accountants about the foreign bank accounts at the end of 2016?

**A.**    That sounds like I knew it at the time, then yes.

**Q.**    Do you remember that the accountants at GRF asked you about the foreign bank accounts in 2019?

**A.**    Yes, I do remember this.

**Q.**    And the reason you remember is because the accountants misinformed you about whether those accounts were open or closed; right?

**A.**    I think that was the topic of the conversation.

          **MS. REAVES:**  So, if we pull up Defense Exhibit 279. It should be 279.  Yes.  Defense Exhibit 279.

**BY MS. REAVES:**

**Q.**    So here we see an e-mail starting at the bottom.  It's from Jill Leonard at the accounting firm to you.  Subject is "items, firm 1020-S return."

       Do you see that?

**A.**    Yes.

**Q.**    And in this e-mail, Ms. Leonard tells you, bullet number 2, "In 2018, there were bank accounts in Montenegro.  The accounts were closed before 12/31/18, but if there are any foreign accounts that were opened in 2019, please let me know and send the statements."

       Do you see that?

**A.**    Yes.

**Q.**    So what is happening here is Ms. Leonard is telling you that the Montenegro bank accounts had been closed; right?

**A.**    Right.

**Q.**    In response, you went and asked Mr. Goldstein about any new foreign bank accounts; right?

**A.**    Right.

**Q.**    Because you took Ms. Leonard's information to be accurate, that the accounts had been closed; right?

**A.**    Yes.

**Q.**    And it sounds like in 2020, for whatever reason, this is what Ms. Leonard at the accounting firm thought; right?

**A.**    Yes.

**Q.**    And the reason this came up later --

        **MS. REAVES:**    If we go to Defense Exhibit 291.

**BY MS. REAVES:**

**Q.**    -- in Defense Exhibit 291, we see at the bottom --

        **MS. REAVES:**    If we go to the next page, please. Actually, let's go to the third page.

**BY MS. REAVES:**

**Q.**    So we see it starts with that same e-mail that we're talking about, right, where Ms. Leonard at the accounting firm tells you these bank accounts were closed; right?

**A.**    Right.

        **MS. REAVES:**    And if we go to the first page of this?

**BY MS. REAVES:**

**Q.**    This is an e-mail that you were writing to Mr. Goldstein on October 15 of 2020.  Do you see that?

**A.**    Yes.

**Q.**    And October 15 of 2020 was the day after the criminal IRS had come to visit; right?

**A.**    Yes.

**Q.**    And you say, "Just got off the phone with Ian from GRF and he pointed me to this e-mail exchange I had with Jill earlier in the year."

And then it copies again this information that Ms. Leonard gave you about the bank accounts; right?

**A.**    Right.

**Q.**    And then you say, "I followed up with you at this point about any new foreign accounts, but we may have completely excluded all Montenegro accounts from our 2019 prep because I took the statement above to be true."

Do you see that?

**A.**    Yes.

**Q.**    Okay.  And so I don't know if this refreshes your memory about the foreign bank accounts coming up during the IRS, or at least -- the day after the IRS visited, you were asked to look into what happened with the reporting of the bank accounts; right?

**A.**    Right.

**Q.**    And it turned out that the accountants had given you the

wrong information; right?

**A.**   Right.

**Q.**   And so you had asked Mr. Goldstein about new bank accounts and not about the existing bank accounts; right?

**A.**   Right.

**Q.**   But to your knowledge, no one had ever told GRF that these accounts were closed; right?

**A.**   Which ones?  Sorry.  Yes.  I don't know --

**Q.**   I can clarify.  I can clarify.

So at the point of this e-mail, when you realize, okay. These accounts are still open and Ms. Leonard had asked me about new bank accounts, that's when you realized that GRF had made a mistake that lead you to ask only about new foreign bank accounts; right?

**A.**   Right.

**Q.**   Mr. Goldstein hadn't hidden the foreign bank accounts from the accountants.  There had been a miscommunication?

**A.**   Correct.

**Q.**   Okay.  And these foreign bank accounts are ones that the accountants, for sure, should have known about; right?

**MR. WHITMAN:**  Objection.

**THE COURT:**  Headsets.

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:**  Mr. Whitman, are you on?

**MR. WHITMAN:**  Yes, Your Honor.

**THE COURT:**  All right.  Ms. Reaves?

Ms. Reaves, can you hear us?

**MS. REAVES:**  Yes.

**THE COURT:**  Okay.  Mr. Goldstein?

All right.  Go ahead, Mr. Whitman.

**MR. WHITMAN:**  I was just asking for speculation, and then argument that they can make to the jury later based on the answers that were elicited.

**THE COURT:**  All right.  So objection is speculation.

**MR. WHITMAN:**  Yes, Your Honor.

**THE COURT:**  Ms. Reaves?

**MS. REAVES:**  So she has the foundation for this.  I'm about to go over a document where she's communicating with the accountants about transactions that happened in the bank account in 2016, 2018, and 2019.

**THE COURT:**  Well, I think you need to go to the document first and then ask her the question.

**MS. REAVES:**  Sure.

**THE COURT:**  All right.

**MR. WHITMAN:**  Thank you, Your Honor.

**THE COURT:**  Thank you.

(Whereupon, discussion concluded.)

**MS. REAVES:**  All right.  And let's look at Government Exhibit 22.  If we scroll all the way to the bottom.  Make sure

we're at the bottom page, or if we could look at both pages at once.  Okay.

**BY MS. REAVES:**

Q.   So this is an e-mail from Mr. Goldstein to the accountant, Mr. Dehyle, copying you, in October 23, 2020.

Do you see that?

A.   Yes.

Q.   All right.  So this is a little bit more than a week after the IRS had come to Goldstein & Russell's office; right?

A.   Right.

Q.   And in this e-mail, Mr. Goldstein is specifically asking about deposits that came in in 2016, 2018, and 2019.

Do you see that?

A.   Yes.

Q.   Okay.  And then let's look at the response from the accountants.

Now, first, we see that it sounds like Mr. Deyhle had an annoy message and so additional people from the accounting firm were looped in; right?

A.   Right.

Q.   And then, if we go to the actual substantive response in the first page, you see that Ian Shuman from the accounting firm, GRF, is responding; right?

A.   Right.

Q.   Okay.  And he's responding specifically about these

69

deposits that are listed as coming from something that says Monex Europe Limited.

Do you see that?

A.    Yes.

Q.    And there are notes about each time that money came in from these accounts.  Do you see that?

A.    Yes.

Q.    And so for the October 2016 ones, we see that the ones highlighted say "all treated as income"; right?

A.    Yes.

Q.    And these are deposits coming in from this Monex Europe Limited account; right?

A.    Yes.

Q.    Now, for the 2018 transaction, they say something about how it was treated.

Do you understand what that means in terms of accounting speak?

A.    No.

Q.    Okay.  But let's skip to the actual notes.

So for the September 2, 2018 transfer, it again says that there were euros transferred from the Montenegro account.

Do you see that?

A.    Yes.

Q.    Okay.  And there is a note that said, "Okay.  Correct.  We understood from Jon that this was a loan to Tom, who then made

a capital contribution to G & R."

Do you see that?

A.   Yes.

Q.   Okay.  So it looks like Ian is providing a specific note of why that one was not treated as income.  Do you see that?

A.   Yes.

Q.   Okay.  And then there's a third transaction also included in this list from February of 2019.  Do you see that?

A.   Yes.

Q.   But for this transaction, there's no note with any explanation of why the accountants treated it as a distribution; right?

A.   Yes.  I'll take your word for it.

Q.   Well, I'm asking you to just look at the line there. Similar to -- for 2018, there was a note where Mr. Shuman explained why it was treated that way.  For 2019, there's no note; right?

A.   Right.  Sorry.  Yes.

Q.   Okay.  And essentially, this is an e-mail that you were part of showing that there was money coming in from the foreign bank account in Montenegro in 2016, 2018 and 2019; right?

A.   Yes.

Q.   So it was incorrect for Ms. Leonard to tell you that the account had been closed in 2018?

A.   Yes.  It seems so.  Yep.

Q.   Now, we talked about how after the IRS came, part of your job became helping Mr. Goldstein collect documents to give to the IRS; right?

A.   Right.

Q.   And this e-mail we're looking at is an example of how part of your job also became communicating with GRF about your response to the IRS; right?

A.   Right.

Q.   Because what you're helping to do is figure out what went wrong and try to fix any issues with the taxes; right?

A.   Yes.  Yeah.

Q.   And it turned out that everyone learned after this October 2020 visit --

         MS. REAVES:  You can take this document down, Mr. Mendoza?

BY MS. REAVES:

Q.   Everyone learned after this October 2020 visit that GRF had never reported the foreign bank accounts on Mr. Goldstein's taxes; right?

A.   Yes.

Q.   And the accountants at GRF, essentially, admitted to you that this was their mistake?

A.   I don't remember them doing it.

Q.   That's fair.

     Do you remember a conversation with Mr. Shuman where he

told you that GRF was getting in touch with their insurance liability company?

**A.**    Yes.  I remember that.

**Q.**    All right.  And you've spent some time in the legal world to understand insurance liability means, if a company made a mistake, they're looking for insurance in case they get sued or they have liability; right?

**A.**    Whether or not they made a mistake, yes.  I think all accounting firms have insurance liability, yes, like law firms do, too.

**Q.**    That's fair.

But so after this visit with the IRS, when you all were trying to figure out what happened with the Montenegro bank accounts, GRF told you that they had to get in touch with their insurance liability?

**A.**    I don't know if it was specifically related to the foreign bank account.  I remember Ian saying that, because we had a call, to start figuring out how to gather documents or just to update him on the situation, and he mentioned it at the end of the call.  But I don't know if it was in response specifically to the foreign bank account issue or not.

**Q.**    Okay.  So it might have been in response to other issues that might have come up related to Mr. Goldstein or Goldstein & Russell's taxes?

**A.**    Or just the situation itself, yes.

Q.    That's fair.

Okay.  Now, when you were firm manager, you knew that Mr. Goldstein knew Tobey Maguire; right?

A.    Yes.

Q.    And did you know that Mr. Goldstein did work for Tobey Maguire?

A.    Yes.

Q.    And Mr. Goldstein even asked you to open a case for Mr. Maguire for the firm; right?

A.    A matter in FreshBooks, which is where we did our invoicing, yes.

Q.    Okay.  So a matter in FreshBooks means that there would be a place in the firm's invoicing system that showed that there was an open case -- or an open matter with Mr. Maguire; right?

A.    Yes.

Q.    And so you weren't actually at the firm in June of 2021 when that matter ended; right?

A.    Right.

Q.    But your predecessor -- not your predecessor -- your replacement could have looked into the FreshBook system and seen that there was a matter for Mr. Maguire in the system?

A.    Assuming that I followed his instruction and opened it, yes.

Q.    Okay.  That's fair.

Now, the government also asked you some questions about a

time Mr. Goldstein had you wire money to someone named Michael McGuinness.

Do you remember that?

A.    Yes.

Q.    Okay.  Now, you don't know what money was for; right?

A.    I don't recall now what it was for, no.

Q.    Okay.  But, ultimately, Mr. Goldstein told you that money to Mike McGuinness was a distribution; right?

A.    I don't recall that.

MS. REAVES:  Okay.  So I want to pull up -- this is Government Exhibit 497.1.

All right.  If we go to the second page.

BY MS. REAVES:

Q.    If we look at the last two messages -- or the last message, Mr. Goldstein says, "Mike McGuinness is a distribution."

Do you see that?

A.    Yes.

Q.    Okay.  And, again, a distribution means that this is money that's personal to Mr. Goldstein; right?

A.    Yes.

Q.    Okay.  I want to take a step back and make sure we understand the context of when Mr. Goldstein told you this. Okay?

A.    Uh-huh.

Q.   So if we look at the message before this, you say to Mr. Goldstein, "Unfortunately, you took about 550,000 during the loan period, almost twice the loan.  I'll submit the app and cross my fingers.  I mean, we hired people during this period, too."

     Do you see this?

A.   Yes.

Q.   Okay.  Do you remember that Goldstein & Russell took out a PPP loan during the pandemic; right?

A.   Yes.

Q.   And in this message, you're talking about whether or not Goldstein & Russell would qualify for forgiveness on that PPP loan; right?

A.   Right.

Q.   So one of the pieces of information that you had to look at to determine whether Goldstein & Russell qualified for that loan was how much money Mr. Goldstein had received in distributions; is that right?

A.   I don't know if that was one of the questions on the loan, like, forgiveness application, but it seems like that was something that was of concern to me in this text message, so...

Q.   Because in this text message, you are informing him and talking about the amount of money that was -- that Mr. Goldstein had taken during the loan period; is that right?

A.   Yes.

Q.    And you remember working with the accountants to figure out whether or not it was appropriate for you all to submit the loan application -- the forgiveness application; right?

A.    Yes.

Q.    And the accountants ended up saying, yes, it's all right to submit is the forgiveness application?

A.    Yes, they did.

Q.    So, if we look at both of these text messages together, now this happens to be in October 26, 2020.

      Do you see that?

A.    Yes.

Q.    And that happens to be a week or two after the IRS had visited; right?

A.    Right.

Q.    But in the context of this text, Mr. Goldstein is telling you that specific payments are a distribution in response to you asking him about -- in response to you talking about the loan forgiveness; right?

A.    Right.

Q.    I know this is from a long time ago, so just taking a step back.

      The point is when Mr. Goldstein tells you that this is a distribution, he didn't say anything about it being connected to the IRS investigation; right?

A.    Right.

Q.    And you don't have any other memory or document that said Mr. Goldstein called this a personal distribution because the IRS investigation had happened; right?

A.    Right.

Q.    The document that we have is he is providing this in response to you giving him information about this PPP loan forgiveness; right?

A.    Right.

Q.    Switching gears again.

On direct examination, the government asked you some questions about text messages you had with Mr. Levitan.

Do you remember that?

A.    Yes.

Q.    And specifically, I'm talking about text messages where you two are kind of joking back and forth or speaking sarcastically about Mr. Goldstein paying his taxes.

Do you remember that?

A.    Yes.

Q.    But to be clear, when you were working at Goldstein & Russell, part of your job was helping Mr. Goldstein pay his taxes; right?

A.    Yes.

Q.    So you know that Mr. Goldstein made payments on a payment plan with the IRS; right?

A.    Correct.

**Q.** And he paid $20,000 a month because that was the amount in the installment agreement; right?

**A.** Yes.

**Q.** That installment agreement was in place before you got at the firm; right?

**A.** Yes. I'm not sure of the amount, so I'm taking your word for the amount.

**Q.** That's fair.

When you were at the firm, you didn't personally have to interact with any revenue officers or anyone from the IRS who was coming to negotiate payment plans; right?

**A.** Right.

**Q.** And while you were at the firm, you didn't have to monitor the bank accounts for the IRS taking money out of any bank accounts; right?

**A.** I'm not aware of that happening during my time there, no.

**Q.** And I know in the text messages you all are saying, Okay. Mr. Goldstein needs to spend money on his taxes. I want to pull up a text message you had with Mr. Goldstein. This is Government Exhibit-171. This is another text message where I think -- I think the government showed it to you.

But if we look at the second to last message on this page, you were writing Mr. Goldstein, "Can I borrow money from your personal savings account to pay some of the taxes this year?"

**A.** Yes.

Q.   And -- I'm sorry, "this month;" is that right?

A.   Yes.

Q.   And if we look at Mr. Goldstein's response, Mr. Goldstein says, "Yes.  And we have 125,000 coming in soon.  Also, is there Google money?" right?

A.   Yes.

Q.   So despite kind of the text messages you later had with Mr. Levitan, in fact, Mr. Goldstein did pay his taxes or paid towards his taxes while you were at the firm; right?

A.   Yes.

Q.   In this example here, he's even having -- allowing you to take money from his personal savings so that it could go towards taxes?

A.   Yes.

Q.   Now, in terms of the installment agreement that Mr. Goldstein had with the IRS, no one told you that Mr. Goldstein needed to pay more money than the amount that he agreed to; right?

A.   No one said that, no.

Q.   And no one from GRF or the IRS told you that if Mr. Goldstein failed to pay more than the amount he agreed to, he would be committing a crime; right?

A.   Right.

     MS. REAVES:   May I have a husher just briefly, Your Honor?

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT:  Mr. Whitman, are you on?

MR. WHITMAN:  Yes, Your Honor.

THE COURT:  Mr. Goldstein?

Okay.  Ms. Reaves, go ahead.

MS. REAVES:  Thank you, Your Honor.

I think I'm almost done, but there is something I need to discuss with Mr. Kravis.  I'm wondering if we could take a brief break, and then I can be efficient and pass the witness on?

THE COURT:  Any objection, Mr. Whitman?

MR. WHITMAN:  No objection.

THE COURT:  Okay.  We will give the jury their morning break.  Thank you.

(Whereupon, discussion ended.)

THE COURT:  Members of the jury, I think this is a good time for your morning break.

At this time, please rise for the jury.

(Whereupon, the jury exited the courtroom at 11:25 a.m.)

THE COURT:  Please be seated, everyone.  I'm going to invite the witness to step down for just a moment.  Take your break.

(Whereupon, the witness exited the witness stand and the courtroom at 11:26 a.m.)

THE COURT:  Ms. Reaves, about how long do you want for the break?

MS. REAVES:  Five or ten minutes is fine.

THE COURT:  Five minutes?

MS. REAVES:  Five or ten.

THE COURT:  Five or ten minutes.  We'll take ten, but let's all be back.

When we come back, about how long do you think you are going to need?

MS. REAVES:  I think three or five minutes.

THE COURT:  Then we will do redirect from the government.

MR. WHITMAN:  It will be very brief.

THE COURT:  Then I will then excuse the witness and do the instruction when she's out of the courtroom.

Let's step down for ten minutes.

DEPUTY CLERK:  All rise.  This Honorable Court stands in recess for ten minutes.  Thank you.

(Whereupon, the recess was taken from 11:26 until 11:35 a.m.)

DEPUTY CLERK:  All rise.  This Honorable Court now resumes in session.

THE COURT:  Please be seated, everyone.

Are we ready to have Ms. Bart returned to us?

MR. WHITMAN:  She's coming in right now.

THE COURT:  You may just retake your seat in the

witness box and make yourself comfortable.

Are we ready to have the jury?

**MR. WHITMAN:**  Yes, Your Honor.

**MR. KRAVIS:**  Yes, Your Honor.

**THE COURT:**  Okay.  Please rise for the jury.

(Whereupon, the jury entered the courtroom at 11:37 a.m.)

**THE COURT:**  Please be seated.

Ms. Reaves?

**MS. REAVES:**  Thank you, Your Honor.

**BY MS. REAVES:**

Q.   All right.  Ms. Bart, just a few more minutes.

So I want to talk again about the text messages that you sent to some friends in the day and then in the months after you resigned from the firm.  Okay?

A.   Sure.

Q.   Now, you've described those messages as venting or being a tad dramatic; right?

A.   Yes.

Q.   And you were talking to friends in an informal message; right?

A.   Correct.

Q.   You never thought that these were going to be used in a court proceeding; right?

A.   Correct.

Q.   If you had known that your precise words were going to be

used in a court proceeding, would you have used different words to describe how you were feeling?

**A.**    Yes.

**Q.**    And it's been a little over five years since you've had time to reflect on all this; right?

**A.**    Yes.

**Q.**    And looking back, it's been reasonable to be anxious about this criminal investigation popping up at your workplace; right?

**A.**    Yes.

**Q.**    And that is true whether or not Mr. Goldstein did anything wrong; right?

**A.**    Yes.

**Q.**    And at the time, when you hadn't told Mr. Goldstein that you were already unhappy at the job, it was reasonable for Mr. Goldstein to want you to stay?

**A.**    Yes.

**Q.**    And it was reasonable to offer you a bonus to stay because you were doing hard work for the firm?

**A.**    Yes.

**Q.**    Now, in the moment, again, I think it was reasonable and you felt uncomfortable; right?

**A.**    Yes.

**Q.**    But, I guess, sitting here today, do you regret that the text messages have given this misimpression about what Mr.

Goldstein intended or was thinking at that time?

MR. WHITMAN: Objection.

THE COURT: Let's come to the headsets, counsel.

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT: Mr. Whitman, can you here hear the Court?

MR. WHITMAN: Yes, Your Honor.

THE COURT: Ms. Reaves?

MS. REAVES: Yes.

THE COURT: Mr. Goldstein?

Thumbs up.

Go ahead, Mr. Whitman.

MR. WHITMAN: We have not identified what the supposed misimpression has been left. I would also add -- so it's vague. It's calling for speculation.

And if we are going to talk about a text message, I would at least like the witness to know, hey, we are talking about what you said, X, Y, Z as opposed to generally suggesting that her text messages sent contemporaneously are either false or she's walked them back.

I just would like a little more clarity on which text messages we are talking about.

THE COURT: So speculation, clarity about the text message is what the Court is hearing.

Ms. Reaves?

**MS. REAVES:** Sure. I'm happy to clarify the text messages. I was trying not to pull up the documents again and again, but I could reference the specific ones where she is speculating about what Mr. Goldstein is thinking in reference to this investigation.

**THE COURT:** All right. Well, let's try that. Mr. Whitman, you can come back if you still have concerns.

**MR. WHITMAN:** Thank you.

**THE COURT:** Thank you.

(Whereupon, discussion concluded.)

**BY MS. REAVES:**

**Q.** Just to be clear, the text messages I'm talking about are the ones where you, in an informal conversation with your friends, are speculating about Mr. Goldstein's intents connected to the IRS investigation.

Do you remember those?

**A.** Yes.

**Q.** So the text message where you said that he's trying to throw off the IRS.

Do you remember that?

**A.** Yes.

**Q.** Or the text message that says that the tax stuff is really getting to him; right?

**A.** Yes.

**Q.** Now, looking back, having had time to reflect, do you

regret that those text messages give the impression that Mr. Goldstein was doing something nefarious when you were speculating about what he was thinking?

**A.**    Yes.   I wish I had just said how I was feeling about it instead of -- yeah -- speculating on what he was thinking.

**MS. REAVES:**  Thank you, Your Honor.  No further questions.

**THE COURT:**  Thank you very much, Ms. Reaves.  Mr. Whitman, any redirect?

**MR. WHITMAN:**  Thank you, Your Honor.

REDIRECT EXAMINATION

**BY MR. WHITMAN:**

**Q.**    Good morning again, Ms. Bart.

**A.**    Good morning.

**Q.**    You were asked questions about whether you told Mr. Goldstein prior to the other partners at Goldstein & Russell that you were going to resign.

Do you remember those questions?

**A.**    Yes.

**Q.**    Why didn't you tell Mr. Goldstein before the other partners?

**A.**    I wanted to make sure that everyone knew of my decision at the same time, and I felt that they were all my bosses and deserved to know at the same time.  I think I was trying to avoid a situation where Tom and I would have to talk about it

just one on one.

**Q.**    Why?

**A.**    I don't know if I'm allowed to say the reasons why without...

          **MS. REAVES:**  Objection, Your Honor.

          **THE COURT:**  Let's come to the headsets.

     (Whereupon, a discussion was held outside the presence of the jury.)

          **THE COURT:**  Mr. Whitman, do we have you?

          **MR. WHITMAN:**  Yes, Your Honor.

          **THE COURT:**  Ms. Reaves?  Mr. Goldstein?

          **MS. REAVES:**  Yes.

          **THE COURT:**  I'm not sure where we are going, so let's hear the objection and then maybe I can figure out what's going on.

     Ms. Reaves?

          **MS. REAVES:**  Yes, Your Honor.  I think the witness knows the government seems to be eliciting information about a whole bunch of things that the Court has excluded both on constitutional grounds and, again, because it's unfair prejudice and substantially it has no probative value.

     Part of the reason that Ms. Bart was uncomfortable with her job was because she received some information about -- received phone calls and e-mails from Ms. Adamova about Mr. Goldstein's personal life and relationships, and we have

not gotten into any of that.

I don't know why -- the reason why she did not want to talk to Mr. Goldstein in particular is relevant. I don't know if the government has some other proffer for what they think that she is going to say.

THE COURT: All right. Mr. Whitman, where are we going?

MR. WHITMAN: I was just asking why she didn't tell Mr. Goldstein before the other partners. This was literally a subject of the cross-examination 15 minutes ago, so we should be able to ask why not. I didn't know that this was going to elicit testimony, potentially, the other women, but --

THE COURT: She seems to be indicating she doesn't think she can answer the question, so...

MR. WHITMAN: Right. Because we have been --

THE COURT: I'm not really sure -- is that what the response is going to be?

MR. WHITMAN: I actually don't know, Your Honor. This first came up on cross. I do know that the witness left Goldstein & Russell in large part because of things that she knew about Mr. Goldstein. I was not trying to elicit that. We were very careful, which is why I think the witness is saying she's hesitant.

But I think, having opened the door to this and talked about whether she told Mr. Goldstein first or whether she told

the other partners, the government should be allowed to ask the question and get the answer.

**THE COURT:**  Ms. Reaves?

**MS. REAVES:**  Your Honor, the government knows this is going to elicit an extremely prejudicial answer that has no bearing on the tax issues that are relating to the case.  The bell can not be unrung if she starts disclosing information about Mr. Goldstein's personal life or even how she felt about it in a vague way.

I don't see how asking questions about the timeline of when she resigned requires the government to ask this as a follow-up question.

**THE COURT:**  All right.  Well, I have no idea what she is going to say, but the witness is indicating she doesn't feel she is able to talk about it, so I'm going to take the defense at their word that it has something to do with the woman.

So in that, I'm not going to allow the question.

Objection sustained.

**MS. REAVES:**  Thank you, Your Honor.

**MR. WHITMAN:**  Thank you, Your Honor.

(Whereupon, discussion concluded.)

**BY MR. WHITMAN:**

Q.  Do you recall when I was asking you questions, we asked you about a series of text messages from Mr. Goldstein mentioning the individual name Mike McGuinness?

A.    Yes.

Q.    Do you recall that those text messages -- and if helpful, they are at tabs 3 through 4 of your binder -- were prior to the IRS criminal investigation and the agents coming to the office; right?

A.    Yes, I believe so.

Q.    And then, just now, on cross, you were shown additional documents, text messages from Mr. Goldstein, in which he is declaring that the payments to Michael McGuinness should be classified as a personal distribution.

Do you recall that?

A.    Yes.

Q.    When, in relation to the IRS criminal investigation agents visiting the office, was the subsequent message where Mr. Goldstein calls the payment to Mike McGuinness a personal distribution?

A.    After.

Q.    You were asked a number of questions about Mr. Goldstein's intent in making you offers of Bitcoin and other things.

Do you recall that?

A.    Yes.

Q.    You cannot get into Mr. Goldstein's head; right?

A.    Right.

Q.    You can't today and you couldn't back then; is that fair?

A.    Yes.

Q.   At the time, you thought one of the reasons for him offering you these things of value, including Bitcoin, was so that you would be less likely to talk to or --

MS. REAVES:  Objection.

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT:  All right.  Mr. Whitman.

MR. WHITMAN:  I'm here, Your Honor.

THE COURT:  We have you.

MR. WHITMAN:  Yes.

THE COURT:  All right.  Ms. Reaves?

MS. REAVES:  Yes, Your Honor.

THE COURT:  Mr. Goldstein?

All right.  Go ahead, Ms. Reaves.

MS. REAVES:  Your Honor, I'm objecting because the government is just reading grand jury transcript to the point where the government is trying to get an answer that Ms. Bart said no to twice.  Multiple times she has said -- she's provided an answer to her reasons for why she thought Mr. Goldstein was providing Bitcoin, or her impression of it.

I don't understand -- I don't think the government -- it's appropriate for the government to read in any prior testimony when she's already answered the question.  It's not an open-ended question, and it's unfairly prejudicial, and it's leading.

**THE COURT:** So it sounds like the objection is to the form of the question, and also that it's been previously asked and answered?

**MS. REAVES:** Yes. I'm sorry. It's leading and asked and answered. And I just want to make sure the Court is aware of the point is that the government now has asked her multiple times to try to get into Mr. Goldstein's head. She declined to provide a reason why she thought Mr. Goldstein was doing this. The government just asked her, you don't actually know what he was thinking. And now they're trying to lead her into providing answer about what he was thinking.

So it's -- it is leading. It is asked and answer, but it is also unfairly prejudicial because it contradicts testimony she's already provided.

**THE COURT:** All right. Mr. Whitman?

**MR. WHITMAN:** Your Honor, it's true the defense could see me reading from a grand jury transcript, but that doesn't make the question improper. I am asking her the same question as she was asked in grand jury, but I do think that's proper.

Also, if I were not to lead in this situation, and if I were to just ask open-ended questions, then we would run into the same situation we did just a second ago where Ms. Bart doesn't know whether she's able to talk about other reasons that Mr. Goldstein might have offered her Bitcoin.

**THE COURT:** All right. So your expectation, we're

not getting into the women; correct?

MR. WHITMAN:  We're not getting into the women. That's part of the reason.

THE COURT:  Tell me the question again.

MR. WHITMAN:  At the time you thought that one of the reasons for him -- being Tom Goldstein -- offering you these things of value, including Bitcoin, was so that you would be less likely to talk to or cooperate with the IRS investigation; is that right?

THE COURT:  All right.

MR. WHITMAN:  And the answer --

THE COURT:  Okay.  I'm going to allow the question. If I want to redirect -- recross, I'll let you do that, Ms. Reaves.

MS. REAVES:  Thank you, Your Honor.

THE COURT:  All right.

(Whereupon, discussion concluded.)

BY MR. WHITMAN:

Q.   Back in October of -- sorry.  I'll start it again.

At the time, in end of 2020 or beginning of 2021, you thought that one of the reasons that Mr. Goldstein was offering you these things of value, including Bitcoin, was so that you would be less likely to talk to or cooperate with the IRS investigation; is that right?

A.   Yes.  That crossed my mind.

Q.   You were asked a number of questions about the law schools that other firm managers went to.  Do you recall that?

A.   Yes.

Q.   Did you end up going to law school?

A.   No.

Q.   What's your position today?

A.   I am the director of operations at Gupta Wessler.

Q.   What's that?

A.   The firm.  It's an appellate plaintiff-side firm.

Q.   And do you have people reporting to you in your job?

A.   Yes.

Q.   Are you very important to the law firm?

A.   Yes.

Q.   Are you proud of what you were able to overcome to get to the place you are today?

A.   Yes.

        MR. WHITMAN:  Nothing further.

        THE COURT:  Thank you very much.  Have all questions been asked of the witness?

        MS. REAVES:  Just briefly --

        THE COURT:  Okay.

                    RECROSS-EXAMINATION

BY MS. REAVES:

Q.   To be clear, I think everyone knows that these text messages from way back in 2020, 2021 are important; right?

Your feelings about Mr. Goldstein's intent were complete speculation; right?

**A.** Yes.

**Q.** Okay. And no one has ever suggested that the work that you do now is not important or good work; right?

**A.** Right.

    **MS. REAVES:** Okay. Thank you, Ms. Bart.

    **THE COURT:** Thank you very much, Ms. Reaves.

I believe all questions have been asked of the witness.

Ms. Bart, I want to thank you for your time and testimony. You may step down at this time and be excused.

Have a good day.

    (Witness excused.)

    - - -

    **THE COURT:** And members of the jury, the Court has an instruction for you related to Ms. Bart's testimony. I'm going to read that instruction to you at this time, so I'd ask you to give me your close attention.

It reads as follows:

You have heard evidence about Mr. Goldstein offering items of value to Ms. Bart in October 2020 through January 2021, as well as evidence about the timing of her departure from the law firm.

Mr. Goldstein is not charged with any crime in connection with the offers he made to Ms. Bart during that time period or

her departure from the firm.  The offers are not an affirmative act of evasion alleged to support Count One of the indictment, as to tax evasion charge for 2016.  Therefore, even if you find that the offers were made, that is not sufficient to prove an affirmative act of evasion as required by Count Number One. This evidence may be considered by you only to the extent that it bears upon whether Mr. Goldstein willfully violated the tax laws as alleged in Counts One through Thirteen of the indictment.  And those charges involve tax evasion, filing false tax returns and willful failure to pay.

You may not consider testimony on this topic as any kind of reflection on Mr. Goldstein's character.

Thank you very much for your attention.

Counsel, can we come to the headsets for just a moment?

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:**  Mr. Beaty?

**MR. BEATY:**  About 60 minutes.

**THE COURT:**  Okay.  So we're a little before noon.  Do you want to get our next witness started or --

**MR. BEATY:**  Entirely defer to you, Your Honor.

**THE COURT:**  Okay.  You need an hour --

**MR. BEATY:**  I'd rather just do it straight through.

**THE COURT:**  Okay.

**MR. BEATY:**  So I guess I'd rather send them on their

break, if I had to --

THE COURT:  I'm leaning break if you need an hour. Mr. Kravis?

MR. KRAVIS:  No objection.

THE COURT:  All right.  Why don't we break for lunch at this time.  When we come back, who is our next witness, Mr. Beaty?

MR. BEATY:  The next will be Roman Hernandez, and then we have one more witness after that, Ms. Gou.  Both are from out of town, so we really do need to make sure that we're sticking to reasonable lengths of cross-examination.

THE COURT:  All right.  All right.

MR. BEATY:  We want to get them both on their way.

THE COURT:  Well, we'll have Hernandez when we come back from lunch.  Thank you.

MR. BEATY:  Thank you, Your Honor.

(Whereupon, discussion concluded.)

THE COURT:  Members of the jury, given the hour, I'm going to suggest you take your lunch break at this time.  And we will ask you to be back with us in one hour.

Please rise for the jury.

(Whereupon, the jury exited the courtroom at 11:55 a.m.)

THE COURT:  Please be seated.

And, Counsel, is there anything else that we need to discuss before we break for lunch?

**MR. BEATY:**  Nothing from the United States, Your Honor.

**MR. KRAVIS:**  Not from the defense.  Thank you, Your Honor.

**THE COURT:**  All right.  Then I'll see you at one o'clock.  Enjoy your lunch.

(Whereupon, a lunch recess was taken from 11:56 until 1:05 p.m.)

**DEPUTY CLERK:**  All rise.  This Honorable Court now resumes in session.

**THE COURT:**  Please be seated, everyone.

I believe we were up to our next witness, Mr. Beaty, for the government; is that correct?

**MR. BEATY:**  Yes, Your Honor.  Two housekeeping matters.

One, I'm going to pass up the exhibits for the witness.

Two, I'm happy to report that the government and Mr. Goldstein have entered into two additional stipulations.  I think Mr. Kravis wants to be heard on that, so I'm not asking that they be read at this moment.  But if I could hand them up that way Your Honor could look them over and maybe we can talk about them on our next break.

**THE COURT:**  All right.

**MR. BEATY:**  And I believe Mr. Adenrele had a --

**THE COURT:**  So I see two stipulations and then I

have -- or is this a stipulation as well, this chart?

MR. BEATY:  No.  The chart is -- those are the documents, Your Honor, so you have two -- there are just two copies.  One was for Mr. Cook and one is for you.

THE COURT:  Okay.  It's the same document.

MR. BEATY:  Yes.

THE COURT:  All right.  Thank you.  That's what was confusing me.  Okay.

MR. ADENRELE:  And, Your Honor, one other housekeeping matter.  On the first day of trial, we moved in a number of exhibits which had amounted to 11 certifications with them.  My intent was to move in the full list.  I believe I may have omitted four of those exhibits.  I'd like to move those in.  I have spoken to Mr. Kravis about this.  I believe he said after lunch we'd be in a position to do that, mut I'd like to do those now.  If not, at some point today.

THE COURT:  You'd like to move them into -- to be admitted?

MR. ADENRELE:  Correct.

THE COURT:  Are they over the opposition of the defense or do they concur?

MR. KRAVIS:  No objection.

THE COURT:  All right.  So let's just go ahead and do that and take care of it.

MR. ADENRELE:  Fantastic.  At this point, the

government would like to move in Exhibits 36, 362, 652 and 694.

**MR. KRAVIS:**  No objection.

**THE COURT:**  All right.  The exhibits are admitted.

**MR. ADENRELE:**  Thank you, Your Honor.

**THE COURT:**  All right.  Anything else?

**MR. BEATY:**  Ready to go.

**THE COURT:**  All right.  Let's have the jury and then you can call your next witness.

Please rise for the jury.

(Whereupon, the jury examined the courtroom at 1:09 p.m.)

**THE COURT:**  Please be seated.

Members of the jury, welcome back from your lunch break.

Mr. Beaty, is the government prepared to call its next witness?

**MR. BEATY:**  It is, Your Honor.  The United States calls Roman Hernandez.

**THE COURT:**  Very good.

Good afternoon, Mr. Hernandez.  If you want to come all the way towards me, and then you will go to your left over to the witness box.  Please remain standing once you're there. All the way over.  And please remain standing.  The courtroom deputy will swear you in.

- - -

ROMAN HERNANDEZ, after having been duly sworn, was examined and testified as follows:

                              - - -

**DEPUTY CLERK:**  Thank you.  You may be seated.  Please adjust the microphone.  Scoot all the way up.  State and spell your first and last name for the record, please.

**THE WITNESS:**  Roman Hernandez, R-o-m-a-n, H-e-r-n-a-n-d-e-z.

**DEPUTY CLERK:**  Thank you.

**THE WITNESS:**  You're welcome.

                         DIRECT EXAMINATION

**BY MR. BEATY:**

**Q.**    Good afternoon, Mr. Hernandez.

**A.**    Good afternoon.

**Q.**    Tell the jury, where do you work?

**A.**    I work for the Internal Revenue Service, also known as the IRS, in Austin, Texas.

**Q.**    And tell the jury just a little bit what are some of the positions that you have held at the IRS over the years.

**A.**    I started with the IRS in 2001 as a contact representative.  And they're some of the people, if you ever tried calling the IRS, we answer the phones part time.  We also make corrections to accounts, answered letters the IRS received.  Did that for three years.

   After that, I switched over to auditing returns. Form 1040, which is a return for individuals.

   After that, I went to a place called The Taxpayer Advocate

Service, which is a separate part of the IRS.  It helps people out there who are in financial hardship situations.

And then I started this job in 2011.

Q.   And what's your current title?

A.   My job title is court witness coordinator.

Q.   What does a court witness coordinator do?

A.   There is no coordination of witnesses.  I am the witness. When I'm in the office, I prepare records to be -- IRS records to be used as exhibits at trial.  And when I appear at trial, I represent the commissioner of IRS in his role as custodian of records.

Q.   What role, if any, did you have in the investigation of this case?

A.   None.

Q.   How many times did you speak to Mr. Goldstein?

A.   None that I know of.

Q.   How many interviews with witnesses did you attend in this investigation?

A.   None.

Q.   How many audits did you perform of Mr. Goldstein's tax returns?

A.   None.

Q.   Okay.  If you didn't do any of those things, what are you here to talk about?

A.   The records.  I'm a records custodian.  So that's where my

testimony concentrates on.

Q.    Let's talk just a little bit about how the IRS maintains records.  Where does the IRS maintain records and what format?

A.    There are a couple formats.  If you file a paper return, then we're going to have a paper record.  Also, when we process that return, the return, whether it's paper or electronic, it's processed electronically.  So there is an electronic record on our master file.  It's the main database for tax information.

So as far as paper records, we keep them on site for about a year.  And then they're stored -- they go onto be stored at the Federal Records Centers for about another six years.

Q.    How are you able to authenticate IRS records in your role?

A.    Well, I'm familiar with records in my time with the IRS, so I know what they look like, and I know how to retrieve them.

Q.    Are you familiar with a term called a DLN, a document locater number?

A.    I am, yes.

Q.    What is that?

A.    A document locater number, it's basically a tracking number for a record.  So if you look at a paper or electronic return, you are going to see a document locater number on the upper right-hand side of the page, and it's a unique number assigned to that record.

Q.    Are you familiar with federal tax returns and forms, generally?

**A.**    I am, yes.

**Q.**    Remind the jury, what is a Form 1040?

**A.**    A Form 1040 is an income tax return for individuals.

**Q.**    And who must file a IRS Form 1040 each year?

**A.**    People who have income above a certain threshold are required to file.

**Q.**    And when must taxpayers file that Form 1040 each year?

**A.**    It's generally due on April 15 of the following year.  So this is 2026, so the 2025 return is going to be due -- I haven't checked the due date, but it's normally going to be April 15 of this year.

**Q.**    The specific day depends on whether it falls on a weekend or if there's a holiday or other exception?

**A.**    Correct.

**Q.**    What is an IRS Form 1120?

**A.**    Form 1120 is an income tax return for a corporation.

**Q.**    And, again, so who must file Forms 1120?

**A.**    The corporation or one of their officers.

**Q.**    What is an IRS Form 1120-S, as in Sierra?

**A.**    An 1120-S is also a corporate return, but it's a corporate return for an S corporation.

**Q.**    So just to be clear, what's the difference between a Form 1120 and a Form 1120-S?

**A.**    The main difference is an 1120-S, the income flows through to the shareholders, to the owners of the corporation, so you

are not going to be taxed on that return.  If there is income from the corporation, you get taxed on your Form 1040.

Q.    Have you heard the term S election?

A.    Yes.

Q.    What is an S election?

A.    It's the election to be designated as an S corporation.

Q.    And have you reviewed and verified certain records that the IRS has maintained in relation to Mr. Goldstein and his law firm in this case?

A.    I have, yes.

Q.    Let's talk a little bit more about corporate tax returns, the IRS Form 1120-S.  And I'm going to show a form just for reference point.  So let's just start here.

This is the Goldstein & Russell 2016 corporate tax return?

A.    Yes, it is.

Q.    When did Mr. Goldstein's law firm make its S election?

A.    Prior to this return date file.  Oh, I'm sorry.  There it is.  November 1 of 1999.

Q.    And that happens to be the same date of incorporation?

A.    I'm not sure about that.

Q.    If you look at Box E.

A.    Oh, yes, it is.

Q.    Perfect.  So let's look, then, at the first section.

Tell the jury what kind of information is reported on lines 1 through 6, generally.

**A.** Lines 1 through 6 are used to report income for the corporation.

**Q.** That would include gross receipts, gross profit, and total income?

**A.** Correct.

**MR. BEATY:** And for the benefit of the record, Your Honor, this is Exhibit Number 64.

**THE COURT:** Thank you.

**BY MR. BEATY:**

**Q.** So we have talked about income. Let's also look at deductions.

If we look further down on Goldstein & Russell 2016 corporate tax return, please tell the jury what kinds of information is reported in lines 7 through 21.

**A.** Those lines, 7 through 21, are used to deduct expenses.

**Q.** And does that include salary and wages?

**A.** Right. Salaries, wages, rents, compensation of officers.

**Q.** We see a note on line 19 where it says "other deductions."

What does that parenthetical mean?

**A.** That you should attach a statement to this return to explain or to list the deductions included on line 19.

**Q.** So, if you have other deductions, you attach a statement that lists those out?

**A.** Yes.

**Q.** So let's look at the other deductions schedule. This is

page 7 of Government's Exhibit 64.

And so we've split the screen, with page 1 of Government's Exhibit 64 on top and page 22 on the bottom.

Tell the jury what we're looking at here.

**A.** We're looking at an itemization of the expenses being deducted on line 19.

**Q.** And what do we see in the highlighted section on the bottom?

**A.** On the bottom, it's legal and professional fees in the amount of $4,164,955.

**Q.** So that's among the deductions that is being taken on Mr. Goldstein's law firm on this return?

**A.** It is, yes.

**Q.** Finally, if we look at the bottom of page 1 of Goldstein & Russell's 2016 tax return, what are we looking at at the bottom half of the screen?

**A.** The bottom half is a signature area for the return.

**Q.** Is every IRS form filed with the IRS signed with the penalties of perjury?

**A.** Yes, they are.

**Q.** Who signs the 1120 under -- the 1120-S under the penalties of perjury?

**A.** In this case, it's the president.

**Q.** And what does the president of Goldstein & Russell, of this firm, attesting to under the penalties of perjury?

**A.**    Well, the statements read, "Under penalties of perjury, I declare that I have examined this return, including the accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete."

**Q.**    So let's go back to ordinary business income, back to page 1 --

**THE COURT:**  Pardon me, Counsel.  We need to take a break for just a moment.  Court reporter needs to deal with a technical issue.

(Whereupon, a recess was taken from 1:20 until 1:23 p.m.)

**BY MR. BEATY:**

**Q.**    Okay.  So we're turning back to the jurat section of the -- which is on page 1 of Government's Exhibit 64.  Again, looking at the bottom of Goldstein & Russell's 2016 tax return, looking at the bottom half of the screen, are all IRS Forms 1120s filed under the penalties of perjury?

**A.**    Yes, they are.

**Q.**    And what was the president attesting to about this return being true, correct and complete?

**A.**    I'm not sure I heard that question.  I'm sorry.

**Q.**    Sure.  What was the president of Goldstein & Russell attesting to under penalties of jury?

**A.**    That the return is true, correct and complete.

**Q.**    Okay.  So now let's go back to line 21 on page 1 of Government's Exhibit 64, which line is the law firm's ordinary

business income reported on?

**A.**    That is reported on line 21.

**Q.**    This is ultimately the annual profits of the company?

**A.**    Yes.

**Q.**    And for a corporation that makes an S election, who pays the taxes on the company's profits?

**A.**    That would be the shareholders of the -- the recipient's of the K-1 statements.

**Q.**    And you've mentioned K-1.  How do annual profits of the company flow to the individual owners?

**A.**    There is an attachment to this return called a K-1.  It's similar to like a W-2 statement, and the individuals that receive the K-1 would include that with their 1040.

**Q.**    And so if you look at pages 23 and 26 of Government's Exhibit 64, what are we looking at?

**A.**    We're looking at K-1s for Thomas Goldstein and Amy Howe.

**Q.**    Those were the two shareholders of the law firm in 2016?

**A.**    Correct.

**Q.**    And in what proportions do they own Goldstein & Russell at that -- in that year?

**A.**    For Mr. Goldstein, it was 97.29 percent and for Ms. Howe, it was 2.71 percent.

**Q.**    Okay.  Now, do you know anything about whether those numbers are actually correct?

**A.**    I do not.

Q.   That, what you're reporting, is what's on the return?

A.   Yes.

Q.   Okay.  Now, if we add up those two numbers from the Forms K-1 for Mr. Goldstein and Ms. Howe, how much do we get?

A.   You get $1,569,974.

Q.   If we add up the two numbers from the Forms K-1 for Mr. Goldstein and Ms. Howe, how does that correspond to the ordinary business income amount reported on line 21?

A.   It matches the line 21 figure.

Q.   So our little math demonstration.  Tell us about how the income from the business flows to the owners of the business?

A.   Well, the income from the business gets reported separately by shareholder on the K-1, and that K-1 income gets reported on their 1040.

Q.   Turning back to page 1 of Government's Exhibit 64, is it a fair summary to say that the total income of the business minus deductions equals the business income that ultimately flows to the owners?

A.   That is correct.

Q.   And because this is just straightforward math, what happens to business income if we increase total deductions by 500,000?

A.   If you increase deductions by 500,000, you reduce the business income by $500,000.

Q.   And if we decrease business income by 500,000, how does

that decrease the income reported on the owner's individual tax returns?

**A.**    It works the same way.  It's a dollar-for-dollar change in the income.

**Q.**    Now, in conjunction with this case, did you identify additional IRS Forms 1120s filed on behalf of Goldstein & Russell?

**A.**    I did, yes.

**Q.**    I show you page 2 of Government's Exhibit 50.  Please tell the jury what we're looking at.

**A.**    We're looking at a summary of Forms 1120s covering years 2016 through 2019.

**Q.**    And just for the benefit of the record, Goldstein & Russell's corporate tax returns for tax years 2016 through 2019 are Government Exhibits 64, 65, 66 and 67.  What role did you have in certifying that Exhibits 64 through 67 were copies of the individual tax returns filed with the IRS on behalf of Mr. Goldstein's firm for tax years 2016 to 2019?

**A.**    I verified that they were the returns that were filed with the IRS.

**Q.**    And then what role did you have in verifying that the information on page 2 of Government's Exhibit 50 is true and correct?

**A.**    I compared them line by line to the returns that we have on file.

MR. BEATY: Your Honor, at this time, I would move into evidence Government's Exhibits 61 through 69.

THE COURT: So admitted.

MR. KRAVIS: I'm sorry. Can we have the husher, please?

THE COURT: Okay.

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT: Mr. Kravis?

MR. KRAVIS: We don't need the husher.

THE COURT: Are we good? Are we okay, Mr. Kravis?

MR. KRAVIS: Yes, I'm here, Your Honor.

THE COURT: Are you okay? No objection? Okay.

MR. KRAVIS: No. No. No. I'm sorry. I'm sorry. I'm sorry. The Government's Exhibit 61, 62 and 63 are returns for tax years 2013, 2014 and 2015. My understanding was that those returns are not coming into evidence at this time.

I think the government may just be trying to authenticate those records in case they become relevant at some later point depending on some defense argument or something like that.

I don't have any objection to doing it that way, but I want to make sure the record is clear that, at this moment, 61, 62 and 63 are not actually in evidence in the case.

THE COURT: Mr. Beaty, is that the plan?

MR. BEATY: That will work.

**THE COURT:** All right.

**MR. BEATY:** I'll make it clear, Your Honor.

**THE COURT:** Okay. Very good.

**MR. KRAVIS:** Thank you, Your Honor. Thank you.

(Whereupon, discussion concluded.)

**MR. BEATY:** So Your Honor, let me correct myself. At this time the government moves into evidence Government's Exhibits 64 through 69.

**MR. KRAVIS:** No objection.

**THE COURT:** So admitted.

**MR. BEATY:** Thank you, Your Honor.

**BY MR. BEATY:**

**Q.** Let's also look together at Government's Exhibit 48. This is a summary of certain QuickBook entries from Government Exhibit 81, which is the audit trail of Goldstein & Russell's QuickBooks for 2013 through 2020; is that correct?

**A.** That's correct.

**Q.** And fair to say that you did not review thousands of entries in the Goldstein & Russell's QuickBook audit trail?

**A.** No, I did not.

**Q.** Showing you Government's Exhibit 81, this was a 12-page printout from a much larger spreadsheet; is that correct?

**A.** That's correct.

**Q.** And did you have an opportunity to compare Government's Exhibit 81, a printout from QuickBooks, against Government's

Exhibit 48, the summary chart?

**A.**    I did.

**Q.**    And does Government's Exhibit 48 accurately summarize a total of eight transactions from the Goldstein & Russell's QuickBooks audit trail?

**A.**    Yes, it does.

**Q.**    So turning back to Government's Exhibit 48, just to be clear, do you have any independent knowledge about the accuracy of any of these underlying transactions or how they were reported?

**A.**    No, I do not.

**Q.**    Okay.  Let's turn to everybody's favorite tax return, the IRS Form 1040.  And again, we're going to look at Mr. Goldstein's 2016 individual tax return for base of reference.  This is Government's Exhibit 54.

Now, we're still a couple of months away from filing season.  So again, let's just walk through this.  If we look at the income section, tell the jury what kind of information is reported on lines 7 through 22.

**A.**    Well, generally it's used to report income, all types of income.

**Q.**    Wages, interest, S Corporations?

**A.**    Yes.

**Q.**    And then what is reported on line 22?

**A.**    Line 22 is where you report total income on the return.

Q.    Now, is it fair to say that the tax forms themselves have changed over time?

A.    They do, yes.

Q.    And that includes the specific line numbers?

A.    They do now, yes.

Q.    They do -- they have changed?

A.    They have changed since 20 -- yeah -- 2016.  Yes.

Q.    If we jump ahead to pages 42 and 43 of Mr. Goldstein's 2016 tax return, tell the jury what kind of information is reported on a Schedule E, as in echo?

A.    A Schedule E is used to report various things.  It could be rental, rental real estate, income from a partnership or an S Corporation.

Q.    Okay.

A.    Estates and trusts.

Q.    And so let's split the screen with the Forms K-1 from Government's Exhibit 64 on the top and page 43 of Government's Exhibit 54 on the bottom.  What does this comparison show?

A.    The comparison is showing that the K-1s that we looked at on the 1120s are included on this Form 1040 return.

Q.    Again, that's how the money from the corporation flows to the individual return?

A.    Correct.

Q.    So now let's turn back to the first page -- excuse me -- first and second page of Government's Exhibit 54.  Tell the

jury what kinds of information are reported on lines 38 through 56.

**A.**    Lines 38 through 56 are used to report adjusted gross income, taxable income and credits.

**Q.**    Okay.  What's reported on line 40?

**A.**    Line 40 reporting is itemized deductions.

**Q.**    And line 43?

**A.**    Line 43 is the taxable income on the return.

**Q.**    And then if we look a little further down on the second page of Mr. Goldstein's 2016 tax return, tell the jury what kind of information is reported on lines 57 through 74.

**A.**    Fifty-seven through 74, are used to report taxes, other taxes and payments.

**Q.**    What's on line 63?

**A.**    Line 63 reports tax of $1,679,649.

**Q.**    That is the total tax reported on this return?

**A.**    It is, yes.

**Q.**    And then what is reported on line 74?

**A.**    Line 74 reports total payments against tax in the amount of $28,515.

**Q.**    And if we look even farther down on the second page of Mr. Goldstein's 2016 tax return, we get to everybody's favorite section.  If you've already paid the IRS more than you owe in taxes that year, what's reported on line 75?

**A.**    Line 75 is used to report -- at the IRS we call it an

overpayment, but most people know it as a refund.

MR. BEATY:  Your Honor, may I approach?

THE COURT:  Yes.

MR. BEATY:  Thank you.

BY MR. BEATY:

Q.    Now, if a taxpayer has not yet paid all the taxes that they owe in that year, where is that reported on the tax return?

A.    That is reported on line 78, amount you owe.

Q.    And finally, let's look at that jurat, page 4 of Mr. Goldstein's 2016 tax return, what are we looking at at the bottom half of the screen?

A.    The bottom half of the screen is the signature section of the return.

Q.    Is every Form 1040 filed with the IRS signed under the penalties of perjury?

A.    Yes, it is.

Q.    And who signs the return under the penalties of perjury?

A.    The taxpayers and the return preparer.

Q.    What is the taxpayer attesting to under the penalties of perjury?

A.    They're attesting that the information in the return is true, correct and complete.

Q.    And so if a taxpayer uses a return preparer, who is ultimately responsible for making sure the tax return is true

and correct?

**A.**    Ultimately, it's the taxpayer.

**Q.**    Are taxpayers allowed to delegate that responsibility to anyone else?

**A.**    No, they can -- cannot.

**Q.**    Now, in conjunction with this case, did you identify any IRS Forms 1040, any additional IRS Forms 1040 filed on Mr. Goldstein's behalf?

**A.**    I did, yes.

**Q.**    Showing you page 1 of Government's Exhibit 50, again, please just tell the jury what we're looking at?

**A.**    We're looking at a summary of Tom Goldstein's Forms 1040 for tax years 2016 through 2021.

**Q.**    These are just various line items from the returns over the years?

**A.**    Yes.  Yes.

**Q.**    And for the benefit of the record, Mr. Goldstein's individual tax returns for 2016 through 2021 are Government's Exhibits 54 through 61; is that correct?  Excuse me.  Through 60?

**A.**    That's correct.

**Q.**    What role did you have in certifying that Government's Exhibits 54 through 61 were copies of individual tax returns filed with the IRS on Mr. Goldstein's behalf for 2016 through 2021?

**A.**    I verified that they were the returns from IRS records.

**Q.**    And what role did you have in making sure that the line entries here on Government's -- page 1 of Government's Exhibit 50 are true and accurate?

**A.**    I compared each of the entries on the summary chart with the entries on the return.

        **MR. BEATY:**  Again, Your Honor, at this point, I would move into evidence Government's Exhibits 54 through 60.

        **MR. KRAVIS:**  No objection.

        **THE COURT:**  So admitted.

**BY MR. BEATY:**

**Q.**    Let's also look at page 3 of Government's Exhibit 54. What does that term "effective tax rate" mean?

**A.**    Effective tax rate means, ultimately, based on your income, that's the amount of tax that you're paying for that year.

**Q.**    There's graduated levels depending on how much total tax you have?

**A.**    There are, yes.

**Q.**    Is effective tax rate effectively the average of those things together?

**A.**    They are.

**Q.**    And again, if we divide total tax by taxable income, is that how we get an effective tax rate?

**A.**    That's correct.

Q.    What role did you have in checking the math to make sure those effective tax rates for tax years 2016 through 2021 for Mr. Goldstein were true and correct?

A.    I had to break out my calculator and make sure these were right -- right tax rates.

Q.    Okay.  Were they?

A.    They are, yes.

Q.    Okay.  So then turning back to our question of how business income flows to owners tax return.

      Using Mr. Goldstein's 2021 effective tax rate, how much would an additional $500,000 of income have cost him in taxes in that year?

A.    It would have cost an additional $177,950 in taxes.

Q.    Okay.  Let's switch topics just a little bit.

      Must taxpayers report gambling winnings on their tax returns?

A.    Yes.

Q.    What about gambling losses?

A.    Well, they should.  It's to their benefit to claim losses.

Q.    What if a taxpayer's losses are greater than its gains?  What are they supposed to do?

A.    They're only allowed to claim losses up to the amount -- or -- yeah, losses up to the amount of their winnings.

Q.    Okay.  So should they report both?

A.    They should report both, yes.

**Q.** How familiar are you with the rules for who must issue an IRS Form 1099 and when they must issue one?

**A.** I know the general rule for reporting, but the dates, I think, for when have changed recently. So I'm not sure I'm the best person for that question.

**Q.** Who from the IRS would be in the best position to answer that question?

**A.** Probably a revenue agent.

**Q.** Okay. If a taxpayer's employer fails to send them a copy of their W-2, how does that affect the taxpayer's obligation to report the wages that they earned that year?

**A.** They still must report those wages on their return, whether they received a W-2 or not.

**Q.** So then same question for Forms 1099. If a taxpayer earned nonemployment income that would ordinarily be reported on a Form 1099, but they don't get one, how does that affect their obligation to report that income to their -- on their tax return?

**A.** They still have the same obligation to report the income, whether they received a statement or not.

**Q.** Turning together back to page 1 of Government's Exhibit 50, we see that Mr. Goldstein reported gambling winnings in 2016?

**A.** Yes. I see that.

**MR. BEATY:** So let's split the screen with

Government's Exhibit 50 on the left side and Mr. Goldstein's 2016 tax return, Government's Exhibit 54, pages 33 and 34 on the right.

**BY MR. BEATY:**

**Q.** Mr. Goldstein reported having $13.6 million of gambling winnings in 2016 and 10 million of gambling losses?

**A.** That's correct, yes.

**Q.** Actually, 10.9 million?

**A.** Yes.

**Q.** What, if anything, do you know about the accuracy of those numbers?

**A.** All I know is that they were reported on the return. I'm not sure if it's the right number or not.

**Q.** Okay. Splitting the screen between Government's Exhibit 412 on the left and Government's Exhibit 54, page 33 on the right, can we agree that Mr. Goldstein's tax return does not report $49 million of gambling winnings for 2016?

**A.** It does not.

**Q.** Again, do you personally know anything about how the numbers ended up on Mr. Goldstein's tax returns?

**A.** No, I do not.

**Q.** Somebody else can solve that mystery?

**A.** Not me. Yes.

**Q.** Turning back to page 1 of Government's Exhibit 50, how much did Mr. Goldstein report as gambling winnings in tax years

2017, 2018 and 2020?

A.    There were no gambling winnings reported in those years or those returns.

Q.    We talked previously about how the Form 1040 has changed over time?

A.    Yes.

Q.    In 2021, what changes did the IRS make with respect to giving gambling income its own line item?

A.    In 2021, the new schedule was created for returns which was supposed to make things simpler, but it didn't.  So that income is now reported within the Schedule 1.

        MR. BEATY:  Let's just split the screen with Government's Exhibit 50 on the left and on the right, Mr. Goldstein's 2021 tax return, which is Government's Exhibit 60, page 1.

BY MR. BEATY:

Q.    Where on the revised Form 1040 was a tax return -- was a taxpayer expressly required to report gambling income in 2021?

A.    That would be on the Schedule 1, line 8B.

Q.    And how much gambling income did Mr. Goldstein report on line 8B of Schedule 1 for tax year 2021?

A.    There's no gambling income on the schedule.

Q.    Let's also look at page 1 of Government's Exhibit 58.

    Did there come a time when the IRS began to ask taxpayers about virtual currency?

**A.**    Yes, there was.

**Q.**    Okay.  By 2020, were taxpayers required to answer specifically whether they had transactions in virtual currency?

**A.**    They were, yes, in 2020.

**Q.**    Why is the answer to this question material to the IRS' determination of a taxpayer's taxes due and owing?

**A.**    Well, for a couple reasons.  It could be -- depending on what happened with the currency, it could be considered income. It also could be considered an asset if IRS is trying to recover unpaid taxes, get payment for unpaid taxes.

**Q.**    Does the fact that this is a checkbox diminish the importance of a taxpayer truthfully answering this question?

**A.**    No, it does not.

**Q.**    Looking at this tax return, what box did Mr. Goldstein check on this tax return?

**A.**    The box is checked "No."

**Q.**    Splitting the screen between Government's Exhibit 58 and Government's Exhibit 59.  That's 2020 on the top and 2021 on the bottom, page 1 of both.

How did Mr. Goldstein answer the question about virtual currency for tax year 2021?

**A.**    For 2021, the check box is also "No."

**Q.**    Again, sitting here today, do you have any idea whether that statement is true or false?

**A.**    No, I do not.

**MR. BEATY:** Let's split the screen with the top portion of Government's Exhibit 58, page 1, Mr. Goldstein's 2020 tax return on top, and page 1 of Government's Exhibit 434 on the bottom.

**BY MR. BEATY:**

**Q.** If Mr. Goldstein had hundreds of thousands of transactions in Coinbase -- in a Coinbase account in 2020, would that be consistent or inconsistent with his answer regarding virtual currency on his 2020 tax return?

**A.** It would be inconsistent.

**MR. BEATY:** Let's also split the screen between Government's Exhibit 59, 2021 tax return on top, with page 2 of Government's Exhibit 434 on the bottom.

**BY MR. BEATY:**

**Q.** If Mr. Goldstein had almost $1 million of transactions in his Binance account in 2021, would that be consistent or inconsistent with his answer regarding virtual currency on his 2021 tax return?

**A.** It would be inconsistent.

**Q.** Let's turn to our last topic, and let's look together at page 4 of Government's Exhibit 50.

What role did you have in ensuring that all the information on this part of the summary chart was true and accurate?

**A.** I looked at each of the returns for the years on the

summary, 2017, 2019, 2021 and 2020.  I skipped 2020.  All the entries on the summary chart match what were on the return.

MR. BEATY:  Your Honor, at this time, I would move into evidence Government's Exhibit 73 through 78.

MR. KRAVIS:  No objection.

THE COURT:  So admitted.

MR. BEATY:  Thank you, Your Honor.

BY MR. BEATY:

Q.   Mr. Hernandez, what is an estimated tax payment?

A.   It's a payment you make during the year, during the tax year.  There's four -- usually, four times a year when you make those payments towards tax, and it's usually paid by people that are self-employed.

Q.   And how is the amount of the quarterly estimated tax determined?

A.   I'm sorry.  I didn't hear that question fully.

Q.   Sure.

How is the amount of the quarterly estimated tax determined for a taxpayer, if you know?

A.   It's been a while, but there's a form you can use to estimate your amount of payments for the year.

Q.   Okay.  Now, if a taxpayer does not make estimated tax payments with their tax return, or their return shows a balance due, when must a tax payer remit the balance of that tax due and owing?

**A.** It's due on the due date of the return.

**Q.** How does obtaining an extension of filing affect the date of when the payment of outstanding taxes are due?

**A.** It doesn't affect the payment date. It just affects the filing date for the return. So the tax is still due on the same date, the due date of the return.

**Q.** Let's look together at Government's Exhibit 76. This is the transcript of Mr. Goldstein's account for 2019, just for reference.

Just again, tell us what an account transcript is.

**A.** An account transcript, it's basically a history of a filing of a return.

**Q.** And if we turn together at page 2 of Government's Exhibit 76, when did Mr. Goldstein apply for an extension to file his 2019 tax return?

**A.** The date on this -- on the account transcript is July 14 of 2020.

**Q.** And was Mr. Goldstein granted an extension?

**A.** Yes, it was.

**Q.** To when?

**A.** To October 15 of 2020.

**Q.** Notwithstanding his extension, when were Mr. Goldstein's outstanding taxes for 2019 due?

**A.** They were due on the due date of the return.

**Q.** Mr. Goldstein received an extension to file his 2019

return to October 15, 2020.  When did the IRS actually process this return?

A.    The processing date of the return was December 7 of 2020.

Q.    Now, what, if any, estimated payments had Mr. Goldstein made in -- excuse me -- for tax year 2019?

A.    I see three estimated payments.  The first one was -- there were two in March and one in April of 2019.

Q.    Okay.  Fair to say, all of those were made prior to him filing the tax return?

A.    That's correct, yes.

Q.    And if we jump to page 3 of Government's Exhibit 76, when did Mr. Goldstein finally pay off his balance for tax year 2019?

A.    The final payment on the return was -- was April 29 of 2021.

Q.    During the nine months between July 15, 2020, when the return was due, and April 29, 2021, how much had Mr. Goldstein voluntarily paid towards his outstanding taxes for tax year 2019?

A.    Nothing between those dates.

Q.    Let's look back at page 4, Government's Exhibit 50.

If a taxpayer does not make full payments of the balance of their tax due and owing with the tax return, what kind of notice does the IRS generally send?

A.    We call it a balance due notice.  It's basically a bill

saying, You owe this amount of tax.

**Q.** Let's look together at Government's Exhibit 74. This is Mr. Goldstein's account transcript for tax year 2017.

Again, what are we looking at here on the first page?

**A.** We're looking at an account transcript for tax year 2017 for the Form 1040.

**Q.** And if we look at page 2 of Government's Exhibit 74, when did Mr. Goldstein apply for an extension to file his 2017 tax return?

**A.** The application for the extension was received or processed on April 15 of 2018.

**Q.** Was he granted an extension?

**A.** Yes. The extension was granted to October 15 of 2018.

**Q.** Notwithstanding the extension, when were Mr. Goldstein's outstanding taxes for 2017 due?

**A.** They were due April 15 of 2018.

**Q.** That's what that million bucks figure is?

**A.** Yes.

**Q.** Mr. Goldstein received an extension to file his 2017 tax return to October 15, 2018.

When did the IRS process this return?

**A.** The return was processed November 26 of 2018.

**Q.** If you look a little farther down, did the IRS send a balance due notice CP, Charlie Papa, 14 to Mr. Goldstein for tax year 2017?

**A.**    Yes, they did.

**Q.**    Again, just what is that?

**A.**    The CP14 is one of the notices the IRS sends out to let people know that they have unpaid taxes.

**Q.**    If we look down a little farther, what other notices did the IRS send to Mr. Goldstein for his 2017 tax deficiency?

**A.**    They sent out two notices of intent to levy.

**Q.**    Turning to the next page, page 3 of Government's Exhibit 74, when did Mr. Goldstein first make a voluntary payment to the IRS?

**A.**    There is a payment on December 16 of 2019 in the amount of $73,969.

**Q.**    During the 19 months between April 17, 2018 and December 16, 2019, how much had Mr. Goldstein voluntarily paid towards his outstanding taxes for tax year 2017?

**A.**    There are no payments between those time periods.

**Q.**    How long was it between Mr. Goldstein's December 2019 payment and when he finally paid off his balance in April of 2021?

**A.**    It was over a year.  About a year and five months.

**Q.**    Again, let's turn back to Government's Exhibit 50, page 4.
    During the 18 months between May 17, 2021 and December 8, 2022, how much had Mr. Goldstein voluntarily paid towards his outstanding taxes for tax year 2020?

**A.**    There were no payments.

Q.    And during the almost six months between April 18, 2022 and October 16, 2022, how much had Mr. Goldstein voluntarily paid towards his outstanding taxes for tax year 2021?

A.    There were no payments between those dates for tax year 2021.

Q.    Let's look together at our last exhibit, Government's Exhibit 410, four one zero.

What role did you have in comparing the information in this summary chart, Government's Exhibit 410, to the transcripts of Mr. Goldstein's accounts for tax years 2016 through 2021?

A.    I verified that these figures matched the information on the account transcripts.

Q.    And based on your review, is Government's Exhibit 410 true and correct?

A.    It is, yes.

Q.    Essentially, this aggregates the amount due reported on Mr. Goldstein's tax returns each year with the cumulative debits and credits that Mr. Goldstein's account -- to his account after they were filed each year?

A.    It does, yes.

Q.    If we turn to page 4 of Government's Exhibit 410, this is just a line chart of those data points of the cumulative balance with the IRS as they are reflected on the transcripts of his account?

**A.**    That's correct, yes.

**Q.**    Where we see these large bumps up in the amount owed, what are those?

**A.**    Those are the filings of the returns.

**Q.**    So, for example, in the one in the middle, that's the 2019 return filed in 2020?

**A.**    That's correct, yes.

**Q.**    We also see a red arrow here in October of 2020.

What -- how does that or -- how does that arrow correspond to IRS Criminal Investigation's October 14, 2020, interview with Mr. Goldstein?

**A.**    I'm not sure about that.

**Q.**    Okay.  If we drill in, where does that arrow fall?

**A.**    It falls between October 5 of 2020 and October 26 of 2020.

**Q.**    Turning to -- back to the data itself.  Let's look at page 2 of Government's Exhibit -- page 2 of Government's Exhibit 410.

Again, what is the date break between the section with the yellow highlighting and the section without the highlighting?

**A.**    The beginning date is October 5, 2020, and the next date is October 26, 2020.

**Q.**    All the payments after -- all the payments in yellow are after IRS CI's interview on October 14, 2020?

**A.**    That's correct.

**Q.**    Scrolling back to the top of page 1 of Government's

Exhibit 410, what do we see as the cumulative high balance for Mr. Goldstein that he owed to the IRS in calendar year 2017?

A.    That was in November 2017.  It's $1,837,359.24.

Q.    If we look at in all of 2018, what was the cumulative high balance Mr. Goldstein owed to the IRS?

A.    That would have been $2,782,529.93.

Q.    How did Mr. Goldstein's high balance of 1.8 million owed to the IRS compare with his poker wins in 2017?

A.    I would say it's about less -- less than half of what the winnings were -- or no.  Well, they were less, much less than the winnings.

Q.    How did Mr. Goldstein's high balance of $1.8 million owed to the IRS in 2017 compare with his poker losses that year?

A.    The losses were about eight times the amount of tax owed.

Q.    And while Mr. Goldstein had a high balance of $2.7 million owed to the IRS in 2018, how much did he lose to Mr. Safai in poker that year?

A.    The losses that year were $220,000.

Q.    Now, is it correct that Mr. Goldstein has now paid all outstanding balances for tax years 2016, 2017, 2019, 2020, and 2021?

A.    That's correct.

Q.    When viewed with respect to the IRS's criminal investigation interview with Mr. Goldstein in October 14, 2020, when did Mr. Goldstein start making the most progress on paying

back the IRS?

**A.**    Looks like it was in April of 2021.

**Q.**    After the interview with the Internal Revenue Criminal Investigation?

**A.**    After the interview, yes.

**MR. BEATY:**  Your Honor, a moment to confer?

**THE COURT:**  Yes.

**MR. BEATY:**  No further questions, Your Honor.  Pass the witness.  Thank you.

**THE COURT:**  Thank you very much, Mr. Beaty.

Can we come to the headsets for just a moment, please?

I guess counsel could approach very quickly.  Our technology seems to not be working.

- - -

(Discussion off the record.)

- -

**THE COURT:**  Go back on the record.

Members of the jury, I think this is a good time for to you take your afternoon break.  So I'm going to invite to you step down at this time and take your break.

Please rise for the jury.

(Whereupon, the jury exited the courtroom at 2:04 p.m.)

**THE COURT:**  Please be seated, everyone.

Counsel, why don't we take a five-minute break, and then we will have cross.

Before we do that, I'll invite the witness to step down, remind you that you will now be on cross, so please do not communicate with the government while you are taking your break.

(Whereupon, the witness exited the witness stand and the courtroom at 2:05 p.m.)

THE COURT: And why don't we take five minutes.

MR. ADENRELE: Thank you.

(Whereupon, a recess was taken from 2:05 until 2:16 p.m.)

DEPUTY CLERK: All rise. This Honorable Court now resumes in session.

THE COURT: Please be seated, everyone.

Are we ready to have the witness rejoin us?

MR. BEATY: Yes, Your Honor.

THE COURT: Let's do that, and then we will have the jury.

Mr. Hernandez, you can just go ahead and take your seat. I'll remind you, you remain under oath.

DEPUTY CLERK: Please rise for the jury.

(Whereupon, the jury entered the courtroom at 2:18 p.m.)

THE COURT: Please be seated.

Does the defense wish to cross-examine the witness?

MR. KRAVIS: Yes. Thank you, Your Honor.

May I approach?

THE COURT: You may.

**CROSS-EXAMINATION**

**BY MR. KRAVIS:**

**Q.**    Good afternoon, Mr. Hernandez.

**A.**    Good afternoon.

**Q.**    Now, you and I have never spoken before; right?

**A.**    No, I don't think so.

**Q.**    We have never met before?

**A.**    What's your name?  I'm sorry.

**Q.**    Jonathan Kravis.

**A.**    Oh, no.

**Q.**    It's nice to meet you.

**A.**    Nice to meet you.

**Q.**    Thanks.  Since we have never spoken before, I'm just going to ask you questions about some of the charts that you were shown during your direct examination.  Okay?

**A.**    Okay.

**Q.**    I want to start with Government's Exhibit 48.

Now, I think you testified on direct examination that these are some particular transactions that came out of the Goldstein & Russell law firm bank account.

Did I hear that right?

**A.**    I think it was from a QuickBooks statement.

**Q.**    I see.

So you looked at these in the Goldstein & Russell QuickBooks statement?

**A.**   Yes.

**Q.**   Do you know whether there are other payments in the Goldstein & Russell QuickBooks statement to these same parties?

**A.**   I don't.

**Q.**   Do you know how those other payments were characterized in the QuickBooks?

**A.**   I only looked to match these statements or these items with the QuickBooks listing.

**Q.**   And is the reason for that because you were told just to look at some particular transactions?

**A.**   Yes.

**Q.**   And who was it that told you which ones to look at?

**A.**   Mr. Beaty.

**Q.**   So, in other words, the only information -- the only transactions that you are able to testify about are the ones that Mr. Beaty told you to look at?

**A.**   Correct.

**Q.**   Just to state the obvious here, you don't have any information about the communications that Mr. Goldstein or his law firm had with their accountants about these particular transactions.

     Is that fair to say?

**A.**   That's correct.

**Q.**   And you don't have any information about the communications that Mr. Goldstein had with his office managers

about these particular transactions.

Is that fair to say?

**A.**   I do not, no.

**Q.**   And the same would be true with those other transactions with these other parties that Mr. Beaty didn't ask you to look at.  You don't have any information about the communications between Mr. Goldstein's firm and the accountants about those transactions, either; is that fair?

**A.**   I don't have those communications.

**MR. KRAVIS:**  All right.  Let's take a look at Government's Exhibit 54 if we could, please.  And could we look first at page 4 of the exhibit.  Okay.  And if we focus in on the top there.

**BY MR. KRAVIS:**

**Q.**   I think you told me this was -- is this called the jurat. Is that the term you used?

**A.**   I've heard it pronounced jurat or jurat, yes.

**Q.**   This is the thing that a taxpayer signs when they prepare their tax returns; right?

**A.**   It is.

**Q.**   Okay.  I think there might have been a couple of words missing on the direct.  So can we just get the whole thing, get the red all the way over.  I just want to make sure what this says.  Am I reading this right?  "Under penalties of perjury, I declare that I have examined this return and accompanying

schedules and statements and, to the best of my knowledge and belief, they are true, correct and complete."

Did I read that right?

A.    You did.

Q.    In other words, what the taxpayer is signing says that the tax return is accurate "to the best of their knowledge and belief"; right?

A.    Right.

Q.    Now, you were asked some questions about some gambling numbers.  Do you remember that?

A.    I do.

Q.    And we looked at some pretty big numbers.

MR. KRAVIS:  Can we take a look at Government's Exhibit Number 412, please?  And could we go to the next page?  Next page.  Next one.  Next one.

BY MR. KRAVIS:

Q.    I think this is the one you were shown.  Do you remember seeing a slide like this or one like it that's got like $50 million on there.  Do you remember that?

A.    I remember this one.

Q.    Now, again, just to be clear about your knowledge on this, you do not know where these numbers come from.  Is that fair to say?

A.    I don't know.

Q.    And in particular, you do not know whether these numbers,

this 49 million, includes money that was paid to investors of Mr. Goldstein in his poker games; right?

**A.**    I wouldn't know that.

**Q.**    Are you familiar with that concept of people investing in other people to play in high-stakes poker games?

**A.**    I've read about that, yes.

**Q.**    And do you know how those investments are treated for tax purposes?

**A.**    I don't.

**Q.**    Okay.  So you actually don't know the rules about -- the tax rules about how you treat investments in poker activity?

**A.**    I do not.

**Q.**    Tax rules around gambling can be a little complicated sometimes; right?

**A.**    I don't gamble, so...

        **MR. KRAVIS:**  And can we take a look at government's -- go back to Government's Exhibit 54.  Yes.  This is it.  Page 33.

**BY MR. KRAVIS:**

**Q.**    Do you remember being asked about this, about the gambling winnings number on the 2016 tax return?

**A.**    I do, yes.

**Q.**    Just to be clear, you looked at the numbers that actually show up on the 2016 tax return; right?

**A.**    That's correct.

**Q.** You do not have any information about the numbers that Mr. Goldstein gave to his accountant, Mr. Deyhle; is that fair?

**A.** That's correct.

**Q.** You don't know if Mr. Goldstein gave Mr. Deyhle this number or some other number; right?

**A.** I don't know that.

**Q.** That's probably something we'd have to ask Mr. Deyhle about; is that fair?

**A.** Yes.

**Q.** Okay. Now, I think I heard you testify that, in a particular year, someone who gambles is allowed to deduct their gambling losses from their gambling winnings for tax purposes. Did I hear that right?

**A.** That's correct.

**Q.** And I think I also heard you say that, even in a year where a taxpayer's gambling losses are greater than their gambling winnings, your understanding is that they're still supposed to write the winnings and losses on the tax return.

Did I hear that right?

**A.** Yes.

**Q.** But you would agree with me that, in that kind of year, in the year where the gambling losses exceed the gambling winnings, the taxpayer doesn't have any taxable income on the gambling; right?

**A.** Right.

**Q.**    Because the idea is they can deduct the losses from the winnings for purposes of calculating their income; right?

**A.**    Right.  But it's still reportable.

**Q.**    Right.  But the point I'm making is just what they are. If the losses are greater than the winnings, they're not going to owe anything; right?

**A.**    Correct.

**Q.**    So, if a taxpayer, like, doesn't understand the rule and they do not write down the gambling winnings and losses in one of those years, where they lose more than they win, that doesn't actually have any effect on how much taxes they owe; right?

**A.**    In that situation, it wouldn't.

**Q.**    Okay.

        **MR. KRAVIS:**  Let's take a look at Government's Exhibit 50.

**BY MR. KRAVIS:**

**Q.**    Okay.  First of all, did you prepare these charts?

**A.**    No, I did not.

**Q.**    Do you know who did prepare the charts?

**A.**    I don't.

**Q.**    All right.  I want you to -- I just want to ask you some questions about some of the numbers on these charts.  And I want to start by looking at, on the first page, at the tax year 2021.  Do you see that?

**A.**    Yes, I do.

**Q.**    And I think the exhibit citation here is Government's Exhibit 59.  Do you see that?

**A.**    Yes.

**Q.**    Now, that was the initial tax return that Mr. Goldstein filed in 2020 -- for the tax year 2021; right?

**A.**    Yes.

**Q.**    Mr. Goldstein filed an amended tax return in that year; correct?

**A.**    Yes.

**Q.**    And the numbers that you're reporting here are not from the amended return, are they?

**A.**    No, they are not.

**Q.**    Okay.  So just to be clear, the numbers that are on here are not the numbers that are on the actual amended tax return that was eventually filed; right?

**A.**    Right.

**Q.**    I want you to take a look with me now at page 4 of the exhibit, please.  Now, here there is a column.  The second column from the left is labeled "taxable income."
      Do you see that?

**A.**    Yes, I do.

**Q.**    Now, taxable income is different from total income; right?

**A.**    Different from what?  I'm sorry.

**Q.**    From total income?

**A.**    Yes, it is.

**Q.**    And what is the difference between taxable income and total income?

**A.**    Taxable income is it's basically the number that the taxes -- it determines the amount of tax on the return.  Total income is just generally adding up all your income for the year.

**Q.**    All right.  Now, I want you to take a look with me at the 2020 tax year.  Do you see that?

**A.**    Yes.

**Q.**    And do you see that you have the taxable income listed as $2,976,261?  Do you see that?

**A.**    Yes.

**Q.**    All right.  Now, I want you to take a look at the 2020 tax year.  It's Government's Exhibit 58.  On the first page, if you look at the numbers, this is the 2020 tax return; right?

**A.**    Correct.

**Q.**    If you look at the numbers at the bottom, the taxable income is on line 15 of the return; right?

**A.**    Yes.

**Q.**    And the number that's on line 15 of the return is different from the number in your chart; right?

**A.**    Can I see it again, please?

**Q.**    Sure.

         **MR. KRAVIS:**  Can we do this as a split screen?  Yeah.

There we go.

**BY MR. KRAVIS:**

Q.    Take a look at what you have as the taxable income in 2020.  It's going to be on page 4.  No.  No.  No.  Page 4.  And now take a look at what the return has got as taxable income.

A.    Yes, it is different.

Q.    Okay.  You put down the total income by mistake instead of the taxable income; right?

A.    Right.

Q.    Okay.  When it comes to the tax stuff, we all make mistakes; right?

A.    Yes.  I thought I caught that earlier, so I'm surprised to see it there.

Q.    I just want to be clear that I'm not saying this is like earth shattering or anything, but this is $250,000 here; right?

A.    Yes.

Q.    I mean, when you're dealing with tax returns like the ones we are talking about that are reporting millions of dollars, a relatively small simple mistake can have effects on the order of hundreds of thousands of dollars; right?

A.    It could, yes.

        **MR. KRAVIS:**  Let me -- can I have back the full chart, page 4 of Government's Exhibit 50.  Great.

**BY MR. KRAVIS:**

Q.    Now, is there a column on this chart that shows the date

that Mr. Goldstein paid off his taxes?

**A.**    No, there is not.

**Q.**    Is there a column that shows the penalties and interest that Mr. Goldstein paid in all of these tax years?

**A.**    No.

**Q.**    Do you know when Mr. Goldstein paid off his taxes in each of these years?

**A.**    Not without looking at the account records.

**Q.**    Do you know how much money he paid in penalties and interest in each of these years?

**A.**    I do not.

**Q.**    But you would agree Mr. Goldstein paid the penalties and interest for all of these years; right?

**A.**    Yes.

**Q.**    Would a person looking at this chart, just looking at the chart, would that person have any idea that all of these taxes eventually got paid?

**A.**    No.  This doesn't record those payments, no.

**Q.**    Now, you mentioned -- I want to ask you about another column on here.  There is a column towards the right that says "date of next voluntarily payment."  Do you see that?

**A.**    Yes.

**Q.**    And do you see how the government asked you some questions about tax year 2017, the next voluntarily payment is December 16, 2019.  Do you remember that?

**A.**    Yes.

**Q.**    In tax year 2019 the next voluntary payment is April 2021. Do you remember that?

**A.**    Yes.

**Q.**    Now, just to be clear, in that time period, between the -- let's just take 2017.  Between April 17, 2018, the payment due date for tax year 2017, and the date of next voluntary payment, December 16, 2019, it's not your testimony that Mr. Goldstein was making no tax payments at all in that time, is it?

**A.**    Not for the 2017 tax.

**Q.**    Right.  Right.  But I'm asking you now not about a particular tax year.  Just in that time period -- you see where I was going -- the date between April 17, 2018 and December 16, 2019, it's not that Mr. Goldstein was making no payments at all on his taxes; right?

**A.**    Right.

**Q.**    In fact, in that time period, Mr. Goldstein paid like over a million dollars to the IRS; didn't he?

**A.**    I would have to look at the account transcripts.  There was lots of years involved.

**Q.**    The reason it looks like this is because, in that time period between April 17th of 2018 and December 16th of 2019, Mr. Goldstein's tax payments were going to the 2016 tax year; right?

**A.**    I'm not sure without -- sorry.  I don't have the knowledge

without looking at the account transcripts.  But we do -- the IRS does apply payments towards the earliest amount of tax so it might have.

Q.    Sorry.  I didn't mean to cut you off.

A.    Oh, I was just going to say, I'm not sure if that's what you were saying.

Q.    Yeah.  Right.  That is kind of what I was saying.  The way the IRS handles this is, if you owe taxes in multiple years and you just send a check to the IRS, the IRS credits that payment to a particular tax year; right?

A.    Right.

Q.    And as a general matter, I believe, the IRS is going to credit it to the earliest year that you owe taxes; right?

A.    Yes.

Q.    The only point I'm trying to make for right now is that this date of next voluntary payment of December 16, 2019, this does not mean that Mr. Goldstein was paying like $0 to the IRS during this time period; is that fair?

A.    Yes.

Q.    He's paying money to the IRS.  It's just going to a different tax year; right?

A.    Right.

Q.    Okay.  Now, let's take a look at Government's Exhibit 410. This exhibit is titled "Summary of Tom Goldstein's cumulative IRS balance."

Do you see that?

A.    Yes, I do.

Q.    What does that -- excuse me -- what does that title mean? What does "cumulative IRS balance" mean?

A.    It's a rolling -- I'm not sure how to define cumulative. It's rolling total of the amounts owed.

Q.    And I think what you were telling me a moment ago is that the cumulative balance is actually not how the IRS, like, assigns payments for tax purposes; right?

A.    Right.  Can you rephrase that?

Q.    Yes.

A.    Because I do -- I think -- like, going back to your earlier question, you can specify what year you want a certain payment to go to.  I mean, I think you kind of said this, too. If you don't specify, it will just automatically apply it to the earliest year.  But there is a way to specify, I want this money to go here.

Q.    Yes.  You anticipated exactly what I was trying to say.

The way the IRS keeps track of this is what balance a taxpayer owes for each particular tax year; right?

A.    Yes.

Q.    And so, for example, if you owe taxes in 2016 and 2017, the IRS will have like a 2016 balance for you and a 2017 balance for you; right?

A.    That is correct.

Q.    And the point I was making earlier is, if I'm in that situation, if I have a 2016 balance and a 2017 balance, and I just send the IRS a check and I don't say anything more about it, they're going to apply it to the 2016 balance; right?

A.    They would, yes.

Q.    And that is why on the last page we saw those dates of voluntary payments for those other years are so much later, it's because everything up until then that Mr. Goldstein is paying to the IRS is going to 2016; right?

A.    I'm not sure how the payments came in.  That could be one explanation.

Q.    Now, are you familiar with the charges in this case?

A.    No.

Q.    Okay.  So do you know whether Mr. Goldstein is charged with, like, a cumulative IRS balance charge, or whether there are specific charges for each year?

A.    I don't know that.

Q.    Okay.  But you would agree with me that this chart that we're looking at does not break out the tax debts and the tax payments by particular years.  It's just showing a cumulative running balance; right?

A.    What was that question again?  I'm sorry.

Q.    Yeah.

      You would agree with me that the chart that we're looking at here does not break out the debts by particular tax years.

It's just showing a cumulative running balance; right?

A.    No.  From what I understand, how I understand the chart, it is broken up by tax year.

Q.    Sorry.  Let me ask the question a better way.

A.    Okay.

Q.    Do you see the balance column?  It's like the fourth column from the left?

A.    Yes.

Q.    That balance column is a cumulative balance; right?

A.    Right.

Q.    That is not a balance that's showing the balance for the 2016 tax year, the balance for the 2017 tax year, the balance for the 2018 tax year, it's just the total balance; right?

A.    Correct.

Q.    And in the later years, the reason the balance is going up even -- well, actually, let me -- sorry.  Strike that and ask a different question.

Do you see where it says debits and credits, the next column over the left?

A.    Yes.

Q.    And do you see how there are some numbers in parentheses there?

A.    I do, yes.

Q.    Like, for example, 8/17/2018, there's a $50,000 -- the number 50,000 is in parentheses there?

**A.**    Yes.

**Q.**    The numbers in parentheses are payments, levies, credits towards Mr. Goldstein's tax balance; right?

**A.**    That's correct.

**Q.**    In other words, that is money coming in that is reducing the balance; right?

**A.**    Yes.

        **MR. KRAVIS:**  Okay.  If we could zoom back out again, please.

**BY MR. KRAVIS:**

**Q.**    The reason that the --

        **MR. KRAVIS:**  And let's turn, actually, to -- let's turn to page 3.

        Sorry.  Can we go back to page 2.

**BY MR. KRAVIS:**

**Q.**    So we see on this page, if you just look with me at the bottom half of page 2, you can see that even though Mr. Goldstein is making significant tax payments during this time, the balance is still relatively high; right?

**A.**    Right.

**Q.**    Like, for example, on April 27, 2021, the balance is still $1.9 million; right?

        **MR. KRAVIS:**  Sorry.  If we go one up to the previous entry.

**BY MR. KRAVIS:**

Q.   On April 27, 2021, the top entry, the balance is still, like, $1.9 million?

A.   Yes.

Q.   And the reason that's happening on this cumulative balance chart is that even though Mr. Goldstein is making payments to the IRS, he is continuing to accumulate tax debts in future years; right?

A.   Right.

Q.   And as Mr. Goldstein is making payments, the payments are all going to, as you told me, the earliest year that he has the tax debt; right?

A.   Right.

Q.   That is why the cumulative balance is continuing to go up even though Mr. Goldstein is making a bunch of payments; right?

A.   Yes.

Q.   Now, you were asked --

        MR. KRAVIS:  Can we zoom back out, please.

BY MR. KRAVIS:

Q.   You were asked by the government about these payments in yellow.  Do you remember that?

A.   Yes, I remember that.

Q.   And I think what the government was asking about here was that the payments in yellow are the ones that occurred after Mr. Goldstein's initial interview with the IRS investigators; is that what you understood?

**A.**    That's what I understood.

**Q.**    But just to be clear, even prior to those yellow entries, Mr. Goldstein was still making significant payments to the IRS; right?

**A.**    Yes.

**Q.**    Like, if you look at the top of this page, for example, there are payments every month of $20,000; right?

**A.**    Correct.

**Q.**    And if you go to the previous page, and look at the bottom of the previous page, there are more payments there every month of $20,000; right?

**A.**    Yes.

**Q.**    And if you go further up on this page, and look at the payments sort of between 2017 and 2018, there's like over a -- $1.3 million in payments in this time period; right?

**A.**    Yes.

**Q.**    And all of that is happening before Mr. Goldstein was interviewed by the IRS; correct?

**A.**    Correct.

**Q.**    Now, I think I heard you testify that Mr. Goldstein received a balance due notice in some of these years?

**A.**    Yes.

**Q.**    Have you looked at a balance due notice?  Do you know what it says?

**A.**    I don't memorize it, but I've seen those notices several

times.

Q. You've seen them before; right?

A. Yes.

Q. Okay. The balance due notices that Mr. Goldstein received did not say anywhere that he was committing a federal crime, did it?

A. I don't think they say that, no.

Q. Okay. You also testified that Mr. Goldstein received some notices of intent to levy. Do you remember that?

A. Yes.

Q. The notice of intent to levy also does not say that Mr. Goldstein was committing a federal crime; right?

A. I don't think it does, no.

Q. In fact, you were not shown any document on direct examination that tells the taxpayer, if you don't pay all your taxes on April 15, you are committing a federal crime.

You weren't shown any document like that, were you?

A. No, I was not.

Q. And Mr. Goldstein -- you certainly weren't shown any document that Mr. Goldstein saw, were you?

A. No.

Q. Do you have an understanding, when we're talking just about the payment of the taxes, of when it is that Mr. Goldstein's conduct becomes a crime?

A. No, I don't.

Q.   So you, as the IRS official, do not know when Mr. Goldstein's conduct becomes a crime, but Mr. Goldstein is suppose to know?

A.   Well, most people in the IRS don't deal with criminal allegations.  We just do the day-to-day operations.

Q.   That's because most of the IRS work in this area is civil; right?

A.   Right.

        MR. KRAVIS:   Thank you.  I have no further questions.

        THE COURT:   Thank you very much, Mr. Kravis.

    Is there any redirect from the government?

        MR. BEATY:   Yes, Your Honor.

    Sorry, Your Honor.  I'm just waiting for the system to cooperate with me.

                    **REDIRECT EXAMINATION**

**BY MR. BEATY:**

Q.   Mr. Hernandez, you were asked some questions about whether the defendant was advised that failing to pay his taxes year, after year, after year, after year on time was a federal crime.

    Do you remember those questions?

A.   I do, yes.

Q.   Okay.  Where on the tax return does it say it's a federal crime to lie on this tax return?

    Does it say that anywhere?

A.   It does mention that under penalties of perjury what

you're filing with the IRS should be a correct return.

**Q.** But it doesn't use the words "federal crime"?

**A.** No, it does not.

**Q.** So Mr. Goldstein can go free if he lies on a return because it doesn't say the words "federal crime"?

**A.** I don't think that's correct.

**Q.** Okay. Because what matters is whether he knows what the law is. Is that fair to say?

**A.** No. I don't think you need to know the law.

**Q.** Okay. But you testify in criminal tax cases?

**A.** I have, yes.

**Q.** Okay. You're aware of willfulness, generally?

**A.** I've heard the term, yes.

**Q.** Okay. And that's about knowing your legal obligation and failing to comply with it?

**MR. KRAVIS:** Objection if they're going to raise this.

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:** All right. Mr. Beaty, do we have you?

**MR. BEATY:** I'm here.

**THE COURT:** All right. Mr. Kravis?

**MR. KRAVIS:** So --

**THE COURT:** Wait a minute. Mr. Goldstein, thumbs up? All right. Go ahead.

**MR. KRAVIS:** The objection is calls for a legal conclusion. I let a few questions go here because I get that I kind of went into it on cross. But the reason I'm objecting now is asking the witness about the definition of the term "willfully" in the criminal tax context, I think this is too far.

The Court knows that willfulness is a contested issue here. The Court is going to instruct the jury on the meaning of the term "willfulness."

I recognize that I asked a few questions in this area. I didn't object when the government asked a few questions, but asking about the definition of the term "willfulness" is too -- I think is too far. So I'm objecting that it calls for a legal conclusion.

**THE COURT:** Mr. Beaty?

**MR. BEATY:** Your Honor, if the next step is going to be the next time they mention criminal -- was he advised it was a federal crime, I'm going to ask for curative instruction because they are actively misleading the jury about what the obligation is.

I'm happy to move on, Your Honor, but I don't want to hear this again. I will -- and Your Honor will have to make a decision, but it's absolutely outrageous to, on the one hand, mislead the jury about what the mental state is required here and now complain that we're trying to make it clear.

So I'm happy to move on.  I think I've made my point.

THE COURT:  Thank you, Counsel.  I think you have made your point.  Let's move on.

(Whereupon, discussion concluded.)

BY MR. BEATY:

Q.    Mr. Hernandez, let's look at Mr. Goldstein's 2016 tax return and the jurat, which is just a fancy word for saying his penalties of perjury statement.

What did Mr. Goldstein report was his occupation?

A.    It's listed as lawyer.

Q.    What did he say for tax year 2017?

A.    I believe it was lawyer, also.

Q.    What did he say in 2018?

A.    Lawyer.

Q.    What did he say in 2019?

A.    Lawyer.

Q.    What did he say in 2020?

A.    Lawyer.

Q.    And what did he say in 2021?

A.    Also lawyer.

Q.    You were asked some questions about comparing a mistake on the chart.  This is page 4.

In fact, the line reference is correct.

Is that fair to say?

A.    Yes.  Line 9 is $2.9 million.  Yes.

Q.    The difference is it wasn't taxable income.

That refers to total income?

A.    I'm sorry.  What was that?

Q.    Yeah.  The difference is that you weren't referring to --
line 15 is taxable income, and that's what the header of the
chart says.

What you reported was still a number from the tax return?

A.    Yes, it is.

Q.    And the citation is still correct?

A.    Yes.

Q.    Let's look at Government's Exhibit 410.

Again, you were asked questions about Mr. Goldstein's high
balance and cumulative balance.

This is not how the IRS maintains any individual year.

Is that fair to say?

A.    That's correct.

Q.    But simple math will tell you how much this added up year
after year?

A.    Yes.

Q.    And year after year, this added up, by 2018, to
$2.7 million?

A.    That's correct.

Q.    While Mr. Goldstein was catching up in 2016, how timely
was he in paying any of his taxes for 2017, 2019, 2020 or 2021?

A.    Those taxes were all late paid.

**Q.**   You saw earlier evidence that Mr. Goldstein agreed that he was gambling millions of dollars in some of these years?

**A.**   Yes.

**Q.**   While he owed taxes and was not paying his -- timely paying his taxes for each of these years?

**A.**   That's correct.

          **MR. BEATY:**   No further questions, Your Honor.

          **THE COURT:**   Thank you very much.

     Have all questions been asked of the witness?

          **MR. KRAVIS:**   Yes.   Thank you, Your Honor.

          **THE COURT:**   Very good.

     Mr. Hernandez, thank you so much for your time and testimony.   You may step down and be excused.

     Have a good afternoon.

                         (Witness excused.)

                              - - -

          **THE COURT:**   Is the government prepared to call its next witness?

          **MR. WHITMAN:**   Yes, Your Honor.   The government calls Ms. Angie Gou.

          **THE COURT:**   Thank you.

          **MR. WHITMAN:**   May I approach with a binder for the Court?

          **THE COURT:**   You may.

     Ms. Gou, if you want to come towards me, and then you are

going to go to the left over to the witness box.  Please remain standing and the courtroom deputy will swear you in.  All the way around.

- - -

ANGIE GOU, after having been duly sworn, was examined and testified as follows:

- - -

**DEPUTY CLERK:**  You may be seated.  Please adjust the microphone and the chair all the way up.  State and spell your first and last name for the record .

**THE WITNESS:**  Okay.  Angie Gou.  Want to spell -- A-n-g-i-e.  Last name, G-o-u.

**DEPUTY CLERK:**  Thank you.

DIRECT EXAMINATION

**BY MR. WHITMAN:**

Q.   Good afternoon, Ms. Gou.

A.   Good afternoon.

Q.   Have you traveled a long way to be here?

A.   I have.

Q.   Where have you traveled from?

A.   Geneva, Switzerland.

Q.   What are you doing in Geneva, Switzerland?

A.   I'm doing an internship at an international organization.

Q.   Are you in law school in the United States?

A.   I am.

**Q.** Can you tell the jury where?

**A.** University of Michigan.

**Q.** Let's rewind.

Where did you grow up, Ms. Gou?

**A.** Mostly San Diego, California.

**Q.** Did you attend college?

**A.** Yes. Yes.

**Q.** Can you tell us where?

**A.** University of Chicago.

**Q.** Did you graduate from the University of Chicago?

**A.** Yes. Yep. Yes.

**Q.** What year did you graduate from the University of Chicago?

**A.** 2020.

**Q.** What, if any, degrees did you receive?

**A.** Bachelor's degree. I majored in economics and minor in music.

**Q.** Did you take any accounting classes while you were at the University of Chicago?

**A.** I took one financial accounting class.

**Q.** Can you tell the jury, generally, what that class entailed?

**A.** It was a high-level class where, you know, I learned what debits and credits are. Yes.

**Q.** Did you get any hands-on accounting experience while at the University of Chicago?

**A.**    I did not.

**Q.**    Did you get any hands-on bookkeeping experience while at the University of Chicago?

**A.**    No -- not -- no.  I mean, I was in a student organization where I did manage the budget, but aside from that, no.

**Q.**    Do you know the defendant, Mr. Thomas Goldstein?

**A.**    Yes.

**Q.**    How do you know him?

**A.**    He was my previous employer.

**Q.**    Tell us when you applied for a job at Goldstein & Russell?

**A.**    I applied for a job at Goldstein & Russell around, I want to say, October/November of 2020.

**Q.**    Why did you want to work there?

**A.**    I wanted to know what working at a law firm would be like. I had just graduated college.  And I, you know, wanted to see if, before committing to law school, that this would be the right fit for me.

**Q.**    Did you talk at all with Mr. Goldstein while you were applying to Goldstein & Russell?

**A.**    I did.

**Q.**    Did you all talk at all about gambling or poker during your application process?

**A.**    Yes.  During -- we had an -- yes.

**Q.**    Can you tell us what you all talked about in terms of gambling or poker?

**A.** Yeah. So during the interview, I think it came up that, you know, I speak Chinese and Tom had mentioned that he -- you know, that he had wanted to learn Chinese at some point, but that he also told me a story about how he essentially had been at like a high-stakes poker table where I think, upon losing, one of the -- this was not Tom, but like one of the people just handed over a hotel deed as the price of losing to another person at the table.

**Q.** What was your reaction to hearing that story as you were applying to Goldstein & Russell?

**A.** I just thought, you know, we were in different worlds.

**Q.** When you were applying to Goldstein & Russell, did Mr. Goldstein tell you that he was under an ongoing criminal investigation into his taxes?

**A.** No.

**Q.** Would you have wanted to know that?

**A.** Maybe. Yeah.

**Q.** Were you -- what position or positions were you hired for?

**A.** I was hired as the firm manager for Goldstein & Russell, the deputy blog manager of SCOTUSblog and then like partly Tom's personal assistant.

**Q.** Can you tell the jury about some of the things that you were asked to do as Mr. Goldstein's personal assistant?

**A.** You know, just small, anything that he needed done. Right. Like I purchased and I think framed like a picture of

Amy, his wife, for Mother's Day.  I, you know, eye doctor's appointments, paying bills.  I think there was -- just like a variety of, you know, mundane tasks that he needed done essentially.

Q.    Who did you replace at Goldstein & Russell?

A.    I replaced Katie Bart.

Q.    Did you get to know Ms. Bart as part of your onboarding process at Goldstein & Russell?

A.    I did.

Q.    Who trained you for the job at Goldstein & Russell?

A.    Katie.

Q.    Can you give us an approximation of when this training process was going on?

A.    This was during my first two weeks, roughly first two weeks at the office.

Q.    Can you tell us about the training itself?

A.    Yes.  So Katie was, at this point, juggling two jobs because she was also working at a bakery.  So I would say we had, you know, two weeks, but a little under because it wasn't necessarily a full day of training.  And I think I was also getting set up with my apartment at the same time.

But essentially we sort of just, you know, did tasks as they came, and Katie tried to hand over most of the accounts that she was managing and, you know, just trying to give me a rundown while also us actually doing the job as we're going

along.  Uh-hum.

**Q.**    When you say "handing over the accounts," are you talking about bank accounts?

**A.**    Bank accounts, phone accounts, like health insurance, any variety of accounts either for Tom or for the firm.

**Q.**    Was this training occurring in or about January of 2021?

**A.**    Yes.

**Q.**    Did you come to learn while you were a firm manager at Goldstein & Russell that Mr. Goldstein had a personal Wells Fargo account?

**A.**    Yes.

**Q.**    Did you ever, while you were at Goldstein & Russell, have access to his personal Wells Fargo account?

**A.**    I did not.

**Q.**    Tell the jury whether -- about -- sorry.

Did anyone else at Goldstein & Russell ever participate in training you, besides Katie Bart?

**A.**    I mean, I would say Tom probably a little, but not, not particularly.

**Q.**    How did Mr. Goldstein help train you?

**A.**    Just, you know, if certain things needed to be corrected or like I would ask, like, hey, do you have a preference to for a certain thing to be done a certain way.  Yeah.

**Q.**    Did you believe that your training was sufficient for what you would end up doing at Goldstein & Russell?

**A.** I think yes and no. There were a lot of things that could have been clearer. Right. And I think, you know, Katie did the best she could with the limited time we had, but there were definitely aspects that I wish had been clearer prior to me taking on the job.

**Q.** Did you learn when you joined Goldstein & Russell that Mr. Goldstein owed taxes to the federal government?

**A.** I did.

**Q.** Did you learn that at some point he had been on a payment plan to pay off those taxes?

**A.** Yes.

        **MR. WHITMAN:** Could we please go to, Mr. Resto, Exhibit 809?

**BY MR. WHITMAN:**

**Q.** That's tab 1 of your binder, Ms. Gou, if you would like to look there.

**A.** Okay.

**Q.** Do you see Government's Exhibit 809 on the screen in front of you, Ms. Gou?

**A.** I do.

**Q.** This first e-mail we've pulled up here doesn't have you on the e-mail; is that right?

**A.** Yes.

**Q.** Who is this -- first of all, let's just start. What is the date of this e-mail?

**A.**    February 24, 2021.

**Q.**    Is this around the time that you started being firm manager at Goldstein & Russell?

**A.**    Yes.

**Q.**    Who is the e-mail from?

**A.**    Jackie Graham.

**Q.**    Where does that person appear to work?

**A.**    First Savings.

**Q.**    Can you see at the bottom of this callout what First Savings is?

**A.**    They seem to be a mortgage company.

**Q.**    Do you recall shortly after you joined Goldstein & Russell that Mr. Goldstein and Ms. Howe were trying to buy a house in Washington, D.C.?

**A.**    Yes.

**Q.**    Did you help Mr. Goldstein with various tasks related to the purchase of the house in D.C.?

**A.**    Yes.

**Q.**    Let's look at the first --

        **MR. WHITMAN:**    If we could just highlight that first sentence in that e-mail that starts, "Amy and Tom."

**BY MR. WHITMAN:**

**Q.**    What is Ms. Graham asking for here?

**A.**    The actual personal tax returns of Amy and Tom, not transcripts, for 2018 and 2019.

Q.   I should have clarified this earlier, but who is in the "to" column or the "to" field of this e-mail?

A.   Tom and Amy.

MR. WHITMAN:   Let's then highlight the first paragraph starting with "also" and ending with "plans."

BY MR. WHITMAN:

Q.   What is Ms. Graham saying in this paragraph?

A.   She is asking to Tom and Amy, "What is your personal IRS obligation, not combined with the business obligation, and we need a copy of both payment plans."

Q.   Do you understand that to be a reference, the payment plans with the IRS?

A.   Yes.  Yes.

MR. WHITMAN:   Can we look then at the top e-mail?

BY MR. WHITMAN:

Q.   So do you see Mr. Goldstein responds that same day, February 24 of 2021?

A.   Yes.

Q.   Are you now on the e-mail?

A.   Yes.

Q.   What does Mr. Goldstein say?

A.   He says, "There is no business obligation," and that, "I can get the payment plan from the accountants to forward it to Jackie."

Q.   Who do you understand the accountants to be a reference

to?

**A.**    I think Yong and Walter.

**Q.**    Was helping Mr. Goldstein collect tax documents from the accountants among the responsibilities you had as firm manager?

**A.**    Yes.

MR. WHITMAN:  Can we please now go to GX 504.

**BY MR. WHITMAN:**

**Q.**    It's tab 2 in the binder, Ms. Gou.  We are only going to look at that the e-mails on the first page here.

MS. REAVES:  Objection, Your Honor.

Can we take the documents down, please?

THE COURT:  Let's come to the headsets, Counsel.

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT:  Mr. Whitman, are you on?

MR. WHITMAN:  Yes, Your Honor.

THE COURT:  Ms. Reaves?

MS. REAVES:  Yes, Your Honor.

THE COURT:  Mr. Goldstein?  Thumbs up.

Go ahead.

MS. REAVES:  Thank you, Your Honor.

So the objection is both hearsay and confrontation clause. My understanding is the government may draw Ms. Gou's attention to -- there's a portion of this where Yong Choi from the accounting firm says that there is currently no federal payment

plan with the IRS.

I believe the government is offering it for the truth of the matter asserted, and Mr. Choi is not here to testify about that. I'm not even sure if he's on the government's list.

So both of that is hearsay and it's a confrontation clause issue.

**THE COURT:** So you're mentioning -- it looks like the e-mail kind of mid-page?

**MS. REAVES:** Yes.

**THE COURT:** There is currently no federal payment plan with the IRS?

**MS. REAVES:** Yes.

**THE COURT:** Sounds like the objection is hearsay. Mr. Whitman?

**MR. WHITMAN:** This goes --

**MS. REAVES:** And --

**THE COURT:** I'm sorry. Did you -- and confrontation clause.

**MS. REAVES:** Yes.

**THE COURT:** Okay. Mr. Whitman?

**MR. WHITMAN:** This goes to Mr. Goldstein's state of mind. As the evidence and the testimony will show, it's true that Ms. Gou, after being directed by Mr. Goldstein, figured out from the accounting firm that there is no federal payment plan, and I think in the subsequent message, we will see that

there was a phone call that night between Mr. Goldstein and the individuals on this chain.

The importance, Your Honor, is that -- and we will hear this through a subsequent witness who is associated with the mortgage company -- is that Mr. Goldstein subsequently, after learning what was said in this e-mail chain, subsequently represented it to the mortgage company that they -- something that is inconsistent with the idea of there not being a federal payment plan. I forget the exact words that Mr. Goldstein says subsequently, but the point is we're trying to establish this is what Mr. Goldstein knew. There was no payment plan.

Whether or not that is true -- we're not offering it for the truth of the matter. We are just offering it to show his understanding as of around February 24, 2021, before he then e-mails a contradictory statement to the mortgage company.

THE COURT: I guess what I'm -- for the -- let me make sure I understand the facts.

For the e-mail, the e-mail is between Choi and Ms. Gou, so how is this showing what Mr. Goldstein was thinking?

MR. WHITMAN: Because there's a subsequent document, Your Honor, where it's the same e-mail chain, but it goes off in kind of a different direction -- I'm trying to find the e-mail right now. Oh. So if you look at tab 11 in your binder, Your Honor --

THE COURT: Yep.

**MR. WHITMAN:** -- this is a similar e-mail chain and it --

**MS. REAVES:** Can the government give me the number for that so I can follow along?

**MR. WHITMAN:** Sure. It's 520.

So if Your Honor is looking at 520, if you go to the third page of 520, you'll see this is the same e-mail from Angie Gou, but someone else responds to it. And it turns into a conversation that ends at the first page of 520 when Ms. Gou is scheduling a call between Mr. Goldstein and the accountants to talk about -- I mean, I can't speculate as to what the call is about, but clearly, it comes in the context of them talking about whether there's a payment plan.

So I think there's foundation to elicit this. We're going not to any facts, but really, Mr. Goldstein's state of mind and his knowledge.

**THE COURT:** Okay. And any comment to the confrontation clause concerning the defense is also raising?

**MR. WHITMAN:** As to the statements of Mr. Choi, these are not testimonial statements.

**THE COURT:** All right. Ms. Reaves, go ahead.

**MS. REAVES:** So I think the government has confirmed that they are trying to use this for the truth of the matter asserted, that there was not, in fact, a payment plan. I think it is fair to ask this witness whether there were conversations

with Mr. Goldstein about it.  I think it's a pretty weak argument.  This goes to the state of mind as the government has even said that there's no context behind, can we set up a call? They don't know why he was doing that.

I also just -- I wasn't able to pull up Government's Exhibit 520.  So I'd like to just take a quick look at the document.

THE COURT:  All right.

MS. REAVES:  And I just want to double-check.  Is 520 the correct number?

MR. WHITMAN:  Yes.  I can show you if you want.  I just, I have writing on mine, but I don't -- I can show you.

MS. REAVES:  Thank you, Your Honor.

So the other point is Government's Exhibit 520, which is the one that actually has Mr. Goldstein on it, does not include this hearsay from Mr. Choi saying that there is no payment plan.  It is a discussion.  It is a different thread of this, but doesn't include the question that we're objecting to.

We have no objection to the government using Exhibit 520 to discuss with this witness the back and forth with the accountants about a payment plan because it doesn't include the objectionable portion.

THE COURT:  Okay.  Anything further from you, Mr. Whitman?

MR. WHITMAN:  Yes.  The other e-mail, Exhibit 520,

does have messages from Mr. Choi.  So I think it's become clear that what they're objecting to is not whether it's hearsay, but because there's a bad fact for Mr. Goldstein on this e-mail.

So I don't know why the government would be able to show 520, which has statements from Yong Choi, but not the one that we're on.

**THE COURT:**  Okay.  Well, I have taken a look at both of the exhibits, albeit quickly.  I'm going to overrule the objection.  The government can ask questions of this witness based on Exhibit 504 and 520.

Yes, Ms. Reaves.

**MS. REAVES:**  I understand the Court's ruling.  I just want to make sure that the government then is not able to argue this for the truth of the matter asserted because they're saying that that's not the purpose.

**THE COURT:**  Mr. Whitman?

**MR. WHITMAN:**  I don't plan to argue here at all today, Your Honor.  But I think we can just address what arguments can be made from these facts after we have the witness back on the plane to Switzerland.

**THE COURT:**  All right.  Very good.  Thank you, Counsel.

**MS. REAVES:**  Thank you, Your Honor.

**MR. WHITMAN:**  Thank you.

(Whereupon, discussion concluded.)

**MR. WHITMAN:**  Could we pull up Government Exhibit 504, tab 2 of the binders?  Could we call out Ms. Gou's e-mail at the bottom of this page at 2:36 p.m.?

**BY MR. WHITMAN:**

**Q.**  Ms. Gou, what is the date of this e-mail?

**A.**  February 24, 2021.

**Q.**  Who sent the e-mail?

**A.**  Me.

**Q.**  Do you recall if February 24 was the same date that we just talked about in regards to the e-mail in between Mr. Goldstein and the mortgage company?

**A.**  Yes.

**Q.**  Who are you sending this e-mail to?

**A.**  Walter and Yong.

**Q.**  What do you ask them?

**A.**  I'm asking them for the info for the federal payment plan with the IRS.

**Q.**  Why were you asking them that?

**A.**  Because that was what was just asked of me in the previous exchange.

**Q.**  Who had asked you that, to get this information in the previous exchange?

**A.**  Tom.

**MR. WHITMAN:**  Could we please go up to the next e-mail from Mr. Choi?

BY MR. WHITMAN:

Q.   Do you see this e-mail, Ms. Gou?

A.   Yes.

Q.   What's the date of this e-mail?

A.   February 24, 2021.

Q.   What's Mr. Choi telling you as to whether there is currently a federal payment plan in place with the IRS?

A.   He says, "There is currently no federal payment plan with the IRS."

Q.   What does he say next?

A.   "The original payment plan defaulted once Tom and Amy had a balance due on their 2019 taxes."

Q.   What does he indicate to you in the final sentence?

A.   "We are working on establishing a new payment plan with the IRS."

        MR. WHITMAN:   Can we now go to tab 11 -- or I'm sorry -- GX 220?

BY MR. WHITMAN:

Q.   That's tab 11 in your binder, Ms. Gou.

        MR. WHITMAN:   Could we go specifically to page 3, Mr. Resto?  And could we call out that e-mail from Ms. Gou on February 24 at 2:36 p.m.?

BY MR. WHITMAN:

Q.   Ms. Gou, is this the same e-mail we had just looked at in the context of the other exhibit, GX 504, but is now part of

Exhibit GX 520?

**A.** Yes.

MR. WHITMAN: Could we go to page 2, and if we could call out Mr. Deyhle's e-mail at the bottom of this page?

**BY MR. WHITMAN:**

**Q.** By the way, I've said Deyhle. People have said different things.

Do you know how to say this individual's last name?

**A.** No.

**Q.** Okay. Does Mr. Deyhle respond to your e-mail request?

**A.** He says -- yes.

**Q.** What does he say?

**A.** He says, "That's Yong."

MR. WHITMAN: Could we go up, Mr. Resto, to this next e-mail?

**BY MR. WHITMAN:**

**Q.** And do you see you ask her at -- so there's an e-mail at February 24 at 2:43 p.m. You see that?

**A.** Yes.

**Q.** You sent it to Mr. Deyhle and Mr. Choi?

**A.** Uh-hum. Yes.

**Q.** What are you asking them?

**A.** I asked, "Would either one of you be able to take a call with Tom this afternoon?"

MR. WHITMAN: Could we go up to the -- page 1 of that

document, and if we could call out the first two e-mails at the top.  So Mr. Choi's email -- or sorry -- Ms. Gou's e-mail from 12/18 and then Mr. Choi's e-mail from 3:18 p.m.?

BY MR. WHITMAN:

Q.   Does it look like you successfully coordinated a call that same day, February 24, 2021?

A.   It does.

Q.   Between whom?

A.   Between Yong and Tom.

        MR. WHITMAN:  Could we please now go to DX, Defense Exhibit 145?

BY MR. WHITMAN:

Q.   And this is tab 3 of your binder, Ms. Gou.

        MR. WHITMAN:  Could we a call out -- or zoom in to the bottom e-mail on this first page?

BY MR. WHITMAN:

Q.   Ms. Gou, who sent this e-mail?

A.   Tom.

Q.   When?

A.   March 29, 2021.

Q.   Who did he send it to?

A.   Me.

Q.   What's the subject?

A.   "Wiring."

Q.   What's he asking you?

**A.** He asked me if I have the authority to wire from the MD IOLTA account, or whether I'd need to move it to the firm first -- or whether he would need to move it to the firm first.

**Q.** What's the MD IOLTA account?

**A.** It's the Maryland IOLTA account for the firm.

**Q.** Do you know what that means?

**A.** Vaguely.

**Q.** Do you understand what an IOLTA account is?

**A.** Generally, I think it's for -- like, it's a holding account for client funds before we actually distribute it to the clients.

**Q.** What do you take from Mr. Goldstein's question -- or what do you understand him to be saying when he says, "Do I need to move it to the firm first"?

**A.** He is asking if I can -- if I have the ability to send a wire from the IOLTA account, or whether he would need to move money into the firm account first before I make a wire trans- -- yeah, before I am able to wire the money.

        **MR. WHITMAN:** Could we scroll up to the next e-mail, Mr. Resto, or the next two?

**BY MR. WHITMAN:**

**Q.** How did you respond to Mr. Goldstein on March 29, 2021?

**A.** I said, "I don't believe so, as that's a separate account. You need to move it to the firm first."

**Q.** Does Mr. Goldstein respond that same day?

**A.**    Yes.

**Q.**    What does he say?

**A.**    He says, "Cool.  Make sure you're able to do a million-dollar wire tomorrow, please.  Otherwise, we need to send it to Citi for Amy."

          **MR. WHITMAN:**  Could we go up to next page?

**BY MR. WHITMAN:**

**Q.**    What do you say there, Ms. Gou?

**A.**    I said, "I will check with Wells Fargo and let you know."

**Q.**    When you were at Goldstein & Russell, did you ever hear Mr. Goldstein say he was going to represent himself as his own attorney?

**A.**    I don't believe so.

**Q.**    Did you ever hear Mr. Goldstein say he was going to represent himself as his own attorney in regards to the purchase of a new home in Washington, D.C.?

**A.**    I don't think so.

**Q.**    Did you ever hear Mr. Goldstein say he was going to represent himself and his wife, Ms. Howe, in regards to his purchase of a new home in D.C.?

**A.**    I don't believe so.

**Q.**    Did he ever ask you to open a file or open a matter concerning his representation of himself to buy the house in D.C.?

**A.**    I don't think so, no.

**Q.** What is Bench?

**A.** Bench is the bookkeeping service that we used while I was at Goldstein & Russell.

**Q.** Were you trained on Bench?

**A.** Vaguely.

**Q.** Did you consider the training on Bench sufficient?

**A.** No.

**Q.** Do you recall a time when the Bench software misclassified about $5 million worth of payments?

**A.** Yes.

        **MR. WHITMAN:** Could we please pull up GX 508?

**BY MR. WHITMAN:**

**Q.** This is tab 5 of your binder, Ms. Gou. And we're going to start on page 2.

        **MR. WHITMAN:** If we could highlight the number 1 -- Mr. Shuman's e-mail on September 13 at 3:58.

**BY MR. WHITMAN:**

**Q.** Who is this e-mail from?

**A.** Ian Shuman.

**Q.** What's the date of this e-mail?

**A.** September 13, 2021.

**Q.** Who was the e-mail sent to?

**A.** Walter.

**Q.** Can you summarize for the jury what Mr. Shuman is telling Mr. Deyhle in Number 1 in this e-mail?

**A.**    He says, that he is not sure that the separation between deposits from Tom personally versus legal fee income is clear. He says that -- I think I'll just read the e-mail, if that's okay?

**Q.**    Sure.

**A.**    I think he's -- I think he -- I think referring to Tom -- sometimes has various things run through the company that aren't company activities.  There is a $4.9 million deposit that I think is probably a personal transfer, but can't get a straight answer.  Angie has no idea.  Are you okay just leaving that in legal fee income?

**Q.**    Does Mr. Shuman then paste two -- into this e-mail, two transactions representing funds that were classified as "legal fee income"?

**A.**    Yes.

        **MR. WHITMAN:**  Can we go to page 1 and look at the bottom e-mail from Mr. Goldstein at 11:05 a.m.?

**BY MR. WHITMAN:**

**Q.**    Did Mr. Goldstein forward you the e-mail chain between the two individuals from the accounting firm?

**A.**    Yes.

**Q.**    What's the date of this e-mail?

**A.**    September 15, 2021.

**Q.**    What did Mr. Goldstein ask you?

**A.**    Did they ask you about this $4.9 million.

MR. WHITMAN:  Could we then go up to the next e-mail just above this?

BY MR. WHITMAN:

Q.    Do you see that you responded to Mr. Goldstein on September 15?

A.    Yes.

MR. WHITMAN:  Could we just highlight the first two sentences of that first paragraph?

BY MR. WHITMAN:

Q.    What are you telling Mr. Goldstein here?

A.    I essentially said I looked at the e-mail chains and I had not prioritized correctly, and then --

Q.    We'll stop there for a second.  Sorry.  I was thinking through.

When you say the e-mail chains, what are you referring to?

A.    I think I was looking to -- for e-mails that Ian had sent me.

Q.    Did you find any?

A.    I did.

Q.    Were there any long e-mails from Mr. Shuman that you found on this issue?

A.    I think there was a very long e-mail from Ian with, like, a number of items, and I think this 4.9 million was tucked in there somewhere in the middle, like, one line, what is this 4.9 million.  And I believe I was just working through it and

had not gotten to it yet.

**Q.**   Are you trying to take ownership of that oversight in this e-mail?

**A.**   Yes.

MR. WHITMAN:   Could we highlight the second to last sentence in the second paragraph that starts "the new accountants"?

**BY MR. WHITMAN:**

**Q.**   Do you see where it says the new accountants he's talking about?

**A.**   Yes.

**Q.**   Did Goldstein & Russell have new accountants at this point in time?

**A.**   No.

**Q.**   What is that a reference to then?

**A.**   I think Ian mistakenly thought that Bench was a new accountant when it was just the bookkeeping system.

**Q.**   What do you say in here about why Goldstein & Russell switched to Bench?

**A.**   I said that Goldstein & Russell had switched to Bench at some point in the previous year to save money, and I -- or that was what Katie had told me, you know.

**Q.**   And then what do you say after that?

**A.**   I said, "Not sure at this point if the calculus is working out."

Q.    Could we then go to the next e-mail up in the same chain?

Do you see Mr. Goldstein responds to you on September 16?

A.    Yes.

Q.    What does he say in the first sentence?

A.    He says, "You just have to understand how nearly utterly catastrophic this was."

Q.    What does he say in the next sentence?

A.    "They were treating it as income because they didn't hear otherwise from you because you didn't ask me, which would have been a multimillion dollar error."

Q.    Who is "they" in that sentence?

A.    "They," referring to the accountants.

Q.    When he says "a multimillion dollar error," what's your understanding of the error he's describing?

A.    Well, if that money had been classified as, you know, legal income, we would have had to pay much more in taxes on income than we had actually earned.

Q.    That's the context of these messages?

A.    Yes.

Q.    Could we then go up to the next e-mail in the chain?

What did you tell Mr. Goldstein on September 16, 2021?

A.    I said, "I sincerely apologize for the oversight on this. I have scheduled calls with the accountants and Bench to review 2021 books and to work out a system so that I'm able to review and correctly categorize items along the way.  This won't

happen again."

Q.    How old were you, approximately, at this point in time?

A.    Twenty -- 23.  23.

Q.    Yeah.  Approximately?

A.    Yeah.  No.  I mean, I -- I think I was 23.

Q.    Yet, even as a 23-year-old, you decided to own up for your mistake as it came to taxes and apologize?

A.    I believe so, yes.

Q.    Could we go to Government Exhibit-510, which should be tab 6 of your binder, Ms. Gou.

      Do you see the document in front of you on the screen?

A.    I do.

Q.    Who is this an e-mail from?

A.    Walter -- or sorry, me.

Q.    To whom?

A.    To Walter, with Tom copied.

Q.    What's the subject of the e-mail?

A.    2020 taxes.

Q.    Is there an attachment to the e-mail?

A.    There is.

Q.    What do you tell Mr. Deyhle in the e-mail itself?

A.    I said, "Please find the signed tax forms attached.  This is just the government copy.  Not sure if we needed to sign the client copy as well."

Q.    Could we please go to Government Exhibit 509, which is tab

7 of your binder?

      **MR. WHITMAN:**  If we could go to page 2 and call out the top half, if you could, Mr. Resto?

**BY MR. WHITMAN:**

**Q.**   Do you see this document on the screen here?

**A.**   Yes.

**Q.**   This is the attachment to the e-mail we just talked about?

**A.**   Yes.

**Q.**   What is the title of this document?

**A.**   2020 tax return filing instructions.

**Q.**   For which year does this document apply?

**A.**   2020.

**Q.**   Who was it prepared for?

**A.**   Tom and Amy.

**Q.**   Who is it prepared by?

**A.**   GRF.  Gelman, Rosenberg and Freedman.

**Q.**   Can we go to page 3 and focus on part 2?

    Do you see this document is titled Form 8879?

**A.**   Yes.

**Q.**   It says, "IRS e-file signature authorization"?

**A.**   Yes.

**Q.**   Who is the taxpayer's name on the top of this document?

**A.**   Tom Goldstein -- Thomas C. Goldstein.

**Q.**   Do you see where it says part 2?

**A.**   Yes.

Q.   Can you read the first sentence underneath part 2 for the jury?

A.   "Under penalties of perjury, I declare that I have examined a copy of the income tax return, original or amended. I am now authorizing, and to the best of my knowledge and belief, it is true, correct, and complete."  I've --

Q.   Sorry.  I'm just thinking.  Sorry.

Did you ever see Mr. Goldstein review a tax return while you worked at Goldstein & Russell?

A.   I don't -- I don't recall.

Q.   Do you recall Mr. Goldstein ever asking you to get a copy of the tax returns so that he could review it?

A.   I don't think so.

Q.   Do you ever recall Mr. Goldstein expressing, in any way, an interest in reviewing his tax return before it was filed?

A.   I don't.  I don't recall.

MR. WHITMAN:  Could we go down just a bit to show the signature line here?

BY MR. WHITMAN:

Q.   Do you see the signature line right here, Ms. Gou?

A.   Yes.

Q.   Whose signature is that?

A.   That was me signing on behalf of Tom.

Q.   What's the date on this document?

A.   October 15, 2021.

Q.    Were you trying to hide from Mr. Goldstein that you had signed this form on his behalf?

A.    No.

Q.    How can you tell?

A.    I think Tom is copied on the e-mail.

MR. WHITMAN:    Could we go now to GX 517?    We are going to start on page 2, at the very bottom e-mail.

BY MR. WHITMAN:

Q.    Ms. Gou, this is tab 8 of your binder if you would like to look there.

Do you see the document that's been pulled up on the screen?

A.    Yes.

Q.    Who's it from?

A.    Me.

Q.    Who's it to?

A.    Tom.

Q.    What's the date?

A.    May 9, 2022.

Q.    What's the subject?

A.    Accounting woes.

Q.    Are you asking Mr. Goldstein in this e-mail about how to classify certain transactions?

A.    Yes.

MR. WHITMAN:    Could we go up on the same page,

page 2, Mr. Resto, to the June 9, 2022 e-mail from Mr. Goldstein?

BY MR. WHITMAN:

Q.   Does Mr. Goldstein respond to your request about a month later?

A.   Yes.

Q.   At the bottom at the second paragraph, what does he say about Mike McGuinness?

A.   He says, "The Mike McGuinness transfer is personal gambling income, but it should be offset against other transfers to him as gambling losses."

Q.   So we have seen this e-mail.  We heard about the story while you were applying to Goldstein & Russell.

     Besides that, were there -- well, actually, I'll just strike that whole question.

     Did Mr. Goldstein ever give you records of his wins and losses in poker?

A.   He did not.

Q.   Did he ever ask you -- did Mr. Goldstein ever ask you to help him track his wins and losses in poker?

A.   No.

Q.   Did he ever ask you to help him track and report to the IRS his wins or losses in poker?

A.   No.

Q.   Did Mr. Goldstein ever tell that you he won approximately

$47 million playing poker in 2022?

**A.**    I don't think so.  No.

**Q.**    Did he ever tell you that in that same year, 2022, he had lost 26 million or thereabouts playing poker?

**A.**    Also, I don't think so.  No.

**Q.**    Were you the firm manager for Goldstein & Russell in 2022?

**A.**    I was.

**Q.**    What would you have done if Mr. Goldstein had told you about a particular poker loss or win?

**A.**    I think I would have just passed that info to the accountants.

        **MR. WHITMAN:**  Let's go to the same document, 517, but go to page 1, please, Mr. Resto.

    And that's tab 8, again, in your binder, Ms. Gou.

    If we could call out the very top e-mail from Ms. Gou on March 22 of 2023.

**BY MR. WHITMAN:**

**Q.**    So, Ms. Gou, this is the same document; right?

**A.**    Yes.

**Q.**    Do you see what the date is on this e-mail?

**A.**    March 22, 2023.

**Q.**    Do you recall -- okay.

    Who are you writing this e-mail to?

**A.**    Tom.

**Q.**    Is the subject still -- say accounting woes?

**A.** Yes.

**Q.** And then what do you say in the first sentence of this e-mail?

**A.** I said, re your -- "Re: your e-mail on December 15, we never resolved these questions."

**Q.** So there were certain questions or issues involved in this e-mail chain that still, by March of '23, had not been resolved?

**A.** Yes.

**Q.** Then in the second paragraph, you reference something called the Titan retainer on the first line.

Do you see that?

**MS. REAVES:** Objection, Your Honor.

**THE COURT:** Go to the headsets.

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:** Mr. Whitman, are you on?

**MR. WHITMAN:** Yes, Your Honor.

**THE COURT:** Ms. Reaves?

**MS. REAVES:** Yes, Your Honor.

**THE COURT:** Mr. Goldstein?

Go ahead, counsel.

**MS. REAVES:** So I would like a proffer from the government as to where they're going with this. We're now in 2023, which is two years outside the charged period. And the

concern is that the government is going to get into either uncharged conduct or a notice 404(b) information.  I'm not understanding the relevance of these particular transactions and Ms. Gou and Mr. Goldstein's conversation about it in 2023, and a concern that it's unfairly prejudicial and confusing to the jury.

**THE COURT:**  Thank you.  Mr. Whitman, where are we going?

**MR. WHITMAN:**  Your Honor, there's an attachment that I was about to show in this e-mail, which is tab 10 in Your Honor's binder.  It is a retainer agreement that's actually dated because this e-mail train goes on for so long. The retainer agreement is actually dated June 16, 2021.

So I am going to ask Ms. Gou about this retainer agreement, and particularly, if you look on page 2 of tab 10 or Exhibit 502, there -- portions of the retainer are the payments under this agreement would be sent via cryptocurrency.  You can see that at the bottom of the page.

So we are going to -- the plan was to establish through Ms. Gou that this was a client where the agreement provided for parts of the payment in cryptocurrency, and by the way, it's in a year where he's charged for not reporting his use of cryptocurrency.

So it's relevant.  That's what I was going to do.  I appreciate this e-mail is in 2023, but the document itself is

firmly within the charged period.

THE COURT: All right. Well, can you go to the document without dealing with the e-mail given the timeframe?

MR. WHITMAN: Sure.

THE COURT: All right. Ms. Reaves?

MS. REAVES: Your Honor, I just want to add, though, part of the concern also is the specific cryptocurrency transaction. Even if we go to the other document, there is no evidence that I'm aware of that there was any payment, in fact, made in cryptocurrency. The government is just going to show a retainer without any context.

And so that is still getting into either uncharged misconduct or unnoticed 404(b) evidence, and I don't think the government has any evidence what they're planning to present that there was actually any money paid in cryptocurrency. And so it does not go to their point. You can only charge what's at issue here, it's whether Mr. Goldstein should have checked a box on his 2021 tax return regarding cryptocurrency transactions. And that document does not tell us whether he received any cryptocurrency.

THE COURT: Mr. Whitman, anything else from you?

MR. WHITMAN: The document does show that he was actively dealing in or negotiating in over cryptocurrency. I think the nature of the cryptocurrency data is such that, yes, we don't have a bank record saying Titan Global or Ben Wong

paid him X amount in 2021.

But clearly, Your Honor, if he's charged with not reporting his cryptocurrency use at the same time he's asking for clients to pay him in cryptocurrency, we should be able to explore that.

THE COURT:  All right.  I'm going to allow you to call up, I think it's 502.  We're going to move on from the e-mail --

MR. WHITMAN:  Yes, Your Honor.

THE COURT:  -- and the defense can make its points in cross-examination.  Thank you.

MS. REAVES:  Thank you, Your Honor.

MR. WHITMAN:  Thank you Your Honor.

(Whereupon, discussion concluded.)

MR. WHITMAN:  Could we pull up, Exhibit 502, Mr. Resto?

BY MR. WHITMAN:

Q.   Do you see this document on this screen, Ms. Gou?

A.   I do.

Q.   Just generally, tell the jury what type of document this is.

A.   This is a retainer letter.

Q.   What's the date of this document?

A.   June 16, 2021.

Q.   Were you the firm manager at Goldstein & Russell on that

date?

**A.**   I was.

**Q.**   Who is this letter addressed to?

**A.**   Ben Wong.

**Q.**   Do you know Ben Wong?

**A.**   Personally, no.

**Q.**   Is there a company associated with Mr. Wong in this letter?

**A.**   Yes.  It seems that he works for Titan Golden Capital, LLC.

**Q.**   Did you know what that was at the time?

**A.**   From the letter, I can tell it's a company.

        **MR. WHITMAN:**  Could we highlight just the first sentence in this letter after "Dear, Mr. Wong?"

**BY MR. WHITMAN:**

**Q.**   And, Ms. Gou, could you tell the jury what this is indicating, this first sentence?

**A.**   The first sentence says, "This letter confirms that you have retained our firm to serve as legal counsel for the company."

        **MR. WHITMAN:**  Could we go to page 2 and focus on, somehow, the second and third paragraphs?

**BY MR. WHITMAN:**

**Q.**   Do you see these paragraphs that have been pulled out on the screen, Ms. Gou, from page 2 of Exhibit 502?

**A.**    Yes.

**Q.**    What does this retention letter or retainer agreement say about the annual fee that Goldstein & Russell and would be paid for the representation?

**A.**    It says, "The annual fee for this representation is 2.8 million payable in quarterly installments."

**Q.**    Okay.  And then do you see where there is a reference to "Four each 700,000," about halfway down that paragraph?

**A.**    Yes.

**Q.**    What does that sentence say?

**A.**    It says, "Four each 700,000 installment, the fee will be paid 450,000 by wire and 250,000 by cryptocurrency transfer."

**Q.**    What does the next sentence indicate?

**A.**    "In addition, you will pay half the cost of a 50-hour jet card.  $224,900 payable now."

         **MR. WHITMAN:**  Could we go down to the bottom of that same page, Mr. Resto, and call it where it says, for the wire transfer portion and then for the cryptocurrency transfer portion?

**BY MR. WHITMAN:**

**Q.**    Okay.  Let's look at this first -- where it says "for the wire transfer portion of the fee."  What is the information below that sentence?

**A.**    That is the account address for Goldstein & Russell.

**Q.**    You had access to that account while you were there?

A.    I did.

Q.    What comes next, after that account information?

A.    The next part lists the cryptocurrency address for the --
so the next sentence just says, "For the cryptocurrency portion
of my fee, the USDT address is..."

Q.    Do you know what USDT means?

A.    I do not.

Q.    Do you know what this series of numbers and letters
indicates?

A.    I assume that is indicating the equivalent of an address
for cryptocurrency accounts.

          MR. WHITMAN:    Could we just go to page 3, Mr. Resto,
and call out the signature?

BY MR. WHITMAN:

Q.    Whose signature appears on this document, Ms. Gou?

A.    Tom's.

Q.    As of June 16 of 2021, had Mr. Goldstein ever given you
records of his cryptocurrency transactions?

A.    No.

Q.    Had he ever given you access to any cryptocurrency account
so that you could track his transactions?

A.    No.

Q.    Had he asked you to work with the accountants so that his
transactions in cryptocurrency could be properly reported?

A.    No.

Q.    Did he ever tell you that in 2021 he engaged in over 100 cryptocurrency transactions?

A.    No.

Q.    Did he ever tell you he had engaged in transactions worth million of dollars in the year 2021?

A.    No.

Q.    If Mr. Goldstein had told you about specific transactions in cryptocurrency, what would you have done with that information?

A.    I think I would have probably stored it and then sent it to the accountants.

Q.    Are you familiar with Tobey Maguire?

A.    As in Spider-Man.

Q.    Who is he?  Do you know -- know anything about him other than Spider-Man?

A.    He was Spider-Man.

Q.    I think that was asked and answered.

      What, if anything, do you recall about Mr. Goldstein's or Goldstein & Russell's relationship with Tobey Maguire?

A.    Nothing.

Q.    Were you the firm manager for all of 2021?

A.    Aside from, I think, the first couple of weeks where Katie and I crossed over, and, like, not from January 1, but from, like, January 8 or something, yes.

Q.    Did Mr. Goldstein ever mention to you that Mr. Maguire had

paid him a legal fee?

**A.**    No.

**Q.**    Did Mr. Goldstein ever tell you that Mr. Maguire was a legal client of Goldstein & Russell?

**A.**    He did not.

**Q.**    Did he ever give you records about his work for Tobey Maguire and say, hey, please bring this to the accounting firm?

**A.**    No.

**Q.**    Were you at Goldstein & Russell when Mr. Goldstein retired?

**A.**    Yes.

**Q.**    What did Mr. Goldstein tell you, if anything, about why he retired?

**A.**    I think there was a call with several of the other attorneys on the line, and what I understood was just that Tom had -- you know, there are more interesting things to do with his time.

**Q.**    Did he ever tell the folks at Goldstein & Russell, including yourself -- sorry.  I'll start that again.

Did Mr. Goldstein ever tell you that the main reason for him retiring from the practice of law was to play heads-up poker with a banker in Texas named Andy Beal?

**A.**    I don't believe so.

**MR. WHITMAN:**  One moment to confer, Your Honor.

No further questions.  Thank you.

**THE COURT:** Thank you very much, Mr. Whitman.

Does the defense wish to cross-examine the witness?

**MS. REAVES:** Yes.

**THE WITNESS:** I would like to ask for a bathroom break.

**THE COURT:** I was just about to say that. So we were definitely going to give you a break.

**THE WITNESS:** Okay.

**THE COURT:** I think we could all use a break at this point.

Let's rise for the jury and let them take their break.

(Whereupon, the jury exited the courtroom at 3:47 p.m.)

**THE COURT:** Please be seated. And, Ms. Gou, please take your break at this time as well. You may step down. You will be on cross, so please do not communicate with the government while you are on your break.

(Whereupon, the witness left the witness stand and exited the courtroom at 3:48 p.m.)

**THE COURT:** And five minutes? All right. Why don't we take five -- Mr. Whitman?

**MR. WHITMAN:** Your Honor, may I just add that -- is there any way we could get an approximation from the defense on the cross? Ms. Gou really needs to get back on a plane, like, soon to Switzerland.

So we just want to make sure if there's any way of getting

her off today, whether it be staying ten minutes long or, you know, whatever needs to happen.

THE COURT: Let's find out.

Ms. Reaves, what are you thinking?

MS. REAVES: So I'm bad at estimates, but I definitely think we should be done today. I don't know if the government will have a lengthy redirect, but it's more than an hour before five o'clock. So I hope to be done in less than an hour.

THE COURT: So an hour or less?

MS. REAVES: That's the goal.

THE COURT: All right. And then any redirect. You know, it's ten minutes to 4:00, so we can stay a little late --

MR. WHITMAN: Thank you, Your Honor.

THE COURT: -- but let's try to wrap it up in the five o'clock hour.

MR. WHITMAN: Will do.

THE COURT: This jury has been here for several weeks, as you know. All right. Let's -- as have we. Let's take five minutes.

DEPUTY CLERK: All rise. This Honorable Court stands in recess for five minutes.

(Whereupon, a recess was taken at 3:49 until 3:58 p.m.)

DEPUTY CLERK: All rise. In Honorable Court now resumes in session.

**THE COURT:**  Please be seated, everyone.

Are we ready to have Ms. Gou rejoin us?

**MR. WHITMAN:**  Yes, Your Honor.

**THE COURT:**  Let's have the witness, please.

Ms. Gou, you can just come right on back and retake your seat and make yourself comfortable.  I will remind you that you are under oath.

**MS. REAVES:**  Your Honor, may I approach now with binders?

**THE COURT:**  Yes.  Please go ahead.

**DEPUTY CLERK:**  All rise for the jury.

(Whereupon, the jury entered the courtroom at 4:00 p.m.)

**THE COURT:**  Please be seated.

Ms. Reaves?

### CROSS-EXAMINATION

**BY MS. REAVES:**

**Q.**   Good afternoon, Ms. Gou.

**A.**   Good afternoon.

**Q.**   I wanted to start with some big picture questions.

Mr. Goldstein never instructed you to hide information from the accountants; right?

**A.**   Could you repeat the question?  Sorry, I just didn't hear.

**Q.**   Sure.

Mr. Goldstein never instructed you to hide information from the accountants?

**A.**    No.

**Q.**    And Mr. Goldstein never instructed you to withhold information from the accountants; right?

**A.**    No.

**Q.**    There was never a time when you knew that Mr. Goldstein was making a personal payment, but he told you to label it as a business expense anyway?

**A.**    No.

**Q.**    And Mr. Goldstein highlighted the importance of classifying transactions correctly; right?

**A.**    I believe so, yes.

**Q.**    In general, he told you whether something was business related or personal related?

**A.**    Yes.

**Q.**    Now, on direct examination, you talked a little bit about how when you started the job, you had about a two-week training.

Do you remember that?

**A.**    Yes.

**Q.**    And I think you said on direct exam that it would have been better if the training were a little bit longer or a little bit more extensive; right?

**A.**    Yes.

**Q.**    And part of what happened was that the person you were replacing, Katie Bart, had left the job early; right?

**A.**   I guess.  Sure.

**Q.**   Let me rephrase if you don't have -- part of the problem was that Ms. Bart had another job at the same time that she was training you; right?

**A.**   That was part of it, yes.

**Q.**   And in January 2021, that was still pretty much the pandemic; right?

**A.**   Yes.

**Q.**   And so not all of your training was able to be in person; right?

**A.**   I think most of it was.

**Q.**   Most of your training was in person.

But Ms. Bart wasn't able to be there with you full time; right?

**A.**   That's correct.

**Q.**   And from the overlapping time that you had with Ms. Bart, you are not aware of Mr. Goldstein asking Ms. Bart to hide any information from the IRS; right?

**A.**   I don't think so.

**Q.**   And you didn't learn of -- from the time when you were overlapping, you are not aware of Mr. Goldstein asking Ms. Bart to hide anything from the accountants?

**A.**   No.

**Q.**   You were aware that there was some sort of an IRS investigation at some point; right?

**A.**    Yes.   Katie did mention that.

**Q.**    But you didn't have to do anything with regard to that IRS investigation; right?

**A.**    No.

**Q.**    And so that's why you thought the investigation was over?

**A.**    Yes.

**Q.**    Now, when you first started at Goldstein & Russell, you also knew that Mr. Goldstein had some back taxes that he needed to pay; right?

**A.**    I think I learned on the job that, you know, if I was working on IRS payment plans for previous years, that, yes, that was the case.

**Q.**    Right.   Right.

Because part of your job was that you needed to make these payments to the IRS; right?

**A.**    Yes.

**Q.**    And those payments were paying at least $20,000 a month to the IRS?

**A.**    Yes.

**Q.**    Now, on direct examination, the government showed you an e-mail from one of the GRF accountants, Yong Choi.

**A.**    Okay.

         **MS. REAVES:**   Can we pull up Government's Exhibit 504?

**BY MS. REAVES:**

**Q.**    Now, in this e-mail, the government directed you to the

portion where Mr. Choi says that there is currently no federal payment plan with the IRS.

Do you see that?

**A.**   Yes.

**Q.**   But to be clear, aside from this statement from Mr. Choi in this e-mail, you don't remember having to deal with any paperwork of a payment plan being canceled; right?

**A.**   Any pay -- I don't think I directly dealt with paperwork for payment plans being canceled, no.

**Q.**   Right.  So you don't remember receiving any IRS notice that said that the payment plan was, in fact, canceled?

**A.**   No.  I don't -- I don't think so, no.

**Q.**   And you haven't looked at the IRS records to see whether or not there is a cancelation of a payment plan in Mr. Goldstein's IRS accounts; right?

**A.**   I have not, yes.

**Q.**   So you are just relying on this information that is in this e-mail; right?

**A.**   That's correct.

**Q.**   Okay.

**MS. REAVES:**  We can take this e-mail down?  Thank you.

**BY MS. REAVES:**

**Q.**   But, in fact, what happened was, on behalf Mr. Goldstein, you all kept paying the $20,000 a month; right?

**A.** Yes.

**Q.** And your understanding was that the accountants at GRF, if there needed to be a conversation with the IRS, were having that conversation; right?

**A.** That was what I understood, yes.

**Q.** Now, the government also asked you questions on direct examination about a time when Mr. Goldstein and his wife were trying to move from Maryland to D.C. and buy a house in D.C.

Do you remember that?

**A.** Yes.

**Q.** And this was a couple months into when you started at Goldstein & Russell; right?

**A.** Like, two months, yes.

**Q.** Right. Okay. So this was five years ago; right?

**A.** Yes.

**Q.** And you are starting a new job still?

**A.** Uh-hum.

**Q.** So at this point, you don't remember all of the details of exactly what your role was in helping them prepare to buy a house; right?

**A.** That's correct.

**Q.** I just want to walk you through a couple of things that hopefully will remind you.

So do you remember that one of the things that you were doing was facilitating transfers between bank accounts so that

Mr. Goldstein and his wife could use some retirement savings to put towards the new house?  Do you remember that?

**A.**    Vaguely, yes.  Something like that.

**Q.**    So let's pull up -- this is Defense Exhibit 100.

At the bottom of Defense Exhibit 100, you see this is an e-mail from you to Amy, Ms. Howe, and I think you say, "Hi Amy, I believe today is the day we should be able to put your Vanguard IRA funds into Citibank account.  Let me know when would work for a call."

Do you see that?

**A.**    I do.

**Q.**    And so does this refresh your memory that one of the things you were doing was helping Mr. Goldstein and his wife move money from a retirement account into a bank account; right?

**A.**    Yes.

**Q.**    And this is on March 23, 2021?

**A.**    Yes.

**Q.**    I want to look at another exhibit.  This is Defense 99.

**MS. REAVES:**  Actually, if it's possible to pull up Defense 99 and Defense 98 at the same time.

MR. MENDOZA:  What number?

**MR. WHITMAN:**  What was the last exhibit?

**MS. REAVES:**  Ninety-eight.

**BY MS. REAVES:**

**Q.** So Defense 99 and 98 are both, it looks like, automatic alerts from Citibank; is that right?

**A.** Yes.

**Q.** And the subject is, "your wire transfer was sent."

Do you see that?

**A.** Yes.

**Q.** And one is on March 24, and one is on March 26?

**A.** Yes.

**Q.** And then below each of these e-mails, there is information about money being transferred from the Citibank account to the firm's IOLTA account.

Do you see that?

**A.** Yes.

**Q.** All right. And so part of the reason you received these alerts is because you were on firm bank accounts; right?

**A.** Yes. I think so, though -- yeah.

I think if it were the Citi, it would be because I was on the Citi account.

**Q.** On the Citi account. Okay. Thank you.

So the point of these e-mails -- and if we can look at both e-mails in full -- is on March 24 and March 26, this is -- again, money was being transferred.

This time it looks like from the Citibank account the Goldstein & Russell account; right?

**A.** To the IOLTA account.

Q.   To the Goldstein & Russell IOLTA account.

And the point of this was for Mr. Goldstein and his wife to be able to buy a house; right?

A.   I think that is something I connected later.  Maybe even, you know, through this process rather than at the time.

Q.   Okay.  So to be fair, you didn't need to know the purpose for the money transfers.

You were just helping with whatever you were asked to help with; right?

A.   Yes.

Q.   And then I think the government already showed you this.  This is Defense Exhibit 145.

Do you remember this e-mail that the government showed you?

A.   Yes.

Q.   And, essentially, Mr. Goldstein was checking in with you to find out whether you are able to wire the money from their retirement savings to the party that needs it at the end of the day so that they can purchase this house; is that right?

A.   I don't think that's this e-mail because it says, "Do you have the authority to wire from the IOLTA account?"

Q.   Right.

A.   And I think the question you just asked me is, can you wire to the IOLTA account?

Q.   So let's go through it and make sure we are clear.

So at the bottom, Mr. Goldstein is asking, "Do you have the authority to wire from this IOLTA account or do I need to move it first;" right?

A.    Uh-hum.

Q.    And then your response is, "I don't believe so.  It's a separate account.  Move it to the firm first;" right?

A.    Yes.

Q.    And then Mr. Goldstein says, "Cool.  Make sure you are able to do a million dollar wire tomorrow, please.  Otherwise, we need to send it to Citi for Amy;" right?

A.    Yes.

Q.    So the big import of this is that Mr. Goldstein is asking you to eventually be able to wire almost a million dollars because he would like you to be able to do it instead of him or instead of Amy; right?

A.    I believe so, yes.

Q.    And one of the things about these large wire bank transfers is that sometimes you might have to go into the bank in person or you might have to get authority in advance; right?

A.    That's correct, yes.

Q.    And so Mr. Goldstein is trying to set it up so that whenever they need to money, you can have the authority to transfer it; right?

A.    Yes.

Q.    Do you remember if Mr. Goldstein was traveling or if there

was some reason why he couldn't transfer it himself?

**A.** I mean, I think that's just part of my job to help him, save time. I think he was also probably traveling, but, like, Tom was traveling half the time, so...

**Q.** Okay. The point is, if the money needed to move on a particular day --

**A.** Yes.

**Q.** -- they want to make sure you have the authority to move it; right?

**A.** That's correct.

**Q.** Okay. And so last e-mail I want to show you on this is Defense Exhibit 112. Do you see that?

I'm sorry. We need to wait for it to come up.

All right. So in Defense Exhibit 112 we see at the bottom you're not on this e-mail but then Mr. Goldstein says to you in the next e-mail up from this "I moved money to the firm. Wire 960,000 from the firm to these people with Amy Howe as a reference." And then you respond. "Will do. Just made an appointment with WF."

Do you see that?

**A.** Yes.

**Q.** So essentially you needed to make an appointment with Wells Fargo in order to make sure that this transfer could go through; right?

**A.** Yes.

Q.    And the reason that you were the one who was doing this is because it looks like this was something that required an appointment at the bank; right?

A.    Yes.

Q.    And so if you weren't able to do it, then Mr. Goldstein or his wife would have needed to be the ones to go to the bank or make an appointment with the bank to do it?

A.    That's -- that's vaguely correct.  I mean, that's more or less correct.  I just want to clarify that, later on in this process, there was an ability to where you can phone in.  If you set up, like go through some procedures to set up the wiring, you could just call and do the wire.

      So it's not that you have to make an appointment, but yes. It's something that requires time, right, and that would have taken out Amy and Tom's time.

Q.    Okay.  And so at least at this point in time, the way the process was handled was that you were the one who, you were making an appointment at Wells Fargo to be able to transfer the money?

A.    That's correct.

Q.    And if we look at the amount of time between that initial e-mail where you're e-mailing Ms. Howe about transferring the money from their retirement account to this last e-mail where Mr. Goldstein is asking you to actually transfer it.

            MS. REAVES:  So can we keep this one up and then also

pull up Defense Exhibit 100?

**BY MS. REAVES:**

Q.   Okay.   So we see -- they're in flipped order, but we see that all of these transactions happened between March 23, 2021 and March 29, 2021; right?

A.   Yes.

Q.   Okay.   And again, during this period at the firm, you didn't have to deal with any paperwork with the IRS about collecting Mr. Goldstein's outstanding tax debt; right?

A.   I don't think so.

Q.   Okay.   During this period, you weren't monitoring bank accounts to make sure that the IRS hadn't taken money out of the bank accounts; right?

A.   I was not.

Q.   All right.   And during this period, you were helping Mr. Goldstein to continue to make those $20,000 payments, whether or not the payment plan was still official?

A.   I think so.   Yes.

Q.   Now, in addition to helping with these wire transfers, you also helped Mr. Goldstein and his wife kind of gather some of the documents they needed for the mortgage company; is that right?

A.   Yes.

Q.   And some of those documents the mortgage company asked included tax documents; right?

**A.**    Yes.

**Q.**    So the government talked a little bit about it earlier.

          **MS. REAVES:**    I want to pull up, this is Defense Exhibit 324.

**BY MS. REAVES:**

**Q.**    And I think this is -- the government showed you a version of this on direct.  But in Defense Exhibit 324, we see at the bottom there is an e-mail between someone at First Savings bank and Ms. Howe and Mr. Goldstein that you're not on yet where Ms. Graham is asking Amy and Tom, "We need your actual personal tax returns all pages, not transcripts for 2018 and 2019. Also, what is your personal IRS obligation."

    Do you see that?

**A.**    Yes.

**Q.**    And the date of this e-mail is February of 24th, 2021; right?

**A.**    Yes.

**Q.**    And so as of February 24, 2021, this First Savings, whatever it is, is asking for additional information about Mr. Goldstein's taxes; right?

**A.**    Yes.

**Q.**    And, then, if we see up that Mr. Goldstein responds copying you or, I guess, forwards the e-mail to you and asked you to get them the payment plan to the IRS; is that right?

**A.**    Yes.

Q.   So at least -- and then if we see your response to Mr. Goldstein, you say, and this is still February 24, 2021. "I asked Yong about this last week and still haven't received a response.  I'll ask again."

Do you see that?

A.   Yes.

Q.   And so what was happening in this time was you were already talking to the accountants about getting tax documents to give to the mortgage company; right?

A.   That's correct.  Or that seems, yes.

Q.   It's hard to remember based on these documents.  That seems that that's what was happening?

A.   Yes.  Yes.

Q.   Now, on direct examination you also talked a little bit about the role you had with financial transactions at the firm as the firm manager.  Do you remember that?

A.   Yes.

Q.   And I just want to clarify a few things.  So you testified on direct examination that you felt like you needed -- I think you said yes or no to whether you had enough training; is that right?

A.   Yes.

Q.   Okay.  Now, to be clear, this company, Bench, was supposed to be doing the bookkeeping services; right?

A.   Yes.

Q.   And you weren't present at the firm for actually making the decision to switch to Bench from having GRF do the bookkeeping; right?

A.   I was not.

Q.   But Bench was supposed to be bookkeeping; right?

A.   Yes.

Q.   And Bench wasn't just a software.  There was also a person assigned to your account who was supposed to work with you in the bookkeeping; right?

A.   Yes.

Q.   And your role, in terms of financial records, was to communicate with Bench and to communicate with GRF when they had questions that needed to be answered by the firm; right?

A.   Yes.

Q.   Now, the government showed you an e-mail -- I want to see if I can find that e-mail -- so there was a time when you were working at the firm and the government showed you an e-mail about an almost $5 million mistake; right?

A.   Yes.

Q.   But to be clear, you were not actually responsible for classifying this almost $5 million in the accounting records; right?

A.   I don't think so because the transaction was in 2020 which was before my time.

Q.   Right.  Okay.  So to be clear, when we talk about the

mistake that you made, the mistake was just you missed something in an e-mail from the accountants that you needed to communicate to Mr. Goldstein; right?

**A.**    That's correct.

**Q.**    And in that e-mail the government showed, it started out with the accountants talking to each other and then Mr. Goldstein forwarded it to you; right?

**A.**    Yes.

**Q.**    Right.  You don't actually know what the accountants told Mr. Goldstein; right?

**A.**    I -- I don't know anything besides what was forwarded to me in that e-mail chain.  Yes.

**Q.**    Right.  Right.  To say that you don't know if the accountants called Mr. Goldstein and said "I've been trying to get in touch with Angie and she didn't respond to the e-mail," right?

**A.**    I don't -- I don't think so.

**Q.**    So basically --

**A.**    I don't know.  Yes.

**Q.**    The only context you had was the long e-mail the accountants had sent that sandwiched this information in?

**A.**    Yes.

**Q.**    And then Mr. Goldstein copied you back in; right?

**A.**    That's correct.  Yes.

**Q.**    But at the end of the day, the thing that you were

responsible for was, when you received e-mails, communicating with the people who needed to be communicated with; right?

A.    That's correct.

Q.    And Mr. Goldstein was a little bit, it seems like he was frustrated that this was something that was almost missed; right?

A.    Yes.

Q.    And the reason he was frustrated was because the taxes were about to be filed and his income would have been $5 million higher than it actually was; right?

A.    Yes.

Q.    And if you saw in those e-mails with -- that the government showed you, the accountants were ready to just go ahead and file the tax returns without having received a response back; right?

A.    I -- potentially, yes.

Q.    And at the end of the day, what Mr. Goldstein told you was that you could just ask him; right?

A.    Yes.  Yes.

Q.    So Mr. Goldstein was always willing to answer questions about these transactions; right?

A.    Yes.

Q.    And if you didn't know how to do something, Mr. Goldstein was happy for you to ask the question so that you could figure out the answer; right?

**A.** Yes.

**Q.** Now, I just want to talk briefly about kind of the role that you did have in helping to prepare tax returns for Mr. Goldstein and for Goldstein & Russell. Okay?

**A.** Sounds good.

**Q.** All right. So one of the things you did in your role for Mr. Goldstein for Goldstein & Russell was help collect tax documents and give them to the accountants so that the accountant could prepare the tax returns; right?

**A.** Yes.

**Q.** All right. And I want to pull up, this is Defense Exhibit 252. All right. And 252, if we start at the bottom, there is an e-mail from Ian to you copying also April Wu that says "Angie, did you need the vendors that G & R sent 1099s to or the companies that sent you 1099s? April sent the former. I'm not sure we have the latter, but I can ask my tax department."

Do you see that?

**A.** Yes.

**Q.** Okay. And so to orient us, in this Ian is one of the accountants on the accounting side at GRF; right?

**A.** Yes. But by accounting side, do mean like firm accounting versus personal or?

**Q.** I can clarify. So at GRF, even though Goldstein & Russell started to use Bench, you still -- Goldstein & Russell still

used the accountants to help review the accounting records and also to help prepare tax returns; right?

A.    Yes.

Q.    Okay.  And so when Ian, in this e-mail, is saying "I can ask my tax department," that's because Ian is an accountant at GRF but he's not the tax guy at GRF; right?

A.    Yes.

Q.    And he's saying that -- or I need to know what he's saying.  What happened when you were at the firm is that, on the side of Goldstein & Russell making business payments, the accountants would sometimes ask you for information so that they could send out 1099s; is that right?

A.    Yes.

Q.    Right.  And 1099s are these tax documents that would document that payments that Goldstein & Russell had made for businesses -- business purposes; right?

A.    Yes.

Q.    And it was a regular thing that, on the Goldstein & Russell payment side, they would send out these 1099s for business payments; right?

A.    Yes.

Q.    And Mr. Shuman is saying, "Okay.  I need to ask our tax department about the 1099s that Goldstein & Russell receives." Right?

A.    I think so.  I'm having slight trouble following because

it is 10:00 p.m. for me normally my time.

Q.    I'm sorry.

A.    So like, yes, they are tax forms that the accountants need.  And it looks like I'm asking for info here.  Yeah.

Q.    Okay.  So let's read it.  I want to walk through.  And if you have questions, just let me know.

A.    Okay.

Q.    So Anne is saying to you, "Angie, did you need the vendors that G & R sent 1099s to"; right?

A.    Yes.

Q.    That part is talking about the 1099 tax documents that Goldstein & Russell sends out; right?

A.    Yes.  Yes.

Q.    Okay.  Or the companies that send you 1099s.  So the 1099s that Goldstein & Russell receives from other parties; right?

A.    Yes.  Yes.

Q.    Okay.  And he says -- I think we don't know from this e-mail why you're asking for this information, but Mr. Shuman says, "If it's the latter, if it's the 1099s from other companies, I have to ask my tax department."

     Do you see that?

A.    Yes.

Q.    All right.  And then let's look at his response a little bit later.

     Well, so you respond saying, "The latter.  Thanks"; right?

**A.**    Uh-hum.

**Q.**    And so you were asking information about the 1099s that Goldstein & Russell receives from other companies; right?

**A.**    Yes.

**Q.**    And then Mr. Shuman responds, he says, "Hi, Angie.  I talked to Walter and he confirmed that as a corporation, companies don't need to issue 1099s to G & R for services.  You might get a few by mistake, but they don't require them, so we don't keep them."

       Do you see that?

**A.**    I do.

**Q.**    Okay.  So essentially, Mr. Shuman, on behalf of Walter -- is "Walter" Walter Deyhle?

**A.**    Yes.

**Q.**    Okay.  Mr. Shuman, on behalf of Mr. Deyhle, is saying sometimes we get 1099s by mistake but we don't require them, so we don't keep them; right?

**A.**    Yes.

**Q.**    Do you know whether that is correct or not, that the accountants who were doing Goldstein & Russell's taxes don't require and don't keep the 1099s they receive?

**A.**    I don't think that's quite correct.  I do believe that we still kept them, or I still kept them and would send them to the accountants so that they would have the record.  But, I mean, that's what this e-mail says.

Q.    Okay.  But you don't know one way or the other what Mr. Deyhle was actually doing with the 1099s you sent him; right?

A.    Yes.

Q.    And this was in July of 2022; right?

A.    Yes.

Q.    And your understanding is Goldstein & Russell had been using Mr. Deyhle and GRF for accounting for years; right?

A.    Yes.  That's correct.

Q.    Now, the government also asked you some questions about cryptocurrency transactions.  Do you remember that?

A.    Yes.

Q.    Okay.  I want to focus on the portion that relates to Mr. Goldstein's tax returns.  Okay?

A.    Okay.

Q.    Now, do you have any memory of asking Mr. Goldstein for tax purposes whether he had any cryptocurrency transactions in 2020?

A.    No.

Q.    Do you have any memory of asking Mr. Goldstein for tax purposes whether he had any cryptocurrency transactions in 2021?

A.    No.  I mean, I -- I -- yes to your question.  Right.  I do not remember ever asking Tom anything about cryptocurrency.

Q.    Okay.  Are you aware that the cryptocurrency discloser was

a relatively new requirement around 2019, 2020?

A.    I am now.

Q.    Okay.  But the government hasn't shown you any tax organizer for tax years 2020 or 2021 where you filled out that information one way or the other and gave it to the accountants; right?

A.    I fill -- can you repeat the question?

Q.    Take a step back.

Do you know what a tax organizer is?

A.    Yes.

Q.    All right.  And on direct examination, the government didn't show you any tax organizer that you completed for Mr. Goldstein's 2020 taxes; right?

A.    Yes.

Q.    Meaning, they did not show a tax organizer?

A.    Or I thought the 2020 -- actually, did they?  They did show me 2020 tax filing instructions, I believe.

Q.    Okay.  Right.  Tax filings instructions?

A.    Instructions, yeah.

Q.    But did the government show you any checklist that shows you whether the accountant asked you:  Does Mr. Goldstein have any cryptocurrency transactions for 2021?

A.    I don't think so, no.

Q.    And did the government show you any checklist where the accountants asked you:  Does Mr. Goldstein have any

cryptocurrency transactions for 2020?

**A.**    I don't believe so.

**Q.**    All right.  Do you remember any communication with GRF about whether Mr. Goldstein had any cryptocurrency transactions in 2020 or 2021?

**A.**    I don't recall.

**Q.**    And you generally communicated with the accountants via e-mail; right?

**A.**    Yes.

**Q.**    You haven't seen any e-mail where the accountants are asking you whether Mr. Goldstein has any cryptocurrency transactions to report for 2020 or 2021 taxes; right?

**A.**    I don't think so.

**Q.**    Now, the government asked you some questions about Tobey Maguire.  Do you remember that?

**A.**    Yes.

**Q.**    Okay.  And you don't remember any sort of legal matter involving Mr. Maguire; right?

**A.**    No.

**Q.**    Now, when you were at the firm there was a system called FreshBooks where you could track open matters at the firm; right?

**A.**    I did not use FreshBooks for tracking.  But it was the application we used to make retainer letters and send invoices, that's correct.

Q.    Okay.  So if Ms. Bart had opened a matter for Mr. Maguire and put it in FreshBooks, you could have seen it there; right?

A.    Yes.

Q.    All right.  And to be clear, if Mr. Maguire's accountant had called Goldstein & Russell and asked for an invoice, you would have asked Mr. Goldstein about it and sent one; right?

A.    That sounds correct, yes.

Q.    And if Mr. Maguire's accountant had called or e-mailed Goldstein & Russell and said, Hey, we need you to fill out a W-9 so we can provide the tax documents, you would have -- you would have talked to Mr. Goldstein and sent that information; right?

A.    Yes.

Q.    And so if there was a matter for Mr. Maguire that was open before you started there, it could be that it just didn't come up during your time at the firm?

A.    That's, yeah, very possible.

Q.    Now, in your experience in managing the firm, Mr. Goldstein was more of a big-picture guy than a details guy; right?

A.    Yes.

Q.    And he wasn't always aware of firm finances?

A.    I guess, yes.

Q.    He wasn't always tracking firm finances in detail?

A.    I don't believe so.

**Q.** All right. Because, for example, Mr. Goldstein would ask you to update him on the balances in his bank accounts; right?

**A.** That's correct.

**Q.** And I want to show you --

   **MS. REAVES:** Can we pull up government's -- sorry -- Defense Exhibit 744.

**BY MS. REAVES:**

**Q.** Now, in Defense Exhibit 744, you see that Mr. Goldstein receives an e-mail from Mr. Deyhle and it says, "Hi, Tom. Will send 2A. You need to get 2B from Bench."

Do you see that?

**A.** Yes.

**Q.** And then, this is in March of 2021; right?

**A.** Yes.

**Q.** And then Mr. Goldstein forwards this e-mail to you, and what does he say?

**A.** He asked, "Do you know what he means by 'Bench'?"

**Q.** Do you know what he means by "Bench"?

**A.** I mean, I do.

**Q.** What did he mean by "Bench"?

**A.** He meant the bookkeeping service that we had swapped to right before -- or before my time, essentially, that we kept throughout my time.

**Q.** All right. But fair to say, Mr. Goldstein wasn't deeply involved in using Bench; right?

A.    No.

Q.    Now, in your experience at GRF, you also -- sorry -- in your experience at Goldstein & Russell, there were times when you weren't totally satisfied with the services of the accountants at GRF; right?

A.    That's correct.

Q.    There were times when you thought that they needed to be better with their communication; right?

A.    Yes.

Q.    You thought they could be more detail oriented?

A.    Oh, for sure.

Q.    You thought that they sometimes were slow to respond to things when you had questions?

A.    Yes.

Q.    I want to go through --

        **MS. REAVES:**  Let's pull up, this is Defense Exhibit 453.  All right.  And if we can start at the bottom of this e-mail.  Sorry.  The -- page 6 of this e-mail.

**BY MS. REAVES:**

Q.    All right.  And this e-mail starts with you e-mailing Mr. Deyhle and Mr. Choi, and saying "Hi, all.  In which state did we file Amy's taxes in 2021?  Thanks, Angie."

    Do you see that?

A.    Yes.

Q.    Okay.  And you sent this e-mail in February of 2023;

right?

**A.**  Yes.

**Q.**  So this was almost two years after you had helped Mr. Goldstein and Ms. Howe with these transactions to purchase a house in D.C.; right?

**A.**  Yes.

**Q.**  And as we saw in some of the earlier e-mails, the accountants at GRF had been involved in helping to pull documents for the purchase of that house in D.C.; right?

**A.**  Yes.

**Q.**  Let's go to the next e-mail up.  And Mr. Deyhle says, "Hi, Angie.  No state returns have been filed for 2021.  I am waiting for the firm income broken out by state.  Thanks."

Do you see that?

**A.**  Yes.

**Q.**  And let's see the response.

So you e-mail back and say, "Well just, to clarify, this also means no taxes have been filed in D.C. for 2021?"

And let's see Mr. Deyhle's response.  Mr. Deyhle responds, "Correct."

Okay.  And so this is February 2023 and Mr. Deyhle is saying, Oh, we didn't file the D.C. taxes for Ms. Howe yet; right?

**A.**  Yes.

**Q.**  All right.  And then let's keep going up in this chain.

You respond again to Mr. Deyhle, "Hi, Walter.  Tom wants to know why we need the firm income info to file Amy's individual D.C. tax return.  Thanks."

And then a little more than a week later, you e-mail Mr. Deyhle again.  "Hi, all.  Following up on this.  In addition" -- and a question about their kids -- "Thanks, Angie"; right?

A.    Yes.

Q.    All right.  And then let's look another week later, you follow up again with Mr. Deyhle.  "Hi, Walter.  Could we get an update on why Amy's individual tax return for D.C. hasn't been filed yet?"

And then let's see Mr. Deyhle's response.  Mr. Deyhle says, "Hi, Angie.  Two things.  One, when and how did D.C. enter the picture?  Two, the 2021 return reports no income for Amy.  Thanks."

Do you see that?

A.    Yes.

Q.    Okay.  So to make sure we all understand what's happening here is, you had reached out to just get documentation of something tax related for Ms. Howe; right?

A.    Yes.

Q.    And then after some back and forth, Mr. Deyhle is asking you, Why are we even talking about D.C. and I think that Ms. Howe has no income; right?

**A.**    Yes.

**Q.**    Now, at this time Mr. Deyhle was the person responsible for the taxes for Mr. Goldstein and Ms. Howe; right?

**A.**    I believe so, yes.  And Yong.

**Q.**    Yes.

And also at this time, Ms. Howe worked for SCOTUSblog, and so the accountants were also handling the tax documents for her payments; right?

**A.**    I believe so, yes.

**Q.**    All right.  Let's keep going up in this thread.  You respond, "Hi Walter.  Amy received income from SCOTUSblog for working as a contractor in 2021 and she moved to D.C. in April of 2021.  Which return are you talking about?"  And then Mr. Deyhle responds, "She doesn't show up on the SCOTUSblog 1099 vendor analysis and she wasn't issued a 1099."

Do you see that?

**A.**    Yes.

**Q.**    And so Mr. Deyhle is saying, well, if she was working there, we didn't send out the 1099 we were supposed to send; right?

**A.**    I think so, yes.

**Q.**    And let's look at your response.  "Hi Walter, please find Amy's 1099 for 2021 attached.  It seems we never changed her address, which should be addressed, which would need to be corrected on the personal return" and then you nudge again

about the question about their kids.

Do you see that?

A.    Yes.

Q.    And let's see Mr. Deyhle's response.  He says, "We're preparing 1099s too for three other people.  Not sure it matters to the IRS.  However, the 120,000 in income is not reported on their 2021 return.  It will have to be amended.  We can prepare a D.C. return for Amy.  Are Tom and Amy going to be filing separate federal returns going forward?  If so, Tom makes too much money to get the credit for the kids."

Do you see that?

A.    Yes.

Q.    All right.  And the last portion and then we're going to talk about this.  Your response, "Hi, Walter.  Tom and Amy will be filing separate tax returns going forward and should have been since 2021.  I sent you an e-mail in April of 2021 regarding this which you confirmed."

Do you see that?

A.    Yes.

Q.    All right.  So that was a long back and forth, but big picture here is that --

MS. REAVES:  And we can -- you can take down the -- we can just look at the document in whole.  Thank you.

BY MS. REAVES:

Q.    Big picture here is that you were reaching out to the

accountants who work on Mr. Goldstein's and Goldstein & Russell's taxes to get information about prior tax returns; right?

A.    Yes.

Q.    And in the course of this back-and-forth conversation, it turned out that Mr. Deyhle had forgotten that Tom and Amy bought this house in D.C.; right?

A.    It seems so.

Q.    And he had forgotten that he was told to file separately and that he confirmed that; right?

A.    Yes.

Q.    And he had not reported Ms. Howe's income on the 1099; right?

A.    Yes.

Q.    And it seemed that he thought that the reason they wanted the 1099 even though you were able to provide one; right?

A.    I guess so.

Q.    And because of all of that, Mr. Deyhle hadn't reported Ms. Howe's income on the 2021 tax returns; right?

A.    It seems so, yes.

Q.    And also hadn't filed a 2021 tax return for Ms. Howe; right?

A.    Yes.

Q.    And it turns out that this series of mistakes were just out there for several years until 2023 when you all discovered

that there was this problem; right?

**A.**    Yes.

**Q.**    Now, you have no reason to believe that Mr. Goldstein or Ms. Howe intentionally omitted any of this information; right?

**A.**    No.

**Q.**    But they were relying on Mr. Deyhle and the accounting firm to help them prepare their taxes accurately each year; right?

**A.**    Yes.

        **MS. REAVES:**  Could I just have the husher briefly?

        **THE COURT:**  Yes.

        **MS. REAVES:**  Can we have that document back just briefly?

**BY MS. REAVES:**

**Q.**    So at the top line we see that it says, "So this seems to be a very messed up situation.  Can we talk on Monday?  I'm available all day."  Do you see that?

**A.**    Yes.

**Q.**    And if we flip to the page 1, you can see that that's the point at which Mr. Goldstein was looped into this conversation; right?

**A.**    Yes.

**Q.**    Do you agree that it was a pretty messed up situation with the taxes?

**A.**    I do.

**MS. REAVES:**  Thank you.  No further questions.

**THE COURT:**  Thank you very much, Ms. Reaves.

Is there any redirect from the government?

**MR. WHITMAN:**  Briefly, Your Honor.

REDIRECT EXAMINATION

**BY MR. WHITMAN:**

Q.    Ms. Gou, do you recall questions about whether Mr. Goldstein had ever asked Ms. Bart to hide anything from the accountants or from the IRS?

A.    Yes.

Q.    Did you know, when you started at Goldstein & Russell, that the IRS criminal investigators had visited the office on October 14th of 2020?

A.    I don't believe so.  I know -- again, I know that Katie mentioned there was an investigation, and now I'm not -- I don't think she said on October 4th or there was so not quite. Yeah.

Q.    Did you know that Mr. Goldstein offered Ms. Bart Bitcoin after that visit by IRS criminal investigators in October of 2020?

A.    No.

Q.    Did you know that Mr. Goldstein offered Ms. Bart expensive head phones following that visit by IRS CI in October of 2020?

A.    No.

Q.    Did you know that Mr. Goldstein offered Ms. Bart a $10,000

bonus after the IRS criminal investigators visited the office on October 14th of 2020?

**A.** No.

**Q.** Did you know that Mr. Goldstein had offered to pay for Ms. Bart's student loans after the visit by the IRS criminal investigators to the Goldstein & Russell offices on October 14th of 2020?

**A.** No.

**Q.** You were shown a document where Mr. Goldstein asked you to add Ms. Howe's name as the reference or memo on a payment. Do you recall that?

**A.** Yes.

**Q.** How common was that when you were working for Mr. Goldstein that he would ask you to put his wife, Amy Howe's name in the memo or reference line of a payment?

**A.** I don't think that was very common.

**Q.** You were asked about Mr. Goldstein's knowledge of the finances of Goldstein & Russell. Do you recall that?

**A.** Yes.

**Q.** Besides you and Mr. Goldstein, was there anyone else at the firm who knew the finances better?

**A.** I don't believe so. At Goldstein & Russell, right? No.

**Q.** You were asked if -- well, you were asked if Mr -- well, I'll just skip that.

You were asked a series of questions about 2021 taxes for

Ms. Howe. Do you recall that?

A. Yes.

Q. You were talking about a conversation that was happening over e-mail in 2023?

A. Yes.

Q. Did that e-mail chain include Mr. Goldstein, certain of the members of the accounting firm as well as yourself?

A. Yes.

Q. Did the issue of filing an amended return come up in that conversation in 2023?

A. In the phone conversation?

Q. In the e-mail conversation that we were looking at.

A. Sorry. Could you just repeat the question?

Q. Do you recall there being any conversation in which the accounting firm or representatives of the accounting firm referenced the possibility of filing an amended return that would pick up Ms. Howe's income for 2021?

A. Yes.

Q. In the context of that conversation, did Mr. Goldstein say that he wanted to amend his 2016 tax returns to include millions more in gambling income?

A. I don't believe so.

Q. Did Mr. Goldstein say I would like to amend my 2017 tax return because I actually won $3.2 million that year?

A. I don't think so.

Q.    Did Mr. Goldstein say we should amend my 2019 tax return because I actually had $250,000 of winnings that year?

A.    No.

Q.    Did Mr. Goldstein say we should amend the 2020 tax return because I had at least 23,000 of winnings that year?

A.    I don't think so.  No.

Q.    Did Mr. Goldstein say we should amend the 2021 tax return because he had made $177,000 gambling that year?

A.    No.

        MR. WHITMAN:  One moment to confer, Your Honor.

BY MR. WHITMAN:

Q.    Did Mr. Goldstein ever offer you any Bitcoin on your way out of Goldstein & Russell?

A.    No.

Q.    Have you ever heard of Mr. Goldstein offering other firm managers besides -- or any other firm managers at Goldstein & Russell Bitcoin?

A.    I had not.

        MR. WHITMAN:  Nothing further.  Your Honor.

        THE COURT:  Thank you very much, Mr. Whitman.

    Have all questions been asked of the witness?

        MS. REAVES:  Yes, Your Honor.

        THE COURT:  All right.  Ms. Gou, thank you very much for your time and testimony.  You may step down and be excused.

        Have a good evening and a safe flight.

THE WITNESS:  Thank you.

(Witness excused.)

- - -

THE COURT:  Counsel, could we come to the husher for just a moment?

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT:  Mr. Beaty, are you on?  Okay.  Mr. Kravis?

MR. KRAVIS:  Yes, Your Honor.

THE COURT:  Mr. Goldstein?  Okay.

Mr. Beaty, where are we?  It's five o'clock.  Where are we in terms of what you would like to do?

MR. BEATY:  I think we'd like to break for the day with the one question that Mr. Kravis wants to put his objection on the record for the third stipulation.  Then we can, if Your Honor wants to end the day, that would be a good way to end it reading the third stipulation, third and fourth.

THE COURT:  Okay.

MR. KRAVIS:  That's fine.

THE COURT:  You want me to read them to the jury?  That's going to take me more than five minutes.

MR. BEATY:  Yeah.  That works.  We don't need to -- we're not planning to call another witness just because where we were and how late in the day we are.

THE COURT:  All right.  Mr. Kravis?

MR. KRAVIS:  Your Honor, this concerns the third joint stipulations of fact.  As the Court knows, the defense has objected to the government's continuing presentation of evidence of personal spending by Mr. Goldstein as cumulative and substantially more prejudicial than probative.

So at this point in the trial the jury has heard evidence about the 2022 poker.  They heard in the opening about a car and a rental property and the restaurant bill.  Last week we heard about the night at the club where he saw Paris Hilton and to see the play Chicago.  So the defense objects to further presentation of evidence on this topic.

I understand the Court has overruled that objection.  We agreed to the third joint stipulation here, so that the government would not have to call a live witness from out of town to present all of this.

So I just want to make clear that we're agreeing to the stipulation for the convenience of the trial, but we are continuing to object to the presentation of this evidence.

THE COURT:  Understood, Mr. Kravis.  Your objection is duly noted.

Anything further from the government before I read the two stipulations?

MR. BEATY:  No, Your Honor.  I was looking for a copy -- if the Court still has a second copy, I'm happy to put

them on the Elmo while we --

        **THE COURT:**  I think Mr. Cook may have them.  Yes, you may.

        **MR. BEATY:**  May I approach?

        **MR. KRAVIS:**  Right.  I don't think we need to put this one on the Elmo.  There is no chart here.

        **THE COURT:**  Okay.  There's a chart on the fourth stipulation of fact, as I'm reading it.

        **MR. KRAVIS:**  All right.  It's a pretty simple chart, but I don't object to the fourth one.

        **THE COURT:**  All right.  I'm going to come off and then we'll do the stipulations once the documents are up.

                (Whereupon, discussion concluded.)

        **THE COURT:**  Members of the jury, the parties have entered into two additional stipulations that I am going to read to you now.  You'll also see them up on your screen, and you will be able to take them with you to the jury room when I begin your deliberations.

    Please give me your attention at this time.  I'm going start with the third joint stipulation of fact.  Okay.

    On January 18, 2017, Thomas Goldstein paid $110,000 to rent Unit 12A, an apartment in the -- West Hollywood located at 6250 Hollywood Boulevard, Los Angeles.

    On May 11, 2017, he paid an additional $116,800 in rent.

    On February 14 of 2018, he was refunded a security deposit

of $32,500.

In January 2017, Thomas Goldstein purchased a 2017 Bentley Bentayga, then ending in 5183.  The purchase price for the car was $255,635.  On January 23 of 2017, he made $100,000 down payment.  For March 2017 through September of 2018, he made monthly payments typically of $3,025.07 to Bentley for the car.

On March 2 of 2018, Thomas Goldstein paid $70,600 to rent David Belasco's house located at 1712 Manhattan Avenue, Hermosa Beach, California, for July and August of 2018.

On September 5 of 2018, Thomas Goldstein paid $25,000 to Diamond Elyte.  That month, he then stayed at the St. Regis Hotel in Bali, Indonesia, and took a private cruise there. Diamond Elyte credited his payment towards $14,560 for the St. Regis and $2,704.89 for the cruise.

In June of 2020, Thomas Goldstein purchased a 2020 Bentley Continental GTC VIN ending in 6238.  The purchase price for the car was $291,355.  On June 16, 2020, he made a $60,000 down payment.  From August 2020 through September 2022, he made monthly payments typically of $4,651.69 to TD Auto Finance for the car.

On April 13 of 2021, Thomas Goldstein paid $143,000 to rent Unit 2009, an apartment in the Brickell Flatiron located at 1000 Brickell Plaza, Miami, Florida.

On May 18, 2021, Thomas Goldstein paid $202,274 to rent Unit 4702, an apartment in the Waldorf Astoria located at

3750 South Las Vegas Boulevard in Las Vegas.

On November 28, 2022, Thomas Goldstein paid $382,857.15 to Diamond Elyte to rent Le Manoir de Lorient, a villa on the island of St. Barthelemy, St. Bart's.

From December 26, 2022, through January 5 of 2023, Mr. Goldstein's poker investors later reimbursed him for all but approximately $125,000 of the cost by allowing him to deduct the rest of the cost from his -- from their shares of Mr. Goldstein's winnings against Mr. Beal.

And lastly, on November 29, 2022, Thomas Goldstein paid $200,000 to Diamond Elyte to purchase a wristwatch:  A black ceramic and rose gold Audemars Piguet -- excuse my pronunciation -- fiftieth anniversary Royal Oak self-winding chronograph.

"I have reviewed the factual stipulations above and I agree that they are true and correct," signed by Mr. Goldstein and a representative of the government.

Next, we'll turn to the fourth joint stipulation, which I believe is now up on your screens as well.  It reads as follows:

In calendar year 2020, Thomas Goldstein paid poker losses totaling $350,000 to Michael McGuinness as listed in the transactions below:

June 9, 2020, $100,000; August 18, 2020, 100,000; September 11, 2020, $150,000.  Total gambling losses, $350,000.

On September 22 of 2020, Thomas Goldstein received income in the form of $70,000 in poker winnings from Michael McGuinness.

On May 5 of 2021, Thomas Goldstein paid a $150,000 poker loss to Michael McGuinness.

On May 17, 2021, Thomas Goldstein received income in the form of $75,000 in poker winnings from Michael McGuinness.

In 2022, Thomas Goldstein and Michael McGuinness entered an agreement in which Mr. Goldstein would invest in Mr. McGuinness' poker matches against other players by loaning him money to fund those matches.

On May 27 of 2022, Mr. Goldstein was wired $800,000 to Mr. McGuinness as the first part of that loan.

On August 16, 2022, Mr. Goldstein wired $200,000 to Mr. McGuinness as the second part of that loan.

And lastly, on October 24, 2022, Thomas Goldstein made a poker staking payment of $500,000 to Michael McGuinness for Mr. McGuinness' piece of Mr. Goldstein's winnings from poker matches against Andrew Beal.

And again it states, "I have reviewed the factual stipulations above and agree that they are true and correct," signed by Mr. Goldstein and a representative of the United States.

That concludes the two stipulations.  Thank you so much for your attention.  And thank you, Counsel.  I believe that we

are just about at the 5:00 p.m. hour. And so without objection, I'm going to invite the jury to step down for the evening.

Before you get up, a few gentle reminders. Please do not talk about the case with your fellow jurors or anyone else. Please do not watch or read anything about this case on the news media or social media. And please do not do any independent research during your break. With that, I wish a good evening. Have a wonderful evening.

Please rise for the jury.

(Whereupon, the jury exited the courtroom at 4:59 p.m.)

THE COURT: Please be seated, everyone. Yes, you can bring it up to the desk.

All right. Well, before we break, I do want to get a sense of what we can expect tomorrow from the government, Mr. Beaty.

MR. BEATY: Yes, Your Honor. If you'll give me a moment, I'll just tell you. I think since we're already at the five o'clock hour, our plan tomorrow is Sarah Harrington, I believe it's Gregg Busch, Mr. Cooper, and then we'll have Walter Deyhle.

THE COURT: Harrington. Did you say Busch?

MR. BEATY: And I'll e-mail this to you, Your Honor, as well.

THE COURT: Okay.

**MR. BEATY:**  Harrington, Busch, Cooper, and Deyhle.

**THE COURT:**  Okay.  All right.

**MR. BEATY:**  I think Mr. Deyhle will take a considerable amount of time and will likely carry to the next day.

**THE COURT:**  So he'll probably carry over?

All right.  Anything else you need to share before we depart?

**MR. BEATY:**  Your Honor, you mentioned something this morning.  I just want to make sure we're crystal clear about it.

We're moving as expeditiously as possible.  Obviously, when we started this, the government estimated its case would be 15 days.  I think we are in, technically, day seven.  And I think we are -- likely be able to wrap up by Friday.  You had asked about Thursday.  We had agreed -- or we were planning to try to be done on Thursday, but because of this issue with defense witness availability, we had agreed and have set aside the afternoon of Thursday for two defense witness.

And so I just -- you know, we could just go straight through, but there's a problem about availability.

So I just didn't want Your Honor to be left with the impression, A, that we're stalling or not -- you know, not trying to go as fast as we can; and B, to the extent you thought it was going to be Thursday, I didn't want you to be

disappointed if it's Friday.

THE COURT: Okay. Well, a couple things. As you know, Thursday morning we're still scheduled to have a motions hearing, so we'll have to figure out how that's going to impact the shuffling of the witnesses.

Friday, I'm probably going to have to wrap up before 5:00. Probably in the four o'clock hour, just to flag that. I will sit on Friday, but I can't stay until 5:00.

So I guess we should talk maybe Wednesday about how we're going to break to deal with the motions practiced on Thursday. I did ask those individuals to be here. So we're going to have to spend, you know, a little time in the morning to take care of that and then pivot back to the witnesses.

MR. BEATY: Sounds good.

THE COURT: All right. Anything else?

MR. BEATY: No, Your Honor. Thank you.

THE COURT: Okay. Mr. Kravis, anything from you?

MR. KRAVIS: Just one question. Does the jury know that we're sitting on Friday?

THE COURT: Well, they will know in about two seconds if they don't know. I thought they did.

MR. KRAVIS: Okay. Thank you.

THE COURT: Okay. Apparently, that has not been communicated, but it will be.

MR. KRAVIS: Thank you, Your Honor.

**MR. BEATY:**  Thank you, Your Honor.

**THE COURT:**  Okay.  Anything else?

**MR. KRAVIS:**  Not from the defense.  Thank you.

**THE COURT:**  All right.  Well, have a good evening, Counsel.  We'll see everyone in the morning.  We are adjourned.

**DEPUTY CLERK:**  All rise.  This Honorable Court stands adjourned.  Thank you.

(Proceedings concluded at 5:02 p.m.)

- - -

C E R T I F I C A T E

        I, KIMBERLY A. BURSNER, Federal Official Court Reporter in and for the United States District Court for the District of Maryland, do hereby certify,  pursuant to 28 U.S.C. §753, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

*Kimberly Bursner*

_____
Kimberly A. Bursner
Registered Professional
Reporter & Federal
Official Court Reporter