IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

_____

UNITED STATES OF AMERICA          )
                                  )
    Plaintiff,                    )
                                  )
       vs.                        )Case Number
                                  )8:25-cr-00006-LKG-1
THOMAS C. GOLDSTEIN               )
                                  )
    Defendant.                    )

TRANSCRIPT OF JURY TRIAL – DAY 13
BEFORE THE HONORABLE LYDIA K. GRIGGSBY
UNITED STATE DISTRICT JUDGE
THURSDAY, FEBRUARY 5, 2026 at 9:20 a.m.

APPEARANCES:

On Behalf of the Plaintiff:

        UNITED STATES ATTORNEY'S OFFICE – DOJ
        BY:   ADEYEMI ADENRELE, ESQUIRE
             SEAN BEATY, ESQUIRE
             SEAN GORDON-MARVIN, ESQUIRE
             HAYTER WHITMAN, ESQUIRE
        36 South Charles Street, Suite 400
        Baltimore, Maryland 21201
        (410) 209-4800

On Behalf of the Defendant:

        MUNGER, TOLLES & OLSON, LLP
        BY:  STEPHANY REAVES COUPER, ESQUIRE
             ADEEL MOHAMMADI, ESQUIRE
             JONATHAN I. KRAVIS, ESQUIRE
             SARAH WEINER, ESQUIRE
        601 Massachusetts Avenue NW, Suite 5E
        Washington, DC 20001
        (202) 220-1126

- - -

ALSO PRESENT:
        THOMAS C. GOLDSTEIN, DEFENDANT
        JIMMY MENDOZA, PARALEGAL
        ROBERT RESTO, PARALEGAL
    ***COMPUTER AIDED TRANSCRIPTION OF STENOTYPE NOTES***

I N D E X

**GOVERNMENT'S TESTIMONY:**

| WITNESSES | DIRECT | CROSS | REDIRECT | RECRS |
|---|---|---|---|---|
| SPECIAL AGENT JOHN McDONALD | * | 19 | 58 | 69 |
| MAXWELL HOWELL | 72 | 84 | * | * |

– – –

| DEFENSE'S TESTIMONY WITNESSES: | VOIR DIRE | DIRECT | CROSS | REDIRECT | RECRS |
|---|---|---|---|---|---|
| ANDREW ROBL | * | 88 | 112 | 142 | * |
| ZACHARY MARKS | 146 | 151 | 224 | 262 | * |

**DEPUTY CLERK:** All rise. The United States District Court for the District of Maryland is now in session. The Honorable Lydia Kay Griggsby presiding.

**THE COURT:** Good morning, everyone. Please be seated and welcome back. I believe we're in week four of trial. I'm losing track of some days.

Yesterday we continued with the presentation of the government's case in chief with several witnesses. The Court understands that today we will continue Mr. McDonald's testimony. There may be one additional witness for the government. And then in the afternoon, we anticipate turning to a few witnesses that the defense wishes to present that have some availability issues.

So my hope is that we can get all that testimony in and accommodate the defense today and move forward with that part of the case.

Going forward, I generally understand the government will have at least a few more witnesses before they're ready to rest their case in chief.

I have two preliminary items that I want to discuss with counsel. The first, of course, is the matter involving the motion to quash and the *New York Times* article. The Court is in receipt of information that the parties have made progress in reaching a stipulation that will render that pending motion moot.

Last night, at least, I got two different versions of what might be happening, so I want to hear from the parties on that to make sure I understand what's going on and we can deny that motion as moot and not have to deal with that issue today.

The second issue is the Brady matter that we discussed yesterday. The Court is in receipt of a chronology of the facts from the government, which I have carefully reviewed. And I thank government counsel for getting that in promptly.

The Court is also in receipt of a response from the defense and a letter, I think, that was sent between the parties. And I've also reviewed that carefully.

I think our next step is to get a formal response from the government as to the alleged Brady violation in terms of how they view that legal argument. So I will await those papers before I rule further on the matter.

As a general matter, as the Court has said since the very beginning of this case, and I know the government knows this, Brady obligations are serious. They are always well-respected in this district, and those obligations continue no matter where we are in the case. And so I will carefully consider the matter. I'm not going to take any view on it right now, but I do appreciate the party's attention to the matter.

Mr. Beaty, we'll talk about when you can get some paper in on the legal part of your response because I do want to see that, and then the Court will rule.

I know everyone is working very hard. So I do appreciate the time counsel took, I'm sure, late into the evening yesterday to get these matters before the Court.

Those are the only two items I have. Are we ready to talk briefly about the stipulation?

**MR. BEATY:** I have even better news for Your Honor.

**THE COURT:** Even better. Okay.

**MR. BEATY:** Cherry on top of the sundae. The government has agreed to version two of Mr. Goldstein's stipulation regarding the *Times*. That is -- and I have handed a copy up to the Court. That is the version that simply says -- and we have -- I've handed signed versions to the extent that's helpful.

**THE COURT:** All right. Well, I guess just give me the current one now because I have multiple versions here. Which one is version two? Are these all the same thing?

**MR. BEATY:** It's the one Your Honor now has in front of you.

**THE COURT:** I have something that says "joint stipulation of fact" and "fifth joint stipulation of fact."

**MR. BEATY:** Yep. I'm going to explain. So the one that says "joint stipulation of fact" relates to the *New York Times*. We just didn't know where we are going to be in the numbering so we just called it "joint stipulation of fact." That is the version the parties have now agreed should be read

to the jury.

THE COURT: Okay.

MR. BEATY: So we agree -- we have -- the United States has withdrawn its subpoena for Mr. Toobin and for Mr. Lee formally, and we agree that the motion to quash can be denied as moot.

THE COURT: All right.

MR. BEATY: And we -- the parties also reached a second stipulation, technically a fifth, which is also before Your Honor. And so -- and that has been signed, and so we've given you a copy. We just ask that whenever the jury is ready, we start the day, read those off and then we're off to the races.

THE COURT: All right. So just to be clear, these two from the government's point of view are ready to be presented to the jury at some point?

MR. BEATY: We would like to do it this morning.

THE COURT: All right.

MR. BEATY: With respect to today, you've got it exactly right. The government -- Mr. Kravis has persuaded us that we wanted to give them all the available time we could, so we're going to present -- we'll finish with Mr. McDonald. We have one short witness. I think he's 30 minutes or so.

MR. ADENRELE: Fifteen on direct.

MR. BEATY: Fifteen on direct. So we're hoping 30

altogether. That's Mr. Howell. And then we're going cede the rest of the day to the defense to do whatever they need to do. And that way, I think that should be more than enough -- as I understand from the estimates of the time, that should be more than enough to give them what they need to get their two witnesses through.

THE COURT: All right. So from the government's point of view, we have two stipulations: One that will moot the Toobin motion, another that just is related to the evidence in the case. I'll wait to hear from Mr. Kravis. But if you're in agreement, I'm happy to read those. Then we're going to work through your two witnesses, and then turn to the defense for the afternoon.

MR. BEATY: Yeah. If we can start, you know, 9:30 until ten o'clock, whenever the jury is ready to roll --

THE COURT: Well, it's 9:30 now.

MR. BEATY: -- then I think -- I have no reason to believe that we shouldn't be able to give the entire afternoon to Mr. Kravis and probably -- just in terms of his own ability or his own awareness, I mean, it may even be before lunch. We'll just have to see how these two witnesses go.

THE COURT: Okay.

MR. BEATY: What else can I do to help?

THE COURT: Well, I want to hear from Mr. Kravis first on the two stipulations to make sure we're in agreement.

Mr. Kravis, what's your view about the stipulations?

**MR. KRAVIS:** We're on agreement on the stipulations.

**THE COURT:** All right. So I will read these to the jury when the jury joins us.

**MR. KRAVIS:** Yes, Your Honor.

**THE COURT:** All right. Now, what are we doing with your witnesses this afternoon?

**MR. KRAVIS:** So in terms of the schedule, I just want to note two things -- three things.

First, I do appreciate the government's accommodation of our witnesses out of order.

Second, I wanted to just note for the record that by presenting these witnesses now, we are not waiving our right to move for judgment of acquittal at the close of the government's case.

As the Court is aware, the only reason we're doing this is because we lost two and a half days to the snow and witnesses -- as a result of those lost days, defense witnesses developed scheduling conflicts that we did not anticipate and we would not have encountered but for the snow.

And so I just want to make sure the record is clear, this is not a waiver of our right to file any motion to close the government's case.

The last thing was, I did want to note -- I have raised with the defense -- I do think -- I'm sorry -- raised with the

government -- I do think that the most efficient practice here would be for us to move to the defense witnesses as soon as we're done with the cross of Agent McDonald. I'm mentioning that because we worked last night to make our examine outlines for these witnesses as efficient and streamlined as possible. No one wants to be in a situation where -- but I don't know what their cross is. No one wants to be in a situation where it's five o'clock and they're in the middle of a cross of a defense witness who cannot come back.

So our request has been that as soon as we're done with McDonald, that we move to the defense witnesses, and then we can go back to the government witnesses so that we just minimize the chance of any kind of issue arising.

THE COURT: So basically, not do -- I think it's Howell, was the second person?

MR. BEATY: Yeah. And, Your Honor, honestly, it comes down to scheduling. We just can't agree to make Mr. Howell sit around all day in case they -- what if they go all the way to five o'clock? We just don't want to do it. We have here --

THE COURT: All right.

MR. BEATY: We'll have him here. We'll roll through him. He's going to be fast.

THE COURT: I understand. So it's almost 9:30, so instead of belaboring the point, why don't we get started? At

this point, we'll go with McDonald and Howell and see where we are.  If the schedule gets a little off kilter, I'll come back to the parties, and we can revisit what we need to do to try to get the defense's witnesses done today.

**MR. BEATY:**  And, Your Honor, as we've done previously with the stipulations, we would like to show the paragraphs that you're reading to the --

**THE COURT:**  Yeah.  That's fine.

**MR. BEATY:**  Okay.  Thank you.

**THE COURT:**  All right.  So is the jury ready, Howard? We don't know?

All right.  I'm going to step down for just a minute, make sure the jury is ready.  When I come back, we'll have the jury and we'll start with the stipulations.

**MR. BEATY:**  May I take a humanitarian break?

**THE COURT:**  Everyone's going to take one right now.

**MR. BEATY:**  Thank you, Your Honor.

**THE COURT:**  All right.

**DEPUTY CLERK:**  All rise.  This Honorable Court stands in recess for five minutes.  Thank you.

(Whereupon, a recess was taken from 9:29 until 9:35 a.m.)

**DEPUTY CLERK:**  All rise.  This Honorable Court now resumes in session.

**THE COURT:**  Please be seated, everyone.  Are we ready to have the jury?

**MR. BEATY:** Yes, Your Honor.

**DEPUTY CLERK:** All rise for the jury.

(Whereupon, the jury entered the courtroom at 9:37 a.m.)

**THE COURT:** Please be seated, everyone.

Members of the jury, good morning and welcome back. Today we will continue with trial and the presentation of the government's case in chief. We will start off where we left off yesterday, with further testimony from Special Agent McDonald. There may be at least one additional witness that the government will present today as well.

This afternoon I anticipate that you will hear from two witnesses presented by the defense. These witnesses are appearing today a little out of order due to the dates we missed because of the snow, to accommodate their schedule. And so after you hear from those witnesses, you will hear further from the defense a little later, probably next week.

We will take breaks periodically, as has been our custom throughout the day. And I will update you on the schedule before we close this afternoon so you know what to expect for next week.

This morning I'm going to begin by reading two stipulations to you that have been agreed upon by the parties. I believe we will also have them up on your screen so you can read along with me.

We're going to start with the joint stipulation of fact,

Mr. Beaty. And we'll pull that one up first.

I will ask that you give me your attention at this time. And please know you will have copies of these stipulations to take with you to the jury room when you begin your deliberations. And you'll see the -- let's start with the joint stipulation of fact. All right. It's up on the screen. I'm going to begin at this time.

In 2025, Mr. Goldstein had a series of conversations with someone he has known since at least 2000, during which he gave the following quotes, or made the following statements and substance, which Mr. Goldstein believed to be true.

One, in the early 2000s, ESPN began broadcasting poker, a game Mr. Goldstein had never played. Mr. Goldstein said, "I loved watching. I think of it as a pretty intellectual thing. Actually, I like it because what poker is, fundamentally, is management of luck and management of risk."

Mr. Goldstein quickly graduated from games around the kitchen table with jars of quarters, to tables of high rollers in Washington and New York. Mr. Goldstein said, "I would play in home games where you could win and lose $100,000."

Number two, Mr. Goldstein's style of play reflected his swaggering, risk-friendly approach to litigation. Mr. Goldstein said, "Very often, lawyers, or people in general, want to make every conceivable argument. And you get in the situation whereby making every point, you essentially make no

points. I'm a big believer that you have to figure out what your winning argument is. It is a poker thing. And that is being willing to say, 'This is not working. And if I just sit here and hedge my bets and argue both, I'm not going to accomplish anything.'"

Number three, that Mr. Goldstein had law clients in the poker world helped him explain to his wife his increasingly long absences from Washington. He also represented the website PokerStars, which was headquartered on the Isle of Man.

Number four, Mr. Goldstein quickly realized that even with his successful law practice, he didn't have the cash to compete. Mr. Goldstein said, "The idea was to be able to play very, very, very deep and not to be out of money." Mr. Goldstein took out a $10 million line of credit from Stewart Resnick, a California billionaire, who owns the parent company POM Juice, a former client of Goldstein's.

Number five, after getting the loan from Resnick, Mr. Goldstein promptly lost $9 million playing ring games. Mr. Goldstein said, "playing ring poker against a bunch of people requires enormous discipline, enormous patience, and those are just not things in poker that I have. If you're playing against eight people, just mathematically, the odds that somebody has a hand that's better than yours are quite high. If you're playing against one person, you don't have to be nearly as patient. What's rewarding is being very

aggressive. So heads-up, in essence, is built for me."

Mr. Goldstein started taking on investors in his heads-up contests who would share in his wins and losses.

Number six, in heads-up games, most of Mr. Goldstein's opponents were billionaires with an expensive hobby. With just three men in the room, the games didn't feature a lot of conversation. Mr. Goldstein said, "You can imagine people who are just super super focused. They're not chit-chatting. Best is there's me. There's the dealer. There's them. And you know, somewhere between two and 20 hours are produced on silence except for the bets."

In Manila, Goldstein played poker with a gambler known as Tango and won $13.4 million. He also won $9.96 million from a gambler known as Chairman. From 2016 to 2018, Mr. Goldstein was out of the country for almost a full year.

Number seven, at the end of 2016, Mr. Goldstein played a California businessman named Alec Gores in Beverly Hills and won $26.435 million, the biggest score of his life. Earlier that year, Mr. Goldstein also won $200,000 in a game that included actor, Kevin Hart.

During his run, Mr. Goldstein won a total of about $50 million. And even though he had sold roughly 75 percent of his stakes to investors, Mr. Goldstein still personally cleared about $12 million.

Flush with his success against Gores, Mr. Goldstein sat

down to a heads-up match with a real estate magnet named Bob Safai, and this time he didn't spread the risk by taking on backers. Mr. Goldstein said, "I just have convinced myself because I won 50 million in heads-up poker that I am a savate at heads-up poker." Mr. Goldstein promptly lost $14 million to Mr. Safai, all out of his own pocket.

Number eight, Mr. Goldstein was asked how he could stand the stress of playing for such gargantuan stakes. Mr. Goldstein said, "I had both the benefit and the great disadvantage of not placing particular value on the money. So that means that I can play at very large stakes and not get psyched out about it. But it also means that I will take too many risks with too much money. So it's a blessing and a curse. It does not bother me. It doesn't cause my heart rate to go up. I mean, I can think of 26 million like I think of 26,000. Really genuinely."

Number nine, Mr. Goldstein told the reporter that the main reason he ultimately abandoned the law was because he was finally playing heads-up games against the southern businessman. "I was beating him and that was just a way more interesting life." Mr. Goldstein won roughly $50 million from the southerner, netting $15 million for himself after paying off his investors.

And number ten, Mr. Goldstein discussed the applications that he and Ms. Howe filled out for mortgages. In those bank

forms, Mr. Goldstein understated his debts, especially the multiple millions of dollars that he still owed to Resnick for his line of credit.

Mr. Goldstein told the journalist that he omitted the information because he wanted to keep that debt secret from Ms. Howe, and he had kept her in the dark about most of his poker activity.

This concludes the joint stipulation of facts.

I am next going to read to the jury the parties' fifth joint stipulation of fact, and we'll also have that up on the screen, please.

That stipulation reads as follows:

Number one, in early September of 2021 an IT vendor extracted e-mail data from the e-mail accounts of Goldstein & Russell & Russell, PC. In the process, meta data was applied to the e-mails that erroneously listed date created information in September 2021. The government is not alleging that Mr. Goldstein or anyone acting on his behalf intentionally manipulated the meta data in those documents.

Number two, when the e-mail data was extracted in early September 2021, draft e-mails that had never been sent received identical date created and date sent information.

Number three, the below Montenegrin terms, which appear on certain bank statements from Universal Capital Bank correspond to the English meanings below. Term: "Datum," meaning date.

Term: "Opis," meaning description. Term: "Priliv," meaning credit. Term: "Odliv," meaning debt. And term: "Stanje," meaning balance.

Number four, the following individuals correspond to the entities listed below. Person: Andrew Beal. Entity: Beal Bank USA, Montgomery Capital Advisors, LLC.

Person: Antonio Esfandiari. Entity: Magic Antonio, LLC.

Person: Chamath Palihapitiya. Entity: Hello Family Warrior Trust.

Person: Daniel Bilzerian. Entity: Blitz NV, LLC.

Person: Erik Boneta. Entity: Boneta Incorporated.

Person: Kevin Hart. Entity: Just Having Fun 215.

Number five, the following individuals on bank accounts ending in the corresponding last four digits listed below:

Andrew Robl, which is the person. Account number: 8566.

Person: Lauren Roberts. Account number: 3524.

Person: Richard Salomon. Account number: 9068.

Number six, on June 9 of 2016, Thomas Goldstein transferred $500,000 to Andrew Robl. This payment was not a poker loss or staking payment by Mr. Goldstein.

Number seven, on February 26 of 2019, the Macau Court of First Instance acquitted Wei Seng Phua, known as Paul Phua, of a criminal charge after trial. Thomas Goldstein advised Mr. Phua of the legal defense for the case.

Number eight, Mr. Goldstein brought approximately $968,000

in cash into the United States on October 25, 2028 [sic].

And finally, the stipulation states, "I have reviewed the factual stipulations above, and I agree that they are true and correct." Signed by Mr. Goldstein and a representative of the United States of America.

That concludes the second stipulation.

Thank you for your attention.

Counsel, are we ready to proceed with Mr. McDonald's testimony?

**MR. BEATY:** The government is ready, Your Honor. Thank you.

**MR. KRAVIS:** Yes, Your Honor.

**THE COURT:** Let's have the witness rejoin us.

- - -

SPECIAL AGENT JOHN McDONALD, after having been duly sworn previously, recalled for further testimony, examined and testified as follows:

- - -

**THE COURT:** Good morning.

**THE WITNESS:** Good morning.

**THE COURT:** You can go ahead and retake your seat, and I will remind the witness is already under oath.

Mr. Kravis?

**MR. KRAVIS:** May I approach, Your Honor?

**THE COURT:** You may.

**MR. KRAVIS:** Thank you.

**CROSS-EXAMINATION**

**BY MR. KRAVIS:**

**Q.** Special Agent McDonald, good morning.

**A.** Good morning.

**Q.** I'd like to start by just making sure I understand your role in this investigation. I think I heard you testify yesterday that you were not the case agent. Did I hear that right?

**A.** Yes. That's correct.

**Q.** And can you just remind us, please, what does the term "case agent" mean?

**A.** So the case agent is the primary agent assigned to the case. They're generally involved in planning for the investigation and executing the investigation and requesting assistance where needed from other agents.

**Q.** Who was the case agent for this investigation?

**A.** That was Special Agent Accardi, Andrew Accardi.

**Q.** And Special Agent Accardi is in the room today?

**A.** I believe so, yes. He's in the room, yes.

**Q.** Okay. Sure. Beyond, attending the interview with Mr. Goldstein in October of 2020, did you have any other role in this investigation?

**A.** I attended the interview for Mr. Deyhle as well.

**Q.** And that was the same day?

**A.**    That was the same day.

**Q.**    Beyond those two interviews, did you have any other role?

**A.**    No.  We had a few preliminary discussions early on from a list of leads where the case was developed from, but I'm not part of the investigation.

**Q.**    So since the October 2020 interviews, you did not do any work on the investigation?

**A.**    That's correct.

**Q.**    And what was the -- what did you say your assignment is now?

**A.**    So I'm a Special Agent within our cyber crimes unit of IRS Criminal Investigation.

**Q.**    And you joined the cyber crimes unit after your work on this investigation?

**A.**    Yes.  So I joined the cyber crimes unit, yeah, shortly after my involvement in this investigation about five years ago.

**Q.**    Since Mr. Goldstein's interview in October of 2020, how many investigations have you worked on for the IRS?

**A.**    Investigations have I worked on?

**Q.**    Yeah.

**A.**    Probably -- where I was the primary, probably about ten to 12.

**Q.**    And how many where you were not the primary, where you were just assisting someone else?

**A.** That would be hard to count. Like probably another 40 or so more so.

**Q.** In the interview -- and in terms of your role in the interview with Mr. Goldstein, who was asking most of the questions?

**A.** So we both asked questions, but I think Mr. -- or Agent Accardi was the primary one asking questions, at least at first. I was asking follow-up questions from his more often than not.

**Q.** All right. So let me just ask you a little bit about this interview. The interview with Mr. Goldstein went on for a while; right?

**A.** Yes, sir.

**Q.** The interview was almost like three hours long?

**A.** I think it was about two and a half, but that sounds right.

**Q.** The interview -- and the interview started around 5:40 p.m.; right?

**A.** That's correct.

**Q.** And I think you told us yesterday the reason it started late is because you arrived at Mr. Goldstein's -- well, let me back up.

You did not make, like, an advance appointment to talk with Mr. Goldstein; right?

**A.** I don't believe we did, no.

Q.   You showed up at his law firm; right?

A.   Right.  Yeah.

Q.   And at the time you showed up at his law firm, Mr. Goldstein was not actually there; right?

A.   That's correct.

Q.   And by the time Mr. Goldstein learned of your presence and came back and sat down with you, it was like 5:30 in the evening; right?

A.   Yes.  Somewhere around there.

Q.   So this interview went on until, I mean, it was like after eight o'clock at night; right?

A.   I think it was to -- I think it was like 5:45 to 8:30, something to that effect, yes.

Q.   You did not record the interview, did you?

A.   No, we did not.

Q.   That's something that federal law enforcement does sometimes, record interviews; right?

A.   That is true.  And policy has kind of changed related to that.  That's a good example of a decision a case agent would make while discussing with the prosecution versus a secondary.

Q.   Oh, I see.  So it would have been Agent Accardi's decision not to record this interview?

A.   It certainly wasn't my decision.

Q.   And some -- one of the reasons that federal law enforcement agents sometimes record interviews with key folks

in the investigation is so that there is no dispute later about what was said in the interview; is that fair?

**A.** Yes. I mean, there is definitely a benefit to having a recording of specifically what was said.

**Q.** And that benefit is even higher when the proceedings in the case end up being years after the interview occurred; is that fair?

**A.** I would say that's fair. But also, at the same time, we have and have been for a while law enforcement, generally, recording interviews in other ways, memorializing them through memos, and that's why we have multiple agents present at an interview.

**Q.** Well, let's talk about that for a second. Your -- we talked about recording for a minute. But another way that you sometimes memorialize what happens in an interview is to write a memo; is that right?

**A.** That's correct.

**Q.** And sometimes you'll also be taking notes in the interview; is that right?

**A.** That's also correct.

**Q.** And I'm going to ask you a little bit more about the notes in just a minute. But just for right now to get some concepts on the table, the idea is that the notes are being taken like as the interview is occurring; right?

**A.** Correct.

**Q.** And you could do that writing notes by hand; right?

**A.** Correct.

**Q.** Or you could also do it, if you wanted to, like typing notes out on a computer; right?

**A.** That is done occasionally. I think, in my experience, more often it's done via handwritten notes.

**Q.** But whether you do it handwritten or you do it on the computer, the notes are being taken like as the interview is happening; right?

**A.** That's correct.

**Q.** And then the standard practice in federal law enforcement is to generate a memorandum of the interview; right?

**A.** That is correct. Or at least, that's within our agency, that's the policy.

**Q.** And there was an interview memo that was generated from the interview of Mr. Goldstein; right?

**A.** Correct.

**Q.** I think that interview memo is almost, like, 20 pages long; right?

**A.** It is lengthy, yeah. Twenty pages sounds right.

**Q.** And the interview memo gets generated sometime after the interview occurs; right?

**A.** That is correct.

**Q.** The idea is, sometime after the interview happens, somebody sits down with the notes and then they type up a memo

that summarizes what happened during the interview; right?

**A.**   Yes.  I mean, typically, it's -- that memo is kind of a collaborative product between the two agents that were present in the interview, assuming that there was two.  In this case, there was actually three because there was a revenue agent that was also present.

**Q.**   And sometimes witnesses are interviewed in an investigation multiple times; right?

**A.**   That can happen, yes.

**Q.**   And sometimes over the course of interviews, witnesses start to change their story; right?

**A.**   That happens occasionally, yes.

**Q.**   And when you're in an interview and -- well, a second interview or third interview with a witness and they start to change their story, you write it down, don't you?

**A.**   If that were to occur, then we -- yes, we take notes related to what is said.

**Q.**   You take notes and then you would write it up in an interview memo; right?

**A.**   Correct.

**Q.**   You would do that so it was clear what the witness said when they changed their story; right?

**A.**   Yes.  And that you would have a documentation of what was said and when.  You would have a timeline.

**Q.**   That's important; right?

**A.**    The timeline?

**Q.**    Yep.

**A.**    The timeline is important, yes.

**Q.**    All right.  Let's go back to Mr. Goldstein.

At the very beginning of the interview, Mr. Goldstein gave you a stack of documents that he had printed out; correct?

**A.**    That is correct.

**Q.**    And some of those documents that he gave you were e-mails that he had printed out; right?

**A.**    Correct.

**Q.**    I think we looked at one of those e-mails when you testified on direct yesterday; right?

**A.**    Right.

**Q.**    Mr. Goldstein produced those documents to you voluntarily; right?

**A.**    He did, yes.

**Q.**    In other words, he gave you the documents before you served him with the subpoena; right?

**A.**    That is true, yeah.

**Q.**    Now, I think I heard you say yesterday that you discussed several issues with Mr. Goldstein in the interview.  Did I hear that right?

**A.**    Yes.

**Q.**    In fact, your interview covered many topics; right?

**A.**    That is correct, yes.

**Q.** I don't want you to tell me what Mr. Goldstein said about these topics. I just want you to confirm with me that these topics were covered in the interview. Okay?

**A.** Okay.

**Q.** And the interview memo is actually in the binder in front of you, so if you need to refer back to it at any point, you should feel free to do that. All right?

**A.** Okay.

**Q.** Okay. You asked Mr. Goldstein about the Montenegro bank accounts; right?

**A.** Yes.

**Q.** You asked Mr. Goldstein about his relationship with a fellow named Paul Phua; right?

**A.** Yes.

**Q.** You asked Mr. Goldstein about the million dollars in cash from overseas; right?

**A.** Yes. That is correct.

**Q.** You asked Mr. Goldstein about how his tax returns are prepared; right?

**MR. ADENRELE:** Objection.

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:** Mr. Adenrele, do we have you? I cannot hear you. Speak in the mic.

**MR. ADENRELE:** I'm here.

**THE COURT:** Okay. Got you.

All right. Mr. Kravis?

**MR. KRAVIS:** Yes, your honor.

**THE COURT:** Mr. Goldstein's thumb is up.

Go ahead, Counsel.

**MR. ADENRELE:** This is just an end runaround self-serving hearsay. You know, Mr. Kravis attempting to --

**THE COURT:** Okay. We can't hear you. You've got to talk a little bit more directly into the microphone.

**MR. ADENRELE:** I'm sorry.

**THE COURT:** I thought it was just me, but the court reporter can't hear you either.

**MR. ADENRELE:** My apologies.

**THE COURT:** All right. Go ahead.

**MR. ADENRELE:** Yeah. This is just to end runaround eliciting self-serving hearsay from the witness. He's trying to get at other statements that Mr. Goldstein made to him by saying, Oh, Mr. -- did you ask Mr. Goldstein this? Did you ask Mr. Goldstein that? And what we're going to get next is, did you learn anything from those questions? Did Mr. Goldstein -- what were your reaction to those answers?

**THE COURT:** Well, so far, I think the questions was, what topics were covered? And Mr. Kravis is going through the topics. That's where we're at right now. What's the concern, is the next thing that's going to happen?

MR. ADENRELE: Exactly. It is my concern.

**THE COURT:** All right. Now, go ahead.

**MR. ADENRELE:** Let me clarify. I'd like to get a proffer from Mr. Kravis about where we're heading here and what we're doing.

Secondly, I think it's inappropriate to simply put the interview memo in front of this witness. The witness hasn't said that his recollection needs to be refreshed or anything like that. So the idea that he can just sit there with the report and just look down at the report any time he may not remember something that Mr. Kravis wants him to remember, that's also improper.

So the objection is twofold.

**THE COURT:** All right. So the main concern seems to be where are we going, and there seems to be some concern about the binder, which includes the memo, but other documents being with the witness.

Mr. Kravis?

**MR. KRAVIS:** Okay. So I'm not planning to ask the agent about Mr. Goldstein's statements and all of these topics. I am planning to ask him about Mr. Goldstein's statements on the topics we heard about on direct to make sure we all understand what was said there.

The reason I'm asking about all of these topics is I want to make sure the jury understands that there were numerous

topics covered in the interview. I don't think it's fair to leave the jury with the misimpression that they talked with Mr. Goldstein for two and a half hours and the only thing that came up was Paul Phua and the million-dollar loans. I think it's fair to make sure the jury understands that this was an interview over a long period of time that covered a wide range of topics.

Again, I'm not going to ask about the content of Mr. Goldstein's statements unless it's something they got into on direct. And I think I was pretty clear about that when I started this line of questioning.

In terms of what we're doing with the memo, all I said to the agent was if he needs to consult the memo to refresh his recollection, he can do that. I don't think there's anything improper about that.

**MR. ADENRELE:** It's clearly improper. The witness has to first identify --

**THE COURT:** Well, if you're concerned about that, we can take the binder back because the memo is in the binder with many other documents, as I understand it.

So I guess we can have Mr. Kravis take the binder back. And if the witness says he's not clear, give him the binder back to refresh, we can do that. But that's not the only document that's -- you know, there's other materials that were provided to the witness as well.

MR. ADENRELE: And that's fine. I just don't think it's proper to stick the memo --

THE COURT: All right. Okay. So we'll take the binder back for purposes of this line of questioning, unless the witness asked to be refreshed. And then I think, otherwise, the questioning is fine. Thank you very much.

MR. KRAVIS: Thank you, Your Honor.

MR. ADENRELE: Thank you, Your Honor.

(Whereupon, discussion concluded.)

MR. KRAVIS: May I approach?

THE COURT: You may.

BY MR. KRAVIS:

Q. Just so the record is clear, Agent McDonald, I just walked up to you and took the binder from you and brought it back to the podium. At any point, if you need to see the memo, just ask -- to refresh your recollection about these topics, you just ask me, and then I'll hand you the binder. Okay?

A. Okay.

Q. Okay. On the list of topics, you asked Mr. Goldstein about the role of his accountants when it came to his taxes; right?

A. That's correct.

Q. You asked him about the role of his office managers when it came to the preparation of his taxes; right?

A. So, generally, we asked him about those things. I would

say more -- the phrase I would use is we asked him how those things were prepared, and let him tell us who was involved and how they were involved.

Q.   And when you say "those things," you're referring to the tax returns?

A.   Tax returns, books and records.  Those type of things.

Q.   You asked Mr. Goldstein about his 2016 gambling; right?

A.   That is correct, yes.

Q.   You asked Mr. Goldstein in particular about his games against Alec Gores; right?

A.   So we -- yes.  We certainly discussed Mr. Gores specifically.  And, you know, it was a more open-ended question at first about his -- the reporting on his tax returns.

Q.   And you asked him about his poker playing in other years, besides 2016; right?

A.   That's right.  Yeah.  Mostly from the context of, okay.  So you reported gambling winnings and also losses associated with this.  So how -- have you done that before, and how was that treated in previous years?

Q.   You asked him about charitable deductions on his tax returns; right?

A.   That is correct, yes.

Q.   You asked him about trusts that have been created for his children; right?

A.   We did ask him about that, yes.

**Q.** You asked him about --

**A.** We discussed it with him, yes.

**Q.** You asked him about the operations of an entity called SCOTUSblog; right?

**A.** Yes.

**Q.** You showed him tax returns in the interview; right?

**A.** Yes, we did.

**Q.** You showed him tax returns for five different years; right?

**A.** 2014 through 2018, so...

**Q.** And the tax returns you showed him were not just his, but also the Goldstein & Russell & Russell returns; right?

**A.** Correct.

**Q.** And the SCOTUSblog returns; right?

**A.** Correct.

**Q.** So, in total, you discussed like 15 different tax returns with him in the meeting?

**A.** Yes. It was quite a few documents, yes.

**Q.** Now, you testified on direct examination about some statements that Mr. Goldstein made about his relationship with a fellow named Paul Phua.

Do you remember that?

**A.** His relationship with -- can you repeat the question?

**Q.** Yeah. You testified yesterday about some statements Mr. Goldstein made to you in the interview about his

relationship with a guy named Paul Phua, or maybe Paul Phua.

Do you know who him talking about?

**A.** Yes, yes.

**Q.** Paul.

**A.** Yes, yes.

**Q.** Okay. Yeah. Mr. Goldstein told you -- I think you said this yesterday, that he met Mr. Phua about seven years ago, right, at that time?

**A.** That's correct, yes.

**Q.** I think you said --

**A.** That's what he told you, yes.

**Q.** Yeah. I think you said he told you that he met Mr. Phua in connection with a criminal case in Las Vegas?

**A.** That's correct.

**Q.** And Mr. Goldstein told you in the interview that he had received two loans from Mr. Phua; right?

**A.** Yes. That is right.

**Q.** He told you that the first loan was for about a million dollars; right?

**A.** That's correct.

**Q.** And I think you testified that this was money that Mr. Goldstein received in a bank account in Montenegro; right?

**A.** Correct. Yes. Two different bank accounts, yes.

**Q.** And I think you told us yesterday that the number actually ended up being like maybe a little bit less than a million

dollars because of the exchange rate. Did I hear that right?

**A.** That's correct.

**Q.** And the bank that received this money was -- is a bank in Montenegro; right?

**A.** So the bank that originated the money was in Montenegro and the -- Mr. Goldstein's accounts were also in Montenegro.

**Q.** And Mr. Goldstein told you in the interview -- and I think we saw an e-mail with you yesterday -- that he instructed his accountants to disclose the bank accounts in Montenegro; right?

**A.** He sent an e-mail, yes. And his office manager as well sent an e-mail. There were several e-mails to the accountant basically summarizing the two loans as well as the other transaction which was that income from Malaysia.

**Q.** And those e-mails were among the documents that Mr. Goldstein voluntarily provided to you at the start of the interview; right?

**A.** Yes.

**Q.** Mr. Goldstein told you that the money, this loan from Montenegro was wired to the Wells Fargo bank account of his law firm; right?

**A.** Yes. Yes.

**Q.** Mr. Goldstein told you that the second loan was also for about a million dollars; right?

**A.** Correct.

**Q.** And I think you testified to this yesterday, this one

Mr. Goldstein told you he received in cash; right?

**A.** Yes. That's correct.

**Q.** And I think you -- I heard you say this yesterday. Mr. Goldstein told you in the interview that he had to get the money in cash because Mr. Phua did not have money in Montenegro that he could wire to Mr. Goldstein. Do I have that right?

**A.** That was -- yes. That's correct. It was that -- I don't think he knew exactly why Mr. Phua -- or Phua I guess I called him yesterday -- couldn't get the cash from Montenegro, but or couldn't get the money from Montenegro. But in any case, he needed the money so he would get it from where he could. And Mr. Phua said -- and was willing to give it to him in cash.

**Q.** And Mr. Goldstein told you in the interview that he deposited this money, this million dollars in cash, in a United States bank account; right?

**A.** Yes. After he traveled to Dulles and deposited it ultimately in Wells Fargo. That's right.

**Q.** And Mr. Goldstein told you that he got these loans from Mr. Phua so that he could repay his taxes; right?

**A.** That is correct.

**Q.** Now, I think I heard you testify that Mr. Goldstein did not say anything to you in the interview about repaying the loans. Did I hear that right?

**A.** About repaying the loans to Mr. Phua?

**Q.** Yes.

**A.**   That's -- that's correct.

**Q.**   Okay.  Well, let me show you an exhibit on that.

**A.**   I'm not sure if I did not -- he said that he had not started paying, didn't know what the payments were, those types of things.

**Q.**   Okay.  Well, let me just show you something here.

      **MR. KRAVIS:**  Could we have Defense Exhibit 290, please?  And could we go to the second page, please?  Can we look at the bottom e-mail, the one that is December 1st?  That's the one.  Yes.

**BY MR. KRAVIS:**

**Q.**   Agent McDonald, do you remember -- I think you were shown this e-mail or a version of this e-mail on direct examination yesterday.  Do you remember this?

**A.**   Yes, I do.

**Q.**   Yeah.  So this is the one from December of 2018 where Mr. Goldstein is telling the firm manager, Mr. Levitan, to tell the accountants about the -- about some of these monies that we've been talking about; right?

**A.**   Correct.

**Q.**   And I want you to look at the fourth paragraph of the e-mail, the one that starts, "I got 500K."  Do you see that?

**A.**   I see that.

**Q.**   Okay.  That reads -- oh, and by the way, this e-mail is one of the e-mails that Mr. Goldstein gave you at the beginning

of the interview; right?

A.    That is correct.

Q.    All right.  The fourth paragraph reads, quote, I got 500K in income from Malaysia that went to someone else overseas as loan repayment.  Do you see that?

A.    I see it.

Q.    Yeah.  So Mr. Goldstein did provide you with an e-mail on the day of the interview that references repayment of a loan; right?

A.    In this -- yes.  This e-mail definitely references the repayment of a loan to somebody overseas.

Q.    And just so that we're all clear, Mr. Phua is overseas; right?

A.    That is correct.  Yeah.  That's my understanding.

Q.    All right.  Now, by the way, there was one other thing you were asked about in this paragraph, so I just want to make sure it's clear.  Do you remember you were asked some questions on direct yesterday about what this e-mail shows, about Mr. Goldstein's understanding of having to report money that doesn't go into a bank account.

      Do you remember that?

A.    Yes, I do.

Q.    Okay.  I just want to be perfectly clear about this.  Mr. Goldstein here is talking about income he received from Malaysia; right?

**A.** That's right. Yeah.

**Q.** It's your understanding that like the Malaysian government does not issue 1099s; right?

**A.** That -- yeah. That's correct. Not that I'm aware of.

**Q.** Okay. So, by contrast, companies in the United States that make payments for legal fees, they do issue 1099s; right?

**A.** Sorry. Repeat that question, please.

**Q.** Yeah. When a company in the United States hires a law firm to do legal work for them and then the company pays legal fees to the firm, the company is required to issue a 1099; right?

**A.** That's right. Yeah.

**Q.** Unlike the Malaysian government; right?

**A.** Sure.

**Q.** Okay. That's all I wanted to make.

        **MR. KRAVIS:** We can take this down.

**BY MR. KRAVIS:**

**Q.** I think I heard you testify yesterday that Mr. Goldstein said in the interview that he would provide the government with more information about these loans but, to your knowledge, he never did that. Do I hear that right?

**A.** That's correct.

**Q.** Okay. In fact, Mr. Goldstein did provide the government with text messages between him and Mr. Phua discussing the loan; isn't that true?

**A.**   So I was made aware of some text messages later, but I can't specifically say where they came from or who they were with.

**Q.**   Okay.  Well, let me show you one and see if you've seen it before.

        **MR. KRAVIS:**  Can we have Defense Exhibit 738 --

        **MR. ADENRELE:**  Objection, Your Honor.

        **THE COURT:**  Let's come to the headsets, Counsel.

    (Whereupon, a discussion was held outside the presence of the jury.)

        **THE COURT:**  Mr. Adenrele, do we have you?  Can you hear us?  Okay.  Mr. Kravis?

        **MR. KRAVIS:**  Yes, Your Honor.

        **THE COURT:**  Mr. Goldstein's thumb is up.

    All right.  Go ahead, counsel for the government.

        **MR. ADENRELE:**  Thank you, Your Honor.

        **THE COURT:**  I need you to speak a little bit louder into the mic.

        **MR. ADENRELE:**  Indeed.  Thank you, Your Honor. Mr. Kravis is now going to put forward a text message between Mr. Goldstein and an unknown individual which has clear self-serving hearsay in it.  There is no hearsay exception for this text message.

    Honestly, I'm not even sure if it can be properly authenticated, but the text message doesn't even exactly say

who it is to. Although Mr. Kravis seems to be putting forth that the text message says it's between Mr. Goldstein and Mr. Phua. But the issue is hearsay.

THE COURT: All right. I want to make sure I'm on the right document. Defense 738, is that the right document?

MR. KRAVIS: That's the one. Yep.

THE COURT: All right. Go ahead, Mr. Kravis.

MR. KRAVIS: I think they opened the door here. They asked him yesterday on direct if Mr. Goldstein ever provided the government with any additional information about these loans. They were in possession of this text message. I didn't spring it on them this morning. They chose to go into that with the witness. And since they brought it up, I think I'm allowed to pursue it with him.

I would also note that yesterday the government started showing this witness plenty of text messages that the witness has never seen before and then asking the witness to draw inferences about the truthfulness of Mr. Goldstein's statements based on text messages that the witness had never seen. I think at this point, I'm just doing the same thing.

THE COURT: All right. Well, first of all, what is this document? I'm looking at it now. I see TG, Tom Goldstein. Who is "you"? We don't know? Who does defense think "you" is?

MR. KRAVIS: The other person on this message user

ends in 1444, that's Paul Phua.

THE COURT: All right. And you want the witness to do what with this information?

MR. KRAVIS: I want to know if the witness has seen this before, and I want to know if it changes his view about whether his assessment is that Mr. Goldstein was untruthful or at least if he wanted to know about this before being asked under oath to make that assessment.

THE COURT: All right. Anything else from the government?

MR. ADENRELE: Yes, Your Honor. One, objection still stands. My questions yesterday were specifically to whether there was any payback on the loan, whether there is a payback period, whether Mr. Goldstein had provided any information about interest rates. And at the end, I said "Did Mr. Goldstein provide any of this information at a later date?" I did not say, "Did Mr. Goldstein provide any documentation or anything at all at a later date?" That's not what I said.

Nonetheless, I'm not sure that you can open the door to hearsay. It's still hearsay. It's still self-serving hearsay. Opening the door is not an exception to hearsay, nor does it make it nonhearsay.

THE COURT: All right.

MR. ADENRELE: This is hearsay, Your Honor.

THE COURT: And, Mr. Kravis, how are we getting

around the hearsay problem?  I've read the text.

MR. KRAVIS:  Regardless of whether it's hearsay, I think the government has opened the door to it by asking about information that the government received from Mr. Goldstein about these loans.  At this point, at this moment, it's not actually being offered to prove the truth of the matter asserted.  It's being offered to rebut the testimony on direct examination that Mr. Goldstein never provided any further information.

In addition, the government went a step further yesterday.  Over my objection, they showed the witness a bunch of text messages that the witness had never seen before and then asked the witness if he thought Mr. Goldstein was lying.  Since they did that with the witness, I think I'm allowed to show him some additional documents and ask if that affects his opinion.

THE COURT:  All right.  I think I understand the concern.  I've read the text.  I think they're hearsay.  I'm not sure how we get around that.  You can certainly ask Special Agent McDonald again about what he may have known or learned about the loans, but you're not going to be able to show him the document.

Objection sustained.

(Whereupon, discussion concluded.)

BY MR. KRAVIS:

Q.   So just so I'm clear, Agent McDonald, did you know, as of

yesterday let's say, whether Mr. Goldstein had provided the government with text messages about these loans?

A.   So I was aware that there are documents that I believe are text messages -- I don't really know the origin of them -- that discuss the loans.  Yeah.

Q.   Okay.  Is that material that you would have wanted to review before being asked under oath if you thought Mr. Goldstein's statements were truthful?

A.   So I did review them.  And so my understanding was they were made at the time of -- around the time of the actual trip itself.  And again, the fundamental issue with the loans is whether they were paid and what the terms of those loans are.  And nothing that I've seen has made me change my analysis of the issue with the loans, which is that we still don't know the details of those loans.

Q.   I appreciate that.  But that's not exactly the question I asked you.  So let me try again.  I'm not asking you if you know about the details of the loans.

My question is:  Would you have wanted to take a little bit of a closer look at those contemporaneous text messages before offering, under oath, your impression about the truthfulness of Mr. Goldstein's statements that those were loans?

A.   So if I were the case agent, certainly that would be a line of investigation that I would be following.  I wasn't the

case agent, and that really wasn't my role in this.

**Q.** And, yet, you were the one who was asked to come up here and offer your opinions about -- your impressions about Mr. Goldstein's truthfulness; right?

**A.** I was -- yes. I was the one who testified on that. And like I said, those text messages -- and again, I can't tell who they are with, and I also can't really tell -- I mean, I would have to look at them to refresh on specifically what they say. But there is -- there is not a lot of substance to them.

**Q.** Okay. I'm not sure I'm allowed to go any further so maybe we'll move on.

You testified on direct examination that Mr. Goldstein said in this interview that he had not played poker with investors on any other occasions. Did I hear that right?

**A.** Yes. That was my recollection. That's right.

**Q.** Okay. That specific statement that you testified to is not actually in the notes from the interview, is it?

**A.** In the notes from the interview as opposed to the memo from the interview?

**Q.** Right.

**A.** That I can't say for certain.

**Q.** Who took the --

        **MR. KRAVIS:** Well, may I approach with the binder? Can I approach with the binder?

        **THE COURT:** Do you want to refresh the witness's

recollection?

MR. KRAVIS: Well, I actually want to ask him about -- some foundational question about the notes before we go next, and I'd like to show them to him.

THE COURT: All right. Any objection from the government?

MR. ADENRELE: No objection.

THE COURT: All right. Please go up, Mr. Kravis.

MR. KRAVIS: Thank you, Your Honor.

THE WITNESS: So I'm looking for the notes?

MR. KRAVIS: I'll get it.

THE WITNESS: Okay.

MR. KRAVIS: Could you -- let's not publish this for the moment, please.

BY MR. KRAVIS:

Q. Could I ask you to just take a look in the binder that I just handed you for Defense Exhibit or DX 622.

A. Yes. I see them.

Q. You with me? Okay. First of all, these are the handwritten notes from the interview of Mr. Goldstein; correct?

A. Yes. These are my notes. Yep.

Q. Okay. That's what I was going to ask you.

A. Yeah.

Q. You're the one who took these notes?

A. Yes, sir.

Q. Okay. And you can see in the top right corner the date is October 14, 2020; right?

A. Correct.

Q. That's the date of the interview; right? That's the date of the interview?

A. Yes. Yes.

Q. Yeah. Yeah. And you know that these are the notes because your name and Agent Accardi's name and Mr. Goldstein's name all appear in the top left corner of the first page; right?

A. That's correct. I'm familiar with these notes. Generally, I recognize my handwriting on them.

Q. And I think you told me a moment ago that these were contemporaneous notes; right?

A. Yes. They were taken during the interview as we went along, yes.

Q. And the interview memorandum was generated using these notes sometime later; right?

A. Correct.

Q. In this case, it was like two weeks later; right?

A. So the interview memorandum was written over a period of time because it looked -- because it was a long memo. I wouldn't say that it was written necessarily two weeks later. I would say it was a document that took that long to create.

Q. Okay. I want you to turn to page 11 of the document in

front of you.  Okay?  And then I want you to look at the very last, the bottom two lines of -- on page 11 of the notes.  Are you with me?

**A.**    Yes.

**Q.**    Okay.  This is the passage in the handwritten notes that refers to the portion of the interview that we're talking about now, the statement about the other investors; right?

**A.**    Yes.  I mean, certainly these two sentences or lines do discuss that topic, yes.

**Q.**    Okay.  And you would agree with me that the statements in the handwritten notes is not exactly the same as what you said yesterday.  It's on the same subject, but it's not exactly the same; right?

**A.**    So, generally, the memorandum and the -- so yes, you're correct.

**Q.**    Okay.

**A.**    The memorandum and the notes are not necessarily going to say the same thing, and I paraphrased my testimony yesterday.

           **MR. KRAVIS:**  Okay.  At this point, I'd like to publish for the jury just the bottom two lines of page 11 of Defense Exhibit 622.  I'm sorry.  The bottom two lines of page 11 of Defense Exhibit 622.  It's -- the paragraph begins with a D.  It's "Doesn't."  Yeah.  Could we have just the bottom two lines here?

**BY MR. KRAVIS:**

Q. Agent McDonald, we have the contemporaneous notes in front of us, the notes you took. And what the notes actually say is that first word is "doesn't"; right?

A. Yes. That is the first word. That's correct.

Q. So what the notes actually say is "doesn't play poker with investors. Made an agreement with wife not to take risks like this." That's what the contemporaneous notes say; right?

A. So that is what the words on that paper say, yes. I'm not saying that -- in some instances our memory is -- I was taking these very fast and trying to keep up with the interview and all the questions that were being asked.

So I agree that that is what those state. But also, I don't necessarily agree that that is a more accurate representation than what was in the memo or what was in my memory.

Q. Okay. But you would agree with me that this interview happened like five and a half years ago; right?

A. Yes. Yes, sir.

Q. You told me that your only role on this investigation was two interviews that happened on this one day; right?

A. Yes, sir.

Q. And since that time you've moved to another unit. You now do cyber crime; right?

A. That's correct.

Q. Since that time, you've been the lead agent on -- or the

case agent on ten investigations of your own; right?

**A.** That's right.

**Q.** And I think you told me at the beginning you worked on 40 or more other investigations in that time; right?

**A.** Yes.

**Q.** And these notes, you were creating these notes on the day of the interview as the words were being spoken; right?

**A.** Yes.

**Q.** And what the words actually say is "doesn't play poker with investors"; right?

**A.** So that is -- that is the word that I wrote. And like I said, I was writing quite quickly to try to make sure that I documented everything, but that is what that says.

**Q.** And look, the reason I'm asking you all these questions about this point is because what Mr. Goldstein actually said was not that he's never played poker with investors. It's that he doesn't do it anymore because he told his wife he wouldn't take risks like this. That's what he said in the interview; right?

**A.** So that was not my recollection. This was in the context of the document or the tax return that had gambling winnings and then gambling losses. So the whole purpose of this line of questioning was to determine, are there other instances where this has been done previously.

There was gambling winnings that were not all attributable

to Mr. Goldstein, but there's also gambling losses that were paid out to other investors in him. So that was the line of questioning trying to determine specifically whether that had happened before.

Q. Right. And when you write -- I get that. And when you raised that issue with him, what Mr. Goldstein said to you was, "I don't do this with investors anymore because I told my wife I wasn't going to take these kinds of risks." That's what he said in the interview; right?

A. So he said that -- my understanding was he said that I don't have any other instances where there were investors. And again, we have the tax returns to reconcile with that, and there is no instances of him reporting, at least to my knowledge, other investors on his tax returns.

Q. You're talking about after 2016; right?

A. I am talking about -- I think I'm talking about generally. I'm not aware of another instance where he reported the winnings and losses like that.

Q. Right. But I'm not asking you what you are aware of.

You told me you showed Mr. Goldstein the 2016 tax return; right?

A. Correct.

Q. And is the 2016 tax return has some information in there about investors in his poker games; right?

A. That is correct. It has -- yes, one line item, basically.

**Q.** And that was all of 2016; right?

**A.** Yes. That was my understanding.

**Q.** And what Mr. Goldstein told you was, I don't play with investors anymore because my wife doesn't want me to take the risks; right?

**A.** So I think my understanding was that he had not played with investors before because there was no other instances of him having winnings and losses like that, that were presented in that way on that 2016 tax return.

**Q.** Let me make a couple of points with you about this.

First of all, you agree with me that as between our interpretations of what Mr. Goldstein said, the notes are closer to me than they are to you; right?

**A.** So, specifically, what you're -- these two lines?

**Q.** Yep.

**A.** I would agree that that's what they say and we discussed what they say.

**Q.** Second point, Mr. -- the question you were asking Mr. Goldstein, even on your recollection of what he said here, even on -- your recollection from five and a half years ago is that Mr. Goldstein didn't do it after 2016; right?

**A.** I think that that was part of what we discussed, was that, yes, that after 2016, that there were no further investors.

But I think we did go further than that and, like I said, specifically discuss the instances where you've got winnings

and losses that are counteracting each over, reported separately on a tax return, and whether that had ever been done before.

Q. Right. But what I'm asking about now is you -- I think what just told me is that your recollection is that -- or at least your understanding is Mr. Goldstein was saying after 2016 there were no other investors.

Is that your recollection?

A. So I believe there was -- I believe he did say that after 2016. I think there might have been a time line on that.

But, again, it was still -- it was asking about whether there were other instances where there were investors.

Q. Right. But the timing is really important here, so I want to make sure that -- again, we are talking about an interview that happened five and a half years ago that you did not -- or someone did not audio record, where you're not the case agent, and where the notes on the point are not clear.

So I want to make sure I have your best recollection of that -- of that conversation, and what I think I heard you say was that your understanding was that Mr. Goldstein was telling you that after 2016 had he no other investors.

Am I hearing that right?

A. I do recall -- I think I could refresh on that point it in the memo, but I do recall, like, a time line, so after 2016 does sound right.

54

**Q.** So this is the last point I want to make with you about this.

Just as a matter of, like, tax liability, it really doesn't make any sense for Mr. Goldstein to be concealing investors, does it?

**A.** Sorry. Can you repeat the question?

**Q.** Let me try a different way.

Your understanding is that Mr. Goldstein is -- not Mr. Goldstein.

Your understanding is that a taxpayer is not required to pay taxes on the shares of the gambling winnings that go to the investors; right?

**A.** That would be -- so I've never handled that personally, but that would be what my understanding is, yes.

**Q.** So if a taxpayer is falsely saying that they do not have investors when they really do have investors, they are, in fact, inflating their own tax liability, aren't they?

**A.** Yes. That would be correct.

        **MR. KRAVIS:** We can take this down. Thank you.

**BY MR. KRAVIS:**

**Q.** I think I heard you testify yesterday that Mr. Goldstein told you in the interview that his tax return, his 2016 tax return, was accurate.

Did you testify to that yesterday?

**A.** So, it was more -- it was the -- the -- specifically the

income related to gambling in 2016. I think he acknowledged that there were issues with foreign bank account and other things.

Q. What Mr. Goldstein actually said about the 2016 tax return is, "If that is what is filed, then it must be correct;" right?

A. So he said that specifically about the 1099 from Mr. Gores, was my recollection, which was a $26 million 1099 versus the 13 million that was reported.

Q. Right. So what Mr. Goldstein told you with respect to how the Gores' money was reported was, "If that is what is filed, then it must be correct."

That's what he said; right?

A. Yes. So this was a discussion about the discrepancy between the W-2G that Mr. Goldstein explained had -- he had received from Mr. Gores for about 13 million. And we had reason to believe that there was a 1099 that conflicted with that that was basically double the amount of income.

So when we asked him, "Do you have a reason to believe that there is a 1099 out there from Mr. Gores that effectively doubles your income," he says, "I don't really have" -- "I don't have reason to dispute that," or "If that was filed, then it must be correct."

Q. Right. I just want to make sure we are getting the exact words right.

What Mr. Goldstein told you about this issue was that

there would be records and instructions from Mr. Deyhle about how the Gores' money would be reported; right?

**A.** Sorry. Say that again.

**Q.** Mr. Goldstein, in the interview, told you that there would be records and instructions from the accountant, Mr. Deyhle, regarding how the money from Gores would be reported; right?

**A.** I don't recall that specific statement, but that -- that sounds right.

**Q.** Well, I want to make sure we have this right, so can you turn to tab DX 600 in the binder? And I'm going to direct your attention to page 10. It's page 10 of 18. I'm going to ask you to look at paragraphs 87 and 88, and you can look at anything around that if you want. Don't say anything. Just read them to yourself, and then look up at me when you are finished. Okay.

**A.** Yes.

**Q.** Can you close the binder?

**A.** Just 87, you said?

**Q.** I want you to look at paragraphs 87 and 88. Don't say anything out loud. Just look at them, and when you have read them, look up at me.

**A.** Okay.

**Q.** Does that refresh your recollection that what Mr. Goldstein said to you was that there would be records and instructions from Mr. Deyhle regarding how the money from Gores

would be reported?

**A.**　That is correct.　Yeah.　So, again, we were talking about a W-2G from Mr. Gores.

**Q.**　Does this also refresh your recollection that Mr. Goldstein then said that, "If that is what is filed, it must be correct"?

**A.**　So I still believe that was in the context of 1099 that we had asked about.

**Q.**　Yeah.　I understand.

But in the context of the Gores 1099, Mr. Goldstein told you, "If that is what is filed, it must be correct"?

**A.**　Yes.　But a 1099 is different than a tax return, but yes. He was saying that the 1099 that reflected $26 million of income would have been correct, as opposed to the 13 million W-2G that he said.

**Q.**　Well, let's be clear about $26 million in income.

I think you told me a moment ago that your understanding is that if a taxpayer has investors in a poker game, the taxpayer is not required to pay income on the shares that go to the investors; right?

**A.**　That makes sense to me.　I'm not personally familiar with that issue, but it makes sense to me.

**Q.**　So if Mr. Goldstein won $26 million off Mr. Gores and, let's say, I don't know, 13 million of it went to investors, then Mr. Goldstein's taxable income for that particular

transaction is 13 million; right?

**A.** So if that were actually what happened, then yes, that would be an explanation for it. I'm not sure if that's what happened, and I don't believe we discussed that, specifically.

**Q.** But just to be clear on, like, your knowledge of what happened, you told me that your work on this investigation is limited to these two interviews on October 14, 2020; right?

**A.** That is correct.

**Q.** Now, just to sort of end where you all started, and I think you mentioned this yesterday, when you first sat down with Mr. Goldstein on October 14, 2020, one of the very first things he said to you was that this all comes down to a catastrophic fuck up by his accountants; right?

**A.** That is correct.

      **MR. KRAVIS:** Thank you. I have no further questions.

      **THE COURT:** Thank you very much, Mr. Kravis.

Is there any redirect from the government?

      **MR. ADENRELE:** Indeed, Your Honor.

<div align="center">REDIRECT EXAMINATION</div>

**BY MR. ADENRELE:**

**Q.** Special Agent McDonald, good morning.

**A.** Good morning.

**Q.** Let's just go over a few things here that were just discussed.

First, can you tell us the process by which a memorandum

of interview is created?

**A.**   Yes.   So after the interview, we'll basically collectively sit together, the agents that are involved in the interview, go over the notes, typically, and then one person will start typing them up, and then, generally, there will be a discussion between the agents if there is any questions or handwriting.

A lot of times -- depends on who writes the interview, but a lot of times there is handwriting questions, so the agents discuss and then complete the interview over a series of days. Obviously, there is other cases and other operations going on so it can take a number of days to finalize that.

But then, ultimately, the interview memorandum is, after it's written, is circulated between the people that were involved in the interview, and in the case of the IRS, we sign it at the end.   Not everyone does that, but we sign it.

**Q.**   So would you consider it a collaborative process?

**A.**   Yes.

**Q.**   Why is there a collaborative process?   Why do agents engage in that process to produce the memorandums of interview?

**A.**   The purpose is so we can refresh our recollection much later down the line, and also, it's collaborative because the purpose is to make sure we are confident in the facts that are in it so we want to have multiple witnesses that are involved in making it.

And this is a case there was actually three witnesses.   In

a lot of cases there is only two, but there is actually three related to this memorandum of interview for Mr. Goldstein.

Q.   So would you -- when you compare notes that you take against a memorandum of interview that's based on a collaborative process, which of the two is generally more accurate and more reliable?

A.   The memorandum of interview is more reliable.  The notes -- the note taker is taking notes very, very quickly, and in some cases, you know, it's not uncommon to just kind of stop in the middle of a note if what you realize is not critical but something else is more important.  So it is definitely the memorandum of interview that is more reliable.

Q.   You got a lot of questions about your notes anyway.

        MR. ADENRELE:  So let's go to 622, Defense Exhibit 622.  Let's go down to page 11.

        MR. KRAVIS:  Sorry.  Can we take this down and discuss it on the husher?

    (Whereupon, a discussion was held outside the presence of the jury.)

        THE COURT:  Mr. Kravis, do we have you?

        MR. KRAVIS:  Yes, Your Honor.

        THE COURT:  Mr. Goldstein?

        MR. ADENRELE:  Yes, Your Honor.

        THE COURT:  And, Counsel, thank you.

    Go ahead, Mr. Kravis.

MR. KRAVIS: Yes. I just ask for it to be taken down. I don't think the government is allowed to show the jury, like, all the notes. I think the notes, it has to be a specific portion, which -- I tried to be careful, was the way I did it. I think that's the proper way to do it here.

I mean, unless there is some exception, like a prior inconsistent statement, which is what I was doing. The notes themselves are hearsay.

THE COURT: We are on page 11 of the notes during the cross.

Mr. Adenrele, go ahead.

MR. ADENRELE: I don't actually have anything to say against that. I was attempting to get to the exact portion that Mr. Kravis showed during his cross-examination. I got to page 11, and I was about to go down to the bottom.

MR. KRAVIS: I just wanted to voice that.

THE COURT: Okay.

(Whereupon discussion concluded.)

BY MR. ADENRELE:

Q. All right. We can go back to page 11 of Defense Exhibit 622, and we can just highlight the bottom. Do you see that Special Agent McDonald?

A. Yes.

Q. All right. Can you just read the whole thing?

A. "Doesn't play poker with investors. Made an agreement

with wife not to take the risks like this -- not to take risks like this."

Q.    Okay.  Do you say here in your notes what year this agreement was made with Mr. Goldstein's wife?

A.    No.

Q.    Does it say here whether the agreement was made in 2016 or '14 or 2020 or today?

A.    No.  It doesn't.

Q.    Okay.

        MR. ADENRELE:  Let's go to Defense Exhibit 290. Let's go to the bottom e-mail.  I'm sorry.  The bottom one -- the last page, bottom e-mail.  Thank you.

BY MR. ADENRELE:

Q.    You got some questions around the final paragraph here. Do you remember that?

A.    Yes.

Q.    All right.  And specifically, the questions were around the words that this was a "loan repayment."  Do you remember those questions?

A.    I do.  I do.

Q.    All right.  Does it say anywhere here that this $500,000 was a loan repayment for the two so-called loans being referred to above?

A.    No, it doesn't.  And in fact, we -- I don't recall that Mr. Goldstein ever mentioned -- we were specifically asking,

you know, have you made payments, when will you make payments, those types of things. And at no point did he say, oh, this line on this e-mail right here is one of the payments. In fact, he said he couldn't remember or he didn't know when the payments would even start, so...

Q. Do you think it would have been a good idea if he was talking about this loan being -- or this line being a reference to a repayment of these loans, would it have been a good idea to tell that you day?

MR. KRAVIS: Objection. Objection.

MR. ADENRELE: I'll move on.

THE COURT: Are you going to withdraw the question?

MR. ADENRELE: I'm moving on.

THE COURT: All right.

BY MR. ADENRELE:

Q. Now, you were also asked about whether a hypothetical individual or taxpayer, whether it would be to the benefit of a hypothetical taxpayer to hide their stakers. Do you remember that?

A. Not in those exact words --

Q. Not in those exact words.

A. -- but I know what you're referring to me.

Q. Can you think of any other reasons then a taxpayer might hide their stakers or individual?

A. Taxpayers could -- I'm not sure exactly what you're

referring to, but...

**Q.** If there was other income that isn't being reported, would the fact of there being stakers would that -- might lead to additional questions about where those other games were happening or where that other income may be?

**A.** Yes. So that -- so if somebody had additional gambling income that was not reported on their tax returns, it would be in their best interest to not tell or it would be, I'll say, the best interest from a, you know, illegal potential tax evasion standpoint. But it would be in their best interest to not let the government know of those investors, because the government would have no way or the return preparer would have no way of knowing that that gambling income existed.

**MR. ADENRELE:** I mean, let's go to the stipulation -- let's go to the stipulation. Thank you. Let's start at paragraph four.

**BY MR. ADENRELE:**

**Q.** What, if anything, did Mr. Goldstein tell you during the interview about getting a $10 million line of credit to play poker?

**MR. KRAVIS:** Objection.

**THE COURT:** Let's come to the headsets, Counsel.

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:** All right. Mr. Adenrele?

MR. ADENRELE:  I'm here, Your Honor.

THE COURT:  Mr. Kravis, do we have you?

MR. KRAVIS:  Yeah.  I'm here.

THE COURT:  Okay.  Mr. Goldstein's thumb is up.
Go ahead.

MR. KRAVIS:  I think we're way outside the scope
here.

THE COURT:  I'm not sure where we're going.
Counsel for the government?

MR. ADENRELE:  All right.  I'm just asking the
witness about what Mr. Goldstein said during his interview.  I
haven't -- this is redirect.

THE COURT:  What's that have to do with the
stipulation?

MR. ADENRELE:  Oh, I'm just putting the stipulation
up.  I'm not asking Agent McDonald about the stipulation.  I'm
just putting the stipulation up.  So that's it.  I'm asking him
about statements made during the interview, what was or was not
said.

THE COURT:  You're talking about the interview with
Mr. Goldstein and the Special Agent?

MR. ADENRELE:  That's correct.  Absolutely.

THE COURT:  Because it's a little confusing.  This
has to do with a different interview.  So why is the
stipulation up?

**MR. ADENRELE:** No. No. No. I'm just putting it up for the benefit of the jury. But the questions are still about the interview from October of 2020.

**THE COURT:** Okay. But I don't know why the stipulation is up if you're not asking questions about the stipulation. It's confusing, particularly -- it's at least to me it's confusing.

Mr. Kravis?

**MR. ADENRELE:** If I -- I'm sorry.

**THE COURT:** I'm sorry. Go ahead, Counsel.

**MR. ADENRELE:** I apologize. If I may, Your Honor. I'm happy to clarify -- if my question is confusing, I'm happy to clarify the question or I'm happy to signal to the jury that I'm not asking questions about the stipulation. I'm just putting the stipulation up for the benefit of the jury, but I am still just asking questions directly about the October 2020 interview.

**THE COURT:** Mr. Kravis?

**MR. KRAVIS:** So, first of all, I agree with the Court. It's confusing what we're doing with the stipulation, which is about a different conversation, not this conversation. But also, this is all still outside the scope. Like I didn't ask him on cross about Resnick.

**THE COURT:** Any comment about the scope objection, counsel for the government?

**MR. ADENRELE:** Yeah. I'm happy to narrow the scope. But as Your Honor knows, there is specific affirmative acts about statements made, all statements made during the interview. The stipulation --

**THE COURT:** Yeah. I get all of that and that's fine. But the stipulation is not -- you're not talking about the stipulation. I think that's confusing. The stipulation needs to come down. You can ask him questions about his interview with Mr. Goldstein and whatever he said. Obviously, the government can argue later if it conflicts with something with the stipulation, but I think that's too confusing. Take the stipulation down.

**MR. ADENRELE:** Okay.

**THE COURT:** You can ask the question.

(Whereupon, discussion concluded.)

**BY MR. ADENRELE:**

**Q.** Just a few more questions, Special Agent McDonald. Again, what, if anything, did Mr. Goldstein say about winning $50 million in 2016 playing poker?

**A.** Sorry. Repeat the question.

**Q.** What, if anything, did Mr. Goldstein say during the October 2020 interview about winning $50 million playing poker?

**A.** 50?

**Q.** 50. Five, zero.

**A.** He did not mention anything about that number. We

discussed the line items on the tax return and how that income was derived and that it was from Mr. Gores, but we did not speak about anything that added up to $50 million.

Q.   And what did Mr. Goldstein say during the October 2020 interview about the fact that playing -- or about playing Alec Gores in 2016 and that being the only time that he had investors?

A.   He was clear that that was the only time that he had investors.

Q.   What did Mr. Goldstein say about winning 13.4 million and 9.96 million from a gambler named Tango and Chairman?

A.   He did not mention that.

Q.   What did Mr. Goldstein say about earlier in 2016 playing Kevin Hart and also winning $200,000 in poker?

A.   Mr. Goldstein never mentioned Kevin Hart or anything about that.

Q.   What did Mr. Goldstein say about personally clearing $12 million in gambling winnings in 2016?

A.   Personally declaring?

Q.   Personally clearing.  After the 50 million, personally clearing 12 million?

A.   I don't recall him mentioning anything about that.

        MR. ADENRELE:  No further questions.  Thank you.

        THE COURT:  Thank you very much, Counsel.

    Have all questions been asked of the witness?

MR. KRAVIS: May I recross on one point?

THE COURT: You may.

MR. KRAVIS: Thank you.

**RECROSS EXAMINATION**

BY MR. KRAVIS:

Q.   Just very briefly, Agent McDonald.  You were just asked some questions a moment ago about like hiding investors in poker games.  Do you remember that?

A.   Yes.

Q.   I just want to be clear.  Mr. Goldstein told you that he had investors in the Gores' games; right?

A.   Yes, sir.

Q.   Okay.  And so if those investors were also investors in other games he played in 2016, he wasn't trying to hide those investors; right?

A.   I don't know the answer to that question.

Q.   Okay.  You knew about the Gores' investors is my point; right?

A.   Yes, sir.

MR. KRAVIS: Okay.  Thank you.

THE COURT: Thank you very much.  I believe all questions have been asked of the witness.

Special Agent McDonald, thank you very much for your time and testimony.  You may step down and be excused.

Have a good morning.

THE WITNESS: Thank you.

(Witness excused.)

- - -

THE COURT: Counsel, if we can come to the headsets for just a moment.

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT: Mr. Beaty, can you hear us? Pull the mic down. We can't hear you.

MR. BEATY: Yes. Your Honor. Somebody's signaling. That's what I was -- yeah. Sorry.

We agree to --

THE COURT: All right. We need to take a break. I was about to say the same thing. All right. I'm going to let the jury take a break.

MR. BEATY: Thank you, Your Honor.

(Whereupon, discussion concluded.)

THE COURT: Members of the jury, I'm going to invite you to take your morning break at this time. Please rise for the jury.

(Whereupon, the jury exited the courtroom at 10:55 a.m.)

THE COURT: Please be seated. So when we come back, are we still going to move forward with the government's next witness?

MR. ADENRELE: Yes, Your Honor.

THE COURT: Okay. How much time on direct?

MR. ADENRELE: I'm thinking 20 minutes at most on direct.

THE COURT: Okay. Then we'll do cross and hopefully we can get that witness done and break for lunch. And then we'll come back and deal with the defense's witnesses in the afternoon.

MR. KRAVIS: Your Honor, if we -- I think our cross of this next witness may be very brief. If we get through it quickly, can we at least start the first defense witness?

THE COURT: We'll see where we are.

MR. KRAVIS: Thank you.

THE COURT: All right. Let's take five minutes.

DEPUTY CLERK: All rise. This Honorable Court stands in recess for five minutes.

(Whereupon, a recess was taken from 10:56 until 11:06 a.m.)

DEPUTY CLERK: All rise. This Honorable Court now resumes in session.

THE COURT: Please be seated, everyone. Are we ready to have the jury rejoin us?

MR. ADENRELE: Yes, Your Honor.

THE COURT: Are there materials for the next witness?

MR. ADENRELE: There are just two documents. Do you want me to hand them up now?

THE COURT: Yes.

**DEPUTY CLERK:** All rise for the jury.

(Whereupon, the jury entered the courtroom at 11:08 a.m.)

**THE COURT:** Please be seated, everyone.

Is the government prepared to call its next witness?

**MR. ADENRELE:** Indeed, Your Honor. The government now calls Mr. Maxwell Howell.

**THE COURT:** Very good.

Good morning, sir. If you want to come all the way towards me, and then you are going to go to your left over to the witness box. Please remain standing and the courtroom deputy will swear you in.

— — —

MAXWELL HOWELL, after having been duly sworn, was examined and testified as follows:

— — —

**DEPUTY CLERK:** Thank you. You may be seated. Please move your chair all the way up to the microphone, state and spell your first and last name for the record.

**THE WITNESS:** Maxwell Howell. M-a-x-w-e-l-l, H-o-w-e-l-l.

**DEPUTY CLERK:** Thank you.

**MR. ADENRELE:** Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. ADENRELE:

Q. Mr. Howell, good morning.

**A.**    Good morning.

**Q.**    Mr. Howell, can you tell the jury where you work?

**A.**    I work for MTA Title & Escrow, LLC.  It's a title company in Rockville, Maryland.

**Q.**    What do you do there?

**A.**    I operate the company, along with an office assistant.

**Q.**    Tell us a little bit about your responsibilities in your role.

**A.**    Well, we conduct residential and commercial real estate settlements, mostly residential.  So we process them from the beginning when we get the title order from the lenders or -- and then abstract the property, communicate back and forth with the lenders for the title documents, receive loan documents from the lenders, and then arrange an appointment with the customer to come in and sign at our office.

Then we, after that, disperse the file, give copies to everyone, either in the form of a USB flash drive or hard copies.  The original documents go back to the lenders, and we record the documents in the county courthouse.

**Q.**    You gave us a lot there.  We will work through some of this.

You mentioned the word "settlements."

Are those also referred to as closings?

**A.**    Correct.

**Q.**    Those are the same thing?

**A.** Same thing.

**Q.** In your experience with doing closings, do the borrowers sign loan documents at the closing or some other time?

**A.** Historically, they would come to our office to sign closing documents in person. With technology advances, there are situations where a lender might have what we call a hybrid closing, where some documents are signed by the customer electronically over the internet, and then the balance of documents would come to my office for closing. And then, of course, there are virtual closings with remote notaries, which is pretty rare, but it's possible.

**Q.** Let's switch gears.

Who is Thomas Goldstein?

**A.** He is an attorney that was referred to me by a friend of mine to do some real estate work back in 2021.

**Q.** You say you did some real estate work for him.

What else did you do with or for Mr. Goldstein?

**A.** My recall, it initially was to draft some documents for a lender after running the title abstract on one or more of his properties. I believe one of them was in Montgomery County. Nothing came of that.

And then subsequent to that, I received a title order from a lender to refinance a property that he had owned in Washington, D.C.

**Q.** You said you were working with a lender.

Who was the lender?

**A.** I believe it was NFM Lending.

**Q.** Just to be clear, you are not an employee of NFN Lending?

**A.** No. I'm not employed with them at all.

**Q.** With respect to the transaction on the D.C. house, what was your role?

**A.** NFM Lending sent me a title order to do a refinance. It wasn't really a refinance. The property was free and clear of any mortgages, so it was a cash out refinance, I guess the lender would call it.

So I was engaged to conduct that settlement and process that transaction.

**Q.** When you conducted the settlement or closing, when did that happen?

**A.** The title order probably came in somewhere in August of 2021, and the closing was the following month, in September, once the loan was ready to go.

**Q.** And where did the closing occur?

**A.** My office in Rockville.

**Q.** And about how big was your office -- is your office?

**A.** The conference room is probably is 15 by 20 feet, something like that. Holds a table of maybe 10 or 12.

**Q.** Is this where the closing occurred, in the conference room?

**A.** That's correct.

**Q.** Who else was there -- or who was there?

**A.** Myself, Mr. Goldstein, and his wife, Ms. Howe -- Mrs. Howe.

**Q.** At that closing, were the loan documents signed?

**A.** Yes.

**MR. ADENRELE:** Your Honor, may I approach?

**THE COURT:** You may.

**BY MR. ADENRELE:**

**Q.** Mr. Howell, I just handed you Exhibit 10.

What is Exhibit 10?

**A.** It appears to be the loan package from NFM Lending, and my title commitment.

**Q.** We can put that aside.

**MR. ADENRELE:** If we can pull up Exhibit-10.1, and let's go to page 8.

**BY MR. ADENRELE:**

**Q.** Mr. Howell, what is Exhibit 10.1?

**A.** It appears to be a loan application.

**Q.** You say "appears to be." You have seen it before; is that right?

**A.** I have seen these before many times, yes.

**Q.** So what is it?

**A.** A loan application.

**Q.** And who is the borrower?

**A.** In this case, on this page, Thomas Che Goldstein. Listed

on this page.

Q.   And there is some initials that are kind of in faint highlights a little bit below.

Do you see that?

A.   I do.

Q.   Whose initials are those?

A.   Thomas Goldstein and Amy Howe.

Q.   Now, this application has multiple sections.  Part -- Section A, 1, 2, 3, and so on; is that right?

A.   That's correct.

MR. ADENRELE:  Let's go down to Section 2.  I'm sorry.  Next page.  Section 2.

BY MR. ADENRELE:

Q.   What does Section 2 say there?

A.   Financial information, assets and liabilities.

Q.   What does it say about where we can find the information that Mr. Goldstein provided with respect to assets and liabilities?

A.   It says, "My information for Section 2 is listed on the uniform residential loan application with Amy Louise Howe."

MR. ADENRELE:  So let's go up to the section of the application for Ms. Howe where Mr. Goldstein and Ms. Howe responded jointly.

Let's go back up to page 1.

Let's go to page 2.  If we can zoom in.  There you go.

**BY MR. ADENRELE:**

**Q.** What is the purpose of this section, Mr. Howell?

**A.** This is the bank's section to have all assets and liabilities listed.

      **MR. ADENRELE:** If we can go down to the liabilities section, 2C and 2D.

**BY MR. ADENRELE:**

**Q.** Mr. Howell, what liabilities do you see listed there provided by Mr. Goldstein?

**A.** Looks like seven loans, one appearing to be an auto loan, and the rest -- two appearing to be auto loans with TD Bank and Volvo, and then the rest of revolving credit lines. They could be credit cards or something like that. I don't know.

**Q.** And there is a Section 2D.

Do you see that?

**A.** I do.

**Q.** What is the response that Mr. Goldstein provided there?

**A.** The box is checked "does not apply."

**Q.** What is the purpose of that section, if you know?

**A.** Well, I gather since there is a limited amount of space in Section 2-C, if you have to run out, you will not have the box checked that says "does not apply," and the software would generate an additional page for the extra items.

**Q.** Do you see any multi-million dollar gambling debts listed here?

**A.** I do not.

   **MR. ADENRELE:** Let's zoom back out and go to the next page. Zoom out to Section 4.

**BY MR. ADENRELE:**

**Q.** Mr. Howell, what's the purpose of Section 4?

**A.** It appears to list the property information that's going to be the collateral for the loan.

**Q.** And what is the loan amount?

**A.** $1,987,500.

**Q.** And what is the property address?

**A.** 4323 Hawthorne Street NW, Washington, D.C.

   **MR. ADENRELE:** Let's go down -- let's to page 8. I'm sorry. Page 10.

**BY MR. ADENRELE:**

**Q.** Well, now we are on page 8 again. What is page 8?

**A.** That is a part of the uniform residential loan application where they list additional borrower.

**Q.** This is the portion for Mr. Goldstein?

**A.** That's what it says, yes.

   **MR. ADENRELE:** Now, let's go to page 10. Let's zoom in on declarations.

**BY MR. ADENRELE:**

**Q.** What's the purpose of this declarations section?

**A.** Well, according to the definition, it asks you specific questions about the property, your funding, and your past

financial history.

Q.   Are there a series of questions listed here?

A.   Yes.

Q.   Let's go down to question 5F.

     What does 5F says?

A.   "Are you a cosigner or guarantor on any debt or loan that is not disclosed on this application?"

Q.   How did Mr. Goldstein respond?

A.   Box "no" was checked.

          MR. ADENRELE:  Let's zoom back out.  Let's go down to Section 6.

BY MR. ADENRELE:

Q.   What does Section 6 tell us?

A.   "Acknowledgment and agreements.  My signature for Section 6 on the uniform residential loan application with Amy Louise Howe."

          MR. ADENRELE:  So let's go to the portion where Ms. Howe and Mr. Goldstein responded together.  Let's go to page 5.

     Let's go ahead and zoom in on the section after "I agree to acknowledge and represent the following."  There we go.

BY MR. ADENRELE:

Q.   And, Mr. Howell, what does it say in that first bullet point there, number 1 and then the bullet point below?

A.   "The complete information for this application."  All

right.

    "The information I have provided in this application is true, accurate, and complete, as of the date I sign this application."

**Q.**    If we go down, there is a bullet that starts "any intentional or negligent misrepresentation."

    Do you see that?

**A.**    I do see that.

**Q.**    What is that telling us?

**A.**    "Any intentional or negligent misrepresentation of information may result in the imposition of," and then it --

**Q.**    And what does it say about criminal penalties down below?

**A.**    "Criminal penalties on me, including, but not limited to, fine or imprisonment or both under the provisions of federal law 18 U.S.C. Sections 1001, et seq."

**Q.**    And then there are signatures at the bottom.  We can go to those.

    Who is signed there?

**A.**    Amy Louise Howe and Thomas Goldstein.

**Q.**    And what's the date?

**A.**    September 29, 2021.

**Q.**    And is this the date when Mr. Goldstein sat in your office and provided these signatures?

**A.**    It is.

            **MR. ADENRELE:**  Let's go to Exhibit 10.2.

**BY MR. ADENRELE:**

**Q.** Mr. Howell, what is this?

**A.** It's entitled "undisclosed debt acknowledgment."

**Q.** What's the purpose of this document?

**A.** My understanding is it's for the bank's benefit in case there are additional debts that have been incurred since the finalization of the loan that may not appear on a credit report or other debts that existed during a prior time period, but just didn't happen to appear on the credit report so that the bank wouldn't know about it.

**Q.** Let's go down where it says "I/we." What does that say there, Mr. Howell?

**A.** "I/we, Amy Howe, Thomas Goldstein acknowledge and certify that I/we have no other debt obligations that are expected to exist on or around the time of this transaction, closing, beyond what I/we provided and my/our loan application and what is provided on this document. I/we further acknowledge and certify that I/we understand that knowingly withholding debt obligation information is mortgage fraud which is punishable by incarceration in federal prison."

**Q.** And who signed this document. Let's back up.

All right. Down at the bottom -- well, we see a number of initials on the side. Do you see that?

**A.** I do.

**Q.** All right. Whose initials are those?

**A.** That would be Amy Howe and Thomas Goldstein.

**Q.** And then we see a signature at the bottom. Do you see that?

**A.** Yes. I see that.

**Q.** Whose signature is there under coborrower?

**A.** Coborrower is Thomas Goldstein.

**Q.** And what is the date?

**A.** September 29, 2021.

**Q.** After this application -- well, this document and the loan application were signed in your office by Mr. Goldstein, what happened next?

**A.** The documents would be copied and the customer would be provided copies of the documents, again either physical copies or on a USB flash drive, depending on the situation of what we were doing back then. I would retain a copy for my file, and then the lender would get the original documents sent back to them by Federal Express, except the deed of trust which is the lien instrument that I needed to record in the county courthouse. I would retain that original.

**Q.** All right. You sent these documents back to NFM?

**A.** I did.

**Q.** Okay. Do you remember at anytime Mr. Goldstein pulling you aside and telling you, I'm making false statements on an application to hide them from my wife -- to hide debts from my wife?

**A.**   No.

          **MR. ADENRELE:**  No further questions.

          **THE COURT:**  Thank you very much, Counsel.

     Does the defense wish to cross-examine the witness?

          **MR. MOHAMMADI:**  Yes, Your Honor.

                    **CROSS-EXAMINATION**

**BY MR. MOHAMMADI:**

**Q.**   Good morning, Mr. Howell.  Could you just tell me a little bit of background about your business?

**A.**   It's a title company that we started, I think, in 2008, 2009, if I'm not mistaken.

**Q.**   Bring up the papers here.

**A.**   And as I said earlier, we conduct residential and commercial real estate settlements in Maryland and the District of Columbia.

**Q.**   How many closings, approximately, did you do last year?

**A.**   Not many.  We've always been a small company, so I forget what we put on our renewal application with our title carrier, but probably averaging about ten a month, give or take.  I just don't know.  I have an accountant.

**Q.**   And you've been in business for how many years?

**A.**   I've been an attorney since 1988 and practiced law mostly from 1988 through, I'd say, 2010, including going to court and stuff.  And then mostly real estate settlements through MTA Title and Escrow after it was formed in 2008 or '09.

**Q.** So just back of the envelope, you've maybe done this hundreds, thousands of times; is that right?

**A.** Thousands, yes. I don't know about hundreds of thousands.

**Q.** Sorry. Hundreds or thousands. But thank you, thousands.

**A.** Probably, if you do the math, thousands I guess.

**Q.** Yeah.

**A.** Over 37 years I guess that would add up.

**Q.** And just to make sure I understand, you don't represent the mortgage company; is that right?

**A.** No. In Maryland, we're an escrow agent and a fiduciary for all parties. So the terminology is we represent the transaction if we represent anybody.

**Q.** And it's the mortgage company who issued the loan; is that right?

**A.** Correct.

**Q.** So to know if there was a default on the loan you'd have to ask the mortgage company?

**A.** I'm sorry. Can you repeat that?

**Q.** To know if there was a default on the loan, we'd have to ask the mortgage company; is that right?

**A.** A default on their loan?

**Q.** Right. You're not the right person to ask. It's the mortgage company?

**A.** Unless it's made public record of the filing of foreclosure, that's correct.

Q.    Understood.  Okay.

MR. MOHAMMADI:  No further questions, Your Honor.

THE COURT:  Thank you very much.

Is there any redirect with this witness?

MR. ADENRELE:  No redirect, Your Honor.

THE COURT:  All right.  Then I believe all questions have been asked of the witness.

Thank you so much for your testimony and time.  You may step down.

Have a good morning.

(Witness excused.)

- - -

THE COURT:  Counsel, can we come to the husher for just a moment?

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT:  Mr. Kravis?

MR. KRAVIS:  Yes, Your Honor.

THE COURT:  Mr. Goldstein?  Do we have the government?

MR. BEATY:  Yes, Your Honor.

THE COURT:  All right.  It's 11:30.  How do you want to proceed, Mr. Kravis?

MR. KRAVIS:  If the Court doesn't mind, we were hoping to start our first witness here, Mr. Robl.  I think I

might be able to get done with his direct or pretty close to done with his direct by the lunch hour.

THE COURT: Well, the lunch hour is in 30 minutes.

MR. KRAVIS: Right.

THE COURT: All right. So any objection to getting started from the government?

MR. WHITMAN: We're ready to go, Your Honor.

THE COURT: We'll get started, but I'm going to ask that we try to break at noon so the jury can have lunch.

MR. KRAVIS: Understood.

THE COURT: All right. Very good.

MR. KRAVIS: Okay. Understood.

MR. WHITMAN: Thank you, Your Honor.

(Whereupon discussion concluded.)

THE COURT: Mr. Kravis, is the defense prepared to call its witness?

MR. KRAVIS: Yes, Your Honor. Thank you. The defense calls Andrew Robl.

THE COURT: Thank you very much.

And, Mr. Robl, if you could come all the way in towards me and please stand by the witness box. Come all the way forward and over towards me. Yep. And the courtroom deputy will swear you in.

- - -

ANDREW ROBL, after having been duly

sworn, was examined and testified as follows:

- - -

**DEPUTY CLERK:** Thank you. You may be seated. Please go all the way up there to the microphone. You may take your mask off. State and spell your first and last name for the record.

**THE WITNESS:** My name is Andrew Robl. A-n-d-r-e-w. R-o-b-l.

**THE COURT:** Mr. Kravis?

**MR. KRAVIS:** Your Honor, may I approach?

**THE COURT:** You may.

**DIRECT EXAMINATION**

**BY MR. KRAVIS:**

**Q.** Good morning, Mr. Robl.

**A.** Hey, good morning.

**Q.** What do you do for a living?

**A.** I'm a professional poker player.

**Q.** How long have you been a professional poker player?

**A.** For about 20 years.

**Q.** Do you know my client, Tom Goldstein?

**A.** I do.

**Q.** How do you know Mr. Goldstein?

**A.** I know Tom from playing poker with him, and we just -- we had a friendship around poker for many years.

**Q.** About how long would you say you've known him?

**A.** I would say 16 years about, approximately.

**Q.** Now, Mr. Robl, did there come a time in 2016 when Mr. Goldstein asked you to help him train or practice for some poker matches?

**A.** Yes.

**Q.** And did you agree to do that?

**A.** Yes, I did.

**Q.** Why did you agreed to do that?

**A.** He was going to play a match against a gentleman named Alec Gores, and I thought I could train him to beat Alec Gores and invest in it and make some money from it.

**Q.** And was it just you training Mr. Goldstein for these games or was somebody else involved, too?

**A.** No. I got some friends who are also professional poker players to help train Mr. Goldstein.

**Q.** And who else was helping out training Mr. Goldstein?

**A.** One of the people was Keith Gipson, and then I think another person named Phil Galfond helped a little bit.

**Q.** And just briefly, what does that mean? Like what is involved in training Mr. Goldstein to play somebody else in poker?

**A.** Well, poker's kind of like a game like chess, so we're just teaching him kind of like the basics, so opening moves, the whole game tree. And then his opponent in this match had a particular style that, once we were aware of that, we made

adjustments on how to play against him and kind of how to beat his style or his game play.

Q.    Now, I heard you mention Mr. Gores.  Did you come to be involved in some other poker games that Mr. Goldstein played in 2016 as well?

A.    Yes.

Q.    And who were the opponents in those other games?

A.    It was a gentleman called the Chairman and then another guy called Tango.

Q.    I'm going to ask you about each of those games individually.  But before I do that, did you have an investment or share of Mr. Goldstein in these games?

A.    Yes.

Q.    And what does that mean when you have an investment or a share of Mr. Goldstein?

A.    When you take a share of someone when they're playing poker, that just means -- for example, if you had ten percent of them, if they won money in the match, you would get ten percent of what they won.  If they lost money in the match, you would have to pay ten percent of what they lost.

Q.    And why did you choose to take an investment or share of Mr. Goldstein in these games?

A.    I thought it would be a profitable investment.

Q.    Let's start with Chairman.  Who is Chairman?

A.    His name is Mr. X-I, I believe.  He's a wealthy gentleman

from China who liked to gamble and liked to play poker.

**Q.**　Did Mr. Goldstein prepare a memo that he shared with you to help with the training for the games against the Chairman?

**A.**　Yes, he did.

**Q.**　All right.  I'd like to show now Government's Exhibit 278.2.  Mr. Robl, this is in the binder in front of you.  It's also going to come up on the screen, whatever is easier for you.

**A.**　Okay.

**Q.**　Is this the -- starting with the first page, Mr. Robl, is this the, like, cover e-mail where Mr. Goldstein is sending you and some others the memo we've been talking about?

**A.**　Yes.

　　　　**MR. KRAVIS:**　And now, could we have the second page of the exhibit, please?

**BY MR. KRAVIS:**

**Q.**　Mr. Robl, is this the memo?

**A.**　Yes.

　　　　**MR. KRAVIS:**　Could we zoom in on the first paragraph, please?

**BY MR. KRAVIS:**

**Q.**　Mr. Robl, do you see here the memo begins, "this memo, which is substantially revised from the first version, has two parts.  First, I write generally about lessons I learned in the first session."  Do you see that?

**A.** Yes.

**Q.** Did you understand this "first session" to mean some games that Mr. Goldstein had played against Chairman before you got involved?

**A.** Yes.

**Q.** And just to be clear about this, those earlier games, the games that came before this memo, did you have an investment or share in those earlier games?

**A.** No, I don't believe so.

          **MR. KRAVIS:** All right. Now, let's take a look at the last paragraph, the last two paragraphs of the introduction. It's "in terms of broadly assessing" and then "obviously."

**BY MR. KRAVIS:**

**Q.** I just want to direct your attention, Mr. Robl, to the paragraph of the memo here that begins "obviously." Do you see that?

**A.** Yes.

**Q.** Do you see it reads, "Obviously, it is bad to lose, but a small benefit of our bad results in the first session is that it seems unlikely that C will quit me without numerous losing sessions."

     Do you see that?

**A.** Yes.

**Q.** So was it your understanding that Mr. Goldstein was saying

here that in those earlier games against the Chairman where you were not an investor, that he had been losing?

A.   Yes.  I mean, he says, "Yeah, I had a bad result in the first session," so I take that as a loss.

Q.   Do you, yourself, know how much Mr. Goldstein lost against the Chairman in the earlier sessions?

A.   No.

MR. KRAVIS:  We can take this down.  Thank you.

BY MR. KRAVIS:

Q.   Did there come a time in the fall of 2016 when Mr. Goldstein played the Chairman in the games that you had an investment in?

A.   Yes.

Q.   Did Mr. -- you mentioned a Mr. Gibson earlier.

Do you remember that?

A.   Yes.

Q.   Did Mr. Gibson also have a share of Mr. Goldstein in those games against the Chairman?

A.   Yes.  I believe so.

Q.   And a fellow named Paul Phua, did he also have a share of Mr. Goldstein in those games?

A.   I believe so.

Q.   Would Mr. Goldstein have had the funds himself to play without investors in a high-stakes game against somebody like the Chairman?

**A.** No.

**Q.** Where did the heads-up games -- I'm sorry.

Do you know -- do you remember what your own share of Mr. Goldstein was in the Chairman games?

**A.** I don't remember off the top of my head. I think maybe five or ten percent. I believe it's in the -- you know, the tab that's in evidence, the exact amount.

**Q.** Do you know what Mr. Phua's share was?

**A.** I don't know. No.

**Q.** Where did the heads-up games -- and the games against Mr. Goldstein and the Chairman were heads-up?

I'm sorry. Let me withdraw that and rephrase.

The games against Mr. Goldstein and Chairman where you had an investment, were those heads-up games?

**A.** Yes.

**Q.** Where did those games take place?

**A.** I don't know the exact location. I think somewhere in Asia, maybe.

**Q.** Since you say you don't know the exact location, I take it you were not physically present for the games; is that right?

**A.** That's correct.

**Q.** Do you know what Mr. Goldstein was doing with his time on that trip when he was not playing in the heads-up games against Chairman, where you had an investment?

**A.** No.

**Q.** Is it possible Mr. Goldstein, on that trip, was also playing in other games, like ring poker, for example?

**A.** Yes. It was possible.

**Q.** Would you have invested in Mr. Goldstein in ring poker games?

**A.** Generally, no.

**Q.** Why not?

**A.** He was not a profitable player in ring games. He normally lost.

**Q.** Just to sort of state the obvious here, if Mr. Goldstein was playing in ring games at the same time he's playing in the heads-up match against the Chairman in Asia, do you know if he lost money in those ring games?

**A.** No. I don't know.

**Q.** I think you told me earlier that when you are an investor in Mr. Goldstein and he losses, you pay a portion of the loss; right?

**A.** Yes. That is correct.

**Q.** If Mr. Goldstein is playing in a ring poker game and he has no investors and he loses, who pays all those losses?

**A.** Well, if he had no investors -- generally, whoever loses in the ring game has to pay their own loss.

**Q.** What was the outcome of Mr. Goldstein's heads-up poker games against the Chairman in the fall of 2016?

**A.** He won in the game.

**Q.** Does the total winnings 13.8 million sound about right to you?

**A.** Yeah. Again, I think he noted it in the chat and whatever it is, but that sounds like the ballpark.

**Q.** Based upon your experience as a professional poker player, these kinds of investment arrangements, is it possible that even though Mr. Goldstein won in total 13.8 million, that he, himself, only took home much less?

**MR. WHITMAN:** Objection, Your Honor.

**THE COURT:** Come to the headsets.

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:** Mr. Whitman, do I have you? Can you hear the Court?

**MR. WHITMAN:** Yes, Your Honor.

**THE COURT:** Mr. Kravis, can you hear us?

**MR. KRAVIS:** Yes, Your Honor.

**THE COURT:** Mr. Goldstein? His thumb is up.

Okay. Mr. Whitman?

**MR. WHITMAN:** The objection is speculation. He's asking him whether it was possible that Goldstein lost money. I think the testimony was that it sounds familiar, the amount that he won, which is fine because the witness knows that.

But he's asking him to speculate could he have also lost money. I don't think it's relevant to the jury. I don't think

it's relevant, and I don't think it's proper questions.

THE COURT: So the main objection is speculation. Mr. Kravis?

MR. KRAVIS: That was not what I asked. I didn't ask if Mr. Goldstein also lost money because he already said he doesn't know about the losses.

I was asking if it's possible that Mr. Goldstein's share of the winnings was much lower because there were investors. I think the witness has already testified that he is familiar with the investor relationship, there were investors in this game, and so on and so forth.

The only point I'm trying to make here is that even though the total winnings were 13.8 million, that doesn't mean that Mr. Goldstein took home 13.8 million. A chunk of that would have gone to the investors.

Based on what the witness has testified to already, I don't think that's speculation.

THE COURT: Thank you.

Mr. Whitman, anything further from you?

MR. WHITMAN: What we just heard from Mr. Kravis is an interesting argument to make later in the case, but that's not testimony. The witness is speculating, so I'm going to object.

THE COURT: I'm going to allow the question. Objection overruled.

(Whereupon, discussion concluded.)

**BY MR. KRAVIS:**

Q.    Let me just give you the question back.

Based on your experience as a poker player, your experience with investments in these games, what you knew about this arrangement in particular, is it possible that even though Mr. Goldstein won $13.8 million off the Chairman, that Mr. Goldstein himself actually took home much less than that because the investors got shares, too?

A.    Yes.

Q.    Is it possible that Mr. Goldstein's share might have been as low as 5.4 million?

A.    You know, I don't know the exact details, but I would say that's possible.

Q.    Do you know whether -- do you know how Mr. Goldstein got into the heads-up games with the Chairman?

A.    I do not know.

Q.    Do you know if the person you mentioned earlier, Mr. Phua, had anything to do with that?

A.    You know, I don't know, but I would assume so.  I mean, I know he had a good relationship with the Chairman.

Q.    You mean, Mr. Phua had a good relationship with the Chairman?

A.    Yes.

Q.    Do you know if the winnings that Mr. Goldstein received

from the matches against Chairman would have been paid through Mr. Phua?

**A.** I don't know any details of that.

**Q.** Do you know whether it was Mr. Phua's practice to keep a ledger of wins and losses in the games that he arranged?

**A.** To keep a ledger for just -- yeah. Sometimes, if a game is not being paid in cash, if it's being played on credit, there would be a ledger saying who won and who lost, and there would be records of that.

**Q.** And can you just explain what you mean by that when you say the game is being played on credit?

**A.** So sometimes if you are playing in a casino, everyone has to send money in to the casino. You are playing with actual chips that have actual dollar value.

Sometimes, in other locations and in casinos outside of the U.S., like in Asia or in home games, instead, you just play where the chips -- everyone has to sign for chips, basically, when they take them. And that, you are just saying, "I'm responsible for this money, If I lose, I'm going to pay it after the game."

So there is just, I guess, like, a clipboard with how much everyone has bought in for and how much they won or lost.

**Q.** Given the dollar amounts we are talking about here, would the games that Mr. Goldstein was playing against Chairman have been, like, pay up in cash or, like, credit?

**A.**   Well, I would assume the game was run on credit.

**Q.**   Why is that?

        **MR. WHITMAN:**  Objection.

        **THE COURT:**  Let's come to the headsets.

    (Whereupon, a discussion was held outside the presence of the jury.)

        **THE COURT:**  Mr. Whitman?

        **MR. WHITMAN:**  I'm here, Your Honor.

        **THE COURT:**  Mr. Kravis?

        **MR. KRAVIS:**  Yes, Your Honor.

        **THE COURT:**  Mr. Goldstein?

    Go ahead, Mr. Whitman.

        **MR. WHITMAN:**  This is a similar issue.  The witness said he assumes something and the lawyer for defense said why would you assume that.  We were already speculating the prior question.  We are certainly speculating as to what he is saying.

        **THE COURT:**  So I do tend to agree.

    But, Mr. Kravis, go ahead.

        **MR. KRAVIS:**  That is fine.  I got the answer.  I'll withdraw the question and move on to something else.

        **THE COURT:**  All right.  Thank you very much.

                (Whereupon discussion concluded.)

**BY MR. KRAVIS:**

**Q.**   Mr. Robl, let's turn now to the games that Mrs. Goldstein

played against Mr. Gores.

**A.** Okay.

**Q.** Did you have a share or investment in Mr. Goldstein for the games against Mr. Gores?

**A.** Yes.

**Q.** Did you also help secure a financial guarantee or financial backing for Mr. Goldstein to play in that game?

**A.** I helped secure a financial guarantee.

**Q.** What is a financial guarantee?

**A.** Well, sometimes if you are -- there is a new person playing poker or someone is coming to a game, if the game is played on credit, you don't really know if the person is going to pay or not if they lose. So sometimes a known person who is known to always pay will vouch for or guarantee the new person.

**Q.** In this particular game, the game that Mr. Goldstein played against Mr. Gores, were you, yourself, involved in securing that financial guarantee for Mr. Goldstein?

**A.** Yes.

**Q.** What were the steps you took to secure the financial guarantee for Mr. Goldstein to play against Mr. Gores?

**A.** Well, this is a long time ago, so the details as best I remember a decade ago.

I think Tom told me that Paul Phua would guarantee him for the match with Alec Gores. I talked to Paul. He confirmed he would guarantee Tom for 3 million. Paul Phua and Alec Gores

didn't know each other, but I was friends with a gentleman named Bobby Baldwin who ran the Aria Casino who knew Mr. Gores.

So I went to Mr. Baldwin and told him I would guarantee Tom for 3 million to play Alec Gores. If Tom lost 3 million and didn't pay, I would pay, for whatever reason, knowing that Paul had guaranteed the money.

Q. So that was a mouthful.

Just to make sure I got it right, the steps you took to provide the financial guarantee for Mr. Goldstein to get into this game were Mr. Phua guaranteed 3 million?

A. Yeah.

Q. And then you got Mr. Baldwin to make the 3 million guarantee?

A. Yes. He reached out to Mr. Gores to guarantee it.

Q. And you did that because Mr. Baldwin knew Mr. Gores?

A. Yes.

Q. And then you, yourself, were telling Mr. Baldwin that you would make a 3 million guarantee to him?

A. Yes.

Q. I got it. I think. How much was the financial guarantee?

A. It was for $3 million.

Q. All right. In addition to providing the financial guarantee, did Mr. Phua have a share or investment in Mr. Goldstein in the Gores game?

A. I would think so.

Q.    Do you know how large that share was?

A.    I do not.

Q.    How did Mr. Goldstein do against Mr. Gores?

A.    He won a lot of money.

Q.    Do you remember how much money he won?

A.    I don't remember the -- I would guess around $25 million, but I don't know the exact amount.

Q.    And do you remember what your share of that was?

A.    I think my share changed from match to match, but it was between ten and 15 percent.

Q.    So that would -- it's like somewhere in the neighborhood of a little north of $3 million.  Does that sound about right?

A.    Yes.  I believe that's correct.

Q.    Similar to the question I asked you about the Chairman game, is it possible, based on your experience as a poker player, your experience with these investment arrangements, your knowledge of the particulars of the Gores game, that Mr. Goldstein took home something far less than the 26 million or so he won off Gores?

A.    Yes.  He'd have to pay out all of the investors, including me which he did pay out.

Q.    Is it possible Mr. Goldstein took home something like $8 million?

A.    Again, I don't know all the details of, you know, all his investors and everything, but that seems possible.

Q.   All right.  Let me turn to the last person that I heard you mention.  I think the third player you mentioned was a fellow named Tango.  Did I hear that right?

A.   Yes.

Q.   And did there come a time in December of 2016 when Mr. Goldstein actually played against Tango?

A.   Yes.

Q.   Did you have a share or investment in the -- a share or investment in Mr. Goldstein in the games he played against Tango?

A.   Yes.

Q.   Did Mr. Phua?

A.   I don't know.

Q.   Do you remember what your share of Mr. Goldstein was for the Tango games?

A.   I believe it was five percent.  Again, it's in the documents, but this was ten years ago, so my exact share of each game, I don't remember.

Q.   And let me ask you the same question I asked about the Chairman game.  Would Mr. Goldstein have needed additional investors to have the credit to be able to play in a high-stakes poker game against Tango?

A.   Yes.  And he probably would have needed someone to guarantee him as well for some of the games they were playing.

Q.   Do you know precisely when Mr. Goldstein was payed for --

oh, let me back up and ask you.  How did Mr. Goldstein do against Tango?

**A.**   He won a lot of money.

**Q.**   Do you know precisely when Mr. Goldstein was paid for his winnings from the Tango match?

**A.**   No.

**Q.**   Is it possible that he didn't get the payment until 2017?

**A.**   Again, I don't know the exact terms, but I would say that it's possible.

**Q.**   If the money, the credit, let's say, was not going to Mr. Goldstein directly, is it possible that Mr. Goldstein might not even know when exactly Tango paid up?

**A.**   I guess so.  It would be possible.

**Q.**   Did you actually -- you mentioned you had an investment. Did you actually receive a share of the Tango winnings?

**A.**   You know, I'm not exactly sure about it.  There was -- because it was a complicated situation because I had an investment in Tom.  But my investment had a stop loss.  So if he got down to a certain amount, then I would be done.  My risk was capped.

In that match, he got down more than that amount, but he continued playing.  So I think there was some ambiguity between me and him on, you know, if I was actually in for the winnings or only in it for the loss.  And I don't remember exactly how we resolved it, but I don't believe I made money from that

particular match.

Q.   So the upshot of it is, the result of that dispute over the -- or the issue I should say arising out of the stop loss, you don't believe you made any money off of this one?

A.   Off this exact match, no.

Q.   I just have a few more questions for you, Mr. Robl.  In your experience as a poker player, will players in the world of high-stakes poker sometimes agree to offset debts that they owe one another?

A.   What do you mean by that?

Q.   Yeah.  Let me give you an example.  Let's suppose that you and I are playing heads-up poker and I win a million dollars off of you.  Okay?

A.   Okay.

Q.   Unlikely, but let's just say.

A.   Yeah.

Q.   Yeah.  You were pretty quick with that one.

     And then let's say the next week you win a million dollars off of me.  Okay?

A.   Yes.

Q.   In your experience in the poker world, in that situation, would it be common for you and I to just sort of cancel out the debts we owe each other rather than me sending you a million dollars and you sending me back a million dollars?

A.   Yes.  People who play against each other a lot sometimes

will call it like rounding a figure. So instead of settling the amount, if you're going to play again, you'll just keep the figure going.

Q. And will the players who know each other do that sometimes even when we're talking about large amounts of money?

A. Yes. If they trust the other person for the money.

Q. Now, the jury has heard some evidence earlier in this case about some payments that went to you from Mr. Goldstein's law firm bank account all the way back in 2016. I'm not going to ask you about the details of those transactions. I just want to be clear, do you, yourself, have any first-hand information about how Mr. Goldstein's accountants characterized those payments?

A. No.

Q. And do you, yourself, know anything about the communications between Mr. Goldstein's office managers and the accountants about those payments?

A. No.

Q. I was asking you a moment ago about the situation where two folks owe each other money. Are there also some times in the world of high-stakes poker when a player might ask for a payment to be sent directly to a third party?

A. Yes.

Q. So, I'll just give you another example. Let's say, again counter factually, I win a million dollars playing poker off of

you, and then Ms. Reaves over there, she wins a million dollars playing poker off of me. Is it common in that situation that I might just ask you to pay the million dollars directly to Ms. Reaves instead of doing separate transactions?

A. I don't know if I'd say it's common, but that definitely happens.

Q. It happens; right?

A. Yeah.

Q. We've been taking about -- this is my last topic for you. We've been talking about some transactions here that involve large sums of money. We've been talking about poker games and investments and shares and financial guarantees.

So let me ask you, did you have formal written contracts with Mr. Goldstein for your investments in the games in 2016?

A. No. We just have verbal agreements or we, you know, send a message with, you know, whatever the share was that would be agreed on.

Q. I mean, we're talking about a lot of money here. Why is it that you would not demand like a formal written contract?

A. I mean, gamblers kind of just go by the word and the reputation and stuff. You know, a lot of the times you're gambling for a lot of money on credit. And you know nothing really makes the other person pay besides their honor. So you know, people don't litigate gambling debts generally so. Yeah. It's just -- I don't know. It's common practice in the

gambling world.

**Q.** In addition to gambling, have you lent Mr. Goldstein money in the past?

**A.** Yes.

**Q.** Did you require formal written loan agreements for those loans?

**A.** No.

**Q.** Did you charge him interest?

**A.** No.

**Q.** In fact, does Mr. Goldstein owe you a significant sum of money right now?

**A.** Yes.

**Q.** Now, just to be clear, that's not a loan; right? That's something else?

**A.** Yes.

**Q.** Do you have any formal written contract for that money that Mr. Goldstein owes you right now?

**A.** No.

**MR. KRAVIS:** May I have just a moment, please?

**THE COURT:** You may.

**MR. KRAVIS:** Thank you very much, Mr. Robl. I have no further questions.

**THE COURT:** Thank you very much, Mr. Kravis.

Counsel, can we come to the headsets, please?

(Whereupon, a discussion was held outside the presence of

the jury.)

THE COURT: All right. Mr. Beaty, are you on? Mr. Kravis?

MR. KRAVIS: Yes, Your Honor.

THE COURT: Mr. Goldstein? We're just about noon. Should we break now for lunch and then do the cross after the lunch break?

MR. WHITMAN: Your Honor, we're glad to start now with 15 minutes or send the jury to lunch and then start when we come back. Either way is fine.

THE COURT: All right. How much do you think you're going to have on cross?

MR. WHITMAN: Probably 45 minutes, Your Honor.

THE COURT: All right. Let's break for lunch. Let the jury take its lunch, and we'll begin after the lunch break. Mr. Kravis?

MR. WHITMAN: Thank you, Your Honor.

MR. KRAVIS: No objection. Thank you.

THE COURT: Okay. Very good. Thank you.

(Whereupon, discussion concluded.)

THE COURT: All right. Well, members of the jury, we're just about at noon, so I'm going to suggest that we break now for your lunch break.

Please rise for the jury.

(Whereupon, the jury exited the courtroom at 11:58 a.m.)

**THE COURT:** Please be seated, everyone.

And, Mr. Robl, if you want to step down and take a break, you may. You will be on cross when you come back, so please do not communicate with the defense during the lunch break.

**THE WITNESS:** How long is the break?

**THE COURT:** It will be about an hour. They'll let you know when to come back.

(Whereupon, the witness exited the witness stand and the courtroom at 11:59 a.m.)

**THE COURT:** All right. So, Counsel, when we come back, we'll have the government's cross of Mr. Robl, any redirect. Sounds like we can do that in an hour or so, I think. And then hopefully, we'll have plenty of time for your next witness, Mr. Kravis.

**MR. KRAVIS:** Thank you, Your Honor. And just so the Court is aware, our next witness will be Zachary Marks, whose our expert -- one of our experts.

**THE COURT:** Understood. Understood.

All right. Why don't we break until one o'clock for lunch.

**MR. BEATY:** Thank you, Your Honor.

(Whereupon, a lunch recess was taken from 12:00 p.m. to 1:06 p.m.)

**DEPUTY CLERK:** All rise. This Honorable Court now resumes in session.

THE COURT: Please be seated, everyone. And welcome back from the lunch break.

Where are we?

Mr. Whitman is at the podium, so yes?

MR. WHITMAN: The government was ready to start with the cross-examination of the witness. I think that's where we are.

THE COURT: And we have the witness in place.

Are we ready for the jury?

MR. WHITMAN: Yes, Your Honor.

THE COURT: Please rise for the jury.

(Whereupon, the jury entered the courtroom at 1:10 p.m.)

THE COURT: Please be seated, everyone.

Mr. Whitman.

### CROSS-EXAMINATION

BY MR. WHITMAN:

Q. Good afternoon, Mr. Robl.

A. Good afternoon.

Q. I want to start off right where the defense attorney left off.

Mr. Goldstein owes you money for poker right now; right?

A. Yes.

Q. He owes you money for a game -- a poker match at Kevin Hart's birthday party; right?

A. Yes.

**Q.** That was in Greece?

**A.** Yes.

**Q.** Where in Greece?

**A.** At Mykonos.

**Q.** Is that a fancy location?

**A.** It's a nice location, yes.

    **THE COURT:** I'm sorry, Mr. Robl. Can you speak a little bit more directly on the microphone so we can hear you?

    **THE WITNESS:** Yes.

    **THE COURT:** Thank you.

**BY MR. WHITMAN:**

**Q.** Mr. Goldstein also owes you because you had a piece of him in a game against Andy Beal, and he owes you for that piece; right?

**A.** Yes.

**Q.** Were you asked on direct examination how much Mr. Goldstein owes you, sitting here today?

**A.** Today. No, I don't believe I was asked that.

**Q.** It's approximately $1.5 million; right?

**A.** Yes.

**Q.** That's a lot of money to you?

**A.** It's a lot of money, yes.

**Q.** And you wanted to be repaid; right?

**A.** I would like to be.

**Q.** Now, the match against Andy Beal -- well, let's put it

this way.

In December of 2024 and January of 2025, you exchanged text messages with Tom Goldstein about the poker debt that he owed you; right?

MR. KRAVIS: Objection.

THE COURT: Let's come to headsets, Counsel.

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT: Mr. Whitman, are you on?

MR. WHITMAN: Yes, Your Honor.

THE COURT: Mr. Kravis, can you hear us?

MR. KRAVIS: Yes, Your Honor.

THE COURT: Mr. Goldstein's thumb is up.

Go ahead, Mr. Kravis.

MR. KRAVIS: So we are now well-outside the charged time period. I did not object to the initial questions because I recognize I raised the issue of the debt and I understood that the government might want to explore that a little bit with the witness. But I think now we're getting in to questioning that is well-outside of the charged time period.

THE COURT: All right. Mr. Whitman, where are we going?

MR. WHITMAN: This all goes to witness credibility and understanding the communications between Mr. Robl and Mr. Goldstein surrounding the debt that Mr. Goldstein, today,

owes to Mr. Robl. It's relevant to credibility.

I think it's fair to say that Mr. Robl is more likely to be repaid for that debt if Mr. Goldstein is not convicted and, therefore, we should be able to explore it. I don't think I'll be more than five minutes on this, but we should be allowed some leeway on cross to go to issues of credibility.

**THE COURT:** All right. Mr. Kravis?

**MR. KRAVIS:** Right. But my point is I think I already gave him that leeway. He just got that. Like, he just got that my client owes Mr. Robl $1.5 million. And he asked him these questions about, "You would like to be repaid."

He even asked -- threw in a few questions there about how Mykonos is a fancy island, which I didn't object to.

But going into the details of the transaction now has minimum probative value. He has already established the bias point, and you we're getting into a prejudicial area because, again, it's well-outside the charged time period.

**THE COURT:** Thank you.

Anything further from Mr. Whitman?

**MR. WHITMAN:** On cross, I do not think, in terms of credibility, the government should be limited to what Mr. Kravis thinks is the minimum amount of evidence to ensure the jury understands the ongoing financial relationship between the defendant and the witness.

**THE COURT:** I'm going to allow the government to ask

the questions and, obviously, the defense can address that on redirect.

The objection is overruled.

MR. KRAVIS: Thank you, Your Honor.

(Whereupon, discussion concluded.)

**BY MR. WHITMAN:**

Q. In December 2024 and January 2025, you and the defendant, Mr. Goldstein, exchanged messages about the debt that he owed to you; right?

A. Between the poker game in Mykonos up until the time Tom's indictment got made public, we were talking about him paying me back, yes.

Q. After the indictment, Mr. Goldstein's attorney reached out to you about the debt; right?

MR. KRAVIS: Hold on. I object here.

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT: Mr. Whitman, do we have you?

MR. WHITMAN: Yes, Your Honor.

THE COURT: Mr. Kravis?

MR. KRAVIS: Yes, Your Honor.

THE COURT: Mr. Goldstein?

Go ahead, Mr. Kravis.

MR. KRAVIS: So I just want to make sure everyone is clear on what is about to happen here. Mr. Goldstein -- as the

Court may be aware, Mr. Goldstein, from the time of the indictment to the present day, is under a no-contact order that has over 80 names on it, and this guy is one of the -- is one of the names.

If they're going to start asking him questions about communications -- and that's why the lawyer was reaching out to him, is because -- to make sure that Mr. Robl understood that Mr. Goldstein was not allowed to have contact with him.

If they are going to start asking questions about this, then on redirect, I am going to explore the fact that Mr. Goldstein was prohibited by a court order from speaking with this guy and, like, 80 other people as the result of the stayaway -- as a result of the release conditions that the government requested in this case.

I just want to make sure that we are all clear that that's where we are going.

THE COURT: Mr. Whitman, where are we going?

MR. WHITMAN: Your Honor, he is partially right. What we are going to show is that after the indictment -- and you can see in tab 5 of your binder -- which might be more helpful context than the way it was just described. So let me know when you are there, Your Honor.

THE COURT: I am there.

MR. WHITMAN: By the way, I do not plan to show this exhibit, but I do plan to explore what this is, which is a text

message, as you can see on its face, from one of Mr. Goldstein's attorneys directly to Mr. Robl referencing the ability of Mr. Goldstein to pay him in that moment.

By the way, Your Honor, the idea that this is somehow proper -- I mean, this is a message directly from one of Mr. Goldstein's attorneys to a witness who is represented at the time.

I don't plan to elicit that either, nor do I plan to show this document but, again, I think we should be able to --

THE COURT: What are you -- what are you trying to ask? Again, whether the witness has any interest in the outcome of the trial? Is that the point?

MR. WHITMAN: Yes. I mean, it still goes to the issue of credibility because he is receiving messages about the ability of Mr. Goldstein to pay after the indictment.

And if we have three more questions, four more questions, I think we can wrap this topic up.

THE COURT: All right. I'm going to allow the question. You are not to go to show the document to the jury.

And, again, I'm going give the defense latitude on redirect if they want to explore those issues.

Objection overruled.

MR. WHITMAN: Thank you, Your Honor.

(Whereupon discussion concluded.)

BY MR. WHITMAN:

**Q.** Mr. Robl, are you ready?

**A.** Yes.

**Q.** After the indictment was handed down as to Mr. Goldstein, you were contacted by one of his attorneys; correct?

**A.** Yes.

**Q.** That attorney sent you a text message, directly to you; correct?

**A.** Yes.

**Q.** At the time, you were represented by an attorney; correct?

**MR. KRAVIS:** Hold on. Object -- hold on. Objection.

**THE COURT:** Let's go to the headsets.

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:** Mr. Whitman?

**MR. WHITMAN:** Yes, Your Honor.

**THE COURT:** Mr. Kravis?

**MR. KRAVIS:** Yes, Your Honor.

**THE COURT:** Mr. Goldstein?

Mr. Whitman -- I'm sorry.

Mr. Kravis, go ahead.

**MR. KRAVIS:** Now it's relevance and prejudice.

Two things. Number one, this wasn't me and it wasn't anybody who is sitting here at the table, and I think the jury now has the impression that I did something or someone on my team did something improper, which is not true.

B, what's the difference?  Like, what is the difference if some other attorney working for Mr. Goldstein at that time reached directly out to a witness who was represented by counsel?

First of all, I don't even know if that attorney knew the witness was represented by counsel.  We didn't have the Jencks material at that point.  But even if they did, what does that other lawyer's ethical conduct have anything to do with what's going on in this trial today?

**THE COURT:**  I guess let me say just from what I'm trying to understand what is going on.

I think the government is seeking to show potential bias or interest of this witness in the outcome of the trial, as I can understand it, as it relates to him recovering whatever debt is owed.

If that's what is going on, I guess just ask the witness does he have an interest.  I'm not really sure -- I can't follow what is going on here either.  I gave the government some latitude, but we seem to be going in a lot of different directions, but clearly chronologically not in the right area.

So am I misunderstanding the point of this area of questioning?

**MR. WHITMAN:**  No.  I think you are understanding the point.  I think that we just think we should be able to do a line of questions without -- I agree it's been disjointed.

There has been three objections so far in first ten minutes.

But I just think we should be able to finish up this line of questioning. It's not -- I'm glad to ask a few more. I won't reference whether he was represented or anything like that.

THE COURT: Can't you just ask the witness if you think has an interest? Just ask.

MR. KRAVIS: And I'll just note, he has already done that. He did that five minutes ago.

THE COURT: I think we can ask those questions. You've already got on the record about the debt.

And so if you want to ask him about the debt, if he has an interest, you can ask him. I don't even think this --

MR. WHITMAN: I'll move on, Your Honor.

THE COURT: All right. Let's move on. Thank you.

(Whereupon discussion concluded.)

BY MR. WHITMAN:

Q. Mr. Goldstein played in a series of high-stake poker matches in 2016 against Chairman, Alec Gores, and Tango; right?

A. Yes.

Q. You helped him prepare for some of those matches?

A. Yes.

Q. You had a piece or a share of the success?

A. Yes.

Q. And part of this is you are one of the world's best poker

players; correct?

**A.** Yes.

**Q.** Mr. Gores, Mr. Tango and Mr. Chairman might be less likely to play you directly; right?

**A.** Yes.

**Q.** So investing in Mr. Goldstein is a way for you to make money off those gentlemen without necessarily having to play them directly; right?

**A.** Well, just to clarify, I have played with all those gentlemen, correct. But maybe for, you know, a one-on-one match for this amount of money, I think maybe they would prefer to play Tom over me.

**Q.** Mr. Goldstein told you in a text message in December 2016 that his gross wins from playing those three gentlemen, Alec Gores, Tango and Chairman, was just over $50 million; right?

**A.** Yes.

**Q.** You were asked questions on direct examine about how you settled poker debts; right?

**A.** Yes.

      **MR. WHITMAN:** Could we please go to GX 378.1?

**BY MR. WHITMAN:**

**Q.** Mr. Robl, do you see the document on the screen?

**A.** Yes.

**Q.** This is a bank record of yours; right?

**A.** Yes.

**Q.** This reflects a payment on November 14, 2017; right?

**A.** Yes.

**Q.** That's a payment from you to someone else; right?

**A.** Yes.

**Q.** You can -- it's a payment from you to someone or something called Napoli Shkolnik & Associates; right?

**A.** Yes.

**Q.** It says on this line that's called out on the screen, "Reference, Tom Goldstein"; right?

**A.** Yes.

**Q.** This was a payment to Napoli Shkolnik from you for a poker debt; right?

**A.** Yes, I believe so.

**Q.** You owed this amount of money to Mr. Goldstein at that time in November of 2017; right?

**A.** Yes. I believe so.

**Q.** Mr. Goldstein asked you to send a payment not to him, but to Napoli Shkolnik; right?

**A.** Yes.

**Q.** You had no idea what or who Napoli Shkolnik was at the time; right?

**A.** At the time, I did not.

**Q.** You testified a lot on direct exam or were asked a lot of questions about a man named Paul Phua?

**A.** Yes.

**Q.** You know Paul Phua?

**A.** Yes.

**Q.** You've talked to Paul Phua?

**A.** Yes.

**Q.** Talked to him about poker?

**A.** Yes.

**Q.** Played poker with him?

**A.** Yes.

**Q.** Invested in him to play poker?

**A.** Maybe once or twice, yes.

**Q.** He's invested in you to play poker?

**A.** Yes.

**Q.** He's invested in Mr. Goldstein to play poker?

**A.** Yes.

**Q.** Mr. Goldstein has invested in him to play poker?

**A.** I have no knowledge of that.

**Q.** Sometime -- you've communicated with Paul Phua by text message; is that fair?

**A.** Yes.

**Q.** Sometimes, instead of talking to Paul Phua, you have to talk to one of his representatives; is that fair?

**A.** I normally talk to him directly.

**Q.** Before we show this exhibit, Mr. Robl, I'd just like you to turn -- there's a binder in front of you. I'd like you to turn to tab three.

Do you see there's a photo in tab three?

**A.** Yes.

**Q.** Is that a photo of Paul Phua?

**A.** Yes, it is.

**MR. WHITMAN:** Could we please show GX 436?

**MR. KRAVIS:** No objection.

**BY MR. WHITMAN:**

**Q.** This is Paul Phua; right?

**A.** Yes.

**Q.** He's a billionaire?

**A.** Yes.

**Q.** He's a powerful guy?

**A.** I suppose so. I don't --

**Q.** He's involved in high-stakes poker?

**A.** Yes.

**Q.** Owns a bank in Montenegro?

**A.** I don't know if he owns a bank.

**Q.** Do you know if he's associated with one in Montenegro?

**A.** Yes.

**Q.** Maybe the bank is in someone else's name?

**A.** I don't know the details of any, you know, bank ownership in Montenegro.

**Q.** One of the things about Mr. Phua is that he runs junkets in Macau. You know that; right?

**A.** Yes. He used to.

Q.   And Mr. Phua doesn't come to the United States, does he?

A.   No, or not recently.

Q.   For about the past decade he hasn't come to the United States?

A.   Correct.

Q.   But he does gamble with individuals in the United States; right?

     Sorry.  I'll rephrase that.  Mr. Phua plays poker with people who themselves live in the United States?

A.   Yes, but the games are played outside of the United States.

Q.   But he doesn't have, to your knowledge, bank accounts in the United States; right?

          MR. KRAVIS:  Objection.

          THE COURT:  Let's come to the headsets.

     (Whereupon, a discussion was held outside the presence of the jury.)

          THE COURT:  All right.  Mr. Kravis, do we have you?

          MR. KRAVIS:  Yes, Your Honor.

          THE COURT:  Mr. Goldstein, thumb's up.  Mr. Whitman, can you hear us?  All right.

     Mr. Kravis, go ahead.

          MR. KRAVIS:  So I let this go on for a few questions, but I think there's a foundation issue here.  I don't know how Mr. Robl would know whether Mr. Phua has bank accounts in the

United States.

I mean, look, maybe Mr. Robl is Mr. Phua's banker and so he has first-hand knowledge that way. That seems a little unlikely to me but, if the government has some foundation for it, then they've got to put it out there before they can start asking these questions.

**THE COURT:** All right. I tend to agree. There is a lack of foundation.

Mr. Whitman?

**MR. WHITMAN:** There is foundation because -- and I can do it a different way and build that up first, but I thought I was building --

**THE COURT:** Well, what I mean is it hasn't been established in front of the jury that there is a foundation. How does he know about Mr. Phua's bank accounts?

**MR. WHITMAN:** Because he's been paid by Paul Phua for gambling winnings, but he's been paid through individuals in the United States, including Mr. Goldstein. So he does have knowledge of how. And we heard a lot about how the payments from Phua worked on direct.

**THE COURT:** But I thought you were asking him about whether specifically Mr. Phua has certain bank accounts or is associated with certain banks. How is he going to know that?

**MR. WHITMAN:** I think it's -- I was really just asking if he knows. And it's equally helpful if he says "I

don't know. I don't know of any bank accounts he has in the United States." This is foundation for the subsequent questions about the ways in which Mr. Phua has to move money into the United States.

So -- and again, that's a key part of our case, including with the $1 million bag of cash. That's a creative way that Mr. Phua had, in the government's view, of transporting --

THE COURT: I guess I'm lost, because I don't understand how Mr. Robl is talking about how Mr. Phua moves money around. I know we're on cross. I get you on the credibility points and bias. So be it. But now we seem to be trying to establish something about what Mr. Phua does. I'm not really sure why we're doing that with this witness or how it has anything to do with the direct examination. But maybe I'm missing it.

Go ahead.

MR. WHITMAN: I would just respectfully push back and say we heard a lot about Paul Phua in the direct. We've heard a lot about Paul Phua in the trial. We've heard a lot about the ways that allegedly Paul Phua like holds money for Mr. Goldstein or how he does or does not pay him or whether it's loans.

This witness right here, Your Honor, unless Mr. Goldstein testifies, is probably the best witness of the whole trial to talk about Mr. Phua and how he puts -- and how he will

transport money, including gambling winnings, to an individual like Mr. Goldstein. If the witness doesn't know, the witness doesn't know, but that's why we're doing this. And I'm sorry if I'm not explaining it correctly.

THE COURT: No. You're explaining it, but, you know, this is the defense's witness now. I'm not sure we covered all this on direct.

Let me hear from Mr. Kravis.

MR. KRAVIS: Your Honor, I agree. I mean, I thought my questions about Mr. Phua were fairly targeted. And when he said he didn't know, I moved on. If the defense -- if the government had an objection to one of those questions, they could have made it. But I'm just not hearing any foundation for how this guy would know anything about Mr. Phua's bank accounts.

THE COURT: Mr. Whitman? And I will note that, you know, it's 1:30 and we're still on the cross. But go ahead, Mr. Whitman.

MR. WHITMAN: I'm glad to build more foundation. But again, we have heard a lot about Paul Phua and this is the witness who knows that. That's why they asked so many questions. I bet if we read the transcript later, there will be 25 to 30 references to Paul Phua, to the poke -- they were talking about a Paul Phua poker ledger.

THE COURT: All right. All right. I'm going to see

if you can lay the foundation, because right now I don't think it's clear how this witness is answering any of the questions that we've been talking about.  So you can try to lay the foundation.

If it's not sufficient, Mr. Kravis, you can come back --

**MR. KRAVIS:**  Okay.

**THE COURT:**  -- and we'll see where we are.  And I hope we can try to move this forward because it's 1:30.  I know there's another witness that the defense wants to put on.  I'm just saying this globally, not to criticize anyone, but that was the concern I heard to get through these two witnesses.

Mr. Whitman, go ahead.

**MR. WHITMAN:**  Absolutely.  And we're trying to do this as quickly as possible.  We're just trying to cross-examine the witness, Your Honor.  And I appreciate the rulings and we'll build the foundation.  But it is going slow because of these objections, frankly.  So I just wanted to say that.

**THE COURT:**  Thank you very much, Mr. Whitman.

**MR. WHITMAN:**  Thank you, Your Honor.

**THE COURT:**  Thank you, Counsel.

(Whereupon, discussion concluded.)

BY MR. WHITMAN:

Q.   Have you won poker -- have you won against poker -- against Paul Phua in poker?

**A.** Yes.

**Q.** Has Mr. Phua paid you for those games?

**A.** Yes.

**Q.** Mr. Phua did not pay you from a bank account in the United States?

**A.** Correct.

**Q.** Mr. Phua needs to figure out other ways to pay people he pays poker with when they're located in the United States?

**MR. KRAVIS:** Objection.

**THE COURT:** Let's come to the headsets, Counsel.

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:** Mr. Whitman, do we have you? Can you hear us?

**MR. WHITMAN:** Yes.

**THE COURT:** Okay. Mr. Kravis?

**MR. KRAVIS:** Yes, Your Honor.

**THE COURT:** Mr. Goldstein's thumb is up.

Go ahead, Mr. Kravis.

**MR. KRAVIS:** Okay. The last -- I did not object to the questions about personal knowledge, he how got paid by Mr. Phua. This last question was Mr. Phua needs to find other ways to pay people in the United States. Lack of foundation. Calls for speculation. And I guess, at this point, relevance.

**MR. WHITMAN:** I'll move on.

**THE COURT:** All right. Thank you.

(Whereupon discussion concluded.)

BY MR. WHITMAN:

Q. You won money against Paul Phua in 2016; right?

A. You know, I don't -- I would say over the past, you know, in that timeframe, but I don't know about the exact year.

Q. There was a time when you had won money against Paul Phua and he paid you by having Mr. Goldstein wire you money; right?

A. I'm not sure about that.

Q. Mr. Phua expects people to pay their debts; right?

A. Yes, as most people do.

Q. In 2020 or 2021, Paul Phua loaned you money; right?

A. Yes.

Q. The loan was related to a real estate transaction; right?

A. Yes.

Q. He made three payments to you as part of the loan?

A. He made -- I want to say he made payments to me, but I think he made payments on my behalf.

Q. Mr. Robl, could you, without showing it on the screen, go to tab 4 of your binder?

**MR. KRAVIS:** Can we have the exhibit number? We don't have a binder.

**MR. WHITMAN:** It's 698.

BY MR. WHITMAN:

Q. Do you see the document in the binder?

**A.** Yes.

**Q.** Do you see that there are signatures at the bottom of the document?

**A.** Yes.

**Q.** One of those signatures is yours; right?

**A.** Correct.

**Q.** This is a loan agreement between you and Mr. Paul Phua?

**A.** Yes.

> **MR. WHITMAN:** Could we please show Exhibit 698, please?

**BY MR. WHITMAN:**

**Q.** While we are pulling that up, is Mr. Phua's -- oh, here we go.

This is the loan agreement we were talking about?

**A.** Yes.

**Q.** This agreement it says was made at Dubai; right?

**A.** That's what it says.

**Q.** Do you understand that series of numbers next to that to be a reference to the date?

**A.** Yeah.

**Q.** So 2021?

**A.** Yes.

**Q.** The parties to this agreement are Mr. Andrew Timothy Robl. That's you; right?

**A.** Yes.

**Q.** Who is other party?

**A.** It's Paul Phua with his Chinese name, which is Wei Seng. I probably butchered it and said it wrong.

      **MR. WHITMAN:** Can we go down to the -- okay.

**BY MR. WHITMAN:**

**Q.** So this loan agreement between you and Paul Phua has a number of provisions; right?

**A.** Yes.

**Q.** The amount of the loan was 544,000 euros; right?

**A.** Yes.

**Q.** There is a section, article 2, about how to terminate the loan; right?

**A.** Right.

**Q.** 2.2 down here at the bottom of the screen says, "On termination, the borrower shall be responsible for returning the whole amount of the loan;" right?

**A.** Yes.

**Q.** You're the borrower in this situation?

**A.** Yes.

**Q.** So at the termination of this loan, you would be responsible for returning the whole amount to Mr. Phua; right?

**A.** Yes.

      **MR. WHITMAN:** Could we scroll down a little bit, Mr. Beaty?

**BY MR. WHITMAN:**

Q.   Do you see there's a section titled -- or article 3 titled "responsibilities"?

A.   Yes.

Q.   There is a section about payments and how payments are to be applied; right?

A.   Yes.

Q.   There is a section on prepayment; right?

A.   Yes.

Q.   It says, "The borrower has the right to prepay all or any part of the amount of this loan at any time without prepayment penalty or premium of any kind;" right?

A.   Yes.

          MR. WHITMAN:   Could we please go to page 2?

BY MR. WHITMAN:

Q.   A section at the top about costs and fees related to the loan; right?

A.   Yes.

Q.   A section about waiver; right?

A.   Yep.

Q.   Successors and assigns; right?

A.   Yes.

Q.   Joint and several liability?

A.   Yep.

Q.   Let's look at 3.1.7.  It says "amendment;" right?

A.   Yes.

Q.   This is a section describing how, if the loan is to be amended, how it has to be amended; right?

A.   Yes.

Q.   It says it has to be -- sorry.

It says, "This loan may be amended or modified only by a written agreement signed by the borrower and the lender;" right?

A.   Yes.

Q.   The borrower is you; right?

A.   Yes.

Q.   The lender was Mr. Phua; right?

A.   Yes.

Q.   So if you were going to amend this loan, you would need a new written agreement; right?

A.   According to this document, yes.

Q.   In writing; right?

A.   Yeah.  According to the document, yes.

Q.   And if you go down to 3.1.9, do you see it says "notifications"?

A.   Yes.

Q.   It says, "Any notice or communication under this loan must be in writing and sent via one of the following options;" right?

A.   Yes.

Q.   It says, "The governing law of this loan will be the laws

of Dubai, United Arab Emirates;" right?

A.    Yes.

Q.    Let's look at article 4.  It says "no oral changes;" right?

A.    Yes.

Q.    "This agreement constitutes the entire agreement between lender, Mr. Phua, and the borrower, Mr. Robl, supersedes all prior understandings and writings, and cannot be orally exchanged" -- "orally changed;" right?

A.    Yes.

Q.    At the bottom of this document, that's where we have the signature of Mr. Phua on the left; right?

A.    Yes.

Q.    And the signature of yourself on the right; right?

A.    Yes.

Q.    You repaid Mr. Phua the full amount of this loan; right?

A.    Yes.

Q.    You were asked questions about whether you know what Mr. Goldstein tells his representatives and accountants and firm managers about the classification of payments.
      Do you recall that question?

A.    Yes.

Q.    You don't know what Mr. Goldstein tells his accountants or tax preparers or firm manager; right?

A.    I do not know.

**Q.** You do know how you work with your accountant on your taxes though; right?

**A.** Yes.

**Q.** You have an accountant; right?

**A.** Yes.

**Q.** They help you file tax returns?

**A.** Yes.

**Q.** You provide your accountant with records so that they can accurately fill out your tax returns?

**A.** Yes.

**Q.** You do monthly reconciliations of your gambling records with your accountant; right?

**A.** Yes, I do nowadays.

**Q.** You show your accountant your bank records; right?

**A.** Yes.

**Q.** You show your accountant your cryptocurrency records; right?

**A.** Yes.

**Q.** You have been doing that for years and years, haven't you?

**A.** Yes.

**Q.** It's important to provide your accountant records showing what you've won or lost while playing poker so that they can accurately complete your tax returns; right, Mr. Robl?

**A.** Yes.

**Q.** That's common knowledge in the high-stakes poker

community, isn't it, Mr. Robl?

A.    That you have to provide your accountant with records for -- I mean, I would say so.  I mean, people don't generally discuss their tax matters, but I think that's fair.

Q.    So you think it's fair to say it's common knowledge in the high-stakes poker community that you have to provide your accountant with records showing what you have won or lost while playing poker so that they can accurately complete your tax returns; right?

A.    Yes.

Q.    At one point you referred Mr. Goldstein to your accountant; right?

A.    Yes.

Q.    Do you know whether Mr. Goldstein ever followed through with that and hired your accountant?

A.    I believe he never hired her.

Q.    But you did hire your accountant; right?

A.    Yes.

Q.    That was your choice; right?

A.    Yes.

Q.    She's a fantastic accountant, isn't she?

A.    Yes.

Q.    And she has some expertise in poker; right?

A.    Yes.

Q.    You chose an accountant with an expertise in poker because

you wanted to take responsibility for your wins and losses in poker; isn't that right?

A.   Well, I'm a professional poker play.  My income is from poker.  Yes.  So I wanted an accountant who specializes in that.

Q.   Sorry.  Can you speak a little closer to the mic?

A.   Yes.  Sorry.

Q.   You don't try to mislead your accountant about your poker wins or losses, do you?

A.   No.

Q.   Why not?

A.   Because she needs to know my records to file my taxes accurately.

Q.   You've never, at the end of the year, created a second set of books that reduced your poker income by $3 million; right?

A.   No.

Q.   You've never lied to your accountant and hid poker winnings; right?

A.   No.

Q.   You were asked questions about what's possible in terms of how much of a piece various other individuals had of Mr. Goldstein in poker games in Asia in 2016.

     Do you recall that?

A.   Yes.  Yes.

Q.   You don't know the specifics of the other staking

arrangements, if any, that Mr. Goldstein had for those games in Asia, do you?

**A.** That's correct. I don't know the specifics.

**Q.** That's not your business; right?

**A.** Correct.

**Q.** Are you aware that Mr. Goldstein recently said that he personally cleared $12 million after paying investors for those games in 2016 against Chairman, Gores, and Tango?

**A.** In my --

**Q.** Are you aware that Mr. Goldstein recently said that he personally cleared $12 million after paying investors from the games in 2016 against Chairman, Gores, and Tango?

**A.** I don't recall that off the top of my head.

**Q.** Is it possible that he personally cleared $12 million against those three gentlemen in 2016?

**A.** Sure. Again, I don't know the specifics, so yes.

**Q.** By "personally cleared," you would understand that to be -- well, actually, I won't ask that.

    **MR. WHITMAN:** A moment to confer, Your Honor.

Nothing further.

Thank you, Mr. Robl.

    **THE COURT:** Thank you very much, Mr. Whitman.

Mr. Kravis, do you wish to do any redirect?

    **MR. KRAVIS:** Briefly. Thank you, Your Honor.

<div align="center"><b>REDIRECT EXAMINATION</b></div>

BY MR. KRAVIS:

Q.    Okay.  Good afternoon, Mr. Robl.

A.    Good afternoon.

Q.    You were asked some questions by the government a moment ago about some money that Mr. Goldstein owes you.

      Do you remember that?

A.    Yes.

Q.    Okay.  So, first of all, do you have some kind of, like, formal written loan agreement with Mr. Goldstein about that money?

A.    No.

Q.    Does the fact that Mr. Goldstein owes you money affect in any way your ability to tell the truth in this trial?

A.    No.

Q.    Have you tried your best today with my questions, the government's questions, to answer them truthfully as best you can?

A.    Yes.

Q.    All right.  Now, do you remember being shown a text message that you received from a lawyer representing Mr. Goldstein?  Do you remember that on cross?

A.    Yes.

Q.    Okay.  First of all, that wasn't me, was it?

A.    No.

Q.    All right.  And that message, was that shortly after the

indictment against Mr. Goldstein in this case?

A.   Yes.

Q.   Do you know why Mr. Goldstein did not contact you directly at that time?

A.   Yeah.  Because it was a court order, he couldn't contact any potential witnesses.

Q.   Right.  There was a court order prohibiting Mr. Goldstein from contacting like 80 different people including you; right?

A.   Yes.

Q.   And do you remember if you had been, around that time, trying to reach Mr. Goldstein?

A.   Yeah.  I was in contact with him up until the indictment, and then, basically, I think I had sent him messages about payment and he never returned them.

Q.   And so that lawyer was reaching out to you explain to you why Mr. Goldstein couldn't talk to you directly anymore?

A.   Yes.

Q.   When was the last time you actually had a direct contact -- a direct communication with Mr. Goldstein?

A.   It would probably be a day or two before he -- the grand jury indicted him.

Q.   So it's been like over a year now?

A.   Yes.

Q.   Let me ask you about the loan agreement, Government's Exhibit 698.  Do you remember looking at that on cross?

**A.** Yes.

**Q.** I think I heard you say that this was a loan agreement for a real estate deal. Did I hear that right?

**A.** Yes.

**Q.** Okay. So this was not poker related; is that right?

**A.** Correct.

**Q.** And it wasn't like a personal loan?

**A.** No. I was buying a condo in Montenegro, but it was irrelevant.

**Q.** Do you know if the written -- or excuse me -- whether the real estate deal actually required there to be a written agreement?

**A.** No, but I would assume it probably did.

**Q.** Are you aware, in your experience of Mr. Phua, doing these kinds of written loan agreements outside of the real estate context?

**A.** No.

**Q.** If Mr. Phua made a personal loan, based on your experience with him, do you think it's likely he would have created a written contract like that?

**A.** No.

**Q.** Last set of questions, Mr. Robl. You were asked a bunch of questions about the back and forth with your accountant. Do you remember that?

**A.** Yes.

**Q.** I think I heard you say a moment ago that you're a professional gambler. Did I hear that right?

**A.** Yes.

**Q.** What does that mean to be a professional gambler?

**A.** The majority of my income is derived from gambling.

**Q.** And as you understand it, are there then tax consequences associated with being a professional gambler?

**A.** I think there is a different way you file.

**Q.** Right.

     **MR. KRAVIS:** Okay. Thank you, Mr. Robl.

     **THE COURT:** Thank you very much, Mr. Kravis.

Have all questions been asked of the witness?

     **MR. WHITMAN:** Yes, Your Honor.

     **THE COURT:** Mr. Robl, thank you very much for your time and testimony. You may step down and be excused.

Have a good afternoon.

     **THE WITNESS:** Thank you.

               (Witness excused.)

                  - - -

     **THE COURT:** Mr. Kravis, is the defense ready to call its next witness?

     **MS. REAVES:** Yes. Your Honor, the defense calls Zach Marks.

     **THE COURT:** Thank you.

Good afternoon. If you want to come all the way towards

me and then go over by the witness stand and please remain standing.  The courtroom deputy will swear you in.

**MS. REAVES:**  May I approach?

**THE COURT:**  You may.

- - -

ZACHARY MARKS, after having been duly sworn, was examined and testified as follows:

- - -

**DEPUTY CLERK:**  Thank you.  Please be seated.  Please move the chair all the way to the microphone.  State and spell your first and last name for the record.

**THE WITNESS:**  My name is Zachary Marks.  That is spelled Z-a-c-h-a-r-y.  Last name is spelled M-a-r-k-s.

VOIR DIRE EXAMINATION

**BY MS. REAVES:**

**Q.**   Good afternoon, Mr. Marks.  Where do you work?

**A.**   I work at a company called FTI Consulting.

**Q.**   And what is FTI Consulting?

**A.**   It's a global business advisory consulting firm that does many things, including litigation support.

**Q.**   Now, broadly, what kind of work do you do at FTI Consulting?

**A.**   I'm a forensic accountant.

**Q.**   And what is a forensic accountant?

**A.**   So the word "forensic" just means, literally means for the

court. So it is the practice of accounting applied to legal matters. That can be several things. A lot of people know it for doing fraud investigations or investigations over the proper accounting for things when it comes to financial statements or tax returns.

MS. REAVES: So I'm going to mark an exhibit just for identification, a demonstrative. This is Defense Exhibit 797. And can we go to slide three.

BY MS. REAVES:

Q. Mr. Marks, can you tell us about your education to become a forensic accountant?

A. Yes. So initially, in college I have a bachelor in science -- a bachelor of science in accounting and finance. That was the beginning of my accounting education.

Q. And do you have any professional certifications?

A. I do. I am a certified public accountant, which most people know as a CPA. I'm certified in financial forensics. I am a certified fraud examiner, and I am a certified anti-money laundering specialist.

Q. And just briefly, I want to walk through those. What is a CPA?

A. A CPA is essentially the gold standard certification for accountants. It -- you have to have a certain number of credits typically equivalent to a five-year college degree with specific courses in accounting. You then get tested on all

different types of accounting, tax accounting, financial reporting, several different things. And so if you're a CPA, it essentially indicates that you're qualified in a host of different accounting topics.

Q. And what is a CFF?

A. A CFF, which is the certified and financial forensics, is a certification that's specific to individuals like me who are forensic accountants, and it specializes or it focuses on fraud investigations for people who are accountants.

Q. What about CFE? What does that mean?

A. So the CFE stands for the certified fraud examiner. That is, as it sounds, about people who are doing fraud investigations. In training, the main distinction between the CFE and the CFF is that the CFF is only for accountants, whereas the topics covered in the CFE certification are also applicable to non-accountants, such as law enforcement.

Q. And the last one, CAMS, what is that?

A. So that's the certified anti-money laundering specialist certification. That, as it sounds, focuses on a specific type of fraud, which is money laundering. It includes tracing funds and, for financial institutions, what types of red flags they would look for to spot money laundering.

Q. Now, do you complete any continuing education to keep up these certifications?

A. I do. Yes. All four of these certifications require

continuing education every year.

MS. REAVES: Now, can we turn to slide four, please?

BY MS. REAVES:

Q. Does your work with forensic accounting and financial and fraud investigations, does that include investigation of tax fraud or tax reporting?

A. It does, yes.

Q. Can you tell us, just at a high level, about some of your work that includes tax -- involves taxes?

A. Sure. So taxes come up almost in every matter that a forensic accountant works on. It's at a minimum of data source and then, as I mentioned, I also have investigated tax fraud specifically. So you know, as an example, I worked on a criminal investigation where we were investigating an individual who owned over a hundred different business entities, and he was -- there was concerns about whether this individual had committed tax evasion. We worked for a law enforcement agency in that matter to investigate.

Q. Have you worked on any tax investigations that involve tax preparers?

A. I have, yes. There was an instance where I was hired by a tax preparation company who was concerned that certain of their tax preparers in a couple of their different offices were actually committing a tax fraud. And so we were hired by that company to investigate the tax preparers and determine whether

there was evidence that they were committing fraud.

Q.   And at a high level in these investigations, what are you actually doing?

A.   It varies investigation by investigation.  If it's a tax evasion investigation, usually our starting point would be to, obviously, look at the tax returns.  We then look for a source of truth to determine if what's on the tax return is accurate or not.

If we determine that there is something inaccurate with the tax return, we tried to figure out where -- where did that go wrong, essentially.  Did it come by a mistake that the tax preparer made, did it come from a mistake the taxpayer made, and is there any evidence that anyone intentionally put this error on the tax return.

MS. REAVES:  Your Honor, we're offering Mr. Marks as an expert in accounting, forensic accounting, and fraud investigation.

THE COURT:  Is there any objection from the government?

MR. ADENRELE:  No objection.

THE COURT:  The Court is satisfied that the witness is qualified to be an expert in those areas.

DIRECT EXAMINATION

BY MS. REAVES:

Q.   Now, at some point, did the defense engage you to work on

this case, United States versus Thomas Goldstein?

**A.**    Yes.

**Q.**    What is the scope of your assignment in this case?

**A.**    In this matter, I was asked to evaluate the conduct of the tax preparers, a firm called GRF, I think.  You may have also heard them referred to as Gelman.

So my task was to evaluate their conduct and determine whether it complied with professional standards and best practices applicable to tax preparers.

**Q.**    And what did you review in order to assess GRF's conduct?

**A.**    I reviewed hundreds of different types of records.  I reviewed -- I reviewed grand jury testimony from two of the tax preparers, Mr. Walter Deyhle and Mr. Ian Shuman.

I was also here yesterday and heard Mr. Deyhle's testimony in the afternoon and had read what he testified to the day before as well.

I have read memorandums of interviews that the government prepared.  Those are summaries of the different interviews that the government has done of, I believe, four different employees at GRF.

I reviewed witness statements that the government provided, again, related to the interviews they had done of Goldstein & Russell employees as well.

I've reviewed a host of e-mails between GRF and Goldstein & Russell and Mr. Goldstein himself.  I have reviewed

the general ledger for Goldstein & Russell, which is the -- one of the main types of accounting documents that is prepared in the course of a bookkeeping engagement. I've reviewed bank statement for several of the bank accounts. I have reviewed the tax returns themselves. I've reviewed the indictment in this matter. That's what comes to mind.

Q. Have you reviewed the work papers for GRF?

A. I have, yes. I have searched through the work papers of GRF to also be another point of information for me as far as what GRF was doing.

Q. And what are work papers?

A. Work papers can look like many different types of things. It is a sort of a term of art for accountants, but it's essentially the records that a tax preparer or any accountant keeps to document the work that they're doing, and any work product that they have, any calculations they have, those would all be considered work papers.

Q. Now, at a high level, what are the standards and best practices that you are using to assess GRF's services?

A. There's several different applicable standards and regulations. The AS -- let me start.

There is an organization called the AICPA, of which I'm a member. That's the American Institute of Certified Public Accountants. That is the main body that issues professional standards for CPAs.

And so they have two binding standards that apply to tax preparation. That's the AICPA Code of Professional Conduct, as well as the AICPA Statements on Standards for Tax Services, which you may have heard Mr. Deyhle spoke about that as well.

The AICPA also publishing frequently asked questions about those standards. They publish interpretation statements to help people better understand the standards. And they also publish a due diligence guide on tax preparation, which are additional resources to help tax preparers understand their responsibilities.

There is also something called Treasury Circular 230, which you also heard about from Mr. Deyhle yesterday, which is a federal regulation that talks about what is required of tax preparation.

There is also another federal regulation that addresses when tax preparers can be penalized.

Q. And at a high level, what is your opinion as to whether GRF's work for Mr. Goldstein and Goldstein & Russell's tax preparation met these standards and best practices?

A. It is my opinion that GRF's work did not comply with professional standards or best practices in several significant areas.

Q. So I want to take a step back and make sure that the jury understands the relationship between Mr. Goldstein or Goldstein & Russell on the one hand, and GRF CPAs & Advisors on

the other.

So for tax purposes, what type of business is Goldstein & Russell?

A. For tax purposes, it's what's known as an S corporation.

Q. And what does being an S corporation mean for Mr. Goldstein's personal tax returns?

A. So it's a type of corporation, a type of business. The main distinction is that whereas a -- a normal corporation is known as a C corp. For a C corp, the corporation itself pays taxes.

However, for an S corp, it's -- and sorry, that's the shorthand for an S corporation. They are known as a pass-through entity, which means that you calculate taxable income for the S corp, but that amount then is passed through as a line item on the individual owner or owners of the S corp.

And so the short of it is that all taxes owed by the S corp are not paid by the S corp. They're instead paid directly by the owner of the S corp.

MS. REAVES: To make it a little bit more concrete, can we pull up -- this is Government's Exhibit 504 and Government Exhibit 64 on split screen.

Thank you, Mr. Mendoza.

BY MS. REAVES:

Q. Mr. Marks, can you tell us what these two exhibits are, Government's Exhibits 54 and 64?

**A.** Yes. So on the left or at the top is Form 1040. That is going to be the tax -- the personal tax return for Mr. Goldstein and Ms. Howe.

At the bottom -- and that's for 2016.

At the bottom is the 2016 Form 1120 S. That form is the tax return used to file taxes for an S corporation. In this instance, you can see that one is for Goldstein & Russell.

**Q.** What is the relationship between these two documents?

**A.** So as I mentioned, the 1120S, so that tax return gets filed first with the taxable income for the S corporation, which, again, then becomes -- that taxable income becomes a line item on Mr. Goldstein's personal tax return, and then Mr. Goldstein pays taxes for that income on his -- through his personal tax return.

**Q.** Now, so in this trial, we have heard a bit about income and about deductions.

Can you tell us what a deductible business expense is?

**A.** Yes. So a business incurs expenses. If an expense is ordinary and necessary to the business -- and there are some additional requirements that the IRS has -- then it is typically a deductible business expense, which means that it reduces the taxable income that business has the pay.

**Q.** And does the 1120S, meaning the Goldstein & Russell business tax return, does that include information about the amount of money that was deducted as business expenses in 2016?

**A.** It does, yes.

**Q.** So if we could look just at Government's Exhibit 64 on page 22.

What is on page 22 of the business tax return?

**A.** This is a summary of the different categories and types of expenses that the business incurred.

**Q.** And what is in the legal and professional fees line? What is that?

**A.** So it's hard to tell just looking at it, but in general, I would expect that that would include fees paid to attorneys and other professionals.

**Q.** Now, does the tax return itself include the accounting records of what is actually included within that legal and professional fees line item?

**A.** No. So what you are seeing here, where you see legal and professional fees in an amount of 4,164,955, that's all that would be shown on the tax return. It would not show the individual transactions that build up to that $4.1 million.

**Q.** And so if I'm looking at a tax return and I want to know the actual individual transactions that were part of the deductions here, where can I find it?

**A.** So you would find that on a document I mentioned earlier, which is the general ledger, which is an accounting document that lists all of the different accounting transactions throughout the year and indicates how they are accounted for,

as well as if they are being accounted for as a deductible business expense.

**Q.** Now, is the general ledger, is that attached to the tax return itself?

**A.** It is not, no.

**Q.** Do you know, for Goldstein & Russell, were there other terms used to refer to the general ledger?

**A.** One common term used is the -- it's a component of the books and records, is a common shorthand phrase people use to refer to that.

**Q.** Are there particular software programs that are used to maintain the general ledger?

**A.** Yes. In general, there are multiple different softwares that someone can use.

**Q.** And what are the softwares that were used in the case of Goldstein & Russell's accounting?

**A.** Before 2020, Goldstein & Russell used QuickBooks, which some of you may have heard of. That is the most popular basic accounting software for small businesses.

After be -- or beginning in 2020, the Goldstein & Russell firm switched and they started using another service called Bench to -- to do their bookkeeping.

**Q.** And in terms of these bookkeeping or accounting records, from your review of the records in this case, do you have an understanding of who maintained the QuickBooks records?

**A.** Yes. GRF, the tax -- the same firm as the tax preparers, they did the bookkeeping and they maintained the general ledger in QuickBooks.

MS. REAVES: Can we go back to DX 797 and onto slide 6, please?

**BY MS. REAVES:**

**Q.** I want to talk at a high level about the role of a tax preparer. So I think you might have just said this.

Did GRF prepare Mr. Goldstein's personal and business tax returns?

**A.** They did, yes.

**Q.** Now, at a high level, what is the role of a tax preparer?

**A.** So at a very high level, the role of a tax preparer is to use their expertise and knowledge in tax matters to advise their clients as necessary and ultimately collect all the information that's needed to go onto a tax return, and then the tax preparer actually puts that information onto the tax return.

MS. REAVES: If we could go to slide 7, please?

**BY MS. REAVES:**

**Q.** Now, are you familiar with the term "due diligence"?

**A.** I am, yes.

**Q.** What does it mean for a tax preparer to apply due diligence in their work?

**A.** So due diligence is a very important term for accounting

in general, but specifically tax preparation. It's specifically required in that federal regulation I mentioned earlier. Treasury Circular 230 requires that tax preparers apply due diligence in their work.

So it's required of tax preparers. It's a very important term. It conveys the quality and the level of diligence that a tax preparer has to apply in their work.

Q. All right. If you were going to break it into three buckets, what are the main aspects of exercising due diligence in preparing tax returns?

A. Sure. So I'll go left to right from what you can see on the screen.

So starting with reasonable inquiries. It sounds basic, but a tax preparer is required to make reasonable efforts to get the information from their clients that are going to -- that is going to be needed for the tax returns. So a tax preparer actually has to ask questions of their clients. If they don't ask something, they can't make an assumption about what the taxpayer would have said. They actually have to ask the questions.

Q. And what about the second bucket, diligence in providing accurate information? What does that mean for the tax preparer?

A. So that means -- it can mean really two things. That the tax preparer needs to be diligent in providing its own clients

with accurate information, as well as that the tax preparer is providing accurate information from the IRS in the form of a tax return.

That means, among other things, that a tax preparer needs to rely on all of the information that they have heard. They can't ignore any information. They have to make their best efforts to ensure that they believe the tax returns are accurate and complete.

Q. And this third bucket, confirming tax return items substantiated, what does that mean?

A. So that is a specific requirement of the standards that tax preparers have -- so to back up a little bit, when you put items on a tax return, particularly a business tax return, the IRS has certain conditions of what you need to prove that that is the appropriate tax treatment of an item.

A common condition is that the taxpayer has documentation to support the different transactions they are putting on the tax return and a specific tax treatment. So a tax preparer is required to ask their client if they have the documentation that is needed -- that's going to be needed by the IRS if they look into this.

Q. Now, does this process of making reasonable inquiries, applying diligence and providing accurate information and confirming that tax returns are substantiated, does that benefit the taxpayer or the tax preparer?

**A.** Well, it's good for both, of course, because if you do these procedures, you minimize the risk of there being any tax return errors, which, of course, is good for both parties. But in particular, for the tax preparer, if you do your duties completely correct, then it, obviously, reduces your liability and the risk that you would face of being penalized.

**MS. REAVES:** Now, if we go to slide eight, please?

**BY MS. REAVES:**

**Q.** Now, you testified earlier that aspects of GRF's work failed to meet applicable standards of best practices. We're going to get into that. But can you tell us, at a high level, what conclusions you came to about the adequacy of GRF's work?

**A.** As I mentioned, their work was not adequate. It did not comply with the best standards and the -- I'm sorry -- the best practices and the professional standards that are applicable.

**Q.** And if you're going to put them into a couple of categories, tell us what those are.

**A.** Sure. So again, I'll start with what you see on the screen on the left here, which is that GRF failed to exercise due diligence. You know, we just talked about due diligence on the proper slide. And what you'll see is they failed to ask the questions to their tax client. They failed to ask Goldstein & Russell to ask Mr. Goldstein the questions to actually gather the information that goes on a tax return.

**Q.** What was the second opinion that you have?

**A.** The second is that GRF ignored information that was provided to them by Goldstein & Russell and Mr. Goldstein. The standards do not allow you to ignore information. If you know of something as a tax preparer, you have to incorporate that into the tax returns.

**Q.** And your third category of opinion, what was that?

**A.** That GRF failed to provide competent tax advice. And this is reflected both in instances where they affirmatively tell their client something that is not correct from a tax perspective. It also comes into play as far as instances where GRF should have provided some tax advice to their client to ensure that -- to help the -- ensure that the tax returns were correct but simply failed to provide any tax advice.

**MS. REAVES:** So let's go to slide nine, please.

**BY MS. REAVES:**

**Q.** And I want to talk more about that first bucket, exercising due diligence and making adequate inquiries. So what does it mean for a tax preparer to make reasonable inquiries of their clients?

**A.** So I'm going to -- again, this time, I'll go top to bottom and start with the top one here, which is that -- and I mentioned this now, which is that tax preparers have to make reasonable inquiries of their clients to confirm that the information they're collecting is accurate and complete. They actually have to ask the question. They can't make

assumptions.

Q.   All right.  And do taxpayers need to verify the underlying data provided by their clients?

A.   No.  So first let me clarify the word "verify," what it means in this context.  So verifying for under the standards is that the tax -- you know, I mentioned there is certain documentation, like bank records, for example, or receipts or invoices that the IRS may look for in the case that they do an audit.

The tax preparer does not need to go to that level.  They do not need to review receipts and invoices.  So that's what I mean when I say to verify information or verify underlying data.  However, there is an exception to that, which is that they may need to do that or they certainly at least need to take -- make follow-on inquiries in the event that the information they have leads them to believe that that information is incomplete or incorrect.

Q.   And so when you talk about information that may be incomplete or incorrect, what is the role of a tax preparer in educating their clients about what documentation or substantiation could be helpful?

A.   Right.  So, you know, obviously, I mentioned at the beginning, as far as the high level role, that tax preparers come in with tax knowledge and expertise, particularly if you're a CPA.  And tax clients generally hire them, you know,

to rely on that expertise because the tax client does not have that expertise themselves.

So the IRS talks about the importance of a tax preparer in educating their clients to ensure their clients understand, you know, what is properly classified as income. What is properly classified as an expense. What are those conditions, those documentations and substantiation requirements for the -- that the IRS is going to require. So that is all part of the tax preparer's role to inform their clients and educate their clients.

MS. REAVES: If we go to slide 11.

BY MS. REAVES:

Q. Can you tell us about -- I think you mentioned earlier the AI CPA. Tell us about the specific standard that you're referring to in terms of due diligence.

A. Sure. So I mentioned this before, it's a mouthful, but the AICPA's statements on standards for tax services, the shorthand for that would be SSTS, so I may use that. SSTS number two is on the screen here at the top, which just says, you know, what I have been indicating, which is that a tax preparer needs to make a reasonable effort to obtain all of the information that is going to go on a tax return.

Q. And what constitutes a reasonable effort of obtaining that information?

A. So a reasonable effort for a tax preparer is asking

questions, gathering information, telling clients what information they need to be sent. That's how a tax preparer exercises reasonable effort.

Q. Is sending an engagement letter to a client, is that sufficient to fill -- fulfill the reasonable efforts?

A. No. An engagement letter is a contract initiating the tax engagement. That is not considered an inquiry or how you gather information.

Q. And why isn't an engagement letter sufficient?

A. As I mentioned, it's simply -- it's not -- you don't ask the client for information through an engagement letter. It doesn't tell the client specifically what you're going to need, so it is a contract with the client. It is not -- it is not part of the inquiry process.

MS. REAVES: Can we go to slide 12, please?

BY MS. REAVES:

Q. Now, is there practical guidance from the AICPA on what the reasonable inquiry looks like?

A. Yes. So at the top here, it's part of the due diligence guide from the AICPA. This speaks to, at the top paragraph, what we mentioned before now, which is the importance of a tax preparer to educate their clients. And if they don't and there ends up being a tax error on the tax return, the IRS may blame the tax preparer for that.

They reference something called a tax organizer, which is

a commonly used -- I'll describe it as a form that's used to gather tax information. And what you see written in the maybe second to last sentence here is that tax organizers are a helpful starting point, but not the ending point to due diligence.

So a taxpayer helps gather a lot of the key data points that you'll need to do a tax return but not all of them. And based on the responses in a tax organizer, the tax preparer then follows up and asks more questions.

Q. All right. So I want to ask a few more questions about tax organizers. Now, does a tax preparer have to use a tax organizer?

A. They do not.

Q. So, then, why is using a tax organizer helpful?

A. It's helpful because there's a lot of different data points that go onto a tax return, and if you use a tax organizer or at least one that's been well-formulated, it will make sure you cover and don't forget to ask your clients one of these important questions.

Q. Can a tax organizer help identify sources of income?

A. It can, yes.

Q. Can a tax organizer help identify information about foreign bank accounts?

A. It can, yes.

Q. Can a tax organizer help identify information about

cryptocurrency?

**A.** It can, yes.

**Q.** Now, does a tax organizer cover all of the questions that a tax preparer may need to know in order to accurately complete the tax return?

**A.** No. And I should also mention, every tax organizer may be different. Some of them are more thorough. Some of them may have some missing data points. Even one that -- and actually, the AICPA publishes tax organizers that are pretty thorough and that are helpful to use. But as I mentioned, depending on how the client answers certain of the questions on the tax organizer, that will then prompt the tax preparer to ask the appropriate follow-up questions.

**Q.** And is there anything a tax preparer should do to make sure that their clients actually understand the questions or is it sufficient to just give your client a tax organizer?

**A.** Yes. So some of the questions can be complex to understand for a layman. And so certainly if -- a lot of tax accountants will sit down with their clients in person and go through a tax organizer, which is a great practice, because then, if the tax client doesn't understand anything on there, they can ask questions and the tax preparer can give further information. But yes, certainly, if there is anything that is not understood in a tax organizer, the tax preparer should provide additional information.

**Q.** Now, do tax organizers exist for both personal and business taxes?

**A.** They do. And I mentioned the AICPA publishes tax organizers as templates that people can use, and that would include both personal tax organizers, as well as for business and specifically S Corporations.

**Q.** Now, focusing on the years 2016 through 2021, since that's what at issue in this case, based on your review of the records and the testimony, did you identify any completed tax organizers for Goldstein & Russell?

**A.** I did, yes.

**Q.** What did you identify?

**A.** In the years -- in the tax years of 2018 and 2019, there were completed -- I would describe them as partial tax organizers. It -- and those tax organizers were specifically for Mr. Goldstein's personal tax returns. I did not see any tax organizers completed for any other years, nor did I see tax organizers completed at all for Goldstein & Russell, the S Corporation.

**Q.** So did you see any tax organizers for the years 2020 or 2021?

**A.** I think I saw a -- maybe a blank first page of the 2020, but I didn't see any completed ones, no.

            **MS. REAVES:** Okay. I want to pull up, this is Defense Exhibit 286. If we go to page 11.

**BY MS. REAVES:**

**Q.** All right. Now, what is Defense Exhibit 286?

**A.** So this is an e-mail from Molly Runkle, who is an employee at Goldstein & Russell and appears to be handling Mr. Goldstein's taxes or personal taxes in this year. So she's talking about the 2015 tax year, and she's writing to Walter Deyhle, who I think everyone is familiar with, is a tax preparer that GRF hired -- or sorry, that Goldstein & Russell hired.

And she's basically saying she received a tax organizer in the mail from GRF, and it's her first year doing it. And she's saying she's going to have questions and, in fact, she does have a question, which is whether Tom or Amy is considered the taxpayer or the spouse on the document.

**Q.** All right. Now, to state the obvious, you weren't personally involved in these e-mails; right?

**A.** I was not, no.

**Q.** Okay. So what are you looking for when you're reviewing these e-mails.

**A.** So when I'm evaluating a tax preparer, what I'm looking for is to understand a level of diligence in the procedures they take, whether -- again, whether they're asking the right questions, whether they're gathering the information that they're supposed to.

**Q.** All right. So I want us to read up from this e-mail a

little bit. So we started at the bottom, and then if we see Mr. Deyhle's response. Can you tell us what Mr. Deyhle responds to Ms. Runkle?

A. Yeah. Essentially, Mr. Deyhle tells Ms. Runkle that she does not have to fill out the tax organizer.

Q. All right. And then what's Ms. Runkle's response?

A. So then she asks, she says, "Okay. Perfect." And then she asks, "Can you give me a sense of what I should get for you and what information you need in preparation for Mr. Goldstein and Ms. Howe's taxes?"

Q. All right. And what does Mr. Deyhle respond?

A. Mr. Deyhle responds that it's just a matter of sending him the 1099s and W-2s that Mr. Goldstein and Ms. Howe receive.

Q. What is your opinion on the advice that Mr. Deyhle is providing to Ms. Runkle on this e-mail?

A. So there is a couple of layers to this. First, candidly, I find Mr. Deyhle's instruction to not complete the tax organizer to be a pretty bizarre. When you have a willing compliant who's willing to give you information in this very convenient and efficient way, I don't see, as a tax preparer, why you would actually take an affirmative step to prevent them from doing that. That was the first sort of strange thing that I saw in this e-mail chain.

And then when we find out the information that he actually wants, and that it is simply the tax forms that Ms. Runkle

receives in the mail, that is woefully short of the types of questions that a tax preparer is supposed to be asking their clients.

Q.    What's wrong with just asking Mr. Runkle to collect the tax documents she receives and provide them to GRF?

A.    Well, the tax return includes information that's not going to be reflected on 1099s and W-2s that you receive in the mail.

Just to give an example, there are certain questions that -- yes/no questions that are posed on tax returns, such as do you have a foreign bank account interest, or do you have cryptocurrency holdings.  That question is added from a later year.  So there are certain questions that you're only going to find the answer to if you ask your client.

The other thing is that there is, of course, the risk that a client could have income that's not reported on a 1099 or W-2, so you also have to ask.  For sure, you need to ask if the 1099s and W-2s cover all of the income.

Q.    Now, was Mr. Deyhle required to have Ms. Runkle or Goldstein complete a tax organizer?

A.    No.    That is, again, not a required practice.  It's -- it could be -- I'll say it in just the same words that the AICPA does, which is that it is a helpful starting point, but not required.

Q.    But if Mr. Deyhle was not going to ask for it to complete the tax organizer, what else should Mr. Deyhle have done?

**A.** So if you choose not to use a tax organizer -- which, again, that is completely okay -- that does not relieve the tax preparer from still going through and gathering and collecting that same information.

So instead of going through a tax organizer, you could have a in-person meeting and take notes on the different responses. You can ask a bunch of questions via e-mail, if that's the way you want to do it.

But somehow, some way, you have got to get the information that you need to put on a tax return.

**Q.** Now, this particular e-mail chain was about the tax organizer or the tax season for 2015.

But from your review of the records in this case, what is your understanding of GRF's practices for using tax organizers or otherwise gathering the information that they need?

**A.** So Mr. Deyhle stated to the government that he, as a firm, GRF stopped sending tax organizers after 2015. Obviously, that's not -- as I mentioned, I did see that -- two years in which tax organizers were complete.

I did not see Mr. Deyhle ask those to be completed, so I don't -- I don't have the background on how they came to be completed, but all I know from what Mr. Deyhle has stated is that they did not send out tax organizers to clients like Mr. Goldstein after 2015.

**Q.** In your review of the records relevant to this case, did

you see other evidence of GRF asking all of the information that's necessary to provide -- to prepare an accurate tax return?

**A.** No. I saw GRF ask one-off sort of ad hoc questions about specific transactions. I think later on they may have asked for a list of charitable contributions.

So I saw questions here and there, but certainly not at all anywhere close to the level of information that you would get from a tax organizer or that you are required to get to fill out a tax return.

**Q.** Now, according to the documents and testimony that you've reviewed, how often did Mr. Deyhle communicate directly with Mr. Goldstein?

**A.** He told the government he -- well, you all heard him testify as well that he met in person with Mr. Goldstein on two occasions, and he had a practice of asking Mr. Goldstein a couple questions per tax year.

**Q.** And according to the testimony and documents you've reviewed, did Mr. Deyhle review the tax returns with Mr. Goldstein before filing?

**A.** No. Mr. Deyhle testified that he did not review the tax returns with Mr. Goldstein before filing.

**Q.** Is a tax preparer required to personally review tax returns with their client?

**A.** It's not -- no. It's not specifically required.

Q.   Okay.  But what should a tax preparer do to make sure that the tax return they are preparing is accurate?

A.   So the tax preparer, again -- you know, this can happen a few different ways.  But the tax preparer, for example, would want to go through the income and say, "Mr. Goldstein, I got your 1099s for this and I've got your W-2s for this.  Do you have any other types of income or does, you know, what I've captured look accurate to you?"

So that could be done in the form of reviewing the tax return.  It doesn't have to be.  That could have been a conversation that happened prior.

Q.   Have you reviewed the indictment in this case?

A.   I have, yes.

Q.   You understand that, for example, the government alleges that Mr. Goldstein willfully failed to disclose that he had transactions in cryptocurrency in tax years 2020 and 2021.

Do you understand that?

A.   I have seen that allegation, yes.

Q.   Now, in your review of the records in this case, did you identify any tax organizer or other documentation of GRF asking those questions of Mr. Goldstein in tax years 2020 or 2021?

A.   No.  I saw no evidence that Goldstein & Russell or Mr. Goldstein were ever asked in 2020 or 2021 if they had cryptocurrency activity.

Q.   And we touched on this earlier.

Is it sufficient if the Goldstein & Russell engagement letter referenced the fact that cryptocurrency can be taxable income?

**A.** No. That's a statement. Maybe you could consider it tax advice, but that's not a question. It's not a request for information.

**MS. REAVES:** Now, can we go to slide 13 in Defense Exhibit 7? Thank you. 797.

**BY MS. REAVES:**

**Q.** Now, let's talk about this next standard for the AICPA. Can you tell us what this?

**A.** Yes. So I mentioned this before. And I heard Mr. Deyhle's testimony yesterday. He talked through some of these standards. This is a particular one he did not mention. In fact, quite significantly misstating the role of the tax preparer.

So what this third statement here is saying is that -- and I alluded to this before. If the IRS requires documentation or substantiation as a condition for putting an item on a tax return, the tax preparer does have an obligation to ask the client to make sure that they have that documentation or substantiation.

**Q.** And does the tax preparer have a role in educating the taxpayer about that documentation?

**A.** Absolutely. So the tax preparer would know or should know

what that documentation or substantiation is. Of course, to make sure their client has it, they have to first explain what's required, and then ask the client if they have that.

Q.   Who does that documentation benefit?

A.   Having the documentation, I would say it benefits both parties, but most particularly, it benefits the taxpayer because in the event of an IRS audit down the road, you don't want the IRS to say -- let's say you have something that is completely true on your tax return, you do not want the IRS to start to questioning it because you don't have the documentation.

So if the tax preparer tells what you the requirements are in advance, you can make sure that you have got all the required documentation.

And, you know, just to broadly say about all of these standards, it's all about minimizing the risk of something going wrong down the road. If everyone does their duties under these standards, the chance that you are going to have anything wrong on a tax return is minimized.

Q.   Now, I want to turn to some of the inquiries that GRF should have made with respect to the business tax return for Goldstein & Russell, specifically. Okay.

MS. REAVES:   Can we pull up -- this is Government's Exhibit 48. And focus in on this box in the top.

BY MS. REAVES:

**Q.** Can you tell us what is Government's Exhibit 48?

**A.** So I understand that this is a list of outflows out of the Goldstein bank account that were reported as deductible business expenses on the Goldstein tax return, but for which the government alleges that those were not properly deductible business expenses.

**Q.** How many of these outflows are at issue for 2016?

**A.** There are six.

**Q.** And 2017?

**A.** There is one.

**Q.** And 2019?

**A.** There is one.

**Q.** Now, earlier you testified that Goldstein is an S corporation.

Can you remind us of what that means?

**A.** Again, the main distinction of an S corp is that they are a pass-through entity, so any taxable income on the S corp will ultimately flow through as a line item on Mr. Goldstein's personal tax return.

**Q.** All right. And for an S corporation, is there a shareholder?

**A.** Yes. There's -- in this instance, there is one shareholder, one owner, and that is Mr. Goldstein.

**Q.** So is the owner of an S corporation, in this case Mr. Goldstein, allowed to make personal payments or conduct

other personal transactions through the business bank account?

**A.** Yes. That's allowed.

**Q.** Why is that allowed?

**A.** There is no prohibition about what bank account you use to do business or personal transactions. If you have a personal expense in your business account using assets of the business, that's what is known as a distribution, which is, again, completely fine. It's one way of a shareholder, an owner extracting money or value from the business that they own.

So, again, there is nothing wrong with that. The importance of it is the accounting and that it's not accounted for as deductible business expense, but instead, that it's reflected as a distribution to the owner.

**Q.** All right. And when we talk about how it's accounted for, as practical matter, where does that happen?

**A.** That happens on the general ledger that I mentioned before.

**Q.** This is the same as the QuickBooks or Bench records?

**A.** That's right. It would be QuickBooks for this period.

**Q.** When you say "QuickBooks for this period," what do you mean?

**A.** These transactions you see for 2016 to 2019 were during the time period that GRF was using QuickBooks to maintain the general ledger.

**Q.** All right. So I want to talk about the process, if any,

that GRF had in place to make sure that these eight transactions were accurately classified within Goldstein's accounting records; okay?

Now, did you review any information from Mr. Deyhle regarding his personal role in asking either Mr. Goldstein or Goldstein about these eight transactions?

A.   No.  As far as I can tell, in general, Mr. Deyhle simply took -- as far as Goldstein goes, simply took the numbers from his colleague, Mr. Shuman, and the work they did, he would just kind of take those numbers at face value.

But specific to these transactions, no, I did not see Mr. Deyhle ever ask a question about these transactions or whether they are appropriately business or -- sorry -- deductible business expenses or distributions.

Q.   You mentioned Mr. Shuman and Mr. Deyhle.

What's your understanding of each of their roles within GRF?

A.   So Mr. Deyhle led the tax preparation process.  He is the individual who signed both the tax returns for Mr. Goldstein and for Goldstein, the firm.  So taxes was his responsibility.

Mr. Shuman was the bookkeeper -- I shouldn't say just him, but he and his team were the bookkeepers at Goldstein.  As I mentioned, they maintained the QuickBooks, they did all the accounting, including choosing to classify these as deductible business expenses.

**Q.** In terms of the information that you've reviewed, what was Mr. Shuman's direct role in ensuring that these eight outflows were accurately classified?

**A.** Mr. Shuman would do a review at the end of the year of the accounting, look through what his staff had done, but I did not see him ask -- him or, candidly, any of his staff ask questions to Goldstein about these transactions, and particularly whether they were business -- deductible business expenses or distributions.

**Q.** Now, have you looked for evidence that GRF had a process for making sure that the classifications for these eight transactions or transactions in general were accurate?

**A.** No. As far as I can tell from the work papers, GRF would take the -- so the basis of what GRF did with Goldstein & Russell is they would -- they had the banking data, so they had the business bank accounts and all the transactions, and they would make their best efforts or assumptions on how to classify it.

I know from the testimony that that system made default categorizations for transactions. For example, anything that was a deposit, got automatically classified by their system as income. So it was really default categorizations. But through my review of the work papers and the e-mails, no systematic process during these years to confirm the accounting -- the correct accounting of the transactions.

Q.    All right.  And focusing on these eight transactions, did you identify any e-mails where GRF actually asks someone at Goldstein & Russell how to classify these eight transactions?

A.    No.

Q.    And from your review of the work papers and other documents, have you identified any other documentation that GRF actually asked someone at Goldstein & Russell how to appropriately classify these eight transactions?

A.    Not documentation.  The one 2017 transaction that you see to Napoli Shkolnik, there is an e-mail where Jill Leonard, who is an employee at GRF, she basically is going through the checks that are going out of the bank account, and she says that, to Mr. Levitan, who is a employee at Goldstein & Russell, she basically tells him that she can't read his handwriting on these checks.

And so there is a question, one question asked about that one transaction which, again, is Mr. Levitan clarifying who the payee is and I think maybe providing contact information.  But there was not a question asked about if these were deductible business expenses or they are distributions or anything about the accounting.

Q.    Okay.  And in your review of the e-mails and other documentation, did you see any evidence or documentation that anyone at Goldstein & Russell ever told GRF that these were appropriately classified as business deductions?

**A.** No.

**Q.** Now, I want to ask some questions about inquiries a tax preparer should make about loans. Okay?

      **MS. REAVES:** So can we pull up Defense Exhibit 265? And I want to focus on this e-mail in the bottom.

**BY MS. REAVES:**

**Q.** Again, obviously, you're not a party to this e-mail, but can you tell us what you're looking for when you're reviewing these e-mails?

**A.** Sure. So I'm looking -- again, I'm looking at the interaction between GRF and Goldstein & Russell and Mr. Goldstein. I'm trying to understand what information was being requested by GRF and what information was being provided by Goldstein & Russell.

**Q.** So here, what is Mr. Levitan communicating to Mr. Deyhle about loans in this e-mail?

**A.** So there's two loans that are discussed in the e-mail. So the first one is there is a paragraph that begins on 9/26/18, that's the first loan that's being talked about. And Mr. Levitan is telling Mr. Deyhle that the firm's Wells Fargo account received $999,967 from the G & R account in Montenegro and that that money was a loan to Tom. So that was the first loan that was disclosed.

There's also -- one paragraph below that, there's a second loan that's discussed which says that Tom brought back $960,000

in late October from Hong Kong and also deposited that in his personal Wells Fargo account. That was also a loan.

Q. Now, what was Mr. Deyhle's response to receiving this information?

A. I believe he said that that makes sense, but that he will need more details later.

Q. And based on the standards that are applicable to tax preparers, what's your opinion of Mr. Deyhle's response?

A. I agree with Mr. Deyhle that he needs more details. However, in looking through the records, I was not able to see that Mr. Deyhle ever followed up to actually get more details.

Q. Now, are there specific requirements for how a person has to document a loan for it to be a loan?

A. There is not.

Q. Can you have a loan without a written agreement?

A. Yes.

Q. And if you don't need specific documentation and it doesn't need to be written, why do you say that Mr. Deyhle should have gotten more details later?

A. So this goes back to the idea that we have -- tax preparers have to make sure that, if scrutinized on an audit, for example, by the IRS, that the IRS is going to agree with the classification of, in this instance, the transactions as loans.

So if you look at the IRS's audit processes, they have a

multifactorial test of when they look at loans and what factors they're looking for to confirm that things are really loans. That's -- again, this term I used, substantiation, that's what they're being -- what's being looked for.

So, although you don't have to have a loan document, that is one of the IRS's things that they look for is, yes or no, do you have a loan document. If you don't, again, it doesn't mean that it's not a loan. It just is one of the factors. And so Mr. Deyhle should let -- should have let Mr. Levitan and/or Mr. Goldstein know about what factors the IRS is going to look for in taking this position on a tax return and ask questions, both to gather basic information about the loan and essentially ensure that there is not going to be a risk. If it gets audited, that Mr. Deyhle is satisfied that there is enough substantiation to prove these are loans.

Q. And in your review of the records, have you seen any evidence of Mr. Deyhle or someone else at GRF educating Mr. Goldstein or Goldstein & Russell about this substantiation advice?

A. No.

Q. Now, did you review information regarding reporting gambling -- income of gambling winnings for Mr. Goldstein's 2016 tax return?

A. Yes.

Q. What did you review?

**A.** I, at first, reviewed Mr. Deyhle's grand jury testimony on the topic. I then reviewed an e-mail that talked about the 2016 taxes. That was an e-mail chain between Mr. Deyhle and Mr. Goldstein that I know everyone here saw yesterday when Mr. Deyhle was testifying.

**Q.** Okay. So I want to break things down into a couple different buckets. Now, in terms of the initial information that you reviewed and assessed, how, according to Mr. Deyhle, did Mr. Goldstein communicate his gambling information?

**A.** So in the initial grand jury testimony, Mr. Deyhle stated that he had an in-person meeting with Mr. Goldstein once about the gambling and where Mr. Goldstein had asked to have this meeting and disclosed to Mr. Deyhle during this meeting that he's going to have significant gambling income in the year 2016. And Mr. Deyhle testified that he received those amounts only verbally and put them on the tax returns after only hearing those amounts verbally.

**Q.** Now, is relying on verbal information allowed for a tax preparer?

**A.** It can be under certain circumstances.

**Q.** Why do you say that?

**MR. ADENRELE:** Objection, Your Honor.

**THE COURT:** Go to the headsets.

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT: I think I heard Mr. Adenrele.

MR. ADENRELE: Indeed.

THE COURT: Okay. Let's wait for Ms. Reaves to get on.

MR. ADENRELE: Yeah. This is --

THE COURT: Just a moment.

Ms. Reaves, can you hear us?

MS. REAVES: Yes. Yes, I am.

THE COURT: Mr. Goldstein's thumb is up.

Go ahead, Counsel.

MR. ADENRELE: Your Honor, this is -- they are using an expert to improperly impeach Mr. Deyhle's testimony from yesterday. They've already done that when we put Mr. Deyhle on the stand in cross-examination. Now they're doing it again using an expert who reviewed Mr. Deyhle's testimony, grand jury testimony, and said -- getting into Mr. Deyhle's testimony yesterday in court is improper impeachment. They're doing the same thing a second time but not, obviously, with Mr. Deyhle on the stand. It's improper.

THE COURT: All right. So I think the objection is that the questioning is impeachment of the witness who is not on the stand.

MR. ADENRELE: Correct.

THE COURT: Ms. Reaves, go ahead.

MS. REAVES: Yes, Your Honor. We're not impeaching

the witness. I'm asking the witness questions about what documentation is necessary, what advice is necessary. I'm going to ask him about verbal, because that's how he initially assessed based on the information that we had from the government. And I'm also going to ask about how to -- what advice Mr. Deyhle should have provided and what documentation would have been helpful with regards to receiving the advice in writing.

This isn't -- it is true that Mr. Deyhle provided two different statements about what happened. But really, I'm asking about what a tax preparer should do when they receive this information, whether verbally or in writing.

**THE COURT:** All right. Anything further from the government?

**MR. ADENRELE:** Just briefly, Your Honor. If that's the point that's attempting to be made, there is really no reason to point out that grand jury transcripts said this, Mr. Deyhle said this other thing yesterday. That's not even necessary.

The point is, if they're just trying to talk about whether statements were made verbally or not, just get to it. But we don't need to talk about the conflicting statements.

**THE COURT:** All right. Thank you, Counsel. I think the line of questioning is appropriate for the witness. I think his frame of reference is not just the testimony

Mr. Deyhle, but all the materials that he testified that he looked at. So I think that can be made clear in the questioning going forward.

Before we come off, it's 2:43. I would like to get a break around 3:00, so the jury can take their afternoon break.

So can you identify a time, Counsel, for us to pause briefly for their break?

**MS. REAVES:** Sure. I think after I ask these questions about the advice for reporting gambling, I think that could be a good break of I could go through another section if the Court wants to get to 3:00.

**THE COURT:** All right. Well, why don't you do your last question. We'll break then and come back.

**MS. REAVES:** All right. Thank you.

**THE COURT:** All right. Thank you.

**MR. ADENRELE:** Thank you, Your Honor.

(Whereupon, discussion concluded.)

**BY MS. REAVES:**

Q. All right. I'm trying to remember what my question was. Is a tax -- I think I asked you whether a taxpayer is allowed to rely -- sorry -- whether a tax preparer is allowed to rely on verbal information. And I think you said "it depends." Why does it depend?

A. So there is no standard that says that information can only come written or verbally. Just broadly speaking, I think

receiving information verbally is impractical for a large number of reasons when it comes to many transactions. In particularly, gambling would be a good example of that. But there is not an explicit prohibition that you can't ever take information verbally.

And by the way, a tax preparer is supposed to be documenting the increase. So let's say that there is a oral conversation. A tax preparer should be writing that information down to make sure they're collecting all the information, again, whether that's received orally or in writing.

Q. Okay. And I understand you said it depends on the types of information. Why do you think that this is particularly helpful for gambling?

A. So if you have multiple transactions, the tax standards talk about it in the explanation section. They talk about how you can gather a list of transactions from your client and that would be a sufficient thing to rely on as long as -- again, as long as it has all of the data points that you need.

When it comes to gambling specifically and if you're gambling more than one time in the year, so again multiple transactions, a list is really what you should be getting. But with gambling, it's a very complex and, candidly, gray in some areas part of the tax code.

So the tax preparer -- if they have a client that has

substantial gambling income, the tax preparer, as part of their due diligence, is going to need to know a lot of information about that gambling to determine the right way to put it on a tax return.

Q.   And again, are there specific documents that are required in the AICPA or the Treasury Circular 230 that say these are the particular documents that must be provided for a gambling transaction?

A.   There are documentation requirements, yes.

Q.   Okay.  And does the -- do the applicable standards require a taxpayer to actually give those documents to their accountant?

A.   No.  So, again, the tax preparer is not obliged to independent -- to look at, let's say, receipts and, you know, ATM withdrawal information to confirm that information is correct.  That goes beyond the responsibilities of a tax preparer.  It would be fine -- and it specifically says it would be fine for a tax preparer to receive a list.  For example, this case, a list of gambling transactions, that would be okay for the tax preparer to get from their clients in order to put it on a tax return.

Q.   Now, in order to receive information about gambling, what does a tax preparer have to do?

A.   Can you restate that question?

Q.   Right.  In order for a client, a taxpayer -- a taxpayer to

know what the IRS might like in terms of documentation of gambling, what is a tax preparer's role in making sure that that happens?

**A.** Right. So just to clarify, there's really two things happening. Number one, there is the tax preparer asking for a list of gambling transactions. So again, that would be the best way to do it. And then, at the same time, there is the tax preparer asking the client, do you have the documentation that's required to support that this is gambling essentially.

**Q.** Is there any role for the tax preparer in educating the client about what those documents look like?

**A.** Yes. Again, specific to gambling, it's very complex. It's commonly misunderstand. There are areas that are gray. So it's going to require education on the part of the tax preparer to make sure that the taxpayer understands what is required around gambling expenses.

Candidly, it's gray enough that the tax preparer, in some instances, is going to need to make a professional judgment about how to put it on the tax return because the IRS does not put a line in the sand about how to deal with certain complex situations.

**Q.** So, in your review of the documents in this case, your understanding is that -- well, let's just pull it up.

**MS. REAVES:** Can we pull up Defense Exhibit 304, and go to page 2?

**BY MS. REAVES:**

**Q.** Now, what is your understanding of the information that Mr. Deyhle actually asked for from Mr. Goldstein with respect to his 2016 gambling?

**A.** So at the -- at first, Mr. Deyhle asked for the gains and losses for the gambling activity for the year of 2016, and then he asked for the -- it says the contact info for the guy in Vegas, which I understand to be a tax professional in Las Vegas who specializes in gambling, who Mr. Goldstein had asked Mr. Deyhle to specifically confer with.

Again, gambling is a very complex part of the tax code. And that's what I understand that to be a reference to.

**Q.** Now, what should Mr. Deyhle have asked for?

**A.** That's a fine starting point for a line of inquiry. It certainly is not enough information to put numbers on a tax return.

**Q.** Have you seen any documentation of Mr. Deyhle asking Mr. Goldstein for additional information or documentation of the 2016 gambling?

**A.** I have not seen any requests that Mr. Deyhle asked to confirm that Mr. Goldstein had documentation, and heard in his testimony yesterday that he affirmatively did not and didn't -- incorrectly did not think that that was his responsibility.

There is a e-mail later -- I think it's the next e-mail in this chain -- where he does ask one follow-up question.

Q.   And what was that follow-up question?

A.   So Mr. Goldstein, you can see that in his reply he combines the losses and distributions in this amount of $24,436,700.  And Mr. Deyhle responds and asks Mr. Goldstein to delineate that number and basically indicate what portion of that is losses and what portion is distributions.

Q.   Now, is that follow up of asking him to separate out losses and distributions, is that sufficient inquiry to adequately advise Mr. Goldstein about his 2016 gambling reporting?

A.   It is not.

Q.   Did you see other documentation in your review of the records of this case where Mr. Deyhle provided Mr. Goldstein with adequate advice as to how to report gambling for 2016?

A.   I did not, and I heard Mr. Deyhle testify that he did not provide such advice.

Q.   Did you see -- and not just for 2016, but have you seen any documentation of Mr. Deyhle or GRF advising Mr. Goldstein on the appropriate way to keep his own records of gambling?

A.   I have not seen that.

Q.   And in your view of the records and testimony of this case, did you see any documentation of GRF explaining to Mr. Goldstein the specific requirements for reporting wins, losses, and net values on a tax return?

A.   No.  And, again, from Mr. Deyhle's testimony, I understand

that they did not ask those questions or provide any tax advice on this.

MS. REAVES: Your Honor, can we go to the husher?

THE COURT: Yes, we can.

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT: Counsel for the government, are you on? Ms. Reaves? Mr. Goldstein?

Go ahead.

MS. REAVES: Just saying that we can take a break if the Court wants to now.

THE COURT: I think this would be a good time.

Any objection from the government?

MR. ADENRELE: No objection, Your Honor.

THE COURT: Very good. I'll have the jury take its afternoon break.

(Whereupon, discussion concluded.)

THE COURT: Members of the jury, I think this is a good time for you to take your afternoon break.

Please rise for the jury.

(Whereupon, the jury exited the courtroom at 2:51 p.m.)

THE COURT: Please be seated.

I'll also invite, Mr. Marks, if you want to step down and take a break, you may do so at this time as well.

(Whereupon, the witness exited the witness stand and the

courtroom at 2:52 p.m.)

THE COURT: Counsel, before we break, just want to get a sense of how much longer we think we have for direct?

MS. REAVES: I think about an hour. I think probably 45 minutes.

THE COURT: Okay. And then we will need to have cross from the government.

Any sense of that right now, Mr. Beaty?

MR. BEATY: I don't know that we do, Your Honor.

I have to make an objection here. I'm sorry to do it.

THE COURT: Let me just make sure we got the first part.

So about 45 minutes for you on direct, Ms. Reaves?

MS. REAVES: I'm sorry?

THE COURT: Forty-five additional minutes?

MS. REAVES: Yes.

THE COURT: Mr. Beaty, go ahead.

MR. BEATY: Thank you, Your Honor.

During this testimony, experts are allowed to look at all kinds of things, including information that is not in the record, and I don't begrudge that. At several times in his testimony, Mr. Marks referred to grand jury testimony that is not before this jury. He's now expressly telling them about evidence that is not before them.

It is entirely improper for them to be smuggling in

statements from Mr. Deyhle, Mr. Shuman, from anyone else, if they are not statements that were made in this courtroom. It's absolutely improper. It is wrong under the hearsay rules, and it's just plain wrong.

**THE COURT:** All right. Thank you, Mr. Beaty.

So the concern is that the witness has made reference to grand jury testimony. I believe Mr. Deyhle may be one of those witnesses.

What does the defense have to say?

**MS. REAVES:** Yes, Your Honor.

Mr. Marks' review of the record, of course, includes the documentation and statements made by the -- by the accountants in this case. The government knew that Mr. Marks was going to rely on the statements of the accountants and all of the records and documentation involving the work that they do.

I don't know how Mr. Marks can testify to his analysis of what they did without relying on the statements. I think we can advise him not to reference the grand jury transcript specifically because I think, in honesty, I think he is replying to a combination of the documentation that he's seen and the testimony that he observed, which the government knew he was going to observe, with the Court's permission.

So I don't think there is anything improper here. If the government's concern is that he's specifically referencing memorandums or grand jury transcript, then we are happy to have

the Court advise him not to do that. But he's simply providing his analysis of his understanding of how the interactions worked, and I don't think his -- I don't think it's outside of the bounds of what his expert testimony was expected to be.

**THE COURT:** All right. Mr. Beaty?

**MR. BEATY:** I agree, Your Honor, he can say, "I looked at this. I didn't see any record. I don't see any e-mails between these people. I looked at this." Whatever it is, he can say that.

He cannot introduce statements of witnesses from outside the courthouse -- this courtroom.

**MS. REAVES:** And, Your Honor, we are happy to -- well, I can't talk to him right now, but if the Court wants to make sure --

**THE COURT:** I'm happy to give an instruction. Are we comfortable doing that outside the presence of the jury?

**MR. BEATY:** Yes, Your Honor. That's fine.

**MS. REAVES:** Yes.

**THE COURT:** Because I think that would be more appropriate.

So after we take the break, we will have the witness come back. I will make the instruction. I'll run it by you all to make sure you're comfortable. I will do that. And then we will have the jury.

**MS. REAVES:** Thank you, Your Honor.

**MR. BEATY:** Thank you.

**DEPUTY CLERK:** All rise. This Honorable Court stands in recess for five minutes.

(Whereupon, a recess taken from 2:55 until 3:14 p.m.)

**DEPUTY CLERK:** All rise. This Honorable Court resumes in session.

**THE COURT:** Please be seated, everyone. Is the Court providing an instruction to Mr. Marks, but when he retakes the stand --

**MS. REAVES:** Can we go ahead and bring him?

**THE COURT:** I was just going to make sure I understand what we want to say.

I think I'm simply instructing him not to make any reference to the grand jury testimony in connection with this case.

Is that sufficient, Mr. Beaty?

**MR. BEATY:** Grand jury testimony or memorandum of interview.

**THE COURT:** Or memorandum of interview.

**MS. REAVES:** No objection.

**THE COURT:** Let's have him come back.

**MR. ADENRELE:** Your Honor, just before that --

**THE COURT:** Just a moment because he's opening the door.

Go ahead, Counsel.

**MR. ADENRELE:** Just one other point here. I would just like to make a record and maybe we will follow up later with some briefing.

But at our 404(b) motion hearing, we discussed the issue of Mr. Goldstein not filing taxes in subsequent years, including 2022 and 2024 as a point of contention. I believe at the time Your Honor disagreed and said it was out.

Today we have heard plenty of testimony around an expert discussing the errors of GRF. The quality of their work --

**THE COURT:** I hear where you are going. Let's let the witness finish testifying and we can talk about that issue later.

**MR. ADENRELE:** I just want to finish the record.

**THE COURT:** Okay.

**MR. ADENRELE:** I believe that the witness's statements about GRF's errors and the quality of their work has opened the door for us to be able to present evidence that Mr. Goldstein did not file his tax returns between 2022 and 2024.

**THE COURT:** Understood. I'm not going to address that right now. I want to hear the totality of the witness's testimony and hopefully we can get the witness done today. It's 3:16.

Are we ready to have Mr. Marks come back?

**MS. REAVES:** Yes. Can I just -- two responses.

One, to be clear, we are not asking Mr. Marks about anything related to filing or failure to file taxes, so I don't think it opens the door on cross.

The second, I understand we're short on time, so I'm going to try to be efficient, but I'd ask if I could have 15 minutes at the end, if we could run over a little bit. I'm not sure how long the government will take on cross.

**THE COURT:** You are talking about after five o'clock?

**MS. REAVES:** I just want to make sure that I have some time for redirect of this witness.

**THE COURT:** Of course, you will have an opportunity to redirect. Whether we get that done today is up to the parties.

**MS. REAVES:** Thank you, Your Honor.

**THE COURT:** Let's have the witness come back. I will give the instruction, and then we will have the jury.

Mr. Marks, you can retake your seat in the witness box. As you know, you remain under oath.

Before we have the jury, I do want to give you an instruction in connection with the remainder of your testimony. You are not to make any reference to grand jury testimony or memorandums of interview in the course of your responses to the questions from the parties.

**THE WITNESS:** Can I clarify?

THE COURT: Yes.

THE WITNESS: Am I allowed to refer to information I learned in those documents without referring to the documents themselves?

THE COURT: I think that would be fine. I think the concern is specifically referencing the statements.

MR. ADENRELE: Yep.

THE COURT: I think everyone is okay with that.

THE WITNESS: I will do my best in light of that.

THE COURT: All right. Thank you very much.

Let's have the jury.

Please rise for the jury.

(Whereupon, the jury entered the courtroom at 3:20 p.m.)

THE COURT: Please be seated, everyone.

Ms. Reaves?

MS. REAVES: All right. Thank you.

BY MS. REAVES:

Q. So, Mr. Marks, before the break, we were talking about GRF's failure to ask the questions that are necessary for accurate tax preparation. I want to turn to the second bucket of your opinions.

MS. REAVES: Can we go to slide 14, please?

BY MS. REAVES:

Q. And I want to talk about your assessment of how GRF acted on the information and instructions that it did have. So did

you form an opinion as to whether GRF failed to act on information and instructions provided to them by Mr. Goldstein or Goldstein?

A.    Yes, I did form an opinion.

Q.    And what's your opinion on that topic?

A.    My opinion is I did identify instances where GRF disregarded and ignored the information that they had from Goldstein and Mr. Goldstein.

            MS. REAVES:  Can we go to slide 15, please?

BY MS. REAVES:

Q.    Now, what standards are you using to make that assessment?

A.    So there is this third standard from the AICPA, and it essentially clearly delineates.  It says "however, a member" -- a member is a tax preparer -- "should not ignore the implications of information furnished and should be make reasonable inquiries if the information furnished appears to be incorrect, incomplete or inconsistent."

      So that's all to say, you know, it sounds very straightforward and somewhat obvious.  But you know, a tax preparer can't forget information they have heard.  They can't pretend they didn't hear information they've heard.  They have to use all information that they know about as part of their diligence to create accurate and complete tax returns.

Q.    All right.  Now, you had mentioned that there were instances where GRF failed to act on information they had.  I

want to talk about some of those examples. And so we were just talking about Mr. Goldstein's 2016 gambling income as reported on his tax return. Did you have an opportunity to review Mr. Goldstein's 2016 tax return?

**A.** I did, yes.

**Q.** And did Mr. Deyhle, based on the information that he had, accurately report the gambling income that Mr. Goldstein had communicated to him?

**A.** He did not.

**Q.** And what did Mr. Deyhle do wrong?

**A.** In that last e-mail where Mr. Goldstein communicated the losses and the distributions, Mr. Deyhle did the exact opposite of what Mr. Goldstein had asked him to do with the tax return, and he swapped the losses of the distributions when he put it on the tax return.

**Q.** Now, when we're talking about gambling income, is a 1099 required?

**A.** Can you clarify the 1099 to be received or to be issued?

**Q.** So is -- when a person receives gambling income, is there supposed to be a 1099 that comes with that?

**A.** There's typically not a 1099 for gambling income. More typically, there's a form W-2G that someone would receive if they have made gambling income above a certain threshold.

**Q.** Now, in your review of the records, did you see a 1099 for approximately $26 million from someone named Alec Gores?

**A.** I did, yes.

**Q.** Did that 1099 indicate that it was specifically for gambling winnings?

**A.** I don't believe it did, but I could double-check if you have the document.

**MS. REAVES:** Can we pull up Government's Exhibit 1, please?

**BY MS. REAVES:**

**Q.** Is this the 1099 that we were just referring to?

**A.** Yes.

**Q.** Okay. And does anything on this 1099 indicate that this is for gambling winnings?

**A.** No.

**Q.** Now, would it be helpful for a tax preparer to have a 1099 in preparing a taxpayer's tax returns?

**A.** Yes. A tax preparer would want all tax forms that are received by the client.

**Q.** All right. What is your opinion on, if a taxpayer discloses the amount in a 1099, does a tax preparer need the document itself?

**A.** No. That would be fine. The important thing is that the amount is captured on the tax return. There would be no requirement that a 1099 had to be passed on if the client communicated the same information.

**Q.** Now, I want to turn from gambling income to legal income.

Now, is there any requirement that legal income for an S Corporation go directly into the S Corporation's firm bank account?

A.    No.

        MS. REAVES:    I want to go back to, this is DX 265.

BY MS. REAVES:

Q.    And if we look at the bottom, I want to go now to the second to last line, the one that starts "He got 500,000."  Do you see that?

A.    I do, yes.

Q.    All right.  Now, what is your understanding of what Mr. Levitan is communicating to Mr. Deyhle in this e-mail?

A.    Essentially, Mr. Levitan is communicating that Mr. Goldstein or Goldstein & Russell -- it's not entirely clear -- but one of those two parties received $500,000 of income, but it never passed through a firm bank account.  And so if a tax preparer was solely relying on the bank statements, they would not know about that income.  And most likely, this e-mail would be the only way to ensure that it got on the tax return.

Q.    Now, have you had an opportunity to review the QuickBooks accounting records for Goldstein & Russell in this year 2018?

A.    Yes.

Q.    And in those QuickBooks accounting records, did Mr. Deyhle or someone from GRF actually record the $500,000 in income that

was disclosed in this e-mail?

A.   No.   Despite Mr. Levitan's disclosure of the income, it never made it onto the tax return.

Q.   Now, aside from the failure to record the income that was disclosed, is there other information that Mr. Deyhle, as a tax preparer, should now be acting on based on the information in this e-mail?

A.   To clarify, you're asking specifically about the Malaysian income?

Q.   Yes.   About the fact that there was income coming in from a bank account, but there was no record of it happening.

A.   Yes.   So, number one, and I've sort of alluded to this. The first question should be whether this is Mr. Goldstein's income or Goldstein & Russell.   Otherwise, and that's a key data point before you can even put it on a tax return.

And then from this e-mail, Mr. Deyhle would know that Mr. Goldstein has foreign income.   You heard Mr. Deyhle testify yesterday that -- about how you don't typically receive Form 1099s and other tax forms on foreign income.

So if you think back to the earlier e-mail chain with Ms. Runkle where Mr. Deyhle was only asking for 1099s and W-2s, this would be a clear example of why that's insufficient. Because if you have income that's not going through a bank account and is from a foreign source, you may not capture it by simply looking at 1099s and W-2s.

**Q.** And from your review of the records in this case, did you see any evidence of GRF asking about additional income that might be -- might not be captured on a 1099 or bank account prior to filing tax returns?

**A.** No. I never saw them ask any question, such as do you have any other types of income besides that which goes on a 1099 or a W-2. I never saw them ask questions like that.

**Q.** All right. Now, while we're talking about this e-mail, you alluded to foreign bank accounts. Now, what is the requirement or are there requirements for reporting foreign bank accounts on your tax return?

**A.** Yes.

**Q.** And what is that requirement?

**A.** For an individual, there is a box to check on your tax return to indicate that you have an interest in a foreign bank account. There is also a separate tax form called an FBAR that you have to file with the IRS if the highest balance in that foreign account was higher than, I believe, $10,000 at any point in the year.

**Q.** All right. And how is a tax preparer going to know whether or not the balance in a bank account requires filing of this FBAR form?

**A.** One way would be to look at the statements.

**MS. REAVES:** Can I pull up Defense Exhibit 1, please?

BY MS. REAVES:

**Q.** All right. Are you familiar with Defense Exhibit 1?

**A.** Yes.

**Q.** All right. Now, what is happening here?

**A.** In this instance, so we have an e-mail from Ms. Jill Leonard, who is an employee at GRF, the tax preparer. And this e-mail is going to Jon Levitan, who is an employee at Goldstein & Russell.

And she's basically saying that both the firm, Goldstein & Russell, and Mr. Goldstein personally are going to have to file that FBAR filing I just alluded to. And she sends -- and that's, she mentions, is relating to the Montenegro accounts. And then she sends a link for which -- through which Mr. Levitan could file the FBAR.

**MS. REAVES:** Can we scroll up on this e-mail and see the response from Mr. Levitan and then Ms. Leonard again?

**BY MS. REAVES:**

**Q.** What does Mr. Levitan respond?

**A.** Mr. Levitan says that he's having trouble accessing the FBAR form that she sent in that link. And so he says "maybe it's best if you all" -- meaning GRF -- "take care of the filing."

**Q.** All right. And then what was Ms. Leonard's response?

**A.** Ms. Leonard communicates that she'll notate it in GRF's file so that GRF will file instead the FBAR on Mr. Goldstein and Goldstein & Russell's behalf.

**Q.** All right. Now, have you had an opportunity to review Mr. Goldstein's tax return for tax years 2016, 2018 and 2019?

**A.** Yes.

**Q.** Now, in those years, 2016, 2018 or 2019, did GRF, in fact, disclose the foreign bank accounts on Mr. Goldstein's tax returns in any of those years?

**A.** So I mentioned there is two ways to disclose it. One is checking a box on the tax return. The box was checked in one of those years which was 2019. It was not checked in the other years. And my understanding is no FBAR was filed in any of those years.

**Q.** Now, did GRF have sufficient information, based on your review of the records, to disclose the fact that Mr. Goldstein and Goldstein & Russell had foreign bank accounts?

**A.** Yes. GRF was repeatedly informed about the existence of the Montenegro accounts from the very day -- essentially the very day that they were opened in 2016. They were informed about them multiple times and actually -- yeah, completely separate e-mail chains multiple times in 2016 they were informed. They were informed again in 2018. They were informed again in 2019. So throughout this period, they were repeatedly informed about those accounts.

**Q.** All right. And I think you mentioned that, in 2019, there was at least one year where the foreign bank accounts were checked off on a tax return. Did you see any records of the

actual FBAR filing for any of those tax years?

**A.** No.

**Q.** Now, we talked about, in order to actually file the FBAR, there needs to be a minimum amount in the bank account; is that right?

**A.** That's correct.

**MS. REAVES:** Now, I want to go to, this is Defense Exhibit 269. If we start on page 3, please.

**BY MS. REAVES:**

**Q.** This e-mail that's towards the top from Ms. Leonard to Jon Levitan. Can you tell us what information GRF is or what request GRF is making to Mr. Levitan in this e-mail?

**A.** So Ms. Leonard is asking that Mr. Levitan send the Montenegro bank account statements to GRF.

**Q.** All right.

**MS. REAVES:** And if we scroll up to page 2 and look at Mr. Levitan's eventual response. Again, towards the top, Mr. Levitan responding to Ms Leonard at GRF.

**BY MS. REAVES:**

**Q.** What is Mr. Levitan communicating to Ms. Leonard?

**A.** He is indicating that he just uploaded the Montenegro statements. In other words, he just provided it to GRF.

**Q.** All right. So if, according to this e-mail, Mr. Levitan had provided bank statements for Montenegro. Did GRF have sufficient information to actually file the FBAR?

**A.** Assuming that he provided a full calendar year's worth of bank statements, then yes.

**Q.** Now, in your review of the records of this case, did you identify any other examples of GRF failing to follow explicit instructions from Goldstein & Russell about how to classify transactions in the QuickBooks accounting records?

**A.** Yes, I did.

**Q.** All right. I want to talk through a few of those examples.

        **MS. REAVES:** If we can pull up, this is Defense Exhibit 318 and Defense Exhibit 261 on a split screen, please. Thank you.

**BY MS. REAVES:**

**Q.** So tell us -- and Defense 318 is on the left, 261 is on the right. Tell us what is being communicated in these e-mails.

**A.** Sure. So it's a bit of a complicated situation, but I'll try to simplify. There were certain -- so this is looking at the tax year of 2017. And in January of 2018 the following year, GRF has some questions about certain outflows from Goldstein & Russell's bank account. It's -- in particular, and you see this at the bottom e-mail on the left, the -- they're looking for a contact information and W-9s for three individuals, a Pasha Esfandiari -- I'm not sure how to pronounce that -- Matthew Winnick and Ryan Anderson.

Q.   What is your understanding of why an accountant would need addresses and W-9s?

A.   So if Goldstein & Russell is issuing payments to others as forms of compensation, they may need to issue 1099s to those recipients, and so that's why an accountant would collect this information.

Q.   In this first e-mail, tell us more about what is happening in terms of getting this information to issue 1099s.

A.   So, again, in the e-mail, it is just requesting the contact information and the W-9s.  It's not requesting, for example, how to account for these transactions or if these transactions were deductible business expenses or distributions.

     And then if we go to a later e-mail, if we go to the right, there is a e-mail from Jon Levitan to Jill Leonard on January 26 at 4:10 p.m.  And he basically tells her that PE Entertainment -- so you remember there is the individual Pasha, who I struggled with the last name.  That's a Pasha E.  That's what PE stands for, PE Entertainment.

     And what Mr. Levitan is telling Jill is that that outflow is actually a personal distribution.  TJ [sic] personal means Tom Goldstein personal, which means it's a personal distribution, not a deductible business expense.

     So even though Ms. Leonard did not ask how these transactions should be accounted for, Mr. Levitan, just seeing

the name, he interjects and lets her know that this is not a deductible business expense.

Q.   Did you have an opportunity to review how this transaction was ultimately classified in Goldstein & Russell's accounting records?

A.   I did, yes.

         MS. REAVES:  So if we can pull up -- this is Government's Exhibit 1090.  It's an Excel spreadsheet, and we are going to go to row 856.

BY MS. REAVES:

Q.   Can you just tell us what you are seeing in this document in Government's Exhibit 1090?

A.   Yes.  So this a general ledger, that sort of very key accounting document that I mentioned earlier.

     And on the row that was highlighted, row 856, that is the transaction of $100,000 going to PE Entertainment in 2017 that we saw discussed in that e-mail chain.

Q.   And I think we just saw in the two prior e-mails that Goldstein & Russell communicated to GRF that PE Entertainment was TG personal.

     But how is that classified in GRF's -- in the accounting records that GRF was maintaining?

A.   So in cell D 848, you can see that all these transactions fall under an account called legal fees, other.  That is a deductible business expense account.  So, in other words, even

though Mr. Levitan told GRF that this is not a deductible business expense, GRF disregarded or ignored that instruction and still accounted for it as a deductible business expense.

Q.   We'll look at another example.

MS. REAVES:  Can we pull up -- this is Defense Exhibit 268, and go to page 2.

BY MS. REAVES:

Q.   So in the bottom half of this e-mail --

MS. REAVES:  Actually, we can blow up both e-mail at the same time, if possible.

BY MS. REAVES:

Q.   What is being communicated from GRF to Mr. Levitan in the bottom half of this e-mail?

A.   So Ms. Leonard -- again, the same Ms. Leonard that we were just looking at.

In January 2019 -- so now we are talking about the tax year of 2018 -- she's got -- at the bottom of this e-mail, she's identified six outgoing transfers that were paid via wire from Goldstein & Russell.  And she asked if any of those payments are for consulting or legal fees.

She says, "If so, we should do a 1099."

Q.   What is Mr. Levitan's response in communicating to GRF?

A.   So, again, even though it wasn't the question asked specifically of him, he responds to actually let Ms. Leonard know that they are all TJ personal, meaning they are all

distributions, not deductible business expenses, except for this one gentleman, Mr. Cabraser.

So all of the other outflows are -- he's telling her are distributions.

Q.   Did you have an opportunity to review how these transactions were, in fact, classified in Goldstein & Russell's accounting records?

A.   I did, yes.

MS. REAVES:   So I want to pull up -- this is Defense Exhibit 403, and we are going to look at lines 1102 and 1103.

BY MS. REAVES:

Q.   Again, can you tell us what is happening in Defense Exhibit 403?

A.   So these are the two transactions that were being referred to in the e-mail.  There is an outflow for a $100,000 to Mr. Robl, and the $2,000 to DJ Edson.

Again, similar to the last example we just looked at, GRF has disregarded the request to account for these as personal distributions and has, instead, accounted for them as legal fees, which is one category of deductible business expense.

Q.   Let's look at just one more example.

MS. REAVES:   Can we go to Defense Exhibit 277 on page 2.

And that middle e-mail, can you blow that up?

BY MS. REAVES:

**Q.** What is Ms. Bart communicating to GRF in this e-mail?

**A.** So Ms. Bart is an employee at Goldstein & Russell. She is telling Ms. Leonard in 2020 -- she is discussing transactions to Hook and Flynn, and she is indicating that both of those transactions, which were outflows from Goldstein & Russell's bank account, are, in fact, also personal distributions, not to be accounted for as deductible business expenses.

**Q.** Did you have an opportunity to review the underlying accounting records for this here as well?

**A.** I did, yes.

        **MS. REAVES:** Can we pull up Defense Exhibit 405, looking at rows 1196 and 1197?

**BY MS. REAVES:**

**Q.** Again, if you can explain to us what we are looking at here?

**A.** So these, again, are the transactions that are being referred to in the e-mail that we just looked at. There is $60,000 going to a Mr. Hook, and $54,200 going to a Mr. Flynn in 2019.

    And, again, exactly as we saw in the prior examples, GRF ignored what Mr. -- sorry, what Ms. Bart had communicated, and instead of classifying these as personal distributions, they were accounted for as legal and professional fees.

**Q.** I want to give one more example. It's a different flavor, but I want to talk about --

**MS. REAVES:** Can we pull up Defense Exhibit 456?

**BY MS. REAVES:**

**Q.** This is a pretty basic one, but what is being communicated in this e-mail to Mr. Deyhle?

**A.** Ms. Gou, if that's how you pronounce her last name, she's requesting or noting to Mr. Deyhle that Tom and Amy, meaning Mr. Goldstein and Ms. Howe, need to be filing married but separately on their 2021 tax return.

**Q.** This maybe isn't expert testimony, but what should Mr. Deyhle do with this information?

**A.** He should have followed it.

**Q.** Did you have an opportunity to review the tax return for 2021?

**A.** I did, yes.

**Q.** And were Mr. Goldstein and Ms. Howe's taxes filed separately in that year?

**A.** Not -- no.

**Q.** And did you see any documentation of Mr. Deyhle following up on this request to file taxes separately?

**A.** He did not follow up on his own. It was in 2023, about two years later, it's brought up to him again.

**Q.** Based on these examples that we went through, what is your opinion on whether GRF complied with the applicable standards in terms of acting on the information that it did have from GRF?

**A.** GRF did not comply with those professional standards.

**Q.** I want to turn to the last bucket of your opinions.

**MS. REAVES:** If we go to slide 16 of our presentation, please.

**BY MS. REAVES:**

**Q.** And I want to talk about preparing competent tax advice. What does it mean to prepare competent tax advice?

**A.** So as I mentioned, tax preparers, particularly CPAs, like Mr. Deyhle, are supposed to be competent in all of the professional services that they provide, and to the extent that they provide tax advice, that advice should be accurate, and they should provide tax advice when that's called for.

**Q.** And did you form an opinion as to whether GRF provided any incorrect or inadequate advice to Goldstein & Russell or to Mr. Goldstein?

**A.** Yes. I identified instances where both inaccurate tax advice was affirmatively provided by the tax preparers, as well as instances where the tax preparer should have provided advice but did not.

**MS. REAVES:** Let's go to slide 17.

**BY MS. REAVES:**

**Q.** Can you tell us what standard are you using that to make that assessment?

**A.** That would be the seventh AICPA standard.

**Q.** What does that standard require?

**A.** It, essentially, just -- you know, again, some of these sounds obvious, but the tax preparer should be a providing accurate and competent tax advice. The tax preparer should specifically assume that clients are going to rely on the tax advice they receive, and if they receive incorrect tax advice, that may result in how something is reported on a tax return.

It also talks about how for particularly unusual or high-dollar-value or complex transactions, written advice is recommended instead of oral advice.

**Q.** What's an example of an unusual or high-dollar-value or complicated transaction where written advice would be recommended?

**A.** For example, the 2016 gambling gains.

**Q.** Now, let's talk about some examples of advice, specifically.

**MS. REAVES:** So can we go to Defense Exhibit 252, please, on page 1?

**BY MS. REAVES:**

**Q.** So, if we start at the bottom e-mail, can you tell us what Mr. Shuman is communicating or -- yes. The e-mail one up from that.

What Mr. Shuman communicating to Goldstein & Russell?

**A.** So he's -- there's sort of confusion. I guess -- I take it maybe earlier in this chain there is another question, but he is saying, Do you -- Did you, April Wu -- and I guess this

one is directed at Angie, "Did you need the vendors that G & R sent 1099s to, or the companies that sent you 1099s?"

So he's trying to figure out if -- whatever is being discussed here, he's trying to figure out are we talking about 1099s that Goldstein & Russell receives, or 1099s that Goldstein & Russell issues.

Q.   And I want to break that down a little bit.

What is a 1099?

A.   So a 1099 is a tax form.  So when the payor, meaning the person issuing some form of compensation -- so if someone is sending some sort of compensation to someone else, they have to generally issue a 1099 to accompany that, unless it's for wages, and a W-2 would be another way.

So most of us in this room would either receive from our employers a W-2 if we're a salaried employee.  We may also receive a 1099 if we are an independent contractor.

Q.   And are there different types of 1099s?

A.   There are.

Q.   Can you tell us about some of the types of 1099s?

A.   So as I mentioned, you can see a 1099 as an independent contractor.  That's standard in many industries.

You can also -- you will receive a form of 1099 from your bank, a 1099 INT or a 1099 DIV, depending on -- to report other types of income, investment income, interest income, stuff like that.

**Q.** And in this e-mail they refer to 1099s that Goldstein & Russell sent, and 1099s that Goldstein & Russell received.

Can you tell us the difference between those?

**A.** Sure. So you would -- Goldstein & Russell would have received a 1099 when they received payments, and they would issue a 1099 when they sent payments.

**Q.** What advice -- let's look at what advice GRF is providing to Ms. Gou or to Goldstein & Russell about 1099s in an e-mail about this.

**A.** So Mr. Shuman says that he conferred with Walter Deyhle and confirmed that, as a corporation, companies do not need to issue 1099s to G & R. In other words, that G & R does not need to receive 1099s for payments that they receive.

**Q.** Is that accurate?

**A.** That is incorrect.

**Q.** Who was supposed to issue -- or are payments for legal services supposed to be documented in a 1099?

**A.** Yes. So in general, payments to law firms specifically -- and, obviously, Goldstein & Russell is a law firm -- for any legal services, 1099s are generally issued.

**Q.** Now, what is the tax preparer supposed to do with 1099s?

**A.** They're supposed to use that information and ensure that that income gets captured on the tax return.

**Q.** Now, what if the business is a business with a cash basis?

**A.** That would be -- I don't understand the question.

**Q.** What is a cash basis business?

**A.** A cash basis? So there's two general forms of accounting, cash basis and accrual basis. I won't belabor the point, but cash basis accounting is when you account -- it all has to do with the timing of when you record income. And cash basis means that you record income when you actually take possession of the cash so to speak.

**Q.** Now, does the fact that a business is a cash basis business mean the tax preparer can ignore the 1099s that they receive?

**A.** No. I don't -- I don't understand why that would be at all -- 1099s are also issued on a cash basis, so that would not be an issue.

**Q.** And when 1099s are issued, who do they go to?

**A.** They go to the party that received payment.

**Q.** And is there anyone else they go to?

**A.** They also go to the IRS.

**Q.** Now, what should a tax preparer do with the 1099s that they received?

**A.** They should make sure that income is captured on a tax return.

**MS. REAVES:** The Court's indulgence. Could I have the husher briefly?

**BY MS. REAVES:**

**Q.** Now, just a few final questions.

Mr. Marks, does a taxpayer have to provide accurate information to their tax preparer?

**A.** Can you restate that question?

**Q.** Does a taxpayer have to provide accurate information to their tax preparer?

**A.** Yes.

**Q.** And is a tax preparer allowed to rely on the information provided by their client when the tax preparer has asked sufficient questions and adequately educated their client?

**A.** Yes, unless that information that they've received appears to be inaccurate or incomplete.

**Q.** And if it's inaccurate or incomplete, then does the tax preparer have additional duties?

**A.** Yes. The taxpayer would need to follow up, ask follow-up inquiries, get enough information or at times actually do that verification stuff of the documentation so that the tax preparer is comfortable.

**Q.** So if a tax preparer fails to exercise due diligence in asking for the information that's necessary for a tax return, what's a likely impact of that failure?

**A.** If a tax preparer fails to ask the questions to their client and perform due diligence, then the tax return would be at high risk for having errors on it.

**Q.** If a tax preparer fails to act on the information that they've received from their client, what's the likely impact of

that?

**A.**    That the tax returns would be misstated.

**Q.**    And if a tax preparer fails to provide competent advice or education to the taxpayer, what's the likely impact of that failure?

**A.**    It could result in the tax returns being misstated.

**MS. REAVES:**    Thank you.

**THE COURT:**    Thank you very much, Ms. Reaves.

Does the government wish to cross-examine the witness?

**MR. ADENRELE:**    Indeed, Your Honor.

### CROSS-EXAMINATION

**BY MR. ADENRELE:**

**Q.**    Mr. Marks, good afternoon.

**A.**    Good afternoon.

**Q.**    Now, Mr. Marks, are you or have you ever been a tax preparer?

**A.**    Not as a professional.

**Q.**    As a nonprofessional?

**A.**    Yes.

**Q.**    Okay.  Are you ever -- or have you ever been employed as a bookkeeper?

**A.**    I have.  That has been one of my job duties, yes.

**Q.**    I'm sorry.

**A.**    Yes.  So I have held jobs where my role has included bookkeeping.

**Q.** As a professional?

**A.** Correct. Yes.

**Q.** As an employee at FTI, are you or have you ever been a bookkeeper?

**A.** That is not my role at FTI, no.

      **MR. ADENRELE:** Let me pull up the demonstrative shown by the defense. First page. Let's go to the second page where we see Mr. Marks' experience.

**BY MR. ADENRELE:**

**Q.** All right. Now, we have here that you are a certified public accountant. Am I reading that right?

**A.** That's correct.

**Q.** That doesn't say that you are or have been a tax preparer, does it?

**A.** It does not.

**Q.** Certified in financial forensics. Am I reading that right?

**A.** That's correct.

**Q.** That doesn't say that you're a tax preparer; right?

**A.** No.

**Q.** Certified fraud examiner. Am I reading that right?

**A.** That's correct.

**Q.** That doesn't say that you're a tax preparer; right?

**A.** Nope.

**Q.** All right. Certified anti-money laundering specialist.

Did I read that right?

**A.** That's correct.

**Q.** That also doesn't say that you're a tax preparer; right?

**A.** No. But I would like to clarify. The CPA designation does enable you to prepare tax returns.

**Q.** But I think you already clarified earlier that you've never been a tax preparer as a professional. Did I hear that right?

**A.** That's correct.

**Q.** Okay. And just to be clear, this isn't a -- as to your knowledge, this isn't a anti-money laundering case, is it?

**A.** No.

**Q.** Now, you've seen a copy of the indictment?

**A.** I have, yes.

**Q.** I believe you said you reviewed a number of documents, and you've seen a copy of the indictment; right?

**A.** That's correct.

**Q.** You're familiar with the charges in this case; right?

**A.** I am.

**Q.** You're familiar that Mr. Goldstein is charged with tax evasion for year -- for tax year 2016?

**A.** I am aware of that, yes.

**Q.** You're familiar that Mr. Goldstein has been charged with aiding and assisting the preparation of false and fraudulent tax returns; right?

**A.** Yes.

**Q.** You're also familiar that Mr. Goldstein has been charged with willful failure to pay taxes; right?

**A.** I am aware of that.

**Q.** And you're also familiar that Mr. Goldstein has been charged with false statements on mortgage applications; right?

**A.** Loosely. It's not been part of my scope, but I'm --

**Q.** You read the indictment?

**A.** That's right.

**Q.** Now, you've testified before; correct?

**A.** That's correct.

**Q.** You actually testified in this courthouse before; right?

**A.** That is correct.

**Q.** And, then, you testified another time in state court somewhere; right?

**A.** That is correct.

**Q.** And on neither one of those times were you identified as an expert; right?

**A.** The first time I testified in a state court was in 2012 or 2013. I was working for the DA's office at the time. I wasn't in the courtroom when they officially announced my designation. I believe it was as an expert, but I'm not entirely sure.

**Q.** You were a summary witness; right?

**A.** I'm not aware that I was a summary witness. I believe I was an expert witness, but I'm not entirely sure.

**Q.** Now, the time you testified before in this courthouse, you were designated as a summary witness; right?

**A.** That's correct.

**Q.** And that's not an expert; right?

**A.** That's a different designation.

**Q.** Okay. And those were really, between this time and those other two times, these are the three times that you've testified in court in total; is that right?

**A.** Can you repeat that question?

**Q.** Sure. Previously, you testified in this courthouse once; right?

**A.** Twice.

**Q.** In this courthouse?

**A.** That's correct.

**Q.** In the District of Maryland?

**A.** Correct.

**Q.** All right. Now, when you say "twice," are you including this time today?

**A.** I am not.

**Q.** Okay. So those previous two times that you testified in this courthouse, you were not designated as an expert; right?

**A.** That is correct.

**Q.** And it seems like you're unclear about whether the time you testified in state court as to whether you were or were not designated as an expert. You're not sure; right?

**A.** That is correct.

**Q.** And so this is the first time that anyone in any courthouse anywhere has considered you an expert; is that right?

**A.** That is not correct.

**Q.** Well, I mean, let's do this again. You testified once before, twice before in this courthouse; right?

**A.** That is correct.

**Q.** And both of those times you were not designated as an expert; right?

**A.** That is correct.

**Q.** You testified one other time in state court; right?

**A.** That is correct.

**Q.** And that time, you're not sure if you were designated as an expert; right?

**A.** I believe I was, but I'm not -- I looked through the records, and I couldn't find an official designation.

**Q.** Okay. So between those three that we've just talked about, none of those times you were designated as an expert; right?

**A.** But there was another time that I was.

**Q.** And when was that?

**A.** That was last summer.

**Q.** Okay. So you were designated once as an expert?

**A.** Well, again, my understanding is I've been designated as

an expert twice before, including the state court.

**Q.** All right. And so today you're here not as a -- with no one -- with no experience in tax preparation; right?

**A.** No. I did not say that.

**Q.** With no professional experience in tax preparation; right?

**A.** I have experience analyzing tax preparation.

**Q.** Oh, you have experience analyzing tax preparation. But you personally, do you have experience as a tax preparer, you personally?

**A.** I have experience preparing taxes not for pay.

**Q.** Okay. All right. So you've never worked as tax preparer; right?

**A.** Correct.

**Q.** All right. Now, Mr. Deyhle, who you've spoken a lot about, to your knowledge, has he worked as a tax preparer?

**A.** Yes.

**Q.** To your knowledge, how long has he worked as a tax preparer?

**A.** At least since the 80s.

**Q.** Okay. So you're here criticizing Mr. Deyhle's work who has worked as a tax preparer for 40 years; is that right?

**A.** I have to look.

        **MS. REAVES:** Objection.

        **MR. ADENRELE:** And you have never worked as a tax preparer?

THE COURT: Let's come to the headsets, Counsel.

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT: All right. Do we have the government?

MR. ADENRELE: Government is here.

THE COURT: Ms. Reaves, I think you made the objection.

MS. REAVES: Yes.

THE COURT: And Mr. Goldstein?

I'm going to let you talk first. Go ahead.

MS. REAVES: So I think a couple things. I think if he wanted to ask the nature -- he's testified many times that he has not worked professionally as a tax preparer, although he has prepared taxes.

But second, the questions are fairly argumentative and inappropriate.

Mr. Marks is not criticizing Mr. Deyhle. Mr. Marks is testifying as an expert in this case pursuant to the Court's ruling, so I think that the government needs to ask an appropriate question.

THE COURT: Yeah. I tend to not care for that tone either, Counsel.

MR. ADENRELE: I apologize. I'm happy to move on.

THE COURT: Thank you very much.

(Whereupon discussion concluded.)

**BY MR. ADENRELE:**

**Q.**   Mr. Marks, you testify that you were retained by Mr. Goldstein's counsel in this case; is that right?

**A.**   That is correct.

**Q.**   I believe you testified that you were at a company called FTI; is that right?

**A.**   That is correct.

**Q.**   And is FTI being paid for your testimony?

**A.**   Yes.

**Q.**   How much is FTI being paid?

**A.**   My -- I bill hourly through FTI, so FTI, not me individually, receives $790 an hour.

**Q.**   Has FTI been paid yet at all, to your knowledge?

**A.**   I have no involvement in our billing with this case.

**Q.**   So you don't know one way or the other whether FTI has or has not been paid yet?

**A.**   I have no idea of that, no.

**Q.**   Okay.  So I believe you said -- and maybe I misheard, but I believe you said $790 an hour; right?

**A.**   That's correct.

**Q.**   During your testimony on direct examination, you talked a lot about the documents that you reviewed, if I heard that right; right?

**A.**   That's correct.

**Q.**   There were, seemed like, a lot of documents; right?

**A.** That is correct.

**Q.** How many hours have you spent thus far reviewing all of those documents?

**A.** I don't know exactly.

**Q.** Why don't you, you know, give us a guess?

**A.** I would approximate about a hundred hours, roughly.

**Q.** So a hundred hours so far reviewing documents?

**A.** That is not just reviewing documents, but including that.

**Q.** I'm not a math genius, so let's just do the multiplication here. 790 hours -- or $790 multiplied by 100 hours.

Am I doing the math right?

**A.** If you are trying to calculate the timing.

**Q.** I am trying to calculate.

**A.** Yes.

**Q.** So that's $79,000 thus far that either will be or has been paid to FTI; is that right?

**A.** Yes.

**Q.** To your knowledge, is Mr. Goldstein being represented by a law firm?

**A.** Yes.

**MS. REAVES:** Objection.

**THE COURT:** Let's come to the headsets, Counsel.

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:** Ms. Reaves, do we have you?

**MS. REAVES:** Yes, Your Honor.

**THE COURT:** Mr. Goldstein's thumb is up.

Go ahead, Ms. Reaves.

**MS. REAVES:** I would like a proffer for where we are going because I'm concerned the government is about to comment on Mr. Goldstein's right to present a defense by talking about who hired a law firm.

I'm also concerned about them providing an inaccurate impression on the jury about the cost of our services or something else. As the Court knows, a contested issue is the issue that our firm actually has not been fully paid a retainer for this case because. Mr. Goldstein does not have the funds to do so, and so I think it would be extremely inappropriate for the government to suggest otherwise to the jury.

So I let it go for the expert because I understand the bias line. I think it's inappropriate and it intrudes on the right to present a defense and to have representation, if the government is going to ask questions about counsel.

**THE COURT:** Thank you, Ms. Reaves.

Counsel for the government?

**MR. ADENRELE:** It's a fair question. I'm not asking about the bills due to Munger, Tolles.

Instead, I'm just going down a line to point out this witness' bias. If FTI is doing other work for the law firm of Munger, Tolles, I think this witness is allowed to answer that

question, and I think it goes to his bias --

**THE COURT:** You mean other work outside of this case?

**MR. ADENRELE:** Correct.

**THE COURT:** Ms. Reaves?

**MR. ADENRELE:** And it's simply to the bias.

**THE COURT:** Go ahead.

**MR. ADENRELE:** I apologize. I didn't mean to interrupt.

**THE COURT:** No. You finish your statement.

**MR. ADENRELE:** I just wanted to clarify.

The question goes simply to the bias of the witness. If FTI is doing millions of dollars of work for the law firm of Munger, Tolles, I think the jury is allowed to hear that and the witness can answer.

If he doesn't know, he will say he doesn't know, but that's the line of questioning.

**THE COURT:** Ms. Reaves, anything further from you?

**MS. REAVES:** I think that the bias argument is pretty weak. I think, if anything, it should be whether Mr. Marks is performing additional work for our law firm because he already testified that he's a salaried worker. He is not directly compensated based on his work in this case.

**MR. ADENRELE:** May I respond, Your Honor?

**THE COURT:** Yes. Go ahead.

**MR. ADENRELE:** I think the judgment as to whether the

argument is weak or not is one for the jury to make, not for Ms. Reaves.

MS. REAVES: But, again, the broader concern is the comment that -- the suggestion that Mr. Goldstein has resources that he does not have, and I think typically it's inappropriate and irrelevant to comment on counsel and who is representing him.

The jury has no information about what type of law firm we are or not, and it's inappropriate and unfairly prejudicial for the government to insert that.

THE COURT: Go ahead, Counsel.

MR. ADENRELE: Just one point here.

This witness is the managing director at FTI, not just, like, a lowly employee somewhere that doesn't know anything. He is the managing director of FTI. He likely knows about other matters at FTI, and I think he's allowed to discuss it here.

THE COURT: I think I got it. We have already explored with the witness about his fees for this particular case, so that piece of the bias argument is already out there. You can ask him about other work that he or his firm is doing with the law firm. That's as far as we are going.

MR. ADENRELE: That's it, Your Honor. Thank you.

THE COURT: Thank you.

(Whereupon discussion concluded.)

**BY MR. ADENRELE:**

**Q.** As I was saying, Mr. Marks, Mr. Goldstein is being represented by a law firm; right?

**A.** That is correct.

**Q.** And do you know the name of that law firm?

**A.** Yes.

**Q.** What is the name of that law firm?

**A.** Munger, Tolles & Olson.

**Q.** Do you know whether FTI has done or is doing other work for that law firm?

**A.** I do not know.

**Q.** Now, as part of the hundred hours of work that you have done thus far, did you meet with the defense?

**A.** Can you clarify what you mean by the defense?

**Q.** Did you meet with lawyers sitting at this table right here?

**A.** I met with attorneys, yes.

**Q.** How many times?

**A.** I would estimate five to six times.

**Q.** And how long were each of those meetings?

**A.** Actually, I want to clarify my last answer. I arrived physically in this courthouse yesterday. I'm not including sort of seeing them throughout the day.

**Q.** Understood. You said -- I believe I heard you say five or six times?

**A.** Yes.

**Q.** When was the first time?

**A.** Approximately, two months ago.

**Q.** How long was that meeting?

**A.** I don't know. I would --

**Q.** Where was it? I'm sorry.

**A.** I would probably say 30 minutes.

**Q.** Okay. What about the second time?

**A.** I don't recall.

**Q.** You don't recall where it was?

**A.** Oh, it was all virtual.

**Q.** It was all virtual.

So the third, fourth, fifth, and sixth time all happened within the last two months; is that right?

**A.** That is correct.

**Q.** Now, on direct, you listed off a number of documents that you reviewed in preparation for your testimony today.

Did I hear that right?

**A.** Yes.

**Q.** I believe you said you reviewed the general ledger for G & R; right?

**A.** Yes.

**Q.** You reviewed bank statements for G & R; right?

**A.** Yes.

**Q.** You reviewed tax returns; right?

239

**A.** Yes.

**Q.** You reviewed the indictment; right?

**A.** Yes.

**Q.** You reviewed grand jury transcript for Mr. Deyhle; right?

**A.** Yes.

**Q.** You reviewed grand jury transcript for Mr. Shuman; right?

**A.** Yes.

**Q.** And you sat in court yesterday and listened to Mr. Deyhle's testimony; right?

**A.** In the afternoon, yes.

**Q.** And you said you reviewed some e-mails as well; right?

**A.** A lot of e-mails, yes.

**Q.** A lot of e-mails.

I think you said you reviewed witness statements; right?

**A.** That's what the government called them, yes.

**Q.** Well, you haven't talked to us, so what are witness statements? I'm confused to what you are referring to.

**A.** So basically, the government sends -- and I'm not a lawyer, but I understand it's called a Brady disclosure that -- well, I'm not going to go in to what a Brady discloser is, but it includes the government's disclosure of witness statements that they took.

**Q.** So these weren't verbatim statements. These are summaries of things the witnesses have said?

**A.** I don't know. The government described them as witness

statements. I don't know if they were signed statements are unsigned. I don't know.

Q. Let's talk about what you didn't review.

You haven't sat through the testimony of any other witnesses in this case; right?

A. I am only allowed --

MS. REAVES: Objection.

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT: Ms. Reaves, do we have you? Mr. Goldstein? Mr. Adenrele?

MR. ADENRELE: I'm here, Your Honor.

THE COURT: All right.

Go ahead, Ms. Reaves.

MS. REAVES: As the Court knows, Mr. Marks didn't sit through the rest of the testimony in this case because there is a rule on witnesses, and we asked for permission for specific witnesses. It's not a summary for the entire case, and so it wasn't appropriate for him to sit through everything.

He was also going to sit through Mr. Shuman's testimony, but because of the snow delay, we weren't able to do that, and Mr. Marks isn't available next week.

So I don't think it's appropriate for the government to suggest that his failure to do something that is not permitted by the rules undermines his testimony in this case.

**THE COURT:** I tend to agree.

Counsel for the government?

**MR. ADENRELE:** I'm happy to move on.

**THE COURT:** Let's move on.

(Whereupon discussion concluded.)

BY MR. ADENRELE:

Q. You haven't reviewed any other grand jury transcripts, have you?

A. No.

Q. Are you aware that there is over 40 grand jury transcripts of prior testimony from witnesses?

A. I'm not aware.

Q. So you reviewed 2 out of maybe 40 grand jury transcripts?

A. If that's what you say.

Q. You haven't reviewed any prior statements by IRS agent Gary Libbin, have you?

A. I don't believe so.

Q. You haven't reviewed any transcripts by IRS Gary Libbin in which he explained to Mr. Goldstein's accountant that Mr. Goldstein needed to keep better books and records, have you?

A. Can you repeat that question?

Q. Sure. You haven't reviewed any statements from IRS agent Gary Libbin in which he explains to Mr. Goldstein's accountant that Mr. Goldstein needed to keep better books and records with

respect to his gambling?

**A.** No. As I mentioned, I don't believe I've read any witness statements by him.

**Q.** And you haven't reviewed any statements from Mr. Goldstein's former accountant from back in 2010, have you?

**A.** I'm not entirely -- I don't believe so. If I did, it would have been in the form of an e-mail, but I don't believe so.

**Q.** You haven't reviewed any grand jury transcripts from that accountant in 2010, have you?

**MS. REAVES:** Objection.

**THE COURT:** Let's come to the headsets.

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:** Ms. Reaves? Mr. Goldstein? Counsel for the government?

**MR. ADENRELE:** Yes, Your Honor.

**THE COURT:** All right. Go ahead, Ms. Reaves.

**MS. REAVES:** Your Honor, as far as I know, there is no grand jury transcript that exists for the prior accountant. It's also, obviously, outside the scope of the charged conduct. But I think the government needs to be a little bit more precise and careful about suggesting facts in its questions that are not actually facts in this case.

**THE COURT:** Counsel for the government?

**MS. REAVES:** And if there is a transcript, it wasn't provided to the defense.

**THE COURT:** Okay. All right.

Counsel for the government?

**MR. ADENRELE:** I'm simply going through and talking about what he hasn't reviewed.

**THE COURT:** Well, we need to make clear what you're talking about and whether it's actually part of the case. I think that's the concern.

**MR. ADENRELE:** Just to be clear, certainly the discussion about -- from Agent Gary Libbin talking to Bill Caldwell telling him that Mr. Goldstein to keep better books and records with respect to his gambling and then Bill Caldwell telling Mr. Goldstein that information is relevant. It was during our 404(b) hearing. It was ruled as in.

And so I'm allowed to ask this witness about that and the fact that he doesn't know anything about that. I think that's relevant.

**MS. REAVES:** So, Your Honor, I didn't object to the precise question of: You didn't know that IRS Agent Gary Libbin told Mr. Goldstein's old accountant that Mr. Goldstein to keep better records, because I think that is the evidence that has actually been presented to this jury.

I objected when the government said you didn't review a grand jury transcript that, if it exists, it hasn't been

provided to defense. And I'm objecting to the government mischaracterizing the actual information that has been --

THE COURT: All right. So I think it was the last question that's of concern to the defense.

MR. ADENRELE: The witness has said he's reviewed witness statements. I'm happy to rephrase. So you haven't reviewed any witness statements from Mr. Gary Libbin. You haven't reviewed any witness statement from Bill Caldwell. I'm happy to do that.

MS. REAVES: And I just want to clarify that no grand jury transcript exists because we didn't receive one.

MR. ADENRELE: Okay. Great. I'm not sure who's going to clarify that. But I'm happy to rephrase the question to say that he didn't review any witness statements from a Gary Libbin or --

THE COURT: Okay. Were there witness statements from those individuals?

MR. ADENRELE: Yes, there were.

THE COURT: All right. Does defense understand that?

MS. REAVES: You can't clarify whether there was a grand jury transcript? We have an MOI from it. I just want to clarify whether there was a grand jury transcript for this witness who has testified that the government has not disclosed.

MR. ADENRELE: The answer is no. There is no grand

jury transcript.

MS. REAVES: Then --

THE COURT: All right. Go ahead, Ms. Reaves.

MS. REAVES: Sorry. Then our objection is to that question because it does not exist.

MR. ADENRELE: I'm not sure what the remedy is to reverse the question. I don't know. But I'm happy to rephrase the question to revert to the fact that this witness hasn't --

THE COURT: I think you can just say you misspoke and then rephrase the question.

MR. ADENRELE: I'm happy to do that.

THE COURT: Otherwise, I have to instruct the jury and have to make sure they understand what's going on.

MR. ADENRELE: I'm happy to do that.

THE COURT: All right. Thank you.

(Whereupon, discussion concluded.)

BY MR. ADENRELE:

Q. All right. Changing the question slightly, Mr. Marks, you haven't reviewed any witness statements from IRS Agent Gary Libbin, have you?

A. No.

MR. KRAVIS: Can we have the husher, please?

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT: All right. Is this Mr. Kravis or

Ms. Reaves?  Ms. Reaves?

MS. REAVES:  So we -- yes.  Your Honor --

THE COURT:  Just a moment.  Wait a minute. Mr. Goldstein?  Counsel for the government?  Just a minute.

All right.  Go ahead, Ms. Reaves.

MS. REAVES:  So we just want the government to clarify their statement that they actually say that they misspoke so the government -- the jury doesn't have a misimpression.

THE COURT:  We need to first clean up the last question that was asked before we came off the husher, because there is no grand jury transcript for the witness that you mentioned.

So just mention that you misspoke and then go into the question.

MR. ADENRELE:  I'm happy to do that.

THE COURT:  All right.

(Whereupon, discussion concluded.)

BY MR. ADENRELE:

Q.   So a moment ago, I mentioned something about a grand jury transcript for Agent Gary Libbin and for Mr. Caldwell.  Did you hear that question?

A.   Did you ask about two individuals?

Q.   I asked about two individuals.

A.   Yes, I did.  As I mentioned, I only reviewed the two grand

jury transcripts that I mentioned.

**Q.** And just to clarify, I misspoke. There is no grand jury transcript for those individuals. However, there are witness statements. Have you reviewed witness statements from those two individuals?

**A.** No.

**Q.** Are you aware -- and you're not aware that Mr. Caldwell relayed information to Mr. Goldstein that he needed to do better with his books and records with respect to his gambling; right?

**MS. REAVES:** Objection, Your Honor.

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:** Ms. Reaves?

**MS. REAVES:** Yes, Your Honor.

**THE COURT:** Mr. Goldstein? Mr. Adenrele?

**MR. ADENRELE:** I'm here. Thank you.

**THE COURT:** All right. Go ahead Ms. Reaves.

**MS. REAVES:** Thank you, Your Honor. I understand that, typically, obviously, the government could lead. There is some leeway. But the government cannot misstate testimony that the jury has heard and ask it as a question. That was not the testimony the jury has heard from both of these witnesses, and so I think the government needs to ask a different question or ask it in a different way.

And in particular, the testimony was that the IRS agent informed Mr. Caldwell that there should be books and records for gambling.  And Mr. Caldwell's testimony was that he never told that to Mr. Goldstein.

So the government can't ask a question that provides its own interpretation of facts that's inconsistent with the record and pretend like that's a question.

**THE COURT:**  All right.  So I think the concern is that the question is misleading.  Mr. -- counsel for the government?

**MR. ADENRELE:**  Sure.  No one has a transcript in front of us, so I'm not sure how certain we are about what Mr. Caldwell said.  As I remember it, Mr. Caldwell said that he told Mr. Goldstein that he needed to keep his books and records better, keep better books and records.

**MS. REAVES:**  We could get a transcript if that's helpful.

**THE COURT:**  Do we need to look at the transcript, Counsel?

**MR. ADENRELE:**  I'm happy to move on.

**THE COURT:**  All right.  Thank you.

(Whereupon, discussion concluded.)

**BY MR. ADENRELE:**

Q.  Now, you're not aware, Mr. Marks, that Mr. Goldstein later decided to keep a secret poker ledger, are you?

**A.** I don't know if what you said is a true statement.

**Q.** All right. You didn't review Mr. Goldstein's secret poker ledgers; right?

**A.** I don't know that there are secret poker ledgers.

**MR. ADENRELE:** Let's pull up Exhibits 2 and 3 side by side.

**BY MR. ADENRELE:**

**Q.** You haven't seen Exhibits 2 and 3 before, have you?

**A.** I did see them when you were -- or not "when you" but when Mr. Deyhle was testifying yesterday.

**Q.** That was the first time you ever saw Exhibits 2 and 3; right?

**A.** Yes.

**Q.** And you weren't aware that on January 22, 2017, that Mr. Goldstein sent this poker ledger to himself over protonmail; right?

**A.** I saw that in the indictment.

**Q.** And then I think you said at least you saw the poker ledger one time for the first time yesterday; right?

**A.** I don't know if this is a poker ledger. I've seen this document yesterday.

**Q.** You saw this document for the first time yesterday; right?

**A.** That's right.

**MR. ADENRELE:** Now, let's pull up Exhibits 21 and 451 side by side.

**BY MR. ADENRELE:**

**Q.** You've never seen these documents before, right, either?

**A.** I may have seen it -- I think I saw it yesterday.

**Q.** You think you saw it during Mr. Deyhle's testimony?

**A.** That's correct.

**Q.** And that would have been the first time that you have ever seen Exhibits 21 and 451; right?

**A.** Correct. My scope did not include analyzing gambling transactions.

**Q.** Just to be clear, I think you said your scope did not include reviewing gambling transactions. Did I hear that right?

**A.** Correct. My scope was to review what the tax preparers asked of Mr. Goldstein about gambling, not whether or not the amounts that Mr. Goldstein reported were accurate or not.

**Q.** You're aware that Mr. Goldstein is charged with tax evasion in this case; right?

**A.** I am aware of that, yes.

**Q.** And you're aware that -- you're aware that the underlying facts of the tax evasion charge in this case is related to gambling income; is that right? Are you aware of that?

**A.** I am aware that the charges include allegations around gambling and tax evasion, yes.

**Q.** Now, you're not aware that the two versions of this poker ledger were never shown to anyone besides Mr. Goldstein

himself; right?

MS. REAVES: Objection.

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT: Ms. Reaves?

MS. REAVES: Thank you, Your Honor.

THE COURT: Mr. Goldstein? Counsel for the government?

All right. Go ahead, Ms. Reaves.

MS. REAVES: So again, I understand the government can lead, but they need to ask actual questions and they can't misstate facts. I believe the testimony that we have is that Mr. Goldstein didn't e-mail this record. And there are particular witnesses who were asked about whether or not they had seen it before.

The government can't stand up there and say Mr. Goldstein has never shown this poker -- this list of poker wires to anyone besides himself. The government doesn't have any basis to say that and it's misleading to ask that as a question.

THE COURT: All right. Can we kind of rephrase the question, Counsel?

MR. ADENRELE: I can try. And just to be clear about what the question is, I'm just saying this witness is not aware whether Mr. Goldstein has shown this gambling ledger to anyone.

MS. REAVES: That would be a question. That wasn't

the question he posed.

THE COURT: Okay. I mean, phrased that way is fine. I think the way it was phrased before was --

MR. ADENRELE: I apologize. If I didn't phrase it that way, I'm happy to rephrase.

THE COURT: All right. Thank you.

(Whereupon discussion concluded.)

BY MR. ADENRELE:

Q. Mr. Marks, you are not aware one way or another whether this gambling ledger has been shown to anyone besides Mr. Goldstein; right?

A. I don't know if it is a gambling ledger, and I don't know who it was shared with.

Q. You don't know one way or another whether it was shared --

A. Sorry. I should clarify my prior answer.

I do know that the tax preparers did not have this document in their records or ask for it.

Q. You anticipated my question.

Just to be clear, the tax preparers we are talking about, you are aware that Mr. Deyhle never saw this document here?

A. I have heard his testimony saying that.

Q. And you weren't told -- or among the documents that you reviewed -- that Mr. Goldstein actually lied to his accountants; right?

MS. REAVES: Objection, Your Honor.

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT: Ms. Reaves?

MS. REAVES: Yes, Your Honor.

THE COURT: Mr. Goldstein's thumb is up.

Counsel for the government?

All right. Ms. Reaves, please go ahead.

MS. REAVES: Objection is vague, speculation, and misstates the facts, lack of foundation.

I think the government has asked actual questions, not vaguely just assert it's believed that Mr. Goldstein lied.

THE COURT: Counsel for the government?

MR. ADENRELE: I think that's what a leading question is. You are allowed to ask the question -- I mean, I know it's --

THE COURT: Well, I don't think you can say lied. I mean, you can say someone testified that they didn't -- he didn't tell us, but I think characterizing as lying in a question is not appropriate. That's something, again, that the jury can look at the evidence and draw an inference and make their own conclusion.

MR. ADENRELE: Okay. Will do, Your Honor.

THE COURT: Thank you.

(Whereupon discussion concluded.)

BY MR. ADENRELE:

Q.   You weren't told that Mr. Goldstein never told his accountants that he won $50 million in 2016 in gambling, were you?

A.   Could you restate or rephrase that question?

Q.   Sure.

You were never told, and among all the documents you reviewed, you didn't learn that Mr. Goldstein earned over $50 million or around $50 million in gambling in 2016; right?

A.   I have no idea as to how much Mr. Goldstein earned from gambling in 2016.

Q.   Now, you would agree that it's probably not best practice to not provide a gambling ledger to your accountants who are responsible for reporting your gambling income; is that right?

A.   So I can only speak on best practices and standards for tax preparers, and I agree that it does not conform to the professional standards to not ask for that documentation from a tax preparer perspective.  I don't have an opinion on what a taxpayer should do.

Q.   So you have no opinion on whether a taxpayer should provide records to their accountant who is preparing their taxes?

A.   There is no -- the standards are for tax preparers, so there is -- the standards don't apply to taxpayers.

Q.   Okay.  So, if a taxpayer does not provide their bank account that they exclusively use for playing -- for income for

gambling and paying gambling debts, if a taxpayer does not provide that bank account statement or any of those statements to their accountant who is preparing their taxes, you have no opinion as to whether that's a good or bad idea?

A.    I mean, I know that's routine for taxpayers.  Like, probably many people in this courtroom do not provide their bank statements to their accountants.

I don't -- there is no professional standard that I'm aware of that would relate to that, but I know it's common practice.

Q.    I'm sorry.  You know what is common practice?

A.    For taxpayers to not provide bank statements to their tax preparers.  That would be the -- as I mentioned in my testimony, the underlying verification, tax preparers do not need to go all the way to bank statements and verify information to that level.  They can, but they are not required to.

Q.    Would that be an accurate -- if a taxpayer is attempting for their tax preparer to have accurate records, would a bank statement be a good way to do that, to provide that information to their tax preparer?

A.    It would provide one data point.  It wouldn't tell the complete story.

Q.    So just to be clear, a tax preparer receiving a bank statement from a taxpayer related to a particular tax year

would just be one data point -- just one data point that they could use to help accurately report that taxpayer's taxes.

Did I hear that right?

**A.** That's right. So, for example, Goldstein & Russell, that was the data point that Goldstein & Russell, as a firm, was providing to GRF, but that wasn't enough because they weren't asking about what the transactions were for, whether they were deductible business expenses or not. So that's why I say it's one data point. It doesn't tell a complete story.

**Q.** So if a taxpayer provides false statements to their tax preparer, it's likely that those false statements will end up on that taxpayer's tax return; right?

**A.** That's a hypothetical. There is more to it, I guess. I mean, it's possible.

**Q.** It's possible.

And you weren't told that this gambling account was never ever shared with Mr. Goldstein's assistants either; right?

**MS. REAVES:** Objection, Your Honor.

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:** All right. Ms. Reaves?

**MS. REAVES:** Thank you, Your Honor.

**THE COURT:** Mr. Goldstein, thumb's up.

Counsel for the government?

**MR. ADENRELE:** Here, Your Honor.

THE COURT: Ms. Reaves, go ahead.

MS. REAVES: So, again, the government is assuming facts that are not evidence or misstating facts. For example, we showed on cross-examination of the government's expert that Mr. Goldstein gave access to his assistant, Mr. Levitan, to this -- one of the versions of this document to have him actually do the e-mail to send to himself.

So, again, I think the government needs to ask questions and not just state its version of the facts for the witness to respond to.

THE COURT: Counsel for the government?

MR. ADENRELE: I'm not aware of evidence that this gambling ledger right here was ever shared with anyone.

But nonetheless, the witness can answer the question. If, you know -- if Ms. Reaves would like to redirect --

THE COURT: Well, I think the concern is whether we are really asking questions that accurately reflect the evidence. And I'm not going to go back and edit all the questions, but this is an expert witness who has heard some limited testimony for the time that he was here, I think, yesterday. He's already explained his scope of review was focusing on really the accounting firm and how they gathered information to prepare the taxes.

So a lot of the other discussion about the poker debts and all the other things that's not things that he apparently was

reviewing, he wasn't here for the testimony, so I think when you add all that to then a question about other evidence, it is misleading.  He really can't answer it.

So I think the question is -- I think your point is that a lot of stuff he doesn't know.

MR. ADENRELE:  Yes.  That's it.

THE COURT:  I think that he made that point, but I think framing it the way it's coming up in terms of the questions, even if they were accurate, the witness has no idea what you are talking about.  So I think that point has been made.

Go ahead, Counsel.

MR. ADENRELE:  Your Honor, that -- I'm happy to move on.

THE COURT:  Ms. Reaves, anything further from you?

MS. REAVES:  No, Your Honor.

THE COURT:  Let's all move on.

(Whereupon, discussion concluded.)

MR. ADENRELE:  Let's go to Defense Exhibit 405.

BY MR. ADENRELE:

Q.   And I believe you looked at this document on direct examination, did you not?

A.   That is correct.

Q.   And I believe you were specifically looking at the lines below the one that's highlighted now.

Do you remember that?

**A.**   I do, yes.

**Q.**   Do you know if that row 1196 and 1197, which you reviewed, you don't know whether that's charged in this case one way or another; right?

**A.**   I do not believe it was charged.

**Q.**   So the whole conversation around these transactions on these rows, 1196 and 1197, had nothing to do with the charge in this case; right?

**A.**   I would say it does have to do with the charges in this case.

**Q.**   These two lines were not charged; right?

**A.**   Correct.  There is a difference.  They are not charged, but they do have to do with the charges.

**Q.**   Happy to make the distinction.

Now, line 1195 you were not asked about; right?

**A.**   I do believe that transaction was on one of the exhibits that I was shown earlier.

**Q.**   But when we looked specifically at this exhibit, DX 405, you didn't receive any questions with respect to this transaction for $170,000 to the Chuck Pacheco corporation; right?

**A.**   Not while we were looking at this document, no.

**Q.**   Now, this transaction is charged; right?

**A.**   I believe that is one of the charged transactions.

MR. ADENRELE: Let's look at Defense Exhibit 252.

BY MR. ADENRELE:

Q. You were shown this exhibit as well on direct examination; right?

A. That's correct.

Q. Now, is the issue of whether 1099s were issued to G & R for services, is that charged in this case?

A. Could you clarify what you mean by that question?

Q. Sure.

Are there any charges in this case related to whether 1099s were issued to G & R for services?

A. There are allegations of unreported Goldstein & Russell income, which could have been transmitted via 1099s, yes.

Q. You don't know one way or another; right?

A. I know what I just said.

What's your question, specifically?

Q. The question is, are there any charges in this case that are specifically about 1099s issued to G & R for services?

A. Well, if -- if you are asking whether G & R is being charged with not receiving 1099s, that wouldn't really make sense because, if anything, you would charge the person who should have issued the 1099.

Q. So it sounds like the answer is no?

A. Your question does not make a lot of sense to me.

Q. That makes sense.

So you went through a number of errors that you are saying that GRF made. Did I hear that right?

A. Yes.

Q. It seems like for number of those errors, you aren't able to make any direct connections between the errors you are claiming you found and the charges in this case; right?

A. No. There are definitely connections.

Q. Now, if a taxpayer, again, makes false statements to their accountant, the accountant isn't responsible for figuring out how to unearth the truth of those false statements; right?

A. If the tax preparer believes the statement is incomplete or incorrect, they are obliged to follow up on it.

Q. But my question was, if a taxpayer makes a false statement to an accountant, is the accountant responsible for unearthing the truth of the false statement?

A. As I mentioned, it depends on if the -- if the accountant thinks it is a complete and accurate statement and that they don't need any more information, then I agree with you that they don't need to go beyond that.

If they feel that the information they have is incomplete or inaccurate in some way, then they do have a duty to do more work.

MR. ADENRELE: No further questions.

THE COURT: Thank you very much.

Does the defense wish to conduct any redirect of the

witness?

MS. REAVES: Just briefly, Your Honor.

REDIRECT EXAMINATION

BY MS. REAVES:

Q. Mr. Marks, you were asked a number of questions about things that you didn't review in this case.

Do you remember that?

A. Yes.

Q. Can you remind us, what was the scope of your assignment and your testimony for today?

A. The scope of my assignment, again, was to evaluate the conduct of GRF, the tax preparer, and determine whether their actions, their level of inquiry or their failure to ask inquiries, if that was all in compliant with tax preparation standards and best practices.

Q. So the grand jury transcripts for Ian Shuman and Walter Deyhle that you reviewed, who are they to -- why are these transcripts relevant to your analysis of GRF's conduct?

A. Mr. Deyhle was the tax preparer for both Goldstein & Russell and Mr. Goldstein personally. He signed both of those tax returns for both of those entities, I should say.

Mr. Ian Shuman was responsible for doing the bookkeeping of Goldstein & Russell, which fed directly into the tax returns for Goldstein & Russell. So those would be the two relevant witnesses from GRF for me to understand what procedures they

were or were not doing.

Q.   All right.  In order to evaluate the conduct of GRF's services, did you need to review witness statement from Mr. Goldstein's prior accountant in 2010?

A.   No.

Q.   You were asked some questions about your firm's compensation.

Do you remember those questions?

A.   I do remember.

Q.   Are you directly compensated for your work in this case?

A.   No.  I'm a salaried employment of FTI.  My compensation is not at all tied to this case.

Q.   And is your compensation or your firm's compensation dependent on the outcome of this case?

A.   No.

Q.   You were asked a number of questions about the fact that you are not -- you have not professionally practiced as a tax preparer.

Do you remember that?

A.   Yes.

Q.   Can you tell us what your qualifications are for conducting the analysis and providing the opinion that you provided in this case?

A.   Sure.  I mean, there is a lot I could say about that.

As I mentioned, I have a degree in accounting.  I learned

about taxes.  I have taken continuing education on taxes ever since I graduated college.  I am a CPA, which involves being tested on taxation and tax preparation, and I passed that test. I have worked on several tax fraud investigations.  Tax returns are a key part of the investigations and matters that I work on.  I have specifically investigated tax preparers.  I have specifically worked on tax evasion investigations for the prosecution, where we had to determine whether an error on a tax return stemmed from a mistake by the tax preparer or the taxpayer.  So this is all very much within my experience.

**Q.**  And how long have you been working on tax fraud and financial investigations?

**A.**  Approximately, 12 years.

**Q.**  You were asked some questions about 1099s.

Do you remember those questions about whether they related to the charges in this case?

**A.**  Yes.

**Q.**  Can you tell us why you said that they are related to the charges in this case?

**A.**  Yes.  So, again, we saw the instruction from GRF that 1099s do not need to -- if Goldstein & Russell receives a 1099, that does not need to be kept.  And, in fact, if it's sent to GRF, that they wouldn't keep it anyway.

So Goldstein & Russell -- sorry.  GRF's procedures when it came to Goldstein & Russell is that they relied on the bank

accounts. That was their procedure. They looked at the bank account data, and credit cards and other statements like that, to identify the -- to do the bookkeeping, which, again, flow directly into the tax return.

However, as, obviously, we all know is being alleged in this case, that it's being alleged that there is items of income for Goldstein & Russell that did not hit those bank accounts. And so one of the ways that you would be able to identify those sources of income as a tax preparer is looking at the 1099s, not discarding them, and secondarily, asking your client if they had income outside of the bank account.

**Q.** And going back, you were asked some questions about the documents that you reviewed in this case and that you did not review all of the documents that might be relevant to the case more broadly.

How did you decide which documents to review for your analysis and for your testimony today?

**A.** I asked -- I looked for any documents that contained information on GRF's procedures, that -- their work papers. I specifically looked for correspondences about the specific charged transactions. As I mentioned in my testimony, I did not find instances where GRF asked the right questions regarding the charged transactions.

**MS. REAVES:** Now, can we pull up Government's Exhibit 48, please?

**BY MS. REAVES:**

**Q.** The government showed one of the examples of the QuickBook records and asked some questions about a payment in 2019 to someone named Chuck Pacheco.

Do you remember that?

**A.** I do.

**MS. REAVES:** If we can look at Government Exhibit 48, Mr. Cook? Thank you. If we can blow this up.

**BY MS. REAVES:**

**Q.** Do you see the payment, the outflow that the government referenced in their cross-examination in Government's Exhibit 48?

**A.** I do, yes.

**Q.** So we discussed this on direct examination?

**A.** Yes.

**Q.** To be clear, for these eight charged transactions, did you find any documentation of GRF asking someone at Goldstein & Russell whether these eight charged transactions were classified correctly?

**A.** I did not see any -- any such correspondence.

**Q.** I want to ask you -- you testified that you were in court yesterday for Mr. Deyhle's testimony.

Do you remember that?

**A.** Yes.

**Q.** At the end of his testimony, do you remember that

Mr. Deyhle said that he thought he had done a good job with respect to these tax returns.

Do you remember that?

A.   Yes.

Q.   What is your opinion as to whether Mr. Deyhle had done a good job with these tax returns?

A.   You would be hard pressed to say that someone did a good job when they didn't comply with the professional standards. So, in my opinion, I would say he did not do a good job.

And some of the mistakes that we saw today were very significant in dollar value and would have -- and did -- were significant to the tax returns.

Q.   Tell us again, what are the standards that Mr. Deyhle, at least in some significant respects, failed to follow?

A.   Again, he failed -- so with the AICPA standards -- and Mr. Deyhle is a CPA.  He's also a member of the AICPA, so these standards are completely binding upon him.

There was multiple standards, of course, but just at a very high level, again, he did not make reasonable efforts and ask the reasonable questions that a taxpayer preparer is supposed to do.  A tax preparer is supposed to be asking questions and gathering information and helping their clients understand what information needs to be provided, and that was just not done by Mr. Deyhle.  And as we saw in the 2016 e-mail chain about the tax organizer, you know, he actually intervened

to prevent getting information.

So, again, that is just not compliant with that. And all of the errors that were made are specific instances of GRF ignoring the information that Goldstein & Russell was providing them, which, again, that's another violation of the standards.

**MS. REAVES:** Thank you, Mr. Marks.

No further questions.

**THE COURT:** Thank you very much, Ms. Reaves.

Have all questions been asked of the witness?

**MR. ADENRELE:** Nothing further from the government, Your Honor.

**THE COURT:** Very good.

Well, Mr. Marks, thank you very much for your testimony and time. You may step down and be excused.

Have a good evening.

**THE WITNESS:** Thank you.

(Witness excused.)

- - -

**THE COURT:** Counsel, given the time, I think this might be an appropriate time to wrap up for the day.

Is there is any objection to doing to?

**MR. KRAVIS:** No objection.

**MR. ADENRELE:** No objection, Your Honor.

**THE COURT:** Members of the jury, I hear the rustling already. Before you do step away, just a few gentle reminders.

Again, do not talk about the case with your fellow jurors or anyone else while you are on your break.  Do not read anything about the case or listen to something in the news about the case, and do not conduct any independent research.

We will come together again next Monday at our usual time and continue with the trial.  I wish you a safe and pleasant weekend.

Please rise for the jury.

(Whereupon, the jury exited the courtroom at 4:46 p.m.)

**THE COURT:**  Please be seated.

Counsel, before we break for the long weekend, I just want to get a sense of where we are.  I believe we completed the two witnesses the defense wished to present out of order.

So we are now back in the government's case in chief, Mr. Beaty, as I understand it; is that correct?

**MR. BEATY:**  As I understand it -- that's how I understand it as well.

**THE COURT:**  Where are we in the case in chief?

**MR. BEATY:**  I think we are doing pretty good, Judge. We got through all of this today and that was great.

I imagine that we will have -- I will try look up the list, but Mr. Shuman and I believe Mr. Anthony on Monday. Those are --

**THE COURT:**  I'm sorry.  I heard Anthony, and I thought you said something else.

**MR. BEATY:** Shuman and Anthony.

**THE COURT:** Oh, Shuman.

**MR. BEATY:** I believe Flack, who is a summary witness, and I think the last one a Ranahan. So I think we are at four witnesses. I don't know if they will all get done on Monday, but I think Monday or Tuesday.

**THE COURT:** So we will hopefully rest by Tuesday?

**MR. BEATY:** Here's hoping.

**THE COURT:** All right. Thank you.

**MR. BEATY:** Thank you.

**THE COURT:** It looks like next week the government is going to rest its case.

Mr. Kravis, what's it looking like for the defense?

**MR. KRAVIS:** We will be ready to begin. It sounds like the defense does not need to have a witness here on Monday. We will be ready to begin the defense case on Tuesday.

At this point -- may I just have a moment?

I would say our estimate at this point is somewhere between a day and a half and two days. That's assuming that Mr. Goldstein does not testify.

**THE COURT:** All right. So you will be ready to go on Tuesday, assuming we get through the government's case in chief and they rest by Tuesday. A day and a half -- I'll say two days of testimony at this point. We will talk about the other piece a little closer to time.

MR. KRAVIS: Right.

THE COURT: In between, of course, we do have the motion for acquittal, if you want to do that. I don't know how long you want to spend on that, but that will be a little bit of time outside the presence of the jury once the government rests. So if we can rest maybe on Monday, that would work nicely. If not, it might be later in the day on Tuesday before you can get started.

MR. KRAVIS: Your Honor, we would like to be heard on the MJOA. We will plan to file something.

THE COURT: The MJOA?

MR. KRAVIS: I'm sorry. The motion at the conclusion of the government's case.

THE COURT: Of course, you will be. And that's standard practice. I'm just flagging that in this case, they seem to be pretty meaty issues, and so there will be some time. The Court has some flexibility about that as well, but I want to make sure we pigeonhole some time for that before we get into your case.

MR. KRAVIS: Yes. Thank you, Your Honor.

THE COURT: Maybe Tuesday we will get started with the defense's case, and if it goes as currently planned, we might wrap up next week with the defense's case. We will see where we are, and we will have further conversations about that once we get going with your case.

MR. KRAVIS: Thank you, Your Honor.

THE COURT: I do want to also just flag in terms of wrapping the case up, I think we have a number of issues to work out during the charge conference, and so I do hope the parties can start thinking about those.

One request I will have, there was an instruction from Ms. Bart that the Court gave. If someone could e-mail that to chambers so we can go ahead and put that in our version, and we will send back around to everyone what we have so we're on the same page. I believe that was the only instruction that has happened since we have been in trial. But I do think that is going to take some time to work through, so I'm going to flag that as one of the terms of that process.

I do the charge conference and work out those issues before you close, so just keep that in mind in terms of timing.

The following week will be, as you know, a short week because of the holiday. All right.

So I'll see everyone -- any other issues?

Mr. Beaty, you are still standing.

MR. BEATY: I'm just stretching.

THE COURT: I think the Court still needs paper from the government on the substance of the Brady issue, and I will await receiving that before I talk about that any further.

MR. BEATY: Yes, Your Honor.

THE COURT: I believe that's the only outstanding

issue in terms of paper.

We did have, I think, another motion the defense had filed that we are deferring to the charge conference because it relates to jury instructions but, again, I think those are a number of issues we are going to have to work through during the charge conference.

I don't think I have anything else.

Anything else from the government?

MR. BEATY: We are in the home stretch.

THE COURT: I like that.

Mr. Kravis, anything else from you?

Oh, Mr. Whitman. See, I was too quick.

Go ahead, Mr. Whitman.

MR. WHITMAN: I'm the last person standing between us and getting out of here, so I will be quick.

Again, the government would just reiterate that the door has clearly been opened now on 2022 through 2024. We will put something on papers for Your Honor to review but, really, this has sounded more like a civil lawsuit against GRF the last few days, and that's kind of what we previewed in the prior briefing. And we will reiterate it now, but that's going to be the government's position.

THE COURT: Well, give me some paper, and we will talk about it.

Mr. Kravis, anything else from you?

**MR. KRAVIS:** Just wanted to mention that there were the -- there were a couple of issues that -- I think I mentioned this yesterday at the end of the day. A few issues that came up during the week that we will be filing on, and the Court should expect that from us in the next few days.

**THE COURT:** It would be helpful to get whatever papers the parties want to submit in by the end of next week so I can have time to look at them. Many of these instructions will impact jury instructions, and so it's hopeful to kind of have the paper ahead of time.

So if you can consolidate them as much as possible. Just give me one thing from each side. That will be helpful. I will look at it, and we will spend some time on that when we get to the charge conference.

Again, I want to thank everyone for their hard work. I think we're on week four now in this trial. I've lost track, but I know it's been quite a while, and I do appreciate the hard work of all counsel and, of course, Mr. Goldstein's presence each day as well.

Have a great weekend. I will see everyone on Monday at 9:30.

**DEPUTY CLERK:** All rise. This Honorable Court stands adjourned. Thank you.

(Proceedings concluded at 4:53 p.m.)

- - -

C E R T I F I C A T E

I, KIMBERLY A. BURSNER, Federal Official Court Reporter in and for the United States District Court for the District of Maryland, do hereby certify, pursuant to 28 U.S.C. §753, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

*Kimberly Bursner*

_____
Kimberly A. Bursner
Registered Professional
Reporter & Federal
Official Court Reporter