IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

_____

UNITED STATES OF AMERICA　　　)
　　　　　　　　　　　　　　　　)
　　　Plaintiff,　　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　vs.　　　　　　　　　　)Case Number
　　　　　　　　　　　　　　　　)8:25-cr-00006-LKG-1
THOMAS C. GOLDSTEIN　　　　　　)
　　　　　　　　　　　　　　　　)
　　　Defendant.　　　　　　　　)

TRANSCRIPT OF JURY TRIAL - DAY 16
BEFORE THE HONORABLE LYDIA K. GRIGGSBY
UNITED STATE DISTRICT JUDGE
WEDNESDAY, FEBRUARY 11, 2026 at 9:37 a.m.

APPEARANCES:

On Behalf of the Plaintiff:

　　　　UNITED STATES ATTORNEY'S OFFICE - DOJ
　　　　BY:　ADEYEMI ADENRELE, ESQUIRE
　　　　　　SEAN BEATY, ESQUIRE
　　　　　　SEAN GORDON-MARVIN, ESQUIRE
　　　　　　HAYTER WHITMAN, ESQUIRE
　　　　36 South Charles Street, Suite 400
　　　　Baltimore, Maryland 21201
　　　　(410) 209-4800

On Behalf of the Defendant:

　　　　MUNGER, TOLLES & OLSON, LLP
　　　　BY:　STEPHANY REAVES COUPER, ESQUIRE
　　　　　　ADEEL MOHAMMADI, ESQUIRE
　　　　　　JONATHAN I. KRAVIS, ESQUIRE
　　　　　　SARAH WEINER, ESQUIRE
　　　　601 Massachusetts Avenue NW, Suite 5E
　　　　Washington, DC 20001
　　　　(202) 220-1126

- - -

ALSO PRESENT:
　　　　　THOMAS C. GOLDSTEIN, DEFENDANT
　　　　　JIMMY MENDOZA, PARALEGAL
　　　　　ROBERT RESTO, PARALEGAL
　　***COMPUTER AIDED TRANSCRIPTION OF STENOTYPE NOTES***

                    I N D E X

**DEFENDANT'S TESTIMONY:**

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **THOMAS C. GOLDSTEIN** | **101** | * | * | * |

                    – – –

**DEPUTY CLERK:** All rise. The United States District Court for the District of Maryland is now in session. The Honorable Lydia Kay Griggsby presiding.

**THE COURT:** Good morning, everyone.

Please be seated. Welcome back.

On yesterday, the government rested its case in chief, and we began a discussion about our next steps in the case. They include addressing, I believe, really two motions filed by the defense.

First, the motion for acquittal under Rule 29. The Court has now received the government's written response. Thank you very much. That was very helpful to have. And so I am prepared to hear argument on that motion today and at least give a preliminary ruling on the motion before we go forward. I think we are likely going forward regardless of what the Court rules.

I read the motion to kind of address aspects of the charges, but not to actually seek acquittal on many of the charges. So I think some matters will clearly be going forward anyway. So we will turn to the defense's case a little later today. The Court understands that Mr. Goldstein intends to testify, and that he may be the only witness that the defense wishes to present.

So before we get to his testimony, the Court will have a brief conversation with Mr. Goldstein about his intention to

testify. And I think we'll also need to resolve the motion in limine and some of the issues with the text messages. So hopefully the Court can give some guidance before we begin his testimony.

I know that these issues, again, are being briefed or looked at pretty quickly, so we may have to work some of it as we move through his testimony. But my hope is we can maybe get some ground rules on some of these issues, mainly hearsay issues up front. And so I am also prepared to talk about that.

I will say I did read it. I had a lot of paper to read last night. I did read it, and I think we're going to have to kind of work through the text messages one by one and sort out what's in and what's out based upon the various hearsay exceptions or arguments that the texts are not hearsay.

So with that, I believe that's all that the Court has at this time. As you know, the jury will be joining us at 10:30. If we're ready for them then, we'll have them. We may need a little bit more time, but they will be arriving around 10:30, and hopefully, we can get started relatively soon with the rest of the trial.

With that, are there any preliminary issues from either party before we get into the motion for acquittal?

**MR. KRAVIS:** Your Honor, no preliminary issues. I just want to make one note to make sure we were clear. Mr. Goldstein is the only witness we're calling today. Based

on -- we expect that his testimony will take up the day today and maybe part of the day tomorrow. I do expect we will have additional witnesses to call in the defense case. I just don't think we're going to get to them today.

THE COURT: Okay. Thank you for clarifying because that was my question from yesterday. I misunderstood. That's helpful.

Counsel for the government?

MR. ADENRELE: Your Honor, just very briefly. Although we did receive the motion in limine, I think, close to midnight last night, the government had a few comments with respect to that motion in limine.

Indeed, I hear Your Honor's point we can work through these text messages point by point. However, I did want to make one kind of overarching argument with respect to the hearsay matter. I don't know if now is the right time to be heard or later.

THE COURT: Why don't we do it when we get to that motion?

MR. ADENRELE: Understood.

THE COURT: And then we can deal with those issues altogether. I'd like to deal with the motion for acquittal first.

MR. ADENRELE: Indeed. Thank you, Your Honor.

THE COURT: Anything else from the government?

**MR. ADENRELE:** Nothing else.

**THE COURT:** Okay. And I apologize. My voice is fading on me today. So I'm sipping tea. Please excuse me.

All right. Mr. Kravis, do you want to talk about your motion for acquittal? And I guess, before you begin, or, Counsel, I want to share a few initial thoughts.

I did read this last night. It was a long night. So I'm kind of sharing this to make sure I haven't misunderstood the motion.

The Court reads the motion primarily to be moving for acquittal with regards to the tax charges in this case, tax evasion, false tax returns and the willful failure to pay, and largely attacking, at least some of the allegations or theories the government has advanced to support those charges.

As we've been talking about throughout the trial, for many of the tax charges, there are multiple factual allegations and multiple theories that the government has relied upon in the superseding indictment to support the charges. And the Court reads quite a bit of the motion to be pointing out from the defense's point of view where they believe the evidence is insufficient to support some of those factual allegations. Notably, with the tax evasion count, what were the affirmative acts to support that. And the defense, I think, has some arguments about at least some areas where they believe the evidence is insufficient.

So I raise this up front to say broadly I read this to kind of seeking partial acquittal on pieces of the case. I'm not sure if that's really appropriate venue for Rule 29 discussion, but I'm certainly happy to hear argument on that as well. But it looks to me as if, even if the Court agrees with most of what's in the motion, we're going to have many tax charges still kind of hanging out there at least for now.

I just flag that now because there is also an opportunity at the conclusion of the defense's case to renew this motion, and there is also an opportunity, even after trial if necessary, to renew the motion. And so I just want to lay that out that there maybe needs to renew or continue our discussion once the Court hears the defense's case.

With that, I've said all I want to say.

Good morning. Go ahead.

**MS. WEINER:** Good morning, Your Honor. Just to make sure our record is clear and because there are some weird preservation rules under Route 29, the defense is moving under Rule 29 for a motion of judgment of acquittal as to all counts on all grounds, including because the evidence is insufficient to sustain a conviction.

That said, we agree with Your Honor that there are arguments that we have made that we believe are much stronger and perhaps appropriate for discussion now and others that may be more appropriate for discussion later. We've highlighted

those in our motion. And in fact, in this presentation, I might like to focus on even a smaller subset of those. I was hoping to talk about the interest in 401K income, the IOLTA affirmative act, the diverted fees allegations, the separately reported gambling wins and losses allegations, and, depending if we still have steam after all that, the willful failure to pay.

THE COURT: Let me ask you some clarifying things first before we get into this.

Since you're going to focus on particular aspects of some of the tax charges, in the alternative, the government -- I'm sorry -- the defense is moving for jury instructions. We'll talk about that later.

But I guess I'm trying to understand, at this point, what is the remedy you're asking because I'm not yet -- I don't have yet before me the arguments to acquit on those charges altogether.

So what are you asking for the Court at this point?

MS. WEINER: I totally understand. I'd probably ask there's a motion -- is a partial motion for judgment of acquittal.

We've cited a couple cases to the Court where courts indicated that that was something that was possible. There's a Seventh Circuit case to that effect. It doesn't come up a lot.

However, if that's not something that the Court is

comfortable with, we still think it's important that we have this discussion now because, if there are legal theories that are invalid that, at the jury instruction stage, the government is not going to be able to ask the jury to convict Mr. Goldstein upon, those are lines of inquiry, for example, that should not be pursued while Mr. Goldstein is on the stand.

Those are lines of inquiry that we need to be really careful that don't show up in closings. And if counsel is in favor of a special verdict form, because, if we get a verdict back from the jury that just says guilty on Count One, and there are some invalid affirmative acts that are closed on and some that are not, we're not going to know what the jury did on that.

**THE COURT:** And I take your point on the verdict form. And that was one of the other observations the Court was going to make that I think some of this does speak to the verdict form. And I believe we have a draft special verdict form that might need some tweaks, but I take your point that that's an important one.

Go ahead.

**MS. WEINER:** Yes, Your Honor. And we have also tried both in this motion and the motion about uncharged acts that we filed yesterday or the day before, you know, time expands and contracts. Lay out what we --

**THE COURT:** If you're losing track, imagine how I'm

feeling at this point.

MS. WEINER: We have laid out what we think are the acts of assistance that are charged in the indictment, that table we put together. The government hasn't said that they think that's wrong, so that's what we think the universe is. To be clear, we're -- anything that's not there, we're still moving on. We don't think there is evidence of it.

But for everyone to be on the same page, that's what we think the case is now. It's the eight affirmative acts charged in Count One. It's that like 13 acts of assistance that are charged in Counts Two through Nine, and then the willful failure to pay counts, the mortgage counts, are a little easier to wrap your arms around in terms of the content, Judge.

THE COURT: And are you moving right now on the mortgage fraud counts? I saw a footnote that seemed to indicate that, but nothing in the body of the motion.

MS. WEINER: Formally, yes, we are moving on all counts.

THE COURT: Okay.

MS. WEINER: I understand the rule to be that there's some concern that, if we don't move on all counts, then perhaps it is waived going forward. But what we would like to focus on today is not the mortgage counts. Let me answer your question that way.

Maybe I'll start with -- start with the interest income

and the 401K income, unless they're more sort of preliminary procedural matters.

**THE COURT:** So are we now moving to the false tax return or --

**MS. WEINER:** Yeah. Or is there an order that Your Honor would prefer?

**THE COURT:** Let me tell you what I think was in the motion, and again, I read this last night and again this morning, so feel free to correct me.

I read, again, arguments related to the three big-bucket tax charges: Tax evasion, which is now just Count One, 2016; the false tax return, Counts Two through Nine and several arguments there; and then the willful failure to pay counts, Ten through Thirteen.

I saw an argument about the issue of willfulness, which has come up a lot in this case, and also some constitutional arguments at the end. Then there were some other points later on that we've dealt with previously about due process, et cetera.

So on the tax evasion, I guess, for me, it would be helpful to start there just to follow along your position. That would also match, I think, how the government's prepared its brief. What I understood the defense to be arguing again is that there's insufficient evidence on willfulness.

We've been talking about that a lot, particularly related

to two items:  The funds that were transferred into the Goldstein & Russell IOLTA account sometime in March of 2021, as I recall, and then statements that are alleged to be false that Mr. Goldstein made to IRS Agent Parrish that she testified about earlier in the trial.

And the Court generally read those to be areas where the defense thought they were not supported and couldn't show willfulness.  Okay.

MS. WEINER:  Yeah.  So let me start there.  So on the IOLTA charge or the affirmative act, I should say, there are two issues with the government's evidence.  And I think both of them are sort of independently sufficient to show that this charge is invalid.

The first is that the government's theory is that Mr. Goldstein evaded payment, not assessment, of his 2016 taxes by moving funds into the IOLTA account.  But the evidence at trial showed that that happened over a long weekend.  It was Friday to Monday.

But even putting that aside, the evidence is that the IRS was not levying Mr. Goldstein's accounts at that time, hadn't been levying Mr. Goldstein's accounts since May of 2019, for almost two years.  Then you can see that that's GX 73.  That's the tax transcript.  So it is literally in --

THE COURT:  So does it not matter whether Mr. Goldstein thought that his accounts might be levied at that

time, because I know there's been some evidence about that as well?

MS. WEINER: Yeah. I don't think it does. Like that's a legal impossibility. So we cited this case. There is a Fourth Circuit case, *Hamrick* at 43 F.3d 877. It says, "The defense of legal impossibility is available where the defendant's acts, even if fully carried out as attended, would not constitute a crime."

So, if the IRS isn't levying accounts, it just can't matter what accounts he's moving his money into because the IRS isn't taking money out of those accounts. As a factual matter, I also don't think the allegation that he thought his accounts might be levied so he was moving the money around makes a lot of sense. Like that was something that his accountant told to his assistant. There is no evidence that the assistant said that to Mr. Goldstein, that Mr. Goldstein thought that his accounts were going to be levied. But I understand that that gets sort of closer to the factual line.

THE COURT: And let me ask kind of the other piece of that. Does it matter if the IRS could have levied the accounts at that time?

MS. WEINER: It might matter if the IRS could have levied the accounts at the time. Again, I don't think that Mr. Goldstein could have been willfully evading payment if the IRS was not levying, because, like, maybe if they had restarted

levying and that's when the money was in the account. Again, it was in the account for like four -- the IOLTA account for like four days.

But on that point, I think this is sort of an academic question because also -- and this is the second, like, reason this doesn't work -- the government put on no evidence that it could not have levied G & R's IOLTA account. Like, as a factual matter, there is no testimony to that effect. The IRS could have levied that.

THE COURT: I guess, again, just in terms of what is the relevant evidence, on willfulness, basically we are trying to get into Mr. Goldstein's head and find out what he was thinking, why he did certain -- why he took the affirmative acts, and the affirmative acts are being put on as evidence to show his state of mind, essentially.

So, I guess, back to my first question, if Mr. Goldstein -- if there was evidence to show that Mr. Goldstein believed his other accounts were being levied or could be levied by the IRS, is that sufficient, even if they factually were not, because we're looking at what he thought; right? No?

MS. WEINER: So that gets us back to the legal impossibility thing. And I think that scopes out beyond willfulness. That is just a defense to the crime. If it was legally impossible for him to have evaded payment of taxes by

moving his funds into an account that the IRS could have levied but wasn't levying, like, there is just no crime. It doesn't matter what he thought he might have been doing. It's legally impossible for that to have violated 7201.

That said, there is also no evidence that Mr. Goldstein thought the IRS couldn't levy his IOLTA. We cited a couple cases in our brief that show that the IRS has, in fact, levied IOLTA accounts.

So at this time, the government's theory is that over a long weekend, Mr. Goldstein willfully evaded payment of his 2016 taxes by moving money into an account that the IRS -- when the IRS wasn't levying any accounts, and when the IRS could have levied that account, and then one month later Mr. Goldstein paid off the entirety of his 2016 tax debt.

So I just -- like, we are just not adding up to a willful act of tax evasion. Just, like, the pieces aren't there.

**THE COURT:** Let's talk about IRS Agent Parrish. I think that's your second point under this a tax evasion charge.

**MS. WEINER:** Yes.

**THE COURT:** Again, I think there was some -- she testified about her conversations with Mr. Goldstein when they began the investigation and she had the visit with Mr. Goldstein. I think the government will point to testimony about how Mr. Goldstein characterized his income for 2016 or failed to fully characterize the income. I believe the defense

argues that's also insufficient to show willfulness.

Can you explain a little bit more?

**MS. WEINER:** Yes. So Mr. Goldstein can't have evaded -- as a legal matter, can't have evaded payment of his taxes by failing to tell Officer Parrish something that the IRS already knew. The evidence at trial showed that his 2016 tax returns did disclose gambling winnings.

I understand that the government's theory is that he did not disclose enough gambling winnings. But the evasion of payment theory here is that somehow Officer Parrish just, like, did not know that he had gambling income in 2016. That's just wrong. That's on his tax return.

Now, she testified that she didn't look at his tax return, but there is no -- but Mr. Goldstein --

**THE COURT:** So your view is that the IRS globally was aware of this, and so her personal information is not relevant to showing that he lied to her?

**MS. WEINER:** Right. And the case we have for that is --

**THE COURT:** But you agree the evidence showed that he did not disclose to her the poker winnings during the discussions?

**MS. WEINER:** I disagree -- well, I agree the evidence shows that he did not have a conversation with her where he disclosed poker winnings. I disagree with the government's

characterization that Mr. Goldstein said something untrue to Officer Parrish, certainly not something that he thought was untrue because what Officer Parrish asked him about was the reason for his balance.

So this is at GX 19. That is that long thing where she -- she actually said she asked the taxpayer about the reason for his balance, not why his 2016 tax bill was large, but why he hadn't paid it yet. So Mr. Goldstein's answer, which was honest, was that at that time, in March of 2018, he was having cash flow issues because of a big legal case.

So I understand the government thinks that Officer Parrish asked one version of the question. Mr. Goldstein answered another version of the question, but given, like, it's fundamentally ambiguous, no reasonable jury could conclude based on that that it is beyond a reasonable doubt that Mr. Goldstein knew what she was asking and decided to lie because he had a willful intent to evade payment of his taxes, like, again, by failing to tell Officer Parrish something that he had already put on his tax returns.

Even if that is not -- does not legally foreclose this charge, and we think it does, certainly it undermines the willfulness theory to the point of zero. Why would Mr. Goldstein have not told her about gambling winnings? He had already disclosed to the IRS gambling winnings.

I did want to add just quick, there is that Second Circuit

case, *Romano* -- that's 938 F.2d 1569 -- that does treat the IRS as sort a single entity for purposes of thinking about tax evasion.

In that case, someone was coming across -- someone was coming across the border with a large amount of cash, which, you know, that is actually not why this is factually interesting. And he didn't -- and there was an allegation that afterward -- so the IRS officers at the border, custom border, like, knew about the cash, handed him some thing that said that they were going to record it or report it, and then later, that defendant didn't file a turn.

The Court said that failing to file that tax return could not have been an act of evasion because it would have provided only -- and now I'm quoting -- "information that the government already had and which the defendant knew the government had."

So, again, it is just sort of like, as a legal matter, not possible for Mr. Goldstein to have evaded taxes by not telling Officer Parrish something that he had already told the IRS.

And then including -- and there is a second sort of -- there is no evidence to show willfulness because it does not actually seem like he told Officer Parrish anything incorrect.

**THE COURT:** As to this particular affirmative act?

**MS. WEINER:** Yes. Yes.

So those two affirmative acts that we just talked about, just to sort of orient us, are the only two affirmative acts

that would go to evasion of payment. All of the other affirmative acts, as I understand it -- and I didn't read the government's brief, which admittedly I read pretty quickly this morning, to sort of dispute that understanding.

So if we are right about those two, there is no more evasion of payment theory in the case. It's only evasion of assessment.

And it is also the case those are two of three affirmative acts of evasion that come after January 1, 2018. As Your Honor knows, that is important because that is when the statute of the stipulation begins to run. So that puts sort of all the pressure -- the only way that this case is within the statute of limitations is if that October 2020 meeting with the IRS agents was an affirmative act.

**THE COURT:** I think the government also addresses in its response, the other issue that I saw in your discussion of tax evasion has to do with the use of the firm's funds to pay debts. I guess personal debts or gambling debts.

Again, I think, as I read the argument, it seems that what your argument said is that there is not evidence to show that Mr. Goldstein was directing people to, you know, mischaracterizing the payments or trying to hide what they were for.

**MS. WEINER:** Right. So I don't even think the government will disagree. I think, like, Officer -- Agent

Ranahan testified to this yesterday. There is no evidence in this case as to the 2016 mischaracterized transactions or -- which are in the tax evasion count -- or the 2017 or 2019 mischaracterized transactions. There is one of each of those relevant to the false charges counts.

No evidence on any of those eight transactions that Mr. Goldstein told the office manager, told the accountants, told anyone how to characterize those transactions.

So in 2016, at least, the government's whole theory hinges on this single e-mail that Molly Runkle sent to him on December 27. That's GX 18.

In the government's presentation, they showed the jury all these e-mails that Ms. Runkle had had with Jill Leonard at GRF, and she was explaining this spreadsheet that was attached to the e-mail. But Mr. Goldstein did not see any of that. The evidence is clear that he didn't say any of that.

So from Mr. Goldstein's perspective, this e-mail correspondence proceeds as follows. He asks for, quote, how much we sent in wires of 40K or more to individuals like Dan Bilzerian in 2016? Mr. Runkle clarifies the request. Eventually, she responds to his e-mail and she attaches two spreadsheets. One is called G & R wires, and one is called wires from Wells and Bilzerian, et cetera, 2016 spreadsheet. So the Bilzerian spreadsheet is the one Mr. Goldstein asked for.

In her e-mail, she is explaining how that spreadsheet came to be, and then a single sentence she says parenthetically, quote, I've also attached a general breakdown of firm wires this year from Joe.

So the government's theory is that Mr. Goldstein, like, opened that e-mail, which, by the way, he never responded to, opened that G & R wires spreadsheet, which he hadn't asked to see, navigated to the legal fees tab, and then scrutinized every transaction on that list, and then realized, oh, shoot, they've reported some payments as legal fees when they actually should have been personal distributions.

And there is just, like, no proof beyond a reasonable doubt that any reasonable jury could come to to think that Mr. Goldstein did any of that. He got an e-mail. He didn't respond to it. It attached a document he hadn't asked for.

So I think the government's fallback position on tax evasion has to be that Mr. Goldstein willfully evaded taxes by arranging his financial affairs in some way that he knew would cause GRF to make these errors. That was sort of the theory that was promised when we were sort of doing the pretrial motions to dismiss on these affirmative acts.

But now the government's case is closed and there is, like -- that is a tough theory to prove, and they don't have any evidence of that. They would have to show that Mr. Goldstein's use of the G & R account to make personal

payments would have the likely effect of producing inaccurate deductions. That is that *Goodyear* case, 649 F.2d 228. They just can't do that. They can't meet the likely effect standard because there is no evidence that the majority of G & R's wires for personal purposes were incorrectly characterized.

What happened was, like, six mistakes. And it is the case that those mistakes would not have happened if Mr. Goldstein had kept his firm money and personal money separate. Totally get that. That was not prudent. Might have been negligent. But it is not a criminal act of willful tax evasion, and we don't think any reasonable jury could come to that conclusion.

THE COURT: Okay.

MS. WEINER: That's the end of tax evasion. Should we do --

THE COURT: Let's go to false tax returns.

MS. WEINER: All right.

So the first item that we talked about under false tax returns -- I'll combine them because our arguments are the same -- this is interest income and 401K income.

The indictment alleges there are two years, 2017, 2018, where Mr. Goldstein omitted interest income, and one year where we forget to include -- well, the indictment alleges he willfully didn't include -- income from a retirement account, like a distribution he took from the retirement. Honestly, I don't quite understand it because, again, it was only in the

indictment.

But the government didn't put any evidence on about this. I read their brief this morning to say, well, there are documents in evidence that he did receive interest income and he didn't report it, but what they point to is evidence of willfulness. Like, sometimes people forget to report income on their tax returns, especially the interest income for one year was $263.

The inference that this was willful is just silly. Like, as we know --

THE COURT: So you agree there is evidence that the income was not reported. You're arguing that it does not demonstrate willfulness?

MS. WEINER: There is zero evidence that it willfully was not reported.

THE COURT: But you agree that it was not captured as interest income in the 401K?

MS. WEINER: I agree it wasn't captured. Yeah. And if is the evidence had been presented in the government's case in chief, we would have elicited evidence in response that the IRS sent Mr. Goldstein, like, a notice of deficiency on these two items, in fact. That letter said -- excuse me -- you don't have to refile. Just send us the money. And as soon -- like, within a month of getting that, Mr. Goldstein sent the money.

So there is -- so we didn't see this evidence because the government didn't attempt to show willfulness.  If it had, we think we would have had responses.  But the fact that they didn't show it to begin with, no reasonable jury could look at this mistake and think, yep, that is a crime.  Mr. Goldstein knew he wasn't telling the IRS about interest income, knew he was not telling the IRS about this, like, retirement distribution thing, and willfully hid it.

The inference is especially implausible because, like, 1099-INTs, and I think the retirement one is, like, a 1099-R, those go to the IRS.  Mr. Goldstein would have known they go to the IRS.

So just, like, the idea that he was trying to avoid assessment on those things when he would have known the IRS would have known about it just doesn't add up.  Maybe some jury, if presented with some evidence, could have concluded it was, but this jury wasn't presented with that evidence.

**THE COURT:**  Let me ask you this broader question as we work through the different allegations that the defense is challenging.  And we are kind of taking them largely one by one or maybe two at a time.

But what's your response to that the evidence can be looked at holistically and you get to willfulness?  So maybe the income tax income that was not included in isolation does not get you the willfulness but, I mean, the government has

alleged, I think you just said, 13 different things here. So a lot of different things that went on during the relevant period to demonstrate willfulness. And we have had a lot of discussions during trial about the scope that the government can go to to address willfulness, which can, to some extent, go beyond the actual alleged conduct to show how it was willful.

So I guess my question for you is -- we can keep walking through these -- but is it a mistake to just look at them in isolation? Doesn't the jury or the Court in this setting need to also look at them collectively to the extent that they're relevant to particular tax year in seeing whether all that evidence, as the jury right now is looking -- just looking at the government's case in chief favorably, is that sufficient to reasonably infer willfulness?

**MS. WEINER:** I take Your Honor's point. A couple answers. Like, yes. The short answer to your question is I totally understand the jury can kind of think about this a little bit more holistically evidence of willfulness.

However, that can't go too far, and there are a couple different kinds of acts of, like, assisting in the creation of false returns. There are some times when, like, as with the interest income and the 401K income, where there is, like, items that Mr. Goldstein, like, would have known needed to be reported, and the question is, like, was it willful or an accident that it wasn't reported.

There are other buckets, like the failure to separately report gambling winnings and losses in years when he was a net loser, or the sort of 1099s issue, where the question is whether Mr. Goldstein, like, knew that the -- that his tax forms either required that recording to begin with, or whether he knew that his accountants, like, were not picking up that income.

So I think to try to lump it all in together is getting a little bit too close to sort of like a character inference, that Mr. Goldstein just didn't care about his taxes, which we have heard the government say a lot. Because the standard for willfulness under all tax crimes, not just tax evasion, is really high. It has to be --

**THE COURT:** Well, let's talk about the definition that I believe we all agreed to during the preliminary jury instructions about willfulness, and I'm just reading what I think is in the instruction. I think everyone agreed, at least at that time. Willfulness, a willful act is defined as a voluntary and intentional violation of a known-legal duty. Willfully mean purposefully and deliberately and not because of mistake, accident, or negligence.

In particular, that last sentence, just to kind of circle back to my question about is it appropriate just to look at these -- I think it's 13 total, but there are about six or seven that the defense is highlighting -- acts or allegations

to support Counts Two through Nine, or any of the counts, frankly, in terms of willfulness.

Isn't the Court or the jury looking, again, at the totality of the evidence? I hear your point where it maybe gets too far. But I don't think -- just by reading the definition, to rule out a mistake or accident or negligence, sometimes that can be ruled in or out of that by, you know, a pattern of conduct or several things that were going on around the same time.

Again, we are trying to get into Mr. Goldstein's state of mind. So I guess that's a long way of me asking: If the Court agrees with the defense on some of these things, is that really the end of the discussion? Because maybe I agree that the interest income that was not included, either there is no evidence of it or it's not sufficient, but maybe when combined with some of the other allegations, particularly if they might be around the same -- contemporaneous in time. I don't know. I'm just saying. A reasonable inference could be a drawn.

You may look at those facts differently depending on what is the combination of facts, and also maybe when they occurred, in terms of assessing Mr. Goldstein's state of mind.

**MS. WEINER:** So I hear Your Honor.

Actually, if we could move to the sort of next issue, which is the failure to report, like, gambling winnings because I think that that sort of crystallizes the problem or the

downside of that way of thinking.

The definition you just read, the willfulness definition, violation of a known legal duty. So on these counts, on '17, 2019, '20, 2021, the indictment alleges that Mr. Goldstein failed to separately report his gambling wins and losses when he was a net loser.

So the legal duty he has to have willfully breached is the duty to report gross gambling wins on one line and gambling losses on another line. And we heard a lot of testimony that there is no -- in this years, there was no tax consequence whatsoever of failing to do this. His taxable income on gambling was zero.

It is just, did he tell the IRS the two numbers instead of --

THE COURT: Does that relieve him of the legal duty to do so?

MS. WEINER: And I'm not saying it relieves him of the legal duty.

What I'm saying is the question is whether or not he knew he had that specific legal duty, and it's not --

THE COURT: He does not have the duty.

MS. WEINER: And it's not an intuitive rule. And as we know, in 2016, he did disclose net gambling winnings, so --

THE COURT: Isn't there a presumption that he would be aware of the law or no?

**MS. WEINER:** I have no -- I think the presumption is the opposite. No. There is no presumption that Mr. Goldstein, as, like, a nontax professional civilian, would be aware of this law about how he is supposed to report his gambling winnings and losses.

In fact, we heard from -- like, the government tried to show willfulness. They brought up two different accountants, like Caldwell, who was his first accountant, through, like, 2012, and then Walter Deyhle, who was his accountant after that. And neither of those accountants testified that they told Mr. Goldstein how to do this correctly.

In fact, I think the Caldwell example is really telling. So Officer or Agent Libbin, he is the IRS officer who did the 2012 audit. He testified on the stand that taxpayer was educated as to how to report gambling winnings and losses.

However, he clarified -- and here, I can just read from the transcript. It's on page 94. This is January 22. So the question was, when did -- "When you say taxpayer was educated, you are referring to a conversation that you had with Mr. Caldwell; right?" Answer, "That is correct."

So Mr. Libbin told Mr. Caldwell, the accountant, how to record these gambling wins and losses.

Then we asked Mr. Caldwell, okay, what did you tell Mr. Goldstein? And here is the question: "And if Mr. Goldstein has told you that he had net winnings in that

year, let's just say $1,000, where on his tax return would you have reported the net or the gambling winnings?" And he says.

So I would have said to him, do you have losses more than $1,000 and to which I would have expected the answer to be yes. He says because a lot of the people poker, a lot of people lose. And I would have said that, well, if you have losses more than gambling winnings, then that would not show up on this form.

So Mr. Goldstein's first accountant told him what you report is net gambling winnings. Then we get to Mr. Deyhle. And we ask Mr. Deyhle. This is now on February 4, the transcript at 100.

Question, "The rule you just described to me, you did not tell that to Mr. Goldstein, did you?"

Answer, "We never discussed it."

Again, a few pages later.

And question, "And you never had a conversation with Mr. Goldstein where you told him, even in a year where you are a net loser, even in a year where you paid out money to investors, we still have to report the gross winnings on the tax return? You just told me you never had a conversation with him like that; right?"

Answer, "That's right."

So, like, I don't know how Mr. Goldstein would have gotten this information about the fact that he had to report all of

his gambling winnings in a year when he was a net loser, and it just sort of, like, makes intuitive sense.

Like, if you have someone who lost, let's say, a million dollars gambling in 2018, whether or not they had gambling winnings in 2018, I think that person would say no.

And without some evidence that Mr. Goldstein was educated by someone that he had this duty, no reasonable jury could find that he knowingly breached a known legal duty to report this income -- not to report this income. Excuse me. To report this sort of gross net problem.

To circle back to the question we started with, can the jury infer that it was willful because, like, in some years there is an allegation that he failed to report other kinds of income or is evading taxes? I think the answer is no because they're just different legal duties. This is a legal duty to report something on a tax return in a particular way, a way that we have seen several accountants get wrong. And the idea that Mr. Goldstein willfully did that just does not add up, I don't think.

The next item is the 1099s, the diverted legal fee income. So on that -- I'm so sorry, Your Honor. There are three payments. There are three allegations of diverted legal fees. This is the Robbins Geller payment to Mr. Goldstein's personal account in 2017. There is this, like, argument that Napoli Shkolnik sort of offset a debt with a legal fee owed in 2018,

and then there is the Tobey Maguire payment that was sent to Bob Safai in 2021.

And on this theory, I think the meeting of aiding and assisting under Section 7206(2) is really important because it requires some sort of active attempt to cause the tax preparer to error.

So in the jointly proposed jury instructions, the parties agreed that this element means, quote, knowingly provided false information or directions with the expectation that the information he provided would be used to file a tax return.

So, like, I think the government's theory is that Mr. Goldstein assisted GRF in preparing false returns by accepting a few legal fee payments in some manner outside of that money hitting the Goldstein & Russell account. That doesn't sound like false information to me, but even if it were, it would only be willful if Mr. Goldstein, like, adopted that course of conduct with the intent that it would cause GRF to miss the firm income.

And that theory just does not make sense because payers, people who may for legal services, are, by law -- we heard testimony about this -- legally obligated to send law firms a Form 1099 for their legal services payments.

So it should not --

**THE COURT:** So you are arguing if there was no 1099, there is no issue of Mr. Goldstein putting the money in a

different account?  I'm not following.

**MS. WEINER:**  So the reason -- so as a legal matter, because -- so to start with sort of, like, first principles, which I think we all understand.

Because Mr. Goldstein was a sole owner of Goldstein & Russell, there is sort of nothing independently unlawful about him receiving money into the personal account versus the G & R account.

So the next step is even if that is, like -- you know, a public corporation couldn't do that.  But even if that's not unlawful in its own right, the government says, well, it caused your returns to be false because it caused your accountants not to know that G & R received that income.

And the answer is -- I think, you know, as a matter of logic, there are two ways for the accountants to know about that income.  They could have a practice of pouring over the bank statements of G & R and picking up income that way, or they could have a practice of looking at the tax statements that are sent to the firm that are legally required to report income sent to the firm and using those tax statements, which are 1099s --

**THE COURT:**  So, in your view, Mr. Goldstein had no obligation himself to clarify with the accountants, you know, what the funds were for?

I mean, I think that was a large part of the discussion,

too, during the government's case in chief about what Mr. Goldstein disclosed and whether the accountants would have needed to rely on his disclosing what the money was for, where it came from, particularly in situations where it didn't hit the right account.

**MS. WEINER:** I -- I think if there had been evidence that Mr. Goldstein, like, knew before the tax returns were filed that that income hadn't been picked up, it would be a much closer question, but there's --

**THE COURT:** Wouldn't he know if he saw any -- I mean, he presumably reviewed the returns before they were filed, so...

**MS. WEINER:** I think that's what -- perhaps he did, perhaps he didn't. You know, I think different people take different scrutiny to the tax -- you know, review their tax return more closely --

**THE COURT:** Well, he seemed to have reviewed them. He signed them.

**MS. WEINER:** Yes. However, I want to be really clear about this, they have charged an offense under 7206(2). (2) is usually used for tax preparers. (2) says you have to have aided and assisted in the preparation of a false tax return. 7206(1), that's the one that is usually used for taxpayers. I don't know why they didn't charge that. 7206(1) doesn't have this aiding and assistance requirement. That one

says if you are a taxpayer, you file a tax form under penalty of perjury, and if you know it's false at the time, you are guilty.

That is -- those are not the elements that are met that matter here. They can't show that he aided and assisted in the preparation of a false tax return just by signing it. He had to have done some active conduct to cause the return to be false, and that has to be willful.

Our point is that because people who pay for legal services are supposed to send these Form 1099 recording the fact that they paid those legal services. If -- Mr. Goldstein could not have willfully used personal accounts to receive firm income with the hope that the income wouldn't be picked up by his tax preparers because there was an entirely separate route of information about those payments, those 1099s that the payers were legally obligated to send. Now, that's where Napoli and Maguire fell short.

And that his accountants, then, should have paid attention to. And that is what GRF fell short. There was a lot of evidence that they just ignored these 1099s. They had the information, which Mr. Goldstein -- he never told someone not to send a 1099. There is no information that he interfered with it when Robbins Geller asked for his W-9. He sent it the same day. There is no evidence that he interfered with that information pipeline.

Again, would it had been more prudent to structure things differently? Yes. Is there an argument that it was negligent not to have done it that way? Potentially. But we're here because the government has charged Mr. Goldstein with 13 tax crimes, and we just don't think any reasonable juror could find that he willfully caused his accountants to prepare false returns omitting these three items of income when there is an entirely separate route of information for the accountants to get that, those 1099s, that there is no allegation Mr. Goldstein interfered with whatsoever.

There is one more bucket under false returns --

THE COURT: Is that the salary and benefits for the women?

MS. WEINER: I actually -- yes. I mean, I think that one is pretty straightforward. I think we have all agreed where we are on that. That was not the one I was talking about.

THE COURT: I'm sorry. Go ahead.

MS. WEINER: Yeah. Thank you for the reminder. The other one that I think will be sort of talked about today is that -- these two allegations about Mr. Goldstein using firm funds to pay personal debts. That's the 2017 payment to Napoli, and then there is a 2019 payment to Mr. Pacheco.

This is sort of a ditto of the conversation we had about

the mischaracterized payments in 2016, which are charged as acts of tax evasion. Again, no evidence that, as to these two payments, Mrs. Goldstein told anyone how to characterize them, not the accountants, not the office managers.

So, again, they have to fall back to the idea that somehow he knew that the payments would be missed and it was willful. And, again, we're back to the 7206(2) problem. It can't just be that he signed a tax return that is false, and it might have been better for him to review it more closely. He had to have done something willfully to cause the accountants to miss the income --

THE COURT: Again, in your view, would that conduct require Mr. Goldstein affirmatively directing someone or saying it's personal or not saying -- or pay this, but it's not personal. It's for business when it really was personal.

What would he have to do, in your view, to have a problem with regards to how the funds were used?

MS. WEINER: I think what you just described. Yes.

I also think that if there had been evidence that Mr. Goldstein, like, knew that these errors were happening all the time, and had, like, structured his financial arrangements in a way to make sure they happened, I think that could be a jury question, but there is no evidence of that either.

You know, we are talking about five years of conduct, hundreds of thousands of payments from the law firm. The

government has charged, like, eight mistakes, eight mischaracterizations. And we are getting, like, a sample selection bias because, obviously, those are the ones we have talked about at trial, but it's a small business. They had a few employees. They were relying on external accountants to do bookkeeping. Like, was it perfect? No. Is it, like, what you would want, like, a Fortune 500 Company? No. But it's not -- it's not willfully false returns. They are just mistakes. That's it.

THE COURT: Okay.

MS. WEINER: Finally, taxes due and owing, if that's -- I want to start, if I can, Your Honor read the jury instruction that we had all agreed to. We still agree to it. Known violation -- or intentional violation of a known legal duty.

However, the cases say -- like, but I think the parties have very different views of what known legal duty means.

And our view, which is supported by the case law, is that known legal duty in the context of taxes cases means you have to know that your conduct is criminal, not just civilly wrongful.

We cited a lot of cases in our brief on this. There is a Supreme Court case that sort of starts it -- that's *Bryan*, 524 U.S. 194 -- that says, quote, The jury -- quote -- must find that the defendant was aware of the specific provision of the

tax code that he was charged with violating.

And then there is some other courts of appeals cases. I will grant you, I did not find a Fourth Circuit case. That is because this crime is rarely charged, Your Honor.

But the Second Circuit said, "Subjective knowledge of a criminal violation is necessary for willful conduct in a tax context." That's *Efthimiatos* case, E-f-t-h-i-m-i-a-t-o-s, 799 F Appendix 77.

There is a First Circuit case, *Marder*. This is 48 F.3d 572, Note 6, that says, in the tax evasion context, willfulness, quote, requires specific knowledge that the conduct at issue was criminal, closed quote, which is different from merely, quote, acting in violation of some known legal duty.

There is another Third Circuit case, which says, like, the opposite of their Third Circuit case. Both of our Third Circuit cases are unpublished. This is one *Bunchuk*, 799 F Appendix 103. Quote, To act willfully requires knowledge of a legal duty, and a defendant is not guilty if she honestly believed that her conduct was not criminal under the law, closed quote.

**THE COURT:** And I know the government is going to disagree with your position on what the legal standard is, but explain to me in a nutshell what the government would have to prove to support your theory about what willfulness requires.

**MS. WEINER:** They would have to have put on any testimony, any evidence that Mr. Goldstein knew that it was a crime for him not to pay his taxes on tax day.

That is different than putting on evidence that Mr. Goldstein knew it was a crime to not pay his taxes ever, but as Your Honor knows, in this case, the evidence has established that Mr. Goldstein did pay all of his taxes for all of these charged years with all penalties and all interest.

And I will say, even if we are wrong about the standard, and even if the standard is something -- so the government's sort of squishier understanding of what known legal duty means, we still think no reasonable jury could convict because Mr. Goldstein's accountants told him that he options.

There is that e-mail from Mr. Deyhle -- it's GX 5878 -- where he says, "Mr. Goldstein has the following" -- here, I actually have it. "Mr. Goldstein has the following options if he doesn't want to pay his taxes." Yeah.

Here we go. "He has the following options: "One, file returns on 4/15 and pay the tax in full.

Two, file returns on 4/15 and ask for an installment plan. This will avoid some penalties, but start the collections process.

Three, file an extension and pay what he can on 4/15 with a balance due on 10/15. There will be a penalty and interest on the unpaid balance."

So the question is -- I think -- I was trying to think of a good analogy. In school, sometimes the teacher says, your paper is due on this day. If you turn in your paper late, I will take ten percent off your grade. You know it's due on the day, but it's presented as a choice; right? There will be a consequence if you do it late, but you have not violated some duty. You know, in that case, it was supposed to be some academic duty. Here it's a legal duty. But it's nuanced. You can think you have options.

THE COURT: So is the defense's position that you can never have the crime of willful failure to pay a tax in a circumstance where a taxpayer doesn't pay on April 15 but, you know, does pay later with the penalties and interest?

MS. WEINER: Not as matter of law that you couldn't do that. And we understand the Court's ruling on this. We are not trying to relitigate it.

But now it's a question of willful -- of what it means for a --

THE COURT: So is the willfulness is missing?

MS. WEINER: -- willful failure to pay, and there is no evidence that Mr. Goldstein knew that he was violating a legal duty to pay on tax day, and we think the lack of that evidence is strongly underscored by the fact that he did get on an installment plan, eventually pay with all penalties and interest. We talked about this a lot. That's the Court's

inference, that he thought what he was doing was taking a legitimate option to pay late; right? It's a financial cost to him, not a legal breach.

And the point here is that the government has not put on evidence from which a reasonable jury can infer that Mr. Goldstein knew that option two, pay late with penalties and interest, was a breach of a legal duty, as opposed to just, like, a financially costly decision to Mr. Goldstein.

**THE COURT:** And that undermines willfulness, in your view?

**MS. WEINER:** Indeed.

**THE COURT:** Got that.

**MS. WEINER:** The last little bit -- thank you so much for bearing with me -- is the constitutional issues. I think I can --

**THE COURT:** We've kind of covered these before, I think, mostly in a tax evasion setting, but I believe we discussed this prior to trial in connection with some of the other charges as well.

**MS. WEINER:** In connection with some of the other charges, not in connection with -- I don't believe precisely in connection with the 7203 charges, failure to pay.

We understand the law, and Your Honor has ruled and we get it. The law says your taxes are due on tax day. But a law can be void for vagueness. This is the *Lawson* case. If it's a

penal statute, does it define the criminal offense -- or if it defines a criminal offense, quote, in a manner that does not -- or that it must define it. I'm sorry. In a manner that does not encourage arbitrary and discriminatory enforcement.

So now we have heard the evidence. We have seen what the government thinks, like, made Mr. Goldstein unique, why he, among 15 million taxpayers, was the one to be charged with failing to pay his taxes on tax day. And I think their answer is that he was spending money on other things. You know, he paid all of his taxes eventually, with penalties and interest. He got whole with the IRS.

So all we have heard throughout trial is that, well, it was willful because he was spending on other things. He was focused on other things. That is the arbitrariness problem. Like, that is not in the statute. 7203 doesn't say it's a misdemeanor to not -- like, to owe taxes while spending money, and -- on other things.

And I think we have seen in this trial that it's -- it does precisely what the Court says is a problem with sort of vaguely-worded statutes, which is just like allowing the government and the jury -- just, it's totally at the whim of what they want to charge.

Like, I think the government's theory is that Mr. Goldstein, like, could have ate at a restaurant, but couldn't have gone to a nightclub, or could have gone on a

cheap vacation but not a fancy vacation. I'm not arguing the evidence -- I don't want to get back to the sort of evidentiary objections.

But the point is that for a statute to give an ordinary person an understanding of what conduct is prescribed, they have to know that what they're doing might cause them to be prosecuted. Millions and millions of people violate the statute every year. That's not noticed. There is also no notice that you are going to get charged with this misdemeanor because you are spending money on other things.

The last thing on my outline was to talk about the procedural issues, but I think we started there.

So unless if Your Honor has further questions?

THE COURT: I don't think I have any additional questions. This was helpful to walk through it, and it matches largely how I read the motion. I may have further questions for the defense once I hear from the government.

I will, again, say as a general observation, while I appreciate the defense is preserving its right to move on all charges in this case, at least the ones we're talking about right now, are discrete aspects of the various tax charges in the case.

So I'm not completely sure ruling on a motion for acquittal under Rule 29 is appropriate right now. I did take a look at the cases that the defense pointed the Court to. But

that's generally how I'm viewing the motion at this time.

But, in any event, thank you very much. That's helpful. We've been going for about an hour. I suspect the government is going to want some time to walk through its response. I'm suggesting maybe a two-minute break, and then we will give the government whatever time it wishes to respond.

**DEPUTY CLERK:** All rise. This Honorable Court now stands in recess for two minutes.

(Whereupon, a recess was taken from 10:33 until 10:38 a.m.)

**DEPUTY CLERK:** All rise. This Honorable Court now resumes in session.

**THE COURT:** Please be seated, everyone.

Mr. Whitman, good morning.

**MR. WHITMAN:** Good morning, Your Honor. Hayter Whitman on behalf of the United States.

So, first of all, I just want to answer any questions that Your Honor has. I have responses to the arguments raised by the defense. But, obviously, at the outset, happy to answer any questions here.

**THE COURT:** Sure. My big picture question is the same one I raised with the defense.

At least at this phase, I understand the defense if going to move on all the counts and charges, but the paper in front of me is largely specific allegations, specific theories that undergird the government's charges.

So, at least as I read the papers, if I were to agree with most of what is in the papers, we are still going to be left with the same tax charges, as maybe certain factual allegations that won't be able to support it.

So I guess my first question, is that an appropriate thing for the Court to resolve under Rule 29 in this posture?

**MR. WHITMAN:** If it is, I have not found a case saying that that is something that should be done in this situation, nor in defendant's brief was there any -- I think they cited two cases for this idea that, while it's rare to grant a Rule 29 motion as to some theories and not counts, but even in those cases, the trial court did not actually dismiss claims or theories under Rule 29.

So there is no reason that the government sees why that should happen here. And even if you look just directly at the Rule 29, it speaks in terms of offenses as opposed to theories or as opposed to allegations or as opposed to specific facts.

So the government's position certainly would be that it's not necessary, nor appropriate at this stage to kind of cut up the allegations in the way that the defense has proposed.

**THE COURT:** And my next big picture question is the defense moves in the alternative for jury instructions to address many of these issues. We have been talking about that previously to some extent. There are some legal disputes that I think will need to be addressed in the jury instructions.

What's your view on whether these issues are more appropriately addressed in the charge conference versus, at least at this stage, at a motion for acquittal?

MR. WHITMAN: Absolutely anything about what the jury instructions say should be handled at the charge conference. The parties, I think -- and just as a preview to Your Honor, I know the Court has mentioned having worked on the jury instructions. I believe it's the parties intent, at least from my discussions from defense, to submit a streamlined updated version of the jury instructions that incorporates things like the counts that were dropped at the outset of trial.

THE COURT: Wonderful.

MR. WHITMAN: And the evidentiary issues. So we are working on that so that Your Honor --

THE COURT: Because we were attempting to do that, and I was going to have a lot of questions for you later on. So that's perfectly fine with the Court.

Mr. Kravis, do you concur that's how you want to move forward on the jury instructions?

MR. KRAVIS: Yes. Thank you, Your Honor.

THE COURT: That's super helpful. And we can talk later about when I would like to see them.

MR. WHITMAN: Absolutely to your question, Your Honor, as to the -- requesting the alternative for jury instructions, that is just something that should be handled,

the government thinks, at that charge conference, and we can have a fully flushed out conversation then about what the evidence does require, what the jury should be instructed on.

So that's certainly the government's position on that.

**THE COURT:** I guess I would like to walk through the arguments. I have read your papers. I got them this morning, so I read them quickly.

I'm going to try to start and read a little bit about what I think the issues are, and then you can add whatever you want. But I think we should go in the same order as I did with defense counsel.

Let's a start with tax evasion Count One. I think we are now only in the 2016 time period in terms of the tax evasion count that we are trying in connection with this matter. And I read the defense's papers and heard their argument.

Again, to be addressing primarily the issue of willfulness and whether or not the evidence is sufficient, the defense points particularly to two items, the transfer into the Goldstein & Russell IOLTA account in March of 2021, and then Mr. Goldstein's alleged false statements to IRS Agent Parrish when she had the visit with him about his outstanding tax debt. And I understand them to argue that both of those allegations are insufficient to support a willfulness element for tax evasion.

Can you briefly explain whether you disagree and why?

**MR. WHITMAN:** We absolutely disagree, Your Honor. I had a note to myself. I should have apologized at the outset for filing the brief this morning. I know that puts the Court in a bind as to how quickly it has to review it.

But I will just say, on the IOLTA, the evidence was -- we just had this discussion. The evidence was that through the discussions of Mr. Goldstein's firm manager and the accounting firm, the government has presented sufficient proof that Mr. Goldstein understood that the prior payment plan, pursuant to which he was making payments, had been defaulted. Therefore, he was back in the world where -- prior to the payment plan, which was entered in 2019. He's back in the world in which the money could be -- the money could be levied, at least in his mind.

**THE COURT:** So we are talking about what's in his mind, because that was one of the questions I asked your opposing counsel. Is that -- willfulness is about what is in his mind.

So, as I asked your opposing counsel, does it matter whether there was a levy on the account or they could levy the account, or does it matter mostly what Mr. Goldstein understood the situation to be vis-a-vis the IOLTA account and potential levies?

**MR. WHITMAN:** It's the latter, Your Honor. All these arguments about legal impossibility really ignore that

affirmative acts of evasion don't have to be illegal actions. They could be innocuous. They could be innocent conduct as long as the intent is to evade or conceal.

So that is exactly what happened with regard to the IOLTA. Mr. Goldstein thought the payment plan was canceled, therefore his bank accounts might be subject to levy. There was even testimony from Mr. Deyhle that sometimes the IRS might levy an account accidentally or erroneously, so that was also on the table.

But either way, certainly he thought that if he took the money from the retirement account and put it into, for example, the Wells Fargo account, where previously 950,000 or so had been levied from that account, then it would be possible to be levied.

So there has been a lot of testimony as well about IOLTA accounts and the nature of IOLTA accounts and how, as a general matter, they are for client funds before they are earned by the law firm.

So I think the evidence has been sufficient for the government to argue, and for a reasonable jury to find that what he was -- that what he was doing in transferring the money through the IOLTA was shielding it, even if it's just for a weekend.

The point is, is that I think in the past, especially with regard to the cash brought back from -- the cash brought back

from Macau, after it was deposited into the account, it was levied relatively quickly.

So certainly, we think that his state of mind in terms of why he funneled the money through the IOLTA account matters. The government does not believe that whether or not the IRS could or would, in fact, have levied the account really matters here for purposes of whether was an affirmative act of evasion.

THE COURT: And they also -- the defense also points to statements that IRS Agent Parrish, about -- I think the reasons for Mr. Goldstein's tax debt, or some other comments that he made, and I know she testified quite a bit about that.

In your view, do you feel there is sufficient evidence for that particular allegation to support willfulness?

And I will also note, I believe there are other alleged misstatements to IRS agents at a later time period the government also points to.

MR. WHITMAN: Yes, certainly. RO Parrish was interviewing Mr. Goldstein to try to collect on the debt from 2016, the tax debt from 2016, and ask questions about what had generated that debt.

I think there is this, frankly, I don't think important dispute about whether it was a balance or whether it was a debt. Really, what mattered was, and what I think the evidence showed through RO Parrish was, she was asking what had generated or what had led to this tax bill in 2016, and

Mr. Goldstein said something to the effect of -- and I'll let the testimony speak for itself, but a large legal case, which is totally false, and had an effect on RO Parrish's ability to do her job, even if, you know, the IRS knew that he had reported some gambling winnings in 2016.

I'll note, though, that this idea that Mr. Goldstein had disclosed his gambling winnings on his tax return is kind of a fantasy as well because the evidence has shown that he actually won $50 million in 2016 and ended up reported to his tax preparer about 27.

**THE COURT:** So in your view, he underdisclosed?

**MR. WHITMAN:** Yes.

**THE COURT:** And I also want to -- I'm just kind of working through based on what the defense argued, but feel free to add other stuff if you want to raise it.

Sticking with tax evasion, there was also concern about Mr. Goldstein's alleged use of firm funds to pay certain debts, and I think the argument said, essentially, there is no evidence showing that Mr. Goldstein somehow mischaracterized those payments or caused them to be mischaracterized, so that can't support tax evasion, willfulness. The willfulness element.

**MR. WHITMAN:** Absolutely. Two main points to address that.

First, we have heard about the Excel sheet or sheets that

Mr. Goldstein had requested at some level from the firm manager at the time, Ms. Runkle. We had gone through at -- in great detail what those sheets said. We have gone through in great detail how that information, at least arguably, got from the sheet that Ms. Runkle sent to Mr. Goldstein's secret poker ledger. So the evidence -- and this was -- that was the most recent evidence, I think, elicited in the case yesterday afternoon about how the numbers matched up.

So there is certainly evidence that Mr. Goldstein knew about the classifications being incorrect in 2016. There is evidence from Mr. Deyhle that Mr. Goldstein knew what was on his tax returns. So the next year, when he's filing for 2016 and sees that there is hundreds of thousands of dollars of false deductions, certainly that shows that he was willful in failing to report those.

And then, just more generally, on the -- there has been discussion about misclassified payments subsequent to 2016 where we don't have the same, you know, an e-mail with the spreadsheet. But, really, this gets into willful blindness, Your Honor, and I don't think there was much discussion of this from the defense earlier. But the evidence has been that Mr. Goldstein, time and time again, set up a situation, including by hiring these firm managers who were trying to do their best, but hiring them right out of college with no experience.

And so the idea that Mr. Goldstein can continue to use the firm bank account after 2016 to pay poker debts and then can say, "well, I didn't tell anyone that it was a legal fee payment," really I think gets at this issue of willful blindness, and there's certainly been sufficient evidence of that. So that's our -- I think our two main answers on the misclassifications.

THE COURT: Let me ask you another broader question. And this goes not only to the willfulness piece for tax evasion but also on the filing false tax return and the failure to pay counts. They all have this element of willfulness. I've read the definition that the parties have agreed to earlier, so we'll keep that in the back of our minds.

And I guess I have the same question for you. We have been talking about today several discrete factual allegations and/or theories that the government is putting forward to support the tax charges and also to show willfulness. And I guess my question for you is: Is there an argument that you don't necessarily need to look at them one by one, but sometimes the combination or as a group, can also inform willfulness?

Again, as the Court understands it, ultimately, we're trying to figure out what's in the mind of Mr. Goldstein. And so, at least in terms of some of the specific acts that are challenged here, what's your view on whether the jury might

need to look at them in combination or in collection in terms of making a willfulness assessment and that they may be in a different place when you look at it that way versus one by one by one?

**MR. WHITMAN:** Absolutely, Your Honor. The charges are year by year. They're tax charges. But certainly, this is one story. Right. This is the story of Mr. Goldstein having initially falsified his poker winnings in 2016 and then failing to even pay the debt on the amount that he did report and then, for years and years, hiding his poker activity.

So certainly this is one story, and the willfulness evidence as to certain counts can be relevant to others, and it can be considered holistically.

I think a good indication of this is the stipulation or the -- sorry -- the instruction that the parties agreed on as to Ms. Bart's testimony where the parties agreed to read to the jury that the issue of Mr. Goldstein offering cryptocurrency and a $10,000 bonus, et cetera, to Ms. Bart could be considered for willfulness as to all the Counts One through Thirteen.

So that's also just an agreement by the parties that, at least as to that one specific type of willfulness evidence, that can certainly apply to multiple charges, and it should be considered wholistically would be the government's position.

**THE COURT:** Thank you. I have no further questions on tax evasion. Anything else you want to share on that? And

again, I've read the papers where the government walks through, of course, each of the elements. I'm just trying to focus right now on the pieces the defense is raising, because I don't think I have a full motion in front of me right now.

So is there anything else you want to argue at this point?

MR. WHITMAN: We can move on, Your Honor.

THE COURT: Okay. Let's talk a little bit more about the false tax returns, Counts Two through Nine. We've kind of touched on this. Defense very helpfully walked through, by my count, at least six factual allegations or theories that the government has relied upon to support these claims in the second superseding indictment, as I recall, omitting certain interest income, omitting a 401k income, failing to separately report gambling winnings and losses, accepting legal fees through the firm, G & R's account, and the issue with the 1099s or lack thereof, use of firm funds for personal debts or payments, and then the issue with the women, which I think we've kind of put out of the case.

But in any event, those are the six that I understand the defense is particularly raising a concern about. Happy to hear your response to any of those or all of those if you want to.

MR. WHITMAN: Yep. So let's start with the interest income and the pension income. Certainly, there has been evidence we cited to the admitted exhibits in the case that reflect the income as to the interest from the bank account,

the poker account, as well as the pension payment. We have also introduced the government into evidence Mr. Goldstein's tax returns and summaries of those tax returns that I believe the defense just agreed don't reflect the income that we talked about in terms of the interest and the pension.

I'll note that, on the interest, it's a small amount of money. But when you consider that the interest rate for a bank account, I think that one was .05 percent, it's actually quite a bit of money to have $300 or so in interest for that.

So certainly the government's position is, you know, whether the government ends up asking for it. And this is, again, something we can talk about in the context of jury instructions that there is sufficient evidence as to the interest and the pension unreported income.

As to the Forms 1099, people have to report their income even if they don't get Forms 1099. I understand Mr. Goldstein is going to make willfulness arguments related to, oh, well, so and so didn't give me a Form 1099, so how could I have known to report $500,000. That's fine. He can do that. But it doesn't mean that -- it doesn't mean that there is not sufficient evidence of willfulness or anything else as it goes to those false returns.

I do believe the evidence as to Mr. Tobias Maguire yesterday was that, as an individual, he would not have to send a 1099 to Mr. Goldstein. But I think the 1099 issue is,

obviously, one that Mr. Goldstein may feel entitled to argue to the jury, but is not pertinent to whether there has been sufficient evidence put on at this point in the case.

The reporting -- let's talk about reporting the wins and losses separately. There has been sufficient evidence that Mr. Goldstein knew that he had to report his poker winnings. There has been evidence that, after 2016 when doing so, it led to a large tax bill for him. He stopped doing so altogether.

There has been evidence that, even when asked the straightforward question of whether he had any gambling winnings in 2017, he said no gambling winnings. And I'm not trying to mischaracterize the document. It speaks for itself, but I think the Court and the parties remember that document.

So I think, as to this issue of reporting them separately, surely Mr. Goldstein has made arguments at the trial that, well, I lost more than I won, so no harm, no foul. I actually don't think that's consistent with the testimony of IRS representatives who have come in and testified under oath saying that actually there would be a significance to knowing that Mr. Goldstein was failing to report millions or hundreds of thousands of dollars in income, especially while the IRS was trying to collect on his debt from 2016.

So certainly, we think as to this idea of -- and Mr. Goldstein called a witness named Andrew Robl, who is one of the world's best poker players, and he said something to the

effect of, it's common knowledge in the poker community, in the high-stakes poker community that you have to, you know, give documentation of your wins and losses to your accountant and tax preparer.

So we think that whatever arguments Mr. Goldstein might make about having lost more than he won, it still stands. And the evidence has been, including from Revenue Agent Ranahan and another IRS representative earlier in the trial, that you do have to report your poker winnings or your gambling winnings, even if you end up having more losses than you had wins.

I think I've addressed maybe three of the items that Your Honor mentioned. There was another reference, I think, to paying debts out of the firm bank account. But I think that is similar to our prior discussion, which is that either Mr. Goldstein had seen evidence from Ms. Runkle that these debts and payments were going to be misclassified or he had set up a system by later that was really a willful blindness situation where, you know, he continued to hire people with very little experience. Not that they weren't trying their best, but very little to no experience and then benefiting from that by running kind of a -- there is a method to the madness, I think, is one way to put it.

So as to the payments from the firm bank accounts, we think that those also support 72062 charges.

I will note, because as a former tax division attorney, I

should say this.  There was a discussion about 7206(2) and whether it's just for tax preparers.

THE COURT:  Right.

MR. WHITMAN:  That's just not true.  And we -- you know, if Your Honor wants a bunch of cases on that, we can submit them.  But that's -- but in this case there is evidence that Mr. Goldstein aided and assisted or advised and assisted in preparation of the tax returns.  He worked with Mr. Deyhle. He signed them.

So there is plenty of evidence that he was involved.  Even if it was people working on his behalf, like the firm managers, I think that would still count.  So there has been sufficient evidence of aiding and assisting in the preparation of false returns, and it's not just for tax preparers.

So I think, unless Your Honor has more questions on 7206(2) and I might have been missing something, but I think that's what we have --

THE COURT:  Do you agree that the -- if the facts regarding the so-called women, the salaries and benefits are out at this point?  I know the Court made evidentiary rulings about that.  I don't think we heard anything about that to date.

So is that no longer a theory that the government is relying upon to support the tax -- I guess really the false tax return charges?

You don't want to answer that now.  I can see.

**MR. WHITMAN:**  I think we have --

**THE COURT:**  I know you don't agree with the Court's ruling, but I don't recall hearing any evidence on the women.

**MR. WHITMAN:**  Right.  So I think it's --

**THE COURT:**  We can revisit it later.

**MR. WHITMAN:**  May I confer briefly, Your Honor?

**THE COURT:**  I won't belabor the point now, but I think that might be one that we can sort out at the end of the defense's case and the case as well.

**MR. WHITMAN:**  Certainly.  Certainly.

**THE COURT:**  I haven't heard anything.  All right.  Go ahead.

**MR. WHITMAN:**  So that's what I had on false returns. I'm happy to address 7203 and the motion that it's --

**THE COURT:**  Yeah.  Let's briefly address that statute.  We don't need to spend a lot of time on the constitutional arguments at this point, but I know there is also, again, a substantive argument about willfulness, which I think goes to a dispute between the parties about what is the legal standard here and whether there is a requirement that the defendant knows that the alleged conduct was criminal or a crime at the time, I guess, is what the defense's position is.

And they've cited the Court to *Bryan* and some other cases. I've started to look at those cases, but I believe the

government has a different view. And I see nothing in the Fourth Circuit.

MR. WHITMAN: Absolutely. The government has a different view. The government's way is that the Court rightly shut down the other day the questioning of numerous witnesses as to whether they had ever told Mr. Goldstein that this was a federal crime. Obviously, I think we'll have this dispute to the jury instructions as well.

But the government's position will be that you do not need to know the criminal consequences of your conduct. You just need to know that your -- you know, that there is a legal duty that applies to you and then decide not to abide by it. That's what happened in terms of the failure to pay.

THE COURT: So the legal duty could be civil as opposed to criminal? I'm not following.

MR. WHITMAN: Well, in this case it was criminal. But I think it's really just do you know -- for example, there is no dispute the way that the evidence is, is that even in the e-mail where it's, you know, someone telling Mr. Goldstein you have options of how to deal with this tax bill, even in that context, it says penalties, like you have to pay penalties.

So the idea that Mr. Goldstein doesn't know what he is doing is wrong when he -- when the government is going to enforce penalties on him in addition to interest, it's not just interest. Right. It's not just I have to pay more because of

the time value of money. It's like I am being punished and it's called a penalty.

So I think certainly, in that context and the context of the facts of this case, there is, you know, willfulness. It's not vague. But also that he doesn't need to know that it was a crime and -- yeah. Right. So he doesn't need to know it was a crime. And there was a discussion about a teacher. I think if the teacher charged you penalties that could be collected by the federal government for being late, that might be a more apt analogy, which is what we have here.

So the government thinks the 7203 charges are supported by evidence, and they're not impermissibly vague.

THE COURT: Thank you very much. Anything else you want to share with the Court?

MR. WHITMAN: Not at this moment, Your Honor.

THE COURT: All right. Thank you, Counsel.

MR. WHITMAN: Thank you.

THE COURT: In the interest of time, since the Court has already indicated I'm not sure we're in the right posture to actually rule on a Rule 29 motion at this time, I think I'm going to share some initial thoughts. I will revisit this issue at the conclusion of the defense's case, but I would like us to get into any evidentiary issues so we can get Mr. Goldstein moving forward today if he wishes to testify.

At the very high level, as the Court reads the current

papers in front of me, they address a number of different factual allegations or legal theories that the government cited in the second superseding indictment to support the tax charges, which again are tax evasion, now just Count One; false tax returns, Counts Two through Nine; and the willful failure to pay, Counts Ten through Thirteen.

So largely -- and I appreciate there is some constitutional arguments. But largely, if the Court were to agree with the defense at this point, I don't think it's going to get us to a point of any offenses actually coming out of the case.

So at a high level, I'm not sure we are properly in the posture of resolving the motion at this time. I'm going to give a few thoughts because I think that will inform, if nothing else, our charge conference and perhaps some of the evidentiary issues we are going to deal with between now and then.

To begin with, just to be clear, under rule of criminal procedure 29, the defendant can seek a judgment of acquittal for any offense at the close of the government's case. If the evidence is insufficient to sustain a conviction, the standard that the Court applies in ruling on the motion is whether substantial evidence exists, that viewed it in the light most favorable to the government would permit a reasonable jury to find the defendant guilty beyond a reasonable doubt.

So at this point, the Court is solely looking at the evidence in the government's case in chief, and I highlight that because we did have a little bit of the defense's case come in already due to scheduling issues. I'm not considering that evidence for purposes of the motion.

As I indicated earlier, I don't think we even have a full motion here right now in terms of the arguments in front of the Court. But the Court did receive, in the government's response, citations to the evidence that kind of walks through the various elements of the case.

So at this point, I think that is probably sufficient for the Court not to rule in favor of the defense at this point. I'm going to start with tax evasion. There are three things that the government had to show.

One, that Mr. Goldstein had a substantial tax deficiency for 2016 in this case.

Second, that he attempted to evade or defeat the assessment and/or payment of the tax.

And lastly, that he attempted to evade or defeat the tax by acting in a willful manner.

And this case has been about willfulness since we began the trial, and most of the issues raised by the defense go to that element. I have heard the arguments on both sides, and I believe that -- I will say there is sufficient evidence to support the government's view on willfulness as it relates to

the transfer regarding the IOLTA account and the alleged false statements that Revenue Agent Parrish, and there is also some evidence that could support the defense's view on that. I think those are matters that should be left to the jury to make their reasonable inferences.

I've taken into account the evidence, including weighing the credibility of the witnesses. So at this point, I see no basis for ruling on acquittal with regards to those two particular factual allegations.

Similarly, the use of the firm's funds. Again, the parties just disagree about what that shows, but there is certainly evidence to show how Mr. Goldstein used those funds and whether or not that misled or mischaracterized how the payments were being made. We talked about Ms. Runkle's e-mail that is something where the parties, again, I think, disagree about the weight or significance of that evidence. But, again, something for the jury to sort out. So I don't think, at least at this point, that gives the Court a concern.

Moving to the false tax return charges, Counts Two through Nine. And very quickly, there are a couple things the government has to show for these claims.

One, that Mr. Goldstein advised or assisted in the preparation of his tax returns that were subsequently filed.

Second, that the tax return was false as to a material matter.

And thirdly, again, the willfulness issue.

Again, I think we are largely discussing willfulness in terms of the motion, and the defense has pointed to I think at least six particular factual allegations that they argue either aren't supported by the evidence or aren't sufficient to show willfulness. The government has a different point of view.

I've looked at the transcripts. I think there is evidence in the record that perhaps supports both sides and, again, these are matters for the jurors to weigh, draw their inferences, and I do believe that they can do so in the case.

So, again, I don't see any basis right now to, I guess, even dismiss these theories of the case at this stage. The Court might be in a different place once we hear the defense's case.

Lastly, on the willful failure to pay, I'm not going to get into the constitutional arguments right now. I don't find them persuasive, but I'm certainly happy to have further paper on that as we move forward because those issues would, obviously, supersede evidentiary questions at this time.

As to the legal standard, I'm going to also defer ruling on that until we get to the charge conference. I have taken a look at the cases. I don't see anything thus far, at least in the Fourth Circuit, although I do appreciate *Bryan* might be a Supreme Court case.

But in any event, I am going to defer on that until we get

to the charge conference. But at this point, I'm not going to hold that that's any basis for acquitting on any of the willful failure to pay counts.

So at this point, I'm going to deny the motion without prejudice. The defense can certainly renew at the end of their case, and they also have an option of renewing later if that's warranted. I'm sure we will talk in much greater details about these issues, and the Court will also have a fuller record to assess the evidence in determining whether or not any of these charges should be subject to acquittal.

That's a brief summary of the Court's ruling at this time. The motion is denied without prejudice to the defense to renew at the appropriate time as the case moves forward.

Any immediate questions or concerns about the Court's ruling from the defense?

**MS. WEINER:** No, Your Honor. Thank you.

**THE COURT:** From the government?

**MR. WHITMAN:** No, Your Honor. Thank you.

**THE COURT:** I appreciate good discussion. I think that will help us frame issues as we move forward.

Next, I think we need to sort out evidentiary issues with regards to the motion in limine.

Mr. Kravis?

**MR. KRAVIS:** Yes, Your Honor.

We did file a motion in limine yesterday evening

addressing some issues that we thought might arise, evidentiary issues, during Mr. Goldstein's testimony. They're kind of in two buckets here.

I think the first is questions related to the scope of cross-examination, issues that the Court has previously excluded. The defense's view is that that is still out for cross.

And then the second bucket was the phone messages. And I heard the Court mention this morning taking up these messages one by one. We're happy to do them in the context Mr. Goldstein's testimony, if that would be easier for the Court.

**THE COURT:** I think we should at least look at them now and see what we can do.

And, again, I looked at them quickly.

**MR. KRAVIS:** Yeah.

**THE COURT:** That's why saying maybe they can be grouped together, but I'm happy to work through them now and see if we can at least get some addressed and then see where we are.

**MR. KRAVIS:** Yes. So I'm going to focus on my comments on that piece of it. I'm happy to answer any questions about the scope of the cross, but I want to talk about the messages.

**THE COURT:** Let me just make sure I understand what

we have. There were three exhibits attached to the defense's motion.

They're heavily redacted, so I'm assuming -- what are these, text messages?

**MR. KRAVIS:** Yeah. So -- well, they are in different buckets.

So Exhibit A is a text message exchange between Mr. Goldstein and another individual, someone who has actually been identified for the Court as employee four, in which Mr. Goldstein tells the person that he is planning to go abroad to borrow money to pay his taxes.

**MR. BEATY:** Your Honor?

Sorry to interrupt, Mr. Kravis.

May we just have the trial exhibit number that's been marked? That way we'll know, because Exhibit A --

**THE COURT:** You don't have the materials?

**MR. BEATY:** I have what they filed, but that's not the number that they are going to use.

**MR. KRAVIS:** For purposes of the record, it's Defense Exhibit 462.1.

**THE COURT:** 462.1.

**MR. KRAVIS:** This is attached as Exhibit A to the defense's motion.

**THE COURT:** All right.

**MR. KRAVIS:** This is on October 16, 2018. This is

before Mr. Goldstein leaves to go get the bag of cash we have heard so much about.

He writes, at the bottom page 1, "Have to go pick up 1 to 2 million in cash I'm borrowing to pay taxes. LOL."

This message is a classic example of a statement of future intention. It is a statement of something that Mr. Goldstein is planning to do in the future, and under Rule 803(3), and the Supreme Court case all the way back to 1892 of *Mutual Life Insurance Company versus Hillmon*, a statement of future intention is admissible to prove that the speaker subsequently acted in conformity with the statement. In other words, a text message that says "I'm going to go pick up a loan" is admissible to show that the declarant likely then did go and pick up a loan.

The reason that's significant for purposes of the trial, of course, is that the government says -- sometimes the government says it's gambling winnings, sometimes the government says it's a legal fee. I think we are going to have to decide at some point, but for purposes of what we are doing today, this is a statement of future intention that's admissible under *Hillmon* and 803(3) that directly refutes the government's allegation that the money was either gambling winnings or a legal fee.

I would also note --

**THE COURT:** I want to make sure I got some things put

on the record.

MR. KRAVIS: Okay.

THE COURT: So there's an exchange back and forth between employee four and Mr. Goldstein.

MR. KRAVIS: Yes.

THE COURT: I assume that the defense wants to show the whole thing, but the concern is particularly Mr. Goldstein's statement, have to go pick up the 1.2 million in cash, bla, bla, bla.

MR. KRAVIS: All we're asking to show is the message only October 16 of 2018, "Have to go pick up 1 to 2 million in cash I'm borrowing to pay taxes."

THE COURT: So that's it? You are not going to show the context around it?

MR. KRAVIS: There are messages at the top that he say -- looks like he's going to Hong Kong three to four days, so we would ask that just for the context of, you know, what he's talking about, but that's it.

THE COURT: But the question is whether the statement you just quoted to the Court is admissible; correct?

MR. KRAVIS: Yes. Yes.

THE COURT: I'm going to read 803(3) in the record so we are clear, so when the Court rules, we know we are on the same page.

803(3), as I read it, is, again, an exception that deals

with then existing mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, such as motive, intent, or plan, or emotional, sensory, or physical condition, such as mental feeling, pain, or bodily help, but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

And that's the exception you are seeking to come in under?

MR. KRAVIS: Yes, exactly. And specifically the specific word "intent."

So the Supreme Court, in *Mutual Life Insurance versus Hillmon* in the Fourth Circuit, and *Phoenix Mutual versus Adams* squarely held that a statement that "I am going to do something" is admissible under 803(3) to prove subsequent conduct in conformity with the stated intention.

If Mr. Goldstein had sent this message after he got back, like, "Just got back from Hong Kong, picked up a million-dollar loan, LOL," then the government might be able to argue that the second half of the rule the Court just read would apply.

But that's not what is happening here. The statement, the message, precedes the conduct and, therefore, it is a statement of future intention.

THE COURT: Well, let's hear from the government on that one, and we will just work through them that way.

MR. KRAVIS: Okay.

**MR. ADENRELE:** Good morning, Your Honor.

**THE COURT:** Good morning.

**MR. ADENRELE:** Adeyemi Adenrele for the government.

Indeed, we received this brief. Mr. Kravis referred to it yesterday evening. Obviously, it was closer to midnight, and so we are arguing it here orally.

What's important here, though, is that, one, as Your Honor knows, this issue has come up and time and time again at this trial, whether the funds received from Mr. Phua were a loan or were they not a loan.

Obviously, the government's position is that this was income to Mr. Goldstein. Indeed, we had one witness, Mr. Foy or Officer Foy, testified that Mr. Goldstein told him that it was gambling income. We've had a couple other witnesses who were Mr. Goldstein's old partners who identified that they understood that this was legal fee income. Either way, both were income.

Specifically speaking to the 803(3) issue, though. Here, this is simply an attempt to smuggle in self-serving hearsay. The defense has tried this time and time again throughout this trial. This is now their final attempt.

**THE COURT:** How come the exemption doesn't apply?

**MR. ADENRELE:** The reason the exemption does not apply, because what is being attempted to do here is to prove a fact of a memory. Mr. Goldstein is attempting to get up here

on the stand, put this text message up, and say that the time he received a loan from Mr. -- or received income -- sorry -- funds from Mr. Phua, it was a loan.

It was -- that is the fact at issue. That is the memory at issue. It's not about his travel plans. Of course, his travel plans are not at issue here.

**THE COURT:** Well, he says, "I'm borrowing to pay taxes," so I assume the argument is going to be it's a loan.

**MR. ADENRELE:** Of course. That is -- you are exactly right.

**THE COURT:** So why is this not showing his intent back on October 16th of 2018 with regards to the money?

**MR. ADENRELE:** Right. Because simply making up a reason as to why the statement was made so it can be shoehorned within the exception is not sufficient.

What is really at issue here is the fact of whether this money was or was not a loan. Simply by looking at a statement here made and saying, "Oh, well, my intent actually was related to my travel plans, when I was going to leave and what I was going to do there," that is not sufficient. You can't simply rearrange a particular text message from October of 2018.

**THE COURT:** I guess I'm not quite following. I understand the argument, which seems to go to why the government, if it comes in, is going to, you know, try to argue it's not of any probative value.

But why doesn't the statement show Mr. Goldstein's intent or plan as of October 16, 2018 with regards to why he's getting the money?

MR. ADENRELE: Again, the statement is more so about his travel plans and what he's planning to do when he gets there.

THE COURT: I have to go --

MR. ADENRELE: The issue in this case is about whether those funds were a loan. And that's looking more so towards -- to root, to bolster a memory of Mr. Goldstein about what those funds were for --

THE COURT: Well, he says --

MR. ADENRELE: -- not about travel plans.

THE COURT: He says, "Had to go pick up 1.2 mill in cash I'm borrowing to pay taxes. LOL." So he's mentioning that he -- of course, he's traveling, but he specifically says "I'm borrowing this money to pay taxes," which I guess he will argue is evidence that this was a loan which the government can obviously rebut.

So I guess I'm just on the basic hearsay exception, why is this not evidence of his intent as of the time of the text message with regards to why he's getting the money?

MR. ADENRELE: Again, the fact at issue here is about whether this was or was not a loan. Mr. Goldstein's attempting to use this text message here to shoehorn it within the

exception. The government disagrees with that. It's simply a hearsay statement used to prove the truth of the matter asserted within the statement itself.

The statement is useless without being proved for its truth, which is that it says here he's using the money to borrow -- or borrowing the money to pay taxes. That's the truth of the statement. It's being used to prove its truth. It's not being used for any other purpose. It can be --

**THE COURT:** So it's not being used to prove intent at the time, from your perspective?

**MR. ADENRELE:** No. Again, the statement is useless without its truth. And therefore, the government -- it's the government's position that's what it's being used for and, therefore, it's hearsay.

**THE COURT:** Okay.

**MR. ADENRELE:** However, nonetheless, having said that, the text message here, if it's only -- if all we can point to is this one or two lines here, it's devoid of context. And as Your Honor knows, we've talked about Rule 106 multiple times throughout this trial, why would Mr. Goldstein be making this statement to this individual? Who is this person?

All of those are relevant to provide more context such that the government can, one, rebut the truth of this statement which, again, that's why it's being asserted. And without that, the jury will be confused as to what the statement is

even about.

THE COURT: Okay.

MR. ADENRELE: Just to paint the picture here, if the statement is presented to Mr. Goldstein and all we have here is "I have to go pick up one to $2 million in cash and I'm borrowing it to pay my taxes," what can the -- the government wants to be able to now impeach -- will need to be able to impeach Mr. Goldstein on that statement. We need to talk about who the statement is being made to. The jury needs to be able to understand the credibility or whether they do or do not believe the statement. The context will be important.

Without that, all we have is a misleading picture of a statement made on a day out of the blue. We don't know who it was to, why it was being said. All of those issues need to be explored, and the government should be given an opportunity to do so. Right here, he's already redacted a few lines on the text message.

THE COURT: Okay. Thank you.

Mr. Kravis, why is this statement not a statement of memory or belief to prove the fact remembered or believed?

MR. KRAVIS: Right.

THE COURT: Because we're not talking about will, so...

MR. KRAVIS: It's because he made the statement before he left. So if he had come back and said, "I'm back

from Hong Kong. I borrowed a million dollars," and he sent that text message six months later or a year later, I agree with the Court that it -- that could be a statement of memory. I remember a time when I borrowed a million dollars in cash.

What distinguishes the message is that Mr. Goldstein sent it before he left. That's what makes it a statement of future intention, rather than a statement of memory. That's just sort of definitional. Like a memory is something that happened in the past, and intention is something that is happening in the future.

And I do think -- the government mentioned, I do think that both the Supreme Court decision in *Hillmon* and the Fourth Circuit decision in *Adams* are squarely on point here. When a declarant says in a message, "I am going to do something in the future," that is admissible under 8033 as evidence that they actually did the thing they said they were going to do.

I also want to note here, because we heard this term "smuggling in self-serving hearsay," over and over again, Mr. Goldstein is testifying. He is the person who made the statement. They can ask him whatever they want about this message, about the context for the message, about what he meant, about what his other motives might have been for sending the message. He is the speaker and they can question him about it.

I actually think we would have been entitled to get this

in without his testimony. But I do think the fact that Mr. Goldstein is testifying further reinforces the admissibility. My colleague's argument that, well, see the truth is like buried inside it is -- would swallow the rule. Like, if that were the right way to look at this, then *Hillmon* was decided wrongly and *Adams* was decided wrong, and all of the other cases were decided wrong because you could say that about anyone.

I do want to briefly address the recipient of the message.

THE COURT: Yeah. I was about to ask you about that, because I think this is one of the women employees.

MR. KRAVIS: It is.

THE COURT: And I know we had a lot of discussions about that.

MR. KRAVIS: Right.

THE COURT: I'm hearing from the government concerns about context and what all is going on. So go ahead.

MR. KRAVIS: I don't really understand why the identity of the hearer matters. If we were talking about a message sent by employee four was the speaker, I could understand, like, we need some context for the speaker's motivations in speaking the words. But that's not what's going on here.

Mr. Goldstein is the speaker and, of course, because he's testifying, they are free to cross-examine him about the

context for his own statements. Who he was making the statement to is not relevant and is also, as the Court is aware, enormously prejudicial.

THE COURT: All right. Thank you. I think I understand this one. I'm satisfied that the statement can come in, and I'm referring right now to the Tom Goldstein statement, "I have to go pick you one-two mill in cash I'm borrowing to pay taxes. LOL." I think it comes in under 8033.

So I'm going to allow the defense to introduce that and, obviously, the government can cross. And we'll see if we have any messy issues in terms of who the recipient is. And we'll have to work that through once we, I guess, hear what the government has to say.

So that one is. Let's go to next one.

MR. KRAVIS: Okay. The next one is also about the loan. It is attached as Exhibit B to the motion. And for the record, it is Defense Exhibit 738.1. This is another text message about the loans. The Court can see in the message, this is Mr. Goldstein asking Mr. Phua for the second loan of a million dollars. So he says --

THE COURT: Where are we reading, so I can follow you in the exhibit?

MR. KRAVIS: Mr. Goldstein writes on October 11, 2018, at 7:45 p.m., and this communication, Mr. Goldstein will testify, was with Mr. Phua himself. "Do you happen to know

whether the remainder of the loan will be okay with Richard? Apologies for the bother. Just got another communication from the IRS."

This is Mr. Goldstein asking Mr. Phua, can I get another million dollars. The IRS is on me. And you can see Mr. Phua replies, "We're all losing a lot. I'll see what can be done Monday. Will another million be enough?" And he says, "TD lost huge last week." Not really relevant.

Mr. Goldstein says, "I'm so sorry. The million you already lent to me is, of course, very kind. Doing another million is extremely generous, too. If it's possible, I'm incredibly grateful. My situation will be the same in terms of what I owe. So I would likely come back towards the end of the year just in case the circumstances are better for you. But of course, I'm grateful for whatever is possible for you and this is important. Ask for nothing else."

This text message is admissible because it's a question or a request. As the Court is aware, the Court actually has a ruling on this from the *Mosby* case. A question or a request is not hearsay because it's not being offered for the truth of the matter asserted.

THE COURT: Which part of the statement are you saying is the question?

MR. KRAVIS: I think you read in context the entirety is -- the entirety of Mr. Goldstein's statements are questions.

**THE COURT:** Both entries? "Do you happen to know whether the remainder of the loan will be okay with Richard?" Are you talking about that?

**MR. KRAVIS:** That one and then the one at the bottom where he says, he asks, "Doing another million is extremely generous. I'm grateful for whatever is possible. I ask for nothing else." That's Mr. Goldstein saying "I'm asking you for" -- "to lend me another million dollars."

It's a request. It's a request for a loan. A request, like a question, is not hearsay because it's not being offered for the truth. It's being offered to show that the request was made or that the question was asked.

**THE COURT:** All right. Anything else on that one?

**MR. KRAVIS:** That's all I got on that one. I'm sorry, Your Honor, just one note. I don't know if the Court wants to send the jury to lunch. I know we have another --

**THE COURT:** Well, let's just see where we are.

**MR. KRAVIS:** Okay. Understood.

**THE COURT:** And then we'll figure that out.

**MR. KRAVIS:** All right.

**THE COURT:** Counsel for the government?

**MR. ADENRELE:** Thank you, Your Honor. All right. Now, we've moved on to another theory, right, because 8033 wouldn't work here, because the statement is clear on that last paragraph that says, "I'm so sorry. The one million dollars

you already lent to me is, of course, very kind."

So here we just have kind of bouncing around from theory to theory to be able to get in the statement. And, of course, once again, the fact at issue here is whether this -- these funds were or were not a loan. From what I heard, this is supposed to be a question. I guess it's a matter of whether Mr. Goldstein knows when to use question marks or not.

Clearly, in the beginning of the statement, he uses a question mark. Wherein the first statement it says, "Do you happen to know whether the remainder of the loan will be okay for Richard," question mark. We don't see -- I don't see any other question marks. There may be one other here from user 89308144, which we still don't know exactly who that is.

But there aren't any other question marks in the whole text message. So I'm not sure where the argument comes that this is being used to propose a question and is being proposed to identify a question to the recipient. Again, this is really -- the defense wanted to point to 8033, knows it doesn't apply, and now have moved onto another theory.

I don't think the Court should accept that whatsoever. The fact at issue, again, is that whether this was or was not a loan. They're attempting to use this text message to prove that for the truth itself. Again, otherwise, this text message is useless and the Court shouldn't accept that.

**THE COURT:** All right. Thank you. I think I

understand this one. Generally, first of all, the only question I see is the first sentence of the top text. I think that's all we're even really talking about here to reasonably argue it would not be hearsay potentially.

I guess the question, Mr. Kravis, is this really again being put forward to show that it was a loan and that would go to the truth of the matter?

**MR. KRAVIS:** It's being offered to show that Mr. Goldstein asked for a loan, and those are not the same thing. To the extent that the Court has any -- to the extent that the interpretation of the message is up in the air, Mr. Goldstein, of course, is going to testify. And he can testify that what he was doing here was asking for a loan.

But a request, I think this is just the difference between a factual assertion and a request. The statement "I would appreciate it if you would lend me $1 million," which does not need a question mark, is a request. And a request is not a factual assertion that can be true or false.

By contrast, a statement that is like "I am grateful for your decision to loan me a million dollars" or "thank you for lending me a million dollars" could be a factual assertion because, at that point, you're offering a statement about something that already happened. A request, "I would appreciate it if you would lend me $1 million," is not a factual assertion. It is not hearsay. It is not offered for

the truth. It is offered to show that the request was made.

THE COURT: All right. I think arguably the first line, "Do you happen to know whether the remainder of the loan will be okay with Richard" is a question. I guess I could see that as not being a statement. I'll allow the defense, if you want to use that part of it, you can. The rest of it, I think, has a hearsay problem. And it's up to you if you want to use just that first line.

MR. KRAVIS: Okay. Understood.

THE COURT: I think we're now up to Exhibit Number C or letter C.

MR. KRAVIS: Yes. So Exhibit C is a -- and for the record, this is Exhibit C is Defense Exhibits 737.1 through 737.14. These are a series of text messages and photographs of a ledger exchanged between Mr. Goldstein and an assistant for Mr. Phua. The Court has heard and the jury has heard a bunch about Mr. Phua already.

There has been evidence already introduced and Mr. Goldstein will testify that Mr. Phua invested in some of the poker matches that are at issue in the case, including the Chairman games, the Gores game, the Tango games, and that Mr. Phua was also instrumental in arranging other -- other gambling by Mr. Goldstein outside of the United States.

The Court and jury have heard testimony that Mr. Phua kept a ledger tracking Mr. Goldstein's wins and losses and the

amount of money they owed one another. These messages are between Mr. Goldstein and Mr. Phua's assistant, and they discuss -- they include photographs of the ledger, and they discuss the precise calculations of the amount of money that the two men owe one another.

For example, the message is 737.1, page 2. It's page 2 of the exhibit is a photograph of the ledger that Mr. Phua was keeping in Asia recording Mr. Goldstein's wins, losses and investor shares, including the shares of the Chairman games that the Court and the jury heard about.

Similarly, if the Court looks ahead to Defense Exhibit 737.5, in -- this is page 9 of the attached exhibits, this is a discussion between Mr. Goldstein and Mr. Phua's assistant about the precise calculation of Mr. Phua's share of the winnings from the Gores games.

Now, this is a little difficult. The numbers are a little difficult to decipher. These folks are speaking in shorthand. The Court can see they are moving quickly. But Mr. Goldstein will testify, and he will explain what he understood these messages to mean when he received them, and how he understood the photographs of the ledger that he was receiving.

**THE COURT:** So just to be clear, the defense is seeking to introduce the entirety of the text messages that seem to go on for several pages? All of Exhibit C?

**MR. KRAVIS:** Right. So Exhibit C is a compilation of

a series of text messages -- sets of text messages over a period of time. This is not the entire exchange in the thread.

We did produce all of that to the government a couple of months ago. These are just the selected excerpts that we would introduce during Mr. Goldstein's testimony.

THE COURT: And are you arguing that, what, either this is not hearsay or there is exception? I'm not following you.

MR. KRAVIS: Yeah. So there a couple arguments here. First of all, the ledgers and the messages discussing the ledgers are business records. There is clear case law that a ledger is a business record. Mr. Goldstein will testify that this ledger was kept in the regular course of his gambling activity with Mr. Phua.

THE COURT: I'm sorry, is it Mr. Phua's ledger or Mr. Goldstein's ledger?

MR. KRAVIS: Well, it's Mr. Phua's -- it's both of their ledgers. They are both using it to keep track Mr. Goldstein's wins and losses.

THE COURT: Who is typing in the document?

MR. KRAVIS: The document is being kept by Mr. Phua based on -- and Mr. Goldstein knows the details of that, and Mr. Goldstein understands it's being used to record their mutual -- their mutual use of the ledger. This is similar to *General Insurance Company versus United States Fire Insurance*

*Company*, the Fourth Circuit case that we cited.

Second, the messages are relevant for a nonhearsay purpose, which is Mr. Goldstein's state of mind. I heard the Court aptly note several times during the earlier argument this morning that this case is really about trying to get into what is in Mr. Goldstein's head, and these messages and the accompanying photographs, the ledger, are the most powerful evidence of what is in Mr. Goldstein's head, what he understood in terms of how much money was his, how much money was Mr. Phua's, and how much he was winning and losing in these games and abroad. And the reason that's --

**THE COURT:** Are you at 803(3) or something else? I'm not following you.

**MR. KRAVIS:** No. Yes. Yes. It's the exception that's relevant to state of mind, 803(3), a statement of the declarant's then existing state of mind.

Mr. Goldstein -- the messages that Mr. Goldstein receives are also relevant to his state of mind because he will testify that he received them and he read them, and they informed his understanding of where he was in terms of the gambling.

The reason that that is significant, of course, is because the question, the bottom line question for the 2016 gambling, is what was Mr. Goldstein's good faith belief about the numbers that he was reporting to his accountant, and his good faith belief about what he owed and what he did not owe in taxes.

These messages show what Mr. Goldstein's state of mind was with respect to his wins and losses in Asia, with respect to Mr. Phua's share of the games against Chairman and Mr. Gores and Tango and so on. They are, therefore, relevant to Mr. Goldstein's -- Mr. Goldstein's state of mind.

They're also -- the messages are also requests and negotiations. So communications back and forth about, like, I owe you this, you owe me that, under Federal Rule of Evidence 801(a) are -- and the Fourth Circuit's -- or the Eighth's Circuit decision in *Mueller versus Abdnor* are admissible, aside from the truth of the matter asserted, as statements reflecting the negotiations between the parties themselves.

The last thing I would note is I believe that these are also prior consistent statements. The government's argument throughout the trial has been that Mr. Goldstein was making false statements to his accountants and then later the IRS and then later, I think they are going to say in this trial, about what he understood in terms of his gambling winnings and losses.

These messages are probably the most powerful evidence that the jury could see about what Mr. Goldstein understood and what he was saying and what he was hearing about his state of affairs with respect to gambling in 2016. That is -- this is the most powerful evidence of the bottom line question here, which is, as the Court said, what was in Mr. Goldstein's head?

What did he understand about his gambling winnings and losses in 2016?

THE COURT: Well, Mr. Goldstein, if he is on the stand, he can, obviously, speak to that about the text messages.

MR. KRAVIS: Well, he can, but that does not mean the text messages are not admissible.

THE COURT: I'm not saying that. I'm just making the point that there is other evidence besides the text messages.

MR. KRAVIS: Right. But I actually view that a little bit differently.

I see the fact that Mr. Goldstein is testifying as a further reason to admit the messages, not an argument against their admissibility.

The reason I say that, of course, is because Mr. Goldstein is available to explain the messages, to explain what they understood them to mean and what he was trying to communicate, and then, of course, to be cross-examined about, well, no, that is not what it means, that is not what it says, or whatever it is.

The fact that Mr. Goldstein is available to testify further supports the admission of the messages because Mr. Goldstein can testify firsthand that these relate to -- that these informed his state of mind and how he understood them.

I'd note that throughout the trial, of course, many witnesses have been shown their own prior text messages and been asked, what did you mean by this, what did you mean when you said that, what did you mean when so and so told you this. This is that in the same vein, as Mr. Goldstein will be able to testify about his understanding of the information he was receiving, how it informed his state of mind, and what he understood the gambling situation to be, and that is really the bottom line question for 2016.

**THE COURT:** Thank you.

Let's hear from the government.

**MR. ADENRELE:** Just a few points here, Your Honor.

First, I believe in defense's brief that they filed late last night, it didn't address the two levels of hearsay, so we are dealing with this here the first time.

First, I think I heard or read that the ledgers and other documents embedded within these text messages were business records. I think the Court knows, you know, when you have communications, text messages, e-mails, those are rarely considered business records. Of course, with a question of whose business record it is.

Of course, within the rule itself, I'm not sure that we can say that these were records that are kept in the course of any regularly conducted activity of a business. I mean, these are communications between two individuals. So that is just

not applicable at all.

Whether this -- the messages themselves, on the first level of hearsay, it goes 803(3), that existing mental state or state of mind. Again, the rule speaks to looking at the existing state of mind, such as motive, intent, or plan to do something in the future.

I don't believe we heard any proffer from Mr. Kravis with respect to any of those issues. Sure. The first text message we looked at, maybe he was talking about what he was going to do in the future when he was traveling to Asia and what he was going there for.

These text messages, which go over multiple pages, three pages, don't speak to any of those three points, his motive, intent or plan to anything, and we heard no proffer whatsoever on that matter. So on the first level of hearsay, we don't have an 803(3) exception.

On the second level of hearsay, 803(6) simply does not apply. This is not a business record. We have seen business records throughout this case. We have had business record certifications, in which we have simply just admitted documents without witnesses on the stand. We have done that.

Here, obviously, the defense can't do that because, one, it is just not a business record and there is no one who is going to certify that it is, and we don't have anyone on the stand that could even go through -- and even if Mr. Goldstein

was here on the stand, he couldn't go through the elements of the business record exception.

The last thing I'll say about whether these statements are prior -- one moment. Whether these fit 801(d)(1)(D) as prior consistent statements, just for the Court's -- just for a little bit more of an explanation here, this rule, this nonhearsay rule, does not expand -- or does not extend to all prior consistent statements.

It's only used, one, for those that are offered to rebut a charge or a recent fabrication or improper influence or motive. And what is important about this is that the improper influence or motive has to have happened subsequent to the consistent statement.

So simply looking back and saying -- well, one, I'm not sure what the allegation here is the improper motive. We are not saying that it's an improper motive. We think it's a lie. But we are not saying there's some sort of improper motive or act or an improper motive for Mr. Goldstein to change his belief about, about whether these -- about whether his -- his wins or losses at the time.

So -- and I have not heard a proffer, yet again, about what the improper motive was or what was going on about this potential improper motive. Two, we haven't heard a timeline with respect to the improper motive that may or may not be being asserted here and the statement that came prior to that.

And so, again, with that, the prior consistent statement simply does not apply.

Now, if he's on the stand and we get into testimony and maybe some sort of argument about complete fabrication and the timeline of the fabrication of the statement with respect to the consistent statement or the consistent statement that's being alleged comes up, we can revisit the issue.

However, as of right now, to simply admit the statement as a prior consistent statement is certainly premature, and I would submit really, even in the future while he's on the stand, would still not be admissible.

THE COURT: Thank you very much, Counsel. I think I got this one.

I guess I'll make a few observations. Exhibit C is about 33 pages long, including a number of different text communications between Mr. Goldstein, I understand Mr. Phua. There is a lot going on in here. I think globally, it's just a no.

And I'll talk a little bit about the particular exceptions that the defense is raising. Business records, I don't see how the ledger could possibly come in as a business record. I'm not really even sure who is maintaining the ledger. I think maybe Mr. Phua is maintaining it with input. But in any event, Mr. Goldstein would not be able to do the proper certification. So that is not a place to start.

As to some of the other arguments, I'm going to start with issues that relate to what Mr. Goldstein's state of mind might have been at the time. I think we are, again, in 803(3). Globally, I don't see it.

Perhaps there is some things in here, Mr. Kravis, you can point me to once he's on the stand that might fit, and I'm going to leave the door open to do that in context. But looking through this right now, I don't really follow.

And, again, on the 801(d), similarly, I don't see how that exception is going to apply either. What I think is, again, once Mr. Goldstein begins to testify, if the defense wants to call up some of this, we can talk about particularly how it fits in, and I'm open to revisiting it at that time, but right now it's a no.

So denied without prejudice, and we can work that through as we get through the testimony.

I think that takes care of all three of the exhibits that the defense attached to their motion, so hopefully this at least helps a little bit with expediting some of the discovery issues.

I think our next step is to voir dire Mr. Goldstein and then, given the hour, we might want to talk about breaking for lunch before we begin.

Unless there is any objection, I would like to voir dire Mr. Goldstein at this time.

**MR. KRAVIS:** No objection.

**THE COURT:** Mr. Goldstein, if you want to pull your mic close to you so you can respond back to the Court.

I'm just going to ask you a few questions about your decision to testify.

**THE DEFENDANT:** Yes, Your Honor.

**THE COURT:** First, the Court understands that you have decided to testify in this matter; is that correct?

**THE DEFENDANT:** Yes, Your Honor.

**THE COURT:** Do you understand that you have the right to testify in this case?

**THE DEFENDANT:** Yes.

**THE COURT:** Do you also understand you have the right to decline to testify in this case?

**THE DEFENDANT:** Yes, Your Honor.

**THE COURT:** Do you understand if you decline to testify, that cannot be held against you in any way?

**THE DEFENDANT:** Yes, Your Honor.

**THE COURT:** Have you had the opportunity to consult with your attorney before reaching your decision to testify?

**THE DEFENDANT:** I have.

**THE COURT:** And again, is it your decision to testify in this case?

**THE DEFENDANT:** Yes, Your Honor.

**THE COURT:** Mr. Kravis, are there any other questions

you wish the Court to ask of your client?

MR. KRAVIS: No. Thank you, Your Honor.

THE COURT: All right. Thank you very much, Mr. Goldstein. The Court is satisfied that you have knowingly decided to testify in this matter. And so we can proceed with your testimony once we have the jury.

Are there any other issues to address before we talk about when we're going to get started?

MR. ADENRELE: Nothing else from the government. Thank you.

THE COURT: Mr. Kravis?

MR. KRAVIS: No. Thank you, Your Honor.

THE COURT: All right. It's about quarter of 12:00. Perhaps we'll have everyone take lunch, and then we'll begin in about an hour, and the defense can begin its case.

Any objection to that?

MR. KRAVIS: No objection. Thank you, Your Honor.

THE COURT: All right. So let's reconvene at one o'clock to begin or resume the trial, and we'll have the jury take its lunch break at this time as well. See you back then.

DEPUTY CLERK: All rise. This Honorable Court stands in recess until one o'clock. Thank you.

(Whereupon, a lunch recess was taken from 11:48 until 1:01 p.m.)

**DEPUTY CLERK:** All rise. This Honorable Court now resumes in session.

**THE COURT:** Please be seated, everyone. Welcome back from lunch.

Are we ready to have the jury?

**MR. KRAVIS:** Before the jury, Your Honor, I just have one question. My understanding is that Mr. Goldstein is allowed to bring the husher with him to the stand because, even while he's testifying, he has a constitutional right to participate in all aspects of his trial. But I wanted to make sure I'm giving him the right instructions before I tell him to do that.

**THE COURT:** All right. Is there any objection from the government?

**MR. ADENRELE:** No objection, Your Honor.

**THE COURT:** Okay. As long as he doesn't, you know, put it on until we're actually on the husher, so there is no suggestion that he's getting communication when we're not on the husher.

**MR. KRAVIS:** Oh. You mean, so like I'm communicating, okay. No. No.

**THE COURT:** Well, just so we don't even have that concern.

**MR. KRAVIS:** Okay. Got it.

**THE COURT:** All right. That's fine. Are we ready to

have the jury?

MR. KRAVIS: Yes, Your Honor.

THE COURT: All right. Let's have the jury, and then I'll invite the defense to call its first witness.

Please rise for the jury.

(Whereupon, the jury entered the courtroom at 1:04 p.m.)

THE COURT: Please be seated, everyone.

Members of the jury, good afternoon. It's a pleasure to see you and thank you for your patience. I hope you enjoyed a good lunch before we begin today.

Today I anticipate that you will hear the defendant's case, and you may hear from one or more witnesses this afternoon. I will have further guidance on schedule before we depart later today.

With that, again good afternoon and welcome.

Mr. Kravis?

MR. KRAVIS: Your Honor, the defense calls the defendant, Tom Goldstein.

THE COURT: Very well. Mr. Goldstein, if you would kindly stand by the witness box, remain standing, and the courtroom deputy will swear you in.

- - -

THOMAS GOLDSTEIN, after having been duly sworn, was examined and testified as follows:

- - -

**DEPUTY CLERK:** Please scooch your chair over to the microphone. Spell your first and last name for the record, please.

**THE WITNESS:** Thomas Goldstein. T-h-o-m-a-s. G-o-l-d-s-t-e-i-n.

**DEPUTY CLERK:** Thank you.

**MR. KRAVIS:** Your Honor, may I approach?

**THE COURT:** You may.

**DIRECT EXAMINATION**

**BY MR. KRAVIS:**

**Q.** Mr. Goldstein, did you cheat on your taxes in 2016?

**A.** No.

**Q.** The other years we've been talking about in this trial, 2017, '18, '19, '20, 2021, did you cheat on your taxes in those years?

**A.** No.

**Q.** The jury's heard some statements. The jury's heard about some statements in your tax returns that were not accurate. Did you cause those errors on purpose?

**A.** No.

**Q.** Did you even know about those errors until this investigation started?

**A.** No.

**Q.** The jury's also heard about some debts that did not appear on your mortgage applications. Did you leave the gambling

debts off your mortgage applications?

**A.** Yes.

**Q.** And just to be perfectly clear about this, did you know that you were leaving the gambling debts off the applications?

**A.** Yes.

**Q.** Why did you do it?

**A.** I did not want my wife to know about the scope of my gambling debts.

**Q.** Did you intend, when you did that, to defraud the mortgage companies?

**A.** No.

**Q.** By the way, do you also have a legal defense there?

**A.** Yes.

**Q.** All right. We'll talk about that a little later.

The jury's also heard that there were times when you fell behind on your taxes. Did you think that it was okay that you were allowed to pay back your taxes by making payments over time with penalties and interest?

**MR. BEATY:** Objection, Your Honor.

**THE COURT:** Let's come to the husher, please. Mr. Goldstein, you may also join us.

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:** All right. Mr. Goldstein, do we have you?

THE WITNESS: (Nods head up and down.)

THE COURT: All right. Mr. Kravis?

MR. KRAVIS: Yes, Your Honor.

MR. ADENRELE: Mr. Beaty?

MR. BEATY: Yes, Your Honor.

THE COURT: All right. Go ahead, Mr. Beaty.

MR. BEATY: Your Honor, I know habit's die hard. Mr. Kravis is leading. He's got to open his questions and speak for himself.

THE COURT: All right. So concern with the form of the questions.

Mr. Kravis?

MR. KRAVIS: I asked, "Did you think it was okay." I can add, "Did you or did you not think it was okay." But I don't think that's a question. It's just an answer.

MR. BEATY: He's absolutely inferring the answer from his questions. "Did you or did you not" doesn't solve that. If he did, then Mr. Kravis owes me an apology for many objections.

THE COURT: All right. I think we can phrase in a way that's not leading. Thank you very much, Counsel.

(Whereupon, discussion concluded.)

BY MR. KRAVIS:

Q. Mr. Goldstein, did you think it was okay or did you think it was not okay or did you think something else about whether

you were allowed to pay your back taxes by making payments over time with penalties and interest?

**A.** I thought that that was okay.

**Q.** Have you or have you not paid the IRS your taxes for '16, '17, '18, '19, '20 and '21 with penalties and interest?

**A.** I have.

**Q.** Do you know, by the way, how much you ended up paying the IRS in penalties and interest alone?

**A.** Unfortunately.

**Q.** How much?

**A.** About a million dollars.

**Q.** The jury also heard testimony during this trial about some debts that you owed to a fellow named Bob Safai, a fellow named Paul Napoli and Parabellum. Do you remember that?

**A.** Yes.

**Q.** Have those people or have they not been paid back?

**A.** They have.

**Q.** Did you ever try to walk away from those debts?

**A.** No.

**Q.** Looking back now, do you think that you made some mistakes when it came to how you handled your taxes?

**A.** Sure.

**Q.** Looking back, do you think you made some mistakes in how you handled your personal finances?

**A.** Sure.

**Q.** Do you think you made mistakes when it came to how you handled the finances of your law firm?

**A.** Sure.

**Q.** Do you or do you not understand that those tax returns were your responsibility?

**A.** The -- yes, I do.

**Q.** Do you or do you not understand that, for those mistakes, you could face civil penalties and interest?

**A.** Yes.

**Q.** But to be clear, did you willfully and intentionally put false information in those tax returns?

**A.** No.

**Q.** Mr. Goldstein, where did you grow up?

**A.** I grew up in the East Coast -- on the East Coast. I was born in New Jersey. My family -- my parents were very young. We eventually moved to South Carolina, and I bounced around between New Jersey and South Carolina and Florida.

**Q.** Where did you go to college?

**A.** Chapel Hill.

**Q.** Why did you decide to go to law school?

**A.** To be perfectly honest, I can't remember a time that I didn't think that I was going to be a lawyer.

**Q.** Did you ever think about going to business school or getting an accounting degree or going into finance or something like that?

**A.** That is not my skill set.

**Q.** The jury heard about the experience of the office managers. What kind of experience do you have in finance and accounting?

**A.** It's basically limited to this case.

**Q.** Where did you go to law school?

**A.** I went to American University in Washington.

**Q.** And what did you do after you graduated from law school?

**A.** I worked for some judges for a year. I went to a big law firm. I went to a small law firm that I helped start, and then I started my own law firm that gave rise to the firm we've talked about.

**Q.** The jury has heard a little bit about some of the cases you handled before the United States Supreme Court. How did you become interested in practicing before the Supreme Court?

**A.** When I was a law student at AU, it's not a school where you get really high paying law jobs as a summer law student, so I worked for free for Nina Totenberg, who is the National Public Radio legal affairs correspondent. And what she basically covers is the Supreme Court, and I just kind of fell in love with it then.

**Q.** And what was your relationship like with Ms. Totenberg from NPR?

**A.** Kind of our adopted mother. My first -- my daughter's name is Nina. My -- she was an intern for Nina Totenberg. So

was my wife.  So was my sibling.  Just kind of family.

Q.   Now, these Supreme Court cases we've heard about, the briefs and the arguments and so on, are those hard to get?

A.   You do have to, if you really want to be involved in that, you have to be willing to go out and get them.  They won't come to you, and it's harder now than when I started.

Q.   So as a young lawyer, how did you manage to go out and get yourself Supreme Court cases and arguments?

A.   I -- I guess I was just more willing to put myself out there.  I would try and identify cases that I thought the Supreme Court was interested in.  I would reach out to the lawyers involved in those cases and ask if I could somehow get involved and kind of one built on another.

Q.   The jury heard Ms. Harrington testify I think it was last week that you changed the practice of Supreme Court lawyering, something to that effect.  What did you understand her to mean by that?

A.   I think she's talking about that.  The people who do what I did as a Supreme Court lawyer tend to be very very fancy lawyers.  They went to elite law schools.  They clerked on the Supreme Court.  They worked in the solicitor general's office as Sarah did.

And for somebody to come along and just say, "Look, I'm going to do this, I'm going to build this practice, I'm going to get involved in this thing," was kind of a new thing.

**Q.**   Approximately, how many cases have you argued before the Supreme Court?

**A.**   It's -- it's in the mid 40s.

**Q.**   Now, we have been talking about the Supreme Court and handling appeals.  In your career as a lawyer, do you have much trial experience?

**A.**   No.  I was -- I sat through a trial that lasted a couple of hours when I was in -- in 1988.  I sat through a trial in Macau that was in Portuguese, and now we are here.

**Q.**   I'm not going to ask you to walk us through all of them, but can you tell us about just a few of the big Supreme Court cases you've handled over the years?

**A.**   The most prominent case that I did was *Bush versus Gore*, which was the presidential election case.  I was the second chair for Al Gore.  I managed the case for the Democratic Party and for the candidate.  That went to the Supreme Court twice.

There have been a bunch of privacy cases, free speech cases, civil rights cases.  A lot of search and seizure and free speech, probably more than anything else.

**Q.**   Now, when you are doing cases before the Supreme Court, how does it work in terms of, like, focusing in on the legal issues in the case?

**A.**   The justices -- and we think about them taking big, big constitutional cases because that's what we hear a lot about, you know, rights to marriage, and really, really significant

things.

The justices actually tend to take narrow questions most of the time, and just expect you to dive very, very, very, very deeply into them. And so they will take a very particular question. This case has a bunch of issues in it, for example. A Supreme Court case would have, basically, just one or two, but it would be handled with incredible depth.

Q. Now, have you worked on some tax cases in the past in your career?

A. There have been isolated tax questions that I've -- you know, over the course of an entire career.

Q. When you were describing that deep, deep dive you have to take for the Supreme Court cases, had you ever had the occasion in your legal career to do that kind of deep, deep dive on the particular IRS rules and regulations involved here?

A. Not deep dive, not undeep dive, not paddle around.

Q. I want to ask you about one other thing in your career.

On the very first day of trial, the government put up an e-mail between you and Mr. Gores that mentioned your work for the White House.

Do you remember that?

A. Yeah.

Q. And then we kind of never heard about it again. I just want to bring us back.

MR. KRAVIS: Can we take a look -- this is

Government's Exhibit 332, and this is in evidence.

**BY MR. KRAVIS:**

Q.   I want to direct your attention, Mr. Goldstein, to the message that you wrote to Mr. Gores on March 6 of 2016.  It's the second message from the top.

          **MR. KRAVIS:**  If we could focus on the -- yeah.  The top is two messages is fine.

**BY MR. KRAVIS:**

Q.   We saw this on the very first day, but your message on March 6, 2016, 3:52 p.m., you write to Mr. Gores, "I do have one request, that we keep the game very private.  People love to talk about your games."

     Do you see that?

A.   Yes.

Q.   And then you write, "I'm doing a bunch of stuff with the White House now and have my law practice generally."

     Did I read that right?

A.   Yes.

Q.   So, first of all, just generally, why are you writing to Mr. Gores here?

A.   I'm trying to set up a poker game.

Q.   When you mentioned privacy, what was it that you were referencing in terms of the bunch of stuff at the White House?

A.   I worked with the administration on the Supreme Court nominees and kind of the government's position in the Supreme

Court as an outside adviser, including with respect to some requests from the president, and I think my view was that was a great opportunity and it would be bad if that -- you know, if playing high-stakes gambling came out publicly.

MR. KRAVIS: Thank you. We can take that down.

BY MR. KRAVIS:

Q. Are you still a full-time practitioner before the Supreme Court today?

A. No.

Q. Why did you decide to retire from being a Supreme Court advocate?

A. It's one of those things it's a combination. You know, I had done the same thing for a quarter century. Had kind of gotten what I could out of it. The kinds of people that I represented in the Supreme Court tended to be the little guy. The court was getting much more conservative -- not just conservative, much more conservative, with the new appointees, and I had opportunities when it came to, you know, playing poker.

Q. Why did you decide to start your own law firm?

A. I like to be my own boss.

Q. Was there a period of time when the law firm was operating out of your house?

A. Yeah.

Q. Was I working for you back then?

**A.** You, indeed. Exactly. And sorry that we had to get together again.

**Q.** The jury has heard a bit about how the name of your law firm changed over the years.

Can you just give us a brief history of the forms that the firm went through?

**A.** Sure. Law firm names are not like company names. They tend to vary as lawyers come in and out, depending on the significance of the lawyer.

So it started out as Thomas C. Goldstein, PC. Amy joined the firm. It came Goldstein Howe. Kevin joined, Kevin Russell was here. It became Goldstein, Howe & Russell.

I then left to go work for a big firm and I just -- they were doing all pro bono work, all free work, civil rights work and stuff like that. So I just paid for their law firm, and then it was Howe & Russell.

Then I came back and it ended up -- when Amy went to go work for the blog, SCOTUSblog, full time, it became Goldstein & Russell.

**Q.** Now, the jury had a chance to hear from Kevin Russell several weeks ago.

Why did you decide to bring Mr. Russell on as a named partner in your law firm?

**A.** He's really talented and a nice guy, as I hope people got a sense of. He was working for the government. We were doing

a case where he represented the Clinton administration and I represented the plaintiff in a civil rights case in the court of appeals that was going to go to the Supreme Court, and it did. And we argued it together there and I got to know him and, you know -- and I was having -- I had more work to do and he wanted to -- an election happened. Somebody else won the election and the -- kind of the politics of it changed, and he was looking to come out and join the law firm, and so it worked out.

Q. The jury also heard from several of the younger lawyers who worked at your firm, like Daniel Woofter and Sarah Harrington.

Was it important to you when you had your own firm to bring on younger lawyers, in addition to more established folks, like Mr. Russell?

A. Sure. I think everybody who is building something wants to bring people up, you know.

Q. The jury has also heard from some of the firm office managers. There was Molly Runkle, Jon Levitan, Katie Bart, Angie Gou.

Why did your law firm hire recent college graduates into the role of office manager?

A. So the idea is or my kind of thinking about things is you get the smartest person you can, and you work with them and you let them pick up challenges. You are only going to have one

person working in the law firm as a staff member, and so that's not the easiest thing. Like, we have heard that there's some money issues, but there is lots of logistics issues. There is all kinds of things.

So the idea was, you know, get somebody really, really smart. And our shot at getting somebody really, really smart was somebody coming out of college who we thought -- or they thought probably wanted to go to law school, and so we would have them for a couple of years. They would work really hard for us, and then, generally, they would go on to law school. It has upsides and its downsides, but that was the idea.

Q. You mentioned people -- the office managers going on to law school.

Are you proud of what those office managers have accomplished in their careers since then?

A. Sure. Of course.

Q. At the time, did you think that you were giving the office managers more responsibility than they could handle?

A. No. I'll say I thought that I was challenging the office managers, but it's apparent from, you know, some of what I have learned that they may have felt, and they may be right, that it was too much sometimes.

Q. What was your reaction to hearing the testimony from the firm office managers during this trial that they felt they could have used more support in some of their tasks?

**A.** I mean, I -- I just take -- I do take responsibility for that. I think that this is a small workplace. I own the workplace. I set the tone for the place. And if it was overwhelming for them, I did not realize it at the time. I don't think people have said that they were telling me, you know, at the time -- in the moment that they were having an issue, but it's my job to know that, and so I regret that and, you know, wish that that was not true.

**Q.** Yeah. Looking back now, do you think it might have been wiser to give the office managers a little bit more training and support in certain aspects of the job?

**A.** Sure.

**Q.** But just to be crystal clear about this, who was responsible for accounting and tax preparation for Goldstein & Russell?

**A.** Well, here I'm paying somebody. I pay a firm to do that. I pay GRF to do that.

**Q.** That's GRF?

**A.** Yeah. Sorry.

**Q.** In addition to starting your own law firm, did you also cofound something called SCOTUSblog?

**A.** Yes.

**Q.** What is SCOTUSblog?

**A.** Is SCOTUSblog is the Supreme Court of the United States. That's the SCOTUS part. Blog, it's a website devoted to

covering the Supreme Court.

**Q.** When did you create SCOTUSblog?

**A.** It was at the time that Nina was born, so around 22 years ago.

**Q.** And has SCOTUSblog become a widely recognized source for Supreme Court news?

**A.** People have said that very kindly, yes.

**Q.** Where did the money come from to create the blog and keep it going over the years?

**A.** For me, there were a few years where we might have, like, a little bit of sponsorship, some corporate sponsorship, but basically from me.

**Q.** How much money do you estimate you put into SCOTUSblog over the years?

**A.** 8 million to $10 million.

**Q.** Do you still own SCOTUSblog?

**A.** No.

**Q.** What happened to it?

**A.** It was sold as a result of this.

**Q.** In addition to the law firm and the blog, did you also teach?

**A.** Yes.

**Q.** What did you teach?

**A.** I taught this. Supreme Court litigation.

**Q.** And did you do that in the context of a law school clinic?

**A.** Yes.

**Q.** And what is a law school clinic?

**A.** A law school clinic is, you know, like in school, you have a teacher who teaches you a subject. A clinic, the idea is now we are going to do it -- do the real thing.

So a Supreme Court clinic is we are going to do real Supreme Court cases.

**Q.** Now, I think law school clinics have been around for quite a while. But are you actually the person who came up with the idea of doing a Supreme Court law clinic?

**A.** I suppose.

**Q.** Were your Supreme Court law clinics the first of their kind in the country?

**A.** Yeah.

**Q.** Where did you teach them?

**A.** First at Stanford and then also at Harvard.

**Q.** With everything else you had going on with the firm and the blog and so on, why did you also take on the responsibility of teaching?

**A.** A couple of reasons. Remember, because it's real cases, it can be my real cases. So the law firm was doing half of all of its work for free for, like, indigent people and things like that. So we could take those cases, I could put them into the clinic, and it would work out well because you would get the free help of law students.

I really believe, since I went to AU, you don't have to be some, you know, super super star to do the cases of the Supreme Court, so I would involve the students. It's a balance. You know, it took the time up from teaching, and then you also get to work with, you know, up and coming young lawyers.

Q. All right. We talked about starting your own law firm and SCOTUSblog and the teaching. I want to ask you now about how you handled firm finances and taxes in the years that we've been talking about in this trial.

Did you pay a lot of attention to the finances of the firm?

A. No.

Q. Were you good about getting the invoices out to clients and following up to make sure they got paid?

A. No.

Q. To be clear, did you keep the financial books and records for your law firm?

A. No.

Q. Who did you rely on for that?

A. This is the thing about hiring GRF, yes.

Q. And when GRF had questions, like, for example, questions about how to classify a particular transaction, would they come directly to you or somebody else?

A. Somebody else.

Q. Who would GRF ask?

**A.** We only had one other somebody else, and it would be the office manager.

**Q.** Now, we're going to look at some specific examples later. But just to be clear, if the office managers came to you with a question about firm transactions, what would you do?

**A.** Answer them.

**Q.** And would you try your best to answer it truthfully?

**A.** Sure.

**Q.** You're answering the questions as they come to you. Are you checking the financial books and records of the law firm on a regular basis for accuracy?

**A.** No. The law firm doesn't have the books and records of the law firm to check for accuracy.

**Q.** I want to show you one e-mail that we saw earlier in the trial. This is Defense Exhibit 744.

        **MR. KRAVIS:** Okay. If we could highlight the two -- if we can bring up? It's just the two messages.

**BY MR. KRAVIS:**

**Q.** Do you see the bottom e-mails from Mr. Deyhle, one of the folks at GRF, and he's writing to you?

**A.** Yeah.

**Q.** And he says, "Hi Tom. Ian will send 2A. You need to get 2B from Bench." Do you see that?

**A.** Yes.

**Q.** Okay. As you sit here today, do you know what Bench is?

**A.** Sure.

**Q.** As you sit here today, what is it?

**A.** It is the outsourced accounting software package/accounting company that we started using after around 2020 apparently.

**Q.** Looking back to what you knew then, what do you do with Mr. Deyhle's e-mail?

**A.** I turn to Angie and I ask her what he's talking about. Do you know what he means by Bench?

**Q.** And why did you have to e-mail Ms. Gou to ask what Mr. Deyhle means by Bench?

**A.** Because I don't know what Bench is, which is unfortunate, but is the truth. I didn't know, you know, what we were doing for accounting just in terms of my level of involvement.

**MR. KRAVIS:** We can take that down.

**BY MR. KRAVIS:**

**Q.** I want to ask you about one more thing when it came to your finances. During the relevant time period, the period we've been talking about, did you have a personal Wells Fargo bank account?

**A.** Sure.

**Q.** Did you keep that account a secret from the office managers?

**A.** No.

**Q.** Did you, in fact, communicate with them sometimes about

Q. that account?

A. Lots.

Q. Did you keep that account a secret from the IRS?

A. No.

Q. I'm going to talk a little bit more about that later. Recognizing you didn't try to keep it a secret, did you give the office managers access to that personal bank account?

A. In terms of being able to log in and do transactions?

Q. Right.

A. No.

Q. Why not?

A. It's private. I mean, they are the office managers. They have -- they will pay bills and things like that, but this is something that, you know, was just not their role.

Q. Let's talk about your taxes. When it came to your taxes, the period we've been talking about, 2016 through 2021, were you paying a lot of attention to how your taxes were prepared?

A. No.

Q. Who did you rely on there?

A. That's -- well, this is particularly Walter, but GRF.

Q. Now, the jury heard a few weeks ago from the guy you had before Mr. Deyhle, Bill Caldwell, and how you moved on from him. Why did you decide to move on from Mr. Caldwell back in the day?

A. We got audited. It's a scary thing. Kind of doesn't

compare to this, but it's still a scary thing, and it just seemed like I just lost confidence in him.

**Q.** After Mr. Caldwell, who did you hire to handle your tax returns?

**A.** GRF and the tax guy, Walter.

**Q.** And was GRF doing just your returns or also the firm and the blog?

**A.** All of it.

**Q.** We're going to talk more about GRF a little later. But for right now, let me just ask you, would you sit down and go over your personal tax returns with GRF every year?

**A.** Back then?

**Q.** Yes.

**A.** No.

**Q.** And back then, 2016 to 2021, would you sit down and go over the firm and blog tax returns with GRF every year?

**A.** No.

**Q.** Why not?

**A.** My mentality was -- and this is not me disclaiming responsibility or saying the taxes aren't my responsibility, but just in terms of what I was thinking, I do not like accounting. I don't like dealing with the taxes. I paid somebody to do it.

Again, this is not me saying I'm not responsible. But if you just want to know what I was thinking, nobody was telling

me I needed to sit down. They said you can sign this and I signed it.

Q. In this period, the years we've been talking about, 2016 to '21, do you think you even read the tax returns before they were filed?

A. No. And I have seen these e-mails where they e-mail it to me and then I e-mail it back minutes later.

Q. Looking back at that time period, 2016 to 2021, looking back at it now, do you think you handled this well, the tax returns?

A. No.

Q. Why not?

A. Well, look, the -- you have to learn lessons from things. And now, I have, obviously, a much greater understanding of like the kinds of mistakes that can happen and the questions that people can ask later, and so I wouldn't want -- I would not want to experience this.

Q. Let's talk a little bit about poker. How did you get into playing poker?

A. It became a little bit of a thing in the law firm. A former professional poker player named Tejinder Singh joined the law firm. It was right at the time of kind of poker boom on TV. ESPN was televising the World Series of Poker. And we -- it started out with just, you know, people around the firm playing.

**Q.** What did you like about playing poker?

**A.** I think playing poker is a little bit of problem solving. You have to like figure out the strength of your position, the strength of other people's positions, be able to, you know, work through it. It's a weirdly intellectual thing.

**Q.** The jury's also heard a little about some different styles of poker here. First of all, can you just remind us, what's the difference between heads-up poker and ring games?

**A.** You and I would be playing heads-up poker. It would be the two of us. And the defense and the prosecution, all of us together, would play a ring game.

**Q.** But which of those did you like better?

**A.** I mean, I liked them all. I did better in the heads-up thing by a lot.

**Q.** Why did you do better in the heads-up thing?

**A.** So heads-up poker -- oh, ring poker requires you to be very patient. If all of us were playing, the odds that somebody had a better hand than me would go up a bunch. If it's just you and me, then I've got a better shot of that and I can play more aggressively.

**Q.** Now, the jury heard some about heads-up versus ring games. We didn't actually hear a lot about No Limit Texas Hold'em. First of all, what is the style of No Limit Texas Hold'em?

**A.** So No Limit Texas Hold'em is however much money you have, I have or whoever the two people are playing, in any given

moment in any given hand we can bet it all.

Q. What did you enjoy about playing no limit Texas Hold'em in particular?

A. It's the ability to essentially risk everything, to say I believe that I have the better position. I will put it all on the line. That involves being -- and someone else can do that to me, too. And I have to be able to withstand that pressure. I have to be able to put that pressure on. And that is some -- that is something that, you know, some people thrive in and some people don't. And I'm not saying it's a good thing, but it's what I like the most.

Q. Now, we heard some questions during the trial suggesting that your poker playing was like some big secret. Was it a big secret at your law firm that you liked playing poker?

A. Certainly not.

Q. Would you sometimes organize poker games at the firm?

A. Sure.

Q. When did you start playing poker for higher stakes?

A. Everything is a sense of scale, so, you know, it depends on what we mean by "higher." But I would say the numbers started going up, you know, from 2010 on.

Q. Did you actually have a personal experience in 2014 that kind of changed your outlook about these kinds of activities?

A. Yeah. I had a pulmonary embolism and I almost died.

Q. And how did that experience lead you to get deeper into

the world of high-stakes poker?

A.    I think it gave me a sense of kind of you only live once and, you know, to live life to the fullest.  I may have over cooked it a little bit.

Q.    Now, how did you get into this circle of the folks we've heard from in this trial who were playing in these ultra high-stakes poker games?

A.    Through Paul Phua.

Q.    In the years that we've been talking about -- I'm going to ask you more about Mr. Phua in a minute -- but in the years we've been talking about, 2016 to 2021, how did you do playing high-stakes poker?

A.    I lost.

Q.    Is that in every year?

A.    Yeah.

Q.    Even 2016?

A.    Yeah.

Q.    And we're talking about that later, too.  Do you have a sense of how you're doing lifetime as a high-stakes poker player?

A.    Unfortunately.

Q.    What is it?

A.    I think I'm down about $10 million.

Q.    Now, did there come a time in 2016 when you took on investors in some of the games that you played?

**A.** Yeah.

**Q.** And which games in particular in 2016 did you take on investors for?

**A.** The three heads-up opponents who I trained with the coaches for and who they then told Paul and other people I was ready to play.

**Q.** And that's Chairman, Gores and Tango?

**A.** Yep.

**Q.** Why did you go out and look for investors in those games?

**A.** Well, it divides into two parts, please. For some of the games I couldn't get into without Paul, and for all of them, the stakes are so high that I -- you know, I couldn't put myself into those games.

If you want to have somebody else risk 10 or 20 or $30 million, you know, the idea that you might lose a few hundred dollars, which is real money, don't get me wrong, but to those people, these are billionaires, it's not real money.

So I had to be able to put up more money than I could. And then there's also the problem, like, if I put up all the money I have in the world and then I lose, then I'm done. It's a way of spreading risk.

**Q.** Now, just to be clear on how this works, when you have investors in these games and you win, what do the investors get?

**A.** They get their proportionate share.

**Q.** And when you have investors in these games and you lose, what are the investors' obligations?

**A.** The other side of it. They lose some, too.

**Q.** When you are playing in the games and you have no investors and you lose money, who has got to pay all the losses?

**A.** Me.

**Q.** So was 2016 the first time that you actually had investors in high-stakes poker games you were playing?

**A.** Yes.

**Q.** So was that the first year, 2016, that you had to deal with the tax rules that come with poker investors?

**A.** Yes.

**Q.** Now, the jury heard from high-stakes poker players during this trial. There was Mr. Robl. Way back at the beginning, there was Mr. Gipson, Mr. DeCarolis. Mr. Salomon.

Are all of those folks professional poker players?

**A.** Yes.

**Q.** Do you have -- did you have, in 2016 -- in 2016, did you have the same kind of background and experience in investors and how all that worked as these professional poker players?

**A.** No. They, even by then, had been doing it for, like, ten years each.

**Q.** And after the games you played in this time period, Chairman, Gores, Tango, throw in Mr. Safai, after that time

period, did you continue taking on investors, or did you stop?

**A.** I stopped.

**Q.** Why did you stop?

**A.** Well -- and I should say, until, you know, much later. If you are talking about in the period 2016 to 2021?

**Q.** Yes.

**A.** Why did I stop? I had no choice. You know, I wasn't in these kinds of matches anymore. I wasn't playing poker where other people said, "I think Tom is likely to win, so I want to get, you know, a piece of that possible profit."

**Q.** After the games of those time period, Chairman, Gores, Tango, Safai, when was the next time you played in a poker game where you had taken on investors?

**A.** With the very, very exception -- you wouldn't call it an investor. Sometimes people would say, "If you come play in this poker game, I will cover ten percent of your losses." That is not somebody hoping to profit. That is somebody hoping you will lose.

So like we were talking with the Gores match and things like that, that would be Andy Beal.

**Q.** And when was that?

**A.** That is much more '21-ish.

**Q.** So when the IRS interviewed you --

**A.** '22.

**Q.** -- in October of 2020, had you played in any poker games

with investors since Chairman, Gores, Tango, and then Safai?

**A.** No. As of that time, no.

**Q.** Did you have -- you mentioned that sometimes you play in ring games.

Did you have investors in the ring games you played in?

**A.** No.

**Q.** Why not?

**A.** People did not have faith in me, perhaps for a good reason.

**Q.** Now, I want to ask you about how the winnings and losses get settled up in these ultra high-stakes games.

When you are playing heads-up against another fellow, like Mr. Gores, for millions of dollars, is Mr. Gores, like, bringing cash to the game to pay you whatever you win?

**A.** No. That is not where the bag of cash comes from.

**Q.** So how do you settle up at the end?

**A.** Well, you could settle up in a few different ways. With Alec, though, there were wires.

You could have a situation in which, if you already have a debt with somebody, you could swap that debt. You could do a transaction where you -- one person gives to another person who gives to another person.

There's -- it's going to be done financially, and in the high-stakes community, there is generally desire to just keep the -- keep it simple, as simple as possible, and reduce the

number of wires.

**Q.** Can that process of settling up after an ultra high-stakes game take some period of time?

**A.** Sure.

**Q.** Could it take as long as months?

**A.** Sure.

**Q.** Will you have written contracts with investors and the people you are playing against that document all this?

**A.** No.

**Q.** Why is that? You are talking about transactions involving millions of dollars. Why, in your experience, are there no written contracts here?

**A.** All right. This is a place where high-stakes gambling is very strange.

In every other part of life, the idea that you -- someone would owe you $1,000, much less 10,000 or a 100 or a million or even $10 million, you would have a written agreement.

The people who play super high-stakes poker are constantly interacting with each other. It's as if we've known each other for a really, really, really long time. There is a culture of trust and reputation because there is only so many people who will play like this.

So people are either trusted in this way or they are not, and it is -- there are rare times when it happens. In the Bob Safai example, like, I was overdue in paying him and he wanted

confidence. He said, like, if something happened to me or something like that. But those are really an exception.

The way that this works is with simple text message and even sometimes verbal understandings.

MR. KRAVIS: Could we have slide one, please?

BY MR. KRAVIS:

Q. Now, Mr. Goldstein, we have heard testimony about a bunch of different topics in this treat.

For your testimony, I want to talk about what happened here in chronological order, starting in 2016 and moving forward. I want to walk with you through the timeline of events.

You got that?

A. Yes.

Q. And just fair warning, a lot of the questions are going to be about 2016 gambling, what we are doing right now.

Okay. Let's get started.

I want to talk with you about the poker games that you played in 2016.

MR. KRAVIS: And can we start, please, with Government's Exhibit-1?

BY MR. KRAVIS:

Q. I think the first theory we heard from the government way back in their opening statement was that you made $26 million playing poker against Alec Gores, and then you hid it from your

accountants; is that true?

**A.** No.

**Q.** What is the truth about this?

**A.** The truth is that I told Walter in writing this number plus more.

MR. KRAVIS: Can we take this one down.

Can we have Government's Exhibit 412, page 5?

**BY MR. KRAVIS:**

**Q.** The next theory we heard from the government was that you made $50 million playing against Chairman, Gores, and Tango, heads-up, in 2016; is this true?

**A.** No.

**Q.** What is the truth?

**A.** This is what they lost, not what I got from it in any way, shape or form.

**Q.** Why is there a difference between what they lost and what you got?

**A.** Because when I'm in these games against Chairman and Gores, for example, I have about one third of that. They are -- all of those go to the investors who are involved, got me involved, are spreading the risk.

With Tango I had a bigger share, but it is still, you know, substantially less than that.

**Q.** So we are going to walk through these numbers in some detail, but just to be perfectly clear, why is it that the

numbers on this slide do not reflect what you took home from these games?

**A.** Because I -- I have a share of myself, and my share is much smaller than the whole.

**MR. KRAVIS:** Can we take this one down and put up Defense Exhibit 340?

**BY MR. KRAVIS:**

**Q.** The next theory we heard from the government was that you falsely claimed, like, $3 million in deductions on this document you created; is that true?

**A.** No.

**Q.** What is the truth about this document?

**A.** This document is a list of wires. This is going to be the second version of it. So this is the October 2017 one. And so these are wires that went -- if we start out with, because that's where most of the numbers are, these were wires -- there are a couple of checks, but these are wires and a couple of checks going out of the bank accounts related to poker, and the ones at the top are, you know, larger transactions coming in.

**Q.** To be fair, looking back now, are there some errors in this document?

**A.** Oh, sure. I mean, the document is -- was never finalized. I mean, it's always a draft. There are always brackets, there are question marks, and things like that.

But yes, there are mistakes.

Q. But to be clear, were you trying to hide your gambling winnings from 2016?

A. No.

Q. If you had been trying to hide your gambling winnings from 2016, would you have told your accountants that you made $2.7 million gambling?

A. I mean, I don't really think of myself in those terms, but I suppose I would not.

Q. As you -- going back and put it altogether.

What is the truth about what happened with your gambling winnings and losses in 2016?

A. Do you mean like logistically or financially? What do you mean?

Q. I mean like financially?

A. Like, every year before and every year since, I lost.

Q. How is it that you ended up reporting a $2.7 million net profit from gambling on your tax returns if you actually lost money?

A. Because I used, you know, utterly the wrong way of computing my gambling wins and losses very, very, very quickly.

Q. Just to sort of cut to the kind of bottom line here, and then we'll talk in more detail, is there one, like, enormous mistake on this document?

A. Yeah.

Q. What is the one enormous mistake on this document?

**A.** This is wires. And Paul Phua had one-third of Alec Gores, and there is no wire to Paul Phua.

**Q.** Why is there no wire to Paul Phua for the third of Alec Gores?

**A.** The Alec Gores game and the Tango game happened at the end the year -- or the Tango matches -- and our shares of each other -- of our winnings from both matches is basically the same. So when Tango paid in 2017, we just swapped the debts.

So I never had to wire the money out to him, but I didn't earn that part until Tango paid in 2017. In 2016, I am just holding money for Paul Phua, kind of in a virtual sense.

**Q.** So Paul Phua got paid his share of Gores through this swap from Tango in 2017.

How did that lead to there being this enormous error on the document that you used?

**A.** Well, to be clear, Paul Phua is paid his share in the sense the wire comes in from Alec, Paul Phua has a share of that. He's paid. I'm the person who the money is sent to. The question is when I'm going to send it to him.

Then I beat Tango. Tango eventually pays. And when Tango pays, there's a little bit of a balance and Paul has me, you know, pay off the balance.

So, basically, it's -- at the end of 2016, I'm holding onto money for Paul. In 2017, he gets paid money from me, and then we just balance the accounts.

**MR. KRAVIS:** Can we take this down?

**BY MR. KRAVIS:**

**Q.** So I'm going to walk you through all of that, the wins, the losses, the calculation, and all of it.

But first, I just want to be clear, I think I heard you say a moment ago that everything that you just described is something that you have put together as you've looked back on it for this case.

Did I hear that right?

**A.** Yeah. From -- from -- from message -- not from just like remembering it, from message, yes.

**Q.** But I want to just talk about what your good faith belief was at the time --

**A.** Sure.

**Q.** -- in 2016 and 2017.

**MR. KRAVIS:** Could we have the joint stipulations of fact, please?

**BY MR. KRAVIS:**

**Q.** Mr. Goldstein, is this a stipulation that you have entered into with the government?

**A.** Sure.

**Q.** It's a stipulation of facts in this case?

**A.** Sure.

**MR. KRAVIS:** Can we turn to the very last page of the document, please? At the top there -- no, the very last page.

You got it right.

**BY MR. KRAVIS:**

**Q.** At the top there, is that your signature on the document?

**A.** Yes.

**Q.** All right.

**MR. KRAVIS:** Let's turn back to the previous page.

**BY MR. KRAVIS:**

**Q.** I want to direct your attention to paragraph seven. And I talked with Agent Ranahan about this yesterday. I want to just read this to you and then I'm going to ask you about it.

"At the end of 2016, Mr. Goldstein played a California businessman named Alec Gores in Beverly Hills and won 26.435 million, the biggest score of his life." Are you with me so far?

**A.** Yes.

**Q.** "Earlier that year, Mr. Goldstein also won $200,000 in a game that included the actor Kevin Hart. During this run, Mr. Goldstein won a total of about $50 million. And even though he had sold about 75 percent of his stakes to investors, Mr. Goldstein still personally cleared about $12 million."

Did I read that correctly?

**A.** Yeah.

**Q.** Okay. The stakes to investors, is that what you were telling me about earlier, the folks who have shares in the game?

**A.**    Yes.

**Q.**    And at the time, in 2016 and 2017, was it, in fact, your good faith belief, as it says here, that you personally cleared about $12 million from the game -- the high-stakes games you had played?

**A.**    Yeah.  I cleared -- in 2016, I cleared $12 million here.

**Q.**    Okay.  And then the next thing it says is, "Flush with his success against Gores, Mr. Goldstein sat down to a heads-up match with a real estate magnet named Bob Safai, and this time he didn't spread the risk by taking on backers.  Mr. Goldstein said, I just have convinced myself, because I won $50 million in heads-up poker, that I am a savant at heads-up poker.  Mr. Goldstein promptly lost $14 million to Safai all out of his own pocket."

       Did I read that correctly?

**A.**    Yeah.

**Q.**    So you told me that you -- your good faith belief was that you had cleared 12 million.  What was your good faith belief about your losses?

**A.**    Okay.  I mean, we have to be clear about years because the -- as was suggested yesterday, the 14 million to Safai is not all in 2016.  So there is a part that I lose to Safai in 2016, and then I lose a bunch of other money to other people in 2016.

**Q.**    Thank you.  That's a very helpful clarification.  Just

focusing on 2016, what was your good faith belief at the time about how much you had lost?

**A.** I had lost at least \$10 million.

**Q.** All right. So you had a good faith belief you cleared about 12 million, and you had a good faith belief you lost about 10 million.

**A.** Yeah.

**Q.** What was your good faith belief about where you came out?

**A.** Around 2 million.

**Q.** And what was the actual net number that got reported on the 2016 tax return?

**A.** 2.7.

    **MR. KRAVIS:** All right. We can take that down.

**BY MR. KRAVIS:**

**Q.** Let's start with Chairman. Did there come a time when you played a series of poker games against the Chairman over the course of 2016?

**A.** Yes.

**Q.** Who got you in to play the Chairman?

**A.** Paul Phua.

**Q.** Now, we've heard a lot about Paul Phua during this trial.

    **MR. KRAVIS:** If we could have Government's Exhibit 436. Okay. We'll get in a minute. I think it's a picture of Mr. Phua that came into evidence.

**BY MR. KRAVIS:**

**Q.** Who is Paul Phua?

**A.** Paul Phua is a Malaysian Chinese businessman and poker player.

**Q.** How did you meet Paul Phua?

**A.** He was my client.

**Q.** And your client, was that in a criminal case back in 2015?

**A.** Yeah. This was kind of the biggest nonappellate Supreme Court thing I ever did.

**Q.** And where was that case?

**A.** Las Vegas.

**Q.** What was Mr. Phua charged with?

**A.** Running an illegal gambling operation which gave rise to a bunch of charges.

**Q.** And was that in state court or federal court, like who brought the charges?

**A.** The U.S. Department of Justice.

**Q.** Now, what were the possible consequences to Mr. Phua if he had been found guilty in that case?

**A.** Very severe.

**Q.** And were there -- was it just Mr. Phua or were there other defendants?

**A.** No. There were a lot.

**Q.** Did the other defendants plead guilty?

**A.** They did. The -- you know, when you have a situation like that, there is a lot of pressure on you, and they were offered

plea deals and they took it.

Q. Did Mr. Phua plead guilty?

A. No.

Q. What happened to him?

A. I told him, you know, understanding that the consequences were very severe, I told him that I believed that we were right, and I would win the case. And so he refused to plead even to the tiny little thing and he stuck it out.

Q. Now, when you say "he stuck it out," was this like, in the world of litigation, like on the more gentile side or the more hard core side?

A. It was a brutally hard-fought, year-long fight between us and the Department of Justice.

Q. At the end that case, what happened to Mr. Phua?

A. The case was dismissed.

Q. Did you stay in touch with Mr. Phua after the case ended?

A. Yeah. We remained very good friends.

Q. Was it your sense that Mr. Phua was grateful to you for the results in Las Vegas?

A. Yes.

Q. Why did you ask Mr. Phua to get you into a high-stakes poker game against the Chairman?

A. So that was in 2015. And in 2016, I kind of developed this idea, because I was a lawyer, that there would be businessmen who would be willing to play heads-up against me at

very very high stakes when they wouldn't play against professionals, because I'm much less threatening and I have a reputation, justifiably, of being a losing poker player.

And so I had this idea that I could get coached up, and I spent a lot of 2016 doing that. And one of the people in the world who is willing -- most willing to play super high-stakes heads-up poker, which is there aren't -- we were talking about a handful of people on earth -- was this guy, the Chairman. And Paul knew him very well.

Q. Would you have been able to get into a high-stakes heads-up poker game against the Chairman without Paul Phua?

A. No. I mean, I don't -- I don't even know his -- I only know him as the Chairman. I don't have his contact information. He wouldn't trust me to give me credit. I don't know that I would to give him. It's about -- it's Paul has to do that.

Q. Did Mr. Phua also have a share of you in those games against the Chairman?

A. An enormous one, yeah.

Q. How was Mr. Phua keeping track of your wins and losses in the games against the chairman?

A. He has an assistant. So he has a lot of these kinds of relationships. He plays a lot of poker himself, and he has a lot of people who he has financial investments in to do poker. So he has an assistant, and that person has a whole bunch of

just ledgers of poker games and also other financial transactions that that person is responsible for coordinating with the other person.

And so that, the assistant will record everything that happens and then check with the other person, make sure that this is accurate, and so the ledger is maintained.

Q. And what was your understanding about how the money was going to be settled up at the end for the transactions that are being -- the games that are being recorded on the ledger?

A. And periodically, there is no like, okay, it's year end. Just if I needed money, I could ask for it. If I was ahead, if I was behind, he might ask me to pay into it. It's just a kind of rolling thing.

Q. Now, I just want to be clear about this, because there's some questions about a bank account in Asia. Did you have a bank account in Asia?

A. No.

Q. Did you have like a secret bank account in Asia?

A. Secret or not. I did try. I did try and open a bank account in Macau or I should say Jon Levitan tried for me in both Macau and Hong Kong. And just you can't -- you cannot do it. So no, this was just the Paul Phua ledger that, all this reference to money in Asia, is about.

Q. Okay. Now, the Chairman games, did they all take place at the same time in 2016 or were they like broken up?

**A.**   They were broken up.

**Q.**   I want to focus on the earlier games.  Do you remember when, approximately, those were?

**A.**   They are in the spring.

**Q.**   Okay.  And just roughly, do you have a sense of how you did in those games?

**A.**   Roughly, I do.  I can tell you roughly.  I don't know it exactly.

**Q.**   Is there anything that would refresh your recollection about the exact number that you lost to Chairman in the early spring 2016 games?

**A.**   The ledger would have it exactly.

         **MR. KRAVIS:**  All right.  This is for the witness only, please.

**BY MR. KRAVIS:**

**Q.**   Mr. Goldstein, I'm going to ask you to turn to Defense Exhibit 737.2.

         **MR. KRAVIS:**  Don't publish.

         **THE WITNESS:**  Defense 737.2.

**BY MR. KRAVIS:**

**Q.**   Is this a photo of the ledger?

**A.**   This is a photo of part of the ledger in one period of time.

**Q.**   Okay.  I don't want you to say anything.  I want you to look at the ledger.  Look at the exhibit.  When you finish

looking at it, I want you to close the binder and then look up at me. Okay?

**A.** You want me just to look at it as a whole, not any particular thing?

**Q.** I want you to look at the portion of this ledger that would refresh your recollection about the early losses -- the exact amount of the early losses to the Chairman in the spring of 2016.

**A.** Okay.

      **MR. KRAVIS:** Okay. And for the record, the binder is closed.

**BY MR. KRAVIS:**

**Q.** Mr. Goldstein, has Defense Exhibit 737.2 refreshed your recollection more precisely of how much you lost to the Chairman in the spring of 2016?

**A.** Yes.

**Q.** How much was it?

**A.** $1.787 million. That's my share.

**Q.** I was going to ask you, is that -- does that include Mr. Phua's piece or is that just you?

**A.** No. That's just me.

**Q.** So you personally, in the spring of 2016, lost $1.787 million playing against the Chairman?

**A.** That day, yeah.

**Q.** Now, this was all in one day?

**A.** Is that a question?

**Q.** Yeah. Was it all in one day?

**A.** Yeah.

**Q.** Okay. The jury heard some testimony earlier in the trial from Mr. Robl and Mr. Gipson about how they had an investment in some games against Chairman. Do you remember hearing that testimony?

**A.** Yes.

**Q.** Just so this is perfectly clear, did Mr. Robl and Mr. Gipson have shares in the early game you played against Chairman in spring of 2016 where you lost $1.787 million?

**A.** No.

**Q.** After your $1.787 million loss to Chairman early in 2016, did you ask some folks to train you up so that you could do a little better?

**A.** Yes.

**Q.** Who did you ask?

**A.** Andrew Robl who then brought in Keith Gipson.

**Q.** And what exactly did that training involve?

**A.** There really are two parts to it. One is becoming a better heads-up poker player generally. You want to just develop a kind of core skill set. And the second is adapting to the person who you're going to play against, because they have a particular style.

And so for all three of these people, they had a history

Q.   After the training, did you end up going back and playing Chairman again later in 2016, like in September?

A.   Yes.

Q.   This time, did Mr. Robl and Mr. Gipson have shares in you?

A.   Yes.

Q.   Mr. Phua, did he also have a share?

A.   Yes.

Q.   Okay.  Just approximately, how did you do in the September 2016 games against the Chairman?

A.   Just in terms of winning or losses or a number or --

Q.   Just in terms of winning or losses.

A.   I won.

Q.   As you sit here today, do you remember the exact amount of money that you won off of Chairman in September of 2016?

A.   No.

Q.   Would the ledger refresh your recollection?

A.   It would.

Q.   Same thing again.  Please don't publish.

Mr. Goldstein, open up the binder, take a look at 737.2. I'm going to direct your attention to the entries in the bottom quarter of the document.

Don't say anything.  I want you to look at that portion. When you finish looking at it, I want you to close the binder

and look up at me.

**A.** You would like me to know the period or the amounts? What is it --

**Q.** The amounts. The amounts of the September 2016 games against Chairman?

**A.** For each of them individually or the net?

**Q.** The net. How it all came out?

**A.** Just my share or overall?

**Q.** I'm going to ask you both.

**A.** Okay. Well, hold on.

Am I allowed to write something down or do I have to remember it?

**Q.** No, you should remember it. So just look at the document.

Let's do them one at a time. Let's just start with the gross amount.

**A.** I think I can do them both. Just give me a second.

**Q.** Okay. Okay.

**A.** Okay.

**Q.** Close the binder.

Mr. Goldstein, does the ledger refresh your recollection as to -- let's start with the gross number -- the total that Chairman lost in September of 2016?

**A.** It's 101 million Hong Kong dollars.

**Q.** And how does that translate to U.S. dollars?

**A.** That's going to translate -- you divide it by 7.75, so

it's going to be about 12 or 13.  I could do it with a
calculator, but...

Q.    And what was your share?

A.    5.4 million-ish.

Q.    5.4 million-ish was your share of the Chairman winnings
from September of 2016?

A.    Yeah.

Q.    Again, just to make sure I understand how this works, did
Chairman, when you won that game, like, hand over $5.4 million
in cash?

A.    Still not where the bag of cash comes from.

Q.    Did Chairman then, like, send you a wire to your bank
account a few days later?

A.    No.

Q.    How did you end up getting credited for your share of the
winnings?

A.    I get credited for my share of the winnings against
Chairman because it all goes through Paul, and so Chairman pays
Paul.  Paul pays me.

      Well, I should say, Paul has it in my virtual account
because I have also been losing, and so it's accounted for in
my account with Paul.

Q.    It's being accounted for in your account with Mr. Phua of
the gambling winnings and losses that Mr. Phua is keeping track
of?

**A.** Of all the overseas stuff, yes.

**MR. KRAVIS:** Now, could we have slide -- could we have slide three of the deck, please?

**BY MR. KRAVIS:**

**Q.** Mr. Goldstein, just so the record is clear, does this slide accurately reflect your share of the total winnings against Chairman in September of 2016?

**A.** Yes.

**MR. KRAVIS:** Could we then turn to slide four, please?

**THE WITNESS:** Can I just say something?

**BY MR. KRAVIS:**

**Q.** Sure. Go ahead.

**A.** Can we go back? So this is divided between me and Paul. I actually am going to owe, I think, Keith something small out of this. I just want to be --

**Q.** Oh, right. I forgot. This is a good point. Thank you.

Just to be clear, you mentioned a moment ago that Mr. Robl and Mr. Gipson have shares of you this time around against Chairman.

Do I have that right?

**A.** Yeah.

**Q.** So how are those shares getting paid out?

**A.** So because of the timing of the match, I think Andrew Robl loses money in this because it's the very first game.

But Keith, I have to pay, and I would pay from my share.

Q. So Mr. Gipson's share comes out of your account?

A. Yeah. But it's much smaller. The -- most of that is me.

MR. KRAVIS: Could we move onto the next slide, please?

BY MR. KRAVIS:

Q. Did there come a time after these games against the Chairman when you asked Ms. Runkle to help you open some bank accounts in Montenegro?

A. Yes.

Q. Why did you ask Ms. Runkle to help you open those bank accounts?

A. Well, I've had this account with Paul for the first time, and I'm ahead after the Chairman matches, and he's also reimbursing me for some other things. And so I need to bring money into the United States, and Paul says to do that through a bank account in Montenegro because he lives in Montenegro.

Q. When you opened the accounts, did you tell Ms. Runkle to disclose the Montenegro bank accounts to GRF?

A. Immediately.

Q. Why did you do that?

A. I knew that I was supposed to do that.

MR. KRAVIS: Could we look at Defense Exhibit 115, please?

BY MR. KRAVIS:

Q. I believe this is evidence, Mr. Goldstein.

Is this the e-mail chain between you and Ms. Runkle about disclosing the bank accounts in Montenegro to the accountants?

A. Yes.

Q. I want to direct your attention to Ms. Runkle's e-mail. It's the second from the top at -- it's September 19 at 10:57 a.m.

Ms. Runkle writes, "So just to make sure I'm on board, you are opening two new bank accounts, a domestic and an international, in this Montenegro bank, and it is tied to the firm, not personal, as in I need to tell the accountants about it and report the credit card's records to them? Thanks."

Did I read that correctly?

A. Yes.

Q. So first of all, what was your understanding about why you had to open a couple of different bank accounts here?

A. Montenegro and the banking rules. I can explain.

Q. Well, let's just --

A. Montenegro made me.

Q. Right.

You needed both a domestic and an international account?

A. Domestic, international, personal and firm. You had to have four.

Q. Let's look at your response to Ms. Runkle's message.

When Ms. Runkle tells that you she needs to disclose the

bank accounts to the accountants, what do you say in response?

A. She has mentioned in passing that she got confused, I guess, that there was just a firm one, and I was like no. No, no there is a personal one, too.

Q. Were you specifically telling Ms. Runkle to make sure that the accountants knew about the personal bank account as well as the firm account?

A. Yeah. There is this paired personal accounts, and there is this paired firm accounts. The only difference between them is one is in euros and one is in dollars.

MR. KRAVIS: Can we look now at Government's Exhibit 576, please? Can we look at the bottom e-mail from Ms. Runkle?

BY MR. KRAVIS:

Q. I believe this is already in evidence.

Is this Ms. Runkle disclosing the bank accounts in Montenegro to the accountants at GRF?

A. It's the first e-mail doing that, but it's not the only one, yeah.

Q. What did you expect GRF to do with this information?

A. Whatever it was supposed to do. I knew that there are requirements relating to overseas bank accounts and their disclosure. I know there are rules, I think, about amounts of money and things like that, but just whatever needed to be done.

Q.    Did that end up happening?

A.    No.

Q.    We will talk about that a little later.

Shortly after these accounts were opened, did you receive a wire from Mr. Phua?

A.    Yes.

Q.    And, approximately, how much was that wire?

A.    I think $750,000.

Q.    What was your understanding of what that money was for?

A.    That was the money that I asked to pull from my account that we were just talking about.

Q.    And when you say the account --

A.    Yeah.  Sorry.

Q.    When you "the account," what is it that you are referring to?

A.    The virtual thing that Paul is, you know, keeping track of on the ledger.

Q.    So it's -- the 750 is, like, coming out of your ledger?

A.    Yes.

Q.    I'm going to show you Government's Exhibit 552.  Is this the $750,000 we have been talking about?

A.    Yep.

Q.    And after it came to you from Mr. Phua in Montenegro, what did you do with it?

A.    I think there may be a -- yeah.  This is me sending it

from the -- I guess the personal one.  I'm sending it to the law firm in the U.S.

Q.   You are talking -- you are saying the money went to the law firm bank account held by Goldstein & Russell --

A.   Yes.

Q.   -- in the United States?

A.   Yes.

Q.   What is your understanding about what happened with this $750,000 in terms of the taxes?

A.   My understanding is that it was taxed as law firm income.

Q.   Is it your understanding that's the only time it was taxed?

A.   No.  It would have been -- because that's a mistake. It -- that cost me a lot.  This is just an example of mistakes.

Q.   Can you explain what you mean by that?  What was the mistake here?

A.   Yeah.  So it's a mistake.  This is mostly gambling income. You can say that there is reimbursement in here, too, but there's -- I've listed various -- a bunch of gambling income in here, so -- but it gets treated as money that I'm making as a lawyer, say.

     But then, it's also going to get treated as gambling income a second time, so it gets taxed both when it comes through the company and then -- because it's being treated as if it was the law firm's income for legal fees, and then it's

also being taxed because I'm including it as money that I made in gambling.

Q. So it's your understanding, as a result of the error by GRF, you ended up paying taxes on this money twice?

A. Twice. Yeah.

Q. Now, you mentioned Mr. Gipson's share. How did that get paid?

A. Keith wanted -- he needed money quickly, and so I think I wired it straight -- as soon as I got it, I think I wired it straight.

MR. KRAVIS: We can take that down. Thank you.

BY MR. KRAVIS:

Q. Okay. That's Chairman. Later in 2016, did you play poker against a guy named Alec Gores?

A. Yes.

Q. Why did you decide to play Mr. Gores?

A. Very similar. This is one of the few people whose, you know, very wealthy, willing to play heads-up poker, which is an unusual style. The coaches worked with me on it and believed that I was ready.

Q. Who were the coaches?

A. Andrew and Keith.

Q. That's Mr. Robl and Mr. Gipson?

A. Sorry. I didn't use their last names.

Q. Now, did you need financial backing to get into the game

against Mr. Gores?

**A.**   Sure.

**Q.**   Why?

**A.**   Same sort of idea.  I mean, I have made some money against Chairman, but that $5.4 million that we have is me winning from Chairman is offset almost entirely by other losses in Asia.  So it's not like I have a bunch of money.

So I have to be able to know play against Alec for very high stakes, so I need someone to come in and say, "okay, Tom will play for say three or $4 million and part of that can be my share."  But somebody else is going to have to be willing to, whose got a lot of money, put up the rest of it.

**Q.**   How did that financial backing get worked out?

**A.**   It was a multi-stage thing.  So what our problem is Alec has to trust somebody, and Alec is sitting in Los Angeles in his house, and the person who I need him to trust is Paul Phua.

Now, they don't know each other, so we have to play a little bit of a game of telephone to get from over here and Paul to Alec.  And it goes from Paul talking to Andrew Robl, Andrew Robl talking to Bobby Baldwin, who he knows.  This was a mentioned guy who was mentioned in passing.  And that's a friend of Alec.  Basically, it's a chain of people who are promising to cover my losses.

**Q.**   And what is the amount of money that's getting promised along this chain to get you into this game?

**A.** $3 million.

**Q.** Now, did you have investors in the games you played against Mr. Gores?

**A.** Yes.

**Q.** And based on your review of the records and some government exhibits, have you prepared a summary of the wires that were paid out to those investors?

**A.** Yes. Although, you have to -- Paul Phua is an investor, and then there is a set of -- who has a big share, and then there are a bunch of people who have other shares. They are the ones who get the wires. And I did prepare a summary, yes.

**Q.** I'm going to ask you about each of those separately. So I want to start with like everybody who is not Paul Phua?

**A.** Everybody who is not Paul Phua.

**MR. KRAVIS:** Could we have slide five here, please?

**BY MR. KRAVIS:**

**Q.** Mr. Goldstein, is this the summary of the wires that were sent out to the investors in the Gores matches we have been talking about?

**A.** Yeah. Although, I will just say that these are not -- some of these are not entirely divorced from Paul Phua. But in terms of like the literal recipient of the wire, yeah.

**Q.** And is it your understanding, by the way, that all of these wires appear on the government's summary exhibits we saw yesterday?

**A.** Yeah. We looked.

**Q.** All right. Now, let me ask you about Mr. Phua. Did Mr. Phua have a share of you for the games against Mr. Gores?

**A.** Yes.

**Q.** And as you sit here today, do you have a specific recollection of exactly what Mr. Phua's share of Gores was?

**A.** No. Not exactly.

**Q.** Okay. Would looking at text messages from the time period refresh your recollection?

**A.** Yes.

**Q.** All right. I'm going to ask you to turn back to the binder.

MR. KRAVIS: Once again, please don't publish.

BY MR. KRAVIS:

**Q.** I'd like you to -- I'm going to direct your attention in the binder to Defense Exhibit 737.6.

**A.** I am there.

**Q.** And just so the record is clear, what you're looking at, Defense Exhibit 737.6, is this a message exchange between you and an assistant of Mr. Phua in December of 2016?

**A.** Yes.

**Q.** Okay. So same as before, I'm going to direct your attention to the text messages at the top of the page. Please don't say anything. I want you to just look at it. And then when you're done, I want you to look up at me.

**A.** All right. I'm supposed to look at it and learn what?

**Q.** I'm going to ask if it refreshes your recollection about Mr. Phua's share of your winnings against Mr. Gores.

**A.** Okay.

MR. KRAVIS: For the record, the binder is closed.

**BY MR. KRAVIS:**

**Q.** Mr. Goldstein, does that text message exchange refresh your recollection about what Mr. Phua's share was from the Gores games?

**A.** Yes.

**Q.** How much was it?

**A.** From the -- at what point in time, just overall?

**Q.** Overall. Overall.

**A.** What was his share? His share was $10.8625 million.

**Q.** Okay. So that's Mr. Phua. And then we've looked at the other investors. Oh, by the way, out of that 10.8625, did Mr. Phua give you a little bonus?

**A.** Yeah. There are two issues. One is he does -- I think he's very grateful, again, and so he does. He has his assistant give me a $600,000 bonus, and then there's an overlap in that 10.8625 and the document you have on the screen to some extent.

**Q.** What is the overlap that you're describing?

**A.** So there are two payments here that Paul has me send --

**Q.** Which two -- before we go any further, which --

**A.** Oh, am I allowed to do this?

**Q.** Yeah. Yeah. Yeah. Before we go any further, which two -- just so we're clear, which two payments are we talking about?

**A.** Thomas Dwan and Dan Cates.

**Q.** Are those the Tom Dwan wire for 500,000 on December 9th and the Dan Cates wire for 750,000 on December 31st?

**A.** Yeah. That's -- Paul has me do that.

**Q.** Okay. Can you just -- when you say "Paul has me do that" --

**A.** I apologize.

**Q.** Can you just explain -- no, that's fine.

Can you just explain what happened?

**A.** So I'm holding this money for Paul Phua, and we have to figure out what to do with it. And at this stage, in stages, Paul has his assistant tell me to send the money to these people, that amount of money. He says -- right off the bat, he has me give the $500,000 to Tom Dwan for him, and then the Dan Cates thing comes at the end of the year.

**Q.** And was it your understanding that Mr. Phua was controlling that money, his share of Gores that was in your bank account?

**A.** Yes. Whether it was in my bank account or not, but yes.

**Q.** And was it your understanding that Mr. Phua had the authority there to tell you, "Take the money, go pay Tom Dwan

and Dan Cates"?

**A.** Yes.

      **MR. BEATY:** Objection, Your Honor.

      **THE COURT:** Headsets, please.

    (Whereupon, a discussion was held outside the presence of the jury.)

      **THE COURT:** Mr. Kravis, can you hear us?

      **MR. KRAVIS:** Yes, Your Honor.

      **THE COURT:** Mr. Goldstein, are you on?

   All right. Mr. Beaty, go ahead.

      **MR. BEATY:** I generally don't care --

      **THE COURT:** Can you talk right in the mic, please?

      **MR. BEATY:** I generally don't care, Your Honor, but we're back to leading. Mr. Goldstein needs to tell his story, not Mr. Kravis.

      **MR. KRAVIS:** Sorry. I thought I was just summarizing what we already did. I can rephrase the question.

      **THE COURT:** Okay. And, Mr. Kravis, can we find a break time in the next ten minutes just so I can let the jury take a break.

      **MR. KRAVIS:** I actually think, if I can just do this piece, this would be a good time for a break.

      **THE COURT:** All right. Any objection from the government?

      **MR. BEATY:** No objection. Thank you.

THE COURT: All right. Thank you.

(Whereupon, discussion concluded.)

BY MR. KRAVIS:

Q. So just to be clear on that, Mr. Goldstein, what, if any, understanding did you have about whether or not Mr. Phua had the authority to tell you to go pay Tom Dwan and Dan Cates with his money?

A. Yeah. It was his money. He could tell me to do something with it or if I wanted to do something with it, I needed to ask him.

Q. And did you, in fact, make the payments to Mr. Dwan and Mr. Cates as Mr. Phua directed?

A. Yes.

MR. KRAVIS: Your Honor, this would be a good time.

THE COURT: All right. Thank you very much, Counsel.

Members of the jury, I think this might be a good time for your afternoon break, so I'm going to invite you to step down for just a moment at this time.

Please rise for the jury.

(Whereupon, the jury exited the courtroom at 2:19 p.m.)

THE COURT: Please be seated, everyone.

Mr. Goldstein, if you wish to step away and go back to counsel's table for just a moment, you may do so as well. Make yourself comfortable.

(Whereupon, the witness exited the witness stand and the

courtroom at 2:20 p.m.)

Counsel, why don't we take ten minutes and then we can resume?

MR. KRAVIS: Thank you, Your Honor.

THE COURT: All right.

(Whereupon, a recess was taken from 2:20 until 2:34 p.m.)

DEPUTY CLERK: All rise. This Honorable Court now resumes in session.

THE COURT: Please be seated, everyone. We have Mr. Goldstein already back in the chair.

Are we ready to have the jury?

MR. KRAVIS: Yes, Your Honor.

THE COURT: All rise for the jury.

(Whereupon, the jury entered the courtroom at 2:36 p.m.)

THE COURT: Please be seated.

Mr. Kravis?

MR. KRAVIS: Thank you, Your Honor.

BY MR. KRAVIS:

Q. Welcome back, Mr. Goldstein. Did you and I speak during the break?

A. No.

Q. I want to just go over some of the numbers here and then start adding some stuff up. Okay?

A. Okay.

Q. So just to recap where we are with Gores.

**MR. KRAVIS:** Can we go back, please, to slide five. I think this is the one we're on.

**BY MR. KRAVIS:**

**Q.** Can you remind us what does this show?

**A.** This is wires out from money that Alec Gores paid me in 2016.

**MR. KRAVIS:** And then if we go to slide six.

**BY MR. KRAVIS:**

**Q.** What does this show?

**A.** This is what Paul Phua had from Alec Gores, my match with Alec Gores when we get to the end of 2016.

**Q.** So just to add up the numbers here.

**MR. KRAVIS:** If we go to slide seven?

**BY MR. KRAVIS:**

**Q.** What are we looking at here?

**A.** This is how the Alec Gores winnings get divided almost exactly.

**Q.** Okay. And so what is Mr. Phua's share as of the end of December?

**A.** $9 million and change.

**Q.** The other investors, besides Paul Phua, their share?

**A.** A little over nine and a half million dollars.

**Q.** And what is your share?

**A.** Almost $8 million.

**Q.** And then what does that all add up to?

**A.** About 26 and a half million dollars.

**Q.** Okay. So we've talked about Chairman. We've talked about Mr. Gores. Did you also have some smaller poker wins in the United States in 2016?

**A.** Yes.

**MR. KRAVIS:** Can we look at the next slide, please?

**BY MR. KRAVIS:**

**Q.** What are we looking at here?

**A.** Those are the -- me getting paid from the smaller wins.

**Q.** And these are games against Kevin Hart and Andrew Robl?

**A.** Not quite. These would be ring games, and those are the people who paid.

**Q.** I see. In addition to the winnings, did you also lose some money playing poker in the United States in 2016?

**A.** Yeah.

**MR. KRAVIS:** And can we look at the next slide, please?

**BY MR. KRAVIS:**

**Q.** What are we looking at here?

**A.** This is -- some of this we've talked about, so Bob Safai is on here. And the rest is money that I lose playing poker in the United States in 2016, and these are the dates that those wires went out.

**Q.** And I'm going to ask you about something else in a second. But before that, I just want to notice, Mr. Goldstein, do you

see how the numbers are like getting bigger as we go through 2016?

A.   Unfortunately.

Q.   So do you see, for example, you got a -- there's Tom Dwan, 25,000; Dan Bilzerian, 58,000; Tom Dwan again, 25,000; in the spring of 2016?

A.   Yeah.

Q.   And then do you see that the numbers are much larger in November, December 2016?

A.   Yeah.

Q.   Why is that happening?  Why are the losses getting so much larger?

A.   So this is a period in which I'm winning.  And, you know, when I'm winning, then I'm playing higher and higher stakes in riskier and riskier situations and this is what happens.  You win in one place, and then you lose back in another.

Q.   So we have now covered Chairman winnings.  We have covered Gores winnings, your share of Gores.  We did your U.S. wins, your U.S. losses.

A.   Yeah.

Q.   Did you also lose money gambling outside of the United States?

A.   Net, or just some -- do you mean overall or?

Q.   Overall?

A.   Overall, outside the United States in 2016, because of

Chairman, I win. If you exclude Chairman, I lost.

MR. KRAVIS: Can we look at the next slide, please?

**BY MR. KRAVIS:**

Q. Is this a summary of those losses?

A. This is.

Q. And can you just explain what we are looking at here?

A. So this is a summary of all of the overseas games.

MR. BEATY: Objection, Your Honor.

Can we take that down, please?

THE COURT: Come to the headsets and take the exhibit down, please.

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT: Mr. Goldstein, can you hear us?

Mr. Kravis?

MR. KRAVIS: Yes, Your Honor.

THE COURT: And Mr. Beaty?

MR. BEATY: Yes, Your Honor.

THE COURT: Please go ahead.

MR. BEATY: What's the basis of this summary? It doesn't have a citation to any exhibit in evidence.

THE COURT: The concern is what is the evidentiary support for the summary.

MR. KRAVIS: I think what Mr. Goldstein said was it was a summary that he prepared based on the ledger.

MR. BEATY: Right. So we are right back to he's just bringing in the ledger through another way.

THE COURT: The ledger is not in, is it?

MR. BEATY: It is not.

MR. KRAVIS: This is not is the ledger. This is just a summary.

THE COURT: But what is it summarizing, Counsel?

MR. KRAVIS: The losses outside the United States.

MR. BEATY: On the ledger.

THE COURT: But it's based on the ledger?

MR. KRAVIS: Yes.

THE COURT: Mr. Beaty?

MR. BEATY: You know my position, Judge.

THE COURT: Talk into the mic.

MR. BEATY: You know my position, Your Honor.

THE COURT: Let's hear it again.

MR. BEATY: This has already been ruled outside. This is absolutely inappropriate, and I cannot believe they just tried to pull this off.

THE COURT: The ledger is not in, so if the only basis for the exhibit is the ledger, it's not coming in.

MR. BEATY: Thank you, Your Honor.

(Whereupon discussion concluded.)

BY MR. KRAVIS:

Q. Mr. Goldstein, do you have a rough sense, as you sit here

today, of the approximate amount of money you lost gambling outside the United States in 2016, setting aside the Chairman wins?

A.  So just to make sure I get it right, you want to know -- forget Chairman?

Q.  Right.

A.  How did I do outside the United States?

Q.  Well, forget the September Chairman.  Forget the --

A.  Oh, forget the September Chairman?  The one that people were invested in?

Q.  Yes.  So set aside the September Chairman, everything else, how did you do outside of the United States in terms of losses in 2016?

A.  Just roughly?

Q.  Just roughly.

A.  I lost, I think, $4.5 million.

Q.  So to make sure I understand the testimony, your recollection is you lost -- I just want to make sure I'm clear on the number.

Setting aside the 2016 wins, the September 2016 wins against the Chairman, $4.5 million is your recollection of what?

A.  So 4.5, if -- I'll tell you what I'm recalling and how I recall it, and that is I think in the end, outside the United States, I win about $950,000.  I think we put on the screen

that I won $5.4 million from Chairman.

**Q.** Right.

**A.** So if I subtract $950,000, then I get about 5.4 -- actually, 4.5 million that I lost.

**Q.** And now I want to sort of bring all of these numbers that we have just been doing together.

**MR. KRAVIS:** May I approach with a calculator?

**THE COURT:** You may.

**MR. KRAVIS:** Let's turn back to slide three.

BY MR. KRAVIS:

**Q.** What is this on slide three?

**A.** This is what -- on the left is going to be what Chairman lost. In the middle is going to be what I won from it, and then I had to pay Keith. And then on the right is going to be what Paul won.

**Q.** So the first number I want you to put into the calculator is 5.4 million, your share of Chairman. Okay?

**A.** Okay.

**MR. KRAVIS:** Can we have, then, slide seven? I'm sorry, the next one. Maybe slide eight. No. Back -- the one down. The one before we just had. Nope. Nope. Nope. Back. Back. Yes. I found it.

BY MR. KRAVIS:

**Q.** Mr. Goldstein, what are we looking at on this slide?

**A.** This is how the Gores winnings were divided?

**Q.** And what was your share of that?

**A.** 7.909.

**Q.** Just so we're rounding here, can I ask you now to add 7.9 million on the calculator?

**A.** Okay.

**Q.** Where are we?

**A.** 13,300,000.

     **MR. KRAVIS:** Can we go to the next slide, please?

**BY MR. KRAVIS:**

**Q.** Can you remind us what we saw here?

**A.** This is the other winnings in 2016 in the United States.

**Q.** So can you now add 300,000 in the calculator.

**A.** I messed it up. Give me a second. It was 133 before?

**Q.** Yep.

**A.** Okay. I got it.

     **MR. KRAVIS:** Can we go to the next slide, please?

**BY MR. KRAVIS:**

**Q.** Can you remind us what this was?

**A.** This was all of the losses. I'm being imprecise. This is money that I lost in the United States playing poker in 2016, the wires that I sent out for it.

**Q.** So now can you subtract for me $11,853,000?

**A.** I do not know how to use a calculator. Hold on a second. It was 13,600,000?

**Q.** Right.

**A.** And then subtract 11,853. Nope. Okay.

**Q.** And the last thing I want you to do is -- oh, sorry. Where are we now?

**A.** I have it as 1,747,000.

**Q.** So then the next thing I want you to do is subtract the number just gave me, approximately 4.5 million in gambling losses outside the United States -- or gambling totals outside the United States, excluding September Chairman?

**A.** Now this is where I somehow manage to screw this calculator up. So it's 1,747. Now I'm going to subtract 4.5?

**Q.** Yeah. I think that was the number you just gave me.

**A.** Okay.

**Q.** So when you add all of that up, your share of the Chairman winnings, your share of Gores, the other U.S. wins.

**A.** So these are the three things I win. Okay.

**Q.** The U.S. losses?

**A.** Okay.

**Q.** The 4.5 million number that you gave me. I think we just put all of that in to the calculator. What did you get?

**A.** So that would be everything that happened in 2016, and I lose $2.753 million.

**Q.** Just at a high level, you told me you won $9 million paying this guy Gores. Then you won, like, over $5 million playing this guy Chairman. How do you come out a negative two

and a half million dollars?

**A.** The same way that I do every year. I end up playing other people, and these are the people I lost to in the U.S., and then I lot the 4.5 overseas.

**Q.** Now, the jury heard testimony about another guy you played in 2016 --

**A.** Am I done with this? Sorry. The calculator?

**Q.** You can just leave it up there. I can't promise that we won't need it again.

Did you play poker against a guy named Tango in December of 2016?

**A.** Yes.

**Q.** When did you actually get control over your share of the Tango winnings?

**A.** In the spring of 2017.

**Q.** How did you get it in the spring of 2017?

**A.** That's when he paid Paul Phua.

**Q.** Sitting here today, do you have an understanding of why that matters for tax purposes, like, when you get paid from that game?

**A.** Yes.

**Q.** What's your understanding?

**A.** So when Paul gets paid, I get paid. And when I get paid, well, then that's my money and I am taxed on it.

**Q.** In that year?

**A.**    Yeah.

**Q.**    Since it happened in 2017, I'm going to set it aside for a minute and come back to it later.

First, I want to talk about how 2016 got handled on your tax return. And I want to start here.

**MR. KRAVIS:** Could we have Defense Exhibit 329, please?

**BY MR. KRAVIS:**

**Q.**    Mr. Goldstein, I think we have heard about Defense Exhibit 329 in a later version of it. It's been referred to as the poker ledger or the poker tracker. What is this document actually?

**A.**    So I know this is the first version of it because it does not have the bold stuff in the middle. So this is the first version of a list of wires related -- well, there are a couple of checks -- wires and a couple of checks that related to 2016 gambling, and I created it after -- I created something for a meeting with Walter Deyhle, but this is created in the wake of that meeting.

**Q.**    And why did you create this document?

**A.**    So I said to Walter -- or I set up this meeting with Walter to talk about it because this is the first time any of this is happening in my tax life. And Walter is concerned that we may need to send out these 1099 forms to the investors.

So he says that I need to figure out who I sent money out

to.  So I then go collect a list of them -- the money that goes out and here are the wires in.  I'm just, I think, at the top, just separating some things out just so I can keep track of it.

But the purpose here is because we may be sending out 1099s.

Q.  So I just want to be really clear about this.  You created this document.  Is this document a list of all the poker games you played in 2016?

A.  No, it doesn't list any poker games.

Q.  What is it actually a list of?

A.  Transactions.

Q.  And why exactly are you listing transactions?

A.  Because I may have to send out tax documents related to all of the transactions.  We don't know.  Walter says, you know, this may be the rule.  Start to figure it out.  And I say to him, Look, we need to -- we may need to get somebody who like does this thing.  And let's find somebody who really knows what they're talking about.  But he says, you know, let's -- Let's gather that information.

Q.  And did Mr. Deyhle tell you, like in addition to keeping track of the wires you've also got to separately keep track of all the games or all the investors?

A.  No.

Q.  Did he ever give you any other advice about how to keep track of the investors from 2016?

**A.** I mean, he hasn't given me any advice. This was just him saying "we may need to do this," but no, certainly nothing else.

**Q.** In 2016, when you're putting this together, prior to 2016 had you ever taken on investors in your poker games?

**A.** No.

**Q.** So did you have any experience about how to put this together, how to keep track of it and so on?

**A.** No.

**Q.** Who were you relying on for that?

**A.** For Walter and then my suggestion that we also get a specialist.

**Q.** Let's talk about that for a minute.

     **MR. KRAVIS:** Can I have Government's Exhibit 278.5?

**BY MR. KRAVIS:**

**Q.** Mr. Goldstein, this is an e-mail exchange between you and Mr. Gipson on December 20th of 2016. What's going on here?

**A.** I mean, this is all basically at the same time. I try and set up a meeting with Walter, and then I say to Keith, Hey, like this is all -- do you have somebody who knows what they're doing when it comes to the gambling taxation. And this was his response.

**Q.** And why did you reach out to Mr. Gipson to ask for someone with expertise in reporting gambling winnings and losses on taxes?

**A.**   He's a professional gambler.

**Q.**   What did you do with the information that Mr. Gipson provided you?

**A.**   I gave to it to Walter.

**Q.**   Why did you give this information to Walter?

**A.**   Because he was supposed to consult with this person on what the special -- how you deal with these situations.

**Q.**   Now, there were some questions, I think, last week about why you didn't hire Mr. Robl's accountant or Mr. Gipson's accountant.  Why didn't you go out and hire somebody else at this point?

**A.**   Well, I mean, I have a tax preparer.  So I say, "I have this situation."  And I say, "We may need somebody who really knows what they're doing.  Will you go talk with them and see if we need somebody, you know, to add somebody who's a specialist in this."  I asked my tax guy to talk to another tax guy.

**Q.**   And when you had this conversation with Mr. Deyhle, what was his response?

**A.**   That he would talk to him.

**Q.**   If Mr. Deyhle had told you in that conversation, "Look, I don't really know what I'm doing here.  I think you should get another accountant who has expertise in gambling," what, if anything, would you have done?

**A.**   That.

MR. KRAVIS: All right. Let's go back to Defense Exhibit 329. And I want to ask you a little bit more about what all this means.

BY MR. KRAVIS:

Q. Starting at the top, do you see the section that says "funded"?

A. Yep.

Q. What's that?

A. So this is -- there is a -- I have a line of credit with Stewart and Lynda Resnick. And so this tells -- this says that I got a wire in on November 14th of 2016 from them for $1.2 million.

Q. And the section that says "returned," what is that?

A. That's me sending money back.

Q. And the section that says "in," what is that?

A. That is wires coming in for poker.

Q. And the two -- do you see the two Alec Gores entries there?

A. Yes.

Q. What do those entries reflect?

A. He paid in two parts from our matches.

Q. And the entry on October 26, 2016, for 750,000. Do you see that?

A. Yes.

Q. What does that reflect?

**A.**   Well, do you want to know what I know now or what it looks like when I thought then or --

**Q.**   What was your understanding at the time about what this entry meant?

**A.**   I mean I -- look, this was ten years ago.  I couldn't tell you.  I can tell you from the fact that it's question mark, question mark, in parentheses.  But I don't -- I, obviously, don't know the details.  But this is the $750,000 wire in from Asia.

**Q.**   And when you testified earlier that you ended up paying taxes on that money twice, does this sort of help explain what's going on there?

**A.**   Yeah.  So this number is going to be baked into, that 750, into my gambling winnings.  So I've paid for taxes over here, because it's treated as law firm income at the time we saw the wire, and I'm also treating it as tax -- gambling income here.

**Q.**   And why -- I'm sorry.  Remind us.  Who did that 750,000 come from?

**A.**   Well, it came from me.  But before that, it came from Paul Phua.

**Q.**   Okay.  And then if we move further down, do you see there's a section that says "out"?

**A.**   Yeah.

**Q.**   What is --

**A.**   And can we go back to the other thing?

**Q.** Yeah.

**A.** I just need to say something. When we say it's double counted, that's not what's happening right now. It is true at the end, but this is not -- this is just a list of wires. It's not a -- this is just in the beginning of 2017. It's just a list of wires. It's not a tax document.

**Q.** So it's counted once as firm income and then once here?

**A.** Yes. As a result of this document in the end.

**Q.** All right. So if we go back and look at the "out" section, what is in this section?

**A.** Well, these are the wires for, in one case -- two cases checks I think out. Like again, it's a draft. There are questions in here, and then I, obviously, don't know all the details at the time, but it's a list of transactions. It's a list of wires.

**Q.** And do you see how some of the entries under "out" have "share from Alec Gores" written next to them?

**A.** Yes.

**Q.** What does that mean?

**A.** Well, these are the people we -- we saw these numbers earlier. These are all the people who have invested in me for Alec Gores matches. The reason that they might show up twice is because, again, Alec pays in two parts. So they might get paid once from the first wire.

People like to get their money, you know, as soon as

possible. And then there is a, you know, when he pays the second time, they get paid a second time. And then there's also the money that I'm told to send for Paul in here. That's what those numbers.

Q. And the entries that say stuff besides "share from Alec Gores," like "December 12th heads-up, last Manila trip," and so on, what are those?

A. So those are explanations that I have in mind at the time. That must be writing down, you know, where I think this comes from.

Q. And the things that say "out," are these the results of poker games or are they something else?

A. They are -- these are wires out related to poker.

MR. KRAVIS: Okay. So if we just zoom back out for a second?

BY MR. KRAVIS:

Q. Is there an entry on here for Chairman for $5.4 million?

A. No.

Q. Why not?

A. Well, because the only wire in -- again, this is a list of wires. It's not a list of games or winnings or anything like that. This is a list of wires. And there isn't a specific wire from Chairman. That 10/26/16 is related to Chairman. It's me bringing in money from Asia, but that's not what this document is. This is not gambling wins and losses. It's

wires.

Q. Okay. I think you told me earlier that Mr. Phua had a share of the Gores wins that was over $9 million. Did I hear that right?

A. Yeah.

Q. Is the Phua share of Gores on here?

A. No. There would never be a time I would send Paul a 1099. He's not even in the United States, and there's no wire to him. So it would not be on this list that I was preparing.

Q. Were you trying to hide this document?

A. No.

Q. If you were trying to hide your gambling winnings, would you have declared $2.7 million in gambling winnings on your tax return?

A. Again, I don't really think of myself in those terms, but it seems unlikely.

        MR. KRAVIS: Can we take a look at Government's Exhibit 3, please?

BY MR. KRAVIS:

Q. All right. Now, I think the government pointed out during their case that you are -- well, first of all, let me ask.

    The attachment, what is the attachment on this e-mail?

A. It's that. It's -- this is the -- in January of 2017, so it's that first version. It's the thing we just saw.

Q. All right. And I think the government pointed out that

you are sending this to a protonmail account.  Do you see that?

**A.**    Yeah.

**Q.**    So what is protonmail?

**A.**    It is a -- it's like a gmail.

**Q.**    And why were you using protonmail in January of 2017?

**A.**    I mean, again, I don't know.  The -- I now know that protonmail had just launched.  It was in beta then.  And I liked new technology things or anything like that.  The reason I'm sending it somewhere is -- you know, this is ten years ago. You have a desktop computer.  And if you travel, it's -- you have to be able to get the -- get whatever you need.

    And so if I would go somewhere else, look, the Goldstein & Russell e-mail, you can't like log into it the way you do now.  You had to send it somewhere.  And so I was sending the document in somewhere that I could like log into my e-mail account and get it if I was on the road.

**Q.**    Just to be clear, what e-mail address are you using to send the document?

**A.**    The law firm one.

**Q.**    You're not using a protonmail account?

**A.**    No.  I guess I could have logged onto -- I mean, this is, again, ten years ago, but I guess I could have logged onto protonmail and mailed it to myself from protonmail.  No.  I just send it from my Outlook.

**Q.**    Okay.  Notwithstanding the protonmail account, what is

your understanding about whether the government can get this document if it wants it?

**A.** Then the government got this document because it wants it.

**Q.** And was this document, in fact, produced to the government by Goldstein & Russell?

**A.** The reason I can look in the corner and see.

**Q.** Can you look in the bottom right corner?

**A.** Yeah. Yeah.

**Q.** So -- and how do you know from just looking at the bottom right here?

**A.** "GR" is Goldstein & Russell. So this was the 61,265 document. And then the government sent it back, and coincidentally, it was the 61,020th document the government sent to us.

**Q.** Okay. If you had been trying to hide this document, would you have sent it from your law firm e-mail account?

**A.** No. It would accomplish nothing.

**Q.** And in fact, sometime later in October, did you ask Mr. Levitan to just like go into your computer and find this document and e-mail it to you?

**A.** Yeah.

**Q.** If you were trying to hide the document, would you have asked Mr. Levitan to go into your computer and find the document and e-mail it to you?

**A.** No.

**MR. KRAVIS:** All right. We'll take that down.

**BY MR. KRAVIS:**

Q. I think you were telling me earlier about a meeting or a conversation between you and Mr. Deyhle about the gambling figures in January of 2017. Do you remember that?

A. I don't know if it's about the gambling figures, but it's about the, you know, gambling and taxes.

**MR. KRAVIS:** All right. Could we have Defense Exhibit 236, please?

**BY MR. KRAVIS:**

Q. Mr. Goldstein, is this the e-mail exchange setting up that meeting?

A. Yep.

Q. And to be clear, who asked for this meeting? Was it Walter or was it you?

A. I mean the e-mail is from Molly, but it's explaining that I asked for it.

Q. Why did you ask for the meeting?

A. Because this was all, you know, new. I mean, the taxes wouldn't be due for a while, but this was going to be a thing.

Q. When you say this was all new, what is the "this"?

A. The notion of people who have shares and, like, all these wires and how do we have to handle it as a tax matter. It's just I have never been in this situation.

Q. Were in-person meetings between you and Mr. Deyhle to

discuss tax issues common?

**A.** No.

**Q.** What happened at the meeting?

**A.** Again, this is ten years ago. I tell him that, you know, I have been playing much bigger stakes. I have these investors. There is a lot of money that's gone in, a lot of money that's gone out. And that we are going to have to deal with this.

I talked to him, I think, about the idea. Because by then, I have gotten from Keith Gipson the specialist, the idea of talking to a specialist. And Walter recognizes and says, "There may be this issue of whether you are going to have to send out tax documents to all the people. So, you know, why don't you collect the rest of people who you've sent wires to?"

**Q.** Did Mr. Deyhle in that meeting ask to see your personal bank statements?

**A.** No.

**Q.** Did he ask for any other documentation regarding your gambling wins and losses?

**A.** Look, I don't want to overstate that I have some perfect memory of this. All that I know is that if he would have asked for something, I would have given it. And if I haven't, he would have e-mailed and me and said, "What's up with that?"

**Q.** To your recollection, did Mr. Deyhle provide any advice to you about how to record the shares paid by investors or any

other information?

**A.** No. I mean, I think everybody knew that it was new to me, but this was also not something that he had particular experience with, too.

**Q.** In the meeting, did you give Mr. Deyhle the name and contact information for the accountant that we saw earlier Mr. Gipson had given you?

**A.** Yeah.

MR. KRAVIS: Could we have Defense Exhibit 314, please? And could we go to the second page? And then -- I'm sorry. Can we go all the way to the end? And then one page back from there.

There it is.

**BY MR. KRAVIS:**

**Q.** Okay. Mr. Goldstein, what's going on here?

**A.** Starting with the one on the bottom?

**Q.** Yeah. Starting with Mr. Deyhle's e-mail on March 21, 2017 at 2:59 p.m.?

**A.** So he says, "Hi, Tom. Without the other income, your tax" -- he must be talking about the gambling.

"Without the other income, your tax is 600,000. Can you tell me the actual total of net winnings? I'll contact the guy" -- so there is the guy. "I'll contact the guy in Vegas." So yeah, we must have talked about it. "I'll contact the guy in Vegas next week."

So he asked for the total -- these are two a little bit contradictory things. The total of net winnings.

Q. Did Mr. Deyhle ask you at this point for any information besides just the total net winnings?

A. No.

Q. Can you just remind us, please, what do you understand net winnings to mean in this context?

A. Net winnings would be, like, at the end end. So we are going to take out the shares to people. We are going to take out the losses. Like, what happened in the end.

Q. And when Mr. Deyhle says, "I'll contact the guy in Vegas next week," what did you understand him to mean by that?

A. The guy that we have been talking about, the specialist.

Q. If you scroll a little bit further up in this e-mail, do you see that there is some discussion -- your response above mentions an instruction about 1099s?

A. Yeah.

Q. What were you referring to there?

A. This is the genesis of the wire list. So that's what the 1099 is in this context.

So what's happened is Alec Gores pays me. I pay the investors out through the wires. There is some question in gambling whether you have to send a tax form to all of those people at the end of the year.

Walter, in that January meeting, says we may have to do

this. I think there is an e-mail here when I say, "Hey, can I get one of these forms?" "Hey, it's March 31. There is some rule about them being on April 2." So that's the exchange going on now. To this one.

Q. Did you end up sending out 1099s to the investors?

A. No. So what happens then -- I will say this has never come up because you do this when you are -- you know, have these investing shares, so this is a new thing for me.

So I then contact -- I don't remember which -- some group of high-stakes players and ask, "Does this really happen? Do we send these tax documents out?" And everybody is like, "No. That guy is just wrong."

So the 1099s don't end up getting sent out, but that's what the genesis of the document is and that is what this exchange is about.

Q. So just moving forward a little bit here.

MR. KRAVIS: Can we have Defense Exhibit 313?

If we could start on the second page, please?

BY MR. KRAVIS:

Q. Do you see this starts with an e-mail from Molly Runkle to Walter Deyhle and Jill Leonard on April 11, 2017?

A. Yes.

Q. So this is, like, a few weeks after the last e-mail we just saw?

A. Yes.

Q. What is Ms. Runkle asking for here?

A. She's talking to both sides of GRF. Walter is the tax guy. Jill is an accounting person.

"I'm writing to ask for a rundown of what all you need from us to finalize the firm, blog, and personal taxes." So what do we need to send you.

Q. If you look a little bit further up, I think Mr. Deyhle's response is the bottom of one and top of two.

How does Mr. Deyhle respond?

A. In two pieces. "So the corporate returns were completed a while ago." That's going to be the law firm. "I need the e-file authorization forms signed and sent back to me." This is the technical part about, like, how do you send those in. "And they are in the packages." I don't know what the reference to the packages is.

"I have asked Tom for some information on his tax return." So that is, I expect, him referencing back this question of the net winnings. "You have provided everything you have access to. The personal return will be extended."

Q. When Mr. Deyhle writes, "I have asked Tom for some information on his return." What did you understand him to be referring to there?

A. I don't understand him to be saying anything in the moment. I'm not on this e-mail.

Q. Whether the e-mail gets forwarded from Ms. Runkle to you

in April of 2017, at that point, when you read it, what was your understanding about what Mr. Deyhle was saying?

A.   He's referencing our earlier exchange where he says, "Hey, can you tell me the total of the net winnings?"

        MR. KRAVIS:  And then if we move a little further up?

BY MR. KRAVIS:

Q.   What does Ms. Runkle say in response?

A.   "When do you need that?"

Q.   What does Mr. Deyhle say?

A.   Walter says, back to Molly, "At his convenience, since we are extending the tax return."  So in the last e-mail, he said, hey, the personal return is just going to get extended.

    "Does he want to make a payment with the extension?"  So he is saying here we are going to file the extension request to file your actual tax return.  Do you -- does he want to -- Tom want to pay money at the same time.

Q.   I want to ask you about that part in a minute, but first move up.

    So Mr. Runkle then forwards the e-mail to you; right?

A.   Yep.

Q.   So when you reviewed it, based on this whole exchange, what was your understanding about how urgently Mr. Deyhle needed the gambling numbers from you?

A.   He just says whenever.  He says, "at his convenience."

Q.   Let's go down to that last e-mail from Mr. Deyhle.

That second sentence, "Does he want to make a payment with the extension?" When this was forwarded to you and you read it, what did you understand Mr. Deyhle to be asking?

A.   That we are going to file the extension for the 2016 tax return here in April of 2017, and he wants to know if I want to pay any money when I file the extension.

Q.   So when he says, "Does he want to make a payment," what did you understand that to be referring to?

A.   That -- a tax payment for 2016 at the same time as we file the extension request.

Q.   Did you have an understanding from this e-mail that it was unlawful for you not to make the payment?

A.   No.   Obviously, he's asking if I want to do it or not.

MR. KRAVIS:   All right.   We can take that down.

Let's keep moving on in the timeline here.   Can we have Defense Exhibit 304?   If we can start on the second page? Maybe it's the third.   No.   It's the second.

BY MR. KRAVIS:

Q.   So this is October 8, 2017.

So we're now -- this is now, like, six months since last e-mail; right?

A.   Okay.

Q.   Can you take a look at the bottom e-mail from Mr. Deyhle?

What is Mr. Deyhle saying there?

A.   "Hi, Tom.   The return is due 10/16.   So we need to wrap up

the one big issue. Can you get me the gains and losses and the contact info for the guy in Vegas?"

Q. So, first of all, what do you understand Mr. Deyhle to be referring to when he says "the one big issue"?

A. That's the poker.

Q. The last e-mail was April. This e-mail is October.

Between April and October, do you have any recollection of Mr. Deyhle reaching out to you about the gambling numbers?

A. No.

Q. Have you seen any e-mail between April and October where Mr. Deyhle is reaching out to you about the gambling numbers?

A. No.

Q. When is the tax return due here?

A. In seven or eight days.

Q. And do you see where Mr. Deyhle writes, "Can you get me the gains and losses?"

A. Yeah.

Q. Was this the first time that Mr. Deyhle had asked you for gains and losses, as opposed to just the net number?

A. Yes.

Q. Eight days before the return is due?

A. Yes.

Q. The next part reads, "the contact info for the guy in Vegas."

What did you understand that to refer to?

**A.** That's the same guy again.

**Q.** And based on what Mr. Deyhle writes here, did he reach out to the guy in Vegas at this point like he told you he was going to?

**A.** The tax specialist? No.

Look, I will tell what you -- my understanding of this is that if I gave the information to him in January and then in March, but then he asked me for the contact information again in October, it is unlikely that he has spoken to the guy in the meantime.

**Q.** Okay. Let's take a look at your response.

What do you say when you respond?

**A.** So this is four days later, and I say, "The wins were 27,185,050, the losses and distributions were 24,436,700, so the net was 2,748,350. The tax guy is Russell Fox," and his URL.

**Q.** So I want to ask you about the timing of this exchange.

But first, when you say, "so the net was 2,748,350," what are you telling Mr. Deyhle about what you're reporting in taxes in terms of your gambling?

**A.** I'm telling him that I made 2.748 million playing poker.

**Q.** In this exchange, does Mr. Deyhle ask you for a phone call to walk through the numbers?

**A.** No.

**Q.** Does he ask you for an in-person meeting to sit down and

talk about it?

**A.** No. I mean, this is -- to this point, no.

**Q.** Does he ask you for further documentation, like your personal bank statements?

**A.** No.

**Q.** All right. I want to ask you about where you were when this e-mail exchange started.

    **MR. KRAVIS:** Can we go to grand jury -- excuse me -- Government Exhibit 1057, page 14, please?

**BY MR. KRAVIS:**

**Q.** Mr. Goldstein, these were previously admitted into evidence. They're text messages between you and Mr. Levitan. Can we look at the bottom of 14 and the top of 15? On October 2, 2017, what are you asking Mr. Levitan to do?

**A.** Put me on a flight.

**Q.** And where does the flight depart from?

**A.** Where is it --

    **MR. KRAVIS:** Can we see the bottom of one and the top of two?

    **THE WITNESS:** From BWI to LAX.

**BY MR. KRAVIS:**

**Q.** And where is LAX?

**A.** Los Angeles.

**Q.** When is the flight departing?

**A.** October 4.

Q. What airline are you flying?

A. Southwest.

MR. KRAVIS: All right. Now, if we could take a look at page 16, please?

BY MR. KRAVIS:

Q. What are you asking Mr. Levitan to do here in the messages on October 8th?

A. Put me on some other flights.

Q. And where are those flights going?

A. There's a flight from Chicago to Washington, D.C. and LA to Chicago.

Q. This is your route home from LA?

A. I believe so.

Q. And when are the flights back from LA to Chicago to D.C.?

A. It's very faint, but it's October 10th.

Q. So, based on these records, what is your understanding of where you were when you received Mr. Deyhle's October 8th e-mail asking you, out of the blue, for the gambling numbers?

A. I was in Los Angeles.

Q. And were you also working on a legal project at that time?

A. Yeah. So at the time -- I mean, I would not remember this otherwise, but I have looked at this. So I'm working with Darren Robbins and Robbins Geller on a Supreme Court case.

Q. Did we hear from Mr. Robbins during the trial?

A. Yeah.

**Q.** Same guy. Okay. Go ahead.

**A.** Same. We're in a Supreme Court brief, the end of the Supreme Court brief. So when I say I'm in Los Angeles, I couldn't tell you if I'm in -- his office is in San Diego. But a lot of times when I would go there, I would fly through LA, so because San Diego is down the coast, not that far and you can fly direct from D.C. to LA. So I'm some -- I'm either in LA or San Diego, somewhere on the southeastern -- it's not southeastern -- the southern part of California working on this brief.

      **MR. KRAVIS:** And could we go to -- just to ask about the timing of that brief, can we go to Defense Exhibit 206, please and if we could look on the second page?

**BY MR. KRAVIS:**

**Q.** Mr. Goldstein, what is Defense Exhibit 206?

**A.** This is the -- from the docket of the Supreme Court of the United States. It is for a case. The case is number -- in a court every case has a number. This case has a number. And the -- the Supreme Court case has a number, number 151439. That means it's from the Supreme Court's 2015 term, which goes from 2015 to 2016. That's when the case got there.

      The title, that's the name of the people in the case. So it's Cyan, Incorporated -- those were the bad guys -- versus Beaver County Employees Retirement Fund. Those are the good guys. And it started there in May of 2016, and this is the

top -- if you were to go to on your computer to the Supreme Court's website and try and find this case, this is what would you find.

Q. Is this the case you were working on the brief for in October of 2017?

A. Yes.

Q. Okay. You mentioned the good guys and the bad guys. Just so it's clear, who were you representing?

A. The good guys.

Q. And they are?

A. The Beaver County Employees Retirement Fund. That's basically people who invested in this company, Cyan, the bad guys.

Q. Okay. Now, I'm going to direct you to page five of the docket entries. I'm going to direct your attention to the entry on October 13, 2017. Do you see that?

A. Yeah.

Q. What does that docket entry reflect?

A. So I'm the lead lawyer for the Beaver County Employees Retirement Fund. So on the 13th -- when you represent the second party, so the first party goes into court, then the second party, the second party only gets to file one brief in the Supreme Court before the case is argued. And so we are filing the one brief for the respondents in this case on the 13th.

**Q.** Do these Supreme Court briefs require a lot of work?

**A.** Yeah.

**Q.** Like what do you have to do?

**A.** So the Supreme Court -- I think I mentioned this earlier. They -- when the Supreme Court hears a question, they expect you to go very, very, very, very deep in the question. So there's just a lot of legal analysis, a lot of writing that goes into preparing Supreme Court briefs. And so it's an involved process.

**Q.** And when you're working on this particular Supreme Court brief, do you have like a big team that's supporting you on this?

**A.** No. It's one of these things where I'm going to stand up and argue this case in Supreme Court in a few weeks, and so I really have to be responsible or know it. Are there other people involved? Sure. And Darren Robbins' firm, they're specialists in this kind of lawsuit.

And so that's probably why -- again, I don't remember, but that's probably why I'm there working with him. But it's not like some big army of people, no.

**Q.** Now, we heard from professional poker players during the trial. During this time, in October of 2017, do you think of yourself as a professional poker player?

**A.** No. This is the -- this -- on some level, this is my world of poker for law. This is like this is what I -- this is

what I do.

MR. KRAVIS: So let's go back to Defense Exhibit 304, please. And if we go to the second page. And if we could look at those bottom two e-mails again for a second.

BY MR. KRAVIS:

Q. Just to make sure I have the timing lined up here, we looked at flight records between October -- showing, have you going out to LA on October 4th and coming back on the 10th. So when you get this e-mail from Mr. Deyhle on October 8th, where do you believe you were?

A. Somewhere in southern California.

Q. And had Mr. Deyhle given you any warning that this request was going to be coming?

A. I mean, there's -- I haven't seen an e-mail with any warning. I'm not aware of it. Look, I don't have a perfect memory of this, but I haven't seen something like that, no.

Q. And the e-mail that you write above, Thursday, October 12th, what is the timing of that in relation to the Supreme Court brief you're filing?

A. It's going to be right before. My guess is -- look, I get this thing on October 8th asking me to figure this out. And I don't respond -- I respond on October 12th. My guess is that what I did is I had to put this to the side to like get the brief nearly done. And so, you know, this is the afternoon of the 12th. So my guess is like the brief is like being

formatted or something like that. And I can try and figure out the answer to this question.

Q. And I just want to be really clear while having this conversation. Mr. Goldstein, do you understand that any errors that appear on the tax return here are your responsibility?

A. Yeah.

Q. And do you understand that like traveling a lot and having a Supreme Court brief due is not like, you know, an excuse for those -- for that responsibility?

A. Sure.

Q. Okay. But did you intentionally, on purpose, give Mr. Deyhle false information about your gambling numbers?

A. No. That's the big difference between being responsible for it and it being like this.

MR. KRAVIS: All right. Let's move further up in the e-mail chain.

BY MR. KRAVIS:

Q. So Mr. Deyhle responds the next day, October 13, 2017, the day your brief is due. What does Mr. Deyhle say there?

A. "Hi, Tom. The return is due Monday. I'm only in the office through tomorrow afternoon." So like, you know, this is going to be the kind of right now thing. "Can you break out losses from distributions? They are treated differently."

Q. And what did you understand Mr. Deyhle to be asking you when he asked you to "break out the losses from the

distributions"?

**A.** Could we -- could I see the e-mail I sent to him? It may make more sense if -- because I'm referring back to something. I don't know if it's possible to -- I can just tell you.

So what's happened is I sent him the number before and he wants it split. I mean, because I told him what the combination of money I lost playing poker to other people and money that I just was forwarding to other people. I put those together, because that's what I thought he wanted the first time. And the second time, he's saying, "No. No. No. Divide those in two. Just tell me what each is."

**Q.** And I think you respond here on Friday, the 13th. Do you see that?

**A.** Yeah.

**Q.** And what is the information that you provide Mr. Deyhle there?

**A.** I say, 13,498,000 is losses. The rest is distributions.

**Q.** And I asked these questions about the initial exchange, but in this back and forth between you and Mr. Deyhle we are seeing now about the numbers, does he ask you for any additional information?

**A.** I mean, this is from me to him, but not so far in this, no.

**Q.** Does he ask you for any additional documentation like your personal bank statements?

**A.** No.

**Q.** Does he ask you for a meeting to sit down and walk through the numbers?

**A.** No.

**Q.** At this point, on Friday, the 13th, are you even going to have time for an in-person meeting with him if the return is due on Monday?

**A.** Not if he was going to be gone especially.

**Q.** And again, these calculations that you're doing for Mr. Deyhle here, had you done this before?

**A.** No.

**Q.** All right. Can we -- I want to ask you now about where these numbers came from.

        **MR. KRAVIS:** And can we take a look at Defense Exhibit 340, please?

**BY MR. KRAVIS:**

**Q.** Mr. Goldstein, what is Defense Exhibit 340?

**A.** Yeah. I was saying that the last time I knew the other one wasn't the second version because it didn't have the bold. This has the bold, so this is the second version of the document.

**Q.** And why did you -- well, first, let me ask. Is this the document that you used to put together the numbers that you sent Mr. Deyhle in the e-mail that we just saw?

**A.** Again, look, I don't have perfect recollection of this,

but I think so.

Q.   Is this -- are there changes between the earlier version of this document we saw and this version?

A.   Yes.

Q.   So I want to just show you a few of them.  Do you see there is out 1/17/17 to Bob Safai 770,000?

A.   Yep.

Q.   Is that something that is added since the prior version?

A.   The only reason I know this is I have now looked at these a bunch, so I happen to know that, no, that is not on the prior version.

Q.   The two entries in bold on 12/23/16.  Do you see that?

A.   Yep.

Q.   Having gone back and looked at these, was that also changed from the prior version?

A.   Yes.

Q.   Do you recall, approximately, how much time you spent working on this document in October of 2017?

A.   Very little.  This -- I mean, again, I'm -- I don't mean to overstate how much I remember this happening ten years ago. I do remember having to urgently figure this out for the first time and it being stressful.  And but just kind of doing it and doing it and doing it very quickly.

     I have thought about this and thought about this and tried to think about it, and I think I spent about, you know, 20

minutes revising this document.

Q. Now, I think I heard you tell me earlier that the prior version of the document we were looking at was a document listing wires, not like poker games. Did I hear that right?

A. Yeah. It's just a Word document. It's just a list. It's not a spreadsheet or something. It's just wires. Again, there, two checks. Two things went out by check, but yeah. It's the ins and outs as it says.

Q. Is that -- is the same thing true of this version or is it different? Are these wires or are they something else?

A. These are -- it's the same. The -- even the changes are the same.

Q. Now, looking back on all of this, have you identified some mistakes in this document?

A. Yes.

MR. KRAVIS: Okay. So could we have slide -- I think it's slide 12, please?

BY MR. KRAVIS:

Q. Mr. Goldstein, is this slide a summary of the mistakes that you have since identified in the document that we were just looking at?

A. Yeah. There are things that reduce the number. There are things that increase the number. There are five mistakes -- or fives sets of mistakes.

Q. I'm going to walk through each of these with you one by

one.

I want to start with the mistakes that went in your favor, the numbers in black.

A.    Okay.

MR. KRAVIS:  Can we go back to Defense Exhibit 340, please?

BY MR. KRAVIS:

Q.    I think you told me when we were speaking earlier that your share of the Chairman winnings from September 2016 was over $5 million.

Did I hear that right?

A.    Yes.

Q.    Is there an entry on this document for your full $5 million-plus share of the Chairman winnings?

A.    No.

Q.    Why not?

A.    Because it's -- there is no wire.  Look, I think what happened is I have to do this really quickly.  Walter is saying I'm gone tomorrow.  And I have one thing that is available to me, which is this document.  It's way, way, way, way, way later, and I'm not really thinking about these sorts of things. I'm trying to do this very, very quickly.

And so there is a list of wires.  There is no wire from Chairman on it.  It's just not here.

Q.    How did you compile the list of wires?

**A.** From bank statements, I think.

**Q.** Was there an entry on your bank statements for the -- your share of Chairman for 5.4 million?

**A.** No, because I don't get a wire. That's on Paul Phua. That's on my virtual -- call it what we will. Paul Phua has that. And then there is the $750,000 that's the money that I draw in. That's, I think, in all likelihood, in my mind, what I'm thinking about.

**Q.** I'm going to ask you about that 750K in a minute, but let's keep going with the mistakes in your favor.

**A.** Okay.

**Q.** I want you to take a look at that $1.3 million entry on December 23, 2016.

**A.** Yeah.

**Q.** Is this, like, connected -- this 1.3 million, is this connected to an actual wire transfer?

**A.** Sure.

**Q.** Was that wire transfer actually gambling related?

**A.** Yes.

     **MR. KRAVIS:** Could we look at Government's Exhibit 419, please?

**BY MR. KRAVIS:**

**Q.** This is a summary exhibit that the government used with Mr. Flack.

The $1.3 million wire that we were just looking at, does

that appear on the summary exhibit?

A.    Yeah.  Can we -- I've accidentally touched the screen, and so there is some red lines on here.  I don't know if we can wipe those out because I've screwed that up.  But -- yes.

      Okay.  Great.  Thank you.

      So yes.  Your question is, is there a 1.3 million transaction on December 23 of 2016?  Yes.

Q.    And is that the same date of the $1.3 million outgoing wire we just saw on the wires document?

A.    Yeah.

Q.    And is it the same amount?

A.    Yeah.

Q.    Now, do you see here that the government's summary exhibit identifies the counterparty as Stewart and Lynda Resnick?

A.    Yeah.

Q.    What is your understanding of what counterparty means here?

A.    Who is on the other side.

Q.    When you were actually preparing the wires document in October of 2017, did you have Mr. Flack's summary exhibit in front of you?

A.    No.

Q.    What did you actually have in front of you?

A.    Look, I -- this is ten years ago.  I can tell you what I would have had.  I would have had access, I think, to -- you

could call up, even then, your -- you know, your bank records.

I now know that there is also e-mails or there's an e-mail with attachments or something like that, but I don't have -- I think it's most likely the bank statements because I think that's the only place this would show up. It would kind of have to be in the bank statements.

MR. KRAVIS: Can we take a look at Government's Exhibit 4, please? Can we go all the way to page 221?

BY MR. KRAVIS:

Q. Mr. Goldstein, is this a portion of your bank statements?

A. Um.

MR. KRAVIS: Could we scroll down further to the -- yeah. No. All the way down.

Yeah. That's fine.

THE WITNESS: Yes. Then this would be me.

BY MR. KRAVIS:

Q. The $1.3 million wire we have been talking about, do you see it on here?

A. Yeah.

Q. Where is it?

A. It's in yellow now.

Q. Now, when you are looking at not Mr. Flack's summary, but the actual bank statement, can you see who the wire was to?

A. No.

Q. Why not?

A.    Because -- it may be because they used the same bank.  I don't know.  Sometimes when do you a transaction, it does not tell you in your bank statement who it went -- I don't know why, but it just does not -- it does not say who it went to.

So I know that this is -- I'm sure at the moment I knew that this had to be gambling related because look at the size of the thing.  So I knew that there was a wire out.

When it says withdrawal I made in the branch, I didn't walk in and get $1.3 million.  This is just how they list certain transactions.  So I would have known that this -- if I looked at this statement, that it was $1.3 million, and I would have understood it to be gambling related.

Q.    Based on all of the information you have now, was it proper for you to deduct this $1.3 million wire for tax purposes?

A.    No.

Q.    Why not?

A.    Well, because in reality, even though you can't tell it from the bank statement, this is me repaying the Resnicks.

Q.    And why is it that you repaying the Resnicks cannot be properly be deducted for tax purposes?

A.    That is just me repaying back a loan.  That's not me losing anything in poker.

Q.    And on the bank statement that you have in front of you, can you see that the payment is to the Resnicks?

**A.** No.

**Q.** If you could have seen on the bank statement, like Mr. Flack had on his summary, that the wire was going out to the Resnicks, would that have affected your decision about whether to include it on the wires document?

**A.** Yes.

**Q.** How so?

**A.** Well, because I -- this is what I think is happening here. Again, we're ten years later. But I believe what is happening is this, I'm told, I need to know everything. Before I'm just told, like, put together wires. Now, I need to know -- like, get everything together in this period.

And I -- what I do, it's -- I don't know if I do this on the 8th, I don't know if I do this on the 12th. Somewhere in this period, I have to double-check. I have to just look and see if I missed anything the first go around.

So what I assume I did is I looked to see if there were transactions that are on the bank statement that are not on the wires document, and I must have found this.

        **MR. KRAVIS:** Let's go back to Defense Exhibit 340, please?

**BY MR. KRAVIS:**

**Q.** I want to show you the next error I think you identified. It's the December 23, 2016 entry for $1 million going out.

Do you see that?

**A.** Yes.

**Q.** Again, is this connected to an actual wire?

**A.** Yes.

**Q.** And let's take a look -- and was that wire also gambling related?

**A.** Sure.

**Q.** Let's take a look at Mr. Flack's summary.

**MR. KRAVIS:** Can we have Government's Exhibit 419 again, please?

**BY MR. KRAVIS:**

**Q.** The $1 million outgoing wire on December 23, 2016, does that appear on Mr. Flack's summary?

**A.** Yeah. At the bottom -- near the bottom.

**Q.** Where is it?

**A.** The next to last line.

**Q.** Looking at all of these transactions on Mr. Flack's summary, was it proper for you to deduct this $1 million for tax purposes?

**A.** No, because even though you don't see it, if you look at the bank statement, you would see $1 million went out, but if you continue looking -- if you're not looking at the money that goes out, but you also look at the money that comes in, you are not looking just at the money that goes out, you will see it does not have the same name or anything like that, and it's a few days later, but the money comes back. Almost all of it.

There must be a wire return fee.

And while the names are different and all the numbers are -- not all the number, but, like, if you look in the -- you go way down into this. If you see the numbers down there, they will line up, but the recipient and the return are different. That means that I haven't actually -- the money left my account, but it came back. I was sending money away for poker, but it came back into my account.

Q. Let's take a look at what the bank statements show about this.

MR. KRAVIS: Could we have, again, Government's Exhibit 4, page 221? Can we go down to, again, the bottom third?

Yeah. That's good.

BY MR. KRAVIS:

Q. Mr. Goldstein, we are going back to the same page of your bank statements.

Do you see the $1 million wire that we have been talking about in here?

A. Yeah.

Q. Where is it?

A. Now it's in yellow.

Q. Now, looking at how this appears on your bank statement, do you have an understanding as to how you made a mistake and included it in the wires document we just saw?

**A.** Yeah. I mean, again, I can reverse engineer it. I can tell what you I think happened, and that is, just like with the 1.3, I'm just going through the big transactions. Is there something that's missing on the return.

I even think that the -- they're all lined up. I think that this 178 gets corrected. They are just all right next to each other on the bank statement.

So I see the 1 million. I look at the wire tracker, and I'm like, I have not tracked this wire, and I put it on the wire tracker.

And then what I don't focus on, I'm just -- I assume I'm just looking at the right side. I'm looking for wires out. That's what I'm trying to figure out.

**Q.** At the time that you put this $1 million wire on that wires document, did you realize that this wire had been returned a few days later?

**A.** No, I would not have. Again, I don't have a precise recollection of writing any of this down. But no, I would not have done that because that's not -- that's not -- it's out and it's back.

**Q.** I want to show you another exhibit on this subject.

        **MR. KRAVIS:** Can we go to Government's Exhibit 720.1, please?

**BY MR. KRAVIS:**

**Q.** Mr. Goldstein, do you remember seeing this wire report

Q. And what is the transaction being reported on the first page?

A. I mean, I could not -- I mean, I can only answer your question because I saw it at the time. If you ask me to decipher it --

Q. In that case, let me ask it a different way. Directing your attention to the top, what is the debit amount?

A. The debit amount is a million dollars.

Q. And what is the debit value date?

A. The 23rd.

Q. And so does this, the amount and the value date correspond the same as the wire we were looking at earlier?

A. Yeah. Sorry. Yes.

Q. All right. And, then, if you look at the second page of the exhibit, what is the debit amount here?

A. The debit amount is 999,950.

Q. What is the debit value date here?

A. That's four days later, the 27th.

Q. And if you look at bank name, debit address, do you see what it says there?

A. Bank name, debit address. "WF return wires in process." That?

Q. Yes.

**A.** Yeah.

**Q.** Now, is it your understanding that this wire report corresponds to the return of the wire?

**A.** Yeah.

**Q.** Okay. Now, do you remember hearing Mr. Flack testify about how you can use the transaction IDs or the reference numbers to line up these two transactions?

**A.** Yes.

**Q.** Did you have access to this document when you were preparing the wires document in October of 2017?

**A.** No.

   **MR. KRAVIS:** Okay. We can take that down. Let's go back to the document, Defense Exhibit 340.

**BY MR. KRAVIS:**

**Q.** I think the third error that you identified for us is the Safai transaction, the one on January 17, 2017?

**A.** Yep.

**Q.** For 770,000?

**A.** Yep.

**Q.** Okay. Is this one also connected to an actual wire?

**A.** This is connected to a wire, yeah.

**Q.** Is that wire also gambling related?

**A.** Yes.

**Q.** Was it proper -- as you look back on it now, was it proper for you to deduct this 770,000 from your gambling numbers in

2016?

**A.** I don't think I have the expertise to answer that question. I think the safest answer is no, but there are -- but because of other transactions that are properly deducted, probably not, but not definitely not.

**Q.** Why is that?

**A.** So this is for a game that happened in 2016 and the payment happens in 2017. It's a transaction that spans years, and the early parts of years. So there are other examples of that here where the game happens here and the money comes out of my account here, and it's deducted. And I don't think anybody is giving me a hard time about that.

This one is further out and it's not by check. It's by wire. So they're different, but it's the same phenomenon of straddling a year between a poker loss and when you pay for the poker loss.

**Q.** Looking back, do you know how this happened?

**A.** Look, I will give you my best shot and that is I believe what I was doing was looking for wires in the -- when I -- remember, the first document is in January of the year is just a draft. It's just Walter says, "Hey, we may have to send 1099s." I go through and I try to assemble the wires. It's not -- it all has brackets and questions marks and everything.

I come back to the thing in October of 2017. With very little time. I try and do like double-check is what it looks

like. I find these things for poker games in 2016. This is a -- for a poker game in 2016 and I list the $770,000. That is what I believe happened.

MR. KRAVIS: And can we zoom back out for a moment, please?

BY MR. KRAVIS:

Q. I think you told me earlier when we were doing the numbers on the calendar, that you had received $300,000 total. There was some from Kevin Hart?

A. Yeah.

Q. And some from Andrew Robl as U.S. wins. Do you remember that?

A. Yes.

Q. Okay. Are those entries on the document?

A. No. The ins that I list are the four above that, and those two are not on it.

Q. Do you know how that happened?

A. No. I mean, it's a mistake by me. I think -- I can tell you what I think the mistake probably was. This document is created by Walter to create 1099s potentially going out. I think, as I saw transactions, I put them in the "in" section, but that was -- the purpose of this wasn't to do ins. It's no excuse. I'm not saying that I -- I mean, I had to pay the taxes on it. But I think that's, in my brain, I'm focusing on the outs in all this. That's the point of this document.

**Q.** Okay. Those are the errors that went in your favor. I want to ask you now about the errors that went against you.

**A.** Yeah.

**Q.** I think you told me earlier that the "out" section of this document includes shares that were paid out to investors for Alec Gores. Did I hear that right?

**A.** Yep. Sorry. Yes.

**Q.** Is Paul Phua on here?

**A.** Paul Phua is not personally on here. There is -- his name is not on here, no.

**Q.** Why -- what was Paul Phua's share of Gores again?

**A.** At the beginning or at the end?

**Q.** By the end of December of 2016?

**A.** $9 million.

**Q.** And how is it that Paul Phua's $9 million share of Gores did not end up on this document?

**A.** Because this is a list of wires, and there is no wire to Paul Phua.

**Q.** Take a look at the "out" section. Do you see that?

**A.** Yeah.

**Q.** I think you told me that, in addition to the shares from Alec Gores, the "out" section also included losses in other games that you played in. Did I hear that right?

**A.** Yes.

**Q.** When you testified about the $4.5 million that you lost

gambling in Asia, is that on here?

**A.** No. This is -- again, it's not a list of losses. There's lots of wires from a single loss. There might be multiple losses consolidated into a single wire. There are no wires to the people that I lost to overseas, so there is nothing on here.

**Q.** Where were -- just to remind us, where were those overseas losses being accounted for?

**A.** On the Paul Phua -- may we bring up the Paul Phua ledger, just so we can know what we're talking about. So there.

**Q.** Can I ask you to take out the calculator again. It's right in front of you. Yep.

**A.** I'm not good at this.

**Q.** You're getting experience.

**A.** Okay.

**Q.** All right. If you take the -- I want you to first start with the $9 million Phua share of Gores that is not on the document.

**A.** So just enter it as 9 million?

**Q.** Just enter it as 9 million. Let's call it 9 million.

**A.** Okay.

**Q.** And now I want you to enter the -- add to it the 4.5 million that you recall losing in Asia. Go ahead and do that.

**A.** So this is money that's owed to Paul and then money that I

lost in -- it's not all in Asia but oversees.  Yeah.

Q.    What does that number add up to?

A.    13.5 million.

Q.    And with respect to these errors we have been talking about, what is your understanding of what that 13.5 million reflects?

A.    So this would be stuff that I'm not accounting for.  So I'm not accounting for the fact that I'm holding onto $9 million for Paul Phua.  I'm not accounting for the fact that I lost $4.5 million overseas.  So there's 13.5 million. There's -- this is a -- these are errors that hurt me because these of things that would reduce my gambling totals.

Q.    Okay.  So now let's subtract out -- take the errors that hurt you.

A.    Okay.

Q.    The 13.5 and let's start subtracting out the errors that went in your favor.

A.    Okay.

Q.    Let's start with the three wires we just discussed, so that's $3.077 million.

A.    3077.

Q.    3077000.

A.    Okay.

Q.    Now, let's subtract out the other mistake that helped you here, the 300,000 in the missing poker wins?

**A.** Okay.

**Q.** And now let's subtract out the entire -- your entire share of the Chairman win. $5,390,000?

**A.** 5390?

**Q.** Yes.

**A.** Yeah.

**Q.** When you add all of it up, you take the mistakes that went against you and you subtract out the mistakes that went in your favor, where do we end up?

**A.** This says 4,000,733, so I think that would mean that's how I got hurt.

**Q.** Yeah. Four million -- yeah. That's what I was going to ask. 4,000,733 in your favor or 4,000,733 against you?

**A.** Against.

**Q.** And just to make sure we're clear, how exactly -- looking back on it now, how did that happen? How did it happen that you ended up putting together a wires document, sending numbers to your accountant that was off against you by $4.733 million?

**A.** Because I had used the wires document. The -- I had not done this before. If you just -- usually, I suppose if you were a gambler, you would just look at the money that would be safe. You would do money that went in and out, if you were a gambler in the United States.

But two things happened here and it just screws up in both directions. I don't think -- I just go based on the wires.

I'm not thinking about money that is, at this point in time, in the end of 2016, because now we're in the end of 2017.  I'm not thinking about what was happening in 2016 in terms of where Paul Phua's share was sitting.

And then, you know, I don't even count -- it just goes in both directions.  The Chairman money that is income doesn't get counted in there.  I just look at the wires in and out of the U.S. bank account.  I take the one document that I have.

Q.   This may be an obvious question.  But looking back on it now, do you think that this method you described of looking for wires and putting the wires into this document was a good way to keep track of your gambling wins, losses and investor shares in 2016?

A.   No.

Q.   At the time you were putting this together in 2017 for games in 2016, before 2016, had you ever played in high-stakes poker games where you had investors with shares of you?

A.   No.

Q.   Did you have any experience in keeping track of the money paid to investors and so on and so forth?

A.   No.

Q.   I want to ask you about one more thing on this ledger.  Could we go -- excuse me.  On the wires document.

MR. KRAVIS:  Could we go out, please?

BY MR. KRAVIS:

Q. I want to focus in on the 750,000. Do you see that on the inside?

A. Okay.

Q. As you sit here today, what is your understanding of what that 750,000 represents?

A. That $750,000 represents two things. This was money coming out of the -- what we're now calling the Paul Phua ledger. And it represents a lot of gambling winnings, but it's also reimbursing me things that I have done for him through the law firm. It's a combination of things.

Q. Now, I want to take you back to what was in your head at the time that you were putting this together. Okay?

A. Yeah.

Q. I think you told me earlier that you had won $13.8 million playing against the Chairman in September of 2016; right?

A. Well, you're using that phrase loosely. Do you mean my share or do you mean what I lost?

Q. I mean, I'm sorry. I don't mean you had won. I'm using that loosely. I mean everybody, you, the investors, all of it put together, what everybody took off of Chairman in September of 2016.

A. Right. Okay.

Q. You told me it was 13.8 million?

A. Yeah.

Q. At the time that you were putting this together, even

though Chairman had lost 13.8 million games with you --

**A.** Yeah.

**Q.** -- did you have an understanding as to why this $750,000 number was nevertheless correct?

**A.** Yeah. Sure. I mean, look, it's ten years ago. I'm not going to pretend that I have some perfect understanding of what's in my head. But I know that I have beaten Chairman, and I have taken money out of the game and brought it to the United States. And so this is what is, I assume, in my head, saying, "hey, look, I just brought in money from the Chairman win."

**Q.** And was there something that you were relying on that you were looking at at the time, so your good faith belief, that this 750,000 was an accurate reflection of what you got from the games outside the U.S.?

**A.** I mean, I would have had to have asked for it to be sent to me.

**Q.** And were you look -- was there anything -- is there any documentation you were looking at to develop your good faith belief that this number accurately reflected the total amount of money that you were due from the games overseas?

**A.** So I would have had the ledgers would have told me that and the communications about it and the, you know, the request to send the money.

**Q.** All right. I want to direct your attention to Defense Exhibit -- don't put it up, just in your binder -- 737.2.

**A.** D or G?

**Q.** DX 737.2.

**A.** Okay.

**Q.** I think we looked at this earlier. Is this one of the photos of the ledger?

**A.** Yeah.

**Q.** And is this one of the documents that you would have relied on to form a good faith belief about the correctness of the $750,000 number?

**A.** Sure.

**Q.** Is this a document that you received in 2016?

**A.** Yes.

    **MR. KRAVIS:** At this time, the defense moves Exhibit 737.2 into evidence.

    **THE COURT:** Let's come to the husher.

    (Whereupon, a discussion was held outside the presence of the jury.)

    **THE COURT:** Mr. Goldstein? Mr. Kravis?

    **MR. KRAVIS:** Yes, Your Honor.

    **THE COURT:** Mr. Beaty?

    **MR. BEATY:** Your Honor, we have been going a long time. Can we maybe take a break?

    **THE COURT:** I was about to say the same thing.

Is that the only thing you have?

    **MR. BEATY:** No, I want to talk about this, too.

THE COURT:  Go ahead.

MR. BEATY:  Let's do it after.

THE COURT:  After the a break?  All right.

Mr. Kravis, can we take a break now?  We have been going about 90 minutes.

MR. KRAVIS:  Sure.

THE COURT:  Okay.  Thank you.

(Whereupon, discussion concluded.)

THE COURT:  Members of the jury, I'm going to suggest you take another break at this time.  Please rise for the jury.

(Whereupon, the jury exited the courtroom at 3:56 p.m.)

THE COURT:  Please be seated.  Mr. Goldstein, if you want to step down and rejoin counsel's table for just a moment, you are welcome to that.

(Whereupon, the witness exited the witness stand at 3:56 p.m.)

THE COURT:  Anything before we take a break?

MR. BEATY:  So we have the same objection, Your Honor.  It the same chart.  It's the same ruling.  It's still hearsay for the same reason.

THE COURT:  The ledgers issue?

MR. BEATY:  This is that document, Your Honor, that they are now trying to submit.  I don't know.  Anyway, it's the same chart, 730 --

MR. KRAVIS:  It's 737.2.  When combined --

THE COURT:  This is the document that is based upon

the ledger that's not coming in?

**MR. BEATY:** No. This is -- this is a screenshot of the actual ledger.

**THE COURT:** Okay. Now, go ahead, Mr. Kravis.

**MR. KRAVIS:** Okay. So the Court ruled, as a global matter, the document's not coming in.

I think Mr. Goldstein just testified that he relied in good faith on this photograph of the ledger when he was forming his belief that the $750,000 on the wires document was an accurate reflection of the total wins and losses in Asia.

As the Court said this morning, the key issue here is what is in Mr. Goldstein's head. The government has argued and put you up over and over again a slide showing that Chairman lost $13.8 million in a game against Mr. Goldstein in 2016. That raises the obvious question. This guy -- you took this guy for 13.8 million. This thing only says 750,000.

Mr. Goldstein just testified that in figuring -- in assessing the correctness of this number, his mental state, what was in his head, he was relying in good faith on the ledger. That means -- I'm not asking for all of it, but this particular document that he just testified to is directly relevant to his state of mind about the number on the wires document, and that is, like, the key issue in the case.

**THE COURT:** This document that's being pulled up on the screen, is this another shot of the ledger, or some other

document that Mr. Goldstein prepared?

**MR. KRAVIS:** It's a shot of the ledger.

**THE COURT:** Mr. Beaty?

**MR. BEATY:** Same position, Your Honor. I'm sorry for not standing. Same position. Your Honor, this is -- you've already ruled it's out --

**THE COURT:** It's not coming in, and I apologize. I couldn't quite follow what the document was because the earlier version I saw, I think, looked a little different in my book.

It's not coming in. Objection overruled -- I mean, sustained. Pardon me.

Let's take five.

And then, Mr. Kravis, we can figure out how long we can go when we come back.

**DEPUTY CLERK:** All rise. This Honorable Court stands in recess for five minutes. Thank you.

(Whereupon, a recess was taken from 3:59 until 4:10 p.m.)

**DEPUTY CLERK:** All rise. This Honorable Court now resumes in session.

**THE COURT:** Please be seated, everyone.

Mr. Kravis, before we have the jury back, can we find a place to wrap up within the hour? For today, I mean.

**MR. KRAVIS:** Yes, Your Honor. I think we will be basically done with gambling by the five o'clock hour. I will ask for the husher when we are getting close to the time.

**THE COURT:** Okay. Thank you.

Are we ready to have the jury?

**MR. KRAVIS:** Yes, Your Honor.

**THE COURT:** Okay. Please rise for the jury.

(Whereupon, the jury entered the courtroom at 4:12 p.m.)

**THE COURT:** Please be seated.

Mr. Kravis?

**MR. KRAVIS:** Thank you, Your Honor.

Could we have slide 12, please?

**BY MR. KRAVIS:**

**Q.** So, Mr. Goldstein, I just wanted to go back to the conversation that we were having before the break about the errors in the wires document just to make sure that was clear; okay?

**A.** All right.

**Q.** And directing your attention to slide 12 here, what is on this slide?

**A.** That's the things that we talked about, the three things that went -- the mistakes that went my way, and the two mistakes that went the government's way.

**Q.** So just walk me through them. Three improper deductions, what are those?

**A.** Those are the two -- the wire for $1 million, a wire for $1.3 million, and the $770,000 wire.

**Q.** And so what does that all add up to?

A.    3,077,000.

Q.    So was that an error that went in your favor or in the IRS's favor?

A.    That went in my favor.

Q.    Because you weren't supposed to deduct them; fair?

A.    Yeah.

Q.    The next one, the three missed poker wins, what is that?

A.    That is the Kevin Hart and Andrew Robl wires in from early 2016.

Q.    And those were, I think we saw, not included in the wires document?

A.    Right.

Q.    And whose favor did that one go in?

A.    That went in my favor.

Q.    If you look at the next one, Chairman wins missing, what is that?

A.    That is -- because we're actually trying to list all the wins and all the losses and do that technically, then there are wins with me beating Chairman over here, and that is missing.

Q.    And I think I heard you say earlier it's missing because you were looking for wires and there is no wire; is that fair?

A.    Right.  Yeah.

Q.    And whose favor does that go in?

A.    That goes in the -- in my favor.

Q.    What's the next one?

**A.**   $4.5 million, and that's, you know, the other side of what is going on with the Chairman piece.  It's -- I'm also losing overseas.

**Q.**   And what does that 4.5 million include?

**A.**   That's all of the overseas losses in 2016.

**Q.**   Why did you omit that from the wires document?

**A.**   Because there is no wire.

**Q.**   And whose favor does this one go in?

**A.**   The government does very well.

**Q.**   Why does this go in the government's favor?

**A.**   Well, because I'm losing money.  We are trying to calculate wins, and they would be offset by losses.

So over here, I have done something incorrect with the, like, the Chairman win.  Now I'm forgetting things that are really important for me, the other side of the equation, so all the times that I lost overseas.

**Q.**   And then let's take a look at the last one.

What is that?

**A.**   That's Paul Phua's share of Alec Gores.  That's not my money.

**Q.**   Why was that not in your mind?  Why is it not in the wires document?

**A.**   Because there is no wire.

**Q.**   And whose favor does this one go in?

**A.**   This is in the government's favor.

**Q.** Why is this in the government's favor?

**A.** Well, because I have the -- I'm not taking this out. I'm including it -- there is in wire in from Gores. So you have to start with that, and that is there is $26 million that comes in, and that's the baseline. Remember I tell Walter it's 27 and change.

So we start way, way, way, way, way up with 26, 27. But unless I take out Paul Phua's share of 9, that number stays way up here. So if I don't take it out, then I'm over declaring by $9 million.

**Q.** And if you add all of it up, everything that you missed on the wires document that you used for the e-mail to Walter, you add up the ones that go in your favor and the ones that go in the government's favor, where do we end up?

**A.** I -- in the government's favor by $4.679 million.

**Q.** What was actually reported on the 2016 tax return?

**A.** So the -- something like 2.7 something as a -- if you -- Walter messes up the numbers, but if you do the -- net them out, I think that it says that I come out ahead 2.7.

**Q.** So adding all of this up, looking back on it, what is your understanding of what that number should have been?

**A.** So if -- what we are saying is start with what -- the wires document, as I understood it, and that shows me as winning 2.7. And there are mistakes in there that overstate that by 4.7.

So the truth of the matter is that I -- you take 2.7 and you subtract 4.7, you end up 2 million down.

Q. What should had been reported on the tax return for gambling winnings?

A. In terms of, like, what the -- what's the end result or?

Q. Yes. What's the end result?

A. There is zero gambling winnings because I'm -- you can't report negative gambling winnings. If it gets down to zero, it can't get lower.

Q. So what does that mean in terms of where you -- whether you underpaid or overpaid on your 2016 tax return?

A. I overpaid by a lot.

Q. How much is a lot?

A. You would have to do a tax calculation, but the income that's over declared is $2.7 million, and so I've seen numbers saying that I had, like, a 35 or 40 percent effective tax rate, so you would take a third of that. So it would be a lot.

Q. Let's take a look at --

A. Like $900,000.

        MR. KRAVIS: Let's take a look at Defense Exhibit 316. If we go to the -- no. Sorry. Can we have 316, please?
    There it is.

BY MR. KRAVIS:

Q. Going to the second page here, you see the e-mail from Mr. Deyhle on October 13, 2017 at 5:23 p.m.?

**A.** Yeah.

**Q.** What is happening here?

**A.** It says, "Hi, Tom. I have attached two PDFs. The first contains the entire return for your review." So it's a tax return. "The second thing is the E-file forms that need to be signed and sent back to me and the payment vouchers for you to submit payments." Okay. So he's sending a tax return. He's sending the authorization and the payment voucher.

"Please let me know if you have any questions. If you prefer, I can have a paper copy delivered to the office on Monday, but that's the due date, and I need to get the signed E-file forms back. I'll be sending a paper copy as well."

So he's saying like here's the -- here's your tax return and your permission for me to file it and the payment voucher electronically or I can give it to you in hard copy if you want instead.

**Q.** And just one more time, does Mr. Deyhle ask you for any additional information about the gambling numbers?

**A.** No. This is October 13th. I think this was right -- this was fast. He turned this right around.

**Q.** And does he ask you for any documentation, like your bank statements or anything like that?

**A.** No. Not at all.

**MR. KRAVIS:** Could we have please Defense Exhibit 340 and Defense Exhibit 316 side by side? I'm sorry. It not 340.

It's 304. Yep. Can we go to the second page of 304? Sorry. Can we go -- no. No. Can we go up? Can we look at -- yes.

And Mr. Goldstein's e-mail on Friday, October 13, 2017 at 2:24 p.m. And then looking at Defense Exhibit 314? Is that 314 on the right? No. Can we have 314, please? Yep. I'm sorry. I have the wrong number. 316. I apologize. That's my fault. 316. The e-mail from Mr. Deyhle --

**MR. KRAVIS:** No. Move it down, please. No. There we go.

**BY MR. KRAVIS:**

**Q.** How much time passed between when you send Mr. Deyhle the final gambling numbers that he had asked for and the time when Mr. Deyhle sends you the tax return?

**A.** If we're in the same time zone, almost exactly three hours.

**MR. KRAVIS:** We can take these down. Thank you.

**BY MR. KRAVIS:**

**Q.** You send Mr. Deyhle the numbers in October of 2017. What was your expectation about what he would do with them?

**A.** He would file the return.

**Q.** Was it your expectation that he would input the numbers that you gave him on the return correctly?

**A.** Yeah. And if there were questions or anything, that he would ask them.

**Q.** Looking back, is that what actually happened?

**A.** Well, he didn't ask questions and I now know that he did not do the return correctly.

      **MR. KRAVIS:** Okay. Can we have Government's Exhibit 54, please? And can we have page 33.

**BY MR. KRAVIS:**

**Q.** The section that says "gambling winnings." Do you see that?

**A.** Yes.

**Q.** As you sit here today, what's your understanding of what's supposed to go there?

**A.** At least a couple million dollars more.

**Q.** Why is that?

**A.** Well, because I -- the number I gave him you would calculate gambling winnings, and it's actually like 15 or 16 something million.

**Q.** And if you look at the next page, the "gambling losses," what is your understanding of what's supposed to go there?

**A.** At least that he messed up the math and he got it wrong by two or three million.

**Q.** What was your reaction to hearing Mr. Deyhle testify that he had messed up the one big issue that he e-mailed you about on your tax return in October of 2017?

**A.** I mean, you have to understand I learned this sitting there, so my reaction might be pretty strong. But like this is -- you know, I was counting on them to -- to do this right

and, obviously, they did not.

Q.   Did there come a time --

MR. KRAVIS:   You can take this down.   Thank you.

BY MR. KRAVIS:

Q.   Did there come a time a few years later when you raised the accuracy of the 2016 gambling numbers with Mr. Deyhle?

A.   Yes.

MR. KRAVIS:   Can we look at Defense Exhibit 320, please?   Starting with the bottom two e-mails, let's just focus on Mr. Deyhle's e-mail for a moment.

BY MR. KRAVIS:

Q.   What does Mr. Deyhle write to you on March 11, 2019?

A.   "Hi, Tom.   All ready for the meeting tomorrow."

Q.   And do you have an understanding of what meeting he's talking about here?

A.   Only from like other context.   I do know that -- I do believe that this is a meeting with Revenue Officer Parrish.

Q.   And what is it that you ask Mr. Deyhle above?

A.   So I say, "I will be."   So that's about the meeting.   "But there may be a threshold issue about how much we actually owe. Do you all have me as receiving loans in 2016 and 2017 or just income?"

Q.   And then continuing up, what does Mr. Deyhle say in response?

A.   I'm down here at the bottom, on March 11, he says, "We

reported the income that came from the K-1s in 2017 and '16." I only know that from this case. That means the law firm's return. So from the K-1s in 2017 and 2016. "And 2016 had the gambling winnings, too." So he's saying on my personal -- I know this so much better now.

He's saying that on my personal tax return, I have the stuff from the law firm, but I also had the gambling winnings. "You provided the income figure for the gambling winnings. Loans wouldn't get reported anywhere."

Q.   And so what did you understand Mr. Deyhle to be saying in response to your question?

A.   He is saying that we had gambling winnings on your personal return in 2016 and that number came from you.

Q.   And what do you say in reply?

A.   "Okay.  I'm just going to confirm that none of what you had as gambling winnings was loans.  Gathering info."

Q.   And then if you look up at the top, what does Mr. Deyhle say next?

A.   "We need to tread lightly in this area.  We only reported your share of the winnings.  Even though you didn't report payments back to backers to the IRS, making a change on the income could open up a whole new can of worms."

Q.   Now, as you sit here today, what is your understanding of what Mr. Deyhle was saying to you?

A.   You want what I understood him to mean?

**Q.** Yes.

**A.** Do not do that. Like, you know, this -- it would be bad to start changing around the income number on the tax return.

**Q.** And in particular, when he says "making a change in the income could open up a whole new can of worms," what does that mean to you?

**A.** It means that if you -- we're talking about my looking at -- I gave him the instance of, you know, maybe the number seems too high, as I'm getting ready for the meeting apparently. So he says, look, if you were to go back and change the income number with gambling, that -- you know, we are already dealing with the IRS. This could be a whole new problem.

**Q.** Okay. So do you remember a minute ago when we were just looking at a series of mistakes on that wires document, some of which went for you and some of which went against you?

**A.** Yeah.

**Q.** What do you understand Mr. Deyhle to be saying here when you came back a few years later and said, "I think we need to take another look at these numbers"?

**A.** I mean, I cannot tell you what was in my head in the '19, but I can tell you my impression of this time and, you know, him telling me something like this because I was -- it just seemed wrong. The -- I was struggling paying the -- we're in 2019. I'm struggling paying the taxes. I had declared a bunch

of winnings even though I had no money.  Something seemed just terribly wrong, and he is saying do not go back and open this back up.

Q.   Okay.  Were you here -- of course, you were here -- when Mr. Deyhle testified that, when we wrote this e-mail, he was like looking out for your interests?

A.   Yeah.

Q.   Is that how you understand it?

A.   No.  I mean, the -- no.  No.

Q.   Before we move on, I just want to go back to one of the mistakes in the wires document.  Do you remember there is a $770,000 payment to Mr. Safai?  Do you remember that?

A.   Yep.

Q.   And can you just remind us briefly exactly what the mistake was there?

A.   The mistake is that that's a game that happens in 2016 and a wire that happens in 2017.  And because it's a wire rather than a check and because it's across a span of time, if you like really think about this, as I now understand the tax rules, that's got to be a 2017 thing, even though the game happened in 2016.

Q.   All right.  Now, let me show you another document.

     MR. KRAVIS:  Can we have Government's Exhibit 12, please?

BY MR. KRAVIS:

Q.   The government has shown this e-mail to a bunch of witnesses.  What is this?

A.   This is a draft e-mail.

Q.   And who wrote the draft e-mail?

A.   Me.

Q.   And around when did you write it?

A.   People -- there has been an effort to make it a point that it's not at this 9/4/2021.  That's correct.  This is actually -- I agree with what's been said in general terms.  This must be in late '16.

Q.   And who is Craig Cooper?

A.   Craig Cooper was here and he works for the Resnicks and is in charge.  If I wanted to take money out or return money to the line of credit, I did it through Craig.

Q.   And just at a high level, what does this draft e-mail concern?

A.   So we're getting towards the end of 2016, and I want to be able to play poker in 2016 but I need to put up money.  So I'm asking -- this is a draft about getting money from -- well, for getting money from the line.

Q.   I want to direct your attention to the third paragraph that says, "I'm writing about a specific dilemma, taxes."  It reads, "There is no carry forward for gambling losses.  So the fact that I lost on the funds from the line in 2016 will be of no help" -- "will be no help when we win in 2017.  In effect, I

have to collect twice as much in 2017 as my share of the winnings versus 2016 because the 2017 winnings are taxed in full." Do you see that?

A.   Yes.

Q.   What did you mean in this draft e-mail when you wrote that?

A.   What I mean is, if you have a game in which you play and pay in one year, so you play in 2016, you pay, you've lost in 2016, you get over here to 2017 and you say you win. When you've played and payed over here, you cannot deduct this from when you won and collected over here. It's not across the year problem.

Q.   Does this paragraph here have anything to do with the Safai transaction we were talking about earlier?

A.   I mean, it just depends on what you mean by "anything to do." This is, in the broadest sense of there's -- the rules are complicated about transactions on one side of the calendar year and, you know, the other side then in that sense. But it's not the same phenomenon.

     There are several transactions on the wire tracker where the game happens in one year and the money comes out of the bank account in other year, and there the rules around that are complicated. This other thing is less complicated.

Q.   What you're talking about here, there is no carry forward for gambling losses?

**A.** Yes.

**Q.** Did you ever try to cheat on your taxes by carrying forward gambling losses?

**A.** No.

MR. KRAVIS: Okay. We can take that down. Thank you.

**BY MR. KRAVIS:**

**Q.** Just to, as we're sort of making the transition from 2016 to 2017, I want to be perfectly clear about one thing. If Mr. Phua had this huge share of your wins against Mr. Gores, why is it that we do not see any wire going out from you to Mr. Phua to pay him that money?

**A.** Because he ends up with a huge area of my winnings from Tango.

**Q.** And --

**A.** We both have huge sets of money for each other. And Tango -- and that gets resolved when Tango pays.

**Q.** And when does Tango pay?

**A.** The next year, 2017.

**Q.** Okay. Let's talk about 2017. First, in late December 2016, did you play some poker games against Tango?

**A.** Yes.

**Q.** Who is Tango?

**A.** Tango is like Paul Phua, a Chinese businessman. He wasn't a client of mine at the time. He later became a client of

mine.

**Q.** How did you get into a game against Tango?

**A.** Paul Phua.

**Q.** And like when exactly did you play Tango, like early December, mid-December, late December?

**A.** Mid to late I think. Maybe mid. I think I played Alec, beat Alec and soon thereafter went to Asia to try and play Tango.

**Q.** And did you have investors for the games against Tango?

**A.** So Andrew and Keith would have had their shares, but the -- as with the Chairman game, the big other investor is Paul.

**Q.** And Paul is Paul Phua?

**A.** Yeah.

**Q.** How did you do against Tango?

**A.** I won.

**Q.** As you sit here today, do you have a specific recollection of Paul Phua's share from the Tango winnings?

**A.** No.

**Q.** Is there a document that would refresh your recollection?

**A.** Yeah. So we -- it would have gone back and forth with his assistant, kids, you know, collecting all the very specific numbers from the game, who had what share and everything.

So there would be messages saying, "This is your share. This is PP's share."

**Q.** Just in the binder, not on the screen, can you look for me, please, Defense Exhibit 737.8?

**A.** So I'm looking at the text messages? What is it, 737?

**Q.** 737.8. I'm going to direct your attention to the bottom of page 1 and the top of page 2 of the messages.

I want to read them and see if this refreshes your recollection about Mr. Phua's share of the Tango winnings. Don't say anything out loud. Just read it, and then when you're finished reading, close the binder and then go ahead and look up.

**A.** What do you want me to remember?

**Q.** The total share -- Phua's total share of the Tango winnings.

**A.** Paul Phua's total share of the Tango winnings. Okay. Hold on. Okay.

**Q.** Can you close the binder and look up at me?

What was Mr. Phua share of the Tango winnings?

**A.** 80 million Hong Kong dollars.

**Q.** How does that translate to U.S. dollars?

**A.** It's almost --

**Q.** Do you need the calculator?

**A.** I'll give you lawyer math and that's going to be -- it's a little bit more than $10 million because it's 7.75. It's just a lucky coincidence. 7.75 to 1, so it would be about $10 million.

Q.   And whose share is that again?

A.   That's Paul's.

Q.   And what was -- let me just back up for a second.

What were the total Tango winnings?

A.   I have to look back.  I apologize.

Q.   Okay.  If that will refresh your recollection.

A.   Sorry.

Q.   That's fine.

A.   What is it?

Q.   I first want the number that is the total Tango winnings.

A.   I apologize.  Then I did this wrong.

What number, 737?

Q.   Yeah.  If you can look at 737.8.

Again, don't say anything.  Just look at the document, look up at me when you are done.

A.   You want the total Tango winnings?

Q.   Yes.

A.   Okay.

Q.   Close the binder.

A.   Yeah.  Oh, yeah.  Just trying to remember.

Okay.  Great.

Q.   Does that refresh your recollection?  Let's start with the total number for Tango.

A.   91.85 million Hong Kong dollars.

Q.   Do you want to a calculator to get that to U.S.?

**A.**   Yeah.

**Q.**   Do you have the calculator?

**A.**   Yeah, I do.  91 point -- what did I say?

**Q.**   85.

**A.**   85.

$11.85 million U.S.

**Q.**   That's the total that Tango lost?

**A.**   That is the total that Tango lost.

**Q.**   Now, how about Mr. Phua's share?

You can look back if it will refresh your recollection.

**A.**   Okay.  787.2?

**Q.**   737.8.

**A.**   Okay.  Is it all right if I -- when I close this back, can I just put a piece of paper in it so I don't --

**Q.**   Yeah.  If you need it again.  That's fine.

**A.**   All right.  You want me to refresh my recollection about what?

**Q.**   Mr. Phua's share of the Tango winnings.  Bottom of page 1, top of 2.

**A.**   Yeah.  I got it.

**Q.**   Can you close it up?

What was Mr. Phua's share?

**A.**   31.29 million Hong Kong dollars.

**Q.**   You want to use the calculator to convert it?

**A.**   No.

**Q.** What does it come out to in U.S.?

**A.** Sorry. No. I was joking. I just don't want to use the calculator.

31.29 million?

**Q.** Yes.

**A.** 4.037.

**Q.** With apologies for the calculator again, what does that leave you with?

**A.** What did we start with?

**Q.** I think you told me 11.85.

**A.** And the U.S., 4.03?

**Q.** Yeah. That's what you just testified to.

**A.** 7.82.

**Q.** Now, Mr. Goldstein, before we go any further, I can't help but notice that your share of the Tango winnings is much higher than what we were talking about for Gores and Chairman.

Did I hear that correctly?

**A.** Yes.

**Q.** Why is that?

**A.** Well, because I won -- so the amount -- the share that I can have and that I'm willing to take depends on how much money I have going in.

So Paul knows that I have just beat Alec Gores and I have a good share of Alec Gores, so I can have a bigger share of my own and Paul will take a smaller share. So, you know, I have a

significantly bigger chunk of my winning here.

MR. KRAVIS: Can we then have slide 14 up, please?

BY MR. KRAVIS:

Q. Is this a summary of the breakdown of the Tango winnings?

A. Yeah.

Q. Now, here again, when you win the game, does Tango pull out, like, a suitcase filled with cash and hand over to you $11.84 million?

A. No.

Q. How do you get paid from this game?

A. Do you want to know in broad strokes or actually how it happened?

Q. Let's do it in broad strokes first, then we'll drill down on the details.

A. So tango would need to get the money to Paul Phua, and then I would get paid or credited, you know, on the Paul Phua ledger.

Q. And so in terms of how that transaction works, what is your understanding about when, you know, you have control over your share of the Tango winnings?

A. When Tango pays. I mean, it's just a lot of money. I mean, it's a big number. And so, you know, this is just handled as a -- he gets the money and then it's swapped. It's just handled directly in that way, but it's not until he gets paid. This was a -- this turned out to be some drama in 2017.

**Q.** I want to show you an exhibit already admitted on this.

**MR. KRAVIS:** Could we have Government's Exhibit 32.1? This was admitted during Mr. Gipson's testimony, his text messages.

**BY MR. KRAVIS:**

**Q.** I want to direct your attention to page 38. Directing your attention to the middle messages on the screen.

**A.** Yeah.

**Q.** Do you see the first message? It's from Keith on March 13, 2017.

**A.** Yeah.

**Q.** Who is Keith here?

**A.** Keith Gipson.

**Q.** And what does Keith Gipson write to you on March 13, 2017?

**A.** "I'm guessing no word from the big man on six-plus."

**Q.** And what did you understand him to be referring to when he says "the big man"?

**A.** Paul Phua.

**Q.** That's the Paul Phua we have been talking about?

**A.** Yes.

**Q.** So what is Mr. Gipson asking you about here?

**A.** He's asking whether I have heard from Paul Phua on six-plus, which is a kind of poker.

**Q.** And then can we look at the next message down?

**A.** I keep hitting the screen, so that's where that line is

coming from. I apologize.

Q. What do you respond to Mr. Gipson on March 13, 2017?

A. "Correct. Delicate situation with him because Tango still hasn't paid the 12 that he lost to me." So those are the words.

Q. And the Tango that you are referring to here is the same Tango we have been talking about?

A. Yeah.

Q. And when you say, "Tango still hasn't paid the 12 he lost to me," what did you mean by that?

A. I mean that I have heard from Asia, from Paul and his staff, that even though Tango owes $12 million U.S. as of this date, he still hasn't paid it.

And that's -- the delicate situation is I'm trying to go play more in Asia. That's what the six-plus reference is, but I can't because all the money is frozen. The -- my -- I don't have any winnings from Tango now because Tango hasn't paid.

Q. And was your understanding about the timing of the Tango payment specifically informed by text messages you were receiving from the folks in Asia?

A. Of course.

Q. Now, I want to direct your attention -- not on the screen for now -- to Defense Exhibit 737.9.

A. Okay.

Q. Mr. Goldstein, do you see the message --

**A.** Do I have a page that I'm supposed to be in?

**Q.** Yeah. Look at the -- it's page 2 of the exhibit. It's the first page of messages.

**A.** Okay.

**Q.** Who are these messages from?

**A.** This is the Paul Phua assistant.

**Q.** And who are they to?

**A.** Me.

**Q.** I want to direct your attention halfway down to the message on February 5, 2017 at 4:18 p.m.

**A.** Okay.

**Q.** Don't read it, but are you with me?

**A.** Okay. I apologize.

**Q.** Is this one of the messages that informed your state of mind, your understanding about the timing of the Tango payment?

**A.** Sure.

**MR. KRAVIS:** At this time, the defense moves this message into evidence.

**MR. BEATY:** I'm sorry. Which is this, Your Honor?

**MR. KRAVIS:** It is Defense Exhibit 737.9, the message on February 5, 2017 at 4:18 p.m.

**THE COURT:** Can we put up on the screen without publishing it so everyone can see, except the jury?

Counsel, can you see the exhibit?

**MR. BEATY:** I can see the exhibit. I'm not clear on

which lines.

MR. KRAVIS:  It is the message of 4:18 p.m.

MR. BEATY:  There is a series of them.

Your Honor, may we have the husher?

THE COURT:  You may.

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT:  Mr. Goldstein?  Mr. Kravis?

MR. KRAVIS:  Yes, Your Honor.

THE COURT:  Mr. Beaty?

MR. BEATY:  Your Honor, yes, I'm here.

THE COURT:  Go ahead.

MR. ADENRELE:  Our arguments are the same.  Just --

THE COURT:  Is this Exhibit C?  From earlier today? A part of it?

MR. KRAVIS:  This is one of the pages from it.

THE COURT:  Go ahead, Mr. Beaty.

MR. BEATY:  Then my objection is the same as Mr. Adenrele.  It's already ruled out.  What are we doing?

THE COURT:  I need to understand how this comes in, Mr. Kravis.

MR. KRAVIS:  Right.  So I think Mr. Goldstein just testified that this specific message was relevant to his state of mind about when Tango made the payment.  That piece of information is critical because Mr. Goldstein's state of mind

about the timing of the Tango payment informs how he treated that payment for tax purposes. This is directly relevant -- Mr. Goldstein just testified it's directly relevant to his state of mind.

THE COURT: Okay. So which specific statement speaks of that from Mr. Goldstein?

MR. KRAVIS: It is the statement "you know we haven't received any from Tango yet." Mr. Goldstein just testified he received this message. It's not something he wrote. He received it, and it's relevant -- that information was relevant to his state of mind about the timing of the payment.

THE COURT: So it's a statement from someone else to Mr. Goldstein saying "you know we haven't received any from Tango yet"; correct?

MR. KRAVIS: Yes. It's relevant to --

THE COURT: Is that from Paul Phua?

MR. KRAVIS: It's from -- I think Mr. Goldstein just testified it's Mr. Phua's assistant with whom he would communicate about these matters. And again, this is directly relevant to Mr. Goldstein's state of mind about when -- about the timing of the Tango payment.

THE COURT: Mr. Beaty?

MR. BEATY: Your Honor, one, I need Mr. Kravis to stop talking as loudly as he is. Everybody is hearing him.

Two, Your Honor has already ruled this is out. Nothing

has changed.  This is still an out-of-court statement that, for whatever nonsense they're offering, it is still truly being offered for the truth of the matter asserted.

Mr. Goldstein has already testified about it.  And the fact it's in, that's all they need.  Let's move on.

THE COURT:  All right.  Mr. Kravis, anything further?

MR. KRAVIS:  Nothing further, Your Honor.

THE COURT:  All right.  I'm going to sustain the objection for the reasons we discussed earlier today.  Thank you.

(Whereupon, discussion concluded.)

BY MR. KRAVIS:

Q.   Mr. Goldstein, you can close the binder in front of you.

A.   Okay.

Q.   What was your understanding -- what is your understanding, as you sit here today, about why this matters, about why the timing of the Tango payment matters for the tax calculations we've been talking about?

A.   Well, we're now well into 2017.  We were in the spring of 2017.  Tango hasn't paid yet.  I have not been credited with the Tango winnings.  So I don't have -- even though I have won the big number that we've said, everybody agrees, I think, that it's not income to me because it hasn't happened yet.  And that also relates to this swap with Paul Phua.

Q.   And at some point in 2017, did you come to understand that

Tango had, in fact, made the payment?

**A.** Yes.

**Q.** Now, do you remember way back at the very start of trial Mr. Gipson testified about how the typical practice here is the player gets paid first and then the investor gets paid?

**A.** Yeah.

**Q.** As a general matter, setting aside this specific example, do you agree with Mr. Gipson on that point?

**A.** Sure.

**Q.** Is that what happened in this particular case?

**A.** In the transaction between me and Keith or with somebody else?

**Q.** Yeah. In the transaction between you and Keith -- you and Mr. Gipson --

**A.** I'm sorry.

**Q.** That's fine. You and Mr. Gipson -- I think you're allowed to do it, but I'm not -- between you and Mr. Gipson as it related to the Tango winnings?

**A.** This was not the typical thing.

**Q.** Why not? Why was it different this time?

**A.** Well, because there were two things going on. One is Keith needed money. And the second is you have to understand that the end of 2017, I don't know if Tango has paid. There is -- the way that Tango ends up paying is like a game of financial telephone.

He has to pay somebody named -- another guy, I won't even add the Chinese name -- who then ends up paying Paul. And I am unaware of, you know, the precise day that that's going to happen. And so what I do, I try and do is just unload the payments I can related to Tango in late 2016, so I don't get caught in some trap and I find out, no, he did pay on the 28th or something like that.

So I -- one of the people that I'm paying, remember we said, you know, Keith gets paid out of my share. I pay Keith his share.

Q. Okay. So we get to some point in 2017 that you told me you learned that Tango has paid Mr. Phua; right?

A. Yes.

MR. KRAVIS: All right. Can we have slide 14, please? Can we have the next one, 15?

THE WITNESS: Are other people supposed to be seeing this?

BY MR. KRAVIS:

Q. Yeah. So does this depict --

A. Other people can't see it just so you know.

Q. I'm sorry.

A. Now we can. Now it's up.

Q. Okay. After you come to learn that Tango has paid Mr. Phua, what is the state of play that's depicted here?

A. So Paul Phua has -- there's 9 million worth of money from

Gores that Paul hasn't received yet, and there is, at that point, $7.8 million of Tango that I haven't received yet.

Q.   And just to pause there.  The 9 million that Mr. Phua hasn't received from Gores, what is that to Mr. Phua?

A.   That's his share of Gores.

Q.   And where is that money sitting at that point?

A.   That money is sitting in different moments in different places.  Most of it's in my bank account, but I also get permission to use some of it, but it's in the United States.

Q.   Okay.  And the money that you mentioned that you were owed, what is that from?

A.   That's from Tango.

Q.   And where is that money?

A.   I mean, I don't know.  It's some -- it's with Paul Phua. I don't know literally in what bank account.

Q.   Okay.  So at this point, what do you and Mr. Phua agree to do?

A.   Swap it.

Q.   And when you say "swap it," what exactly do you mean?

A.   I apologize.  Cancel the debts.  This is the thing we talked about earlier where two people owe each other money.

        MR. KRAVIS:   So if we can look at the next slide?

BY MR. KRAVIS:

Q.   What does this show?

A.   So if I -- I have $9 million to Paul Phua's money, and he

has about $8 million of my money, then there's no point in sending each other these big wires. We cancel it, and I end up owing him 1.2 million. That's what is left over when we trade.

Q. And did you and Mr. Phua have specific conversations about this?

A. Yeah.

Q. And did you and Mr. Phua, in those conversations, agree to handle it this way?

A. Yeah.

Q. Why did you handle it this way instead of, like, I'll send you the nine and then you send me the 7.8 when we get it? Like why do it like this?

A. Two reasons. There is the general idea, and then there is the idea that Paul Phua wants nothing to do with the U.S. banking system after his case in Las Vegas. And that's just --

Q. Okay. Can you explain each of those in turn for me?

A. Sorry. We've had these discussions about how if two high-stakes gamblers, one owes each other the money, they just cancel it rather than sending multiple wires. It's just regarded as simpler, but also less likely to generate mistakes.

And the second is, particularly with Paul, you know this is a large amount of money for anybody. And you know, sending that large amount of money into the United States unnecessarily is not something that he would want to do. And so it's correct as a tax matter and you just cancel the debts out.

**Q.** Okay. So at this point, with the 1.2 million, if we can go to the next slide, what happens next?

**A.** I -- well, so at this point we are in 2017.

**Q.** Yep.

**A.** The debts have been canceled. I owe him money. So I have to send him money, and he has me do it through at least some of if through Tom Dwan.

**Q.** And what was your understanding about why Mr. Phua was authorized or had the control to tell you to send the money to Mr. Dwan?

**A.** It's his money. I mean, it's sitting in my account, but it's his money, or I -- or, you know -- again, it's not a question necessarily of what bank account it is, but I am responsible for it.

**Q.** And what happened to the debts after you sent the money to Mr. Dwan?

**A.** Then we are even.

**Q.** And did you receive a message saying that, "we are even now"?

**A.** Yeah.

**Q.** Now let's talk about the rest of 2017. Other than the Tango payment we've been looking at here, how did you do playing poker in 2017?

**A.** Very badly.

**Q.** Who were most of the losses to?

**A.**    Bob Safai.

          **MR. KRAVIS:**  Can we look at the first stipulation, please?  Can we go to the second page?

**BY MR. KRAVIS:**

**Q.**    I want to direct your attention to the fourth and fifth photographs, as well as -- was this stipulation signed by you, Mr. Goldstein?

**A.**    Yep.

**Q.**    It was also signed by the document?

**A.**    Yep.

**Q.**    How much did you pay out in -- this says losses or staking amounts per the stipulation in 2017?

**A.**    8.836 million.

**Q.**    By the way, the stipulation says poker losses or staking amounts.

          Were any of these staking amounts?

**A.**    Sure.  I mentioned the payment to Thomas Dwan.

          Sorry for touching the screen.

          So there is a $680,000 payment to Tom Dwan that's there.

**Q.**    What are the rest of them?

**A.**    The rest of them -- Bob Safai is heads-up poker, and the others are just other poker matches.

**Q.**    Moving up above to the previous paragraph, what were your poker winnings in 2017?

**A.**    $3,256,500.

**Q.** By the way, when you're losing $6.78 million to Mr. Safai, do you have investors in that game?

**A.** No. No -- everybody knew that I was losing. The only people who invested were the Napoli firm.

**Q.** We heard Mr. Safai testify about this.

At this time, when we get later into the year of 2017, did you end up gambling with Mr. Safai for more money than you could afford to lose?

**A.** Yeah.

**Q.** How did you -- how did you end up doing that?

**A.** I mean, I don't want to say anything that sounds like an excuse. I'll just tell you that what happens is, you know, you chase the losses. You think that you can beat somebody, and then you lose and you lose and you lose. You know, that's what happened. I mean, I lost, I think, 14, 15, $16 million to him.

**Q.** Looking back, was it a good idea for you to be gambling with Mr. Safai for more money than you could afford to lose?

**A.** No.

**Q.** But to be clear, are you charged in this case for defrauding Bob Safai?

**A.** No. Bob -- you know, Bob is tough, but we worked it out. And then he bought -- he sold the debt. Everything -- you know, financially, it's all worked out.

**Q.** Did you ever try to walk away from the debt?

**A.** No.

Q.   Did you ever tell Mr. Safai, you know, you weren't going to pay.  Go try to enforce it in a court?

A.   No.

Q.   Do you even know if gambling debts are in enforceable in the court in California?

A.   I do because of the Tobey thing.

Q.   What did you learn in the Tobey thing?

A.   That no, I -- I mean, I was down $14 million.  I could have just walked away from it and just said sorry.

Q.   Now, the Tobey thing is Mr. Maguire; right?

A.   Yeah.

Q.   And what was the work -- just remind us briefly, what was the work you did for him?

A.   Sure.  So this is a situation where money takes a while to get paid.  And Tobey Maguire had played Andy Beal and beat him for a lot of money, and then Andy wanted a discount on that.  And so this was a -- there was just a lot at stake.

And -- well, first he didn't want to pay, and then he wanted a discount, and so Tobey asked me to represent him to -- if he needed to, to sue Andy, but to persuade Andy to pay.

Q.   Did you ever try to do anything like that with Mr. Safai, like haggle for a discount or hold out or anything like that?

A.   No.  I mean, the common theme here is I think that I will build up debts, but I -- I will always pay them.

Q.   After the huge losses to Mr. Safai, did you continue

taking on investors in poker gamers, or did you stop doing that?

**A.** Well, for the entire period here, I definitely stopped. Nobody would invest in me.

**Q.** So when you were interviewed by the agents in October 2020 and you told them that you were not playing with investors anymore, in October 2020, was that statement true?

**A.** Of course.

**Q.** Now, in addition to Mr. Safai, did you also lose money -- and the others -- did you also lose money gambling overseas in 2017?

**A.** Yes.

**Q.** Do you remember, approximately, how much you lost?

**A.** I mean, approximately, yes.

**Q.** Would looking at the ledger refresh your recollection as to the precise number?

**A.** Regrettably.

**Q.** So I'm going to direct your attention to -- this is just for you -- Defense Exhibit 737.12.

Mr. Goldstein, is this another shot of -- a photo of the ledger we have been talking about?

**A.** For a different period of time.

**Q.** Is this for the period of 2017?

**A.** Yes.

**Q.** So without saying anything about the contents, I want you

to just look at it for a moment. Look up at me when you are done, and I'm going to ask you about the loss number.

**A.** Do I close it?

**Q.** Yes.

Mr. Goldstein, does that refresh your recollection as to how much money you lost gambling overseas in 2017?

**A.** Yes.

**Q.** How much is it?

**A.** Just over, I think, 2.2 million.

**Q.** So if you add up the wins and losses reported in the stipulation, your share of Tango, the overseas losses, how does it all come out?

**A.** I end up -- just like the government says, I end up losing.

**Q.** Mr. Goldstein, I just want to conclude on the gambling stuff, and then we'll move on to something else. I guess not today.

Did you ever try to hide this 2016 gambling income?

**A.** No.

**Q.** Did you give the numbers to Mr. Deyhle in good faith?

**A.** Yes.

**Q.** Going back and looking at the wires document you created, did you discover mistakes on both sides?

**A.** Yes.

**Q.** Did you put those in there on purpose?

**A.** No. I mean, I've -- I truly figured this out, you know, within the last -- like, the current -- like, really locking it down in the last few weeks.

No, this was over the course of, you know, less than an hour ten years ago on the road.

**Q.** When you factor in, looking back on it, all of the mistakes on both sides, how did it come out in 2016?

**A.** I just wildly overpaid my taxes.

**Q.** Did you have any reason at that point to start overstating or making up poker losses that didn't exist?

**A.** No. I mean, that's the -- to my mind, the crazy thing about the allegation. Like, there is no need to come up with $3 million in losses. All I have to do is recognize that I'm holding a $9 million share.

Like, why create these smaller losses? I already, if I just take the time, know what I'm supposed to do, figure it out. There is no point -- there is no need to make anything up. I'm a loser.

**Q.** Finally --

       **MR. KRAVIS:** This is my last question, Your Honor. Could we go back to the joint stipulation?

**BY MR. KRAVIS:**

**Q.** I'm been asking you just now, Mr. Goldstein, about your -- how you figured it all out looking back.

**A.** Yeah.

Q.   But at the time, as you are sitting there --

MR. KRAVIS:   The second page.

BY MR. KRAVIS:

Q.   What was your good faith belief in October of 2017 about where you were sitting with the gambling numbers for tax purposes?

A.   In October 2017 it is what I sent to Walter.

MR. KRAVIS:   Your Honor, I think this might be the right spot to break.

THE COURT:   All right.  Very good.  Thank you, Mr. Kravis.

Members of the jury, it's just about five o'clock, so I think it's time for us to break for the day.

A few gentle reminders before you step down for the evening.

First, as always, please do not discuss the case with your fellow jurors or anyone else while you are away.  Please do not conduct any -- do not watch anything in the news about the case or on social media, and do not conduct any independent research.

We will see you back tomorrow at your regular time.  Hope you have a good evening.

Please rise for the jury.

(Whereupon, the jury exited the courtroom at 4:59 p.m.)

THE COURT:   You may be seated.

Mr. Goldstein, if you want to rejoin your seat at counsel's table, you are welcome to that as well. Make yourself comfortable.

Well, before we break, I just want to get a sense of what tomorrow is going to look like. Obviously, we will have Mr. Goldstein back on direct.

Mr. Kravis, any sense of how long you are going to go tomorrow?

**MR. KRAVIS:** At this point, I expect maybe another 90 minutes.

**THE COURT:** Okay. So about an hour and a half or so. I'm sure there will be cross from the government. I'm going to wait until tomorrow to figure out what that might look like once you have heard a little bit more of the testimony, but I suspect we will have a few hours on cross from the government. That will take us probably through at least mid-afternoon.

If we are able to wrap up Mr. Goldstein tomorrow, do you anticipate other witnesses available for tomorrow?

**MR. KRAVIS:** Yes, Your Honor.

If we have the time, we are planning to call Justin Bell-Masterson, who is -- I'm sorry -- Jason Bell-Masterson. I know him well. He's on our witness list. This is a witness testifying to the contents of the e-mails produced by GRF.

If we have more time, I think we would plan to call

Special Agent Accardi. That may be a little bit ambitious.

THE COURT: So possibly Bell-Masterson and Accardi, depending on when we get through with Mr. Goldstein, which will be our first lift for tomorrow.

Mr. Beaty, anything you want to talk about before we adjourn?

MR. BEATY: Can we just have a proffer as to what the -- is this a custodian witness? I'm not clear on what the --

THE COURT: Bell-Masterson?

MR. BEATY: Yeah. Please.

THE COURT: Mr. Kravis?

Or counsel?

MR. MOHAMMADI: Your Honor, this is a witness who will testify about the contents of the productions from GRF and, specifically, the numbers of e-mails that were produced, the internal e-mails versus the external e-mails.

THE COURT: Which production? The production to the government during its investigation or production to the defense?

MR. MOHAMMADI: Correct, Your Honor. Actually, both of those. So the production that was made from GRF to the government in response to the grand jury subpoenas, and as Your Honor knows, there was some Rule 17 subpoenas that were issued to GRF.

So this is a witness who will testify about that as well. Just to make everyone -- everything clear, this is a fact witness who is testifying about his facts.

THE COURT: I was just going to say is this a fact witness?

MR. MOHAMMADI: Correct, Your Honor.

THE COURT: Why is he a fact witness?

MR. MOHAMMADI: Your Honor, he has personal knowledge about having counted the number of e-mails produced.

THE COURT: So he's reviewed the files, but he wasn't directly involved in the --

MR. MOHAMMADI: Correct, Your Honor.

MR. BEATY: Your Honor, I'll just stipulate to -- if they'll tell me the number, I'll say, okay. They produced ten. They got five. I don't care.

This is dumb. This is -- I don't understand the relevance of this, and I'm lost. And I hear the representation about this being a fact witness, but it sounds like we are right back to where we are with the Epiq witnesses, where it's, oh, no. No. No. They are fact, but maybe he's going to talk some technical jargon.

Again, I don't have reports. I have not seen anything from this person. I don't have any discovery about this person. Not seen any drafts. You know, I like my cocounsel, so I'll give him good faith that maybe he can produce something

tonight and we will work together on it, but if it's tomorrow and it's more of the same, if it turns out this is another forensic accountant who -- or forensic analyst who did some math, we are going to have a problem again.

THE COURT: Well, at this point, I'll encourage counsel to be in touch with one another and maybe sort out the facts first, and we will see where we are. We will have some time tomorrow before we would get to this witness in any event.

Anything else from the government?

MR. BEATY: No, Your Honor. Thank you.

THE COURT: Anything else from the defense?

MR. KRAVIS: No. Thank you, Your Honor.

THE COURT: Have a good evening, everyone. We'll see you tomorrow morning at 9:30, and we'll continue with Mr. Goldstein's testimony at that time.

We are adjourned until then.

DEPUTY CLERK: All rise. This Honorable Court stands adjourned. Thank you.

(Proceedings concluded at 5:04 p.m.)

- - -

C E R T I F I C A T E

I, KIMBERLY A. BURSNER, Federal Official Court Reporter in and for the United States District Court for the District of Maryland, do hereby certify, pursuant to 28 U.S.C. §753, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

*Kimberly Bursner*

_____
Kimberly A. Bursner
Registered Professional
Reporter & Federal
Official Court Reporter