IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

_____

UNITED STATES OF AMERICA        )
                                )
    Plaintiff,                  )
                                )
       vs.                      )Case Number
                                )8:25-cr-00006-LKG-1
THOMAS C. GOLDSTEIN             )
                                )
    Defendant.                  )

TRANSCRIPT OF JURY TRIAL – DAY 17
BEFORE THE HONORABLE LYDIA K. GRIGGSBY
UNITED STATE DISTRICT JUDGE
THURSDAY, FEBRUARY 12, 2026 at 9:33 a.m.

APPEARANCES:

On Behalf of the Plaintiff:

        UNITED STATES ATTORNEY'S OFFICE – DOJ
        BY:  ADEYEMI ADENRELE, ESQUIRE
            SEAN BEATY, ESQUIRE
            SEAN GORDON-MARVIN, ESQUIRE
            HAYTER WHITMAN, ESQUIRE
        36 South Charles Street, Suite 400
        Baltimore, Maryland 21201
        (410) 209-4800

On Behalf of the Defendant:

        MUNGER, TOLLES & OLSON, LLP
        BY:  STEPHANY REAVES COUPER, ESQUIRE
            ADEEL MOHAMMADI, ESQUIRE
            JONATHAN I. KRAVIS, ESQUIRE
            SARAH WEINER, ESQUIRE
        601 Massachusetts Avenue NW, Suite 5E
        Washington, DC 20001
        (202) 220-1126

- - -

ALSO PRESENT:
        THOMAS C. GOLDSTEIN, DEFENDANT
        JIMMY MENDOZA, PARALEGAL
        ROBERT RESTO, PARALEGAL
    ***COMPUTER AIDED TRANSCRIPTION OF STENOTYPE NOTES***

I N D E X

**DEFENSE'S TESTIMONY:**

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| THOMAS GOLDSTEIN | 7 | 143 | 225 | * |

- - -

**DEPUTY CLERK:** All rise. The United States District Court for the District of Maryland is now in session. The Honorable Lydia Kay Griggsby presiding.

**THE COURT:** Good morning, everyone. Please be seated, everyone. Welcome back, Counsel, and Mr. Goldstein.

Today we continue the defense's case. I believe Mr. Goldstein will still be on the stand for his direct examination.

I think we said about an hour and a half, perhaps, Mr. Kravis, on that or not? I'll check back with you in a bit to find out where we are.

Then I anticipate there will be cross-examination from the government, and then any redirect. If we get through Mr. Goldstein today, I believe the defense has additional witnesses that they may wish to call as well.

Just a moment, Mr. Kravis. I'm going to let you update me.

I also want to note that the Court did receive a notice from the defense last night. I think that primarily will relate to evidentiary issues once we get through cross and on redirect.

So I'm happy to look very closely at that and hear argument when we get a little further along in the testimony. I don't believe I have any other housekeeping matters.

So, Mr. Kravis, why don't you go ahead, and then we will

hear from the government.

**MR. KRAVIS:**  Thank you, Your Honor.

I did have a chance to confer with the government this morning, and I think we have a sort of joint proposal on a path forward for today.

**THE COURT:**  Wonderful.

**MR. KRAVIS:**  As the Court is aware, there are some disagreements remaining between the parties about the remaining witnesses in the defense case.  The Court heard yesterday about Mr. Bell-Masterson.  I think the government may want to be heard about the scope of our questioning of Agent Accardi.

What I discussed with the government, and we agreed, is that we defer those conversations for now so that we can continue with Mr. Goldstein's testimony.

Once Mr. Goldstein is finished testifying, I would like the opportunity to then speak briefly with him.  We have been careful not to discuss the substance of his testimony, but once he's off the stand, talk about where we are in the case.

At that point, I think I can give the government a more streamlined, a more focused vision of what the defense has in mind.  And then at that point we can come to the Court with any remaining areas of disagreement.

I expect that we would probably be doing that later in the afternoon this afternoon.  And I also did want to assure the Court that while there may be remaining areas of disagreement,

the parties are conferring, at least from my perspective, constructively, to try to get the -- to narrow those areas of disagreement and get the matters resolved.

And at this point, I fully expect that the defense will be in a position to rest at some point during the day on Tuesday. And what part of the day that is just kind of depends on how a few things go.  That's it.

**THE COURT:**  Thank you very much, Mr. Kravis.  Very helpful.  And I do appreciate the parties continuing to work today to streamline matters and resolve issues so we can keep the trial going.

I guess I'll wait until we get through Mr. Goldstein, and we will figure out if we need to pause at some point and what we should do, maybe let the jury go home at that point, but we will see how the day goes.

Mr. Beaty, good morning.

Anything from you or your cocounsel?

**MR. BEATY:**  Good morning, your Honor.  No.  I'm good.

**THE COURT:**  Okay.  This is wonderful. All right.

**MR. BEATY:**  Great day.

**THE COURT:**  Are we ready to have the jury?

**MR. KRAVIS:**  Yes, Your Honor.

**THE COURT:**  So what I'm going to do is, I'm going to step down for just a moment to make sure everyone is here.

When we come back, Mr. Goldstein, you can go ahead and

make yourself comfortable on the witness stand when you are ready, and then we will have the jury.

Let's take two minutes to make sure they are ready.

**DEPUTY CLERK:**  All rise.  This Honorable Court stands in recess for two minutes.

(Whereupon, a recess was taken from 9:36 until 9:39 a.m.)

**DEPUTY CLERK:**  All rise.  This Honorable Court now resumes in session.

**THE COURT:**  Please be seated, everyone.

I see we already have Mr. Goldstein already in the chair.

Mr. Goldstein, I will remind you that you remain under oath.

And we will have the jury.

THOMAS GOLDSTEIN, after having been duly sworn previously, recalled for further testimony, was examined and testified as follows:

**THE COURT:**  Please rise for the jury.

(Whereupon, the jury entered the courtroom at 9:41 a.m.)

**THE COURT:**  Please be seated, everyone.

Members of the jury, welcome back and good morning.

Today we will continue with the defense's case and the testimony of Mr. Goldstein.  We will take our customary breaks throughout the day, and I will have an update this afternoon about our schedule for next week.

Again, welcome and good morning.

Mr. Kravis.

MR. KRAVIS:  Thank you, Your Honor.

**DIRECT EXAMINATION**, continued

**BY MR. KRAVIS:**

Q.   Good morning, Mr. Goldstein.

A.   Good morning.

Q.   Since you left the stand yesterday afternoon, have you and I discussed the substance of your testimony?

A.   Not you and me, or me and any of the other lawyers.

MR. KRAVIS:  Can we have slide 13, please?

**BY MR. KRAVIS:**

Q.   Okay.  We are making progress here.  I told you 2016 gambling would be long, but there is going to be less math today.

I want to ask you now about your 2017 tax return.

A.   If we are supposed to be seeing something, we can't.

Q.   Oh.  Oh, no.

Mr. Goldstein, what is your understanding of what you are charged with when it comes to the gambling income on your 2017 tax return?

A.   For 2017 and all the later years, I'm charged with, even though I lost money gambling, not reporting both the wins and the bigger losses on separate lines on the tax return, and then zero as the result.

Q.   Did there come a time when Mr. Deyhle reached out to you

about the gambling winnings for your 2017 tax return?

**A.**    Yes.

         **MR. KRAVIS:**  Could we have Defense Exhibit 319, please?  Could we turn to -- yes.  There it is.

**BY MR. KRAVIS:**

**Q.**    Mr. Goldstein, do you see the e-mail from Mr. Deyhle on October 10, 2018?

**A.**    Yeah.

**Q.**    What is Mr. Deyhle asking you for here?

**A.**    I need to send the 2017 returns to the office for filing on Monday, so this must be right before.  I just need the e-file forms -- that let's him do that -- and send back.  I don't have any gambling winnings for 2017.  Is this correct?

      Do you want me to keep going?

**Q.**    You can stop there.

      If I represent to you that October 10 of 2018 was a Wednesday, how much time is Mr. Deyhle giving you now for the tax return?

**A.**    Four or five days.  A couple business days.  Sure.

**Q.**    What did you understand Mr. Deyhle to be asking for when he says "any gambling winnings for 2017"?

**A.**    Look, I mean, this is -- again, this is eight years ago. I'm not going to pretend that I remember this e-mail at all, but I'm sure what I thought is, just like before, when he had asked for, at the very beginning, the net gambling winnings, he

wants to know in the end.  I don't have any gambling winnings.  Did you win?  No, I lost.  I'm sure that's how I reacted to this.

Q.    When you say you are sure that you understood this means net gambling winnings, can you just remind us what net gambling winnings means?

A.    Sure.  Like, what happened in the end.  Were you a winner?  Were you a loser?  Here, I was a loser.  And so, no, I didn't win anything.

Q.    Just to be clear, did Mr. Deyhle ever tell you that, even in a year like 2017, where you lost more than you won gambling, you still had to report the gambling win and loss numbers on the tax return?

A.    No.  And this is an example of that.  If he wanted that, he would have to say are there winnings and losses; right?  But he would have to ask for both of them.

Q.    To be clear, your prior accountant, Mr. Caldwell, did Mr. Caldwell ever tell you that?

A.    No.

Q.    By the way, do you remember Mr. Caldwell testifying during this trial a few days ago?

A.    Yeah.

Q.    When Mr. Caldwell testified about this, is it your understanding that he described it correctly?

A.    Mr. Caldwell?

**Q.**    Yeah.

**A.**    No.  Mr. Caldwell just said, hey, if Tom told me that he lost -- "I would ask him" -- "If he said he won something, I would ask if he lost something, and if he lost more than he won, I would just say, well, then, there is nothing to report."

**Q.**    Was your understanding consistent with that of your former accountant, Mr. Caldwell?

**A.**    Sure.

**Q.**    Let's take a look at what you told Mr. Deyhle in your e-mail.

What do you say just above?

**A.**    "That's right.  No gambling winnings."

**Q.**    Was that true?

**A.**    Yeah.  The idea that I'd -- like, anybody who wins $5 on a scratch-off lottery is subject to this rule.  It is not like I didn't play poker for $5 in my house or anything else.  I'm not trying to hide the fact that, yes, there was a time during the year that I won.  I'm just saying that overall, I did not win, so...

**Q.**    In the other years we have been talking about in this trial, 2018, '19, '20, '21, did you lose more money gambling in each of those years than you won?

**A.**    Unfortunately.

**Q.**    What was your understanding for each those years about what you were supposed to put on the tax return for gambling?

**A.** Nothing.

**Q.** What was that understanding based on?

**A.** That was based on what my tax advisors had said. I wouldn't mind -- I mean, it would be sad, but I wouldn't mind listing, you know, I won and then I lost more, but there is nothing to hide.

**Q.** Okay. Can we move along to another topic?

What happened in terms of the frequency and scale of your poker playing after 2017?

**A.** It went down significantly.

**Q.** Why did it go down significantly?

**A.** Well, I mean, even when we are talking about the beginning of 2017, I get destroyed by Bob Safai. I have lost, you know, all of the money I have -- you know, we now -- Paul has let me use it to pay down Bob Safai, but we have even done the swap and now the money is gone. I owe Bob Safai money.

There is no way to play higher stakes, and nobody is going to invest in me. Chairman, Tango, Gores, they were not -- I had won. They weren't going to keep playing me.

So, you know, I did continue to play poker -- it's perfectly fair -- but the scale was very, very different.

**Q.** Now, we heard during the government's case and testimony about your poker games against a fellow named Andy Beal.

Do you remember that?

**A.** Sure.

**Q.**   Let's just talk about that for a minute.  How did you meet Mr. Beal?

**A.**   I met Andy Beal indirectly, you know, years -- like, years ago through a friend.  So we had some e-mail correspondence. And then I met him again through the Tobey Maguire thing kind of indirectly.  And then I met him again in person through Alfred DeCarolis, who testified.

**Q.**   When did you start playing poker against Mr. Beal?

**A.**   '21 or '22.

**Q.**   So I just want to be clear, that would be after your interview with the IRS in October of 2020?

**A.**   Definitely.  Yes.  Absolutely.

**Q.**   Did you have investors in the games you played against Mr. Beal?

**A.**   Sure.

**Q.**   How did you do?

**A.**   I won.

**Q.**   What did you do with the money?

**A.**   A variety of things, but I guess, most importantly, I paid all my back taxes.

**Q.**   And by the end 2022, were you paid up on your taxes?

**A.**   Yeah.

**Q.**   And how did that feel?

**A.**   For a while, it felt great.

          **MR. KRAVIS:**  Could we go to slide 19, please?

**BY MR. KRAVIS:**

**Q.** So I want to talk about where the gambling situation, the games in 2016, and then Mr. Safai in 2017, where all that left you in terms of your taxes.

Let me ask you first, what is your understanding of what you are charged with when it comes to your tax debts from this time period?

**A.** In terms of not paying my taxes?

**Q.** Yes.

**A.** My understanding of the charge is that, while I filed my tax returns on the correct date, I did not pay the full amount on the day, and that is a crime. If you, instead, pay with penalties and interest, you have committed a crime if you know you are -- that tax day is tax day.

**Q.** Now, just to kind of review the bidding here, in terms of where we were yesterday, I think I heard you tell me yesterday that as a result of the various errors that you made in the wires calculation in 2016, you ended up overpaying on your 2016 taxes in terms of gambling winnings. Did I hear that right?

**A.** In terms of gambling winnings and then in terms of my taxes because that's a big chunk of it.

**Q.** And then I think you also told me yesterday, and there is a stipulation on this, that you ended up losing a whole bunch of money to Mr. Safai in 2017. Did I hear that right?

**A.** Yes.

**Q.**    Okay.  So where did that leave you when your tax bill came due in April of 2017?  Even I got it wrong.  In April of 2017.

**A.**    In terms of money of any scale, I'm broke.

**Q.**    So what did you decide to do?

**A.**    I decided to pay with penalties and interest.

**Q.**    So I want to be really clear about this.  Did anyone ever tell that by not paying your entire tax bill in full on April 15, 2017, you were violating a legal duty?

**A.**    No.

**Q.**    What was your understanding about what the law allowed you to do?

**A.**    My understanding then, my understanding now, is that on April 15th, you can do the following, these are all options to you.  One will be cheaper, but these are all options to you. Pay the whole thing, pay and get on an installment plan, and pay interest if they will give it to you, pay -- don't put it on an installment plan, pay penalties and interest and, you know, let those accumulate until you pay it all off.  Those are the three things I believed then and I believe now that you can do.

**Q.**    And what was your understanding about the lawfulness of each of those options?

**A.**    They are all completely lawful.  I mean, tens of millions of people do them every year.

**Q.**    All right.  So let's take a look at an e-mail on this.

MR. KRAVIS: Can we have Government's Exhibit 587, please? And can we turn to page 8, please -- well, first of all, actually -- yeah. Can we turn to page 8, please?

BY MR. KRAVIS:

Q. Do you see here that there is an e-mail on March 3, 2016, to Andrew Hamm? Do you see that?

A. Yeah.

Q. Now, I don't think we actually heard from Andrew Hamm during this trial. Who is Mr. Hamm?

A. He is the person before Molly.

Q. So he was the Goldstein & Russell office manager at this time?

A. Right. Yeah. In March of 2016, Andrew is the office manager. He then takes on a more significant role with the blog, and Molly becomes the office manager.

Q. And you see the e-mail begins, "Hi, Andrew. Can you convey the following to Tom?" Do you see that?

A. Yeah.

Q. Can you read for us, please, the paragraph that begins "Based on the very large amount"?

A. "Based on the very large amount of income reported by G & R, Tom will owe MD" -- so Maryland -- "400K and the IRS $1.7 million with his individual returns. He has the following options: Number one, file returns on 4/15 and pay the tax in full" -- he's just saying what I just said -- "two, file

returns on 4/15 and ask for an installment plan.  This will avoid some penalties but start the collection process.  Three, file an extension and pay what he can on 4/15 with the balance due on 10/15.  There will be a penalty and interest on the unpaid balance."

Q.   Okay.  And so what was your understanding of the lawfulness of each of these three options that Mr. Deyhle sets out in the e-mail?

A.   Those are -- he's telling me those are lawful -- those are my options.

Q.   Did -- does Mr. Deyhle say anywhere in this e-mail, if you chose option two or three you are committing a crime?

A.   No.

Q.   Was that your understanding that if you chose option two or three you would be committing a crime?

A.   Of course not.

Q.   Did IRS Revenue Officer Parrish ever tell you that?

A.   No.  She says the -- this is what everybody says.  This is what Revenue Parrish -- or Officer Parrish said.  That's what Walter said, what Bill Caldwell said, that's what everybody says because it's true.

Q.   And just to be totally clear about this, on the day that you filed that return -- that 2016 tax return, April 15 of 2017, what was your intention about what you were going to do about that tax bill?

**A.** What I did. I was going to pay the taxes. I was going to -- I mean, I pay a million dollars over the course of this whole, you know, series of events, that I'm the -- you know, you can say I'm the cause of it, including my screw-ups. But, you know, I'm going to pay. I never asked for anything. I'm going to pay the whole thing and whatever it cost.

**Q.** And is that, in fact, what you ended up doing?

**A.** Yes.

    **MR. KRAVIS:** Could we have slide 20, please?

**BY MR. KRAVIS:**

**Q.** Mr. Goldstein, what is on slide 20?

**A.** I happen to know it. I'd prefer not to look at it.

**Q.** Understood. Even so.

**A.** Yeah. This is the penalties and interest.

**Q.** Is this the total amount of penalties and interest, to your understanding, that you paid for each of these tax years?

**A.** Yeah.

**Q.** We can put a total here. Do you know, roughly, what this adds up to?

**A.** Yeah.

**Q.** What is it?

**A.** A million dollars.

**Q.** Let me show you just one document on this. It's already in evidence.

    **MR. KRAVIS:** Could we have Government's Exhibit 455,

please?

**BY MR. KRAVIS:**

**Q.**    Mr. Goldstein, I think we have seen during the trial many notices that you received from the IRS during this time period. Is this one of them?

**A.**    I mean, I don't remember this particular document, but it's directed to me at my address, yes.

**Q.**    And I'm going to direct you to the first paragraph that begins, "We have approved your request."

What did you understand this document to be conveying?

**A.**    This is the installment agreement.

**Q.**    And I want you to -- you can take a minute to look at the document, look at it on the screen and your binder.  Is there anywhere in this document where the IRS tells you, if you go on an installment plan, you are committing a crime?

**A.**    I mean, I --

**MR. BEATY:**  Objection, Your Honor.

**THE COURT:**  Let's go to the headsets.

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:**  Mr. Goldstein, do we have you?  Can you hear us, Mr. Goldstein?  Mr. Kravis?  Not yet.

Mr. Beaty, are you on?

**MR. BEATY:**  Yes, Your Honor.

**THE COURT:**  Go ahead, Mr. Beaty.

**MR. BEATY:**  Your Honor, we are back where we are on asking for a curative instruction.  Mr. Goldstein -- both, apparently, Mr. Goldstein and Mr. Kravis, know the law and continually misrepresent this to the jury.  I'm asking for a curative instruction at this point.

**THE COURT:**  And the concern is, again, the issue about whether he was committing a crime and what the --

**MR. BEATY:**  Correct.  That's not the standard.  It's whether he knowingly violated his legal duty.  It does not matter whether he knew it was a crime or not.  That's not the standard.

**THE COURT:**  All right.  Mr. Kravis?

**MR. KRAVIS:**  Your Honor, I think we discussed this yesterday --

**THE COURT:**  Can you come a little closer to the mic?

**MR. KRAVIS:**  I'm sorry.  I was talking too loud yesterday.  I think I overcorrected.

I think we were discussing this yesterday morning in the context of our motion.  As Ms. Weiner argued to the Court, I think it is not at all clear that Mr. Beaty's statement was correct.

I think there is ample case law to support the proposition that for criminal charges.  The willfulness requirement is that you knew it was a crime.  In any event, I think that is something that we can sort out when we get to jury

instructions. But right now, we are talking about Mr. Goldstein's state of mind and what he understood.

As the Court noted yesterday morning, what is in Mr. Goldstein's head is kind of the key issue here. I think I'm allowed to elicit the testimony about what he understood, and then later we can hash out what the Court tells the jury about how to evaluate that testimony.

**THE COURT:** Anything further from the government?

**MR. BEATY:** Your Honor, you told them they could not ask that question anymore. They continue to do so. I don't care -- we don't have to do the curative instruction right now, but I would like a curative instruction delivered. We can break before Mr. Goldstein's cross, and we can deliver it then, but I feel like we need it. And they directly, again, violated one of your orders.

**THE COURT:** All right. A couple things. Number one, there is disagreement between the parties about the legal standard. We talked about this yesterday. We talked about this, I think, earlier in the case. The Court has not formally ruled, but I certainly have not ruled in the defense's interpretation.

So I think we need to tread carefully in the phasing of the questions. I believe the line is -- it's more his answer, frankly, than the question is problematic. I'll consider an instruction. I think the best time would be during jury

instructions, but if the government wants to propose something now, we will talk about it during the break.

**MR. BEATY:**  Thank you, Your Honor.

**THE COURT:**  But I'm going to ask the defense not to phrase directly, "Do you think you were doing the crime or not," because you can make your point, I think, without doing that and avoid the issue until we get the instructions straight, and you can argue that to the jury.

**MR. KRAVIS:**  Understood.  Thank you, Your Honor.

**THE COURT:**  All right.  Thank you.

**MR. BEATY:**  Thank you, Your Honor.

(Whereupon discussion concluded.)

**BY MR. KRAVIS:**

**Q.**  Mr. Goldstein, just to sum up here, the contents of this exhibit, Government's Exhibit 455, the installment plan, does this accurately convey what you learned from the IRS about your options here?

**A.**  All right.  Let me just be clear.  I've looked at a bunch of these things.  Okay.  So I'm -- I mean, I will take the jury's time to -- or all of our time to go and read this thing and refresh my recollection or anything.

But I will tell you that my sense is that all of these documents, basically the same thing -- say the same thing about the thing we are talking about --

**Q.**  Okay.

**A.**   -- and this is, look, if you file the return on the right date and you don't pay all the money, you can either pay the money on that date -- or this is after you haven't done that --

**Q.**   Yep.

**A.**   -- here's -- here are your options --

**Q.**   Got it.

**A.**   -- and here's what is going to happen to you.  And they list several things, and they all involve giving them a lot more money.

**Q.**   Now, the jury has heard some evidence about your personal spending during this time period.

**A.**   Yes.

**Q.**   Do you know what I'm talking about?

**A.**   Yeah.

**Q.**   There was the car and the watch and so on.  What was your understanding about whether you were allowed to spend money on personal items during this time period while you still owed on your taxes?

**A.**   I mean, you have to separate out whether I'm allowed to do it and whether it's smart to do it.  If you are asking if I'm allowed to do it, I'm certainly allowed to do it.  There is nothing anybody anywhere, from the IRS or the tax people or anybody, tells me, like, hey, you know, this is going to be a legal problem.

**Q.**   Okay.  So let me ask you about the second piece of it.

**A.**    All right.

**Q.**    Looking back only it now, how do you view that personal spending during this time period?

**A.**    You know, it has an element of being embarrassing when you put it -- if you just pluck all these things out.

I do think that, you know, you try and grow through this process, and through the trial, in particular, you realize, look, your priorities may have been out of whack.  It would have been better to do this directly.

I'll say only one thing.  Most of the things that we're talking about in terms of big money are right after big poker wins, and they are my effort to either celebrate or, you know, there is a car that I had always wanted.  You beat Alec Gores for what is $8 million of your share or, you know, you are paying off your taxes finally after all of this and you're beating Andy Beal or something like that.

I'm not making excuses.  I am just telling you in my head, it's not that I'm just -- I'm not trying to blow this off.  I know I'm responsible for all this.  I pay all of it.  I pay all of the penalties and interest.  I have paid a larger price than that.  It is not my intention to just, you know, ignore my responsibilities.

        **MR. KRAVIS:**  Could we turn to slide 21, please?

**BY MR. KRAVIS:**

**Q.**    Now, while we were on the subject of the taxes, do you

remember Officer Parrish testifying about a meeting that she had with you in 2018?

**A.**   Sure.

        **MR. KRAVIS:**   Can we look at Government's Exhibit 19, please?

**BY MR. KRAVIS:**

**Q.**   Mr. Goldstein -- this is already in evidence -- I'm going to direct your attention to page 13 where it says "cause and cure."  Do you see that section?

**A.**   Yeah.

**Q.**   Now, Mr. Goldstein, I want to direct your attention to the paragraph that begins "results."

     It says here, "Mr. Goldstein indicated the balance for 2016 was a result of a case where he received a large amount of money for.  This was a one-time thing, and other years are more reflective of his income.  He indicated they usually pay when they file the return."

     What do you remember telling Ms. Parrish about this issue, the issue of the balance?

**A.**   She comes to me because she wants the IRS's money.  That seems perfectly fair.  She wants the balance of what they are due.

     At this point, I have -- I don't know how much I paid, but I paid something.  She wants the balance.  She wants to know when I can pay her the balance.  I paid part of the balance

when I gave her $100,000 there.  She wants to know how she is going to get the rest of the balance.

When we talk about when somebody owes something, they owe the balance.  It's what's left.  It's not the whole thing.  She was not asking anything going backwards.  She was asking going forwards.  She wanted to know how they would get the rest of their money, and I told her that I had, you know -- to be honest, I do not remember the details of it, but the only thing I could be telling her is there is legal work coming in and I need to get paid for it and I will pay the IRS.

Q.    Did you ever tell Ms. Parrish that your 2016 income, not the balance but the income, was from a big legal case?

A.    Obviously not.  That would be crazy.

Q.    Why would it be crazy?

A.    She is coming to collect on the 2016 1040.  The 2016 1040 lists more than $10 million in gambling income.  For me to then turn to a federal officer and say, "by the way, this is all legal fee income," when, so far as I know, she is about to pull out the page that says however many, $10-plus million, in gambling income would be just absurd.

Q.    When you sat down to meet with Officer Parrish, what was your understanding about whether she would have reviewed your 2016 tax return before she came and met with you?

A.    How could she not have reviewed the tax return?  She was coming to collect on the tax return.

**Q.** And were you aware at that time that your 2016 tax return disclosed million of dollars in gambling winnings?

**A.** Yeah.  Walter had asked me for the numbers.  Yeah.

**Q.** So in light of that, your understanding of Parrish reviewing the tax return and what it said on the tax return, would you have said to Officer Parrish the income in 2016 is from a big legal case?

**A.** No, obviously not.

**Q.** When was the first time you learned that Officer Parrish actually had not reviewed your 2016 tax return?

**A.** I think in getting ready for trial, the government turned over a statement to us, like, the -- yeah.

**Q.** By the way, in this meeting with Officer Parrish, did you write the IRS $100,000 check?

**A.** Yeah.

**Q.** Let me ask you one more thing about your interactions with Ms. Parrish here.

          **MR. KRAVIS:**  Can we have Government's Exhibit 226, please?  Can we start with just the first page of the document?

**BY MR. KRAVIS:**

**Q.** When Mr. Levitan testified a few weeks ago, the government showed him the first page of this document during his direct examination.

     Do you remember that?

**A.** Yeah.

27

Q.    So let's start with the page the government showed.

What is this on the first page?

A.    What is what?  Sorry.  The whole thing or --

Q.    Yes.

What is your understanding of what appears on the first page of the document?

A.    This is information about me and my finances, and also Amy.

Q.    So if you zoom back out here, do you remember the government asking Mr. Levitan about how the personal Wells Fargo account and the Montenegro bank accounts aren't on here?

A.    Yeah.

Q.    Let me show you the second page, which the defense raised on cross-examination.

Looking at the second page, is this the version of the document that actually went to the IRS?

A.    No, definitely not.

Q.    How do you know that?

A.    You can look in the bottom right-hand corner, where it says RW and then PROD, U.S.A.  This is a technical legal thing. RW means that it came from the files of Russell Woofter, which is the -- Goldstein & Russell became Russell Woofter when I left.

So Russell Woofter means this is in the files of the law firm, not of the IRS.  Then the IRS turns around and sends it

back to us.  But the IRS never had this document.  This is the original.  You can tell.  It is in blue pen.  This is not an IRS document.

Q.   Now let me show you Government's Exhibit 93, starting with page 16.

What is you understanding of what this document is?

A.   I believe we learned that this is the one that Revenue Officer Parrish made when talking to me.

Q.   Can we now look at page -- it's a little confusing. Page 15 is actually the second page of the document because of the way it was produced to us.

Is your personal Wells Fargo bank account mentioned on here?

A.   Yeah.

Q.   Where is it?

A.   It's the second one, Wells Fargo.

Q.   The Bank of Montenegro account, is that mentioned on here?

A.   Yeah.

Q.   Did you disclose these accounts to the IRS?

A.   Of course.

Q.   Did you try to hide bank accounts, either Montenegro or the Wells Fargo account, from the IRS?

A.   No.  I mean, they're there.

Q.   By the way, was there a time when your own accountant suggested to you that hide bank accounts from the IRS?

**A.** Yeah. Walter said, back, back, back, when -- in the day, when I had the back taxes, hey, you know, maybe we -- maybe the move here is just to create some new bank accounts they don't know about.

**MR. KRAVIS:** Can we look at Defense Exhibit 384?

**BY MR. KRAVIS:**

**Q.** Is this the advice that you were talking about?

**A.** Yong to Jon. So this is in '19. This the same time when all this is going on.

"Hi, Jon. After speaking to Walter" -- do you want me to read it or just read it myself?

**Q.** I just want to ask if this is the --

**A.** Yeah.

**Q.** This is the advice you were talking about?

**A.** Yeah.

**Q.** When it says here, "We do not want the IRS taking any monies from those accounts," is that what you were referring to?

**A.** Yeah.

**Q.** Did you take this advice?

**A.** No.

**Q.** Why not?

**A.** Because it's hiding -- hiding money from the IRS in some bank account in some new bank or something like that.

**Q.** Looking back, do you think you probably made the right

call on that one?

**A.**    Of course.

        **MR. KRAVIS:**  Let's go to the next slide on the timeline, please.

        **THE WITNESS:**  Oh, the bag of cash.

**BY MR. KRAVIS:**

**Q.**    You knew we would get there.

    In your meeting with Revenue Officer Parrish, did she talk to you -- take any particular steps to try to pay off your back taxes?

**A.**    Yes.

**Q.**    What did she ask you to do?

**A.**    Take out a loan.

**Q.**    So after the meeting with Revenue Officer Parrish, did you do just that?

**A.**    Yes.

**Q.**    Now, during the government's case, we heard testimony about conversations that happened, like, over seven years ago, the CBP officer, the folks from the law firm.

    Do you remember that?

**A.**    Yes.

**Q.**    Do you have contemporaneous text messages about what was actually happening with respect to these loans back in 2018?

**A.**    We have them and the government has them, yes.  They were -- yes.

MR. KRAVIS:  Can we see Defense Exhibit 462.1, please?

Can we zoom in, down there on the bottom?

BY MR. KRAVIS:

Q.  Mr. Goldstein, what are we looking at here?

A.  We are looking at a text message -- or a series of text messages.

Q.  Was this before or after you traveled outside the United States to pick up the cash?

A.  It's describing -- oh, it's in the future.  This is before.

Q.  Now, on October 16, 2018 at 2:58 p.m., what do you write about that trip?

A.  Three, four days.

Oh, next.  Sorry.

Q.  Yeah.  The next one.

A.  "Have to go pick up $1-2M" -- so one to two million -- "in cash I'm borrowing to pay taxes.  LOL."

Q.  Is this a reference to be the trip that you are about to go on to get that million dollars in cash?

A.  Yes.

Q.  Let's pull this down and let's just, like, back up.

Let me ask you first, what is your understanding about what you are charged with when it comes to these loans?

A.  That's not a possible question really to answer because

the government has charged two inconsistent things, as I understand them.

**MR. BEATY:**  Objection, Your Honor.

**THE COURT:**  Let's come to the headsets.

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:**  Mr. Goldstein, can you hear us?  Mr. Kravis, are you on?

**MR. KRAVIS:**  Yes, Your Honor.

**THE COURT:**  Mr. Beaty, go ahead.

**MR. BEATY:**  Your Honor, this is irrelevant.  It's wildly improper.

**THE COURT:**  Speak a little more directly into the mic.

**MR. BEATY:**  This is irrelevant, wildly improper and something that Mr. Goldstein knows better than to try to sneak in.  This is absolutely wrong.

**THE COURT:**  I think you are referring to his response, not the question.

**MR. BEATY:**  Yeah.  I know -- since they practiced this, I'm pretty sure Mr. Kravis knew where he was going.

**THE COURT:**  Mr. Kravis, what's going on?

**MR. KRAVIS:**  Your Honor, I'm just asking Mr. Goldstein about his understanding of the charges to frame the fact testimony that he's about to give about what actually

happened here.  That's it.

THE COURT:  Well, he can speak to what he understands, but he can't critique the government's investigation.

If he does it again, I'm going to cut it off.

MR. KRAVIS:  Understood.  Thank you, Your Honor.

(Whereupon, discussion concluded.)

BY MR. KRAVIS:

Q.   At a general level, what is your understanding of what you are charged with when it comes to the loans?

A.   I'm charged with misreporting these as loans rather than either gambling income or legal income.

Q.   Now, who did you ask for the loans?

A.   Paul Phua.

Q.   Is that the guy we were talking about yesterday?

A.   Yeah.

Q.   Why did you ask Mr. Phua specifically for the loans?

A.   Because we have that kind of relationship.  You know, he both, I think, feels very -- felt very indebted to me for what happened in Las Vegas.  I had made him a lot of money through the poker matches.

And, you know, he was the person in my life who I believed without -- you know, who I could just turn to and say, look, I need this, and on an informal level, and he would just be willing to do it for me.

**Q.** And did Mr. Phua, in fact, agree to loan you the money?

**A.** Yes.

**Q.** And how many loans were there in total?

**A.** Two.

**Q.** Let me ask you about the first one. How much, approximately, was the first loan for?

**A.** A million.

**Q.** And how did Mr. Phua transmit that money to you?

**A.** By wire through the same set of Montenegro accounts.

**Q.** And did you tell the office manager, at the time, Mr. Levitan, to disclose this loan to the accountants?

**A.** I mean, I don't know the exact timing, but, yeah, promptly, I'm sure.

          **MR. KRAVIS:** Let's look at Defense Exhibit 290, please. Can we go to the second page, I think it is. Yes. The e-mail from Mr. Goldstein to Mr. Levitan on December 1st of 2018. We are going to come back to this e-mail a few times.

**BY MR. KRAVIS:**

**Q.** I'll direct your attention just to the first two sentences. Can you read those for us, please?

**A.** "Can you make sure that Walter understands the following, please? We got a 1 and $1 million transfer into the account in Montenegro. That was a loan."

**Q.** Is that -- your e-mail to Mr. Levitan, "We got a $1 million transfer into the account in Montenegro, that was a

loan."  Is that a reference to the first million-dollar loan that Mr. Phua made to you for your taxes?

A.    Sure.

Q.    And then did Mr. Levitan, in fact, report this information to the accountants?

A.    Yes.

            MR. KRAVIS:  Can we look at Defense Exhibit 385, please?  Can we go to the second page?  Third page?  Yes.  It's the bottom of two, top of three.  Yeah.

BY MR. KRAVIS:

Q.    Do you see, Mr. Goldstein, the e-mail from Mr. Levitan to Mr. Deyhle on -- it's, actually, I think, that same day, December 1 of 2018?

A.    Yes.

Q.    Can you read for us, please, the first two paragraphs?

A.    "You may be aware of some/all of this, but we just wanted to make clear the nature of some 2018 transactions for Tom.  On 9/26/18, the firm's Wells Fargo account received $999,960.48 from the G & R account in Montenegro" -- oh, so this is another time we talked about that account.  "That money came into the Montenegro account as a loan to Tom."

Q.    Is that a reference to the $1 million loan we have been talking about?

A.    Yes.

Q.    And if you look up to Mr. Deyhle's response, what does

Mr. Deyhle say about this?

**A.**    "Makes sense, but I will need more details later."

**Q.**    To your recollection, did Mr. Deyhle ever follow up with you to ask you for any more information about the loan?

**A.**    No.

**Q.**    Did Mr. Deyhle ever come back to you and say, look, I need a written loan agreement from you?

**A.**    No.

**Q.**    Did Mr. Deyhle ever come back to you and say, I need some more documentation on this?

**A.**    No.

**Q.**    Did Mr. Deyhle ever come back and ask you any questions at all about this loan?

**A.**    No.

         **MR. KRAVIS:**    If we could go back to Mr. Goldstein's e-mail, Defense Exhibit 290?

**BY MR. KRAVIS:**

**Q.**    The government presented some testimony during the trial about there being, like, no payments on these loans from Mr. Phua.  Do you remember that?

**A.**    From Mr. Phua?

**Q.**    The government --

**A.**    Or the loan of Mr. Phua, did you ever make any payments?

**Q.**    Yes.  Yes.

**A.**    Okay.

**Q.**    In this e-mail to Mr. Levitan, do you reference a partial repayment of the loan to Mr. Phua?

**A.**    Yes.

**Q.**    Where is it?

**A.**    It's -- it's -- it's the fourth line --

**Q.**    Can you read that for us, please?

**A.**    "I got 500K in income from Malaysia that went to someone else overseas as a loan repayment -- or as loan repayment and never came into our bank account.  So we need to record it as income even though there is not a record of it happening."

I mean, to my mind, this document explains me better than any other in the case.

**Q.**    And why is that?

**A.**    Well, look, I mean, I'm given $500,000 in cash in Malaysia by the Malaysian government.  And I give it to somebody who works for Paul Phua because, like, I just do not want to have to deal with it.  And I have possession of this money for three minutes.  And the easiest thing on earth for somebody who wants to cheat on their taxes is to just pretend that never happened.

The government of Malaysia is not going to create a tax document.  There is no tax document.  It's not in a bank account.  There's -- like, it is just gone.  And I -- there are a lot of things that I don't remember from ten years ago.  But I remember -- I remember saying, look, this is what you do.  There is not going to be a tax document.  There's not going to

be a 1099 here.

This is a situation where two things are going to happen. It is not going to go into the law firm bank account, and there is not going to be a tax document that gets sent to the law firm and to the IRS.  This money is gone.  Nobody knows about it.  But that is not what you do.  You go and you tell the accountants, put it on the taxes.  You pay your taxes.

**Q.**    What do you mean when you said you know there is not going to be a tax document created for this?

**A.**    So, like, the last sentence is actually kind of important. So we need to record it as income even though there is not a record of it happening.  Income can get recorded and get reported to the IRS in multiple different ways, as we have been talking about at great length.

When it comes to my income getting to the tax preparer, getting to Walter, there are two ways that that can happen that we have been talking about.  One is it can show up in the firm bank account.  The second is the person who pays it, if it does not go into the firm bank account, can be required to send a tax document, a 1099.  But this is the government of Malaysia. They do not send those tax documents.  Those rules do not apply to the government of Malaysia.

So there -- neither one is going to happen.  This money is gone.  It is into ether.  Nobody will ever know about it.  The only person in the United States, of all the 300 million

people, is me.  And what I know is you do not pull a stunt like that.  You report your income.  You pay the taxes on it.

Q.    And so for these purposes, in your mind, as you understood how all this would get reported, is the government of Malaysia here situated the same or different from Robbins Geller, Napoli Shkolnik, and Tobey Maguire, the folks who made payments of law firm income directly to other sources?

A.    Totally differently.

Q.    Why?

A.    Because the rules don't apply to Malaysia.  They are not in the United States.  They were not U.S. taxpayers.  Robbins Geller, Tobey, the Napoli firm have to send, as I understand it, a tax document that will go to the law firm.  And the law firm, as it turned over dozens and dozens and dozens of those to GRF, I am paying them.  They never tell us don't send them. They will get those tax documents.  They will be reported on my taxes.

This $500,000 will not -- unless I write an e-mail, I will never pay taxes on this unless I, the only person that knows about it, tell the tax preparers "include it on the taxes."

Q.    By the way, did you hear the testimony of the defense expert, Mr. Marks, last week testify that this $500,000, actually, GRF never reported it?

A.    Yeah.  I cannot imagine now what it is going to cost me after this to now pay the $500,000 in the interest because GRF

left it off the taxes.

MR. KRAVIS:  All right.  Now, we can take this down.
Thank you.

BY MR. KRAVIS:

Q.   We've talked about the first loan.  I want to turn to the second loan.  Did there come a time when you went back to Mr. Phua and you asked him for some more money, another loan?

A.   Yeah.  So the first loan, I ended up paying various debts and everything like that.  The second one is the one that I end up doing -- you know, this is the tax loan for Parrish.

MR. KRAVIS:  Can we have, please, Defense Exhibit 738.1, the redacted version?  And can we go to the second page?

BY MR. KRAVIS:

Q.   Mr. Goldstein, what is this exhibit?

A.   This is a message between me and Paul Phua.

Q.   And do you see your message, "Do you happen to know whether the remainder of the loan will be okay with Richard?"

A.   Yes.

Q.   What is that a reference to?

A.   Richard is Richard Yong, who is Paul Phua's business partner.  He was also a defendant in the case in Las Vegas, and I think he's the person who took the $500,000 from the Malaysian government.

Q.   Is this -- when it says "the remainder of the loan," what

were you referring to there?

**A.**   So there is a -- there had been a whole exchange between me and Paul about the -- I'm asking for two.  He had given me one.  This is a reference to the second half to the million, the million after that.

**Q.**   Because this one ends up being the million dollars in cash?

**A.**   Yes.

**Q.**   Now, did Mr. Phua agree to loan you the money?

**A.**   Yes.

**Q.**   Now, how did you get the loan from Mr. Phua this time?

**A.**   This was a huge pain.  So the bottom line is I get it in cash in Macau.

**Q.**   Now, getting a loan in the form of a bag of cash, you got to admit, is a little unusual.  What was your understanding of why you had to do it this way?

**A.**   It is not a little unusual.  It is a very unusual thing. Anything involving a million-dollar bag of cash is unusual. Why did I do it this way?  Because Paul said I had to do it this way.

**Q.**   Now, I think we heard Mr. Levitan testify that there was a time when you asked him to try to open a bank account for you in Macau.  Do you remember hearing that?

**A.**   Yes.  Not just Macau, but I think he said Macau and Hong Kong because that's what we tried.

Q.   What, if any, connection was there between that request of yours and this loan we are talking about here?

A.   They are intimately tied.  So Paul says, look -- he says, I can't do this through the Montenegro bank.  I don't have the money there.  That's what he said.  So you are going to have to -- if you want this, you are going to have to go and do this in Macau.  You can go get it from the junket in Macau, and then you can have it in cash.

     And so what I say to Jon is, I'm going to have to go over there.  I need you to find a bank in Macau or in Hong Kong that I can deposit this into and then just wire it into the law firm just the same way that I do in Montenegro.

Q.   Okay.  So where did you go to get the money?

A.   Well, I go to Macau to get the money.  I go to the junket in a casino in Macau.

Q.   And why do you go to a junket in a casino in Macau?

A.   Can I explain what a junket is briefly?

Q.   Oh, yeah.  Okay.  Fine.  What's a junket?

A.   So in Asia, there is a casino just like there is in Las Vegas, but inside the casinos there frequently are little mini casinos that are privately owned.  Those are called "junkets."

     And what would happen is, Paul Phua -- there was a bit of the reference to this earlier.  Paul Phua, at one point, was a junket operator, and that is he would bring gamblers from mainland China over the water into Macau.  They would gamble

there, and that junket would make money.  So he and Richard owned a junket inside the casino in Macau, and that's where I'm told to go to get the cash.

Q.    And who told you to go there to get the cash?

A.    Like, that specific place?

Q.    Yes.

A.    Somebody who worked for -- for Richard.

MR. KRAVIS:  Now, can we have that -- the text message we were looking at a moment ago, 462.1?

BY MR. KRAVIS:

Q.    So just to be clear about the timing of all of this, when you write this text message, "Have to go to pick up 1 to 2 million in cash I'm borrowing to pay taxes.  LOL," did you send this message before the trip or after the trip?

A.    Before.  I'm talking about what I have to go do.  This is -- I'm going to go do that.

Q.    Do you remember hearing Officer Foy testify that the CBP officer -- that you said when you came into the United States that this was gambling income?

A.    Yeah.

Q.    If this was gambling income, could you have possibly have known before you left on the trip how much money you are bringing back?

A.    No.

Q.    As we heard you testify earlier, how do you usually do at

gambling?

**A.**   Well, I usually lose, but I also don't get paid in cash.

**Q.**   Did you also tell Mr. Levitan that this was a loan?

**A.**   Yes.

**Q.**   Let's talk about your journey back.

When you landed in the United States, did you declare the money?

**A.**   Sure.  So to get back, I have to go from Macau into Hong Kong -- oh, so Jon has found out that I cannot get the bank accounts.  I'm stuck.  The only way to get it back is going to be to bring it back in the actual cash.

I go to Hong Kong.  I change the money from Hong Kong dollars into U.S. dollars, and when you do that they charge a fee.  So a million dollars becomes less than a million dollars. I bring it in, and then yes, I fill -- back in the day, we had the actual paper forms and I think I filled out the paper form. "Are you bringing more than $10,000 in cash in?"  Actually, yes.

**Q.**   If you were trying to hide the money from the IRS, would you have declared it when you came into the United States?

**A.**   No.

**Q.**   Okay.  So after you left Dulles Airport, you go home that night.  What do you do with the cash next?

**A.**   I take it to the office.

**Q.**   Where do you go from there?

**A.**    Well, we have told Wells Fargo ahead of time.  We've told the IRS ahead of time this is going to happen.  We've told Wells Fargo ahead of time this is going to happen.  We go to Wells Fargo.

**Q.**    And --

**A.**    Which is where the law firm account is.

**Q.**    What did you do with the money when you got to Wells Fargo?

**A.**    I didn't do anything.  They counted it.  It took a while.

**Q.**    I was going to ask.  What is it like when you go to a bank in the U.S. and try to deposit a million in cash?

**A.**    Well, like I said, this had been planned in advance so they were ready.  They had the staff, everything.

So they took it, and either Jon or I watched.  I have some recollection that it may have been both of us.  And they have to run it through, you know, the machines because they are not going to be like, "Ah, looks like," and so they counted it all.

**Q.**    If you were trying to hide this from money from the IRS, would you have had it deposited in a United States bank account?

**A.**    I don't think about myself in those terms, but, obviously, not.

**Q.**    What did you do with the money after it was deposited in the Wells Fargo account?

**A.**    I wrote a check immediately to the IRS.  The IRS had -- I

had given them a head's up, or I had someone give them a head's up that, you know, this is going to be coming.  And I wrote a check and I sent it to the IRS.

          **MR. KRAVIS:**  Can we look at Government's Exhibit 462, please?

**BY MR. KRAVIS:**

**Q.**   Mr. Goldstein, this e-mail that you wrote to Mr. Deyhle on November 1st, 2018, is this related to the million dollars in cash we have been talking about?

**A.**   Yeah.

**Q.**   Can you just explain what happened here?

**A.**   Do you want me to read it or just explain it?

**Q.**   If you could just read the e-mail and then explain what you meant by it?

**A.**   Sure.  I have got 950K -- $950,000, because I think I didn't send -- I think it was 968 or something.  I may be shortening it or that might have been the amount I sent.  To give them this week, but they took --

**Q.**   Let me stop you there.

     When you said "them," who did you mean by "them"?

**A.**   Oh, the subject is IRS.

**Q.**   So you were -- so you said, I got 950K to give to them this week.  The "them" is the IRS?

**A.**   Yes.

**Q.**   Keep going.

**A.**   But they -- the omnipresent "they," there they are -- but they took it by the lien first.

**Q.**   What do you mean when you write they took by lien first?

**A.**   I'm using that word incorrectly.  They levied it.  They took it out of the bank account.

**Q.**   Go ahead.

**A.**   So what had happened is because you had told them, she knew it was coming.  Revenue Officer Parrish knew it was coming.

So I think the second that -- they must have been in touch with the bank or something like that.  So I put it in, I write a check, but unbeknownst to me, it, like, got into my account, it was gone.  I had a problem.  I had just written them a $950,000 check and, unbeknownst to me at the time, they had already gone in and taken the money knowing it was coming.

"Do we need to explain?"  I don't want them to think I was somehow holding back money because I didn't want there to be some impression by somebody at the IRS that, hey, you had $950,000 in the account.

So I just wanted him to confirm with -- that, you know, it was in whatever relevant file.  I brought this money for them. I wrote the check, and I sent it to them.

          **MR. KRAVIS:**  Okay.  Thank you.  We can take that down.

**BY MR. KRAVIS:**

Q.   Mr. Goldstein, you heard some testimony from a couple of the folks who worked at the law firm about some statements that they think they overheard in the office about the cash.

Do you remember that?

A.   Yeah.

Q.   Can you tell us what you believe you actually said around the office about this money?

A.   Well, one, we know I had the conversation with Jon.  I mean -- about the loan.  He -- you know, everybody agrees.

This is what I think happened.  And you remember this is ten -- a long time ago for everybody.  I think there is some conversation which somebody says, "where did you get this money," and I say, "a client."

Q.   Let me stop you there.

What did you mean when you said that you got the money from a client?

A.   From Paul Phua.  Paul Phua is a client.

Q.   Did you mean that it was legal fee income?

A.   No.

Q.   Let me talk for a minute about the work for Mr. Phua.

Did you do some work for Mr. Phua in connection with a criminal case in Asia?

A.   Yeah.

Q.   When did that criminal trial begin?  When did that trial happen?

**A.**   After all of this.  But, like, five, six months after that.

**Q.**   And what was the result of that trial?

**A.**   He's acquitted.

**Q.**   And how did you get paid for that work?

**A.**   By wire.

          **MR. KRAVIS:**   Can we see Defense Exhibit 366?

**BY MR. KRAVIS:**

**Q.**   Mr. Goldstein, what is this?

**A.**   This is the invoice.

**Q.**   Who is the invoice to?

**A.**   Paul.

**Q.**   What is it for?

**A.**   Being his lawyer.

**Q.**   And in connection with that particular case?

**A.**   Yep.

**Q.**   What is the date?

**A.**   February 15, 2019.

**Q.**   How does this date relate to the timing of your trip to pick up the million dollars?

**A.**   It's after.

**Q.**   And is that your signature in the bottom right-hand corner?

**A.**   Yeah.

**Q.**   I just want to be clear, the million dollars that you got

in cash on that trip, was that a legal fee payment?

**A.**    No.  Obviously, not.  I mean, you have to remember, I mean, Paul is generous, but he's not crazy.  The -- what I do in this case -- like, I go to help with this trial.  The trial is in Portuguese and Cantonese.  I'm not a big help.

They want, you know, some context from what happened in the other cases because the two cases are related and everything like that.  I'm not a lawyer in Macau.  I'm not running the case or something like that.  I'm being helpful and he's appreciative.  This is both fees and expenses, I'm sure, because, you know, I do go back and forth.  But no, I don't do $2 million or $1 million worth of work on it.

**MR. KRAVIS:**  We can take this down.

**BY MR. KRAVIS:**

**Q.**    The government asked some questions during their case about the details of this loan.

So let me ask you, why is there no written loan agreement between you and Paul Phua?

**A.**    I mean, there is -- there are text messages.  There is not a written loan agreement, let's be clear.

The reason is because this is this culture.  We have talked about this a little bit.  Other people have talked about this.  Like, this is how -- we go back ten years.  I've made him -- I got -- I saved ten years of his life and made him tens of millions of dollars.

If I write him a message saying, "Hey, can I have 1 million or $2 million," he might say no.  But if he says yes, he's just going to say yes.  He's not going to say, okay.  And here is my five pages of terms and conditions, and that sort of thing.  He's going to say, okay.  Yes.  And he's going -- you know, that's going to be the end of it.

I understand it is a very, very, very, very different culture, but that is what it is, and that's why you don't see these kinds of documents, except in very rare circumstances.

Q.    Why no interest or payment schedule?

A.    I think in the gambling community, unless you are doing, you know, this rare -- like Bob did.  Unless you are doing some very rare thing -- we're talking about $1 million, $2 million, $10 million, talking to somebody about getting $300 in interest seems a little nitpicky.

People are not worried about -- one of their experts referred to the time value of money.  Like, okay.  You are going to pay me back.  I'm going to give you $1 million.  When you can, you are going to give me $1 million back.

There might actually be, like, Well, I will lend you this money, but when can you pay me back?  If it matters to the person.  But it is just not going to a bank.  It's just -- like when, you lose to somebody or you beat somebody or you borrow money from somebody, I get that it is different.  But it is absolutely -- and that's why everybody has said the same thing

about it.

Q.   And, in fact, did we hear from Mr. Robl during this trial about another loan of yours that was very similar?

A.   Yes.  I mean, I have owed Andrew, for more than a year, more than $1 million.  It is in a couple of text messages.

I mean, to be perfectly honest, the best example of this was Rick Salomon.  He said he's been owed more than $50 million based on a text message.

Q.   Now, yesterday, the government -- or it was the day before, I guess -- the government showed Agent Ranahan a document describing -- or an e-mail chain talking about this payment as a capital contribution.

Do you remember that?

A.   Yes.

Q.   So let me just ask you about that.

MR. KRAVIS:   Can we have Government's Exhibit 544?

BY MR. KRAVIS:

Q.   Mr. Goldstein, just focusing on the top half of the message, the e-mail chain here between you and Mr. Levitan. First, a general matter.

Does this concern that $237-some-thousand legal fee invoice we were talking about earlier?

A.   I know from the timing, yes.

Q.   Okay.  Starting with Mr. Levitan's message at the bottom, can you just explain to us what is going on here?

**A.** In which sentence? The first -- both? The second?

**Q.** Yeah. In the whole e-mail. Can you explain what your understanding is and what Mr. Levitan is telling you there?

**A.** Sure. So he's telling me, "The banker said that they have not received the funds yet so they couldn't send the wire." So I must be asking for the money to be forwarded.

Remember, it has to come to my account in Montenegro, and it has to switch accounts because of Montenegro banking rules, and then it has to make its way to me. They are saying that you haven't gotten the money yet.

Then he says, "They are asking for some sort of supporting document detailing the transfer from your personal account to the firm account. Last time we characterized it as a capital contribution. Will it be the same this time?"

Do you want me to explain what is happening?

**Q.** Yes, please.

**A.** Okay. In Montenegro, two kinds of bank accounts, personal one and the law firm one. I need to get it to the law firm account in the United States. It has to go through several trips because of the rules. Paul sends it to me here. Then it has to get to the law firm one in Montenegro. They have a law that says you got to explain why that is, why is it coming from your personal account to your business account.

As a technical matter, it turns out I'm giving it to the law firm so I am making a capital contribution to the law firm.

So I have to write them a document that says -- to go to the bankers, not to Paul, to the bankers -- to say if it is going to go from my personal account over here to my law firm account here, still in Montenegro, I have to say this is a capital contribution.

Q.   Did you ever tell GRF that they should treat the $230-some-thousand payment as a capital contribution for tax purposes?

A.   No.

Q.   Did you ever instruct Mr. Levitan or anyone else to tell GRF that they should treat the $230,000 payment as anything other than legal fee income?

A.   No.  I wrote an invoice.  Legal fee income and signed it.

Q.   If you were trying to hide that money, would you have written and signed a legal fee invoice for the money?

A.   No.

Q.   Do you have any idea why GRF made the decision to classify this $230-some-thousand as a capital distribution rather than as legal fee income?

A.   I have a guess.

Q.   What's your guess?

A.   We had done the loan.  And there, that's personal money. I had gotten it from Paul Phua.  It had made its way -- the same journey.  It had gone into the personal account, into the law firm account and to the law firm.

I think the GRF just assumed, when something happened later with a smaller amount of money, first we do it with a loan.  That is a capital contribution.  That is my personal money, and that's why I say it's a loan.

So another $235,000 makes the same path.  Paul Phua into my personal account in Montenegro, into the law firm account in Montenegro, and into the U.S. bank account of the firm.  And because it traveled in the same direction along the same path, I think they just assumed.

MR. KRAVIS:  Can we see Government's Exhibit 22, please?

BY MR. KRAVIS:

Q.    I think we looked at this e-mail chain the other day. When was the first time that you learned that GRF had treated that $230,000 payment, that legal fee payment, as a distribution rather than income?

A.    I mean, I don't have a precise recollection even of this exchange.  I'm just not going to make up, oh, I remember, unless it is something incredibly significant to me.  But the -- this document, I got in October 2020.  It would have been the first time I could have learned.  It says, on the left distribution, but that's like one of those codes for, you know, the accounting software.

On the right, it just says G & R, PC own fund transfer. But this is the first time I could have learned something like

that, October 23, 2020.

Q.   By this point, had you already filed your 2019 tax returns?

A.   Yeah.

Q.   To your understanding, in this case, are you charged with the crime of failing to amend your return?

A.   No.  Not only that, the investigation is on.  I'm not trying to find something out for myself.  I'm trying to find stuff out for the IRS.

Q.   And so, I mean, regardless of what you are charged with, why not file an amended tax return at this point?

A.   Oh, no.  No.  No.  No.  This is -- I mean, the criminal investigators have showed up.  Like, I've hired a lawyer.  I talked to them for hours and hours and hours.  I've hired a lawyer.  This is just -- this gets sent -- the legal team is who is going to handle this now.

Q.   And is it your understanding that the -- your lawyers were in communication with the prosecutors at this point?

A.   Yes, and --

Q.   Just to be fair, are you talking about the people over here or other people?

A.   No.  The lead prosecutors are gone.  These are -- it's not these specific people, but this Department of Justice, yes.

          MR. KRAVIS:  Okay.  Can we turn back to the next slide, please?

**BY MR. KRAVIS:**

**Q.** Okay. Let's talk about cryptocurrency.

**A.** Okay.

**Q.** What is your understanding of what you are charged with when it comes to cryptocurrency?

**A.** That there is a requirement starting in, I think, 2019 where on your tax return, it says if you had any amount of cryptocurrency, dollar or more, millions, whatever, you have to check a box and acknowledge that on your tax return.

**Q.** When did you start using cryptocurrency?

**A.** 2020.

**Q.** Why did you start using cryptocurrency in 2020?

**A.** I think that just, you know, the very first days of this, it's just like, you have been hearing about this for a long time, and so I decided to open up a -- it turns out -- I only remember this from the documents, to be perfectly honest, but I decided, apparently, to open up a Coinbase account.

**Q.** I think you told me a moment ago that there was a question added to the IRS Form 1040 about the use of cryptocurrency. Did I hear that right?

**A.** I mean, I know that now.

**Q.** Right. That's something you are aware of now. Is that something that you were aware of in 2020?

**A.** No.

**Q.** Did Mr. Deyhle ever send you an e-mail flagging that, hey,

there's a new question about crypto on the tax return?

**A.**    No.

**Q.**    Did Mr. Deyhle ever call you up and say, hey, I just want you to know there is a new question about crypto on the tax return?

**A.**    No.

**Q.**    I think we saw in the government's case a reference to cryptocurrency in the GRF retention letter.  Do you remember that?

**A.**    Sure.

**Q.**    Did you even read the GRF retention letter?

**A.**    No.  I mean, actually, you can tell I don't read it, because if I read it, I would have signed it.  I'm sure either, you know, Katie knew she had authority or she might have asked, like, there's a GRF retention letter, can I sign this for you? But, like, you know, who read it by the person who signed it, and she explained she signed it, not me.

**Q.**    Did you think, then, that GRF would be providing you with substantive tax advice in an engagement letter?

**A.**    No.  I mean, to be -- to be even more fair, that letter does not talk this rule.

**Q.**    Do you, as a lawyer -- or did you, as a lawyer, send out engagement letters to clients?

**A.**    Sure.

**Q.**    Did you put substantive legal advice about a client's case

in an engagement letter?

A.    No.  You are hiring them, and then we will give you advice.

MR. KRAVIS:  All right.  Let's take a look at Government's Exhibit 490.  It's in evidence.

BY MR. KRAVIS:

Q.    I think Ms. Bart testified about this document.  Do you remember that?

A.    Yes.

Q.    What is this document?

A.    This is the tax organizer.  I -- to be perfectly honest, I don't know that I ever saw it, but it says it's the 2019 tax organizer.

Q.    Okay.  First of all, do you have a recollection of, like, sitting down with Ms. Bart and going through the answers to these questions?

A.    I think that's pretty unlikely because, if so, again, I would have signed it.

Q.    But --

A.    I mean, that's not my signature.

Q.    But regardless, what year is this a tax organizer for?

A.    So this happens -- there are two different things you have to look at.  It's signed in 2020, but it's talking about the 2019 taxes.  In fact, it is signed in early 2020, before I even started with crypto, but it's about 2019 taxes.

Q.    It says "2019 tax organizer."  Did you own cryptocurrency in 2019?

A.    No.

Q.    Did you see any tax organizer during this trial for 2020 or 2021 with a box checked on cryptocurrency?

A.    No.

Q.    Do you recall having any conversation with any of the officer managers in 2020 or 2021 about the cryptocurrency question on the tax returns?

A.    No.

Q.    If you had known about the question, would you have answered it truthfully?

A.    Of course.  I mean, it's just like, do you have a dollar or more.  If I know you are supposed to do that, you just check the box.  It is not hard to do.  You just have to know to do it.

        MR. KRAVIS:  Let's have the next slide, please.

BY MR. KRAVIS:

Q.    So we are moving forward in time here.  We have talked about the interview with Ms. Parrish, the loans the cryptocurrency.  I want to talk with you now about your interview with the IRS agents in October 2020.

    What is your understanding of what you're charged with when it comes to the October 2020 interview?

A.    We can talk about the details, but they say there are

things in there that -- I talked to them for a long time, and they said that I said things that are not true.

**Q.** Let me ask you straight up: Did you lie to the IRS in the October 2020 interview?

**A.** No.

**Q.** Where were you when you heard that the IRS was at your office?

**A.** I apparently was in Baltimore.

**Q.** Had they given you advanced notice that they were coming --

**A.** No.

**Q.** -- schedule an appointment or anything like that?

**A.** No. This is how they do this, no.

**Q.** Okay. What did you do when you got that information?

**A.** I came back -- oh, I did two things. I called Walter to say, hey, the -- there is criminal investigators from the IRS, apparently, at my office. Giving you a head's up. So I called Walter.

**Q.** What did you do after you called Walter?

**A.** Well, Walter said that they had been there, too. I'm pretty sure either he told me that right before or right after the interview. I learned that that day. But I think maybe -- I think so. And then I just went straight back -- well, I apologize. I called them -- I had multiple calls back and forth to coordinate so that they would know when I would be

there.  And I went straight to the office.

Q.    What happened with you arrived at the office?

A.    Well, I knew -- so I must have talked to Walter first because I knew what this was about.  He said that they had come to him about the disclosure of the Montenegro accounts.  So I went to my office, and I just searched for every document I could find about that.

Q.    And when you got there, what did the agents tell you about the purpose of their investigation?

A.    I don't think they were there yet.

Q.    When the agents arrived --

A.    Sure.

Q.    -- what did they tell you?

A.    They said that I was the subject of a criminal investigation that had been opened on the basis of the failure to disclose the Montenegro accounts.

Q.    And at that time, did you give the agents the documents that you printed out?

A.    I'm sure -- I can't tell you at what moment I handed them what document, but over the course of this discussion, sure.

Q.    Did you produce those documents to the agents voluntarily?

A.    Yeah.

Q.    In other words, you gave them over even before they gave you a grand jury subpoena or anything like?

A.    Yeah.  Yeah.  Yeah.

**Q.**    Why did you give the agents the documents voluntarily right off the bat?

**A.**    I mean, on every single topic -- so what happens is, this interview starts and they are like, it's been opened about Montenegro, and they start with Montenegro, you know, very early on.  They might have done general tax questions.  And so I give them all these documents, but different topics come up during the conversation.  And I just go back to my office and I just print things.

You know, there is a variety of stuff that I give them because they want to know things, so I tell them -- I answer their questions, and I go get whatever documents I can.  So we are just going back and forth and back and forth for hours.

**Q.**    How long was the interview?

**A.**    I couldn't have told you except that I know from this, that it was long.  I knew it was long, but it was something like two hours and 45 minutes.

**Q.**    You heard Agent McDonald's testimony about -- was the interview audio recorded?

**A.**    No.

**Q.**    You heard Agent McDonald's testimony about a statement about whether you had other investors.  Do you remember that?

**A.**    Yes.

**Q.**    Did you tell the IRS agents that you had never had any other investors besides in the Alec Gores game?

**A.**    No.    That would be -- I'm sorry.    No.

**Q.**    What did you tell them?

**A.**    I mean, again, look, I really promised that anybody who pretends to know exact words all years later -- all I can tell you is that I would have told them the truth.    I don't even really remember this particular question.    But if you had asked me, you know, did you have investors for this game?    Sure.    Did you have investors for other games in this period?    Sure. There is no reason to hide something like that.    Hiding -- all the investors are the same.

**Q.**    Let me just stop you there for a second.

**A.**    Yeah.    Sorry.

**Q.**    When you say "all of the investors are the same," what do you mean by that?

**A.**    Okay.    I apologize.    For the Alec Gores game, do you remember we saw the big list of people who all had shared in Alec Gores?    There is nobody that who had the share of Alec Gores, including Paul Phua, and all of those individual people.

There is not some new person for the non-Alec Gores games. It is some subset of them.    You can't hide people by saying, for others games, I didn't have investors.    You know, the only possible exception -- and they're filing documents, I suppose -- is the Napoli firm.    Again, I have everything to lose by saying I don't have investors because then the money is taxed to me.    And it is also just not true.    Like, why would I

say I didn't have investors?

Q.    Can you remind us, please, who were the investors in your games against -- the September games against Chairman in 2016 and the games you played against Tango in 2016?

A.    Paul Phua, Andrew Robl, Keith Gipson.

Q.    Were you trying to hide the names of those investors from the IRS in this interview?

A.    No.  All those people are discussed in the interview.

Q.    Did you tell the agents that your 2016 tax return was accurate?

A.    No.

Q.    What did you tell the agents about the 2016 tax return?

A.    They had pointed out that it was inaccurate, and I agreed with them.  They are the ones who told me it was inaccurate.

They said, this Montenegro thing is -- "Do you see the box checked saying you have a foreign bank account?"  And I was like, "No."  And we went through the whole reason for why that had happened.

No.  Everybody agreed that the 1040 is not -- the tax return is not right.

Q.    What did you tell the agents in the interview about how that 2016 tax return got prepared?

A.    Again, I don't know the exact words, but I would have said by Walter.

Q.    Did you tell the agents in the interview about the loans

from Mr. Phua?

**A.**   I'm sure.

**Q.**   What would you have told them?

**A.**   The truth.

**Q.**   What is the truth?

**A.**   The truth is that there were two loans that the -- you know, the -- my overall goal here -- I had other debts, but my overall goal here is I am supposed to get a loan -- Officer Parrish has told me that and has given me a piece of paper that says that.  I'm getting it from Paul Phua to pay down the taxes.  Half of it comes from wire, half of it comes in cash.

**Q.**   At the end of the interview, did the agents serve you with you some grand jury subpoenas?

**A.**   Yes.

**Q.**   Did you comply with those subpoenas?

**A.**   Yes.

**Q.**   Did your law firm and the blog receive more subpoenas over the years?

**A.**   Oh, yes.

**Q.**   Do you know how many subpoenas in total you and your entities, the entities you were affiliated with, received during the course of the investigation?

**A.**   I do not, other than it's a lot.

**Q.**   All right.  Now, while we are on the subject of this

investigation, I want to ask you about Katie Bart.

When did you hire Ms. Bart to work as an office manager at the firm?

**A.**    I think that Katie Bart starts working in maybe in '18, 2018.

**Q.**    Why did you hire her?

**A.**    I mean, you heard from her.  She's incredibly kind, incredibly earnest, you know, very thoughtful, smart.  She, you know, tries very hard to do a very good job, and she has my original background.  You know, she came from, you know, not a lot, and she didn't go to a super-fancy college and that sort of thing, and she wanted to know if she wanted to be a lawyer.

**Q.**    You heard her describe in her testimony some of the difficulties that she had while she was working at the firm?

**A.**    Yeah.

**Q.**    Did you know at the time that Ms. Bart was having those difficulties with her job?

**A.**    No.  I mean, we were -- I'm not -- until all of this happens, I'm not with her very much.  It's COVID.  We are gone. We are not even -- we are away from Washington, D.C. for a ton of this time.  And I was -- I regret that I was not aware of what she was going through.

**Q.**    If you had known what she was going through in the job, what would you have done?

**A.**    I would have helped her.  I would have tried to put her in

a better situation.

Q.   So the IRS investigators come to your office to do the interview, and I think we heard Ms. Bart testify that a day or so later, she resigned by sending a letter to all the partners of the firm.

Do you remember hearing that testimony?

A.   Yeah.

Q.   What was your reaction when you saw that Ms. Bart had sent a resignation letter to all of the partners in the firm?

A.   I mean, she said she had never quit a job.  I had never had somebody quit a job.  I felt this is a person who worked directly for me, who I feel responsible for.  I feel terrible.

I just feel -- like, somebody just ups and -- you know, if somebody, like, tells you they are having problems, having problems, and then leaves, okay, you understand.  But if somebody just turns around and says they quit, so my first reaction was to feel terrible for her, and then my second reaction is, "Oh, my God, what is this going to look like?"

Q.   What do you mean by that when you say your second reaction is, "Oh, my God, what is this going to look like?"

A.   Remember, you know, I have never -- this process is -- thank God, I've never went through this or, you know, on the personal side, anything like this.

The -- several agents of the criminal division, the criminal division of the IRS come and say, "We are looking at

you."  And in this interview, they just go through, like --
they pull up, like, huge binders of things.  They are like --
they have been looking at me.  Okay?  And they have all kinds
of questions about all kinds of things.

And the single person who is, like, most involved in all
of that is -- if you want to talk about spanning the business
side and the personal side -- is Katie.  And they have met
Katie.  Katie has sat there and watched, at least a chunk of
the interview.  The first they met was Katie.

They show up and then she quits, like, the next day.  It
looks like she thinks that, you know, I'm a tax cheat.

**Q.**  If you hadn't done anything wrong, then why did this
concern you?

**A.**  Exactly that reason.  Like, if you haven't done something
wrong and somebody else does something that makes it look like
you have done something wrong, you are really worried about
that.

The other thing is that she's the office manager.  She is
the person -- we have to respond now to gobs of subpoenas that
just keep coming over the transom.  Like, more and more and
more of them.  If somebody is going to be able to put their
hands on documents so that we can turn them over to the IRS and
show, like, this is what happened.  We have nothing to hide,
the person who is going to be able to do that for me is her.
She's been there for a while now.

So if she ups and goes, not only does it look bad, but what am I going to do without her?

MR. KRAVIS:  Can we have Government's Exhibit 497.2, please?

**BY MR. KRAVIS:**

Q.    During Ms. Bart's testimony, the jury saw some text messages that you sent to Ms. Bart on the night that she sent her resignation letter.

Do you remember these?

A.    I remember them from earlier in the trial.

Q.    I just want to ask you about one or two lines in here.

Can I direct your attention to the message on the 15th at -- it says 1808, 6:08 p.m?

A.    Yeah.

Q.    Can you just read for us what you wrote there?

A.    "Please do talk to me.  I feel literally crushed at this. You are so good at your job and such a good person.  The idea that things have pushed you to the point that you have to quit is devastating to me."

Q.    What did you mean when you wrote that?

A.    That, I kind of think it speaks for itself.

Q.    The government asked Ms. Bart about how you sent her, like, a series of messages that evening.

Can you explain why you did that?  What was going on there?

**A.**   I mean, look, I'm not going to pretend that I reach back in my head and -- I just feel bad.  I mean, I just feel bad. Like, this is a young person.  She's up and quit.  There is no warning.

This is a good human being, and she's just -- the first person that's ever quit for me, and I want to do -- I don't know what to do, but I want to do something.

**Q.**   After these text messages -- when you say you wanted to something, after these text message exchanges, did you offer some stuff to Ms. Bart?

**A.**   Yeah.  But this is -- that' a little different.  That's -- I'm not, like, trying to make up for something.

I'm trying to do two different things.  One is she's now working her butt off.  She's -- it was kind of unusual to me. She went in to work for a bakery, and she's, like, starting work at three o'clock in the morning, the bakery, going through, like, a workday and then coming to the firm.  She is exhausted, and so I am trying to do something, you know, nice for her.

The other thing is I'm trying to get her to stay as long as possible.  Like, we are hiring somebody else, but I have no idea when the subpoenas are going to start showing up.  So I -- like, if Katie Bart picks up and leaves, I am in a world of hurt in terms of being able to get, you know, tens and hundreds of thousands of documents to the IRS.

**Q.** Did Ms. Bart ever tell you at the time that these things that you were offering made her feel uncomfortable?

**A.** No.

**Q.** I want to be really clear about this.

Did you ever, ever tell Ms. Bart not to cooperate with the IRS investigation?

**A.** Tell, suggest, breathe in the direction, no. That would have been the craziest thing in the world. I'm trying to get her to stay, see more documents than she's ever been involved with, and be involved in the process of giving them to the IRS.

If you want Katie Bart to not be involved, not know things, not deal with the IRS, you would do the exact opposite. You would be like, "Okay. Bye."

**Q.** Did you ever, ever say or even suggest to Ms. Bart that you were offering her stuff to try to get her not to cooperate with the IRS investigation?

**A.** No, of course not.

**MR. KRAVIS:** Can we have the next slide, please?

**BY MR. KRAVIS:**

**Q.** I want to talk with you about these misclassified transactions.

What is your understanding of what you are charged with here?

**A.** So as everybody knows, I pay -- the law firm bank account is my bank account because it's my business. There are times

when I send money out of the law firm bank account for my expenses, my personal expenses.  That's all -- everybody agrees that's fine.

But if I willfully caused those to be treated as business expenses, if I intentionally break the law by cheating on my taxes by having them treated as business expenses, then that's a tax crime.  That's what I'm charged with here.  It's not the spending the money, but how I supposedly caused them to be treated as business expenses.

Q.   Was your understanding that if you are making a personal payment from the law firm bank account, that that is automatically necessarily going to be treated as a business expense?

A.   No, of course not.  There are probably thousands of times over the course of the law firm, and many hundreds of times during the course of all these events, where stuff goes out of the law firm bank account and it's treated as personal distribution and it's taxed correctly.

Q.   What was your understanding of how that was supposed to work?

A.   It could work in a couple of different ways.  I guess I can think of three, maybe.  One is sometimes I would say, "Please send this from the firm.  It's a personal distribution."  The second could be I could say, "Please send this from the firm," and the office manager, from other

experience, would argue, "No.  This person is somebody that we're" -- or it could be just be obvious, pay some personal expense.  And the third is, if neither of the first two, they would come back and ask me if there is some question.

**Q.**    Let me just ask you, plain and simple, for the transactions we have been talking about here, the ones that are charged in this case, did you intentionally mischaracterize those transactions as business expenses?

**A.**    No.  We're talking about these six from the thousands?  No.

**Q.**    Did you ever tell the accountants that these payments were business expenses?

**A.**    No.

**Q.**    Did you ever tell an office manager to tell the accountants that they were business expenses?

**A.**    No.

**Q.**    Let me show you Defense Exhibit 342.

            **THE COURT:**  Counsel, if we can come to the headset for just a moment before we do that.

    (Whereupon, a discussion was held outside the presence of the jury.)

            **THE COURT:**  Mr. Goldstein, can you hear us?

    Mr. Kravis?  Mr. Beaty?

    We are at eleven o'clock.  I would like to give the jury a break at some point.

Is now good?

MR. KRAVIS:  This is fine.

THE COURT:  Why don't we break, and then we will come back and do the rest?

(Whereupon, discussion concluded.)

THE COURT:  Members of the jury, I'm going to suggest that we take your morning break at this time.

Please rise for the jury.

(Whereupon, the jury exited the courtroom at 11:00 a.m.)

THE COURT:  Please be seated, everyone.

Mr. Goldstein, if you want to step down from the witness stand and take a break, you are welcome to do so at this time as well.

Counsel, before we take a brief break, about how long on direct, Mr. Kravis?

MR. KRAVIS:  Your Honor, I know I am a little beyond the estimate I gave the Court yesterday.  I expect to be done with the direct by the lunch hour.

THE COURT:  All right.  So we will come back and have the rest of the direct and hopefully break for lunch, and then we can get ready for cross after the lunch break.

Let's take five minutes.

MR. BEATY:  Thank you, Your Honor.

THE COURT:  Thank you, Your Honor.

(Whereupon, a recess was taken from 11:01 until 11:11 a.m.)

**DEPUTY CLERK:**  All rise.  This Honorable Court now resumes in session.

**THE COURT:**  Please be seated, everyone.  Are we ready to have the jury rejoin us?

**MR. KRAVIS:**  Yes, Your Honor.

**THE COURT:**  Okay.

Please rise for the jury.

(Whereupon, the jury entered the courtroom at 11:13 a.m.)

**THE COURT:**  Please be seated.  Mr. Kravis?

**MR. KRAVIS:**  Thank you, Your Honor.

Could we have Defense Exhibit 342, please?

**BY MR. KRAVIS:**

**Q.**   Mr. Goldstein, is this an e-mail exchange between you and Andrew Hamm?

**A.**   Yeah.

**Q.**   And just remind us, who is Andrew Hamm?

**A.**   He was the office manager before the folks who have come in -- he's the office manager around this time in 2014 to '16-ish.

**MR. BEATY:**  Objection, Your Honor.

**THE COURT:**  Let's come to the headsets, please.

**MR. BEATY:**  Take that down, please.

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:**  Mr. Goldstein, can you hear us?

Mr. Goldstein, can you hear us?  Okay.

Mr. Kravis?

**MR. KRAVIS:**  Yes, Your Honor.

**THE COURT:**  Mr. Beaty?

**MR. BEATY:**  Yes.

**THE COURT:**  Okay.  Please go ahead.

**MR. BEATY:**  Thank you, Your Honor.  Again, we are objecting to the hearsay.  This is an out-of-court statement that Mr. Goldstein -- in which Mr. Goldstein tells Mr. Hamm, quote, we always play by the rules.  He is clearly offering it for the matter -- the truth of the matter asserted and no other basis.  There is no other appropriate basis for this.

**THE COURT:**  Okay.  Can I see the exhibit on my screen so I can see exactly what we're talking about?  Can we clear the screen?  I think there is some red blots on it.  Where am I looking?

**MR. BEATY:**  The second message down, it's unfortunate, but we always play completely by the rules.  This -- there's no other basis for this now.

**THE COURT:**  I see it.  Mr. Kravis, how are we using the e-mail?

**MR. KRAVIS:**  Your Honor already ruled on this issue at the motion in limine state.  The Court may recall that the government moved in limine to exclude evidence that Mr. Goldstein, on other occasions, properly characterized

personal expenses.  The Court denied that motion.  And the basis for the Court's ruling was that it's just not fair to cherry-pick out a few examples of mischaracterized transactions without presenting the jury the full context of the correctly characterized transactions.

Again, the Court already ruled on this.  That's what is happening in this e-mail.  As you can see, if you start where I'm going to start, at 3:25 p.m. Mr. Hamm writes, "Our accountant called to confirm that all the payments are meant to be personal distributions."

And then further up, Mr. Goldstein says, "Yes.  These are personal distributions."

And then Mr. Hamm writes, "The accountants want to make sure you understand that by classifying them as personal distributions, you are going to take a tax hit."

And Mr. Goldstein says, "Yes.  I understand, but we play by the rules."

This is within the scope of what the Court already ruled as coming in.  This is an example.

**THE COURT:**  All right.  I thought I heard a hearsay objection or did I misunderstand --

**MR. BEATY:**  It is, in fact, hearsay.

**THE COURT:**  All right.  So how are we getting around the hearsay issue?  It's beyond relevance.

**MR. KRAVIS:**  Well, Your Honor, it's not hearsay

because it's not being offered to prove the truth of the matter asserted.  It does not matter whether -- for these purposes, whether the transactions are personal or not.  It's relevant to Mr. Goldstein's state of mind.

The fact that he is characterizing transactions as personal distributions is relevant to his state of mind about willfulness and correctly or incorrectly characterizing distributions.  There is no --

**THE COURT:**  So "we always play by the rules," that's not being offered for the truth of the matter asserted?

**MR. KRAVIS:**  It's being offered for his state of mind with respect to this communication about characterizing transactions as personal distributions even when he is told that there are tax consequences for him.

**THE COURT:**  Mr. Beaty?

**MR. BEATY:**  Your Honor, it's clearly not being offered for that, and they can make this up.  He is on the stand.  He can say what his mental state is.  He does not need the document to do it.  All of this is, is improper bolstering with an out-of-court statement.

**THE COURT:**  All right.  The witness can certainly testify to this and say that's what he said.  At this point, I'm not letting the document come in.  I may revisit it later.

Mr. Kravis?

(Whereupon, discussion concluded.)

**MR. KRAVIS:**  Let me move to Government's Exhibit 430, and we can have page 2 of Government's Exhibit 430.

**BY MR. KRAVIS:**

**Q.**  Now, Mr. Goldstein, what is your understanding of what is on page 2 of Government's Exhibit 430?

**A.**  I'm looking at page 2?

**Q.**  Yes.

**A.**  These are what we call the six charged transactions.

**Q.**  So --

**A.**  From -- from 2016.

**Q.**  And what is your understanding about what the charge or allegation is with respect to these transactions?

**A.**  So each one of these is a wire that went from the Goldstein & Russell law firm account.  It was for me.  It was not for the law firm.  Therefore, it is not something that can be put on the law firm's list of deductible expenses.  And if I willfully did that to cheat on my taxes, then that's a crime.

**Q.**  Are these six transactions the only time in the history of the firm when you ever paid personal expenses from the firm bank account?

**A.**  No.  It's probably one percent of the time.

**Q.**  And in all of the -- the other times, are any of those charged in this case?  We will get to 2017 and 2019 in a moment.

**A.**  So there is one in '17 and one in '19, but across that

whole span of time, there is this and then those two.

Q.   Okay.  Setting aside these particular charged transactions for a moment, in the past, with respect to other transactions, did you consistently tell the firm office managers to treat personal payments to you as personal distributions?

A.   Sure.  This has come up through the entire history of the law firm.  This has always been my money in the firm bank account, and there are reasons that you would need to wire from the firm account.  So, sure, this is a recurring question.

Q.   Did you specifically tell the firm office managers to play by the rules, even knowing that there were tax consequences to you, for treating personal payments as distributions rather than business expenses?

A.   Yes.  There's a -- in fact, there is a specific exchange to that effect involving the office manager and the tax preparer.

Q.   So just to be clear, what is your understanding of how these transactions were supposed to get classified by GRF and then for -- for purposes of keeping the books firms and records?

A.   Yeah.  There is no problem with it coming out of the law firm bank account.  There is a second stage that happens later when you do your taxes.  These things have to be coded correctly if the taxes are going to be right.  And they have to be coded as personal expense, and then they will be treated as

income.

Q.    And in terms of it being coded, to your knowledge, did anyone at Goldstein & Russell have access to the QuickBook files where these transactions were being coded?

A.    Definitely not.

Q.    Did you, yourself, ever look at the QuickBook files kept by GRF?

A.    Before the trial?

Q.    I'm sorry.  Before this --

A.    Before the case, no.  In this time, no.

Q.    Did anyone from GRF ever ask to sit down with you to go over the classification of the records?

A.    No.  I mean, literally, the first time that -- I didn't even understand these documents, you know, until well into the preparation for trial.

Q.    And then when GRF had questions about how to classify transactions, would they come directly to you?

A.    No.  There is one time that we have seen where they were having a problem with one of the office managers.  And I think that's the only time in the history of the firm where they, like, just, like, jump over the office manager and they came to me and say, look, what's the answer?

Q.    If the firm office -- and so who would GRF go to if not --

A.    The office manager.

Q.    And if the office managers came to you with questions

about classifying transactions, would you answer them?

**A.** Sure. This almost always happened -- you wouldn't have to guess. It almost always happened in writing.

**Q.** Would you answer those questions honestly?

**A.** Sure.

**Q.** Did you tell the office managers to misclassify personal payments as business expenses?

**A.** Never.

**MR. KRAVIS:** Okay. Now, I want to go back -- can we have slide 26, please?

**BY MR. KRAVIS:**

**Q.** So we have seen the wires, but I don't think we have actually seen the communications themselves. Mr. Goldstein, what is it that's on slide 26?

**A.** Okay. So you have taken your earlier slide, which was six transactions from 2016, so these are the six things that went from the firm bank account and were miscoded in the QuickBook files. And now you have taken here, and you've put them all on here. And in "instruction," which is the further column, you have listed what I see -- just to be sure. Yes. You have listed what I -- literally, all the words that I said to the office manager to make that happen.

**Q.** In any of these communications, did you ever tell the office manager, classify this as a business expense?

**A.** No. This is the kind of communication that happened

hundreds and hundreds and hundreds and hundreds of times. It is just that this is -- these are the ones where a mistake was made. This is me saying, wire it the firm. Nobody thinks that's illegal or something like that.

Wire it -- it's saying from the firm account. And, no, none of them say -- I mean, I just happen to know these communications. None of them say, look, treat this as a deductible business expense.

**Q.** And did -- in any of these communications, do you tell the office manager, go tell GRF to put in the QuickBook files that these are legal fees or something like that?

**A.** No.

**MR. KRAVIS:** At this time, the defense moves into evidence the exhibits cited here, 310, 302, 803, 301 and 311.

**THE COURT:** Is there any objection?

**MR. BEATY:** No objection.

**THE COURT:** So admitted.

**MR. KRAVIS:** Can we have the next slide, please?

**BY MR. KRAVIS:**

**Q.** Mr. Goldstein, what are we looking at here?

**A.** So we had said that there were -- again, from this whole span, there are the six and then there is one that happens in late '17 and one that happens in early '19. These are the '17 and '19 examples.

**Q.** Here again, did you -- are these your instructions to the

office manager about these transactions?

**A.**    Yeah.

**Q.**    In these communications, did you say anything about classifying the payment as business expenses?

**A.**    No.  I mean, I didn't even say where the money should come from --

**Q.**    Did you --

**A.**    -- but, no.

**Q.**    Did you tell the office managers to tell GRF to code these as legal fees or business expenses in the QuickBooks ledger?

**A.**    No.

          **MR. KRAVIS:**  At this time, the defense moves in Exhibits 537 and 321.

          **MR. BEATY:**  No objection, Your Honor.  Thank you.

          **THE COURT:**  So admitted.

**BY MR. KRAVIS:**

**Q.**    Did you see any e-mail or text message in this trial where anyone from GRF asked you about these transactions?

**A.**    No.

**Q.**    Did you see any e-mail or text message in this trial where any office manager asked you about the classification of these transactions?

**A.**    No.

**Q.**    And are these the only payments you have made to these particular people in the time period that we are talking about?

**A.**    No.

**Q.**    We have a summary witness that's going to talk about some of these communications.

        **MR. KRAVIS:**    But for now, I'm going to show you Government's Exhibit 493.

    Can we start with the bottom e-mail?  It's going to be at the end of the document.

    Yeah.

**BY MR. KRAVIS:**

**Q.**    Okay.  Mr. Goldstein, what is Ms. Bart asking you for here?

**A.**    So this is from Katie Bart in early 2020.  Katie at the time is the office manager.

    Firm tax prep info.  Do you have e-mails or phone contact information for Vivek Rajkumar, who is here, Stewart and Lynda Resnick, Craig Cooper works for them, Charles Hook and Jeffrey Flynn.  I need their addresses and FEIN.  So that's federal employee identity number, I learned later, and SSN.  So that's the -- it's, like, the business and Social Security number, and SSN is Social Security number.  Info for 1099s.

    So we keep hearing about these tax documents.  She wants to -- she wants it to prepare our tax documents.

**Q.**    Are Stewart and Lynda Resnick the people who received two of the payments that you are charged from 2016?

**A.**    Yes.

Q.   Can we look up to your response?

Ms. Bart asks you again, and then what do you say right above it?

A.   "Vivek is repaying a loan.  There should be inbound money from him, and the Resnicks are personal distributions.  I don't recognize the other names."

Q.   What do you mean when you say the Resnicks are personal distributions?

A.   So this is a time where somebody asks me -- this time, unlike the other times -- they ask me, like, what are these -- what is this Stewart Resnick one, and I say it's for me.  It's personal.

Q.   Did you understand, when you said the Resnicks are personal distributions, that means you are going to end up paying more in taxes as a result?

A.   Yeah, of course.  She's asking me about 1099s.  This is a question about taxes, and she's asking, "What is this?"  And I say it's personal.

MR. KRAVIS:  We can take this down.

BY MR. KRAVIS:

Q.   We saw some e-mails where Ms. Runkle is sending you some spreadsheets that reference some of the transactions from 2016.

Do you remember that?

A.   Yeah.  So now a different office manager, back in 2016 itself.  Yes.

**MR. KRAVIS:**  Can we have Government's Exhibit 18, please?  Can we go to the -- no.  First page.  Bottom of the first page.

**BY MR. KRAVIS:**

**Q.**   Mr. Goldstein, I'm going to direct your attention to your e-mail on December 21, 2016 at 5:19 p.m.  In the third sentence, what are you asking Ms. Runkle to do?

**A.**   I'm now starting to think about this list of wires, I guess.  So I ask her to send me something in the third line.  Asking her to send me, "How much we sent in wires 40K or more to individuals like Dan Bilzerian."

**Q.**   And when you said you are starting to think about the wires, are you talking about the wires document from 2016 that we discussed yesterday?

**A.**   Yeah.  The one that's in late '16 is the first version, and then -- in early '17, and then October '17 is the second version.

**Q.**   What did you mean by "individuals like Dan Bilzerian"?

**A.**   Poker players.  From conversations with us, she must know who those are.  She must know that I'm asking for the poker players.

**MR. KRAVIS:**  Can we go up to Ms. Runkle's e-mail at the top?

**BY MR. KRAVIS:**

**Q.**   Did Ms. Runkle, in fact, end up sending you a couple of

spreadsheets, actually?

**A.**    Yes.

**Q.**    Do you see that one is labeled wires from Wells and Bilzerian, et cetera, 2016, and the other is labeled G & R wires?

**A.**    Yes.

**Q.**    Based on the e-mail from Ms. Runkle, what was your understanding about what these two documents were?

**A.**    Well, she says that there are two things here.  "Attached are all the Bilzerian people."  So I've asked her for this.

"I've attached all the Bilzerian people, all the times you told me to wire the Wells account from the firm, approximate dates, and the three times the firm received money from you. Whether those came from your personal or Wells, I can't tell. Let me know if you think I've missed anything here."

So she's answered that question, and then she says also, "I've also attached a general breakdown of firm wires this year from Jill."

**Q.**    Of these two spreadsheets that Ms. Runkle sent you, which of them was the one that you had actually asked for?

**A.**    The first one, the one that says Bilzerian.

**Q.**    Which of these two spreadsheets did you use when you were putting together the wires document we looked at yesterday?

**A.**    Okay.  Look, this is -- maybe it would be very convenient for me to just say, "I don't know."  Look, I -- this is -- I

can tell you what I can infer from what happened here, and that is I either used neither of them -- because I was also gathering the bank statements. There is lots of stuff that is not on either of these. The -- I either used just the bank statements, or if I used one of them, I used the first one.

MR. KRAVIS: Can we go to the next slide, please? Yeah. The next slide.

BY MR. KRAVIS:

Q. Mr. Goldstein, have you had an opportunity, going back now in connection with this case, to compare some of the entries that appear in the wires document with the wires from Wells and Bilzerian, and also with the other spreadsheet Ms. Runkle sent you, the G & R wires entry? Have you had a chance to do that?

A. Yeah.

Q. So what are we looking at here?

A. Let me just give context. We are looking at the same thing in -- from three different places. The first place we are looking at is from the wires tracker document that I use, and everybody agrees I used as I was coming up with what my gambling wins and losses were. The second is the document that I asked for from her. Okay? And the third is the other document that they attached.

You know, we think the second document is important. The government thinks the third document is important. So it said, we are trying to figure out, hey, the document that I created

-- if it came from one of these other two that she was sending to me, which one was it?

So this is the same entry in three different places.

Q.    Now, which of the entries is the one that actually appears in your wires document?

A.    The first one.

Q.    And the second entry, where does that one come from?

A.    From the spreadsheet that I asked for.

Q.    And the third one, where does that come from?

A.    That comes from the other one that she attached -- in addition.  She attached them both.

Q.    Just to state the obvious, if you had been looking at the one that is G & R wires, what would you have put as the date on your wires document?

A.    4/30/2016.

Q.    What did you actually put?

A.    I put 5/5/2016.

Q.    Let's look at the next slide.  Is this one the same idea?

A.    Yep.

Q.    And what is the date on the G & R wires entry?

A.    The G & R wires lists that as July 31, 2016.

Q.    The wires from Wells and Bilzerian, what is that?

A.    July 6.

Q.    And which one does your wires tracker have?

A.    July 6.

Q.   Let's just do one more.  Which one is the G & R wires entry?

A.   So this is Al, who is here.  The G & R wires entry, the other one that she sent, says July 31.

Q.   Which one, wires from Wells and Bilzerian?

A.   July 6.

Q.   And which one actually appears in the wires tracker?

A.   July 6.

Q.   Now, I want to explain why I'm asking you these questions. Take a look at --

MR. KRAVIS:  Can we have Government's Exhibit 557, the wires from Wells and Bilzerian?

BY MR. KRAVIS:

Q.   Is this the spreadsheet that you believe that you actually consulted, as one source among others, in putting together the wires document?

A.   I mean, I wouldn't recognize this document, except I know it from the case.  This is -- I happen to know is the wires from Bilzerian people.

Q.   Is there anything in this document about legal fees?

A.   No.  It says where it's from, the account that it's from.

Q.   Now, let's take a look at the other spreadsheet Ms. Runkle sent you that you didn't ask for, GX 556, G & R wires.

Do you see that there is a tab on this spreadsheet that is labeled as legal fees?

**A.** Sure.

**Q.** Do you see that there are dates and wires in the legal fees tab?

**A.** Sure.

**Q.** Is this the section that we were looking at where the dates here do not line up with the dates in your wires document?

**A.** Yes.

**Q.** Is this the one that you believe you did not look at, since the dates don't line up?

**A.** Yeah. I mean, I just wouldn't -- it just doesn't make sense. If I'm using this document, I would put in the information from this document.

**Q.** In any event, if we go back to the e-mail, Government's Exhibit 18, in that e-mail, did Ms. Runkle say anything to you about the classification of these transactions for purposes of G & R's accounting or taxes or anything like that?

**A.** No. She just says it's a list of firm wires. It's not that, like -- it is a list of firm wires, and here are things that went from the law firm account that are coded as business rather than personal or anything like that. She just says this is a list of wires.

**Q.** Do you recall Ms. Runkle asking you at any time about the classification of these particular payments for accounting or tax purposes?

**A.**   No.   And it's all by e-mail.

          **MR. KRAVIS:**   Okay.   We can take this down.

**BY MR. KRAVIS:**

**Q.**   One of the people who is a recipient of the payments we have been talking about is Chuck Pacheco.   I want to ask you about one aspect of his testimony.

          **MR. KRAVIS:**   Can we have Government's Exhibit 314?

**BY MR. KRAVIS:**

**Q.**   Do you remember when Mr. Pacheco testified the government showed him this exhibit about disappearing messages?   Do you remember that?

**A.**   Yes.

**Q.**   Can you please explain what is actually going on here?

**A.**   So, as I -- do you want me to describe the document or what I understand the whole thing is?   Do you want me to just describe this document?

**Q.**   Let's start with the document.

**A.**   So this is -- I recognize and I remember from the testimony -- this is a WhatsApp chat.   It must be from his phone, and I'm that guy, Thomas Goldstein.

     It says, on January 11 -- this chat would have been started then because it uses a default timer, and then Mr. Goldstein updated the message timer.   New messages will disappear from the chat 24 hours.   It's saying that on my phone, it is set to disappear.

**Q.**    Okay.  When you did this, did you erase or delete any prior messages with Mr. Pacheco?

**A.**    No.  That's what was frustrating, because the questioning -- can I just give the context?

**Q.**    Sure.

**A.**    The question to him was, "Hey, did you have a bunch of messages in the past?"  And then, "Did Mr. Goldstein change the setting?"

This setting can only go forwards.  It cannot go backwards.  I cannot go delete WhatsApp messages from Chuck Pacheco's phone.  Like, the impression that's left is I sent this, and that caused, like, the messages -- as he referred to.

I don't have that power.  This is talking about new messages will disappear.  It's talking about what will happen in the future.  And there weren't any other messages.  I have not been able to talk to a huge percentage of the people in my life for an entire because of the restrictions that are put on me.  I haven't -- I don't have any communications with Chuck Pacheco.

**Q.**    Did you go back and delete old messages between you and Chuck Pacheco?

**A.**    No.

        **MR. KRAVIS:**  We can take this down.

**BY MR. KRAVIS:**

**Q.**    One of the transactions in 2017 was a payment to the

Napoli firm.  I want to ask you briefly about that.

MR. KRAVIS:  Can we have Defense Exhibit 532?

BY MR. KRAVIS:

Q.   Okay.  I want to direct your attention, Mr. Goldstein, to the e-mail at the bottom.  You write to Mr. Levitan, "Please wire 175K to Napoli Bern.  We have sent them money recently." Do you see that?

A.   Yes.

Q.   What are you asking Mr. Levitan to do there?

A.   This is that transaction.  I say, "Send the money to Napoli Bern."

Q.   To be clear, in this e-mail, do you tell Mr. Levitan, make sure that this is classified as a business expense?

A.   I don't tell him where to send it from, and I don't tell him how to classify it.

Q.   Do you even tell Mr. Levitan which bank account to use?

A.   No.

Q.   Okay.  Let me direct your attention to that second sentence, "We've sent them money recently."  Do you see that?

A.   Yes.

Q.   Was there another transaction earlier in this year that also involved the Napoli firm?

A.   Yeah.

Q.   Let me show you Government's Exhibit 153.  I'm going to direct your attention to your e-mail.  This is from a few

months earlier.  It's about seven months earlier.  What is happening here?

**A.**    This is from me to somebody at Wells Fargo.  This is a time when I'm sending the instructions, because I'm sending it from the personal Wells Fargo.  So I'm sending them profits -- profits from the game against -- for them to Napoli.

**Q.**    Where is this payment coming from?

**A.**    From my personal account.

**Q.**    So looking at these two messages, is it possible that when you -- well, let me just be clear.  Is Mr. Levitan on this particular e-mail from April 2017?

**A.**    No.  I apologize for interrupting.  I need to stop doing that.  No.  This is me telling Wells to send the wire.

**Q.**    Okay.  Looking at these two messages together, do you think it's possible that when you said to Mr. Levitan, "We've sent them money recently," you were referencing this earlier wire and you just kind of forgot that it wasn't Levitan who did the wire?

**A.**    That's, obviously, what is happening because why would I refer to a prior wire?  I know that we had sent them money.  I, of course, was treating it as personal.  I now -- there must be either -- the money must be sitting in the firm account or something like that.  So I say, "Just send them the money.  We have done this before."  So I don't even tell him to do it from the firm account.  I have it in mind that this is going to be

personal.  I'm referencing a personal wire.

MR. KRAVIS:  Okay.  We can take this down.

BY MR. KRAVIS:

Q.    I want to ask you about one more the jury heard about. It's not actually charged, but it came up.  It's the payments to a fellow named Mike McGuiness in 2020.  Do you remember that?

A.    Yes.

Q.    All right.  Let's start by taking a look at Government's Exhibit 497.1.

A.    Yeah.

MR. KRAVIS:  And if we look at -- go to the next page, please.

BY MR. KRAVIS:

Q.    If we look at the bottom there, your message on October 26, 2020, do you see that?

A.    Yep.

Q.    What was your instruction to Ms. Bart about how to characterize the payments to Mr. McGuiness?

A.    As a personal distribution.

Q.    All right.  Now, let's go back and look at what you originally told Ms. Bart about the payment.

MR. KRAVIS:  Can we have government's Exhibit 17.2?

BY MR. KRAVIS:

Q.    Do you see where it says, "Please wire 100K from the firm

for the firm to Mike McGuiness"?

**A.**    Yeah.

**Q.**    Do you recall why you were wiring Mr. McGuiness money in June of 2020?

**A.**    Yeah.  There is, in this time, a game involving -- so this is COVID.  There is a game that I am managing for a bunch of people, including Mike McGuiness, including me, including a bunch of other people that is being played online.  And I have been designated as the person who will handle all of the finances for everybody sending money in or out.

**Q.**    And why did you say "for the firm" here?

**A.**    Because I -- I have it in mind that the firm will be responsible for doing this.  That will let the office manager keep an account of all of this.  The idea is -- I think it's just like writing these days, is I can just put this in somebody else's hand and they will be able to deal with it.

I mean, this is all just -- you know, I expect -- again, I don't remember this particular instruction, but this is, I think, what it is that I'm talking about, is that they will just handle this responsibility.  And then at the end, we will make sure that all of the money goes in from everybody and everybody's out money will be tax neutral.

            **MR. KRAVIS:**  All right.  Can we look at Defense Exhibit 802?  And starting on the second page.

**BY MR. KRAVIS:**

Q.   Mr. Goldstein, I'm not going to walk you through all of this, but just briefly, is this a text message exchange with you and Mr. McGuiness and some other folks about the setup that you were describing?

A.   Yeah.  This is a -- this is me taking responsibility for being the person who will do all of the ins, all of the outs. And, you know, we have to pay fees online and everything like that.  So I just say, I will handle this for everyone.  It's an incredibly detailed set of responsibilities.

Q.   Okay.  Did this end up going anywhere?

A.   No.  This, as sometimes happens -- you know, we end up -- some of the shutdowns end up stopping and that sort of thing. I end up losing, actually, to Mike instead, rather than it being -- kind of thing.

So this -- this idea exists for a while.  There are other messages like this, where I'm taking this responsibility.  But, no, this is, like, 9/27.  The other thing happens, like, ten days later or something like that.  But this ends up going away.

Q.   So then, if we go back to Government's Exhibit 497.1, why did you end up telling Ms. Bart in the end to classify the payment as a distribution?

A.   Because now, when I'm not -- the firm isn't going to do this.  It is a personal distribution.  I end up losing that money in gambling.  So I make sure she knows, don't keep it --

it should not be a firm thing.  Make sure that it's personal.

Q.   Now, I think the government suggested in their questioning of Ms. Bart that all of this happened because of the IRS investigation.  Looking at these messages, why, in fact, are you and Ms. Bart communicating about the classification of these payments in October of 2020?

A.   There is two different things going on -- or a bunch of different things going on.  We are applying for COVID forgiveness.  And it's important that in doing COVID forgiveness, you have to have -- it's very -- you know, what is -- how much money has -- I don't know if anybody remembers this or was involved at the time.  You could only take so much money out of your business and still qualify for the loan and the forgiveness on it.

So I'm telling her how to do this.  Let me also be very clear about one thing.  I'm not going to be kid here.  I also know that in this time, we had better be -- check every, you know, thing, do everything right.  And so the IRS had not shown up -- I'm not that I am aware that the IRS around, but the process here is a different one, the COVID one, and I want to make sure that it's done correctly.  This seems like you are doomed if you do and doomed if you don't.  Like, you try and do something right, you are charged with a crime.  You don't do something, you are charged with a crime.

Q.   And just directing your attention to Ms. Bart's message at

3:02 p.m., when she says, "Just wondering because I'm trying to do our forgiveness app." Is that the application process you were talking about?

A.   Yeah.  Absolutely.

MR. KRAVIS:  Okay.  Can we have the next slide, please?

BY MR. KRAVIS:

Q.   Mr. Goldstein, you are aware that the government's allegations about the redirected income?

A.   Yes.

Q.   What is your understanding of what you are charged with here?

A.   There are three times where, for poker-related reasons, that I needed to get people paid.  I tell people expressly, hey, you owe the law firm money.  Don't send it to the law firm.  Either send it to somebody else directly for poker related, or send it to me and then I turn around and send it directly or -- or I just tell them to keep it.  Those are the three times.

Q.   So just to be clear, is it your understanding -- was it your understanding that you were allowed to do that, in other words, direct the income to another source?

A.   Yes.  There's no question I could do that.

Q.   Okay.  So what is your understanding of what you're charged --

**A.** Oh, yeah. Yeah.

**Q.** -- with here as a crime?

**A.** But -- but -- but -- but if I do that intending that the income will not show up on the taxes, then that could be willful tax evasion.

**Q.** So let me just ask you directly, when you asked for those three payments to be sent to those other sources, were you trying to hide law firm income?

**A.** No.

**Q.** But if the income is being paid to some other source besides the firm bank account, then how are the accountants supposed to know about that?

**A.** Because the people who are sending the money are required, by law, to send that information --

**MR. BEATY:** Objection, Your Honor.

**THE COURT:** Let's come to the headsets.

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:** Mr. Goldstein, can you hear us? Mr. Kravis?

**MR. KRAVIS:** Yes, Your Honor.

**THE COURT:** Mr. Beaty, I think I know what you are going to say, but go ahead.

**MR. BEATY:** Okay. Well, I'm sure you are going to read my mind.

THE COURT:  A little louder.

MR. BEATY:  As experienced an attorney as Mr. Goldstein is, he should not be lecturing the jury on the law.  That is the Court's province only.  We will submit a jury instruction about who has to issue Forms 1099 and when.  We don't need to hear from Mr. Goldstein.

THE COURT:  Mr. Kravis?

MR. KRAVIS:  Your Honor, this is testimony about Mr. Goldstein's state of mind.  If his state of mind was that the law required it, then that is directly relevant here.

THE COURT:  Then he needs to say that's what he believed or he understood.  He can't just declare, this is what the law is.

MR. KRAVIS:  Okay.  I mean, I thought I asked him what his understanding was, but I can clarify.

THE COURT:  Well, he needs to make that also clear in his response because he's speaking for a length of time in his responses.

MR. KRAVIS:  Okay.  All right.

THE COURT:  All right.  Thank you.

(Whereupon, discussion concluded.)

BY MR. KRAVIS:

Q.   All right.  Mr. Goldstein, just to be clear, what was your understanding about how the accountants were supposed to know about these payments that are not going directly to the firm

bank account?

**A.**    I apologize.  This is my fault.  My understanding, including my understanding at the time, is that when they sent the money to my personal account, they had to do other things, too.  They had to send a Form 1099, which is the official tax form.  They had to send that to the IRS so the IRS would know about the income.  They would have to send that same 1099 to the law firm and would it go to GRF and it would be on the taxes.

**Q.**    Let me show you an example.

       **MR. KRAVIS:**  Can we have, please, Government's Exhibit 217?

**BY MR. KRAVIS:**

**Q.**    And directing your attention to the bottom e-mail, Mr. Goldstein, you write to Mr. Robbins --

       **MR. KRAVIS:**  I'm sorry.  Can we go to the second page?  There it is.

**BY MR. KRAVIS:**

**Q.**    Mr. Goldstein, in this e-mail on February 1, 2017, did you ask Mr. Robbins to send some legal fee payments directly to your personal bank account?

**A.**    Yes.

**Q.**    Why did you do that?

**A.**    Because I needed to be able to send the money out directly for poker.

Q.   And what was your understanding of how the accountants were supposed to know about this payment?

A.   There would be an official tax document with all of this money, including the money that went to my personal account. It would be sent to the law firm.  It had to be sent to the law firm.  The law firm process is that it would go to GRF.  GRF collects them.  They do my taxes, and it would be on the taxes.

MR. KRAVIS:  Let's look at Defense Exhibit 226.

BY MR. KRAVIS:

Q.   Is this an example of the 1099 that you had in mind?

A.   This is an example of 1099, yes.  And the 1099 -- but -- can I actually ask for something?  Can I just -- can I see this and the -- the GX 1 just to explain.

MR. KRAVIS:  Can we have this document and GX 1 split screen?

BY MR. KRAVIS:

Q.   Mr. Goldstein, what is it you wanted to explain about the two documents side by side?

A.   These are both 1099s.  This is the one the government started with.  My understanding is that not giving the 1099 -- you know, getting this to the accountants is supposed to be the crime.  And over here, I understand that relying on the 1099 is supposed to be the crime.

These are just tax documents.  They show the account.  I told Walter about all the income in the first one.  And then in

the second one, this is the one that they're required -- my understanding, I apologize.  My understanding is that -- and it did happen -- is that this would go to the law firm and it would be counted on the taxes.

Q.    And was it your understanding that the other clients -- I just showed you Robbins Geller -- your understanding the other clients here, Napoli Shkolnik and Tobey Maguire, would also be under the same requirements?

A.    Yes.

Q.    We heard some testimony from Mr. Deyhle, and I think we saw an exhibit, that he did not even look at the Forms 1099 for tax purposes.

      Do you remember hearing that?

A.    We -- yes, we did.  There was an e-mail --

      MR. KRAVIS:   Can we have Defense Exhibit 252?

      Could we zoom in on the Ian Shuman e-mail to Angie Gou, "Hi, Angie.  I talked to Walter"?

BY MR. KRAVIS:

Q.    At the time of the payments from Robbins Geller, Napoli Shkolnik, and Mr. Maguire, did you know that GRF was not even looking at the Forms 1099 for tax purposes?

A.    No, I -- well, no.  And I knew the opposite, that we would send -- we sent all the tax documents off.

Q.    And there was testimony from Mr. Deyhle and Mr. Shuman about the concept of cash-basis accounting.

Do you remember all of that?

**A.** Sure.

**Q.** Before this case and this trial, did you know any of that about the details of cash-basis accounting and how it was applied to Goldstein & Russell?

**A.** God, no.

**Q.** I think we saw some e-mails earlier in the trial about Napoli Shkolnik and how they were treating this.

**MR. KRAVIS:** Could we have Defense Exhibit 557, please?

MR. MENDOZA: 547?

**MR. KRAVIS:** 5-5-7.

**BY MR. KRAVIS:**

**Q.** Do you remember seeing --

**MR. KRAVIS:** 557. Defense Exhibit 557, no?

**BY MR. KRAVIS:**

**Q.** Do you remember seeing this e-mail exchange earlier in the trial about Napoli Shkolnik not sending 1099s to Goldstein & Russell?

**A.** Yes.

**Q.** At the time that all this was happening in -- the time of the payment in 2017, did you know that Mr. Napoli's firm was not, in fact, sending Forms 1099 to Goldstein & Russell and the IRS?

**A.** No.

MR. KRAVIS:  We can take this down.

BY MR. KRAVIS:

Q.    Do you remember some legal work you did for Mr. Maguire?

A.    Yeah.

Q.    How did you ask Mr. Maguire to pay you for that work?

A.    It's -- we are all a big family now.  I had him pay the debt to Bob Safai.

Q.    Were you trying to hide income doing it that way?

A.    No.

Q.    How did you think the accountants would know about the payments?

A.    The same way.

MR. KRAVIS:  Can we have Defense Exhibit 791?

BY MR. KRAVIS:

Q.    Mr. Goldstein --

MR. KRAVIS:  The second page.

BY MR. KRAVIS:

Q.    Mr. Goldstein, there were some questions during the trial about the Maguire payment.  Were you trying to hide your work for Tobey Maguire from the other people in your law firm?

A.    No.

Q.    In this chat, the top message, what is it that you ask Ms. Bart to do with respect to the Maguire matter?

Fourth paragraph down.

A.    "Open the Tobey Maguire matter."

Q.    If you had been trying to hide your work for Tobey Maguire, would you have asked Ms. Bart to open a Maguire matter?

A.    No.

Q.    All three of the matters we've talked about, Robbins Geller, Napoli Shkolnik, and Maguire, were they all opened in the law firm's system?

A.    Yes.

Q.    Were the other lawyers aware of them?

A.    I mean, look, I cannot say what they were aware of.

Q.    Let me ask you one more question.

        MR. KRAVIS:  You can take this down.

BY MR. KRAVIS:

Q.    The specific transactions we have been talking about here, the mischaracterized transactions, these specific payments, do these specific details appear on the tax return that you review?

A.    No.

Q.    Do you see the specific classifications broken out on the tax form that Mr. Deyhle sends to you, sometimes very late, in October of each year?

A.    Oh, you want to know, like -- he e-mails me the tax return.

Q.    Right.

A.    On it.  And is, like, this stuff at the back of it?

**Q.**    Right.  Right.

**A.**    No.  No.  No.  No.  It's just the return.  The details are inside GRF's form.

**Q.**    So if you are reviewing the information that Mr. Deyhle is providing you at -- as to your tax season, are you seeing the classification of the specific transactions?

**A.**    No.  When he says, like, he knows I'm aware of the taxes, he's not talking about that.

**Q.**    Are you seeing how the specific payments, like, Napoli and Maguire and Robbins Geller, how those are broken out?

**A.**    Not just how they're broken out, they are just not referenced at all.  It is just numbers.  It's not people or clients and stuff like that.

**Q.**    Mr. Goldstein, I want to ask you about the Napoli transaction in particular, and then we'll move to our last subject.  We heard some about testimony and some documents about Mr. Napoli investing in your poker games in 2017.

Do you remember that?

**A.**    Yes.

**Q.**    I just want to be clear about this right up front.  Other than that disputed 125,000, which I'm going to ask you about in a second, did Mr. Napoli get his entire investment back?

**A.**    Yes.

**Q.**    In fact, did he make a profit from the investment?

**A.**    Yes.

Q.    Now, if he's investing in you in 2017, and you are getting killed by Bob Safai in 2017, would you have been allowed to tell Napoli, like, "Sorry.  Your money is gone"?

A.    Sure.

Q.    Why didn't you do that, then?

A.    I -- I had told Paul, you know, that I could beat this guy, and he had trusted me and invested in me.  I was already losing some, and then for, you know, the value of his investment, I -- I lost it.  And it is a lot -- you know, it's real money.  It's $500,000.  I've lost his $500,000.

And by all rights, it was just gone.  It just -- it felt wrong.  It was an awkward situation, and the right thing to do, having told him, like, "I can beat this guy," seemed to me to -- even though he had lost, was to pretend that he had won.

Q.    Do you remember when Mr. Napoli testified and we saw the e-mails, he seemed a little steamed about the delay on getting the last $125,000 back?

A.    Yes.

Q.    Do you remember that?

A.    Yes.

Q.    What was going on there?

A.    Well, he doesn't know -- he still doesn't, I think, know to this day that he actually lost and I paid him $500,000.  But he was right.  You know, he said I was being a jerk, and I that's right.

I was having a hard time -- I had lost the money.  And so I was having a hard time getting it, and I was delaying paying him, and he is critical of me of that.  We go way, way -- he's a New York guy.  We go way, way back.  I've said that about him.  He's said that about me.  We keep doing work together.  But yeah.  He's right.

Q.   I just want to be really clear about this, did Mr. Napoli ever tell you, "Look, we're just going to offset the two debts, the 125,000 that my group owes you and the 125,000 that you owe me from the poker"?

A.   Okay.  Now, we are talking about the specific 125?

Q.   Yes.

A.   Like, what was the accounting?

Q.   Yes.

A.   No.  No.  No.  No.  No.  No.

Q.   Did anybody from Mr. Napoli's firm ever tell you, "We are going to treat these as an offset.  We are going to cancel out the 125 that our group owes you for the legal work, and we are going to cancel out the 125 that you owe us for the poker"?

A.   No.  The exchanges with him and with them owing me 125, and me owing them 125.  There is no -- there is not some swap.

There is a discussion of how we may swap it in the future, but there is no discussion that we actually do do it.

Q.   Let me just quickly show you Government's Exhibit 167.  Remember this is Napoli Shkolnik document showing the two wires

offset?

A.   Yeah.

Q.   When was the first time that you learned that this was the Napoli firm treated these payments on their books and records?

A.   Like, when he -- on the screen during the trial.

MR. KRAVIS:   Can we have the next slide, please?

BY MR. KRAVIS:

Q.   Let's talk about our last topic, Mr. Goldstein, the mortgage.

Did there come a time in the spring of 2021 when you decided to buy a new home?

A.   Yes.

Q.   So we can keep the two houses straight here, I'm going to refer the house you were living in at the time as the old house, and the house you were looking to buy as the new house. Okay?

A.   Yes.

Q.   Why did you decide to move?

A.   The old house had room for the law firm up top, on the top floor.  The law firm was there for a while when we bought it. And eventually -- and, you know, the kids got older and that sort of thing -- it was just not well-suited to us.  We needed a more normal house.

Q.   How were you doing financially with the gambling at that point, in the spring of 2021?

**A.**    Poorly.

**Q.**    Now, I want to ask you about at this time when you start going looking for the mortgage, about where you stood with the IRS.  Did you owe money to the IRS?

**A.**    Yes.

**Q.**    Were you making regular payments to the IRS?

**A.**    Yes.

**Q.**    Was the IRS levying money from your accounts at this point?

**A.**    No.

**Q.**    I want to show you quickly a document on this, Government's Exhibit 504.  I think we looked at this a few days ago.

Do you remember there is an e-mail from Mr. Choi, in the middle of the screen, from February of 2021, where he says, "There is no federal payment plan with the IRS.  The original payment plan defaulted."

Do you see this?

**A.**    Yeah.

**Q.**    Are you on this e-mail from February of 2021?

**A.**    No.

**Q.**    Did you ever receive any notice of default from the IRS at this time in the spring of 2021?

**A.**    No.

**Q.**    Did you ever receive any notice in the spring of 2021 that

the IRS was going to go back to levying your bank accounts?

**A.** No.

**Q.** Did you ever receive any notice from Ms. Parrish in the spring of 2021?

**A.** No.

**Q.** What was your understanding at this time, in the spring of 2021, about whether the IRS could levy your bank accounts?

**A.** No. We're just making payments. We have this thing, we make payments.

**Q.** Were you, in fact, making regular payments for the IRS at this time?

**A.** Yeah. Every month.

　　　**MR. KRAVIS:** We can take that down.

**BY MR. KRAVIS:**

**Q.** So even though the IRS was not levying money, were there still tax liens on the old house?

**A.** Yeah. So what happens is if you don't pay, they give you some time. They talk to you, whatever, but they can get frustrated with you and they can put a lien on the house so you that, like, you can't sell it.

**Q.** Where was the first place you went to try to get a mortgage for the old house?

**A.** It's the -- I forget their names. I apologize.

**Q.** FSM?

**A.** FSM.

**Q.** Did you and your wife end up submitting two applications to FSM, one for a mortgage and one for a bridge loan?

**A.** Yes.

**Q.** How were those applications submitted?

**A.** Electronic.

**Q.** Let's take a look at the first one, Defense Exhibit 468. I'm going to direct your attention to page 2, the section on assets and liabilities.

I just want to be really clear about this, Mr. Goldstein, did you put the gambling debts on the application?

**A.** No.

**Q.** Why not?

**A.** Because I did not want -- this is me and Amy. I did not want Amy to know about the scale of the debts, which were very large.

**MR. KRAVIS:** Can we have page 4, please, and can we take a look at that warning, the acknowledgment and agreement? No. Sorry. Above it.

**BY MR. KRAVIS:**

**Q.** Mr. Goldstein, it says it right here on the application, did you realize that you could go to prison for up to 30 years for making a false statement on the application?

**A.** Yeah.

**MR. KRAVIS:** Let's take a look at the next one, the bridge loan. Can we have Government's Exhibit 9? Can I have

pages 4 to 5, please?

**BY MR. KRAVIS:**

**Q.** The second application, again, Mr. Goldstein, I'm just going to ask you directly, did you disclose the gambling debts on the second FSM application?

**A.** No.

**Q.** Why?

**A.** Because I did not want Amy to know about the gambling debts.

MR. KRAVIS: Can we turn to page 29?

**BY MR. KRAVIS:**

**Q.** Did you understand, Mr. Goldstein, that mortgage fraud is punishable by up to 30 years in federal prison?

**A.** Yes.

**Q.** Do you regret this?

**A.** Yes.

**Q.** Did you intend to defraud the mortgage company?

**A.** No.

**Q.** Did you understand what was going to happen if you did not keep up with the mortgage payments?

**A.** Sure.

MR. KRAVIS: And if we could look at the joint application, please -- or -- I'm sorry. The joint stipulation, please. The last page of the joint stipulation.

**BY MR. KRAVIS:**

Q.   Have the parties stipulated that you made statements that this is why you did not put the gambling debts on the mortgage applications?

A.   Yes.

Q.   Setting aside the gambling debt, did you disclose the tax debts to FSM?

A.   Yeah.

        MR. KRAVIS:  Can we see Defense Exhibit 338, please? And direct your attention to the top of page 2, the one below, too.  Can we see the one below it, both of them?

BY MR. KRAVIS:

Q.   The bottom e-mail from Jackie Graham at First Savings, what is Jackie Graham asking there?

A.   How much -- she knows from earlier conversations, I guess -- and I think I have seen this recently.  She knows that I owe taxes.

Q.   In your response, did you tell Ms. Graham that you had a tax debt of, like, $1.9 million?

A.   Yeah.

        MR. KRAVIS:  Okay.  We can take that down.

BY MR. KRAVIS:

Q.   What happened with the FSM application?

A.   It didn't go forward.

Q.   So just so we're perfectly clear, the application that you're charged with making false statements on, it was denied?

**A.**    Yeah.

**Q.**    Before we move on from here, I just want to ask you about where you were when the applications were signed.

**A.**    Okay.

**Q.**    Do you -- first of all, do you have an understanding as to why that matters?

**A.**    Venue matters for charges like this --

            **MR. BEATY:**  Objection, Your Honor.

     (Whereupon, a discussion was held outside the presence of the jury.)

            **THE COURT:**  Mr. Goldstein?  Mr. Kravis?

            **MR. KRAVIS:**  Yes, Your Honor.

            **THE COURT:**  Mr. Beaty, go ahead.

            **MR. BEATY:**  Your Honor, it's more of the same.  It's instruction of law.  He can ask him where he was and then we'll move on and we'll finally get to lunch.

            **THE COURT:**  Mr. Kravis?

            **MR. KRAVIS:**  Your Honor, it's just like another orientation question so the jury understands why I'm asking. I'm not asking Mr. Goldstein to opine on a thing.

            **THE COURT:**  No.  Okay.  No.  He can't explain why you are asking the question.  You can ask the questions to get the evidence in on venue.  And, obviously, the parties can argue venue later.

     So if you want to ask him where he was and all that,

that's fine.  You can ask him why it's important.

MR. KRAVIS:  Okay.  I'll move to that now.

(Whereupon, discussion concluded.)

BY MR. KRAVIS:

Q.    Okay.  How were the FSM applications signed?

A.    I mean, you can see they're DocuSigned.

Q.    Do you recall where you were when you signed the first application in late February?

A.    No.

Q.    Do you recall where you were when you signed the second application on March 1?

A.    Yes.  I was away from Maryland.

Q.    Where were you?

A.    I was -- I was in the islands.

Q.    What did you decide to do after the FSM application was denied?

A.    There were a complicated set of transactions involving Parabellum.

Q.    Who is Parabellum?

A.    They are a litigation funder.  The law firm had a real relationship with them.

Q.    And why did you turn to Parabellum at this point?

A.    Because of that relationship, and I thought that I -- we were -- I was crunched -- like, the house -- we had a closing on the house, so we had to get the money pretty quickly.

Q.    And did you, in fact, end up doing two transactions with Parabellum?

A.    Yep.

Q.    What was the nature of the first transaction?

A.    The first transaction was we were going to get the house, the new house.

Q.    And I just want to know clear, did you make clear to Parabellum that you were planning to use the funds from this transaction to buy a new house?

A.    Yeah.

Q.    And they were okay with that?

A.    Yeah.  Yeah.

Q.    Did you tell Parabellum about the gambling loans?

A.    No.

Q.    Now, Mr. Goldstein, is it your understanding -- to your understanding, are you charged in this case with making a false statement to Parabellum?

A.    No.  No.

Q.    Nevertheless, do you regret the decision not to tell Parabellum about the gambling loans?

A.    Sure.  I mean, these are people I have dealt with for a long time, and I should have done that.  Again, there is lots of security on these things, but absolutely.

Q.    Nevertheless, has Parabellum been repaid?

A.    Yes.

Q.    What did you do with the Parabellum money?

A.    Got the house, the new house.

Q.    That's part of the new house?

A.    It's part of the money that went for the new house.

Q.    And what did you do with Parabellum after you bought the new house?

A.    After I bought the new house, I got the second loan from Parabellum.  We were having trouble -- this was referred once as the chicken and egg problem.  And that is, I needed to sell the first house, but the first house had tax liens on it.  So I needed to pay the IRS first in order to sell the first house.  So I got the money from Parabellum, and in a series of transactions, paid the IRS.

Q.    Did the IRS end up getting a bunch of money from those transactions?

A.    Yeah.  This is an extension of Ms. Parrish's idea and the forms and everything, go take a loan.  So I go take a loan to pay the IRS.

Q.    And after you made the payment to the IRS, were the tax liens lifted?

A.    Yes.

Q.    And at that point, did you go back to look for -- to apply again for a mortgage?

A.    Yes.  So, then, Parabellum gets paid back a bunch.  I have agreed with Parabellum, hey, you are going to get even more

money for us by getting a mortgage -- it may be a home equity loan on the second house.

Q.    I just want to be clear on the timing here.  First of all, the company you went to the second time for the mortgage is NFM?

A.    Yes.

Q.    At the time that you went to NFM for the mortgage, where were you living at that point?

A.    I was living in Washington, D.C.

Q.    Is that in the new house?

A.    Yes.  Sorry.

Q.    Okay.  So if you are already in the new house --

A.    Yeah.

Q.    -- why do you need to go to NFM to get a mortgage?

A.    Oh, because I need to take -- so I -- we have bought the first house.  We own it whole.  There is no mortgage on it. But I need to pay Parabellum money.  So I take a home equity loan and take value out of that first house and hand it to Parabellum.

Parabellum is charging me -- he said it was a low rate.  I mean, it's 24 percent a year.  So I'm trying to get that -- we think the IRS is expensive, talk to Parabellum.  It's 24 percent that I needed to pay them down.

Q.    And just to be perfectly and totally clear, at the time you sought the mortgage from NFM, where were you living?

**A.**    Washington, D.C.

**Q.**    In the new house?

**A.**    Yes.

        **MR. KRAVIS:**  All right.  Let's a take a look at the NFM application, Government's Exhibit 10.  Can I go, please, to page 81?

**BY MR. KRAVIS:**

**Q.**    Are the gambling debts listed here?

**A.**    No.

**Q.**    Did you put the gambling debts on the NFM loan application are anywhere?

**A.**    No.

**Q.**    Why not?

**A.**    The same reason.

**Q.**    Looking back, do you regret that decision?

**A.**    And here we are, yes.

        **MR. KRAVIS:**  Can I go to page 146, please?

**BY MR. KRAVIS:**

**Q.**    I show you the warning again.  Did you -- where it begins "It is illegal" above the signature, did you understand that making false statements on this application could be punishable by up to 30 years in federal prison?

**A.**    Yes.

**Q.**    Was it your intention to deceive NFM?

**A.**    No.  They have a -- if I were -- I would never default.

If I were to default, they have the house. The house is worth more than the loan.

Q. What did you understand about what was going to happen if you got this mortgage and then you could not make timely payments on it?

A. They would get all their money. They would get the house.

Q. Just to be clear, have you, in fact, made all of your mortgage payments to NFM?

A. Of course.

Q. To your understanding, what is the status of that mortgage today?

A. It's being paid just like it's supposed to be.

Q. Where were you when you signed the NFM mortgage application?

A. At the house.

Q. Where?

A. In Washington, D.C. I don't remember precisely how this all came to be. There were discussions about it, and then it was done at the house.

Q. Let me go back and ask you about one aspect of the purchase of the new house. Did you have to withdraw some money from your retirement account to help pay for the purchase of the new house?

A. Yeah.

Q. Where did you deposit the money after it came out of your

retirement account?

**A.** It went from the retirement account first and went to the personal Citibank account.

**Q.** And where did it go from there?

**A.** It went to the very much discussed firm IOLTA account.

**Q.** How long did it stay in the IOLTA account?

**A.** Over a weekend.

**Q.** And after that weekend, where did the money go from the IOLTA account?

**A.** It turns out that the -- the point was -- there were two points. But the firm manager couldn't wire it out, I found out, from the IOLTA account. So it went to the firm account, and then it went on its way.

**Q.** Did you put the money in the IOLTA account to avoid the money being levied by the IRS?

**A.** No.

**Q.** Was the IRS even levying money from you at this time?

**A.** No.

**Q.** And just to be perfectly clear, to your understanding, at that time, had you received any notices from the IRS telling you that they were going to resume levying?

**A.** No.

**Q.** Had you heard from Ms. Parrish at this time?

**A.** No.

**Q.** Were you making regular payments at this time?

**A.**    Yeah.

**Q.**    There is one other thing I wanted to ask you about.  I don't think it really got discussed much, but it's in the indictment.

In 2017, did you take a distribution of about $215,000 from your retirement plan?

**A.**    Yes.

**Q.**    Where were you working at that time?

**A.**    Like, physically, or the law firm?

**Q.**    Your employer.

**A.**    I had been at a big law firm.  I think I'm back at Goldstein & Russell.

**Q.**    Did you get a Form 1099 for that?

**A.**    I don't know.

**Q.**    Instead of making you guess, I'll show you Defense Exhibit 594.

Is this a Form 1099 from State Street Retiree Services?

**A.**    Yep.

**Q.**    Do you see it says for Akin, Gump, Strauss, Hauer & Feld?

**A.**    Yeah.

**Q.**    Who or what is Akin Gump?

**A.**    That's a big law firm that -- remember, I said that I funded Kevin and Amy's law firm for several years while I went to a law firm, that was Akin Gump.

**Q.**    Is this addressed to you?

**A.**    Yep.

**Q.**    Is this the retirement distribution we have been talking about?

**A.**    Yeah.  And this is at the first house.  This is before I moved.  Yeah.  I take the money out from my retirement.

**Q.**    Was it your understanding that a copy of this form would go to the IRS?

**A.**    Yes.

**Q.**    Box 4, federal income tax withhold, what is your understanding of what gets reported here?

**A.**    That means that they pre-took out $43,000.

**Q.**    Did there come a time a few years later when you got a notice from the IRS about this?

**A.**    Yeah.

        **MR. KRAVIS:**  Can we see Defense Exhibit 619?

**BY MR. KRAVIS:**

**Q.**    What is the date of the letter?

**A.**    September 9, 2019.

**Q.**    Just moving further down, what does the IRS tell you about the retirement distribution in this letter?

**A.**    Where am I looking?

**Q.**    If you look --

        **MR. KRAVIS:**  And if we can highlight or blow up the section that begins, "your tax return does not match the information we have on file"?

**THE WITNESS:** Yeah. This is saying you made a mistake.

BY MR. KRAVIS:

Q. So it says, "The income and payment information we have on file from sources, such as employers or financial institutions, does not match the information you report on your tax return."

Do you see that?

A. Yes.

Q. Is it your understanding that this was about that retirement distribution we talked about?

A. I mean, not from this, but there must be some other thing. I do figure this out, but not from those words. But I know there is a mistake.

Q. The notice you get from the IRS, what do they tell you to do?

A. Nothing.

Q. If it --

**MR. KRAVIS:** Can we see -- the section that says, "If we don't hear from you," can we blow up that, please?

At that time bottom, "If we don't hear from you."

BY MR. KRAVIS:

Q. "If we don't receive a response from you by October 9, 2019, we will send you a notice stating the proposed changes to your tax return and the amount of the additional tax you owe, plus any penalties and interest that apply."

Is that what the IRS told you?

A.   Yeah.

Q.   Did you contest this, by the way?  Did you contest this change?

A.   No.  I mean, there was a mistake.  For all of these mistakes, I'm responsible for them.  No, I didn't contest it.

Q.   So was your understanding that, if you were not contesting it -- well, if you were not contesting it, what is your understanding about what you needed to do?

A.   They will send me a notice of the proposed changes in my return, and they will tell me, as usual, about penalties and interest.

Q.   If we look at Government's Exhibit 477, is that the notice you, in fact, received?

A.   Yeah.  It's in November, so they do just what they say they are going to do if I don't say I disagree.

So they say, down here on the right, "Hey, you owed us 110,000 for this.  There was 43 that we started with.  You owe $6,000 from that, and now you owe us 73,969 more."

Q.   Did you make the payment?

A.   I assume.  Yes.  I guess.

Q.   Were you trying to cheat on your taxes here?

A.   No.  I mean, I said yes, and I did it.

        MR. KRAVIS:  All right.  We can take that down.

BY MR. KRAVIS:

**Q.**   Mr. Goldstein, over yesterday and today, we have talked about some of the mistakes that you made during the years at issue in this trial, 2016 through 2021.

Looking back, should you have paid more attention to the tax returns?

**A.**   Yes.

**Q.**   Should you have paid more attention to the firm finances?

**A.**   Yes.

**Q.**   But just to be perfectly clear, did you cheat on your taxes in 2016?

**A.**   No.

**Q.**   Did you cheat on your taxes in '17, '18, '19, '20 or 2021?

**A.**   No.

**Q.**   Did you intentionally put false statements on those returns?

**A.**   No.

**Q.**   Do you understand that the false -- the errors on those returns are your responsibility?

**A.**   Yes.

**Q.**   Do you accept responsibility for them, including the penalties and interest that come with them?

**A.**   Yes.

**Q.**   And looking back in retrospect, is it possible that some of the personal spending was a little bit too much?

**A.**   Yes.

Q.    But at the time you filed those returns for 2016 through 2021, what was your intention about paying the IRS?

A.    I would pay my taxes.

Q.    And did you do just that?

A.    Yes.

Q.    With penalties and interest?

A.    Yes.

Q.    Not telling the mortgage companies about the gambling debts, was that a good idea?

A.    It's worse than not a good idea.

Q.    Why did you do it?

A.    To spare myself embarrassment.

Q.    Did you make every mortgage payment to NFM?

A.    Yes.

        MR. KRAVIS:    Thank you, Tom.    I have no further questions.

        THE COURT:    Thank you very much, Mr. Kravis.

    I think given the hour, a lunch break would be appropriate at this time, unless there is any objection from counsel?

        MR. BEATY:    Let's go to lunch, Judge.

        THE COURT:    All right.

    I'm going to let the jury step down for their lunch break.

    Please rise for the jury.

    (Whereupon, the jury exited the courtroom at 12:16 p.m.)

        THE COURT:    Please be seated, everyone.

Mr. Goldstein, if you want to step down and go sit at counsel's table, that's fine.  But, of course, please do not confer with counsel, as you will be on cross when we come back.

Before we break, Counsel for the government, what are we looking at in terms of cross-examination?

**MR. BEATY:**  With the caveat that it's really not up to me, I think my outline should be about an hour and 15 minutes, so not very long.

**THE COURT:**  An hour and 15 or so.

**MR. BEATY:**  I want to be clear that I'm caveating that with --

**THE COURT:**  I understand.

**MR. BEATY:**  -- how things go.  I'll do my best.

**THE COURT:**  So we will have the government's cross when we come back, and then any redirect.

Mr. Kravis, that will be the point to talk about the notice that was sent to the Court, and we can assess if there are any additional evidentiary issues to resolve.

I guess we will see where we are, and we can see whether we should -- I guess we will need the break because you don't have your other witnesses; correct?  For today?

**MR. KRAVIS:**  No.  I mean, we got them.

**THE COURT:**  But we have issues.

**MR. KRAVIS:**  We had asked the government to make Special Agent Accardi available and, of course, he's here.  I

know there is some conversations about the scope of his testimony.  I believe Mr. Bell-Masterson is also available.

We are going to continue conversations with the government about him as well.  I'm just going to need a few minutes to confer with my client once he's off of the stand.

**THE COURT:**  We will cross that bridge when we get there.

Why don't we come back at 1:20.  See you after lunch.

**DEPUTY CLERK:**  All rise.  This Honorable Court stands in recess until 1:20 p.m.

(Whereupon, a lunch recess was taken from 12:18 until 1:20 p.m.)

**DEPUTY CLERK:**  All rise.  This Honorable Court now resumes in session.

**THE COURT:**  Please be seated, everyone.  Welcome back from lunch.

Before we have the jury, I just want to get a few housekeeping matters sorted out to make sure we are all comfortable.

We are now going to be on cross.  I did not interrupt during direct, but there were a few occasions where the witness and the lawyers were talking over each other.  I think particularly on cross, I know that can be a little back and forth.  I'm going to encourage the parties to be careful about that right now so I don't have to interrupt, but it does become

a little hard to follow.

My other question is, Mr. Goldstein, of course, was on the husher during his direct.

Are there any concerns about him doing that on cross?

**MR. BEATY:**  Yes, but not enough that I think we should do anything about it.

**THE COURT:**  Okay.

**MR. BEATY:**  I think it's just easier to have him on the husher, and it will be what it is.

**THE COURT:**  Mr. Kravis?

**MR. KRAVIS:**  That's fine for the defense.  I do think he's entitled to be present for that.

**THE COURT:**  I do as well.  But as you know, sometimes I may raise it if we get on the husher and I have a concern. I'll put it that way.  It is not about the general need to be on the husher, but, of course, to make sure that his testimony is his testimony and not influenced by some of other discussions.

So we'll see how it goes.  It went fine before.  I just wanted to flag it, and if I have a concern or if does counsel does, just let me know and we will sort that out.

Okay.  That is all I have.

Are we ready for the jury?

Mr. Kravis, I'm sorry.  Go ahead.

**MR. KRAVIS:**  No.  Your Honor, there were two

exhibits -- I had a chance to confer with the government at the end of the lunch hour.

There are two exhibits or maybe I should say two issues, that my understanding is that they intend to pursue on cross-examination. I thought it might be helpful to discuss those before the jury comes in so we are not doing it all over the husher.

THE COURT: Okay. Do we have the documents so I can see what is going on? Are these documents not already in, I assume?

MR. BEATY: These are documents that are not yet in.

THE COURT: Okay. Mr. Kravis, go ahead.

MR. KRAVIS: So there is -- one of the documents that I'm talking about here is a photograph of -- it was disclosed to us a few days ago.

Yeah, this is it. 791.

THE COURT: Yeah, I got it.

MR. KRAVIS: It appears to be Mr. Goldstein talking to a woman in a -- well, a revealing dress. The Court will notice there is a white box. I'm not sure what this has to do with anything, and I think it's highly prejudicial.

The other one is my understanding is that the government intends to now ask Mr. Goldstein about the details of his relationship with employee four, including her status as an employee of the firm.

**THE COURT:** Is this employee four on this --

**MR. KRAVIS:** No. This is something different.

Based solely on the fact that we spent a few minutes on one text message that references the Hong Kong loan.

**THE COURT:** I flagged that when we had that conversation a couple days ago. I don't know that that completely opens the door to a fulsome examination. I think, as my recollection, I don't think even employee four was discussed --

**MR. KRAVIS:** No.

**THE COURT:** -- when you look at the text. They just read the lines.

**MR. KRAVIS:** Right. I was very careful. There were more details, by the way, about -- on the trip and so on that I stayed away from purposely. So it was focused only on the one message. I don't know the personal relationship of this person has anything to do with anything. She is not even the speaker. She's just the person that gets the message. So what does that matter?

**THE COURT:** Mr. Beaty?

**MR. BEATY:** Your Honor, it absolutely opens the door. Now, I don't plan to go far. It's opened a crack. I don't plan on opening it much more than a crack.

But it is unfair to have this text from Kristina Adamova, employee four. One, the United States intends to show an

e-mail -- excuse me -- a further text message further in that same chain, where they have a conversation about once Mr. Goldstein is through customs.

And so I think the jury should be entitled to see that and his communications with Ms. Adamova. Candidly, Ms. Adamova -- I think -- I think it is entirely proper for the United States to lay some foundation as to who this person is.

And I don't intend -- I will not ask about the personal relationship. I am intending to ask, was she somebody you were paying and, you know, she's a -- you paid her as a translator. In fact, in a later text, Mr. Goldstein told her, "You can't speak English." And I think that is --

THE COURT: Well, I mean, I think she's in the document. Even though she wasn't discussed, there are text messages between Mr. Goldstein and this person that are in front of the jury. I think it's fair to have some explanation as to who the person is.

We're not getting into all of the relationship stuff, who she is and -- I think that's fair. I'm happy to hear -- when we get into it, we can talk. But I think, generally speaking, that's okay and kind of just makes it clear what is going on in that text message.

MR. BEATY: And since we are taking a moment, Your Honor, I think the one other position is, I understand where the Court ruled on 2022 through 2024. That was, obviously,

before anyone knew that Mr. Goldstein was going to testify. We, obviously, now have additional testimony about his thoughts on GRF, what the problems were.

I think the door is wide open on 2022. I don't expect to spend a lot of time on it, but I think it's only fair at this point that the United States be allowed to show -- to ask him about his failure to file in 2022.

THE COURT: Mr. Kravis?

MR. KRAVIS: I think we are -- I don't think -- with respect to GRF, I don't think we heard anything new today. I don't think we are in any different place than we were before. I think that Mr. Goldstein's testimony is -- was, I think, perfectly consistent with the evidence we had previously presented about the nature of the relationship and so on and so forth.

I think the Court's prior rulings on this issue were correct, and I don't think we heard anything today that changes that.

THE COURT: All right. Well, right now I'm not prepared to revisit that ruling. I'm going to listen to the cross, and we will see where we are.

Mr. Beaty, you may be able to talk me down once we get into it, and we'll see how things are going.

MR. BEATY: See where we go.

THE COURT: All right. Yes?

MR. KRAVIS:  And the photo that I mentioned?

THE COURT:  What's the purpose of the photo, Mr. Beaty?

MR. BEATY:  The photo is just to show that he was in possession of this watch.  There's nothing --

THE COURT:  The possession of the watch?

MR. BEATY:  Yes.

THE COURT:  Okay.  All right.  I see the watch.

MR. BEATY:  That's it.  We are not talking about the woman.  We are not talking about -- he's dealing with friends. I purposely redacted the box because I just didn't want to embarrass -- I don't know who this woman is, but I didn't want to embarrass her.

THE COURT:  Mr. Kravis?

MR. KRAVIS:  I see in here -- I'm not sure why the watch is relevant at all.  But to the extent it is, I see three photographs of Mr. Goldstein wearing a wrist watch.  I see defense exhibits -- or Government Exhibits 791, 792 and 793.

791 is the one where he is talking to the woman in the revealing dress with her lower torso whited out.  I don't know why we need that one.  I'm not sure I understand why we need any of them, but I particularly don't understand why we need that one.

THE COURT:  Have -- all three of them show he had the watch?

**MR. BEATY:** All three of them are going to go to the watch. That's it.

**THE COURT:** All right. I don't see why we need the women either. You've got two others that clearly, actually, are much clearer that he's wearing the watch.

So at this point, unless I get an explanation as to why we also need 791, I think we can pull that one out. You got 792. It's a nice close up of the watch. And you've got a real close up on 793. Very clear.

**MR. BEATY:** Understood, Your Honor.

**THE COURT:** All right. Anything else before we have the jury?

**MR. KRAVIS:** Nothing else at this time. Obviously, I don't know the full scope of the government's cross. We did put some case law in our motion about the Fifth Amendment issue. We will see if that comes up.

**THE COURT:** Yeah. We will talk about that once we kind of hear the cross.

Mr. Goldstein, are you ready to return to the chair?

**THE DEFENDANT:** Please, let's not call it the chair.

**THE COURT:** Well, your witness box.

**THE DEFENDANT:** Can I run very fast to the restroom?

**THE COURT:** Of course. Let's take two minutes.

**DEPUTY CLERK:** All rise. This Honorable Court stands in recess for two minutes.

(Whereupon, a recess was a taken from 1:37 until 1:40 p.m.)

**DEPUTY CLERK:**  All rise.  This Honorable Court now resumes in session.

**THE COURT:**  Please be seated, everyone.  Are we ready to have the jury?

**MR. KRAVIS:**  Yes, Your Honor.

**MR. BEATY:**  Yes, Your Honor.

**THE COURT:**  Let's get the jury.

Mr. Goldstein, you remain under oath.

**THE WITNESS:**  Thank you, Your Honor.

**THE COURT:**  Please rise for the jury.

(Whereupon, the jury entered the courtroom at 1:42 p.m.)

**THE COURT:**  Please be seated.

Members of the jury, welcome back from your lunch break.

Mr. Beaty?

**MR. BEATY:**  Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. BEATY:

Q.  Good afternoon, Mr. Goldstein.

A.  Good afternoon.

Q.  Mr. Goldstein, let's see if we can agree on three things.

A.  Okay.

Q.  Tom Goldstein is no dummy; right?

A.  Okay.

Q.  You are smart?

**A.** Thank you.

**Q.** Do you agree?

**A.** Okay. Sure.

**Q.** You can read and write the English language?

**A.** Yes.

**Q.** You went to law school?

**A.** Yes.

**Q.** You studied the law?

**A.** Yes.

**Q.** You passed the bar?

**A.** Yes.

**Q.** You became a lawyer?

**A.** Yes.

**Q.** You were a successful lawyer?

**A.** Thank you.

**Q.** You agree?

**A.** Yes.

**Q.** You worked at top-tier law firms?

**A.** Mostly my own law firm, but okay. Sure.

**Q.** You opened your own law firm?

**A.** Yes.

**Q.** You were making millions of dollars each year as a lawyer?

**A.** Depending, but yeah.

**Q.** You even taught other people the law?

**A.** Yes.

**Q.** You were a Supreme Court advocate?

**A.** Yes.

**Q.** You wrote briefs submitted to the Supreme Court?

**A.** Sure.

**Q.** Sorry?

**A.** True.

**Q.** And you poured over every detail of those briefs?

**A.** I will not argue with you.  I did or should have, yes.

**Q.** And you argued 35 cases before the Supreme Court?

**A.** No.  More.

**Q.** How many?

**A.** Something in the mid 40s.

**Q.** Numbers matter; right?

**A.** Okay.

**Q.** Do you disagree that numbers don't matter?

**A.** I'm not being disrespectful.  Depends on the context, but sure, numbers -- everything matters, including numbers, sure.

**Q.** You know the difference between 35 and 45?

**A.** Do I know the difference between 35 and 45?  Of course.

**Q.** And you know the difference between 27 million and 50 million?

**A.** Sure.

**Q.** And you know the difference between 2.7 million and 12 million?

**A.** Sure.

**Q.**   Clients sought your advice on appellate cases?

**A.**   Sure.

**Q.**   Clients sought your opinion on complex legal matters?

**A.**   Sure.

**Q.**   And you commanded substantial fees for your legal work?

**A.**   Half my work was free, but the other times, sure.

**Q.**   The ones that paid got the value for which they paid you; right?

**A.**   I hope.

**Q.**   You were very good.

**A.**   Thank you.

**Q.**   And you would dig deep on every facet of the case for your clients?

**A.**   I would endeavor to do a good job.  Thank you.

**Q.**   On direct, I think you said you dig very, very, very, very deeply; is that right?

**A.**   In the brief in the Supreme Court and getting ready for argument, absolutely.

**Q.**   Four very's?

**A.**   I did not count.  Numbers matter, but I did not count.

**Q.**   When you had a case, you would read every statute?

**A.**   Probably not.  I'm not being argumentative.  I would read the important stuff, for sure.

**Q.**   You would read every case?

**A.**   Definitely not.

**Q.** You would not read every case?

**A.** Every case cited in every brief, no. But if something was important, absolutely.

**Q.** Okay. You represented a company called Centerior Energy Corporation in a petition to the Supreme Court?

**A.** Okay. Hold on. Let me grab my glasses.

**Q.** Yes, sir.

**A.** Okay. I don't remember the case, but sure. I'm sure you are right.

**Q.** Let's look at the question presented in that case. First sentence reads, "Federal law requires petitioners to report to the Internal Revenue Service and to shareholders the amount of dividends they distribute. See 26 United States Code 6042(A)(1)(C)."

Did I read that correctly?

**A.** Yes.

**Q.** Further down, it says, "The question presented is whether a lawsuit that turns critically on the proper construction of the Internal Revenue Code and that seeks to cover overpaid income taxes," et cetera, et cetera, "arises under federal law."

Did I, other than the et cetera, et cetera, read that correctly?

**A.** Yeah. Can just give me a second? I'm trying to figure out what this is --

**Q.** Sure.

**A.** -- so I can answer your questions.

Okay.

**Q.** My question is simple.

**A.** Yes.

**Q.** You've heard of the Internal Revenue Code?

**A.** Yes.

**Q.** You also mastered heads-up poker?

**A.** No.  But I've certainly played a lot of it and tried very hard.

**Q.** You are a savant at heads-up poker?

**A.** No.  I thought I was a savant at heads-up poker and, obviously, I was wrong.  But I did think so, yeah.

**Q.** As recently as 2025, you told somebody you were a savant at heads-up poker?

**A.** No.  I said that I was wrong about it.  I thought I was at heads-up.  I'm not trying to argue with you.  I said those words for sure.

**Q.** You won $50 million in heads-up poker in 2016?

**A.** No.  Other people lost it to me.

**Q.** In those games, other people lost to you $50 million in heads-up poker?

**A.** Uh-hum.

**Q.** And you sold roughly 75 percent of your stakes to your investors that year?

**A.**    Yes.

**Q.**    And after paying your investors, you still personally cleared $12 million?

**A.**    Yes.

**Q.**    And 12 million is more than 2.7; right?

**A.**    Sure.

**Q.**    You won $40 million from Andy Beal in 2022?

**A.**    No.  He lost that to me.

**Q.**    You told the *New York Times* reporter that poker represents the route to your salvation?

**A.**    Yes.

        **MR. KRAVIS:**  Sorry.  Can we just have a husher, please?

    (Whereupon, a discussion was held outside the presence of the jury.)

        **THE COURT:**  Mr. Goldstein?  Mr. Goldstein, are you on?  Mr. Goldstein, can you hear us?

    All right.  Mr. Kravis?

        **MR. KRAVIS:**  I don't have an objection.  I just thought that our agreement here was that we were not going to refer to a *New York Times* reporter so that the jurors don't go and look for the article.  That was the whole point of correcting the stipulation.

        **THE COURT:**  Mr. Beaty?

        **MR. BEATY:**  No.  That was the agreement with respect

to the stipulation.  Now that Mr. Goldstein is on the stand, it is what it is, Your Honor.  That's what he did.  There is no need to hide it from the jury.

MR. KRAVIS:  I'm going to ask that we not do that. The Court may recall, we revised the stipulation and then we had to go back and file a corrected one.

THE COURT:  I remember that.

MR. KRAVIS:  The whole reason we did that is because we don't want the jurors leaving here with the impression that there was an article, and then they go and they look up the article and then they see all these things that are not coming in during the trial.

It does not make a difference.  That's why we did the stipulation.  It was precisely to avoid this.  Just say he said it to a person.  He knows what he said.  He's not going to deny it.

THE COURT:  Mr. Beaty?

MR. BEATY:  Happy to move on, Your Honor.

THE COURT:  All right.  Thank you.

(Whereupon, discussion concluded.)

BY MR. BEATY:

Q.   Your plan is to milk Andy Beal for a quarter billion dollars for the rest of your life?

A.   I hope to beat him for that.

Q.   In that interview, when you made that statement, I should

say, you told the person that you knew since 2005 that you were good at other stuff, too?

**A.**    Good at other stuff?

**Q.**    Yep.  Do you remember that?

**A.**    I don't remember that, but I'm sure it's true.

**Q.**    Point number two, Tom Goldstein is responsible for his choices.  Do you agree?

**A.**    Yes.

**Q.**    You have free will?

**A.**    Yes.

**Q.**    You choose what to wear this morning?

**A.**    Yes.

**Q.**    Chose what to eat this morning?

**A.**    Yes.

**Q.**    Chose to testify?

**A.**    Yes.

**Q.**    Free will comes with a burden of choice.  Do you agree?

**A.**    Yes.

**Q.**    And choices have consequences?

**A.**    Yes.

**Q.**    No one forced you to become a lawyer?

**A.**    No.

**Q.**    That was your choice?

**A.**    Yes.

**Q.**    No one forced you into appellate law?

**A.** Correct.

**Q.** That was your choice?

**A.** Yes.

**Q.** No one forced you to play poker?

**A.** Correct.

**Q.** That was a choice?

**A.** Yes.

**Q.** You chose Munger Tolles as your attorneys in this case?

**A.** Yes.

**Q.** Mr. Kravis and his team have done an excellent job.

**A.** I'm sure they would thank you.

**Q.** You agree?

**A.** Yes.

**Q.** You have no basis to complain about them; right?

**A.** No.

**Q.** But you were also calling the shots?

**A.** I mean, they're my lawyers.  I am their client.

**Q.** You chose to start a law firm?

**A.** I'm sorry?

**Q.** You chose to start a law firm?

**A.** It's just hard --

**Q.** No worries.  I'll talk louder.

You chose to start a law firm?

**A.** I don't think you have to talk that loud.

Yeah, I did.

Q.   And your law firm had an IOLTA account?

A.   Yes.

Q.   That account is only for client funds?

A.   Okay.

Q.   Do you disagree?

A.   No.

Q.   Okay.   And there are ethics rules on this?

A.   Yes.

Q.   Yes?

A.   Yes.

Q.   And you were bound by those ethic rules?

A.   Sure.

Q.   And choosing those -- to violate those rules in 2021 could have subjected you to sanctions if you were caught doing it; right?

A.   Sure.

Q.   You chose who to hire at your law firm?

A.   Yes.

Q.   You chose your office assistants?

A.   The lawyers collectively, but I would say I was the most important person.

Q.   You decided what qualifications they should have?

A.   Yes.

Q.   You chose people fresh out of college?

A.   Yes.

**Q.**   You decided that they did not need to have accounting experience?

**A.**   Yes.

**Q.**   You were in charge of the firm?

**A.**   Yes.

**Q.**   No one countermandered your orders?

**A.**   I'm sorry.  I didn't hear you.

**Q.**   No one countermandered your orders; is that correct?

**A.**   You are saying nobody said -- anytime any -- there was nothing I said and someone else said, "you can't do it," that would not be true.  But generally speaking, absolutely, I was in charge.

**Q.**   No one did anything without your approval?

**A.**   No.  That's not true.

**Q.**   No one questioned your instructions?

**A.**   That is definitely not true.

**Q.**   Well, let's just look at some documents.

     You instructed Mr. Levitan to wire -- this is Defense Exhibit 532.  Apologies.

     You instructed Mr. Levitan to wire Napoli $175,000?

**A.**   Yes.

**Q.**   That was to repay Paul Napoli's poker investment, part of it?

**A.**   Yes.

**Q.**   This e-mail does not say, "FYI, this is a personal

expense"?

**A.**    It does not.

**Q.**    This e-mail does not say, "Please characterize as a distribution"?

**A.**    Correct.

**Q.**    Defense Exhibit 10.

You knew how to say that in February of 2016; right?

**A.**    Yes.

**Q.**    Defense Exhibit 300.

You knew how to say that in May of 2016?

**A.**    You want me to -- I'm sorry.  You are putting this in front of me.  Do you want me to read it, or do you want me just to answer just based on time?

**Q.**    Based on timing, May 2016, you knew how to say, "This is a personal expense;" right?

**A.**    Sure.

**Q.**    And you knew how to direct somebody to classify an expense?

**A.**    Absolutely.

**Q.**    Defense Exhibit 318.

You classified expenses in January 2018?

**A.**    Yes.

**Q.**    Defense Exhibit 11.

You classified expenses in June of 2018?

**A.**    Yes.

Q.   Government's Exhibit 1057, page 150.

You classified expenses in September 2018?

A.   Oh, this is in response to a question?  Yes.

Q.   Defense Exhibit 290.

You classified expenses in December of 2018?

A.   Yes.

Q.   Back to Government's Exhibit 1057, page 241.

You classified expenses in February 2019?

A.   Can I assume that's me on the left, or do you want me to figure it out?  Because it's weird.  It looks like it could be me on the right.

But if you're just telling me it's me on the left, I'll answer the question yes.

Q.   We talked about this with Mr. Levitan.

Do you remember that?

A.   This?  No, I don't remember this e-mail.  If that's me on the left, then yes.  I'm just trying to figure out what the document is.

Q.   Fair.  I will represent to you that I believe the testimony that you heard from Mr. Levitan is that that's you on the left.

A.   Great.

Q.   Government's Exhibit 1057, page 273.

You classified expenses in May of 2019?

A.   Yes.

Q.    Defense Exhibit 6.

You classified expenses in January 2020?

A.    Sure.

Q.    Government's Exhibit 17.2.

You classified expenses in June of 2020?

A.    Yes.

Q.    Government's Exhibit 47.

You classified expenses in July of 2021?

A.    Yes.

Q.    Government's Exhibit 17.1.

You classified expenses August 2020?

A.    No.  I mean, I'm sure I did it.  That is not an example of it, but yeah.

Q.    Once again, directing to send $100,000 to Mr. McGuiness?

A.    Right.  That's a location.  That's not a classification. I'm sure I did it in this time period.  It's just not -- this isn't an example.

Q.    Sure.  Well, let's not guess.

But previously, you said, "Please wire $100,000 from the firm for the firm to Mike McGuiness;" right?

A.    Correct.

Q.    Turning back to Government's Exhibit 17.1.

Now in August, you are saying please send 100 again from the firm to McGuiness?

A.    Yes.

Q.    Government's Exhibit 497.1.

      You classified expenses in October 2020?

A.    Yes.  Someone is asking me a question here.  "Would you say the Bentley is a company car or a personal disbursement."

      "I don't want to do anything where they can even ask questions, and so it's personal."  Yep.

Q.    Government's Exhibit 508.

      You classified expenses in September 2021?

A.    Are you asking me if this is an example of that?

Q.    Well, in the red box, Ms. Gou says that she asked you about classifications; right?

A.    Hold on.  I don't know.  I would need more context.  If you will represent to me that "code" here referred -- oh, the document disappeared.

Q.    That's okay.  We will move on.

      Government's Exhibit -- excuse me -- Defense Exhibit 56.

      You also classified transactions in October of 2021?

A.    Yes.

Q.    Government's Exhibit 81, page 6, you were capable of wiring money from your business account to your personal account?

A.    Yes.

Q.    Wires you sent to yourself were always classified correctly?

A.    Yes.

**Q.** Government's Exhibit 212, you instructed Darren Robbins to wire $250,000 to your personal bank account?

**A.** Yes.

**Q.** You did not tell Gelman about that?

**A.** No.

**Q.** You instructed Spider-Man to wire you your $500,000 fee to Bob Safai?

**A.** To send it to him, yes.

**Q.** You didn't tell Gelman about that?

**A.** No.

**Q.** You offered things of value to Katie Bart after you learned about the criminal investigation against you?

**A.** That's chronologically right.  It's not the reason.

**Q.** You knew why she didn't want to work at Goldstein & Russell any longer?

**A.** I knew what she had told me, yes.

**Q.** And you were worried about how it would look if your office manager left as soon as IRS criminal investigation came knocking?

**A.** Yes.

**Q.** The offers to Katie Bart had nothing to do with her collecting documents to respond to the grand jury, did it?

**A.** No.  You are not correct.

**Q.** You are offering things of value to Ms. Bart in January 2021?

**A.**    Okay.

**Q.**    Do you disagree with that?

**A.**    No.  Definitely not.  Yes.

**Q.**    Government's Exhibit 795, it will be on your screen momentarily.

**A.**    Thank you.

**Q.**    Munger tells -- excuse me -- Goldstein & Russell had already completed its production to the grand jury as of December 29, 2020?

**A.**    I'm sorry.

**MR. KRAVIS:**  I'm sorry.  Objection.  May we have the husher?

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:**  Mr. Goldstein, can you hear us?  All right.  Mr. Kravis?  Mr. Beaty?

Go ahead, Mr. Kravis.

**MR. KRAVIS:**  Your Honor, before we go further, I just want to make sure we are clear on what's happening here because Mr. Beaty was not on this matter at this time, but I was.  I think he's trying to make the point that the document production was completed in December of 2020 before Ms. Bart left.  That's not true.

I have e-mails in my possession from the U.S. Attorney's Office with several follow-up requests in to 2021.  I just want

to make sure that everyone understands that if he's pursuing this line of questioning, on redirect, I'm going to start showing Mr. Goldstein e-mails from the government to me asking for additional documents from Goldstein & Russell in response to these subpoenas.

There was a whole back and forth about the Montenegro accounts and the e-mails and everything.  I just want to make sure people know that that's what we are walking into, Your Honor.

**THE COURT:**  All right.  Let's hear from Mr. Beaty.

**MR. BEATY:**  I'm happy to clarify.

**THE COURT:**  All right.  Let's try that.

(Whereupon, discussion concluded.)

**BY MR. BEATY:**

**Q.**  December 29, 2020, is it fair to say that Goldstein & Russell had substantially completed its document collection by December 29, 2020?

**A.**  To the subpoena that we had at that point, yes.

**Q.**  There may have been some additional back and forth with -- between whoever the attorneys were on the case at the time?

**A.**  Not me, but there was.

**Q.**  I wasn't on the case at the time, was I?

**A.**  No.  That guy quit.

**Q.**  I would like to think he got a better job.

Mr. Goldstein, you chose to hire William Caldwell?

**A.**    Yes.

**Q.**    And he was your tax return preparer before Mr. Deyhle?

**A.**    Yes.

**Q.**    And you chose to fire Mr. Caldwell?

**A.**    Yes.

**Q.**    You fired Mr. Caldwell after the IRS's audit of your 2010 tax return?

**A.**    Yes.

**Q.**    The IRS audit included gambling income?

**A.**    Yes.

**Q.**    The audit was resolved in your favor?

**A.**    Yes.

**Q.**    You fired Mr. Caldwell, anyway?

**A.**    Not because of the audit, but because of what led to the audit, but yes.

**Q.**    You fired him for not telling you to keep better gambling records?

**A.**    Well, that's not -- that detail is not quite correct.  For not getting it right, not asking the right questions, not asking enough questions.

**Q.**    He had to ask you the right questions?

**A.**    Pardon me?

**Q.**    He had to ask you the right questions.  That's what your testimony is?

**A.**    Yes.

Q.    And if they don't ask you, then you don't have to disclose it?

A.    If there is a tax rule that I don't know or information that I don't know to give them, I need them to ask me for it. That's why I hire them.

Q.    You chose to hire Gelman?

A.    Yes.

Q.    You chose to work with Mr. Deyhle?

A.    Yes.

Q.    You chose to keep working with Mr. Deyhle even after October 14, 2020?

A.    For a time, yes.

Q.    And you chose to keep working with Gelman for three more years?

A.    Yes.

Q.    Government's Exhibit 148.  You found another accountant in Las Vegas named Russell Fox?

A.    Yes.

Q.    Russell Fox had experience recording gambling income and expenses?

A.    More than that.  He was supposed to be the biggest expert.

Q.    Okay.  And you chose not to hire Mr. Fox?

A.    If Walter had said we need to hire this guy, I would have, and he did not do that.  That's true.

Q.    I'm not talking about Walter.  I'm talking about you.  You

chose not to hire Mr. Fox?

**A.**   I'm talking about me, too.  I sent Walter to this guy, yes.  And then I didn't hire this guy, yes.

**Q.**   So you didn't have any agency in this one area of your life?

**A.**   Mr. Beaty, I'm, obviously, not saying that.

**Q.**   Okay.  You had access to world-class poker players?

**A.**   Yes.

**Q.**   They provided you with information about tax return preparers that professional tax -- poker players used?

**A.**   It overstates that.  I sent an e-mail and I found out who the best guy was, and I sent it to my tax guy.

**Q.**   Okay.  But you also had a question about 1099s?

**A.**   Pardon?

**Q.**   You said, in your direct testimony, that you had a question about 1099s.

**A.**   Yes.

**Q.**   And you tapped your counsel of poker pros for advice?

**A.**   I asked professional poker players, yes.

**Q.**   And you prepared a ledger of your poker winnings and expenses in January of 2017?

**A.**   No.

**Q.**   You didn't prepare that poker ledger?

**A.**   That is not a ledger of winnings and expenses.

**Q.**   Okay.  Let's just look at Government's Exhibit 2.  You

don't dispute that you prepared this document; right?

**A.** Absolutely.

**Q.** And you used the information Molly Runkle sent to you in December of 2016 to prepare this document?

**A.** I explained I'm not sure if I used just bank statements or the e-mail from Molly as well, but definitely the bank statements.

**Q.** Defense Exhibit 313. Ms. Runkle gave Mr. Deyhle all the information she had?

**A.** Hold on a second. I will just read it.

I'm sorry. Your question?

**Q.** Ms. Runkle gave Mr. Deyhle all the information that she had access to?

**A.** That she was supposed to, yeah.

**Q.** Molly Runkle did not have this poker journal?

**A.** Correct.

**Q.** And Mr. Deyhle asked you for additional information for your tax return; correct?

**A.** Yes.

**Q.** Then you prepared a second investigation of your ledger of your poker winnings and expenses in October of 2017?

**A.** I'm not going to debate when I say -- what it is. We will call it whatever you want to call it, so we know what it is.

**Q.** Mr. Deyhle asked you for your poker gains and losses in 2016?

**A.**    Can we see the document?  I'm sure we have it.

**Q.**    Yeah.

Defense Exhibit 317, you remember this one; right?

**A.**    Yeah.  This is the one you learned about in the middle of the trial.

**Q.**    Sure did.  Government's Exhibit 1057, let's take a look at that.  This is page 23.  You instructed Jon Levitan to e-mail a copy of the October 2017 poker journal to your e-mail account from your e-mail account; right?

**A.**    Yes.

**Q.**    You instructed him to do that on October 13, 2017?

**A.**    Okay.  Yes.

**Q.**    Mr. Levitan followed your instructions?

**A.**    I'm sure that's right.

**Q.**    Mr. Levitan worked with Mr. Deyhle?

**A.**    Yes.

**Q.**    Mr. Levitan had Mr. Deyhle's e-mail address?

**A.**    Sure.

**Q.**    Did you not instruct Mr. Levitan to send the October 2017 version of the poker journal to Mr. Deyhle?

**A.**    I don't know that the October 13 version is different from the January one, but whatever existed -- whatever he sent to me, then no.  I don't know which version it is.

**Q.**    You don't know the difference between these two?  Is that what you just testified to?

**A.**   Because he's sending it to me.

**Q.**   Let's just be clear about this.

**A.**   Uh-hum.

**Q.**   Do you remember when we went through with Mr. Deyhle? This is Government's Exhibit 2 on the left and Government's Exhibit 451 on the right.

**A.**   Yes.

**Q.**   You remember we did a math demo?

**A.**   Very much so.

**Q.**   It was entertaining; right?

**A.**   No.

**Q.**   Then we saw where these numbers came from?

**A.**   Yes.

**Q.**   And then we compared where the two versions were different?

**A.**   Yes.

**Q.**   Does this refresh your recollection as to whether the October version is different than the January version?

**A.**   No.  No.  No.  I always knew the October one, obviously, was different than the January one.  I didn't know which one he had e-mailed me, but yes.

**Q.**   Again, you watched the same math demonstration that the jury saw with Mr. Deyhle?

**A.**   Yes.

**Q.**   A total number of losses in distributions that you

provided to Mr. Deyhle matched the number from your own poker journal?

**A.**    Yes.

**Q.**    Defense Exhibit 318.

You explained on direct examination today that there are two ways the IRS can get information.

Do you remember that?

**A.**    Yes.

**Q.**    There is actually a third way; right?

**A.**    You are with the IRS, I believe.

**Q.**    There is an easier way; right?

**A.**    That the IRS can learn information?

**Q.**    Uh-hum.

You could just put it on your tax return?

**A.**    Directly?

**Q.**    Yep.

**A.**    Sure.

**Q.**    Defense Exhibit 316.

Mr. Deyhle sent you the 2016 tax returns for your review?

**A.**    Yes.

**Q.**    You told the jury that you were busy at that time?

**A.**    Yes.

**Q.**    Defense Exhibit 206.

You were in Los Angeles preparing for -- preparing a brief; correct?

**A.** I'm on travel. I think we agreed I was in Los Angeles, yeah.

**Q.** You were the good guys?

**A.** Definitely.

**Q.** And you were too busy to review your tax returns because you were working on preparing this brief?

**A.** No.

**Q.** That's not what we heard over many, many minutes yesterday?

**A.** No. There are two different things going on.

First is I just don't want it to seem that I don't -- I disclaim responsibility for not reviewing my returns. That's my responsibility, to review the returns.

In the time that I'm trying to figure out all the poker numbers, there is a lot going on, including finalizing this brief. That's been true for all of October.

**Q.** I see. Okay.

While you were in Los Angeles, you found a little time for you, though?

**A.** I do not remember. I'm sure you are right.

**MR. BEATY:** Can we go to the husher, Your Honor?

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:** Mr. Goldstein? Mr. Kravis?

**MR. KRAVIS:** Yes, Your Honor.

THE COURT:  Mr. Beaty, go ahead.

MR. BEATY:  Thank you, your Honor.

I think, based on his testimony yesterday, Mr. Goldstein's prior testimony was that he was awfully business and he didn't do it.  He had some very, very personal expenses that I would like to now show the jury.  I'm doing it on a husher because I just don't want to -- I don't think I want to go through it.

If Mr. Cook can take this down, I'll show you what they are.

THE COURT:  Well, let's put it up so I can see it and not the witness at this point.

MR. BEATY:  Precisely.

THE COURT:  I see a Wells Fargo portfolio for checking account.  Is this it?

MR. BEATY:  Correct.

THE COURT:  Go ahead.

MR. BEATY:  It's simply that he provided this money to people for time spent with him in Los Angeles.

THE COURT:  And the point of this is show it was around the same time as what?

MR. BEATY:  When he said he was very, very busy and wasn't able to prepare his tax returns, he was -- he had time for social engagements, Your Honor.

THE COURT:  Mr. Kravis?

MR. KRAVIS:  So we object.

First of all, these are not the right dates.  The evidence we went over yesterday showed that Mr. Deyhle e-mailed Mr. Goldstein out of the blue on October 8 asking for the poker numbers.  Mr. Goldstein testified that he was busy between October 8 and October 13, when they have their e-mail exchange.

These expenses all predate Mr. Deyhle's October 8 e-mail.  This has nothing to do with anything.

**MR. BEATY:**  Your Honor --

**THE COURT:**  Just a moment.

Go ahead, Mr. Kravis.

**MR. KRAVIS:**  Second, I think the insinuation here is enormously prejudicial.  I think what Mr. Beaty is saying is that he has some reason to believe that Mr. Goldstein was paying for escorts.  If that is what is going on here, I think that is -- this is just enormously prejudicial evidence, and the probative value at this point is incredibly small.

**THE COURT:**  Mr. Beaty?

**MR. BEATY:**  Your Honor, if the only period that mattered was October 8, then why were we looking at travel expenses for the 2nd through whenever?  Why on earth were we hearing about the good guys?  That is not how this happened.

What Mr. Goldstein did on direct yesterday was explain how he had traveled all the way out to Los Angeles.  He was so busy pouring over this, and it is completely fair -- he has opened the door to what else he was doing at that time.

And, candidly, we appreciate that he wasn't thinking about his taxes or working on this poker journal, but he was working on other things.

THE COURT:  All right.  I'm going to first say ask him first and see what the responses are, and then we will see if we are going to pull the document up and walk through the expenses.

MR. KRAVIS:  I do think that the questions should be precise about the chronology here.  I think the timing is wrong.  I just don't think these -- I think these expenses came before there was any discussion about the poker numbers.

The whole point of the testimony yesterday was that it was -- that he got the poker e-mail out of the blue on October 8, and that's when he was very busy.  This is before Mr. Deyhle even reached out to him.

MR. BEATY:  Again --

THE COURT:  Counsel, I'm going to ask Mr. Goldstein to take off his piece for just a moment.

MR. KRAVIS:  The reason I'm making the point about the timing is because the timing is very important here.  The testimony was --

THE COURT:  I understand that.  I get that.

Go ahead.  Mr. Beaty, ask him first.  If he doesn't respond, then we can pull up the document and you can walk him through the expenses.  I think the issue of timing is a fair

point, and that's something you can raise on redirect.  The government will have to explain why they disagree.

So ask him first what he was doing, and then if he's still not acknowledging other stuff, then you can pull up the document.

MR. KRAVIS:  I do just want to note the objection --

THE COURT:  Mr. Kravis?

MR. KRAVIS:  -- that this is enormously prejudicial and the probative value is minimum.

THE COURT:  The objection from the defense is noted.  At this time, it's overruled.

(Whereupon, discussion concluded.)

BY MR. BEATY:

Q.   Mr. Goldstein, you were in Los Angeles in -- you were in Los Angeles October 2 of 2017?

A.   I believe we saw that I was there after that.

Q.   By October 3, you were there?

A.   Mr. Beaty, I believe you know when I was there.

Q.   You were there by October 5?

A.   I was there by October 5.  Okay.

Q.   Do you disagree with that?

A.   Quite the opposite.

Q.   While you were there, you were working on the Beaver Creek -- whatever it is -- brief for the good guys; right?

A.   In that period, sure.

Q.    In that period, were you spending your time on anything else?

A.    I'm sure.

Q.    And those were personal endeavors?

A.    I'm sure there were personal things and business things, sure.

Q.    Now, you instructed Gelman to file an amended tax returning for tax year 2021; correct?

A.    Yes.

Q.    You worked with Walter Deyhle on that tax return in 2023?

A.    Yes.

Q.    The only change to that amended tax return for 2021 was adding Amy Howe's income?

A.    Yes.  Gelman had forgotten to include it, and so later, they fixed it.

Q.    And your amended Form 1040 for 2021 still did not disclose your cryptocurrency transactions?

A.    Didn't check that box.  That's correct.

Q.    Also didn't pick up any income from there; right?

A.    Correct.

Q.    And you are telling the jury that all your tax problems were Gelman's fault?

A.    I'm responsible for my taxes.

Q.    And you are all paid up now?

A.    For --

**MR. KRAVIS:** Objection. No. No. No. No. Objection. No.

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:** Mr. Goldstein? Mr. Kravis?

**MR. KRAVIS:** Yes, Your Honor.

**THE COURT:** Mr. Beaty?

**MR. BEATY:** Yes.

**THE COURT:** Mr. Kravis, go ahead.

**MR. KRAVIS:** I think we just went over this. I think just before the jury came in, Mr. Beaty said, "Well, now he's opened the door to the after 2022 stuff." I said we are in exactly the same place, and I thought the Court agreed with me and said we were not going there.

I would also note that if we are going to be getting into what is happening now, Mr. Goldstein has Fifth Amendment privileges. That was the point of the filing that we made -- one of the points in the filing we made yesterday.

**THE COURT:** Mr. Beaty?

**MR. BEATY:** Your Honor, on direct examination, he testified -- I'm sure will remind me of the quote, but it was that, "I accumulate debts, but I always pay all of my debts." Specifically, "I built up debts, but I will always pay them."

And the point, Your Honor, is that was his direct testimony, I believe it was today, and that's not true.

Credibility is always, always relevant, and the government should be allowed to pursue this.

THE COURT:  Mr. Kravis?

MR. KRAVIS:  As I believe the Court is aware from a recent prior case, inquiries into credibility do not trump a Fifth Amendment privilege.

If the government is going to start asking now about uncharged conduct that post dates the time period, then I think -- first of all, I don't think this should come in.  I think the Court has already ruled on this several times, that this stuff is out.

If that ruling is changing, then I think we need to excuse the jury and I need to talk about to my client about his Fifth Amendment privileges here.

THE COURT:  Mr. Beaty?

MR. BEATY:  Your Honor, Rule 608, I believe, is very clear about this.  Mr. Goldstein does have a right to assert that, and if need as a break, I'm a reasonable man.  I don't mind taking a break.

But this is relevant.  What he said is now -- I'm impeaching him with his later conduct, and I'm impeaching what he said, and I -- frankly, the answer is -- the case law is really very straightforward here.  He does have a Fifth Amendment right and he can assert it.  I don't have any angst about that.  But it is relevant.

**MR. KRAVIS:** I think the Court has ruled, like, four different times.

**THE COURT:** Yes, I have, and the challenge is we are now on cross and we have 608 issues, and the government, or anyone on cross, has a little bit more latitude. It's on the bubble.

I'm inclined right now to say no, but I think the government makes a point, and if we need to pause and have a conversation, we can.

I'm going to say no. Let's move on, and you can come back to it at the end of cross.

**MR. BEATY:** Thank you Your Honor.

(Whereupon, discussion concluded.)

BY MR. BEATY:

Q. You chose, Mr. Goldstein, to fire Gelman in 2023?

A. For part of the accounting.

Q. I'm sorry?

A. For part of the accounting.

Q. You mentioned during direct examination today some of the conditions of your pretrial release in this case?

A. Yes.

Q. The Court ordered you not to violate federal law while on pretrial release?

A. I'm sure that is a condition.

Q. Let's switch topics.

You chose not to pay your taxes on time every year?

A.    In full, that's correct.

Q.    Government's Exhibit-12.

    MR. BEATY:  May I have the screen, Your Honor?  Or Mr. Cook?  Thank you.

    THE COURT:  Mr. Cook?

    MR. BEATY:  Thank you.

BY MR. BEATY:

Q.    In your draft e-mail, you said you had $800,000 still in Asia that you could have used for your taxes; correct?

A.    Yes.

Q.    You chose to just pay penalties instead?

A.    I chose to pay a debt, and then to pay penalties to the IRS.

Q.    I see in your e-mail here you said, "I'm paying" -- "just paying penalties instead.  That's fine.  And it's my problem."  Right?

A.    Yes.

Q.    Penalties are a punishment?

A.    Penalties are a punishment.

Q.    You get punished when you do something wrong?

A.    Yes, sir.

Q.    You chose to spend plenty of money on whatever else interested you; right?

A.    That's an overstatement, but I did spend a lot on personal

expenses.  Absolutely.

Q.   Poker?

A.   Yes.

Q.   Travel?

A.   Yes.

Q.   Cars?

A.   Yes.

Q.   Watches?

A.   Yes.

Q.   All while you owed million of dollars to the IRS?

A.   Yes.

Q.   You chose to pay $190,000 to rent an apartment in Hollywood in 2017?

A.   Yes.

Q.   Chose to buy a $225,000 Bentley in 2017?

A.   That's not quite right.  I mean, I purchased it, and then I made payments on it.  I paid a down payment on it.

Q.   And the purchase price was 225,000?

A.   Yes.

Q.   Chose to rent David Velasco's house in Hermosa Beach, California, in July and August 2018?

A.   Yes.

Q.   You paid him $70,000?

A.   Yes.

Q.   You chose to stay at the St. Regis in Bali in 2018; right?

**A.**    Yes.

**Q.**    And that wasn't for work; right?

**A.**    No.

**Q.**    And that trip cost you $17,000?

**A.**    Yes.

**Q.**    January 2020, you spent $12,000 at The Box nightclub?

**A.**    I'm sure.

**Q.**    That's in New York?

**A.**    Yes.

**Q.**    Government's Exhibit 771, you chose to buy another Bentley in June of 2020?

**A.**    Yes.

**Q.**    You met with Revenue Agent Parrish in March of 2019?

**A.**    Yes.

**Q.**    That's the person from the IRS who was trying to collect your tax deficiencies?

**A.**    Yes.  This is before I go get the money, yeah.

**Q.**    Uh-hum.  And you told her in March 2019 that you had sold the 2017 Bentley?

**A.**    Okay.  I would have to look back at the notes, but I believe you.

**Q.**    Fifteen months later, here you are again buying another Bentley?

**A.**    Yes.

**Q.**    Government's Exhibit 880.1, you ask Niko Contardi to find

you this 2020 Bentley?

**A.**   What would you like me to do with this document?

**Q.**   I'm sorry.  Let me show you Exhibit 880.1.  Sorry.

You ask Niko Contardi to find you the 2020 Bentley?

**A.**   I asked him to find the 2020 -- yes.

**Q.**   And then he sent you a brochure?

**A.**   Yes.

**Q.**   That was the brochure we were just looking at?

**A.**   Yeah.

**Q.**   Page 3 of 880.1, it was super important that your new Bentley had the special rotating clock?

**A.**   It says that I want the rotating clock.

**Q.**   Everybody loves a rotating clock; right?

**A.**   I don't suppose everyone loves a rotating clock, no.

**Q.**   That feature alone cost $8,000?

**A.**   Yeah.

**Q.**   Again, you chose to pay $290,000 for that Bentley?

**A.**   And then a million dollars in penalties and interest, that's true.

**Q.**   Again, penalties for punishments?

**A.**   Punishments, but they are civil punishments.

**Q.**   Chose to rent an apartment in Miami in 2021 for 143,000?

**A.**   Yes.

**Q.**   Chose to rent an apartment in Waldorf Astoria in Las Vegas in 2021 for 200,000?

**A.**   Sure.

**Q.**   Government's Exhibit 779, page 2, February 2022, you spent $5,000 at The Box nightclub in New York?

**A.**   I guess you guys were following me around.

**Q.**   You are thinking too highly of yourself, sir.

But do you disagree that you spent that?

**A.**   No.

**Q.**   You hadn't paid off your taxes as of February of 2022?

**A.**   No.  I paid them off after this, that's true, a few months.

**Q.**   April 2022, you spent $21,000 at The Box nightclub in New York?

**A.**   Okay.  Yes.

**Q.**   You still hadn't paid off your taxes?

**A.**   No.  We are getting closer, but, yes, that's true.

**Q.**   Let's see how much closer we get.  Let's look at May in 2022 when you spent $46,000 at The Box nightclub in New York. Do you see that?

**A.**   Yes.

**Q.**   Eight bottles of champagne, six bottles of tequila, 14 small bottles of water?

**A.**   I don't drink that much.  It's not just me, but yes.  Yes.

**Q.**   You were hosting others?

**A.**   I was hosting others, yes.

**Q.**   Page 9 of Government's Exhibit 779, August 2022, spent

$60,000 at The Box nightclub in New York?

**A.** Yeah.  I've won the money.

**Q.** Seven bottles of tequila, 15 bottles of glow-in-the-dark champagne, a bottle of vodka and ten large bottles of water?

**A.** Yeah.

**Q.** They really get you on that $10 large bottle of water, don't they?

Still hadn't paid your taxes?

**A.** No.  I won the money, so it's in process.

**Q.** You still hadn't paid your taxes?

**A.** I trust you.

**Q.** You paid Niko Contardi $382,000 on November 28, 2022 to rent a house in Saint Barts?

**A.** Yes.

**Q.** That's it?

**A.** Pardon?

**Q.** That's a picture of it?

**A.** Yes.

**Q.** You hadn't paid your taxes yet?

**A.** Okay.  Yes.

**Q.** Government's Exhibit 874, you bought a Audemars Piguet watch.  Did I pronounce that correctly?

**A.** I actually don't know, but yes.

**Q.** You bought that watch in 2022?

**A.** Yeah.

**Q.** You chose to pay $200,000?

**A.** Yeah.

**Q.** For a watch?

**A.** Yeah.

**Q.** You hadn't paid your taxes off yet?

**A.** No.  This is really special thing.  I --

**Q.** Well, you can explain that on redirect.  I guess the question is, you had not yet -- at the time you purchased this, you had not, in fact, paid off your taxes; right?

**A.** This is to celebrate paying off my taxes.

**Q.** Great.  You still think you are the victim here; right?

**A.** I'm sorry?

**Q.** You still think you are the victim here?

**A.** Still?

**Q.** Yep.

**A.** No.  I do not think I'm the victim here, sir.

**Q.** Now, you chose some text messages to talk about with the jury yesterday and today?

**A.** Okay.

**Q.** On Monday you disclosed to the government three forensic experts that you had hired to extract data from two cell phones?

    **MR. KRAVIS:**  Well, objection.

    **THE COURT:**  Come to the headsets.

    (Whereupon, a discussion was held outside the presence of

the jury.)

THE COURT: All right. Mr. Goldstein? Mr. Kravis? Mr. Beaty?

MR. BEATY: I'm here, Your Honor.

THE COURT: Go ahead, Mr. Kravis.

MR. KRAVIS: So I don't think it's proper for the government to object and try to exclude our evidence and then start using it on cross-examination. They just went into -- they just referenced in front of the jury three -- not experts, three witnesses that we were going to present, and they opposed.

Why -- I don't understand why they would be allowed to do that. I also think it's not proper for them to object to the admission of evidence and then start using it themselves. The evidence should be in or out.

THE COURT: I'm not really sure where we are going, Mr. Beaty.

MR. BEATY: Your Honor. It's simple. The question is: We ask to inspect -- or we commanded our lawful right under the discovery rules -- I'm not going to ask that questions.

THE COURT: We're not going to discuss what --

MR. BEATY: Fair enough. I'll move one.

MR. KRAVIS: I don't --

MR. BEATY: I'll just move on.

MR. KRAVIS:  But what are we doing about the fact that we just mentioned three forensic experts to the jury that came out of nowhere and now they have heard about these forensic people?

THE COURT:  I'm going to instruct to disregard if you want the Court to do that.

MR. KRAVIS:  I would like that instruction.

MR. BEATY:  No problem.

THE COURT:  All right.  I'm going to need the court reporter to read back the line correctly because I don't have it clearly here.

So, Madam Court Reporter, I want you to read back -- go back to the husher.

Madam Court Reporter, I want you to read back the line about --

MR. KRAVIS:  I'm sorry, Your Honor.  You know what, I would actually prefer to address it on redirect.

THE COURT:  All right.  That makes a little bit more sense to me, too.

MR. KRAVIS:  Okay.

THE COURT:  All right.  Okay.

(Whereupon, discussion concluded.)

BY MR. BEATY:

Q.   We can agree, Mr. Goldstein, that trials are a search for truth?

**A.**    Yes.

**Q.**    You testified on direct examination about some additional poker journal that you and Mr. Phua shared with one another?

**A.**    The ledger, yeah.

**Q.**    You never provided a copy of that document to Mr. Deyhle?

**A.**    No.

**Q.**    You advances some legal fees on Mr. Phua's behalf in the United States in 2016?

**A.**    Yes.

**Q.**    You paid $82,000 to Kroll on behalf of Mr. Phua in June of 2016?

**A.**    Yes.

**Q.**    You paid $300,000 of lawyer fees on behalf of Mr. Phua in July 2016?

**A.**    Yes.

**Q.**    And Mr. Phua credited your account with $382,000 for those two payments?

**A.**    Yes.

**Q.**    You also deducted those as business expenses on Goldstein & Russell's corporate tax return in 2016; right?

**A.**    Yes.  And then paid taxes on the money.

**Q.**    You understand what deductions do; right?

**A.**    Right.  And then I counted it as income.

**Q.**    Great.

    Let's see if we can agree on point three.  Tom Goldstein

does not always tell the truth?

**A.** Sure.

**Q.** You lied to the mortgage companies, FSM and NFM, about your debt to Stewart Resnick?

**A.** Yes.

**Q.** You did not include your debt to the Resnicks on your mortgage applications?

**A.** Correct.

**Q.** You did not include your debt to Bob Safai on your mortgage applications?

**A.** Correct.

**Q.** You testified you don't know where you were in the world when you signed the February 2020 application to FSM?

**A.** Which one is that?

**Q.** The first application?

**A.** I think I was in the DMV, but I don't know exactly where. I mean, it's a -- at that moment in time, I don't think anybody does.

**Q.** And you said you were in the islands when you signed the second one, March 2021?

**A.** Yep.

**Q.** Which island?

**A.** Saint Thomas.

**Q.** Ms. Howe was not with you in Saint Thomas?

**A.** No.

Q.    She was home in Maryland?

A.    I don't know if she was home in Maryland.

Q.    The IP address from the DocuSign shows both those applications were signed from Maryland, though; right?

A.    I don't think that's true.

Q.    You didn't watch that evidence?

A.    I did watch that evidence.  That's not what it says, but okay.

Q.    Ms. Howe did not know about your poker losses?

A.    Mr. Beaty, you know that I was in Saint Thomas.

Q.    I don't know where you were.

      You know that Ms. Howe did not know about your poker losses?

      THE COURT:  Counsel and Mr. Goldstein, you are starting to talk over each other.  Let's slow it down just a bit.

      THE WITNESS:  I had said that you knew where I was.

BY MR. BEATY:

Q.    I don't know that I do because I don't know that much about you.

      My question is simple.  Ms. Howe did not know about your poker losses?

A.    Correct.

Q.    And that's why she cosigned a false mortgage application that did not include your poker debts?

**A.**   That's true.

**Q.**   You lied to your wife about your poker debts?

**A.**   Yes.

**Q.**   What else did you lie to her about?

        **MR. KRAVIS:**   Wait, hold on.   Objection.

        **THE COURT:**   Please come to the headsets.

    (Whereupon, a discussion was held outside the presence of the jury.)

        **THE COURT:**   Mr. Goldstein, can you hear us?

    Mr. Kravis?

        **MR. KRAVIS:**   Yes, Your Honor.

        **THE COURT:**   Mr. Beaty?

        **MR. BEATY:**   I'm here, Judge.

        **THE COURT:**   Go ahead, Mr. Kravis.

        **MR. KRAVIS:**   So I have two objections here.

    The first is I just generally don't think that's a proper question.   Even on cross, when you are attacking credibility, I don't think you can just ask a witness, "What else have you lied about?"

    I believe what the rule says is that the witness can be confronted with specific instances of conduct that goes to their character for truthfulness, so I think a specific example is what is appropriate, not just, like, what have you lied about?

    Second, I think Mr. Beaty is now getting into evidence

that the Court has repeatedly excluded regarding Mr. Goldstein's personal relationships.

**THE COURT:** Well, on the first point, I would tend to agree.

On the second point, Mr. Beaty, what are your thoughts?

**MR. BEATY:** Your Honor, I'm purposely turning this way. I hear you on the first part. Typically, we would ask. I would be happy to ask that, but I think, candidly, Mr. Goldstein's credibility is -- well, I don't have to think it. It is --

**THE COURT:** Well, his credibility is certainly something you can address on cross. I'm just trying to understand. I do think you need to ask specific examples.

So is the issue about getting into the affairs? Is that the concern?

**MR. BEATY:** Yeah. I mean, I think he is leading this massive -- I don't want to get into the specifics. I don't care.

But he's leaving this as, well, I just didn't tell her about the debts. There is a whole other part of his secret life that he was not telling his wife, and that is -- I can ask it just that simply or whatever it is but, I mean, I think this is fair at this point.

**THE COURT:** Mr. Kravis, I tend to agree the government can explore this on credibility, so we're kind of

treading in a little area where it's going to be difficult.

So if he asks specifics, he's going to, I can assume, ask about specific individuals.

MR. KRAVIS:  First of all, I think that is enormously prejudicial.  More prejudicial than probative at this point.

I would also note, Mr. Goldstein has a marital communications privilege not to testify about communications with his spouse that occurred during the marriage.

THE COURT:  Well, he can assert the privilege if he wants to.

MR. KRAVIS:  Well, I don't think he should have to do that in front of the jury.

MR. BEATY:  I'm not going to ask him any questions about those communications.  I can phrase it without that.

THE COURT:  Let's try it and see how it goes.

If not, we are going to have to voir dire him outside the presence of the jury.  Let's try it without.

(Whereupon, discussion concluded.)

BY MR. BEATY:

Q.   There are other things, Mr. Goldstein, that your wife did not know?

MR. KRAVIS:  Well, I have the same objection.

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT:  Mr. Goldstein?  Mr. Goldstein, can you

hear us?

Mr. Kravis?

MR. KRAVIS: Yes, Your Honor.

THE COURT: Mr. Beaty?

MR. KRAVIS: Again, I just don't think --

THE COURT: Wait a minute.

Mr. Beaty, are you on?

MR. BEATY: I am. Sorry.

MR. KRAVIS: Again, I just don't think this is a proper method of cross-examination on credibility. Asking, you know, what are some things that another person does not know. Like, I just don't think you are allowed to do it this way.

THE COURT: Mr. Beaty, go ahead.

MR. BEATY: He specifically said don't ask about communications. I'm happy to just ask him a pointblank question, and we will just go from that.

THE COURT: I mean, you kind of have to be specific. So if you aren't specific, I'm going to probably be right back on here. But, I mean, on cross, you need to ask him did you lie about this, did you -- you know, whatever. Let's try.

MR. KRAVIS: I will also note -- I want to note one more thing, which is our -- one of our prior motions, the motion in limine we filed previously, specifically cited case law about extramarital affairs not being relevant to credibility, not being probative of character for truthfulness.

There is case law on this.

THE COURT:  Mr. Beaty, anything further?

MR. BEATY:  Nothing further, Your Honor.  I think he has opened the door to all of this.

THE COURT:  I think the government is allowed to ask the question.  We'll see what happens.

MR. BEATY:  Thank you.

(Whereupon, discussion concluded.)

BY MR. BEATY:

Q.  Mr. Goldstein, you did not tell your wife that you were having many, many affairs on her; right?

A.  To tell you what I talked about with Amy, I would have to tell you about my conversations with Amy.

Q.  You are declining to do that; is that fair?

MR. KRAVIS:  No.  Objection.

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT:  Mr. Goldstein?  Mr. Kravis?

MR. KRAVIS:  Yes, Your Honor.

THE COURT:  Mr. Beaty?

MR. BEATY:  Sorry.  Got it.

THE COURT:  Go ahead, Mr. Kravis.

MR. KRAVIS:  So, I mean, I raised the objections.  I don't think this is proper.  I think there is case law that says that extramarital affairs are not probative of

truthfulness.  I think this is substantially more prejudicial than probative.

I understand the Court has disagreed.  Mr. Goldstein is not required to assert a privilege in the presence of the jury.

THE COURT:  That is correct.

MR. BEATY:  Let's just move on.

THE COURT:  Let's move on.

(Whereupon, discussion concluded.)

BY MR. BEATY:

Q.   You also lied to Parabellum?

A.   Yes.

Q.   You signed two separate guarantees?

A.   Yes.

Q.   You did not disclose your debts to the Resnicks to Parabellum?

A.   Correct.

Q.   You did not disclose your debt to Bob Safai to Parabellum?

A.   Correct.

Q.   Ms. Howe was not a cosigner on the Parabellum guarantees?

A.   That is correct.

Q.   So you weren't hiding anything from Ms. Howe on those applications; right?

A.   No, because the Parabellum ones were intimately tied to the mortgage.  They're the underlying documentation.

Q.   You lied to other people as well?

MR. KRAVIS:  Objection.

MR. BEATY:  I'll just -- withdrawn.

BY MR. BEATY:

Q.    Keith Gipson trained you take on three targets?

A.    Yes.

Q.    Keith Gipson was a professional poker player?

A.    Yes.

Q.    You lied to Alec Gores about who Keith Gipson was?

A.    I may have understated it, but whatever.  Sure, let's just assume that I lied.

Q.    You lied to Paul Napoli to get his $500,000 poker investment?

A.    Yes.

Q.    And you lied to Paul Napoli when you were telling him that he had winnings?

A.    That's right.  I was overpaying him by, like, $570,000.

Q.    Showing you Government's Exhibit 172.

      That an example of that?

A.    Yes.

Q.    You lied to Stewart Resnick when you got a $10 million line of credit?

A.    I won't argue with you.  Yes.

Q.    Because you told him you were going to invest in a poker player named Dan?

A.    Yeah.  But there are -- in years that follow, it's very

clear to Stewart what I'm doing.  But at the very beginning, yes.

Q.    And you just used the money yourself?

A.    I used it to play poker, and Stewart then knew.

Q.    You were shown on direct examination a text message, Defense Exhibit --

MR. KRAVIS:  Wait, hold on.  Objection.

Can we take it down?

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT:  Mr. Goldstein?  Mr. Goldstein, can you hear us?  Mr. Goldstein?  Mr. Goldstein?  All right.

Mr. Kravis?

MR. KRAVIS:  Yes, Your Honor.

THE COURT:  Mr. Beaty?

MR. BEATY:  I'm here, Your Honor.

THE COURT:  Go ahead, Mr. Kravis.

MR. KRAVIS:  This is not the redacted version.  It's not the version I used, and I thought we had discussed before the jury came back that we were not getting into the personal relationship between these two people.  I thought that was exactly what we discussed.  The unredacted --

THE COURT:  I'm not even sure what the document is.  Can someone put it on the screen?  The version -- I know the document, but the version that we are concerned about now?

MR. BEATY:  I am going to show the version that I will show, and I will make sure that it's redacted.

THE COURT:  Are these the text messages between Mr. Goldstein and employee four?

MR. KRAVIS:  Yes.

MR. BEATY:  So that's what I'll show.

THE COURT:  That's fine.

(Whereupon, discussion concluded.)

BY MR. BEATY:

Q.   You texted Kristina Adamova about picking up money in Asia?

A.   Yes.  Not just picking up money.  Picking up cash.  One to $2 million in cash to pay taxes, yes.

Q.   When you said "not just that," what else did you mean?

A.   I'm sorry?

Q.   You just said "not just that," what else did you mean?

A.   That I said I was picking up 1 to 2 million in cash I'm borrowing to pay taxes.  LOL.

Q.   You also texted Ms. Adamova when you were done with Officer Foy?

A.   Yes.

Q.   You expressed how Officer Foy reacted to carrying through a million dollars of cash?

A.   Yes.

Q.   Now, you were paying Ms. Adamova through your law firm?

**A.**   I don't know if at this time, but she was a translator that got hired by the firm for a short time, yes.

**Q.**   As a Russian translator?

**A.**   Yes.

**Q.**   And you told Mr. Levitan you were paying her $900 per week?

**A.**   Yes.

**Q.**   Ms. Adamova did not, in fact, do any work for your firm?

**MR. KRAVIS:**   Objection.

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:**   Mr. Goldstein?  Mr. Kravis?

**MR. KRAVIS:**   Yes, Your Honor.

**THE COURT:**   Mr. Beaty?

**MR. BEATY:**   I'm here, Your Honor.

**THE COURT:**   I think I know where you are going.  Go ahead, Mr. Kravis.

**MR. KRAVIS:**   We just talked about this.  We just talked about how we were not getting into this.  "Ms. Adamova did no work for your firm," we just talked about this.

**THE COURT:**   Mr. Beaty, where are we going?  I know we talked about giving some context and we know who the person was.  What are we talking about now with whether she did work for the firm?

**MR. BEATY:**   He has now said that she was a Russian

translator for the firm.  I think, Your Honor, we are permitted to now ask him about the veracity of that.  That was his testimony.  I didn't -- he volunteered that.

THE COURT:  Mr. Kravis?

MR. KRAVIS:  This is the employee that went on unpaid medical leave right after she started with the firm.  We litigated this so many times in front of the Court.  We just talked about this.

THE COURT:  All right.

MR. BEATY:  This is why we have redirect, Your Honor.

THE COURT:  I understand that.  I'm just trying to figure out how far -- what is the point of now following up -- he's testified who she is from his point of view.

Now, what are you trying to make -- what is the point you are trying to make with your next question?

MR. BEATY:  The next question, Your Honor, I have to show you, he sends her an e-mail saying, "You can't speak English."  And that's a pretty important role for someone who is translating from Russian to English.

THE COURT:  So you want to, basically, challenge whether she was a translator or not --

MR. BEATY:  Yes.

THE COURT:  -- by showing this document --

MR. BEATY:  Yes.

THE COURT:  -- which is an e-mail between --

**MR. BEATY:** I'll put it up.

**THE COURT:** Put it up on the screen.

Can you see it, Mr. Kravis?

**MR. KRAVIS:** Yes, Your Honor.

**THE COURT:** All right. Go ahead.

**MR. KRAVIS:** What is the point of any of this? Where we -- I just want to remind the Court where we started here.

Mr. Goldstein sent one text message to her that mentions he's picking up a loan. She doesn't respond. There is no communication from her.

Okay. The government wants to do a little context. She was employed by the firm. She was employed as a translator, whatever. Now, we are getting into this was a time when the two of them had an argument. They had a personal relationship. There was a time when they had an argument, and they said some mean things back and forth to each other during this time.

What does this have to do with anything like that?

**THE COURT:** I'm not sure. Mr. Beaty?

**MR. BEATY:** Your Honor, the answer is simple. He testified that he was hiring her and paying her as a translator. He has opened the door to this, and it -- notwithstanding what happened -- that we dismissed the 2018 tax evasion count, this is still very alive and --

**THE COURT:** Okay. I understand, but I think we're now two or three degrees from context about who she is. I'm

going to sustain the objection.

MR. BEATY:  Very well, Your Honor.  Thank you.

(Whereupon, discussion concluded.)

BY MR. BEATY:

Q.   Mr. Goldstein, you lied to Revenue Officer Parrish in April of 2018?

A.   No.

Q.   You lied to Special Agent McDonald during your interview on October 14, 2020?

A.   No.

Q.   The IRS criminal investigators didn't exactly ambush you; right?

A.   Pardon?

Q.   They didn't exactly ambush you --

A.   No.  I knew they -- I heard from them -- or through them several hours before.

Q.   They came to your office?

A.   Yes.

Q.   You weren't there?

A.   Correct.

Q.   They came back hours later?

A.   Yes.

Q.   You had hours to pull together documents?

A.   I did not have hours, but I had the time I needed.

Q.   You had hours to come up with your story?

**A.**    Pardon?

**Q.**    You had hours to come up with your story?

**A.**    No.

**Q.**    Your story yesterday and today is different than what you told the IRS Special Agents on October 14, 2020?

**A.**    No.

**Q.**    What you are telling this jury is that everything you have told them over the last two years is entirely consistent with what you told them?

**A.**    As I understand it now, I believe so.  If I'm wrong, I apologize.

**Q.**    The plan was always for you to testify at trial; right?

        **MR. KRAVIS:**  Hold on.  Hold on.

        **THE COURT:**  Let's go to the husher.

    (Whereupon, a discussion was held outside the presence of the jury.)

        **THE COURT:**  All right.  Mr. Goldstein?  Mr. Kravis?

        **MR. KRAVIS:**  Yes, Your Honor.

        **THE COURT:**  Mr. Beaty?

        **MR. BEATY:**  I'm here, Your Honor.

        **THE COURT:**  Go ahead, Mr. Kravis.

        **MR. KRAVIS:**  I mean, privilege.  Attorney-client privilege.  I mean, relevance.

        **MR. BEATY:**  I'm not asking for privileged communications.  I'm asking him his plan.  His plan has always

been to testify.

THE COURT:  No.  Objection is sustained.  No.

MR. BEATY:  Thank you, Your Honor.

(Whereupon, discussion concluded.)

BY MR. BEATY:

Q.  Government's Exhibit 58 -- 59.

THE COURT:  Counsel, since we are pausing for just a second, can we come to the husher, please?

MR. BEATY:  Sure.

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT:  Do we have everyone?  I want to give the jury a break around 3:00.

Mr. Beaty, can we find a break point?

MR. BEATY:  I think we are going to hit it.

THE COURT:  All right.  So we will do the break now?

MR. BEATY:  No.  I just mean I think we are going to --

THE COURT:  Let's try to do that.

MR. BEATY:  Great.

(Whereupon, discussion concluded.)

BY MR. BEATY:

Q.  Your 2020 and 2021 individual tax returns were filed after your interview with the IRS criminal investigation?

A.  Yes.

**Q.** You knew you were under criminal investigation?

**A.** Yes.

**Q.** And you still lied about not having cryptocurrency?

**A.** I don't think so.  No.

**Q.** Let's look at Defense Exhibit 338.  You tried to use cryptocurrency with FSM in February 2020 as part of your mortgage application?

**A.** Yes.

**Q.** Now, you also lied to the Court about your finances in August 2025?

**A.** Pardon?

**Q.** You also lied to the Court about your finances in August of 2025?

**A.** No.

**Q.** You submitted a declaration to the Court in August of 2025?

**A.** Okay.

**Q.** Government's Exhibit 790, do you see that?

**A.** Yes.

**Q.** Do you remember this?

**A.** Do I remember it?  Sure.

**Q.** Pages 4 and 5, declare under the penalties of perjury, do you remember that?

**A.** Yes.

**Q.** Just like your tax returns each year?

**A.**    Yes.

**Q.**    You listed the minimum -- minimal assets you claim to have at the time?

**A.**    Can I see the whole document?

**Q.**    Sure.  Let me get the full size up here.  Take as much time as you need.

**A.**    And you just want me to tell you when I want to see the next page?

**Q.**    Sure.

**A.**    Yes.  Next page.  Yes.

**Q.**    Next page?

**A.**    Please.  Okay.

**Q.**    Paragraph 21, you said you had staff at $5,000 a month?

**A.**    Yes.

**Q.**    Tell me when you need the next page.

**A.**    Sorry?

**Q.**    Tell me when you need the next page, sir.

**A.**    The next page, you already shared with me.

**Q.**    Do you feel like you are refreshed on this?

**A.**    Yes.  Thank you.

**Q.**    You're welcome.  Let's look at page 3, and let's zoom in here.

Paragraph 12, you said you didn't have any cryptocurrency?

**A.**    Correct.

**Q.**    You also said, other than what was listed, you didn't have

any other significant assets?

**A.** Correct.

**Q.** Again, that was under the penalties of perjury?

**A.** Yes.

**Q.** Now, we talked about that watch, Audemars Piguet, that you bought in November of 2022?

**A.** Yes.

**Q.** You still had that watch in August of 2025?

**A.** Yes.

**Q.** Do you still have that same watch on September 29, 2025?

**A.** Yes.

**Q.** You didn't tell the Court you had the watch?

**A.** No. I had tried to sell the watch. I believe I could not sell the watch. But it's not listed, that's true.

**Q.** You're friend Erik Boneta, Government's Exhibit 794, told you in September 2024 that that watch was still worth ninety to $100,000?

**A.** Yes. But there is a piece of that puzzle that's missing. I tried to sell it through Erik and Niko in late '24. And Niko had said that because the original buyer would not sign off on it, it would be hard to repair.

So if Niko cooperates -- I -- it ends up being worth around this much money, it's true, but that's what my understanding was at the time, yes.

**Q.** Again, you didn't disclose this to the Court?

**A.** No.

**Q.** And you didn't disclose this watch as an asset to U.S. Pretrial Services?

**A.** Well, no. That's not true. So what happens is, it's not an asset for pretrial services. You guys have jacked in court -- you say, hey, he has filed this thing. It's not on there. We have a concern with pretrial services.

I immediately go to pretrial services. I disclose it to pretrial services. I take your point that, look, you can't complain about you are completely broke. You sold your cars. You're trying to sell your house. You can't afford the lawyers. You don't have any money if you are holding this.

I then try for quite a while. I eventually find someone who can sell it -- who will buy it. I sell it, and then I use it to pay lawyers.

**Q.** You also lied yesterday about this constructive possession stuff with Mr. Phua?

**A.** Pardon?

**Q.** You lied yesterday about Mr. Phua having -- you holding money for him?

**A.** No.

**Q.** You received the Alec Gores winnings in your personal bank account?

**A.** Yes.

**Q.** That's your gambling account; right?

**A.**    It is the gambling account, sure.

**Q.**    You never held $9 million set aside in your bank accounts for Mr. Phua?

**A.**    You can't do that.

**Q.**    You didn't leave $9 million in your gambling account for Mr. Phua; right?

**A.**    Correct.

**Q.**    You burned through money the second you had it in your accounts?

**A.**    No.

**Q.**    You constantly instructed your assistants to transfer money between your accounts, did you not?

**A.**    Yes.

        **MR. BEATY:**    Let's look at Government's Exhibit 4. Excuse me.   4.1.   Let's start with page 11.

**BY MR. BEATY:**

**Q.**    You don't have $9 million set aside for Mr. Phua in your bank account in November 2016?

**A.**    No.

**Q.**    You received $9 million -- if we look at page 9, Government's Exhibit 4.1, you received $9 million from Mr. Gores in November?

**A.**    Sure.

**Q.**    Back to page 11.

        You received $10 million and you withdrew $6.3 million in

November of 2016?

A.   Yeah.  So you understand what is going on here?

Q.   You can explain that on redirect, sir.

A.   Okay.  That was just pointless.

Q.   Great.  You didn't have $9 million, looking at page 30, set aside for Mr. Phua in your bank account in December 2016; correct?

A.   Correct.

Q.   We are looking here -- we talked about that $1 million transfer?

A.   Yes.

Q.   We talked about that one yesterday?  Yes?

A.   Yeah.  I already said yes.  Sorry.

Q.   Just two transactions down is the return of that wire?

A.   Yes.

Q.   Again, 2018 -- excuse me -- December 2016, you received 18.6 million and you withdraw 16.9 million?

A.   Yes.

Q.   You did not have $9 million set aside for Mr. Phua in your bank account in January 2017?

A.   Do you actually want to know what happened?

Q.   Just answer this question, sir.  You can explain it all on redirect.

A.   Okay.  Whatever you want.

     Then ask the question.  I'm sorry.  Is there money set

aside for Paul Phua here, like literally set aside, no.

Q.   There is not.

Not in this account?

A.   No.

Q.   Not in any account?

A.   This is the gambling account.

Q.   You didn't have $9 million set aside for Mr. Phua in any bank account; correct?

A.   Now I can explain.  IM messages back and forth with Paul, both in the first instance about his share of the game detailing what he was owed down to the dollar, and then with Paul.

He agrees that I can use the money to pay Bob Safai because we are going to have the Tango exchange.

Q.   You received $200,000 in December -- excuse me -- 2017, January 2017, and you withdrew 6.7 million?

A.   Sorry.  Where do you want me to look?

Q.   Just on the screen.

$200,000 net withdrawals -- excuse me -- deposits, and there is $6.7 million net withdrawals; right?

A.   No.

Q.   You don't see that?

A.   It's 5.7.

Q.   You read that as 5.7?

Okay.  You are right, 5.7.  So let's just say it again.

You received $200,000, and you withdrew 5.7 million in December -- January of 2017?

A.   If you are -- if this is the bottom of the page, I will believe you.

Q.   Again, that 5.7, most of that was payments to Mr. Safai?

A.   Yes.

Q.   You told the jury that you did not use the IOLTA account to avoid the IRS levies?

A.   Correct.

Q.   And I believe that Mr. Kravis showed you this e-mail; correct?

A.   Yes.

Q.   And you weren't on this e-mail?

A.   Correct.

Q.   But Government's Exhibit 506, she did forward this e-mail to you; right?

A.   I'm sorry.  I don't understand.

Q.   You understand what forwarding an e-mail is?

A.   Obviously, sir.  But you are showing an e-mail.

I assume what you want me to know is that it's forwarding of that.  If you say that's a forward of it, sure.

MR. KRAVIS:  Wait.  Objection.

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT:  Mr. Goldstein, do we have you?

Mr. Kravis?  Mr. Beaty?  All right.

We are after 3:00, but go ahead.

**MR. KRAVIS:**  I am going to suggest that Mr. Goldstein remove his headset just for the thing I want to say now.

I asked him to remove his headset.

I'm not sure these are the same e-mails.  He was being shown a close up there.  I didn't want to do this with Mr. Goldstein on the thing because I don't want to be accused of coaching him, but I think they need to show him the whole e-mails here.  I'm not sure.  This is happening fast, but I don't think these are the same e-mail.

**THE COURT:**  Mr. Beaty?

**MR. BEATY:**  Yes.  When we take a break, Your Honor, we will sort this out.

**THE COURT:**  All right.

**MR. BEATY:**  I only -- I think it's truly ten minutes left, but it's not --

**THE COURT:**  We are going to take a break.  You all can consult about the document, and then we'll come back up and try to wrap up the cross and any redirect.  Thank you.

(Whereupon, discussion concluded.)

**THE COURT:**  Members of the jury, I think this is a good time for your afternoon break.  I am going to invite you to take it at this time.

Please rise for the jury.

(Whereupon, the jury exited the courtroom at 3:03 p.m.)

**THE COURT:**  Please be seated.

Mr. Goldstein, if you want to step down for a moment and return to counsel's table, that's fine.  Just please do not consult with your attorney about your testimony.

Anything before we take the break?

**MR. KRAVIS:**  Your Honor, in connection with the motion that defense filed last night, I do believe that the questioning I heard on cross has now opened the door to one prior consistent statement.

I'm happy to address it now, or if the Court would do it later.  I just don't want to break break, and so on.

**THE COURT:**  Can we do it briefly now or do you need time?

**MR. KRAVIS:**  I can certainly explain the issue briefly.

**THE COURT:**  Tell me what the issue is.  I read the papers.

**MR. KRAVIS:**  So the last exchange between Mr. Goldstein and the prosecution was, I think, directly challenging Mr. Goldstein's testimony on direct examination that Paul Phua had a $9 million share of Gores.

There is a text message from November 24, 2016.  It is Exhibit A to our motion.  It is a prior statement where Mr. Goldstein communicates that Mr. Phua has that share of the

Gores game.

Now that he's been accused of lying about that share, I think this comes in as Mr. Goldstein's prior consistent statement that predates the motive to fabricate.

**MR. BEATY:** I want to be clear. I did not say he lied about the share.

What I said was, this constructive possession, and that's all my questions were about, was whether he had set aside that $9 million.

In fact, if anything, I was merely going through where is that $9 million. I don't think it opened the door, and to the extent it references that Mr. Goldstein volunteered something about, "Well, I can explain," and then volunteered that he had a text message, he cannot open the door himself.

It should still be out. This is absolutely improper.

**THE COURT:** All right. I'll think about it over the break.

**MR. BEATY:** Thank you, Your Honor.

**DEPUTY CLERK:** All rise. This Honorable Court stands in recess for ten minutes.

(Whereupon, a recess was taken from 3:06 until 3:15 p.m.)

**DEPUTY CLERK:** All rise. This Honorable Court now resumes in session.

**THE COURT:** Please be seated, everyone.

Are we ready for the jury?

**MR. BEATY:** Your Honor, we had asked the question about the --

**THE COURT:** I forgot. Let me see the text message one more time.

**MR. KRAVIS:** Can we pull up 737.4.

**THE COURT:** And, again, is for redirect; correct?

**MR. BEATY:** Yes.

I will publish it, Your Honor. Sorry.

**THE COURT:** So this is a text message with Mr. Goldstein and who?

**MR. KRAVIS:** It is Mr. Phua's assistant, and you can see, in the fourth and fifth lines down, he says, "I play Gores Saturday and Sunday. PP has 70 percent. 50/50 with me."

That is Mr. Goldstein explaining -- PP is Paul Phua, has a 70 percent share. It's him describing Paul Phua's share in the Gores game.

**THE COURT:** All right. I guess maybe I misunderstood the testimony. I heard the government's cross to be about where the money was. Not the amount of the share, but whether there was a constructive holding of the 9 million in Mr. Goldstein's poker account.

Is that what we are saying?

**MR. BEATY:** That is my position, Your Honor, that it's no longer -- it's no more admissible because of that. I didn't ask him about this. I didn't -- I didn't contest that

he had a share.

The question was what we put away. So I don't think we opened door.

THE COURT: Mr. Kravis?

MR. KRAVIS: Respectfully, I don't think those two things are different. I think the question whether Mr. Phua actually had a share of the Gores game is directly connected to the issue that Mr. Beaty is exploring now, which is the question of the constructive possession of the funds. That was sort of the point of direct examination was if Mr. Phua has a share of your game, then why do we not see a wire going out to Mr. Phua for his money. Mr. Goldstein testified about that, that explanation, and that is what is now being challenged here.

THE COURT: So how much of the text do you want to show, the whole chain or --

MR. KRAVIS: No. No. No. The two messages. "I play Gores Sat and Sun. PP has 70 percent. 50/50 with me."

I'd also point out if the government is not challenging this, then I'm not sure what the prejudice is to them from it.

MR. BEATY: Because it's an out-of-court statement and it's improper.

THE COURT: It normally would be hearsay.

MR. BEATY: Yeah, it's hearsay.

Again, Mr. Goldstein has already testified to it. He can

continue to testify to it.  I have not challenged that in a way this becomes suddenly a prior consistent statement.  I was very careful request in my examination, measured even, in not touching that.

I just don't think it opens the door, Your Honor.

THE COURT:  Mr. Kravis, why do you think it's a prior consistent statement?

MR. KRAVIS:  The -- the -- the "PP has 70 percent, 50/50 with me," is a statement from back in 2016, from years before this investigation, from any of it.  It's a statement of Mr. Goldstein that Mr. Phua has a large share in the Gores game.

Mr. Goldstein himself can testify and explain exactly how much -- exactly how much that is.  I believe that while the government did not directly ask the question this way, they're attacking Mr. Goldstein's explanation of Phua's share of the Gores game by making the point that there was no $9 million of Mr. Phua's in Mr. Goldstein's account.

Those two concepts are the same concept.  That was the point of this aspect of his direct examination testimony.

THE COURT:  It comes in under 801(d)?

MR. KRAVIS:  Yeah.  It's a prior consistent statement.

MR. BEATY:  Your Honor, this does not say anything about the $9 million.  It doesn't say bank account.  It doesn't

say constructive possession.  It doesn't say -- it doesn't even -- it says PP.  It's from somebody who we don't know, isn't identified.

Again, this is textbook hearsay.  We didn't open the door.  The Court already ruled this out.  We have not done anything to open this.

**MR. KRAVIS:**  I would note that the rule -- I'm sorry.  I apologize.

**THE COURT:**  Counsel.

**MR. KRAVIS:**  I'm sorry.  I would note that the rule we cited and the cases cited in our filing -- the text of the rule is an expressed or implied charge that the declarant fabricated.  I think all these questions about the $9 million and so on is, at least, an implied charge that he is fabricating this point about Phua having a share of Gores.

**THE COURT:**  I think it depends on how you view the evidence.  I will let the defense have a little latitude on redirect.  And if the government wants to come back and revisit, I will let you do that as well, but it's very limited to just this, you know, "PP has 70 percent and 50/50 with me."

I think Mr. Goldstein has testified largely to that already.  I appreciate the document is a little different, but I will let it come in for that limited purpose on redirect.

If there is any more recross, that's fine.

Mr. Beaty?

**MR. BEATY:**  And it's that single text; correct?

**THE COURT:**  Yeah.  Just the "PP has 70 and 50/50 with me."

**MR. BEATY:**  Nothing else will come in.

**THE COURT:**  Mr. Kravis?

**MR. KRAVIS:**  "I play Gores Saturday and Sunday.  PP has 70 percent and 50/50 with me."

**THE COURT:**  Because that puts it in context.  Okay.  That's fine.  All right.  Okay.  We will deal with that on redirect.  And I'm going to give the government some leeway if you want to come back.

**MR. BEATY:**  I really don't.  Your Honor, I do -- but I have to come back on something else, which is, again, we are back to 2022.  Mr. Goldstein now -- after we had this last discussion, Mr. Goldstein testified that he bought the -- volunteered, for the record, that he bought the Audemars Piguet, the AP, for the purpose of celebrating that he had paid off all of his taxes.

Once again, he has opened the door.  And I want to show what is important.  He said it at various places, but I want to show you his testimony from yesterday because I think this -- he is -- I think we are strongly in 403 land.

Mr. Goldstein -- he does not get to use this as a sword and a shield.  He volunteers answers about how, you know, he's right on the law and he understands where he is.  At the same

time -- and yesterday he said, look, you got to learn lessons and implying that he has learned his lesson.

That is wrong.  It's wrong for the jury to be left with the impression that he has now filed all of his taxes and he is right with the IRS.  It's just wrong.  I didn't open that door.  He did.  He should not be able to both mislead the jury about --

THE COURT:  I don't think he actually says in the statement, "I've now paid all my taxes."

MR. BEATY:  No.  No.  He said that while he was on the stand today.  I don't have a copy because I don't have realtime transcript.  We can read it back, but when I asked him about the watch, he said, "Well, funny story.  I bought that watch to celebrate paying off my taxes."

We can read it back if we need to.

THE COURT:  I remember when he said it, but I think he was talking in the context there of the earlier taxes.

MR. BEATY:  Yeah.  But that's the whole point, Your Honor.  What he has told the jury is, I'm free and clear.  I'm celebrating because I'm all caught up.  Everything is great.  And that's absolutely misleading and strongly prejudicial to the United States.

And it's so overwhelmingly prejudicial because he's leaving them with the impression that everything is right, and it's not.

THE COURT:  All right.

MR. BEATY:  He still is not filing -- and at least for 2022, there is already a stipulation in evidence that he had net winnings -- or he didn't win.  Somebody lost to him $40 million.  And he lost to other people $20 million, which includes negative losses of $20 million that would have to be --

THE COURT:  Well, I guess on that comment about the watch being for celebration, that could have easily been clarified that he was talking about the taxes that were due at that point.  I'm not sure if that's enough to open the door, but let me hear from Mr. Kravis.

MR. KRAVIS:  Yeah.  I agree, that is exactly what I think Mr. Goldstein was testifying to.  If the government wants to clarify the points, the jury is not up for misimpression, I think that is fine.

Otherwise, I was planning to make that clear briefly on redirect.  But I just don't think that that is -- I think that is separate from the issue that the Court has already ruled on, I think, now like four different times.

MR. BEATY:  Your Honor, how could I -- we know how this went.  We did this with Adamova.  And, again, he's ably represented.  This is great.  Mr. Kravis is doing a great job.  I am not mad at him.  You're welcome.

But what is happening here is clear.  I could go back and

say, oh, you were only celebrating prior taxes; right?  And I could clear that up, and he could say that.

But he is still leaving the impression that everything else is okay.  And with the next question is, where are you now?  There is going to be an objection because their answer is, oh, you can't do that.  It is -- you know how I feel, Judge.

THE COURT:  I understand.  I don't see the testimony that's quite putting us in the same place, but I understand the government's concern and your strong position on this.  I'm not changing my ruling at this point.

MR. BEATY:  Understood, Your Honor.  I'll abide.  I'm ready for the jury.

THE COURT:  All right.  Mr. Kravis, are we ready for the jury?

MR. KRAVIS:  Yes.  Thank you, Your Honor.

THE COURT:  All right.  Let's have the jury.

Please rise for the jury.

(Whereupon, the jury entered the courtroom at 3:26 p.m.)

THE COURT:  Please be seated, everyone.

Mr. Beaty?

MR. BEATY:  Thank you, Your Honor.

BY MR. BEATY:

Q.   Mr. Goldstein, let's go back to where we were when we broke.  Let's look at Government's Exhibit 506, and I will put

it up on the screen for you.  Take a moment to read that to yourself.  You tell us when you are ready.

A.    Okay.

Q.    Gelman told Ms. Gou that your payment plan was canceled on February 24, 2021.

A.    Okay.

Q.    Do you see that?

A.    Yes.

Q.    Scroll up.  Ms. Gou then communicated that -- forwarded that e-mail to you on February 24, 2021?

A.    Yes.

Q.    So you were aware that the payment plan had been canceled?

A.    Oh, no.  You are leaving out a bunch of other messages.

Q.    Great.  I'm just talking about the ones in this chain.

A.    You mean from the moment 239 as opposed to all the things that followed?  Sure.

Q.    I see.  There is something else that follows the matters. Is that what you are saying?

A.    I believe that there's -- this is part of a series of e-mails back and forth.  There is a phone call.  There is a lot that happens.

Q.    Okay.  Again, February 24, 2021, you are notified payment plan is canceled.

A.    Okay.

Q.    Mr. Marks was paid $79,000 for his expert conclusions?

**A.**    That's what I heard, too.

**Q.**    Let's see if you can answer the question he could not.

**A.**    Okay.

**Q.**    Accountants can't report transactions if they don't know about them?

**A.**    Correct.

**Q.**    Tax return preparers can't report income if they don't know about it?

**A.**    Correct.

          **MR. BEATY:**  No further questions, Your Honor.

          **THE COURT:**  Thank you very much, Mr. Beaty.

     Is there any redirect from the defense?

          **MR. KRAVIS:**  Yes, Your Honor.

                    REDIRECT EXAMINATION

**BY MR. KRAVIS:**

**Q.**    Good afternoon, Mr. Goldstein.

**A.**    Good afternoon.

**Q.**    I heard you mention that -- on cross, that Mr. Beaty knew where you were on March 1 of 2021?

**A.**    Yes.

**Q.**    Well, let me ask you about that.  So, first of all, just remind us, why is that date significant?

**A.**    That is the date of the second mortgage filing, and they say I was in the same place both times.

**Q.**    And where were you on the date of that second mortgage

filing?

**A.**  As I said, Saint Thomas.

**Q.**  And is the government in possession of records corroborating that?

**A.**  Yes.

MR. KRAVIS:  Could we have Government's Exhibit 886, please?

**BY MR. KRAVIS:**

**Q.**  Mr. Goldstein, what are we looking at here?

**A.**  We are looking at travel records.

MR. KRAVIS:  Can we turn to page 550?

**BY MR. KRAVIS:**

**Q.**  I'm going to direct your attention to flight information at the top.  What is this -- what does this travel record show?

**A.**  This is a flight on February 26, 2021, MIA to STT, which I think is Miami to Saint Thomas.

**Q.**  Where is Saint Thomas?

**A.**  It's Saint Thomas.  It's -- like I said, it's the islands.

MR. KRAVIS:  Can we go to page 852 of the record, please?  Flight information.

**BY MR. KRAVIS:**

**Q.**  What's this trip?

**A.**  This is Saint Thomas to Miami.

**Q.**  What's the date of this trip?

**A.**  March 2, 2021.

Q.    What do these records show about where you were on March 1, 2021?

A.    Saint Thomas.

        MR. KRAVIS:  We can take that down.

BY MR. KRAVIS:

Q.    You were asked at the beginning of your examination about a brief you wrote one time.  Do you remember that?

A.    A cert petition request, yeah.

        MR. KRAVIS:  I don't know if I caught the exhibit number.  Can I get the exhibit number?

        MR. BEATY:  One moment.  It's Government Exhibit 614.

        MR. KRAVIS:  Can I have Government's Exhibit 614, please?

BY MR. KRAVIS:

Q.    First of all, when was this brief written, the petition?

A.    It was written, like, 18 years ago, I guess.  I don't know.  Is that 2008?

Q.    Yeah.

A.    Okay.  In 2008.

Q.    Let's turn to the question presented.  Is that on the next page?

A.    Yeah.  I was wrong.

Q.    Mr. Goldstein, recognizing that this was 18 years ago, can you just explain for us briefly what was at issue in this case?

A.    Oh, gosh.  Okay.  I'm going to read the question, and I'll

tell you.  I have no recollection.  But I will hopefully be able to figure it out.

"Whether a lawsuit that turns critically" -- so somebody is suing somebody -- "on the proper construction of the Internal Revenue Code" -- so somebody is suing and they're trying to figure out what the Internal Revenue code is -- "and then seeks to recover overpaid income taxes" -- so somebody is suing to get their money back from the IRS, and it depends on what the Internal Revenue Code means -- "on the basis of reports required by law arises under federal" -- oh, this is a jurisdiction question.

Q.   Right.

A.   So the idea here is somebody is suing for a tax refund, and the question is do they file that lawsuit in federal court versus state court.  It's not a tax question.  It's a question about the federal courts.

Q.   And it sounds fascinating, but just to be clear, does this case, this cert petition have anything to do with how you report gambling wins and losses on your tax return?

A.   No.  I think probably the word "report" is the only thing that's common between them.

MR. KRAVIS:  We can take that down.  I'm sorry.
Can we -- we can take that down.

BY MR. KRAVIS:

Q.   Just go back to the venue question for a second.

I think the travel records show that you were in Saint Thomas on March 1.

A.    Okay.

Q.    Do you remember when Agent Nguyen testified about the IP records in the government's case?

A.    Yeah.  Yeah.

Q.    What did the IP records show about where you were on March 1?

A.    The IP records say that in the same place both times.  I don't really understand or read them the same way, but, I mean -- they cannot -- they cannot actually be showing that. We know that I'm in Saint Thomas for the second one, so --

Q.    Okay.

A.    -- it just can't be right.

Q.    You were shown some for examples on cross-examination of times when you expressly instructed an office manager to classify an expense to personal distribution.

      Do you remember that?

A.    Bunches.

Q.    I'm not going to show you every one, but I do want to, just to make sure I understand, show you one of them.

      **MR. KRAVIS:**  Can we have Defense Exhibit 318, please?

**BY MR. KRAVIS:**

Q.    Okay.  So at the bottom here, what is Mr. Levitan asking you?

**A.**    "Our accountants need addresses and W-9s," so this is going to be -- that's the tax form that you fill out in order to get a 1099.  "Our accountants need addresses and W-9s for some wires that we made this year.  Do you have contact info for Pasha, Esfandiari, Matthew Winnick, and Ryan Anderson?"

So she is trying to get their addresses.

"I should be able to track down the FEIN," so that's the federal employee identifying number for Bob Safai's company.

So she asks me, "Hey, how do I get in touch with Pasha, Esfandiari, and the other two people."

**Q.**    The Bob Safai reference here, is this the same Bob Safai we have been talking about during the trial?

**A.**    Yes.

**Q.**    What do you say back to Mr. Levitan in the first sentence?

**A.**    I tell him Pasha, Ryan, and Bob were personal.

**Q.**    What is it that you were conveying when you say Pasha, Ryan and Bob personal?  What does that mean?

**A.**    So you know from the first message that she is about to send out tax documents from the firm.  I'm saying no.  No.  No. Don't do that.  They should not be getting tax documents from the firm.  They're personal.  Pasha, Ryan, and Bob, those expenses are personal.

**Q.**    What did you expect Mr. Levitan to do with the information you were providing?

**A.**    Treat them as personal expenses.

Q.    Did you understand that as a result of telling Mr. Levitan Pasha, Ryan, and Bob were personal, that these are not going to get deducted as business expenses?

A.    Yeah.  I mean, this is a tax question.  This is about tax documents.

      And so, I mean -- this is me just, without being asked, realizing no.  No.  No.  Something could be -- could go wrong here, and I tell her Bob Safai is personal and so we put it as personal.

Q.    Did you understand that by saying Pasha, Ryan and Bob were personal, you are going to end up paying more taxes because these aren't going to get deducted as business expenses?

A.    Of course.

Q.    Is that true in all of the other examples the government showed you, you understood that by saying these were personal distributions, you are going to have to pay more in taxes?

A.    I mean, those and 500 others they could've --

Q.    So why did you do it?

A.    That's -- that's the right thing to do.  That's not a question.

Q.    In the examples that you are charged with in this case, have you seen, still, after your cross-examination, any e-mail, any text message, any document where you instructed the office manager to characterize those payments as business expenses?

A.    No.

Q.   Sometimes we saw, I think, that in the messages, you just didn't say anything one way or the other; right?

So, like, here, you say it's personal.

Sometimes, the message, you just don't say anything about how to characterize the distribution; is that correct?

A.   Well, you saw two things.  Sometimes I do that, but then we saw lots of examples they showed of the assistants coming back and asking.

Q.   Right.  So my question was -- my next question was going to be:  What was your expectation about what the office managers would do if they or the accountants had any questions about how to classify a particular transaction?

A.   What the government just showed they did.

Q.   And that is what, exactly?

A.   They would ask me, and I would tell them if it was personal or business.

Q.   And when you asked them, would you give them a truthful answer?

A.   Of course.

Q.   Why was it that, on occasion, you would use the firm bank account to make these personal payments?

A.   There are different reasons.  The money might be sitting there.  It might be me being away and only the assistant would have the authority to wire.  It could be a variety of different things.

**Q.** Just to be perfect clear, did you instruct the office managers or the accountants to misclassify any personal payments as business expenses?

**A.** No.

**Q.** You were asked --

**MR. KRAVIS:** Thank you. We can take this down.

**BY MR. KRAVIS:**

**Q.** You were asked some questions about the timing of Ms. Bart's departure and the completion of the subpoena production.

Do you remember that?

**A.** Yes.

**Q.** Do you remember the document you were shown said that the subpoena production was substantially completed as of December 2020?

**A.** Yes.

**Q.** I think the implication from the question was that, "Well, you did not need Ms. Bart anymore at this point." Okay.

After that letter was sent in December of 2020, did you and your lawyers, whoever they may be, continue to reach out to Ms. Bart to gather information in response to further requests from the government?

**A.** Reach out to her? I mean, she's sitting there.

**Q.** I mean work with Ms. Bart?

**A.** Yeah, exactly.

Q.   Did Ms. Bart continue to play a role in gathering information in response to requests from the government for this investigation?

A.   Yes.

Q.   Okay.  You were asked about the text message.

        MR. KRAVIS:  Can we call this up again, please?

     Defense Exhibit 462.1.

BY MR. KRAVIS:

Q.   You were asked a variety of other questions about this message.

     I just want to be clear about this, the second message you send on October 16, 2018 at 2:58 p.m., what do you write?

A.   "I have to go pick up 1 to 2M" -- "1 to 2 million in cash that I'm borrowing to pay taxes."

Q.   What is this a reference to?

A.   This is, before I go, saying what it is that I'm going to do, and the reason that I'm going to do it.

Q.   Is this a reference to the trip to pick up the 1 million in cash?

A.   Yes.

Q.   Was the 1 million in cash gambling winnings?

A.   No.

Q.   Was the 1 million in cash a legal fee?

A.   No.

Q.   What was it?

A.    It was a loan.  As it says, I'm borrowing it to pay taxes.

Q.    Is this the only text message you were shown today that references the loan?

A.    Is it the only text message that references the loan?

Q.    That references the loans?

I'm not going to make you guess.  Let me show you.

MR. KRAVIS:  Can we go to Defense Exhibit 738.1?

MR. MENDOZA:  Say it again.

MR. KRAVIS:  738.1.

BY MR. KRAVIS:

Q.    Is this another text message referencing the loans?

A.    Yes.  This is a prelude to that one.  So this is me -- there are an array of messages about this question and this is another one, and this is just on the side with Paul.  This is one of the messages with Paul.

Q.    Okay.

MR. KRAVIS:  Thank you.  We can take this one down.

BY MR. KRAVIS:

Q.    You were asked some questions about your communications with Mr. Napoli from 2017.

Do you remember that?

A.    Yes.

Q.    Could you just remind us what was it that Mr. Napoli was investing in with you in 2017?

A.    The Bob Safai matches.

Q.    How much did Mr. Napoli invest with you?

A.    $500,000.

Q.    How did you do in the Bob Safai matches?

A.    I lost everything.

Q.    Because Mr. Napoli was an investor in those matches, would you have been within your rights to tell Mr. Napoli he had just lost all of his money?

A.    More than in his rights.  I'm supposed to.

Q.    Is that what you did?

A.    No.

Q.    What did you do instead?

A.    I not only gave him all the money back, but I gave him, I don't know, 70 or $80,000.

Q.    Why?

A.    I -- I -- I felt bad.  I felt like I had told him, "Look, I really should win here," and just on reflection, I felt that I should not have -- I should not have done that, and the right thing to do is to eat $600,000.

Q.    Let's talk for a moment about the personal spending.  You were asked a number of questions on cross-examination about things that you spent money on.

    Do you remember that?

A.    Yeah.

Q.    I just want to be perfectly, perfectly clear about this.

A.    Yeah.

Q.   As you've been sitting here during this trial, watching the evidence of your personal spending, being asked about your personal spending, what is your reaction to those decisions at this point?

A.   I have two reactions.  The first is I regret it.  It is, obviously, humiliating now.  It is the wrong set of priorities. And I wish that -- nobody in their life wants to have somebody be able to pick out, like, the ten worst things.

If you pick out, over this period of time, you know, there are a number of things that I should not have done in terms of spending.  I do think that I wish people had a more balanced understanding of me.

Q.   What do you mean by more balanced understanding of you?

A.   Because, like, I'm spending $8 million on SCOTUSblog, for example.  There are instances in which I should not have been spending.  Sometimes -- not all the time -- sometimes I'm celebrating some big poker win.

But it is, you know -- charitable contributions, helping other people out, whatever it is, we are just not talking about.  We are not putting in issue because it is just about what is supposed to be my bad spending.

Q.   You mentioned the 8 million in spending on SCOTUSblog.

Do you still have SCOTUSblog?

A.   No.

Q.   What happened to it?

**A.**    It had to be sold for -- to pay for this.

**Q.**    Recognizing that you -- what you said about regretting that personal spending --

**A.**    Yeah.

**Q.**    -- what was your understanding at the time about what the law allowed in terms of your own personal spending while you owe back taxes?

**A.**    My understanding then, as it is now, as it is for everybody else in my position, is that you can pay at the time that you file.  If you don't, you are going to pay penalties and interest.

There are other mechanisms, but that is an entirely civil set of penalties.  That is how that it works, and if you go spend your money on something else, even if it is stupid, it is not a crime.

**Q.**    I think I heard you mention a couple times that some of these purchases that the government has raised were things that you bought for yourself to celebrate either poker wins or other moments in your life.  Did I hear that correctly?

**A.**    Yes.

**Q.**    Can you just give us a couple examples of that the government brought up?

**A.**    I mean, the first -- the first car is when I beat Al Gores.  And there are other things that happened later on when I beat Andy Beal.  You know, these are things you kind of dream

about, that you think about.  I'm not making excuses.

I take responsibility that I should have had a different set of priorities.  But it's not a situation where I am just, like, all the time, wildly doing things.  There are other times -- look, this was not the right thing to do.  It was not the right set of priorities.

I do not want to be seen as making excuses, but some of this has to be contextualized.

Q.  I notice that a number of the payments the government referenced, the -- the watch, for example, and some of the trips to the restaurant or the club were in 2022.  Did I have that right?

A.  Yeah.  So in late '22, I beat Andy Beal.  I am ecstatic because the 2016 to 2021 taxes have been on my back.  It is a great thing to be able to win like that, and I celebrate in a variety of ways.

And, you know, the -- in that time, right, when all of that is happening, the 2016 to 2021 taxes are paid off.  And it is -- it has started in 2016 something feeling wrong, I -- you know, it turns out I have overpaid by a ton.  And I have been in huge trouble in a variety of ways through that entire period, '16 through '21.  And I feel in that moment that I -- that it is by me.

Q.  In the -- you were asked on cross-examination about the situation with the IRS around the time that you were buying the

house.  Do you remember that?

**A.**    Yes.

**Q.**    You were shown, in particular, an e-mail exchange from February of 2021.  And I think you said we were missing some context there.  Do you remember that?

**A.**    Yes.

**Q.**    What is the context that was missing from the government's questions around that time?

**A.**    So the government shows the beginning of the conversation, and it wants -- and it would be quite right that in that moment, I would think the payment plan has been canceled.  But then I learned more, and I found out that, no, in fact, there has been no notice of the payment plan being canceled and we are still making the payments.

What the accountants are talking about is that we have technically fallen out of compliance, but we are still making the payments on it.  There is still no levying of any kind.

        **MR. KRAVIS:**  Can we have -- on that point, can we have Government's Exhibit 73?  And this is in evidence as the IRS account transcript from 2016.

**BY MR. KRAVIS:**

**Q.**    Mr. Goldstein, I'm going to direct your attention to page 4.  Do you see on page 4, we are in 2019 now, that there is a bunch of entries in the middle that say "payment levy." Do you see that?

**A.**    Yes.

**Q.**    What are those entries?

**A.**    Those are levies.  There are so many technical terms. That is the government coming in and taking money out of the bank account.

**Q.**    What is the date of the last payment levy for 2016, according to this transcript?

**A.**    None of these are 2016.  I think you mean 2019.

**Q.**    I'm sorry.  No.  No.  No.  I'm sorry.  I'm sorry.  Let me ask a better question.

**A.**    Oh, for the 2016 tax --

**Q.**    According to this transcript --

**A.**    Yeah.

**Q.**    -- what is the date of the last levy for the 2016 tax year?

**A.**    I do not know this document well-enough to know that this is the 2016 tax year.  If you tell me it is, then I will ask the question as May 20, 2019.

**Q.**    And then what is the entry under the levies 971?

**A.**    Installment agreement established.

**Q.**    What is the installment agreement?

**A.**    That's this payment plan.  So they stopped levying.  What happens is, you work it out.  I think somebody said they get your attention.  That's true.

    And when they have your attention, you can work out

some -- a payment plan.  We all have payment plans of various kinds.  I had this payment plan.  So they stop just coming in taking money from you, and you send them money regularly.

MR. KRAVIS:  Can we go to page 5?

BY MR. KRAVIS:

Q.   Do you see any levies on page 5?

A.   No.

MR. KRAVIS:  Can we go to page 6?

BY MR. KRAVIS:

Q.   Any levies on page 6?

A.   No.

MR. KRAVIS:  Can we go to page 7?

BY MR. KRAVIS:

Q.   Any levies on page 7?

A.   No.

Q.   So at the time that you were pursuing the mortgage, in the spring of 2021, what was your understanding with respect to the levies that the IRS had been imposing?

A.   There weren't levies going on.

Q.   Did you receive, in 2021, any notice from the IRS saying that your payment plan had been canceled?

A.   No.

Q.   Did you receive any notice from the IRS saying -- in 2021, saying that a notice of levy had been imposed?

A.   No.

Q.    Were you continuing to make payments regularly to the IRS during this time?

A.    Yeah.

Q.    All right.  Last set of questions I wanted to ask you, Mr. Goldstein, concerns the 2016 poker.

MR. KRAVIS:  So, first, can we go back to the joint stipulation?  Can I have -- yeah.  You knew where I was going.

BY MR. KRAVIS:

Q.    You were asked some questions on cross-examination about how 12 million is bigger than 2.7 million.  I noticed you were able to answer without the calculator.

I just want to ask you, at the time that you made these stipulated statements --

A.    Yeah.

Q.    -- what was your -- or maybe I should ask, in the stipulated statement, what did you say about your good faith belief in October of 2017 with respect to your 2016 gambling?

MR. BEATY:  Objection, Your Honor.

THE COURT:  Come to the headsets.

(Whereupon, a discussion was held outside the presence of the jury.)

THE COURT:  Mr. Goldstein?  Mr. Kravis?  Mr. Kravis?

MR. KRAVIS:  Yes, Your Honor.

THE COURT:  Mr. Beaty, go ahead.

MR. BEATY:  Yes, Your Honor.  They continue to

mislead the jury as to this. If they want to pose this, they should also show -- or I have to do some stupid recross, which I don't want to do, because this statement is made in 2025.

It's not about -- this is nothing about his misstated belief -- or excuse me -- his belief in 2017. What it says is I said this in 2015 -- or 2025, and he believed it to be true at that time.

He continues to mislead this jury about what this means. We can either clean it up now or I am going to have to spend more time on cross-examination.

**THE COURT:** Mr. Kravis?

**MR. KRAVIS:** I realized in the middle of the question that I was asking it awkward. I would like to withdraw the question, rephrase it, and if government counsel still objects, we'll come back to the headsets.

**THE COURT:** Very good. Thank you.

(Whereupon, discussion concluded.)

**BY MR. KRAVIS:**

**Q.** I'm sorry, Mr. Goldstein. That's a really awkward question. I'm going to direct your attention to paragraph seven of the joint stipulation.

**A.** Yeah.

**Q.** Do you see where it reads, "During this run, Mr. Goldstein won a total of about $50 million, and even though he had sold roughly 75 percent of his stakes to investors, Mr. Goldstein

still personally cleared about $12 million."

Do you see that?

A.   Yeah.

Q.   What did you mean by that statement?

A.   This is everybody agreeing that, at this time, I believed that I had made 12 out of the $50 million.

Q.   Does that 12 include the losses that you suffered playing poker in 2016?

A.   No.  It says "during this run."  You would have to -- you know, it's talked about ahead -- above it.  I'm playing these three people.

Q.   And both in the United States and abroad, approximately how much money did you lose playing poker in 2016?

A.   I -- well, do you want to know what I believed at this time?

Q.   Yeah.  I want to know what you believed at the time of this statement.

A.   At this time, I believed that I had lost, probably, 15.

Q.   And so where would that have put you in terms of your 2016 taxes?

A.   This would have put me down.  It would have put me down by about 3 million.

Q.   And what was, in fact, reported on the 2016 taxes?

A.   That I won 2.7 million.

MR. KRAVIS:  Okay.  You can take that down.

BY MR. KRAVIS:

Q.    Mr. Goldstein, you were asked questions on cross-examination about some forensic vendors that were hired. Do you remember those questions?

A.    Yes.

Q.    Why were forensic vendors hired?

A.    There is -- the technical term -- very early on in the case, I gave you my phone and I gave you the office manager's phone, which had been turned over to me by Angie so that you could make a copy of it and keep all of the messages from early on -- from that point on.

Q.    And did the phone include messages between you and Mr. Phua and his assistant?

A.    Yeah.

Q.    And were those messages all collected from your phone and were those messages produced to the government?

A.    Yes.  They have -- through the trial, they have had them all.

Q.    You were asked on cross-examination --

        MR. KRAVIS:    Can we have Defense Exhibit 340?

BY MR. KRAVIS:

Q.    I think the government lawyer repeatedly referred to this as a poker journal.  And I could tell that you had a little bit of discomfort with that term.  Can you explain what this document actual is?

**A.** Yes. This is a wires list. That's how it started. I created this document. I had the conversation with Walter. He says, "We may have to send out these taxes forms. Collect a list of all the wires." This is the second version of it.

What I do, apparently, is in, like, the 20 minutes or so -- not 20 hours -- 20 minutes or so that I work on this document, I go through and just check -- I must open up my phone or something like that and just look, are there outgoing wires that I'm missing here. And I noticed some outgoing wires, and those get added in. And that's what this is. This is a list of wires. The -- the catastrophe is thinking, oh, the list of wires is what you can use to make your taxes.

**Q.** And what was missing from the list of wires?

**A.** Well, there are five sets of errors. The biggest error of all is what I think is now agreed, that Paul Phua had a $9 million share.

**Q.** Let's talk about that share. You were asked some questions about your dealings with Mr. Phua at this point.

**MR. KRAVIS:** Could we have -- I think it's slide six, please?

**BY MR. KRAVIS:**

**Q.** Mr. Goldstein, can you just remind us what Mr. Phua's share of the Gores matches was, at least as of the end of December of 2016?

**A.** Sure. So there are a bunch of messages with Paul's

assistant detailing all of the math of the shares, like, in --
precisely the statistics, everything like that.

And they concluded, and I agree, that Paul has 10.862500. Then he tells me, "Can you send $500,000 to Tom Dwan?" I do. Then at the end the year, they have me send $750,000 to Dan Cates, which I do.

He was very generous because he had won a lot. He sent $600,000. He accounted it for me. So his share is the $9,012,500. You know, he had about a third of it.

Q. If there is no wire out to Mr. Phua for $9 million, how is Mr. Phua eventually given his share of the Gores game?

A. He keeps my money. Like, I win against Tango. Tango pays in 2017.

So I have got a bunch of his money that I'm responsible for. He is -- it's, you know, some in my account, some he has said I can do things with it.

The rest of it is -- he has my money when he -- Tango pays over here, and we just cancel them out.

Q. The government asked you questions on cross-examination about your -- what happened to some of this money after the games against Gores, and showed some of the money going out of your bank account.

Do you remember that?

A. Yes.

Q. Did you and Mr. Phua have an agreement about how that was

going to be handled?

**A.** Yes.

**Q.** What was your agreement?

**A.** It's his money, so I have to have his permission to do that. The reason he gives -- he does give me permission. The reason that he does that is because he knows Tango is going to pay. So he's safe. He's not worried that I'm going to, like, steal the money from him.

There is still millions of dollars in the account through the end of 2016, which is, you know, the year we're talking about. But that's the understanding.

And in that period, he has me send money. He has me send money to Tom Dwan. He has me send it to Dan Cates, because it's his.

**Q.** What was your understanding about whether Mr. Phua had the authority to tell you to pay Mr. Dwan and Mr. Cates out of that money?

**A.** I didn't -- I would never have a choice in that. It's his money.

**Q.** On this point and because you are asked about it, Mr. Goldstein, I want to show you Defense Exhibit 737.4.

**MR. KRAVIS:** I would like to show just the messages at the -- oh, boy. Yeah. Those two. 3:02 a.m.

**BY MR. KRAVIS:**

**Q.** Is this one of the messages from your phone you were

discussing earlier?

A.    I mean, it's -- there are a lot that have all the details. This is one before the game.

Q.    Okay.  How do you know this is from before the game?

A.    Because it's saying a game that's going to happen in the future.

Q.    When we say before the game, we are talking about the Gores game?

A.    Yeah.  These are -- there are, I think, five -- there are five matches, maybe six, but I think five.  This is before the first of them.  And this is -- we're only showing anything from either -- we are showing just me, and it is just me talking, but the person I'm talking -- do you want me to say the context?

Q.    Let's just stop there for a second.

Just to be clear, the date of these messages is November 24, 2016; right?

A.    Right.

Q.    When did you become aware of this investigation?

A.    This investigation, in -- it started in 2019, but I became aware of it in 2020.

Q.    And the -- so is this -- are these messages from before you became aware of the investigation?

A.    Oh, yeah.

Q.    In fact, are they even from before the matches against

Gores?

**A.** Before the match against Gores, before the investigation, before I know about this.

**Q.** Who is this a message to?

**A.** This is a message to Paul Phua's assistant, who maintains the ledger.

**Q.** I want to direct your attention to the second message. "PP has 70 percent, 50/50 with me."

Who is PP?

**A.** Paul Phua.

**Q.** And when you say, "PP has 70 percent, 50/50 with me," what are you referring to?

**A.** All right. This is how conversations about chairs work. Imagine there is 100 percent. PP has 70 of it, that's 70 percent of it. And we are splitting that 50/50.

So he has, at this point -- it changes during the course of the matches, but at this point, he has 70 percent, and then half of that. He has 35 percent. So of the 26.5, he ends up with about 35 percent.

**Q.** Obviously, since the match has not happened yet, you are talking in percentages and splits, but after the match, after all is said and done, at the end of December 2016, what is Mr. Phua's share of the Gores winnings?

**A.** There are -- as is recorded in all of the messages, all the math is done and it's -- only because I have seen it so

many times recently -- 10.86125 million U.S. dollars belongs to Paul, and then you subtract some things that happened in 2016, and then you end up with 9 million at the end of 2016.

MR. KRAVIS:  Thank you.  We can take that down.

BY MR. KRAVIS:

Q.   Mr. Goldstein, I want to conclude where we started, and I think the government asked you some questions about this as well.

Are you denying or evading responsibility for the errors in the tax returns we have been talking about here, '16, '17, '18, '19, '20 and '21?

A.   No.  There are mistakes in both directions because people make mistakes, and they are big ones.  The mistakes -- the responsibility for the taxes in those tax years is mine.  I may end up continuing to pay for those for a long time.  That's my responsibility.  It's just -- that's very different from whether I committed a crime.

Q.   Right.  On that point, understanding that you take responsibility for those errors, did you put those errors in your tax returns on purpose?

A.   No.

Q.   Did you evade taxes in 2016?

A.   No.

Q.   Did you evade taxes in '17, '18, '19, '20 or '21?

A.   No.

**MR. KRAVIS:**  Thank you, Mr. Goldstein.

**THE COURT:**  Thank you very much, Mr. Kravis.

Have all questions been asked of the witness?

**MR. BEATY:**  I got nothing else, your Honor.

**THE COURT:**  Very good.

Mr. Goldstein, I believe you can step down at this time. Thank you very much.

(Witness excused.)

- - -

**THE COURT:**  If we could come to husher, please.

(Whereupon, a discussion was held outside the presence of the jury.)

**THE COURT:**  Let's give Mr. Goldstein a moment to get back.

Mr. Goldstein, are you with us?

Mr. Kravis?

**MR. KRAVIS:**  Yes, Your Honor.

**THE COURT:**  Mr. Beaty?  All right.

So where are we now?

**MR. KRAVIS:**  Your Honor, I would ask if we could break a little bit early today.  We do have two witnesses lined up.  One of them is Special Agent Accardi.  The other is Mr. Bell-Masterson.

However, I think our conversations with the government about the scope of those examinations is productive and

ongoing.

I would also like the opportunity to talk with my client because I think there may be some streamlining we can do here, but I don't think that's a decision I can make without talking with him.

So I would just ask that we break here. I do expect that the defense will be in a position to rest on Tuesday.

THE COURT: So you would like for us to break for the day at this time?

MR. KRAVIS: Yes, Your Honor.

THE COURT: Mr. Beaty, what is your thoughts?

MR. BEATY: (Nods head up and down.)

THE COURT: So when we come off, I'm going to excuse the jury and remind them they are back on Tuesday because of the holiday. And then we can talk a little bit before we break for the weekend. Okay. Thank you, Counsel.

(Whereupon, discussion concluded.)

THE COURT: Well, members of the jury, I hope I have some good news for you. I think we are at a point where we can break for the day a little earlier than usual.

As you may recall, we will not sit on Friday. Monday is a federal holiday. So we will return on Tuesday to continue the trial.

So, again, I want to provide some gentle reminders not to talk with your fellow jurors or anyone else about the case

while you are on the long weekend.  Please do not conduct any independent research about the case.  And, of course, do not read or listen to any news reports or social media about the case or issues related to the case.

With that, I wish you a wonderful weekend, a happy Valentine's Day and a happy Presidents' Day.

Please rise for the jury.

(Whereupon, the jury exited the courtroom at 4:04 p.m.)

THE COURT:  Please be seated, everyone.

So I understand when we come back on Tuesday, we may have additional witnesses from the defense and likely will rest on Tuesday, Mr. Kravis, you think at some point?

MR. KRAVIS:  Yes.  That's right.  So there are two witnesses that are under discussion.  That's Mr. Bell-Masterson counting up the e-mails, and Special Agent Accardi on a few topics, some of which we have already discussed with the Court.

We also have Jason Trager, who is our -- a rebuttal to Agent Nguyen expert.  We have Mr. Williams, who is a summary witness and an expert on one topic, the payment plans -- two topics?  Oh, okay, and also on the income calculations.

It's possible that we may have one additional witness.  And I'll e-mail chambers and the government as soon as I have that one locked down.  That's the possible lineup here.  I think those are all relatively short witnesses.

THE COURT:  Do you think you can get through all of

that on Tuesday?

**MR. KRAVIS:** I do.

**THE COURT:** All right.

**MR. KRAVIS:** I do.

**THE COURT:** And then I want to know whether the government wants any rebuttal time. And you can let me know now if you think you do, or we can talk about that on Tuesday just to get a feel for where we are in the trial.

Good afternoon, Counsel.

**MR. ADENRELE:** Good afternoon, Your Honor. We need to talk amongst ourselves --

**THE COURT:** I need you to speak into the mic.

**MR. ADENRELE:** I'm sorry. We need to talk amongst ourselves as to whether we need to do a rebuttal case. I can't tell you that right now, but I think over the weekend, we will have a pretty good idea.

**THE COURT:** Sure. Understood. I would like to have that conversation on Tuesday --

**MR. ADENRELE:** Absolutely.

**THE COURT:** -- so we know where we are, if we are ready to start getting ready for the charge conference and additional motions practice, are we going to have a couple more days of the evidence.

**MR. ADENRELE:** Understood.

**THE COURT:** Any other issues before we break for the

weekend?

MR. ADENRELE:  Nothing from the government.  Thank you.

THE COURT:  Mr. Kravis and team?

MR. KRAVIS:  Your Honor, we would -- I know we have talked to the government about this.  We would be available -- I know the Court is not available the whole day tomorrow.  We would be available for any part of the day tomorrow if the Court would find it productive to discuss jury instructions or any other end of trial matters.

THE COURT:  I think we should wait until we get through the evidence --

MR. KRAVIS:  All right.

THE COURT:  -- because we are not going to know what all the issues are.

MR. KRAVIS:  Okay.

THE COURT:  So when we figure out next week what is happening after the defense's case, we will know when we'll be ready for the charge conference.  And I know the parties are working on instructions, but I think if we get too far ahead, we are going to have to come back and go over stuff.

All right.  Well, we will see everyone on Tuesday.  As always, thank you for your hard work and time.  I hope you have a great, long and restful holiday weekend.  See you next week.

DEPUTY CLERK:  All rise.  This Honorable Court stands

adjourned.  Thank you.

(Proceedings concluded at 4:09 p.m.)

- - -

C E R T I F I C A T E

I, KIMBERLY A. BURSNER, Federal Official Court Reporter in and for the United States District Court for the District of Maryland, do hereby certify,  pursuant to 28 U.S.C. §753, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

*Kimberly Bursner*
_____
Kimberly A. Bursner
Registered Professional
Reporter & Federal
Official Court Reporter