**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. LKG-25-6** |
| | * | |
| **THOMAS C. GOLDSTEIN,** | * | |
| | * | |
| **Defendant.** | * | |
| | ******** | |

**DEFENDANT THOMAS C. GOLDSTEIN'S OPPOSITION TO THE GOVERNMENT'S
MOTION TO RECONSIDER THE COURT'S JANUARY 28, 2026 DISCOVERY
VIOLATION RULING**

On January 28, 2026, the Court "f[ou]nd a *Brady* violation with regards" to the

government's failure to disclose a January 2024 email exchange between the government's lead

case agent, Andrew Accardi, and GRF accountant Ian Shuman. *See* 1/28/26 Tr. 37:3-4; *see also*

ECF No. 381.[1]  As the Court acknowledged, that email exchange (previously filed at ECF No.

367-1, and re-filed herein as Exhibit A) contained critical exculpatory information that was

material to the defense.  That email should have been provided to the defense in advance of trial

for use in trial preparation and presentation, including in the defense's opening statement.

Indeed, the email clearly establishes two facts, each of which directly undercuts the theories that

the government presented to the jury: (1) even the government's lead case agent was unable to

identify documents showing that anyone at Goldstein & Russell systematically reviewed the

classifications GRF entered of the relevant firm expenditures; and (2) that, to the extent that GRF

---

[1]     The defense initially obtained that email mid-trial from GRF in response to a Rule 17(c)
subpoena.  Without that third-party subpoena production, the defense would have likely never
known about the existence of that email.

asked Goldstein & Russell how to categorize specific transactions, such interactions were with the Goldstein & Russell office managers (and not Mr. Goldstein). Had the defense been able to use this critical email in its pre-trial preparations and opening statement, the jury may well have rejected the government's arguments to the contrary.

In finding that the government committed a *Brady* violation, the Court ordered as a remedy "a combination of the defense's broad latitude on cross-examination, any closing statements and an instruction to the jury" about the *Brady* violation. 1/28/26 Tr. 37:4-7. Following the Court's decision, on January 29, the government indicated that it planned to file further briefing on the Court's *Brady* ruling. *See* 1/29/26 Tr. 3:17-18. The Court stated that it was "happy to give the government a chance to file paper . . . [b]ut the Court has ruled" and that it would "not . . . revisit the issue." *Id.* at 5:3-5 (emphasis added).

Notwithstanding the Court's explicit statement that it would not "revisit" its conclusion about the *Brady* violation, on February 1, 2026, the government filed a sealed motion for reconsideration of the Court's January 28 order. *See* ECF No. 390. That filing incorrectly accused the defense of making "false representations" and "false statement[s]" to the Court in both its motion at ECF No. 367 and its oral presentation to the Court on January 28. The government also filed a motion to seal its reconsideration request, supported only by the tenuous claim that the motion contained grand jury materials protected under Rule 6(e) of the Federal Rules of Criminal Procedure. *See* ECF No. 389.[2]

---

[2]   The government apparently filed its motion to seal (ECF No. 389) itself under seal. The Clerk's Office noted at ECF No. 391 that the motion to seal "may not be filed under seal," and instructed the government to "re-file the motion publicly." As far as the defense is aware, the government has not yet filed its motion to seal publicly.

The Court should deny the motion for reconsideration because the government has failed to identify any error, let alone manifest error, in the Court's January 28 order. The Court correctly walked through the *Brady* analysis and concluded that the defense met each of the three prongs: favorability, materiality, and suppression. The Court further exercised its broad discretion to fashion a remedy for the government's *Brady* violation in the form of "broad latitude" to the defense in its cross-examinations and closing statement, as well as a jury instruction about the *Brady* violation.

Unable to challenge the soundness of the Court's order, the government's motion for reconsideration goes on the offensive, accusing the defense of having made "false and misleading" representations about the contents of that critical suppressed email to the Court. ECF No. 390, at 5. The government is incorrect, not least because the defense provided the Court with a copy of the critical, two-page email for its own review. The email speaks for itself, and its clear import is that neither Agent Accardi nor Mr. Shuman were able to identify documents in the GRF production showing that Goldstein & Russell reviewed the classification of the relevant firm expenditures *because they do not exist*. The email also establishes that any communications about the classification of the firm expenditures would have been with the firm office managers and not with Mr. Goldstein.

In short, there is no reason to revisit the Court's prior ruling concerning the government's *Brady* violation. The Court should also deny the government's motion to seal.

## ARGUMENT

**I.    The Government Has Failed to Identify Any Error With the Court's Order, Let Alone "Manifest" Error.**

As the government's own authorities acknowledge, "[m]otions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered

evidence." *United States v. McNeill*, 420 F. Supp. 2d 448, 451 (D. Md. 2006), *rev'd on other grounds*, 484 F.3d 301 (4th Cir. 2007) (cited at ECF No. 390, at 9). Here, the government relies on the first ground, arguing that the Court's prior order was "a manifest injustice." ECF No. 390, at 10. But "[a] prior decision does not qualify for" reconsideration on this ground "by being just maybe or probably wrong" — instead, it must be "dead wrong." *TFWS, Inc. v. Franchot*, 572 F.3d 186, 194 (4th Cir. 2009) (citation modified); *see also Pac. Ins. Co. v. Am. Nat. Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998) (reconsideration "is an extraordinary remedy which should be used sparingly") (citation omitted).

Measured against this exacting standard, the government's request for reconsideration plainly fails. The government is unable to identify *any* error with the Court's January 28 order, let alone manifest error. In its oral order, the Court walked through the three elements of a *Brady* claim: (1) favorability; (2) materiality; and (3) suppression. *See United States v. Parker*, 790 F.3d 550, 558 (4th Cir. 2015). The Court confirmed that "there is agreement that elements one and three" — favorability and suppression — "have been met." 1/28/26 Tr. 34:8-9. Specifically, as to favorability, the Court acknowledged that the Accardi-Shuman email exchange was "potentially exculpatory" because it showed that Mr. Goldstein "was not directly involved in some of the alleged or any of the alleged errors on his tax returns"; that "his accountants had the responsibility for preparing those documents and that any errors were due to their error"; and that "communication with the accountants was primarily through his firm office managers." *Id.* at 34:16-23.

As for materiality, the Court noted that the suppressed emails contained "information directly coming from the lead case agent." *Id.* at 35:16-17. Thus, the suppressed emails show that *even the government's lead case agent* was unable to find evidence that Mr. Goldstein

4

willfully failed to correct the GRF accountants' erroneous classifications of transactions.  The government's failure to disclose this clearly exculpatory evidence "hindered [Mr. Goldstein's] ability to prepare his case fully and make stronger opening statements."  *See United States v. Cloud*, 102 F.4th 968, 980 (9th Cir. 2024) (citation modified).

Taken together, the Court found that the defense established each of the elements of a *Brady* violation.  As for remedies, the Court concluded that a jury "instruction would be appropriate," as well as "broad latitude on cross-examination" and "any closing statements." 1/28/26 Tr. 37:1-6.  And on February 17, 2026, during the charge conference, the Court reaffirmed its conclusion that a jury instruction on the government's *Brady* violation was appropriate.

The government's arguments about why the Court's order was manifestly erroneous each fall flat.

*First*, the government argues that the Accardi-Shuman email only contained exculpatory information already in possession by the defense.  *See* ECF No. 390, at 10-11, 13-16.  The Court already rejected this argument.  It held that though it "agree[d] with the government that the overall theory . . . is not new," "this is information directly coming from the lead case agent to the accountant."  1/28/26 Tr. 35:14-17.  No other evidence in the defense's possession establishes that even Agent Accardi, the lead case agent, was unable to locate documents in the GRF production showing that Goldstein & Russell reviewed the classification of the relevant firm expenditures.

*Second*, the government incorrectly argues that because the critical email was disclosed to the defense before the conclusion of trial, there can be no *Brady* violation.  *See* ECF No. 390, at 11-13. But, as this Court has already concluded, the email would have been material to the

defense's trial preparation and presentation.  Indeed, courts routinely find *Brady* violations even when materials are disclosed mid-trial.  *See, e.g.*, *Cloud*, 102 F.4th at 981; *United States v. Davis*, No. 4:18-CR-00011, 2020 WL 522146, at *7 (W.D. Va. Jan. 31, 2020).  For mid-trial discoveries of withheld evidence, courts "evaluate the relative value of the withheld evidence on the basis of the indictment, the pretrial proceedings, the opening statements, and the evidence introduced *up to that point*."  *Cloud*, 102 F.4th at 980 (internal quotation marks and citation omitted) (emphasis added).

Here, as the defense pointed out in its moving papers (ECF No. 367, at 7), the defense would have used the critical Accardi-Shuman email in its trial preparation and trial presentation, including by incorporating that email in its opening statement. As a threshold matter, the government apparently had a fundamental misunderstanding about the facts of its own case that seriously prejudiced Mr. Goldstein's defense.  The government called numerous former employees of Goldstein & Russell as witnesses and intentionally emphasized a false theory that the inexperience of Goldstein & Russell office managers was the reason charged transactions were misclassified in Goldstein & Russell's accounting records.  But in the undisclosed email, Mr. Shuman told Agent Accardi clearly and succinctly that "my staff" (in other words, GRF) "was maintaining a QuickBooks file" and "we" (again, GRF) "were doing transaction coding." Ex. A at 2.  Because the accounting firm, GRF, was responsible for bookkeeping and classifications, it was irrelevant that Goldstein & Russell office managers lacked bookkeeping or accounting experience.  Yet the government repeatedly suggested otherwise.  *See, e.g.*, 1/20/26 Tr. 124:10-11 (Kevin Russell) ("Q.  Now, how did the office managers reconciled the firm's bank accounts with the firm's books and records?"); *id.* at 124:16-17 ("Q.  And who from your

firm was charged with making sure that the bank reconciliation was done correctly?"); 125:5-6 ("Q. How often did you open up the QuickBooks and review the accounting records?").

There should have been no dispute that the accountants at GRF, and no one at Goldstein & Russell, maintained the QuickBooks accounting records. And because GRF maintained those records, it was all the more important that (1) even the government could not find evidence that anyone from Goldstein & Russell reviewed those record and (2) to the extent GRF asked questions to create those records, GRF asked the office managers. But because the defense was not able to use the suppressed emails in its opening statement, the jury took it as a disputed fact that Goldstein & Russell's office managers (rather than GRF) were responsible for maintaining Goldstein & Russell's books, and that Mr. Goldstein played a role in reviewing GRF's classifications for accuracy. As the Court pointed out, it is one thing for the defense to assert that GRF, not Mr. Goldstein, was responsible for the classification errors. But that assertion has significantly more strength when backed by documentary evidence sent to the government's lead case agent.

By the time the defense was able to show the suppressed email to the jury during its cross-examination of Mr. Shuman in the fifth week of trial, the government had already reinforced through numerous witnesses the idea that Mr. Goldstein misclassified transactions directly, or by using inexperienced office managers as bookkeepers. By the time the government called Mr. Shuman—its very last civilian witness—the jury's opinion had already solidified, and the defense's presentation of this critical evidence likely struck the jurors as post-hoc rationalization. *Cf. United States v. Gonzalez-Maldonado*, 115 F.3d 9, 15 (1st Cir. 1997) (stating that "[a] defendant's opening statement prepares the jury to hear his case" and holding that "promising to admit … important evidence" in an opening statement and "then failing to produce

it is prejudicial as a matter of law"); *Testa v. Vill. of Mundelein, Ill.*, 89 F.3d 443, 446 (7th Cir. 1996) (noting the "widespread belief that juries typically make up their minds about a case after the opening statements"). The defense should have had the opportunity to present its theory backed by this evidence—including that it was known to the lead case agent—from the very beginning of the case, not after the government spent over a month reinforcing a false premise about Goldstein & Russell's bookkeeping.[3]

## II.    The Accardi-Shuman Email Establishes Key Elements of Mr. Goldstein's Defense.

In its motion for reconsideration, the government levels serious but erroneous accusations that the defense made "false representations" and "false statement[s]" to the Court in both its motion at ECF No. 367 and its oral presentation to the Court on January 28. Having been caught violating Mr. Goldstein's due process rights, these accusations from the government ring especially hollow. Moreover, the defense submitted the Accardi-Shuman email to the Court as an exhibit to its motion (ECF No. 367-1), and the Court announced that it had "read the[se] papers carefully." *See* 1/28/26 Tr. 21:24. Far from providing a "misleading" rendition of the critical email (ECF No. 390, at 5), the defense was fully transparent and provided the entire email to the Court for its own review. The government is now accusing not just the defense, but also the Court, of misconstruing the critical email.

In addition to having provided the Court with the email itself, the defense's prior representations about the email are accurate and based on a plain reading of that email. As the Court is aware based on its own review, the email is significant for at least two reasons, each of

---

[3]    The government's brief also argues that if the Court is unwilling to reconsider its finding of a *Brady* violation, a jury instruction would only be appropriate upon a finding that the government "contribute[d] to the destruction or loss of evidence." ECF No. 390, at 16-17. This issue is now moot because the Court reaffirmed at the charge conference that the *Brady* jury instruction was appropriate in this case.

8

which establishes critical elements of Mr. Goldstein's defense.  *First*, Special Agent Accardi's email to Mr. Shuman states that the government *cannot find* documents in the GRF production showing that Goldstein & Russell reviewed the classification of the relevant firm expenditures. Agent Accardi states that "there should be a list of all items or counterparties that fell into specific categories, like 'Legal Fees'" that "would have been sent to Mr. Goldstein or his firm for review to determine if items were appropriately classified."  But Agent Accardi states that he "was not able to identify the" relevant documents, and asks for Mr. Shuman's help in "identify[ing] these files."  In response, Mr. Shuman acknowledges that those files did not exist. Instead, GRF had only "just" general ledgers (though not any specific files showing that Mr. Goldstein or his law firm reviewed whether items were "appropriately classified").  This correspondence directly undermines the government's theory that Mr. Goldstein willfully aided and assisted GRF's misclassification of certain transactions—the very accountants responsible for maintaining Goldstein & Russell's general ledger admit that they have no record of asking Mr. Goldstein about the ledgers, let alone reviewing those ledgers for accuracy.

*Second*, Mr. Shuman's response to Agent Accardi explained that GRF (and not Mr. Goldstein or his law firm's staff) "maintain[ed] a QuickBooks file" and that GRF (and, again, not Mr. Goldstein or his law firm's staff) was responsible for "doing transaction coding monthly."  Mr. Shuman also acknowledged that the GRF accounting firm's "communication[s] would be with Tom's assistant rather than with Tom directly."  These statements undermine the government's allegations that Mr. Goldstein knew (or was willfully blind to) the status of transactions that were erroneously classified.

### III.    The Court Should Deny The Government's Motion to Seal.

Finally, the Court should deny the government's motion to seal its reconsideration motion at ECF No. 390.  The government provides only one justification for its attempt to keep

its filing from public access: certain generalized references to Mr. Shuman's grand jury testimony.  ECF No. 390, at 1; *see* ECF No. 389 (motion to seal invoking Federal Rule of Criminal Procedure 6(e)).  Those references to Mr. Shuman's grand jury testimony are sufficiently generalized and can be disclosed on the public record; any slight interest the government may have in keeping such material confidential cannot overcome "the 'presumption' … [in] favor[] [of] public access."  *See Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 302 (4th Cir. 2000) (citation omitted); *see also Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 602 (1978) (discussing the "presumption . . . in favor of public access to judicial records").

Alternatively, even if the Court were to agree that references to Mr. Shuman's grand jury testimony are covered by the secrecy requirements of Rule 6(e), the Court should order the government to narrowly redact those portions of its filing that reference the contents of Mr. Shuman's testimony and file public versions disclosing the remainder of its motion for reconsideration.  *See Ashcraft*, 218 F.3d at 302 ("before a district court may seal any court documents, … it must," *inter alia*, "consider less drastic alternatives to sealing the documents," and "provide specific reasons and factual findings supporting its decision to seal the documents and for rejecting the alternatives").

<u>**CONCLUSION**</u>

For the reasons discussed above, the Court should deny the government's motion for reconsideration and deny its motion to seal that filing.

Dated: March 6, 2026                              Respectfully submitted,

/s/ *Jonathan I. Kravis*
Jonathan I. Kravis (Bar No. 31556)
Stephany Reaves (Bar No. 19658)
Sarah E. Weiner (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP

10

601 Massachusetts Avenue NW, Suite 500E
Washington, DC 20001
(202) 220-1100
Jonathan.Kravis@mto.com
Stephany.Reaves@mto.com
Sarah.Weiner@mto.com

Adeel Mohammadi (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
Adeel.Mohammadi@mto.com

*Attorneys for Defendant Thomas Goldstein*