**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. LKG-25-6** |
| | * | |
| **THOMAS C. GOLDSTEIN,** | * | |
| | * | |
| **Defendant.** | * | |

\*\*\*\*\*\*\*\*

**[CORRECTED] DEFENDANT THOMAS C. GOLDSTEIN'S RENEWED MOTION FOR
JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, FOR A NEW TRIAL**

# TABLE OF CONTENTS[*]

**Page**

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................6

LEGAL STANDARD.............................................................................................................8

ARGUMENT........................................................................................................................10

I.     THE COURT ERRED IN TWO INDEPENDENT WAYS WITH RESPECT TO THE JURY INSTRUCTIONS ON ACCESSORY LIABILITY......................................10

     A.     Background ....................................................................................................10

     B.     The Court Made Two Errors..........................................................................12

          1.     The Final Jury Instructions Omit The Requirements For Finding Accessory Liability That Are Not Expressly Specified By The Text Of Section 2 .....................................................................................12

               (a)     The Court Was Required To Instruct The Jury On The Elements Of Accessory Liability. ...................................12

               (b)     The Error In Failing To Instruct The Jury On The Elements Of Accessory Liability Requires A Retrial On Every Count.........17

          2.     The Court Independently Erred By Changing The Jury Instructions To Expand Accessory Liability After Closing Arguments.......................25

II.     THE COURT ERRED IN INSTRUCTING THE JURY ON WILLFUL BLINDNESS...............................................................................................................28

     A.     It Was Error To Instruct The Jury That It Could Convict Mr. Goldstein Of Tax Evasion On The Basis Of Willful Blindness ...................................................30

          1.     Gambling Income....................................................................................30

          2.     Mischaracterized Transactions................................................................31

          3.     Bank Account Interest.............................................................................34

     B.     It Was Error To Instruct The Jury That It Could Convict Mr. Goldstein Of Assisting The Preparation Of False Returns On The Basis Of Willful Blindness.......................................................................................................35

          1.     Mischaracterized Transactions (Counts 3 And 7)....................................35

          2.     Redirected Income (Counts 3 And 9) ......................................................37

          3.     Unreported Income From Paul Phua (Count 7) ........................................38

          4.     Gross Gambling Wins (Counts 8 And 9)..................................................38

---

[*] ECF No. 485 inadvertently omitted a portion of the table of contents. This motion corrects the table of contents and typographical errors.

5.      Cryptocurrency Box (Counts 8 And 9)...................................................39

C.      It Was Error To Instruct The Jury That It Could Convict Mr. Goldstein Of Willful Failure To Pay Based On Willful Blindness (Counts 10, 11, 12, 13) ...............................................................................................................41

III.      THE COURT SHOULD ORDER A NEW TRIAL BASED ON THE IMPROPER EXCLUSION OF MR. GOLDSTEIN'S CONTEMPORANEOUS MESSAGES............43

IV.      JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, A NEW TRIAL IS NECESSARY AS TO COUNT 1 .......................................................................................52

A.      The IOLTA Allegation Was Legally Invalid...........................................................53

B.      The Officer Parrish Allegation Is Legally Invalid ..................................................58

C.      The Appropriate Remedy Is A New Trial................................................................62

V.      A JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, A NEW TRIAL IS NECESSARY AS TO COUNTS 3, 7, 8, AND 9.............................................62

A.      The Evidence Was Insufficient To Sustain A Conviction As To Count 3 ............63

1.      Mr. Goldstein Did Not Assist The Filing Of A False Tax Return By Directing The Office Manager To Send A Wire To Napoli Shkolnik ....................................................................................................64

2.      Mr. Goldstein Did Not Assist The Filing Of A False Tax Return By  Asking Robbins Geller To Make A Legal Fee Payment Into Mr. Goldstein's Personal Account.............................................................65

B.      The Evidence Was Insufficient To Sustain A Conviction As To Count 7 ............68

1.      Mr. Goldstein Did Not Assist The Filing Of A False Tax Return By Directing The Office Manager To Send A Wire To Chuck Pacheco ...................................................................................................68

2.      Mr. Goldstein Did Not Assist The Filing Of A False Tax Return By Failing To Report $235,000 Legal Fee Income Paid Into G&R's Business Account ..........................................................................70

C.      The Evidence Was Insufficient To Sustain A Conviction As To Counts 8 and 9.......................................................................................................................71

1.      Mr. Goldstein Did Not Assist The Filing Of A False Tax Return By Failing To Report The Existence Of Cryptocurrency Transactions ..............................................................................................72

2.      Mr. Goldstein Did Not Assist The Filing Of A False Tax Return By Failing To Report Gambling Winnings...............................................75

3.      Mr. Goldstein Did Not Assist The Filing Of A False Tax Return By Asking Tobey Maguire To Make A Legal Fee Payment To Bob Safai .............................................................................................................76

D.      The Evidence Was Insufficient To Sustain a Conviction Based On The Employee Allegations.............................................................................................77

ii

VI.     JUDGMENT OF ACQUITTAL IS REQUIRED AS TO COUNTS 10-13 ......................78

CONCLUSION.................................................................................................................................80

## TABLE OF AUTHORITIES

**Page(s)**

*Atl. & Gulf Stevedores Inc. v. Ellerman Lines, Ltd.*,
  369 U.S. 355 (1962)..................................................................................................63

*California v. Roy*,
  519 U.S. 2 (1996).......................................................................................................15

*Cheek v. United States*,
  498 U.S. 192 (1991)..............................................................................................52, 76

*Evans v. Michigan*,
  568 U.S. 313 (2013)....................................................................................................77

*Global-Tech Appliances, Inc. v. SEB S.A.*,
  563 U.S. 754 (2011)..........................................................................................28, 29, 38

*Griffin v. United States*,
  502 U.S. 46 (1991).......................................................................................................9

*Hedgpeth v. Pulido*,
  555 U.S. 57 (2008).......................................................................................................9

*Herring v. New York*,
  422 U.S. 853 (1975)....................................................................................................25

*Hicks v. United States*,
  150 U.S. 442 (1893)....................................................................................................15

*Hwang L. Firm, LLC v. United States*,
  No. 07-2973, 2008 WL 2704316 (E.D. Pa. July 9, 2008) ........................................57

*James v. United States*,
  366 U.S. 213 (1961)....................................................................................................80

*Kawashima v. Holder*,
  565 U.S. 478 (2012)....................................................................................................58

*Kwong v. United States*,
  179 Fed. Cl. 382 (2025) .............................................................................................78

*L. Offs. of Scott E. Combs v. United States*,
  767 F. Supp. 2d 758 (E.D. Mich. 2011)....................................................................57

*Neder v. United States*,
  527 U.S. 1 (1999)..................................................................................................10, 24

*Nye & Nissen v. United States*,
    336 U.S. 613 (1949)..................................................................................................15

*Phillips v. Pneumo Abex, LLC*,
    713 F. App'x 191 (4th Cir. 2017) ...............................................................63, 66, 76

*Rosemond v. United States*,
    572 U.S. 65 (2014)..............................................................................................15, 16

*Sansone v. United States*,
    380 U.S. 343 (1965)..................................................................................................62

*In re Sealed Case*,
    223 F.3d 775 (D.C. Cir. 2000)..................................................................................54

*Spies v. United States*,
    317 U.S. 492 (1943)..................................................................................................58

*Tibbs v. Florida*,
    457 U.S. 31 (1982)..................................................................................................8, 9

*United States v. Ali*,
    735 F.3d 176 (4th Cir. 2013) ...................................................................................28

*United States v. Andra*,
    218 F.3d 1106 (9th Cir. 2000) ..................................................................................58

*United States v. Barnhart*,
    979 F.2d 647 (8th Cir. 1992) ....................................................................................30

*United States v. Booker*,
    146 F.4th 332 (4th Cir. 2025) .....................................................................................8

*United States v. Carter*,
    15 F.4th 26 (1st Cir. 2021)........................................................................................54

*United States v. Ciesiolka*,
    614 F.3d 347 (7th Cir. 2010) ....................................................................................30

*United States v. Critzer*,
    498 F.2d 1160 (4th Cir. 1974) ..................................................................................80

*United States v. Curran*,
    20 F.3d 560 (3d Cir. 1994)..................................................................................13, 15

*United States v. Davis*,
    No. CRIM. WDQ-13-0002, 2013 WL 4026969 (D. Md. Aug. 6, 2013)..............................55

*United States v. de Francisco-Lopez*,
   939 F.2d 1405 (10th Cir. 1991) .......................................................................30

*United States v. Fernandez-Jorge*,
   894 F.3d 36 (1st Cir. 2018)........................................................................15, 24

*United States v. Frazier*,
   560 F.2d 884 (8th Cir. 1977) ...........................................................................54

*United States v. Gabriel*,
   125 F.3d 89 (2d Cir. 1997)...............................................................................13

*United States v. Gallagher*,
   90 F.4th 182 (4th Cir. 2024) ..................................................................25, 47, 48

*United States v. Gambone*,
   314 F.3d 163 (3d Cir. 2003)........................................................................64, 73

*United States v. Garber*,
   607 F.2d 92 (5th Cir. 1979) .............................................................................80

*United States v. Gaskins*,
   849 F.2d 454 (9th Cir. 1988) ...........................................................................27

*United States v. Gaudin*,
   515 U.S. 506 (1995).........................................................................................14

*United States v. Giovannetti*,
   919 F.2d 1223 (7th Cir. 1990) .........................................................................30

*United States v. Goodyear*,
   649 F.2d 226 (4th Cir. 1981) .....................................................................52, 58

*United States v. Graham*,
   758 F.2d 879 (3d Cir. 1985)........................................................................64, 73

*United States v. Gumbs*,
   283 F.3d 128 (3d Cir. 2002)........................................................................13, 14

*United States v. Hale*,
   857 F.3d 158 (4th Cir. 2017) ...........................................................................29

*United States v. Hamrick*,
   43 F.3d 877 (4th Cir. 1995) .......................................................................53, 55

*United States v. Harris*,
   346 F.2d 182 (4th Cir. 1965) ...........................................................................15

*United States v. Harris*,
942 F.2d 1125 (7th Cir. 1991) ........................................................................52, 80

*United States v. Harvill*,
501 F.2d 295 (9th Cir. 1974) ................................................................................26

*United States v. Hastings*,
134 F.3d 235 (4th Cir. 1998) ......................................................................10, 24, 62

*United States v. Hayden*,
64 F.3d 126 (3d Cir. 1995)....................................................................................13

*United States v. Head*,
641 F.2d 174 (4th Cir. 1981) ................................................................................14

*United States v. Henry*,
797 F.3d 371 (6th Cir. 2015) ................................................................................15

*United States v. Hilliard*,
31 F.3d 1509 (10th Cir. 1994) ..............................................................................30

*United States v. Hirschfeld*,
964 F.2d 318 (4th Cir. 1992) ................................................................................76

*United States v. Horton*,
921 F.2d 540 (4th Cir. 1990) ..........................................................................13, 26

*United States v. Huebner*,
48 F.3d 376 (9th Cir. 1994) ..................................................................................58

*United States v. Hutchison*,
338 F.2d 991 (4th Cir. 1964) ................................................................................14

*United States v. Ibisevic*,
675 F.3d 342 (4th Cir. 2012) ..........................................................................46, 47

*United States v. Jacob*,
242 F.3d 391, 2000 WL 1694300 (10th Cir. Nov. 13, 2000) ................................58

*United States v. Jefferson*,
674 F.3d 332 (4th Cir. 2012), *as amended* (Mar. 29, 2012) ..............................9, 10

*United States v. Jinwright*,
683 F.3d 471 (4th Cir. 2012) ..................................................................28, 29, 33

*United States v. Josephberg*,
562 F.3d 478 (2d Cir. 2009)..................................................................................59

*United States v. Kimble,*
  855 F.3d 604 (4th Cir. 2017) ........................................................................63, 73, 75

*United States v. Kottwitz,*
  614 F.3d 1241 (11th Cir. 2010), *opinion withdrawn in part on other grounds,*
  627 F.3d 1383 (11th Cir. 2010) ................................................................................65

*United States v. Leake,*
  642 F.2d 715 (4th Cir. 1981) ....................................................................................47

*United States v. Lieberman,*
  106 F.3d 393 (4th Cir. 1997) ....................................................................................30

*United States v. Lighty,*
  616 F.3d 321 (4th Cir. 2010) ....................................................................................29

*United States v. Macias,*
  786 F.3d 1060 (7th Cir. 2015) ..................................................................................30

*United States v. Mallas,*
  762 F.2d 361 (4th Cir. 1985) ....................................................................................79

*United States v. Mandel,*
  862 F.2d 1067 (4th Cir. 1988) ..................................................................................10

*United States v. Mapelli,*
  971 F.2d 284 (9th Cir. 1992) ........................................................................30, 42, 43

*United States v. McGill,*
  964 F.2d 222 (3d Cir. 1992)......................................................................................58

*United States v. Mendoza,*
  473 F.2d 697 (5th Cir. 1973) ....................................................................................26

*United States v. Moye,*
  454 F.3d 390 (4th Cir. 2006) ......................................................................................9

*United States v. Nealy,*
  729 F.2d 961 (4th Cir. 1984) ........................................................................73, 74, 75

*United States v. Odum,*
  65 F.4th 714 (4th Cir. 2023) ..............................................................................13, 16

*United States v. Ordonez-Zometa,*
  141 F.4th 531 (4th Cir. 2025) ..................................................................................8, 9

*United States v. Paolicelli,*
  505 F.2d 971 (4th Cir. 1974) ....................................................................................61

*United States v. Polowichak*,
   783 F.2d 410 (4th Cir. 1986) .........................................................................................14

*United States v. Prado*,
   815 F.3d 93 (2d Cir. 2016).............................................................................................15

*United States v. Quattrone*,
   441 F.3d 153 (2d Cir. 2006)...........................................................................................13

*United States v. Rafiekian*,
   68 F.4th 177 (4th Cir. 2023) .......................................................................................8, 9

*United States v. Ravelle*,
   947 F.2d 943 (4th Cir. 1991) .........................................................................................14

*United States v. Ravenell*,
   66 F.4th 472 (4th Cir. 2023) ..........................................................................................29

*United States v. Reed*,
   75 F.4th 396 (4th Cir. 2023) ..........................................................................................55

*United States v. Romano*,
   938 F.2d 1569 (2d Cir. 1991).....................................................................................59, 60

*United States v. Salerno*,
   902 F.2d 1429 (9th Cir. 1990) ........................................................................................67

*United States v. Sarwari*,
   669 F.3d 401 (4th Cir. 2012) .....................................................................................61, 62

*United States v. Sassak*,
   881 F.2d 276 (6th Cir. 1989) .....................................................................................64, 73

*United States v. Schiller*,
   81 F.4th 64 (2d Cir. 2023) .............................................................................................54

*United States v. Schmidt*,
   376 F.2d 751 (4th Cir. 1967) .........................................................................................15

*United States v. Silver*,
   864 F.3d 102 (2d Cir. 2017)...........................................................................................25

*United States v. Smith*,
   451 F.3d 209 (4th Cir. 2006) ...........................................................................................9

*United States v. Smith*,
   54 F.4th 755 (4th Cir. 2022) ............................................................................................8

ix

*United States v. Smukler*,
   991 F.3d 472 (3d Cir. 2021)............................................................................................13

*United States v. Strickland*,
   245 F.3d 368 (4th Cir. 2001) ..........................................................................................24

*United States v. Thomas*,
   41 F.3d 1508 (6th Cir. 1994) ...........................................................................................65

*United States v. Tiari El*,
   No. 3:03CR219-1-MU, 2007 WL 2429189 (W.D.N.C. Aug. 22, 2007) ...................................9

*United States v. Vinson*,
   852 F.3d 333 (4th Cir. 2017) .................................................................................29, 32, 67

*United States v. Wander*,
   601 F.2d 1251 (3d Cir. 1979)...........................................................................................26

*United States v. Wilson*,
   118 F.3d 228 (4th Cir. 1997) .....................................................................................52, 60

*United States v. Winstead*,
   708 F.2d 925 (4th Cir. 1983) ...........................................................................................13

*United States v. Yurek*,
   925 F.3d 423 (10th Cir. 2019) .........................................................................................62

*Ventimiglia v. United States*,
   242 F.2d 620 (4th Cir. 1957) .................................................................................55, 56, 57

*In re Winship*,
   397 U.S. 358 (1970)......................................................................................................14

*Wright v. United States*,
   339 F.2d 578 (9th Cir. 1964) ...........................................................................................26

*Yates v. United States*,
   354 U.S. 298 (1957)....................................................................................................1, 9

**REGULATORY CASES**

*Abdo v. Comm'r of Internal Rev.*,
   162 T.C. 148 (2024).......................................................................................................78

**FEDERAL STATUTES**

18 U.S.C. § 2................................................................................ 1, 11, 13, 15, *passim*

18 U.S.C. § 1014............................................................................................................8

18 U.S.C. § 2113 .................................................................................................................15

26 U.S.C. § 6159(b)(5) .......................................................................................................54

26 U.S.C. § 6331(k)(2)(C) ..................................................................................................54

26 U.S.C. § 7201 ...........................................................................................................6, 52

26 U.S.C. § 7203 ...................................................................................................................8

26 U.S.C. § 7206 ...........................................................................................................7, 75

26 U.S.C. § 7508A(d) .........................................................................................................78

**FEDERAL RULES**

Fed. R. Crim. P. 29 .................................................................................................1, 6, 8, 9, 63

Fed. R. Crim. P. 30 ................................................................................................2, 25, 26, 27

Fed. R. Crim. P. 33 ...................................................................................................1, 8, 9, 63

Fed. R. Evid. 803(3)................................................................................................ 45, *passim*

**FEDERAL REGULATIONS**

26 C.F.R. § 1.6045-5(a)(1)...................................................................................................66

26 C.F.R. § 301.6331-4(a) ...................................................................................................54

**TREATISES**

2 McCormick on Evid. § 249 (8th ed.) .................................................................................48

15 Mertens Law of Fed. Income Tax'n § 56:75 (2025) .................................................................71

## **INTRODUCTION**

Defendant Thomas C. Goldstein respectfully moves for a judgment of acquittal or, in the alternative, for a new trial. *See* Fed. R. Crim. P. 29, 33. The jury convicted Mr. Goldstein on charges of tax evasion, aiding and assisting in the preparation of false tax returns, failure to timely pay taxes, and mortgage fraud. But the jury's verdict is directly traceable to a series of legal errors. In addition, there was insufficient evidence on which a reasonable jury could convict and, in the alternative, even if there was sufficient evidence, the Court should grant a new trial in the interest of justice.

The government put numerous theories before the jury. Indeed, all of the tax evasion and false returns charges offered the jury multiple alternative theories. Because the Court used a general verdict form, if any of those theories is legally invalid, the conviction on that count must be vacated. *See Yates v. United States*, 354 U.S. 298 (1957). Here, three legal errors independently invalidate the verdict with respect to all or most of the charges.

**Accessory Liability.** After closing arguments, the Court granted the government's last-minute request to delete the only instruction that defined the elements of accessory liability under 18 U.S.C. § 2, which was charged in every count. As a result, the jury was never instructed that accessory liability required a finding that Mr. Goldstein willfully intended to commit the underlying offense. The jury was also never instructed that aiding and abetting liability required finding another principal or an affirmative act. This failure to instruct the jury on the elements of accessory liability contravenes settled precedent. And a finding of prejudice necessarily follows from this Court's ruling at the charge conference that the record contained sufficient evidence to convict Mr. Goldstein on the basis of accessory liability. Indeed, there is no realistic dispute that the jury did convict Mr. Goldstein on the basis of accessory liability on at least one count, because

that was the only basis on which the jury could have found venue for Count 15.  *See* Part I-B-1, *infra*.

Furthermore, the last-minute change to the jury instructions also violated the plain, mandatory terms of Federal Rule of Criminal Procedure 30(b) by expanding accessory liability after closing arguments.  That error was separately prejudicial because defense counsel was deprived of any realistic opportunity to address the theories of accessory liability on which the jury was permitted to convict.  *See* Part I-B-2, *infra*.

**Willful Blindness.**  It was error to instruct the jury that it could convict Mr. Goldstein on every count on a theory of "willful blindness."  Fourth Circuit precedent sharply limits the rare circumstances under which such an instruction is permissible.  There must be proof that the defendant both subjectively believed that there was a high probability that a fact exists, and took deliberate steps to avoid learning of that fact.  The evidence before the jury did not satisfy that strict standard with respect to any count, much less all of them.  There was no evidence that Mr. Goldstein knew there was a high probability that his taxes would be false and that he took concrete steps to avoid learning about, for example, his 2016 gambling winnings, whether certain transactions were mischaracterized, whether legal fees that were not paid into the law firm's bank accounts were not recorded as income, and whether he had a legal duty to pay his taxes on the deadline regardless of his compliance with the IRS's civil enforcement regime.  But there is every prospect that the jury impermissibly convicted Mr. Goldstein on that basis.  *See* Part II, *infra*.

**Hearsay.**  It was error to exclude, on hearsay grounds, contemporaneous communications that were central to Mr. Goldstein's defense to the charge that he willfully evaded his taxes with respect to his 2016 gambling winnings.  The government argued that this evidence was impermissible "self-serving hearsay."  But the hearsay prohibition applies only to evidence that is

admitted for the truth of the matter asserted.  Here, the evidence was plainly admissible to prove a central question in the case that did not depend on whether the statements in question were true: Mr. Goldstein's state of mind—his understanding and intent.  That error was deeply prejudicial, as Mr. Goldstein's principal defense on this charge was that he did not act willfully.  Further, that prejudice extended to all of the tax charges, because the government argued that the jury should infer willfulness with respect to every tax offense from the fact that Mr. Goldstein intentionally failed to pay taxes on the 2016 gambling winnings.  *See* Part III, *infra*.

**Legally Impossible Theories of Tax Evasion.**  The conviction on Count 1 must be vacated because the jury was permitted to convict on two theories that are legally invalid.  *First*, the government alleged that Mr. Goldstein evaded collection of his 2016 taxes by moving funds into his law firm's IOLTA account for several days.  That charge is legally impossible both because the IRS was prohibited from levying on any account of Mr. Goldstein's during that period, and also because if the IRS did levy it could do so from the IOLTA account.  *See* Part IV-A, *infra*.  The government also alleged that Mr. Goldstein evaded collection by telling Revenue Agent Parrish that his 2016 income resulted from a legal fee.  That charge is legally impossible because the source of the income was known to the IRS—it was set forth on Mr. Goldstein's 2016 tax return. *See* Part IV-B, *infra.*

*Second*, Mr. Goldstein is entitled to a judgment of acquittal on Counts 3, 7, 8, and 9 because the evidence was insufficient for a reasonable juror to find proof beyond a reasonable doubt.  In the alternative, the interests of justice require a retrial on those counts.  The Court also should resolve these questions to narrow any retrial and ensure that Mr. Goldstein is not subjected to double jeopardy on any allegation:

**Mischaracterized Transactions.** There was insufficient evidence with respect to the payments to Napoli Shkolnik (alleged in Count 3) and Chuck Pacheco (alleged in Count 7) that were incorrectly recorded as deductible business expenses. Mr. Goldstein indisputably never directed that any payment be mischaracterized. Mr. Goldstein did not direct these payments to be categorized as business expenses, and there is no evidence that Mr. Goldstein was—or even reasonably could be—aware that the firm's bookkeepers had treated them that way. *See* Parts V-A-1, V-B-1, *infra*.

**Unreported Legal Fee Income.** There was insufficient evidence with respect to payments that firm clients made to sources other than the firm's bank account. Indeed, it is overwhelmingly likely that the jury did not convict Mr. Goldstein based on this type of allegation, given that it also appeared in Count 5, on which the jury acquitted. With respect to the payment by Robbins Geller (alleged in Count 3), Mr. Goldstein specifically provided that firm with the information required to provide the IRS and Goldstein & Russell with a Form 1099, and Robbins Geller in fact did so. There is no evidence that Mr. Goldstein was—or even reasonably could be—aware that the accountants were ignoring that required tax documentation. *See* Part V-A-2, *infra*. The same is true with respect to the payment by Tobey Maguire (alleged in Count 9), given Mr. Goldstein's understanding that Mr. Maguire was required to send the law firm a Form 1099. *See* Part V-C-3, *infra*.

There was also insufficient evidence with respect to the $235,000 in legal fee income from Paul Phua (alleged in Count 7). Mr. Goldstein expressly created a legal fee invoice for this income. The invoice describing a "capital contribution" on which the government relied was entirely accurate and is not probative for two reasons: (1) it described only the transfer between Mr. Goldstein's personal and law firm accounts, not whether the income itself was a legal fee; and (2)

4

it was provided only to the Montenegrin bank, not to Mr. Goldstein's accountants or for any U.S. tax purpose.  *See* Part V-B-2, *infra*.

**Cryptocurrency Disclosure.**    There was insufficient evidence with respect to Mr. Goldstein's failure to check the box on his tax return acknowledging that he owned cryptocurrency in 2020 and 2021 (as alleged in Counts 8 and 9).  There is no evidence that Mr. Goldstein was aware of this requirement.  The government relied only on the fact that a tax organizer from 2019 and an engagement agreement for the accounting firm referenced cryptocurrency.  But assistants from that period expressly testified that they signed those documents (not Mr. Goldstein) and that they did not recall ever reviewing the cryptocurrency references with him.  *See* Part V-C-1, *infra*.

**Gross Gambling Income.**    There was insufficient evidence with respect to Mr. Goldstein's failure to separately list his gambling wins and losses in years in which he lost money (as alleged in Counts 8 and 9).  It is essentially certain that the jury did not convict on this basis.  The identical allegation appeared in Counts 2 and 6, on which the jury acquitted Mr. Goldstein.  Both of Mr. Goldstein's former accountants, Bill Caldwell and Walter Deyhle, testified that they never informed Mr. Goldstein of this requirement, and there is no evidence that he knew of it.  *See* Part V-C-2, *infra*.

**Failure to Pay.**    *Third*, Mr. Goldstein is entitled to a judgment of acquittal on Counts 10, 11, and 12 as a matter of law.  With respect to those three tax years, the government proved the wrong due dates.  The Court of Federal Claims has held that the filing and payment deadlines for those years were extended as a matter of law until late-2023.  Even if this Court disagrees with that ruling, the convictions must be vacated.  The fact that the filing date is ambiguous (as the IRS itself has acknowledged) precludes a finding that Mr. Goldstein willfully violated any legal duty. *See* Part VI, *infra*.

Finally, Mr. Goldstein renews, without waiving or forfeiting, and expressly preserves for appellate review, all arguments that Mr. Goldstein previously made under Rule 29 (including arguments regarding the sufficiency of the evidence for jury instructions) and incorporates them by reference. *See generally, e.g.*, ECF No. 408; ECF No. 416; 2/11/26 Tr. 6:2–68:20; 2/17/26 Tr. 35:23–36:9; *id*. at 112:9–130:3.

## **BACKGROUND**

The streamlined Second Superseding Indictment (the "indictment") charged Mr. Goldstein with sixteen offenses. *See* ECF No. 337-2, ¶¶ 108-125. On February 25, 2026, on its fourth day of deliberations, the jury returned a mixed verdict of guilty as to some counts and not guilty as to others. *See* ECF No. 472.

*Count 1.* The jury found Mr. Goldstein guilty on Count 1 of tax evasion related to his 2016 income, in violation of 26 U.S.C. § 7201. *See* 2/25/26 Tr. 4:11-14; ECF No. 472. That count permitted the jury to find Mr. Goldstein guilty based on any of eight alleged affirmative acts of tax evasion, so long as at least one occurred after January 1, 2018:

    a. using funds and assets of G&R to pay personal gambling debts;

    b. providing false and incomplete information to the Accounting Firm;

    c. making false and misleading statements to an IRS Revenue Officer in March 2018;

    d. making false and misleading statements to IRS representatives in October 2020;

    e. transferring at least $960,000 in personal funds into G&R's IOLTA account in March 2021 to shield the funds from collection by the IRS;

    f. using foreign individuals and foreign bank accounts to receive income;

    g. causing the preparation, signing, and filing with the IRS of a false and fraudulent Form 1120S for G&R; and

6

h.   causing the preparation, signing, and filing with the IRS of a false and fraudulent Form 1040 for Mr. Goldstein and his wife.

ECF No. 337-2, ¶ 109.

*Counts 2-9.* Counts 2 through 9 of the indictment charged Mr. Goldstein with aiding and assisting the preparation of a false and fraudulent tax return in tax years 2017 through 2021, in violation of 26 U.S.C. § 7206(2). *See* ECF No. 337-2, ¶¶ 52, 62, 61, 72, 77, 88-89, 117. The jury found Mr. Goldstein not guilty with respect to Counts 2, 4, 5, and 6. It found Mr. Goldstein guilty with respect to Counts 3, 7, 8, and 9, which alleged as follows:

a.   Count 3 alleged that, in connection with Goldstein & Russell's Form 1120S for tax year 2017, Mr. Goldstein (1) diverted a $250,000 legal fee from Robbins Geller to his personal account, and (2) used $175,000 of firm funds to pay a personal debt to Napoli Shkolnik.

b.   Count 7 alleged that, in connection with Goldstein & Russell's Form 1120S for tax year 2019, Mr. Goldstein (1) used $170,000 of firm funds to pay a personal debt to Chuck Pacheco, and (2) omitted $235,000 in legal fee income from Paul Phua.

c.   Count 8 alleged that, in connection with Mr. Goldstein's Form 1040 for tax year 2020, Mr. Goldstein (1) failed to report $93,180 in gross gambling winnings, and (2) answered "no" to the question whether, at any time during 2020, he had received, sold, sent, exchanged, or otherwise acquired any financial interest in any virtual currency.

d.   Count 9 alleged that, in connection with Mr. Goldstein's Form 1040 for tax year 2021, Mr. Goldstein (1) redirected a $500,000 legal fee payment from Tobey Maguire to Bob Safai, (2) failed to report $267,000 in gross gambling winnings,

7

and (3) answered "no" to the question whether, at any time during 2021, he had received, sold, sent, exchanged, or otherwise disposed of any financial interest in any virtual currency.

**Counts 10-13.**    The jury found Mr. Goldstein guilty on Counts 10 through 13, which charged him with willful failure to pay taxes in tax years 2017, 2019, 2020, and 2021, in violation of 26 U.S.C. § 7203.  *See* 2/25/26 Tr. 6:11-7:5; ECF No. 472; ECF No. 337-2, ¶ 119.

**Counts 14-16.**    The jury found Mr. Goldstein guilty on Counts 14 through 16, which charged him with making false statements on a loan application, in violation of 18 U.S.C. § 1014.  *See* 2/25/26 Tr. 7:6-23; ECF No. 472; ECF No. 337-2, ¶¶ 121, 123, & 125.[1]

## LEGAL STANDARD

Rule 29 "requires a district court to 'enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.'"  *United States v. Booker*, 146 F.4th 332, 341 (4th Cir. 2025) (quoting Fed. R. Crim. P. 29(a)); *see also United States v. Ordonez-Zometa*, 141 F.4th 531, 557 (4th Cir. 2025).  To survive a motion for judgment of acquittal, the verdict must be supported by "substantial evidence"—that is, "evidence that a reasonable fact-finder could accept as adequate and sufficient to support a defendant's guilt beyond a reasonable doubt." *United States v. Smith*, 54 F.4th 755, 766 (4th Cir. 2022).

Under Rule 33, on the other hand, "[a] new trial . . . may be granted where the government *has* presented sufficient evidence for a reasonable jury to convict, but the court nevertheless 'disagree[s] with the jurors' weighing of the evidence' in finding the defendant guilty."  *United States v. Rafiekian*, 68 F.4th 177, 186 (4th Cir. 2023) (quoting *Tibbs v. Florida*, 457 U.S. 31, 42

---

[1] The indictment also alleged that Mr. Goldstein assisted the preparation of false returns by causing salary and/or benefits to be paid to employees who allegedly did little or no work (Counts 5, 7, and 8).  The jury was not instructed on that theory of liability.  *See* Instr. No. 41.

(1982)). "So in determining whether a new trial is warranted, the district court—'sit[ting] as a thirteenth juror'—conducts its own assessment of the evidence, unconstrained by any requirement to construe the evidence in the government's favor." *Id.* (quoting *Tibbs*, 457 U.S. at 42); *see also* Fed. R. Crim. P. 29(d)(1) ("If the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed."). In other words, "while a district court may not draw inferences against the government when deciding a motion for judgment of acquittal, it may do so when considering a motion for a new trial." *Ordonez-Zometa*, 141 F.4th at 557.

A court may also grant a new trial on any other basis "if the interest of justice so requires," Fed. R. Crim. P. 33(a), including on the ground that evidence was improperly excluded. *See, e.g.*, *United States v. Tiari El*, No. 3:03CR219-1-MU, 2007 WL 2429189, at *3 (W.D.N.C. Aug. 22, 2007) ("The appropriate remedy for an error in the admission or exclusion of evidence, which is not harmless beyond a reasonable doubt, is to grant a new trial."); *United States v. Smith*, 451 F.3d 209, 219-23 (4th Cir. 2006) (considering several challenges to evidentiary rulings made in a Rule 33 motion).

Counts 1, 3, 7, 8, and 9 all permitted the jury to convict on multiple alternative theories using a general verdict. Under the Supreme Court's decision in *Yates v. United States*, 354 U.S. 298 (1957), and its progeny, "when a general verdict on a single criminal charge rests on alternative theories, one valid and the other invalid," "the verdict must be set aside" unless "the error was harmless beyond a reasonable doubt." *United States v. Jefferson*, 674 F.3d 332, 361 (4th Cir. 2012), *as amended* (Mar. 29, 2012); *see also, e.g.*, *Hedgpeth v. Pulido*, *555 U.S. 57, 58 (2008) (per curiam); Griffin v. United States*, 502 U.S. 46, 59-60 (1991); *United States v. Moye*, 454 F.3d 390, 400 n.10 (4th Cir. 2006) (new trial is necessary so long as any one such theory is "legally

9

inadequate"); *United States v. Mandel*, 862 F.2d 1067, 1073 (4th Cir. 1988) ("[I]n a case in which the jury considers alternate theories of liability, we must reverse the convictions if either theory is an improper basis for punishment."). It is the government's burden to prove "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Jefferson*, 674 F.3d at 361 (quoting *Neder v. United States*, 527 U.S. 1, 15 (1999)); *see also United States v. Hastings*, 134 F.3d 235, 241-43 (4th Cir. 1998).

## ARGUMENT

## I.    THE COURT ERRED IN TWO INDEPENDENT WAYS WITH RESPECT TO THE JURY INSTRUCTIONS ON ACCESSORY LIABILITY

A last-minute request by the government led the Court into two very significant errors. Under settled precedent, the Court erred when it (1) failed to instruct the jury on the elements that must be found to convict Mr. Goldstein on a theory of accessory liability under 18 U.S.C. § 2, and (2) changed the final jury instructions after closing arguments to expand the bases on which the jury could do so. A retrial is required on every count of conviction because the government cannot make either of the twin showings required to render those dual errors harmless: (1) that there is overwhelming evidence that the jury convicted Mr. Goldstein directly on the basis of the substantive charges rather than on a theory of accessory liability; and (2) that the defense's closing argument would not have been different despite the change in instructions.

### A.    Background

Two interlocking aspects of the jury instructions approved by the Court at the charge conference are relevant here. *First*, the "Charging Instruction" for every category of offense authorized the jury to convict Mr. Goldstein on the basis of either the substantive offense or aiding and abetting liability. *E.g.*, Ex. A, Charging Instructions (hereinafter, "Instr."), Instr. No. 44 ("Counts 10-13 of the indictment charge Mr. Goldstein with failing to timely pay income taxes,

10

and aiding, abetting, counseling, commanding, inducing, or procuring such an offense."). The Charging Instructions for tax evasion, assisting the preparation of false returns, and mortgage fraud (but not failure to pay) also provided that the jury could convict Mr. Goldstein under the accessory statute, 18 U.S.C. § 2. *See* Instr. Nos. 32 (tax evasion), 39 (assisting the preparation of false returns), 44 (failure to pay), & 51 (mortgage fraud).

*Second*, the "Accessory Instruction" defined the requirements of Section 2 for purposes of this case. It permitted the jury to convict *only* on the basis of aiding and abetting an offense (hereinafter, "aiding and abetting liability"), *not* "willfully causing" an offense (hereinafter, "cause liability"). *See* Ex. B (hereinafter, "Pre-Closings Jury Instr."), No. 69; *compare* 18 U.S.C. § 2(a) ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.") *with id.* § 2(b) ("Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.").

The Accessory Instruction specified that in order to find aiding and abetting liability the jury was required to make three findings that are required by law but that do not appear in the text of the Accessory Statute that was quoted in the Charging Instructions: (1) that another guilty principal "committed every element of the offense"; (2) that Mr. Goldstein "acted knowingly and willfully"; and (3) that Mr. Goldstein engaged in "some affirmative conduct or overt act for the specific purpose of bringing about that crime," not an omission. Pre-Closings Jury Instr. No. 69, at 77-78.

The defense presented its closing arguments on the understanding that accessory liability was subject to those strict limits. But after closing arguments, the Court granted the government's last-minute request (ECF No. 430, at 2) to delete the Accessory Instruction. The government

11

advised the Court that it was not necessary to instruct the jury on the elements of accessory liability because the statute's terms are purportedly self-defining. *Id.* The Court reasoned that the instruction misstated the requirements of Section 2 by permitting the jury to convict only on the basis of aiding and abetting liability. 2/19/26 Tr. 21:14-24:3, 25:15-18, 26:5-13. The Court did not reason, however, that the jury should be able to convict based on cause liability. To the contrary, the Court stated that it believed that the jury would *not* be able to convict Mr. Goldstein on a "cause" theory of mortgage fraud. *Id.* at 25:19-26:4. But the Court did not remove the references in the Charging Instructions permitting the jury to convict on the basis of aiding and abetting liability and cause liability.

As a result, under the final instructions: (1) the jury could convict Mr. Goldstein on both an aiding and abetting theory (for every charge) and a cause theory (for tax evasion, false returns, and mortgage fraud); (2) to find aiding and abetting liability, the jury was not instructed that it must find another guilty principal, that Mr. Goldstein willfully intended to commit the substantive tax offenses, and that he committed an affirmative act rather than an omission; and (3) to find cause liability, the jury was not instructed that it must find that Mr. Goldstein had the intent to willfully commit the substantive tax offenses.

### B.    The Court Made Two Errors

**1.    The Final Jury Instructions Omit The Requirements For Finding Accessory Liability That Are Not Expressly Specified By The Text Of Section 2**

**(a)    The Court Was Required To Instruct The Jury On The Elements Of Accessory Liability.**

The government's last-minute request *grossly* misstated the law and led the Court into two serious legal errors. The Court had expressly ruled at the charge conference that because the Charging Instructions recognized accessory liability, the Accessory Instruction was required as a

matter of law.  The government—*which had drafted and proposed the instruction*—fully agreed. *See* Part I-B-1-b, *infra*.  But on the morning after closing arguments, the government persuaded the Court to do the exact opposite.  The Court removed the Accessory Instruction based on the government's erroneous representation—which included no citation to any legal authority—that the instruction was unnecessary because the text of Section 2 quoted in the Charging Instructions adequately described the elements of accessory liability.  *See* ECF No. 430, at 2; 2/19/26 Tr. 10:9-22.

The Court's initial judgment was correct; the government's later assertion absolutely was wrong.  To be permitted to convict on the basis of accessory liability, a jury *must* make findings that are not specified by the text of Section 2.  In particular, aiding and abetting liability requires the jury to find (1) another principal, and (2) an act rather than an omission.  *See United States v. Odum*, 65 F.4th 714, 721 (4th Cir. 2023); *United States v. Horton*, 921 F.2d 540, 543 (4th Cir. 1990).  Both aiding and abetting and cause liability also require the jury to find that "the defendant had the *mens rea* required by the underlying statute"—in this case, the willful intent to commit the tax offenses.  *United States v. Gumbs*, 283 F.3d 128, 135 (3d Cir. 2002); *United States v. Winstead*, 708 F.2d 925, 927 (4th Cir. 1983).

Thus, although Section 2(b)—as quoted by the Charging Instructions—specifies that the jury must find that the defendant "willfully *cause[d] an act*" that would constitute the substantive offense, numerous decisions squarely hold that is not sufficient.  *See Gumbs*, 283 F.3d at 132, 136 (emphasis added); *see also United States v. Smukler*, 991 F.3d 472, 488 (3d Cir. 2021); *United States v. Gabriel,* 125 F.3d 89, 101 (2d Cir. 1997), *overruling on other ground recognized by United States v. Quattrone*, 441 F.3d 153, 176 (2d Cir. 2006); *United States v. Hayden*, 64 F.3d 126, 132 (3d Cir. 1995); *United States v. Curran*, 20 F.3d 560, 567-69 (3d Cir. 1994).  That phrase

13

from Section 2(b) only captures the intent to cause the third party to act.  The jury is required to find independently that the defendant had the intent required to commit the substantive offense. *See Gumbs*, 283 F.3d at 132, 136.  In turn, the instructions must specifically inform the jury of each required finding.  The Fifth and Sixth Amendments require the jury to find beyond a reasonable doubt "every element," *United States v. Gaudin*, 515 U.S. 506, 510 (1995), and "every fact necessary," *In re Winship*, 397 U.S. 358, 364 (1970), to convict.  The Fourth Circuit has therefore repeatedly held that a district court errs when the instructions merely quote the statute under which the jury may convict—as the Charging Instructions did here with respect to Section 2—without separately specifying the elements the jury must find.

More than sixty years ago, the Fourth Circuit reversed where "there was no instruction by the District Court as to the elements and nature of the crime charged," reasoning that "[t]he *most important and essential* part of instruction as to the law which the jury is to apply in a case is the essential elements of the crime charged." *United States v. Hutchison*, 338 F.2d 991, 991 (4th Cir. 1964) (emphasis added).  Since then, the Court of Appeals has "repeatedly said that we 'cannot and will not affirm a conviction by a jury unless the District Court instructs as to the elements of the offense charged in the information or indictment, whether requested or not.'" *United States v. Polowichak*, 783 F.2d 410, 415 (4th Cir. 1986) (citation omitted) (requiring retrial where the district court "merely identified the charges," while "failing to mention the statutory requirement[s]").  Indeed, it has done so in an uninterrupted line of six separate rulings, which regard the rule as so well established that violating it is plain error.  *See also United States v. Ravelle*, 947 F.2d 943 (4th Cir. 1991) (unpublished) ("Ravelle contends that the trial judge's failure to instruct the jury on the specific elements of that crime was plain error, mandating reversal.  We agree and reverse his conviction on those three counts only."); *United States v. Head*, 641 F.2d

14

174, 180 (4th Cir. 1981) (retrial required where the district court read the statute "to the jury rather than setting forth the separate elements of the offense"); *United States v. Schmidt*, 376 F.2d 751, 752-53 (4th Cir. 1967) (district court erred when it instructed jury that defendant was charged under 18 U.S.C. § 2113(a) and (b) and quoted the statute, but "failed to instruct the jury on the elements of the offenses charged in the counts of the indictment submitted to them"); *United States v. Harris*, 346 F.2d 182, 184 (4th Cir. 1965) (requirement that the instructions identify "to the jury the elements of the crime" is not satisfied "by the reading of the statute to the jury," because "an exposition of the constituents of the offense is mandatory and indispensable").

The essential constitutional mandate that the Court instruct the jury on each element squarely applies to a theory of imputed liability, which "requires submission of those fact issues to the jury." *Nye & Nissen v. United States*, 336 U.S. 613, 618, 620 (1949); *see Rosemond v. United States*, 572 U.S. 65, 79 (2014) (district court erred by failing to instruct the jury that based on the particular offense charged in that case, aiding and abetting required that the defendant acted with advance knowledge of the crime); *Hicks v. United States*, 150 U.S. 442, 449 (1893) (district court must instruct the jury "that the acts or words of encouragement and abetting must have been used by the accused with the intention of encouraging and abetting"); *see also, e.g.*, *California v. Roy*, 519 U.S. 2, 5 (1996) (per curiam) (failure to instruct the jury on the requirements of aiding and abetting liability constitutes "an error in the instruction that defined the crime"). The other courts of appeals uniformly apply that rule. *See, e.g.*, *United States v. Fernandez-Jorge*, 894 F.3d 36, 53 (1st Cir. 2018); *United States v. Prado*, 815 F.3d 93, 102 (2d Cir. 2016); *United States v. Henry*, 797 F.3d 371, 374 (6th Cir. 2015). The same principle of course applies to the requirements of Section 2(b): the court must "grant a new trial," when "the jury charge . . . failed to adequately explain the intent requirement under 18 U.S.C. []§ 2(b)." *Curran*, 20 F.3d at 562.

15

Particularly important here, the Fourth Circuit has recently found error in the failure to expressly instruct the jury that to convict on the basis of aiding and abetting it must find that the defendant had the intent to commit the substantive offense. Just as in this case, in *United States v. Odum*, 65 F.4th 714 (4th Cir. 2023), the district court charged the jury by "'read[ing] directly from'" 18 U.S.C. § 2, the federal aiding and abetting statute." *Id.* at 720. The court of appeals held that "[t]he district court . . . committed [an] error" because the text of Section 2 "omitt[ed] any discussion of the intent requirement"—i.e., "'the intent of facilitating the offense's commission.'" *Id.* at 721 (quoting *Rosemond*, 572 U.S. at 71). "Because its instructions on the robbery counts left open the possibility that a mere act in furtherance of the robbery, without the *intent* to further it, might be sufficient to convict Odum, those instructions did not fairly state the controlling law." *Id.* (citation modified). Even though the defendant had not objected at trial, the Fourth Circuit held that the error was plain because the Supreme Court had squarely held in 1893 in *Hicks* and in 2014 in *Rosemond* that such an instruction is required. *Id.*[2]

Here, as a result of the government's request to remove the Accessory Instruction on the morning after closing arguments, the instructions authorized the jury to convict Mr. Goldstein by applying the text of Section 2 but did not include multiple essential elements of aiding and abetting and cause liability, namely: (1) that aiding and abetting liability requires finding another guilty principal, willful conduct by Mr. Goldstein, and an act rather than an omission; and (2) that causing

---

[2] The court of appeals affirmed only because on plain error review the defendant had not "shown a reasonable probability that the outcome of his trial would have been different had the jury been instructed on the intent requirement of aiding and abetting liability," given that there was "powerful" evidence of guilt. *Odum*, 65 F.4th at 722. Also, "[c]rucially," the jury had convicted the defendant on a related firearms count on which it was not permitted to apply accessory liability under Section 2. *Id.* at 723. Therefore, "the jury *must have* found Odum had 'the power and intention' to exercise control over the gun while someone else committed the robbery on his behalf. That finding prevents him from demonstrating prejudice." *Id.* (emphasis added).

liability requires a finding that Mr. Goldstein had the intent to willfully violate the substantive tax offenses. Under the Fourth Circuit's decision in *Odum* and the other cases cited above, this was error.

### (b)     The Error In Failing To Instruct The Jury On The Elements Of Accessory Liability Requires A Retrial On Every Count.

It is impossible to eliminate accessory liability as a basis for the jury's verdict on every count. This Court has *already expressly found* that there was a sufficient basis in the record for the jury to convict Mr. Goldstein based on accessory liability with respect to every count in the indictment. That was the basis for the Court's adoption of the Accessory Instruction, which applied to *every* charge. The Court relied on the government's representation that instructions recognizing accessory liability were "important and necessary given the evidence that's come in about whether other people were involved in or the cause of the wrongdoing that has led us to be in this trial." 2/17/26 Tr. 149:21-24. Having built such a clear record at the charge conference, the Court cannot now plausibly make the diametrically opposite finding to justify deleting the instruction after the jury has returned its verdict.

When the Court asked the government to explain whether it had "evidence in the trial to support the [Accessory] [I]nstruction," 2/17/26 Tr. 184:19-20, the government explained in detail and at length that there was evidence to support a conviction for aiding and abetting on *every* charge other than failure to pay: "But as to the rest of the counts, including tax evasion, false returns and mortgage fraud, we think the evidence is there. We think the aiding and abetting instruction is appropriate. It's in the indictment. We can talk about made or caused to be made later. But that's—the government's position is there is evidence for this. . . . And that's why we put it in there." *Id.* at 185:16-23. The government elaborated on the evidence at length, starting with the tax charges:

17

Absolutely, Your Honor.  We have testimony and evidence dating back to 2016 that—or 2017 when Mr. Goldstein was reporting his income, that he was reporting certain of his gambling income, that he was reporting his winnings or what—you know, what he said they were through his accountant, Mr. Deyhle.

The Gelman representatives have been accused as the reason why Mr. Goldstein is here on trial.  So whether or not the government's position is that they erred in a criminal manner, that seems to be the defense's position has also been.  So there is evidence of Mr. Goldstein working with the accountants throughout the relevant period of time.

There's also been evidence that other people, including firm managers, helped him with these crimes.  Again, I'm not saying that any of the firm managers did anything illegal.  Much the opposite, I think they were more like the victims here.  But still, it's been alleged in the indictment.  There has been evidence about Mr. Goldstein aiding and abetting in various crimes . . . .

*Id.* at 184:21-185:14.[3]

The government then did the same for the mortgage fraud charges: "Also, Your Honor, the streamline[d] indictment for trial . . . does reference the facts and allegations that Mr. Goldstein was submitting these applications with his wife, Ms. Howe." *Id.* at 213:8-11.  In later arguing to delete Draft Instruction 69, the government gave as examples "Maxwell Howell as to Count Sixteen, or Ms. Howe as to Count 15." 2/19/26 Tr. 12:13-21; *see also id.* at 15:2-4 ("We solicited testimony from Maxwell Howell on this exact point, right, that he then sent the application from his office in Rockville, Maryland, to NFM.").  Indeed, the government argued to the Court that with respect to venue for both Count 15 and Count 16 the government's position "in closing . . . was straightforward": "He was the principal and he caused someone else to do part of the act, and that act that they committed established venue in Maryland." 2/19/26 Tr. 12:22-13:1.[4]

---

[3] Of note, the Court at the charging conference had specifically revised the Accessory Instruction to preclude the jury from using such evidence to convict Mr. Goldstein on a theory of "cause liability."  *See, e.g.*, 2/17/26 Tr. 223:6-224:3 (agreeing with defense's request to add language to Accessory Instruction to ensure that the jury not apply cause liability).

[4] No doubt, that was the *jury*'s impression, which illustrates why this error was so prejudicial. But government counsel's further assertion that the government had consistently taken that position, *see* 2/19/26 Tr. 14:21-15:6, ignores that his colleagues had taken the *diametrically* opposite

The government accordingly explained in the charging conference that it "stands by its proposed instruction. We think we have put in evidence in the case of aiding and abetting." 2/17/26 Tr. 199:4-5. The Court expressly agreed, and based on that finding included *both* the accessory language in the Charging Instructions and also the Accessory Instruction: "As I mentioned at the beginning of our conversation, I share that view." *Id.* at 199:6-7. The Court therefore concluded that the instruction "as proposed by the government is appropriate" and it would "keep it in as drafted." *Id.* at 199:9-10. The Court made the same point repeatedly. *See id.* at 137:15-19 ("aiding and abetting, at least it's appropriate as a jury instruction"); *id.* at 150:21-24 (other instructions should be "consistent with what I think are appropriate instructions on aiding and abetting"); *id.* at 185:24-186:3 ("All right. . . . I think the instruction is fine. I'm going to keep in number 38."); *id.* at 211:13-14 ("I don't think the instruction is improper for the same reasons I said earlier.").

Importantly, the Court made that determination after *all* of the evidence was before the jury, based on the government's ultimate understanding of the genuinely possible bases for conviction. Further, the Court found that the jury could convict on the basis of accessory liability even under the severely restricted provisions of the Accessory Instruction—i.e., upon finding another principal, willful conduct by Mr. Goldstein, and an act rather than an omission. Unquestionably, there was still a *much* greater prospect that the jury would convict under Section

---

position to *the Court* over the hushers in response to the defense's objections during the closing arguments. The government's counsel fully recognized at that time (before the deletion of the Accessory Instruction) that the jury could not convict on the basis of cause liability. 2/18/26 Tr. 88:18-24 ("I absolutely disagree, Your Honor. I don't think this is inconsistent at all. *I'm not talking about cause.* I haven't finished the argument. Again, the Court will instruct on the law, and if there needs to be an additional instruction, so be it. I don't think we're – I think we're entirely consistent with what the Court ordered. *I would never do it.*" (emphases added)); *see also id.* at 204:20-205:4 (in response to objection that government was about to argue "cause" theory: "*That's not what I was going to do.*" (emphasis added)).

19

2 once the Accessory Instruction was deleted and all those limitations were eliminated, and the jury was permitted to convict on the basis of cause liability too.

In turn, the government's invocation of facts that would support convicting on the basis of accessory liability throughout its closing argument mirrored its representations regarding the record to the Court in the charge conference.  For example, the government highlighted the central role of GRF in the firm's taxes, 2/18/26 Tr. 58:19-20 (Mr. Goldstein "hired seasoned tax professionals to help him"), and explained that the charges do not "mean he has to sit at the computer with Walter Deyhle," *id.* at 73:16-17.  Indeed, the government expressly stated that Mr. Goldstein "assisted in the preparation of false tax returns," *id.* 76:14-15, which is the language used by Section 2.

The government repeatedly stressed the role Walter Deyhle played in reporting the 2016 gambling winnings.  *See, e.g.*, 2/18/26 Tr. 54:9-15, 57:6-19.  This included a clear invocation of "cause" liability.  *Id.* at 63:4-6 (Mr. Goldstein "knows that he used Walter Deyhle to commit tax evasion in 2016.").  The government explained that Mr. Deyhle was directly involved in the reporting of Mr. Goldstein's gambling income (as alleged in Counts 8 and 9).  *Id.* at 75:14-21.

More broadly, the government stressed the interrelated roles of an array of third parties in determining the law firm's income and expenses: "Mr. Goldstein established a system in which everyone counted on him to correctly classify business versus personal expenses.  If Gelman didn't know . . . they asked Mr. Goldstein's assistants.  And if Mr. Goldstein's assistants didn't know . . . they asked Tom Goldstein himself."  *Id.* at 60:9-14; *see also id.* at 55:14-15 ("This is a man who has his personal assistants doing everything for him.").  The government then invoked cause liability when it argued that Mr. Goldstein (as alleged in Counts 1, 3, and 7) "caused the misclassification by intentionally failing to tell his staff or Gelman that these six transactions were

20

personal expenses and not business expenses," *id.* at 61:10-13, but "*didn't* affirmatively mislead his office managers," *id.* at 61:4-5 (emphasis added). The government also relied on Mr. Goldstein's omission rather than an affirmative act. *Id.* at 74:22-23 ("Mr. Goldstein did not tell Mr. Levitan to reclassify the Napoli Shkolnik wire."). The assistants were equally involved in allegedly asking Mr. Goldstein about his cryptocurrency holdings. *See, e.g.*, 1/29/26 Tr. 221:13-228:7 (asking Katie Bart about 2019 "tax prep organizer").

Similarly, the government asserted that Mr. Goldstein (as alleged in Counts 3 and 9) "instructed" third parties to redirect law firm income to himself "instead of sending it to the firm," resulting in the omission of the redirected income from the law firm's taxes. 2/18/26 Tr. 73:24-74:2, 80:22-24. Here too, the government expressly relied on an accessory-by-omission theory. *Id.* at 197:17-18 ("[Mr.] Goldstein purposefully stayed silent for these transactions and knew it would never be clocked as income."); *id.* at 74:7-8 ("What did Mr. Goldstein do to ensure [the income] got picked up by Gelman as income to the firm? Nothing.").

The government also highlighted the pervasive role of Paul Phua, which related directly to Count 1's allegation that Mr. Goldstein evaded taxes through the use of foreign persons. *Id.* at 64:23-25 ("The IRS did not know that Mr. Goldstein had a secret virtual account with Paul Phua in Asia."); *id.* at 58:8-10 ("[H]e never provided the supposed Paul Phua poker ledger because that would have shown him receiving even more money in gambling income."); *id.* at 69:19-20 ("It's all stashed with Paul Phua in Asia."). The government then directly linked this gambling income to Mr. Goldstein's statements to the IRS agents (as also charged in Count 1). *Id.* at 65:11-68:4. Paul Phua was also at the center of Count 7's allegation that Mr. Goldstein failed to report income from him. *Id.* at 78:8-10 ("Mr. Goldstein's client, Paul Phua, was acquitted in his criminal

21

case. . . the next day Mr. Phua sends payment to Mr. Goldstein."). The government also explained that Ian Shuman was directly involved in that transaction's classification. *Id.* at 78:13-18.

With respect to mortgage fraud, as discussed, the government in closing stressed evidence that would allow the jury to convict on the basis of accessory liability. 2/18/26 Tr. 87:6-17 ("The applications charged in Counts Thirteen and Fourteen are for First Savings Mortgage. Those applications were both submitted to First Savings electronically. . . . The records from First Savings show be [sic] that the IP address assigned to Mr. Goldstein and Ms. Howe's Maryland home was used to transmit their loan application. They were submitted in Maryland."); *id.* at 89:3-7 (MR. BEATY: "[W]hat I'm arguing, Your Honor, is that it was submitted from Maryland." THE COURT: "By Ms. Howe?" MR. BEATY: "It is submitted – I mean, ostensibly, but the jury can draw its own conclusion."). In turn, there can be no doubt that the jury found Mr. Goldstein guilty on that basis. The jury convicted Mr. Goldstein on Count 15, which addressed the "bridge loan" application to First Savings Mortgage. The government conceded in its closing argument that Mr. Goldstein was not in Maryland when the application charged in Count 15 was submitted, *see id.* 87:19, and therefore the jury could have found venue only under an accessory liability theory.

To be sure, the government did advise the Court at the charge conference that accessory liability was "kind of off the table" with respect to one set of charges: the failure to pay counts. 2/17/26 Tr. 185:12-15. But that statement seemingly was based on the government's mistaken belief that the Charging Instruction for failure to pay did not recognize accessory liability. That is not correct: the draft instructions proposed by the government for failure to pay recognized aiding and abetting liability. The Court did not remove that language. *See* Instr. No. 44 ("Counts 10-13 of the indictment charge Mr. Goldstein with failing to timely pay income taxes, and aiding, abetting, counseling, commanding, inducing, or procuring such an offense."). And as noted, the

22

jury critically could have convicted Mr. Goldstein on that basis *without* finding that he acted willfully.  *See* Part I-B-1, *supra*.

The jury may have concluded, for example, that Mr. Goldstein's conduct amounted to "commanding, inducing, or procuring such an offense."  Instr. No. 44.  Mr. Deyhle, in particular, was directly involved in advising Mr. Goldstein with respect to his duty to pay his taxes on time.  *See* 2/4/26 Tr. 148:10-152:18; GX-587.  More generally, GRF was directly involved in the formulation and execution of a payment plan for his back taxes.  *See, e.g.*, 2/3/26 Tr. 181:11-182:8.  The government also addressed the defense's theory that communications deleted by GRF would have helped to prove the accountants were directly involved in Mr. Goldstein's failure to satisfy his tax obligations.  *Id.* at 85:5-23.  And as just discussed, Paul Phua was allegedly involved in holding funds that Mr. Goldstein did not use to fulfill his duty to pay the taxes that he owed.  *See* p. 21-22, *supra*.[5]

The failure to instruct on the elements of accessory liability therefore requires a retrial with respect to each count, unless the government establishes beyond a reasonable doubt that the jury necessarily would have found Mr. Goldstein guilty with respect to the substantive offense, not accessory liability.  That is an extraordinarily high standard.  The government must prove that the "evidence is such that the jury *must have* convicted the defendant on the legally adequate ground."  *Hastings*, 134 F.3d at 241-42 (emphasis added).  Only "[w]here a reviewing court

---

[5] In any event, the errors in allowing the jury to convict Mr. Goldstein on theories of accessory liability on other counts require a retrial with respect to the failure to pay charges as well.  The government explained that its theory of Mr. Goldstein's evasion of taxes with respect to his 2016 gambling winnings was central to its allegation of willfulness on *all* the charges, including failure to pay.  *See, e.g.*, 2/18/26 Tr. 62:7-11 ("[E]verything that happens is motivated by Mr. Goldstein's decision to cheat on his taxes in 2016.").  Further, the government indicated that Mr. Goldstein's supposed willingness to mischaracterize transactions and redirect income reflected his complete disregard for his responsibility to pay his taxes.  *See, e.g.*, *id.* at 78:19-79:2.

concludes *beyond a reasonable doubt* that the omitted element was *uncontested* and supported by *overwhelming evidence*, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless." *United States v. Strickland*, 245 F.3d 368, 380 (4th Cir. 2001) (quoting *Neder*, 527 U.S. at 17) (emphases added). *See also, e.g.*, *Fernandez-Jorge*, 894 F.3d at 54 ("In the end, we cannot say that overwhelming evidence established that the Defendant-Appellants had advance knowledge that the principal was to possess a firearm within 1,000 feet of a school. And so the error that infected the district court's aiding and abetting instructions was not harmless.").

The government cannot possibly meet that exceptionally demanding standard. In the specific context of this case, it is *impossible* to overstate the significance of permitting the jury to convict Mr. Goldstein on the basis of his interactions with third parties and without a finding that he willfully intended to violate the tax laws. Almost all of the charges directly implicated Mr. Goldstein's interactions with others—such as his assistants, bookkeepers, Walter Deyhle, third parties who made payments, and his wife. Furthermore, Mr. Goldstein's principal defense was that the tax charges arose from errors by those parties, not his own willful misconduct. In addition, many of the government's allegations relate to Mr. Goldstein's alleged failure to act, rather than any affirmative conduct by him. The final jury instructions thus made it radically more likely that Mr. Goldstein would be convicted.

Later sections of this brief explain that there was insufficient evidence for any reasonable juror to convict Mr. Goldstein on an array of the charges of conviction. *See, e.g.*, Part V, *infra* (addressing Counts 3, 7, 8, and 9). But even if this Court disagrees with those arguments, it is an *entirely* separate question whether the jury "must have" convicted Mr. Goldstein on the substantive charges. "The issue of whether the Government adduced sufficient evidence to support the

24

convictions is distinct from whether it is clear beyond a reasonable doubt that a properly instructed jury would have convicted." *United States v. Silver*, 864 F.3d 102, 121, 123-24, 144–46 (2d Cir. 2017); *see also, e.g.*, *United States v. Gallagher*, 90 F.4th 182, 192 (4th Cir. 2024) ("Despite holding the evidence was sufficient to support the jury's verdict, we vacate both defendants' convictions on Count 2.  We do so because the jury was allowed to consider a legally insufficient theory, and we cannot conclude it 'necessarily credited' a sufficient one.").  The evidence in this case was far from "overwhelming," to say the very least.  That is particularly true with respect to willfulness, which is the critical element the jury was not instructed it must find in applying accessory liability.

### 2. The Court Independently Erred By Changing The Jury Instructions To Expand Accessory Liability After Closing Arguments

Under Rule 30(b), "[t]he court *must* inform the parties *before* closing arguments how it intends to rule on the requested instructions."  Fed. R. Crim. P. 30(b) (emphases added).  The Rule permits counsel to address the facts in light of the law that the jury will be told governs the case, which "for the defense is a basic element of the adversary factfinding process" and thus a part of "the assistance of counsel guaranteed by the Sixth Amendment."  *Herring v. New York*, 422 U.S. 853, 853, 858 (1975).

Here, the Court violated Rule 30 by deleting the Accessory Instruction after closing arguments—an unprecedented violation of this unambiguous rule.  The post-closing change expanded accessory liability in three ways that defense counsel could not have anticipated:  (1) it permitted the jury to find aiding and abetting liability without another principal or an affirmative act; (2) it permitted the jury to find cause liability despite agreeing that the government alleged aiding and abetting liability, *see* n. 3, *supra* ; and (3) it did not require the jury to find a willful intent to violate the substantive tax statute.

25

Those changes violated the plain terms of Rule 30(b).  Rule 30's requirements are entirely independent of the correctness *vel non* of the instructions.  Even if the Accessory Instruction had been legally flawed, the Court could not simply delete it after closing arguments.  *See Wright v. United States*, 339 F.2d 578, 580 (9th Cir. 1964) ("The government asserts that the requested instructions were faulty.  *But that, if true, is of course irrelevant.*  It was the court's failure to advise counsel of its ruling prior to closing argument, not the soundness of that ruling, which violated Rule 30 and prejudicially affected counsel's summation." (emphasis added)); *see also United States v. Wander*, 601 F.2d 1251, 1262-63 (3d Cir. 1979) ("Whether the actual instruction reflects a better statement of the law is irrelevant."); *United States v. Harvill*, 501 F.2d 295, 296-97 (9th Cir. 1974) ("[w]hether the requested instructions were faulty is irrelevant").  The Rule provides an essential procedural protection so that counsel has "an opportunity to argue to the jury in light of the exact language used by the court."  Fed. R. Crim. P. 30(b) advisory committee's note to 1987 amendment.

As the Fourth Circuit has held, prejudice in this context is narrowly defined as simply affecting the defense's closing, such as through affecting counsel's ability to address a "new line of argument"; it is *not* measured by the effect on the outcome of the case.  *Horton*, 921 F.2d at 547-48.  That is so because the defendant must have "an adequate opportunity to argue his innocence under the district court's instructions in order to be assured a fair trial."  *Id*. at 546-47.  Indeed, the government cannot avoid retrial under ordinary "harmless error" review.  *See United States v. Mendoza*, 473 F.2d 697, 701 (5th Cir. 1973) ("Although we recognize that the evidence against the defendants is nearly overwhelming, we cannot say with reasonable certainty that the outcome would be the same if the defense had argued before the jury with accurate information about the Trial Judge's proposed action . . . .").

26

The Ninth Circuit's decision in *United States v. Gaskins*, 849 F.2d 454 (9th Cir. 1988), is on point. There, the district court initially ruled that it would not instruct the jury that it could find aiding and abetting liability, but changed its mind in response to a question from the jury. The court of appeals explained that "a district court's failure to comply with Rule 30 prejudices a party if the party was unfairly prevented from arguing his or her defense to the jury or was substantially misled in formulating and presenting arguments." *Id.* at 459 (citing cases). The Court explained that prejudice necessarily arose in this circumstance because "arguments based on convicting a defendant as a principal or convicting a defendant as an aider and abettor are based on two conceptually different theories," which have different "elements necessary to convict." *Id.* In turn, there are "different arguments that the defense may make concerning the elements of the theory involved." *Id.* at 460.

Here, the Rule 30(b) violation was undoubtedly prejudicial. As *Gaskins* demonstrates, defense counsel in this case was as a practical matter deprived of the opportunity to argue that Mr. Goldstein should not be convicted under the theories of accessory liability that were presented in the final jury instructions. The deletion of the Accessory Instruction changed accessory liability from essentially a non-issue in the case to a serious basis on which to convict Mr. Goldstein. As required by the Accessory Instruction, the defense in closing arguments understood accessory liability to be strictly limited to circumstances in which some other principal committed every element of the substantive offense. *See* Ex. B, No. 69. Because there was no such evidence, the defense addressed only whether Mr. Goldstein committed the substantive offenses with which he was charged. If defense counsel had known that the jury could find accessory liability without another guilty principal, they certainly would have addressed that theory of liability, and specifically would have addressed, for example, that even if the jury believed Mr. Goldstein *caused*

27

an error through another person, the jury should not convict without finding that Mr. Goldstein acted with the intent to willfully commit the tax offenses or that he committed an affirmative act. On the mortgage counts, defense counsel would have much more directly and thoroughly addressed the theory that other persons submitted the false statements on his behalf in Maryland. But without those arguments, the jury was permitted to find Mr. Goldstein on *exactly* that basis.

The defense was further prejudiced because the Court instructed the jury on the defense's theory of its case, Instr. No. 7, but that instruction did not address accessory liability at all. That was so because the defense instruction was drafted based on the understanding that accessory liability was not a serious concern, given the absence of another guilty principal, and as required by the Accessory Instruction. But in the final jury instructions, so far as the jury knew, the defense inexplicably did not even *dispute* the application of accessory liability.

## II.     THE COURT ERRED IN INSTRUCTING THE JURY ON WILLFUL BLINDNESS

A new trial is required because the Court instructed the jury that it could convict Mr. Goldstein on the basis of "willful blindness" on every count, but there was insufficient evidence in the record to justify that instruction. A willful blindness jury instruction permits the government to establish the knowledge element of an offense by proving that a defendant "deliberately shield[ed] [himself] from clear evidence of critical facts that are strongly suggested by the circumstances." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766–67 (2011); *see also United States v. Jinwright*, 683 F.3d 471, 478–79 (4th Cir. 2012). In the Fourth Circuit, a willful blindness instruction "is appropriate only in rare circumstances." *United States v. Ali*, 735 F.3d 176, 187 (4th Cir. 2013). Indeed, requests for willful blindness instructions "should be handled with caution" because of the risk that they could "mislead a jury into believing that it could convict the defendant for his mere negligence or recklessness with respect to a key fact making his conduct

28

illegal." *United States v. Hale*, 857 F.3d 158, 168 (4th Cir. 2017); *see also Jinwright*, 683 F.3d at 478.

As the Supreme Court has squarely held, the party seeking a willful blindness instruction must satisfy "two basic requirements": "(1) The defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Global-Tech Appliances*, 563 U.S. at 769; *see also Hale*, 857 F.3d at 168; *United States v. Vinson*, 852 F.3d 333, 357 (4th Cir. 2017). Moreover, the Court had the authority to individually assess, for particular counts, whether the willful blindness instruction was appropriately supported by evidence presented at trial. *Cf. United States v. Ravenell*, 66 F.4th 472, 480 (4th Cir. 2023) (noting the district court had provided a willful blindness instruction limited in application to one count).

Here, a willful blindness instruction was not appropriate for any of the government's theories of liability. For each theory, the government presented no evidence of either element—i.e., that Mr. Goldstein knew of a high probability of some fact and that Mr. Goldstein deliberately shielded himself from learning it. *Compare, e.g.*, *Jinwright*, 683 F.3d at 479 ("[S]everal auditors and GSC administrators advised the defendants that they were underreporting their income, but defendants never raised these concerns with their personal CPA, who could easily have explained the law."). Instead, in each instance the government argued either that Mr. Goldstein intentionally evaded his tax liability, or impermissibly suggested to the jury that it could convict Mr. Goldstein on the basis that he *should have known* about his tax liability. *Compare, e.g.*, *United States v. Lighty*, 616 F.3d 321, 377-80 (4th Cir. 2010) (government had "no legitimate basis" for requesting willful blindness instruction because there was no evidence defendant "deliberately avoided, or closed his eyes to" facts of offense); *United States v. Lieberman*, 106 F.3d 393, at *1 (4th Cir.

29

1997) (per curiam) (unpublished) (finding willful blindness from "merely not asking is outright speculation"); *see also United States v. Giovannetti*, 919 F.2d 1223, 1229 (7th Cir. 1990) (instruction improper where evidence showed that the defendant merely had suspicion coupled with failure to investigate); *United States v. Macias*, 786 F.3d 1060 (7th Cir. 2015) (fact that defendant was not curious enough is not sufficient to justify instruction). *See generally United States v. Ciesiolka*, 614 F.3d 347 (7th Cir. 2010); *United States v. Hilliard*, 31 F.3d 1509 (10th Cir. 1994); *United States v. Barnhart*, 979 F.2d 647 (8th Cir. 1992); *United States v. Mapelli*, 971 F.2d 284 (9th Cir. 1992); *United States v. de Francisco-Lopez*, 939 F.2d 1405, 1409 (10th Cir. 1991) (stressing instruction is "rarely appropriate"). In either event, a willful blindness instruction was unwarranted, and likely confused the jury into believing that it could convict Mr. Goldstein based on a finding that he acted negligently.

## A. It Was Error To Instruct The Jury That It Could Convict Mr. Goldstein Of Tax Evasion On The Basis Of Willful Blindness

### 1. Gambling Income

Count 1 of the indictment alleged that Mr. Goldstein committed tax evasion by "falsely understat[ing] his gambling winnings by more than $3.9 million on his 2016 Form 1040." ECF No. 337-2, ¶ 28. There was no evidence to support a theory that Mr. Goldstein subjectively knew of a high probability that he was underreporting his gambling income, and took deliberate steps to avoid learning the truth. Yet under a willful blindness theory, the jury may have accepted arguments by the government that would have held Mr. Goldstein to a higher standard than allowed: finding that he had to affirmatively seek out a gambling specialist accountant, that he should have proactively disclosed information that his accountant never requested, or that as an accomplished lawyer Mr. Goldstein should have been able to figure out how to accurately calculate his gambling tax liability—all arguments the government put forward in this case. 2/12/26 Tr.

163:22 ("And you chose not to hire Mr. Fox [the gambling-specialist accountant]?"); *id.* at 166:19-20 ("Did you not instruct Mr. Levitan to send the October 2017 version of the poker journal to Mr. Deyhle?"); 2/18/26 Tr. 57:22-23 ("He said he just discovered this two weeks ago.  That is literally unbelievable."); *id.* at 80:3-5 ("He is one of the smartest, most accomplished Supreme Court advocates ever.  He's not a dummy.  He's a willful tax cheat.").  The government conceded during trial that an omission is insufficient to meet the affirmative act requirement for tax evasion.  1/28/26 Tr. 97:15-16 ("An omission is not an affirmative act.").  Yet there is a severe risk that the jury, taking the government's arguments at face value, applied the willful blindness standard to criminalize not just recklessness or negligence or omissions, but Mr. Goldstein's alleged failure to affirmatively determine his accurate tax liability in 2016.

## 2.      Mischaracterized Transactions

Count 1 also alleged that Mr. Goldstein committed tax evasion by "us[ing] over $1.1 million of G&R funds to pay personal debts in 2016 . . . causing the filing of false Forms 1120S," i.e., causing six personal payments to be mischaracterized as business expenses.  ECF No. 337-2, at ¶ 28.  It is undisputed that Mr. Goldstein never himself directed the office managers and/or his accountants at GRF to mischaracterize any of those six payments as deductible firm expenses.  *See* 2/10/26 Tr. 212:5-213:6 (Agent Ranahan testifying that the government offered no evidence that Mr. Goldstein directed anyone to classify the six transactions as legal fees); 2/10/26 Tr. 22:14-23:23 (Ian Shuman testifying that he was unaware of Mr. Goldstein ever telling "GRF to classify these documents as legal fees").  In fact, in its closing argument, the government effectively conceded that Mr. Goldstein did not "affirmatively mislead his office managers about these six transactions." 2/18/26 Tr. 61:4-13.  Instead, the government's entire case rested on the claim that Mr. Goldstein "caused the misclassification[s] by intentionally failing to tell his staff or Gelman

31

that these six transactions were personal expenses and not business expenses." 2/18/26 Tr. 61:10-13.

Even if the jury found Mr. Goldstein, by omission, "caused" the misclassification of these payments, unlike cases in which the Fourth Circuit has held that there was sufficient evidence for a willful blindness instruction, there is no evidence here that Mr. Goldstein was ever put on notice that his personal payments had been, or had a high likelihood of being, misclassified as business expenses. On the contrary, the evidence showed that, if anything, "the circumstances" of which Mr. Goldstein was aware "strongly suggested," *Vinson*, 852 F.3d at 357, that GRF should have *correctly* classified the six payments. Mr. Goldstein hired GRF to "provide[] bookkeeping services to Goldstein & Russell." 2/10/26 Tr. 24:2-5. As part of that service, GRF—specifically, Jill Leonard—"maintain[ed] [G&R's] QuickBooks file" and "d[id] transaction coding monthly." DX-788. Ms. Leonard was aware that Mr. Goldstein sometimes used G&R's account to make personal payments. *See, e.g.*, 2/10/26 Tr. 34:9-14; DX-268. If Ms. Leonard was unsure whether an expense was a personal distribution or a business expense, it was her practice (and responsibility) to ask the G&R office managers for clarification. *See* DX-788 (email explaining that GRF "controlled th[e] process" of transaction coding and would "discuss[]" classifications "with our point of contact transaction by transaction throughout the year"); *see also* 2/10/26 Tr. 24:2-41:11. The G&R office managers *also* knew that Mr. Goldstein occasionally made personal payments using G&R's bank account. *See, e.g.*, 1/20/26 Tr. 251:21-252:6, 258:17-259:23. And if GRF asked the office managers about the nature of a particular transaction, the office managers would relay the question to Mr. Goldstein. *See id.* at 231:21-232:14, 252:23-253:3. Critically, Ms. Leonard never asked for clarification about the six payments at issue in Count 1. *See* 2/10/26 Tr. 23:13-23; 26:22-27:4; 35:23-37:17.

In other words, as far as Mr. Goldstein was aware, GRF knew that payments from G&R's account might represent personal distributions to Mr. Goldstein, and GRF was responsible for asking about the proper classification of each payment unless it was a recurring and obvious expense.  No one ever asked Mr. Goldstein about the six transactions charged in Count 1 and Mr. Goldstein had no reason to suspect that they were mischaracterized.  And he definitely was not "aware of a high probability" of that fact.  *Jinwright*, 683 F.3d at 479.

There was also no evidence that Mr. Goldstein "purposefully avoided learning" after-the-fact that GRF had misclassified the transactions.  *Jinwright*, 683 F.3d at 479.  The government's only evidence on this point was the fact that, on December 27, 2016, Molly Runkle (the G&R office manager) sent Mr. Goldstein an email attaching a spreadsheet titled "G&R wires" that listed those six payments on a tab titled "Legal fees."  GX-555.  But there was no evidence to support the inference that Mr. Goldstein opened the "G&R wires" attachment, much less that he understood its significance or reviewed it closely enough to discover GRF's classification errors.  Mr. Goldstein had never requested a spreadsheet identifying all the transactions that GRF had characterized as legal fee payments  *See* GX-18; 1/20/26 Tr. 234:12-235:3.  Rather, he had asked Ms. Runkle to identify "how much we sent in wires $40k or more to individuals like Dan Bilzerian" in 2016.  GX-18; 1/20/26 Tr. 234:12-235:3.  In response, Ms. Runkle attached to her email both the "G&R wires" spreadsheet and a spreadsheet titled "Wires from Wells and Bilzerian etc 2016."  *See* GX-18.  She described in detail how she had created the "Wires from Wells and Bilzerian etc 2016" spreadsheet, which directly answered Mr. Goldstein's question.  But as to the "G&R wires" spreadsheet, she simply noted, "I've also attached a general breakdown of firm wires this year from Jill."  *See id.*  Ms. Runkle did not tell Mr. Goldstein that the "G&R Wires" spreadsheet contained *accounting records* that would be used to prepare G&R's taxes.  *See* 1/20/26 Tr. 234:5-

236:11; 239:1-240:23. And she certainly did not ask Mr. Goldstein to review and verify its contents.[6] *See id.*

Because there was no evidence that Mr. Goldstein knew of a high probability that his accountants had misclassified these transactions and took deliberate steps to avoid learning the truth, allowing the jury to consider a willful blindness instruction likely led the jury to convict on the basis that Mr. Goldstein could have, or should have, figured out the problem—an argument the government made repeatedly in its closing. *See* 2/18/26 Tr. 189:3-9 (arguing Mr. Goldstein should have been "able to figure it out" with respect to correctly classifying payments); *id.* at 189:10-14 (sarcastically arguing that Mr. Goldstein "couldn't figure it out"); *id.* at 189:19-20 ("He knows one, but just can't figure out the other. It's unbelievable."). Notably, even the premise of the government's argument was confusing and misleading for the jury: the evidence at trial was clear that neither Mr. Goldstein nor any G&R employee classified any payment in the G&R QuickBooks—that was the accounting firm's job, for which the accounting firm had exclusive access. 2/9/26 Tr. 158:23-159:1 (Q: "[W]ho was responsible for recording the transactions in Goldstein's books and records?" A: "[GRF] recorded it because we had access to QuickBooks."). The willful blindness instruction undoubtedly compounded the jury's confusion, and allowed for error.

### 3.      Bank Account Interest

While Count 1 also alleged that Mr. Goldstein committed tax evasion by "fail[ing] to report interest income received from the Gambling Account," *i.e.*, Mr. Goldstein's personal Wells Fargo account, the government presented no evidence whatsoever to support this allegation. *See* ECF

---

[6] Because individual transactions are not separately listed as deductions on a business tax return, Mr. Goldstein could not have discovered the misclassification errors by reviewing G&R's Form 1120S or his own Form 1040, either. *See* 2/5/26 Tr. 156:2-157:5; GX-64.

No. 337-2, ¶ 40.  The only basis on which the government could have secured a conviction is willful blindness.  At most, the government suggested—falsely—that Mr. Goldstein hid his personal Wells Fargo from his assistants and the IRS, but the evidence at trial established that Mr. Goldstein's assistants were aware of the Wells Fargo account even if they did not have access to it, *see, e.g.*, 1/20/26 Tr. 206:11-12 ("I believe it would have been his personal Wells Fargo account."), and that Mr. Goldstein directly disclosed his personal Wells Fargo account to an IRS collections officer, *see* GX-92.  There was not a single witness presented with a Form 1099 or other documentation of the interest Mr. Goldstein supposedly willfully failed to pay, and the allegedly willfully unpaid income was not part of Revenue Agent Colleen Ranahan's calculation of Mr. Goldstein 2016 tax liability.  *See generally*, 2/10/26 Tr. 70:10-254:3.  Given the utter lack of evidence supporting this allegation, generally, there can be no serious argument that it was appropriate to allow the jury to convict on the basis of a willful blindness instruction.  Yet the jury may have concluded that, as argued by the government, this was something Mr. Goldstein should have just figured out.

### B.     It Was Error To Instruct The Jury That It Could Convict Mr. Goldstein Of Assisting The Preparation Of False Returns On The Basis Of Willful Blindness

#### 1.     Mischaracterized Transactions (Counts 3 And 7)

Counts 3 and 7 of the indictment alleged that Mr. Goldstein aided and assisted the preparation of false tax returns by using G&R funds to make two payments, one to the law firm Napoli Shkolnik and another to Chuck Pacheco, without specifying that the payments were personal in nature.  ECF No. 337-2, ¶¶ 47, 67.

As with the mischaracterized transactions in Count 1, however, *see* Part II-A-2 *supra*, there was no evidence at trial to support the inference that Mr. Goldstein was on notice of a high probability that those payments would be misclassified.  Just the opposite:  Mr. Goldstein's

35

accountants were tasked with classifying each outgoing transaction, not making decisions by default, *see* 2/9/26 Tr. 167:14-15, and Mr. Goldstein believed that GRF would seek clarification from the office managers as necessary—and that the office managers would in turn escalate those inquiries to Mr. Goldstein, *see* 1/21/26 Tr. 239:10-13.  The government offered no evidence that Mr. Goldstein had any reason to suspect that that process had broken down in this instance, that Mr. Goldstein was aware of any misclassifications in the past, or that Mr. Goldstein took any action to avoid learning how GRF had in fact characterized these particular payments.  And as noted, Mr. Goldstein could *not* have discovered the classification error by reviewing G&R's Form 1120S, which would not have listed individual legal fee payments.  *See* n. 6, *supra*.

Yet, as with Count 1, in light of the willful blindness instruction, the jury may have faulted Mr. Goldstein for not knowing better, or not doing enough to affirmatively determine how this payment was classified—even in the absence of any evidence that he should have suspected a classification error.  With respect to the Pacheco payment, for example, the government did not even question Jon Levitan, the G&R assistant at the time of this payment, about his knowledge of the payment or the payee.  And again, the government relied on omissions rather than evidence that Mr. Goldstein intentionally caused this payment to be misclassified, or evidence that Mr. Goldstein knew of the risk that this payment would be misclassified.  *See, e.g.*, 2/18/26 Tr. 78:19 – 79:1 ("Mr. Goldstein knew how to classify personal expenses in February of 2019.  He knew how to classify personal expenses in May of 2019. Why didn't he know how to correctly classify $170,000 to Chuck Pacheco as a personal expense in March 2019?"); 2/18/26 Tr. 198:15-17 ("You heard about the payments to Pacheco.  Again, staying silent.  Not identifying this was a personal payment.  Remember, he knows how to properly classify.  He did it before and after this.").  Consequently, the willful blindness instruction allowed the jury to convict on the ground that Mr.

36

Goldstein should have known this payment would be misclassified, despite the lack of sufficient evidence to support that conclusion.

### 2. Redirected Income (Counts 3 And 9)

Counts 3 and 9 of the indictment alleged that Mr. Goldstein aided and assisted in the preparation of false tax returns by asking that legal fee payments from Robbins Geller (another law firm) and Tobey Maguire be made to Mr. Goldstein's personal bank account and to Bob Safai, respectively, instead of to G&R's account. ECF No. 337-2, ¶¶ 47, 85-86.

But the government's evidence did not establish that Mr. Goldstein was on notice that a legal fee payment made to a third party had gone unreported as income in the past, nor that one was highly likely to. Instead, all of the evidence presented at trial established that—as far as Mr. Goldstein knew—the payment should have been recorded as legal fee income, regardless of where the payment itself went. That is because, as thoroughly demonstrated by the evidence at trial, payments for legal services must be reported on a Form 1099 that should be sent both to the payee and to the IRS.[7] *See, e.g.*, 2/10/26 Tr. 46:14-16 ("Q: The rule is that, when someone pays money to a law firm, they have to issue a Form 1099; right? A: Over $600, yeah."). There was also no evidence that Mr. Goldstein ever knew that his accountants routinely ignored such tax forms; instead the evidence demonstrated that one account, Ian Shuman, told an assistant *years after the fact* that the tax preparers in his offices ignored Forms 1099s. *See* DX-252. There is no evidence that this fact was ever communicated to Mr. Goldstein.

---

[7] Moreover, for the Robbins Geller payment, the evidence actually showed that Mr. Goldstein explicitly instructed Ms. Runkle to send Robbins Geller a W9—the taxpayer information Robbins Geller needed to prepare a Form 1099. *See* DX-568. And Robbins Geller did, in fact, send both the IRS and G&R a Form 1099 in response. DX-226.

The government nevertheless used the willful blindness instruction to lessen its burden of proving willfulness, and to expand the scope of culpable conduct to include omissions. The government focused in closing not on what Mr. Goldstein ostensibly did to hide this legal fee income, nor on the facts that purportedly should have made Mr. Goldstein aware of a significant risk that it would not be counted as income, but instead on what Mr. Goldstein had supposedly *failed to do*: "What did Mr. Goldstein do to ensure this $250,000 got picked up by Gelman as income to the firm? Nothing." 2/18/26 Tr. 74:7-8. Failure to act was not sufficient for a conviction, yet the willful blindness instruction likely erroneously led the jury to conclude otherwise.

### 3.    Unreported Income From Paul Phua (Count 7)

Count 7 of the indictment alleged that Mr. Goldstein aided and assisted the preparation of a false tax return for tax year 2019 by failing to report legal fee income from Paul Phua, which Mr. Goldstein transferred into G&R's (accountant-monitored) bank account. ECF No. 337-2 ¶ 70. The government offered no evidence whatsoever that Mr. Goldstein was aware of a "high probability" that GRF had failed to record this income. *Global-Tech Appliances*, 563 U.S. at 769. To the contrary, Mr. Goldstein reasonably assumed that GRF would include money paid into the firm account as firm income—especially because, as Mr. Shuman testified, GRF's policy was to code incoming money as legal fee income by default. *See* 2/9/26 Tr. 166:20-167:7. But in the absence of evidence that could support an inference of willful blindness, the willful blindness instruction allowed the jury to convict not just on an omission, but on Mr. Goldstein's failure to go above and beyond to ensure the accuracy of his law firm's books and records.

### 4.    Gross Gambling Wins (Counts 8 And 9)

Counts 8 and 9 alleged that Mr. Goldstein aided and assisted the preparation of false tax returns by willfully failing to separately report gambling winnings and losses. ECF No. 337-2, ¶¶

74, 89.  The suggestion that Mr. Goldstein should have known to ask whether he was obligated to report his *gross* gambling wins, even in a year where he was a net gambling loser, was quickly and conclusively discredited at trial.  IRS Revenue Agent Libbin testified unequivocally that he never discussed with Mr. Goldstein the requirement to report gross gambling wins in a year where Mr. Goldstein was a net gambling loser.  Agent Libbin testified that he spoke only to Mr. Goldstein's then-accountant, Bill Caldwell, about the substance of the audit.  1/22/26 Tr. 93:7-97:5.  Mr. Caldwell, for his part, apparently still does not know the technical rules for reporting gross gambling winnings—he testified that, while he does not remember what he actually told Mr. Goldstein over a decade ago, he would have advised Mr. Goldstein that in a year when he had more losses than wins there was nothing to report.  *See id.* at 117:14-118:11, 130:13-131:17.  And Mr. Deyhle, Mr. Goldstein's tax preparer for the all of the time relevant to the charges in this case, testified that he never informed Mr. Goldstein of this rule, either.  *See* 2/4/26 Tr. 98:20-100:11, 102:11-16.  Unfortunately, again, in the absence of any evidence that Mr. Goldstein deliberately avoided learning the rule that he must report gambling income even in losing years, the willful blindness instruction may have allowed the jury to convict on the basis that Mr. Goldstein was smart enough to figure out the rule, but chose not to.

### 5.    Cryptocurrency Box (Counts 8 And 9)

Counts 8 and 9 of the indictment alleged that Mr. Goldstein aided and assisted the preparation of a false tax return for tax years 2020 and 2021 because he allegedly knew he was required to report his cryptocurrency transactions as of at least March 2020, yet willfully failed to do so.  ECF No. 337-2 ¶¶ 76, 89.  The evidence presented at trial, however, came nowhere close to supporting a reasonable inference that Mr. Goldstein's knew about any cryptocurrency disclosure requirement as of 2020, let alone that he made a willful decision not to comply with that requirement.

Although the government presented evidence that a tax organizer had been completed on Mr. Goldstein's behalf in 2019, *see* GX-490, the first year that a cryptocurrency disclosure was required, *compare* GX-56 *with* GX-57, the government did not come close to proving beyond a reasonable doubt that Mr. Goldstein was ever made aware of that fact. Firm office manager Katie Bart filled out and signed the tax organizer, not Mr. Goldstein, *see* 1/29/26 Tr. 225:12-23, 226:21-22; 2/2/26 Tr. 54:6-16, and she testified that she did not remember whether she did (or would have) asked Mr. Goldstein about the cryptocurrency question before checking "no," *see* 2/2/26 Tr. 15:20-16:12. Moreover, the evidence also established that Mr. Goldstein had no reason to remember the cryptocurrency requirement even if he did participate in completing the organizer—he did not hold any cryptocurrency during tax year 2019, nor in March 2020 when the tax organizer was completed. *See* 1/29/26 Tr. 228:8-229:8 (Katie Bart testifying that Mr. Goldstein asked her for assistance in setting up a Coinbase account in June 2020); 2/2/26 Tr. 15:6-16, 56:16-57:6 (same).

The government also offered evidence that, for the 2019 and 2020 tax years, GRF's engagement letter warned that that cryptocurrency *could be* taxable; although the engagement letters did not identify the disclosure requirement. *See* GX-490 (tax year 2019 engagement letter, dated January 2020); GX-118 (tax year 2020 engagement letter, dated January 2021); *see* 1/19/26 Tr. 224:12-18, 229:23-25. But again, it was the G&R office manager who signed those engagement letters—not Mr. Goldstein. *See* 1/29/26 Tr. 225:12-23 (Katie Bart signed engagement letter for tax year 2019); *id.* at 231:10-21 (either Katie Bart or Angie Gou signed engagement letter for tax year 2020). And neither Ms. Bart nor Ms. Gou testified that they had any memory of reviewing the engagement letter with Mr. Goldstein before signing. *See, e.g.*, 2/2/26 Tr. 58:14-59:8.

Importantly, it is almost certain that the jury convicted Mr. Goldstein on the basis of his failure to disclose cryptocurrency in 2020 and 2021. The only other theory of liability charged in Count 8 was the allegation that Mr. Goldstein willfully failed to report gross income in a year where he was an overall net loser—almost identical to the allegation that the jury necessarily acquitted Mr. Goldstein of in Count 2, where the gross income at issue was millions of dollars rather than less than $100,000. *Compare* ECF No. 337-2 ¶ 52 ($3,250,000 in gross gambling income), *with id*. ¶ 77 ($93,180 in gross gambling income). Consequently, Count 8 provides extremely strong evidence that the jury did, in fact, convict Mr. Goldstein on this count—and surely others—based on a willful blindness theory. There is no evidence in the record that Mr. Goldstein knew of the requirement to check this box on the tax return. Instead, this count demonstrates that the jury held Mr. Goldstein to an improperly higher standard: that he should have reviewed and figured out inaccuracies in his tax return, or that he should have affirmatively determined reporting requirements once he obtained cryptocurrency in the middle of 2020. Indeed, the government urged that very theory in closing: "Ladies and gentlemen, these are not minor mistakes. Mr. Goldstein is not a man who simply forgot to check a box on his tax forms. He is one of the smartest, most accomplished Supreme Court advocates ever. He's not a dummy. He's a willful tax cheat." 2/18/26 Tr. 80:1-5.

### C.     It Was Error To Instruct The Jury That It Could Convict Mr. Goldstein Of Willful Failure To Pay Based On Willful Blindness (Counts 10, 11, 12, 13)

Counts 10 through 13 allege that Mr. Goldstein willfully failed to pay his taxes on the date that they were due. ECF No. 337-2 ¶ 119. Yet there was insufficient evidence at trial to find that Mr. Goldstein knew that complying with the civil tax regime by making periodic payments along with penalties and interest violated a legal duty.

41

The evidence presented at trial established that Mr. Goldstein paid all of his taxes due and owing, with penalties and interest, three or more years prior to his indictment in this case. *See* GX-74, GX-76, GX-77, GX-78. For a significant period of time, Mr. Goldstein made regular payments pursuant to an installment plan negotiated with the IRS. *See* GX-73. Moreover, Mr. Goldstein was never advised—by the IRS or by his accountants—that paying with penalties and interest, rather than prioritizing taxes over all other debts and expenses, was a willful violation of the law. To the contrary, Mr. Goldstein received notices from the IRS that made reference only to civil penalties and interest in response to late payments. *See, e.g.*, GX-455. And on numerous occasions, Mr. Goldstein's accountants presented the requirement to pay as one encompassing multiple options—including both paying in full on time, and paying late with penalties and interest. *See, e.g.*, DX-286. The willful blindness instruction therefore allowed the jury to convict Mr. Goldstein on theory that he should have been more diligent in paying his taxes—rather than adhering to the standard that he voluntarily and intentionally violated a known legal duty, or deliberately avoided learning about a tax obligation that he knew was highly probable.

*     *     *

In sum, across the board, there was insufficient evidence in the record to support a willful blindness instruction. This error was not harmless. As the court in *Mapelli* explained, in tax evasion cases "the issue . . . was not what was done, but rather the state of mind with which it was done." 971 F.2d at 287. Where the government has failed to present sufficient evidence of deliberate ignorance, "the effect of the instruction, if it had an effect, could only have been to enable the jury to convict if they thought [the defendant] was ignorant of the [wrongdoing] but careless in not finding out. That is not the criminal state of mind required for conviction." *Id.* By extension, an instruction permitting conviction on such a basis impermissibly "dilut[es] the

42

government's duty to prove knowledge." *Mapelli*, 971 F.2d at 285. Because there was no evidentiary basis for a willful blindness instruction in this case, and because the error infected all of the tax charges, the instruction relieved the government of its burden of proving Mr. Goldstein's willfulness beyond a reasonable doubt, and the Court should grant a new trial.

**III.    THE COURT SHOULD ORDER A NEW TRIAL BASED ON THE IMPROPER EXCLUSION OF MR. GOLDSTEIN'S CONTEMPORANEOUS MESSAGES**

The indictment alleged that Mr. Goldstein willfully underreported millions of dollars in gambling winnings for tax year 2016. At the start of the trial, the government's theory was that Mr. Goldstein willfully failed to report over $26 million in gambling winnings from a series of poker games against Alec Gores in late 2016. *See, e.g.*, 1/15/26 Tr. 42:6-7; 44:19-20. That theory was thoroughly discredited—an email exchange between Mr. Goldstein and his accountant Walter Deyhle conclusively showed that Mr. Goldstein disclosed the entire amount that he won from Mr. Gores. DX-317. The government apparently was not aware of this email until halfway through the trial. 2/12/26 Tr. 166:3-6. With its original theory in tatters, the government pivoted to an entirely new theory in its closing argument—that Mr. Goldstein willfully hid millions of dollars in poker winnings in a "virtual account" with an individual named Paul Phua. 2/18/26 Tr. 45:22–46:4. The government argued in closing that Mr. Goldstein's total poker winnings added up to almost $50 million, including $26.2 million in unreported poker winnings that Mr. Goldstein supposedly won against an individual named Chairman in September 2016 and unreported poker winnings that Mr. Goldstein supposedly won against an individual named Tango in December 2016. *Id*.

That theory was also discredited by contemporaneous evidence. As discussed in a motion in limine filed in advance of Mr. Goldstein's testimony, in 2016 and 2017 Mr. Goldstein exchanged a series of text messages with Mr. Phua's assistant (named Kids) concerning the amounts of Mr.

43

Goldstein's wins, losses, and investor shares.  ECF No. 411 & 411-3.  Those messages included images of a ledger where the amounts were recorded.  Mr. Goldstein testified that the messages and the ledger images informed his state of mind or understanding about his gambling wins, losses, and investor payments when he reported the 2016 gambling numbers to his accountant.  2/11/26 Tr. 227:11–228:12.

Those messages and ledger images showed that (1) Mr. Goldstein's share of the Chairman winnings was $5.4 million, far lower than the government alleged; (2) Mr. Goldstein lost over $4.4 million gambling outside the United States; (3) Mr. Phua had more than a $10 million share of Mr. Goldstein's winnings against Mr. Gores; (4) Mr. Goldstein's share of the Tango winnings was approximately $7.8 million; (5) Mr. Goldstein was not credited with his share of the Tango winnings until 2017; and (6) Mr. Goldstein and Mr. Phua "swapped" Mr. Phua's share of the Gores winnings and Mr. Goldstein's share of the Tango winnings in 2017.  Taken together, those points established that Mr. Goldstein did not underreport his gambling income in 2016—if anything, he *overreported* his gambling income because he failed to deduct Mr. Phua's share of the Gores winnings.  These documents therefore constituted critical evidence that Mr. Goldstein had a good faith belief that he did not underreport his 2016 gambling winnings because they showed his state of mind regarding the Chairman, Gores, and Tango winnings.

The defense filed a motion in limine seeking the admission of these text messages and ledger images during Mr. Goldstein's testimony on multiple grounds, including that the documents were not hearsay because they were relevant to Mr. Goldstein's state of mind regardless of their truth.  ECF No. 411.  The government objected, and the Court sustained the objection.  2/11/26 Tr. 68:25–69:20; 86:12–96:16; 169:2–170:21.  With the exception of one short message that the

44

Court admitted on redirect, the contemporaneous messages between Mr. Goldstein and Kids were excluded in their entirety.

This was error. The documents were clearly admissible based on Mr. Goldstein's testimony. And this error was not harmless—the government's closing argument repeatedly (and improperly) cited the absence of any evidence corroborating Mr. Goldstein's explanation of the 2016 gambling numbers, fundamentally impacting the jury's assessment not only of Count One, but also of Mr. Goldstein's credibility more broadly.

In turn, that error prejudiced Mr. Goldstein with respect to all of the other tax counts. The government explained that its theory of Mr. Goldstein's evasion of taxes with respect to his 2016 gambling winnings was central to its allegation of willfulness on *all* the charges, including failure to pay. *See, e.g.*, 2/18/26 Tr. 45:22-47:3 ("[T]hat problem, having secretly won $22 million in Asia … that motivated everything that Mr. Goldstein did from March 2016 through December 2022."); *id.* at 62:7-11 ("[E]verything that happens is motivated by Mr. Goldstein's decision to cheat on his taxes in 2016."); *id.* at 84:24-85:4 ("Mr. Goldstein still won't own up to the fact that he lied to Walter Deyhle about his poker winnings in 2016."). Further, the government indicated that Mr. Goldstein's supposed willingness to mischaracterize transactions and redirect income reflected his complete disregard for his responsibility to pay his taxes. *See, e.g.*, *id.* at 78:19-79:2. In the interests of justice, a new trial is therefore warranted.

The text messages and ledger images were admissible to prove Mr. Goldstein's state of mind in 2016 and 2017 regarding his wins, losses, shares, and payments. A long-standing and codified exception to the rule against hearsay provides that "[a] statement of the declarant's then-existing state of mind" such as, but not limited to, "motive, intent, or plan" is admissible. Fed. R. Evid. 803(3). Under this rule, a declarant's own statements about their state of mind are not

45

inadmissible hearsay.  Similarly, out-of-court statements made *to the defendant* are admissible as evidence of the defendant's belief at the relevant time, regardless of their truth, because they are not offered for their truth.  The Fourth Circuit has repeatedly and recently recognized these exceptions to allow a defendant to introduce out-of-court statements evidencing his belief or understanding—particularly for crimes involving specific intent, when the disputed issue is the defendant's mental state.

For example, in *United States v. Ibisevic*, 675 F.3d 342, 344-45 (4th Cir. 2012), the defendant was charged with failing to report the international transportation of currency and making false statements, which required proof that the defendant knowingly, intentionally, or willfully violated the law.  The defendant testified at trial that because English was his second language he misunderstood a Customs and Border Patrol agent's questions, believing that the agent was asking about the value of his checked luggage—not the amount of money he was transporting. *Id*. at 347-48.  After conviction, the trial court concluded that it had improperly precluded the defense from offering testimony from the defendant's mother corroborating that at the time, the defendant had said the agents were asking about the value of their luggage. *Id*. at 347, 349.  The Fourth Circuit agreed that the exclusion on hearsay grounds was error.  The defendant "did not proffer the statement 'to prove the truth of the matter asserted,' i.e., that he was actually being asked the value of his checked luggage.  Rather, he offered it 'merely to prove that [he] expressed [his] belief' that he was being asked about the value of his luggage." *Id*. at 349 (citation omitted). That expressed belief—regardless of its truth—was admissible over a hearsay objection because it provided contemporaneous evidence of what the defendant believed at the time he made the statement.  Indeed, "[b]ecause the Government had to prove that [the defendant] knowingly or intentionally evaded reporting requirements and made a false statement, the issue of [his] intent

46

was the central question in the case."  *Id*. at 350.  And whereas the trial court had denied the defendant's motion for a new trial, the Fourth Circuit concluded this exclusion of evidence was reversible error, and ordered a new trial.  *Id*. at 354-55.

Similarly, in *United States v. Leake*, 642 F.2d 715, 716 (4th Cir. 1981), the defendant was convicted of misappropriating federal funds.  At trial, the court precluded the defense from introducing evidence that the defendant was told the funds at issue were used for a legitimate purpose.  *Id*. at 719-20.  The Fourth Circuit reversed, holding that "[a]lthough the testimony recounted the out-of-court statement of another, it was not hearsay because the statement was not offered to prove the truth of the matter asserted."  *Id*. at 720.  Instead, the statement's purpose "was to show that [the defendant] *believed* that the funds were being used in a legitimate fashion."  *Id*. (emphasis added).  The Fourth Circuit further concluded that the conversation was also admissible under Rule 803(3): the defendant was "competent to testify to what went on in his mind[,]" so his statements were admissible under this rule, and his testimony "would be meaningless unless both sides of the conversation were recounted to the jury."  *Id*. at 720 n.6.  Consequently, prior "statements to [the defendant] were admissible," as well "as necessary to explain the context in which [the defendant] made the statements revealing his state of mind."  *Id*.

As a final example, in *United States v. Gallagher*, 90 F.4th at 195, the Fourth Circuit ruled that the trial court "erred as a matter of law" in excluding out-of-court statements that spoke to a defendant's state of mind "because many—if not all—of the proffered messages either are not hearsay or appear to fall within a valid hearsay exception."  There, the trial court excluded seemingly-loving messages sent back and forth between a foreign service officer and her husband, a noncitizen, who were convicted of conspiring to fraudulently obtain U.S. citizenship.  *Id*. at 187.  The Fourth Circuit concluded that, whether or not the messages were true (i.e., that the two actually

47

loved one another) the messages were "admissible because they [were] offered to 'establish the state of mind thereby induced' in the recipient or 'to show the information which the recipient had as bearing on the reasonableness or good faith of subsequent conduct.'" *Id*. at 196 (citation modified) (quoting 2 McCormick on Evid. § 249 (8th ed.). The Court further concluded that even if offered for their truth, the trial court erred in finding that "each defendant's expressions of their own affection fell outside the hearsay exception for statements of a 'declarant's then-existing state of mind' under Rule 803(3)." *Id.* at 196.

Here, Mr. Goldstein's messages with Mr. Phua's assistant, Kids, and the accompanying ledger images were admissible as evidence of Mr. Goldstein's state of mind regardless of their truth. Mr. Goldstein's own messages were admissible under Rule 803(3) as evidence of his state of mind. And Kids's messages to Mr. Goldstein were admissible because they were offered for the non-hearsay purpose of proving the state of mind they induced in Mr. Goldstein, that is, their effect on him as the listener. A brief description of each category of messages and their relevance to Mr. Goldstein's state of mind follows.

**The Chairman Games.** The defense sought to introduce four exhibits that would have demonstrated Mr. Goldstein's belief in 2016 that his share of the Chairman winnings was about $5.4 million and not (as the government claimed) over $12 million. In September 2016, Mr. Goldstein exchanged text messages with Mr. Phua's assistant regarding the ledger of poker winnings, losses, and shares kept by Mr. Goldstein and Mr. Phua. *See* DX-737.1. That message exchange included an image of the ledger, separately marked as DX-737.2. The ledger image showed that Mr. Goldstein's share of the winnings from the Chairman games was approximately $5.4 million. The image also showed that Mr. Goldstein lost over $4.4 million in other games. Mr. Goldstein responded to the ledger image with instructions for the assistant to adjust the ledger

48

to account for losses and credits for Andrew Robl, an investor in Mr. Goldstein's games. Notably, Mr. Robl (who was originally scheduled to be a government witness) testified in the defense case that he helped train Mr. Goldstein for the September games against Chairman, that he had an investment in Mr. Goldstein for those games, and that Mr. Phua likely coordinated the game with Chairman and invested in Mr. Goldstein as well. 2/5/26 Tr. 89:2-7; 93:10-13; 93:20-22; 98:18-24.

On October 22, 2016, Mr. Phua's assistant sent Mr. Goldstein an image of the updated ledger. *See* DX-737.3 (text messages); DX-737.7 (image of ledger). Like the previous image, this image of the updated ledger showed that Mr. Goldstein lost over $4.4 million in other games. Mr. Goldstein responded by acknowledging the ledger with "tyty" (thank you) and instructing the assistant to wire Mr. Goldstein $800,000. Again, this is corroborated by other evidence the government introduced at trial: on October 26, 2016, Mr. Phua sent Mr. Goldstein approximately 746,000 euros (about $800,000) through his Montenegrin account, $750,000 of which was transferred to the domestic Goldstein & Russell account and recorded as taxable income. *See* GX-423; 2/10/26 Tr. 89:24–90:11. Notably, Mr. Goldstein also included the same $750,000 in the income noted on his gambling wires list. *See* GX-2, GX-451.

These documents were directly relevant to Mr. Goldstein's state of mind regarding his gambling winnings, losses, and investor payments in 2016. The messages from Kids, including the ledger images, are relevant and admissible for their effect on Mr. Goldstein, and in particular to establish his good-faith basis to believe that he earned under $1 million gambling in Asia in 2016, and not over $12 million as the government argued at trial. This in turn shows that Mr. Goldstein believed in good faith that the numbers he sent his accountants were accurate. The wires lists admitted by the government showed that Mr. Goldstein believed his net winnings from his

49

gambling in Asia were approximately $750,000.  The text messages and ledger images show that Mr. Goldstein would have reasonably believed that this number was accurate.  These messages were not hearsay because they were not offered for their truth, but rather as relevant to state of mind.  By the same token, Mr. Goldstein's messages to Kids are admissible under Rule 803(3) as evidence of his state of mind on these topics.

The Gores Games.  Mr. Goldstein sought to introduce two exhibits establishing his state of mind with respect to Mr. Phua's share of the games against Mr. Gores.  On November 21, 2016, Mr. Goldstein and Kids communicated about their understanding of Mr. Phua's share after the first set of Gores games.  *See* DX-737.5.  The correspondence consists of a back and forth between Kids and Mr. Goldstein, determining whether Mr. Goldstein agreed with Kids's computation of Mr. Goldstein's and Mr. Phua's respective shares.  Similarly, on December 7, 2016, another set of messages involved Kids providing and Mr. Goldstein checking a computation after the second set of Gores games.

Together with an earlier message, DX-737.4—which this Court eventually admitted in limited part as a prior consistent statement—these messages establish Mr. Goldstein's understanding that Mr. Phua's share of the Gores games amounted to more than $10 million.  Here again, the messages received by Mr. Goldstein were admissible to establish their effect on the listener as relevant to his state of mind regarding the portion of the Gores winnings that belonged to Mr. Phua.  Again, the messages are not inadmissible hearsay because their relevance was to demonstrate Mr. Goldstein's good faith belief as to Mr. Phua's share of the Gores winnings, regardless of the truth of the messages.  And Mr. Goldstein's own messages were admissible under Rule 803(3) as evidence of his state of mind on the same topic.  Mr. Goldstein's state of mind on

this issue was relevant because the government did not dispute that Mr. Goldstein was not required to report Mr. Phua's share of the Gores winnings.  2/4/26 Tr. 83:17–84:3; 2/5/26 Tr. 54:10-14.

**The Tango Games.** Mr. Goldstein sought to introduce five exhibits that would have shown Mr. Goldstein's share of the games against Tango, and that Tango did not pay his losses for those games until 2017.  On December 17, 2016, Kids and Mr. Goldstein texted back and forth with calculations to determine the amount of money, and respective shares, Mr. Goldstein and Mr. Phua earned in the games against Tango.  *See* DX-737.8.  According to these messages, Mr. Goldstein's share of the Tango winnings was approximately $7.8 million.

In DX-737.9, DX-737.10, DX-737.13, and DX-737.14, sent between February 5, 2017 and March 12, 2017, Kids informed Mr. Goldstein that Tango had not yet paid Mr. Phua for the games he lost in December 2016, and discussed how to clear the balance between Mr. Phua and Mr. Goldstein.  Not until April 12, 2017, did Kids inform Mr. Goldstein that Mr. Goldstein was "even steven" with Mr. Phua, after Mr. Goldstein made a $600,000 payment on Mr. Phua's behalf.

Here again, the messages were admissible as relevant to Mr. Goldstein's state of mind. The messages sent to Mr. Goldstein were admissible to show their effect on the listener—that is, that Mr. Goldstein had a good faith basis to believe that his share of the Tango winnings was $7.8 million and that he did not receive that share until 2017.  And the messages written by Mr. Goldstein were admissible as evidence of his state of mind under Rule 803(3) on the same issue.

In sum, these contemporaneous messages provided strong evidence of Mr. Goldstein's understanding at the relevant time, in 2016 and 2017, of his share of wins from the Chairman games, his other 2016 foreign losses, his and Mr. Phua's shares of wins from the Gores games, Mr. Goldstein's share of wins from the Tango games, and when Tango actually paid his losses. These messages establish that Mr. Goldstein's state of mind was that he had no substantial

deficiency with respect to the gambling income he reported in 2016, which would have entitled Mr. Goldstein to acquittal on Count 1. *See Cheek v. United States*, 498 U.S. 192, 203 (1991) (holding that a defendant's good-faith belief, even if unreasonable, negates the willfulness requirement in tax evasion); *see also United States v. Harris*, 942 F.2d 1125, 1131 (7th Cir. 1991) (reversing tax evasion conviction after erroneous hearsay exclusion where statements were "too important to [the] defense to be excluded"). It also would have impacted the jury's assessment of Mr. Goldstein's credibility for all other counts.

## IV.    JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, A NEW TRIAL IS NECESSARY AS TO COUNT 1

Count 1 of the indictment charged Mr. Goldstein with tax evasion in connection with his 2016 taxes. *See* ECF No. 337-2, ¶ 109. To sustain a conviction for tax evasion, the evidence must establish beyond a reasonable doubt "willfulness, a substantial tax deficiency, and an affirmative act constituting an attempted evasion of the tax." *United States v. Goodyear*, 649 F.2d 226, 227-28 (4th Cir. 1981). Additionally, the "government bears the burden of proving that it began its prosecution within the statute of limitations period," which, for tax evasion, is six years. *United States v. Wilson*, 118 F.3d 228, 236 (4th Cir. 1997).

Because "[t]he limitations period for a violation of § 7201 begins to run on the date of the last affirmative act of tax evasion," *Wilson*, 118 F.3d at 236, the government correctly conceded in this case that "to convict [Mr.] Goldstein on Count One," the jury was required to "find that he committed an affirmative act of evasion on or after January 1, 2018." ECF No. 341, at 1; *see also* Instr. No. 36. The indictment identified four acts of evasion that allegedly occurred after January 1, 2018: (1) "transferring at least $960,000 in personal funds into G&R's IOLTA account in March 2021 to shield the funds from collection by the IRS," (2) "making false and misleading statements to an IRS Revenue Officer in March 2018," (3) "making false and misleading statements to IRS

52

representatives in October 2020," and (4) "using foreign individuals and foreign bank accounts to receive income."  ECF No. 337-2, ¶ 109; *see also* 2/18/26 Tr. 62:12-69:5 (government counsel identifying those four acts as occurring "on or after . . . January 1, 2018"); ECF No. 341, at 7 (same).

Two of these theories of liability—namely, the IOLTA and March 2018 interview allegations—were legally inadequate bases for a conviction.  If the Court concludes that *either* theory was legally inadequate, then the Court must order a new trial because the government cannot establish that the jury's verdict necessarily rested on a legally adequate theory.

### A.      The IOLTA Allegation Was Legally Invalid

The indictment alleged that, in March of 2021, Mr. Goldstein evaded payment of his 2016 taxes by briefly wiring $960,000 from his retirement accounts into G&R's IOLTA account before transferring that money just days later into G&R's business account (and, ultimately, then using that money to complete a home purchase).  *See* ECF No. 337-2, ¶ 103; *see also* GX-421 (funds in IOLTA account for no more than five days); 2/9/26 Tr. 99:17-101:20 (Mr. Goldstein's funds in IOLTA account over a weekend).   The government claimed that Mr. Goldstein's conduct constituted an affirmative act of tax evasion because he ostensibly transferred the money into the IOLTA account in order "to shield the funds from collection by the IRS."  ECF No. 337-2, ¶ 109(e); *see also* 2/18/26 Tr. 68:5-21 (closing argument).  At the time of the IOLTA transfer, Mr. Goldstein owed just under $40,000 on his 2016 taxes (*including* penalties and interest).  *See* GX-73.

The government's theory of liability was invalid because it was legally impossible for Mr. Goldstein to have evaded payment of his 2016 taxes by moving money into G&R's IOLTA account.  A crime is legally impossible "where the defendant's acts, even if fully carried out as intended, would not constitute a crime."  *United States v. Hamrick*, 43 F.3d 877, 885 (4th Cir.

53

1995); *accord, e.g.*, *United States v. Carter*, 15 F.4th 26, 36 (1st Cir. 2021); *In re Sealed Case*, 223 F.3d 775, 779 (D.C. Cir. 2000); *United States v. Frazier*, 560 F.2d 884, 888 (8th Cir. 1977). That is precisely what happened here. The government's own witness, Revenue Officer Parrish, testified that Mr. Goldstein entered into an installment agreement with the IRS on May 22, 2019. *See* GX-73, at 4; 1/28/26 Tr. 134:16-135:8. Because Mr. Goldstein was on that installment agreement, the IRS—as required by law—discontinued levying his accounts as of May 22, 2019.[8] *See* GX-73, at 4-7; 1/28/26 Tr. 135:9-19, 145:14-20; 26 U.S.C. § 6331(k)(2)(C) ("No levy may be made . . . with respect to any unpaid tax . . . during the period that . . . an installment agreement for payment of such unpaid tax is in effect[.]"); 26 C.F.R. § 301.6331-4(a) (same). And the IRS could not have resumed levying without *first* providing Mr. Goldstein with 30 days' notice—which it undisputably never provided—and *then* waiting an additional 30 days post-termination. *See* 26 U.S.C. § 6159(b)(5) (30 days' notice required to terminate installment agreement); 26 C.F.R. § 301.6331-4(a) ("No levy may be made to collect a tax liability . . . for 30 days immediately following the termination of an installment agreement."); *see also United States v. Schiller*, 81 F.4th 64, 68 (2d Cir. 2023) ("the applicable statutory provisions prohibit the IRS from levying . . . during . . . the 30 days following . . . termination of an installment agreement"). As a result, transferring money into G&R's IOLTA account for a handful of days could not possibly have "shield[ed] the funds from collection by the IRS," ECF No. 337-2, ¶ 109(e), because the IRS *was not* levying, and *could not* have resumed levying, Mr. Goldstein's accounts as of March 2021.

---

[8] Because the Count 1 charges tax evasion only with respect to tax year 2016, that is the only tax balance for which levies would be relevant. That said, Officer Parrish's testimony confirmed that in March 2021 the IRS was not levying Mr. Goldstein's accounts with respect to *any* tax balance. *See* 1/28/26 Tr. 147:18-148:24, 149:12-151:1, 154:12-15; GX-74; GX-76; GX-78.

Perhaps recognizing this fatal flaw, the government urged the jury to find Mr. Goldstein guilty of tax evasion on the theory that Mr. Goldstein *believed*—even if incorrectly—that the IRS was about to "start levying his bank accounts again."  2/18/26 Tr. 68:13-14 (government closing statement); *see also* 2/11/26 Tr. 49:24-51:7 (government arguing in opposition to defense's first motion for judgment of acquittal that "[t]he government does not believe that whether … the IRS could or would … have levied the account … matters here for purposes of whether [there] was an affirmative act of evasion").  Even if there were sufficient evidentiary support for this argument (which there is not),[9] it is simply not a crime to attempt to avoid non-existent, legally prohibited IRS levies.  *See United States v. Davis*, No. CRIM. WDQ-13-0002, 2013 WL 4026969, at \*4 (D. Md. Aug. 6, 2013) ("[L]egal impossibility is when the defendant's acts, 'even if fully carried out as intended, would not constitute a crime.'" (quoting *Hamrick*, 43 F.3d at 885)); *United States v. Reed*, 75 F.4th 396, 403 n.2 (4th Cir. 2023) (same).  This is not a case of *factual* impossibility, which exists where there is some "physical impediment to completion of the crime due merely to miscalculation or to the choice of ineffective means which would normally be effective," *Ventimiglia v. United States*, 242 F.2d 620, 625 (4th Cir. 1957)—for example, where a defendant builds a "bomb [that] was incapable of exploding," *Hamrick*, 43 F.3d at 885, or attempts to file a false lien against a pseudonymous victim, *see Reed*, 75 F.4th at 401-03, or "attempt[s] to pick an empty pocket," *Ventimiglia*, 242 F.2d at 625.  Rather, this is a case of *legal* impossibility: "a failure due to an inherent impossibility of completing the crime" because "the act, though consummated,

---

[9] The government's only evidence in support of its contention is a February 2021 email sent by a GRF accountant to a G&R office manager in which the accountant *mistakenly* stated that "there is currently no … payment plan with the IRS."  GX-504; *see* 2/2/26 Tr. 171:6-180:9, 208:23-210:5. But Mr. Goldstein knew the accountant was wrong:  Mr. Goldstein testified that he never received a notice of default (much less a notice that the IRS was planning to resume levying), and he knew that the IRS was in fact not levying his accounts as of March 2021.  *See* 2/12/26 Tr. 115:2-116:12, 127:14-128:1.

would not be criminal." *Ventimiglia*, 242 F.2d at 625; *see also id.* ("A like distinction is that between an unsuccessful murder attempt due to a faulty gun or a blank cartridge, and a failure due to the fact that the intended victim was merely a block of wood, or a shadow.  In the former, there would be a criminal attempt, while in the latter there would not.").

The Fourth Circuit's decision in *Ventimiglia* is directly on point.  There, the defendants were charged both with a substantive violation of, and with conspiracy to violate, the Taft-Hartley Act, which forbids an employer from paying money to any representative of his employees (e.g., a union representative).  After a bench trial, the court acquitted the defendants of the substantive charges on the ground that the agent paid by the defendants did not *actually* represent any of the defendants' employees, *see* 242 F.2d at 621-22, but the court found the defendants guilty of the conspiracy charge on the theory that the defendants had "*intended* to deal with and dealt with [the agent] as a representative of their employees," *id.* at 622 (emphasis added).  On appeal, the Fourth Circuit reversed, reasoning that the conspiracy was legally impossible because, regardless of what the defendants thought, the agent in question simply "was not the employees' representative, formal or informal."  *Id.* at 624; *see also id.* at 626 ("[W]here one mistakenly believes a certain individual is the union representative of his employees, the misconception cannot sufficiently negative the impossibility of committing the substantive offense so as to provide the basis for a conspiracy conviction.").  The court rejected the government's argument—strikingly similar to the one the government has made in this case—that "a conspiracy may be punished even if the objective of the conspirators cannot be achieved, but the conspirators mistakenly think it can be." *Id.* at 625.  The court explained:

> The Government has referred us to cases in which conviction for conspiracy has been upheld despite the fact that, unknown to the conspirators, the object of the conspiracy was impossible of accomplishment, as where pickpockets conspired to rob an intended victim, but were frustrated by the fact that his pocket was empty.

56

Such unexpected physical impossibility would not prevent successful prosecution for conspiracy. But the present case is not comparable to the attempt to pick an empty pocket. The analogy to the present case would be closer if we assumed an attempt or conspiracy to pick the pocket of what is merely a wooden dummy. Criminal liability in such a case would seem highly implausible, and it would not save the prosecution to prove that the defendants thought that the object of their design and effort was human.

*Id.*

This case is on all fours with *Ventimiglia*. Mr. Goldstein was not prevented from evading payment of his taxes by some "physical impediment" or other "ineffective means" of committing the crime of tax evasion. 242 F.2d at 625. On the contrary, Mr. Goldstein accomplished precisely what he set out to do—i.e., to move funds into G&R's IOLTA account. But that conduct *even once accomplished* did not amount to a crime, because the IRS was legally prohibited from levying Mr. Goldstein's accounts during the entire time that Mr. Goldstein's funds were held in the IOLTA account. Thus, it was legally "impossib[le]" for Mr. Goldstein to "commit[] the substantive offense" of tax evasion, regardless of what Mr. Goldstein might have mistakenly thought about the IRS's ability to levy his accounts in March 2021. *Id.* at 626.

Moreover, even if the government could have restarted levying Mr. Goldstein's accounts in March 2021—a claim the government has never made—it would *still* have been impossible for Mr. Goldstein's use of the IOLTA account to evade collection of taxes because the IRS can, in fact, levy IOLTA accounts. *See, e.g., L. Offs. of Scott E. Combs v. United States*, 767 F. Supp. 2d 758, 760 (E.D. Mich. 2011); *Hwang L. Firm, LLC v. United States*, No. 07-2973, 2008 WL 2704316, at *1 (E.D. Pa. July 9, 2008).[10] For a taxpayer's transfer of funds to qualify as an

---

[10] On three separate occasions during trial, the defense pointed out that the IRS can levy IOLTA accounts. *See* ECF No. 408, at 12 (first motion for judgment of acquittal); 2/17/26 Tr. 113:18-114:3 (second motion for judgment of acquittal); ECF No. 416, at 80 (Requested Instr. No. 46). The government never disputed that premise.

"affirmative step[] to evade payment" of taxes, however, that taxpayer must "mov[e] his assets beyond the reach of the Internal Revenue Service." *Kawashima v. Holder*, 565 U.S. 478, 488 (2012); *see also, e.g.*, *United States v. Andra*, 218 F.3d 1106, 1108 (9th Cir. 2000) ("'Evasion of payment ... involves conduct designed to place assets beyond the government's reach after a tax liability has been assessed ....'" (alterations in original; citation omitted); *United States v. McGill*, 964 F.2d 222, 230 (3d Cir. 1992) (same); *United States v. Jacob*, 242 F.3d 391, 2000 WL 1694300, at *3 (10th Cir. Nov. 13, 2000) (unpublished) ("evidence was sufficient to support the element of affirmative acts of evasion" where the defendant "did not . . . merely fail to file taxes" but rather "actively placed assets beyond the reach of the IRS and offensively resisted collection efforts"). Thus, because moving funds into the IOLTA account did not "plac[e] particular funds beyond the reach of . . . IRS levy," *United States v. Huebner*, 48 F.3d 376, 380 (9th Cir. 1994), it was impossible for Mr. Goldstein's use of that account to constitute an affirmative act of tax evasion.

## B.     The Officer Parrish Allegation Is Legally Invalid

The indictment also alleged that Mr. Goldstein evaded payment of his 2016 taxes by telling Revenue Officer Parrish during a March 2018 meeting that "his outstanding liability for 2016 was attributable to his receipt of a significant legal fee" instead of "his gambling income." ECF No. 337-2, ¶ 42. As a matter of law, this alleged conduct cannot support a conviction for tax evasion.

A jury is permitted to "infer[]" a "willful attempt" to evade a tax only from "conduct having the *likely effect* of misleading or concealing." *Goodyear*, 649 F.2d at 228 (emphasis added) (citing *Spies v. United States*, 317 U.S. 492, 499 (1943)). The government's apparent theory for why Mr. Goldstein's alleged misstatement could have "misl[ed] or conceal[ed]," *id.*, is that if Mr. Goldstein had told Officer Parrish "about winning or losing millions of dollars playing poker," then Officer Parrish would have "investigated further" to determine if "that would have been another levy source." 1/22/26 Tr. 228:13-230:19. The problem with that theory, however, is that by the time

58

Mr. Goldstein met with Officer Parrish in March 2018, he had *already* disclosed on his 2016 Form 1040 that he had significant gambling winnings. *See* 1/28/26 Tr. 158:4-161:1; GX-54, at 1, 33 (listing over $13 million in "gambling winnings" for tax year 2016); *see also* 2/4/26 Tr. 248:5-249:2 (Special Agent McDonald confirming that Mr. Goldstein's Form 1040 for tax year 2016 disclosed that significant income "comes from" "gambling winnings"). And Officer Parrish admitted that she had access to that information. *See* 1/28/26 Tr. 158:17-19.

It is not an act of tax evasion to fail to tell the IRS something that it already knows.[11] *See United States v. Romano*, 938 F.2d 1569, 1573-74 (2d Cir. 1991); *United States v. Josephberg*, 562 F.3d 478, 493 (2d Cir. 2009). The Second Circuit's decision in *Romano* is instructive. In that case, the defendant was found guilty of tax evasion after he was discovered crossing the U.S.-Canadian border with nearly $360,000 in undeclared cash. *See* 938 F.2d at 1570-71. The government argued that, among other things, the defendant had committed an affirmative act of tax evasion by failing to file a tax return for the year in which he had attempted to cross the border with the money—money that, according to the IRS, was "presumed to be taxable income from a previously undisclosed source." *See id.* at 1570, 1572. The Court of Appeals rejected that argument, however, because there was no "further information as to [the defendant's] tax obligation [that] the government might have obtained by [the defendant's] filing of a return." *Id.* at 1573. Because the government already "knew the exact amount" of money at issue, "there was nothing that [the defendant] did or failed to do, including his not filing a return for [the year in question], that in any way could have deceived the government." *Id.*

---

[11] For similar reasons, as an evidentiary matter, no reasonable jury could find that Mr. Goldstein willfully misled Officer Parrish about his 2016 taxes by failing to disclose information that he had already freely reported to the IRS, "for there was nothing for [Mr. Goldstein] to gain," and "nothing to conceal from the IRS," *Romano*, 938 F.2d at 1574, by withholding such information.

So too here.  The government contends that Mr. Goldstein unlawfully evaded paying his taxes by concealing from the IRS that his gambling winnings were a possible "levy source."[12] 1/28/26 Tr. 101:16-23.  But "there was nothing" Mr. Goldstein "did or failed to do" in his interview with Officer Parrish that "in any way could have deceived the government" about the fact that he had gambling income in 2016, *Romano*, 938 F.2d at 1573, because the fact that Mr. Goldstein had 2016 gambling income was "information which the government already had and which [Mr. Goldstein] knew the government had," *id.* at 1574, by virtue of Mr. Goldstein's 2016 tax return.  Therefore, as a matter of both law and logic, Mr. Goldstein's alleged failure to tell the IRS *again* in March 2018 about his 2016 gambling winnings could not have "misle[d] the IRS or conceal[ed] [Mr. Goldstein's] assets."  *Wilson*, 118 F.3d at 236.

Moreover, Mr. Goldstein's statement to Officer Parrish could not have been a willful act of tax evasion because Mr. Goldstein, in fact, answered Officer Parrish's question correctly.  Although the indictment charged Mr. Goldstein with misstating the reason for his 2016 tax "liability," ECF No. 337-2, ¶ 42, the undisputed evidence at trial revealed that Officer Parrish actually asked Mr. Goldstein about the reason for the "balance" due on those taxes.  *See* GX-19, at 13; 1/28/26 Tr. 170:2-173:22.  As Officer Parrish testified, those are different concepts:

**Q.** Now, what you wrote was the word "balance"; right?

**A.** Yes.

**Q.** So you didn't write that this was discussing the source of the income that caused him to have tax liability back in 2016; right?

---

[12] Importantly, Officer Parrish was not investigating the "accura[cy]" of Mr. Goldstein's 2016 tax return; she was solely focused on "collecting the balance" due. *See* 1/28/26 Tr. 170:2-171:18.  So the government (correctly) does not argue that Mr. Goldstein could have evaded taxes by misleading Officer Parrish about the precise *amount* of his 2016 gambling winnings.  All that matters under the government's theory is whether Mr. Goldstein concealed from the IRS that he had *any* significant gambling income.

60

**A.** In this particular instance, I talked about what he owed which was the balance.

**Q.** Right. Right. The balance. So just to make sure we're all clear, the balance is the amount that's left due on my taxes; right?

**A.** Correct.

**Q.** Okay. So that's different from the original amount that is due in taxes or could be different?

**A.** It could be different, yes.

1/28/26 Tr. 170:13-171:1. In fact, Officer Parrish testified that that *at no point* during her March 2018 interview with Mr. Goldstein did she ask about Mr. Goldstein's sources of income in 2016. 1/28/26 Tr. 173:14-22. Consequently, when Officer Parrish asked Mr. Goldstein about why he had an outstanding *balance* on his 2016 taxes, he answered honestly: He was having cashflow issues stemming from a legal case. *See id.* at 171:19-22 ("Q. And in order to pay the balance on those taxes, Mr. Goldstein told you he was waiting for money to come in for a big legal case; right? A. Correct."). The government presented no evidence to the contrary.

It is irrelevant whether Officer Parrish *intended* to ask Mr. Goldstein why his 2016 tax bill was so large (i.e., the reason for Mr. Goldstein's "liability"), rather than asking him to explain why he had not yet paid it (i.e., the reason for the "balance"), as it is blackletter law that "[t]he answer to a fundamentally ambiguous question may not, as a matter of law, form the basis for a false statement." *United States v. Sarwari*, 669 F.3d 401, 407 (4th Cir. 2012); *cf. United States v. Paolicelli*, 505 F.2d 971, 973 (4th Cir. 1974) ("[I]f a party does not understand the question and gives a non-responsive answer, such an answer is not perjurious, nor can a charge of perjury 'be sustained by the device of lifting a statement of the accused out of its immediate context and thus giving it a meaning wholly different than that which its context clearly shows.'" (citation omitted)). Nor does it matter whether Officer Parrish's collections efforts might have been aided by Mr. Goldstein's *unprompted* answer to a question he was never asked about the reason for his 2016 tax

liability, as an affirmative act of tax evasion must be just that:  affirmative.  It cannot rest on an omission.  *See Sansone v. United States*, 380 U.S. 343, 351 (1965); 1/28/26 Tr. 97:14-17 (government counsel conceding that "[a]n omission is not an affirmative act").  Thus, because Officer Parrish did not clearly ask Mr. Goldstein about the reason for his 2016 tax liability, Mr. Goldstein cannot have committed an affirmative act of tax evasion by failing to disclose it. [13]

### C.        The Appropriate Remedy Is A New Trial

Under the *Yates* principle, *see* Legal Standard, *supra*, a new trial is required on Count 1. To convict Mr. Goldstein under Count 1, the jury must have found at least one willful act of tax evasion after January 1, 2018.  But there is nothing in the jury's verdict to suggest which of the four post-2018 affirmative acts supplied the basis of conviction—much less "evidence [that] the jury *necessarily* credited" that would indicate the jury "*must have* convicted [Mr. Goldstein] on [a] legally adequate ground."  *Hastings*, 134 F.3d at 242 (emphases added).  Therefore, because "it cannot be determined that the conviction did not rest entirely on a legally inadequate ground, it is impossible to say that the error in submitting the legally inadequate ground to the jury was harmless beyond a reasonable doubt."  *Id.*

### V.        A JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, A NEW TRIAL IS NECESSARY AS TO COUNTS 3, 7, 8, AND 9

Counts 2 through 9 of the indictment charged Mr. Goldstein with aiding and assisting the preparation of false tax returns in tax years 2017 through 2021.  *See* ECF No. 337-2, ¶ 117.  The

---

[13] At the very least, because Officer Parrish's question was "susceptible to multiple interpretations," no reasonable jury could find that Mr. Goldstein's "knew his statement was false." *Sarwari*, 669 F.3d at 407; *see also United States v. Yurek*, 925 F.3d 423, 433 (10th Cir. 2019) ("To satisfy the willfulness requirement, the government had to prove a specific intent to evade taxes."). Mr. Goldstein could not have known what was in Officer Parrish's mind—and, as demonstrated by Officer Parrish's own testimony at trial, reasonable people can (and do) understand the word "balance" to indicate the amount *presently* outstanding.

jury found Mr. Goldstein not guilty as to Counts 2, 4, 5, and 6, and guilty as to Counts 3, 7, 8, and 9. *See* 2/25/26 Tr. 4:15-6:10; ECF No. 472.

The Fourth Circuit has cautioned that "[w]here there is a view of the case that makes the jury's answers . . . consistent, they must be resolved that way." *Phillips v. Pneumo Abex, LLC*, 713 F. App'x 191, 194 (4th Cir. 2017) (alteration in original; quoting *Atl. & Gulf Stevedores Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364 (1962)). Applying that principle, it is clear that the jury did not find Mr. Goldstein guilty as to Counts 3, 7, 8, and 9 on the basis of either (1) diverting legal fee payments into non-firm accounts, or (2) failing to separately report gambling wins and losses in years in which he was a net gambling loser. What remains are the allegations that Mr. Goldstein assisted his tax preparers in preparing false returns by (1) using G&R funds to pay personal debts in 2017 and 2019 (Counts 3 and 7), (2) failing to report $235,000 of legal fee income paid into G&R's Montenegrin account in 2019 (Count 7), and (3) failing to report that he had cryptocurrency transactions in 2020 and 2021.

To sustain a conviction for assisting the preparation of a false return, the evidence must establish beyond a reasonable doubt that "(1) the defendant aided, assisted, or otherwise caused the preparation and presentation of a return; (2) that the return was fraudulent or false as to a material matter; and (3) the act of the defendant was willful." *United States v. Kimble*, 855 F.3d 604, 614 (4th Cir. 2017) (citation omitted). With respect to each possible basis for the jury's verdict, the government's evidence is insufficient to prove those elements beyond a reasonable doubt. And a judgment of acquittal is therefore appropriate under Rule 29. In the alternative, the Court should at minimum order a new trial under Rule 33.

## A.    The Evidence Was Insufficient To Sustain A Conviction As To Count 3

Count 3 charged Mr. Goldstein with aiding and assisting the preparation of a false Form 1120S for G&R for tax year 2017. *See* ECF No. 337-2, ¶ 117. Specifically, Count 3 alleged two

alternative theories of liability: first, that Mr. Goldstein caused G&R's return to "false[ly] overstate[] by $175,000 … G&R's business expenses" by "causing the transfer of $175,000 from G&R to [Napoli Shkolnik] to pay a personal poker debt, and the categorization of that transfer as a G&R 'legal fee expense,'" and second, that Mr. Goldstein caused G&R's return to "false[ly] understate[] … G&R's gross receipts by $250,000 due to [Mr. Goldstein's] diversion of [a] $250,000 payment from [Robbins Geller] to his Gambling Account." ECF No. 337-2, ¶ 52. Both theories lack sufficient evidence.

### 1.    Mr. Goldstein Did Not Assist The Filing Of A False Tax Return By Directing The Office Manager To Send A Wire To Napoli Shkolnik

The indictment alleged that Mr. Goldstein assisted the filing of a false return by directing Jonathan Levitan, G&R office's manager, to wire $175,000 to Napoli Shkolnik to pay a personal debt. *See* ECF No. 337-2, ¶¶ 51-52. But the government offered no evidence that Mr. Goldstein ever directed Mr. Levitan or GRF to characterize the Napoli payment as a firm expense rather than a personal distribution. *See* 1/21/26 Tr. 225:15-228:3 (Jonathan Levitan testifying that he had no memory of "ever hearing" whether the Napoli wire should be treated as a business expense); 1/22/26 Tr. 27:2-5 (same); 2/10/26 Tr. 222:10-223:14 (Agent Ranahan testifying that the government offered no evidence that Mr. Goldstein instructed the office manager or accountants to treat the Napoli payment as a business expense). In fact, Mr. Goldstein did not even instruct Mr. Levitan on which account to use. *See* GX-1077.

That is a fatal gap in the government's evidence. To sustain a conviction under 26 U.S.C. § 7206(2), the government must prove that Mr. Goldstein "affirmative[ly] participat[ed]" in some conduct "which at least encourages" the preparation of the false return. *United States v. Gambone*, 314 F.3d 163, 173 (3d Cir. 2003) (citation omitted); *see also, e.g.*, *United States v. Sassak*, 881 F.2d 276, 277 (6th Cir. 1989); *United States v. Graham*, 758 F.2d 879, 885 (3d Cir. 1985). That

64

is why, in the handful of cases in which courts have sustained convictions under Section 7206(2) where the defendant did not actually prepare the tax return himself, the trial evidence affirmatively demonstrated that the defendant *actually knew* that false records had been used to prepare the return. *See, e.g.*, *United States v. Thomas*, 41 F.3d 1508 (6th Cir. 1994) (per curiam) (unpublished) (collecting cases). And that is why this Court instructed the jury here that, to find that Mr. Goldstein "advised or assisted in the preparation of a tax return," the jury *at least* had to find that "Mr. Goldstein knowingly provided false information (or directions) with the expectation that the information he provided would be used to file a tax return." Instr. No. 41; *see United States v. Kottwitz*, 614 F.3d 1241, 1269 (11th Cir. 2010) (per curiam), *opinion withdrawn in part on other grounds,* 627 F.3d 1383 (11th Cir. 2010) ("Although the defendant's preparation of the returns is not essential, the government must prove that the defendant knowingly provided false documentation with the expectation that it would be used in the filing of a tax return.").

The jury in this case could not have made that finding on the evidence presented at trial. The government's theory was that Mr. Goldstein "caused … misclassification[s] by intentionally failing to tell his staff or Gelman" when a transaction was a "personal expense[] and not [a] business expense[]." 2/18/26 Tr. 61:10-13. But failing to correct third parties' errors—even if those errors were made possible by Mr. Goldstein's negligent conduct—is simply not enough. The assistance must be knowing.

### 2. Mr. Goldstein Did Not Assist The Filing Of A False Tax Return By Asking Robbins Geller To Make A Legal Fee Payment Into Mr. Goldstein's Personal Account

The indictment also alleged that Mr. Goldstein assisted the filing of a false return by directing Robbins Geller to send a $250,000 legal fee payment to Mr. Goldstein's personal bank account. *See* ECF No. 337-2, ¶¶ 46-47, 52. As a threshold matter, it is clear that the jury did not find Mr. Goldstein guilty on this ground, as the jury found Mr. Goldstein *not guilty* of similar

65

conduct alleged in Count 5. *See id.* ¶¶ 56, 61 (Count 5 alleging that Mr. Goldstein assisted the preparation of a false return in 2018 by agreeing to "offset" a legal fee payment owed to G&R with a personal debt owed to the same payor); *Phillips*, 713 F. App'x at 194.

That is no surprise. No reasonable jury could have found Mr. Goldstein guilty of Count 3 on the theory that he willfully caused G&R's 1120S to underreport income by asking Robbins Geller to remit payment to a non-firm account. Witness after witness testified that Robbins Geller was legally obligated to send a Form 1099 to both the IRS and G&R reporting its payment. *See* 2/10/26 Tr. 201:4-212:1 (Agent Ranahan testifying that Robbins Geller was required by law to send a Form 1099 for its legal fee payment to G&R, regardless of whether that payment was made to Mr. Goldstein's personal bank account); 2/5/26 Tr. 221:4-222:21 (Zachary Marks testifying that "payments to law firms specifically – and, obviously, Goldstein & Russell is a law firm – for any legal services, 1099s are generally issued"); 2/9/26 Tr. 195:14-22 (Ian Shuman testifying that "if it's a payment to a law firm for legal services, then you still do a 1099"); *see also* 26 C.F.R. § 1.6045-5(a)(1) ("every payor engaged in a trade or business who, in the course of that trade or business, makes payments aggregating $600 or more during a calendar year to an attorney in connection with legal services (whether or not the services are performed for the payor) must file an information return for such payments"). Consequently, it should not have mattered whether Mr. Goldstein directed Robbins Geller to make payment into G&R's business account or Mr. Goldstein's personal account, because Robbins Geller was required to prepare a tax form reporting the income either way.

Of course, the evidence in this case revealed that, although Robbins Geller did in fact prepare and send a Form 1099 memorializing its $250,000 payment to G&R, *see* 1/21/26 Tr. 112:22-117:3; DX-226, the accountants at GRF chose to ignore it, *see* 2/2/26 Tr. 223:11-226:18;

2/4/26 Tr. 139:17-142:5; 2/9/26 Tr. 193:12-194:9; DX-252.  As a result, G&R's 2017 tax return did not include Robbins Geller's $250,000 payment.  But the government offered no evidence whatsoever that Mr. Goldstein aided or assisted GRF in making that befuddling decision to disregard tax documents.  Nor was there any evidence that Mr. Goldstein ever tried to dissuade Robbins Geller from sending a Form 1099 or interfere with GRF's receipt of that document; on the contrary, when asked by Robbins Geller to send a Form W9 (to facilitate preparation of the Form 1099), Mr. Goldstein promptly complied.  *See* 1/21/26 Tr. 117:13-120:4; 83:11-25.

The government's theory of liability therefore must be that Mr. Goldstein decided to direct payment from Robbins Geller into his personal bank account while either knowing that GRF would ignore the resulting Form 1099, or while deliberately avoiding such knowledge.[14]  *See United States v. Salerno*, 902 F.2d 1429, 1433 (9th Cir. 1990) (a violation of Section 7206(2) "requires specific intent to defraud the I.R.S."); *Vinson*, 852 F.3d at 357 (willful blindness requires the government to "establish[] that the defendant deliberately shielded himself from clear evidence of critical facts that are strongly suggested by the circumstances").  But there was no evidence to support those theories, either.  In fact, Ian Shuman testified that he was not aware of *any* time prior to 2022 that *anyone* at GRF informed *anyone* at G&R—including Mr. Goldstein—that GRF's practice was to ignore the Forms 1099 that G&R received.  2/10/26 Tr. 50:19-55:14, 59:5-7 (admitting he erroneously told an officer manager in 2022 that a Form 1099 was not required for payments for legal services, but explaining that he still passed them along to the tax department).  And there was no evidence even hinting, much less "strongly suggest[ing]," *Vinson*, 852 F.3d at

---

[14] Indeed, the government told the Court that this was precisely the theory it hoped to prove.  *See* 1/21/26 Tr. 18:4-9 (government counsel stating that "[w]e believe the circumstantial evidence offered … throughout this trial will show that the accountants were not using these 1099s" and that Mr. Goldstein "knew full well that there were not 1099s being used by them to prepare the corporate returns and do the corporate records").

357, that Mr. Goldstein ever knew or had reason to believe that GRF had adopted that counterintuitive policy.

To be sure, it might have been more prudent for Mr. Goldstein to have directed Robbins Geller to make payment into G&R's business account, or to have affirmatively alerted GRF to the existence of that payment, or to have double-checked the return prepared by GRF to confirm that it included Robbins Geller's payment. But Section 7206(2) does not criminalize negligence. And there is simply no evidence from which a reasonable jury could have found that Mr. Goldstein knew that GRF would ignore Robbins Geller's Form 1099 and, despite that knowledge, nonetheless chose to divert Robbins Geller's legal fee payment to his personal bank account with the willful intent to capitalize on GRF's anticipated error.

## B. The Evidence Was Insufficient To Sustain A Conviction As To Count 7

Count 7 charged Mr. Goldstein with aiding and assisting the preparation of a false Form 1120S for G&R for tax year 2019. *See* ECF No. 337-2, ¶ 117. Specifically, Count 7 alleged two alternative theories of liability: first, that Mr. Goldstein caused G&R's return to "false[ly] overstate[] … G&R's expenses and deductions … based on [Mr. Goldstein's] use of $170,000 in G&R funds to satisfy [Mr. Goldstein's] personal gambling debt to [Chuck Pacheco]," and second, that Mr. Goldstein caused G&R's return to "false[ly] understate[] … G&R's gross receipts by approximately $235,000, based on the failure to report as fee income the funds received from [Mr. Phua]." ECF No. 337-2, ¶ 72. The government failed to offer sufficient evidence to sustain a conviction under either theory.

### 1. Mr. Goldstein Did Not Assist The Filing Of A False Tax Return By Directing The Office Manager To Send A Wire To Chuck Pacheco

The indictment alleged that Mr. Goldstein assisted the filing of a false return by directing the G&R office manager to wire $170,000 to Chuck Pacheco to pay a personal gambling debt. *See*

68

ECF No. 337-2, ¶ 67. The government's apparent theory of liability is that, by "causing the payment … to be sent from the G&R bank account" without affirmatively "tell[ing] the G&R firm manager or [GRF] that the … payment … was not a business expense," Mr. Goldstein "caused the payment to be falsely categorized as a "Legal Fee[]'' on the G&R books." *Id.* at ¶ 68.

To be clear, the indictment does not allege—and the government certainly offered no evidence to prove—that Mr. Goldstein directed anyone to characterize the payment to Mr. Pacheco as a firm expense. *See* 2/10/26 Tr. 225:15-226:10 (Agent Ranahan testifying that government offered no evidence that Mr. Goldstein directed anyone to classify the Pacheco payment as a business expense). Indeed, the government did not even ask Mr. Levitan, the office manager at the time, *see* 1/21/26 Tr. 251:1-2, about the transaction. *See generally* 1/21/26 Tr. 188:11-272:22. The indictment also did not allege, and the government offered no evidence to show, that GRF ever asked anyone at G&R (including Mr. Goldstein) about how the payment should be classified after the fact. *See, e.g.*, 2/5/26 Tr. 265:24-266:20 (no documentation in GRF work papers indicating that GRF had sought to confirm the accuracy of its classification of the Pacheco payment); 2/2/26 Tr. 52:14-53:9 (GRF never asked Ms. Bart about the Pacheco payment). Instead, the government asked the jury to find Mr. Goldstein guilty of assisting GRF in preparing a false return because Mr. Goldstein failed to tell GRF that he had used G&R's account to make a personal payment. *See, e.g.*, 2/9/26 Tr. 175:15-23 (government counsel asking Mr. Shuman, "If Mr. Goldstein had told you in 2019 that this payment to Mr. Pacheco was related to poker, what would have you done with that information?"); 2/10/26 Tr. 138:2-11 (government counsel asking Agent Ranahan, "What evidence have you seen that Mr. Goldstein told his firm manager or the accountants to correct classification of th[e] payment [to Chuck Pacheco]?").

69

That allegation comes nowhere close to establishing willfulness.  As discussed above, GRF knew that Mr. Goldstein sometimes used G&R's account to make personal payments, and GRF's practice was to seek clarification if it was unsure how to classify a particular transaction.  *See* Parts II-A-2, II-B-1, *supra*.  Mr. Goldstein therefore had no reason to know—and certainly did not consciously avoid learning—that GRF had mischaracterized his payment to Chuck Pacheco in this instance.  No reasonable jury could conclude otherwise.

### 2. Mr. Goldstein Did Not Assist The Filing Of A False Tax Return By Failing To Report $235,000 Legal Fee Income Paid Into G&R's Business Account

The indictment also alleged that Mr. Goldstein assisted the filing of a false return by "caus[ing]" Paul Phua to send "approximately $235,000 … to the G&R Montenegrin bank account" in February 2019.  ECF No. 337-2, ¶ 70.  The allegation answers itself:  Mr. Goldstein properly directed payment for legal services into G&R's business account.  And that series of events was confirmed by the own evidence at trial, which demonstrated that Mr. Goldstein accepted payment for legal work into *G&R's* account in Montenegro and then moved those funds into *G&R's* business account in the United States.  GX-425 (tracing flow of money through Goldstein & Russell accounts); 2/10/26 Tr. 135:24-136:17 (same).

G&R's accountants at GRF apparently missed that legal fee income.  But the government offered *zero* evidence to show that Mr. Goldstein played any role in that error.  He did not, for example, ever tell anyone at GRF to record the payment as anything other than income.  *See* 2/10/26 Tr. 226:11-227:3 (Agent Ranahan confirmed that the government offered no evidence that Mr. Goldstein ever told GRF that the $229,927 payment should not be reported as income).

At trial, the government attempted to make much out of the fact that, in response to the Montenegrin bank's request for "some sort of supporting document detailing the transfer," Mr. Levitan prepared a letter addressed to *the bankers in Montenegro* indicating that Mr. Phua's

payment was a "capital contribution." GX-544; *see* 2/10/26 Tr. 234:9-10, 237:6-238:11. But Agent Ranahan confirmed that GRF was not included on the email exchange between Mr. Goldstein and Mr. Levitan (who the government did not even bother to question about this topic at trial). *See* 2/10/26 Tr. 250:16-252:12, 253:16-23; *see generally* 1/21/26 Tr. 188:13-272:20; 1/22/26 Tr. 8:6-45:5. And, in fact, Mr. Goldstein *also* sent the Montenegrin bankers an invoice issued to Paul Phua in the amount of "$235,000 (converted into €206,942.17)" for "Legal Counsel." GX-524 (invoice); GX-536 (email); *see also* 2/10/26 Tr. 252:14-253:15. Thus, if there were any reason to think that GRF was aware of what Mr. Goldstein told the bankers—and, to be clear, the government offered no evidence to that effect—then GRF *still* would have known that Mr. Phua's $235,000 payment was for legal services.

The government also implied throughout trial that Mr. Goldstein could be found guilty under Count 7 because he failed to amend G&R's 2019 return after he discovered G&R's error in late October 2020. *See, e.g.*, 2/18/26 Tr. 78:19 (government's closing statement); *see also* 2/10/26 Tr. 227:4-229:5 (Mr. Goldstein discovered the error after G&R's return had been filed); GX-22 (email from Ian Shuman dated October 23, 2020, stating that GRF treated Mr. Phua's February 2019 payment "as a reduction to stockholder distributions"). But that is legally incorrect. The jury was both instructed that "a taxpayer has no legal duty to file an amended return upon the discovery of a mistake or error on a prior year's return," Instr. No. 31; *see* 15 Mertens Law of Fed. Income Tax'n § 56:75 (2025), and that the jury could not convict Mr. Goldstein on the basis of his failure to amend because such conduct was not charged in the indictment, *see* Instr. No. 41. As a result, no reasonable jury could have found Mr. Goldstein guilty of Count 7 under the government's legally invalid failure-to-amend theory.

C.    **The Evidence Was Insufficient To Sustain A Conviction As To Counts 8 and 9**

71

Count 8 charged Mr. Goldstein with aiding and assisting the preparation of a false Form 1040 for tax year 2020.  *See* ECF No. 337-2, ¶ 117.  Specifically, Count 8 alleged two alternative theories of liability: first, that Mr. Goldstein "falsely answered 'no' on his 2020 Form 1040 to the question, 'At any time during 2020, did you receive, sell, send, exchange, or otherwise acquire any financial interest in any virtual currency?'" and second, that Mr. Goldstein "caused his 2020 Form 1040 to falsely omit $93,180 in gambling income."  *Id.* ¶ 77.

Count 9 charged Mr. Goldstein with aiding and assisting the preparation of a false Form 1040 for tax year 2021.  *See* ECF No. 337-2, ¶ 117.  Specifically, Count 9 alleged three alternative theories of liability:  first, that Mr. Goldstein "falsely answered 'no' on his 2021 Form 1040 to the question, 'At any time during 2021, did you receive, sell, exchange, or otherwise dispose of any financial interest in any virtual currency?'"; second, that Mr. Goldstein "falsely omitted from his 2021 Form 1040 the reporting of any gambling income"; and third, that Mr. Goldstein "caused" G&R's Form 1120S for the 2021 tax year to "falsely understate[] G&R's gross receipts by $500,000," which in turn "resulted in a false understatement of the taxable income and tax due and owing … on [Mr. Goldstein's] 2021 Form 1040."  *Id.* ¶¶ 88-89.  No reasonable jury could have found Mr. Goldstein guilty of Counts 8 or 9 under any of these theories.

### 1.    Mr. Goldstein Did Not Assist The Filing Of A False Tax Return By Failing To Report The Existence Of Cryptocurrency Transactions

The indictment alleged that, in 2020 and 2021, Mr. Goldstein assisted the filing of a false return by "answer[ing] 'no'" to the question whether he had engaged in virtual currency transactions during those tax years.  *See* ECF No. 337-2, ¶¶ 77, 89.  Mr. Goldstein does not dispute that he did, in fact, have cryptocurrency transactions in 2020 and 2021, nor that his tax returns for those years failed to identify those transactions.  But Section 7206(2) is not a strict liability crime: The government must prove that Mr. Goldstein *willfully assisted* his tax preparers in answering

72

the cryptocurrency question falsely.  *See Kimble*, 855 F.3d at 614 (government must prove that the defendant "aided, assisted, or otherwise caused the preparation and presentation of a return").  As to that element, the evidence at trial is wholly lacking.

To prove that a defendant assisted the preparation of a false return, the government must demonstrate the defendant's "affirmative participation" in its preparation.  *Gambone*, 314 F.3d at 173; *accord Sassak*, 881 F.2d at 277; *Graham*, 758 F.2d at 885.  Therefore, where (as here) the defendant "did not actually prepare" the false return, the jury must find beyond a reasonable doubt that the defendant at least "knowingly participate[d] in providing information that results in a materially fraudulent tax return."  *United States v. Nealy*, 729 F.2d 961, 963 (4th Cir. 1984) (citation omitted); *accord* Instr. No. 41 ("[P]roof that Mr. Goldstein knowingly provided false information (or directions) with the expectation that the information he provided would be used to file a tax return is sufficient to satisfy this element.").

But in this case, the government offered no evidence that Mr. Goldstein provided his accountants with false information relevant to the cryptocurrency question.  *Not one person*—not Walter Deyhle or Ian Shuman (Mr. Goldstein's accountants at GRF), nor Katie Bart or Angie Gou (G&R's office managers at the time)—testified that they personally asked Mr. Goldstein whether he had engaged in cryptocurrency transactions in 2020 or 2021.  *See, e.g.*, 2/2/26 Tr. 227:10-24 (Angie Gou testifying that she had no memory of asking Mr. Goldstein whether he had any cryptocurrency transactions in 2020 or 2021).[15]  The government did not introduce any document like that into evidence, either; the trial record contains no exhibits—no email, no GRF work paper,

---

[15] Although Mr. Deyhle responded to a series of suggestive question that "we asked him" about cryptocurrency; Mr. Deyhle's testimony was about the absence of information, not any affirmative misrepresentation or even direct omission.  Mr. Deyhle's role in preparing these returns was limited to reviewing the returns "that a staff member prepared."  2/4/26 Tr. 12:8–13:18.

no written correspondence—in which Mr. Goldstein was asked to tell his tax preparers whether he bought or sold virtual currency in 2020 or 2021. *See* 2/2/26 Tr. 229:3-13 (Angie Gou testifying that she had no memory of any communication in which GRF asked whether Mr. Goldstein had cryptocurrency transactions in 2020 or 2021); 2/4/26 Tr. 146:13-147:7 (Walter Deyhle testifying that he was not shown any email in which he had asked Mr. Goldstein about cryptocurrency transactions).

The government did question Ms. Bart extensively about a "tax prep organizer" she helped Mr. Goldstein fill out *for tax year 2019*, *see* 1/29/26 Tr. 221:13-228:7, but the government apparently never located a similar tax organizer for 2020 or 2021 in either GRF's or G&R's records. If it did find one, it certainly did not introduce it into evidence—or even bother to ask Mr. Deyhle to confirm its existence. Neither Ms. Bart nor Ms. Gou testified that they remembered helping Mr. Goldstein complete a tax organizer for tax year 2020 or 2021. *See* 2/2/26 Tr. 57:9-58:13, 61:1-10 (testimony of Katie Bart); *id.* at 228:3-229:2 (testimony of Angie Gou). And Mr. Deyhle confirmed that, in years past, he had told G&R's office manager that Mr. Goldstein did not need to fill one out at all. *See* 2/4/26 Tr. 144:19-146:2; DX-298.

So how did Mr. Goldstein's 2020 and 2021 tax returns come to answer "no" to the question whether Mr. Goldstein had engaged in virtual currency transactions during the tax year? Another GRF error. Mr. Deyhle testified that GRF's tax preparation software was programmed to check "no" to that question by default. *See* 2/4/26 Tr. 146:4-12.

In short, the government offered no evidence from which a reasonable jury could find beyond a reasonable doubt that Mr. Goldstein "knowingly participate[d] in providing information that result[ed] in a materially fraudulent tax return." *Nealy*, 729 F.2d at 963 (citation omitted). There is utterly no evidence that Mr. Goldstein's tax preparers at GRF ever asked him whether he

had virtual currency transactions in 2020 or 2021—much less any evidence that Mr. Goldstein answered such a question falsely.

The government's fallback theory was that Mr. Goldstein willfully "hid the existence of [his cryptocurrency] accounts from" GRF in 2020 and 2021, 2/18/26 Tr. 79:9-10, because he was at some point notified that the IRS had added a question about virtual currency transactions to the Form 1040. If true, that claim *might* amount to a crime under 26 U.S.C. § 7206(1), which criminalizes the act of willfully signing a tax return under the penalty of perjury that the taxpayer "does not believe to be true and correct as to every material matter." 26 U.S.C. § 7206(1); *see Kimble*, 855 F.3d at 614 (listing the elements of an offense under § 7206(1)). But the government's theory that Mr. Goldstein (a) knew that GRF should have asked him about whether he had cryptocurrency transactions, and (b) failed to volunteer that information when GRF declined to ask, does not amount to an act of *assistance*, as required by § 7206(2). Put more simply, § 7206(2) criminalizes "providing information that results in a materially fraudulent tax return," *Nealy*, 729 F.2d at 963 (citation omitted)—not failing to provide it.

In all events, as discussed above, *see* Part II-B-5, *supra*, the government's evidence is insufficient to prove that Mr. Goldstein knew he was required to disclose the existence of cryptocurrency transactions on his 2020 and 2021 tax returns.

### 2. Mr. Goldstein Did Not Assist The Filing Of A False Tax Return By Failing To Report Gambling Winnings

The indictment also alleged that Mr. Goldstein assisted the filing of a false return by failing to report *gross* gambling income in tax years 2020 and 2021, *see* ECF No. 337-2, ¶¶ 77, 89, even though he was a net loser in those years. *See, e.g.*, 2/10/26 Tr. 229:6-19 (testimony of Agent Ranahan). It is obvious, however, that jury did not convict on this basis, as the jury found Mr. Goldstein *not guilty* of Counts 2 and 6—which alleged precisely the same conduct with respect to

tax years 2017 and 2019.  *See* ECF No. 337-2, ¶¶ 52, 72.  This Court is obliged to view the jury's verdict as internally consistent, where possible.  *See Phillips*, 713 F. App'x at 194.

In all events, no reasonable juror could find that Mr. Goldstein *willfully* aided and assisted in the preparation of false Form 1040s by failing to direct his accountants to separately list out all his gambling wins and losses.  *See, e.g.*, *United States v. Hirschfeld*, 964 F.2d 318, 322 (4th Cir. 1992) ("'[W]illfulness,' in the context of criminal income tax cases, is defined as a 'voluntary, intentional violation of a known legal duty.'" (quoting *Cheek*, 498 U.S. at 201).  As discussed in Mr. Goldstein's prior motion for judgment of acquittal, which the defense renews and incorporates here by reference, *see* ECF No. 408, at 20-22, the government offered no evidence that Mr. Goldstein ever knew that he was required to report gambling wins to the IRS in years in which he had no net gambling income.

### 3.    Mr. Goldstein Did Not Assist The Filing Of A False Tax Return By Asking Tobey Maguire To Make A Legal Fee Payment To Bob Safai

Lastly, Count 9 alleged that Mr. Goldstein assisted the filing of a false return in 2021 by asking Tobey Maguire to make a $500,000 legal fee payment to Bob Safai on Mr. Goldstein's behalf.  *See* ECF No. 337-2, ¶¶ 85-86, 88.  As discussed above (in connection with the Robbins Geller allegation), *see* Part II-B-2, *supra*, because the jury found Mr. Goldstein not guilty of Count 5—which alleged a similar "diverted legal fee" theory with respect to tax year 2018—it is equally clear that the jury did not find Mr. Goldstein guilty of Count 9 on the basis of this theory, either.

Regardless, the evidence at trial was insufficient to sustain a conviction on this ground because payors of legal fees are required to send Forms 1099 reporting those payments.  *See* Part II-B-2, *supra*.  As with the Robbins Geller payment, there is no evidence that Mr. Goldstein ever attempted to dissuade Mr. Maguire from sending a Form 1099, nor that Mr. Goldstein ever tried to interfere with GRF's receipt of the same.  *See* 1/28/26 Tr. 83:14-25.  The only evidence the

76

government could muster was testimony from Agent Ranahan stating that an individual is not obligated to send a Form 1099 for legal services rendered in connection with something outside that individual's "trade or business." *See* 2/10/26 Tr. 233:6-23. But Mr. Goldstein helped Mr. Maguire recover a poker debt, *see* 1/28/26 Tr. 68:13-74:18, and Mr. Maguire testified that playing poker was one of his trades, *see* 67:13-18 ("Q. Outside of acting, have you also made money in other ways? A. Yes. Q. Is one of those ways poker? A. Yes."); *see also* 82:10-17 (Mr. Maguire testifying that his "business manager" handled sending wires on his behalf). And, in all events, the government offered no evidence that Mr. Goldstein knew that, unlike his other corporate clients, Mr. Maguire was purportedly not obligated to prepare a Form 1099.

## D.    The Evidence Was Insufficient To Sustain a Conviction Based On The Employee Allegations

The indictment also alleged that Mr. Goldstein assisted the preparation of false returns by causing salary and/or benefits to be paid to employees who allegedly did little or no work (Counts 5, 7, and 8). The jury acquitted Mr. Goldstein of Count 5. Count 7 charged Mr. Goldstein with causing G&R to overstate its expenses and deductions by "us[ing] … $5,997 to pay healthcare premiums for an intimate partner." ECF No. 337-2, ¶ 72. The jury was not instructed that it could convict on that basis, however, *see* Instr. No. 41, because even the government conceded that it had not offered "any evidence regarding the women employees," 2/17/26 Tr. 129:11-13. Count 8 charged Mr. Goldstein with causing his Form 1040 to "falsely omit[] $1,800 in income by using G&R funds to pay the healthcare premiums" for a woman with whom he had "an intimate relationship." ECF No. 337-2, ¶ 77. As with Count 7, the government did not present any evidence—let alone sufficient evidence—for this to be a basis of conviction. For the avoidance of doubt, the defense requests a ruling that Mr. Goldstein cannot be retried on these allegations. *See Evans v. Michigan*, 568 U.S. 313 (2013) 318-19 (holding that "the Double Jeopardy Clause bars

77

retrial following a court-decreed acquittal," which includes any "'a ruling by the court that the evidence is insufficient to convict'"); 2/11/26 Tr. 56:17-18 (recognizing that "the issue with the women" has been "put out of the case"); Instr. No. 41 (not permitting the jury to convict on the basis of the employees allegations).

## VI.    JUDGMENT OF ACQUITTAL IS REQUIRED AS TO COUNTS 10-13

The Court instructed the jury that the government must "prove beyond a reasonable doubt . . . the due date for the tax year in question." Instr. No. 47. It thereby rejected the government's claim that the relevant dates were not disputed. *See* ECF No. 416, at 108. The instructions recounted that the indictment alleged the following dates for the corresponding tax years: 2017 (4/17/2018); 2019 (7/15/2020); 2020 (5/17/2021); and 2021 (4/18/2022). Instr. No. 47. In turn, the government introduced at trial a chart that listed those particular dates. *See* GX-50.

But the dates alleged by the indictment and proved by the government are wrong *as a matter of law* with respect to tax years 2019, 2020, and 2021. The correct due date for all three tax years is July 10, 2023. As the Federal Court of Claims recently held, Congress adopted a statute (26 U.S.C. § 7508A(d)) *automatically* extending, *inter alia*, the deadline to file or pay income tax from the date that the COVID-19 pandemic was declared a national disaster (January 20, 2020) until 60 days after the disaster was declared over. *See Kwong v. United States*, 179 Fed. Cl. 382, 386-89 (2025); *see also Abdo v. Comm'r of Internal Rev.*, 162 T.C. 148, 150 (2024). That statute therefore extended the due date for taxpayers as a matter of law until July 10, 2023. That is *after* the date that Mr. Goldstein paid his taxes in full for all three of those tax years. *See* GX76 (2019 taxes paid by April 29, 2021); GX77 (2020 taxes paid by December 8, 2022); GX78 (2021 taxes paid by October 16, 2022); *see also* ECF No. 337-2, ¶¶ 55, 73, 79 (indictment alleging that 2017, 2019, and 2020 tax liabilities were fully paid by end of 2022).

78

As discussed, the indictment did not allege the correct dates.  In turn, the government could not have attempted to prove the correct dates at trial.  The correct deadline is three years after the date alleged in the indictment for 2019; more than two years for 2020; and more than one year for 2021.  Any attempt at trial by the government to cite and prove the correct dates as a basis for convicting Mr. Goldstein would have amounted to an impermissible variance from the indictment.  *See* Instr. 15 (to avoid "variance," there must be "a substantial similarity between the dates alleged in the indictment and the date established by testimony or exhibits").

Mr. Goldstein is accordingly innocent of Counts 10 to 12, as a matter of law.  Relatedly, the jury itself failed to find that an element of the offense (the due date) was satisfied.  Further, no reasonable juror could find that Mr. Goldstein failed to file by the deadline.  The jury necessarily did not find that Mr. Goldstein failed to file by the deadline set by law, because it was not asked to do so.  Nor could Mr. Goldstein have "willfully" violated a legal duty that did not in fact exist.

This Court does not need to conduct the detailed statutory and regulatory analysis required to decide the question resolved by the Court of Federal Claims in *Kwong*.  The convictions on Counts 10 to 12 are invalid even if the Court were to conclude, contrary to *Kwong*, that the government proved the correct dates.  All that matters is that the question is disputed among the courts.  As discussed in detail in Part II-C, *supra*, a criminal tax conviction requires that the duty be clear.  Where the IRS itself regards the question as ambiguous, or a court has squarely considered and rejected the IRS's position in detail, that clarity is missing as a matter of law.  *United States v. Mallas*, 762 F.2d 361, 364 n.4 (4th Cir. 1985) ("The uncertainty of a tax law, like all questions of vagueness, is decided by the court as an issue of law.").

It makes no difference whether Mr. Goldstein was subjectively aware of the ambiguity in the due dates.  The duty itself was objectively too uncertain to create criminal liability.  The Fourth Circuit has thus held:

> As a matter of law, [a] defendant cannot be guilty of willfully evading and defeating income taxes on income, the taxability of which is so uncertain that even co-ordinate branches of the United States Government plausibly reach directly opposing conclusions.  As a matter of law, the requisite intent to evade and defeat income taxes is missing.  The obligation to pay is so problematical that defendant's actual intent is irrelevant.  Even if she had consulted the law and sought to guide herself accordingly, she could have had no certainty as to what the law required.  It is settled that when the law is vague or highly debatable, a defendant–actually or imputedly–lacks the requisite intent to violate it.

*United States v. Critzer*, 498 F.2d 1160, 1162 (4th Cir. 1974).  Other courts of appeals agree that the defendant cannot be convicted "regardless of the defendant's actual reliance on that case law," because the law is "objectively ambiguous . . . so that it fails to provide fair notice as a matter of law."  *Harris*, 942 F.2d at 1132 n.6 (citing *James v. United States*, 366 U.S. 213, 221-22 (1961)).  In holding that "the relevance of a dispute in the law does not depend on whether the defendant actually knew of the conflict," courts reason that "[t]o hold otherwise would advocate convicting an unsophisticated taxpayer who failed to seek expert advice as to whether certain income was taxable while setting free a wise taxpayer who could find advice that taxes were not due on the identical type of debatably taxable income."  *United States v. Garber*, 607 F.2d 92, 98 (5th Cir. 1979).

## CONCLUSION

For the reasons set forth herein, the Court should enter a judgment of acquittal or, in the alternative, vacate the judgment as to those counts and grant a new trial.

81

Dated: March 23, 2026

Respectfully submitted,

/s/ *Jonathan I. Kravis*
Jonathan I. Kravis (Bar No. 31556)
Stephany Reaves (Bar No. 19658)
Sarah E. Weiner (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500E
Washington, DC 20001
(202) 220-1100
Jonathan.Kravis@mto.com
Stephany.Reaves@mto.com
Sarah.Weiner@mto.com

Adeel Mohammadi (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
Adeel.Mohammadi@mto.com

*Attorneys for Defendant Thomas Goldstein*