**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. LKG-25-6** |
| | * | |
| *THOMAS C. GOLDSTEIN,* | * | |
| | * | |
| *Defendant.* | * | |

\*\*\*\*\*\*\*\*

**<u>DEFENDANT THOMAS C. GOLDSTEIN'S</u>**
**<u>OBJECTIONS TO U.S. PROBATION'S GUIDELINES CALCULATION</u>**

**TABLE OF CONTENTS**

**Page**

I.   THE STATEMENT OF FACTS PROVIDED BY THE GOVERNMENT AND ADOPTED BY THE PSR DOES NOT ACCURATELY REFLECT THE TRIAL ...........1

    A.   Conviction Counts ....................................................................................3

        1.   Count 1 – Tax Evasion 2016.........................................................3

        2.   Count 3 – Aiding & Assisting False Return 2017 (Form 1120-S) ..............6

        3.   Count 7 – Aiding & Assisting False Return 2019 (Form 1120-S) ..............7

        4.   Count 8 – Aiding & Assisting False Return 2020 (Form 1040).................8

        5.   Count 9 – Aiding & Assisting False Return 2021 (Form 1040).................8

        6.   Counts 10 to 13 – Willful Failure To Pay (2017, 2019-2021)....................8

        7.   Counts 14 to 16 – False Statements On Mortgage Application...................9

    B.   Acquittal Counts .....................................................................................10

        1.   Count 2 – Aiding & Assisting False Return 2017 (Form 1040)................10

        2.   Count 4 – Aiding & Assisting False Return 2018 (Form 1040)................11

        3.   Count 5 – Aiding & Assisting False Return 2018 (Form 1120-S) ............11

        4.   Count 6 – Aiding & Assisting False Return 2019 (Form 1040)................12

II.  THE PSR FAILED TO CALCULATE TAX LOSS ...........................................13

III. THE PSR INCLUDES UNSUPPORTED ENHANCEMENTS.....................................17

    A.   Money transfers between known accounts and failures to disclose information do not amount to "sophisticated means."...........................................17

    B.   Mr. Goldstein did not obstruct, or attempt to obstruct, justice. ...........................20

IV.  THE CORRECT GUIDELINES CALCULATION IS SIGNIFICANTLY LOWER .....................................................................................................24

    A.   Tax Offenses.........................................................................................24

    B.   Mortgage Offenses.................................................................................25

    C.   Multiple Count Adjustment ......................................................................25

    D.   Adjustments That Decrease The Base Offense Level.........................................25

    E.   Guidelines Range ...................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*United States v. Catone*,
  769 F.3d 866 (4th Cir. 2014) ........................................................................................13

*United States v. Morgan*,
  942 F.2d 243 (4th Cir. 1991) ..........................................................................................1

*United States v. Smith*,
  62 F.3d 641 (4th Cir. 1995) ..........................................................................................23

*United States v. Wolf*,
  860 F.3d 175 (4th Cir. 2017) ........................................................................................20

SENTENCING GUIDELINES RULES

USSG § 1B1.3(c) ...........................................................................................................14

USSG § 2T1.1 ..........................................................................................................18, 19

USSG § 2T4.1 .................................................................................................................24

USSG § 3C1.1 .................................................................................................................22

USSG § 6A1.3 .............................................................................................................1, 13

FEDERAL RULES

Fed. R. Crim. P. 32(I)(3)(b) ............................................................................................1

OTHER AUTHORITIES

*Collections, Activities, Penalties and Appeals*: *Table 27*, IRS (last updated Apr.
  30, 2026), https://www.irs.gov/statistics/collections-activities-penalties-and-
  appeals (reporting that nearly 15 million taxpayers filed returns with
  additional tax due in 2024) .........................................................................................17

## DEFENDANT THOMAS C. GOLDSTEIN'S
## OBJECTIONS TO U.S. PROBATION'S GUIDELINES CALCULATION

The appropriate guidelines range in this case is 15 to 21 months based on an offense level of 14 and criminal history category one, applying the most reasonable estimate of the felony tax loss supported by the jury's verdict and the evidence: approximately $126,527.50.[1] The defense submitted objections to the Probation Officer on April 28, 2026. *See* Attachment A, Defense Objections to PSR. Those detailed objections were summarized in a two-paragraph addendum. *See* PSR at 67. Mr. Goldstein files these objections so that the Court can resolve the disputes. *See* USSG § 6A1.3.

## I. THE STATEMENT OF FACTS PROVIDED BY THE GOVERNMENT AND ADOPTED BY THE PSR DOES NOT ACCURATELY REFLECT THE TRIAL

The government proceeded to trial on nine felony tax counts, each of which alleged multiple distinct theories of underlying conduct, four misdemeanor tax counts, and three mortgage fraud counts. ECF No. 239. Although the defense requested a special verdict form so that the parties would have clarity about the jury's findings for the underlying tax conduct, the government opposed. ECF No. 315, No. 418, No. 419. As a result, the Court must make factual findings regarding what underlying conduct supports the convictions. *See* Fed. R. Crim. P. 32(I)(3)(b) ("At sentencing, the court . . . must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing."); *see also United States v. Morgan*, 942 F.2d 243, 246 (4th

---

[1] As explained below, as a formal matter, the tax loss estimate for this case is just over $3.6 million, resulting in a base offense level of 24. That amount, however, includes approximately $3.5 million in tax loss for the misdemeanor offenses (Counts 10 to 13) which Mr. Goldstein paid in full, with penalties and interest, years before his indictment. A guideline range that uses only the felony tax convictions supported by the evidence is a significantly more useful baseline for the Court, particularly with an eye towards avoiding unfair sentencing disparities.

1

Cir. 1991) (vacating and remanding sentence where the court adopted the presentence report without adequately resolving objections).

Here, the most reasonable assessment of the evidence presented at trial, the jury's mixed verdict, and the requirement that the jury must agree unanimously on affirmative acts that occurred after January 1, 2018, is that the jury reached unanimity on the following factual theories:

- Count 1: Tax Evasion (2016) – transferred funds to IOLTA account

- Count 3: Aiding & Assisting Preparation of False Return (2017 Form 1120-S) – incorrectly deducted personal payment of $175,000 to Napoli Shkolnik

- Count 7: Aiding & Assisting Preparation of False Return (2019 Form 1120-S) – incorrectly deducted personal payment of $170,000 to Chuck Pacheco

- Count 8: Aiding & Assisting Preparation of False Return (2020 Form 1040) – omitted virtual currency disclosure

- Count 9: Aiding & Assisting Preparation of False Return (2021 Form 1040) – omitted virtual currency disclosure

At the same time, the jury acquitted on four felony tax counts. These acquittals were consistent with evidence at trial that failed to support, and even contradicted, the government's theories on the conduct underlying those counts. The government failed to prove that Mr. Goldstein aided or assisted the preparation of a false return with respect to:

- Count 2: Aiding & Assisting Preparation of False Return (2017 Form 1040) – $3,400,000 gross gambling winnings; $215,971 401(k) distribution; and $263 savings account interest

- Count 4: Aiding & Assisting Preparation of False Return (2018 Form 1040) – $968,000 alleged cash gambling winnings; and savings account interest

- Count 5: Aiding & Assisting Preparation of False Return (2018 Form 1120-S) – $125,000 Napoli Shkolnik legal fee income; $968,000 alleged Paul Phua legal fee income; and $1,000,000 alleged Paul Phua legal fee income

- Count 6: Aiding & Assisting Preparation of False Return (2019 Form 1040) – $359,000 gross gambling winnings

The jury also convicted Mr. Goldstein on Counts 10 to 13, which alleged a willful failure to pay taxes on time.  Finally, the jury convicted Mr. Goldstein of Counts 14 to 16, which alleged that Mr. Goldstein made false statements on a mortgage loan application.

### A.    Conviction Counts

#### 1.    Count 1 – Tax Evasion 2016

The government's Count 1 theory did not require proof that Mr. Goldstein underreported his 2016 income, because the government argued that it could prove evasion of *payment* (as opposed to evasion of *assessment*) even if the 2016 return accurately reflected Mr. Goldstein's income.  2/17/26 Tr. 189:2-5.  The jury was likewise instructed that conviction required unanimity on *one* affirmative act of evasion after January 1, 2018.  Final Jury Instructions No. 35.  Consequently, to return a conviction, the jury had to unanimously find at least one post-January 1, 2018 affirmative act; it did not need to consider the earlier allegations to convict.

Count 1 resulted in **no tax loss** because the government's only factually viable post-January 1, 2018 affirmative act theory was that Mr. Goldstein temporarily transferred retirement funds into an IOLTA account in 2021 while still owing 2016 taxes.  The government presented bank records demonstrating that Mr. Goldstein and his wife transferred money to the firm IOLTA account before they purchased a new home.  The money was in the IOLTA account for a long weekend.  *See* Attachment B (2021 Use of IOLTA Account).  The government also questioned multiple witnesses about IOLTA accounts, including suggesting that it was an ethics violation for Mr. Goldstein to transfer personal funds into the account.  1/20/26 Tr. 124:5-7 (Kevin Russell); 1/21/26 Tr. 111:7-15 (Darren Robbins); 222:4-11 (Jon Levitan); 1/22/26 Tr. 60:25-65:15 (Daniel Woofter); 2/2/26 Tr. 181:1-24 (Angie Gou).  And although the IRS Tax Transcripts show that Mr. Goldstein's 2016 payment plan was not canceled until *after* he purchased the home and paid his tax liability, GX 73, the government presented an email in

3

which one of Mr. Goldstein's accountants incorrectly claimed the payment plan had been canceled. GX 504. Moreover, in closing, the government emphasized the theory that Mr. Goldstein transferred money into the firm's IOLTA account to evade payment of taxes. 2/18/26 Tr. 68:5-21. The defense disputes that this was a *legally* valid tax theory of tax evasion, as explained at trial and in post-trial briefing. Moreover, the defense disputes that Mr. Goldstein intended to evade payment of taxes. But the fact that the money was transferred was not in dispute, and it is the most likely basis of the jury's conviction.

The government's remaining theories of post-January 1, 2018 affirmative acts were hotly contested, and arguably rejected, at trial. First, the government alleged that Mr. Goldstein made false statements to IRS Collection Officer Yvette Parrish. However, Officer Parrish testified that she discussed only the outstanding balance owed, not the source of the 2016 income. 1/28/26 Tr. 170:15-19 (testifying that when she wrote about Mr. Goldstein's "balance" she was not "discussing the source of the income" but that she "talked about what he owed"). There was no reason for the jury to resolve the parties' disputed interpretations, and Officer Parrish's memory and testimony were too ambiguous to find that Mr. Goldstein affirmatively lied. Second, the government alleged that Mr. Goldstein made false statements to IRS agents in 2020. But the government's witness, Agent John McDonald, acknowledged ambiguity in his recollection of Mr. Goldstein's statements—which the government chose not to record—and even conceded that the defense's recollection better matched the government's contemporaneous notes. *See, e.g.*, 2/5/26 Tr. 49:1-8 (Agent McDonald acknowledging that DX-622, his handwritten notes, say Mr. Goldstein "*doesn't*" play poker with investors as of 2020, not that he only played poker with investors in the games against Alec Gores). Third, the government suggested in closing that using foreign bank accounts could be another affirmative

4

act that brought Count 1 within the statute of limitations, but there was no evidence to support that claim: Mr. Goldstein's use of a Montenegrin bank account in 2018 and 2019 does not in any way relate back to his 2016 taxes.

Finally, setting aside the fact that the jury may have never reached the government's theory about 2016 gambling—because it was beyond the statute of limitations—the contemporaneous text messages that Mr. Goldstein sought to introduce at trial definitively discredit the government's evasion of assessment theory. As a preliminary matter, every witness that the government called to testify about Mr. Goldstein's 2016 gambling agreed that Mr. Goldstein had investors in the games against the Chairman, Alec Gores, and Tango. *See, e.g.*, 1/15/26 Tr. 106:4-10, 112:12-19, 121:1-7, 132:10-19 (Keith Gipson); 196:21-24 (Alec Gores); 1/22/26 Tr. 206:23-207:25 (Alfred DeCarolis); 1/29/26 Tr. 83:18-84:6 (Rick Solomon). Consequently, there should be no dispute that while Mr. Goldstein's opponents lost approximately $50 million in 2016 poker games, that is not the amount of taxable income Mr. Goldstein personally won. Mr. Goldstein testified as to estimates of how much he won and lost, and his current understanding that he actually overreported gambling in 2016. And Mr. Goldstein's contemporaneous text messages, though excluded at trial on hearsay grounds, corroborate that testimony. *See* Attachment C (Contemporaneous Messages). The numbers within the messages demonstrate that, when accurately calculated, Mr. Goldstein was a net poker loser in 2016 by over $2.6 million—swallowing any errors he made in underreporting other 2016 income. *See* Attachment D (2016 Poker Totals).

More to the point, and regardless of their truth, the messages corroborate Mr. Goldstein's understanding that he did not *willfully* underreport his gambling income for 2016. Instead, Mr. Goldstein's belief at the time was that (1) Paul Phua had a significant share of the

5

Alec Gores games (more than $9 million); (2) Paul Phua's assistant's ledger tracked Mr. Goldstein's overseas wins and losses (over $4.4 million in overseas gambling losses, leaving about $750,000 net wins that Mr. Goldstein did include in his taxes); and Tango did not pay Paul Phua for the games he lost until 2017.

### 2. Count 3 – Aiding & Assisting False Return 2017 (Form 1120-S)

The only conduct supported by the verdict and the evidence for Count 3 was the improper classification of a $175,000 payment to Napoli Shkolnik as a business expense instead of a personal expense.[2]  Multiplied by the government's calculation of Mr. Goldstein's effective tax rate for 2017, 38.35%, this resulted in **tax loss of approximately $67,112.50**.  See GX-50 at 3 (Summary of Tom Goldstein's Effective Tax Rates).  The evidence demonstrated that Mr. Goldstein asked his assistant to make a payment to Napoli Shkolnik, GX 1077, without explicitly stating whether it was for a personal or business purpose.  The government relied on evidence that Mr. Goldstein "could have told [his assistant] $175,000 . . . to Napoli Shkolnik was either a personal expense or business expense," emphasizing a theory that Mr. Goldstein should have known it would be mischaracterized.  2/18/26 Tr. 74:22-75:5.

The separate allegation involving $250,000 in legal fee income from Robbins Geller was not supported by a preponderance of the evidence.  The jury acquitted Mr. Goldstein of a substantially similar allegation in Count 5, crediting his position that he expected legal fee income to be reported to his accountants and the IRS through a Form 1099.  *See* p. 12, *infra*. The government acknowledged at trial that legal fee payments should be reported to both the IRS and the payee on a Form 1099 regardless of the receiving account.  2/10/26 Tr. 46:14-16 (Agent Ranahan).  Documentary evidence also showed that Robbins Geller issued Goldstein &

---

[2] Mr. Goldstein maintains that he did not willfully deduct any mischaracterized payments as business expenses, but does not dispute that he directed personal payments to be made.

Russell a Form 1099 and that Mr. Goldstein provided W-9 information to Robbins Geller for tax reporting purposes.  DX 226; DX 568.

### 3.    Count 7 – Aiding & Assisting False Return 2019 (Form 1120-S)

The only conduct supported by the verdict and the evidence for Count 7 was the misclassification of a $170,000 payment to Chuck Pacheco as a business expense rather than a personal expense.  Multiplied by the government's calculation of Mr. Goldstein's effective tax rate for 2019, 34.95%, this resulted in **tax loss of approximately $59,415**.  *See* GX 50 at 3.  As with Count 3, the government presented evidence that Mr. Goldstein "knew how to classify personal expenses paid from the firm account" and that it was subsequently misclassified in the absence of explicit instructions.  2/18/26 Tr. 60:15-19; GX 542.

The government did not prove the separate allegation concerning $235,000 in legal fee income from Paul Phua.  The evidence established that the funds were deposited into Mr. Goldstein's Montenegrin bank accounts, but then transferred into a U.S. firm account monitored by his accountants.  GX 425.  The accountants testified that incoming funds were ordinarily treated as legal fee income by default.  2/9/26 Tr. 166:20–167:7 (Ian Shuman).  The accountants themselves could not explain why the payment was instead categorized as a reduction to shareholder distributions, and the government presented no evidence that Mr. Goldstein knew of the accounting error before the 2019 returns were filed.  *See* GX 22.

### 4.       Count 8 – Aiding & Assisting False Return 2020 (Form 1040)

Count 8 produced **no tax loss** because the only allegation supported by a preponderance of the evidence concerned Mr. Goldstein's answer of "no" to the virtual currency question on his 2020 Form 1040—conduct that did not affect the amount of tax due.[3]

The government failed to prove the other allegation involving $93,180 in gross gambling winnings, as demonstrated by the acquittals on Counts 2 and 6. *See* pp. 10-12, *infra* (discussing acquittals on gross gambling winnings allegations).

### 5.       Count 9 – Aiding & Assisting False Return 2021 (Form 1040)

Count 9 produced **no tax loss** because the only allegation supported by a preponderance of the evidence concerned Mr. Goldstein's answer of "no" to the virtual currency question on his 2021 Form 1040—conduct that did not affect the amount of tax due.

The government failed to prove the allegations concerning both $500,000 in legal fee income from Tobey Maguire and $267,000 in gross gambling winnings. With respect to the income from Mr. Maguire, the jury acquitted on similar allegations in Count 5 because Mr. Goldstein reasonably expected the legal fee payments to be reported through Forms 1099. *See* p. 12, *infra*. And with respect to the gross gambling winnings, the government failed to prove those allegations, as demonstrated by the acquittals on Counts 2 and 6. *See* p. 10-12, *infra* (discussing acquittals on gross gambling winnings allegations).

### 6.       Counts 10 to 13 – Willful Failure To Pay (2017, 2019-2021)

The government presented evidence that Mr. Goldstein spent money on luxury trips, vehicles, poker debts, and other people while at the same time owing a balance to the IRS.

---

[3] Mr. Goldstein maintains that he did not *willfully* fail to disclose this information; but does not dispute that he had cryptocurrency in 2020 and 2021 and that disclosure box was not checked on his tax returns.

1/28/26 Third Joint Stipulations of Fact.  Mr. Goldstein's defense was that he did not know late payment, with penalties and interest, violated a known legal duty.  2/12/26 Tr. 14:6-24.  It was undisputed that Mr. Goldstein paid all outstanding liabilities for the years covered by Counts 10 through 13, including penalties and interest, well before indictment.  The 2017 and 2019 liabilities were paid by April 2021, while the 2020 and 2021 liabilities were paid by December and October 2022, respectively.  GX 74; GX 76; GX 77; GX 78.  Mr. Goldstein also made substantial payments toward prior tax liabilities between 2016 and 2021 while operating under an IRS installment plan, paid his 2018 taxes on time, and paid his 2021 taxes only a few months late.  GX 72; GX 73; GX 75; GX 78.  In total, Mr. Goldstein paid the IRS over $7 million for tax years 2016 through 2021, including over $1.4 million in penalties and interest.  *See* Attachment E (Filing History and Payment Timing).

### 7.    Counts 14 to 16 – False Statements On Mortgage Application

With respect to Counts 14 through 16, Mr. Goldstein did not dispute that debts to Stewart and Linda Resnick and to Bob Safai were omitted from 2021 loan applications, but instead argued that venue was improper.  2/12/26 Tr. 188:3-11.  He testified that he was in the Virgin Islands when the second First Savings Mortgage ("FSM") application was submitted and in Washington, D.C. when he closed on the NFM Lending loan.  2/12/26 Tr. 121:10-14; 188:19-23; 126:13-19.  Moreover, the NFM Lending closing documents, themselves, indicated that they were signed in Washington, DC.  *See* GX 10 at 71, 96, 119, 122.  For the FSM applications, the government introduced IP address evidence tying the submission to Mr. Goldstein's Maryland residence.  1/29/26 Tr. 141:21-148:23.  But the government did not refute the flight records showing that, for at least the second FSM application (relevant to Count 15), Mr. Goldstein was in the Virgin Islands when the application was submitted.  GX 886 at 550; 852.  Instead, for Count 15 the government presented evidence that Mr. Goldstein forwarded emails from FSM to

9

his wife on the day that the second FSM application was submitted. GX 1096, GX 1097, GX 1098. Finally, for Count 16, the government solicited testimony that Maxwell Howell, a real estate attorney, mailed the closing documents from his office in Maryland. 2/5/26 Tr. 83:9-21.

The FSM applications were denied, and no funds were disbursed. Mr. Goldstein and his wife did receive approximately $1.98 million from NFM Lending, secured by a home valued at approximately $2.65 million, and they remained current on payments through trial. GX 10 at 2; 2/9/26 Tr. 134:17-24.

### B.   Acquittal Counts

#### 1.   Count 2 – Aiding & Assisting False Return 2017 (Form 1040)

The jury acquitted on all of the allegations relating to Mr. Goldstein's personal tax return for 2017. At trial, the government sought to prove that Mr. Goldstein willfully omitted $3.5 million gambling income, relying on an email sent to his accountant indicating that Mr. Goldstein had "[n]o gambling winnings" for 2017. GX 24. Importantly, for 2017, the parties stipulated that Mr. Goldstein won millions of dollars gambling, but that he lost more than he won. 1/9/26 Joint Stipulations of Fact. The dispute centered around whether Mr. Goldstein knew to report *gross* gambling wins even in a year where he had no *net* gambling wins. IRS Agent Gary Libbin conceded that Mr. Goldstein was allowed to deduct gambling losses from gambling wins in the same year, and would have no taxable gambling income if losses exceeded wins. 1/22/26 Tr. 85:16-23.

Although the government presented evidence regarding a 2012 tax audit where Mr. Goldstein's accountant was asked about Mr. Goldstein's gambling, IRS Officer Libbin testified that he never directly advised Mr. Goldstein regarding the requirements for reporting gambling income. 1/22/26 Tr. 94:3-13. Moreover, Mr. Goldstein's accountant at the time, Bill Caldwell, testified that he would have advised Mr. Goldstein there was *nothing to report* if Mr.

10

Goldstein's losses exceeded his wins in a given year.  1/22/26 Tr. 117:25-118:11.  Mr. Goldstein's later accountant, Walter Deyhle, testified that he never advised Mr. Goldstein about reporting gambling income in a year where Mr. Goldstein was a net loser.  2/4/26 Tr. 102:11-16.  This record clearly supported acquittal on Count 2, and other counts that alleged willful failure to report gross gambling wins.

The government also alleged that Mr. Goldstein willfully omitted a 401(k) distribution and savings account interest income from his taxes, but presented no testimony to support the allegation that Mr. Goldstein *willfully* omitted that income.

### 2.    Count 4 – Aiding & Assisting False Return 2018 (Form 1040)

The jury acquitted Mr. Goldstein of all charges related to the 2018 tax year, and the evidence at trial supported those verdicts.  Count 4 rested primarily on the allegation that approximately $1 million Mr. Goldstein brought into the United States from Hong Kong in October 2018 constituted taxable income, although the government shifted between theories that the money was legal fee income or gambling income.  *See, e.g.*, 1/22/26 Tr. 58:3-60:14 (Jon Levitan); 140:24-141:1 (CBP Officer Kareem Foy); 2/3/26 Tr. 11:1-12:8 (Sarah Harrington). The government's evidence consisted largely of disputed recollections by a customs officer and ambiguous statements overheard at the law firm, while contemporaneous text messages referred to the money as a loan.  DX 462.1.  The jury clearly credited Mr. Goldstein's testimony, corroborated by the contemporaneous records.

### 3.    Count 5 – Aiding & Assisting False Return 2018 (Form 1120-S)

Count 5 similarly relied on the allegation that the Hong Kong cash and a separate $1 million wire from Paul Phua were income rather than loans.  The government presented no evidence that the wire was payment for legal services, while the defense introduced contemporaneous messages referring to both transfers as loans.  DX 738.1.  The Court admitted

11

a redacted version at trial; the timing and context of the unredacted version make clear that Mr. Goldstein was thanking Mr. Phua for the $1 million transfer sent through the Montenegro account, and asking Mr. Phua for the additional $1 million he picked up in cash less than a week later.  *See* Attachment F (Unredacted DX 738.1) (Mr. Goldstein asking Paul Phua in October 2018, "Do you happen to know whether the remainder of the loan will be okay with Richard? . . . .  The $1m you already lent to me is of course very kind.  Doing another $1m is extremely generous too.  If it's possible.").  The government's post-trial "new evidence"—an invoice allegedly connected to the wire transfer—was not disclosed during discovery, did not originate from Mr. Goldstein or his firm, and bears numerous indicia of unreliability, including unusual wording, inconsistent payment instructions, and no evidence that Mr. Goldstein ever saw or transmitted it.  4/9/26 Presentence Investigation Report at 40-41.  It is insufficient to support this allegation, particularly after acquittal.

Separately, the jury rejected the government's theory that Mr. Goldstein intentionally concealed legal fee income through a $125,000 "swap" with Paul Napoli.  The evidence showed that Mr. Goldstein reasonably expected any legal fee payments to be reported through Forms 1099 and used by his accountants in preparing the returns.  2/12/26 Tr. 104:23-105:9, 108:17-25.  Moreover, Mr. Napoli's testimony confirmed that Mr. Goldstein never asked for an offset, and that Napoli Shkolnik never informed Mr. Goldstein about the offset.  1/21/26 Tr. 161:2-162:1.

### 4.    Count 6 – Aiding & Assisting False Return 2019 (Form 1040)

The jury acquitted Mr. Goldstein on Count 6 for the same reasons as the jury acquitted Mr. Goldstein in Count 2: there was no evidence Mr. Goldstein knew he should report gross gambling wins in a year where he was a net gambling loser.  *See* p. 10-11, *supra*.

12

**II.    THE PSR FAILED TO CALCULATE TAX LOSS**

For at least four reasons, it would be error for the Court to adopt the statement of facts in the PSR for purposes of determining the appropriate tax loss, enhancements, and advisory Guidelines range.

First, the statement of facts in the PSR—and the Probation Officer's resulting assessment of tax loss, enhancements, and Guidelines calculations—rests almost entirely on the government's one-sided characterization of the trial evidence. Although Mr. Goldstein was convicted on certain counts, the jury returned a mixed verdict and acquitted him of four felony tax charges. Yet the government's factual narrative proceeds as though it proved every allegation it advanced at trial, notwithstanding its shifting theories, allegations unsupported by evidence, and the jury's rejection of multiple portions of the government's case. The PSR itself states that "probation trusts the Government to provide us with factual information" because the Probation Officer "was not present to listen to testimony." PSR at 67. But the Court must independently resolve disputed facts that are "important to the sentencing determination." USSG § 6A1.3. *See also United States v. Catone*, 769 F.3d 866, 877 (4th Cir. 2014) (vacating sentence because "an estimate that is unsupported by any evidence cannot be reasonable"). The trial record supports a tax loss that is only a fraction of the amount asserted by the government and does not support the sophisticated-means or obstruction enhancements. Mr. Goldstein objected to the facts and enhancements in detail, *see* Attachment A; those objections were referenced in but not attached to the final PSR.

Second, the government's tax loss calculation improperly relies on acquitted conduct and factual theories that the jury necessarily rejected. The government's calculation asserts a tax loss exceeding $16 million, without explaining how that figure was derived or how it can be reconciled with the jury's verdict. Indeed, this tax loss exceeds even the amounts the

13

government presented at trial through its summary witness, Agent Ranahan.  For example, for tax year 2016—the only year in which the government (incorrectly) alleged Mr. Goldstein underreported the Chairman, Gores, and Tango games, the government's agent calculated the *total* taxes outstanding as $1,452,805.  *See* GX-427.  Yet instead of providing the Court with a reasoned estimate of tax loss, supported by the evidence, it appears the government provided an estimate that *presumes* the accuracy of each of its allegations—including the nonsensical allegation that Mr. Goldstein won approximately $50 million playing poker in 2016.  *See* pp. 5-6, *supra*.  As a result, the figures in the PSR fail to aid the court in calculating tax loss for guidelines purposes.

The Guidelines generally prohibit reliance on acquitted conduct except in limited circumstances where the conduct forms part of the same offense behavior.  Specifically, "[r]elevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction."  USSG § 1B1.3(c).  Here, that means the Court cannot consider the acquitted conduct in Count 2 (2017 gross gambling wins, 401(k), savings interest), Count 4 (2018 money brought in from Hong Kong), Count 5 (2018 money brought in from Hong Kong and through Montenegrin account),  and Count 6 (2019 gross gambling wins).  These acquitted allegations involved distinct factual theories tied to separate tax years and separate returns—and instead of supporting conviction counts, as explained *supra* they demonstrate that Mr. Goldstein was functionally acquitted of additional conduct.  For example, the allegations concerning the 2017 Form 1040 do not establish wrongdoing with respect to the 2017 1120-S return (or any other year), and the allegations concerning the 2019 individual return do not establish wrongdoing as to the 2019 corporate return (or any other year).  Likewise, the acquitted 2018

14

allegations cannot properly be used to inflate the tax loss for unrelated years.  The Court should especially disregard the government's renewed assertion that the $1 million transferred to Mr. Goldstein's Montenegrin account in 2018 was taxable income because it is unreliable and because the jury acquitted Mr. Goldstein of that allegation.  *See* pp. 11-12, *supra*.

Third, the rule of lenity and basic fairness counsel against treating the verdict as though the jury adopted every factual allegation the government presented within a count of conviction. To do so, without a careful analysis and application of the evidence, would violate due process. At the charging conference, this Court acknowledged that "the defense's proposed special verdict form" tried "to break out the factual allegations or the affirmative acts that the government is charging in the case."  2/18/26 Tr. 30:5-7.  This Court went on to note the "need for clarity about the basis for the jury's verdict."  *Id*. at 30:10-11.  But the government opposed. *Id*. at 31:1-23.[4]  As a result, the government should not now be permitted to argue that it proved every allegation despite the mixed verdict the jury returned.

This was not a case where the jury did, or could, credit all of the government's allegations.  The government itself had shifting theories about Mr. Goldstein's underlying conduct—indeed, the government failed to appreciate (or investigate) basic facts that refuted its core theories.  For example, the government opened on the idea that Mr. Goldstein hid the Alec Gores poker income from his accountant.  That was false.  The trial evidence confirmed that Mr. Goldstein told Mr. Deyhle about his winnings from Gores (including his shares paid to investors).  *See* DX-317; GX-148.  Indeed, that evidence was so conclusive that it caused the

---

[4] At the government's behest, the Court rejected the defense's request for a special verdict on all felony tax counts.  In the alternative, the Court was willing to use a special verdict form for only Count 1.  Mr. Goldstein declined that alternative to avoid jury confusion and prejudice that would result from a special verdict on only some of the felony tax allegations.  *See* 2/18/26 Tr. 29:12-38:7.

government to abandon the centerpiece of its opening statement—i.e., the theory that Mr. Goldstein "concealed" from GRF the fact that he "won $26 million" from Mr. Gores, 1/15/26 Tr. 44:18-45:1—and instead adopt the *directly opposite* position that Mr. Goldstein disclosed *only* his Gores winnings, *see* 2/18/26 Tr. 54:9-22.  During Walter Deyhle's testimony, the government conceded that it "didn't know about" the email disclosing more than $27 million in gambling winnings to Walter Deyhle, which it had in its possession for years, until after reviewing the defense exhibit list.  2/4/26 Tr. 105:18-23.

As another example, the government's opening narrative was that Mr. Goldstein used inexperienced office managers to handle the firm's accounting books and records as a method of evading taxes.  *See also* 1/20/26 Tr. 124:10-13 (government asking Kevin Russell, "Now, how did the office managers reconcile the firm's bank accounts with the firm's books and records?").  That was also false.  The office managers testified that "the entire time it was the accounting firm that was responsible for maintaining the accounting records in Quickbooks" and it "wasn't [the office manager's] job" to classify income or deductions.  1/20/26 Tr. 230:17-231:10 (Molly Runkle).  In a case where the government "realized it had to refine its narrative," 2/4/26 Tr. 107:6-9 (Sean Beaty), as its theories were debunked midtrial, the government cannot show that the jury convicted on more than the minimum conduct required.

Fourth, the misdemeanor failure-to-pay counts should not be considered as part of tax loss because they dramatically inflate the guidelines range beyond the statutory maximum for the misdemeanor offenses, and overstate the culpability of the tax offenses.  At the outset of sentencing, the Court must accurately calculate the guidelines—and as a formal matter, the misdemeanor tax loss is part of tax loss.  Nevertheless, it is undisputed that Mr. Goldstein paid the tax liabilities underlying those counts in full, along with penalties and interest, years before

16

indictment.  *See* pp. 8-9, *supra*.  It is likewise undisputed that millions of taxpayers each year pay penalties and interest for late tax payments through the ordinary civil tax system.  *See, e.g.*, *Collections, Activities, Penalties and Appeals*: *Table 27*, IRS (last updated Apr. 30, 2026), https://www.irs.gov/statistics/collections-activities-penalties-and-appeals (reporting that nearly 15 million taxpayers filed returns with additional tax due in 2024).  This misdemeanor conduct, typically handled entirely through civil proceedings, should not drive a years-long sentence.

For all of these reasons, the jury's verdict and the preponderance of the evidence support a tax loss of approximately $126,527.50 for the felony offenses and approximately $3,549,072.39 for the misdemeanor offenses.

## III. THE PSR INCLUDES UNSUPPORTED ENHANCEMENTS

### A. Money transfers between known accounts and failures to disclose information do not amount to "sophisticated means."

Even accepting the government's allegations, the conviction offenses did not involve sophisticated means.  The government asserts that Mr. Goldstein "used multiple foreign bank accounts and intricate financial transactions to execute and conceal his tax crimes."  That is factually inaccurate.  The only foreign bank accounts Mr. Goldstein had or used were the bank accounts with the United Capital Bank in Montenegro.  It is misleading to describe these as "multiple foreign bank accounts," as the evidence at trial established that Mr. Goldstein was simply complying with Montenegrin bank requirements: he had a business and personal bank account, and domestic and international accounts of each, as required by the bank.  GX 582, 1/21/26 Tr. 66:3–69:5 (explaining GX 582).

Importantly, Mr. Goldstein did not *use* these accounts *to commit or conceal* any tax crimes.  In 2016, Mr. Goldstein disclosed the bank accounts to his accountants when those accounts were created, and rather than using the accounts to conceal income, he used them to

17

transfer income to the United States that was reported on his taxes.  In 2018, Mr. Goldstein again disclosed the accounts to his accountants while using the accounts to repatriate money; this is the transfer as to which the jury credited Mr. Goldstein's testimony that it was a loan. And again in 2019, Mr. Goldstein disclosed the Montenegrin accounts to his accountants while repatriating money, and while his accountants failed to record the money as income, there is no evidence that Mr. Goldstein knew or intended for them to do so.  *See* p. 7, *supra* (discussing the $235,000 transfer from the foreign bank account to the US bank account which should have by default been classified as income).

Although the guidelines note "[c]onduct such as *hiding* assets or transactions, or both, through the use of offshore financial accounts" as an example of something that "ordinarily indicates sophisticated means," that is not the case here.  USSG § 2T1.1 cmt. n.5.  As detailed above, the accounts with the Bank of Montenegro were not used to hide assets or transactions, nor to do anything else that furthered or concealed the offense:  Mr. Goldstein repeatedly disclosed the bank accounts to his accountants, as well as to a civil IRS collections officer.  *See, e.g.*, GX 93 p. 15 (Form 433, which includes the Montenegrin bank accounts).  Indeed, the government repeatedly emphasized that Mr. Goldstein was not on trial for his failure to disclose those bank accounts because he did, in fact, disclose them—and his accountants admitted that they negligently failed to include them on Mr. Goldstein's tax returns.  *See, e.g.*, 2/4/26 Tr. 129:20-25 (government asking whether the FBAR disclosure that Walter Deyhle "failed to" make "would have made a difference" to Mr. Goldstein's tax liability).

Mr. Goldstein's transfer of money in 2021 to purchase his DC home also did not involve intricate financial transactions.  The transfer involved using retirement funds to purchase the home, and the testimony at trial established that the money was transferred to Mr. Goldstein's

18

business accounts so that his assistant was able to facilitate the transfer.  Even accepting the government's (legally impossible) allegation that the money was briefly transferred to the firm's IOLTA account for the purpose of evading payment, the IOLTA account was a pre-existing account known to Mr. Goldstein's assistant and accountants; it did not involve any complex transaction, nor concealing any information.

The assertion that using a VPN was sophisticated is also not supported by the evidence. The use of a VPN is extremely common technology used for security purposes, and also to access websites that are not available in a person's location.  Moreover, the use of the VPN did nothing to further or conceal alleged tax evasion.  Even under the government's version of facts, the VPN was used simply to access an international version of a cryptocurrency account—Binance.com—but Mr. Goldstein then transferred the money in that account to U.S.-based cryptocurrency exchanges.  *See, e.g.*, 1/29/26 Tr. 164:21-165:2 (Agent Nguyen explaining Mr. Goldstein transferred cryptocurrency to US-based accounts).  Moreover, Mr. Goldstein registered for the international cryptocurrency account with his real name and email address. GX 464 (Binance.com Registration Record).  In other words, nothing about using a VPN to access an international cryptocurrency account concealed the existence of cryptocurrency transactions or the value of the currency contained therein.  The false statement that Mr. Goldstein was convicted of aiding or assisting (under a theory that he was willfully blind to the requirement) was checking "no" to the question whether he had cryptocurrency transactions. *Which* cryptocurrency exchange Mr. Goldstein used is irrelevant for the purpose of that requirement.

Recognizing that "tax offenses always involve some planning," USSG § 2T1.1 cmt. background, the guidelines define sophisticated means as "*especially complex or especially*

19

*intricate* offense conduct pertaining to the *execution* or *concealment* of an offense." *Id.* § 2T1.1 cmt. n.5 (emphasis added).  In other words, the government cannot simply assert that the conduct was complex without supporting evidence that the conduct *furthered* the offense. Moreover, there must be "some means of execution that separates the offense . . . from the ordinary or generic." *United States v. Wolf*, 860 F.3d 175, 199 (4th Cir. 2017) (citation and internal quotation marks omitted).  But here, as noted above, the offense conduct at issue involves inadequate communication, understating income, overstating deductions, and spending money on personal expenses and debts rather than taxes, purportedly with the willfulness required by the tax code.  None of this conduct is complex or sophisticated.

### B.    Mr. Goldstein did not obstruct, or attempt to obstruct, justice.

The obstruction enhancement also does not apply because Mr. Goldstein has not "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing" of the offense.

First, Mr. Goldstein did not make false statements to IRS agents in 2020, and the government cannot prove otherwise by a preponderance of the evidence.  The government alleges that Mr. Goldstein obstructed justice by lying to criminal IRS agents by telling them (1) that $1 million he received in 2018 was a loan; (2) that $960,000 he brought back in cash in 2018 was a loan; (3) that his 2016 tax return was accurate; and (4) that he only had investors in the 2016 games against Alec Gores.  The jury acquitted Mr. Goldstein, however, of Counts 4 and 5, crediting his testimony that the transfers he received in 2018, through a Montenegrin bank account and in cash, were loans.  Those acquittals were supported by contemporaneous messages, discussed pp. 11-12, *supra*, confirming those funds were in fact loans.

As for the other two statements, the government cannot show by a preponderance of the evidence that Mr. Goldstein lied.  The government offered no evidence to substantiate the

20

allegation that Mr. Goldstein told the IRS agents that his "2016 Form 1040 was accurate."  ECF No. 337-2, ¶ 43.  In fact, the government never even asked Agent McDonald—the *only* government witness who testified about the October 2020 interview—whether Mr. Goldstein made such a statement.  *See generally* 2/4/26 Tr. 228:6-260:10 (direct examination); 2/5/26 Tr. 58:21-68:23 (redirect examination).  The government instead asked Agent McDonald, "What, if anything, did Mr. Goldstein say about his *responsibility* for the accuracy of his Forms 1040?"  2/4/26 Tr.  247:23-24 (emphasis added).  And Mr. Goldstein's answer did not represent anything about the accuracy of his 2016 return; rather, Mr. Goldstein simply "said [that] he understood that the forms and the tax returns were his responsibility."  *Id.* at 247:25-248:1.

Likewise, Mr. Goldstein did not tell the IRS agents that he "did not have investors in other poker games besides those in 2016 against [Alec Gores]."  ECF No. 337-2, ¶ 43.  What Mr. Goldstein *actually* said, as Agent McDonald confirmed in his testimony, was that Mr. Goldstein stated that "*after* 2016" there were no "other instances where there were investors."  2/5/26 Tr. 53:4-12 (emphasis added); *see also id.* at 53:18-25 (Q. "So I want to make sure I have your best recollection of . . . that conversation, and what I think I heard you say was that your understanding was that Mr. Goldstein was telling you that after 2016 he had no other investors.  Am I hearing that right?  A.  I do recall … a time line, so after 2016 does sound right.").  And that was entirely accurate: it is undisputed that the first year in which Mr. Goldstein played with investors was 2016, and at the time of his October 2020 interview with IRS agents, Mr. Goldstein had not played poker with investors since 2016.  *See* 2/11/26 Tr. 128:8-13, 129:23-130:2.

Agent McDonald's contemporaneous interview notes corroborate that Mr. Goldstein never said that the investors he had *in 2016* were exclusively invested in his games against Mr.

21

Gores.  Those notes record Mr. Goldstein as stating that he "*doesn't*"—present tense—"play poker with investors" anymore because he "[m]ade an agreement with [his] wife not to take risks like this."  2/5/26 Tr. 49:1-8 (emphasis added); *see* DX-622, at 11.  Those notes do not say that, *within the year 2016*, Mr. Goldstein had investors only in the Gores games.  *See id.* at 2/5/26 Tr. 49:8 (agreeing "that is what the words on that paper say"); *id.* at 50:11; *id.* at 52:10-17.  To be sure, it is possible that Agent McDonald subjectively *understood* Mr. Goldstein's statement that he had not played with investors before or after 2016 to mean that Mr. Goldstein had not played with investors in any games other than the Gores games.  But that's insufficient to demonstrate that Mr. Goldstein lied—and falls woefully short of evidence supporting a willful obstruction of the investigation.

For similar reasons, the evidence does not support the government's allegation that Mr. Goldstein made false statements to Officer Parrish in 2018.  *See* pp. 4-5, *supra*.  Importantly, for both the 2018 and 2020 statements, even if the government's allegations were accurate (they are not) this obstruction enhancement does not apply.  "[M]aking false statements, not under oath, to law enforcement officers" ordinarily is not covered by this enhancement.  USSG § 3C1.1 cmt. 5.  Such a statement, not under oath, must be "materially false" and "significantly obstruct[] or impede[] the official investigation or prosecution of the instant offense."  USSG § 3C1.1 cmt. 4.  None of these statements obstructed or impeded the investigation; the government just asserts that they were false.

Second, as explained in objections to Paragraphs 214-218, *see* Attachment A at 22, Mr. Goldstein did not offer things of value to Katie Bart for the purpose of impeding the investigation or deterring her cooperation.  At trial, Ms. Bart made clear that Mr. Goldstein never said or did anything to even imply that Ms. Bart should not cooperate with the IRS and

22

that Ms. Bart did, in fact, help Mr. Goldstein collect and produce documents to the IRS and speak with the IRS about this matter.  See, e.g., 2/2/26 Tr. 36:24-37:1 (confirming Ms. Bart helped Mr. Goldstein provide documents to the IRS).  Moreover, although the government introduced messages Ms. Bart sent to a friend in which she speculated about Mr. Goldstein's intent at the time, Ms. Bart unequivocally confirmed that her messages were entirely based on her own impression and colored by the bad experience she was having at the time.  *See, e.g.*, 2/2/26 Tr. 37:10-38:10 (confirming that Ms. Bart spoke with the IRS multiple times, that Mr. Goldstein never tried to stop her from doing so, and that her text messages were speculation).  Notably, prior to trial the government dismissed the charges directly relating to this allegation. *See* ECF No. 337.

Finally, it should be clear that the fact that Mr. Goldstein testified, and was nevertheless convicted, does not justify the obstruction enhancement.  The obstruction enhancement "does not apply automatically every time a criminal defendant who testifies at trial is convicted." *United States v. Smith*, 62 F.3d 641, 646-47 (4th Cir. 1995).  Rather, "[i]t may be that the defendant's specific statements on the stand were true, or were not intentionally false, or were not material."  *Id*.  And Mr. Goldstein was (and is) entitled to maintain his innocence.  Mr. Goldstein's testimony with respect to his 2016 poker winnings is consistent with contemporaneous evidence.  Although that evidence was excluded at trial, the Court can and should consider it for the purpose of sentencing.

Notably, the government did not even attempt to provide any factual response to those messages, and repeatedly shifted its theory with respect to Mr. Goldstein's 2016 poker earnings because it had not reviewed all of the relevant evidence prior to trial.  The government's shift to an evasion of payment theory for 2016, in both jury instructions and its arguments, further

23

evinces the fact that the government cannot prove even by a preponderance of the evidence that Mr. Goldstein's testimony about his 2016 poker winnings was false. With respect to Mr. Goldstein's testimony about his 2018 income, as explained *supra*, the jury acquitted on these counts because Mr. Goldstein had contemporaneous evidence showing that this money was received as a loan. And the government's evidence otherwise was unreliable: the outdated and inconsistent memories of witnesses who had no reason to recall the details of the transaction.

With respect to the watch Mr. Goldstein did not originally include as an asset, the government presented no evidence that Mr. Goldstein knew he should include an accessory like a watch in his financial disclosures to Pretrial Services, and the watch was irrelevant to a declaration regarding Mr. Goldstein's inability to pay his legal fees. The assertion that the omission of the watch was an attempt at obstruction, particularly when Mr. Goldstein knew the government was aware of the watch, is pure speculation.

In sum, Mr. Goldstein did not do anything to impede the administration of justice, and the obstruction enhancement does not apply.

## IV.    THE CORRECT GUIDELINES CALCULATION IS SIGNIFICANTLY LOWER

### A.    Tax Offenses

A reasonable estimate of the felony tax loss supported by the verdict and the evidence is $126,527.50. *See* Attachment A at 32-38 (Summary Table). This corresponds with a base offense level of 16 ("[m]ore than $100,000"). USSG § 2T4.1(F). As a formal matter, because the misdemeanor tax loss is $3,549,072.39, a reasonable estimate of the total tax loss is $3,675,599.89. This corresponds with a base offense level of 24 ("[m]ore than $3,500,000"). USSG § 2T4.1(J). As described above, the +2 adjustment for "sophisticated means" and the +2 adjustment "obstruction of justice" are not supported and should not be applied.

24

**B.**     **Mortgage Offenses**

The defense agrees with the PSR that the base offense level for False Statements on Loan Application is 7.

**C.**     **Multiple Count Adjustment**

Even with the correct tax offense levels, the defense agrees with the PSR that the mortgage offenses should be disregarded because the difference between the tax offense level and the mortgage offense level is 9 or more.  The correct combined offense level is 16 (including only felony tax loss) or as a formal matter 24 (including $3.5 million of misdemeanor tax loss).

**D.**     **Adjustments That Decrease The Base Offense Level**

The defense agrees with the PSR that the –2 adjustment applies because Mr. Goldstein has no prior criminal history and is a Zero-Point Offender.  The correct total offense level is 14 (including only felony tax loss) or as a formal matter 22 (including $3.5 million of misdemeanor tax loss).

**E.**     **Guidelines Range**

The correct guidelines range for Criminal History Category I is 15–21 months (offense level 14, including only felony tax loss) or as a formal matter 41–51 months (offense level 22, including $3.5 million of misdemeanor tax loss).

25

Dated: June 2, 2026

Respectfully submitted,

_/s/ Jonathan I. Kravis_

Stephany Reaves (Bar No. 19658)
Sarah E. Weiner (*pro hac vice*)
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Avenue NW, Suite 500E
Washington, DC 20001
(202) 220-1100
Stephany.Reaves@mto.com
Sarah.Weiner@mto.com

Jonathan I. Kravis (Bar No. 31556)
**LIU SHUR KRAVIS LLP**
607 14th Street NW, Suite 625
Washington, DC 20005
(202) 240-7100
jonathan.kravis@lskllp.com

Adeel Mohammadi (*pro hac vice*)
**MUNGER, TOLLES & OLSON LLP**
350 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
Adeel.Mohammadi@mto.com

*Attorneys for Defendant Thomas Goldstein*

26

## INDEX OF ATTACHMENTS

| | |
|---|---|
| Attachment A | Defense Objections to PSR (April 28, 2026) |
| Attachment B | 2021 Use of IOLTA Account |
| Attachment C | Contemporaneous Messages |
| Attachment D | 2016 Poker Totals |
| Attachment E | Filing History and Payment Timing |
| Attachment F | Unredacted DX 738.1 |

27