**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**THOMAS C. GOLDSTEIN,**<br><br>**Defendant.** | **CRIMINAL NO. LKG-25-0006** |

# UNITED STATES' SENTENCING MEMORANDUM

# TABLE OF CONTENTS

UNITED STATES' SENTENCING MEMORANDUM ........ 4
BACKGROUND ........ 5
I. Counts of Conviction and Presentence Report ........ 5
II. Factual Background ........ 6
A. 2012 Audit ........ 6
B. Tax Year 2016 ........ 7
C. Tax Years 2017 through 2019 ........ 14
D. Tax Years 2020 and 2021 ........ 18
E. False Mortgage Applications ........ 19
F. Tax Years 2022 through 2025 ........ 22
LEGAL STANDARD ........ 24
ARGUMENT ........ 28
I. The PSR correctly calculates a base offense level of 26 based on total tax loss of more than $9.5 million. ........ 28
A. Tax Loss from 2016 Evasion of Assessment ........ 30
B. Tax Loss from False Tax Returns ........ 35
C. Tax Loss from Evasion of Payment and Later Willful Failures to Pay ........ 40
D. Total Tax Loss ........ 43
II. The PSR correctly calculates the sentencing guidelines range as 78–97 months. ........ 44
A. Sophisticated Means ........ 44
B. Obstruction ........ 47
C. Total Tax Group Adjusted Offense Level ........ 52
D. Mortgage Fraud Group Offense Level ........ 52
E. Total Offense Level & Guidelines Range ........ 52
III. Under the § 3553(a) factors, Goldstein's conduct warrants a sentence of 97 months. 52
A. The Nature and Circumstances of the Offenses ........ 53
B. The History and Characteristics of the Defendant ........ 63
C. The Need to Reflect the Seriousness of the Offenses ........ 67
D. The Need to Avoid Unwarranted Sentence Disparities ........ 70
E. The Need to Afford Adequate Deterrence ........ 71
F. Restitution ........ 80
IV. The Appropriate Sentence ........ 83

CONCLUSION ........................................................................................................ 84

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**THOMAS C. GOLDSTEIN,**<br><br>**Defendant.** | **CRIMINAL NO. LKG-25-0006** |

**UNITED STATES' SENTENCING MEMORANDUM**

Defendant Thomas Goldstein is a highly trained attorney who perpetrated a sophisticated, multi-year scheme to hide his true income from the IRS, delay and evade payment on the income that he did report, and then stymie the criminal investigation into his tax crimes. Even after learning about that investigation, Goldstein continued hiding his true income each new year and habitually failed to pay his taxes when they were due. Even after indictment, he continued to flout the tax laws, not filing returns and not paying millions that he owed. And even after the jury convicted him of nine federal tax crimes, Goldstein filed a false 2025 Form 1040 and failed to pay more than a million dollars in self-assessed taxes due.

Goldstein's conduct, spanning 2012 to the present, is both flagrant and egregious. Between just 2016 and 2023, he hid more than $25,000,000 in income, costing the federal fisc more than $9.5 million in still-unpaid taxes. Through this and his obstinate refusal to pay taxes when due, Goldstein inflicted more than $16 million in harm on the government. Not content with the lifestyle he funded through these crimes and unphased by the criminal investigation, Goldstein also perpetrated a series of mortgage frauds, lying to two different lenders on three separate loan applications in an effort buy and keep a new, $2.6 million dollar home.

His motivation was singular: pure, unrelenting greed. Whether funneling gambling income through offshore bank accounts, shaving millions off his true law firm income, or lying to his lenders, Goldstein's crimes always sought to advance and maintain his exorbitant lifestyle, replete with Bentleys, globe-trotting vacations, and a $200,000 watch.

While Goldstein's criminal conduct results in an advisory Guidelines range of 78-97 months, his coldly calculated decisions to commit those crimes, brazen attempts to conceal them, and astounding subsequent conduct call for a sentence at the top of that range. Such a sentence reflects the nature and seriousness of his offenses, and is necessary to achieve the essential goals of general and specific deterrence.

## BACKGROUND

### I. Counts of Conviction and Presentence Report

On February 25, 2026, a federal jury convicted Goldstein of eight felonies and four misdemeanors after roughly six weeks of trial. Specifically, it convicted him of one count of tax evasion for 2016, in violation of 26 U.S.C § 7201; four counts of aiding and assisting the preparation of false tax returns for 2017 and 2019-2021, in violation of 26 U.S.C. § 7206(2); four counts of willfully failing to pay taxes for 2017 and 2019-2021, in violation of 26 U.S.C. § 7203; and three counts of mortgage fraud, in violation of 18 U.S.C. § 1014. During trial, the parties entered seven fact stipulations, called 39 witnesses, and introduced over 450 exhibits into evidence.

The Probation Officer issued the draft Presentence Report ("PSR") on April 9, 2026. On April 28, 2026, Goldstein submitted a letter detailing his objections to the draft PSR. On May 12, the Probation Officer issued the final PSR, noting Goldstein's objections but concluding the report,

based on information provided by the government, properly calculated the sentencing guidelines range, and requesting the Court resolve Goldstein's outstanding objections.

## II. Factual Background

The PSR and the Government's Opposition to Goldstein's Motion for Judgment of Acquittal, Dkt. 505, detail the substantial factual background of this case. The government will not rehash the entire narrative here, but the following summarizes the critical facts.

Goldstein was a highly prominent appellate attorney who routinely argued before the Supreme Court and made millions of dollars through his law firm, Goldstein & Russell, P.C. ("G&R"). PSR ¶¶ 7-9. Starting in the 2010s, Goldstein also began playing high-stakes poker and continued to play through 2022. PSR ¶ 12.

### A. 2012 Audit

In 2012, IRS Revenue Agent Gary Libbin audited Goldstein's 2010 tax return, focusing on his failure to report gambling winnings. PSR ¶¶ 21-22. RA Libbin advised Goldstein, through his then-account William Caldwell, that Goldstein needed to improve his gambling recordkeeping and reporting. PSR ¶ 23. Although Caldwell did not recall the specific conversation in which he discussed this with Goldstein, he testified that he "would always go back and tell the client what w[as]" discussed with the IRS and had "no reason to believe" it was any different that time. PSR ¶ 23 Thus, he testified that the audit made Goldstein "familiar with the tax requirements of gambling." *Id.* Although the audit resulted in a small refund to Goldstein, he later terminated Caldwell for "not asking the right questions" and "not asking enough questions" about poker and gambling. PSR ¶ 24. Goldstein then hired Walter Deyhle and his accounting firm, Gelman Rosenberg & Freedman ("Gelman") to prepare his tax returns. PSR ¶¶ 26.

By 2014, as Goldstein was playing for higher and higher stakes, he "quickly realized that even with his successful law practice, he didn't have the cash to compete." PSR ¶ 27. He sought and received a $10 million line of credit—effectively, a loan—from Stewart and Lynda Resnick. PSR ¶¶ 28-31. Goldstein told the Resnicks that "he wanted the loan to finance other people to play in high-stakes poker." PSR ¶ 29. More specifically, Goldstein represented that he was going to use the loaned funds "to invest in a poker player named Dan." *Id.* At trial, Goldstein admitted that this was a lie and stipulated that he himself (not "Dan") "promptly lost $9 million" of the loaned funds playing poker. *Id.* ¶¶ 29, 32.

Despite learning about gambling recordkeeping and tax reporting from the 2012 audit—and then receiving the Resnick loan and playing poker for vast sums in 2014—Goldstein did not tell Deyhle and Gelman about his extensive gambling activity until 2017. *See* PSR ¶¶ 69.

**B. Tax Year 2016**

**1. Income and False Tax Reporting**

In 2016, Goldstein won roughly $50,000,000 in high-stakes heads-up poker matches against three ultrawealthy men: Chairman, Alec Gores, and Tango. PSR ¶¶ 51-53, 55. Goldstein summarized his "wins" against these three "targets" in a December 17, 2016, message to Andrew Robl and Keith Gipson, two poker players who had helped train him for the matches and invested in them. PSR ¶ 51. This $50 million included approximately $13.8 million against Chairman, $27.4 million against Gores, and $8.8 million against Tango. PSR ¶¶ 40 (Chairman winnings), 47 (Gores winnings), 50 (Tango winnings in HKD); GX412 at 3 (converting that amount to USD). These figures represent Goldstein's gross winnings and include shares he owed to his investors; they do not represent his ultimate personal net income from those matches. PSR ¶¶ 42, 47, 50.

Eight days after beating Chairman in September 2016, Goldstein began the process of opening accounts at Universal Capital Bank ("UCB") in Montenegro for himself and his law firm. PSR ¶ 46; GX633 at 11 (UCB account opening email thread); 2/10 Tr. 85:25-86:23 (stating time between Chairman games and account opening). Paul Phua—who helped arrange the matches and had a significant investment in them—then made transfers of €180,000 and then €746,872.70 to Goldstein's UCB account, worth $1,013,897 total. GX422 (10/13/16 transfer chart); GX423 (10/26/16 transfer chart); GX428 (summary of 2016 poker transactions); 2/10 Tr. 89:3-90:4 (explaining euro conversions). These two UCB payments from Phua represent partial payment of Goldstein's gambling winnings against Chairman. *See* 2/11 Tr. 156:8-17) (Goldstein stating the $750,000 wire he made to G&R from that money at UCB was "mostly gambling income"); 2/10 Tr. 91:14-16 (concluding the 2016 Phua UCB payments were gambling winnings); GX2 (listing the $750,000 wire as gambling winnings). Goldstein himself testified that Phua kept a "virtual account" of his running gambling balance with Phua, and highlighted a text message thread in which he told Keith Gipson he was getting $200,000 from his account with Phua just before the €180,000 transfer. DX215 at 4.

Goldstein then wired amounts of $50,000, $85,000, $750,000 (for $885,000 total) from UCB to G&R's U.S. bank account, and kept the remaining roughly $128,000 in funds at UCB, much of which he spent at luxury retailers. GX422, GX423, GX706 at 1-2.

In November-December 2016, Goldstein beat Alec Gores, who ultimately wired him $26,435,000 in poker winnings. PSR ¶ 40. Goldstein then beat Tango in December 2016 for almost $10 million. PSR ¶ 55. That year, he also received $200,000 in poker winnings from the actor Kevin Hart and $100,000 from Andrew Robl. 1/29 Tr. 35-36 (2016 stipulation).

In total during 2016, Goldstein personally received $27,748,897 in poker winnings into known bank accounts he controlled, and personally paid $21,643,700 in losses or staking out of those accounts, leading to net gambling winnings of $6,105,197. GX430 at 1; 2/10 Tr. 92:5-8 (calculating 2016 net winnings), 96:17-21 (explaining 2016 total losses).

However, Goldstein lied to his accountants and hid the extent of his gambling income from them. In January 2017, Goldstein created a ledger recording most of his 2016 poker transactions and emailed it to his ProtonMail account. PSR ¶¶ 57, 59-60; GX2 (1/23/17 Poker Ledger). When Deyhle asked him for his total net poker winnings in March 2017, Goldstein responded that he would "figure that out" even though he had already compiled the ledger. PSR ¶ 72. Ultimately, Goldstein never gave Deyhle his poker ledger, never provided him access to the Wells Fargo account he used for poker, never told him he had gross winnings of roughly $50 million, and never told Deyhle he was keeping $800,000 in an account in Asia with Phua. PSR ¶ 82.

Instead, in October 2017, Goldstein created a new version of the ledger that added three false poker payments that increased his poker-related deductions by more than $3 million. PSR ¶¶ 61-67. After Deyhle asked him again for the poker numbers, Goldstein replied using numbers from this falsely revised ledger and stated that his net 2016 poker income was "2,748,350." PSR ¶¶ 70-75, 81. Although Deyhle inadvertently reported losses as distributions to investors and the distributions as losses on Goldstein's 2016 Form 1040, he correctly reported the total net gambling income that Goldstein told him: $2,748,350. PSR ¶ 80. By manufacturing over $3 million in false deductions, Goldstein falsely reduced his 2016 income tax by over $1 million. PSR ¶ 67.

Goldstein further falsely lowered his 2016 taxes by deducting six poker-related payments, worth $1,171,600 in total, as legal-fee business expenses from G&R's net profit even though he knew they were misclassified. PSR ¶¶ 84-89. When Goldstein was first starting his poker ledger

in December 2016, his then office-manager, Molly Runkle, provided him two spreadsheets of transactions; although the misclassified payments appeared on only a sheet identifying them as legal fee expenses, Goldstein listed some of these on his ledger—showing that he had seen the sheet where they were misclassified. PSR ¶¶ 89-91. Moreover, Goldstein knew how to ensure personal payments were properly classified, either by (i) transferring funds from G&R to his personal bank account (which always caused them to be classified correctly), or (ii) by explicitly telling the firm managers that a payment was personal. PSR ¶ 92. Yet these nearly $1.2 million in personal payments were misclassified, falsely reducing his taxes by roughly $450,000. PSR ¶ 88.

As a result of his misconduct, Goldstein's 2016 tax return omitted $3,643,447 in income and $1,442,805 in taxes due. GX427; 2/10 Tr. 124:10-19, 125:22-25 (Ranahan). Despite hiding the true extent of his income and taxes, Goldstein's Form 1040 still reported $1,679,649 in taxes due. PSR ¶ 96. Nonetheless, he chose not to pay the taxes when they were due. PSR ¶ 97-98; GX54 at 3 (Form 1040 listing $1,690,527 in taxes and penalties due); GX410 at 1; GX430 at 4.

**2. Later conduct related to 2016**

Even after filing his false 2016 tax return, Goldstein spent years hiding the true amount of his 2016 income and impeding the IRS's efforts to collect that tax that he had reported. He did so by repeatedly deceiving IRS Revenue Officer Yvette Parrish in 2018 and 2019, lying to special agents from IRS Criminal Investigation ("IRS-CI") in 2020, and then funneling money through G&R's Interest on Lawyers' Trust Account ("IOLTA") in 2021.

In 2018, the IRS assigned RO Parrish to collect Goldstein's unpaid 2016 taxes. PSR ¶ 99. In March 2018, she met with Goldstein for the first time and asked him about the cause of his large 2016 tax balance. PSR ¶ 101-02. Goldstein told her he was an attorney who typically argues in the Supreme Court, and that the balance stemmed from "an unusual circumstance[] as he received a

large payment from a case." PSR ¶ 102. Parrish understood this to mean his large 2016 income came from a case he had in the Supreme Court, *id.*, and summarized his explanation, "Goldstein indicated the balance for 2016 was a result of a case where he received a large amount of money," GX19 at 13. She also noted that "he indicated 2015 & 2017 would be better representative of his income." *Id.* at 14. During the meeting, Goldstein never mentioned winning or losing millions of dollars playing poker, and never mentioned that the IRS had previously audited him for failing to report gambling income. PSR ¶ 103. Later in 2018, Goldstein also told Deyhle that he had "no gambling winnings" for 2017 despite actually having received more than $3 million. PSR ¶ 142.

Goldstein did not respond to RO Parrish in the wake of that meeting, so she issued levies to various bank accounts and counterparties. PSR ¶ 107. Although she levied G&R for Goldstein's wages, she never tried to levy or seize funds from the law firm itself. *Id.*

In March 2019, RO Parrish met with Goldstein and Deyhle. By that point, Goldstein still had not paid his 2016 taxes and had also failed to pay his 2017 taxes. PSR ¶ 111. During the meeting, Goldstein said his 2017 tax balance came from the Malaysian government not paying him, but told RO Parrish nothing about gambling or poker—including that he had spent millions of dollars playing poker. *Id.* Indeed, Parrish completed a Form 433-A, Collection Information Statement, assessing Goldstein's ability to pay his taxes in installments, PSR ¶ 112, but Goldstein did not tell her that he was making period payments on a $10 million loan from Stewart and Linda Resnick, that he had a $6 million promissory note to repay Bob Safai for poker losses incurred in 2017, or that he was continuing to spend money on poker, PSR ¶ 113. Goldstein also said nothing about the $250,000 in poker winnings he had received from Jean Robert Bellande just 15 days earlier. GX420; GX19 at 39.

By assiduously hiding his ongoing poker activity from RO Parrish, Goldstein ensured she would not scrutinize his 2016 tax return and discover it had wildly underreported his income. His deception also impeded her efforts to collect his unpaid 2016 tax liabilities by ensuring she would not try to issue levies based on his poker activity, PSR ¶ 103, and could not account for his poker spending in developing an installment agreement with him, PSR ¶ 113. As a result, in May 2019, the IRS entered an installment agreement that required Goldstein to begin making monthly payments of $20,000. PSR ¶ 114.

When IRS-CI special agents interviewed Goldstein on October 14, 2020, he also hid the extent of his 2016 gambling activity. *See* PSR ¶ 117, 125-26. First, he told them that "the only time he had investors or stakers" was when he played Alec Gores, when in truth he had investors against both Chairman and Tango that same year. PSR ¶ 126 (quoting 2/4 Tr. 251:9-15); *see* 2/5 Tr. 68:4-9 (SA McDonald: "Goldstein was clear that [playing Alec Gores in 2016] was the only time that he had investors."). Second, Goldstein did not mention that he won tens of millions in against those two men in Asia, and also did not mention winning money from Kevin Hart. *Id.* Instead, he claimed the winnings reported on his 2016 tax return "came from an individual named Al[ec] Gores," PSR ¶ 125, implying he had not received winnings from anyone else that year. These statements hid the extent of Goldstein's 2016 gambling, including his massive winnings in Asia and the more than $1,000,000 in Chairman winnings that he received from Phua. This further concealed that his 2016 tax return was false. At the end of the interview, the agents warned Goldstein "that it was a felony to lie to federal agents" but he did not correct any of his answers. 2/4 Tr. 246:17-22 (SA McDonald).

At the time of the interview with IRS-CI, Goldstein's then-personal assistant was already contemplating leaving her job. PSR ¶ 213. On October 15, 2020, the next day after the IRS-CI

interview, Bart emailed Goldstein and others at G&R that she was resigning, but she also offered to stay temporarily to find and train her replacement. PSR ¶ 214. Over the coming months, Goldstein repeatedly offered things of value to Bart. He offered her an $10,000 bonus, expensive headphones, assistance with her student loans, and Bitcoin. PSR ¶ 215. Bart sent text messages to her predecessor, Levitan, describing Goldstein's conduct in the wake of the IRS-CI interview (including the offers of things of value) and Bart's resulting discomfort. Bart thought that one reason that Goldstein was offering her these things was so that she would be less likely to talk to or cooperate with the IRS. PSR ¶ 217. Bart never accepted any of Goldstein's offers: Bart felt that she "shouldn't accept [the offers] because there was an ongoing investigation," and she did not want any Bitcoin. PSR ¶ 218.

Then in early 2021, when Goldstein and his wife were trying to buy a new house, he moved their money into G&R's IOLTA bank account to shield it from the IRS. By that time, he had still not paid off his outstanding 2016 and 2017 taxes. PSR ¶ 128. His IRS installment agreement had required him to pay his federal taxes "on time" and warned that failure to do so could lead to the IRS cancelling the agreement and "collet[ing] the entire amount you owe by levy on your income [or] bank accounts," among other things. PSR ¶ 115. However, on February 24, 2021, one of Goldstein's accountants told his office manager that "there currently is no federal payment plan with the IRS" because it "defaulted once Tom and Amy had a balance due on their 2019 taxes," PSR ¶ 128, and she then forwarded the email to Goldstein, GX506. Goldstein knew the IRS could levy funds from his personal accounts, in part because RO Parrish's previous levies had once seized $954,000 from his personal Wells Fargo account. PSR ¶ 129.

The next month, in late March 2021, Goldstein orchestrated a complex series of transactions to move a nearly identical amount of money—$960,000—from his and his wife's

retirement accounts into the G&R IOLTA account and then to the title company for closing on the new house a few days later. PSR ¶¶ 130-31. Multiple witnesses testified that IOLTA accounts are for client funds, not an attorney's personal funds. PSR ¶ 132. Indeed, Daniel Woofter, Goldstein's former law firm partner, explained that a lawyer can be disciplined or disbarred for such activity, PSR ¶ 133, and Goldstein himself conceded that misusing the IOLTA account in 2021 could have subjected him to sanctions, PSR ¶ 135. Despite this, Goldstein kept personal funds in the firm's IOLTA for days, and never explained during his own testimony why he conducted the complex transactions or used the IOLTA account for them. PSR ¶ 134. By placing $960,000 in the G&R IOLTA, Goldstein put it somewhere the IRS had never levied—and foreseeably would never levy, given its use for client funds—to prevent the IRS from collecting his unpaid 2016 and 2017 taxes before he could use the money to buy his new house.

Goldstein did not pay off his full 2016 tax balance until April 2021. By that point, the total value of the amount he had reported but failed to timely pay, plus penalties and interest, was $2,090,228.13. Meanwhile, after hiding his true 2016 income and while impeding the IRS's efforts to collect the 2016 taxes that he did report, Goldstein continued to conceal his poker winnings from the government for years and otherwise lie on his federal tax returns.

### C. Tax Years 2017 through 2019

Goldstein caused G&R's Forms 1120S to understate its 2017 and 2019 net profit, thereby reducing his own reported income and taxes due.

***As to 2017***: First, on February 1, 2017, Goldstein caused a law firm, Robbins Geller, to wire a $250,000 legal fee to Goldstein's personal Wells Fargo bank account instead of G&R's bank account. PSR ¶ 148. The next day, he used $178,000 of this money to pay a poker loss to Bob Safai. PSR ¶ 149. Goldstein knew he needed to report income to G&R even if it did not hit

G&R's bank accounts, as demonstrated by a December 2018 email in which he told his then-firm manager, Jonathan Levitan, that he "got $500k in income . . . that went to someone else overseas . . . and never came into our bank account. So we need to record it as income even though there isn't a record of it happening." PSR ¶ 151. Despite knowing the need to report income that did was not deposited in G&R's accounts, Goldstein did not tell Deyhle or Levitan that he had diverted $250,000 to his personal bank account. PSR ¶ 150.

Second, Goldstein persuaded Paul Napoli, of the law firm Napoli Shkolnik PLLC ("Napoli Shkolnik"), and a law partner of Napoli's to "invest" $500,000 in Goldstein's 2017 games against Safai by wiring the money direct to Safai's bank account, when in fact Goldstein had already lost millions to Safai and the money was to pay Safai for an outstanding poker debt. PSR ¶¶ 153-55, 159. At trial, Goldstein admitted that he "lied to Paul Napoli to get his $500,000 poker investment." PSR ¶ 160. After Napoli began asking Goldstein to return his investment, Goldstein eventually told Levitan to wire $175,000 to Napoli Shkolnik on November 7, 2017. PSR ¶¶ 162, 167; GX1077 (email directing Levitan to wire the funds). However, Goldstein never told Levitan or Deyhle that the $175,000 represented repayment of a personal debt, rather than a legal fee payment from G&R to Napoli Shkolnik.

The diverted $250,000 payment from Robbins Geller was not recorded as income on G&R's books, while the $175,000 payment to Napoli Shkolnik was recorded as a business expense, rather than a personal one. GX48 at 2 (Summary of Audit Trail); GX81 at 8 (Audit Trail). Both reduced G&R's net profit: the former by causing its income to be understated, and the latter by causing its deductions to be overstated. PSR ¶ 146. These items fraudulently reduced the net profit that ultimately flowed through to Line 17 of Goldstein's 2017 Form 1040 as falsely lowered S corporation income from G&R. GX55 at 1; GX429 at 1.

Goldstein also failed to report more than $3 million in gross gambling winnings on his 2017 Form 1040, instead telling Deyhle that he had "no gambling winnings" in 2017. PSR ¶ 142. Ultimately, Goldstein's tax return did report $1 million in taxes due. PSR ¶ 236 (citing GX74, 2017 Account Transcript). However, he did not pay his taxes when they were due in 2018, and did not fully pay off his 2017 tax balance until April 2021. *Id.*; *see* GX430 at 5 (2017 tax payment timeline).

***As to 2018***: On September 25, 2018, Paul Phua transferred €862,142.19 (worth nearly $1 million) to Goldstein's personal UCB account. PSR ¶ 189; GX424. Separately, on October 25, 2018, Goldstein returned from Macau and Hong Kong carrying a duffel bag of $968,000 in cash, and he told Customs and Border Protection Officer Kareem Foy that the money was gambling winnings. PSR ¶¶ 172, 175.

At trial, the government argued that the September payment represented an unreported legal fee (causing G&R's 2018 Form 1120S to understate its net profit), while the October cash represented unreported gambling winnings (causing Goldstein's 2018 Form 1040 to be false). Goldstein claimed both payments were loans for him to pay his taxes, and put on contemporaneous messages, which he said were with Phua, about the loans. The jury acquitted Goldstein of Counts 4 and 5, which had charged him with causing the 2018 Forms 1040 and 1120S to be false. Dkt. 472 at 2.

***As to 2019***: First, in February 2019, Goldstein assisted Phua's defense team during a criminal trial he had in Macau. 2/5 Tr. 17:21-24 (Fifth Stipulation). On February 26, 2019, the Macau Court of First Instance acquitted Phua of the criminal charges. *Id.*; *See also* PSR ¶ 186 (noting Goldstein's testimony about the trial). The next day, Phua transferred €206,942.17 to G&R's UCB account, which was then wired as $229,927.19 to G&R's U.S. bank account. PSR ¶

204; GX425. Goldstein testified that this payment was for his work for being Phua's lawyer. PSR ¶ 205. However, a few days earlier, Levitan had emailed Goldstein that UCB asked for "some sort of supporting document detailing the transfer," asking, "Last time characterized it as a capital contribution. Will it be the same this time?" GX544. To which Goldstein replied, "Yes. Please write something up." *Id.* As a result, the $229,927.19 was classified as a reduction to stockholder distributions (effectively, a capital contribution), and it was not classified as legal fee income to the firm. *See* PSR ¶ 206.

Shortly after his interview with IRS-CI in October 2020 (and the filing of his 2019 Form 1040 that month), Goldstein learned from Ian Shuman, the Gelman accountant who oversaw G&R's bookkeeping, that the February 2019 Phua payment had not been classified as income. PSR ¶¶ 205-06. However, Goldstein made no attempt to correct the classification. PSR ¶ 207.

Second, on March 4, 2019, Goldstein had $170,000 sent from G&R's bank account to Charles Pacheco as payment for a personal gambling debt. PSR ¶¶ 198-99. Goldstein did not tell his accountants that the payment was a personal expense; as a result, it was classified as a "legal fee" expense and deducted on G&R's 2019 Form 1120S, lowering both the firm's net profit and Goldstein's individual income from it. PSR ¶¶ 199-200; GX48 at 2 (Summary of Audit Trail); GX81 at 10 (Audit Trail).

These two misclassifications fraudulently lowered G&R's 2019 net profit by almost $400,000: the misclassified Phua legal fee falsely reduced its business income by more than $229,000, while the misclassified Pacheco personal payment falsely increased its deductions by $170,000. As a result, Goldstein's 2019 Form 1040 underreported his G&R income by the same amount. His personal tax return also omitted almost $350,000 in gross gambling winnings, in part because Goldstein never "mentioned gambling winnings in 2019" to Deyhle. PSR ¶¶ 194-96.

Goldstein again failed to timely pay the majority of the roughly $700,000 in taxes due that were reported on his 2019 Form 1040. PSR ¶ 237; GX430 at 6 (2019 tax payment timeline).

**D. Tax Years 2020 and 2021**

In June 2020, Goldstein enlisted the help of his then-firm manager, Katie Bart, to open a Coinbase cryptocurrency account. PSR ¶ 211. Using that account in 2020, Goldstein received inflows (*i.e.*, deposits and incoming transfers) of cryptocurrency worth $516,646, and had outflows (*i.e.*, withdrawals or outgoing transfers) of cryptocurrency worth $541,805. PSR ¶ 212. Although Gelman had sent Goldstein documents in 2020 and 2021 stating there may be "tax consequences" for people who transact in or possess cryptocurrency, Goldstein never provided records of his cryptocurrency activity to his accountants or Angie Gou, the firm manager when his 2020 Form 1040 was prepared. PSR ¶ 220; *see* 2/2 Tr. 199-201 (Gou). As result, Goldstein's tax return falsely answered "No" to the question whether, during 2020, he had "received, sold, sent, exchanged or otherwise acquired any financial interest in any virtual currency" (*i.e.*, cryptocurrency). PSR ¶ 219.

In 2021, Goldstein's cryptocurrency use exponentially increased. First, on February 6, 2021, he created a Binance.com account. PSR ¶ 228. Binance blocked U.S.-based individuals, but he circumvented this restriction by using a Virtual Private Network to make it appear as though he was located in other countries when he accessed Binance. PSR ¶¶ 228-29. Using his Binance.com account, Goldstein had cryptocurrency inflows worth $972,850, and outflows worth $991,336, PSR ¶ 230, including roughly $670,000 in cryptocurrency that he transferred to his Coinbase account, GX434 at 2. Second, a June 16, 2021, retention letter between G&R and Titan Golden Capital, LLC, specified that Titan Golden would pay G&R quarterly installments of $700,000, including $250,000 in cryptocurrency. PSR ¶ 231. Third, Goldstein's Coinbase account, in turn,

had $3,658,409 in inflows and $3,643,409 in outflows in 2021. PSR ¶ 230. Fourth, that year, Goldstein offered to use $350,000 in cryptocurrency to close on his new D.C. house. PSR ¶ 232.

Despite all this, Goldstein did not tell Gou or Gelman about his extensive 2021 cryptocurrency use. PSR ¶ 234; 2/2 Tr. 200:17-19, 201:7-11 (Gou) (answering "No" to question whether he, as of June 16, 2021, had "ever given [her] records of his cryptocurrency transactions," and never mentioned conducting millions of dollars in transactions in 2021). As a result, his 2021 Form 1040 falsely answered "No" to the question whether, during 2021, he had "received, sold, sent, exchanged or otherwise disposed of any financial interest in any virtual currency." GX59.

In 2021, Goldstein also diverted a $500,000 legal fee payment from the actor Tobey Maguire. Starting in 2020, Goldstein served as Maguire's attorney to help recover a multi-million dollar poker debt from Andy Beal. PSR ¶ 223. However, Goldstein still owed Bob Safai money on the $6 million promissory note. *Id.* After Beal paid his debt to Maguire, Goldstein directed Maguire to wire the legal fee he earned (which they agreed was $500,000) not to G&R's bank account but instead to Bob Safai on June 7, 2021. PSR ¶ 224. Goldstein never told his firm managers or Gelman about the diverted $500,000. PSR ¶ 225. As a result, Goldstein's 2021 Form 1040 falsely understated his G&R income by $500,000. PSR ¶ 232.

For both 2020 and 2021, Goldstein's returns reported roughly $960,000 and $1.1 million in total taxes, respectively. PSR ¶¶ 238-39. But Goldstein again failed to timely pay his taxes for 2020 and 2021. *Id.*

### E. False Mortgage Applications

#### 1. FSM

In February 2021, Goldstein and his wife were looking to purchase a multimillion dollar home in Washington, D.C. PSR ¶ 249. By then, Goldstein still owed over $5.4 million to Bob

Safai and over $9.8 million to the Resnicks—more than $15 million total—on their respective promissory notes. PSR ¶ 250; GX418 (summary of outstanding debts). To afford the new house, Goldstein and his wife applied for three different loans from two different mortgage lending businesses. PSR ¶ 249. Goldstein lied on all three loan applications.

First, they applied for a $2 million loan from First Savings Mortgage ("FSM") on February 24, 2021. In that application, Goldstein did not disclose his roughly $15 million in private debt to Safai and the Resnicks. PSR ¶ 252.

Second, the couple applied for a $180,000 bridge loan from FSM on March 1, 2021. PSR ¶ 253. On that application, Goldstein again omitted his millions in poker-related debts. PSR ¶ 253. However, FSM ultimately declined to issue these loans after it discovered the tax liens on Goldstein's then-home in Chevy Chase, Maryland. PSR ¶ 254.

**2. Parabellum**

With FSM out of the picture, Goldstein urgently needed financing to be able to close on the Washington, D.C. home on the scheduled date of March 30, 2021. PSR ¶ 256. Goldstein turned to a litigation funder called Parabellum Capital LLC ("Parabellum"). *Id.* Goldstein and G&R had a preexisting relationship with Parabellum, in which Parabellum invested in G&R in exchange for a return tied to fees G&R earned in ongoing cases. *Id.*

The first investment that Parabellum made that year was in March 2021, on the eve of closing on the Washington, D.C. home. PSR ¶ 257. Parabellum agreed to invest $1.6 million in Goldstein in exchange for an investment return and interest in substantial collateral including legal fees from G&R's ongoing cases. *Id.* Parabellum wired the money directly to the title company on March 30, 2021, on Goldstein's behalf. *Id.* As detailed above, Goldstein funneled the rest of the purchase price ($960,000) from his and his wife's retirement accounts through G&R's IOLTA

account and eventually to the title company. As part of the investment agreement, Goldstein made certain representations and warranties "to induce [Parabellum] to enter into" the contract. PSR ¶ 258. The first item under "Representations, Warranties" in the contract reads, "[Goldstein] has fully and accurately represented his financial condition to [Parabellum], and has not made any material omission in connection therewith." *Id.* However, Goldstein did not disclose to Parabellum approximately $15 million in poker-related debts to the Resnicks and Safai. *Id.*

The second investment by Parabellum was in April 2021. PSR ¶ 259. By then, Goldstein had already closed on the Washington, D.C. home but wanted to repay the money borrowed from his and his wife's retirement accounts and sell the Chevy Chase home. *Id.* To sell the Chevy Chase home, however, Goldstein needed the tax liens to be lifted. *Id.* Goldstein convinced Parabellum to invest another $4 million so he could finally pay his 2016 and 2017 taxes and get the tax liens lifted. PSR ¶ 260. The investment was memorialized in a similar contract dated April 26, 2021. *Id.* Goldstein promised Parabellum substantial returns and collateral in exchange for the investment, and he also signed a personal guaranty. *Id.* Once again, Goldstein represented that he "fully and accurately represented his financial condition" while simultaneously concealing approximately $15 million in poker-related debts from Parabellum. *Id.*

**3. NFM**

On September 29, 2021, Goldstein and his wife applied for a loan from the mortgage lending business NFM Lending ("NFM"). PSR ¶ 262. They sought almost $2 million in connection with refinancing the Washington, D.C. home. *Id.* The loan application, which Goldstein signed, did not disclose his poker-related debts (of approximately $15 million) in the "Assets and Liabilities" section or otherwise. *Id.* He also did not disclose that he was a guarantor on the investment agreement with Parabellum. *Id.* According to NFM Lending Divisional President

Darran Anthony, who testified at trial, these all would have factored into whether the loan was approved. *Id.* NFM ultimately agreed to extend the loan of $1,987,500. *Id.*

Goldstein admitted he chose not to tell NFM about the poker-related debts. *Id.* Goldstein testified his reason for not telling NFM was the "same reason" he had not told FSM: he "did not want [her] to know about the scale of the [poker-related] debts, which were very large. *Id.*

**F. Tax Years 2022 through 2025**

Since 2021, Goldstein has continued to flout his tax obligations *every year*, going so far as filing a false tax return and not paying his taxes due in April 2026—*after* he was convicted of nine federal tax crimes. Each year, Goldstein earned millions of dollars in income but either never filed individual income tax returns, never paid the full amount of his taxes due, or both.

First, Goldstein has not filed his 2022 tax return and has not paid millions that he owes on his 2022 taxes. At trial Goldstein stipulated that he received $47,465,350 in poker winnings and made poker losses or staking payments of $26,437,785 in 2022. 1/29 Tr. 38-41 (2022 stipulation). After also deducting Goldstein's poker-related payments of $1,500,000 to Michael McGuiness, this equates to a total net gambling income of $19,527,565. *See* 2/2 Tr. 247-48 (McGuiness stipulation). Meanwhile, G&R's 2022 Form 1120S reported -$1,673,681 in business losses. Ex. 1 (2022 Form 1120S). After accounting for Goldstein's other minor income, deductions, and credits, he had a net taxable income of $17,947,301, and a total income tax due of $6,607,667.

In February 2025, Goldstein's counsel wrote to the government:

> My client has asked me to advise you that he is in the process of preparing his 2022 and 2023 tax returns. The preparation of these returns was slowed by the fact that he had to find a new accounting firm as a result of GRF's involvement in this investigation and transfer the necessary records to them. He is working with the new accountants on these returns.

Ex. 2, 2/19/25 Def. Email to DOJ. However, Goldstein has never filed a 2022 income tax return and has never reported the full amount of his 2022 income to the IRS. Ex. 3 (2022 Account Transcript). Moreover, Goldstein paid only $3,269,163 in taxes (through estimated payments and wage withholdings) before April 15, 2023—and has paid nothing since. *See id.* As a result, he still owes more than $5.9 million in taxes, penalties, and interest.

Second, that new accounting firm *did* prepare G&R's and file 2023 Form 1120S. Ex. 4 at 2 (2023 Form 1120S). This tax return reported $4,079,153 in business income, all of which represented personal income to Goldstein that he had to report and for which he owed taxes. *Id.* at 1, 32. Although that Form 1120S was filed in August 2024, Goldstein has never filed a 2023 income tax return. While he paid $326,631 in taxes through estimated payments and withholdings before April 15, 2024, Goldstein has paid nothing since, and therefore owes at least $1,745,505 in taxes, penalties, and interest for 2023 based on his G&R income.

Third, in 2024, Goldstein received $11,830,000 in gross gambling income from Texas businessman Andrew Beal. Ex. 5, (2024 East West Bank Statement Excerpts). In March 2025, Goldstein filed a 2024 Form 4868, Application for Automatic Extension of Time to File U.S. Individual Income Tax Return, which reported an estimated 2024 total tax liability of $2,072,765 and a balance due of $2,071,134. Ex. 6 at 1-2, USA-194916 (Form 4868). However, Goldstein has never filed his 2024 Form 1040 and has never paid that balance. Ex. 7 (2024 Form 1040 Account Transcript).

Fourth, on April 15, 2026, Goldstein self-prepared and electronically filed his 2025 Form 1040, which reported $3,182,787 in taxable income (including $1,737,000 in gambling income). Ex. 8 at 3, 8 (2025 Form 1040). The return listed $1,258,198 on Line 24, Total Tax, and then claimed that Goldstein had already paid this full amount on Line 26, "2025 estimated tax payments

and amount applied from 2024 return," thereby reporting that he owed zero additional dollars in taxes. *Id.* at 3. In truth, Goldstein has paid only $13,500 toward his 2025 balance. Ex. 10 (2025 IMFOLT). Line 26 was utterly false, and Goldstein has paid only a tiny fraction of the more than $1,125,000 that he owes in 2025 taxes.[1]

In sum, in every year since 2021, Goldstein did not file a tax return, did not pay his taxes due, or both. As discussed below, even *excluding* Goldstein's millions in unpaid 2024 and 2025 taxes, his crimes caused over $16 million in tax loss.

## LEGAL STANDARD

***The two sentencing steps***: In the Fourth Circuit, district courts follow a two-step approach to sentencing. First, the "sentencing court must begin 'by correctly calculating the applicable Guidelines range.'" *United States v. Mendoza-Mendoza*, 597 F.3d 212, 216 (4th Cir. 2010) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)). This requires following the steps set out in United States Sentencing Guideline § 1Bl.1—including determining the applicable offense guideline, calculating the base offense level, applying appropriate specific offense characteristics, and applying appropriate adjustments—to determine the appropriate guidelines range. *See id.*

Second, the Court assesses the factors set forth in Title 18, United States Code, Section 3553(a), to determine a specific sentence that is "'sufficient, but not greater than necessary'" in light of those factors. *Id.* (quoting § 3553(a)). During this step, the court must "giv[e] the parties 'an opportunity to argue for whatever sentence they deem appropriate,'" "'make an individualized assessment'" of how the § 3553(a) factors apply to the facts, and "sufficiently explain its decision"

[1] Goldstein's 2025 return erroneously reported his income from G&R on both his Schedule C and Schedule E, effectively doubling it from $336,580 to $673,160. *Id.* at 14, 18. With that double-counted amount corrected, his taxable income was $2,846,207, and his total tax was $1,125,143.45.

to show that it has considered the parties' arguments and arrived at a "'reasoned basis'" for the sentence imposed. *Id.* (quoting *Gall*, 552 U.S. at 49-50, and *United States v. Carter*, 564 F.3d 325, 328 (4th Cir. 2009)). Thus, while the district court must correctly calculate the guidelines range, it "may not presume that the appropriate sentence" comes from the Guidelines. *Id.*; *see also United States v. Lynn*, 592 F.3d 572, 575-76 (4th Cir. 2010) (summarizing steps).

***Calculating the Guidelines***: "The government bears the burden of establishing the tax loss by a preponderance of the evidence." *United States v. Mehta*, 594 F.3d 277, 281-82 & n.2 (4th Cir. 2010); *United States v. Ukwu*, 546 F. App'x 305, 306 (4th Cir. 2013) (per curiam). The court need only make a "reasonable estimate" of the loss. *Mehta*, 594 F.3d at 282; *United States v. Underwood*, 845 F. App'x 239, 242 (4th Cir. 2021); U.S.S.G. § 2T1.1 app. n.1 ("[T]he guidelines contemplate that the court will simply make a reasonable estimate based on the available facts."). Uncharged, relevant conduct also must be established by only a preponderance. *E.g.*, *United States v. Grubbs*, 585 F.3d 793, 798-99 (4th Cir. 2009).

Similarly, "[t]he government bears the burden of establishing the applicability of a sentencing enhancement by the preponderance of the evidence." *United States v. Henderson*, 88 F.4th 534, 536 (4th Cir. 2023); *see United States v. Kiulin*, 360 F.3d 456, 460 (4th Cir. 2004) (applying rule to obstruction enhancement under § 3C1.1); *United States v. Jones*, No. 24-4288, 2025 WL 2683966, at *8 (4th Cir. Sept. 19, 2025) (unpublished) (applying rule to § 2T1.1(b)(2) sophisticated means enhancement).

Notably, "jury verdicts need not be squared with the relevant conduct considered by judges during sentencing." *United States v. Love*, 134 F.3d 595, 606 (4th Cir. 1998). "The sentencing court [may] find a fact by a preponderance of the evidence that the jury may not have found beyond a reasonable doubt." *Jinwright*, 683 F.3d at 484.

***Objections to the PSR***: Where part of a PSR is undisputed, the district court may "adopt these findings without more specific inquiry or explanation." *United States v. Roy*, 88 F.4th 525, 533 (4th Cir. 2023) (cleaned up); Fed. R. Crim. P. 32(i)(3)(A) ("[A district court] may accept any undisputed portion of the presentence report as a finding of fact.").

Where part of the PSR is disputed, the court must "rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B). Thus, "[w]hen any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court factor." U.S.S.G. § 6A1.3(a).

However, a "mere objection to the finding in the presentence report is not sufficient. The defendant has an affirmative duty to make a showing that the information in the presentence report is unreliable, and articulate the reasons why the facts contained therein are untrue or inaccurate." *United States v. Terry*, 916 F.2d 157, 162 (4th Cir. 1990); *see, e.g.*, *United States v. Carter*, 300 F.3d 415, 425 (4th Cir. 2002); *United States v. Randall*, 171 F.3d 195, 210-11 (4th Cir. 1999) ("If the district court relies on information in the presentence report (PSR) in making findings, the defendant bears the burden of establishing that the information relied on by the district court in making its findings is incorrect; mere objections are insufficient"); *United States v. Walker*, No. 21-4343, 2023 WL 4363655, at *4 (4th Cir. July 6, 2023) (unpublished) ("Counsel's remaining remarks on this issue at sentencing amount only to argument and speculation, neither of which suffices to undercut the veracity of the PSR's findings.").

Without such an affirmative showing, the court may adopt the PSR's findings without a more specific explanation." *Terry*, 916 F.2d at 162 (internal quotations omitted).

When such an affirmative showing has been made, "the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a); *accord United States v. Roy*, 88 F.4th 525, 531 (4th Cir. 2023). It may supplement the PSR with "additional facts adduced at trial" if the defendant is able to contest the relevance of those facts at the sentencing hearing. *United States v. Jinwright*, 683 F.3d 471, 487 (4th Cir. 2012) (citing § 6A1.3(a)). And it may "draw reasonable inferences from the facts in the record when formulating a sentence." *Roy*, 88 F.4th at 531.

Throughout this process, the underlying standard—preponderance of the evidence—continues to apply. *E.g.*, *United States v. McDowell*, 745 F.3d 115, 123 (4th Cir. 2014) (affirming district court's reliance on NCIC criminal history report to which defendant objected where district court found report, when combined with "corroboration provided by the Government" established prior conviction by a preponderance of the evidence); *United States v. Glover*, No. 21-4556, 2023 WL 3944375, at *6 (4th Cir. June 12, 2023) (unpublished) (recognizing parties meaningfully contested sentencing enhancement by presenting "competing testimony" but affirming district court's finding on the preponderance of the evidence).

Ultimately, to rule on a dispute matter and satisfy the strictures of Rule 32(i)(3)(B), "a sentencing court need not articulate a finding as to disputed factual allegations with minute specificity" and need not "separately recite its finding as to each controverted matter." *United States v. Walker*, 29 F.3d 908, 911 (4th Cir. 1994) (internal quotations omitted). Indeed, a court may simply adopt the specific, disputed findings in the PSR if it "makes clear which disputed issues were resolved by its adoption." *Id.* Or it may "adopt[] the PSR's findings *in toto*" as long as the context of its larger sentencing ruling shows that the court "intended by the adoption to rule on

each of the alleged factual inaccuracies." *Id.* (cleaned up); *see United States v. Burnley*, 988 F.3d 184, 190 (4th Cir. 2021). If a court elects this latter approach, then "it must make clear on the record that it has made an independent finding and that its finding coincides with the recommended finding in the presentence report." *United States v. Morgan*, 942 F.2d 243, 245 (4th Cir. 1991). Regardless of its approach, a court must make evident how it is resolving each of a defendant's objections, even if it overrules them all at once. *See Walker*, 29 F.3d at 912-13 (contrasting case with *Morgan*). These standards apply even when a defendant has made more than a "mere objection." *See Glover*, 2023 WL 3944375, at *6 (applying *Terry* and then *Walker* to conclude court properly resolved objection to enhancement and did not error by failing to make explicit specific findings about it).

## ARGUMENT

### I. The PSR correctly calculates a base offense level of 26 based on total tax loss of more than $9.5 million.

Under the Sentencing Guidelines, the base offense level for the tax offenses is the total aggregate tax loss stemming from the nine tax counts of conviction and the associated relevant conduct. *See* U.S.S.G. § 3D1.2(d) (grouping tax offenses), *id.* § 3D1.3(b) (calculating offense level based on total aggregate quantity of group). This section addresses the tax loss from each constituent tax offense of conviction, followed by the total tax loss.

At the outset, the unreported income tax loss for 2016, 2017, and 2019 through 2021 is based on what was proven at trial, as testified to by IRS Revenue Agent Colleen Ranahan and summarized in her calculation of Goldstein's 2016 net poker winnings and misclassified personal expenses (GX430 at 1-2), and tables of tax return false items (GX429). The tax computations for 2016 remain unchanged from trial, while this memorandum also adds computations for 2017 and 2019-2023. *See* Ex. 11, Sentencing Tax Computations; GX427 (2016 Tax Computation). The

methodology for conducting these computations remains the same as at trial. *See* 2/10 Tr. 122:12-123:2, 124:9-126:3 (explaining 2016 tax computation).

The sources of the tax loss from Goldstein's unreported income are summarized below:

- 2016: Unreported net gambling winnings of $3,356,847, and six personal expenses misclassified as business expenses, totalling $1,171,600.
- 2017: The misclassified $175,000 personal payment to Napol Shkolnik and the diverted $250,000 legal fee from Robbins Geller.
- 2019: The misclassified $170,000 personal payment to Chuck Pacheco and the unreported Paul Phua legal fee income of $229,927.
- 2021: The diverted $500,000 legal fee from Tobey Maguire.
- 2022: $19,527,565 in net unreported gambling winnings, as calculated from the parties' Second Joint Stipulations of Fact, 2/12 Tr. 38:11-40:25.[2]
- 2023: $3,881,712 in Schedule E income from G&R.

The tax on this unreported 2016 through 2023 income totals roughly $6.39 million. The tax loss calculations also include the total amount of tax, plus penalties and interest, that Goldstein failed to timely pay in 2016, 2017, and 2019-2021, as well as penalties and interest on his unpaid 2022 and 2023 taxes. The loss from that conduct totals approximately $9.87 million.

When combined, the full tax loss for sentencing purposes is $16,264,804. This calculation accurately reflects the true toll of Goldstein's willful 2016 through 2023 conduct and conservatively omits multiple years and categories of income. Ultimately, the court need only make a "reasonable estimate" of the tax loss. Mehta, 594 F.3d at 282; U.S.S.G. § 2T1.1 app. n.1. The evidence here and at trial proves the full loss, and certainly a reasonable estimate of it, well beyond a mere preponderance.

[2] As discussed below, the calculations for 2022 and 2023 years also strive to consider additional forms of income and give Goldstein credit for applicable deductions and the partial tax payments he made, even though he has not filed tax returns providing any of this information.

**A. Tax Loss from 2016 Evasion of Assessment**

The tax loss for evasion of payment is the "total amount of loss that was the object of the offense." U.S.S.G. § 2T1.1(c)(1). The facts proven at trial establish Goldstein evaded assessment of his 2016 income by (1) intentionally underreporting his gambling income and (2) falsely deducting more than a million dollars in personal expenses from his G&R income.

**1. 2016 Gambling Income**

Goldstein fraudulently underreported his 2016 net gambling income by $3,356,847. This amount is properly included in calculating the tax loss.

In 2016, Goldstein personally received, into bank accounts that he controlled, net gambling winnings totaling $6,105,197. This calculation reflects all of the 2016 gambling transactions to which he stipulated at trial, plus payments he received from Phua for the Chairman games, and less all of the poker payments he made for losses and staking. *See generally* 2/10 Tr. 80-105, 115 (RA Ranahan) (explaining 2016 net poker winnings calculation).

Goldstein's own original January 2017 poker ledger recorded nearly all of these winnings except $200,000 from Kevin Hart and a more than $260,000 of the funds he received from Phua through UCB. GX2. It entirely omitted the payment from Hart, and then included only the $750,000 wire Goldstein made from UCB to G&R—which it labelled "??", omitting Phua's name. *Id.* But by omitting the money from Phua and Hart, it reduced his taxable gambling income by mor than $460,000. However, the January 2017 version of Goldstein's ledger largely calculated his deductible losses correctly, arriving at a total of $21,366,700, when his true losses were slightly higher, at $21,643,700. *See* GX2 at 2; GX430 at 1.

However in October 2017, Goldstein fraudulently inflated this number by adding three false outflows: a January 17, 2017, payment of $770,000 to Bob Safai, and two December 23,

2016, amounts of $1,300,000 and $1,000,000. GX451. Together, these three transactions falsely reduced Goldstein's net gambling income by $3,070,000.

Thus, despite having over $6 million in net gambling, Goldstein told Deyhle in October 2017 that his net 2016 poker income was "2,748,350." *See* GX430 at 1; PSR ¶ 74. This was a willful lie, and the tax loss should include the $3,356,847 in net gambling winnings that Goldstein hid. *See* GX427 (calculating net unreported winnings).

Goldstein's willfulness is clear for many reasons. To start, his decision to title the ledger "Amounts," email it to his ProtonMail account, omit hundreds of thousands of dollars from his Chairman winnings, and label the one piece of those winnings that he *did* record as a payment from "??" all strongly suggests he intentionally understated his income, even on his own ledger. So does his omission of money from Hart, a famous comedian.

Similarly, his statement to Deyhle in March 2017 that he would "figure . . . out" his gambling winnings shows he intended to hide the truth because he had *already calculated* them on his ledger in January 2017, and could have easily given Deyhle that ledger or his bank accounts. Indeed, even in October 2017, he could have emailed his ledger to Deyhle; instead, he emailed it to his own G&R email account. Goldstein had known since the 2012 audit that he had to keep accurate gambling records and accurately report them. Despite firing Caldwell in response to that audit, Goldstein did not tell Deyhle about that audit and did not enlist him in gambling recordkeeping. This strongly suggests Goldstein intended to continue hiding the scope of his gambling. His failure to give Deyhle any underlying records despite the audit shows he did not want Deyhle to know the extent of his true gambling winnings.

The three fake outflows he added to the October 2017 version of his ledger further reinforce his willfulness. The $770,000 payment to Safai occurred on January 17, 2017—long after 2016

had ended. Goldstein knew he was a cash-basis taxpayer and could not deduct payments from 2017 from his 2016 taxes, as shown by his textbook description to Cooper of the related rule that he could not deduct ("carry forward") gambling losses from one year to the next. GX12. Moreover, Goldstein first emailed his January 2017 ledger to himself on January 22, 2017—*after* he had paid the money to Safai. GX3. If he had genuinely thought that payments was a 2016 loss, he would have included it in his original, accurate January version of the ledger.

The false deductions of $1,300,000 and $1,000,000 were equally blatant. Despite listing the vast majority of outflows with a counterparties' name and notes about the payment reason, Goldstein listed these two transactions in the "Out" section with no name and no notes. GX451. These were the only transactions he listed in that manner anywhere in the ledger. *Id.*

Goldstein had correctly listed the $1,300,000 payment with the date "12/xx/16" as funds returned to the Resnicks in his January ledger. GX2. But then he duplicated it and added the same amount, dated "12/23/16" under as a deductible expense. GX451 at 1. Goldstein knew this was incorrect because his bank statements showed only one payment of $1.3 million in December 2016—the one he made to Resnicks and had already included on his ledger.

Goldstein also knew the $1,000,000 amount could not be deducted because he never actually paid it to anyone. On December 23, 2016, Goldstein attempted to wire $1,000,000 from his Wells Fargo account to UCB. GX4.1 at 28 (bank statement); GX720.1 at 1 (wire report). However, that wire failed and was returned to his account four days later on December 27. GX4.1 at 28; GX720.1 at 2. In fact, Goldstein's bank statement showed these two transactions, as well as his single $1,300,000 payment to the Resnicks, all within inches of each other on same page, as shown below:

| | | | |
|---|---|---|---|
| 12/23 | Purchase Authorized On 12/22 Hotels.Com Hotels.Com WA S386358016350614 Card 1818 | | 779.03 |
| 12/23 | Purchase Authorized On 12/22 Hotels.Com Hotels.Com WA S306358024436862 Card 1818 | | 916.00 |
| 12/23 | Withdrawal Made In A Branch/Store | | 403,000.00 |
| 12/23 | Withdrawal Made In A Branch/Store | | 1,300,000.00 |
| 12/23 | Withdrawal Made In A Branch/Store | | 5,000.00 |
| 12/23 | Purchase Authorized On 12/23 Cvs/Pharmacy #01 01831 Bethesda MD P00586358658194862 Card 1818 | | 38.15 |
| 12/23 | WT Fed#05766 Bank of America, N /Ftr/Bnf=Keith Gipson Srf# 0067111358602758 Trn#161223146521 Rfb# | | 178,000.00 |
| 12/23 | WT Fed#05949 Universal Capital /Ftr/Bnf=Goldstein Thomas Che Srf# 0067111358293658 Trn#161223148167 Rfb# | | 1,000,000.00 |
| 12/27 | Purchase Return Authorized On 12/23 Glamsquad, Inc. 2122022938 NY S626360549712735 Card 1818 | 18.00 | |
| 12/27 | WT Seq173947 WF Return Wires IN Proc /Org= Srf# 0067111358293658 Trn#161227173947 Rfb# | 999,950.00 | |
| 12/27 | WT Seq173951 WF Topside Rb Dodd Fran /Org= Srf# 0067111358293658 Trn#161227173951 Rfb# | 50.00 | |
| 12/27 | WT Seq174101 WF Topside Rb Dodd Fran /Org= Srf# 0067111358293658 Trn#161227174101 Rfb# | 45.00 | |

GX4.1 at 28. That $1,000,000 failed wire was the only wire of that amount in the entire month. GX419; *see* 2/9 Tr. 75:24-77:18 (Flack). This alone shows Goldstein listed these false deductions on his "rev[ised]" poker ledger because he wanted to fraudulently pad his deductions, not because he somehow could not tell the nature of the wires.

His subsequent urgent attempt to resend the $1,000,000 to Montenegro further underscore that he knew what that December 23 wire failed and did not accidentally double-count it on his ledger. After his Wells Fargo attempt failed, he enlisted Runkle to try to wire the money on December 28, 2016. GX636 at 1-2; 1/20 Tr. 201:11-204:15. That day, after Runkle emailed a Wells Fargo banker with the routing information for Goldstein's UCB personal international, Goldstein replied "I need to get the wire to Montenegro by Friday [December 30] so it can be distributed this year for tax purposes." GX636 at 1. However, that wire also failed, and Goldstein responded to an email from showing he knew it failed. *See* GX637. Goldstein's urgency and repeated attempts at the failed wire show he followed it closely—and knew full well that it never happened.

Finally, the fact that Goldstein titled the updated figure "rev"—as in "revised"—further shows he knew it was not the true number, but instead a "revised" one he concocted to lower his taxes.

Goldstein willfully underreported his gambling income by omitting gross receipts, including from Phua and Hart, and then falsely deducting more than $3 million in inapplicable expenses. His unreported gambling income of $3,356,847 is properly included in the tax loss. *See* GX427; Ex. 11 at 1, 3.

**2. Misclassified 2016 Personal Expenses**

Goldstein also fraudulently caused six personal payments to poker players and the Resnicks, totaling $1,171,600 to be sent from G&R accounts in 2016 but classified as business expenses. Goldstein did not tell his firm managers or Gelman that the six payments and, as a result, they were misclassified as legal fee expenses, which were then deducted from G&R's income, thereby reducing Goldstein's taxable income by the same amount. Goldstein knew to ensure personal payments were correctly classified by either transferring the funds to his own personal accounts first, or explicitly telling Runkle. He did neither with these payments. He also did not tell her that a spreadsheet she sent him—and upon which he relied to prepare his January ledger—showed the transactions were incorrectly classified as business expenses. These actions demonstrate his willfulness and reinforce that this $1,171,600 in unreported income is properly considered in the tax loss.

Goldstein's evasion of assessment of his 2016 taxes, through these amounts from the misclassified personal expenses and his unreported net gambling income, led to a tax loss of $1,442,805. *See* GX427; Ex. 11 at 1, 3.

### B. Tax Loss from False Tax Returns

#### 1. 2017

Two items of income for 2017 underlie the tax loss. They were the basis for Goldstein's conviction on Count 3. The items are (1) a $250,000 legal fee payment that Goldstein diverted to his gambling account, and (2) a $175,000 poker-related payment that Goldstein falsely deducted as a business expense. The facts concerning the $250,000 diverted payment are summarized extensively in the PSR, ¶¶ 146-152, and the same is true for the $175,000 payment, ¶¶ 153-170.

In short, Goldstein knew he needed to give his employees and Gelman more information about these transactions to ensure they were reported properly. For the $250,000 payment, Goldstein simply needed to tell his representatives that the payment happened, because Goldstein had directed it to a personal bank account to which they lacked access. For the $175,000 payment, Goldstein needed to tell his representatives that although the recipient was a law firm, it was a personal, poker-related payment—and not a deductible business expense. Goldstein chose to structure these transactions in this manner, and was responsible for being transparent about them. His willfulness is clear from the very fact that he did not report these personal transactions to his assistants to Gelman, from his clear knowledge that he need to report transactions that did not flow through G&R's bank accounts (as he did in 2018 with money from Malaysia, DX265), and from the fact that he used funds from both transactions to pay debts to Safai—effectively reducing his debt while also reducing his taxable income.

The transactions were not properly reported on G&R's 2017 Form 1120S. The $250,000 was not counted as income, and the $175,000 was reported as a deductible business expense. That falsely reduced G&R's income, and in turn falsely reduced Goldstein's personal income. As a result, Goldstein's conduct in 2017 caused a tax loss of $173,349. Ex. 11 at 4.

Finally, as detailed below, the acquitted conduct guideline, § 1B1.3(c), does not apply to the tax loss from the false 2017 Form 1120S and Goldstein's resulting unreported income.

**2. 2019**

Two 2019 items of income gave rise to the unreported income tax loss in that year. They were the basis for Goldstein's conviction on Count 7 (false Form 1120S). The items are (1) a $170,000 poker-related payment that Goldstein falsely deducted as a business expense, and (2) a $229,000 legal fee payment from Phua that Goldstein falsely classified as a distribution. The PSR details the facts concerning these items. PSR ¶¶ 198-203 (poker-related payment), 204-207 (legal fee payment).

On the poker-related payment, Goldstein sent $170,000 from G&R's bank account to Charles Pacheco. Pacheco testified that Goldstein was paying him for poker. But Goldstein did not tell his employees or Gelman that this a personal payment, and so it was not properly reported on G&R's 2017 Form 1120S. It was reported as a deductible business expense. This falsely reduced G&R's income, and the falsely reduced income flowed through to Goldstein's 2017 Form 1040.

On the legal fee payment, evidence introduced at trial proved that it should have been reported as income to G&R. PSR ¶ 205. But it was not reported as income on Form 1120S, which Goldstein signed under penalties of perjury. PSR ¶ 208. Roughly two weeks after Goldstein learned of the criminal investigation, he asked a Gelman accountant whether the payment had been reported as income, and the accountant said no. PSR ¶ 206. Goldstein made no attempt to correct the misclassification, even while understanding that there was a criminal investigation into his taxes. PSR ¶¶ 207. Although that interaction happened a few weeks after Gelman filed Goldstein's resulting, false Form 1040, his utter lack of surprise at learning more than $200,000 had been

misclassified (as had all of the 2016 money he wired from UCB to G&R), strongly reinforces that he was aware of the misclassification and totally unsurprised to receive confirmation of it.

By failing to report the legal fee payment as income, Goldstein falsely reduced G&R's income, and the falsely reduced income flowed through to Goldstein's 2017 Form 1040. As a result, this 2019 conduct caused a tax loss of $147,973. Ex. 11 at 5.

Although the jury acquitted Goldstein of the § 7206(2) counts for his 2017 and 2019 Forms 1040, the tax loss caused by the false Forms 1120S remains part of the total tax loss for sentencing. Sentencing guideline § 1B1.3(c) provides that "[r]elevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction." U.S.S.G. § 1B1.3(c). This guideline does not exclude the tax loss from his unreported G&R income in those years for two basic reasons.[3]

***First***, the guideline does not apply because the jury did *not* acquit Goldstein of violating § 7206(2) by underreporting his G&R income on his 2017 and 2019 Form 1040. The jury instruction on the indictment's § 7206(2) allegations, Number 39, identified Goldstein's failure to report his G&R S Corp. income as an alleged falsity on his 2017 and 2019 Forms 1040. 2/19 Tr. 61:14-20, 62:24-63:8 (stating indictment alleged that his 2017 and 2019 Forms 1040 listed false S Corp. Income from Schedule E on various lines); Dkt. 487-1 at 50-51 (Instruction No. 39).

However, the instruction on the first § 7206(2) element—that Goldstein advised or assisted the preparation of a return—did not provide causing his Forms 1040 to omit income from G&R as an option. *See* 2/19 Tr. 65:15-68:2; Dkt. 487-1 at 55-56 (Instruction No. 41).

---

[3] Because the guideline was only recently implemented, the government addresses it out of an abundance of caution.

Instead, it listed acts related to falsities that appeared only on his Form 1040 and did not flow-through from G&R's Form 1120S. *See* 2/19 Tr. 66:5-9 (listing only three acts as options for 2017: that he "failed to report . . . gross gambling winnings," "omitted . . . pension-related income," or "omitted . . . interest income"), *id.* at 67:1-4 (listing only one option for 2019: failing to report gross gambling winnings).[4] And it required the jury to "agree unanimously on which particular act Mr. Goldstein committed," instructing that the jury "may not find Mr. Goldstein guilty of Counts 2 through 9 on the basis of any acts other than the ones I have just listed." 2/19 Tr. 66:2-4, 67:25-68:2.

As a result of this instruction, the jury could not convict Goldstein on Counts 2 and 6 based on the omission of part of his G&R income on the relevant S Corp. flow-through income lines. Its acquittals on Counts 2 and 6 therefore do not "represent conduct for which [he] was . . . acquitted," U.S.S.G. § 1B1.3(c), and therefore remain relevant conduct for the tax loss.[5]

[4] Goldstein proposed this instruction, which departed drastically from the standard model instruction upon which the government had based its proposed version. *See* Dkt. 416 at 93-97; 1 Modern Federal Jury Instructions-Criminal P. 59.04, Instruction 59-28 (2025).

[5] These acquittals also underscore how closely the jury followed instructions. The jury acquitted on Counts 2 and 6 even though it convicted on § 7206(2) Counts 3 and 7 for causing false 2017 and 2019 G&R Forms 1120S, and even though the § 7206(2) indictment *allegation* instruction specifically identified the S Corp. income lines (caused by the false Forms 1120S) as charged false items on his Forms 1040 for Counts 2 and 6. The jury understood that even though the indictment alleged other specific conduct, it still had to follow the § 7206(2) instruction prohibiting it from convicting him on Counts 2 and 4 "on the basis of any acts other than the ones . . . listed." 2/19 Tr. 67:25-68:2.

This highlights that the jury understood it had to follow the instructions on the elements of the substantive offenses *regardless* of what other instructions said about the indictment's allegations—and underscores the absurdity of Goldstein's Rule 33 argument that the jury could have convicted him on *every count* based on § 2 simply because instructions about the indictment's allegations contained three sentences, total, quoting § 2's text. *See* Mot., Dkt. 487; Opp. Dkt. 505 at 10-15.

***Second***, even if the jury could have acquitted Goldstein for omitting part of his G&R income from his 2017 and 2019 Forms 1040, the unreported G&R income would still be part of the tax loss as relevant conduct. The Sentencing Guidelines explain that when conduct "underlies both an acquitted charge and the instant offense of conviction," "the court is in the best position to determine whether such overlapping conduct establishes, in whole or in part, the instant offense of conviction and therefore qualifies as relevant conduct." U.S.S.G. § 1B1.3(c) app. n.10.

Here, Goldstein's omission of net income from G&R's 2017 and 2019 Forms 1120S squarely establishes the basis for his convictions on those corresponding counts, 3 and 7. The jury could not convict him *unless* it found he caused the omission of income from those G&R tax returns. As a result, that omitted income qualifies as relevant conduct. *See id.* Indeed, Goldstein's resulting unreported 2017 and 2019 income indisputably form part of the "same course of conduct, or common scheme or plan," *id.* § 1B1.3(a)(2), as the offenses of conviction: illegally reducing Goldstein's personal income taxes. *See id.* § 1B1.3 app. n. 5(B) (stating that two offenses are part of a common scheme or plan when they are substantially connected by a common factor, such as the same victim or purpose, and that they are part of the same "course of conduct" if they are sufficiently related in similarity, repetition, and time interval).

**3. 2021**

The $500,000 legal fee from Maguire that Goldstein diverted to pay a poker debt gives rise to the tax loss from 2021.[6] The facts relating to that payment have been extensively covered in this brief, at trial, and in the PSR (¶¶ 222-225). In short, Goldstein diverted that legal fee to pay his part of his debt to Safai, and did not tell his personal assistants or Gelman to report the payment

[6] Although Goldstein received millions in cryptocurrency in 2021, the government omits this from its tax loss calculation.

as income. PSR ¶¶ 222-225. Goldstein knew that he needed to inform Gelman about income (such as this legal fee) that did not hit G&R's bank accounts. PSR ¶ 151. His willfulness is clear from, among other things: the impossibility of forgetting to report half a million dollars from a famous actor, shortly after learning of a criminal tax investigation; and Goldstein's decision to later file an amended return that still did not report that income (or his cryptocurrency use) even after discovering Gelman's errors in failing to file FBAR for the UCB accounts and failing to report his wife's Form 1099 income.

The 2021 tax return, which Goldstein signed under penalties of perjury, did not report the $500,000 payment as income. PSR ¶ 233. That failure to report caused a tax loss of $185,000.

### C. Tax Loss from Evasion of Payment and Later Willful Failures to Pay

The tax loss for evasion of payment is the "total amount of loss that was the object of the offense." U.S.S.G. § 2T1.1(c)(1). Similarly, the tax loss from willful failure to timely pay taxes is "the amount of tax that the taxpayer owed and did not pay." U.S.S.G. § 2T1.1(c)(2), (3). "The tax loss is not reduced by any payment of the tax subsequent to the commission of the offense." *Id.* § 2T1.1(c)(5). Critically, the tax loss includes interest and penalties in both "willful evasion of payment cases under 26 U.S.C. § 7201 and willful failure to pay cases under 26 U.S.C. § 7203." *Id.* § 2T1.1 app. n.1; *see United States v. Josephberg*, 562 F.3d 478, 501-02 (2d Cir. 2009).

#### 1. 2016 Evasion of Payment

The taxes due that Goldstein reported on his 2016 tax return but failed to timely pay are properly included in the tax loss. When his taxes were due in April 2017, Goldstein owed but failed to timely pay $1,679,649 in taxes. PSR ¶ 96. By the time he paid off his reported 2016 taxes in April 2021, the full balance—including interest and penalties—had ballooned to $2,090,228.13. *See* GX73 (2016 Account Transcript); Ex. 11 at 1. The government presented powerful evidence

that Goldstein willfully evaded payment of those taxes. Highlights included his 2016 draft email to Cooper explaining that he had decided to not pay his 2016 taxes on time; his recurring lies to RO Parrish that concealed his ongoing gambling activity; his exorbitant annual spending; and his glaring use of the G&R IOLTA to prevent the IRS from seizing funds before he could use them to buy his new house.

Goldstein willfully evaded payment of $2,090,228.13 in reported 2016 taxes, penalties, and interest. This is properly included in the tax loss.

**2. 2017, 2019, 2020 and 2021 Willful Failure to Pay**

The jury convicted Goldstein of willfully failing to timely pay his taxes owed in tax years 2017, 2019, 2020, and 2021. At trial, he did not meaningfully contest the amounts he failed to pay for those years, or the totals he ultimately paid including penalties and interest. Instead, he argued his failure to pay was not willful. But the evidence that he acted willfully was overwhelming. The evidence of his willfulness for evading his 2016 taxes applied equally to these counts, and was reinforced by his habitual failure to pay his taxes even after being instructed to do so by RO Parrish. The jury's verdict proves it agreed. The total losses from Goldstein's failures to pay, including penalties and interest, are listed in the table below.

| Tax Year | Tax Loss from Failure to Pay |
|---|---|
| 2017 | $1,419,164 |
| 2019 | $553,118 |
| 2020 | $1,109,665 |
| 2021 | $1,463,230 |

*See* Ex. 11 at 1. These are properly included in the total tax loss.

**3. 2022 and 2023**

In calculating tax loss based on relevant conduct, "all conduct violating the tax laws" should be considered unless it is "clearly unrelated." U.S.S.G. § 2T1.1 app. n.2. For example, "a

continuing pattern of violations of the tax laws" forms part of the same course of conduct and thus relevant conduct. *Id.*

Thus, uncharged conduct involving willful failure to pay constitutes part of the relevant conduct tax loss, and includes interest and penalties. *See United States v. Adams*, 955 F.3d 238, 248-49 (2d Cir. 2020) (holding that interest and penalties could be included in tax loss calculation based on uncharged conduct involving "willful evasion of payment" or the "willful failure to pay" regardless of the offense of conviction); *United States v. Lombardo*, 582 F. App'x 601, 619 (6th Cir. 2014) (finding court did not abuse its discretion by including penalties and interest in tax loss based on uncharged conduct that was part of the common scheme). And if the precise tax loss is uncertain, "[t]he guidelines contemplate that the court will simply make a reasonable estimate based on the available facts." U.S.S.G. § 2T1.1 app. n.1.

Here, Goldstein knew that he had an obligation to timely pay his 2022 and 2023 taxes but chose to not, and the resulting tax loss from those years constitutes part of his relevant conduct. Indeed, Goldstein himself "identified outstanding tax liabilities" to the Probation Officer "but wished not to provide additional information." PSR ¶ 318.

***Tax Year 2022***: Goldstein still has not filed a tax return for 2022, and has not paid anywhere near the full amount of taxes due. The government's calculation of his 2022 taxes (and thus unpaid tax loss) proceeds in four steps, all reflected in its tax computation, Ex. 11 at 7.

First, it calculates that he had $19,527,565 in net gambling winnings in 2022 based on the parties' trial stipulation regarding his gambling inflows of $47,465,350 and outflows of $26,437,785 that year. Second, it subtracts the net business loss $1,673,681 that G&R reported on its 2022 Form 1120S. Third, it adds his W2 wages, interest and dividends income, and capital gains, and then subtracts mortgage interest and real estate taxes. Fourth, it credits him with the

employment taxes he withheld, as well as $3,250,000 he made in payments between October 2022 and April 14, 2023. Ex. 3 (2022 Account Transcript).

Based on these four steps, Goldstein owed an additional $3,338,546 the day his tax return was due and which he never paid. Ex. 11 at 7. Once penalties and interest are included, the total tax loss from his still-unpaid 2022 taxes is $5,934,767.

***Tax Year 2023***: G&R reported $3,881,712 in net profit on its 2023 Form 1120S—all of which constituted taxable income to Goldstein. However, he has still not filed a 2023 Form 1040. He made estimated payments totaling only $325,000 for 2023, and withheld only $1,631 in federal taxes from his wages. *See* Ex. 12(2023 Account Transcript); Ex. 13 (2023 Wage & Income Statement). After accounting for minor credits and debits, Goldstein's total taxable 2023 income was $3,966,396, with a total tax of $1,432,513. After accounting for the tax payments he already made, Goldstein owed but failed to pay $1,105,882 when his taxes were due in April 2024. Ex. 11 at 8. Once penalties and interests are included, the total tax loss from his failure to pay his 2023 taxes is $1,745,505. Notably, this calculation does not incorporate any gambling income, despite the fact that Goldstein received $13,000,000 in gross gambling winnings from Beal alone.

**D. Total Tax Loss**

Based on the constituent losses from Goldstein's unreported 2016, 2017, 2019, and 2021 income, the amount of 2016 tax for which he evaded payment, and the amounts he willfully failed to pay in 2017, 2019, and 2020 through 2023, the total tax loss from Goldstein's criminal conduct is $16,264,804.97. *See* Ex. 11 at 1.

This calculation omits the tax loss from Goldstein's 2024 and 2025 conduct. In 2024, he received gross gambling winnings of $11,830,000 from Beal but he still has not filed a tax return for that year. Meanwhile, Goldstein's 2025 Form 1040 reported over a million dollars of the taxes

due and he still has not paid this. Nonetheless, the government's tax loss calculation conservatively hews to 2016 through 2023, the years repeatedly litigated leading up to and during trial. *E.g.*, Rule 404(b) Mot., Dkt. 421.

The PSR correctly calculates a base offense level of 26 for the tax counts based on this total tax loss, which is greater than $9.5 million. PSR ¶¶ 272-74.

## II. The PSR correctly calculates the sentencing guidelines range as 78–97 months.

### A. Sophisticated Means

The PSR properly applied a 2-level increase, pursuant to U.S.S.G. § 2T1.1(b)(2), because Goldstein's offenses involved sophisticated means. For purposes of that section, "sophisticated means" applies to "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2T1.1, Application Note 5. According to the Guidelines, "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means." *Id.* The increase applies here for multiple reasons.

***First***, Goldstein repeatedly used offshore bank accounts to hide obscure assets and transactions. Eight days after beating Chairman in September 2016, Goldstein started the process of opening bank accounts at UCB for himself and G&R. The next month, in October 2016, Phua transferred over $1.1 million in gambling winnings to Goldstein's personal UCB account, and Goldstein then wired $885,000 to the United States, through wires of $50,000 to Keith Gipson, and $85,000 and $750,000 to G&R. Goldstein kept the remaining roughly $130,000 at UCB, which he then spent largely at luxury retailers.

When Goldstein opened the accounts, he did not tell Runkle the purpose of his personal account, and told her only that the G&R account was for "Montenegro clients." GX574. This hid

his account's true function as a waypoint for his Chairman gambling winnings. When he had $885,000 wired to G&R, he continued the guise by not telling her or Gelman that it was poker winnings—which led to it being incorrectly classified as legal fee income. When he kept the remaining winnings at UCB, he also did not tell Deyhle. As a result, even though Gelman learned about the UCB accounts, it never learned that he was funneling gambling winnings through them.

By using UCB to disguise the nature and source of his gambling winnings, Goldstein ensured Deyhle would not inquire about Goldstein's massive poker games in Asia or his winnings from Phua, allowing Goldstein to control how much to report on his 2016 taxes. He did precisely that when he listed on his poker ledger only $750,000 of the $1.1 million he received in Chaiman winnings from Phua, while still deducting the staking payments he made to Gipson and Robl from that money. Ultimately, Goldstein's use of the UCB accounts caused fraudulent items on his and G&R's tax returns.

In addition, as the government explains below regarding the obstruction adjustment under guideline § 3C1.1, Goldstein was paid approximately $1 million by Phua through UCB in September 2018, and Goldstein testified at trial that this was a loan (and thus not reportable income). After trial, however, UCB produced an invoice substantiating the government's theory—and undermining the credibility of Goldstein's testimony—that the funds were legal fees Phua paid to Goldstein (and thus reportable income). Ex. 14, 9/7/2018 UCB Invoice. The government's inability to secure this document before trial—despite its due diligence and repeated follow-ups to Montenegro concerning the outstanding MLAT—is a powerful illustration of why the sophisticated means enhancement applies. Using such accounts adds an extraordinary layer of complexity and opacity that can obfuscate the nature and source of financial transactions. Here, this frustrated the government's ability to ascertain and demonstrate the true scope of Goldstein's

crimes. Similarly, Goldstein's "virtual account" with Phua—which he never disclosed to Gelman or his assistants—is yet another example of a foreign account that Goldstein used to commit his crimes.

***Second***, Goldstein's repeated *diversion* of income—so that it would not be picked up and reported by Gelman on his returns—was especially complex offense conduct. At one level, the act of paying a gambling-related debt directly with a diverted legal fee may be simple, requiring only one or two wires. But by doing so, Goldstein effectively made his income disappear from every bank account in his and law firm's bank accounts, much like using a nominee. As with his use of the UCB accounts, this added a layer of complexity to his crimes that made their scope more difficult to ascertain, and would have been all but undetectable had the government not sought records from virtually all of his suspected poker counterparties and scoured *their records* for possible diversions.

***Third***, Goldstein used VPN technology to mask his physical location (as outside the United States) so that he could conduct hundreds of thousands of dollars' worth of cryptocurrency transactions on Binance.com in 2021. PSR ¶ 228. IRS-CI Special Agent Tuan Nguyen explained at trial that in 2021, Goldstein routinely accessed Binance.com while he was purportedly in Italy, Norway, Trinidad and Tobago, and other international locales. PSR ¶ 229. This was in addition to Goldstein's prolific use of the platform Coinbase (which he did not need a VPN to access). See PSR ¶ 230. This was part and parcel of Goldstein's crimes. He was convicted on Count 9 (aiding and assisting in the preparation of a false individual tax return for 2021) because, among other reasons, he falsely denied engaging in any cryptocurrency transactions that year. By concealing his connection to a substantial percentage of those transactions (the ones conducted on

Binance.com), Goldstein made it less likely that the government could discover he directed those transactions. Goldstein's scheme was not successful, but U.S.S.G. § 3C1.1 does not require this.

The scheme, moreover, involved "hiding assets or transactions" by using "offshore financial accounts"—facts which "ordinarily indicate[] sophisticated means." U.S.S.G. § 2T1.1, Application Note 5. In fact, this would not be the first tax prosecution in which a district court applied the enhancement where a defendant used VPN technology to access a foreign cryptocurrency platform. *See United States v. Saris*, 5:22-cr-00502-DCN, Dkt. 50 (N.D. Ohio Jul. 30, 2024) (sentencing memorandum noting that plea agreement included two-level increase under § 2T1.1(b)(2) because defendant used VPN to circumvent a foreign cryptocurrency company's ban on U.S.-based users); *id.*, Dkt. 73 at 25 (district court adopting offense level and Guidelines range from plea agreement, over defendant's last-minute objections). The 2-level increase under § 2T1.1(b)(2) applies.

**B. Obstruction**

The PSR properly applied a 2-point upward adjustment for Goldstein's obstruction of justice under U.S.S.G. § 3C1.1. That section provides that if (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by **2** levels." (Emphasis in original.) This adjustment applies for a number of reasons.

**1. Lies to IRS-CI Special Agents**

At trial, the government proved that Goldstein lied to IRS-CI special agents in October 2020. Goldstein lied about, among other things, his 2016 gambling income, claiming that income

was only from Gores and he only had investors against Gores. Goldstein knew he was talking to federal law enforcement agents conducting a criminal investigation into his taxes. That criminal investigation led to Goldstein's conviction on, among other charges, tax evasion for 2016. Therefore, Goldstein's lies to IRS-CI special agents were an "attempt[] to obstruct or impede[] the administration of justice with respect to the investigation . . . of the instant offense of conviction." U.S.S.G. § 3C1.1. And "the obstructive conduct related to the defendant's offense of conviction." *Id.* Moreover, Goldstein's lies significantly impeded the investigation by preventing it from discovering his tens of millions of dollars in winnings against Chairman and Tango (and the true nature of his 2016 UCB funds) until 2024 when it discovered Goldstein's statements about those games buried in hundreds of pages of text messages produced by Gipson. Applying the adjustment based on the lies to IRS-CI special agents was appropriate.

**2. Attempts to influence a witness**

As explained above and proved at trial, Goldstein's personal assistant announced her resignation in the wake of IRS-CI's visit to the law firm in October 2020. And as the Court has heard, the evidence showed that Goldstein repeatedly offered the personal assistant, who had intimate knowledge of the law firm's and Goldstein's finances, things of immense value, including a $10,000 bonus and Bitcoin—including a $10,000 bonus and Bitcoin—but only in person, when no one else was present. Goldstein's offers to Bart only escalated after G&R hired and began to train her replacement and Bart prepared to leave. She thought Goldstein intended, in part, to influence her participation in the investigation, contemporaneously writing, "This tax stuff must be getting to him because he keeps offering me money." GX17.5 at 1.

This series of events justifies applying the obstruction adjustment. Goldstein was offering money to keep a central witness on his side during IRS-CI's investigation of this case. That satisfies the requirements of U.S.S.G. § 3C1.1.

Goldstein has characterized his offers to Bart as additional compensation for hard work and attempts to dissuade her from leaving the job. But those characterizations ignore that Bart already received a bonus for her work at the end of 2020, and that the offers to Bart escalated once it was clear she was leaving (and thus could not be dissuaded from doing so). Further, Goldstein suggests that Bart's paranoia and speculation about his intent somehow absolves him. It was only natural, however, for Bart to be paranoid upon learning that her boss was under federal criminal investigation, and relatedly to speculate as to why he began offering her things of value once she announced her resignation. None of that changes that the only credible explanation for the offers was to limit or influence Bart's participation in the criminal investigation. By late 2020, Goldstein knew she had received disturbing information about his treatment of women, and that she had been involved in removing one from the firm's health insurance after that woman called and emailed G&R about Goldstein. In fact, Bart later told IRS-CI that she suspected he had improperly placed multiple women on the payroll. In this context, Bart's reactions are more than understandable. Goldstein's conduct, on the other hand, was obstructive and counsels in favor of applying the adjustment in U.S.S.G. § 3C1.1.

**3. Perjury in Declaration**

On August 29, 2025, Goldstein was arguing to the Court that he had insufficient funds to pay his attorneys, and so he needed to be able to sell his house in Washington, D.C. He attached to a related filing a declaration signed under the penalties of perjury. PSR ¶ 245, GX790 (Decl.). The purpose of that declaration was to help persuade the Court to lift the *lis pendens* on his home

and bar the criminal forfeiture of his house if he were convicted—a form of punishment for his mortgage fraud on NFM. *See* Mot. Sell Hawthorne Property, Dkt. 166.

In his sworn declaration, Goldstein listed certain assets, including "three checking accounts with a combined balance of approximately $40,000," had sold his cars, and swore that he did "not have any other significant assets. GX790 at 2-3. However, at trial, he admitted that he did not list on the declaration a watch worth roughly $100,000 (a black ceramic and rose gold Audemars Piguet 50th Anniversary Self-winding Chronograph). *Id.* Goldstein purchased the watch for $200,000 in 2022 and learned from a luxury watch dealer in September 2024 that, if he replaced a broken pin to reattach the bracelet, it would be worth $90,000 to $110,000. GX794 at 23-26 (WhatsApp chat with pictures).

Barely one month after claiming he did not have "any other significant assets," Goldstein wore the (clearly repaired) watch—worth more than double the purported balance in all his bank accounts—to drinks at a D.C. hotel, where he spent more than $250. Ex. 15, 9/30/25 Hotel Receipts & Photographs.

Goldstein further admitted at trial that he only told Pretrial Services about the watch after the government told the Court about it. *Id.* ("So what happens is . . . you say, hey, he has filed this thing. It's not on there. We have a concern with pretrial services. I immediately go to pretrial services. I disclose it to pretrial services."). Concealing such a valuable asset from the Court—in the context of arguing he had insufficient assets so it should let him sell his house—shows a stunning disregard for the truth and the penalties of perjury. Goldstein plainly attempted to and in fact did obstruct the prosecution of the case (including a potential form of punishment) and these proceedings more generally. The adjustment in U.S.S.G. § 3C1.1 applies.

#### 4. Perjury about September 2018 Income

Goldstein received approximately $1 million from Phua in September 25, 2018. PSR ¶ 189. The payment was routed through their accounts at UCB in Montenegro. *Id.* Ultimately it landed in G&R's bank account in the United States. *Id.* At Goldstein's direction, his personal assistant told Gelman that the payment was a loan. PSR ¶ 190. As a result, it was not reported as income on G&R's tax return for 2018 (or, by extension, Goldstein's individual return). *See id.*

At trial, Goldstein testified that the payment was a loan. PSR ¶ 191. On the other hand, IRS RA Ranahan treated the payment as income because Goldstein was representing Phua at the time. PSR ¶ 190. The jury acquitted on count 5, which charged Goldstein with aiding and assisting in the preparation of G&R's false 2018 return, including by failing to report the Phua payment as income.

After trial, UCB produced a new, one-page document pursuant to an outstanding mutual legal assistance treaty request ("MLA Request") to Montenegro. PSR ¶ 191; Ex. 14, 9/7/2018 UCB Invoice. On its face, the document is an invoice dated September 7, 2018, from Goldstein to Phua. PSR ¶ 191. The invoice requested payment of approximately $1 million for "legal consultation charges." *Id.* Later the same month, Goldstein received the payment from Phua. PSR ¶ 189.

This document confirms the government's theory and directly contradicts Goldstein's testimony. Goldstein was lying to the jury about the nature of a large payment to avoid conviction in this case (and perhaps also to minimize the extent of tax loss and restitution in the case of conviction). This lie also casts further doubt on the veracity of Goldstein's testimony that Phua gave him a cash loan of approximately $1 million later on in 2018, leading to Goldstein's interaction with CBP at Dulles Airport. But regardless, Goldstein's false testimony on the September 2018 payment warrants applying the adjustment in U.S.S.G. § 3C1.1.

### C. Total Tax Group Adjusted Offense Level

The PSR correctly calculates the total adjusted offense level for the tax group at an offense level of 30 points. PSR ¶ 279. This incorporates the group base offense level 26, and the two-point enhancements for both the sophisticated means specific offense characteristic and obstruction of justice. PSR ¶¶ 274-78.

### D. Mortgage Fraud Group Offense Level

The PSR also correctly calculates a base offense level of 7 for the group of mortgage fraud counts because 18 U.S.C. § 1014 carries a 30-year maximum term of imprisonment. PSR ¶ 280; U.S.S.G. § 2B1.1(a)(1). The PSR also correctly calculates a total offense level of 7 because no adjustments apply to this group. PSR ¶¶ 281-85.

### E. Total Offense Level & Guidelines Range

The PSR properly applies the grouping adjustments for multiple counts to calculate a combined adjusted offense level of 30, PSR ¶¶ 286-289, and it properly subtracts two points because Goldstein qualifies for the zero-point offender adjustment, PSR ¶ 291; U.S.S.G. § 4C1.1(a). Thus, Goldstein's total offense level is 28. PSR ¶ 292.

Because Goldstein has a criminal history score of zero, the PSR correctly computes the guidelines range for his offense as **78 to 97 months of imprisonment**. PSR ¶¶ 295, 320; U.S.S.G. § ch. 5 pt. A (Sentencing Table). For the reasons set forth below, the government respectfully submits that sentence at the high end of this range is appropriate.

## III. Under the § 3553(a) factors, Goldstein's conduct warrants a sentence of 97 months.

A court must "make an individualized assessment" of how the § 3553(a) factors apply to the facts and "sufficiently explain its decision" to show it arrived a "reasoned basis" for the sentence imposed. *Mendoza-Mendoza*, 597 F.3d at 216. Under § 3553(a), "[t]he Court shall impose

a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). In determining the appropriate sentence, this Court must consider factors, including:

- The nature and circumstances of the offense and the history and characteristics of the defendant;
- The need for the sentence imposed to:
    - (A) Reflect the seriousness of the offense and provide just punishment;
    - (B) Afford adequate deterrence to criminal conduct; and
    - (C) Protect the public from further crimes of the defendant;
- The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
- The need to provide restitution to any victims of the offense.

*See* 18 U.S.C. § 3553(a)(1)-(7).

### A. The Nature and Circumstances of the Offenses

This is the first half of the first factor the Court must consider. *See* 18 U.S.C. § 3553(a)(1). It weighs heavily in favor of a sentence within—and at the high end of—the Guidelines range.

Goldstein's crimes are egregious. He perpetrated a calculated, multi-year, multi-pronged scheme to hide tens of millions of dollars in gambling income from the IRS. For years, he chose not to pay taxes on the income that he *did* report, and even then, he paid that off those liabilities only when it suited him. Even after learning about the criminal investigation, he doubled-down by committing more tax crimes and attempting to bribe a witness. Even this was not enough: in 2021, he purposefully lied to mortgage lenders three separate times to help buy and keep a new, multimillion dollar home.

**1. Premeditation**

The overall arc of Goldstein's scheme reveals yearslong planning, well before his and G&R's 2016 tax returns were filed. First, Goldstein fired his prior accountant, William Caldwell, after the 2012 audit revealed his extensive poker activities to Caldwell, who in turn relayed the importance of good gambling recordkeeping and tax reporting to him. Soon after, Goldstein hired Deyhle and Gelman to handle his and his law firm's taxes. Even though Goldstein claimed Caldwell had failed to ask enough and the right questions about his gambling, he told Deyhle nothing his poker, the audit, or why he fired Caldwell.

Despite receiving a $10 million loan from the Resnicks in 2014 and using it to play poker, and then playing for hundreds of thousands and then tens of millions of dollars in 2016, Goldstein *still* did not tell Deyhle about his gambling until early 2017. He did so only after Alec Gores issued a Form 1099 that ensured the IRS would know about Goldstein's winnings, requiring him to report a plausible amount of them.

Second, when Goldstein finally did tell Deyhle, he lied about the true amount of his net winnings. Goldstein knew his 2016 winnings and losses as early as December 2016 (when he texted a summary of his wins and losses to Robl and Gipson) and January 2017 (when he emailed a copy of his poker ledger to his ProtonMail account). But when Deyhle asked for the numbers in March 2017, Goldstein replied, "I'll figure that out." He could have simply emailed his poker ledger or bank statements to Deyhle, thereby ensuring Deyhle could calculate the amounts in March, and relieving Goldstein of the need to spend any more time on them. Instead, Goldstein waited until October 2017, added three false items that falsely reduced his taxable gambling income by over $3 million, and then emailed only the final numbers (not the ledger or underlying records) to Deyhle. This seven-month delay highlights a stunningly premeditated choice:

Goldstein knew as early as March 2017—after he had lost millions to Bob Safai—that he did not want to report his full 2016 gambling income; he then waited until October to decide the exact amount to hide.

Third, Goldstein's premeditation is similarly reinforced by his decision to not enlist his assistants in tracking his poker. Goldstein delegated myriad personal tasks to them, all the way down to fixing his home's pathway lighting. *See* 1/21 Tr. 197:4-24 (Levitan). And despite that Goldstein's 2012 audit underscored the necessity of good gambling recordkeeping, he never told his assistants about the scale of his poker, never provided them access to the Wells Fargo bank account that reflected most of his gambling, and never had them keep records of his gambling. Even when he sought information from Molly Runkle about 2016 transactions specifically so that he could work on his poker ledger, he declined to give her access to his Wells Fargo account. In fact, Goldstein carefully avoided ever telling her, Levitan, and Bart, that many of the personal payments he had them make were poker related.

Fourth, his premeditation extended to G&R's bookkeeping. By default, G&R's accountants classified income funds as legal fee income and outgoing payments as business expenses. Meanwhile, transfers from G&R's business accounts to Goldstein's personal accounts were automatically classified as distributions, ensuring they would *never* be misclassified as business expenses. However, he routinely paid personal expenses directly out of G&R's accounts.

Even when paying personal expenses directly from the G&R accounts, Goldstein could still have ensured they were correctly classified by reviewing the books at the end of the year. Indeed, for tax year 2015, Runkle sent Goldstein a spreadsheet of 2015 payments from G&R's accounts, including travel expenses and suspected personal expenses, for Goldstein's review so that Gelman could ensure they were properly classified as personal expenses. DX10. But this

process stopped after tax year 2015, ensuring that no one would ever ask Goldstein to systematically confirm business expense classifications in 2016, when his income radically increased thanks to poker and he spent over a million dollars on personal payments out of G&R's business bank account. When Goldstein started working on his 2016 poker ledger, he asked Runkle for certain types of transactions; she sent him a spreadsheet that showed over a $1.1 million in personal payments were misclassified as legal fees. Goldstein used it for the ledger *but never told her* about the misclassifications.

In 2017 and 2019, Goldstein continued to spend hundreds of thousands of dollars on personal expenses from G&R's bank accounts without identifying those payments as personal to his assistants or accountants—all but ensuring they would be misclassified as business expenses and falsely reduce his taxable income.

Fifth, his use of foreign bank accounts at UCB also demonstrates cunning premeditation. In October 2016, Goldstein used the accounts to receive more than $1.1 million in Chairman winnings from Phua. However, by providing scant detail to Runkle about accounts' purpose, and telling her the firm UCB account was for "Montenegro clients," Goldstein ensured neither she nor Gelman would realize the money constituted gambling winnings. This ensured Deyhle would not inquire about Goldstein's massive poker games in Asia or his winnings from Phua—letting Goldstein decide exactly how much to report on his taxes. Indeed, Goldstein's poker ledger only recorded $750,000 of the $1.1 million he received in winnings from Phua, even while it listed the full related staking payments he made to Gipson and Robl as outflows.

**2. Consistent, Calculated Choices**

Beyond premeditation, Goldstein made the calculated choice to cheat on his taxes again and again, year after year. As an initial matter: the jury convicted him of tax evasion or aiding and

assisting the preparation of false tax returns in five different years 2016, 2017, 2019, 2020, and 2021. This near-annual cycle of malfeasance highlights Goldstein's decision to lie on his taxes year after year. It also underscores the extent to which the jury discredited Goldstein's testimony that he did not cheat on his taxes in any of those years.

Equally astounding, Goldstein had myriad opportunities to come clean but still chose to keep lying, even through trial. RO Parrish first met with Goldstein during a cold-call to his house in March 2018, just a few months after Goldstein filed the false 2016 Form 1040. During that meeting, Goldstein asked her whether she was from IRS Criminal Investigation—a question *no other taxpayer* had ever asked her. 1/28 Tr. 189:9-18. That bizarre question betrayed his guilt: he knew his 2016 tax return had been *criminally* false and he was afraid IRS-CI was already scrutinizing it. But when RO Parrish said she was not and asked about the cause of his large 2016 income and tax balance, Goldstein realized she had no idea about his gambling income. In that moment, he made the deliberate decision to deceive her: rather than mention gambling (let alone confess the falsities on his 2016 tax return), he instead chose to lie and tell her that the money came from a legal case.

In the following months, Goldstein continued to hide his poker and deceive RO Parrish. He did so by blaming his failure to pay his 2017 taxes on a fee dispute with Malaysia, while omitting that he spent millions on poker that year. He did so by hiding his ongoing payments to the Resnicks and Safai from RO Parrish when she was evaluating his ability to afford an installment agreement. He also did so by telling Deyhle—his intermediary with RO Parrish—that he had "no gambling winnings" in 2017, ensuring Deyhle would not discuss it with her. These represent repeated, calculated choices that Goldstein made again and again from 2018 through 2019 to hide his gambling (and true 2016 income) from RO Parrish.

Goldstein did not stop committing crimes after learning he was under criminal investigation by IRS-CI in October 2020.Almost immediately, he began offering Bart things of substantial value, including a $10,000 bonus. He did so only in person (never in writing), when no one else was present. He did so to influence her participation in the investigation—as she accurately perceived at the time. His decision to attempt to influence a central witness (whom he correctly predicted would be critical to proving years of criminal conduct), rather than accept the consequences and confess his misdeeds, is alarming.

His decision to then commit *even more crimes* is all the more shocking. First, less than four months after the IRS-CI interview, Goldstein went to the trouble of using a VPN to make a Binance.com account, and promptly ran almost a million dollars of cryptocurrency through it (even though he already had a Coinbase account that could have received it all directly) but never told his firm manager or Gelman.

Second, in June 2021, he diverted the $500,000 legal fee from Tobey Maguire to Safai but never reported it to his firm manager or Gelman. Having realized IRS-CI could scrutinize G&R's books and catch misclassified expenses, Goldstein understood the surest way to reduce his legal fee income was by diverting it altogether, so he did exactly that with the Maguire fee. Together, these two acts rendered his 2021 Form 1040 false by fraudulently reducing his taxable income by $500,000 and by guaranteeing Deyhle would never report his cryptocurrency use, let alone any income paid through cryptocurrency.

Third, less than five months after being interviewed by IRS-CI, Goldstein committed mortgage fraud, lying on two different FSM loan applications. He even signed one of them directly below a giant, bold-type warning that "MORTGAGE FRAUD IS INVESTIGATED BY THE FBI." GX8.1 at 23.

Fourth, after FSM declined his applications over his federal tax issues, Goldstein committed mortgage fraud again, repeatedly lying on his loan application to NFM that September.

Fifth, in 2024, Goldstein filed his amended 2021 Form 1040, which still omitted his cryptocurrency use and his income from Maguire. 2/12 Tr. 174:7-20 (Goldstein confirming the "only change" to his amended 2021 return was adding his wife's income).

Goldstein's staccato of white-collar crime in 2021 is breathtaking: that year, he diverted and concealed income, and then lied on three separate loan applications, leading the jury to convict him on four separate felonies. His choice to do this again and again, after learning about a criminal investigation, highlights his callous disregard for the law and his recurring calculation that he would not get caught.

**3. Greed**

Goldstein's widespread criminal conduct stemmed from a single, enduring motive: greed. Whether evading his 2016 taxes, filing false returns, or lying on loan applications, Goldstein always put himself first. His drumbeat of tax nonpayment encapsulates this.

Over the course of 2016, 2017, and 2019 through 2021, Goldstein failed to timely pay more than $5.2 million in taxes. *See* GX430 at 3 (listing taxes due of $1,651,006, $970,207, $512,522, $946,917, and $1,119,426 in those years). Instead, he disregarded his tax obligations, repeatedly ignored advice to make estimated tax payments, and spent profligately on poker and his lifestyle.

First, Goldstein made explicit his choice to invest money in poker rather than pay taxes. In fall 2016, Goldstein drafted an email to the Resnicks' representative, Craig Cooper, in which he wrote that he had "$800,000 still in Asia," and continued: "I was going to use part of that to pay my personal 2016 taxes, but I'm just paying penalties instead. That's fine, and it's my problem." GX12. Goldstein fully understood his duty to pay taxes and, at that point, even had the money to

pay his 2016 taxes. But instead he *planned* to not pay his taxes and opted not to save money for them. Rather, he would invest it in poker matches against Gores. Then, after beating Gores later that fall and receiving millions more in gambling income, Goldstein *still* did not set any aside for his taxes. Instead, between mid-January and March 2017, he spent over $5 million on poker losses to Safai. GX415. That same January, Goldstein also spent $100,000 on a new Bentley Bentayga and $110,000 on an apartment, all while knowing he would owe 2016 taxes in a few months. GX414; 2/2 Tr. 245:21-246:6 (stipulation); PSR ¶¶ 242, 244. In other words: even though he knew he had a duty to pay his 2016 taxes on time, he viewed them as a minor "problem" that was "fine," and opted to spend his money on luxury and investments in games against Safai instead.

Second, Goldstein could have paid his taxes—as do many people—in quarterly installments. As a self-employed lawyer, Goldstein knew he should make estimated tax payments every quarter. He "understood" what these were and paid them while Caldwell was his accountant. 1/22 Tr. 113:4-19. Caldwell testified that, on a scale of zero to one hundred, he was "a hundred" percent certain that Goldstein understood "his obligation to pay his taxes on time." 1/22 Tr. 115:1-6. Those payments were particularly important because, as a small-business owner, Goldstein was taxed on G&R's business income beyond his W2 wage withholdings, so he was not automatically setting aside the full amount for his taxes. *See* 1/22 Tr. 111:11-112:5. Nonetheless, Goldstein made zero estimated payments during 2016 (when he received over $27 million in poker winnings) or 2017 (when he got over $3 million in legal income). GX73; GX74.

Goldstein only resumed making estimated payments in 2019, after RO Parrish had begun escalating the levies on his accounts. GX76. During their March 2019 meeting, RO Parrish suggested to Goldstein and Deyhle that he should "make [payments] monthly to allow less strain on quarterly payments." GX19 at 42. Despite this, Goldstein immediately stopped making

quarterly estimated payments after he reached an installment agreement in May 2019 and her collections work ceased. GX76. When Goldstein was negotiating an installment agreement and wanted to look compliant, he made estimated payments; when he got what he wanted, he stopped.

Third, Goldstein did not pay off his outstanding 2016 and 2017 taxes until federal tax liens inconvenienced him. As early as March 2018, RO Parrish had suggested he get a loan to repay his outstanding taxes. GX19 at 14. Although Goldstein claims this inspired him to get the $2 million from Phua in 2018, it is undisputed that he paid less than $1 million in taxes with that money. However, after the federal tax liens for 2016 and 2017 on his Chevy Chase house prevented him from getting a mortgage to buy the new DC house in February 2021, Goldstein secured a $1.6 million loan from Parabellum within weeks, and then got another loan of $4 million from Parabellum in April 2021 to pay off his 2016 and 2017 taxes and remove the liens so he could sell the Chevy Chase house. He had the financial resources to fully pay them off but he did care to until the liens encumbered him.

Fourth, even beyond poker, Goldstein spent lavishly on himself while continuing to owe taxes in later years. For example, Goldstein had previously told RO Parrish that he sold his old Bentley Bentayga "to reduce expenses." PSR ¶ 113; 1/28 Tr. 102:5-17. Nonetheless, he bought a new Bentley in June 2020, barely a year after she had ceased collections and just one month before he would fail to pay more than $500,000 that he owed on his 2019 taxes. *See* PSR ¶ 244; GX430 at 3. Similarly, Goldstein spent over $100,000 annually (and more than $950,000 total) on PayPal and Venmo between 2017 and 2021, PSR ¶ 247, frequently sending women hundreds or thousands of dollars.

Most strikingly, even when he could *easily* afford to immediately pay *all* overdue taxes, Goldstein spent wildly on other things instead. On May 25, 2022, Goldstein received $15,000,000

in gambling winnings from Beal. GX426. The previous month, he had failed to pay more than $1.1 million due on his 2021 taxes. GX430 at 3, 8. He also owed just over a million dollars in taxes, penalties, and interest on his 2020 income. GX430 at 3, 7. However, instead of paying *any* of those liabilities, Goldstein instead chose to spend over a $1.5 million on, among other things, an $800,000 investment in Michael McGuiness's poker matches, $324,000 at Rusnak Pasadena (a luxury car dealership), $250,000 on a payment to the Resnicks, $160,000 on gifts to four women, and $46,000 in one night at The Box nightclub. GX27 at 4-6; GX414 at 2; GX779 at 7.

Ultimately, Goldstein did not pay off his 2020 taxes until December 2022. PSR ¶ 238. But that was after receiving more winnings, and then spending $60,000 in another night at The Box, buying his $200,000 watch, and paying approximately $382,000 to rent a villa on St. Bart's. PSR ¶¶ 243-44, 246.

His failure to timely pay his 2020 and 2021 taxes is particularly glaring because he did it after telling IRS-CI—in 2020—that he had not paid his 2016 and 2017 taxes because "he had wildly overspent, so he just didn't have the money." PSR ¶ 124 (SA McDonald testimony). Goldstein's recurring choice to spend wildly on his extravagant lifestyle before paying his taxes also underscores his pernicious disregard for his tax obligations.

At base, Goldstein's crimes were animated by pure, uninhibited greed. These were not crimes of passion or spontaneous, isolated moments of wrongdoing. They were a steady stream of conscious, calculated, often premeditated decisions made year-after-year to conceal income, prevent tax collection, delay payment, and hide debts—all in the pursuit of extraordinary luxury and ever-growing riches. Goldstein's post-2021, post-indictment, and post-conviction conduct (discussed below) only reinforces this conclusion.

### B. The History and Characteristics of the Defendant

Goldstein's history and characteristics—from his professional success and material advantages to his pre- and post-offense conduct—weigh strongly toward a substantial sentence at the high end of the guidelines range. *See* 18 U.S.C. § 3553(a)(1).

Although Goldstein has no criminal history points under the Guidelines, the term "first-time offender" does not comfortably fit him. Back in 2012, Goldstein was caught failing to report his gambling activity during the IRS audit. He could have taken the honest path of tax compliance then, but instead he chose to hire new accountants and to hide his poker from them. He could have taken the honest path in 2016, when he achieved stratospheric winnings. He could have taken the honest path when RO Parrish first asked him questions in 2018. He could have taken it when IRS-CI confronted him in 2020 about his tax crimes. Instead, he chose to further conceal his tax malfeasance, and to commit more tax crimes, plus three separate mortgage frauds. He is a "first-time offender" only in that the breadth of his crimes took years to catch. His chosen course of action—essentially making him a recidivist—should be weighed heavily by the Court when considering his "history and characteristics."

After indictment, he also could have filed his (long overdue) 2022 and 2023 individual income tax returns, timely filed his 2024 one, paid all those taxes, or made estimated 2025 tax payments. After being convicted of 9 federal tax criminal crimes, he could have filed an accurate 2025 tax return and paid his taxes due. Instead, he did none of these things. That relevant conduct reveals a person entirely and obstinately consistent with the man who committed the offenses of conviction.

So do his serial deceptions of those around him. Goldstein lied to the Resnicks to get the $10 million line of credit; he lied about Gipson's poker experience to Gores; he lied to Paul Napoli

to con him into "investing" $500,000 in a game Goldstein had already lost to Safai; and he repeatedly lied to Parabellum about his financial condition by not disclosing his roughly $15 million in debt to Safai and the Resnicks. Never mind that the Resnicks were legal clients, or Napoli and Parabellum longstanding business partners. Goldstein was prepared to lie and cheat for his own financial advantage, whether big or small.

Unlike many defendants, Goldstein has enjoyed exceptional professional success and significant material comfort, yet committed these serious crimes in spite of those advantages.

"Brilliant." 1/20 Tr. 177:7 (Runkle). "Very impressive." 1/20 Tr. 100:23 (Russell). A "pioneer[]." 2/3 Tr. 9:24 (Harrington). "One of the most prominent private practitioners . . . before the Supreme Court." 2/3 Tr. 70:22-23 (Cooper). "The most elite Supreme Court advocate in the [S]tates." 2/4 Tr. 174:21-22 (Chin Feman). "[O]ne of the nation's most experienced Supreme Court practitioners, [and] counsel to party in roughly 125 merits cases at the court. . . . Only 3 lawyers in the court's modern history have argued more cases in private practice." Ex. 16, *Tom Goldstein, Publisher*, SCOTUSBlog (downloaded Dec. 7, 2024). By the mid-2010s, Goldstein was a brilliant attorney at the pinnacle of his profession. He was a member of the prestigious American Law Institute, oversaw the appellate clinic at Harvard Law School, and was "an elected Fellow of the Academy of Appellate Lawyers." *Id.*

He was making millions of dollars as an attorney and won millions more in poker during 2016. He was highly educated and highly respected. He had wealth beyond what most Americans can ever hope to experience. But that was not enough for him. Driven by greed and obvious disdain for the tax system, Goldstein perpetrated his years-long scheme to maintain his lifestyle and further enrich himself. He chose again and again to lie to his accountants, his employees and business partners, the IRS, and multiple mortgage lenders. In so doing, Goldstein flouted the very tax

structure and legal system that made his glittering, wildly profitable legal career possible. *Cf. New York ex rel. Cohn v. Graves*, 300 U.S. 308, 313 (1937) ("Enjoyment of the privileges of residence in the state and the attendant right to invoke the protection of its laws are inseparable from responsibility for sharing the costs of government."). We can and should expect more from every attorney and officer of the court—let alone one of Goldstein's status.

Goldstein's intellect, education, and material advantages reinforce that his crimes were cold, calculated decisions for his own benefit. This should bear heavily in evaluating his history and character.

His conduct after 2022 should as well. After indictment, Goldstein still did not file his 2022 or 2023 tax returns, or pay the full taxes due. In 2022 alone, per the stipulations at trial, Goldstein *netted* approximately $20 million playing poker—and yet he could not be troubled to file a return or to pay his taxes. Then he failed to timely file his 2024 income tax return and pay those taxes. Upon learning this, the Probation Officer "admonished him" for the violation and summarized his adjustment to pretrial supervision "as marginal." 11/3/25 U.S. Probation Notice of Apparent Violation at 3. After he was convicted of 12 different crimes, *this Court* advised him, "I don't like seeing a marginal . . . evaluation." 2/26 Tr. 51:25-52:1. Apparently unswayed, Goldstein filed a 2025 Form 1040 less than two months later, falsely stating that he had fully paid his more than $1 million in 2025 taxes when, in fact, he had paid barely one percent of that. This brazen conduct reinforces his flagrant disregard for the tax system and his thinly veiled contempt for his conditions of release.

Goldstein's history and characteristics—from his professional success and material advantages to his pre- and post-offense conduct—weigh strongly toward a substantial sentence at the high end of the guidelines range. *See* 18 U.S.C. § 3553(a)(1).

These considerations far outweigh any argument that Goldstein may advance about his diminished reputation or past charitable works. First, to the extent that Goldstein argues his sentence should be lower because his convictions have damaged his reputation: "It is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction." *United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012). As the Seventh Circuit has observed:

> [N]o "middle class" sentencing discounts are authorized. Business criminals are not to be treated more leniently than members of the "criminal class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity. It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class. But in this instance we must fight our nature. Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.

*United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999); *see also United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status.").

Second, "[w]ealthy people commonly make gifts to charity. They are to be commended for doing so but should not be allowed to treat charity as a get-out-of-jail card." *United States v. Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010). As the Fourth Circuit held in addressing a defendant's pre-*Booker* argument that his charitable acts justified a downward departure:

> [T]o allow any affluent offender to point to the good his money has performed and to receive a downward departure from the calculated offense level on that basis is to make a mockery of the Guidelines. Such accommodation suggests that a successful criminal defendant need only write out a few checks to charities and then indignantly demand that his sentence be reduced. The very idea of such purchases of lower sentences is unsavory, and suggests that society can always be bought off, even by those whose criminal misconduct has shown contempt for its well-being.

*United States v. McHan*, 920 F.2d 244, 248 (4th Cir. 1990); *accord Vrdolyak*, 593 F.3d at 683; *see also* Am. 836, U.S.S.G. Comm'n (eff. Nov. 1, 2025) (explaining amendment, which deleted guideline discussed in *McHan*, sought "to simplify the guidelines and reduce tension between 18 U.S.C. § 3553(a) and the Guidelines Manual" in the wake of *Booker*), https://www.ussc.gov/guidelines/amendment/836. Indeed, "[p]eople 'who donate large sums because they can should not gain an advantage over those who do not make such donations because they cannot.'" *Vrdolyak*, 593 F.3d at 683 (quoting *United States v. Thurston*, 358 F.3d 51, 80 (1st Cir. 2004)).

**C. The Need to Reflect the Seriousness of the Offenses**

A court must consider the need for the sentence to reflect the seriousness of the offense. *See* 18 U.S.C. § 3553(a)(2)(A). Goldstein's tax and mortgage frauds are serious offenses, and this factor weighs strongly in favor of a within-guidelines sentence.

"No one was hurt." "It's a drop in the bucket." "This should have been a civil matter." Whether expressly stated or not, these are the common refrains that seek to minimize tax crimes as non-serious offenses. These statements understate the seriousness of the crime and undercut government efforts to enforce the tax laws. They are also fly in the face of what courts and policymakers have emphasized: that tax fraud is serious and that sentencing courts need to treat it accordingly.

As the Fourth Circuit observed: "[T]he policy statements issued by the Sentencing Commission make it clear that the Commission views tax evasion as a serious crime and believes that, under the pre-Guidelines practice, too many probationary sentences were imposed for tax crimes." *United States v. Engle*, 592 F.3d 495, 501 (4th Cir. 2010) (citing U.S.S.G. Ch. 1., Pt. A, introductory cmt. 4(d) (1998))); *see also* 18 U.S.C. § 3553(a)(5) (directing sentencing courts to consider applicable policy statements issued by the Sentencing Commission).

Our nation and society depend on the tax system, and that system in turn depends on individuals to voluntarily and honestly report their tax liabilities. As one court summarized, "[T]he Federal tax structure is the ultimate honor system." *Turnham v. C.I.R.*, 979 F.3d 1322, 1323 (11th Cir. 2020); *see also Spies v. United States*, 317 U.S. 492, 495 (1943). "Taxes are what we pay for civilized society." *Compania General de Tabacos de Filipinas v. Collector of Internal Revenue*, 275 U.S. 87, 100 (1927) (Holmes, J., dissenting).

Tax fraud undermines the integrity of the tax system, just as lies undermine any system built on trust. And it contributes to a profound, concrete problem: the annual "tax gap"—the difference between what taxpayers truly owe and what they do not pay "voluntarily or timely"—is $696 billion, as of the IRS's latest estimate. *See* IRS Pub. 5869, Tax Gap Projections for Tax Year 2022 (2024) ("2022 Tax Gap Projections"), https://www.irs.gov/pub/irs-pdf/p5869.pdf. As a result, "'tax crimes represent an especially damaging category of criminal offenses,' which 'strike at the foundation of a functioning government.'" *United States v. Zukerman*, 897 F.3d 423, 428 (2d Cir. 2018) (cleaned up) (quoting district court in affirming district court).

This is why "[t]he criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system." *United States v. Ture*, 450 F.3d 352, 357 (8th Cir. 2006).

This is no less true for willful failure to file or pay under § 7203. As the Supreme Court explained more than 75 years ago:

> The United States has relied for the collection of its income tax largely upon the taxpayer's own disclosures rather than upon a system of withholding the tax from him by those from whom income may be received. This system can function successfully only if those within and near taxable income keep and render true accounts. In many ways taxpayers' neglect or deceit may prejudice the orderly and punctual administration of the system as well as the revenues themselves. Congress has imposed a variety of sanctions for the protection of the system and the revenues . . . [and these] embrace both civil and criminal sanctions. . . . Invocation of one does not exclude resort to the other. . . .

> Punctuality is important to the fiscal system, and these are sanctions to assure punctual as well as faithful performance of these duties.

*Spies*, 317 U.S. at 495-96 (addressing willful failure to file); *see also United States v. Palermo*, 259 F.2d 872, 875 (3d Cir. 1958) ("Congress . . . intended to make failure to make timely payment of income tax a misdemeanor regardless of the civil remedies available to insure prompt collection").

Mortgage fraud is also a serious offense. Subprime loans—those made to borrowers who were less able to afford the cost of the loan and more likely to default—were a major percipient of the 2008 Financial Crisis. *See* S. Rep. 111-10 at 2-3 (2009). After that crisis, Congress passed the Fraud Enforcement and Recovery Act of 2009 ("FERA") to amend § 1014 and encompass mortgage lending businesses. *See* Pub. L. No. 111-21, § 2, 83 Stat. 1617 (2009).

Congress did so to deter mortgage fraud and help prevent a similar financial implosion. *See* S. Rep. 111-10 at 2, *reprinted in* 2009 U.S.C.C.A.N. 430, 431-32 (explaining that after "mortgage companies relaxed their standards for loans, approving ever riskier mortgages . . . , they created an environment that invited fraud," "reports alleging mortgage fraud . . . increased nearly tenfold" between 2002 and 2008, and "[a]ll this fraud has contributed to an unprecedent collapse" so FERA seeks to ensure "this kind of collapse cannot happen again" by "reinvigorat[ing] our anti-fraud measures").

"To use the [Sentencing] Commission's characterization, white collar crimes such as wire fraud and tax fraud are 'serious,' and typically will warrant serious punishment, including prison time." *United States v. Levinson*, 543 F.3d 190, 201 (3d Cir. 2008) (quoting U.S.S.G. § 1A1.1, Ch. 1, Pt. A.4(d) (2006)). Goldstein's tax and mortgage frauds are serious crimes that warrant a serious term of incarceration within the guidelines range.

Moreover, whether he stands to lose professional licenses or standing does not diminish the seriousness of his offenses. "None of these things are his sentence. Nor are they consequences of his sentence; a diminished sentence based on these considerations does not reflect the seriousness of his offense or effect just punishment." *United States v. Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014) (quotations omitted); *see also United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status.").

**D. The Need to Avoid Unwarranted Sentence Disparities**

"One of Congress' primary purposes in establishing the Guidelines was to reduce sentencing disparities and to rest sentences upon the offense committed, not upon the offender." *McHan*, 920 F.2d at 247.

A sentence within the Guidelines range is essential to help prevent unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a)(6). In fashioning the Guidelines for tax offenses, the Sentencing Commission sought not only to achieve consistent sentences for similar tax crimes, but also to eliminate disparities in sentencing between white-collar offenses and equally serious non-white-collar offenses. As former Justice Breyer, an original member of the Sentencing Commission, explained:

> The Commission found in its data significant discrepancies between pre-Guideline punishment of certain white-collar crimes, such as fraud, and other similar common law crimes, such as theft. The Commission's statistics indicated that where white collar fraud was involved, courts grant probation to offenders more frequently than in situations involving analogous common law crimes; furthermore, prison terms were less severe for white-collar criminals who did not receive probation. To mitigate these discrepancies, the Commission decided to require short but certain terms of confinement for many white collar offenders, including tax, insider trading, and antitrust offenders, who previously would have likely received only probation.

Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 HOFSTRA L. REV. 1, 20 (1988).

Eliminating unwarranted sentencing disparities not only makes the criminal justice system fairer, it promotes respect for and faith in the law. *See* 18 U.S.C. § 3553(a)(2)(A). When the public sees a defendant who has committed a serious white-collar offense walk away without a commensurate punishment, it fosters the belief that two systems of justice exist: one for the advantaged and one for the disadvantaged. *See Levinson*, 543 F.3d at 201 ("[I]t has been noted that probationary sentences for white-collar crime raise concerns of sentencing disparities according to socio-economic class."); *United States v. Muffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (emphasizing the need for "the minimization of discrepancies between white-and blue-collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail").

While other § 3553(a) factors (discussed above and below) demonstrate a sentence at the high end of the guidelines range is necessary, the need to avoid sentencing disparities shows the sentence should at least fall within that range to serve the vital goal of fairness and uniformity.

### E. The Need to Afford Adequate Deterrence

#### 1. General Deterrence

The need for general and specific deterrence weighs mightily in favor of a substantial term of imprisonment near the top of the guidelines range. *See* 18 U.S.C. § 3553(a)(2)(B), (C) (identifying "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct [and] protect the public from further crimes of the defendant").

The IRS does not and likely never will have the personnel and resources to monitor and review all tax returns. Cheating on taxes is a common and longstanding problem. Unfortunately,

such criminal behavior often goes undetected and unprosecuted, resulting in millions of lost tax dollars each year. As the Fourth Circuit has explained:

> Given the nature and number of tax evasion offenses as compared to the relatively infrequent prosecution of those offenses, we believe that the Commission's focus on incarceration as a means of third-party deterrence is wise. The vast majority of such crimes go unpunished, if not undetected. Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path.

*Engle*, 592 F.3d at 502.

Compounding the problem, criminal tax prosecutions are relatively rare due the significant time and resources necessary to investigate and prosecute them. Thus, deterrence through imprisonment is essential. As the Sentencing Commission states:

> Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. ch. 2, pt. T, introductory cmt.; *accord United States v. Ture*, 450 F.3d 352, 357 (8th Cir. 2006). This is particularly important because, where the frequency of prosecution is lower, the severity of punishment must be higher to obtain the same level of deterrence. *See generally* Louis Kaplow and Steven Shavell, *Fairness Versus Welfare*, 114 Harv. L. Rev. 961, 1225-1303 (2001).

The calculated nature of tax crimes further underscores the importance of general deterrence. As this Court likely is aware, Congress also has long recognized that deterrence is "particularly important in the area of white-collar crime. Major white-collar criminals often are sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as the cost of doing

business." S. Rep. No. 98-225, at 76 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3259. Thus, the Eleventh Circuit has observed:

> Because economic and fraud-based crimes are "more rational, cool, and calculated than sudden crimes of passion or opportunity," these crimes are "prime candidate[s] for general deterrence." Defendants in white collar crimes often calculate the financial gain and risk of loss, and white-collar crimes therefore can be affected and reduced with serious punishment.

*United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 WM. & Mary L. Rev. 721, 724 (2005)).

The need for general deterrence reaches its peak in tax cases involving schemes that are lucrative, easy to perpetrate, and difficult to detect. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of crime and hence the punishment required to deter it.").

Courts routinely impose sentences within and above the guidelines range on tax offenders for precisely this reason. *See, e.g.*, *Zukerman*, 897 F.3d at 428 (upholding above-Guidelines $10 million fine on 74-year old tax offender who received 70-month within-guidelines prison term, and finding reasonable district court's rationale for upward variance based on vital need for deterrence to fight tax crimes); *United States v. Hassebrock*, 663 F.3d 906, 922 (7th Cir. 2011) (affirming as reasonable a within-guidelines 32-month sentence for a tax evader where the district court explained that "a sentence of probation would not promote respect for the law, but encourage people to flout it"); *see also United States v. Davis*, No. 24-13399, 2025 WL 2985645, at *1, 3 (11th Cir. Oct. 23, 2025) (unpublished) (affirming as substantively reasonable 48-month upward-variance sentence that district court imposed on defendant convicted of tax crimes and § 1014 despite the fact that the sentence was *double* the guidelines range of 18-24 months based, in part,

on defendant's "utter disregard for the law"); *United States v. Karasarides et al.*, 24-3545, Dkt. 50-1 (6th Cir. Nov. 17, 2025) (affirming 112-month sentence for accountant, DiPietro, a first-time offender who committed tax and gambling crimes and caused tax loss of $4.7 million, and remanding only to correct scrivener's error).

Such sentences speak loudly and send a clear message. "Studies have shown that salient examples of tax-enforcement actions against specific taxpayers, especially those that involve criminal sanctions, have a significant and positive deterrent effect." Joshua D. Blank, *In Defense of Individual Tax Privacy*, 61 Emory L.J. 265, 321 (2011).

The importance of general deterrence is further heightened by the need to reduce the gaping hole caused specifically by *business owners* who perpetrate tax fraud. Roughly 60% of the annual tax gap comes from taxpayers underreporting income on their individual tax returns, and "the the underreporting of *business income* by individual taxpayers—income of sole proprietors, farmers and those earning rental, royalty, partnership, and *S Corporation income*—is a major contributor." Chuck Rettig, Comm'r, *A Closer Look - Impacting the Tax Gap*, at 1, 4 (emphasis added), https://www.irs.gov/pub/foia/ig/cl/tax-gap-for-web.pdf.

Here, a sentence below the guidelines range would fail entirely to serve the goal of general deterrence. Instead, such a lenient sentence would send the message that tax fraud is not serious and that a lucrative, almost decade-long tax fraud will not receive significant punishment. It would provide would-be tax cheats every incentive to perpetrate tax evasion: the reward is high, the chance of being caught and prosecuted very low, and the risk of significant punishment after a successful prosecution even lower. The government respectfully submits that this is *not* the message that this Court should send through its sentence of Goldstein. After all, "[w]ithout a real

possibility of imprisonment, there would be little incentive for a wavering would-be [tax] evader to choose the straight-and-narrow over the wayward path." *Engle*, 592 F.3d at 502.

The need for deterrence is particularly strong given Goldstein's shrewd, recurring calculation that the payoff outweighed the risks. He knew the potential benefits: substantial income from investing his money in poker (rather than paying his taxes), as well as a wildly lavish lifestyle. He also knew the risks: that he was evading taxes and underreporting his income, and could get caught, potentially facing criminal punishment. Despite this, he decided that stealing millions from the federal fisc was worth the risk. He made this decision anew, each time he lied to his accountants, hid the truth from his firm managers, or diverted legal fee income. He made it anew each time he caused Deyhle to file another false tax return. And he made it anew each time he lied to representatives of the IRS, whether RO Parrish or special agents. He made the same, basic cost-benefit calculation dozens of times, and decided the benefit outweighed the cost every time.

This type of cold, unrelenting calculation is exactly why general deterrence through substantial imprisonment is so important. *See Martin*, 455 F.3d at 1240. Without imprisonment, tax crimes become a simple cost-benefit calculation: whether the value of the stolen money exceeds cost of a fine and restitution; "a small fine that can be written off as the cost of doing business." S. Rep. No. 98–225, at 76. This same calculation, made many times a year for ten years straight, warrants a meaningful term of imprisonment to provide deterrence and just punishment. *See* 18 U.S.C. § 3553(a)(2)(A), (B).

Anything less than a meaningful prison sentence in this case would fail to provide general deterrence and would, instead, encourage similar fraud by others. As the Eighth Circuit stated when vacating a non-prison sentence in a tax evasion case where the tax loss was just $240,000:

"[T]he goal of deterrence rings hollow if a prison sentence is not imposed in this case." *Ture*, 450 F.3d at 358; *see also* 18 U.S.C. § 3553(a)(2)(B).

This concern also applies to mortgage fraud—another cool, calculated financial crime—and the need for a within-guidelines sentence. *See United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014) (noting defendant's white collar crimes, including conspiracy to make false statements to a financial institution, were "especially susceptible to general deterrence"); *see also United States v. Yagi*, 530 F. App'x 821, 823, 825 (10th Cir. 2013) (affirming as substantively reasonable "an above-Guidelines sentence of 15 months incarceration" for § 1014 violations where supervision would not suffice to deter defendant's conduct).

The logic of general deterrence applies equally to willful failure to pay. The law requires—and our government and tax system depend on—taxpayers making quarterly payments. *See* 26 U.S.C. § 6654(c). Most taxpayers are salaried W-2 wage earners and do this automatically through tax withholdings, effectively setting aside money for their taxes paycheck-by-paycheck, and then having their employer pay it over each quarter. Requiring quarterly tax payments helps ensure people pay their taxes soon after receiving their income, while they still have the money. This helps avoid the problem that arises if people instead spend that money elsewhere (or invest it in an ill-fate venture) before Tax Day the following April, rendering them unable to pay when the full balance reported on their return. By the IRS's most recent estimate, the failure to timely pay taxes that were reported on time accounts for *$94 billion* of the tax gap. 2022 Tax Gap Projections 4.

Goldstein's own conduct highlights the importance of deterring nonpayment. He failed to pay more than $5,200,000 of the taxes he owed for five years between 2016 and 2021. Instead, he spent that money on poker and luxury. His conduct spanning late 2016 and early 2017 is particularly telling: rather than making a fourth-quarter tax payment or setting aside money for

taxes when he still had it at the end of 2016, he instead entered a series of catastrophic gambling matches against Safai in early 2017 and spent much of the money on those losses. The Internal Revenue Code requires quarterly and annual payment to avoid exactly this situation.

The fact that he previously *explicitly recognized* his duty to pay taxes and instead opted to invest money in poker, remarking that he would "just pay[] penalties instead," shows he perfectly understood the tax regime and shrewdly calculated that the benefits outweighed the risks. GX12. He disregarded the civil tax system and viewed its monetary penalties as a minor cost of doing business. This is why § 7203 imposes *criminal* penalties, and why a term of meaningful imprisonment is so important for general deterrence: to send a message that intentionally choosing *not* to pay taxes is a serious crime that receives commensurate punishment through incarceration. And it shows why general deterrence is so important: Goldstein's calculation was based on a cool, rational cost-benefit calculation—exactly the type of crime that can be deterred "and reduced with serious punishment." *Martin*, 455 F.3d at 1240.

This case has been covered by the media, including *The New York Times*. The case has attracted attention in legal and poker circles, among others. To the extent Goldstein's sentence sends a message to the public, it should be that if you commit serious crimes and cause $15 million in loss to the federal government, you will receive a substantial prison sentence. That is essential to dissuade potential tax cheats, to promote respect for the law in the broader public by signaling that there is *one* system of justice for everyone, regardless of status or wealth. *See Levinson*, 453 F.3d at 201; *Muffelman*, 470 F.3d at 40; 18 U.S.C. § 3553(a)(2), (6).

**2. Specific Deterrence**

Goldstein's conduct also demonstrates a profound need for specific deterrence to protect the federal fisc from his intransigent tax violations. First, he is a highly educated, highly trained,

highly successful appellate lawyer. He fully understood the tax system, his duties to it, and the risks of violating those duties. His recurring, calculated decisions to consistently hide his true income, evade payment of his taxes, and not timely pay his taxes over a number of years—despite fully understanding his tax obligations—demonstrates that he viewed civil penalties as a minor cost of business. His initial question to RO Parrish of whether she was with "Criminal Investigation" shows that he also recognized the potential *criminal* penalties of his conduct when he lied on his 2016 taxes. His choice to still commit his 2016-2021 tax crimes shows he thought the benefits of those crimes far outweighed the likely costs of both civil monetary penalties and criminal incarceration. Even without more, a substantial, within-guidelines term of incarceration would be necessary to deter his greed-soaked cost-benefit calculation.

Second, Goldstein's efforts to further conceal his crimes display an even more cynical calculus, which warrants a sentence at the high end of the guidelines range. Take three glaring examples: In 2018, he lied to RO Parrish about the source of his 2016 income to conceal the true extent of his winnings and his criminally false 2016 tax return. In 2020, he lied to IRS-CI special agents about not having investors in matches other than those against Gores, and about his gambling income coming all from Gores. Soon after, he offered Bart $10,000, Bitcoin and other things of value in a desperate attempt to influence her participation in the criminal investigation.

These acts betray a breathtaking calculation that he was more likely to succeed in hiding his tax crimes than he was to face real criminal penalties for those crimes *and* his attempts to cover them up even if he was caught. This aligns perfectly with his belief about in "going all-in," whether in poker or elsewhere, Dkt. 327 1 at 6 (NYT Article), and his statement that "if I just sit here and hedge my bets . . . , I'm not going to accomplish anything," 2/5 Tr. 13:3-5 (stipulation) (discussing legal strategy of going all-in on one's perceived winning argument). Facing the clear risk of

discovery and criminal penalties, Goldstein still calculated that his best option was to go all-in on his tax crimes and try to further conceal them—even if this risked further criminal punishment. A substantial sentence at the high end of the guidelines is necessary to deter him from making that same calculation again.

Third, this is especially true in light of his more recent conduct. He still has not filed 2022 and 2023 tax returns, nor paid the full taxes due, despite winning tens of millions of dollars over those years in poker. In February 2025, shortly after his indictment, he claimed to be working on them with new accountants. Ex. 2. But nearly a year later, he still had not filed those returns or paid the full amounts due despite the real risk that these omissions would become evidence against him at trial. *E.g.*, Rule 404(b) Mot., Dkt. 421 (Feb. 17, 2026). Similarly, he did not file a 2024 tax return when it was due in October 2025, leading the Probation Officer to admonish him and deem his adjustment "marginal." He still has not filed that return. And less than two months ago, he filed a 2025 tax return that reported he already paid more than $1 million in taxes due, when in fact he had paid barely over one percent. The threat of detention or other consequences for violating his conditions of release has not phased him.

This conduct—affecting every year since 2021—is astounding. As is Goldstein's trial testimony: "I believed then and believe now" that paying taxes late, with penalties and interest, is a "completely lawful" option. 2/12 Tr. 14:12-24; PSR ¶ 248. Together, his conduct and testimony show that he *still* thinks the benefits of violating the law outweigh the risks of civil and criminal penalties, even after nine criminal tax convictions. At present, he owes more than *$7.5 million dollars* in taxes, penalties, and interest on just 2022-2023 alone; he has not filed three Forms 1040; the one Form 1040 that he did file is patently false. This egregious conduct necessitates especially heavy punishment to provide specific deterrence and push Goldstein into compliance.

As one court explained when imposing a within-guidelines sentence on a 54-year-old business owner and first-time offender, whose tax crimes caused a tax loss between $250,000 and $550,000:

> [T]he obligation to pay taxes is basic to our civilization. It makes it possible to have a lawful society. . . . And its basic functions of policing and other functions of making sure there is a safety net under people. If people don't pay their taxes, they cheat each other. Your not paying taxes cheats me. If I don't pay my taxes, I cheat you. . . . You're ripping off everybody else by not paying your share of taxes.
>
> So I look upon this and I think the guidelines have it right here. I think a year and a half, 18 months, is a just sentence. I impose it.
>
> I think you're going to have to reflect on what you did and the seriousness of what you did. You just can't make it good by paying the back tax. You've got to understand that when you do something bad, you get punished. It's got to be a lesson to everyone else. Everyone else is tempted to draw a line and cheat a little bit, get an extra edge.

*United States v. Joseph Ciccarella*, No. 16-CR-738, Sent. Tr. at 22:15-23:14 (S.D.N.Y. Mar. 3, 2017). Goldstein must be made to understand that he should pay his fair share because, if nothing else, the punishment will far outweigh the benefit of cheating on his taxes and his fellow citizens. A lengthy term of incarceration at the high end of the guidelines is necessary to teach him that lesson, and to inoculate the public against any temptation to follow his path.

**F. Restitution**

This Court may order restitution as a condition of supervised release. See 18 U.S.C. § 3583(d). The supervised release statute, 18 U.S.C. § 3583(d), authorizes district courts to impose as a condition of supervised release, "any condition set forth as a discretionary condition of probation in section 3563(b)." The text of § 3563(b), in turn, provides that a district court may order the defendant to "make restitution to a victim of the offense . . . ." 18 U.S.C. § 3563(b)(2). This language makes clear that restitution ordered as a condition of probation or supervised release

is available for offenses not covered by §§ 3663(a) and 3663A(c)(1)(A), as is true of tax crimes, *see* 18 U.S.C. §§ 3663, 3663A (not authorizing restitution for Title 26 offenses).

Indeed, "it is well-settled that 'the Supervised Release Statute, together with the Probation Statute, unambiguously authorizes federal courts to order restitution . . . for any criminal offense, including one under Title 26.'" *United States v. Harrison*, 541 F. App'x 290, 293 (4th Cir. 2013) (unpublished) (quoting *United States v. Batson*, 608 F.3d 630, 635 (9th Cir. 2010)); *see also United States v. Blackwell*, 695 F. App'x 64, 66 (4th Cir. 2017).

Further, a court's authority to order restitution for Title 26 offenses as a condition of probation or supervised release is explicitly recognized in the Guidelines, which prescribe the use of that authority. *See* U.S.S.G. § 5E1.1(a)(2). Generally, under § 5E1.1(a)(2), when a defendant has been found guilty after a trial of a tax crime under Title 26 and a court finds that the Government has suffered a loss, the defendant should be ordered to make restitution as a condition of supervised release. *See* U.S.S.G. § 5E1.1(a)(2). Of course, after *Booker*, § 5E1.1 is advisory. However, if the sentencing court does not order restitution, it should state on the record its reasons for not imposing restitution. *See* 18 U.S.C. §§ 3663 and 3664.

Generally, the amount of restitution is limited to loss caused by the specific conduct underlying the counts of conviction, and does not include relevant conduct. *See, e.g.*, *Batson*, 608 F.3d at 637. In imposing restitution, a district court may include both prejudgment and postjudgment interest. *See United States v. Perry*, 714 F.3d 570, 577 (8th Cir. 2013) (affirming inclusion of interest in restitution to IRS because the full loss to the victim included the time value of money); *United States v. Gordon*, 393 F.3d 1044, 1058-59 (9th Cir. 2004) (prejudgment interest is necessary to make the victim whole).

Here, Goldstein hid income totaling nearly $5 million from the IRS in 2016, 2017, 2019, and 2021. If he had timely reported it, he would have owed $1,949,127 in total taxes due. Once interest is included through the date of sentencing, it amounts to $3,103,427. *See* Ex. 11 at 2, (detailing restitution calculation). The government respectfully submits that the Court should impose restitution in that amount. *See United States v. Underwood*, 845 F. App'x 239, 242 (4th Cir. 2021) (unpublished) (affirming restitution order where court "made a reasonable estimate of the [tax] loss"). The government also respectfully requests that the judgement specifically identify the restitution amount for each year, as follows:[7]

| Tax Year | Restitution |
|---|---|
| 2016 | $2,374,520 |
| 2017 | $273,978 |
| 2019 | $208,177 |
| 2021 | $246,752 |
| **TOTAL:** | **$3,103,427** |

The government respectfully submits that the testimony and evidence admitted at trial, when combined with the additional evidence provided herein, establishes that this Court should order Goldstein to pay restitution, and does so far beyond a preponderance of the evidence.[8]

[7] The IRS will use the amount of restitution ordered as the basis for a civil assessment under 26 U.S.C. § 6201(a)(4). However, However, the IRS must make a separate assessment for each tax year, and including the specific amounts of restitution for each year in the judgment facilitates this process.

[8] The government also respectfully submits that no witness is necessary to further establish the tax loss or restitution calculations. However, to the extent that this Court prefers a witness, Revenue Agent Colleen Ranahan will be prepared to testify at the Sentencing Hearing on June 16, 2026. If she is called to testify as to the 2016, 2017, 2019, and 2021 tax loss and restitution calculations, the government anticipates that her testimony on these years would require approximately one hour of direct examination.

## IV. The Appropriate Sentence

Goldstein caused a tax loss over $16 million dollars. He repeatedly attempted to conceal his crimes from the IRS, and then lied to the Court and the jury. He continues to flout his tax obligations, filing a false tax return even after his convictions. He did all this despite a life of privilege and material comfort, and despite his full knowledge of the law and full understanding of the risks from violating it. The government respectfully submits that a sentence of 97 months of imprisonment, at the top of the Guidelines range, accurately considers the context of his crimes, and is essential for general and specific deterrence.

* * *

## CONCLUSION

For the reasons set forth above, the United States requests the Court sentence Goldstein to a term of imprisonment of 97 months' incarceration and require him to pay $3,103,427 in restitution.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

A. Tysen Duva
Assistant Attorney General
Criminal Division

Dated: June 2, 2026

/s/

Emerson Gordon-Marvin
Hayter Whitman
Trial Attorneys
Criminal Division—Tax Section
Department of Justice

Sean Beaty
Senior Litigation Counsel
Criminal Division—Tax Section
Department of Justice

Adeyemi Adenrele
Assistant United States Attorney
District of Maryland