**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| **v.** | **CRIMINAL NO. LKG-25-0006** |
| THOMAS GOLDSTEIN, | |
| Defendant. | |

**GOVERNMENT'S REPLY IN SUPPORT OF ITS MOTION
FOR A PRELIMINARY ORDER OF FORFEITURE**

In 2021, Goldstein wanted to buy a new home in Washington, D.C. But he had approximately $15 million in poker-related debts, which he knew would foreclose any chance of getting a loan. So, Goldstein chose to repeatedly and intentionally defraud a series of lenders by concealing the debts on mortgage applications and other documents. He ultimately convinced NFM to lend him nearly $2 million. Goldstein's calculation—that the loan would be approved if he hid the debts, and denied if he disclosed them—was correct. The evidence shows NFM would not have loaned the money if it knew about Goldstein's massive poker-related debts. Therefore, the Court should enter a preliminary order of $1,987,500 in U.S. currency (the amount of the loan). *See* Dkt. 509-1 (proposed order). Goldstein's counterarguments are belied by the facts, the law, and common sense. His opposition reads as if the government's burden is clear and convincing evidence or beyond a reasonable doubt, when, in fact, the government need only carry its burden by a mere preponderance of the evidence—more likely than not. *See United States v. Tanner*, 61 F.3d 231, 234 (4th Cir. 1995). The evidence easily clears that hurdle.[1]

---

[1] The government will be prepared to address any questions about the forfeiture motion at the Court's convenience, including at the June 16, 2026 hearing.

1

## ARGUMENT

### I.    Goldstein's Fraud Was The But-For Cause Of Getting The Loan

The parties agree that funds are forfeitable proceeds "if a person would not have [them] *but for* the criminal offense." *United States v. Farkas*, 474 F. App'x 349, 359-60 (4th Cir. 2012) (emphasis added) (quoted at Dkt. 509 at 3 & Dkt. 523 at 5). Goldstein argues that his false statements to NFM were not a but-for cause of getting the loan, but this argument contradicts the evidence and common sense. The evidence proves by a preponderance (at least) that Goldstein would not have received the loan if he disclosed (1) his approximately $15 million in poker-related debts and (2) the fact that he had personally guaranteed two substantial investments from Parabellum.[2]

The closing package for the NFM loan (GX10) contains numerous indications that NFM scrutinized the personal debts of applicants, and corroborates that NFM would not have lent to Goldstein if he disclosed his true debt. First, the application required Goldstein and his wife to disclose "all liabilities." Ex. 1, GX10 at -1806. Second, the application required Goldstein and his wife to provide details about the liabilities (such as the balance, lender, and amounts of payments). *Id.* Third, the application required the applicants to declare whether they were "a co-signer or guarantor on any debt or loan that is not disclosed on this application," and to certify that the information "provided in th[e] application [wa]s true, accurate, and complete." *Id.* at -1808-09. Similar certifications or declarations appeared elsewhere in the closing package. *Id.* at -1846, -1871. Fourth, the application repeatedly warned of criminal and civil penalties

---

[2] After FSM rejected Goldstein's applications in Spring 2021 (as discussed later), he turned to a litigation funder called Parabellum to help finance his purchase of the Washington, D.C. home. Parabellum made two investments (in March and April 2021) worth over $5 million that enabled Goldstein to close on the Washington, D.C. home, and lift tax liens on his former residence in Maryland so that he could sell it. Goldstein personally guaranteed both investments. Ex. 10, GX13 at -578-588 (Mar. 2021 Parabellum contract), Ex. 11, GX14 at -246-257 (Apr. 2021 Parabellum contract). Goldstein then applied to NFM for a loan so he could repay Parabellum, while concealing from NFM that he had guaranteed Parabellum's investments.

associated with not disclosing loans, debts, and liabilities. *Id.* at -1809, -1871.[3] Fifth, the closing package made clear that new liabilities "m[a]y impact the applicant's loan approval." *Id.* at -1871.

But Goldstein chose not to disclose to NFM his poker-related debts nor his status as a guarantor on the Parabellum investments. Ex. 2, 2/9 Tr. 126:1-128:21. Darran Anthony, the NFM representative who processed the application, testified at trial. He explained that NFM was responsible for verifying information on the application related to income, assets, employment, taxes, and other matters. *Id.* at 123:6-12. Anthony testified that it is "very important" for applicants such as Goldstein to tell the truth on their applications so that banks and investors can assess the "true risk . . . of lending the money." *Id.* at 123:13-20. Anthony testified that Goldstein's omissions would have factored into NFM's decision on whether to approve the loan. *Id.* at 127:24-128:21. According to Anthony, "if somebody were to tell me that they would have those debts, we would have included those debts in the debt-to-income ratio to see if they still qualified." *Id.* at 132:3-10.

Goldstein's true debt would set off alarm bells for any lender. Simple arithmetic proves as much. For example, Goldstein and his wife disclosed approximately $360,000 in liabilities on the application. *See* Ex. 1, GX10 at -1806. Goldstein's true debt of over $15 million was ***41 times higher*** than what he disclosed (at least). And that is not counting the Parabellum investments, which were technically given to Goldstein's law firm (although Goldstein used the funds for expenses related to his and his wife's home purchase). Ex. 3, 2/4 Tr. at 197:2-20-201:13. Additionally, Goldstein's debt-to-income ratio (which Anthony referenced) would skyrocket if he had disclosed his true debt. Goldstein reported approximately $3.6 million in income on his 2021

---

[3] At closing, Goldstein signed NFM's "Undisclosed Debt Acknowledgement" form (Ex. 1, GX10 at -1871), which underscores Anthony's testimony about the critical role an applicants' debts played in NFM's evaluation process. That form required Goldstein to list any previously undisclosed debts and reiterated, "It is illegal for a person to knowingly withhold debt obligation information regarding a credit application," warning that doing so constitutes "bank fraud," which "is investigated by the [FBI]," and "punishable . . . by up to **30 years in federal prison**." *Id.* (emphasis in original).

tax return. Ex. 4, GX59 at 1 (2021 Form 1040). Assuming only $360,00 in liabilities, his debt-to-income ratio would be 10%. But with Goldstein's true debt of approximately $15 million, his debt-to-income ratio would be *over 400%*. In the but-for world, Goldstein's application would present an entirely different and exponentially riskier proposition for NFM. Moreover, if Goldstein disclosed the debts to NFM, any further inquiry by NFM would have revealed that he was gambling tens of millions of dollars while choosing not to timely repay his poker-related debts, which were many years old. That is another huge red flag—bearing directly on Goldstein's ability and willingness to repay debts—that would have led NFM to decline the loan. There is every reason to believe a rational mortgage lending business like NFM would decline the application.

Goldstein argues that Anthony never explicitly testified that Goldstein's failure to disclose was a but-for cause of the loan's approval. Anthony's testimony as a whole, however, shows that NFM was laser-focused on ascertaining an applicant's liabilities, and substantiates that it would not have approved the loan in the but-for world. His testimony is also consistent with the NFM loan application, which repeatedly warns against failing to disclose liabilities, but does not speak in conclusive terms about whether specific types or amounts of liabilities would lead to a denial. Ex. 1, GX10 at -1871 (noting liabilities "**m[a]y** impact the applicant's loan approval") (emphasis added). Of course, NFM considered myriad factors in evaluating whether to approve a loan, and there could be multiple reasons for its ultimate decisions. *See* Ex. 2, 2/9 Tr. 123:6-12; *see also Burrage v. United States*, 571 U.S. 204, 212 (2014) (home run and "skillful pitching" could both be but-for causes of baseball team's 1-0 win). Given that complexity and variation, it is understandable that Anthony, an experienced professional in the mortgage lending business, would not offer a hypothetical opinion on what would happen if Goldstein was honest.[4] Also, Anthony

---

[4] As an example, Goldstein could have reported his true debt *and* checked the box indicating that the debt was "[t]o be paid off at or before closing." Ex. 1, GX10 at -1806. In that hypothetical scenario, it is possible that NFM would

had multiple chances to deny that disclosure would have changed the outcome, and each time testified that it would have been a factor—which further corroborates that the outcome would have been different. Ex. 2, 2/9 Tr. 126:1-128:21.

Importantly, the Court can and should use its common sense in evaluating causation. The Fourth Circuit, in an unpublished opinion, affirmed a district court's finding of causation where it was "apparent from the facts presented and common sense." *See Goldman v. Food Lion, Inc.*, 99 F.3d 1129 (4th Cir. 1996). *Goldman* concerned a magistrate judge's finding that Food Lion's "sale of peach halves with a peach pit fragment sufficiently large to cause injury" was illegal under Virginia law. *Id.* at *2. The plaintiff was eating a peach when she "bit down on a hard object, heard a crack, experienced pain, . . . and recovered the pit fragment from her mouth." *Id.* The Fourth Circuit ruled that the magistrate judge did not err by basing the decision on evidence and common sense. *Id.* That case presented stark facts, but so does Goldstein's. The role of Food Lion's peaches in the plaintiff's injury was a matter of common sense, as was the role of Goldstein's deception in securing the $2 million loan from NFM. *See also United States v. Narang*, No. 1:16-CR-43 (LMB), 2019 WL 3949308, at *11 (E.D. Va. Aug. 21, 2019) (court's materiality conclusion was "a matter of common sense" and "also flow[ed] from evidence at trial"), *aff'd,* No. 19-4850, 2021 WL 3484683 (4th Cir. Aug. 9, 2021). Here, the government's theory of causation is fact-bound, common sense, and believable.

On the other hand, Goldstein testified that he did not intend to deceive NFM, and instead wanted to hide the scale of his poker debts from his wife. Ex. 6, 2/12 Tr. 117:9-15, 125:24-126:2. The jury clearly concluded that Goldstein intentionally deceived NFM, because it convicted him on count 16. *See* Ex. 5, 2/19 Tr. 81:14-23 (instructing jury must find he "acted deliberately,

---

have considered approving the loan. But Goldstein was not planning to and did not pay off his poker-related debts before closing, and thus there is no realistic possibility that NFM would have extended the loan.

intentionally[,] and understandingly," and "for the purpose of influence in any way the mortgage lending business's actions").

There was no other reason to deliberately and intentionally deceive NFM except inducing it to loan the money. Goldstein correctly surmised that the application would be denied if he told NFM that he was $15 million in debt from poker, and that he recently guaranteed substantial investments from Parabellum. Goldstein is now twisting himself into a pretzel to urge that NFM would still have approved the loan if his true debt were disclosed. That is not a credible alternative to what the government has proven.

Finally, the Court should consider the facts surrounding Goldstein's applications to another mortgage lending business, FSM, earlier in 2021. Gregg Busch, a FSM representative, testified at trial that Goldstein did not disclose the poker-related debts on the applications. Ex. 7, 2/3 Tr. 25:10-15. Like Anthony, Busch confirmed that Goldstein's disclosure of such debts would have been important to FSM because it "would enable [the business] to make a more accurate decision on if we want to or not want to lend [to] Mr. Goldstein and his wife[.]" *Id.* at 25:16-22. FSM ultimately decided against lending money to Goldstein and his wife because it discovered tax liens (not disclosed on Goldstein's applications) on their prior residence in Chevy Chase, Maryland. *Id.* at 36:25-37:10. These liens derived from tax debts worth a fraction[5] of Goldstein's poker-related debts, but they nonetheless dissuaded FSM from lending to Goldstein. If the tax liens prevented FSM from lending to Goldstein, there is no world (but-for or otherwise) in which NFM would have lent to Goldstein knowing that he owed approximately $15 million in poker-related debts.

---

[5] Shortly after FSM declined, Goldstein sought millions of dollars in investment from Parabellum to purchase and afford the Washington, D.C. home. In doing so, told Parabellum that he needed $3 million to clear the tax debts giving rise to the liens. *See* Ex. 3, 2/4 Tr. 190:8-192:24. That means Goldstein's poker-related debts were about 5 times the size of the relevant tax debts.

In sum, the preponderance of the evidence, viewed through the lens of common sense, proves Goldstein's false statements caused NFM to lend nearly $2 million.

## II.      Goldstein's Allusions To His Wife's Interest Are Unavailing

Goldstein next tries to use his wife's purported interest in the loan as a shield against forfeiture, but that argument should be rejected for multiple reasons.

As a preliminary matter, Goldstein's brief wrongly presumes that half of the proceeds of the NFM loan in fact belong to his wife. This is false and reflects a fundamental misunderstanding of the nature of criminal proceeds. The government's superior interest in criminal proceeds vests at the time of the commission of the offense giving rise to forfeiture. As such, no party—including Goldstein's wife—may have a legal interest in or title to criminal proceeds. *See United States v. Gonzalez*, 597 F. App'x. 270, 271 (5th Cir. 2015) (affirming dismissal of wife's third-party petition asserting interest in property that defendant admitted was purchased with criminal proceeds); *United States v. Lazarenko*, 476 F.3d 642, 647 (9th Cir. 2007) (government's interest vests at the time of offense; "[o]therwise, a defendant could attempt to avoid criminal forfeiture by transferring his property to another party before conviction").

Nor is forfeiture limited to criminal proceeds to which Goldstein has formal legal title. Goldstein suggests, based on *Honeycutt v. United States*, 581 U.S. 443, 454 (2017), that forfeiture must be limited to criminal proceeds "belonging to" him, or that he formally owned. *See* Dkt. 509 at 9. But courts consistently reject that argument. *United States v. Carpenter*, 941 F.3d 1, 9 n.6 (1st Cir. 2019) ("*Honeycutt* provides no support for the view that 'acquire' means ownership," and holding "that the definition of 'acquired' in § 981(a)(2)(B) . . . is met . . . where the property was at some point under the defendant's control"); *United States v. Bergstein*, 788 F. App'x. 742, 748 (2d Cir. 2019) (observing defendant's "reliance on [*Honeycutt*] is misplaced," and affirming forfeiture money judgment where defendant controlled funds by transferring them to shell

companies and using them for personal expenses); *United States v. Watson*, No. 1:23-cr-00082-EK, 2025 WL 510814, *20 (E.D.N.Y. Feb. 16, 2025) (calling defendant's reliance on *Honeycutt* "mistaken," and holding defendant liable for fraud proceeds acquired in the name of his company because he "wielded extensive control over" the company).

Those same cases illustrate that what matters for criminal forfeiture is whether Goldstein exercised control over the proceeds. *See id.*; Dkt. 509 at 9. Here, a preponderance of the evidence shows that Goldstein exercised control over the full amount of criminal proceeds. He did so by directing the title company, which handled closing on the loan, to wire the proceeds directly to Parabellum. Ex. 8, PROD-USA-0256583 (record of nearly $2 million wire on October 4, 2021 from MD Affordable Housing to Parabellum); Ex. 9, PROD-USA-0256584 (ledger indicating payment was credited against investment).[6] This was partial repayment of Parabellum's investment in April 2021. *Id.* Goldstein acknowledged as much in testifying, "I need to pay Parabellum. So I take a home equity loan . . . and hand it to Parabellum." *See* Ex. 6, 2/12 Tr. 124:7-23. Goldstein's wife was not involved in negotiating the Parabellum investments, and her name does not appear on any of the paperwork. Goldstein drove those negotiations, and ended up personally guaranteeing investments. *See* Ex. 3, 2/4 Tr. 198:20-199:1. Goldstein routed the full amount of the criminal proceeds from NFM to repay an investment he guaranteed. In other words, he used the proceeds for himself, thus demonstrating his control over the money.

Similarly, the joint nature of the loan application (Goldstein and his wife were co-borrowers) does not change that Goldstein exercised control over the *full amount* of the fraudulent

---

[6] These exhibits were not introduced at trial, but it is appropriate for the Court to consider them in evaluating the proposed forfeiture. *See* Fed. R. Crim. P. 32.2(b)(1)(B) ("The court's determination may be based on evidence already in the record . . . and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable."). Further, the exhibits are simply additional corroboration of what Goldstein testified to: he got the loan from NFM to repay Parabellum. Therefore, even if the Court does not consider the exhibits, it should still grant the government's motion and enter the preliminary order of forfeiture.

proceeds. Goldstein effectively obtained and disposed of the proceeds in one fell swoop, by directing the title company to wire the proceeds to Parabellum. But even if NFM wired the proceeds to a bank account that Goldstein and his wife shared, courts routinely find defendants liable for proceeds deposited into a shared or joint account. *See, e.g.*, *United States v. Goldstein*, 989 F.3d 1178 (11th Cir. 2021) (defendant can be held liable for full amount of proceeds where *jointly* acquired proceeds were deposited into bank accounts under *joint* control); *United States v. Saccoccia*, 1 F.4th 64 (1st Cir. 2021) (upholding forfeiture money judgment against defendant based on *joint ownership* of account through which tainted funds flowed); *United States v. Huber*, 404 F.3d 1047, 1056–61 (8th Cir. 2005) (affirming forfeiture money judgment against defendant for funds paid into accounts of others); *United States v. Rhodes*, No. 21-2236, 2023 WL 2194529, *1 (2d Cir. Feb. 24, 2023) (forfeiture order upheld where proceeds passed through joint account).

Finally, Goldstein conflates forfeiture of criminal proceeds with forfeiture of substitute assets. Dkt. 523 at 9. Although these are not mutually exclusive, and both are appropriate in Goldstein's case, they are distinct concepts. As discussed above, the forfeiture money judgment should reflect the criminal proceeds Goldstein obtained. Because those proceeds were dissipated by Goldstein—when he used them to repay Parabellum—the government has the right to substitute assets, which may be any property in which Goldstein has an interest, regardless of its connection to his crimes. *United States v. McCrea*, 584 F. App'x. 157, 158 (4th Cir. 2014) (holding 21 U.S.C. § 853(p) is not discretionary—it mandates forfeiture of substitute assets when proceeds have, for example, "been transferred or sold to, or deposited with, a third party" or "been placed beyond the jurisdiction of the court"); *United States v. Alamoudi*, 452 F.3d 310, 314 (4th Cir. 2006) ("Section 853(p) is not discretionary. . . . [W]hen the government cannot reach the property initially subject to forfeiture, federal law requires a court to order forfeiture of substitute assets . . . .").

9

To the extent Goldstein purports to assert his wife's interest in the substitute asset (the Washington, D.C. home), the Court should reject it. Criminal defendants have no role in determining a third party's interest in a substitute asset, and as such may not object to forfeiture by arguing that all or part of it belongs to someone else. *See e.g.*, *United States v. Manlapaz*, 825 F. App'x. 109, 117 (4th Cir. 2020) ("[Rule 32.2] provides that a defendant may not object to forfeiture on the ground that the property is owned by someone else. Rather, the rights of third parties are to be determined in ancillary proceeding under [Rule 32.2(c).]"); *United States v. Coffman*, 574 F. App'x. 541, 563–64 (6th Cir. 2014) (holding that defendant "cannot assert a third party's interest in substitute property in a direct challenge to a preliminary forfeiture order"; if defendant "had no interest in the properties, then the Government has acquired nothing from him"). And under the facts of this case, Goldstein would seem an imperfect proxy for asserting his wife's interests. Regardless, Goldstein's wife will have the opportunity to claim her interest in the Washington, D.C. home during the ancillary proceeding, after the preliminary order of forfeiture. Fed. R. Crim. P. 32.2(c)(1); *United States v. Weitzman*, 963 F. Supp. 2d 218, 221 (S.D.N.Y. 2013).

## III.    The Proposed Forfeiture Is Not Excessive Or Unconstitutional

Goldstein is incorrect that the Excessive Fines Clause of the Eighth Amendment renders the proposed forfeiture unconstitutional. The Fourth Circuit applies a four-factor test to determine whether forfeiture violates the Excessive Fines Clause. *United States v. Bajakajian*, 524 U.S. 321 (1998). The factors are: (1) the amount of the forfeiture and its relationship to the authorized penalty; (2) the nature and extent of the criminal activity; (3) the relationship between the crime charged and other crimes; and (4) the harm caused by the charged crime. *United States v. Jalaram*, 599 F.3d 347, 355-56 (4th Cir. 2010).

In evaluating the first factor, the Fourth Circuit looks to authorized statutory penalties. *See, e.g.*, *United States v. Spirito*, 36 F.4th 191, 212 (4th Cir. 2022) (comparison of forfeiture judgment

10

to statutory penalty); *United States v. Bennett*, 986 F.3d 389, 399 (4th Cir. 2021) (comparison of forfeiture judgment to statutorily authorized monetary penalty); *United States v. Blackman*, 746 F.3d 137, 144 (4th Cir. 2014) (comparison of forfeiture judgment to both maximum statutory fine and Guidelines maximum); *United States v. Bollin*, 264 F.3d 391, 418 (4th Cir. 2001) (affirming forfeiture judgment of more than twice the authorized statutory penalty). Here, the statute of conviction, 18 U.S.C. § 1014, provides for a maximum fine of $1 million. That is a significant financial punishment for a non-violent offense, and signals Congress's intent to characterize the offense as serious. *See generally Bajakajian*, 524 U.S. at 336 (discussing deference to the legislature when courts evaluate appropriate punishments). And because the statute authorizes a fine of up to $1 million, so do the Guidelines.[7] U.S.S.G. § 5E1.2(c)(4). The proposed forfeiture amount is reasonable in light of the substantial fines provided for by applicable statute. *See, e.g.*, *Bollin*, 264 F.3d at 418-19 ($1.2 million forfeiture judgment was not excessive although the statutory maximum was $500,000 and defendant received about $30,000).

On the second factor, the nature and extent of Goldstein's criminal conduct was significant. This was not mistake or negligence. In convicting Goldstein on count 16, the jury found that Goldstein acted deliberately and intentionally: he knew what he was doing. *See* Ex. 5, 2/19 Tr. 81:14-23 (instructing jury on elements of counts 14-16). That is unsurprising given Goldstein's admission that he intentionally omitted the liabilities on the application (albeit to deceive his wife, not NFM). Goldstein falsified the loan application in various ways (for example, by omitting the liabilities and by certifying he was not a guarantor on any other loan) in furtherance of the same

---

[7] Goldstein mistakenly asserts, citing U.S.S.G. § 5E1.2(c)(3), that the maximum Guidelines fine is $9,500. *See* Dkt. 523 at 11. The very next subsection says that notwithstanding § 5E1.2(c)(3), "if the defendant is convicted under a statute authorizing a maximum fine greater than $500,000," "the court may impose a fine up to the maximum authorized by the statute." U.S.S.G. § 5E1.2(c)(4). Here, the statute under which Goldstein was convicted provides for a maximum fine of $1 million. 18 U.S.C. § 1014.

scheme to hide his true debt from NFM. Goldstein's con ensnared multiple lenders in addition to NFM; in 2021, he lied on multiple documents submitted to another mortgage lender, FSM, and in the Parabellum contracts. Over and over, Goldstein chose to conceal his poker-related debts, with the goal of obtaining funds to purchase and afford the Washington, D.C. home.

On the third factor, there is a strong relationship between the conduct at issue in count 16 and the other charges. The other mortgage fraud charges (counts 14-15) involved essentially identical conduct but with a different victim, FSM: Goldstein concealed approximately $15 million in poker-related debts so that he could get a loan to purchase the Washington, D.C. home. The conduct is likewise connected to the tax charges, which broadly concerned Goldstein's concealment of his poker activities from the government, and his prioritization of those activities over his tax obligations. And although not charged, Goldstein defrauded Parabellum twice in 2021 by signing investment agreements in which he represented (falsely) that he had disclosed all relevant financial information—while concealing the same poker-related debts. Finally, on the stand at trial, Goldstein falsely denied intending to defraud NFM, which is potentially another crime (perjury) to which count 16 relates. The third factor favors granting the motion.

On the fourth factor, although NFM was not harmed financially, it was fortunate. The home's value has not decreased since Goldstein applied for the loan in 2021, and there is substantial collateral that NFM could recover if Goldstein defaulted. But if the home's value decreased substantially, and Goldstein did not pay, then the undisclosed loans would have made a real difference. Suddenly NFM would face the prospect of fighting other creditors for repayment because foreclosing on the home would not satisfy Goldstein's debt. Goldstein's ability to repay NFM was lucky in a more literal sense, too: he won tens of millions of dollars in 2022-2023 playing poker, which subsidized his (still-partial) repayment. That repayment also was subsidized by

12

Goldstein's failure to file or pay taxes in those years. So while true Goldstein did not harm NFM financially, it does not meaningfully detract from the appropriateness of entering the preliminary order of forfeiture.

All four factors counsel in favor of rejecting Goldstein's argument that the proposed forfeiture order violates the Excessive Fines Clause. Put simply, the Eighth Amendment does not bar the Court from entering the preliminary order of forfeiture.

## CONCLUSION

The government respectfully requests that the Court enter a preliminary order of forfeiture (Dkt. 509-1) to include a money judgment of at least $1,987,500 in U.S. currency, which is proceeds of Goldstein's fraud on NFM.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

Dated: June 9, 2026

/s/
Hayter L. Whitman
Trial Attorney
Department of Justice—Criminal Division

Sean Beaty
Senior Litigation Counsel
Emerson Gordon-Marvin
Trial Attorney
Department of Justice—Criminal Division

Adeyemi Adenrele
Assistant United States Attorney
District of Maryland