**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **CRIMINAL NO. LKG-25-6** |
| **THOMAS C. GOLDSTEIN,** | |
| **Defendant.** | |

**DEFENDANT THOMAS C. GOLDSTEIN'S
<u>REPLY IN SUPPORT OF MR. GOLDSTEIN'S SENTENCING MEMORANDUM</u>**

## TABLE OF CONTENTS

**Page**

I.  The Government's Tax Loss Calculation Is Both Disproportionate And Incorrect. ...........1

    A.  The Government Grossly Overstates the Nature and Seriousness of the Offense Conduct. ................................................................................................1

    B.  The Contemporaneous Messages Undermine the Government's 2016 Gambling Theory and They Are Reliable. ..............................................................2

    C.  The Government's New 2016 Gambling Theory Is Meritless. .............................7

    D.  The Government's Tax Loss Calculation Is Incorrect. ......................................10

II.  ██████████████████████████████████████████ ..........................12

III.  The Government's Deterrence Argument Is Without Merit. ......................................13

IV.  The Data Cited by the Defense Supports a Below-Guidelines Sentence. ..........................14

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*United States v. Chavez-Lopez*,
 767 F. App'x 431 (4th Cir. 2019) (unpublished) ........................................................................4

*United States v. Jimenez-Chaidez*,
 96 F.4th 1257 (9th Cir. 2024) ....................................................................................................4

*United States v. Patel*,
 No. 23-CR-30076, 2025 WL 80388 (S.D. Ill. Jan. 13, 2025) ....................................................4

*United States v. Snipes*,
 611 F.3d 855 (11th Cir. 2010) ..................................................................................................14

*United States v. Williams*,
 83 F.4th 994 (5th Cir. 2023) ......................................................................................................4

**FEDERAL STATUTES**

18 U.S.C. 3553(a) ...........................................................................................................2, 12

26 U.S. Code § 7203 ..............................................................................................................14

For the reasons set forth in Defendant Thomas Goldstein's sentencing memorandum, the Court should sentence Mr. Goldstein to a lengthy period of supervision.  Incarceration is not appropriate here in light of the significant disparity between the actual charged conduct and the government's inflated guidelines calculation, the significant punishment that Mr. Goldstein has already suffered, and sentences imposed by other courts in comparable cases.  The government's arguments to the contrary are without merit.

I.     **The Government's Tax Loss Calculation Is Both Disproportionate And Incorrect.**

   A.     **The Government Grossly Overstates the Nature and Seriousness of the Offense Conduct.**

The government does not dispute the defense's primary point that approximately $6.66 million of the government's purported "tax loss" consists of taxes, penalties, and interest that Mr. Goldstein has already paid and that are included in the calculation by virtue of *misdemeanor* offenses that the government has never charged in a case like this.  When combined with the $7.68 million in tax loss that is attributable to unrelated and uncharged conduct, a whopping $14.3 million of the government's total tax loss of $16.2 million has *nothing to do with any actual tax loss suffered by the government as a result of the conduct at issue in the trial*.  Neither the government's sentencing memorandum nor its opposition cite any case in which a court has imposed a sentence based on such a draconian calculation.

Instead, the government quarrels with the defense's objections to the calculation of the $1.9 million tax loss actually attributable to the conduct that was the subject of the trial.  In considering these arguments, the Court should not lose sight of the forest for the trees—the fact remains that the government is asking the Court to sentence Mr. Goldstein based overwhelmingly on taxes, penalties and interest that Mr. Goldstein paid long ago and that are at issue only as a result of a never-before-charged misdemeanor theory of liability; and uncharged,

unrelated conduct.  Even if the government's guidelines calculation were technically correct, the Court would be obligated to make its own determination of the appropriate sentence considering the factors under 18 U.S.C. 3553(a).  And applying those factors, the government's sentencing request is drastically inappropriate.  But in any event, the defense's objections are correct and the government's responses are wrong.

### B.   The Contemporaneous Messages Undermine the Government's 2016 Gambling Theory and They Are Reliable.

The most significant error in the government's tax loss calculation concerns the 2016 gambling numbers.  In the face of overwhelming evidence to the contrary, the government continues to maintain that Mr. Goldstein underreported his 2016 gambling income.  In fact, the contemporaneous messages conclusively show that Mr. Goldstein *overreported* his 2016 gambling income.

Throughout trial, the government repeatedly argued to the jury that Mr. Goldstein hid more than $50 million in gambling income from his accountants.  *See, e.g.*, GX-412; 2/3/26 Tr. 115:2-6 (government showing accountant GX-412 and asking "What did Mr. Goldstein tell you about winning $49.1 million gross through poker in 2016?"); 2/18/26 Tr. 45:22-46:4 (government arguing in closing that "Tom Goldstein won almost $50 million playing poker" and "[t]he IRS could only possibly discover a sliver of his Asian winnings").  That theory was completely discredited at trial, and corroborated through contemporaneous messages gathered by an established e-Discovery vendor showing that (1) Mr. Goldstein had significant gambling losses overseas that the government never considered; (2) a significant share of the winnings from Mr. Goldstein's 2016 poker games was paid to an investor named Paul Phua; and (3) a substantial portion of Mr. Goldstein's 2016 winnings were not paid out until 2017, a year in which he incurred substantial gambling losses that wiped out those winnings for tax purposes.

Those messages were produced to the government in advance of trial and included on the defense exhibit list.

With its original theory in tatters, the government shifts to a different theory of liability for the 2016 gambling numbers that ignores Mr. Goldstein's international wins and losses. The government now says that Mr. Goldstein underreported his 2016 gambling income by improperly including three wires in the gambling loss figure he sent to his accountants. These three wires account for the vast majority of the alleged tax loss attributable to the actual conduct at issue in this case. But this theory too is completely undermined by the contemporaneous text messages. Those messages show that Mr. Goldstein actually overreported his 2016 gambling income, because the gambling numbers he sent to his accountants did not account for Mr. Phua's share of the Gores winnings. That error erases the three incorrect wires, as well as the incorrect deduction of several gambling payments as business expenses in 2016.[1]

The government does not dispute this calculation. Instead, the government says that the Court should disregard the contemporaneous messages in making factual findings for sentencing. The government is desperate to exclude the messages from these proceedings because it knows that they show that the government's 2016 gambling theories—all of them—are completely and totally wrong. At trial, the government convinced the Court not to admit the messages based on erroneous hearsay arguments. Now, the government tries to convince the Court not to consider the messages at sentencing based on new erroneous arguments.

---

[1] Moreover, the government acknowledges that Mr. Goldstein's taxes double-reported $885,000 in poker income by including it as business income *and* including it in his wires list for reported gambling income. That over-counting offsets almost all of the incorrect business deductions from 2016. *See* ECF No. 521-11 at 3 (government identifying $885,000 of "Gambling Income Included in G & R Gross Receipts").

First, the government says that the messages are "unreliable" because "any number of these messages could be altered or fabricated." ECF No. 543 at 5-6. That is not true. As explained in the attached declaration of Wesley Wong, Associate Director for Forensics and Collections at Epiq eDiscovery Solutions, these messages were collected by Epiq in a forensically sound manner, using a method that would not have allowed any party—including Mr. Goldstein—to edit or modify the contents of the messages. *See* Exhibit A, W. Wong Declaration. As Mr. Wong explains, Epiq collected the full universe of messages between Mr. Goldstein and the relevant accounts directly from Mr. Goldstein's Telegram account.

The government had the opportunity to question Mr. Wong about this collection at trial. Instead, the government raised yet another legally-defective argument—that Mr. Wong was an undisclosed expert. During trial, the defense provided the government with multiple authorities demonstrating that courts routinely allow lay witness testimony for cell phone extraction data, typically *at the government's request*. As one Court of Appeals noted, "[e]very circuit that has addressed this question—whether evidence obtained with [cell phone extraction] technology requires expert testimony for admission—has answered it in the negative." *United States v. Williams*, 83 F.4th 994, 997 (5th Cir. 2023). *See also United States v. Jimenez-Chaidez*, 96 F.4th 1257, 1267 (9th Cir. 2024) (affirming government's presentation of testimony about a cell phone extraction for GPS coordinates as lay testimony); *United States v. Chavez-Lopez*, 767 F. App'x 431, 434 (4th Cir. 2019) (unpublished) (holding that government witness's "testimony concern[ing] the actions he took to extract the data—hooking the phones up to a computer, following a few prompts, and saving data" is "best characterized as testifying about facts in his personal knowledge" and "to the extent [the witness] offered an opinion, it was lay testimony"); *United States v. Patel*, No. 23-CR-30076, 2025 WL 80388, at *3-4 (S.D. Ill. Jan. 13, 2025) ("The

4

Court agrees that the law enforcement officers who will testify in this case do not need to be qualified as experts in order to discuss the data obtained from Defendant Patel's cell phone provided that they do not offer testimony on the mechanics of the Cellbrite software."). The government has never even attempted to establish otherwise. However, based on its erroneous objection, Mr. Wong never testified.[2] The government has no one but itself to blame for its failure to cross-examine Mr. Wong on the collection of these messages.

Second, the government says that the messages are unreliable because Mr. Goldstein did not provide the devices themselves or forensic extraction reports. This argument is the height of hypocrisy. At trial, the government argued *precisely the opposite*—that *only* Mr. Goldstein, and not a forensic vendor, could authenticate the messages. *E.g.*, 1/20/26 Tr. 253:25-254:2 (Mr. Gordon-Marvin: "If Mr. Goldstein wants to take the stand and testify as to these documents, he's welcome to do so. But otherwise, this is self-serving hearsay."); 2/3/26 Tr. 47:1-3 (Mr. Adenrele: "Obviously, unless the defendant wants to take the stand and discuss it. Otherwise, it's a hearsay objection."); 2/10/26 Tr. 8:9-10 (Mr. Beaty: "[T]hese are his text messages, and there is one person who could absolutely authenticate them.").

The government cites no legal authority for this remarkable proposition—because none exists. It is well established that the testimony of a sender or recipient of an electronic message is sufficient to authenticate the message. The forensic exactitude demanded by the government is not required, although Mr. Wong's declaration clearly satisfies it. Indeed, the government admitted numerous text messages from its own witnesses using precisely this same method—

---

[2] At the time, Mr. Wong and other chain of custody witnesses had flown in for the date of their expected testimony, but the government's case was running longer than expected. The government also objected to the defense's request to call these witnesses out of order and asserted that they were irrelevant because Mr. Goldstein himself should take the stand to authenticate the messages.

testimony from the sender or recipient—without providing the defense with forensic images or extraction reports. *See, e.g.*, GX-31.1 (messages with Andrew Robl and Keith Gipson); GX-32.1 (messages with Keith Gipson); GX-401 (messages with Rick Solomon); GX-411 (messages with Alec Gores). And unlike most of the messages disclosed by the government, the messages the defense produced from Mr. Goldstein's Telegram account included metadata that confirms the contemporaneous nature of the messages—that they were sent in 2016 and 2017. Notably, the government had the opportunity to question Mr. Goldstein at trial about the provenance of these messages. It did not ask him a single question on that topic.

Finally, the government's attempt to blame Mr. Goldstein for the fact that some messages from this time period may not have been preserved is—to borrow a phrase—"a bravura demonstration of chutzpah." ECF No. 130 at 8. The government investigated this case for nearly five years. The government issued subpoenas to Mr. Goldstein's firm and his blog for virtually every record imaginable. Yet the government never bothered to attempt to collect messages that were critically relevant to its central theory of liability.

Indeed, until the indictment was returned, the government never disclosed to the defense that it was investigating Mr. Goldstein's overseas gambling or the tax treatment of the winnings against Mr. Gores. As a result, although the defense took steps to preserve evidence relevant to the government's investigation, it was not on notice that these messages were relevant to that investigation. When the indictment was returned and the defense became aware of these allegations, it retained an e-Discovery vendor to collect relevant messages from Mr. Goldstein's devices and accounts. As Mr. Wong's declaration explains, the Telegram messages were collected in February 2025, just a month after Mr. Goldstein was indicted. The government is of

course entitled to conduct its investigations in secret, but it cannot do so and then turn around and complain that the defendant failed to preserve evidence on topics that it did not disclose.

Both because the messages should have been admitted over the government's hearsay objection, and because hearsay is admissible in sentencing, these messages have more than sufficient indicia of reliability for the Court to consider them.

### C.    The Government's New 2016 Gambling Theory Is Meritless.

The messages show the following with respect to Mr. Goldstein's 2016 gambling activity: (a) Mr. Phua had an approximately $9 million share of the winnings from the Gores game; (b) Mr. Goldstein and Mr. Phua agreed that Mr. Phua's share would be swapped with Mr. Goldstein's share of the winnings from the Tango game when Tango paid; and (c) that swap occurred in 2017. This evidence shows that Mr. Goldstein overreported his 2016 gambling income, because he did not account for Mr. Phua's share of the Gores winnings when he provided the gambling figures to his accountant in 2017.

In response, the government's opposition unveils yet another theory of 2016 gambling liability. The "truth," says the government, is that Mr. Goldstein "and Phua did the Gores-Tango swap in 2016, Goldstein kept the money from Gores, and he owed Phua less than $1.2 million, which he eventually repaid in 2017." ECF No. 543 at 9.

This passage alone should give the Court significant pause before imposing any period of incarceration based on any statement by the government about the facts of this case. In this sentence, the government appears to concede that the messages it erroneously convinced the Court to exclude from the trial completely undermined both the theory of liability that the government argued at trial (that Mr. Goldstein hid $50 million in gambling winnings) and the theory it argued in closing (that Mr. Goldstein had millions of dollars hidden in a secret account in Asia).

7

In a complete abandonment of both theories, the government now appears to be arguing

that Mr. Goldstein and Mr. Phua *did* swap Mr. Goldstein's share of the Tango winnings for Mr.

Phua's share of the Gores winnings, but this swap happened in 2016, and therefore Mr.

Goldstein's share should have been treated as 2016 gambling income.  As with its prior theories,

the government's new post-trial theory is wrong.[3]  Messages between Mr. Goldstein and Keith

Gipson, admitted in the government's case, conclusively show that Tango had not paid his losses

until mid-2017.  *See* Exhibit B (Excerpt of GX 32.1) at 38 ("Delicate situation with him bc

Tango still hasn't paid the 12 he lost to me.").

```
"id": 12951,
"type": "message",
"date": "2017-03-13T17:06:30",
"date_unixtime": "1489439190",
"from": "Tom Goldstein",
"from_id": "user35074331",
"text": "Correct. Delicate situation with him bc Tango still hasn't paid the 12
he lost to me.",
"text_entities": [
  {
    "type": "plain",
    "text": "Correct. Delicate situation with him bc Tango still hasn't paid the 12
he lost to me."
```

And messages between Mr. Goldstein and Mr. Phua's assistant confirm that Tango paid his

losses to Mr. Phua in 2017, at which point Mr. Goldstein and Mr. Phua were "even steven."  *See*

Exhibit C (DX 737.13).

---

[3] As the Court well knows, the government abandoned mid-trial the theory that Mr. Goldstein never told Walter Deyhle that he won $26 million in 2016.  Specifically, the government failed to review its own production for communications between Mr. Goldstein and Mr. Deyhle, and as a result did not identify DX-304, in which Mr. Goldstein reported over $27 million in wins.

| | | |
|---|---|---|
| U | user71155414 | 4/12/2017, 12:00 AM |
| | the 600k over of pp number u did pass td ? | |
| TG | Tom Goldstein ▮▮▮▮▮ | 4/12/2017, 12:00 AM |
| | Gave almost all | |
| TG | Tom Goldstein (▮▮▮▮▮ | 4/12/2017, 12:01 AM |
| | Rest arranged with him | |
| U | user71155414 | 4/12/2017, 12:01 AM |
| | ok | |
| U | user71155414 | 4/12/2017, 12:01 AM |
| | thn u and pp even steven  for nw | |
| TG | Tom Goldstein ▮▮▮▮▮ | 4/12/2017, 12:01 AM |
| | Ya 100% | |

These messages (which the government conveniently does not mention, let alone address, in any of its filings) establish that Tango paid his losses *in 2017*, and therefore Mr. Goldstein's share from the Tango game is properly treated as income in 2017—a year in which those winnings were more than offset by his substantial losses to Mr. Safai.

The government argues that "tax law dictates that" Mr. Phua's share "cannot be deducted from" Mr. Goldstein's "gross gambling winnings" because under the "'constructive receipt' doctrine," Mr. Phua did not have possession of his share of the Gores winnings in 2016. ECF No. 543 at 9-11. That conclusion both distorts the constructive receipt doctrine and misses the point. The question is not whether Mr. Phua had constructive receipt of the Gores winnings in 2016 such that the money was income and taxable for Mr. Phua; the point is that money Mr. Goldstein held *for someone else* was not taxable income for Mr. Goldstein. Indeed, at trial, government witnesses repeatedly agreed that Mr. Goldstein was not responsible for paying taxes on investors' shares—only his own. *See, e.g.*, 2/4/26 Tr. 99:16-19 (accountant agreeing that "you do not have to report as income the money that ends up going to the investors" because "[t]hat's their income, not your income"); 2/5/26 Tr. 54:10-14 (Special Agent McDonald agreeing that "a taxpayer is not required to pay taxes on the shares of the gambling winnings that

go to the investors"); 2/10/26 Tr. 198:11-17 (Revenue Agent Ranahan agreeing that if "Mr. Phua's share of the Gores game" went "into Mr. Goldstein's bank account, but Mr. Phua directs how that money is spent" then "that is income to Mr. Phua, not Mr. Goldstein").

In any event, the government presents no evidence whatsoever that Mr. Goldstein was aware of any of the rules, IRS regulations, or cases it cites to support the counterintuitive proposition that Mr. Goldstein was required to pay taxes on what the government now concedes was Mr. Phua's share. Those rules are complicated. *See* 2/2/26 Tr. 140:4-12 (IRS witness testifying that he "do[es] not know . . . the tax rules about how you treat investments in poker activity"). The contemporaneous text messages show that Mr. Goldstein and Mr. Phua agreed that Mr. Phua's share of the Gores winnings would be swapped with Mr. Goldstein's share of the Tango winnings when Tango paid Mr. Phua, which occurred in 2017. The government presented no evidence at trial (and cites none in its opposition) that Mr. Goldstein was aware of the tax rules cited by the government concerning its theory of the proper tax treatment of this transaction.

### D.      The Government's Tax Loss Calculation Is Incorrect.

The government's tax loss calculation also improperly includes loss amounts based on a theory that the jury rejected.

The government argued at trial that, on three occasions, Mr. Goldstein evaded taxes by diverting firm income to a source other than the firm's bank account—a payment from Robbins Geller to Mr. Goldstein's personal account in 2017, a swap with Paul Napoli of a poker debt with funds owed to the firm in 2018, and a legal fee payment from Tobey Maguire to Bob Safai in 2021. The defense argued that this conduct could not have constituted tax evasion because the payors were required by law to send both the law firm and the IRS a Form 1099 memorializing the payment, and so Mr. Goldstein would reasonably have believed that the payments would be

10

recorded as income regardless of where they were sent. (In at least one instance, the payor actually sent such a Form 1099; the payment was not recorded as income because Mr. Goldstein's accountants discarded 1099s based on the incorrect belief that payors were not required to send them to the firm.) The jury obviously agreed with this position, as it acquitted Mr. Goldstein of the count that charged the 2018 Napoli payment. (As explained in the defense sentencing memorandum, the guilty verdicts for 2017 and 2021 are likely attributable to other conduct charged in those years.) It is therefore improper to include the other two payments in the tax loss calculation.

The government says that the other two payments should be included because the government did not expressly reference the 2018 Napoli payment to the jury in its closing argument. But the government consistently argued that the three payments—Robbins Geller, Napoli Shkolnik, and Mr. Maguire—were all examples of the same form of purported evasion. Indeed, in its opposition to the defense motion to dismiss these allegations, the government expressly described the 2018 Napoli offset as "strikingly similar conduct" to the other two payments. ECF No. 130 at 5. And the government alleged, and solicited evidence to support, its argument that all three payments were not reported as income on the firm tax returns because they were not paid into the Goldstein & Russell bank account. To the extent there is any ambiguity in the jury's verdict, that is a problem of the government's own making, as the government repeatedly opposed defense requests for a special verdict form that would have avoided this problem.

The government attempts to avoid the clear import of the jury's verdict by rearguing its version of the evidence. The Court should decline this invitation to second-guess the jury. But the government's arguments are also wrong. The government says that Mr. Maguire had no

obligation to issue a Form 1099, but as Revenue Agent Ranahan admitted, that would not be true if Mr. Maguire made legal fee payments through a business entity, and Mr. Goldstein would have no way of knowing such a detail. *See* 1/28/26 Tr. 82:6-14 (Mr. Maguire testifying that his "business manager firm" wires funds and prepares taxes on his behalf); 2/10/26 Tr. 210:18-21 (Agent Ranahan agreeing "if you are a corporation and you hire a law firm and you pay the law firm more than like $600 for legal services, you're required to send them a 1099"). And the government's invocation of an email regarding a $500,000 payment from Malaysia is a red herring—unlike U.S. taxpayers such as Robbins Geller, Napoli Shkolnik, and Mr. Maguire, the Malaysian government was not under any obligation to issue a Form 1099, and therefore Mr. Goldstein had a specific reason to report this payment to the accountants. Indeed, the Malaysia email supports the defense's position, not the government's—if Mr. Goldstein were trying to hide diverted income from his accountants, the payment from Malaysia would have been the easiest way to accomplish that goal, and for a far larger amount of income.



### III.    The Government's Deterrence Argument Is Without Merit.

The government says that the Court should impose a sentence driven by the value of the taxes, penalties, and interest that Mr. Goldstein paid long ago and that are charged only in the misdemeanor offenses to promote deterrence.  "[T]hese are serious offenses," says the government of the misdemeanors.  ECF No. 543 at 19.  Yet the government still cannot cite a single case in which a court has imposed a sentence that looks anything like the sentence that the government requests here—a lengthy term of imprisonment driven largely by the "tax loss" associated with misdemeanors charged even though the defendant filed his tax returns on time *and* paid the taxes long before indictment; and tax loss for uncharged misdemeanor allegations.

The government's deterrence argument is belied by the fact that the United States practically never charges defendants in these circumstances.

The case relied on by the government, *United States v. Snipes*, supports the defense's position, not the government's.  611 F.3d 855 (11th Cir. 2010).  In that case, the movie star Wesley Snipes was convicted under Section 7203 for his refusal to file income tax returns between 1999 and 2004 despite earning millions of dollars in those years, based on his view that the IRS does not have the legal authority to tax the domestic earnings of individual Americans. In the passage of the Eleventh Circuit opinion cited by the government, the court rejected Snipes' argument for a blanket rule that "*no* first-time offender should be awarded jail time" for a violation of Section 7203.  *Id*. at 869.

Far from supporting the government's argument that a lengthy prison sentence is warranted in this case to promote deterrence, *Snipes* shows the circumstances under which the government actually charges a violation of Section 7203, and under which the courts actually impose a period of incarceration for violations of the statute.  Snipes refused to file his tax returns at all during the charged years.  He never paid the taxes that he owed for those years based on the fraudulent notion that the IRS lacks authority to tax domestic income of American citizens.  By contrast, in the charged years Mr. Goldstein filed his tax returns or extensions on time, and his entire tax bills for those years (with penalties and interest) were paid long before he was indicted.  The fact that *Snipes* is the closest case the government can find to support its sentencing recommendation speaks volumes.

## IV.     The Data Cited by the Defense Supports a Below-Guidelines Sentence

As explained in the defense sentencing memorandum, a sentence within the guidelines range in this case would be disproportionate in light of the sentences imposed on similarly-

situated or more culpable defendants.  The government's arguments to the contrary are not persuasive.

As an initial matter, the government does not address the defense's analysis of the Sentencing Commission data.  The data show that, in the guidelines range calculated based on the actual conduct underlying the jury's verdict, the average sentence is a below-guidelines variance of 12 months, and half the defendants in that category in the last five years received probation or a fine only.  And even under the government's calculation, the average and median sentences imposed to similarly situated defendants (based on tax loss, without considering the underlying circumstances of the offense) is still years below the guidelines range.  The government does not dispute this point.

Instead, the government focuses on the specific cases cited in the defense sentencing memo, arguing that in those cases the defendants pled guilty.  But this argument misses the point.  In those cases, the defendant's acceptance of responsibility was already factored into the Sentencing Guidelines calculation.  The courts nevertheless imposed sentences below the applicable guidelines ranges and notwithstanding the seriousness of the charged conduct.  While acceptance of a guilty plea may make a difference to the government's sentencing requests, the courts in those cases certainly considered factors other than that the defendant took a plea.  The sentences imposed in those cases—and the Sentencing Commission data cited in the defense memorandum—strongly support a below-guidelines sentence in this case.

\*     \*     \*     \*     \*

Mr. Goldstein spent decades building a reputation and career as an extraordinary legal advocate who dedicated a substantial portion of his practice to arguing public-interest cases before the Supreme Court.  He transformed the Supreme Court bar.  He founded the first

15

appellate advocacy clinics, and he devoted significant time and energy to pro bono work—including supporting the public interest and pro bono work of the other attorneys at his law firm. He created the most successful legal blog of all time.  The letters the defense will submit to the Court on Mr. Goldstein's behalf describe the impact of this work—the careers of younger lawyers he promoted, the indigent clients whose lives he changed, his generosity in lending personal and professional time, and so on.  Contrary to the government's suggestion, the Court can and should consider the full picture of Mr. Goldstein's life when imposing a just sentence in this case.

The government's contrary sentencing recommendation is based on an unprecedented, draconian guidelines calculation that would send Mr. Goldstein to prison for years based on taxes he paid long ago and conduct that the government did not charge and that the jury did not consider.  Moreover, the sentence the government seeks is seriously out of step with the sentences imposed on other defendants with comparable guidelines ranges.  The Court should reject this recommendation and sentence Mr. Goldstein to a period of supervision,

16

Dated: June 30, 2026

Stephany Reaves (Bar No. 19658)
Sarah E. Weiner (*pro hac vice*)
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Avenue NW, Suite 500E
Washington, DC 20001
(202) 220-1100
Stephany.Reaves@mto.com
Sarah.Weiner@mto.com

Adeel Mohammadi (*pro hac vice*)
**MUNGER, TOLLES & OLSON LLP**
350 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9100
Adeel.Mohammadi@mto.com

Respectfully submitted,

*/s/  Jonathan I. Kravis*
Jonathan I. Kravis (Bar No. 31556)
**LIU SHUR KRAVIS LLP**
607 14th Street NW, Suite 625
Washington, DC 20005
(202) 240-7100
jonathan.kravis@lskllp.com

17

**INDEX OF EXHIBITS**

| | |
|---|---|
| Exhibit A | Declaration of Epiq Witness W. Wong re: Telegram Messages |
| Exhibit B | Excerpt of GX 32.1 (Messages between Mr. Goldstein and Mr. Gipson) |
| Exhibit C | DX 737.13 (Messages between Mr. Goldstein & Mr. Phua's assistant) |

18