**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL NO. LKG-25-0006 |
| THOMAS C. GOLDSTEIN, | |
| Defendant. | |

## REPLY IN SUPPORT OF GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Thomas Goldstein's recent conduct and sentencing positions only reinforce that he remains undeterred by investigation, prosecution, and conviction, continuing to believe he is above the law. Just this year, he lied under oath to the Court and the jury, and later filed yet another false tax return. This is not a "one-dimensional caricature," Def. Opp. 6, Dkt. 540; it is an accurate summary of his most recent conduct in an almost decade-long crime spree. Goldstein's conduct warrants a substantial sentence at the high end of the Guidelines range. His newest arguments to the contrary misrepresent the Sentencing Guidelines, obfuscate his actual conduct, and overlook clear precedent. The government respectfully requests that the Court reject his proposal of probation, and instead impose a sentence of 97 months' incarceration.

## ARGUMENT

### I.    Sentencing Guidelines

The government extensively detailed the Guidelines calculations and underlying conduct in its sentencing memorandum and opposition brief. *See* Gov. Mem. 6-24, 28-52, Dkt. 520; Gov. Opp. 2-11, Dkt. 543. The government maintains that its proposed tax loss calculations, adjustments, total offense level, and Guidelines range, are all proven far beyond a preponderance of the evidence. Indeed, the Court has already held that each count of conviction Goldstein

challenged in his Rule 29 motion (and the vast majority of the criminal conduct) was supported by sufficient evidence such that a reasonable jury could have found each count proven beyond a reasonable doubt. *See* Mem. Op. 28-39, Dkt. 537. Thus, this brief addresses only a few points on Goldstein's tax loss for 2016 and for the § 7203 violations, as well as adjustments for the Guidelines calculations.

### A. Tax Year 2016

After much ink spilled on both sides, only three further points warrant elucidation: Goldstein's gambling in Asia affects the tax loss calculation only where he actually received or spent money; his own February 2017 text thread reinforces the accuracy of the government's calculations; and the government never shifted theories about 2016.

***To start***, Goldstein now argues that the government's calculations ignore his losses abroad even though the "ledger kept by [Kids] shows [Goldstein] lost approximately $4.4 million gambling outside the United States in 2016." Def. Opp. 12, Dkt. 540. However, Goldstein was a cash-basis taxpayer. 2/10 Tr. 77:14-20 (RA Ranahan). His income and deductions are measured solely by the actual cash inflows to and outflows from bank accounts he owned or controlled. *See* 2/10 Tr. 92:21-22 ("I'm only using what was in and out of the bank account, the actual cash transactions."). Goldstein himself argues, "There is absolutely no evidence . . . to support the idea that [he] held some other, undisclosed, foreign bank account." Def. Opp. 27. And he asserts that his references to a "virtual account" meant only that "Phua's assistant tracked [Goldstein's] shares of wins and losses *on a spreadsheet*." *Id.* at 28 (emphasis added).

These very statements confirm Goldstein never spent money from his own bank accounts on poker losses abroad in 2016. What Kids ostensibly tracked on a spreadsheet does not change

2

Goldstein's net gambling income as a cash basis taxpayer in 2016, as measured by the amounts that flowed through his and his law firm's U.S. and UCB bank accounts.

*Next*, the government contends that Goldstein and Phua conducted the Gores-Tango swap in 2016, leaving Goldstein to keep the Gores money in his own bank accounts as poker income, and owing Phua roughly $1.2 million. *See* Gov. Opp. 9, Dkt. 543. A text message thread buried in Goldstein's Rule 16 productions confirms this. On February 2, 2017, Goldstein had the following exchange with Kids:



Ex. 1 (2/2/17 Text Thread). After, Kids said he would need to check to confirm. *Id.* Goldstein had paid Daniel Cates—nicknamed "Jungleman"—$750,000 with a check dated December 31, 2016. GX718 at 4; GX420 at 2. Kids's estimate that Goldstein's balance with Phua was "around 1.3" (meaning $1.3 million) closely aligns with the $1.2 million balance after the Gores-Tango swap. Moreover, Goldstein's immediate reply, "then around 550," represents that $1,300,000 balance minus the $750,000 he had already paid Cates. His casual mental math confirms the Gores-Tango swap happened in 2016: after that swap, Goldstein owed Phua "something[]" around $1.3 million

at the end of 2016, he paid Cates $750,000 by check the last day of 2016, and then he owed Phua a remaining roughly $550,000. He was never holding a $9 million share for Phua, and the government's 2016 tax calculation is entirely accurate. Goldstein's unbelievable story to the contrary should be rejected. *See United States v. Valenti*, 121 F.3d 327, 334 (7th Cir. 1997) (affirming tax loss calculation where district court "rejected [defendant's] testimony as speculative and incredible").

*Finally*, the government's theory of Goldstein's unreported 2016 gambling income has never meaningfully shifted. The Indictment alleged Goldstein falsely reported that he had "$2,748,350" in net 2016 gambling winnings, whereas his true "net gambling winnings . . . were more than $5,000,000." Streamlined Indictment ¶ 40, Dkt. 337-2 ("Indictment"). The evidence admitted at trial proved that Goldstein lied to Walter Deyhle in an email that his net winnings were "$2,748,350," PSR ¶ 74, and that Goldstein had $6,105,197 in net gambling winnings that year. GX430 at 1. This closely mirrors the Indictment, and shows the government proved its enduring theory. All that changed was the fact that Goldstein lied to Deyhle in email rather than in person.

To be sure, in the Indictment and at trial, the government emphasized Goldstein's texts to Keith Gipson and Andrew Robl that he had won roughly $50 million against his three targets in 2016. *See* Indictment ¶ 33. But it never calculated his net taxable gambling income based on those texts; instead, the government always relied on his actual bank transactions, calculating his unreported 2016 taxable net gambling income at less than $4 million. *See* Indictment ¶ 28; GX427 (2016 tax computation); Sentencing Tax Computation 3, Dkt. 521-11. The fact that Goldstein has never argued a variance occurred between indictment and trial reinforces how little the government's theory changed. *See United States v. Kennedy*, 32 F.3d 876, 883 (4th Cir. 1994)

("[A] 'variance' occurs when the evidence at trial establishes facts materially different from those alleged in the indictment.").

### B. Tax Years 2022 and 2023

Goldstein's 2022 and 2023 tax crimes should be included in the tax loss calculation. To start, a court may properly consider post-indictment conduct as relevant conduct for sentencing. *See* U.S.S.G. § 1B1.3(a)(2) (providing offense level for tax crimes includes all acts committed or caused by the defendant that were "part of the same course of conduct or common scheme or plan as the offense of commission"); *id.* app. n.5(B) (defining "common scheme" to include "common victims, [a] common purpose, or similar *modus operandi*," and "same course of conduct" to apply to sufficiently related acts, as indicated by the "similarity of the offenses, the[ir] regularity (repetitions) . . . , and the time interval between" them).

For tax evasion, failures to pay, and failures to file, "all conduct violating the tax laws should be considered as part of the same course of conduct or common scheme . . . unless the evidence demonstrates that the conduct is *clearly unrelated*." U.S.S.G. § 2T1.1 app. n.2 (emphasis added). Examples include "a continuing pattern of violations of the tax laws," "a consistent method to evade or camouflage income," and "the violation in each instance involves a failure to report or an understatement of a specific source of income." *Id.* Notably, for failures to file a tax return or pay taxes, "the tax loss is the amount of tax that the taxpayer owed and did not pay." U.S.S.G. § 2T1.1(c)(2)-(3).

Thus, tax violations—including failures to file—from before and after the charged period are properly considered as part of the tax loss. *See, e.g., United States v. Meek*, 998 F.2d 776, 782 (10th Cir. 1993) (affirming inclusion of defendant's uncharged "failure to file tax returns" from before and *after* period of charged evasion and failures to file because uncharged conduct

represented "the same course of conduct," and noting government could prove this either (i) directly by showing "a continue pattern of tax violations," or (ii) indirectly by showing all the conduct violated the tax code); *see also Valenti*, 121 F.3d at 334 (affirming inclusion of tax loss from pre-indictment years that "fell outside the statute of limitations," and noting that a court may consider "uncharged crimes [and] crimes where charges have been dismissed" in relevant conduct); *cf. United States v. Kidd*, 12 F.3d 30, 33 (4th Cir. 1993) (affirming inclusion of post-indictment conduct as relevant conduct in drug case where charged and post-indictment acts formed "the same course of conduct" in the form of cocaine distribution and citing § 1B1.3(a)(2)).

Goldstein's failure to file 2022 and 2023 tax returns represent paradigmatic relevant conduct. First, they reflect his recurring failure to report gambling winnings and legal fee income. In 2022, Goldstein had a banner year, raking more than $17 million in net gambling winnings even after paying out his investors. But much like 2016, he did not accurately report those winnings; worse, he opted to not report them at all, and still owes more than $5.9 million in taxes, penalties, and interest. In 2023, he earned more than $4 million in net legal fee income but—much like in earlier years—did not report the full extent of that income on G&R's 2023 tax return and did not even file his own return.

Second, Goldstein was convicted of willfully failing to pay his 2017, 2019, 2020, and 2021 taxes. His blatant failures to pay his 2022 and 2023 taxes are a direct continuation of that pattern and occur in the years *immediately after* his counts of conviction. If anything, in the context of his 2016 tax evasion and later false tax returns, they represent a disturbing evolution in his criminal conduct: mid-investigation and no doubt regretting his false 2016 tax return and email to Deyhle memorializing his lies about his 2016 winnings, Goldstein simply opted to file no 2022 or 2023 tax return at all.

Third, Goldstein himself confirms the relevance of 2022 and 2023 when he notes his tax misconduct those years was "too prejudicial" and thus properly excluded at trial. Def. Opp. at 17. That these years were so intuitively probative reinforces their inclusion now as relevant conduct.

Ultimately, Goldstein's 2022 and 2023 failures to file and timely pay are textbook relevant conduct that represent "a continuing pattern" of tax violations, and a consistent "failure to report or an understatement of" his gambling and legal fee income. *See* U.S.S.G. § 2T1.1 app. n.2. They are properly included unless he can demonstrate his later crimes are "clearly unrelated," *id.* But he cannot, and he makes no meaningful attempt to do so. Thus, the tax loss includes the loss from 2022 and 2023. *See United States v. Hollier*, 321 F. Supp. 2d 601, 602 (S.D.N.Y. 2004) (rejecting defendant's argument that loss from pre-indictment tax years should not be included in tax loss where he did not demonstrate those years were "clearly unrelated" and did "not attempt to explain the nature of the deficiencies at all").

Perhaps recognizing 2022 and 2023 are properly included in the tax loss, Goldstein retreats to the claim that the government's 2022 calculations are "too uncertain to be reasonable estimates," Def. Opp. 24-25. However, these are plainly reasonable estimates established by far more than a preponderance of the evidence.

First, they are premised entirely on Goldstein's own bank statements and the stipulations of fact that he signed about his 2022 gambling transactions. *See* GX426 (summarizing 2022 poker transactions from bank records); 1/29 Tr. 38-41 (2022 poker stipulation). 2/2 Tr. 247-48 (McGuiness stipulation); *see also* Gov. Mem. 22-23, Dkt. 520 (explaining 2022 tax calculation). This more than suffices to establish a "reasonable estimate" of the tax loss by a preponderance of the evidence. *See United States v. Mehta*, 594 F.3d 277, 281-82 & n.2 (4th Cir. 2010). Indeed, it is hard to see how Goldstein can quibble with his own stipulations and bank statements.

Second, Goldstein wholly fails to meet his evidentiary burden. Once the government has established the tax loss, the defendant has the burden of establishing any deductions by a preponderance of the evidence, and the court is not required to accept tax loss calculations of "'doubtful reliability.'" *United States v. Foxx*, 681 F. App'x 249, 251 (4th Cir. 2017) (unpublished) (quoting *United States v. Montgomery*, 747 F.3d 303, 313-14 (5th Cir. 2014)); *see* U.S.S.G. § 2T1.1 app. n.3 ("The burden is on the defendant to establish any such credit, deduction, or exemption by a preponderance of the evidence."). Despite the evidence of his massive net income and unpaid taxes, Goldstein has not even attempted to identify proposed deductions that might reduce the tax loss, let alone provided reliable evidence of such deductions. *See United States v. Hoskins*, 654 F.3d 1086, 1096-97 (10th Cir. 2011) (holding sentencing court did not err in declining to accept defendant's proposed deductions, which were self-serving, based on a short, non-representative period, and could not be independently verified).

Thus, the $7.68 million in still-unpaid 2022 and 2023 taxes, penalties, and interests is part of the tax loss for sentencing. *See* Sentencing Tax Computation 1, 7-8, Dkt. 521-11 (calculating 2022 and 2023 tax losses, and summarizing totals).

### C. Obstruction

Goldstein's conduct plainly warrants the obstruction adjustment. He attempted to influence Bart and ensure she would stay loyal to him during the criminal investigation. His law firm's subpoena productions were substantially complete by late 2020, *see* GX795, yet he escalated his offers to Bart (including $10,000 and Bitcoin), making them only in person when no one else was around. The only logical inference is that these represented a desperate attempt to buy her allegiance by a sophisticated attorney who knew better than to explicitly ask her not to cooperate with law enforcement. That suffices for the adjustment. *See* U.S.S.G. § app. n.4(A) (providing

"attempting to" "unlawfully influenc[e] a . . . witness" as an example of conduct to which enhancement applies).

His false August 2025 financial declaration warrants the obstruction adjustment as well. For the adjustment to apply to perjury, a court must find a defendant made a false statement about a material matter with a willful intent to deceive. *See United States v. Perez*, 661 F.3d 189, 192 (4th Cir. 2011). The financial declaration meets these criteria. Goldstein was arguing he was insolvent and thus needed to sell his house to fund his defense, so this Court should lift the *lis pendens*. Whether he had assets was the whole point of his argument and his declaration; the existence of a $100,000 watch was plainly material. Nonetheless, he falsely omitted that watch from his declaration. And the evidence shows that he did so willfully. Although Goldstein now argues there is "no evidentiary support for the claim that . . . he thought about . . . the value of items in his wardrobe," Goldstein himself testified he had previously tried to sell it watch in late 2024, 2/12 Tr. 13-21, and his messages showed that he knew it was worth $90,000 to $110,000. *See* GX794 at 23-26. He absolutely knew the value of the watch; he just preferred wearing it to disclosing it to his attorneys and the Court, which would have undermined his bid to sell his house and avoid forfeiture of it.

Goldstein's false testimony about the $1 million UCB transfer he received from Phua on September 25, 2018, similarly constitutes perjury and warrants the obstruction adjustment. Goldstein testified this money was a loan to pay taxes, invoking an October 11, 2018, text thread in which he implied it had been a loan for this purpose.

After trial, the government received from Montenegro an invoice, dated September 7, 2018, that sought payment of €862,142.19 from Phua to Goldstein for "Legal Consultation Charges." Invoice, Dkt. 521-14. This is the exact amount that Phua paid a few weeks later, on

9

September 25. *See* GX424 (flow of funds chart). This invoice strongly suggests Goldstein lied to jury under the mistaken impression that no evidence could disprove his testimony.

First, the fact that the invoice predates the transfer by weeks yet perfectly matches the amount of that transfer shows UCB had been told the amount and purpose of the transfer well in advance—likely by Phua or his associates.

Second, in the context of Phua's upcoming February 2019 Macau trial, the $1 million payment follows a typical legal fee structure: a set fee for the work followed by a contingency bonus (which Goldstein received after Phua was acquitted). *See* 1/21 Tr. 101:11-18 (Robbins) (explaining agreement for a $500,000 fee and a discretionary "potential bonus of up to $100,000"); 2/5 Tr. 17:21-24 (Fifth Stipulation); Gov. Mem. 16-17 (discussing Phua's February 2019 payment for Goldstein's role in his Macau trial).

Third, despite his post-hoc claims that the September 2018 money was a loan to pay taxes, Goldstein never used any of it to pay taxes. *See* GX410 at 1 (showing no payments until December 2018 credit of roughly $954,000). Instead, the IRS did not receive money from him until it levied part of the $1 million he brought back from Macau in cash. *See* 1/28 Tr. 107:1-7 (Parrish) (discussing receipt of that $954,000 from levy).

The invoice represents a smoking gun that confirms the September 2018 payment was a legal fee, not a loan to pay taxes. This more than suffices to establish Goldstein committed perjury and the obstruction adjustment applies.

Although Goldstein correctly notes the invoice is *not* one from his law firm or its records, Def. Opp. 34, this fact only makes his conduct worse. His ostensible texts with Phua and Kids are conspicuously devoid of contemporaneous discussions of the September 2018 payment and the February 2019 Macau trial. The G&R records he produced to the government about the September

10

transfer are similarly sparse. This relative paucity of documentation suggests Goldstein intentionally tried to avoid documenting the true nature of that September 2018 legal fee payment, and thought he had done so successfully, going so far as to portray it as a "loan" the next month. But he could not control UCB, and it kept an invoice showing the truth: the $1 million September 2018 payment was a legal fee. Goldstein had no idea, and he testified thinking nothing could contradict him on the stand. He was correct: that invoice did not arrive until trial had already ended, and the jury already acquitted. That false testimony warrants the obstruction adjustment.[1]

## II.    Section 3553(a) Analysis

Despite his many convictions, staggering tax loss, and years of crime even after investigation, indictment, and conviction, Goldstein argues he should receive only probation, in part to "allow him to repay his debts, address his gambling addiction, and contribute to society." *see* Def. Sent. Br. 17, 21, 24, Dkt. 518; Def. Opp. 49-50 & n.23, Dkt. 540. This argument cannot be squared with the Sentencing Guidelines, clear precedent, or Goldstein's own actions.

### A.  General and Specific Deterrence

#### 1.  General Deterrence

Substantial terms of imprisonment are essential to achieving general deterrence for tax crimes, as the government already detailed. *See* Gov. Mem. 71-78, Dkt. 520. Fourth Circuit precedent demonstrates that Goldstein's attempts to minimize the Sentencing Guidelines and emphasize his desire to repay his debts do not change this, let alone justify probation.

---

[1] It also reinforces that his use of the UCB accounts warrants the sophisticated means specific offense characteristic under § 2T1.1(b)(2). Goldstein used those accounts in 2016 to disguise his incoming gambling income from the Chairman games, hiding the extent of his gambling from Deyhle, and leading his 2016 tax return to omit hundreds of thousands of dollars from that income. That the government did not even receive the final UCB records until after trial shows just how effective his use of the foreign bank accounts was at hiding the nature and extent of his overseas income.

*United States v. Engle* is instructive. The defendant caused a tax loss of more than $2 million after evading his taxes for 16 years. 592 F.3d 495, 497-98 (4th Cir. 2010). He pleaded guilty, the district court determined he had a Category I criminal history, and calculated an advisory Guidelines range of 24-30 months. *Id.* at 498. However, the court sentenced him to only four years of probation with 18 months' house arrest, emphasizing a downward variance was appropriate because Engle had an ability to earn significant income and probation would enable him to "settle up with the [IRS]" and pay restitution. *Id.* at 498-99.

The Fourth Circuit reversed, ruling the district court "abused [its] discretion," and held that probation was "substantively unreasonable" where it was driven by Engle's earning capacity and ability to pay restitution. *Id.* at 505. Goldstein's recurring emphasis on his ability to earn income, pay his debts, and contribute to society amount to little more than an appeal to the exact basis for probation that the Fourth Circuit already ruled substantively unreasonable.

Moreover, the Fourth Circuit also vacated for the district court's failure to consider the relevant Sentencing Commission policy statements, as required under § 3553(a)(5). *Id.* at 501-04. The Fourth Circuit quoted the Chapter T introductory comment, "'Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines,'" and concluded that given the nature of tax evasion cases and their infrequent prosecution, "Commission's focus on incarceration as a means of third-party deterrence is wise." *Id.* at 502 (quoting U.S.S.G. Ch. 2, Pt. T, introductory cmt.). Thus, the court emphasized, "Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path." *Id.*; *see also id.* (quoting then-applicable Guidelines introductory

comment 4(d), which also emphasized prison "will serve as a significant deterrent" and seek it over probation).

The Chapter T introductory comment *still applies today*, as does *Engle*'s logic: a meaningful term of incarceration is necessary to achieve general deterrence. Goldstein's suggestion that the Court should discount that comment because it has been in place "almost forty years" since 1987, Def. Opp. 41, ignores the plain ruling of *Engle*—in 2010—applying a comment that remains part of the tax Guidelines. *Engle* rejected a four-year term of probation for a tax evader who caused a loss of roughly $2 million over more than a decade. To achieve general deterrence, this Court should reject probation for Goldstein, who has caused nearly $16 million in loss over nearly a decade.[2] Goldstein's ability to earn income and repay his debts cannot justify a term of probation where the Fourth Circuit already held such logic substantively unreasonable.

The need for general deterrence also underscores the importance of imposing a sentence that reflects the loss caused by Goldstein's perpetual choice to not timely pay his taxes.

Goldstein argues that the tax loss from his § 7203 convictions should be ignored because he already repaid those taxes. This is wrong for three reasons. First, it ignores the fact that Congress made this a criminal misdemeanor, punishable by up to a year in prison—underscoring the harm of willful late payment and the importance of punishing it. *See* Gov. Mem. 68-69.

Second, this conflicts directly with *Engle*, and threatens the very sentencing disparities he decries. Goldstein's argument implies that a wealthy defendant could avoid prison merely by

---

[2] Goldstein also advocates disregarding the against the Part 2 Chapter T comment on the grounds that "anything close" to a Guidelines sentence would "create an enormous sentencing disparity." Def. Opp. 41. However, the cases he previously cited all involved plea agreements and acceptance of responsibility, Gov. Opp. 22, while some of those he now cites involved the same or ongoing cooperation with other investigations, *see* Def. Opp. 39 & n.16 (Ver case), 42 (Binance case). The U.S. Sentencing Commission Dashboard he invokes is equally misleading. None of it controls for plea agreements, the first two pages are premised on an offense level 14, some of the defendants received § 5K1.1 substantial assistance departures, and none of it reflects an offense level or Guidelines range anywhere near his own. *See* Dkt. 518-3. And it is limited to only 2021-2025 (which includes the height of the pandemic), artificially shrinking the sample size to a mere handful of cases. *See id.* at 2, 4 (identifying data sets between 10 and 17 defendants).

paying his taxes at some later date. But the Fourth Circuit rejected analogous logic for tax evasion: "Reduced to its essence, th[is] approach means that rich tax-evaders will avoid prison, but poor tax-evaders will almost certainly go to jail. Such an approach, where prison or probation depends on the defendant's economic status, is impermissible." *Engle*, 592 F.3d at 505 (holding rationale substantively unreasonable and stating *Booker* does not permit sentencing based "on such constitutionally suspect grounds" as a defendant's financial resources); *see also United States v. Bolden*, 889 F.2d 1336, 1340 (4th Cir. 1989) ("[W]e do not think that the economic desirability of attempting to preserve [a defendant's] job so as to enable him to make restitution warrants a downward adjustment from the guidelines."); *United States v. Bragg*, 582 F.3d 965, 971 (9th Cir. 2009) ("Rewarding defendants who are able to make restitution in large sums also perpetuates class and wealth distinctions that have no place in criminal sentencing.").

Third, allowing defendants to escape punishment for § 7203 violations through belated repayment would wholly undermine the deterrent value of that statute, and ensure defendants could escape liability merely by repaying once they learn about an investigation. *See United States v. Tandon*, 111 F.3d 482, 490 (6th Cir. 1997) (rejecting, under prior Guidelines, that tax loss should be reduced by amount defendant subsequently repaid, and stating, "Sound policy also supports this conclusion since [defendant]'s theory would lead to the perverse result of allowing any criminal to nullify much of the burden of his crime simply by paying the tax liability once the IRS had begun to audit or investigate"). Indeed, the Guidelines explicitly prohibit reducing tax loss by later repayment. *See* U.S.S.G. § 2T1.1(c)(5) ("The tax loss is not reduced by any payment of the tax subsequent to the commission of the offense."). Thus, a meaningful term of imprisonment is necessary to achieve general deterrence for § 7203 violations, even when defendants later repay.

14

Finally, Goldstein also cites various publications for the proposition that the threat of apprehension, not the length of incarceration, drives deterrence. Def. Opp. 46-47. But these studies—which focus overwhelmingly on violent and property crime, and the deterrent effects of police presence versus ultra-long incarceration—say virtually nothing about the efficacy of deterrence on calculated financial crime, let alone the value of substantial (but not multi-decade sentences) for such deterrence. *E.g.*, Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201-02, 234 (2013) (citing three-strikes laws and "life without the possibility of parole" as examples of ultra-long carceral policies for which "there is little evidence that increases in the length of already long prison sentences yield general deterrent effects"); Nat'l Research Council, Nat'l Acads. Press, *Growth of Incarceration in the United States: Exploring Causes and Consequences* 45-46 & n.4 (2014) (comparing violent, drug, and property crime rates while noting "white collar offenses" contribute such small amounts to prison populations that measuring their historic crime rates is difficult).

Common sense suggests that highly educated, highly calculated would-be tax scofflaws are precisely the type of highly informed individuals who are more likely to be deterred by examples of substantial prison sentences. *Cf.* DOJ Nat'l Inst. of Just., *Five Things About Deterrence* (May 2016) (stating "[p]risons are good for punishing criminals and keeping them off the street," and suggesting more severe punishments may be less effective "because criminals know little about sanctions for specific crimes," and citing Nagin's *Deterrence in the Twenty-First Century*). Indeed, this is precisely the rationale that has long motivated the Sentencing Commission and courts to find meaningful terms of incarceration vital to deterring tax crimes. *See* Gov. Mem. 71-77 (reviewing deterrence precedent).

Despite Goldstein's arguments, the Guidelines and clear precedent demonstrate a lengthy term of incarceration is necessary to provide general deterrence for tax crimes.

### 2. Specific Deterrence

Although Goldstein argues his years-late payments mean that the tax loss from his § 7203 convictions should be ignored, his conduct before and after indictment demonstrates that incarceration is necessary to achieve specific deterrence—and must reflect the tax loss from *all* his willful failures to pay.

As an initial matter, Goldstein did not pay off his 2016, 2017, and 2019 tax balances until April 2021, after IRS tax liens impaired his efforts to get a mortgage from FSM and then prevented him from selling his old Chevy Chase house (which he need to do so he could afford his new house in Washington, D.C.). This was six months after IRS–Criminal Investigation special agents interviewed him and he learned he was the target of a criminal tax investigation. That timeline shows that even the threat of criminal prosecution did not trigger his temporary compliance; only the hassle of not being able to finance his real estate purchase.[3]

Worse, Goldstein *still* has not filed his 2022 and 2023 taxes, let alone paid the more than $7.68 million that he owes on them. That indictment, trial, and conviction on four § 7203 counts did not lead him to file returns or attempt anything like payment toward those tax debts shows Goldstein continues to view timely filing and payment as optional. His sudden apparent scramble to prepare those years-overdue returns smacks of a last-minute effort to mask his enduring disdain for the tax system.[4] *Compare* Def. Opp. 25 n.9 (stating his 2022 and 2023 returns "will be completed prior to sentencing") *with* Def. Mot. Continue Sentencing 4, Dkt. 522 (stating on June 3,

---

[3] That Goldstein did not come into prompt compliance even after the IRS-CI interview also suggests how little the threat of apprehension did to deter him personally, which further undermines his emphasis on deterrence through apprehension rather than incarceration.

[4] This also represents a tacit admission that those years should be included in the tax loss.

2026, that he "needs additional information . . . to respond to the government's [2022 and 2023] tax-loss theories") *and Engle*, 592 F.3d at 503 (finding probation substantively unreasonable and noting that defendant "paid *nothing* toward his tax debt" in the years before sentencing until "two weeks before the second sentencing hearing"). Just as Goldstein finally paid his 2016, 2017, and 2019 tax debts when it benefitted him (by helping him afford his new house), he is finally preparing these tax returns because he thinks it may benefit him (by helping reduce his sentence).

Moreover, Goldstein's newest arguments are internally contradictory. On the one hand, he urges the Court to give him credit for his (extremely belated) payment of his 2016, 2017, 2019, 2020, and 2021 taxes. Def. Opp. 19-20, 43-44. Yet he also urges it to ignore the millions he has not paid for 2022 and 2023, arguing these unfairly distort his guidelines range. *See id.* 18-19. This contradiction lays bare his real hope: to completely discount § 7203 as a driver of sentencing calculations, and to wholly avoid any meaningful punishment for *seven years* of choosing not to pay his taxes on time.

Other contradictions abound. He seeks to downplay the seriousness of his offenses by reiterating that his crimes had no victims, even though he currently owes the United States more than $7 million. *See* Def. Opp. 37, 41. And he invokes the fact that he has already "prepaid some of his tax liability" for 2022 while claiming elsewhere that he is using over $1 million of that prepayment to instead pay his *2025* tax liability. *Id.* 18, 36. This dissembling underscores the exceptional need for a substantial term of incarceration to ensure specific deterrence and meaningful tax compliance. Goldstein's arguments to the contrary deserve short shrift. *See United States v. Zukerman¸* No. 16-cr-194 (S.D.N.Y. Mar. 21, 2017), Sent. Tr. at 18-19, Dkt. 60 (deriding defense counsel's suggestion that defendant deserved special credit for belatedly paying taxes,

remarking, "So do you think [the defendant] should get a good citizenship reward for paying the back taxes?" and imposing 70-month within-Guidelines term of incarceration).[5]

Goldstein's 2025 Form 1040, and attempts to obfuscate his misconduct, further reinforce the need for specific deterrence. He now claims that he reported on that return "that he had already paid more than $1 million in 2025 taxes" is "part of [his] effort to comply with his obligations—an option *directed by the IRS.*" Def. Opp. 36. But this narrative cannot be reconciled with the return he filed or the tax notice he invokes. Start with the 2025 Form 1040, Line 26:

| 26 | 2025 estimated tax payments and amount applied from 2024 return . . . . . . . . . . | 26 | 1,258,198 |
|----|-----------------------------------------------------------------------------------|----|-----------|

Dkt. 521-8 at 3. The Form 1040 makes plain that a taxpayer can list only "2025 estimated tax payments" and those applied from their 2024 return. But Goldstein never made any estimated payments, and knows full well he never filed or paid for 2024, either. *See* Dkt. 521-9 (2025 Account Transcript); Dkt. 521-7 (2024 Account Transcript). Moreover, it does not take a Supreme Court litigator to know that Line 26 does not permit listing 2022 payments.

The IRS Notice CP81 (dated May 25, 2026—after he filed the 2025 return) fares no better:

### There's a $3,250,000.00 credit on your account

We don't have a record of your tax return for the tax year shown below. The period for claiming a credit or refund for that tax year may expire soon. If you don't file your return or contact us, you risk losing this credit and any resulting refund.

#### What you need to do now

**If you need to file this tax return and haven't yet,** send your signed return to the address at the top of this notice.

We'll use the credit to pay any taxes you owe. If you don't owe other taxes or debts we must collect, we'll refund any extra.

**If you already filed this tax return,** send a newly signed copy (including all forms and schedules) to the address at the top of this notice.

**If you want us to move the credit to another tax form, tax period or tax identification number,** call us at 800-829-8374. Keep in mind the law sets strict time limits for refunding or moving credits.

---

[5] He also misleadingly invokes *United States v. Brennick*, 134 F.3d 10, 14 (1st Cir. 1998), for the notion that his belated payments fall outside the "heartland" conduct proscribed by the tax laws. Def. Opp. 43. But *Brennick* warned while a four to six month "temporary delay in payment" might bear on sentencing, "it would do a defendant no good to say that he deliberately understated his income but sincerely intended to pay the money back to the government in *five years' time.*" 134 F.3d at 14 (emphasis added). Setting aside the fact that the jury found Goldstein guilty of willful tax crimes many times over, this quote makes clear that even *Brennick* would not countenance his nearly five-year delay in payment—and has no bearing on his near-annual (and still ongoing) decision to not pay his taxes.

Dkt. 541-4. That notice, labelled "Tax Year 2022," speaks entirely in terms of "this tax return": Goldstein's still-unfiled 2022 tax return. *Id.* Moreover, it instructs, "If you want us to move the credit to another tax form [or] tax period, call us . . . ." *Id.* Goldstein does not claim he called the IRS, and his 2025 account transcript confirms none of his 2022 balance was moved to 2025. *See* Dkt. 521-9.

Goldstein blatantly lied on the 2025 Form 1040; he now resorts to blaming the victim, claiming that the IRS "directed" him to do it, even though the Notice does nothing of the sort. Worse, he now resorts to yet another shell game, trying to shift his 2022 tax payment to tax year 2025, and get credit for ostensibly paying in both years. The only difference is that now, instead of robbing Peter to pay Paul, he robs the federal fisc in one tax year to pay it in another. The 2025 return and this Notice show his post-hoc rationalization is just one more attempt to minimize his culpability and avoid the consequences of his actions. Both underscore the need for a significant period of incarceration at the high end of the Guidelines range to afford specific deterrence.

### B. Character and History of the Defendant

This sentencing factor weighs strongly toward a substantial sentence of imprisonment. *See* Gov. Mem. 63-67. Goldstein's testimonial letters do not change this, and his broader rhetoric reinforces it.

The government does not doubt that Goldstein is a complex, multidimension person who was, for many, a good colleague, a kind mentor, and a generous attorney. It is entirely appropriate for the Court to consider his letters of support. *See* Def. Opp. 38-40. However, the government respectfully asks that it also consider four points in doing so. First, the attestations to Goldstein's good character do little to distinguish him from the typical white-collar defendant. Instead, they:

19

> fall[] into a pattern advanced by a subset of the white collar criminal. This category encompasses a select class: distinguished, reputable, highly esteemed model citizens such as this defendant. The list of their achievements and virtues is long and impressive. Let us count the ways. At home, they are good family men and women, caring spouses, loving parents, loyal and reliable to friends. At work, they are looked up to as outstanding professionals and business partners. To their community's charities and public causes they are generous patrons and sponsors.

*United States v. Regensberg*, 635 F. Supp. 2d 306, 308 (S.D.N.Y. 2009), *aff'd*, 381 F. App'x 60 (2d Cir. 2010); *see also United States v. McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003) ("[E]xcellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her."). The letters provided by Goldstein are, in many ways, typical of those submitted by white collar criminals and do not differentiate him from similarly situated defendants.

Second, to the extent that Goldstein suggests the humiliation and reputational harm he has suffered as a result of his crimes and convictions should weigh heavily in any sentence, that suggestion should be rejected. *See United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012) ("It is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction.").

Third, to the extent that the letters highlight Goldstein's charity, they overlook the fact that his ability to make charitable contributions—whether through monetary donations, his own legal work, or paying for others' legal work—came in no small part from his long-running tax fraud.

For example, one former associate lauds Goldstein's generosity, noting G&R attorneys were "often fighting the good fight on [his] dime," and that "[f]or the better part of our last full year . . . he paid for my travel to and from Minneapolis so I could help the Minnesota Department

20

of Human Rights negotiate a consent decree with [Minneapolis's] police department after George Floyd's murder." Def. Opp. 38. This was in 2022 and 2023. *See* MN Dept. of Human Rights, *Timeline – MPD*, https://mn.gov/mdhr/mpd/timeline/ (last visited June 30, 2026). This is the exact 2022-2023 period during which Goldstein made tens of millions through poker and legal work but paid little in taxes, and still owes millions more for those years. The associate was working, in a very real sense, on the public's dime.

Similarly, a federal defender recounts Goldstein's devotion to their individual clients, but this overlooks that federal public defenders are federal employees, whose work for their clients depends in no small part on Congress's ability to fund it through taxes. *See* U.S. Courts, *Defender Services*, https://www.uscourts.gov/about-federal-courts/defender-services (last visited June 30, 2026). Goldstein's kindness toward their clients does change the fact that he evaded assessment and payment of his 2016 taxes, routinely lied about his true income and taxes, and then consistently failed to timely pay his taxes—all thereby reducing the tax base available to fund many services, including representation for indigent defendants more broadly. *See also* U.S. Courts, *Funding Crisis Leaves Defense Lawyers Working Without Pay* (July 15, 2025) (discussing CJA funding crisis), https://www.uscourts.gov/data-news/judiciary-news/2025/07/15/funding-crisis-leaves-defense-lawyers-working-without-pay (last visited June 30, 2026).

Fourth, to the extent these letters emphasize Goldstein's role as a talented attorney, this also highlights his culpability, and the need for just punishment and to promote respect for the law. He was a highly successful Supreme Court litigator. He absolutely knew better but nonetheless chose, year after year, to commit tax crimes. His actions, as a prominent attorney, undermine respect for the law. Probation or a substantially below-Guidelines sentence would further undermine it, signaling that even though our legal system purports to expect more from attorneys,

it in fact punishes them less, and even the most sophisticated, entrusted attorney can commit massive financial crimes only to receive little carceral punishment.

Letters of support aside, Goldstein's own rhetoric reinforces the import of a substantial sentence. In December 2025, he told the New York Times, "I have never, ever believed that I did anything wrong." NYT Article 3, Dkt. 327-1. He remains utterly unrepentant. He persists that his "convictions had no victims," Def. Opp. 37, even though he defrauded the IRS and two mortgage lending companies, hid nearly $5 million in taxable income from 2016 through 2021, and currently owes almost $2 million in taxes on the counts of conviction. *See* Sentencing Tax Computations 1, Dkt. 521-11. Even after his many convictions, he still cannot take responsibility, continuing to paint his errors as negligence and his crimes as allegations. *E.g.*, Def. Opp. 40 (writing that he "*neglected* his tax responsibilities . . . and is forced to accept that at least for some *allegations*, the jury found he did so willfully"). Even at the precipice of sentencing, he treats it as negotiation subject to his veto. *See, e.g.*, *id.* at 49 (stating he is "*would accept* a *reasonable* penalty *if* given the time to repay it (emphasis added)); *id.* (offering he is "willing to pay restitution . . . *so long as* he is allowed to repay it at a reasonable pace" (emphasis added)).

Whatever future steps Goldstein may claim that he hopes to make toward rehabilitation and recovery (whether from gambling addiction or otherwise), his own rhetoric shows he has an incredibly long way to go. His history and character—from his crimes of conviction to his post-2021 conduct—weigh toward a substantial term of incarceration. His post-conviction conduct and rhetoric only reinforce this conclusion.

### C. The Appropriate Sentence

The government respectfully submits that a sentence of 97 months' incarceration, at the high end of the Guidelines range, will best serve the ends of justice pursuant to § 3553(a). Such a

sentence reflects the seriousness of Goldstein's offenses, his history and characteristics, and the need for general and specific deterrence.

Courts routinely impose sentences within and above the Guidelines range. *See, e.g.*, *United States v. Zukerman*, 897 F.3d 423, 428 (2d Cir. 2018) (affirming above-Guidelines $10 million fine and within-Guidelines 70-month prison term for 74-year-old, first-time tax offender); *United States v. Davis*, No. 24-13399, 2025 WL 2985645, at *1, 3 (11th Cir. Oct. 23, 2025) (unpublished) (affirming 48-month upward-variance sentence for defendant, convicted of tax crimes and § 1014, who had a range of 18-24 months but displayed "utter disregard for the law"); *United States v. Karasarides et al.*, No. 24-3545, Dkt. 50-1 (6th Cir. Nov. 17, 2025) (affirming 112-month sentence for accountant, DiPietro, a first-time offender convicted of tax and gambling crimes); *United States v Flynn*, 16-cr-347 (D. Minn. 2019) (imposing within-Guidelines sentence of 87 months on tax defendant who pleaded guilty with only one prior conviction); *United States v. Jackson*, No. 10-cr-298 (S.D.N.Y. 2011) (imposing within-Guidelines sentence of 63 months on first-time tax offender convicted at trial); *United States v. Wrubleski*, No. 12-cr-60297 (S.D. Fla. 2018) (imposing within-Guidelines sentence of 55 months on defendant who was convicted at trial, repeatedly lied about his income on tax returns, and obstructed the efforts of IRS employees in collecting taxes owed).[6]

Goldstein's egregious, nearly decade-long financial crime spree (including his offenses of conviction, subsequent tax crimes, and obstruction) warrants a sentence of imprisonment at the top

---

[6] Even when courts go below the Guidelines range, they often do so by degrees, not wholesale. *E.g.*, *United States v. Donaldson*, No. 13-cr-237 (M.D. Fla. 2017) (imposing below-Guidelines sentence of 76 months on 72-year-old tax defendant with no prior criminal history, whose range was 97-121 and had an intended tax loss above $9.5 million); *United States v. Bender*, No. 10-cr-20084 (E.D. Mich. 2014) (imposing below-Guidelines sentence of 48 months on first-time offender tax defendant who was convicted at trial, caused a tax loss of approximately $5.6 million, and had a guidelines range of 78-97 months); *United States v. Smith*, No. 13-cr-322 (D. Md. 2014) (imposing sentence of 42 months on criminal history Category I tax and fraud defendant who pleaded guilty and had a range of 51-60 months, with a tax loss of approximately $840,000).

23

of the Guidelines range. The jury convicted him of three separate counts of § 1014 mortgage fraud, for which probation is prohibited. *See* 18 U.S.C. § 3561(a)(1) (prohibiting probation for individuals convicted of Class B felonies); 18 U.S.C. § 3559(a) (defining offenses with a maximum term of imprisonment of 25 years or more as Class B felonies); 18 U.S.C. § 1014 (providing 30-year maximum term of imprisonment). Even if the jury had not, a term of 97 months' incarceration would remain appropriate given his conduct, and would remain applicable despite the fact that his tax crimes carry statutory maximums of five, three, and one years of incarceration (for §§ 7201, 7206(2), and 7203, respectively). Indeed, the Guidelines advise consecutive sentences in such a situation. *See* U.S.S.G. § 5G1.2(d) (providing that "the sentence imposed on one or more of the other counts shall run consecutively" if "the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment").

In light of his conduct and gambling addiction diagnosis, the government also respectfully suggests that a five-year term of supervised release is appropriate, and should include two special conditions of release. *See* 18 U.S.C. § 3583(b)(1) (providing five-year term of supervised release for Class B felonies). First, that he be barred from gambling of any sort. Second, that he continue to participate in a mental health treatment program for gambling addiction. *See, e.g.*, *United States v. Yi Ching Liu*, 622 F. App'x 81, 82 (2d Cir. 2015) (affirming sentence and noting district court ordered participation in a mental health treatment program for gambling addiction during supervised release).[7]

Before trial, Goldstein said that the jury would have to decide one question: "Am I a good guy or a bad guy?" NYT Article 18, Dkt. 327-1. His all-in sentencing argument—seeking probation based on his character, need for addiction treatment, and an ostensible tax loss of roughly

---

[7] Notably, the Fourth Circuit requires district courts to orally pronounce each and every special conditions of release imposed at sentencing. *E.g.*, *United States v. Rogers*, 961 F.3d 291, 295 (4th Cir. 2020).

$126,000—asks this Court to do the same. However, it should and need not. The government does not discount Goldstein's brilliance as an attorney (or heads-up poker player), nor his genuine kindness toward certain colleagues, employees, and clients. The government sincerely hopes that, after an appropriate term of incarceration, he can return to productive contributions, whether as a litigator or otherwise. But § 3553(a) is not a binary test of black and white. It looks to many factors, and here they overwhelmingly weigh toward a significant period of incarceration at the high end of the Guidelines range.

## **CONCLUSION**

For the foregoing reasons, the United States respectfully submits that a term of 97 months' incarceration is sufficient, but not greater than necessary, to reflect the seriousness of the offenses, promote respect for the law, provide just punishment, and achieve general and specific deterrence.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

A. Tysen Duva
Assistant Attorney General
Criminal Division

Dated: June 30, 2026

   /s/                          
Emerson Gordon-Marvin
Hayter Whitman
Trial Attorneys
Department of Justice—Tax Division

Sean Beaty
Senior Litigation Counsel
Department of Justice—Tax Division

Adeyemi Adenrele
Assistant United States Attorney
District of Maryland